**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, *et al.,*

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants.

Case No. _____________

**DECLARATION OF WENDY WOLFORD,**
**VICE PROVOST FOR INTERNATIONAL AFFAIRS, CORNELL UNIVERSITY**

# DECLARATION OF WENDY WOLFORD, VICE PROVOST FOR INTERNATIONAL AFFAIRS, CORNELL UNIVERSITY

I, Wendy Wolford, declare as follows:

1. I am the Vice Provost for International Affairs at Cornell University ("Cornell" or the "University"). I have held this role since February 26, 2018. The responsibilities of my office include strengthening Cornell's global connections and interdisciplinary academic initiatives and supporting Cornell's international community. As the Vice Provost for International Affairs, I have personal knowledge of the contents of this declaration and/or have knowledge of the matter based on records available to me. If called as a witness, I could and would testify competently to the following facts.

2. Cornell is a member institution of The Presidents' Alliance on Higher Education and Immigration, represented by its President, Michael I. Kotlikoff. Cornell pays annual dues to the Presidents' Alliance on Higher Education and Immigration and has been affiliated with the Presidents' Alliance since 2022.

3. I am familiar with the Department of Homeland Security's rulemaking *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media* (the "Final Rule"). I understand that, among other things, the Final Rule eliminates the "duration of status" admission period for F and J nonimmigrants and replaces it with admission for a fixed time period based on their length of program, not to exceed 4 years absent an extension approved by immigration officials.

**A. Background**

4. Cornell University is a privately endowed research university and a partner of the

State University of New York. Cornell has seven undergraduate colleges and four graduate and professional schools on the main campus in Ithaca, NY; three graduate and professional schools in New York City, including Weill Cornell Medicine and Cornell Tech; an agricultural research campus in Geneva, NY; and a medical school in Doha, Qatar. Cornell is also the largest employer in Tompkins County, NY, and contributes significantly to the local and state economies through its campuses and statewide Cornell Cooperative Extension program, with impacts on the tech and agriculture sectors.

5. Cornell enrolls approximately 26,800 students across all campuses, with students from every state and more than 130 countries. Of the total student population, international students comprise roughly 26 percent, at 7,144 students. Of those 7,144 international students, approximately 70 percent are graduate and professional students. Cornell also has 854 exchange visitors on J-1 visas.

6. These international students and scholars are central to our research and education mission at Cornell. As teachers, researchers, students, and colleagues, they bring a depth of talent and variety of perspectives to our campuses. They also contribute hundreds of millions of dollars every year (estimated at roughly $444.7 million in 2025) to New York District 19 and substantially grow the local economies surrounding our campuses, spending millions of dollars and supporting thousands of jobs.[1]

7. Cornell devotes significant time and resources to serving our international community members and supporting their compliance with all applicable immigration laws. We have 22 DSOs, whose job duties consist of assisting international students and reporting required

---

[1] *See, e.g.,* Exhibit A, NAFSA Economic Value Report – New York District 19 (2024) and NAFSA Economic Value Report – New York District 12 (2024).

information via SEVIS.

8. As detailed below, the announcement of the Final Rule has raised significant concerns and inflicted serious harm on Cornell and its community of international students and scholars.

**B. Harms to recruitment, enrollment, and retention.**

9. Since the publication of the Final Rule, I am aware that Cornell has received feedback from current and prospective international students and scholars, and parents, expressing concerns about the Final Rule, and indicating that the elimination of duration of status and other changes from the Rule create a strong disincentive to come to or continue studying in the United States.

10. In my experience, students or scholars who decline to study, or complete academic milestones (such as, for example, visiting professorships or postdoctoral fellowships), in the United States and instead choose to pursue their education or professional development in another country, are unlikely to be recovered by the university in future years.

11. At a time when other nations are making their immigration systems more welcoming for internationals students and exchange visitors, Cornell is concerned that the loss of admission for duration of status will discourage international students and exchange visitors from applying to programs at Cornell and other U.S. higher education institutions, and risk hampering U.S. leadership and competitiveness in critical fields.

12. If so, each lost enrollment of an international student and scholar leaves Cornell worse off: we miss out on talented teachers and researchers, we miss valued community members who enrich our academic and social lives as a community of learning, and, in some cases, the university loses tuition dollars that help support our programs.

**C. Harms to research and teaching**

13. Many international scholars and students, particularly graduate students, at Cornell make critical contributions to the research capabilities and classroom instruction of the university.

14. Often the research performed at Cornell spans multiple years and its success depends in part on continuity of research staff.

15. Additionally, many international students and scholars make important contributions to Cornell through teaching roles, such as visiting professors, lecturers, teaching assistants, research assistants, research and laboratory supervisors, and similar positions.

16. Any loss in enrollment of international students and scholars from the elimination of duration of status would have direct negative consequences for many research and teaching efforts at Cornell by disrupting the continuity of research and teaching teams and draining the university of talented individuals.

**D. Disruptions to academic programs**

17. The four-year maximum admission period set by the Final Rule does not reflect the reality of many academic programs at Cornell, which frequently take longer than four years to complete—in many cases by design. These include undergraduate degree programs designed to meet educational requirements for professional licensure, B.S./M.S. pathway programs, and most doctoral degree programs, including Weill Cornell Medical College's prestigious Tri-Institutional Ph.D. programs, each of which is described more fully below.

18. Cornell's Bachelor of Architecture (B.Arch.)—one of the top architecture programs in the world—is one example, as it is a *five*-year undergraduate degree program designed to meet educational requirements for architectural licensure without requiring an additional graduate degree.

19. Because of the Final Rule, international students will no longer be assured of their ability to maintain immigration status for the full duration of the program at the time of enrollment, which creates substantial uncertainty for prospective students weighing whether to invest their time and money to attend the program, and may discourage many from enrolling altogether.

20. The current structure of the B.Arch curriculum exacerbates these challenges, as during the fourth year, students complete one semester in New York City and one semester at Cornell's Rome program, meaning they are away from the Ithaca campus for the entire academic year. If a student must apply for an extension of status, or else risk not being re-admitted after traveling abroad, they will face significant logistical and administrative hurdles while simultaneously navigating required academic experiences in multiple locations.

21. The Final Rule is expected to have similar negative impacts on Cornell's integrated 4+1 pathway programs, which are designed to provide students with a seamless transition from undergraduate (4 years) to graduate study (1 year).[2] International students wishing to enroll in these programs will face uncertainty as to whether they will be able to maintain their immigration status throughout the duration of the program. This is expected to make these formerly very successful pathways significantly less attractive to international students and potentially reduce enrollment.

22. In addition, most doctoral programs typically extend beyond four years. The average time to obtain a Ph.D. degree is five to seven years, and nearly all Ph.D. students on Cornell's Ithaca campus take six years to complete their degrees. Similarly, at the Weill Cornell Medical College, the average time to degree is six years, and many graduating Ph.D. students continue their

---

[2] In addition to Cornell AAP's 4+1 pathway programs, many STEM disciplines at Cornell offer similar programs that provide undergraduate students an opportunity to continue their studies by moving directly into a master's degree (B.S. to M.S.), which also, by design, take more than four years to complete.

training as postdoctoral research associates for three to six additional years.

23. All told, Cornell currently has 2,121 international students enrolled in graduate or undergraduate-level programs designed to last longer than four years that will be impacted by the Final Rule simply by virtue of the design and length of their academic program.

24. Further, while most international students complete their degree within their original I-20 end date, it is not uncommon for some to realize they need an additional term to graduate; in my experience, this is typically due to things like authorized health leave or the need to complete extra credits to graduate, as opposed to a sign of failure or fraud.

25. The elimination of duration of status creates considerable new uncertainty regarding the ability of international students in these situations to complete their course of study at Cornell. Students and prospective students considering programs at Cornell are understandably concerned that they may be unable to obtain an extension of stay if needed, which would result in the loss of the years and significant financial resources invested in their U.S.-based education.

26. In addition to the harms anticipated to result from the elimination of duration status, there are other aspects of the Final Rule that conflict with the design of certain programs at Cornell.

27. For example, the Final Rule generally prohibits graduate students from transferring between programs (including transfers between SEVIS-approved campuses) absent extenuating circumstances.[3]

28. This is anticipated to impact Weill Cornell Medical College's Tri-Institutional MD-Ph. D, Chemical Biology, and Computational Biology & Medicine programs, which typically enroll many international students. These joint medical scientist training programs, offered by Weill

---

[3] Although the Final Rule references potential exceptions for extenuating circumstances, the rule does not provide clarity on whether an international student participating in programs of the types described here would qualify for an exception, or the criteria or mechanisms for requesting one, if so.

Cornell Medical College in collaboration with the Rockefeller University and the Memorial Sloan Kettering Cancer Center, are designed to provide interdisciplinary education, and include multiple transfers between the participating institutions during the program.

29. For example, under the MD/Ph.D. program, students can obtain an MD/Ph.D. by first matriculating into WCM's MD program (for two years), then transferring to a Ph.D. program at the Weill Cornell Graduate School of Medical Sciences ("WCGS"), the Rockefeller University, or the Gerstner Sloan Kettering Graduate School of Biomedical Sciences, and then re-enrolling in, and completing, WCM's MD program following the completion of their Ph.D.

30. WCM's Tri-Institutional Ph.D. programs in Chemical Biology and Computational Biology and Medicine operate similarly, with students first enrolling at WCGS, and then transferring to either Rockefeller University or the Gerstner Sloan Kettering Graduate School of Biomedical Sciences to complete their degree.

31. Because approximately 20-40% of students in these programs are international in any given year, Cornell is concerned that the restrictions on transfers, and other hurdles international students will face under the Final Rule as a result of the program length, will significantly impact enrollment, potentially even resulting in a need to reduce program faculty.[4]

32. The Final Rule also prohibits graduate students from enrolling in a program at the same or lower level than the program they completed.

33. Cornell has several dual degree programs where students earn concurrent degrees at the same level that may be impacted by that prohibition, including, for example, its MILR/MBA

---

[4] Cornell also has several academic programs that allow students to complete part of their graduate study at the Ithaca campus, and part of their study at the Cornell Tech campus in New York City, which are expected to face similar challenges.

program and its JD/MPA/MILR/Ph.D. in Developmental Psychology. It is our understanding that one degree will need to be dominant in SEVIS, but the Final Rule is unclear as to whether students would be eligible for OPT based on the other degree. The Final Rule also would prevent international students from deciding to enroll in the dual-degree program after their initial admission to Cornell, reducing academic flexibility.

34. Accordingly, if the Final Rule is not enjoined, Cornell may be required to either make changes to several program offerings and academic pathways to ensure they remain viable for international students (which would be costly and time-consuming to implement and not easily unwound), or else risk the drain of talented international students from these programs.

**E. Academic flexibility harms**

35. In addition to inherent conflicts with certain program designs, the Final Rule also conflicts with common real-world situations at Cornell.

36. Cornell prides itself on the breadth of its course and program offerings, and it is not uncommon for doctoral or other research-based programs and degrees to evolve over time, or for some students in a professional master's degree (e.g., M. Eng.) to transition to a two-year research-focused masters. Many students enter in one major and decide their passion is another, moving from Economics to Sociology or from Plant Genetics to Entomology, for example.

37. It also is not uncommon for some Ph.D. candidates to eventually decide to end their program with a master's degree, in lieu of their originally planned doctoral degree. This can happen when, for example, students begin a long educational course of study only to realize they would rather work in industry or pursue a different career. At Cornell, about 8% of international Ph.D. candidates eventually elect to end their program with a master's degree. Under the Final Rule, students in this position for legitimate reasons would be denied the opportunity for post-completion

training.

38. In my experience, when students pursue these alternative pathways, they do so because it makes the most sense for them academically and professionally. Yet, this natural educational growth will be severely curtailed for many international students because of the new rule.

39. The resulting harm to academic programs and educational quality from these changes are significant, as faculty advisors and students may feel pressure to avoid academically appropriate program changes because of immigration consequences rather than educational considerations, or, depending on the circumstances, students may simply be unable to change majors, research areas, or degree objectives in response to legitimate academic interests and opportunities.

**F. Harms to student success**

40. The Final Rule creates considerable uncertainty for current international students at Cornell who may take longer than four years and/or their program end date to graduate.

41. As noted above, 2,145 international students are enrolled in programs lasting longer than four years. In order to graduate, these students all will need to seek an extension of stay (EOS) or travel out of the country and seek re-entry with a new program end date (at the risk of *not* being re-admitted). Additionally, based on past experience, roughly 450 students a year enrolled in programs lasting four years or fewer will need to seek an EOS to complete their program and ultimately graduate because their studies have taken longer than anticipated, as is relatively common.

42. Any student who must seek an EOS, or travel abroad and attempt to re-enter, simply to complete their academic program faces some risk of falling out of status or having to leave the United States before their program is complete. For example, an immigration officer may deny the EOS or the student's application may be untimely or technically deficient. Based on existing processing delays at DHS, it is substantially certain that students also will encounter considerable

delay in filing their EOS requests and having those adjudicated.

43. In addition, increasing the need for applications requiring biometric appointments disproportionately impacts students at institutions, like Cornell, located in rural communities. The closest USCIS field office to Cornell's Ithaca campus is 53 miles away, in Syracuse, NY. Many international students do not have vehicles, and the limited fee-for-service transportation options would require a two-hour bus journey each way.

44. These challenges create real-world harms that affect academic programs and the campus environment, and we are concerned that student retention, graduation rates, and other markers of student success in many programs may suffer as a result.

45. Students faced with uncertainty related to the Final Rule also may suffer academically. In my experience, students with external stressors or who face an uncertain risk often struggle academically because of stress, anxiety, distraction, and drains on time, resources, and attention.

**G. International travel harms**

46. International travel is a common feature of the educational and academic experience at Cornell. International students and scholars frequently travel abroad, for instance to attend conferences, to study abroad, to perform their research duties, and as part of their classroom curriculum.

47. But current F-1 students may be deterred from traveling internationally after the Final Rule, because students who exit the United States and reenter will receive a new Form I-94 upon return, which would move them from duration of status to the fixed-term system. It would also reduce their grace period at the conclusion of their program from 60 days to 30.

48. These disincentives to travel may cause disruption to travel-based components in

the academic experience at Cornell. Students may not be able to participate in study abroad, complete travel-based components of their course work and research responsibilities, or attend academic and professional development opportunities. These harms to Cornell's ability to carry out its educational mission by ensuring that students and scholars are able to fully participate in academic offering are irreparable—those missed opportunities to provide academic enrichment cannot be recovered in the future.

49. For that reason, Cornell may need to restructure some of these academic offerings to accommodate international students who feel unsafe to travel in light of the Final Rule, which could not be easily reversed.

**H. Compliance costs and administrative burdens.**

50. The Final Rule is already causing and will continue to cause significant harms to Cornell as our International Services (Ithaca) and International Student Services (WCM) offices work to understand and adjust to the new requirements and ensure compliance.

51. Cornell structured these offices in the context of the duration of status system. All of Cornell's policies, trainings, and technological systems and processes were developed with duration of status in mind. Cornell will now need to adjust those systems, processes and materials to account for the Final Rule.

52. Compliance with the new rules will also require substantially more time and resources than duration of status, on an ongoing basis. Under duration of status, our international services offices on both campuses were able to use SEVIS to provide information about international students and scholars to DHS and easily update their I-20s and DS-2019s as conditions changed.

53. Now, Cornell anticipates a significant number of students will need to file EOS

requests every year. Although those are personal forms and school officials cannot provide students with legal advice on how to complete them, students will expect informational resources and support. This means completing much more paperwork in connection with many more students. It also means additional compliance costs for universities and students, including application fees, travel for biometrics appointments and potentially interviews, and more.

54. Significant additional staff time also will be necessary to advise students on extension filings, track case status, coordinate with academic departments, and manage USCIS-related deadlines.

55. Since the final rule was announced, our immigration advisors already are reporting that about 60% of questions they have received from international students, exchange visitors, and departments relate to the new rule, and students have expressed increased anxiety about how the rule change will impact their ability to achieve their academic goals at each stage of the student cycle (incoming, during studies, and post-graduation). Additionally, school officials have expressed concern that the lack of clarity in the Final Rule may increase the risk of advising errors in an increasingly high-stakes process.

56. As a rough example of the potential impact, on our Ithaca and Cornell Tech campuses alone, in the 2025-26 academic year, there were 346 SEVIS transfer-out requests, 456 extension requests, and 63 changes of level. Annually, Cornell averages 70 SEVIS transfers in, although this past year, that number fell to just 20, likely due in part to ongoing concerns about immigration. In addition, in the 2025-2026 AY, approximately 639 international Ph.D. candidates took an average of 5.85 years to complete their degree, and 58 international B.Arch students took 5.1 years. If, in addition, all OPT and STEM OPT applications also require an I-539 application to extend status, Cornell DSOs and AROs could reasonably expect to advise over 3,500 students per

year on the new EOS procedures. Factoring in consultation time, follow-up questions and consultation and document processing, each of 3,500 cases is estimated to take 1.5 hours, for a total annual additional workload of approximately 5,250 hours per year. This would require approximately 750 hours or 18.75 weeks for additional work for each of our seven full-time student immigration advisors in Ithaca and one full-time immigration advisor at Cornell Tech.

**I. Financial harms**

57. International students and scholars make significant contributions to Cornell through tuition, fees, housing, dining, and participation in athletic and research activities. These are significant sources of revenue which promote Cornell's financial stability and improve its ability to offer the best services and programs to the campus community.

58. A reduction in international student enrollment as a result of the Final Rule could disrupt these revenue streams and impact the support available for academic programs and institutional priorities.

59. Additionally, losing international enrollment would mean failing to recover on sunk investments in international student recruitment, admissions, and academic support.

**J. Reputational harms**

60. Most importantly, Cornell prizes its reputation as one of the top universities in the world. That reputation both attracts the most talented young scholars from around the world and is built on our ability to recruit them.

61. Presently, the Cornell community includes students and scholars from more than 130 countries. That is the result of decades of effort building relationships with international students, faculty, scholars, government agencies, and educational partners.

62. The Final Rule undermines international confidence in U.S. institutions of higher

education, including Cornell. It communicates to people around the world, including prospective students and scholars and their families, that the United States is not welcoming to noncitizen students and that the policy and regulatory environment is unstable, unreliable, and unpredictable.

63. When Cornell's identity as a U.S. institution becomes a hinderance, rather than an asset, Cornell's efforts to compete in a global marketplace for academic talent is seriously harmed.

I declare under perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 17, 2026, at Cornell University, Ithaca, New York

Wendy Wolford
Vice Provost for International Affairs
Robert A. and Ruth E. Polson Professor of Global Development