# EXHIBIT 1

PRESIDENTS' ALLIANCE | ON HIGHER EDUCATION AND IMMIGRATION

September 29 , 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536

Re: DHS Docket No. ICEB-2025-0001, Comments in Response to *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*

Dear Sir/Madam:

On behalf of the Presidents' Alliance on Higher Education and Immigration ("Presidents' Alliance"), I submit this comment letter in response to the U.S. Department of Homeland Security's (DHS) proposed rule, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media* (DHS Docket No. ICEB-2025-0001), published August 28, 2025. With strong opposition and very serious concerns, we urge that the proposed rule be withdrawn in its entirety, and that admission for the duration of status remain in effect for academic students and exchange visitors.

The Presidents' Alliance is a nonpartisan, nonprofit education and advocacy organization that brings college and university leaders and their institutions together on the immigration issues that impact higher education, our students, campuses, communities and nation. We work to support immigrant, international, and refugee students and to advance forward-looking immigration policies and practices at the federal level, in our states, and across our college campuses. The Presidents' Alliance is composed of 580+ presidents and chancellors of public and private colleges and universities enrolling over five million students across 42 states, D.C., and Puerto Rico.

International students contribute immensely to the U.S. economy. They help fund U.S. institutions and build a global talent pool for U.S. innovation, entrepreneurship, and novel research, all the while strengthening our national security and fostering cross-country ties and relationships. In 2023/24, international students added $44 billion to the U.S. economy and created close to 400,000 (378,175) jobs.[1] This makes U.S. higher education the seventh largest service export.[2] For every three international students enrolled in the United States, one U.S. job

[1] NAFSA: Association of International Educators. (n.d.). *NAFSA International Student Economic Value Tool* [Data tool]. Retrieved September 10, 2025, from https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[2] U.S. International Trade Administration. (n.d.). *Education Service Exports*. U.S. Department of Commerce. Retrieved September 10, 2025, from https://www.trade.gov/education-service-exports.

is created.[3] They also help sustain enrollments in key disciplines, especially in STEM fields, creating academic opportunities for American students.[4] On average, for every additional international undergraduate student enrolled at a public university, two more in-state first-year students enroll as well.[5]

Beyond direct contributions to the U.S. economy, international education greatly strengthens America's global competitiveness and standing. International students serve as ambassadors for the U.S. They promote cultural exchange and support the national interest, as explained by the State Department.[6] Our role as the premier destination for global talent around the world thus further strengthens our national security.

It is vital that the U.S. remain a global leader in attracting talent from around the world. Actions that limit and deter international students and scholars accessing U.S. higher education will result in economic losses for local employers across our communities, as well as higher tuition rates and potential disruptions to academic programs for all students.

The proposed rule imposes rigid admission timelines, creates unreasonable barriers to changing degree paths and transferring schools, and duplicates oversight already achieved through existing systems. If implemented, it would cause significant harm by adding bureaucratic hurdles and financial burdens, intruding on academic decision-making, and further deepening the atmosphere of fear and uncertainty. This will likely deter international students, researchers, and scholars from coming to the U.S., with negative economic consequences not only for colleges and universities, but also for small businesses, local communities, and the broader economy.

**The Presidents' Alliance objects to this rule in full.**

There are a multitude of serious concerns about both the process and substance of the rule, which, both cumulatively and individually, merit its withdrawal:

## I. The 30-day comment period is inadequate under the Administrative Procedure Act.

On September 16, 2025, we joined more than 100 organizations and higher education institutions to send a letter[7] to DHS to request a reasonable comment period. In what appears to

[3] NAFSA: Association of International Educators. (2024, November 18). *International students contribute record-breaking level of spending and 378,000 jobs to the U.S. economy* [Press release]. Retrieved September 10, 2025, from https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.
[4] Shih, K. (2017). Do international students crowd-out or cross-subsidize Americans in higher education? *Journal of Public Economics, 156*, 170–184. https://doi.org/10.1016/j.jpubeco.2017.10.003.
[5] Zavodny, M. (2025, May 21). *The importance of immigrants and international students to higher education in America* [Policy brief]. National Foundation for American Policy. https://nfap.com/wp-content/uploads/2025/05/Importance-of-Immigrants-and-International-Students-to-Higher-Education.NFAP-Policy-Brief.2025.pdf.
[6] See the mission of the Bureau of Education and Cultural Affairs. Bureau of Educational and Cultural Affairs - United States Department of State.
[7] AILA, NAFSA, and over one hundred other organizations. (2025). Comment submitted to ICEB-2025-0001-8627 regarding the proposed rule *"Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students"*. Regulations.gov. https://www.regulations.gov/comment/ICEB-2025-0001-8627.

be a clear disregard for the process of public input and comment, and in contradiction with the Administrative Procedure Act, the agency has forced the public to comment in an extremely compressed timeline, all while institutions and communities are beginning their academic years, which is one of the busiest times of the year for higher education institutions.

**A minimum of 60 days is required for meaningful public comment on the NPRM to adequately assess and respond for three principle reasons**:

A) The NPRM will have a widespread and complex negative impact on stakeholders that requires careful analysis. Executive Order 12866 states that agencies should allow "not less than 60 days" for public comment in most cases, in order to "afford the public a meaningful opportunity to comment on any proposed regulation." Executive Order 13563 also states that "[t]o the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the internet on any proposed regulation, with a comment period that should generally be at least 60 days." Given the rule's broad impact on millions of international students and exchange visitors, higher education institutions, employers and local economies, and the U.S. healthcare system, a 30-day timeframe does not allow for meaningful public input.

B) The proposed rule is technically complex and highly controversial—as reflected in the volume of comments already submitted—and would have significant negative economic impact across a wide range of stakeholders. Given these factors, there is no justification for limiting the comment period to less than the 60 days required under EO 12866. It takes time to collect metrics and data from students, exchange visitors, institutions, and businesses in all 50 states to adequately assess the impact of the proposed rule. A minimum 60-day comment period would have allowed more stakeholders to carefully examine the NPRM, providing DHS with essential information to consider the scope of related issues, assess unintended consequences, and prevent potential waste of resources.

C) The public had little notice of this rule. The Regulatory Flexibility Act requires that agencies publish semiannual regulatory agendas in the Federal Register describing planned regulatory actions that may have a "significant economic impact on a substantial number of small entities."[8] However, the rule was absent from the Unified Agenda until September 4, 2025, or one week after its publication. The OIRA dashboard also contained errors during review. This lack of transparency further justifies extending the comment period to ensure stakeholders have adequate time to respond.

Given the wide and varied potential impact of the proposed rule, we believe that an extended comment period was not only warranted but necessary.

## II. The proposed rule is substantively flawed for the following reasons:

### A) The proposed rule would harm students and institutions with rigid timelines and unreasonable barriers, increasing processing delays.

---

[8] 5 U.S.C. 602

**1. The proposed date-specific admission does not conform to academic programs and harms students' individualized academic pathways.**

A fixed four-year limit on the period of stay does not take into consideration the actual time that it takes to complete academic coursework, specifically at a higher level (including Master's, and PhD programs). It also fails to take into consideration the reality of undertaking a course of secondary study in the U.S. The current, long-standing rule enables students (both American and international) to change their majors or request time off while studying. Indeed, over half of first-time bachelor's recipients did not complete their bachelor's degree within four years (48 months).[9] According to the National Center for Education Statistics, a median for completing a bachelor's degree is 52 months, or 4.3 years.[10] Further, many international undergraduates at four-year institutions pursue combined programs that require a fifth year or additional time.

Additionally, the four-year limit is completely impractical for longer degree programs, such as PhD programs in the U.S. The National Science Foundation reports that a median for completing a Ph.D program is 5.7 years.[11] In arts and humanities it takes even longer to finish a doctoral program. Between 2003 and 2020, the median was 6.8 years or longer.[12] At one of our member institutions, a major research university, graduate students in doctoral programs usually spend the first two years focused on coursework and core seminars; starting in year three, they begin to focus on dissertation research and acquiring teaching experience, which continues through years 4-7.

This general timeline for doctoral students is reflected at many other research universities. This means that if the rule is finalized, PhD candidates at U.S. schools or programs will need to request an extension in the middle of their program. The goal of PhD programs in the U.S. is most often to develop significant and original research in a student's area of study. These PhD programs are academically rigorous, competitive, highly selective, and require that a student form a close connection to a faculty advisor or institution to undertake their studies properly. Since many PhD programs require extensive student research and faculty support (as well as publication in a peer-reviewed academic journal), it is sometimes necessary to extend programs to accommodate said research.[13] Returning to the example of one of our members, a major research university, they estimate that one-third of their total international population, or 1,300, will be required to undergo the uncertainty of the EOS process–and that's only taking into consideration programs that ordinarily run longer than 4 years, such as PhD programs.

---

[9] "Time to Degree." National Center for Education Studies. https://nces.ed.gov/fastfacts/display.asp?id=569.

[10] National Center for Education Statistics. (n.d.). *Fast Facts: Time to degree (ID 569)*. U.S. Department of Education. Retrieved September 10, 2025, from https://nces.ed.gov/fastfacts/display.asp?id=569.

[11] National Science Foundation, National Center for Science and Engineering Statistics. (2024, December 2). *Doctorate recipients from U.S. universities: 2023 (Survey of Earned Doctorates)* [Data tables]. U.S. National Science Foundation. Retrieved September 10, 2025, from https://ncses.nsf.gov/surveys/earned-doctorates/2023#data.

[12] American Academy of Arts and Sciences. (n.d.). *Years to attainment of a humanities doctorate*. Humanities Indicators. Retrieved September 10, 2025, from https://www.amacad.org/humanities-indicators/higher-education/years-attainment-humanities-doctorate.

[13] Kowarski, Ilana. "How Long Does It Take to Get a Ph.D. Degree?" U.S. News. https://www.usnews.com/education/best-graduate-schools/articles/2019-08-12/how-long-does-it-take-to-get-a-phd-degree-and-should-you-get-one. August 12, 2019.

This rule will have particularly negative consequences for postdoctoral researchers, many of whom enter the U.S. on J-1 visas to conduct vital research. Because sponsor organizations typically issue DS-2019s to match the length of secured funding—often only one or two years at a time, and increasingly limited given reductions in federal higher education funding—postdocs frequently receive documentation in shorter increments. In cases where DS-2019s are issued for only one year, these researchers could be forced to file up to four I-539 applications during a typical post-doctoral program, each time simply to extend for an additional year. This cycle would not only consume significant USCIS resources, but would also impose steep costs and uncertainty on host institutions while discouraging talented researchers from pursuing or continuing their work in the U.S. in favor of opportunities abroad.

Similarly, J-1 Noncitizen Physicians who enter the U.S. for medical residencies and fellowships, along with the entire U.S. healthcare system, would be significantly negatively impacted. Currently, nearly 17,000 J-1 physicians provide essential patient care while in J-1 clinical training programs at more than 770 teaching hospitals in 49 states, the District of Columbia, and Puerto Rico.[14] These clinical residency and fellowship training programs run each year from July 1-June 30. Within this system, most clinical training programs issue annual, or one-year, contracts only a few months prior to each year's July 1 start. As a result, this proposed regulation would require J-1 clinical residents and fellows to file I-539 extensions each year with USCIS, likely resulting in consequential delays in their ability to advance in their training programs on time. For clinical fellows who subspecialize beyond a three-year primary care residency program and pursue clinical training programs (which can add up to eight years of total clinical training), they would likely need to file annual extensions with USCIS in a very short timeframe. This proposed system introduces unnecessary administrative burdens, increased costs, and potential disruptions to critical medical education programs that serve both U.S. patients and the healthcare system at large.

In addition to PhD programs, postdoctoral researchers, and medical trainees, there are other situations and programs that would be severely impacted by this proposed rule. For example, students participating in joint programs (MD/PhD, JD/MBA, etc.) and co-op undergraduate programs would likely require additional time to complete their academic programs.

The proposed rule would hold international students to a different standard, influenced by an enforcement-forward strategy, without having adequately demonstrated the need for this significant change in policy. In the proposed rule, DHS implies that spending more than 10 years in F-1 status signals abuse. However, such a claim overlooks how U.S. education and training actually work. "Student status" expressly includes post-completion practical training—12 months of Optional Practical Training (OPT) plus up to 24 additional months of STEM OPT—and as indicated above, most doctoral programs run 5-7 years even without leaves, fieldwork, or lab delays. A single, continuous pathway—for example, 7 years to complete a STEM PhD followed by 3 years of STEM OPT—already totals 10 years, entirely within existing regulations and institutional norms. Many other legitimate trajectories can also span a decade or more: integrated master's-to-doctorate progressions; research-intensive programs with

[14] *Intealth: Protect Duration of Status for J-1 Physicians, Advocacy Partner Toolkit, 2025.* https://www.intealth.org/.

extended data collection; clinical and internship requirements (e.g., clinical psychology); and pandemic- or disaster-related disruptions that warranted DSO-authorized extensions are all examples.

Moreover, the proposed regulation DHS cites, 8 C.F.R. § 214.2(f)(5)(ii), has long recognized that students who change educational levels or pursue additional degrees remain in status when properly advised and documented by DSOs. Some sequential or same-level programs reflect bona fide academic pivots (e.g., bridging coursework to enter a new field, licensure prerequisites, or institutionally required certificates). These cases are monitored in the Student and Exchange Visitor Program (SEVIS), require full-time enrollment and normal progress, and are subject to DSO oversight and Student and Exchange Visitor Program (SEVP) scrutiny. The fact that DHS identified 77,000 individuals since 2003 who have accrued more than 10 years in student status does not, by itself, evidence abuse; a significant share of that count is entirely consistent with a single doctoral program plus authorized post-completion training, or with other legitimate, DSO-supported academic paths. Any outliers can and should be addressed through targeted compliance tools, not by recasting ordinary, regulation-compliant educational timelines as suspect.

Lastly, DHS mentions overstays as one of the rationales for the proposed rule. However, such reasoning is based on selective and unreliable data that inflates the number of individuals who overstay. DHS systems do not always sync properly and include arrivals whose departure cannot be verified, which leads to inflated overstay rates and mistakenly flags students who are in full compliance with the terms of their visa. A study by the National Foundation for American Policy found that the DHS overstay rate for F-1 international students represents only "an upper-bound estimate" of individuals who the government could not positively identify as leaving the U.S. The report concluded that the DHS overstay reports contain significant flaws that make them inappropriate for justifying new regulatory restrictions or enacting policy changes.[15] Moreover, it is unclear how the fixed I-94 would prevent possible overstays in comparison to the existing SEVIS system that already very closely tracks international students and scholars.

Overall, the proposed date-specific admission policy does not conform to academic programs and harms students' unique and individualized academic pathways. It is based on flawed analysis of the scope of international students impacted and of the incidence of overstays. For its lack of evidentiary bases, the proposed rule should be withdrawn. At the very least, DHS should be required to redo its analysis of overstays and recalculate how many international students would need to apply for EOS before finalizing the rule.

### 2. The proposed restrictions on students' ability to transfer to other institutions and to change their degree programs is unreasonable and prevents students from reaching their full potential.

The proposed rule would severely limit a student's ability to transfer to another institution or change their degree program and does not comport with real-world academic practices.

[15] National Foundation for American Policy. (2025, June 24). *An analysis of the DHS overstay reports* [Policy brief]. https://nfap.com/wp-content/uploads/2025/06/An-Analysis-of-the-DHS-Overstay-Reports.DAY-OF-RELEASE.June-2025.pdf.

- It prevents F-1 students at any level below the graduate degree level from changing programs or educational objectives, including programs, majors, or educational levels, within the first academic year of a program of study.
- International students at graduate level or above may not change programs at any point during a program of study.
- The rule would require students who have completed a program at one educational level to only be allowed to begin another program at a higher educational level while in F-1 status.
- It would prohibit a change to the same or a lower educational level while in F-1 status. Such change would prevent students who want to retrain in a different field (e.g., a JD graduate who wants to pursue a Master's program in policy) from doing so and deter international students seeking the academic flexibility and freedom needed to fulfil their full potential.

There are numerous other situations in which students could encounter uncertainty and difficulty. Examples include students seeking to switch campuses within institutions that have campus across multiple states; students in Master's programs that begin with a general program after which students must decide on a the specific program; and students who start in a doctoral program but cannot continue with their program and instead convert their studies to a Master's degree.

Losing the ability to transfer would be devastating not only to students but also to certain institutions. According to the National Student Clearinghouse Research Center, more than one third of undergraduate students transfer at least once within six years of their matriculation.[16] This rate is increasing. For example, in the fall of 2023, college transfer enrollment grew by 5.3 percent compared to the fall of 2022 to over 1.2 million students.[17]

At one of our member institutions, which is a public community college, the majority of their international student population relies on the ability to transfer. Community colleges and English Language Programs (ELPs) regularly serve returning and nontraditional learners, including students with prior degrees. These institutions offer flexible pathways that support diverse goals, from general education credits to English preparation, academic recovery, or retraining for career shifts. Students often pursue additional certificates or associate degrees to boost transfer competitiveness or job readiness.

Providing students with options to transfer and change educational levels is essential to the institutions' mission and to the success of their students. Preventing international students from enrolling in multiple or same-level programs would limit their opportunities, harm institutions financially, and reinforce inequities in higher education and workforce access.

---

[16] "Transfer & Mobility – 2018." National Student Clearinghouse Research Center. https://nscresearchcenter.org/signaturereport15/. August 7, 2018.
[17] National Center for Education Statistics. (n.d.). *IPEDS Trend Generator: Answer 2/4* [Interactive data tool]. U.S. Department of Education. Retrieved September 10, 2025, from https://nces.ed.gov/ipeds/trendgenerator/app/answer/2/4.

This restriction will be also particularly problematic for students enrolled in ESL (English as a Second Language) programs. Rather than encouraging a natural progression from language training to academic study, the rule would force students to remain in ESL programs longer than necessary. For example, a student who achieves competent English proficiency after one semester would nonetheless be compelled to remain in the ESL program for the balance of the year. Additionally, the proposed rule restricts international student enrollment in language training programs to a lifetime aggregate of 24 months (including breaks and an annual vacation). Such restriction is arbitrary since the length of time students require in English as a Second Language (ESL) programs varies and can justifiably extend beyond 24 months. These proposed changes serve no educational purpose, increase costs for students, and delay their integration into academic programs—contrary to the broader policy goals of attracting and retaining international students in U.S. higher education.

Moreover, the rule does not take into consideration the reasons why a student may choose to extend their program in the U.S., such as transferring schools or changing their major. Students transfer programs for a variety of reasons, including transferring from community college to a four-year institution; changing schools because their intended program is not adequately supported at their first school (e.g., a student who transfers to pursue engineering at another school when their first school was not able to provide adequate training); moving to pursue education and training that is not offered by their first school (e.g., transferring to pursue a STEM-related program from a school that favors the liberal arts, or vice versa); or because their first school was less compatible with their values, needs, or goals (e.g., transferring to a school associated with their faith, to be closer to their support network, or to an area that has more professional and academic opportunities available).

If finalized, the proposed rule would severely restrict international students' flexibility. This would result in loss of educational and professional development opportunities and have a severe impact on institutions that often depend on the students' option to transfer and change educational levels. Moreover, the flexibility enshrined in the U.S. postsecondary system has always been a major draw for international students. As outlined below in section II.B, deterring international students from choosing the U.S. risks harming our economy and global competitiveness.

### 3. SEVIS already fulfills the goals of the proposed rule, making it duplicative, wasteful, and unnecessary.

Only F and J nonimmigrants are connected to the Student and Exchange Visitor Information System (SEVIS). SEVIS is a massive electronic reporting system built after 9/11 specifically to monitor international students and exchange visitors. As such, SEVIS is already providing a higher level of accurate data to DHS and other federal government agencies as it pertains to an individual's lawful status in the U.S.

SEVIS gives DHS immediate access to detailed information related to every student and exchange visitor event that could impact a student or exchange visitor's compliance with immigration regulations. SEVIS populates student & exchange visitor real-time data (including active status) into various government database systems (i.e. SAVE, E-Verify, etc.) which are

accessible by the related federal agencies (e.g., CBP, USCIS, Social Security, etc.) as well as state governments (e.g., DMVs). Unlike other nonimmigrant status systems, SEVIS provides immediate access to detailed information related to every student and exchange visitor to determine eligibility for and compliance with their immigration status. Program completion date and maintenance of status details are also provided in real-time via SEVIS. Should the Principal Designated School Official or Designated School Official (P/DSO), or Alternate Responsible Officer or Responsible Officer (A/RO) determine a student or exchange visitor is not maintaining status at any point, they can update SEVIS with a termination event providing an immediate notification into government databases. This ensures the end of the status is clearly and immediately visible.

In addition to SEVIS, which is itself comprehensive, there exist additional safeguards because, for information not directly submitted in SEVIS, DHS also has the authority to request, "on any individual student or class of students upon notice," all information and documents that schools are obligated under 8 CFR 214.3 to retain throughout the student's enrollment and for a period of 3 years beyond that.

In the course of an extension of stay application, students would have to submit information obtained from their schools or programs. This is information or documentation that schools and programs already provide directly through SEVIS or are required to retain by regulation. Making a student submit to USCIS this same information is duplicative and wasteful.

DHS can effectively enforce the current immigration laws by wisely using its resources to engage in data-driven initiatives that focus on risk factors, rather than subjecting entire nonimmigrant categories to an expensive, cumbersome, and time-consuming extension of stay process that largely duplicates the efforts that schools and exchange visitor programs already make to comply with heavy SEVIS reporting obligations.

If DHS's goal is to ensure F-1 and J-1 nonimmigrants follow the rules and maintain status, the most effective and proportionate path is to enforce existing school and sponsor-level compliance tools, rather than imposing new, universal filing burdens on every compliant student and institution. SEVP and the Department of State already have robust authorities to audit, place on corrective action or probation, and suspend or withdraw schools/sponsors that misuse their certification or fail to supervise students appropriately. A risk-based, data-driven approach—using SEVIS analytics to flag outlier patterns (e.g., abnormal same-level program hopping, excessive language-training tenure, late terminations, unusually low completion rates)—would direct site visits, out-of-cycle reviews, and sanctions to the small minority of institutions that generate most compliance concerns. Graduated remedies, such as mandatory corrective action plans, temporary limits on issuing new I-20/DS-2019s, DSO/RO retraining, and, where warranted, withdrawal of certification, would fix the problem at its source. By contrast, replacing D/S with fixed admissions and mass extension filings penalizes the entire higher-education ecosystem, diverts adjudicative resources into hundreds of thousands of low-risk I-539s, and needlessly disrupts bona fide students and scholars.

We urge DHS to pair D/S (which already provides a clear compliance framework with DSO/RO oversight) with targeted enforcement against noncompliant schools and sponsors, rather than imposing system-wide procedures that burden the compliant majority to address conduct attributable to a small minority.

**4. The proposed rule ignores DHS/USCIS's inability to timely process extension applications to ensure institutions and students are able to efficiently move forward.**

Extensions and authorizations required by the proposed rule will create additional backlogs within USCIS, which will in turn result in extended adjudication timelines, leading to more uncertainty on the student's and school's behalf. This only exacerbates the strain on what is already an overburdened immigration bureaucracy. In July 2025, USCIS recorded the highest volume of pending cases ever with a 11.3-million application backlog.[18] Recent policies such as expanded vetting and stricter social media review have caused case processing and adjudication timelines to increase, which has further added to the existing backlog.[19]

In fact, legacy Immigration and Naturalization Service ("INS") adopted a regulation in 1991 specifically to eliminate "the cumbersome extension of stay requirements" that were present when the agency had to adjudicate F-1 extension of stay filings.[20] Similarly, J-1 exchange visitors were granted D/S in 1993, when the legacy U.S. Information Agency ("USIA") issued a regulation to "simplify the visa status requirements for exchange participants…[so] that transfer of program transactions [could] be facilitated by the sponsors involved without INS adjudication or Agency review."[21] And while Congress expressly authorized the Attorney General to regulate "the admission to the United States of any alien as a nonimmigrant…for such time and under such conditions as the Attorney General may by regulations prescribe,"[22] that authority must be exercised reasonably, with due regard for the harms caused by abandoning longstanding policy.

By requiring international students to prepare and submit additional extensions to USCIS (that are not currently required), DHS estimates that the USCIS's case load would increase by 414,000 applications per year by 2024.[23] However, the number may be much higher if the agency accounted for all the scenarios this proposed rule would affect, as outlined in section II. A 1. above in this comment letter. When combined with a reduced workforce, this increase would result in a further explosion of the case backlog, creating an additional layer of uncertainty in the visa extension process.

Increasing the applications submitted to USCIS at a time when the agency is handling a significant backlog and funding crisis would have an immediate detrimental impact not only to international students and scholars, but to the entire legal immigration system as a whole. If finalized, the rule would result in delayed approvals or adjudications, causing increased

---

[18] Rahman, B., & Gooding, D. (2025, July 8). *US immigration backlog hits all-time high*. Newsweek. https://www.newsweek.com/us-immigration-backlog-hits-all-time-high-2095846.

[19] Presidents' Alliance on Higher Education and Immigration. (2025, July 7). *Directories: International students* [Web page]. Retrieved September 10, 2025, from https://www.presidentsalliance.org/directories-2-directories-international-students/.

[20] 56 FR 55608 (October 29, 1991), https://www.nafsa.org/sites/default/files/media/document/56FR55608_19911029.pdf.

[21] 58 FR 15180 (March 19, 1993), https://archives.federalregister.gov/issue_slice/1993/3/19/15177-15220.pdf.

[22] https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1184&num=0&edition=prelim

[23] U.S. Department of Homeland Security. (2025, August 28). *Establishing a fixed time period of admission and an extension of stay procedure for nonimmigrant academic students, exchange visitors, and representatives of foreign information media* [Proposed rule]. *Federal Register, 90*(166), 42070–42115. https://www.federalregister.gov/documents/2025/08/28/2025-16554/establishing-a-fixed-time-period-of-admission-and-an-extension-of-stay-procedure-for-nonimmigrant.

volatility and uncertainty that would drive students from the U.S. while discouraging other prospective students from studying in the U.S.

Against this backdrop, the proposed 240-day automatic extension is unlikely to be sufficient: as volumes surge and the agency devotes more resources to fraud detection and enforcement, we have repeatedly seen, in the employment context, 240 days elapse with cases still pending—forcing otherwise authorized workers to stop working. The same dynamic will affect F-1 and J-1 students/trainees and their host institutions. To avoid unnecessary disruptions, we respectfully urge DHS to revise the regulation to provide that individuals in F and J classifications remain authorized to work or study for the entire period their timely filed extension remains pending. This approach would eliminate arbitrary work stoppages, reduce the pressure to pay for premium processing, and provide needed continuity for students, trainees, and their educational or training institutions.

Moreover, it is likely that the at least 414,000 annual I-539 filings will lead to major consequences for students and exchange visitors. While most undergraduates usually know well in advance of commencement if they will successfully complete their programs, there are occasions every year at nearly all institutions when a student fails an exam, receives an incomplete, or finds they are otherwise short the credits necessary to graduate with very little advance notice, impacting their ability to timely file and underscoring that there's little margin for error in the proposed rule. Requiring F-1 and J-1 students/exchange visitors to file the estimated 414,000 Form I-539 extension applications annually will inject substantial uncertainty into academic progress and authorized on-campus employment/OPT/J-1 training. The concern is not just filing fees and USCIS bandwidth; it is that these are often 18- to 22-year-old students being asked to complete a complex legal filing where any technical misstep can trigger a rejection or denial and, in turn, a loss of status that prevents timely graduation or continuation of employment/studying. Every additional filing becomes a new point at which a student's education or work authorization can be interrupted.

Based on our experience advising institutions with large student populations, we already see countless students lose OPT eligibility due to filing mistakes. Under this rule, similar errors will proliferate simply because the volume of filings will surge, including rejections/denials for reasons such as:

- Using an expired edition of Form I-539 downloaded days or weeks before USCIS updates the forms;
- Submitting an incorrect or outdated filing fee;
- Completing the form incorrectly or missing a required signature/date, which results in a rejection rather than an RFE; and
- Filing too late, including when students rely on regular mail to control costs and the package arrives after the I-94 end date.

When a filing is rejected after the prior status has lapsed, students often cannot cure the gap, and they may be forced to stop studying or working and, in some cases, may never regain the ability to return to school/work. Given the sheer scale of new I-539 submissions contemplated here, we anticipate these avoidable status losses will increase dramatically.

As evidenced above, the extensions and authorizations required by the proposed rule would create additional backlogs within USCIS. This would result in extended adjudication timelines and likely lead to minor errors, which would create further uncertainty on the student's and school's behalf.

**B) The proposed rule harms U.S. economy, undermines our global competitiveness, and intrudes on academic decision-making.**

**5. International students and exchange visitors strengthen our economy, communities, and campuses. This rule threatens those contributions and undermines U.S. competitiveness.**

To cite just some of the data demonstrating the significant value of international students and scholars to our nation:

- International students contributed $44 billion to the U.S. economy and created almost 400,000 (378,175) jobs in 2023/24, according to the latest data from NAFSA: Association of International Educators.[24] They represent the seventh largest service export.[25]
- International student alumni have founded more than half (319 of 582, or 55%) of the billion-dollar start-ups in the U.S., according to the National Foundation for American Policy (NFAP).[26]
- NFAP also found that two-thirds, or 64%, of U.S. billion-dollar companies were founded or co-founded by immigrants or the children of immigrants.[27]
- Finally, NFAP found that on average, for every additional international undergraduate student enrolled at a public university, two more in-state first-year students enroll as well.[28]

At the same time that the U.S. is making it more difficult for international students to arrive in the U.S. to study,[29] other nations are increasingly successful in competing for these students. In fact, part of competitor nations' strategy is to highlight the ways in which their immigration policies are more welcoming than the U.S. system to talent from abroad. This proposed rule sends a clear, unwelcoming message to prospective and current students and scholars.

---

[24] NAFSA: Association of International Educators. (n.d.). NAFSA International Student Economic Value Tool [Data tool]. Retrieved September 10, 2025, from https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[25] U.S. International Trade Administration. (n.d.). Education Service Exports. U.S. Department of Commerce. Retrieved September 10, 2025, from https://www.trade.gov/education-service-exports.

[26] National Foundation for American Policy. (2022, July 26). Immigrant entrepreneurs and U.S. billion-dollar companies [Policy brief]. NFAP. Retrieved September 10, 2025, from https://nfap.com/wp-content/uploads/2022/07/Immigrant-Entrepreneurs-and-Billion-Dollar-Companies.DAY-OF-RELEASE.2022.pdf.

[27] Ibid.

[28] Zavodny, M. (2025, May 21). The importance of immigrants and international students to higher education in America [Policy brief]. National Foundation for American Policy. https://nfap.com/wp-content/uploads/2025/05/Importance-of-Immigrants-and-International-Students-to-Higher-Education.NFAP-Policy-Brief.2025.pdf.

[29] Presidents' Alliance on Higher Education and Immigration. (2025, July 7). *Directories: International students* [Web page]. Retrieved September 10, 2025, from https://www.presidentsalliance.org/directories-2-directories-international-students/.

- Since 2000, the U.S. has already lost at least 20% of the global share of international students and global talent to countries like Australia, Canada, and the U.K. This will only worsen if international enrollment drops further.[30]
- Postgraduate international student interest in the U.S. has already taken a sharp dive under Donald Trump's second administration, falling by more than 40% from January-March 2025.[31]
- According to one estimate, a 43% decline in international student enrollment in the U.S. could cost the country $17.2 billion annually.[32]
- Without international students, many U.S. institutions would not be able to sustain their overall enrollments. Currently, full-fee paying international students help subsidize American students and also enable certain STEM programs to stay afloat.[33]
- Imposing a limit of a four-year admission period on students will increase the economic burden on international students in the U.S., including:
    - Introducing a significant amount of uncertainty in students' coursework due to the limited four-year period, when in fact most U.S. students are unable to finish their course of study in four years.
    - Having to travel to obtain biometrics, which would be difficult and costly for students at schools outside of urban areas.
    - Requiring students to prepare and file additional applications, pay additional government filing fees, and wait lengthy processing periods for an Extension of Stay (EOS) to complete their education should the degree extend beyond the four year limit.

A survey of U.S. faculty conducted by the Presidents' Alliance between August and September of 2025 found that international students, scholars, postdocs and alumni are consistently rated by their professors and academic supervisors as having a significant impact in traditional academic and research areas, particularly in writing or publishing peer-reviewed journal articles. This is followed by entrepreneurial and research endeavors such as filing a patent or raising funds. Over 80% of responding faculty members with experience supervising international students and scholars indicated they are crucial for enhancing research productivity and output and cross-cultural communication and collaboration. International students and scholars also play a key role in bringing a global or comparative perspective to the classroom and in mentoring other students, researchers and professionals (as reported by 75% of faculty).

66% of respondents indicated that international students launched international collaborations or partnerships. Specific examples of the impact that international students have on the U.S. and globally include the following, among others: bringing nuance and complexity to the curriculum; serving as top researchers in their fields at leading universities in the U.S. and

---

[30] HolonIQ. (2023, April 12). US international education in 2030: 6 charts, top 20 source countries and preliminary forecast [Research note]. HolonIQ. https://www.holoniq.com/notes/us-international-education-in-2030-6-charts-top-20-source-countries-and-preliminary-forecast.

[31] The PIE News. (2025, April 9). Postgrad international student interest in US plunges by 40%. Retrieved September 10, 2025, from https://thepienews.com/postgrad-international-student-interest-in-us-plunges-by-40/.

[32] Presidents' Alliance on Higher Education and Immigration; Shorelight Education; Whiteboard Advisors. (2024, January). Data Snapshot: The Essential Role of Practical Training in U.S. Higher Education and the Innovation Economy [Data snapshot]. Higher Ed Immigration Portal. https://www.higheredimmigrationportal.org/wp-content/uploads/2024/01/Data-Snapshot-Training_v5.pdf.

[33] Shih, K. (2017). Do international students crowd-out or cross-subsidize Americans in higher education? Journal of Public Economics, 156, 170-184. https://doi.org/10.1016/j.jpubeco.2017.10.003.

elsewhere; garnering high impact funding from non-profit organizations such as the Gates Foundation, Wellcome Trust and Burroughs Wellcome funding; and working at the World Health Organization (WHO) leading the fight against hepatitis.

In the midst of fierce global competition for talent, this is not the time to impose harmful, unnecessary restrictions. International students deserve to know that they will be allowed to stay in the U.S. through their entire academic program. Surveys conducted in August–September 2025 by the Institute for Progress (IFP) and NAFSA: Association of International Educators found that nearly half (49%) of current graduate students and postdoctoral researchers in the U.S. would not have enrolled if Duration of Status had been replaced with a fixed admission period at the time of their decision. Among prospective international students abroad — primarily at the bachelor's and master's levels — 16% said they would choose not to study in the U.S. if the ability to remain for the full duration of their program were eliminated.[34]

The proposed rule injects uncertainty and unwarranted hurdles that would undoubtedly either lead international students to depart the U.S. before the end of their program to avoid accumulating any "unlawful presence" or discourage them from studying here in the first place. This will ultimately harm not only international students and higher education institutions, but also domestic students, local businesses and communities, and the broader economy.

### 6. The proposed rule is an unnecessary and harmful intrusion into academic decision-making.

The rule encroaches on the role of the academic institution. As part of ongoing accreditation and re-accreditation requirements, academic institutions are already subject to a variety of regulatory constructs and metrics to ensure that they advance and promote educational and curricular effectiveness, student success, retention and graduation, and operational and financial integrity. Accreditation standards require higher education institutions to demonstrate how they support and track students so that they make reasonable progress toward degrees and to demonstrate the support available to students who require more time or assistance. As noted above, many students may need additional time to complete their educational coursework and programs. It is the institution's, not the federal government's, decision whether and when to grant students additional time to complete a degree.

It is inappropriate and overreaching for the rule to give a USCIS officer the ability to evaluate whether a student is making good academic progress. As a point of comparison, in employer-sponsored temporary worker cases (e.g., H-1B or L-1), USCIS, at extension, evaluates only whether the statutory and regulatory criteria are met; it does not second-guess the quality of the employee's performance. That judgment belongs to the employer. By the same logic, USCIS should not substitute its judgment for that of the school by deciding whether a student is making satisfactory academic progress and thus warrants an F-1/J-1 extension; that determination properly rests with the academic institution.

Moreover, "compelling academic reasons" are not clearly defined by the rule, meaning that the government will have more discretionary power over students than their own colleges or

---

[34] Institute for Progressive Policy. (2025). *2025 Surveys on international talent pipelines* [Report]. IFP. https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf.

universities. This presents an untenable situation in which a student may apply for an extension of their studies and be approved by their own school, but not by the government.

Institutions already have extensive processes to approve additional semesters based on academic and institutional procedures. These procedures are overseen by faculty and faculty committees, academic and student deans, registrars, financial aid officers, and others on campus, who are in the best position to make such determinations. Allowing the federal government to intervene in academic decisions that are best handled by higher education institutions sets an alarming precedent. These matters are best left to academic professionals who understand equally the importance of advising students on compliance with federal immigration regulations and helping them navigate the complexities of academic program requirements.

**7. Implementing the rule would have significantly greater economic effects than estimated by DHS on U.S. higher education institutions, including from the loss of the international student population and economic costs to local communities.**

The proposed rule significantly underestimates the costs of implementation of the proposed rule. The estimate outlined by DHS only acknowledges a portion of the training, software, and technology costs. For example, the proposed rule does not take into account the new and ongoing training that the institution will have to develop and implement for the multiple academic departments and administrative entities that are involved in supporting international students. Given the complexity of the rule, institutions need a greater amount of time to analyze and project those costs. Further, DHS largely dismisses the significant and rippling economic losses that would result from the rule.

The positive impact of international students on the economy (both national and local) has been extensively studied, and would be at significant risk due to the proposed rule. International students typically pay full tuition, which boosts revenue for both public and private American colleges and universities.[35] As a result, international students help to create opportunities for domestic students to attend as well (for example, by supporting class options for domestic students). Research finds that on average, for every additional international undergraduate student enrolled at a public university, two more in-state first-year students enroll as well.[36]

International students in the U.S. contribute to the U.S. economy beyond their school tuition. Spending on housing and other goods (such as food, transportation, and retail) supports U.S. businesses and workers. Their demand for local goods and services supports the employment of U.S. workers as well as tax revenue from their purchases. For every three international students

---

[35] Zavodny, M. (2025, May 21). *The importance of immigrants and international students to higher education in America* [Policy brief]. National Foundation for American Policy. https://nfap.com/wp-content/uploads/2025/05/Importance-of-Immigrants-and-International-Students-to-Higher-Education.NFAP-Policy-Brief.2025.pdf.

[36] National Foundation for American Policy. (2025, May 21). *The importance of immigrants and international students to higher education in America* [Policy brief]. NFAP. https://nfap.com/wp-content/uploads/2025/05/Importance-of-Immigrants-and-International-Students.DAY-OF-RELEASE.2025.pdf.

enrolled in the U.S., one U.S. job is created or supported[37] by spending in higher education, accommodation, dining, retail, transportation, telecommunications, and health insurance. According to the U.S. Department of Commerce, international students contributed over $44 billion USD to the economy and created nearly 400,000 jobs in 2023/24.[38] California and New York, two of the top ten destinations of international students, received $6.4 billion USD and $6.2 billion, respectively, from international students. 55,110 and 51,723 jobs, respectively, were created or supported as a result. Texas gained $2.5 billion, Wisconsin earned $541.3 million in revenue, and Florida received $1.5 billion. [39]

Unwelcoming and arbitrary policies will dissuade talented international students from studying in the U.S., leading them to take their talent and spending power elsewhere. By restricting international students' access to study in the U.S., the proposed rule discourages investment in U.S. schools and businesses and encourages students to spend their money elsewhere. The loss of international students would therefore have a compound effect on many local economies.[40] This is especially true as essential sectors of the U.S. economy remain understaffed due to slowing population growth, as aging continues to outpace the growth of the working-age population.[41]

With the ongoing restrictions impacting international students, estimates show the U.S. economy is likely to lose $7 billion in revenue and more than 60,000 jobs.[42] Canada and Australia, meanwhile, have shown double-digit growth.[43] The stagnation of U.S. enrollment and the increase in competitor states' international student population has a direct relationship: as the U.S. adopts more stringent measures that penalize international students, or create an unwelcoming environment for international students, they will choose to pursue their studies in another country. As a result, the communities that would otherwise benefit from international students could see a significant decrease in business and tax revenue and a depressed demand for U.S. workers' services.

The DHS economic impact calculations provided very rudimentary costs based upon inaccurate data. Given the far greater financial costs associated with implementing the rule, its duplicative

---

[37]NAFSA: Association of International Educators. (2024, November 18). *International students contribute record-breaking level of spending and 378,000 jobs to the U.S. economy* [Press release]. https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.
[38] Ibid.
[39] Ibid.
[40] NAFSA: Association of International Educators. (n.d.). *NAFSA International Student Economic Value Tool* [Data tool]. Retrieved September 10, 2025, from https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.
[41] Denamiel, T., Reinsch, W. A., Schenker, J., & Al-Saleh, D. (2024, November 25). *Immigration policy solutions to shortages in critical sectors of the U.S. economy* [Brief]. Center for Strategic and International Studies. https://www.csis.org/analysis/immigration-policy-solutions-shortages-critical-sectors-us-economy.
[42]NAFSA: Association of International Educators. (2025, July 29). *U.S. economy could suffer a $7 billion loss from precipitous drop in international students* [Press release]. https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students.
[43] Canadian Bureau for International Education. (n.d.). *International students in Canada* [Facts & Figures]. Retrieved September 10, 2025, from https://cbie.ca/media/facts-and-figures/international-students/.
Department of Education (Australia). (n.d.). *International student monthly summary and data tables* [Data set]. Retrieved September 10, 2025, from https://www.education.gov.au/international-education-data-and-research/international-student-monthly-summary-and-data-tables.

and unnecessary provisions, and the additional hurdles it creates for students and institutions, any reasoned determination would conclude that its possible benefits do not justify its costs. DHS should be required to reperform the cost-benefit analysis to reflect these larger scale impacts the proposed rule fails to recognize.

**8. This rule makes the U.S. less competitive globally.**

The U.S. has historically been the top destination for international students.[44] However, as shown in the sections above, the proposed rule injects significant uncertainty and increased costs into the educational plans of international students who are weighing their options among higher education institutions in the U.S. and other countries. Together with other recent actions and anticipated changes, it is likely that international students will instead choose the greater predictability offered in other countries.

The changes suggested in the proposed rule are likely to harm U.S. global competitiveness and negatively impact our national security. Besides what is mentioned above, the proposed rule would impact the Optional Practical Training (OPT), which is an important channel that attracts top-tier international students to the U.S. This program enables international students who have graduated from U.S. colleges and universities to obtain real work experience and training directly related to their degree through temporary work authorization. The OPT program is an important conduit for the contributions of U.S.-trained high-skilled immigrants to the economy.[45] In 2024, a total of 194,554 foreign students obtained work authorization through OPT, while a separate population of 95,384 foreign students obtained work authorization through STEM OPT. Compared to 2023, this was an increase of 21% for OPT and an increase of 54% for STEM OPT.[46]

Many students approved for OPT frequently work for top U.S. companies, such as Amazon, Google, Microsoft, Facebook, IBM, and Apple, and contribute to these companies' reputations as global leaders in technology and research innovation.[47] Students approved for OPT contribute beyond name-brand companies. Altogether, the top 100 employers of students on OPT only comprise 18% of the employer population.[48] Compared to the H-1B visa program, students in the U.S. on OPT more often work for startups and other smaller businesses, providing their insight and experience to companies and organizations that may otherwise struggle to compete against larger conglomerates.

Under the proposed rule, many international students seeking to participate in Optional Practical Training (OPT) will need to apply and pay for an EOS in addition to submitting a parallel petition for an OPT Employment Authorization Document (EAD). The international student would need approval of both EOS and EAD before beginning work. Neither international students nor employers can be assured that both will be adjudicated at the same

---

[44] Batalova, J. (2025, July 24). *International students in the United States* [Spotlight]. Migration Policy Institute. https://www.migrationpolicy.org/article/international-students-united-states.
[45] The Business Roundtable. "The Economic Impact of Curbing the Optional Practical Training Program." https://s3.amazonaws.com/brt.org/BRT-OPTProgramReport_1.pdf. December 2018.
[46] U.S. Immigration and Customs Enforcement, Student and Exchange Visitor Program. (2024). *2024 SEVIS by the Numbers Report* [Data report]. https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf.
[47] Bier, D. J. (2020, May 20). *The facts about Optional Practical Training (OPT) for foreign students*. Cato Institute. https://www.cato.org/blog/facts-about-optional-practical-training-opt-foreign-students.
[48] Ibid.

time, and any delays in processing could create uncertainty for students and jeopardize their ability to begin training on time. Further, the EOS has a biometric appointment requirement at an Application Support Center, so adjudication will likely take longer. As a result of these new hurdles and uncertainties, more international students may decide to attend colleges and universities in other countries, where the pathway to study and work is facilitated.

Taken together, the proposed end of "duration of status" (D/S) and several recent consular policy changes create additional barriers that will make the U.S. a far less attractive study and research destination.

First, DOS now directs nonimmigrant visa applicants to interview in their country of nationality or residence—with limited exceptions—eliminating widely used third-country options that helped students and scholars avoid months-long backlogs when travel or academic calendars required timely visa renewal. Second, DOS has dramatically narrowed interview-waiver eligibility so that most NIV applicants must appear in person for an interview, further constraining appointment supply and adding cost, time, and uncertainty for students and exchange visitors on tight academic schedules. Third, DOS has reduced visa validity for many countries to roughly 90 days and a single entry, meaning even short international travel during a multi-year program can trigger a new, in-person visa application abroad before return—now only in the home country or country of residence. Overlaying these hurdles, the DHS NPRM would replace D/S with fixed admission periods, requiring timely USCIS extensions to remain in the U.S. beyond the I-94 end date.

These measures will make studying in the US and short trips abroad incredibly risky: a single international trip can necessitate a home-country interview for a single-entry, short-validity visa; return to the U.S. then depends on appointment availability abroad, while continued stay in the U.S. hinges on USCIS extensions that face mounting backlogs. The rational response for many prospective applicants is to choose other destinations that offer stability and predictability.

The rippling economic impacts of this loss will be felt across sectors, and particularly in STEM fields. Over half of all international students in the U.S. pursue STEM fields, with math and computer science being the leading fields of study followed by engineering.[49] Similarly, students who pursue OPT work authorization are more likely to work in a STEM field than a non-STEM field.[50] Students benefit from the program by having the opportunity to learn valuable work experience within their field of study, while the economy profits from a skilled workforce educated in top U.S. colleges and universities. The program also strengthens the pipeline of talent between many U.S. schools and top companies, benefitting all students (not just international ones).

To avoid deep, long-term damage to U.S. higher education and research competitiveness, DHS should not finalize the D/S proposal in isolation from these parallel DOS policies; at minimum,

---

[49] Institute of International Education; IC[3] Institute. (2024, December 11). *Meeting demand in the STEM fields: Current international student trends at U.S. higher education institutions* [Report]. https://www.iie.org/wp-content/uploads/2024/12/Meeting-demand-in-the-STEM-fields.pdf.

[50] Bier, David J. "The Facts about Optional Practical Training (OPT) for Foreign Students." Cato Institute. https://www.cato.org/blog/facts-about-optional-practical-training-opt-international-students#:~:text=In%20fiscal%20year%202019%2C%20U.S.,)%20or%20STEM%20(69%2C353). May 20, 2020.

DHS should coordinate with DOS to restore meaningful interview-waiver pathways and multi-entry, longer-validity visas, or else withdraw the D/S changes until mitigating measures are in place.

**III. Requests for clarification and implementation details needed for a workable transition.**

To ensure schools and students can comply if DHS replaces D/S with fixed admissions and extensions, we respectfully request clear answers to the following items—ideally in the final rule text and/or via coordinated SEVP policy guidance:

1. **Graduate-program CIP code updates (no program change intended).** If an institution updates the CIP code for an existing graduate program (e.g., to align with revised federal taxonomies or curriculum refreshes), will this be treated as a "program change" for F-1 that is prohibited/limited under the NPRM's graduate-level transfer rules? Please confirm that non-substantive CIP updates—where the academic program and degree objective remain the same—do not trigger a barred "change of program," do not require an EOS filing solely for the CIP change, and do not jeopardize the student's ability to remain in legal status.

2. **Transfers between campuses within one institution (including across state lines).** Many universities operate multiple campuses (sometimes in different states) under one governance structure, but each campus often has its own unique SEVIS school code. May students relocate between campuses within the same institution while remaining in the same academic program and degree level without that movement being deemed a disallowed "program change"? If policy will hinge on SEVIS school code(s), please clarify the rules for: same code vs. different codes, state-line moves, required I-20 updates, reporting timelines, and whether an EOS is needed when only the physical campus changes.

3. **Premium Processing for I-539 extensions.** Will Premium Processing be available for I-539 extensions (not merely changes of status) for F and J principals and their dependents? If yes, please confirm scope, fee, adjudication clock, bundling for family members, and whether schools may pay on behalf of students to prevent study/work interruption. If no, please explain how DHS will prevent work/learning disruptions when standard processing exceeds the 240-day automatic-extension window.

4. **I-94 fixed end dates in SEVIS (visibility and data integrity).** Because compliance now turns on I-94 end dates, DSOs/AROs need real-time visibility. Will DHS ensure prompt, automatic transfer of CBP I-94 data (including admit-until date) into SEVIS for each F/J principal and dependent? CBP inevitably makes mistakes in entering I-94 data, and these errors can have drastic consequences for students and scholars—including inadvertent violations of status. To safeguard against this, we request: (a) a visible I-94 expiration field on each SEVIS record; (b) batch reports and alerts for upcoming expirations; and (c) a direct line of communication and a specific F/J data-correction pathway with CBP to resolve erroneous I-94 entries quickly. These measures will allow institutions to proactively advise students and scholars and prevent avoidable violations caused by administrative error.

5. **Degree hierarchy and permissible academic progression.**
   To operationalize the NPRM's limits on changing educational objectives, schools need a clear, published hierarchy of degree/credential levels and examples of permissible upward progression. Examples of areas that require clarity include: (1) Where do graduate certificates sit relative to master's and doctoral programs? (2) How is an LL.M. classified (e.g., graduate/professional master's) for progression purposes? (3) Are stackable credentials (e.g., certificate → master's → Ph.D.) considered consistent upward progression? (4) Conversely, when (if ever) is movement to a lower level permitted (e.g., post-doc to master's prerequisites), and what documentation would satisfy SEVP that such movement is academically necessary rather than a status-extension tactic?

6. **Apparent drafting error: Preserve I-129 deference at 8 C.F.R. § 214.1(c)(5).**
   The NPRM appears to inadvertently delete DHS's long-standing I-129 deference provision at 8 C.F.R. § 214.1(c)(5) and replace it with generic "discretion" language that already exists at § 214.1(c)(7). Deference is not discussed anywhere in the preamble or docket, suggesting a renumbering/technical mistake, not a deliberate policy shift. As drafted, the rule would both erase the deference standard and duplicate the discretion paragraph—an outcome that is beyond the scope of this F/J/I rulemaking and, under the APA, would require a reasoned explanation that is absent. We request that DHS: (1) confirm that the NPRM does not intend to alter the I-129 deference policy; and (2) restore verbatim the current deference text at § 214.1(c)(5). Preserving deference maintains predictable, efficient adjudications for unchanged I-129 extensions and avoids unnecessary RFEs, delays, and costs for employers and beneficiaries.

We urge DHS to address these questions in the final rule and SEVP guidance so institutions can implement compliant and supportive processes on Day 1, and students/scholars have clear, predictable pathways to complete their programs without inadvertent status violations.

**Conclusion**

As described above, the proposed rule would increase overall program uncertainty, inject additional and unwarranted hurdles and costs for international students and higher education institutions alike, and introduce significant discretionary powers for the government, reducing schools' appropriate oversight and authority. The additional uncertainty would undoubtedly lead international students to either depart the U.S. before the end of their program to avoid accumulating any "unlawful presence" or discourage students from studying here in the first place.

International students in the U.S. are mandated to comply with a number of visa and immigration program requirements to maintain good standing. Students would find themselves at the mercy of a system in which their immigration status would end before the completion of their academic program. Students who come to the U.S. often look for stability in a program to balance the uncertainty of studying in an international country. U.S. schools and research institutions, meanwhile, work to ensure that a student's transition to life in the U.S. goes smoothly to ensure that they are academically successful and that the school retains the student for the length of their studies. If a school is unable to guarantee their end of the bargain, then students will look elsewhere; this outcome directly causes the U.S. economy to lose out on an

intelligent and hardworking student population and potential workforce, stunting future economic growth.[51]

Data shows that the administration's recent actions impacting international students and scholars will likely lead to a decline in enrollment.[52] At the same time, other countries such as Australia and Canada have seen a double-digit increase in international student enrollment.[53] This convergence of events is not coincidental—rather, it serves as evidence that international students have already started to doubt whether or not the U.S. will be a welcoming place to undertake their studies. Due to the government's actions, some have already decided to choose other destinations. The proposed rule will no doubt accelerate this trend and cause long-term harm to the nation's prior reputation as the preeminent destination for international students.

**We urge that the proposed rule be withdrawn in its entirety, and that admission for the duration of status remain in effect.**

Sincerely,

Miriam Feldblum
President and CEO
Presidents' Alliance on Higher Education and Immigration

[51] NAFSA: Association of International Educators. (n.d.). NAFSA International Student Economic Value Tool [Data tool]. Retrieved September 10, 2025, from https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[52] NAFSA: Association of International Educators. (2025, July 29). *U.S. economy could suffer a $7 billion loss from precipitous drop in international students* [Press release]. https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students.

[53] Canadian Bureau for International Education. (n.d.). *International students in Canada* [Facts & Figures]. Retrieved September 10, 2025, from https://cbie.ca/media/facts-and-figures/international-students/.
Department of Education (Australia). (n.d.). *International student monthly summary and data tables* [Data set]. Retrieved September 10, 2025, from https://www.education.gov.au/international-education-data-and-research/international-student-monthly-summary-and-data-tables.

# EXHIBIT 2

# BRAIN FREEZE: HOW INTERNATIONAL STUDENT EXCLUSION WILL SHAPE THE STEM WORKFORCE AND ECONOMIC GROWTH IN THE UNITED STATES

Michael A. Clemens, Jeremy Neufeld, and Amy M. Nice

September 28, 2025

*Abstract*: America's longstanding strength in science and technology has depended heavily on international students, who make up nearly half of graduate enrollments in many STEM fields. Though universities function as the primary gateway for overseas talent to enter the US workforce, a suite of new federal policies seeks to sharply curtail this flow. This paper considers the potential scenario of a sustained, one-third reduction in foreign STEM graduates from US universities, and reviews the economic research literature on the expected ripple effects of such a decline. Using administrative and census data, we find the high-skilled STEM workforce would shrink, in this scenario, by over 6 percent overall and by over 11 percent at the PhD level. These estimates account conservatively for reactions by international students, scholars, and researchers who come to the US and by foreign STEM workers trained overseas. The best evidence from prior economic research implies cumulative effects on US innovation and productivity, reaching after a decade the present-day equivalent of $240–481 billion in lost economic product per year. Heavy restrictions on international students risk eroding America's innovative capacity and long-term prosperity.

## I. Introduction

The United States has long benefited from an extraordinary competitive advantage: the ability to attract and educate many of the world's brightest minds (Bloom et al. 2019; Glennon 2024; Ganguli and MacGarvie 2025). Yet this advantage, built over decades of scientific leadership and institutional excellence, now faces unprecedented threats. It is crucial for America's continued technological and economic leadership to understand the value of international talent, the scale to which American universities act as a training ground for America's international talent especially in STEM, and the mounting risks to this system.

The US federal government is pursuing an intentional policy to reduce the number of international students at US universities, and to stop most of the students who remain from entering the US

workforce after graduation. The US administration ordered Columbia University to "*take steps to decrease financial dependence on international student enrollment*" as a condition for fulfilling hundreds of millions of dollars in federal research contracts with the university.[1] That is, cutting the number of international students at US universities, in and of itself, is a goal of administration policy. The director of the federal agency that controls all adjudications for US immigration status has stated, "*We've got to do everything we can to really make it abundantly difficult—only in certain situations—for [foreign] students to think that they are just going to continue to live and work in the United States beyond the expiration of their [F-1 student] visa*".[2] That is, cutting the number of US-trained foreign graduates who enter the US workforce, in and of itself, is an explicit goal.

Student visa revocations, country bans, and major cuts to university funding via the National Science Foundation and National Institutes of Health have already affected international education in America. The administration took the further step of announcing a new, heavy tax of $100,000 on entry to the United States on an H-1B visa, on September 19, 2025.[3] All of these policies will without doubt deter many international students from taking the risk of studying in the United States at all. A recent headline in the globally influential *Economist* magazine warned: "Demand for American degrees is sinking".

At the time of writing, the administration has announced[4] several additional, upcoming steps that will directly impact all international students, scholars, and researchers on US campuses or intending to come to the US:

- Ending the 34-year-old practice of issuing student visa status valid through graduation and post-completion employment (so-called duration of status). Instead, the proposed policy would admit PhD students and others for only four years and face the uncertainty of applying for an extension of status during their program or whenever post-completion employment is sought.
- Terminating Optional Practical Training (OPT), the 78 year-old practice of issuing post-graduation work permits. OPT acts as a bridge from school to the US workforce.
- Prioritizing H-1B temporary work visa issuance for later career workers, with fewer slots available in the early career jobs for which fresh graduates can compete, despite a 73 year-old practice of allowing the visa classification to be readily available for early career professionals.

---

[1] Office of the President, "Our Resolution With the Federal Government", New York: Columbia University, July 20, 2025, paragraph 22, page 9.
[2] Director of US Citizenship and Immigration Services Joseph B. Edlow, quoted by Neil Munro, "Citizenship Chief Says Federal Work Permits for Foreign Grads Are 'Depressing Wages'", *Breitbart*, August 19, 2025.
[3] White House, Presidential Proclamation: "Restriction on Entry of Certain Nonimmigrant Workers", September 19, 2025.
[4] Unified Regulatory Agenda of the Department of Homeland Security, Spring 2025 agenda issued September 2025.

The remaining question is how many international students will be lost, and how this will affect the United States.

In this paper, we consider one plausible scenario for the reduction of foreign STEM graduates, and consider the available evidence for its effects on the high-skill STEM workforce and economic growth of the United States. We draw out the implications of a hypothetical one-third reduction in the number of foreign graduates at US universities. We use a wide variety of data sources, from census data to surveys of university graduates to novel administrative data from the US Department of Homeland Security. We focus on STEM students, those receiving higher-education degrees in a Science, Technology, Engineering, or Mathematics discipline.[5]

We find that a reduction of one third in the annual flow of foreign STEM graduates at US universities would, sustained over time, reduce the number of employed high-skill STEM workers in the United States by 6.2%. This figure is for all degree levels collectively, with higher effects at higher levels of education. The same reduction in student flows results in an 11.4% decline in the number of PhD STEM workers employed in the United States. The best available estimates from the economic research literature imply that this reduction in the high-skill STEM workforce would reduce annual productivity growth in the US economy by 3 to 6% (not percentage points), cumulating to a loss of $220–439 billion *per year* after 10 years. We consider these impacts not as a prediction, but as an informative scenario. The true magnitude of future declines in international students cannot be known at the time of writing, but we expect the true decline—and thus the impacts—to be larger than the conservative scenario we consider should all of these policies be adopted and stay in effect.

In section II, we describe the policy history of the programs the administration is proposing to change. In section III, we explain how the country's STEM workforce has been augmented by recruiting international students from US institutions after graduation. Section IV describes and quantifies how international graduates transition between different immigration statuses after graduation, including through programs like OPT, J-1, H-1B, O-1A, and employment-based immigrant categories. Section V quantifies the effects of a reduction in international students on the STEM workforce. Section VI considers whether other STEM workers (foreign-trained or domestic) could mitigate the effects. Section VII estimates how the predicted effects on the STEM workforce would change the trajectory of US productivity and growth, finding major consequences for the US economy.

[5] We follow the National Science Foundation in defining STEM herein as science and engineering ('S&E') disciplines, excluding those related to health ('S&E-related').

## II. Policy Context

International students earning US degrees are a critical input to the nation's STEM workforce and economy, because many international graduates from US universities, and most STEM grads, enter the US labor force in the short term and many remain in the country in the long term. The administrative data show that 54% of F-1 graduates get OPT, with most of the remaining 46% returning home after earning their degree. The initial retention numbers are higher among PhDs (67%) specifically and STEM grads generally, with 77.8% of international students earning STEM degrees immediately entering the workforce upon completing their degree, through what we call in this paper the 'front door' talent pipeline (63.7% on OPT, 13.6% changing status directly to H-1B from F-1 without OPT, .5% changing status to another nonimmigrant work visa category without OPT). The three biggest components of the front door pipeline are F-1 student enrollment, transitions from F-1 status to OPT work authorization, and transitions from F-1 student status (whether on OPT or not) to H-1Bs. Ending Duration of Status, ending OPT, and prioritizing seniority in H-1B issuance would strike a blow at all three components.

A. Duration of Status

Duration of status was introduced in 1978 to allow international students the ability to be admitted to the US for however long it took them to complete their degree and to engage in post-graduation employment experience related to their field of study. As explained by the Immigration and Naturalization Service (INS) then:

> "The proposed amendments will eliminate the need for nonimmigrant students to apply for extensions of stay and summer employment, and will eliminate the need for the Service to adjudicate the large numbers of applications now required under existing regulations. Under the proposed rule, immigration controls on students will be similar to those for foreign diplomats. The Department of State now informs the Service when a diplomat is no longer accredited, and the proposed rule will require Foreign Student Advisors to advise the Service when students are no longer enrolled in school, or when significant changes in their status occur. These amendments are needed to facilitate the admission of nonimmigrant students and intended to reduce the Service adjudications workload, while providing adequate immigration controls on persons here on student visas."[6]

Soon after its initial introduction, during the Iranian hostage crisis, duration of status admission was supplemented by an Iranian Student Registration Program which required additional close government monitoring and compliance obligations for Iranian students but nobody else, followed by a period when INS experimented with various changes and conditions to duration of status, including a two-year testing of whether the agency should return to fixed periods of admission. Ultimately, INS rejected fixed periods of admission. Since October 1991, international students have relied on the expectation that they can maintain status for the duration of their educational

[6] 43 Fed. Reg. 32306 (July 28, 1978).

program – plus any period of post-completion OPT. DHS has published a proposed new regulation eliminating Duration of Status (D/S) admissions whereby international students no longer have the relative certainty their period of stay will cover their completion of a US degree and training programs.[7]

B. OPT recission

In August 1947,[8] the Department of Justice, then responsible for immigration through its component agency INS, promulgated a regulation permitting "employment for practical training" for international students after completion of the student's regular course of study. For over 78 years, a program allowing employment authorization for international students after they have completed their degrees has continued, now through Department of Homeland Security (DHS) regulations governing F-1 nonimmigrants. In 2008, DHS announced the availability of a 17-month STEM OPT extension available for graduates of STEM degree programs. Because this rulemaking was invalidated in an August 2015 court decision, DHS undertook a new rulemaking that developed the final regulation[9] currently governing post-graduation employment authorization for STEM grads. International students earning US degrees in designated STEM degree programs[10] who have employers that complete a STEM OPT attestation,[11] are entitled to a 24-month STEM OPT extension after the 12-month post-completion OPT available to all F-1 visa holders. DHS has announced that it will develop a regulation to restrict post-completion OPT.[12]

C. H-1B restrictions

Established in the 1952 rewrite of the nation's immigration laws, the H-1 visa classification has existed for the last 73 years to allow U.S. employers to hire professionals born outside the US. Since 1990, this category has been subject to numerical limits and a labor condition application, and the category has been designated as the H-1B visa. US Citizenship and Immigration Services (USCIS) and its predecessor agencies have consistently recognized that this category is intended for professionals at all levels of experience including early career professionals. INS explained in a January 1990 rulemaking that the inclusion of entry-level members of a profession had been well-established since before 1970 and "that a Congressional amendment to the statute would be required to change the current interpretation after such a long time."[13] When later that year Congress considered revisions to H-1 in the bill that became IMMACT90, the House Judiciary Committee reported that "the bill recognizes that certain entry-level workers with highly specialized knowledge are needed in the United States and that sufficient US workers are

[7] 90 Fed. Reg. 42070 (August 28, 2025)
[8] 12 Fed. Reg. 5355 (August 7, 1947).
[9] 81 Fed. Reg. 13040 (March 11, 2016).
[10] DHS STEM Designated Degree Program List (last updated July 22, 2024).
[11] I-983 Training Plan for STEM OPT Students.
[12] Spring 2025 Unified Agenda for DHS includes a new rule governing practical training (September 2025).
[13] 55 Fed. Reg. 2606 at 2608-2609 (January 26, 1990).

sometimes not available,"[14] and the enacted 1990 rehaul of the legal immigration system retained the ability of early career professionals to utilize the newly delineated H-1B visa classification.

Yet, DHS has proposed a new regulation to reorder H-1B access by seniority, disadvantaging early career professionals and recent international student graduates, and the Trump administration has announced a presidential proclamation claiming authority to impose a $100,000 fee at the time of adjudication of certain H-1B petitions.[15]

The connective tissue between F-1 student enrollment and the workforce is their duration of status admission, access to OPT, and access by F-1s to H-1B status.

## III. Foreign STEM talent in the US workforce and universities

America's visas for foreign nationals to come to the US on the basis of their skills and employment operate largely as a retention mechanism rather than a recruitment engine. Programs like H-1Bs and employment-based green cards predominantly serve those already within our borders, while our capacity to identify and attract fresh international talent remain fairly limited to institutions of higher education. Universities have become our de facto talent pipeline—international students, visiting scholars, and research fellows represent the primary conduit through which high-skilled individuals first arrive in America. As one National Academies committee chair aptly observed in 2024, "The U.S. has a talent program. It's called graduate school."[16]

International education is a major U.S. export industry, contributing $54.8 billion to the US economy in 2024.[17] But the most important contribution of international students, scholars, and researchers who are attracted to US college campuses is as an engine of American innovation after entering the workforce. Consider that immigrants founded 44% of all "unicorn" billion-dollar startup companies from 1997–2019,[18] and immigrants or their children founded 46% of the "Fortune 500" largest firms in America.[19] Of the immigrants who founded high-potential startups backed by venture capital, 75% came to the United States as international students (Amornsiripanitch et al. 2023)—not on work visas, not on family visas, not by any other channel. International students who remain in the United States after their education are, collectively and disproportionately, a force for economic growth. Of the top AI firms in America, that have received

---

[14] H.R. Rep. 101-723 at p. 6747 (September 19, 1990).
[15] 90 Fed. Reg. 45986 (September 24, 2025) and Restriction on Entry of Certain Nonimmigrant Workers (September 19, 2025).
[16] Karen Fischer, "To remain scientifically competitive, the U.S. must take a coordinated national approach", *Latitudes* blog at the *Chronicle of Higher Education*, September 4, 2024.
[17] Bureau of Economic Analysis, "Table 2.1. U.S. Trade in Services, by Type of Service", US Dept. of Commerce. July 3, 2025 release.
[18] Ilya Strebulaev, "The Immigrant Edge: How Foreign-Born Entrepreneurs Drive America's Unicorn Boom", *Crunchbase News*, May 13, 2025. Data from the Stanford University Venture Capital Initiative.
[19] American Immigration Council, "New American Fortune 500 in 2024", Sept. 9, 2024.

the most venture capital support, 70% have a co-founder that is an immigrant who first came to the US as an international student at a US university.[20]

The value proposition extends beyond individual achievements. International graduate students are a major source of the talent enabling American universities to maintain world-class research programs and American companies to develop and commercialize ideas. Immigrant inventors are responsible for 32% of aggregate innovation in the United States, in part by causing their non-immigrant colleagues to produce more of their own innovations (Jaravel et al. 2018; Bernstein et al. 2022). In engineering fields, 54% of workers with doctoral degrees originally came to the United States on student visas.

The US is more reliant on international talent in technical STEM fields and at higher levels of education. The foreign-born share of the population is approximately 16%, but foreign-born workers make up 30.0% of today's employed high-skill STEM workforce—that is, workers in Census-defined STEM occupations who hold a bachelor's degree or above. Growth in foreign-born workers accounts for 36.2% of all growth in the employed high-skill STEM workforce since the year 2000 (Figure 1a).[21] The figure shows a snapshot of the population in each year—that is, a stock rather than a flow.

The role of immigrants is even more central at higher levels of skill. Foreign-born workers make up 42.1% of today's employed STEM workers whose highest degree is a master's. And the foreign-born constitute 50% of all growth in employed STEM workers whose highest degree is a master's since the year 2000 (Figure 1b). At the doctoral level of training, the role of foreign workers becomes dominant. Foreign-born workers make up 49.2% of today's employed STEM workers with a PhD degree. They constitute 62.2% of all growth in employed STEM workers with a PhD since the year 2000 (Figure 1c).

---

[20] Jeremy Neufeld and Lindsay Milliken, "Most of America's Top AI Companies Were Founded by Immigrants," Institute for Progress, April 16, 2025.

[21] Data from the American Community Survey 1-year public-use files (Ruggles et al. 2025). Includes only workers age 18–65, who have completed a bachelor's degree or higher and are currently employed in an occupation coded as a Science and Engineering (S&E) occupation by NSF (2024, Table SLBR-1). This definition does not include medical fields, which NSF categorizes not as S&E occupations but as "S&E related". At the time of writing the 2023 microdata are the most recent available.

***Figure 1: Immigrant prevalence among employed US high-skill STEM workers (stock), 2000–2023***

(a) All high-skill STEM




(b) Highest degree master's




(c) Highest degree PhD



***Figure 2: Immigrant fraction of new STEM graduates from US universities (flow), 2000–2023***

(a) All university degree completions




(b) Master's degree completions




(c) PhD degree completions



This high prevalence of immigrants in the high-skill STEM workforce has occurred alongside high rates of international-student graduation from STEM programs at US universities. Figure 2 shows the annual flow of new graduates from US universities in STEM fields.[22] In the most recent cohort of students in STEM fields completing any higher-education degree, 20.9% of graduates are nonresident aliens—people who are neither citizens nor permanent residents of the United States,[23] including people on student or training visas. Nonresident aliens make up 24.1% of growth in the flow of STEM graduates, at all degree levels, since the year 2000 (Figure 2a).

Again, the role of international students is even more central at higher levels of education. Among students completing master's degrees in STEM disciplines, 43.8% are nonresident aliens. And those international students make up 45.4% of the rise in the annual flow of new STEM master's graduates since the year 2000 (Figure 2b). These numbers are similar at the PhD level. 43.6% of recent new PhD graduates in STEM are nonresident aliens, and those international students make up 44.2% of the rise in the annual flow of new STEM PhD graduates at US universities since the year 2000. At many top research universities, international students now constitute the majority of graduate students in computer science, electrical engineering, and other crucial fields for American competitiveness.

This phenomenon is not new. Compare the *level* of international student prevalence among STEM graduates to the *growth*. For example, about 44% of the current flow of PhD STEM graduates are international students, and roughly the same percentage of *growth* in PhD STEM graduates over the past quarter century have been international students. This implies striking stability in the reliance of US higher education in STEM on foreign talent over the past generation. The economic importance and public salience of high-skill STEM workers has risen in recent years, as the demand for their work has boomed, but the United States's relative reliance on global talent for new graduates in those fields has been high for decades.

What, then, would be the effect of slashing international student graduates in STEM (Figure 2) on the US high-skill STEM workforce (Figure 1)? The effect is not straightforward. Many international graduates from US universities do not remain in the country in the long term, or even enter the US labor force in the short term. Those would not be 'lost' to the workforce even if they had never come to study in the United States. To quantitatively estimate the effects of reductions in

---

[22] Completion data for 2000–2022 are from the Integrated Postsecondary Education Data System (IPEDS) from the National Center for Education Statistics (NCES) at the US Dept. of Education, via the Urban Institute *Education Data Portal*, accessed July 16, 2025. Data for 2023 have not been incorporated into the Urban Institute portal and are thus taken directly from: National Center for Education Statistics, "IPEDS Data Center", US Dept. of Education, accessed June 20, 2025. STEM degrees are defined using the US Department of Homeland Security DHS *STEM Designated Degree Program List*, which was issued in 2016, 2020, 2022, and 2023, for the relevant year. That is, 2023 graduates are classified using the 2023 list, 2022 graduates using the 2022 list, 2020–2021 graduates using the 2020 list, and graduates before 2020 using the 2016 list (the first official list issued by DHS).

[23] We refer to these noncitizens as "aliens" because that is the term used throughout the administrative data.

international graduates on the US high-skill STEM workforce, we must estimate the US retention rate of different types of international graduates.

## IV. International student transition from university to workforce

Understanding America's high-skill immigration system requires viewing it as a complex pipeline with multiple entry points, bottlenecks, and exit ramps. This pipeline operates on a logic of temporary-to-permanent progression (Bound et al. 2021; Glennon 2024; Ganguli, and MacGarvie 2025).

The employment-based green card system functions fundamentally differently than many assume. Rather than serving as America's primary tool for attracting new international talent, these permanent residency pathways overwhelmingly benefit individuals who have already established themselves within US borders. The vast majority of employment-based green cards—through a process called "adjustment of status"—go to people already working in the United States on temporary visas, particularly H-1B holders.

This distinction is crucial for understanding the immigration pipeline's architecture. While permanent residency offers invaluable benefits—freedom to change employers, launch businesses, enjoy greater career flexibility, and ultimately become a naturalized US citizen—it represents the culmination of an immigration journey. The beginning of that journey was often arrival on a student visa. The green card is the mechanism that transforms temporary workers into permanent residents, preventing brain drain rather than initiating brain gain.

If green cards primarily serve retention, then recruitment happens elsewhere—specifically through the complex ecosystem of nonimmigrant visa programs. These temporary statuses form the actual gateway through which high-skilled workers enter the United States, though they come with significant limitations that make eventual permanent residency essential for long-term retention.

The U.S. high-skilled immigration system resembles a massive funnel with multiple entry points but increasingly narrow passages as individuals progress toward permanent residency.

- **The F-1 student visa** represents the widest opening in this funnel, admitting approximately 350,000 to 400,000 new, first time active international students annually in recent years, without numerical caps. This program does more than educate—it serves as America's primary talent scouting mechanism.
- **The F-1 Optional Practical Training (OPT) program** allows F-1 graduates to gain on-the-job experience as part of their educational program before leaving the country or securing another immigration status. F-1 graduates can get one year of post-graduation employment authorization, with STEM graduates enjoying up to three years of employment authorization. This bridge period allows employers to evaluate talent and workers to establish themselves professionally before transitioning to more permanent arrangements.

This program is a crucial pipeline in transitioning international graduates into the US workforce.

- **The H-1B Visa** stands as the flagship high-skilled work visa, though its dual role often goes unrecognized. A significant share of H-1Bs are used to retain those already here—particularly recent graduates transitioning from student status. The private sector cap of 85,000 visas (with 20,000 reserved for U.S. advanced degree holders) creates an annual lottery system where demand far exceeds supply. Universities, government research entities (like the national labs), and non-profit research organizations enjoy exemptions from these caps, reflecting policy priorities around academic and research talent.
- **The J-1 Exchange Program** occupies a unique niche, bringing in about 100,000 high-skilled participants annually across various categories. The single largest group of J-1 participants are foreign students in degree-granting programs abroad who come to the US on a summer work and travel program (about one-third of all new, first time active J-1s annually), with most others being young people who come as au pairs, camp counsellors, high-school students, interns and the like. But J-1 program participants are also teachers, professors, and researchers. The program is especially important in academic research, with nearly all postdoctoral researchers entering through this pathway. Most of these have historically been prevented from remaining in the US long term due to restrictions on this exchange visitor classification.
- **The O-1A Visa** serves as the elite pathway, reserved for those demonstrating extraordinary ability in their fields. About 10,000 are issued annually.
- **Lawful permanent residency (green card)** affords the right to stay in the United States permanently, enjoying free movement, authorized employment, changes of employer, and retirement without sacrificing status. Only approximately 120,120 employment-based (EB) green cards are issued each year, based on selection tied to education, experience, and future employment.[24] Because spouses of minor children of the so-called "principal" beneficiaries count toward the cap, less than half of the 120,120 green cards do not go to the selected high-skilled principals, although it must be noted that the spouses often are high-skilled themselves. The U.S. awards approximately 40,000 green cards every year to each of the three skill-based categories (EB-1, EB-2, and EB-3).

The talent pipeline structure creates two critical choke points that fundamentally shape the experience of international students transitioning into the U.S. workforce.

The first bottleneck is transitioning to a nonimmigrant work visa. Many international graduates face their first major hurdle when attempting to secure H-1B or other work authorization as their student status expires. Statutory quotas for cap-subject employers (like for-profit companies) mean

[24] There are also 19,880 green cards that are considered part of the "employment-based" system (EB-4 and EB-5) simply because they are not family-sponsored green cards. These go to investors, religious workers, unaccompanied juveniles, former NATO employees, and various others.

talented individuals often must leave despite eligibility, a job with a willing employer, and strong qualifications.

The second bottleneck is imposed by green card caps. The most severe constraint occurs at the pipeline's end, where annual green card limits create massive backlogs. The mismatch between temporary visa numbers and available green cards means many high-skilled workers spend years—sometimes decades—in temporary status, despite having approved petitions confirming eligibility for classification as a lawful permanent resident. This uncertainty affects career decisions, family planning, and entrepreneurial ambitions.

### *Measuring inflows, outflows, and transitions*

To understand how policy changes and changes in enrollment patterns would affect the high-skilled workforce in the United States, we need to estimate both the inflows from abroad and the transition rate. We do this here with anonymized, full-universe administrative data from the Student and Exchange Visitor Information System (SEVIS) of the US Dept. of Homeland Security, obtained by a request under the Freedom of Information Act.

We define the long-term transition rate *between* any two immigration statuses as the share of a new cohort in one program who get status in the second program immediately after their participation in the first program, regardless of how long that transition takes. For example, we take the F-1 OPT to H-1B transition rate to be the share of F-1 OPT participants who get an H-1B immediately following F-1 OPT. The F-1 OPT to EB transition rate is the share of OPT participants who immediately get employment-based green cards after OPT; it does not count OPT participants who get an EB after first transitioning onto an H-1B (or obtain green card status through marriage). We define the long-term retention rate for a program as the share of a cohort in one program who ever get EB permanent residency status, regardless of whether it is their *next* status.

#### A. Inflows

A new cohort within a visa program comprises both new arrivals and transitions. That is, the total number of new people entering a program within a given year is the sum of the new people entering the US from abroad and the people transitioning from another status. We will estimate transition rates in the next section, here we estimate new arrivals. More details on the methods can be found in the appendix.

**Table 1: Estimates of new arrivals from abroad**

| | Total | STEM | PhD |
|---|---|---|---|
| F-1 | 226,000 | 104,000 | 23,000 |
| J-1 | 100,000 | 31,000 | 29,000 |
| H-1B | 61,000 | 48,000 | 9,000 |
| EB-1, EB-2, and EB-3 | 15,000 | 10,000 | 1,000 |

- **F-1.** We estimate F-1 new arrivals using microdata from SEVIS. We estimate 226,000 new F-1 students graduate each year.[25] Of those, 104,000 graduate in STEM fields and 23,000 graduate with PhDs.
- **J-1**. We estimate the arrival of high-skilled J-1 new arrivals using SEVIS data on new J-1s going to visitors by exchange category. From 2014-2023, there were approximately 100,000 high-skilled J-1 visitors entering the US each year.[26] We also have microdata on degree fields for categories representing over half of the 100,000 high-skilled J-1 visitors. From this, we can estimate that the share of new high-skilled J-1s who have STEM degrees is 31%, suggesting an inflow of 31,000 high-skilled J-1 workers in STEM fields. Assuming that PhDs use the research scholar, specialist, and student doctorate categories, we find that there are 29,000 newly arriving PhDs each year on the J-1 program.
- **H-1B.** We estimate H-1B new arrivals using information from DHS's H-1B Characteristics Reports, which specifies whether initial H-1Bs request changes of status or consular processing. Given that some people already with status nevertheless pursue consular processing (we assume it is 6% of total consular processing), we estimate 61,000 new H-1B arrivals each year. Of those, we estimate that 79%, or 48,000, are for STEM workers (inferred from STEM occupations) and 14% or 9,000 are PhDs.
- **EB-1, EB-2, and EB-3**. We estimate aggregate EB-1, EB-2, and EB-3 new arrivals using data from DHS's statistical yearbook. This suggests 15,000 EB green cards each year go to new arrivals, of whom we estimate only 10,000 are STEM and 1,000 are PhDs.

Altogether, this suggests that the U.S. admits about 400,000 high-skilled visitors each year. However, as we will see, it only retains a fraction of them.

### B. Transitions

For F-1 international students, we present estimates of the principal channels for long-term retention—what we call the 'front door'—in Table 2.

[25] We could count new enrollments to capture when people first arrive, but we prefer to count them when they graduate because it simplifies our analysis, allowing us not to factor in variation in program lengths, lags between enrollment and graduation, and attrition of students. It does not materially change our results.
[26] Clemens, Neufeld, and Nice, Expelling Excellence: Exchange Visitor Restrictions on High-Skill Migrants in the United States, Policy Paper No. 214, IZA Institute of Labor Economics, September 2024.

The first major transition we consider is F-1 to F-1 OPT transitions. OPT represents the first opportunity for post-graduation work authorization and represents a major pipeline for graduates into the US workforce. SEVIS data reports directly that over the last five years of data available (2018–2022), 54% of F-1 graduates got OPT. That number is higher among STEM graduates (64%) and among PhDs (67%).

The next major transition is F-1 to H-1B. Some F-1 graduates get an H-1B immediately, without OPT. SEVIS data suggests that bout 9% of a graduating class manages to change status to an H-1B without OPT. That number is higher still for STEM graduates (14%) and PhDs (11%). However, much more common is transitioning to an H-1B from OPT. SEVIS data show 29% of OPT participants in all fields get an H-1B (15.4% of all graduates). Among PhDs, the share is 41% (28% of all graduates). Given STEM OPT's longer duration, it is not surprising that a greater share of STEM grads (52% of OPT participants and 33% of all graduates) change status to an H-1B after OPT.[27]

Next, we consider the H-1B to EB transition rate. H-1Bs are indefinitely renewable for those with an approved EB petition, so even someone who waits decades may eventually get an EB. This likely means there is significant deviation between short-term and long-term transition rates and between countries. We take the transition rate of H-1B into EB-2 (non-National Interest Waiver) and EB-3 from FY 2024 PERM data, and apply this to *principal* visa recipients (without spouses/dependents) adjusting status to EB-1 *excluding* intracompany transfers, and all principals adjusting status to EB-2 and EB-3. This implies that about 41% of H-1Bs and 4.8% of other nonimmigrant work visas (E-3, H-1B1, O-1, and TN) transition to EB-1,2,3.[28] These are the figures we assume in constructing Table 2.

For long-term retention on H-1B visas, we estimate the number of long-term extenders by comparing H-1B petition approvals for continuing employment to the number of approved petitions for initial employment three years prior.[29] Our method is as follows. The number of

---

[27] These rates are those directly observed as changes of status in SEVIS. Given that some F-1s secure an H-1B through consular processing and without changing status, the true transition rates are likely to be roughly 9% higher than the change-of-status rates.

[28] We first count the total adjustments of status to EB green card each year, omitting adjustment to EB-1 by multinational executives and managers who are overwhelmingly adjusting from L-1 visas not typically held by recent graduates of US universities (Mukhopadhyay and Oxborrow 2012, 222). We allocated the remaining adjustments to nonimmigrant work visas in the same proportion as the adjustments recorded publicly in the PERM data, which are available for the large majority of the remaining EB adjustments (all EB-3 adjustments and EB-2 adjustments where the principal has not obtained a National Interest Waiver). We then note that the year of adjustment in the PERM data, compared to the year of first arrival in the United States, implies that a typical adjuster on an H-1B visa is adjusting after roughly six years on an H-1B visa. We then compare, for example, the implied number of H-1B-to-EB adjustments against the number of H-1B visa petition approvals for initial employment from six years prior. This gives the H-1B-to-EB transition rate in the figure. Note that it does not include workers extending stay on an H-1B visa past six years with an approved immigrant visa petition, many of whom may later adjust to EB green card.

[29] The number of H-1B petitions for initial employment is primarily governed by statutory caps, so is relatively stable from year to year. Since the very large majority of H-1B visas for initial employment are extended from the original three years for an additional three years, the number of approved continuing-

petitions for continuing employment is, on average, 1.513 times the number of petitions for initial employment three years earlier. The number of petitions for continuing employment includes both standard continuation (first-time renewal of the H-1B) and extended renewals for those who have already renewed once, and who have an approved petition for an EB green card, but who are waiting for an EB green card to become available. But it would overestimate the transition rate into 'long term' (>6 years) H-1B status to estimate it as 51.3%, because that number includes both the first H-1B extension past 6 years and additional H-1B extensions (which can be required every 3 years, or shorter intervals, for long-term H-1B holders). We estimate the transition rate *for a given cohort* by assuming a constant survival rate in H-1B status at each of the first three H-1B renewals in long-term H-1B status as $\theta = 0.35$, the solution to $1.513 = 1 + \theta + \theta^2 + \theta^3$. That is, we estimate that 35% of H-1B holders reaching the end of the standard six-year period of single-renewal H-1B validity continue renewing past 6 years with an approved EB petition, an approximate transition rate that is consistent with the observation that the number of continuing-employment H-1B petition approvals each year is 51.3% larger than the number of initial-employment H-1B approvals three years beforehand.

We call this pathway the 'front door', because it is not the only path to long-term retention of a foreign graduate. Other pathways include adjusting to an immigrant visa via marriage, other family, or the Diversity Visa lottery; asylum; departure from the US followed by return on a 'new' visa (such as an L-1 intracompany transfer visa; an H-1B visa via consular processing overseas, rather than change-of-status within the US; or an EB visa as a new arrival, not adjustment of status). The 'front door' includes only students who change nonimmigrant visa status and then adjust status to permanent resident directly, without extended absence from the US.

A small number of J-1 exchange visitors, above and beyond the F-1 students shown in Table 2, manage to transition to long-term permanence. Historically, these have been small because most high-skilled J-1s were subject to the two-year home residency requirement. USCIS reports this information directly. From 2019-2023, USCIS reports the average J-1 to H-1B transition rate was 6%. The J-1 to EB-2 (non-National Interest Waiver) and EB-3 transition rate in DOL PERM data is only 0.5%. We take the J-1 to EB transition rate to be 1%.

---

employment petitions in a given year should be roughly equal to or slightly less than the number of approved petitions for initial employment from three years prior. If it is *greater*, this implies that some of the approved petitions for continuing employment are for workers extending beyond six years. We take the ratio of approved continuing-employment petitions to three-year-lagged approved petitions for initial employment, minus one, and averaged over the last 10 years, as an estimate of the fraction of workers receiving H-1B visas for initial employment who extend their stay past six years.

**Table 2: The 'Front Door' pipeline: Principal channels for transition from F-1 student visas to long term (>6 years) work in the United States**

| | All | | STEM | | PhD | |
|---|---|---|---|---|---|---|
| | Num. | % | Num. | % | Num. | % |
| Graduates (F-1), average per year 2018–2022 | 225,752 | | 103,836 | | 22,687 | |
| ***Short term (OPT)*** | | | | | | |
| F-1 to OPT | 121,962 | 54.0 | 66,097 | 63.7 | 15,255 | 67.2 |
| F-1 but no OPT | 103,790 | 46.0 | 37,739 | 36.3 | 7,432 | 32.8 |
| ***Medium term (nonimmigrant work visas)*** | | | | | | |
| OPT to H-1B | 35,479 | 15.4 | 23,919 | 33.4 | 5,987 | 27.8 |
| OPT to 'other' (O-1, E-3, H-1B1, TN) | 2,523 | 1.1 | 864 | 0.8 | 679 | 3 |
| F-1 to H-1B without OPT | 19,866 | 8.8 | 14,127 | 13.6 | 2,461 | 10.8 |
| F-1 to 'other' without OPT | 1,204 | 0.5 | 488 | 0.5 | 327 | 1.4 |
| ***Long term (permanent residency, extended*** | | | | | | |
| H-1B to EB-1, EB-2, EB-3 | 22,709 | 10.1 | 15,611 | 15.0 | 3,466 | 15.3 |
| 'Other' visa to EB-1, EB-2, EB-3 | 181 | 0.1 | 66 | 0.1 | 49 | 0.2 |
| Extended H-1B (>6 years) | 19,372 | 8.6 | 13,316 | 12.8 | 2,957 | 13 |

'All' graduates are all completions of bachelor's, master's, or doctoral degrees in all fields of study by F-1 visa holders in a given year. 'STEM' graduates are all completions at all degree levels by F-1 visa holders in DHS-designated STEM fields only. 'PhD' means all completions of doctoral degrees by F-1 visa holders in all fields, not just STEM. In the table, "%" means percentage of the original F-1 graduation cohort in the first row that eventually makes each transition. Numbers are averages over the years 2018–2022. "Other" nonimmigrant work visas are O-1, E-3, H-1B1, and TN. The source is full-universe administrative data from SEVIS 2004–2023, obtained by request from DHS under the Freedom of Information Act.

## *Pathways to retention*

The 'front door' pipeline to long-term retention from Table 2 is shown graphically in Figure 3. It contains four rows or levels, proceeding forward in time from top to bottom. In the topmost (blue) level, 100 international students on F-1 visas complete a STEM degree at a US university.

The second (orange) level shows how many transition to employment under Optional Practical Training for the first 1–3 years after graduation. The third (red) level shows changes-of-status for those F-1 graduates directly to a nonimmigrant work visa. The most important of these is the H-1B visa. "Other" includes all other meaningful nonimmigrant work visas.[30]

[30] E-3, H-1B1, O-1, TN, and a tiny fraction that pass directly from F-1 to EB-1,2,3

Finally, the lowest (green and red) level represents long-term retention in the US workforce, by 10 years or more. This can occur primarily through adjustment of status from a nonimmigrant visa to an employment-based immigrant visa, or by long-term continuing employment on an H-1B visa for nationals of countries with an immigrant visa backlog.[31] At the time of writing, Indian and Chinese nationals—who make up the large majority of H-1B workers—face backlogs of 12 years for India, 5 years for China.

*Figure 3: 'Front door' pipeline, foreign STEM graduates, all degrees*




Data from Table 2. The percentages at each level of Figure 3 are percentages of the original cohort of 100 F-1 graduates, *not* the percentage of people in each box down the chain—as in Table 2. The transitions from the top level (students) to the second level (OPT) and third level (nonimmigrant work visa) are estimated from the average rate of changes of status recorded in SEVIS between 2018 and 2022.

Figure 3 implies that 77.8% of international student STEM graduates from US universities, at all degree levels, enter the US workforce immediately after graduation via this 'front door' pathway.

---

[31] Under the American Competitiveness in the 21st Century Act (known as "AC21"), most nationals of countries with an approved immigrant visa petition but for whom immigrant visas are not available due to a backlog are exempt from the standard limit of a single, three-year extension of stay on the H-1B visa. In practice, this means that most nationals of India and China—the large majority of H-1B visa holders—can lawfully work indefinitely in the United States as long as they have an approved immigrant visa petition.

This includes 63.7% on OPT, 13.6% who change status directly from F-1 to H-1B without OPT, and 0.5% who change to another nonimmigrant work visa category without OPT.

The transition to long-term retention via this 'front door' is much smaller. A major bottleneck is the availability of employment-based immigrant visas after the six-year maximum stay on a standard H-1B visa runs out (Jacobs 2025). About 28% of graduates remain in the US high-skill STEM workforce 8 years later via the 'front door' pathway.

How many remain long-term by other pathways? We can compare those estimates to overall retention by independent means. We do so in Figure 4 by comparing data on the population of foreign graduates of US universities in 2023, by year of graduation, to the number of foreign-student graduates from each year. Any difference between those numbers is attrition of some kind, of which departure from the country is the most important. But to control for all other forms of attrition (mortality, recall) we estimate foreign-graduate attrition relative to attrition for US students (citizens and residents).[32]

This method, which should capture retention via the 'front door' and all other 'doors', implies that eight years after graduation, about 38% of nonresident alien STEM graduates—at all degree levels, bachelor's and above—remain in the United States. Comparing this to the retention rate estimated for the 'front door' pathway above implies that 74% of foreign STEM graduates in the United States who remain in the country long term utilize the 'front door' pathway of OPT/H-1B/EB-1,2,3 plus a small number of other work visas.

[32] Data from the National Survey of College Graduates (NSCG) and NCES IPEDS. The NSCG survey in 2023 includes the year of graduation for each person who graduated from a US university but arrived as a foreign student, by degree and field. This allows estimation of the number of people who (for example) graduated from a US university with a STEM degree in the year 2015 after arriving as a foreign student, and were (by definition) still present in the US in 2023 in order to answer the survey. Comparing this to the number of nonresident aliens who graduated with STEM degrees from US universities in the year 2015, from IPEDS, allows estimation of the fraction of that graduating cohort of foreign students who remained in the US from 2015 to 2023, that is, the eight-year retention rate.

***Figure 4: Rate of US retention, foreign STEM graduates, all degrees***




Data from the National Survey of College Graduates and IPEDS. The figure shows the estimated mean retention rate of graduation cohorts grouped into five-year intervals (the average retention rate over 1–5 years from graduation is plotted at the middle of the interval, 3 years; the average retention rate over 6–10 years is plotted at the middle of the interval, 8 years; and so on). The shaded area shows the interval of 95% statistical confidence on the estimate of the mean.

### *STEM PhD retention*

The retention pathways for foreign STEM graduates are substantially different at higher levels of education. Figure 5 repeats the analysis of the 'front door' pathway for foreign PhD graduates of US universities on F-1 visas. The figure includes all PhD awards, both in STEM and non-STEM fields. The short-term retention rate is 79.4%. This includes 67.2% entering the US workforce immediately after graduation on OPT, 10.8% changing status directly from F-1 to H-1B without OPT, and 1.4% changing to some other work visa (such as O-1) without OPT. But the long term retention rate of PhD graduates by the 'front door' path, past 8 years after graduation, is limited: just 28.5%.

***Figure 5: 'Front door' pipeline, foreign PhD graduates only, STEM and non-STEM***




How many PhD graduates use other pathways to remain in the US? Figure 6 repeats the overall retention analysis of Figure 4, for STEM PhD graduates specifically (and juxtaposes it with the retention rate of all STEM degrees collectively from Figure 4, for reference). This analysis implies a retention rate, 8 years after STEM PhD graduation, of 60–65%. This suggests that a substantial majority of STEM PhD graduates who remain in the United States long term are using pathways other than the 'front door'. A common path for those working at least initially in academia appears to be temporary departure from the US after the academic year in which the doctorate was earned and return for the next academic year on another temporary visa, like H-1B, followed by adjustment later to an EB-1 immigrant visa. Another common pathway for STEM PhD graduates is marriage to a US citizen or permanent resident. We are not aware of available administrative data on those alternative pathways. In the analysis that follows we rely on the rates of overall retention implied by the analysis underlying Figures 4 and 6.

We note that the US retention rate of foreign STEM PhD graduates in Figure 6 is slightly below other published estimates. We estimate a 10-year retention rate of roughly 65% in 2023, matching the estimate by NSB from 2021 (NSB 2024, 13).[33]

[33] Others have estimated lower attrition rates for STEM PhDs, such as five-year retention of 73% (NCSES 2025) and even a 10-year retention rate of 73% (Corrigan et al. 2022), though these estimates based on the Survey of Doctorate Recipients rest on reported departures among survey respondents—a method that may underestimate departure due to higher nonresponse by those who have left the United States.

*Figure 6: Rate of US retention, foreign STEM graduates, PhD only vs. all degrees*




## V. Effects of a reduction in international students on the STEM workforce

We use the above retention data to model mechanistically the short- and long-term impacts on the US STEM workforce of two different policy scenarios: A decline of one third in international student enrollment, and the elimination of OPT.

### *Policy experiment: Reduce foreign STEM graduates from US universities by one third*

The first scenario examines a one third decline in the enrollment of international students, which we think is a conservative estimate of the likely effect of ending Duration of Status, rescinding all OPT, and adopting an experience-based H-1B prioritization.

International students make decisions about studying in the United States based on expected returns relative to alternative destinations. Policies like ending Duration of Status (D/S) increase uncertainty by raising the risk of disruption mid-degree, lowering the expected probability of program completion. Eliminating Optional Practical Training (OPT) removes the single largest channel for recouping education costs, gaining career experience, and transitioning into the US workforce long-term, significantly reducing the perceived benefit of a U.S. education. Finally, prioritizing H-1Bs by seniority diminishes the probability that new graduates can transition into long-term employment in the United States, since they are disproportionately concentrated at

entry-level wage levels.[34] Each change alters the benefit-cost calculation at the application stage, deterring enrollment. In economic terms, these policies simultaneously raise the risk of an inability to transition from enrollment to graduation (through D/S), from graduation into the short-term workforce (through OPT), and from the short-term workforce into the long-term workforce (through the H-1B), resulting in a sharp decline in the expected net present value of U.S. study.

Survey evidence supports this mechanism. In August and September 2025, two surveys asked current students and postdocs and of prospective students abroad about how policy changes in the United States would change their decisions to enroll. The Current Students Survey surveyed 1,039 graduate students and postdocs on F-1 or J-1 visas and was distributed by professional science societies, led by the American Physical Society and the National Postdoctoral Association. While not a probability sample, it drew from a broad geographic and institutional spectrum, and the sample was heavily concentrated in STEM fields, reflecting the disciplines most tied to U.S. research and innovation. The Prospective Students Survey surveyed 611 prospective students and was distributed by three major global recruitment platforms—IDP Education, StudyPortals, and ApplyBoard. It captured applicants at different degree levels and from diverse sending countries. Among prospective students to the United States, the self-reported likelihood of enrolling in U.S. programs falls by 16 percentage points with the loss of D/S (from 67% to 57%), by 29 points if OPT were rescinded (to 48%), and by 6 points if H-1B allocation were shifted to wage-level prioritization. For current students, retrospective counterfactuals are even starker: 49% said they would not have enrolled without D/S, 54% without OPT, and 53% if H-1Bs were seniority-based.[35] Taken together, these findings indicate that the three policies each exert strong independent deterrent effects. A combined decline of roughly one-third in enrollment therefore represents a cautious estimate that surveys suggest could be substantially larger.

The long-term impact of a reduction in international student enrollment is estimated assuming that retention follows historical patterns. For example, in the most recent data available, 34.6% of the high-skill STEM workforce with a PhD degree is made up by workers who are foreign-born *and* received their STEM PhD degree in the United States (Figure 7).[36] If the number of foreign STEM PhD graduates during the entire period 2003-2023 had been reduced by one third, year after year on a continuing bases—but the retention of any given graduate had remained the same—then the number of foreign-born, US-graduate STEM workers in the United States by the end of that period would be mechanically reduced by one third of 34.6 percentage points of the overall number, or 11.5% of the current stock of high-skill STEM workers with a PhD.

---

[34] Jeremy Neufeld, "The 'Wage Level' Mirage," Institute for Progress, September 24, 2025 calculates that DHS's NPRM on a weighted lottery would have reduced the number of capped H-1B slots going to F-1 graduates each year by 7%. A large fee would only exacerbate this effect.

[35] Institute for Progress and NAFSA: Association of International Educators, "Surveys on International Talent Pipelines," September 15, 2025.

[36] Here we use data from the National Survey of College Graduates, whose sampling frame is respondent to the American Community Survey (ACS), to adjust the above ACS data on foreign-born STEM workers for country of degree. Figure 7 starts in the year 2003 rather than 2000 because 2003 is the year in which the National Survey of College Graduates was conducted that is closest to 2000.

*Figure 7: Immigrant prevalence US PhD STEM workers (stock), 2000 versus 2023*




We show the results of applying the same method to various degree categories in Table 1. The long-term impact of a continuing, year-after-year decline by one-third in the number of international STEM graduates over the past two decades mechanically implies a long-term reduction in the *total* number of employed high-skill STEM workers of 11.5% today, for PhD graduates specifically. It implies a 14.3% reduction in the *increase* of PhD STEM workers over the past two decades. Across all degrees collectively (bachelor's or higher), it implies a mechanical reduction of 6.2% in the number of employed STEM graduate workers today, and a 7.6% reduction to the increase in employed STEM workers over the past two decades. For workers with a master's as their highest degree, the same ongoing reduction in international graduates implies a long-term mechanical reduction of 9.4% in the overall number of employed STEM workers with a master's as their highest degree.

*Table 1: Long term impact scenario, 1/3 reduction in foreign STEM graduates*

| | Total employed | | Foreign-born, US deg. | | Impact: 1/3 reduction in foreign graduates | |
|---|---|---|---|---|---|---|
| | *2003* | *2023* | *2003* | *2023* | *Level* | *Growth* |
| STEM, all degrees | 3,730,767 | 7,837,989 | 532,311 | 1,464,701 | −6.2% | −7.6% |
| STEM master's | 1,049,766 | 2,339,946 | 225,688 | 659,446 | −9.4% | −11.2% |
| STEM PhD | 334,926 | 627,638 | 91,477 | 217,226 | −11.5% | −14.3% |

An alternative way to conceptualize the workforce impact of a one-third reduction in international student graduates is the immediate, short-term impact on US workforce entry by a single cohort of newly-graduated workers. The first stage of the graduation-to-workforce pathway in Figure 3 implies that 77.8% of new foreign STEM graduates from US universities, across all degree levels, directly enter the US workforce the year after graduation via OPT, H-1B, or a handful of minor nonimmigrant visa categories. Because foreign graduates are 20.9% of new graduates in STEM (Figure 2), this implies that a one-third reduction in foreign STEM graduates would reduce the size of the next year's cohort of new STEM workforce entrants by 1/3 × 0.209 × 0.778 = 5.4%.

Table 2 shows this impact for various degree levels. The same mechanical impact for STEM master's graduates implies a short-run reduction of 11.0% in the number of newly-graduated workers. For STEM PhD graduates, this short-term reduction is 11.5%.

***Table 2: Short term impact scenario, 1/3 reduction in foreign STEM graduates***

| | Foreign graduates, 2023 | Total US & for. graduates, 2023 | US retention of foreign grads, yr 1 | Short-term impact of 1/3 reduction |
|---|---|---|---|---|
| STEM, all degrees | 187,416 | 897,938 | 0.778 | –5.4% |
| STEM master's | 123,651 | 282,436 | 0.756 | –11.0% |
| STEM PhD | 16,905 | 38,794 | 0.794 | –11.5% |

### *Policy experiment: Eliminate Optional Practical Training*

OPT is the critical bridge between student status and the first rung of the "front door" talent pipeline. It buys employers up to three years (for STEM graduates) to test and mentor promising international graduates, and petition for H-1Bs or other statuses on their behalf if there is a good match. Terminating OPT would remove the only legal work authorization available to most F-1 graduates immediately after finishing their program. In the pipeline diagram, the elimination effectively seals off the direct F-1 → OPT → H-1B branch and forces all graduates to jump straight from F-1 to another status or, far more likely, to depart. Because the H-1B cap is saturated and adjudications occur months after graduation, the large majority of students who would have used OPT as a holding pattern while waiting on the lottery would now face a forced exit point instead of a gateway.

Figure 3 shows that 63.7% of new foreign STEM graduates on F-1 visas over the last five years pass through OPT, with most of those changing to another nonimmigrant employment visa (34.2% of the original graduates, or 53.7% of those who got OPT), and most of *those* staying long term. In other words, ***OPT is by far the largest part of the 'front door' pipeline that connects foreign STEM***

***graduates to the US workforce***, the pipeline that the large majority of those graduates (3 out of 4) rely on in order to remain in the country. Terminating OPT would cut off this conduit.

We can estimate the short- and long-term impacts quantitatively by the following method. Figure 3 shows that 14.1% of new foreign STEM graduates *without* OPT are able to continue in the front-door pipeline. Thus, although OPT facilitates that transition, even in the absence of OPT some graduates will be able to continue down the 'front door' pathway. Conservatively, suppose that terminating OPT cuts by half the number of students that would otherwise have continued in the pipeline via OPT. This scenario would imply that, even without OPT, the number of new STEM graduates entering the workforce would be 31.2%.[37] Comparing this to the 48.3% of STEM graduates across all degree levels who reach the third level of Figure 3 currently, this scenario implies a reduction of 35% in the number of foreign STEM graduates retained in the US workforce in the long term. This in turn, revisiting the method used in Table 1, implies a long-term reduction of 6–7% in the overall number of high-skill STEM workers in the US economy in the long term. This reduction would be larger if fewer than half of the new graduates who would have found a work visa sponsor and an available visa while on OPT are able to find these in the absence of OPT.

The short-term impact of OPT termination in this scenario would be larger. Immediately after graduation, with OPT as an option, 77.8% of STEM graduates at all degree levels enter the US workforce. In the absence of OPT, under the same assumption above that half of those who found a work visa while on OPT would have been able to find one in the absence of OPT, the immediate post-graduation workforce entry of the average STEM graduate would be, again, 31.2%.[38] That is, the number of new foreign STEM graduates entering the workforce immediately after graduation would fall by 59.9%. Because foreign graduates are 20.9% of all new STEM graduates (Figure 2), this would imply a mechanical reduction of 12.5% in the *total* number of new STEM graduates (foreign, resident, or native) entering the US workforce directly after graduation. Again, this shock would be larger if the fraction of workers who currently find a work visa via OPT, but would still be able to find one without OPT, is less than half.

There are at least two other important mechanisms by which eliminating OPT is expected to affect the high-skilled workforce which we think are important but will leave for future research. First, there is likely substitution within capped immigration categories. H-1B slots currently expected to be filled by F-1s may be filled with new people from abroad, mitigating the aggregate long-term effect on the workforce (though still contributing a short-term shock). That substitution is likely to reduce the average productivity of H-1Bs if not their number. Second, because OPT and US work authorization are part of the value proposition for students, a fuller model would incorporate enrollment feedback whereby fewer prospective students decide to come to the United States.

---

[37] Because 14.1% enter the pipeline without OPT currently, and the 63.7% who get OPT are assumed to proceed in the pipeline at half the current rate, thus 14.1 + (63.7 × (0.5 × (34.2/63.7))) = 31.2.
[38] (34.2 × 0.5) + 14.1.

## VI. Responses by other STEM workers

The above scenarios are mechanistic impacts. To interpret these as indicative of causal impacts requires assumptions that must be examined. One of the most important involves the possible reaction, in the face of a large reduction in international graduates from US universities, of immigration by foreign-educated foreign workers. A second involves the possible reaction by US students. Here we consider existing evidence on each.

### *Substitution by foreign-trained STEM workers*

If a portion of US-educated foreign workers disappear from the US workforce, to what degree will foreign-trained foreign workers substitute for them? In the 'front door' pipeline of Figure 3, this substitution could be substantial. The number of H-1B visas each year for initial employment in the private sector has been capped at 85,000 since 2005. The number of employment-based visas in the relevant categories has been capped at 120,120 since 1990. There is complexity to these caps: the H-1B cap does not apply to initial employment at nonprofit organizations or universities; the employment-based visa cap can vary from year to year with reallocations of unused family-reunification visas from prior years. But broadly speaking, there are binding constraints on the supply of H-1B nonimmigrant employment visas and Employment-Based immigrant visas for permanent residency for the large majority of foreign workers, whether educated in the United States or not. Thus it is possible in principle that reductions in the number of US-trained foreign STEM workers receiving these visas could cause an offsetting increase in the number of foreign-trained STEM workers receiving them.

But the experience of recent years is inconsistent with substitution of this kind. In 2008, the administration of George W. Bush extended OPT for STEM graduates from 12 months to 29 months.[39] The effect of this change was to greatly expand the number of foreign STEM graduates working in the United States on OPT: the number rose by a factor of six by 2019 relative to its level in 2007, before which it had not been rising (Figure 8, in solid red). This caused a large increase in the number of US-educated foreign STEM workers studying in the United States and seeking H-1B visas (Demirci 2019, Amuedo-Dorantes et al. 2023). The number of H-1B visas available to private sector employers was fixed at 85,000 in 2005 and did not rise thereafter. If the post-2008 rise in the number of STEM OPT workers represented (far) more workers competing for a fixed supply of visas, the probability that any given OPT worker changed status to a H-1B visa would naturally fall.

[39] 73 Fed. Reg. 18944 (April 8, 2008).

***Figure 8: STEM graduates on OPT and transitions to H-1B, pre-COVID***




Data from DHS SEVIS obtained by request under the Freedom of Information Act. The fraction changing to H-1B means the fraction that ever changed status from F-1 to H-1B in any subsequent year, not instantaneous transition rates.

But nothing of this kind occurred. The SEVIS data discussed above show that the rate of transition of STEM graduates from F-1 visas to H-1B visas *rose*, whether overall or conditional on OPT employment (Figure 8, in dashed green). The average rate of transition from F-1 to H-1B was higher on average in the pre-COVID years 2010–2019, when far more STEM OPT workers were seeking H-1B visas, than before OPT was extended in 2008. This is consistent with large numbers of foreign graduates pursuing uncapped H-1B visas outside the private sector in response to shifts in demand (Amuedo-Dorantes and Furtado 2019). It is inconsistent with a fixed supply of H-1B visas accessible to US-educated foreign STEM workers.

Nor did the very large expansion of US-educated foreign STEM graduates seeking H-1B visas result in a decline in the number of arrivals of new H-1B workers from abroad. Figure 9 shows the number of H-1B workers each year with an approved petition for initial employment, in each year, in orange ("All initial"). It shows the portion who did not change status in the United States but received their H-1B through consular processing overseas, in purple ("From abroad"). The latter is a good indicator of the number of H-1B workers arriving from abroad after training abroad, rather than starting employment in the United States after training in the United States. Figure 9 reveals dips in these arrivals as the Great Recession hit in 2009, and amidst tightened H-1B restrictions by the first Trump administration in 2018.

But there is little sign that foreign-educated foreign workers were crowded out. The number of arrivals of these primarily foreign-trained H-1B workers was not systematically *lower* in the years 2011–2017, when the number of OPT STEM workers in the United States was high (Figure 8), compared to the years before 2008. If the greatly expanded supply of US-educated OPT workers

were competing for a fixed supply of H-1B visas, we would expect that large expansion in demand for H-1B visas to cause an important reduction in the availability of those visas for foreign-trained workers. The evidence in Figure 9 is inconsistent with such competition being a major determinant of the supply of foreign-trained STEM workers competing for the same pipeline.

***Figure 9: New-arrival H-1B workers from abroad, pre-COVID years***




Data on total approved petitions for initial-employment H-1B visas, and the subset of approved petitions from abroad ('Aliens outside the US'), from US Citizenship and Immigration Services, *Characteristics of H-1B Specialty Occupation Workers, Report to Congress*, US Dept. of Homeland Security, various years.

Together, Figures 8 and 9 are inconsistent with the idea that the large expansion of foreign graduates entering the US workforce after 2008 substituted for foreign-trained workers. This evidence is indirectly inconsistent with the presumption that the reverse experiment—a large reduction in the supply of foreign graduates entering the US workforce—would be automatically substituted for by foreign-trained workers. This suggests that even the purely mechanical impact scenarios in the preceding section are informative. But this indirect evidence is not definitive and should be the subject of further inquiry.

### *Substitution by US natives and residents*

Another possibility would, in principle, complicate the interpretation of the impact scenarios above. It is possible in principle that a large reduction in the supply of US-educated foreign STEM workers cause an offsetting increase in the supply of STEM graduates among US natives and residents. This can be tested empirically: If declines in the supply of international students tend to 'crowd in' US students, we should observe rises in the supply of international students to 'crowd out' US students.

A large research literature has investigated this possibility. It has found no evidence that international students systematically crowd out US students at the national level (Borjas 2007,

Jackson 2015, Shen 2016). Ransom and Winters (2021) find the same for STEM students in particular in the 1990s, on average across all Americans, confirmed by Orrenius and Zavodny (2015), in spite of some heterogeneous effects for specific subgroups of the population.

In fact, positive shocks to foreign student enrollment due to a *force majeure* cause general increases in native student enrollment, in part because revenue from foreign student tuition allows universities to expand programs available to native students (Shih 2017, Bound et al. 2020). Increases in the foreign STEM workforce of US cities leads to greater specialization of native workers in socially-intensive tasks within occupations, but does not reduce their supply of STEM tasks (Lin 2019). In other words, the prevalence of foreign STEM workers, including the US-trained, causes US workers to adjust the task content of occupations in ways that create greater complementarity with foreign workers—offsetting competition that might have dissuaded natives from studying STEM fields. This is likely why the 2008 expansion of OPT caused an *increase* in the wages of exposed native STEM workers overall (Demirci 2020, *Appendix*)—that is, it increased the incentive of US students to study STEM fields.

A limited set of studies have found crowd-out of native STEM students by immigrant STEM students, exclusively at the leading and most selective elite research universities where slots are rationed by design (Borjas 2007, Shen 2016, Anelli et al. 2023). Such an effect arises mechanically for any resource whose supply is fixed in the short term, such as the number of seats available for a freshman mathematics course at Yale University: a rise in the prevalence of students in any group tautologically requires a decline in the number of students in any other group. But the number of slots in university courses in general, or STEM courses in particular, is not fixed at the national level (Jackson 2015). Figure 2 vividly illustrates this: the supply of US higher education in STEM has skyrocketed along with demand in recent decades. Findings that slots at elite colleges are fixed in the short run is not informative about whether slots in STEM training are fixed at the national level, even in the short run, and are thus not informative about generalized crowding out or crowding in of native STEM students by foreign STEM students.

In short, the evidence we have does not suggest that foreign STEM students at US universities are competing with natives for a fixed number of classroom slots before they graduate, or competing with foreign-education foreign workers for a fixed number of work permits after they graduate—to first order. Beyond this, the section to follow will discuss evidence in the literature of a range of effects of foreign students on US productivity, innovation, entrepreneurship, and economic growth. If foreign STEM students were anywhere near perfect substitutes for native STEM students, we would not observe substantial effects of that kind. In such a scenario, foreign STEM students and workers would simply take the place of natives, leaving economic outcomes unchanged. As we discuss below, the evidence on broader economic impacts of foreign STEM students and workers is inconsistent with that conjecture. Increases in the supply of foreign STEM students, at the national level, act as complements for native students at least as much as they are substitutes. This too suggests that the simple, mechanical impact scenarios in the preceding sections—which abstract

from the possibility that slashing foreign STEM graduations at US universities would substantially crowd in native STEM enrollment—are nevertheless informative about real-world impacts.

## VII. Effects on US growth and productivity

The research literature contains very extensive evidence—consensus would not be too strong a word—that high-skill immigration causes large increases in productivity and economic growth in the United States. These effects are largest for immigrants with STEM training. The increase in US city-level productivity caused by inflows of foreign STEM workers from 1990 to 2010 is sufficient in magnitude to explain between 30 and 50% of *all* aggregate productivity growth in the United States during that period (Peri et al. 2015). The leading economists who consider all available policy levers to raise productivity in the United States conclude that the single lever with the greatest impact on productivity—demonstrated by the most conclusive evidence—is policy to encourage high-skill immigration (Bloom et al. 2019).

A very large and essentially uncontested body of research finds that these positive effects on productivity and growth arise from high-skill STEM immigrants' effects on new business formation, scientific discovery, and the patenting of new economic ideas.

Increases in foreign master's graduates driven by an unrelated *force majeure* cause more entrepreneurship in exposed regions, including by US natives (Beine et al. 2024). High skill workers who entered the United States on student visas have much larger rates of patenting, publishing, earning, and entrepreneurship than otherwise comparable natives (Hunt 2011); foreign STEM PhD students report greater preference for entrepreneurship than their US native colleagues (Roach et al. 2019). Historical increases in barriers against skilled immigration caused reduced scientific productivity in the US as a whole (Moser et al. 2014, 2025). Increases in foreign STEM PhD student inflows to the United States driven by unrelated shocks overseas cause increased innovation and discovery in US academic departments (Stuen et al. 2012, Gaulé and Piacentini 2013).

It is generally recognized that many highly educated immigrants increase innovation with their own new ideas. But beyond this, high-skill immigrants cause innovation *by natives*. Beine et al. (2024) find that roughly one third of the positive effect of foreign master's graduates on US entrepreneurship arises from business creates by natives. Bernstein et al. (2022) find that immigrant inventors cause their native colleagues to patent more new ideas. In other words, high-skill immigrants not only bring their own innovative talents, but also make entire firms and even regions more innovative. Increases in foreign STEM worker prevalence cause increased patenting in US cities (Kerr and Lincoln 2010, Winters 2014), increased entrepreneurship in US regions (Tareque et al. 2024), and at US firms, increased employment of high-skill native workers (Kerr et al. 2015), product innovation (Khanna and Lee 2019), and entrepreneurial success (Dimmock et al. 2022). The effect of university-educated immigrant inflows on innovation is large enough to raise United States GDP by 1.4 to 2.4 percentage points over a decade (Hunt and Gauthier-Loiselle 2010). All of this evidence points to a comparative advantage in STEM occupations for highly educated

foreign workers, for reasons including language ability and the tacit knowledge of natives for socially-intensive tasks at work (Hanson and Slaughter 2017). This specialization is an emergent feature of groups that include both immigrants and natives, rather than a trait embodied in one or the other.

Because high-skill immigrants spark new activity and productivity for entire firms, cities, and regions, it may not be surprising that their arrival causes increases in the demand for low-skill workers as well. High-skill STEM immigrant inflows cause increases in the employment (Kemeny and Osman 2018) and wages (Peri et al. 2015) of native workers without a high school degree—the same positive effects on less-skilled workers that arise from concentrations of high-skill workers in general (Winters 2013).

This literature collectively suggests that a substantial reduction in the supply of foreign talent to the US workforce will have large, negative, and lasting effects on productivity and economic growth in the United States. We can approximate the magnitude of those effects using the productivity effects estimated by Peri et al. (2015), who estimate the elasticity of annual growth in Total Factor Productivity (TFP) to the share of the workforce comprising high-skill foreign STEM workers. They estimate an increase of 0.27–0.54 percentage points in annual TFP growth caused by each percentage point increase in high-skill immigrant STEM workers as a fraction of the overall labor force.

We can use this estimate to consider the overall economic growth impact implied by the impact scenarios from Table 1. There, an ongoing reduction of one third in the number of foreign STEM graduates from US universities reduces the supply of high-skill STEM workers in the United States by 6.2%. Because the 8 million high-skill STEM workers overall represent 4.7% of the US labor force, the 6.2% reduction in high-skill foreign STEM workers equates to a 0.29 percentage-point change in high-skill STEM workers as a fraction of the labor force.

The Peri et al. elasticity thus implies a reduction of 0.079–0.158 percentage points in annual TFP growth, arising from ongoing reduction of one third in the number of high skill foreign graduates from US universities. This is comparable in magnitude to the independent estimates of Hunt and Gauthier-Loiselle (2010), which together with the effects jointly implied by Kerr and Lincoln (2010) and Peri et al. (2015), represent the best available evidence on the macroeconomic effects of high-skill foreign STEM workers' presence in the economy.

This is a very large impact, which cumulates over time. Over a ten-year period, lost productivity growth of 0.079–0.158 percentage points each year causes GDP at the end of that decade to be 0.79 to 1.57 percent smaller than it otherwise would have been. This is a percent decline in annual GDP, *not* a percentage-point decline in annual *growth* of GDP. That reduction in GDP equates in size to the loss the US economy would suffer from the *disappearance* of the entire economy of South Carolina (about 1.2% of national GDP), or Utah (1.0% of national GDP), or Wisconsin (1.5% of national GDP).

If such a loss occurred today, amid the United States's $30.4 trillion economy, it would be valued at $240–481 billion.[40] That is, this would be the loss to today's US economy if the stock of high-skill foreign STEM workers had been 6.2% lower, in each of the past 10 years, than it actually was—the loss that would have arisen from a longtime reduction of one third in the number of foreign STEM students graduating from US universities.

## VIII. Conclusion

The challenges facing America's high-skill immigration system will be extensive with consequences far beyond elite coastal enclaves. The impacts ripple through innovation clusters nationwide, threatening not just individual institutions but entire regional economies built around science, technology, and higher education. While Silicon Valley and Boston capture imaginations, the dependence on international talent spans the American map. The South's growing technology corridors—from North Carolina's Research Triangle to Texas's emerging tech centers—depend on international talent pipelines to compete globally. Even smaller metropolitan areas like Rochester, New York, or Madison, Wisconsin, have built innovation economies around universities that attract significant international student populations.

The Global Innovation Index identifies 23 U.S. clusters among the world's top 100 science and technology clusters, demonstrating the geographic diversity of American innovation. These clusters span from San Jose-San Francisco and Boston-Cambridge to Austin, Cincinnati, Denver-Boulder, Pittsburgh, and Raleigh-Durham. Each relies heavily on the international student pipeline to maintain their competitive edge. About 23% of international students who earn a master's degree remain in the United States after graduation to work in the same state as the university they attended. This retention creates regional clusters of expertise that support both established companies and startup formation. But retention varies widely by geography. Between 2012 and 2020, the Mid-Atlantic lost more than 100,000 foreign-born bachelor's graduates, 180,000 foreign-born master's graduates, and 10,000 foreign-born PhDs, including migration to other regions. The Northeast does even worse at retention. Meanwhile, the West Coast does best of all, but the Midwest and South significantly outperform the Northeast and Mid-Atlantic.

Informed policy-making also requires better information. The U.S. lacks comprehensive data on immigration flows, transitions, retention rates, and economic impacts at regional levels. Improved tracking would enable evidence-based policymaking. Our estimates are a start based on information that exists, but better data would allow more accurate and granular estimates of flows (and their characteristics) throughout the entire immigration system.

Complete administrative data detailing status-to-status transition rates should be made regularly available. Detailed surveys of new immigrants like the New Immigrant Survey. Existing surveys like the NCSES surveys that provide rich information on STEM graduates and workforce need to be

---

[40] In the most recent data available at the time of writing, the GDP of the United States in fiscal 2025Q2 was $30.35 trillion: U.S. Bureau of Economic Analysis, Gross Domestic Product[GDP], retrieved from FRED, Federal Reserve Bank of St. Louis, September 18, 2025, available at https://fred.stlouisfed.org/series/GDP.

strengthened to help researchers, policy makers, and social scientists better understand stay rates. This can be accomplished by providing data on nonresponse rates, adding questions related to emigration, and resolving ambiguities in existing immigration-related questions.

Current system dysfunction creates a dangerous feedback loop. As wait times grow and uncertainty increases, fewer top candidates choose the United States as their preferred destination. Meanwhile, other countries modernize their systems and actively recruit the talent America is losing.

US universities are the primary conduit for attracting high-skilled STEM talent to the United States. If current policy measures to deter foreign students from coming to the United States succeed, they will leave a large and lasting hole in the high-skill STEM workforce, in the national capacity to innovate, and in the prosperity of future generations.

**References**

Amornsiripanitch, Natee, Paul A. Gompers, George Hu, and Kaushik Vasudevan. "Getting schooled: Universities and VC-backed immigrant entrepreneurs." *Research Policy* 52, no. 7 (2023): 104782.

Amuedo-Dorantes, Catalina, Kevin Shih, and Huanan Xu. "The implications of optional practical training reforms on international student enrollments and quality." *Economic Inquiry* 61, no. 2 (2023): 253-281.

Amuedo-Dorantes, Catalina, and Delia Furtado. "Settling for Academia?: H-1B visas and the career choices of international students in the United States." *Journal of Human Resources* 54, no. 2 (2019): 401-429.

Anelli, Massimo, Kevin Shih, and Kevin Williams. "Foreign students in college and the supply of STEM graduates." *Journal of Labor Economics* 41, no. 2 (2023): 511-563.

Beine, Michel, Giovanni Peri, and Morgan Raux. "The Contribution of Foreign Master's Students to US Start-Ups." No. w33314. National Bureau of Economic Research, 2024.

Bernstein, Shai, Rebecca Diamond, Abhisit Jiranaphawiboon, Timothy McQuade, and Beatriz Pousada. The contribution of high-skilled immigrants to innovation in the United States. No. w30797. National Bureau of Economic Research, 2022.

Bloom, Nicholas, John Van Reenen, and Heidi Williams. 2019. "A Toolkit of Policies to Promote Innovation." *Journal of Economic Perspectives* 33 (3): 163–84. DOI: 10.1257/jep.33.3.163

Borjas, G. (2007). "Do foreign students crowd out native students from graduate programs?", in (P. Stephan and G. Ehrenberg, eds.), *Science and the University*, pp. 134–49, Madison: University of Wisconsin Press.

Bound, John, Breno Braga, Gaurav Khanna, and Sarah Turner. "A passage to America: University funding and international students." *American Economic Journal: Economic Policy* 12, no. 1 (2020): 97-126.

Bound, John, Breno Braga, Gaurav Khanna, and Sarah Turner. "The globalization of postsecondary education: The role of international students in the US higher education system." *Journal of Economic Perspectives* 35, no. 1 (2021): 163-184.

Corrigan, Jack, James Dunham, and Remco Zwetsloot. "The long-term stay rates of international STEM PhD graduates." Center for Security and Emerging Technology. (2022).

Demirci, Murat. "Transition of international science, technology, engineering, and mathematics students to the US labor market: The role of visa policy." *Economic Inquiry* 57, no. 3 (2019): 1367-1391.

Demirci, Murat. "International students and labour market outcomes of US-born workers." *Canadian Journal of Economics/Revue canadienne d'économique* 53, no. 4 (2020): 1495-1522.

Dimmock, Stephen G., Jiekun Huang, and Scott J. Weisbenner. "Give me your tired, your poor, your high-skilled labor: H-1B lottery outcomes and entrepreneurial success." *Management Science* 68, no. 9 (2022): 6950-6970.

Ganguli, Ina and Megan MacGarvie, "International Students, Immigration Policies and Implications for Innovation", Working Paper 34212, Cambridge, MA: National Bureau of Economic Research (2025).

Gaulé, Patrick, and Mario Piacentini. "Chinese graduate students and US scientific productivity." *Review of Economics and Statistics* 95, no. 2 (2013): 698-701.

Glennon, Britta. "Skilled immigrants, firms, and the global geography of innovation." *Journal of Economic Perspectives* 38, no. 1 (2024): 3-26.

Hanson, Gordon H., and Matthew J. Slaughter. "High-skilled immigration and the rise of STEM occupations in US employment." In *Education, skills, and technical change: Implications for future US GDP Growth*, pp. 465-494. University of Chicago Press, 2017.

Hunt, Jennifer. "Which immigrants are most innovative and entrepreneurial? Distinctions by entry visa." *Journal of Labor Economics* 29, no. 3 (2011): 417-457.

Hunt, Jennifer, and Marjolaine Gauthier-Loiselle. "How much does immigration boost innovation?." *American Economic Journal: Macroeconomics* 2, no. 2 (2010): 31-56.

Jackson, Osborne. "Does Immigration Crowd Natives into or out of Higher Education? Working Papers. No. 15-18." Federal Reserve Bank of Boston (2015).

Jacobs, Elizabeth M. "Greener pastures: why Indian international students leave the US labor market." *Journal of Ethnic and Migration Studies* 51, no. 5 (2025): 1346-1370.

Jaravel, Xavier, Neviana Petkova, and Alex Bell. "Team-specific capital and innovation." *American Economic Review* 108, no. 4-5 (2018): 1034-1073.

Kemeny, Tom, and Taner Osman. "The wider impacts of high-technology employment: Evidence from US cities." *Research Policy* 47, no. 9 (2018): 1729-1740.

Kerr, William R., and William F. Lincoln. "The supply side of innovation: H-1B visa reforms and US ethnic invention." *Journal of Labor Economics* 28, no. 3 (2010): 473-508.

Kerr, Sari Pekkala, William R. Kerr, and William F. Lincoln. "Skilled immigration and the employment structures of US firms." *Journal of Labor Economics* 33, no. S1 (2015): S147-S186.

Khanna, Gaurav, and Munseob Lee. "High-skill immigration, innovation, and creative destruction." In *The roles of immigrants and foreign students in US science, innovation, and entrepreneurship*, pp. 73-98. University of Chicago Press, 2019.

Lin, Gary C. "High-skilled immigration and native task specialization in US cities." *Regional Science and Urban Economics* 77 (2019): 289-305.

Moser, Petra, Alessandra Voena, and Fabian Waldinger. "German Jewish émigrés and US invention." *American Economic Review* 104, no. 10 (2014): 3222-3255.

Moser, Petra, Sahar Parsa, and Shmuel San. "Immigration and Innovation: Lessons from the Quota Acts." (2025). Working paper, Dept. of Economics. New York University.

Mukhopadhyay, Sankar, and David Oxborrow. "The value of an employment-based green card." *Demography* 49, no. 1 (2012): 219-237.

NCSES, National Center for Science and Engineering Statistics. 2025. "Most U.S.-Trained Science and Engineering Doctorate Recipients on Temporary Visas Remain in the United States." NSF 25-325. National Science Foundation. Available at https://ncses.nsf.gov/pubs/nsf25325.

NSB, National Science Board, National Science Foundation. 2024. Science and Engineering Indicators 2024: The State of U.S. Science and Engineering. NSB-2024-3. Available at https://ncses.nsf.gov/pubs/nsb20243.

NSF, "The STEM Labor Force: Scientists, Engineers, and Skilled Technical Workers", NSB-2024-5, *Science and Engineering Indicators 2024,* Washington, DC: National Science Foundation.

Orefice, Gianluca, Anna Maria Mayda, and Gianluca Santoni. Skilled Immigration, Task Allocation and the Innovation of Firms. No. 17662. CEPR Discussion Papers, 2022.

Orrenius, Pia M., and Madeline Zavodny. "Does immigration affect whether US natives major in science and engineering?." *Journal of Labor Economics* 33, no. S1 (2015): S79-S108.

Peri, Giovanni, Kevin Shih, and Chad Sparber. "STEM workers, H-1B visas, and productivity in US cities." *Journal of Labor Economics* 33, no. S1 (2015): S225-S255.

Ransom, Tyler, and John V. Winters. "Do foreigners crowd natives out of STEM Degrees and occupations? Evidence from the US Immigration Act of 1990." *ILR Review* 74, no. 2 (2021): 321-351.

Roach, Michael, Henry Sauermann, and John Skrentny. "Are foreign STEM PhDs more entrepreneurial? Entrepreneurial characteristics, preferences, and employment outcomes of native and foreign science and engineering PhD students." In *The Roles of Immigrants and Foreign Students in US Science, Innovation, and Entrepreneurship*, pp. 207-228. University of Chicago Press, 2019.

Ruggles, Steven, Sarah Flood, Matthew Sobek, Daniel Backman, Grace Cooper, Julia A. Rivera Drew, Stephanie Richards, Renae Rodgers, Jonathan Schroeder, and Kari C.W. Williams. *IPUMS USA: Version 16.0* [dataset]. Minneapolis, MN: IPUMS, 2025. Available at: https://doi.org/10.18128/D010.V16.0

Shen, Ying (2016), "The impacts of the influx of new foreign undergraduate students on US higher education" Working Paper, University of Notre Dame.

Shih, Kevin. "Do international students crowd-out or cross-subsidize Americans in higher education?." *Journal of Public Economics* 156 (2017): 170-184.

Stuen, Eric T., Ahmed Mushfiq Mobarak, and Keith E. Maskus. "Skilled immigration and innovation: evidence from enrolment fluctuations in US doctoral programmes." *Economic Journal* 122, no. 565 (2012): 1143-1176.

Tareque, Inara S., Jorge Guzman, and Dan Wang. "High-skilled immigration enhances regional entrepreneurship." *Proceedings of the National Academy of Sciences* 121, no. 37 (2024): e2402001121.

Winters, John V. "Human capital externalities and employment differences across metropolitan areas of the USA." *Journal of Economic Geography* 13, no. 5 (2013): 799-822.

Winters, John. "Foreign and Native-Born STEM Graduates and Innovation Intensity in the United States." No. 8575. Institute of Labor Economics (IZA), 2014.

# EXHIBIT 3

Yale OFFICE OF THE SENIOR VICE PRESIDENT AND GENERAL COUNSEL

PO Box 208255
New Haven CT 06520-8255
T 203 432-4949
F 203 432-7960

*courier*
Whitney Grove Square
2 Whitney Avenue, 6th Floor
New Haven CT 06510

September 29, 2025

Todd M. Lyons
Acting Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536

**Reference: DHS Docket No. ICEB-2025-0001**

Dear Acting Director Lyons,

On behalf of Yale University, I submit this comment letter in response to the U.S. Department of Homeland Security's (DHS) proposed rule, "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media" (DHS Docket No. ICEB-2025-0001), published August 28, 2025. The proposed rule aims to end the "duration of status" for F and J visa holders, establishing a maximum four-year admission period, with the stated aim of enhancing oversight and national security. However, existing systems already effectively track F and J nonimmigrants, making this change unnecessary. The proposed rule would set a maximum authorized period of stay that is more than three years shorter than the median time to degree for doctoral students and thus would require virtually every international doctoral student to seek permission to stay in the country and complete the degree. The proposed rule would thus shift responsibility for assessing students' academic progress from universities to U.S. Citizenship and Immigration Services (USCIS), when universities are already closely evaluating and monitoring educational progress and productivity for programs of study and research. This policy would create uncertainty about whether students will be able to complete their degrees and would have the effect of discouraging international students from studying in the United States.

We strongly urge DHS to maintain the longstanding "duration of status" framework for F and J visa categories and withdraw the proposed rule. Our rationale and specific negative impacts of the proposed rule are discussed in greater detail below.

**The proposed rule would disrupt orderly completion of degrees.**

The current duration of status policy provides flexibility in the period of admission, which accommodates the fact that the length of time students spend completing a degree is variable. The National Center for Education Statistics reports the median time to completing a bachelor's

degree among all students is 52 months.[1] According to the Survey of Earned Doctorates, in 2024 the median time to complete a PhD for all fields was 7.3 years from the start of graduate school.[2] The current policy allows international students to enroll at a college or university with the confidence that they have permission to remain in the country for the time required to complete the degree. That makes sense – a visa policy for international students should be designed to facilitate the orderly completion of a degree, which is the reason for their admission to the country.

Allowing a maximum stay of only four years would require virtually every international student seeking a PhD to seek an extension of stay when the student is in the midst of completing the research required to write a dissertation and earn the doctorate. This requirement would be disruptive to their study and create uncertainty for the students.

The NPRM claims that the rule changes will have a limited impact, affecting only those who need extra time in their programs or English as a Second Language courses, and suggests that eligible students should face little difficulty obtaining extension of stay approvals. However, the proposed rule simultaneously grants discretionary power to DHS adjudicators; thus, even when students and researchers meet all academic requirements, there is no guarantee that their application for an extension of stay will be approved. The NPRM explicitly replaces mandatory language ("shall") with discretionary language ("may"), thereby increasing uncertainty and placing a burden on those students whose research or studies do not adhere to fixed timelines.

Moreover, DHS is already facing a historic backlog of 11.3 million pending cases.[3] The proposed rule would introduce further delays, as DHS' Regulatory Impact Analysis estimates that eliminating duration-of-status would produce an annual average of 414,000 extension-of-stay requests across F, J, and I nonimmigrant classes (205,000 F; 203,000 J; 6,000 I). Thus, international students might face protracted delays in securing DHS approval of the extension of stay requests needed to complete their education.
The proposed rule would create uncertainty for every admitted PhD student about whether the student will be permitted to stay in the country long enough to complete the degree. It would make higher education, especially doctoral education, in the United States inherently less attractive for international students.

**SEVP and SEVIS are robust programs that provide ample oversight.**
F and J visa holders are the most monitored of any visa category, setting them apart from all other visa classifications. The Department of Homeland Security (DHS) already has a robust data collection tool in the existing Student and Exchange Visitor Information System (SEVIS), through which colleges and universities are required to provide continuous updates. Designated School Officials (PDSOs/DSOs) and Responsible Officers (ROs/AROs) who oversee

---

[1] https://nces.ed.gov/fastfacts/display.asp?id=569
[2] https://ncses.nsf.gov/surveys/earned-doctorates/2024#data, Table 1-12.
[3] Rayna Wachs, *USCIS Q2 Data: Backlogs Hit Record High as EB-1A Growth Slows, Processing Times Surge*, Boundless (July 24, 2025), available at https://www.boundless.com/blog/uscis-q2-fy2025-data/.

them undergo rigorous background checks and training, making them experts in maintaining visa status. Educational institutions are required to report on the progress of all F-1 students and any material changes within 21 days, with similar requirements for J-1 visitors. Robust oversight is provided through federally mandated SEVIS reporting, recertification, redesignation with the Department of State, and annual Student and Exchange Visitor Program (SEVP) Field Representative site visits.

The combination of SEVP and the network of trained and certified campus officials provides a reliable and trusted capacity to verify that international students are in compliance with federal immigration laws. These systems evolved during the growth of international student enrollments in the past few decades, and they already operate at the appropriate scale. They also relieve DHS of the need to increase its own staff, reducing expenses for the taxpayer.

**The proposal would increase DHS's workload.**
The preamble states that the government adopted duration of status in 1978 due to "the large number of nonimmigrant students in the United States at the time and the need to process their EOS applications continually." It goes on to say that "Legacy INS explained the changes would facilitate the admission of nonimmigrant students, provide dollar and manpower savings to the Government, and permit more efficient use of resources." According to Open Doors Enrollment Trends, there were over 1.1 million international students enrolled in 2023-24, nearly three times the 400,000 international students who were enrolled in 1978-79. DHS does not sufficiently address the cost of hiring and training additional officers to facilitate the substantial surge of extension of stay filings that would stem from the elimination of duration of stay.

**The proposed rule would give DHS a direct role in assessing students' academic progress.**
American universities are subject to rigorous accreditation processes and are responsible for maintaining academic integrity and quality. Academic progress, particularly at graduate level, is assessed on the basis of an individual student's achievement. Each year, students are required to demonstrate specific standards of academic progress to remain in the PhD program, including coursework grades, qualifying exams, a thesis prospectus, dissertation progress reports, dissertation drafts, and a dissertation defense. J-1 researchers face equally complex, discipline-specific timelines shaped by peer review cycles, lab experiment outcomes, grant delays, and external dependencies that vary significantly and cannot be uniformly regulated.

USCIS does not have the expertise or the capacity to undertake such evaluations of student academic progress when determining if a "compelling academic reason" exists to grant an extension of stay, and such academic evaluations are not appropriate for the federal government.

Therefore, academic progress should be evaluated by academic institutions, represented by their faculty, advisors, deans, and principal investigators, who are best positioned to assess the progress of students and scholars and uphold academic standards. DHS has deftly decentralized administration to local college and university staff with extensive knowledge of curriculum and

local resources. They are in the best position to gather information about student academic progress and ensure students' compliance with pertinent immigration laws. The proposed rule would instead centralize oversight of students in DHS, at considerable cost to the government, and give DHS an inappropriate role in assessing student performance.

**Visa overstays are infrequent.**

DHS cites concerns about national security and visa fraud but has not explained how existing resources fail to address these concerns. In fact, the current systemic risk remains low. F-1 and J-1 holders undergo background checks and are monitored through SEVIS in real time. In addition, the suspected overstay rate is low, at 2.45 percent out of the 1,412,627 students and exchange visitors (F, J, and M visas) scheduled to complete their program in the United States in 2024.[4] Most overstays are particular to countries with small numbers of nonimmigrants in the U.S. or unique geopolitical challenges and are not reflective of a systemic risk. According to the Open Doors data, the top 20 countries of origin for students account for over 81% of international students in the U.S., and most of them have very low overstay rates.[5] Therefore, current measures provide a high degree of security without disrupting education.

**The proposed rule would discourage international students from studying in the U.S.**

The proposed rule would create uncertainty and discourage international students from enrolling in American colleges and universities. The preamble states that 79% of international students are enrolled in 2- or 4-year programs of study, suggesting that the rule would impact a relatively small proportion of international graduate students. However, large research universities, which are the driving force behind American innovation, have a higher percentage of PhD students in programs that are at least six years in length. For example, 35 percent of Yale international students are at the PhD level. Thus, DHS' rationale for the proposed rule underestimates the impact on PhD programs at research universities.

Even under the assumption that only 21% of international students participate in programs requiring six years for a degree, the proposed rule would impact approximately 214,824 doctoral students nationally. These students represent a deep pool of talent that contributes to American leadership in science and technology, and they are also potential entrepreneurs and future employees of American companies. By imposing such a heavy burden on international PhD students to file multiple extension of stay applications, the proposed rule will discourage international students from seeking doctoral training in the U.S., forcing leading research universities to select trainees from a smaller pool of candidates. This would undermine America's position as the preeminent destination for international graduate students, and, more importantly, undercut our national leadership in science and technology, to the benefit of competitor nations.

---

[4] U.S. Customs and Border Protection, *Entry/Exit Overstay Report: Fiscal Year 2024 Report to Congress* (July 16, 2025), available at https://www.dhs.gov/sites/default/files/2025-09/25_0912_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.

[5] Institute of International Education, *Open Doors: Fast Facts 2024*, available at https://opendoorsdata.org/fact_sheets/fast-facts/.

**The proposal would diminish national capacity for innovation.**
Any proposal that diminishes the talent pool from which research universities recruit students (some of whom will become faculty) will have ripple effects over the long term on the U.S. economy, health and well-being of Americans, and national security. University research is the foundation for some of the most influential technologies that have emerged in recent decades:

- Recombinant DNA techniques, the foundation of the biotechnology industry (Nobel Prize in Chemistry, 1980).
- The field of behavioral economics, which expanded the understanding of economic decision-making (Nobel Prize in Economics, 2017).
- Lithium-ion batteries (Nobel Prize in Chemistry, 2019).
- Gene editing, which is now being applied in clinical trials of therapies for muscular dystrophy, lung cancer, and other conditions (Nobel Prize in Chemistry, 2020).
- Artificial neural networks, which are the foundation of machine learning and artificial intelligence models (Nobel Prize in Physics, 2024).

International students who studied – and stayed – in the U.S. are prominent contributors to innovation. In 2024, about 41% of patents had at least one foreign-born, U.S.-based inventor. In 2014, the number was approximately 34%, representing a 20% increase over the past decade. More than half of these foreign-born inventors in the U.S. went to school in the U.S.[6] International students and researchers who make the transition to immigrant status further contribute their talents to the U.S. economy through entrepreneurship. 35% of all new firms have at least one immigrant co-founder. In comparison, more than 20% of America's billion-dollar start-ups have at least one immigrant founder who came to the U.S. as an international student.[7] Numerous former international students have launched highly successful startups in critical fields, including AI, biotechnology, computing, and engineering. Notable examples include WhatsApp (Jan Koum), Tesla and SpaceX (Elon Musk), and Google (Sundar Pichai), all of which have created substantial employment opportunities in the United States.

The U.S. also leads the world in Nobel Prizes, with many laureates having begun their academic journeys as international students or scholars at American institutions. Approximately 44% of immigrant Nobel Laureates in academic disciplines attended U.S. institutions for their highest educational degree.[8] Within Connecticut, scientists who immigrated to the U.S. have started and led numerous successful bioscience startups. Students and scholars in the F and J visa categories, therefore, play an indispensable role in the conduct of our nation's research and

---

[6] Stephanie Hao, *Foreign-Born Talent Supercharges American Innovation: How Immigrant Inventors Are Key to US Patenting*, Revelio Labs (July 8, 2025), available at https://www.reveliolabs.com/news/tech/foreign-born-talent-supercharges-american-innovation/.
[7] S.P. Kerr & W.R. Kerr, *Immigrants Play a Disproportionate Role in American Entrepreneurship*, Harvard Business Review (Oct. 3, 2016), available at https://hbr.org/2016/10/immigrants-play-a-disproportionate-role-in-american-entrepreneurship.
[8] Sandip K. Sureka & James C. Witte, *Immigrant Nobel Laureates: U.S. Higher Education Infrastructure in a Global Context*, Institute for Immigration Research, George Mason Univ. (Dec. 2024), available at https://iir.gmu.edu/publications/nobelprize.

development (R&D) activities. Additionally, international students and researchers bolster U.S. diplomacy and global influence. Their positive experiences in the U.S. foster global collaboration, goodwill, and strengthen America's international reputation.

America's leadership in science and technology rests in part on a steady and reliable flow of international talent; removing explicit guarantees for extensions of stay threatens this vital pipeline. Meanwhile, countries such as the UK, Canada, Australia, New Zealand, France, Germany, Japan, and South Korea are adopting more welcoming policies for international students, including easier post-study work options, which may attract talent away from the U.S.

**Limits on work authorization will affect teaching and research.**
Limiting doctoral program admissions to four years would disrupt graduate and undergraduate education, as well as research at American universities. Learning to teach and to evaluate student work is a fundamental part of doctoral education at Yale. Yale doctoral students develop their teaching and research skills under the guidance of faculty and play a vital role in Yale's research enterprise, conducting dissertation work and serving as research assistants on other projects. These teaching and research assignments qualify as on-campus employment. The proposed rule would provide an automatic 240 day extension when a student requests an extension of stay, but resolution of extension of stay requests has taken longer than eight months. Requiring students to file an extension of stay and limiting on-campus employment authorization extension to 240 days, while USCIS adjudication historically takes significantly longer, would be catastrophic as students could lose their authorization to work. Losing work authorization would prevent doctoral students from teaching, undermining both their own professional development and the education of undergraduates. Interruptions in research would disrupt ongoing projects and delay scientific discoveries critical to the U.S.' advancement and national interest.

**The proposal creates barriers for use of OPT.**
The proposed rule would also create additional barriers and difficulties for international students seeking practical training (F-1 OPT/STEM OPT and J-1 AT). The proposed addition of an extension of stay application as a requirement for F-1 OPT/STEM OPT or J-1 AT applicants is unnecessary because all practical training applications are already reviewed for eligibility using Form I-765 (Application for Employment Authorization), including maintenance of immigration status, before being approved by USCIS. Adding an extension of stay application, with biometrics and the possibility of an interview, is duplicative. Furthermore, requiring a separate extension of stay application would cause students to incur additional fees and likely lead to adjudication delays, making the process of engaging in practical training more burdensome. For Yale students, the biometrics requirement would necessitate travel to the nearest USCIS Application Support Center, 40 miles away from campus in East Hartford, CT. It would take 4-5 hours round-trip using public transportation. The potential for additional delays is also impractical for many professions that have fixed start dates for training. For example, medical residencies begin on or around July 1 and cannot be postponed. Medical residents would not be allowed to participate in clinical care in the event of a delay in adjudicating extension of stay. In addition, the Department's proposal to reduce the F-1 grace period from 60 days to 30 days

would have a direct and deleterious effect on both students and U.S. employers. Under current regulations, F-1 students may apply for post-completion Optional Practical Training (OPT) up to 90 days before program completion and within 60 days thereafter. This window provides critical flexibility: students who do not apply before graduation retain two months to file applications, resolve Requests for Evidence, or coordinate start dates with prospective employers. By contrast, a 30 day grace period substantially reduces this buffer and reduces such flexibility.

**The proposal does not address the impact on EOS adjudication procedures at ports of entry.**
In addition, the rule is unclear regarding extension of stay adjudication procedures and handling of port of entry admissions. It does not clarify if travel and re-entry would be an alternative to filing an extension of stay. This ambiguity creates uncertainty for students, institutions, and adjudicating officers. Training needs for Customs and Border Protection officers are also unaddressed, which could potentially overwhelm ports and divert attention from genuine security threats.

**The proposal raises issues for J Visas.**
Furthermore, by consolidating DHS authority over the J visa program, which is more appropriately under the jurisdiction of Department of State, the proposed rule disregards significant differences between the two SEVIS categories as they have been defined since 2002 as distinct and separate, governed by different sets of regulations (in Titles 8 and 22 of the Code of Federal Regulations). Unlike F visas, the Department of State already sets strict limits on stay in all J-1 categories, including degree-seeking students, research scholars, and professors. The elimination of the duration of status will disrupt several DoS regulatory provisions, including 22 CFR 62.45, which pertains to correcting minor technical infractions, and the J transfer process defined in 22 CFR 62.42. The J transfer process only allows the new Program Sponsor to extend the J-1 on the expiration date (release date) of the previous sponsor. Therefore, the proposed EOS requirement could not possibly be "timely filed" with USCIS, as suggested. The change would create potential overstays, through no fault of their own, for thousands of exchange visitors across the U.S., causing ripple effects throughout the exchange visitor program.

**Conclusion.**
The proposed rule to eliminate "duration of status" and limit F and J visas to fixed periods of entry will create significant uncertainty for international students, especially students seeking doctoral degrees who will be expected to begin studies in the U.S. without an assurance that they will have permission to stay in the country until they complete the degree. This will clearly have a chilling effect on their willingness to study in the U.S. and contribute to the research that fuels innovation in health care and technology industries. Other countries will gain the benefit of having these students work in their universities and take jobs in their companies.

The preamble refers to a need for DHS to "directly verify that aliens granted such nonimmigrant statuses are engaged only in those activities."[9] DHS has developed over decades robust

---

[9] 85 Fed. Reg. 16554, at p.42071, available at https://www.federalregister.gov/d/2025-16554/p-61

oversight systems based on SEVP, SEVIS, and the network of campus officials who are trained and certified by DHS to ensure compliance with immigration laws. This system works well and relieves the taxpayers of the need to hire a vast number of federal employees. This approach has worked well within the flexibility provided in the duration of status framework. In our view, DHS has not demonstrated the need to centralize oversight in an expanded federal staff. The more direct involvement contemplated in the NPRM will also insert DHS staff in judgments about whether students should be allowed to complete their degrees; federal agencies are not equipped to make such decisions.

The proposed rule creates a need for extensions of stay which proved to be an unmanageable workload in the 1970s when there were far fewer international students studying in the U.S. There is already a large backlog of pending applications before DHS, and the establishment of fixed terms will aggravate that problem.

The United States has secured its global leadership in research, technology, and higher education in part by welcoming international students and researchers. These individuals do far more than learn; they drive scientific discoveries, file patents, found companies, and frequently take on roles that fuel U.S. innovation. Yale and other American universities compete globally for these talented students and researchers, creating an engine for the creation of new knowledge and innovation. Furthermore, engaging international students is compatible with promoting opportunities for citizens and permanent residents. Yale devotes considerable resources and time to fostering expertise in STEM in local schools, in ensuring that Yale is affordable and accessible, and offering hands-on research opportunities for undergraduates to help build the pipeline of students who pursue careers in research.

We urge that DHS rescind the NPRM to ensure that the U.S. remains a global destination for students and exchange visitors who support our nation's research enterprise and national interests. If DHS chooses to proceed with the rule, we strongly recommend that the Department set longer fixed terms, especially for doctoral degrees, that exceed the current median times to degree.

Sincerely,

/s/

Alexander E. Dreier
Senior Vice President for Institutional Affairs, General Counsel

# EXHIBIT 4

September 29, 2025

Submitted via www.regulations.gov

U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security 500
12th Street SW
Washington, D.C. 20536

Re: DHS Docket No. ICEB-2025-0001, Comments in Response to Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media

I serve as Director of International Student & Scholar Services at Babson College. I submit this comment letter in response to the U.S. Department of Homeland Security's (Department) proposed rule, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media [DHS Docket No. ICEB-2025-0001], published August 28, 2025.

**I urge that the proposed rule be withdrawn in its entirety, and that admission for the duration of status remain in effect. It is unnecessary due to existing policies, and imposes additional unnecessary burdens on U.S. institutions, international students and scholars and U.S. government agencies.**

**1. The proposed four-year date-specific admission is insufficient and does not conform to academic programs, harming students and visitors' ability to complete their programs.**

- Four-year admission limits are impractical, and do not conform to academic program lengths. This affects PhDs and other doctoral students, surgery residents, neuroscience postdocs, joint degree program participants, and those pursuing BS/MS programs, among others. According to the National Center for Education Statistics, a median for completing a bachelor's degree is 52 months, or 4.3 years,[1] and the National Science Foundation reports a median of 5.7 years for completing a Ph.D.[2]
    - Each year, Babson College enrolls 70-80 undergraduate and graduate students who transfer their immigration record from other SEVP certified U.S. institutions. An additional 10-15 students pursue second degrees at Babson. The economic impact in the absence of these students would be approximately 11 million USD to the College, in addition to the impact on local community businesses.
- The new proposed rule would allow international students to request an extension only due to "compelling academic reasons," such as a change of major, accommodations due to an unexpected medical condition or campus disruptions due to natural disasters or major events.
    - Between Fall 2022 and Summer 2025, 49 undergraduate students at Babson College needed more than 4 years to complete their degree. Reasons for some of these extended completion rates were medical conditions or change of academic focus, as outlined in the proposed rule. However, there are other common reasons that international students extend their degree program. Examples include students with

disabilities who have academic accommodations that allow for a reduced courseload, students who take a leave of absence to tend to military service requirements in their home country, or temporary care of family members or family businesses. Will these also be considered compelling reasons under the proposed rule?

- Imposing a four-year visa limit will increase the economic burden of international students in the U.S., as well as introduce a significant amount of uncertainty in students' coursework.
  - About 57% of Babson College's graduating international students apply for Post-Completion Optional Practical Training (OPT) or Academic Training (AT). About 100-150 students apply for the 24-month extension for STEM degrees.
  - The cost of additional USCIS applications is significant for students. I-539 $470 (paper filing) or $420 (online filing if permitted) + I-765 $470 online filing. STEM OPT students having to file an additional I-539 + I-765. It is unclear whether there would be additional costs for biometrics, interviews or whether students would require legal consultation to assist with I-539 filings.
- The data does not provide sufficient evidence that the current Duration of Status policy is unsuccessful.
  - In 1978, the Duration of Status policy was changed from a fixed period of admission, proving that a fixed period of time was unsuccessful. While populations have increased, international students and scholars continue to be the most highly monitored group of non-immigrant visa holders. Although F and J nonimmigrants are admitted for duration of status, unlike "most other nonimmigrant categories," none of those "other categories" are connected to a massive electronic reporting system like SEVIS. An enormous amount of information is shared on a daily basis through the use of SEVIS and SEVIS Portal which gives DHS immediate access to detailed information related to almost every student and exchange visitor event that could impact a student or exchange visitor's compliance with the regulations. For information not directly submitted in SEVIS, DHS also has the authority to request," on any individual student or class of students upon notice," all information and documents that schools are obligated under 8 CFR 214.3 to retain throughout the student's enrollment and for a period of 3 years beyond that.
  - There is additional oversight at an institution level through regular DSO/RO training/verification, record keeping requirements, institutional reviews through I-17 updates and Recertification and SEVP Rep site visits.
- The institutional impact would include an increased burden, as it is estimated that it would take 67 hours per school official to get familiarized with the regulatory changes and determine education to students. There would be the need for new systems or staff.

**2. The proposed rule is a significant unwarranted, unnecessary and harmful intrusion into academic decision-making and restricts academic mobility.**

- The proposed rule includes changes that would serve as a significant intrusion into the academic and programmatic decision-making of universities. The proposed rule takes away from the institution the decision as to whether a student is making appropriate progress toward completing studies by requiring filings of extensions of stay.
  - It is extremely reasonable for students to progress through multiple degree levels, especially if beginning at a high school or language school. Many students at our institution take pride in holding multiple degrees. Additionally, there are several reasons for why students' academic timeline could change, from changes to areas of study to authorized medical reduced course loads based on physical or mental health needs.
  - Babson College has policies and deadlines to ensure students are making academic progress toward the completion of their degree.
- It is inappropriate and overreaching for the rule to give a USCIS officer the ability to evaluate whether a student is making good academic progress, rather than the school.
- The proposed rule also limits the academic mobility of international students by restricting their options to change their educational objectives. The proposed rule does not allow F-1 students at any degree level below graduate level to change programs or educational objectives, including programs, majors, or educational levels, within the first year of a program of study.
- International students at graduate level or above may not change programs at any point during a program of study. All international students are also prohibited from pursuing additional degree opportunities that are lateral or below an already completed academic program.
- The rule fails to address specifically what is considered to be lateral or lower degrees – i.e. Would a student enrolled in a master's level certificate program not be able to change to a master's level degree program? This would impact our institution as Babson College offers a Certificate of Advanced Management. Several international students start with the master's Level Certificate program and change to Babson's master's level degree.
- Students pursuing a second master's degree and transferring between institutions or pursuing a second degree at the same institution are common. Often degrees can complement each other. Specific to Babson College, business degrees can complement a variety of fields, or individuals may decide to change industries. Ten percent of Babson's graduate students already hold an advanced degree and seek the institution's business and entrepreneurship curriculum to augment their studies or shift their career focus.
- Restricting international student enrollment in language training programs to a lifetime aggregate of 24 months (including breaks and an annual vacation) is arbitrary. The length of time students require in ESL programs varies and can extend beyond 24 months.
- Since "compelling academic reasons" are not clearly defined by the rule, the government will have more discretionary power over students than their own colleges or universities; a student may apply for an extension of their studies and be approved by their own school, but not by the government.
- Institutions already have processes to approve additional semesters based on academic and institutional procedures.

**3. International students and exchange visitors contribute immensely to our campuses, communities, and country.**

Babson College prepares and empowers entrepreneurial leaders who create, grow and steward sustainable economic and social value—everywhere. As of Fall 2024, Babson College had 1,311 F-1 and J-1 international students, making up 28% at the undergraduate level and 45% at the graduate level. Our students contribute $3.9 billion to the local economy and to 35,849 jobs in Massachusetts. The broad composition of Babson's student population is something that domestic and international students value and reflect on as an important aspect of their experience. While not every student is able to travel or study abroad, classroom discussions and personal relationships across students with different backgrounds lead to lasting positive change.

> *"I fell in love with my classmates on day one…they come from all different countries, industries, and backgrounds, but they are open to others' ideas, anxious to learn about and experience other cultures."*
> *-U.S. Citizen, MBA*
>
> *"80% of our class is international; as a local Bostonian, I'm extremely lucky to work alongside and learn from impressive individuals from every corner of the globe."*
> *-U.S. Citizen, MBA*
>
> *"The diversity of the students, the places they are from, and the background they have – that's what make them the most friendly, interesting and supportive classmates you could ever have."*
> *-International student from Brazil, MBA*

- International students create jobs and significantly contribute to the U.S. economy
  - International students contributed $44 billion to the U.S. economy and created close to 400,000 (378,175) jobs in 2023/24,[3] which makes U.S. higher education the seventh largest service export.[4]
  - For every 3 international students enrolled in the United States, 1 U.S. job is created.[5]
- International students drive innovation and fill critical skills gaps
  - International student alumni have founded a quarter of the billion-dollar start-ups in the U.S.[6]
  - One in four billion-dollar startups were started by former international students, or about 25%.[7]

**4. SEVIS is already sufficient to accomplish DHS's goals, so the rule is duplicative, wasteful, and unnecessary.**

The Immigration and Customs Enforcement (ICE) Student and Exchange Visitor Program (SEVP) has a two-decades old robust system in place to certify institutions to enroll international students and exchange visitors and to track them throughout their study or program. This Student and Exchange Visitor Information System (SEVIS), provides DHS an early and ongoing opportunity to prevent and identify fraud and abuse of the F-1 and J-1 nonimmigrant status. SEVIS allows for the collection of information related to international students and exchange visitors and provides much of the information DHS would request via the extension application process.

- All Babson College's five Designated School Official (DSO) and Responsible Officers (RO) are trained thoroughly in the regulations and their responsibilities. We have routine site visits by

the SEVP Field Representatives for our region and timely file Recertification and Redesignation applications.

- Although F and J nonimmigrants are admitted for duration of status, unlike "most other nonimmigrant categories," none of those "other categories" are connected to a massive electronic reporting system like SEVIS.
- SEVIS gives DHS immediate access to detailed information related to almost every student and exchange visitor event that could impact a student or exchange visitor's compliance with the regulations.
- For information not directly submitted in SEVIS, DHS also has the authority to request, "on any individual student or class of students upon notice," all information and documents that schools are obligated under 8 CFR 214.3 to retain throughout the student's enrollment and for a period of 3 years beyond that.
- Under proposed extension of stay procedures, students would have to submit information that they would have to get from their schools or programs--information or documentation that the schools and programs already provide directly through SEVIS or are required to retain by regulation. Making a student submit to USCIS this same information that DHS already has access to is duplicative and wasteful.
- DHS can effectively enforce the current immigration laws by wisely using its resources to engage in data-driven initiatives that focus on risk factors, rather than subject entire nonimmigrant categories to an expensive, cumbersome, and time-consuming extension of stay process that largely duplicates the efforts that schools and exchange visitor programs will continue to make to comply with heavy SEVIS reporting obligations.

**5. The proposed rule does not consider the significant USCIS backlog and historic processing delays, particularly affecting Form I-539 extensions of stay applications.**

USCIS is currently facing a historic backlog of 11.3 million cases.[10] DHS estimates in the proposed rule that an additional 414,000 extension requests would be filed each year as a result of the changes in the proposed rule, a significant increase over the 253,876 extension of stay applications filed in FY2024.[11]

- The rule is logistically unworkable because of the uncertainty and length of processing times for extension of status applications.
- We anticipate that the extensions and authorizations required by the proposed rule will create additional backlogs within USCIS, which will in turn result in extended adjudication timelines, leading to uncertainty, disruption, and potential harm on the student's and school's behalf.
- It is inappropriate for the proposed rule to give a USCIS officer the ability to evaluate whether a student is making good academic progress or has a compelling academic reason, rather than the school. Additionally, institutions already have processes to approve additional semesters based on academic and institutional procedures. At Babson College, academic offices must provide evidence as to why an international student may need additional time to complete their degree beyond their initial program date.
- Increasing the applications submitted to USCIS at a time when the agency is handling a significant backlog would have an immediate detrimental impact not only to international students, but to the entire legal immigration system as a whole. The increased volatility and uncertainty would drive students from the U.S. following delayed approvals or adjudications and would discourage others from studying in the U.S.
    - The visa appointment delays during the summer 2025 are a strong example

of how administrative backlog can impact international students' ability to study in the United States. Babson College enrollment at the graduate level was directly impacted. The institution welcomed 270 international students to our programs in Fall 2025 and could have increased that percentage by approximately 10% without the Visa delays.

- ○ At Babson College, 57% of our graduating students apply for post-completion OPT. The I-765, I-539 and biometric fees would bring close to $1000 in fees per student (without any outside legal assistance). Additional expenses would be required for our graduate students with family members. These extra fees would not be possible for some of our students, forcing them to lose out on the valuable practical training experience to apply knowledge gained through studying in the U.S.  Application delays would jeopardize a student's ability to lawfully work in the U.S. through CPT and OPT, subsequently impact the economy and employers/institutional relationships.

**6. The proposed rule will hurt employers and local economies**

- Private sector employers have increasingly utilized international student talent to fill critical talent shortages in the U.S. labor force. Over the past decade, the number of international students working under the Optional Practical Training (OPT) portion of student visas has more than doubled from the roughly 150,000 OPT authorization in 2007. According to a May 2025 report from the Congressional Research Service there over 418,000 nonimmigrants who were OPT authorized in 2024. The growth of OPT is largely due to creation and expanded utilization of the STEM extension program created by President George Bush in 2008 that provided international students majoring in STEM disciplines the opportunity to work for 17 additional months provided their employers used the federal E-Verify system and created an appropriate training plan. Hiring under the OPT STEM extension was further increased when President Barack Obama extended the opportunity to 24 months.
- International students represent a critical supply of future STEM talent. Over 55 percent of all international students are STEM majors. The importance of international students to the future supply of private sector STEM talent is even more pronounced for advanced degrees. According to research from the National Foundation for American Policy using National Science Foundation data, international students account for 74 percent of all the graduate students in America in electrical engineering, 72 percent of those in computer science, 71 percent of those in industrial and manufacturing engineering, 70 percent of those in statistics, 67 percent of those in economics, 61 percent in civil engineering, 58 percent in mechanical engineering and agricultural economics, and 56 percent of those in mathematics and applied math. Some of America's most important companies have utilized the OPT program to fill unmet talent needs. In 2024 the following companies hired more than 1,000 international students on their OPT visas:  Amazon, Tesla, Goldman Sachs, Apple, Google, Meta, Microsoft, ByteDance, and Deloitte with Walmart, Intel, Ernst & Young, McKinsey & Company, and JP Morgan Chase also hiring substantial numbers of OPT workers.
- International student graduates go on to launch some of the most important and valuable startup companies in the U.S., having founded or co-founded approximately 25 percent of all U.S. unicorns (143 of the 582 companies), startup companies backed by venture capital with

market valuations in excess of $1 billion. They also contribute to a disproportionate number of U.S.-won Nobel Prizes in science.

- Babson College international students are entrepreneurial, and many go on to start businesses in the communities where they studied. As just one example, a Babson MBA alumnus built four restaurants in several towns across Massachusetts, creating hundreds of jobs and contributing to local communities as a local hub.

**7. The proposed rule would make US higher education less competitive internationally.**

The proposed rule would add uncertainty that could discourage international students from applying to higher education institutions in the U.S. Through this new rule, U.S. colleges and universities would be unable to provide incoming or prospective students with the confidence that they would be able to complete their entire academic program due to the unknown outcomes of Extension of Stay (EOS) applications. The U.S. could then lose a critical pipeline of students, especially with advanced STEM knowledge and talent, potentially to competitor nations. Among other English-speaking countries, the United Kingdom, Australia and Canada continue to expand opportunities for their international students to obtain increased work authorization and/or paths to permanent residency

- "*Access to work experience is vital for this population and the ability to work following the completion of the program (either through OPT or the H1B visa process) drives their willingness to invest in an expensive education in the United States. Additionally, over the last few years, universities in Europe, Canada, and China and have taken great efforts to improve their own universities in an effort to prevent "brain drain" and to tap into this growing market. We have started to see these universities become more viable/attractive options for international students looking to get their MBA or other master's degree abroad. Without the ability to work following the completion of the program, schools in the United States of America will fully lose the diminishing foothold we have on the international applicant market.*" - Senior Associate Director, Graduate Admissions

It is for these reasons that I object to the entire rule and request that it be withdrawn.

Elizabeth Saumsiegle

Elizabeth Saumsiegle, PDSO
Director, International Student & Scholar Services
Babson College

---

[1] National Center for Education Statistics. (n.d.). *Fast facts: Time to degree (ID 569)*. U.S. Department of Education. Retrieved September 10, 2025, from https://nces.ed.gov/fastfacts/display.asp?id=569.

[2] National Science Foundation, National Center for Science and Engineering Statistics. (2024, December 2). *Doctorate recipients from U.S. universities: 2023 (Survey of Earned Doctorates)*. Retrieved September 10, 2025, from https://ncses.nsf.gov/surveys/earned-doctorates/2023#data.

[3] NAFSA: Association of International Educators. (n.d.). *NAFSA International Student Economic Value Tool* [Data tool]. Retrieved September 10, 2025, from https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[4] U.S. International Trade Administration. (n.d.). *Education Service Exports*. U.S. Department of Commerce. Retrieved September 10, 2025, from https://www.trade.gov/education-service-exports.

[5] NAFSA: Association of International Educators. (2024, November 18). *International students contribute record-breaking level of spending and 378,000 jobs to the U.S. economy* [Press release]. Retrieved September 10, 2025, from https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.

[6] National Foundation for American Policy. (2022, July 26). *Immigrant entrepreneurs and U.S. billion-dollar companies* [Policy brief]. NFAP. Retrieved September 10, 2025, from https://nfap.com/wp-content/uploads/2022/07/Immigrant-Entrepreneurs-and-Billion-Dollar-Companies.DAY-OF-RELEASE.202 2.pdf.

[7] Ibid.

[10] U.S. Citizenship and Immigration Services. (2025, June 30). *All USCIS application and petition form types (Fiscal Year 2025, Quarter 2)* [Data file]. U.S. Department of Homeland Security. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx.

[11] U.S. Citizenship and Immigration Services. (2024, December 29). *All USCIS application and petition form types (Fiscal Year 2024, Quarter 4)* [Data file]. U.S. Department of Homeland Security. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx.

# EXHIBIT 5

# Fixed Terms, Unstable Futures: An Analysis of the Proposed Elimination of 'Duration of Status' and its Impact on U.S. Higher Education and National Competitiveness

## Executive Summary

This report provides a comprehensive analysis of the Department of Homeland Security's (DHS) proposed rule to eliminate "duration of status" (D/S) for F and J nonimmigrants and replace it with a fixed time period of admission. The analysis concludes that this policy shift, framed as a measure to enhance national security and reduce visa overstays, is a solution in search of a problem. It leverages a flawed premise to introduce a system that is profoundly damaging, inefficient, and counterproductive to U.S. interests.

Key findings indicate that the rule will:

- Impose severe bureaucratic and financial burdens on international students, placing them in a constant state of precarity and at risk of losing legal status due to processing delays beyond their control.
- Inflict significant administrative and financial strain on U.S. higher education institutions, while simultaneously eroding their academic autonomy.
- Trigger a substantial negative economic impact, with potential losses estimated at $7 billion annually and over 60,000 jobs, disproportionately harming key states and the national STEM innovation pipeline.
- Critically undermine U.S. global competitiveness in education, ceding a strategic advantage to rival nations and diminishing American "soft power."

The report recommends the immediate withdrawal of the proposed rule and calls for a collaborative approach between the government and the higher education sector to address

any legitimate program integrity concerns through the existing, robust Student and Exchange Visitor Information System (SEVIS) framework.

## The End of an Era: Deconstructing the Proposed Shift from 'Duration of Status'

The proposed rule represents a fundamental departure from a decades-old immigration policy that has successfully supported the academic pursuits of millions of international students and scholars. By replacing a flexible, academically-attuned framework with a rigid, bureaucratic mandate, the rule introduces profound inefficiency and uncertainty into the U.S. higher education system. The stated rationale for this change does not withstand scrutiny, suggesting the policy's true purpose is restriction rather than refinement.

### From Flexible Framework to Rigid Mandate

Since the early 1990s, individuals on F (student) and J (exchange visitor) visas have been admitted to the United States for "duration of status" (D/S).[1] This practical and efficient system allows them to remain in the country in legal status for as long as they are enrolled in a full course of study, making normal academic progress, and complying with the regulations of their visa. Compliance is actively monitored by Designated School Officials (DSOs) at their respective institutions, who report required information to the federal government through the SEVIS database.[3] This framework is intentionally designed to accommodate the fluid and often unpredictable nature of academic life, such as needing an extra semester to complete research, changing a major, or progressing from a master's to a doctoral program.

The proposed rule would dismantle this system entirely. In its place, students and exchange visitors would be admitted for a fixed period of time, recorded on their Form I-94 arrival record. This period would be the shorter of their program's expected end date or a maximum of four years.[1] For many, the period would be even shorter; students from countries with student visa overstay rates exceeding 10 percent, or those designated as state sponsors of terrorism, would be limited to an initial two-year period of admission, irrespective of their program's actual length.[5]

The practical implications are stark. A doctoral student in a five-year Ph.D. program would be

admitted for only four years and forced to apply for an extension to complete their final, critical year of dissertation work. A master's student who decides to pursue a Ph.D. at the same institution would no longer be able to have their record updated by their DSO; instead, they would have to file a formal application with the federal government to extend their stay to cover the new program.[1]

## The Extension of Stay Gauntlet

Under the proposed rule, any student or scholar needing to remain beyond their initial fixed admission date—for any legitimate academic reason—would be required to file a Form I-539, Application to Extend/Change Nonimmigrant Status, with U.S. Citizenship and Immigration Services (USCIS).[1] This change transforms what is currently a routine administrative update handled efficiently by a university DSO into a formal, costly, and time-consuming adjudication process with a federal immigration agency.

This new bureaucratic layer introduces significant financial costs through application fees and, more critically, exposes students to the well-documented and severe processing backlogs at USCIS. Educational advocacy groups have warned that USCIS already struggles with long delays, with average processing times having increased by 46% over the past two fiscal years.[3] The agency is fundamentally ill-equipped to handle the massive new volume of extension applications this rule would generate, creating a near-certainty of processing gaps that would leave students in legal limbo. This represents a fundamental shift from a trust-based partnership model, where the government relies on universities to monitor compliance, to a suspicion-based enforcement model that assumes non-compliance and requires direct, intrusive federal adjudication for routine academic milestones.

## Rationale Under Scrutiny

DHS justifies the proposed rule by claiming it will reduce confusion over how long nonimmigrants may lawfully remain in the U.S., decrease visa overstay rates, and improve national security.[6] This rationale is fundamentally flawed because it ignores the capabilities of the existing SEVIS framework. International students are already the "most closely monitored nonimmigrants in the country".[8] DSOs are legally required to report any changes to a student's enrollment status, course load, address, or program, providing federal authorities with real-time data. The system is designed to automatically flag non-compliance.

Therefore, the problems the rule purports to solve are largely non-existent. The claim of "reducing overstays" is particularly weak, as the rule's mechanism is poorly designed for this purpose. The vast majority of individuals who will be forced to file extensions are students in good standing who simply need more time for legitimate academic reasons. By subjecting them to an overwhelmed bureaucracy, the rule is more likely to *create* a new class of "accidental" overstays—individuals who fall out of status through no fault of their own while waiting for a delayed adjudication. This suggests the stated rationale may be a pretext for a broader policy of restrictionism, where the goal is not to reduce willful overstays but to create systemic friction that deters international students from coming to, and remaining in, the United States.

### Déjà Vu: A Policy Resurrected

This proposal is not a new idea but a revival of a nearly identical rule introduced in September 2020.[3] That proposal was met with overwhelming and unified opposition from the higher education community, legal experts, and state governments. It generated over 32,000 public comments, with more than 99% opposing the change.[2] This broad coalition, which included NAFSA, the American Council on Education (ACE), and a group of State Attorneys General, argued that the rule was unworkable, harmful, and unnecessary. The rule was officially withdrawn by the subsequent administration on July 6, 2021.[2] Its re-emergence signals a persistent policy objective that ignores prior expert feedback and widespread public condemnation.

## The Human Variable: Amplifying Student Precarity and Anxiety

The proposed elimination of duration of status would have a profound and detrimental impact on the lives of international students, weaponizing bureaucratic uncertainty and adding a new layer of profound stress to an already challenging environment. This policy goes far beyond existing SEVIS monitoring, transforming a student's immigration status from a stable foundation for study into a constant source of anxiety that undermines their entire educational journey.

## A Climate of Pervasive Uncertainty

International students in the U.S. already navigate a complex and often stressful immigration landscape. They are subject to rigorous and continuous SEVIS monitoring, and in recent years have faced additional pressures including expanded social media vetting, sudden pauses in visa interviews, and the implementation of travel bans.[9] There have been widespread reports of students having their visas revoked with little to no warning or due process, actions that have created a "pervasive climate of fear, anxiety and uncertainty" on campuses across the country.[9]

The proposed rule would dramatically compound this stress. It introduces a constant, ticking clock in the form of a fixed I-94 expiration date. This is a fundamental escalation from SEVIS monitoring, which is a system of compliance checks. The proposed rule, in contrast, creates a recurring threat to a student's legal right to continue their education. Every academic decision—from taking a medical leave to changing a dissertation topic—would have to be weighed against the risk of a lengthy and uncertain immigration adjudication. The psychological toll of this constant precarity cannot be overstated, distracting students from their research and studies and turning their educational experience into a high-stakes battle against bureaucracy. For many, the American dream would become a "precarious proposition".[12]

## The Peril of the Processing Queue

The most acute danger for students under this new system is the risk of falling out of legal status while awaiting a decision on their extension application. Given the severe backlogs at USCIS, it is highly probable that many applications will not be adjudicated before a student's current status expires.[3] This is not a mere inconvenience; it has catastrophic consequences.

Accruing "unlawful presence" in the United States can trigger 3- and 10-year bars on re-entry. A Ph.D. student in good academic standing could be barred from the U.S. for a decade simply because of a bureaucratic delay at a government agency. Even while an application is pending, a student's life can be severely disrupted. They may lose their eligibility for on-campus employment, be forced to halt practical training opportunities (OPT), and be unable to renew their driver's license or lease an apartment. This system effectively weaponizes bureaucratic delay as a tool of attrition. Some students will be forced to abandon their studies not because they failed academically, but because the administrative process failed

them. Many more of the world's brightest students will simply choose not to come to the U.S. at all to avoid this unacceptable risk.

### Academic Pathways Under Threat

Higher education is rarely a perfectly linear process. The D/S system was designed to accommodate this reality. The proposed rule, however, punishes it. Normal academic occurrences—such as needing an extra semester to complete lab work, switching from a thesis to a non-thesis track, or changing majors as intellectual interests evolve—are re-framed as immigration events that require federal government approval.[4]

Worse, the proposal explicitly seeks to curtail academic freedom by restricting students' ability to change their educational objectives, especially for graduate students or undergraduates in their first year.[4] It also includes a bar on "reverse matriculation," which would, for example, prevent a student who leaves a Ph.D. program with a master's degree from then pursuing a second master's in a different field.[4] This represents a direct and dangerous intrusion of immigration enforcement into the domain of academic advising and a student's right to shape their own educational journey. The rule disproportionately harms students in the very fields most critical to U.S. innovation: long-term Ph.D. programs in science, technology, engineering, and mathematics (STEM). Because these programs almost always exceed the four-year admission cap, nearly every STEM doctoral candidate would be forced to undergo at least one high-stakes extension adjudication during the most critical phase of their research, creating a direct impediment to U.S. scientific progress.[1]

## The Institutional Shock: U.S. Higher Education on the Defensive

The proposed rule would not only harm students but would also inflict an institutional shock upon America's colleges and universities. It imposes unsustainable administrative burdens, constitutes an unprecedented intrusion into academic autonomy, and creates significant financial and legal risks that threaten the stability of the entire higher education sector.

## The New Frontline: Administrative and Financial Burdens

University international student services offices (ISSOs) would become the frontline for managing a new and massive bureaucratic challenge. Staff would be responsible for tracking thousands of individual I-94 expiration dates and guiding students through the complex and legalistic I-539 extension process—a task for which they are neither staffed nor resourced.[1] The role of the DSO would be fundamentally altered, shifting from that of an academic advisor and compliance facilitator to a quasi-immigration paralegal consumed with managing a constant cascade of high-stakes government filings.

This new workload also brings heightened legal risks. An error in advising a student on the complex I-539 process or a failure to properly track an expiration date could lead to a student falling out of status, potentially exposing the university to liability and reputational damage.

## An Unprecedented Intrusion into Academic Autonomy

Higher education associations have forcefully condemned the rule as a "dangerous overreach by government into academia" and a "significant intrusion into the academic and programmatic decision-making of universities".[4] The policy's core flaw is that it empowers a USCIS immigration officer, who possesses no academic expertise, to effectively veto a university's academic judgment. A university can deem a student to be making satisfactory academic progress, yet a USCIS officer could deny their extension of stay, terminating their educational career.[2]

This inserts the federal government into decisions that have long been, and must remain, the sole purview of academic institutions. It also creates a moral hazard for universities, forcing advisors into an impossible position. They will have to choose between encouraging a student to pursue a promising but time-consuming research path, knowing it will trigger a risky immigration filing, or advising a safer, less ambitious academic track to avoid bureaucratic hurdles. This conflict forces institutions to compromise their core educational principles to protect their students from a punitive and unpredictable system.

## Financial Vulnerability and Enrollment Projections

The rule will act as a powerful deterrent to prospective international students, who will increasingly opt to study in competitor countries like Canada, the U.K., and Australia, which offer more stable and welcoming immigration policies.[5] Even before this proposal, the current policy environment has led to projections of a 30-40% decline in new international student enrollment.[14] This rule would cement and likely worsen that trend.

The financial consequences for U.S. higher education would be severe. International students, a majority of whom pay full tuition, are a critical source of revenue for many institutions. A Moody's analysis conducted a stress test on U.S. colleges and found that a 20% drop in international enrollment would cause 130 institutions to lose at least half a percentage point from their operating margins, with 18 of those losing between two and eight percentage points. For colleges with already thin margins, this could trigger "significant financial stress".[16]

This financial risk is not distributed evenly. The most vulnerable institutions are private, smaller colleges and those with a special focus, such as arts, music, or faith-affiliated schools, which often have a high percentage of international students and rely on their tuition revenue to remain solvent.[17] The long-term effect could be a degradation of academic quality. To mitigate the risks of the extension process, universities may be incentivized to shorten or standardize their programs to fit within the rigid admission window. Furthermore, as top-tier global talent is deterred, financially desperate institutions may be forced to lower admission standards to fill seats, ultimately damaging the reputation and value of a U.S. degree.[18]

## The Economic Fallout: A Multi-Billion Dollar Risk Assessment

Beyond the campus gates, the proposal to eliminate duration of status represents an act of national economic self-harm. Deterring international students will damage local communities, cripple university budgets, and weaken the U.S. innovation ecosystem, jeopardizing one of the nation's most successful service exports.

### The Economic Engine of International Education

International students are a vital economic force in the United States. During the 2023-2024 academic year, they contributed approximately $43.8 billion to the U.S. economy and supported over 378,000 jobs.[13] This economic activity is a significant services export, creating a trade surplus for the nation. The majority of these students pay for their education with funds from outside the U.S., injecting foreign capital directly into American communities.[20] This revenue is essential for higher education institutions, where it helps fund cutting-edge research, support campus operations, and often subsidizes the cost of tuition for domestic students.[21]

The current hostile policy climate is already projected to cause a $7 billion loss in spending and the elimination of over 60,000 American jobs.[15] The proposed rule would not only lock in these losses but would likely accelerate them, functioning as an indirect and inefficient trade barrier. By making the "product"—a U.S. education—more difficult and risky to obtain, the rule discourages foreign "customers" from buying it, ceding a massive market to global competitors.[14]

## Mapping the Damage: State- and Sector-Level Economic Exposure

The economic pain from a decline in international student enrollment will not be felt uniformly across the country. States with high concentrations of colleges and universities that attract global talent will be hit hardest. A Brookings Institution analysis found that while the national average economic impact is about $130 per resident, several states face much higher exposure. The most vulnerable are Washington, D.C. (with an estimated impact of $855 per resident), Massachusetts ($554), New York ($319), Rhode Island ($254), and Connecticut ($218).[17]

The economic damage will also have a regressive effect, disproportionately harming less-endowed public universities and the American students they serve. While wealthy private universities can rely on large endowments to weather financial shocks, many large public universities depend on the higher tuition paid by international students—often more than triple the in-state rate—to offset declining state funding and keep costs down for domestic students.[21] A significant drop in this revenue stream will force these institutions to either raise tuition for American families or make painful cuts to programs and services.

| State | Total | U.S. Jobs | Est. | Projected | Projected |
| --- | --- | --- | --- | --- | --- |

| | Economic Contribution (USD) | Supported | Impact Per Resident (USD) | Annual Economic Loss (15% Decline, USD) | Jobs Lost (15% Decline) |
|---|---|---|---|---|---|
| California | $5.9 Billion | 57,015 | $164 | $885 Million | 8,552 |
| New York | $4.6 Billion | 43,991 | $319 | $690 Million | 6,599 |
| Massachusetts | $3.8 Billion | 36,442 | $554 | $570 Million | 5,466 |
| Texas | $2.1 Billion | 21,296 | $77 | $315 Million | 3,194 |
| Pennsylvania | $2.0 Billion | 20,443 | $170 | $300 Million | 3,066 |
| Illinois | $1.9 Billion | 19,103 | $159 | $285 Million | 2,865 |
| Florida | $1.6 Billion | 16,339 | $78 | $240 Million | 2,451 |
| Michigan | $1.4 Billion | 13,873 | $151 | $210 Million | 2,081 |
| Washington | $1.3 Billion | 11,280 | $175 | $195 Million | 1,692 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Ohio | $1.2 Billion | 12,015 | $109 | $180 Million | 1,802 | |
| Data sourced and synthesized from NAFSA and Brookings Institution analyses.[17] Projected losses are calculated based on a 15% overall decline in enrollment. | | | | | | |

## Undermining the U.S. Innovation Ecosystem

The greatest long-term economic damage from this rule will be to the U.S. innovation ecosystem. The majority of international students are enrolled in high-demand STEM fields, serving as graduate researchers, teaching assistants, and a vital talent pool for America's most critical industries.[13]

Graduates participating in Optional Practical Training (OPT), particularly the STEM OPT extension, are not displacing American workers; they are filling urgent and persistent talent shortages in fields like artificial intelligence, data science, cybersecurity, and advanced

manufacturing.[13] Major U.S. technology companies, including Amazon, Google, and Microsoft, rely heavily on this talent pipeline to drive innovation and maintain their global competitiveness.[13] By deterring these students, the U.S. is "turning off a tap that feeds American growth," directly threatening the nation's ability to lead in the technologies that will define the 21st-century economy.[13]

## The Geopolitical Calculus: Ceding Leadership in the Global Race for Talent

The proposed rule is not merely a domestic policy misstep; it is a strategic blunder on the world stage. It weakens America's global standing, damages its invaluable soft power, and unilaterally hands a significant advantage to economic and ideological competitors in the global race for talent.

### A Self-Inflicted Competitive Disadvantage

For decades, the United States has been the undisputed premier destination for international students. That preeminent status is now "imperiled".[24] A recent survey showed that perceptions of the U.S. as "safe and welcoming" have plummeted by 24 points, and student visa arrivals have collapsed to a four-year low.[23]

This decline is not occurring in a vacuum. As the U.S. erects new barriers, competitor nations are rolling out the welcome mat. The U.K. is now perceived as a top study destination, while Canada is attracting students with its affordability and clear pathways to post-study work and permanent residency.[14] These countries are the direct beneficiaries of the "massive hit" to the American brand.[14] The proposed rule would codify this self-inflicted disadvantage, making the U.S. system demonstrably more rigid, risky, and bureaucratic than those of its key competitors. This signals a strategic shift in the U.S. posture towards global talent—from one of "attraction and integration" to one of "extraction and exclusion." The world's best and brightest will take note, increasingly viewing the U.S. as a short-term, transactional destination rather than a long-term home for their ambitions.

| Policy Feature | United States (Proposed Rule) | Canada | United Kingdom | Australia |
|---|---|---|---|---|
| Visa Duration | Fixed 2-4 year term, requiring extension for longer programs. | Length of program + 90 days. | Length of course. | Length of course. |
| Extension Process | Formal adjudication with USCIS (Form I-539); lengthy and costly. | Administrative process, often online or via university. | Administrative process with UK Visas and Immigration. | Administrative process, often online. |
| Post-Study Work Rights | Optional Practical Training (OPT) for 1-3 years; under political threat. | Post-Graduation Work Permit (PGWP) up to 3 years; clear pathway to residency. | Graduate Route allows 2-3 years of work. | Temporary Graduate visa allows 2-4 years of work. |
| Government Tone | Restrictive; focus on enforcement and overstay reduction. | Welcoming; national strategy to attract and retain talent. | Welcoming; actively recruiting international students. | Welcoming; part of national education export strategy. |

| | | | | | |
|---|---|---|---|---|---|
| Information synthesized from policy descriptions and comparative analyses.[1] | | | | | |

## The Erosion of American Soft Power

The damage caused by this rule extends beyond economics and into the realm of diplomacy and "soft power." The U.S. is the most popular place of study for overseas students who later go on to become leaders in their home countries.[13] When these future presidents, ministers, CEOs, and scientists form positive, lasting relationships with the United States during their formative years, they are far more likely to visit, invest in, and align with American interests in the future.

By creating a hostile, suspicious, and bureaucratic immigration system, the U.S. is alienating a generation of these future global leaders. The message this rule sends is one of exclusion, which will have lasting negative consequences for U.S. foreign relations. Furthermore, it diminishes the educational experience for American students. A Duke University study found that U.S. students who actively interacted with their international peers reported greater self-confidence, leadership skills, quantitative abilities, and cross-cultural understanding—all critical skills for success in a globalized world.[13]

## A Flawed National Security Paradigm

The DHS's claim that this rule is necessary for national security is a weak justification for the immense collateral damage it would cause. The existing SEVIS system already provides a robust framework for monitoring students and flagging security concerns. The proposed rule is a form of "security theater" that imposes massive costs on the entire education sector for a negligible, if any, security gain.

True national security in the 21st century is inextricably linked to economic strength and technological leadership. As the Council on Foreign Relations has noted, shortcomings in the

U.S. workforce and educational system threaten the country's ability to compete internationally.[25] By actively undermining the STEM talent pipeline and ceding the global race for talent to other nations, this rule paradoxically harms U.S. national security in the long run. Attracting and retaining the world's best minds is a core component of national strength, not a threat to it. This policy, born of an "America First" agenda, would ironically ensure that in the critical fields of science and technology, America falls behind.[24]

## Strategic Recommendations and Outlook

The analysis presented in this report leads to a clear and urgent conclusion: the proposed rule to eliminate duration of status is a deeply flawed policy that would inflict severe and lasting damage on American higher education, the U.S. economy, and the nation's global standing. The following recommendations are offered to mitigate these harms.

### For Higher Education Stakeholders

- Unified Opposition: Institutions, through leadership from associations like ACE and NAFSA, must maintain a unified and vocal front in opposing this rule. The successful campaign against the nearly identical 2020 proposal, which mobilized over 32,000 public comments, serves as a clear precedent for effective advocacy.[2]
- Data-Driven Advocacy: Universities should continue to meticulously collect and disseminate data on the profound academic and economic contributions of their international students. This data should be tailored to show the specific, harmful impact of the rule at the state and congressional district levels, making the consequences tangible for individual policymakers.
- Contingency Planning and Enhanced Support: Should the rule be implemented despite opposition, institutions must prepare for a massive scaling of resources. International student services offices will require significant new funding and staffing to manage the administrative burden. Universities must also be prepared to offer enhanced legal and mental health support to students navigating the stress and uncertainty of the new system.

### For Policymakers

- Immediate Withdrawal of the Proposed Rule: The primary and most crucial recommendation is for the Department of Homeland Security to withdraw this "poorly conceived rule" from consideration, as it did in 2021.[2] The evidence is overwhelming that its potential harms vastly outweigh any unsubstantiated benefits.
- Engage in Constructive Dialogue: DHS should abandon this punitive, one-size-fits-all approach and instead engage in a genuine dialogue with the higher education community. Any legitimate concerns about program integrity can and should be addressed through targeted improvements to the existing SEVIS reporting system or through enforcement actions against the small number of non-compliant institutions, rather than a blanket policy that punishes millions of compliant students and hundreds of responsible universities.
- Develop a National Strategy for International Education: The United States should move from a defensive and restrictive posture to a proactive one. Policymakers should work to develop a comprehensive national strategy aimed at attracting and retaining global talent. This strategy should recognize that international education is a critical component of both economic prosperity and national security. Key elements should include streamlining visa processes, preserving and expanding practical training opportunities, and consistently promoting a welcoming message on the world stage.

Works cited

1. DHS Proposal to Replace Duration of Status - NAFSA, accessed September 23, 2025, https://www.nafsa.org/regulatory-information/dhs-proposal-replace-duration-status
2. Archive: 2020 Trump-Pence Administration Proposal to Replace Duration of Status - NAFSA, accessed September 23, 2025, https://www.nafsa.org/professional-resources/browse-by-interest/proposal-replace-duration-status
3. NAFSA Recommendations to the U.S. Department of Homeland Security, accessed September 23, 2025, https://www.nafsa.org/policy-and-advocacy/policy-priorities/nafsa-recommendations-us-department-homeland-security
4. 1 High-level Guidance to Submit Comments on the DHS Proposed Rule to End Duration of Status Steps to Submit Your Comment Deadli - NAFSA, accessed September 23, 2025, https://www.nafsa.org/sites/default/files/media/document/Duration_of_Status_Guidance_2025.pdf
5. ACE, Other Associations Ask DHS to Withdraw Flawed Duration of Status Proposed Rule, accessed September 23, 2025, https://www.acenet.edu/News-Room/Pages/ACE-Other-Associations-Ask-DHS-to-Withdraw-Flawed-Duration-

of-Status-Proposed-Rule.aspx
6. RIN - View Rule, accessed September 23, 2025, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201910&RIN=1653-AA78
7. View Rule - Reginfo.gov, accessed September 23, 2025, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201810&RIN=1653-AA78
8. DHS Proposal to Curtail International Students' Immigration Status and Restrict Institutions' Academic Decision-making a Gross Governmental Overreach | NAFSA, accessed September 23, 2025, https://www.nafsa.org/about/about-nafsa/dhs-proposal-curtail-international-students-immigration-status-and-restrict
9. Latest Developments Impacting International Students and Scholars - Presidents' Alliance, accessed September 23, 2025, https://www.presidentsalliance.org/directories-2-directories-international-students/
10. Current U.S. Administration | NAFSA, accessed September 23, 2025, https://www.nafsa.org/current-us-administration
11. ACE, Higher Ed Associations Demand Answers as Student Visa Revocations Spread Nationwide - American Council on Education, accessed September 23, 2025, https://www.acenet.edu/News-Room/Pages/ACE-Assns-Demand-Answers-Visa-Revocations.aspx
12. Despite security concerns and turmoil, why international students are clinging to the US for study abroad, accessed September 23, 2025, https://timesofindia.indiatimes.com/education/news/despite-security-concerns-and-turmoil-why-international-students-are-clinging-to-the-us-for-study-abroad/articleshow/124058939.cms
13. International Students Studying in the United States: Trends and Impacts 2025 - Boundless, accessed September 23, 2025, https://www.boundless.com/research/international-students-studying-in-the-united-states-trends-and-impacts/
14. Student visa changes approved by White House - Newsweek, accessed September 23, 2025, https://www.newsweek.com/student-visa-changes-limits-trump-administration-proposal-2112820
15. US could face $7bn loss from international student decline - The PIE News, accessed September 23, 2025, https://thepienews.com/international-student-decline-to-cost-the-us-7bn/
16. Moody's: Trump's tough international student policies could hit some colleges hard, accessed September 23, 2025, https://www.highereddive.com/news/trump-international-student-policies-colleges-finance-moodys/752748/
17. Which US states face the biggest losses from fewer international students, according to Brookings, accessed September 23, 2025,

https://timesofindia.indiatimes.com/education/news/which-us-states-face-the-biggest-losses-from-fewer-international-students-according-to-brookings/articleshow/124018687.cms
18. [U.S.]Colleges see significant drop in international students as fall semester begins - Reddit, accessed September 23, 2025, https://www.reddit.com/r/Futurology/comments/1nhum6g/uscolleges_see_significant_drop_in_international/
19. NAFSA International Student Economic Value Tool, accessed September 23, 2025, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2
20. Economic Impact of International Students | IIE, accessed September 23, 2025, https://www.iie.org/research-initiatives/open-doors/economic-impact-of-international-students/
21. Who loses if US colleges lose international students? - Brookings Institution, accessed September 23, 2025, https://www.brookings.edu/articles/who-loses-if-us-colleges-lose-international-students/
22. U.S. Economy Could Suffer a $7 Billion Loss from Precipitous Drop in International Students, accessed September 23, 2025, https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students
23. UK keeps lead as top study destination, Canada rebounds, & US plummets in Fall 2025, accessed September 23, 2025, https://m.economictimes.com/nri/study/international-students-uk-keeps-lead-as-top-study-destination-canada-rebounds-us-plummets-in-fall-2025/articleshow/123991083.cms
24. US student visa arrivals plummet to four-year low under Trump-era policies: What are the consequences?, accessed September 23, 2025, https://timesofindia.indiatimes.com/education/news/us-student-visa-arrivals-plummet-to-four-year-low-under-trump-era-policies-what-are-the-consequences/articleshow/124059986.cms
25. U.S. Education Slipping in Ranks Worldwide, Earns Poor Grades on CFR Scorecard, accessed September 23, 2025, https://www.cfr.org/news-releases/us-education-slipping-ranks-worldwide-earns-poor-grades-cfr-scorecard

# EXHIBIT 6

EMORY UNIVERSITY | Global Engagement

*Submitted online via www.regulations.gov*

September 26, 2025

Honorable Kristi Noem
Secretary, U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

**RE: Comments in Response to Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (DHS Docket No. ICEB-2025-0001; RIN 1653–AA95)**

We appreciate the opportunity to provide comments on the Department of Homeland Security's (DHS) proposed rule of August 28, 2025, "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media".

For the reasons detailed in this letter, Emory University would respectfully like to submit the following recommendations for your consideration. We appreciate DHS's desire to safeguard the integrity of the US immigration system. National security is everyone's concern, and we recognize that educational institutions have a shared role in ensuring that individuals in F-1 and J-1 status adhere to the parameters of their immigration status. After having reviewed the proposed rule, we have some constructive, mutually beneficial suggestions to achieve the DHS's desired outcomes. The proposed changes as they are written are complicated, burdensome, and could result in confusion that will not accomplish DHS' stated goals as outlined in the preamble. Please see below for an overview of our feedback. Each item is described in greater detail within this letter.

1) The proposed four-year fixed period of admission is problematic for programs with a normal length that exceeds four years, such as doctoral programs.

2) The restriction on pursuing a subsequent degree at the same degree level unnecessarily limits a student's ability to pursue their legitimate education objectives.

3) Simultaneous Filing of Extension of Stay (EOS) applications with OPT and STEM OPT applications is redundant and creates an unnecessary additional burden for USCIS.

4) J-1 scholar programs are structured differently from F-1 and J-1 student programs.

5) DSOs are better situated to work with campus partners who possess the academic and research expertise and access to information needed to make academic decisions.

6) The rule adds additional administrative and financial burdens on DHS.

7) Individuals in F-1 and J-1 status are already heavily vetted and monitored prior to their arrival and during their program duration via multiple government vetting and tracking programs, most notably SEVIS (Student and Exchange Visitor Information System) managed by DHS making this rule redundant.

8) The proposed rule would result in negative, unintended consequences for other benefits, including state-governed processes such as driver's licenses.

9) The proposed rule would have a negative short-term and long-term impact on innovation and research as well as US economic, diplomatic, and national security efforts.

**1. The proposed four-year fixed period of admission is problematic for programs with a normal length that exceeds four years, such as doctoral programs.**

The proposed rule states that "DHS believes that a 4-year period of admission would not pose an undue burden to most nonimmigrant students, because many F and J nonimmigrants would complete their studies within a 4-year period and not have to request additional time from DHS" (42082). However, there are a considerable number of programs with a normal length that exceed the maximum four-year period of entry outlined in the proposed rule, most notably doctoral programs.

Students pursuing a Doctor of Philosophy (PhD) regularly take more than four years to complete their degree program. In Emory University's Laney Graduate School (the academic home of all PhD students at Emory), the median time to degree completion for doctoral students was 5.7 years in 2023.[1] This mirrors the national median program length for PhD programs across disciplines, which is also 5.7 years according to data collected in

---

[1] Emory University, Laney Graduate School. Admission, Enrollment, and Degrees – PhD Programs, 2023. https://gs.emory.edu/academics/data/phd.html. Accessed September 19, 2025.

2024 by the National Center for Science and Engineering Statistics.[2] Should the proposed policy changes go into effect, the vast majority of PhD students would be required to submit at least one EOS in order to complete their degree program within the normal expected timeframe. The proposed rule also requires an EOS application for any Post-Completion or STEM OPT applications. This means that a PhD student in a STEM field who experiences no unexpected delays in their degree completion would likely require three EOS applications if they intend to pursue STEM OPT. Any student that experiences an unexpected delay in their degree completion due to compelling medical or academic reasons would need to file additional EOS applications beyond this. Thus, the proposed rule would create a significant administrative burden on the PhD student population and would result in a drastic increase in the USCIS workload.

Furthermore, the substance of PhD programs differs qualitatively from other academic programs. The proposed rule calculates the four-year maximum period of admission on the basis of the bachelor's degree program model, which normally requires four years of academic course enrollment to meet the requirements for graduation. PhD programs are structured on a fundamentally different model. The culminating academic requirement for most PhD programs is the dissertation, which requires several years of research and writing. The amount of time needed to complete a dissertation varies both by discipline as well as the particular parameters of each individual student's dissertation topic.

The inherently uncertain nature of the research process leads to timelines that evolve as a project unfolds. Even under the best of circumstances, the length of time a student needs to complete their project is variable as they must dynamically respond to challenges or may need to pursue new, unexpected lines of inquiry. This means that a PhD student may not know how much additional time they will need as of the time they must submit an EOS. As a result, it would not be uncommon for PhD students to require multiple EOS applications in order to complete their academic program, which would be disruptive and unnecessarily burdensome on this group of students.

The current duration of status (D/S) model coupled with the careful review of extension requests by Designated School Officials (DSOs) or Alternate Responsible Officers (AROs) provides the appropriate balance between ensuring that students complete their program in a reasonable timeframe while allowing flexibility for students who require additional time beyond the normal program length due to compelling academic or medical circumstances. The actions DSOs/AROs take are time-stamped and reported in SEVIS for DHS to access at any time, providing DHS real-time information about F and J students and their activities in the US. Since the inception of SEVIS, DHS has steadily increased reporting requirements for sponsoring institutions, collecting increasingly detailed information on each F and J status holder. In addition, the US Department of State has strengthened its background

[2] National Center for Science and Engineering Statistics. Survey of Earned Doctorates, 2025. https://ncses.nsf.gov/surveys/earned-doctorates/2024. Accessed September 19, 2025.

checks through expanded biometric data collection. With this in mind, we recommend that DHS kindly reconsider maintaining the current system of admitting F-1 and J-1 students to the US for duration of status.

However, if DHS decides to move forward with implementing a fixed period of admission for F-1 and J-1 status, we recommend that DHS allow students to enter the US for the full program length listed on the I-20 or DS-2019 used for their initial entry. The program dates on a student's immigration document reflect the amount of time in which a student is normally expected to complete that particular degree program, information which is also reported to DHS on a school's I-17 and through the institution's Department of Education reporting.

We also recommend that DHS permit DSOs or AROs to extend a student's F-1 or J-1 status for up to a period of one additional year in SEVIS without requiring an EOS application through USCIS. Instead of inundating USCIS with a significant number of EOS applications, DHS could allow DSOs/AROs to accommodate limited extensions for documented academic or medical reasons permitted under the federal regulations. DHS could still require EOS applications for students who require additional time beyond the period authorized by their sponsoring institutions. This would allow DHS to focus its resources on the cases in which there is a legitimate question regarding the student's nonimmigrant intent while allowing an I-20/DS-2019 extension of limited amounts to be handled by school officials.

**2. The restriction on pursuing a subsequent degree at the same degree level unnecessarily limits a student's ability to pursue their legitimate education objectives.**

The proposed rule includes a provision that would prevent an F-1 student from pursuing a subsequent program at the same educational level or a lower education level. In the preamble, it is stated that "DHS believes that it is reasonable for a student to progress to a higher educational level as that is the traditional trajectory in the pursuit of higher education. Movement within the same level after completion of a program or to a lower educational level raises concerns regarding whether the F-1 alien is a bona fide student who intends to temporarily and solely pursue a full course of study rather than pursuing different degrees as a de facto way to prolong their stay in the United States." (42088)

We share DHS's concern in cases where a student completes a degree program that required English proficiency as a condition of admission and then proceeds to enroll in an English language program. However, a blanket restriction that prevents any student from enrolling in a subsequent degree at the same level significantly hampers a student's ability to pursue their legitimate educational goals. It is true that the bachelor's to master's to PhD pathway is a common degree sequence within the US, but the higher education sector has been evolving, and many degree sequences now fall outside this traditional framework.

The notion of a "higher" or "lower" degree becomes much less clear when comparing degrees across different disciplines. For instance, is a Juris Doctor (JD) degree higher than a Master of Business Administration (MBA) or vice versa? Is a Doctor of Medicine (MD) degree at the same or higher level than a JD program? One could reasonably imagine a student progressing between such degrees in either direction or sequence while still pursuing their educational objective.

There are also legitimate reasons that a student could choose to pursue a second degree at the same education level. A student may desire a change of vocation or have a legitimate interest in additional credentials in a related field. The mere fact that an F-1 student wishes to pursue a second degree at the same level does not inherently suggest that the student has abandoned their nonimmigrant intent.

Furthermore, some degree sequences require prior completion of a degree at the same educational level as a condition for admission to a new program. For instance, according to the Commission on Accrediting of The Association of Theological Schools in the United States and Canada, the ThM degree is "an advanced, academically oriented, master's degree for people who already have a Master of Divinity degree or other graduate theological degree providing equivalent academic background. This degree prepares people to study more deeply in theologically related disciplines, often in preparation for doctoral studies."[3] Thus, admission to the ThM program, a master's degree, is only available to individuals who have already obtained a degree at the master's level. Under the proposed rule, F-1 students in such a scenario would be categorically ineligible to pursue this type of degree.

We are also concerned about the possible impact of the proposed rule in situations where a student needs to take a break during the middle of their degree program and will return to US in the future to resume their program at the same level. Often referred to as a *leave of absence*, this type of scenario is not uncommon for students at the undergraduate level who need to return to their home country for mandatory military duty. However, there are other reasons that a student may choose to take a leave of absence, such as for medical reasons, family reasons, etc. In such cases, a student would normally depart the US and return at a later date under a new SEVIS record at the same degree level to resume their studies. Under the proposed rule, it is unclear whether this population would be subject to the limitation on returning to complete a degree at the same educational level.

In the Preamble, DHS states that the current system "has enabled thousands to stay here for decades by switching programs and not making upward progress" (42088), pointing to 2,134 F-1 students who entered the US between 2000 and 2010 and remain in active F-1

---

[3] The Commission on Accrediting of The Association of Theological Schools. *Standards of Accreditation*. Approved 2020. Section 4.10. pg 5. https://www.ats.edu/files/galleries/standards-of-accreditation.pdf. Accessed September 19, 2025.

status. While DHS raises a genuine concern warranting additional review of these individuals, this group represents a small percentage of the total number of F-1 students who have come to the US during that period. The consequences of the sweeping restriction disproportionately affect the much larger group of students who are adhering to the requirements of their F-1 status. Instead, we recommend that DHS implement a revised version of the provision that specifically prevents students who have already completed a degree in the US from transitioning to an English language program. This would allow DHS to eliminate the most egregious cases of students pursuing language training that is clearly unnecessary without impinging on the ability of F-1 students to pursue their *bona fide* educational goals.

**3. Simultaneous Filing of Extension of Stay (EOS) applications with OPT and STEM OPT applications is redundant and creates an unnecessary additional burden for USCIS.**

The proposed rule states that "an F–1 student wishing to engage in Post-Completion OPT or a STEM OPT extension would need to file both an EOS application and an application for employment authorization" (42084). Thus, the proposed rule would require F-1 students seeking to participate in Post-Completion Optional Practical Training (OPT) and the STEM OPT Extension to file both the I-765 and the I-539 for their work authorization and an EOS for each OPT application with the same agency, USCIS.

When filing the I-765, an F-1 student already provides documentation confirming their maintenance of status and eligibility for Post-Completion or STEM OPT. The evidence in the I-765 includes everything that is needed for USCIS to confirm a student's eligibility to remain in the US for the OPT period. Thus, requiring both of these applications would be unnecessary and redundant. This would substantially increase the administrative burden and cost associated with the OPT application process without enhancing USCIS's ability to assess a student's eligibility for this benefit.

The proposed rule would also constrict the timeline for applying for Post-Completion OPT which will likely delay a student's ability to begin their employment. Under the current regulations, an F-1 student "may properly file his or her Form I-765 or successor form up to 90 days prior to his or her program end date and no later than 60 days after his or her program end date." [4] The student selects a requested start date for the OPT period that falls sometime within the 60-day period after their program end date. The average processing time for that I-765 for Post-Completion OPT is approximately 90 days, and during peak periods, it is not uncommon for the processing time to exceed this amount. Thus, the current system already creates a tight timeline for filing the I-765 application and receiving the EAD card prior to a student's employment start date. Under the proposed rule, DHS intends to reduce the grace period for F-1 students to 30 days. This would result in a narrower window for a student's OPT start date and a shorter timeframe for filing the I-765

[4] 8 CFR 214.2(f)(11)(i)(B)(2)

application, complicating an already delicate application process. Additionally, by requiring both the I-765 and I-539 for OPT applications, the proposed rule would create a more complex process that is likely to result in additional delays. The combined result of the shorter grace period and the requirement of the I-539 would jeopardize a student's ability to begin their OPT employment in a timely manner, creating uncertainty that would negatively impact both the student and their US employer.

Furthermore, requiring both the I-765 and the I-539 for OPT applications would significantly increase the workload for USCIS officials. In fiscal year 2024, USCIS received 253,876 I-539 applications.[5] During that same period, USCIS received 197,318 applications for Post-Completion OPT and 94,485 applications for STEM OPT.[6] Thus, by requiring the I-539 for students applying for OPT, USCIS could expect to receive an additional 291,803 submissions of the I-539 per year, which would represent an increase approximately 115% in the USCIS workload for this type of application. Historically, USCIS has already experienced backlogs in the processing of the I-539, with median processing times as high as 9.6 months (FY2021).[7] Thus, these additional applications would only further exacerbate USCIS's already strained resources.

**4. J-1 *scholar* programs are structured differently from F-1 and J-1 student programs.**

A four-year fixed period of admission for the J-1 exchange visitor program would be inconsistent with the existing J-1 program lengths established by the Department of State (DOS). The J-1 program's current framework is already designed to limit the period of time that an individual may remain in J-1 status. For example, the maximum duration for the Professor and Research Scholar categories is five years, while Short-Term Scholars are limited to just six months. These carefully established, category-specific time limits serve the purpose of ensuring that exchange visitor stays are temporary and limited to fulfilling their educational and cultural objectives. In cases where an exchange visitor needs additional time beyond the maximum period for their category or requires a change of category, the exchange visitor is required to submit an application to DOS, which must be reviewed and approved before the program change can take place. Thus, the application of a fixed period of admission and requirement of EOS applications for J-1 exchange visitors

---

[5] United States Citizenship and Immigration Services. Number of Service-wide Forms By Quarter, Form Status, and Processing Time July 1, 2024 - September 30, 2024. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx. Accessed September 19, 2025.

[6] United States Citizenship and Immigration Services. Form I-765 Application for Employment Authorization, All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type, Fiscal Year 2024. https://www.uscis.gov/sites/default/files/document/data/i765_application_for_employment_fy24.xlsx. Accessed September 19, 2025.

[7] United States Citizenship and Immigration Services. Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year. https://egov.uscis.gov/processing-times/historic-pt. Accessed September 19, 2025.

would unnecessarily duplicate the existing safeguards built into the structure of the J-1 program.

The program length on an exchange visitor's initial DS-2019 may also be limited by the availability of funding. DOS regulations require that an exchange visitor show funding for the full length of the program dates on their DS-2019. For instance, for postdoctoral fellows, it is very common to receive funding that is awarded on an annual basis with the opportunity to renew. Thus, even though individuals can participate in the Research Scholar category for up to 5 years, in such scenarios the DS-2019 program duration would be limited to one year to reflect the length of their contract. The proposed rule would thus require Research Scholars, say a postdoctoral fellow, to apply for multiple extensions, potentially hampering their research progress and inadvertently lengthening their stay in the US even further.

Similarly, the J-1 Alien Physician category, commonly used for medical residents and fellows, utilizes DS-2019s for a one-year duration since Graduate Medical Education (GME) programs operate on structured annual cycles. Under the proposed rule, medical residents and fellows would also need to file multiple extensions, which could cause disruptions in patient care across the country. According to Intealth, approximately 16,000 medical residents and fellows were in J-1 status in 2024, comprising roughly 10% of resident physicians in the US.[8] J-1 Alien Physicians often serve in rural and medically underserved areas of the US, such as locations in Georgia, Texas, Florida, Pennsylvania, and Ohio.[9] Many of these physicians go on to pursue additional training in medical specialties that are much needed in the US. Thus, J-1 Alien Physicians serve a critical role in the US healthcare infrastructure. Requiring annual EOS applications for all J-1 Alien Physicians would create an unnecessary administrative burden that could have a significant negative impact not only on the international medical residents and fellows and their institutions, but also upon the many American citizens who rely on their life-saving care.

On a more general level, the J-1 Exchange Visitor Program is governed by a comprehensive regulatory framework that actively and effectively safeguards against fraud and abuse, such as the 12-Month Bar and the 24-Month Bar. SEVIS allows DHS, DOS, and institutional program sponsors functional oversight of all J-1 program participants. Program sponsors are legally mandated to monitor participants' activities and promptly report any serious issues, including violations of maintenance of status requirements and fraud to DOS. This system of continuous monitoring and accountability already provides a deterrent against misuse. The existing structure of the J-1 program, with its built-in time limits and robust oversight mechanisms already effectively addresses concerns about program integrity and

[8] Intealth, doing business as the Educational Commission for Foreign Medical Graduates (ECFMG), is the only J-1 sponsors designated by the Department of State to host individuals in the J-1 Alien Physician category. Data on medical residents and fellows in the US in J-1 status is available on their website (https://www.intealth.org).
[9] *Id*.

temporary stay. An additional four-year limitation would add an unnecessary layer of regulation that could hinder the educational and cultural objectives of the Exchange Visitor Program, as well as the benefits that the J-1 program offers to the US.

**5. DSOs are better situated to work with campus partners who possess the academic and research expertise and access to information needed to make academic decisions.**

The proposed rule assumes shifting oversight from Designated School Officials (DSOs) to USCIS will strengthen compliance and consistency. However, the existing Duration of Status (D/S) framework already accomplishes these objectives through DSO oversight and real-time SEVIS reporting, as mandated by various government rules.
DSOs are federally authorized school employees responsible for managing SEVIS processes, applying federal regulations within institutional contexts, and maintaining their school's ability to host international students and scholars. With direct access to academic records, faculty, and institutional policies, DSOs are uniquely positioned to make accurate, timely determinations based on legitimate educational objectives. By contrast, USCIS adjudicators, while essential to maintaining the integrity of US immigration programs, are deficient of the institutional knowledge or academic context required to assess academic matters such as whether additional time is justified for doctoral dissertation research, for instance.

At institutions such as Emory University, DSOs receive structured preparation that includes study of federal regulations and supervised training as well as ongoing continuing education through conferences and other training programs. This ensures consistent application of immigration rules in close coordination with institutional academic standards.

If DHS is concerned about inconsistencies in DSO application of regulations, a more constructive alternative would be to standardize training for DSOs rather than centralize adjudications with USCIS. Previously available SEVP resources, such as the External Training Application (SETA) and Online DSO Training modules, could be updated and made mandatory and paired with periodic refreshers and targeted guidance. Combined with SEVIS reporting, such measures would enhance consistency and accountability without duplicating oversight through USCIS.

While DHS raises concerns about inconsistency and instances of fraud, existing mechanisms have already proven effective at addressing these, as evidenced by examples listed in the preamble. SEVIS monitoring, regularly scheduled F-1 school recertification, and enforcement actions have identified and sanctioned violators, demonstrating that the current system can detect and address abuse. Moreover, DSOs do not operate in isolation. They adhere to federal regulations, DHS guidance, and national professional standards. Institutions are also bound by compliance obligations through SEVP certification and

biannual recertification. These layers of accountability already promote consistency and protect integrity.

Immigration compliance and academic determinations are inherently linked in practice. A dissertation extension, for example, cannot be evaluated in purely administrative terms; it requires understanding the academic milestones that justify the additional time. DSOs, directly coordinating with academic programs within their own institutional context, are best positioned to balance academic progress with regulatory compliance. Rather than diverting scarce agency resources to duplicate these determinations through USCIS adjudications, preserving D/S, while enhancing DSO training and accountability, would more effectively achieve DHS's objectives and maintain the efficiency, flexibility, and academic integrity that are central to US higher education.

**6. The rule would add additional administrative and financial burdens on DHS.**

The influx of EOS applications necessitated by the proposed rule would result in a significant increase in workload for USCIS. In assessing the expected impact of the proposed rule, DHS states that "Based on the historical data, regulatory criteria, and the transition period assumptions, DHS estimates an annual average of 205,000; 203,000; 6,000 EOS requests for F, J, and I nonimmigrants, respectively, over the ten-year period of analysis" (42101). Thus, DHS expects to receive an additional 414,000 submissions of Form I-539 by F, J, and I nonimmigrants requiring an extension of their status, representing a 163% increase from the number of applications received by USCIS in FY2024.[10] This in itself represents a substantial administrative burden.

However, the figures presented by DHS in the proposed rule drastically underestimate the number of extensions applications that would be necessitated by the proposed rule. DHS indicates that they expect to receive an additional 205,000 EOS applications annually for F-1 students. Under the proposed rule, any student applying for Post-Completion and STEM OPT would also need to submit an application for an EOS using Form I-539. In FY2024, USCIS received a total of 291,803 submissions of the I-765 for Post-Completion and STEM OPT.[11] This means that the number of new I-539 applications submitted each year for practical training alone would exceed the number of new I-539 extensions for F-1 students estimated by the proposed rule. This is before considering any I-539 applications for

---

[10] In FY2024, USCIS received a total of 253,876 submissions of Form I-539. United States Citizenship and Immigration Services. Number of Service-wide Forms By Quarter, Form Status, and Processing Time July 1, 2024 - September 30, 2024. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx. Accessed September 19, 2025.

[11] United States Citizenship and Immigration Services. Form I-765 Application for Employment Authorization, All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type, Fiscal Year 2024. https://www.uscis.gov/sites/default/files/document/data/i765_application_for_employment_fy24.xlsx. Accessed September 19, 2025.

students who need additional time to complete their program or to pursue a new degree at a higher level.

USCIS has historically struggled with a significant backlog in pending applications. In recent years, the agency has made strides in addressing this backlog, and we appreciate USCIS' efforts. It is difficult to imagine how USCIS would accommodate the drastic increase in applications generated by the proposed rule. Instead, there are more efficient ways to achieve the national security objectives outlined in the proposed rule, such as more effective use of readily available data in SEVIS and increased training opportunities for school officials, that would help avoid this considerable negative impact on the USCIS workload.

**7. Individuals in F-1 and J-1 status are already heavily vetted and monitored prior to their arrival and during their program duration.**

The proposed rule seeks to implement a fixed period of admission as a way to more effectively monitor individuals in F and J status. In the preamble, DHS summarizes the goal of the rule as follows: "These changes would ensure that DHS has an effective mechanism to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications and the US immigration laws, and to obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States" (42072). However, the SEVIS system already provides a robust and effective means of monitoring those in F-1 and J-1 status.

Individuals in F-1 and J-1 status are already among the most heavily monitored nonimmigrant categories in the US immigration system. Most other nonimmigrant statuses are reviewed at the time of entry to the US and only receive further evaluation upon submission of a future application or petition to USCIS. Those in F-1 and J-1 status, on the other hand, are closely monitored through the SEVIS system. SEVIS provides real-time information to US government agencies throughout the duration of an F-1 or J-1 nonimmigrant's stay in the US. In contrast, F and J nonimmigrants are required to report any changes to their academic program, source of funding, biographical information, address and contact information, etc., on an ongoing basis throughout the course of their stay in the US. This information is uploaded into SEVIS and made available for immediate review as of the time of the change in the SEVIS system. Each action is time-stamped and can be tracked by DHS.

The examples of problem behavior by an individual in F-1 or J-1 status cited in the proposed rule provide evidence that SEVIS is working as intended when it comes to monitoring schools and students. At multiple points through the preamble, DHS highlights a group of 2,134 F-1 students who entered the US between 2000 and 2010 and remain in active F-1 status. The fact that DHS is able to compile this exact number of students provides proof that SEVIS possesses the necessary data to quickly and easily locate students of concern

who require additional review by DHS. In section IV.C.ii: Risks within the F Classification, the proposed rule references “school owners who have been criminally prosecuted for ‘pay to play’ fraud, in which school officials, in return for cash payments, falsely report that F-1 students who do not attend school are maintaining their student status” and “school owners who operated multiple schools to transfer students among them to conceal fraud”. In both of these examples, the proposed rule further states that these school owners have been identified, prosecuted, and convicted, therefore indicating that the system is already working as intended in identifying fraudulent activities.

Instead of implementing this proposed rule and drastically changing the current procedures, we recommend that DHS adopt a more targeted, less intrusive, and less cumbersome alternative approach that focuses on these known, problematic cases. This would not only be less disruptive for the vast majority of F-1 and J-1 students and scholars who are adhering to the terms of their status as set by the US government, but it would also allow USCIS to operate more efficiently. This approach would allow DHS to address those limited number schools who are misusing F-1 and J-1 status.

An institution’s approval by DHS or DOS to host F-1 students and J-1 exchange visitors is not indefinite. DHS already conducts bi-annual recertification for all institutions that host F-1 students and redesignation for all program sponsors that host J-1 exchange visitors. If a school is found to be lacking, not following the regulations, or conducting a fraudulent program, it is possible for them to lose their designation during this mandatory review period. Thus, the current recertification/redesignation process provides an opportunity to withdraw the designation from the aforementioned schools when they participate in fraudulent activity. Working within the current framework would allow DHS to target fraud without jeopardizing the academic programs of F-1 and J-1 foreign nationals who are already taking the necessary steps to lawfully maintain their status.

**8. The proposed rule would result in negative, unintended consequences for other benefits, including state-governed processes such as driver’s licenses.**

One of the unintended consequences of the proposed rule is the impact it can have on eligibility for other benefits that are dependent on the applicant’s ability to document their valid status in the US. For instance, in the state of Georgia, nonimmigrants may only receive a driver’s license for the period of approved status based on their current immigration documents. In cases where an individual’s ability to remain in the US is based on a pending extension application with USCIS, they are unable to fully extend their driver’s license until the extension has been approved by USCIS. In Georgia, regardless of a number of extensions, individuals are eligible for just one-time temporary extension of their driver’s license for life. This means a J-1 Alien Physician would not be able to drive while their second and subsequent EOS are pending due to the state’s rules. Many of these physicians work in areas with limited or no public transportation, as such they rely on the ability to drive to their hospitals and clinics to see patients.

**9. The proposed rule would have a negative short-term and long-term impact on innovation and research as well as US economic, diplomatic, and national security efforts.**

The US has a long history of welcoming international students and scholars to our academic institutions. Removing duration of status could deter international students from pursuing a degree in the US by introducing additional fees and administrative processes to a student's regular period of stay and potentially jeopardizing a student's ability to complete their degree program. This heightened risk—along with the perception of increased uncertainty—may prompt international students and their families to pursue academic opportunities elsewhere in the world, given the significant life investment involved. As a result, it would have a disastrous impact on US innovation and research, as well as on the economy and diplomatic efforts.

International students make up approximately 17% of Emory University's student body and contribute economically, intellectually, and culturally to Emory, as well as in Atlanta and Georgia. According to NAFSA's International Student Economic Value Tool, Emory's international students contributed $187.2 million to the US economy and supported 2,136 jobs during the 2023-2024 academic year.[12] Nationally, international students contributed $43.8 billion and created or supported 378,175 jobs during the 2023-2024 academic year. According to a 2022 publication by the National Foundation for American Policy, one in four US startup companies valued at over $1 billion was founded by someone who initially came to the United States as an international student. In addition to the more quantifiable economic benefits, international students and scholars promote cross-cultural understanding in the classroom on a daily basis—in residence halls, across campus programs and engage with the community through Emory's robust volunteer projects—benefiting our domestic students and preparing them for global leadership.

This proposed rule will also negatively affect the mission and philosophy of DOS's BridgeUSA Program whose purpose is "to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchanges." If individuals are unable to complete their program objectives within the legally permitted period of stay and must apply for an extension, they may be less inclined to pursue their studies in the US. As outlined above, this could negatively impact the US economy, stifle innovation, and hinder mutual understanding and global cooperation.

[12] NAFSA. NAFSA International Student Economic Value Tool. https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2. Accessing September 21, 2025.

**Conclusion**

In sum, while we appreciate DHS's desire to ensure national security, the proposed rule in its current form will not achieve the desired outcome in an efficient and effective manner. The proposed rule suggests disrupting the entire immigration ecosystem to prevent fraudulent activities by a limited few. The proposed rule would create a costly and burdensome process that would significantly increase the workload for DHS and would create an unnecessary burden for international students and scholars and their host institutions. The current framework based on duration of status provides a flexible, agile system that appropriately balances the need to monitor individuals in F-1 and J-1 status without unnecessarily taxing the already overburdened immigration system and costing federal resources. There are sound alternative measures using the existing framework that would provide DHS with a substantially more efficient and cost-effective means of accomplishing its goals. Therefore, we recommend that DHS considers withdrawing the proposed rule and partnering with sponsoring institutions to explore ways to enhance the current duration of status framework that will be mutually beneficial.

Thank you, again, for this opportunity to provide comments.

Sincerely,

Jane Gatewood, PhD
Vice Provost for Global Engagement

# EXHIBIT 7

ECFMG Intealth™ FAIMER
Advancing the Global Health Workforce

September 22, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Noem:

On behalf of Intealth, we respectfully submit this comment regarding the U.S. Department of Homeland Security's (DHS) proposed rule, *"Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media."* We focus specifically on the application of this rule to J-1 exchange visitor physicians in graduate medical education (GME) programs.

Based on our extensive experience overseeing the J-1 physician program, the application of this proposed rule as currently drafted would create significant practical challenges and disrupt both physician training and patient care at teaching hospitals nationwide. We instead respectfully urge the Department to exclude J-1 physicians from this rule and to allow this uniquely qualified, in-need, and highly vetted population to continue to be admitted into the United States with the "duration of status" designation. The J-1 physician program should be the model for how a visa program should be reviewed and monitored.

**I. Summary of Intealth's Position.**

For more than three decades, the duration of status (D/S) system has enabled J-1 physicians to complete uninterrupted training, aligning the varying lengths of physicians' medical programs with their immigration admission periods. The system has functioned with stability, transparency, effectiveness, and minimal evidence of visa overstays (DHS, FY2024 Overstay Report). Replacing D/S with fixed admission periods and repetitive extension of stay (EOS) filings would create systemic disruption to U.S. health care, impose economic burdens, and increase administrative inefficiency. At a time when the country faces a projected shortage of up to 187,000 full-time equivalent physicians by 2037 affecting specialties including family medicine, internal medicine, pediatrics, and geriatrics (HRSA, 2024a,b), undermining the ability of J-1 physicians to train and serve will directly harm patient care, workforce planning, and public health in some of the most underserved and in-need communities across the country, including U.S. veterans.

*a. The D/S designation was designed to streamline the Exchange Visitor Program, which is imperative to J-1 physicians' ability to support health care in America.*

The J classification, created by the Fulbright-Hays Act of 1961, was amended in 1985 to admit exchange visitors for the duration of their program plus 30 days. The purpose was explicit: reduce unnecessary reporting, streamline paperwork, and acknowledge that J categories—like J-1 physicians—were low risk for violating their status (*See* INS, 1985). Elimination of D/S in the proposed rule undermines the clearly stated purpose of Congress's public policy goals of achieving administrative efficiency, which J-1 physicians, U.S. hospitals and medical colleges, and American patients need to receive health care.

b. *There is no evidence of visa overstays by J-1 physicians*.

DHS put forth that the proposal addresses visa overstays. However, DHS's own data show no evidence of overstays specific to J-1 physicians (DHS, 2020). Eliminating D/S would add thousands of annual applications for EOS without reducing risk, since existing oversight mechanisms—the Student and Exchange Visitor Information System (SEVIS), sponsor certifications, and reporting—already ensure compliance.

c. *Alternatives exist to achieve the Administration's goals*.

Intealth encourages DHS to consider strengthening SEVIS and expanding programs like the Voluntary Self-Reported Exit (VSRE) pilot, rather than requiring repetitive EOS filings. Enhanced biometric data intake and mandatory sponsor certifications could further reinforce compliance without overwhelming USCIS or disrupting health care delivery.

Below we outline why J-1 physicians are distinct from other J-1 nonimmigrants, how the American health care system will be impacted by the proposed rule, and a summary of recommended adjustments to the rule, in the event the Department proceeds with its final publication.

## II. J-1Physicians are Distinct from Other J-1 Categories.

Currently, close to 17,000 J-1 physicians from nearly 150 different countries train at approximately 770 teaching hospitals in the United States. They participate in the U.S. Department of State's (DOS) "BridgeUSA" J-1 Exchange Visitor Program, designed to advance both U.S. health care delivery and patient care in the most hard-to-reach and underserved rural communities in the country, including those serving U.S. veterans. Unlike other J-1 categories, physicians are subject to extraordinary, overlapping layers of screening and oversight.

Before training, J-1 physicians are subject to:

- **ECFMG Certification:** All physicians must earn ECFMG Certification before beginning training in the United States. This process requires passage of U.S. medical licensing exams to assess medical knowledge, demonstration of clinical skills, proof of English language proficiency, and rigorous primary-source verification of every medical education credential directly with medical schools. Identity is confirmed through notarized or school-certified documents, and applicants are screened against the U.S. Treasury's Specially Designated Nationals (SDN) List and other federal security watch lists both at the outset and at completion of certification.

- **National Security Vetting, Identity Checks, and Fraud-Prevention Screening:** Physicians undergo extensive national security vetting prior to arrival, including multiple checks against the SDN List and other federal security watchlists. Fraud-prevention protocols require identity verification across all exam records and credential submissions, ensuring consistency and guarding against document fraud or impersonation. These safeguards occur before any visa is issued, adding layers of protection for the U.S. health care system.

- **Intealth Sponsorship:** Intealth dba ECFMG, is the sole DOS–designated sponsor for all J-1 physicians. Sponsorship is granted only after comprehensive review to ensure eligibility and compliance with federal and institutional requirements. Physicians must demonstrate readiness for training, secure placement in an accredited program, and meet all documentation and vetting standards before a DS-2019 (Certificate of Eligibility for Exchange Visitor Status) is issued.

After entering training, J-1 physicians are subject to:

- **Program and Accreditation Oversight:** J-1 physicians may train only in accredited residency and fellowship programs or in non-standard training programs at recognized institutions. These programs are subject to stringent institutional and specialty-specific requirements, ensuring that physicians are appropriately supervised and engaged in quality educational experiences throughout training.

- **Continuous Federal Tracking and Reporting:** All J-1 physicians are tracked in the Student and Exchange Visitor Information System (SEVIS), a joint database maintained by DHS and DOS. Sponsors must update SEVIS in real time with events such as program transfers, leaves of absence, or early terminations. J-1 physicians also undergo required semiannual validations, and their DS-2019 (Certificate of Eligibility for Exchange Visitor Status) must be renewed each year, ensuring uninterrupted visibility into their compliance and program status.

- **Ongoing Institutional and Program Director Oversight:** Each teaching hospital designates staff to liaise directly with Intealth, providing continuous reporting on J-1 physician participation. Program directors evaluate physicians formally on a regular basis and must renew training contracts annually, confirming that competencies are met and that the physician is fit to advance in training.

- **Annual Compliance Renewal with Intealth:** In addition to institutional oversight, J-1 physicians must complete an annual renewal process with Intealth. This includes verification of progression in training, confirmation of good standing within the residency or fellowship program, and assurance of continued eligibility for sponsorship. This layered review process ensures alignment with federal regulations and institutional standards.

- **Ongoing National Security and Identity Screening:** In addition to the pre-arrival security vetting that physicians must pass, security monitoring continues throughout the training program. Each time a J-1 physician accesses their Intealth account (MyIntealth), their record is automatically screened against the SDN List and other federal security watchlists. This continuous, real-time vetting ensures that any changes in an individual's security status are immediately flagged and addressed.

This multi-layered framework creates transparency, accountability, and compliance that far exceeds most visa categories.

**III. J-1 Physicians Are Already Subject to Significant Monitoring Through SEVIS.**

SEVIS provides a comprehensive, real-time oversight framework for J-1 physicians. DHS, DOS, and sponsors maintain continuous visibility into physician activities, compliance, and program status through SEVIS. Sponsors are required to update SEVIS promptly with any changes, and DHS automatically integrates entry and exit records from U.S. Customs and Border Protection (CBP). In this way, the existing D/S framework fully satisfies oversight needs while minimizing unnecessary paperwork. By contrast, the proposed EOS requirement duplicates these functions without providing any new compliance benefits, while imposing substantial costs and risks of delay.

SEVIS collects and maintains biographical data and program information, including the J-1 sponsor's details, training site addresses, and program periods, all of which would be redundantly submitted in EOS submissions. For any changes to this information, the J-1 sponsor is required to immediately report changes into SEVIS to ensure compliance, a process that would be duplicated, and indeed made less timely, by an EOS submission. To ensure compliance, J-1 physicians are required to complete mandatory annual DS-2019 renewals and twice-yearly SEVIS validations to confirm active status and compliance—a process that more closely and regularly monitors compliance

than EOS submissions. Importantly, SEVIS also automatically tracks the arrival and departure information for all covered visa holders through CBP's I-94 system—which again would be redundant to an EOS submission. And any status violations or non-compliance is required to be submitted directly into SEVIS, which then automatically notifies both DHS and DOS. In short, the change from the current D/S model to required status extensions would only serve to duplicate the current processes used to closely track compliance of J-1 visa holders.

## IV. J-1 Physicians Do Not Displace U.S. Graduates.

J-1 physicians are essential for the U.S. medical care workforce. They do not displace U.S. physicians. Each year, U.S. medical schools graduate approximately 28,800 students, while residency programs offer roughly 40,000 positions (NRMP, 2025). J-1 physicians fill a little under 5,000 of these positions, directly ensuring that hospitals can meet patient care needs across the country. Without these physicians, thousands of residency slots would go unfilled, leaving critical gaps in both the training pipeline and patient access to care.

J-1 physicians disproportionately serve in primary care specialties most affected by shortages, including internal medicine, pediatrics, and family medicine. More than 70% of J-1 physicians train in hospitals located in communities ranked as medium- to high-vulnerability by the CDC Social Vulnerability Index (CDC Social Vulnerability Index, 2023), meaning they provide essential care for patients facing higher rates of poverty, disability, lack of insurance, and other barriers to health. Their presence allows teaching hospitals not only to sustain residency and fellowship programs, but also to maintain vital services in departments that might otherwise be forced to reduce services or close.

The impact of J-1 physicians extends beyond the bedside. According to the American Medical Association (AMA), each physician in the United States supports an average of seventeen jobs and generates approximately $3.2 million in economic output annually (AMA, 2018). By stabilizing the physician workforce in underserved communities, J-1 physicians strengthen local economies, ensure continuity of care, and safeguard the resilience of hospitals that serve as lifelines for millions of Americans.

In short, J-1 physicians do not displace U.S. graduates, they complement them. By filling positions that would otherwise remain vacant, they expand the capacity of the U.S. health system, shorten wait times, and ensure that patients in underserved rural and urban communities receive timely, high-quality care.

## V. The Proposed Rule Creates Substantial Risks to Patient Care.

Eliminating the D/S designation would exacerbate physician shortages by impeding J-1 physicians from progressing through residency and fellowship, delaying matriculation, and hindering relocation for specialty training. Simply put: disruptions to J-1 physician training have direct, measurable consequences for patients.

- **Hospitals may be forced to reduce services or rely on costly stopgaps.** If Extension of Status (EOS) adjudications are delayed, hospitals may be left without adequate staffing. For many teaching hospitals, J-1 physicians are not supplemental but essential to maintaining service lines, particularly in primary care and high-need specialties. Fewer physicians on the floor means fewer patients cared for each day.

- **Training progression could be interrupted despite full compliance.** J-1 physicians move through a structured pipeline, from one residency year to the next, or into subspecialty fellowship training. If immigration processing lags behind these transitions, physicians may be barred from continuing, even when fully qualified and approved by their programs. These delays create gaps in patient coverage and undermine the continuity of graduate medical education.

- **Patients already face long waits.** Average wait times for a new physician appointment are nearly one month in U.S. metropolitan areas (Merritt Hawkins, 2022), with even longer delays in rural settings. Weakening the J-1 pipeline would exacerbate these waits, disproportionately harming patients in underserved communities where J-1 physicians train in the greatest numbers.

- **Ripple effects extend to other trainees.** When J-1 physicians are absent, remaining residents and fellows must absorb additional workload. This stretches already thin teams, reducing available time for direct patient care and compromising the quality of training for the entire cohort of future physicians.

- **Patient safety is at risk.** Reliance on short-term or temporary coverage fragments care and increases the risk of errors. Patients benefit most from stable care teams that know their medical histories and communities. The proposed rule undermines that stability, making care less safe for patients and less effective for training physicians.

## VI. The Proposed Rule Will Disproportionately Impact Medically Underserved Communities.

The proposed rule would have disproportionate negative social and economic impacts on medically underserved communities, which already experience persistent shortages of physicians. J-1 physicians disproportionately train and serve in hospitals located in Health Professional Shortage Areas (HPSAs) and in regions identified as medium- to high-vulnerability by the CDC Social Vulnerability Index (CDC, 2023). Without these physicians, many teaching hospitals, particularly in rural and underserved regions, would be unable to sustain residency and fellowship programs, forcing reductions in services, closure of specialty departments, or reliance on costly temporary contract physicians (AAMC, 2023).

Beyond patient care, J-1 physicians generate substantial local economic benefits. Each physician supports an average of seventeen jobs and contributes $3.2 million in economic output annually (AMA, 2018). Removing or destabilizing this workforce would directly reduce employment and revenue in fragile local economies. Further disruptions would exacerbate access gaps, increase reliance on emergency departments, and drive up uncompensated care costs. During the COVID-19 pandemic, J-1 physicians served on the front lines in some of the hardest-hit hospitals, underscoring their essential role in sustaining public health infrastructure (ECFMG|FAIMER, 2020). Weakening this pipeline will deepen shortages, destabilize local economies, and jeopardize the resilience of America's most vulnerable communities.

## VII. The Proposed Rule Creates Substantial Economic, Administrative, and System Risks.

If implemented, the proposed rule will destabilize graduate medical education. Residency and fellowship training programs operate on precise annual cycles, with contracts issued just months in advance of the July start date. Requiring thousands of physicians to secure repeated immigration adjudications will inject unpredictable delays into this carefully timed system. The consequences will be profound: hospitals may find themselves unable to have a full complement of residents, leaving patients without coverage and burdening other residents and fellows with untenable workloads. This is not conducive to patient care, not conducive to learning, and jeopardizes a system that has worked effectively for decades.

Further, disruptions caused by delays or denials of extensions could force hospitals to reduce services or rely on costly temporary coverage. Other physicians in training will suffer as their learning is diminished by loss of cohort size and redistributed workload. Over time, the disruption will erode both the stability and the quality of graduate medical education in the United States.

The proposed rule, if implemented, would specifically introduce new points of disruption for hospitals, physicians, and patients.

- **Administrative Strain:** USCIS processing times already average six to nineteen months (USCIS, 2025). Requiring thousands of new EOS filings annually would exacerbate backlogs, creating uncertainty for hospitals and patient care.

- **Systemic Inefficiency:** Residency and fellowship training spans three to seven years, in addition to time required for orientation, remediation, parental/medical leave, exam extensions, or visa delays (ACGME, 2024). Under the proposed rule, these common realities would trigger repeated EOS filings, transforming routine training events into immigration risks.

- **Program Disruption:** Teaching hospitals issue contracts just months in advance of July start dates. With current USCIS processing timelines, thousands of physicians would be at risk for delayed program entry or continuation, interrupted training, or even unlawful presence.

- **Physician Burden:** EOS fees, consular visits, and lost training time would impose heavy costs on physicians earning modest stipends. In a survey of nearly 8,000 J-1 physicians, 63% cited visa uncertainty as a top factor affecting their well-being (ECFMG|FAIMER Wellness Survey, 2019).

Further, a policy that increases obstacles to join the U.S. medical profession dissuades global talent from offering their services, thereby placing our U.S. health care industry at a competitive disadvantage globally.

## VIII. The Current D/S Framework is Necessary for Physicians in the Exchange Visitor Program.

The J nonimmigrant classification was created more than sixty years ago by the Mutual Educational and Cultural Exchange Act of 1961, also known as the Fulbright-Hays Act of 1961. In 1985, the program was amended to admit participants for the duration of their program. And in 1991, The U.S. Information Agency (USIA) then issued a policy defining the purpose for the "D/S" designation: "USIA and the Service have agreed on the need to streamline control of the J program and to eliminate unnecessary, burdensome paperwork between our two agencies."

The existing D/S framework for J-1 physicians works because it:

- **Aligns immigration status with the realities of multi-year medical training programs.** Residency and fellowship training extends over several years, often involving sequential training steps. D/S accommodates this reality without requiring repeated immigration adjudications that could interrupt the continuity of training and patient care.

- **Provides flexibility for the inevitable events that arise in life and education.** Training programs must adapt to real-world circumstances that can extend or modify the duration of a physician's stay. These include:

    - Orientation periods at the start of training;
    - Remediation for physicians who need additional time to achieve competency;
    - Medical, parental, or educational leaves of absence;
    - Delays on reentry to the United States due to visa processing backlogs or international travel issues; and
    - Extensions needed to sit for an American Board of Medical Specialties (ABMS) member board exam (approximately 700 physicians each year require this adjustment). Such extensions are essential because they:

  - Ensure competency and patient safety by rigorously assessing physicians' knowledge and clinical skills;
  - Validate completion of training milestones, confirming that physicians have achieved the standards required by their specialty; and
  - Support physician career progression, enabling physicians to advance to fellowship or practice.

- **Recognizes the complex applications that require DOS review.** Certain cases add unavoidable administrative steps beyond Intealth's direct control, making EOS filings even less workable. These include:

  - **Changes of Category.** Intealth facilitates more than 500 change of category requests each year in which physicians moving from research scholar status to clinical training cannot be issued a DS-2019 until the day before the clinical program begins, even if DOS provided written approval months earlier.

  - **Exceptional Extensions.** J-1 physicians submit more than 150 requests each year to obtain extensions of their stay that require detailed justification and DOS review.

  - **Sponsorship Authorizations.** DOS authorizes ECFMG to sponsor more than 250 additional physicians, requests that must be approved through DOS before training can continue.

- **Operates under overlapping accountability from multiple layers of oversight.** J-1 physicians are subject to ECFMG Certification requirements, Intealth sponsorship and compliance renewal, SEVIS monitoring and reporting, and program accreditation by the Accreditation Council for Graduate Medical Education (ACGME). These redundant safeguards ensure that physicians remain in status, are progressing in training, and are fully vetted at every stage.

- **Has been stable and effective for more than 30 years.** There is no evidence of disproportionate misuse or systemic overstays resulting from the current D/S framework. In fact, there is no evidence that J-1 physicians overstay their visas. Comprehensive federal overstay reporting does not disaggregate a separate "J-1 physician" subgroup, and the J-1 classification is included within the broader student/exchange visitor reporting rather than singled out as a source of overstays (DHS, 2024). Peer-reviewed commentary has explicitly noted the absence of evidence of J-1 physician overstays, even in the face of regulatory proposals aimed at changing their extension process (Ehrlich et al., 2021). Taken together, the available administrative data, programmatic controls, and published commentary support the policy conclusion that J-1 physicians are not a documented source of visa overstays.

  Because J-1 physicians are subject to uniquely rigorous layers of oversight, including annual sponsorship renewals, continuous SEVIS reporting by Intealth, and institutional monitoring by their training hospitals, they have little opportunity or incentive to overstay. This demanding structure is precisely why their overstay rate is expected to be even lower than that of the broader J-1 exchange visitor population.

Under the current framework, Intealth serves as the designated sponsor for foreign national physicians under the J-1 ("BridgeUSA") Exchange Visitor Program. Most residencies are three or more years, and fellowships are one to three years. The initial J-1 sponsorship is usually for one year at a time. The D/S designation allows J-1 medical graduates to extend each year seamlessly through Intealth and SEVIS, only if (1) Intealth supports the extension and (2) the medical graduate meets the medical residency or fellowship program requirements. When medical graduates switch hospitals or programs, transferring sponsorship through Intealth and SEVIS ensures the J-1 visa holder's status remains valid. These processes allow Intealth to manage all requests for extensions and changes of status, without

requiring additional costly filings submitted to DHS. This creates an annual extension process that is standardized, seamless, and efficient.

The removal of the D/S designation would require J-1 physicians to submit applications to the U.S. immigration agencies for renewal of their participation in the program. These applications not only risk disrupting medical training programs and loss of otherwise valid visa status but also would result in an influx of government filings, applying a significant administrative burden on our immigration agencies, particularly given the historic and current backlog of immigration filing adjudications.

## IX. The Proposed Four-Year Admission Limit is Unworkable in Graduate Medical Education.

The proposed rule contemplates a maximum initial admission period of four years. While this limitation may align with F-1 students completing four-year degrees, a four-year period of stay is fundamentally incompatible with the realities of graduate medical education. Residency and fellowship programs range from three to seven years, depending on specialty, in addition to the time often required for board examination preparation, remediation, parental or medical leave, or unavoidable delays in visa processing and entry.

Even under ideal circumstances, many physicians in longer training specialties would exceed the four-year cap, forcing them into repeated EOS filings despite full compliance and likely creating instances of additional visa overstays due to administrative errors. But this misalignment is not merely an administrative inconvenience. It creates systemic uncertainty for physicians, hospitals, and patients alike. Training commitments are made years in advance; hospitals must guarantee continuity of the residency/fellowship complement to ensure patient care. A four-year limit introduces unnecessary risk of mid-program status interruptions, threatening the physician's lawful presence and hospital operations. Patients in the United States already face average wait times of at least one month for a new physician appointment (Merritt Hawkins, 2022). Imposing artificial, non-program-aligned deadlines will further exacerbate delays, deepen shortages, and directly impact public health.

Simply put, the four-year maximum term is unworkable for physicians and hospitals. To align with program realities and protect the U.S. public, the D/S model is most practical, administrable, and economical. However, if the D/S model is terminated, Intealth proposes a less disruptive model by which physicians are admitted for a fixed period of admission to match the full duration of their program length plus six months, ensuring flexibility for educational events while preserving continuity of care and safeguarding the integrity of the training pipeline.

## X. Summary of Policy Recommendations.

Intealth would welcome the opportunity to meet with the Administration to overview our concerns as well as discuss alternatives to the termination of the D/S designation to achieve the Administration's goals of protecting our borders and the health and safety of the American people. To avoid the substantial impacts discussed above, we offer the following policy recommendations.

a. *Preserve the D/S system for J-1 physicians.*

For more than three decades, the D/S framework has worked as intended: it ensures stability, minimizes bureaucratic burden, and allows J-1 physicians to complete uninterrupted training. DHS's own data confirm there is no evidence of systemic misuse or overstays among J-1 physicians (DHS, 2020). HHS projects a shortage of roughly 187,000 full-time equivalent physicians by 2037, affecting specialties including family medicine, internal medicine, pediatrics, and geriatrics (HRSA, 2024a,b), with rural areas expected to experience the greatest deficits. These projections are based on HRSA's Health Workforce Simulation Model, which accounts for retirements, new graduates, and workforce participation (HRSA, 2024a). Dismantling a system that has proven stable, effective, and compliant risks destabilizing the entire physician pipeline. Preserving D/S is the simplest and most effective policy to ensure America's patient care remains consistent while also ensuring compliance.

If DHS declines to preserve D/S for J-1 physicians, we urge the Department to amend the draft rule with the following:

b. *Provide a specific, fixed period admission for physicians to align with program lengths.*

If fixed terms of stay must be imposed, the Department should adopt a model that grants admission to J-1 physicians for the full length of their approved training program (as reflected on the DS-2019) plus an additional six months. This modest buffer reflects the realities of graduate medical education—remediation, board exams, visa entry delays, parental or medical leave—while preventing otherwise compliant physicians from falling out of status due to the administrative timing mismatches discussed above.

Without this adjustment, hospitals and patients will face repeated uncertainty that undermines the continuity of care.

c. *Expand the Voluntary Self-Reported Exit (VSRE) program.*

We note that the Administration has recently piloted the Voluntary Self-Reported Exit (VSRE) program. This program was implemented to more closely track the departures of visa holders in the United States. By integrating this program with the current SEVIS system, DHS will have the ability—potentially greater than that created by annual extension applications—to ensure visa holders are not overstaying their temporary period in the United States.

d. *Include specific reference that J-1 physicians can change programs, with the appropriately endorsed Form DS-2019, during the pendency of an EOS application.*

In the proposed rule, the Department makes clear that "J-1 nonimmigrants who are employment authorized *with a specific employer incident to status, continue to be authorized for such employment* for up to 240 days under the existing regulatory provisions at 8 CFR 274a.12(b)(20), if their status expires while their timely filed EOS application is pending . . .." 90 Fed. Reg. 42,073 (Aug. 28, 2025) (emphasis added).

In order to ensure that J-1 physicians have the flexibility to change hospitals, training programs, and commence medical fellowships, we respectfully request the Department amend this language as follows: "J-1 nonimmigrants who are employment authorized with a specific employer incident to status, continue to be authorized for such employment*, or any employment authorized by their designated J-1 sponsor on Form DS-2019,* for up to 240 days under the existing regulatory provisions at 8 CFR 274a.12(b)(20), if their status expires while their timely filed EOS application is pending . . .." (emphasis added).

Moreover, in order to ensure hospital systems employing J-1 physicians have clarity as to how to document these critical professionals' right to train and work in the United States, we respectfully ask the Department to modify Form M-274, Employer Handbook, which governs the Form I-9, Employment Eligibility Verification, process to reflect the procedures relating to automatic extensions of work authorization for J-1 physicians.

e. *Provide premium processing service for J-1 EOS applications.*

Currently, USCIS's premium processing service is offered for applicants seeking to change their nonimmigrant status to J-1. The proposed rule does not indicate that premium processing service will be offered for J-1 applicants seeking to extend their stay in the United States.

To avoid disruptions in patient care, the uncertainty of application review timelines, and the resulting overstays that may result from the newly required EOS applications, we recommend DHS immediately make premium processing service available for EOS applications.

f. *Provide automatic extensions of work authorization for J-2 Employment Authorization Document holders.*

Intealth supports a significant population of physicians in the United States that are work authorized pursuant to their J-2 status as the spouse of a J-1 visa holder. These J-2 spouses, who frequently are physicians themselves, are required to obtain an Employment Authorization Document (EAD) before they are able to begin work. The proposed rule will likely result in the loss of work authorization for these J-2 EAD holders as (1) their EADs are unable to extend beyond the admission period of the J-1 visa holder and (2) their work authorization ends as of the date of the expiration of the EAD. However, DHS regulations allow for the automatic extension of work authorization for certain EAD holders that timely file EAD renewal application prior to their current work authorization expiration (8 C.F.R. § 274a.2(b)(4)(vii)).

We respectfully submit that DHS include in the final rule a provision to allow for the automatic extension of work authorization for these J-2 EAD holders when EAD renewal applications are timely filed to ensure seamless work authorization and avoid the likely disruptions to patient care that result at the expiration of work authorization.

## XI. Conclusion.

At this moment of urgent national need, the United States cannot afford regulatory changes that risk destabilizing graduate medical education, weakening the physician pipeline, and compromising patient care. The D/S system for physicians has functioned effectively for more than three decades, ensuring that J-1 physicians, who are among the most rigorously vetted and closely monitored nonimmigrants in the nation, can train without interruption and provide critical care in communities across the country.

The proposed rule would introduce unnecessary costs, administrative inefficiencies, and systemic risks without producing measurable benefits for compliance or security. By contrast, preserving D/S aligns immigration oversight with the real-world demands of medical training and safeguards the continuity of care on which U.S. patients rely. International physicians do not displace U.S. graduates; they complement them, strengthen the health care system, alleviate shortages, and serve communities where the need is greatest. Disrupting this system would jeopardize not only the training of these physicians but also the health and well-being of the American public.

On behalf of Intealth, we respectfully oppose the proposed rule as written, as its application to J-1 physicians is both unworkable and impracticable, without adding any additional benefit. We do, however, earnestly seek to work collaboratively with DHS and the Administration to ensure that J-1 physicians continue to be fully vetted, compliant with all regulatory requirements, and well-supported in their training, while preserving the proven frameworks that protect patient safety and quality of health care, sustain the health care workforce, and maintain uninterrupted access to care. We urge DHS to preserve the established D/S system for J-1 physicians so that the United States can continue to rely on this essential workforce while upholding a regulatory approach grounded in stability, integrity, and effectiveness.

Sincerely,

Eric S. Holmboe, MD
President and CEO

Tracy L. Wallowicz, MLS
Senior Vice President, Regulatory Affairs
Chief Communications Officer
Responsible Officer

**Intealth** is a private nonprofit organization dedicated to advancing quality in health care education worldwide through the strategic integration of its two divisions: ECFMG and FAIMER. By uniting the expertise and capabilities of these entities, Intealth delivers a multi-layered portfolio of services that strengthen the education and training of health professionals, rigorously screen and vet individual qualifications, and guide the development of health workforce policies internationally, all while cultivating innovative solutions that serve critical areas of medical education.

Our services include primary-source verification of professional credentials, comprehensive vetting of international medical graduates seeking entry to U.S. graduate medical education through ECFMG Certification and J-1 visa sponsorship, and leadership development and research initiatives through FAIMER fellowship and data programs. Through these efforts, Intealth provides trusted, rigorous, and scalable frameworks that uphold education standards, protect the integrity of the U.S. health workforce pipeline, and inform policymaking worldwide.

References


1. 8 C.F.R. § 274a.2(b)(4)(vii).
2. Accreditation Council for Graduate Medical Education (ACGME). *Common Program Requirements (Residency).* 2024. https://www.acgme.org/programs-and-institutions/programs/common-program-requirements/
3. American Medical Association (AMA). *Physicians support 12.6m jobs, $2.3 trillion in economic activity.* Press Release. January 8, 2018. https://www.ama-assn.org/press-center/ama-press-releases/physicians-support-126m-jobs-23-trillion-economic-activity
4. American Osteopathic Association (AOA). *Osteopathic Medical Profession Report.* 2025. https://osteopathic.org/about/aoa-statistics/
5. Association of American Medical Colleges (AAMC). *Graduating Medical School Class of 2025 Statistics.* 2025. https://students-residents.aamc.org/attending-medical-school/graduating-medical-school-class-2025-statistics-text-only
6. Centers for Disease Control and Prevention (CDC). *CDC/ATSDR Social Vulnerability Index.* 2023. https://www.atsdr.cdc.gov/place-health/php/svi
7. Department of Homeland Security (DHS). *Entry/Exit Overstay Report, Fiscal Year 2024.* October 11, 2024.
8. Department of Homeland Security (DHS). *Notice of Proposed Rulemaking, Elimination of Duration of Status (D/S) for F, J, and I Nonimmigrants, Regulatory Impact Analysis.* RIN 1653-AA95. 2025.
9. ECFMG|FAIMER. *J-1 Physicians: COVID-19 Response.* 2020. https://www.ecfmg.org/annc/covid-19-coronavirus.html?
10. Ehrlich H, Chandra S, Meltzer D. Alien J-1 physicians in a pandemic. *JAMA Intern Med.* 2021;181(6):758-759. doi:10.1001/jamainternmed.2021.1234
11. Government Accountability Office (GAO). *Foreign Physicians: Preliminary Findings on the Use of J-1 Visa Waivers to Practice in Underserved Areas.* GAO-06-773T. 2006.

# EXHIBIT 8

AGS Geriatrics Healthcare Professionals
Leading Change. Improving Care for Older Adults.

THE AMERICAN GERIATRICS SOCIETY
40 FULTON STREET, SUITE 809
NEW YORK, NEW YORK 10038
212.308.1414 TEL
www.americangeriatrics.org

September 29, 2025

**SUBMITTED ELECTRONICALLY**
**https://www.regulations.gov**

Kristi Noem
Secretary
US Immigration and Customs Enforcement
Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

**RE: [RIN 1653–AA95] Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

Dear Secretary Noem:

The American Geriatrics Society (AGS) appreciates the opportunity to submit comments on the proposed rule, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, to the Department of Homeland Security (DHS). AGS is concerned that, if finalized, a fixed-term admission period for F and J visa holders, including international academic students and physicians, will exacerbate the existing workforce gap in primary care and geriatrics and significantly reduce access to essential health care for millions of Americans. We urge DHS to not move forward with its implementation.

AGS is a not-for-profit society devoted to improving the health, independence and quality of life of all older adults. Our 6,000+ members include geriatricians, geriatrics nurse practitioners, social workers, family practitioners, physician associates, pharmacists, and internists who are pioneers in serious illness care for older individuals, with a focus on championing interprofessional teams, eliciting personal care goals, and treating older people as whole persons. AGS is an anti-discriminatory organization. We believe in a society where we all are supported by and able to contribute to communities and where bias and discrimination no longer impact healthcare access, quality, and outcomes for older adults and their care partners. AGS advocates for policies and programs that support the health, independence, and quality of life of all of us as we age.

Despite the well-documented growing number of older adults in the US who are likely to require the care of a geriatrician, there is a workforce crisis with a disappearing supply of primary care physicians, including geriatricians. According to the Health Resources and Service Administration (HRSA), there will be a shortage of 2,110 geriatricians by 2037, leaving thousands without access to

these services and more than 25 percent of the shortage will be in nonmetro rurality areas.[1] Rural populations are generally older, have a higher incidence of poor health, and face greater socioeconomic barriers to receiving the care they need to live independently.[2] It is critically important to strengthen the visa system to help fill physician vacancies in rural and underserved areas and not weaken it. Ensuring an adequate health workforce and access to high-quality person-centered care is essential for us all as we age.

AGS is deeply concerned that the proposed change from duration of status to a fixed admission period that does not exceed 4 years for F visa holder academic students and J visa holder physicians will have a detrimental impact on older Americans and health care professional training. There are currently more than 15,900 J-1 physicians across medical specialties, including geriatrics, training in the United States with programs lasting 1 to 7 years depending on the specialty. The J-1 physician workforce is a crucial part of the American healthcare system providing care in our most underserved areas and they are frequently among our frontline providers serving in primary care settings, safety-net hospitals, and rural communities. Over the past decade, the number of J-1 physicians training and serving patients has increased by 67 percent.[3] Non-US International Medical Graduates (IMGs) proceed to providing health care as practicing physicians and are often more willing than their US medical graduate counterparts to practice in remote and rural areas.[4] The US has historically relied on IMGs and immigrant health professionals to provide critical care for some of the most vulnerable populations in our nation, including lower-income and underserved communities. If this proposed change were to be finalized, patient care across the country in nearly 770 hospitals will be severely impacted.[Error! Bookmark not defined.] We are particularly concerned that an integral part of the geriatrics workforce, J-1 physicians, and the supervised patient care provided by geriatrics trainees who are essential to a teaching hospital's ability to provide continuity of care, and the role they play in our healthcare system will be jeopardized.

Under the current duration of status policy, J-1 physicians are able to apply for an extension of status for subsequent years of training at the same time as their annual visa sponsorship renewal with the Educational Commission for Foreign Medical Graduates (ECFMG) and the Foundation for Advancement of International Medical Education and Research (FAIMER), a rigorous screening and review process that confirms their continuing eligibility for J-1 status. The DHS proposal for a fixed-term admission not exceeding 4 years and the required mid-training extension of stay requirement on an annual basis establishes a timeline that is not feasible for J-1 physicians considering the time it takes for residency and fellowship contracts to be issued and the processing time for an extension application, and creates redundant administrative burden. DHS estimates an annual average of over 400,000 extension of status applications for F, J, and I visa holders if the proposed rule is finalized,[5] magnifying the strain on the US Citizenship and Immigration Services (USCIS) which reached the highest level of pending cases—more than 11.3 million—in the last 10 years in January to March 2025.[6] The significant delays will cause uncertainty and disruptions for J-1

[1] US Department of Health and Human Services, Health Resources and Services Administration. Health Workforce Projections. Accessed September 25, 2025. https://data.hrsa.gov/topics/health-workforce/workforce-projections
[2] Cohen SA, Greaney ML. Aging in rural communities. *Curr Epidemiol Rep*. 2022;10(1):1-16. doi:10.1007/s40471-022-00313-9
[3] Intealth. J-1 visa sponsorship, 2024. February 7, 2025. Accessed September 24, 2025. https://www.intealth.org/pdfs/J-1_US_Infographic.pdf
[4] Jacobs JW, Wheeler AP, Horstman E, Booth GS. How immigration policy threatens US medical training and patient care: a fragile pipeline. *JAMA*. 2025;334(6):483-484. doi:10.1001/jama.2025.9782
[5] 90 Fed Reg 42101
[6] Immigration and citizenship data. US Citizenship and Immigration Services. July 2025. Accessed September 25, 2025. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx

physicians in training for specialties that typically last more than 4 years and negatively impact patient care. Additionally, DHS also estimates that there will be an increased cost with the proposed change of nearly $400 million given the additional resources needed for the increased number of applications under a fixed-term admission policy, a substantial economic impact for the US and American taxpayers. We strongly oppose the proposed changes and urge DHS to withdraw this proposed rule given how harmful it will be to patient care in America.

* * * * *

AGS appreciates the opportunity to provide the above comments. We would be pleased to answer any questions you may have. Please contact Anna Kim at akim@americangeriatrics.org.

Sincerely,

Paul Mulhausen, MD
President

Nancy E. Lundebjerg, MPA
Chief Executive Officer

# EXHIBIT 9

Mass General Brigham

Office for Global Professionals and Scholars (GPS)
399 Revolution Dr. Ste 270
Somerville MA 02145
T 857.282.8211

September 29, 2025

Submitted via www.regulations.gov
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536

Re: DHS Docket No. ICEB-2025-0001, Comments in Response to Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media

Mass General Brigham (MGB) respectfully submits the following comments on DHS Docket No. ICEB-2025-0001, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media.

MGB is a not-for-profit healthcare system that is committed to patient care, research, teaching and service to both the local and global community. The MGB network includes Massachusetts General Hospital, Brigham and Women's Hospital, Mass Eye and Ear, Spaulding Rehabilitation Hospital, and McLean Hospital, along with multiple community health centers and hospitals, physician networks, home care services, long-term care services, and a health insurance plan. We are the largest private employer in Massachusetts, and our employees include physicians, nurses, scientists, and caregivers. We sponsor 1,500+ Research Scholar, Specialist, and Short-term Scholar J-1 visa holders at our medical centers at any given time. These accomplished individuals are here working in biomedical research as graduate students, postdoctoral fellows, and visiting scientists. Their work has included projects as diverse as 3D printable implants, use of artificial intelligence for imaging analysis, identifying promising treatments for kidney disease, studying ways of reducing strokes among the elderly, and development of new antimigraine therapies.

In addition, our institutions typically have 100+ Alien Physician J-1s under the sponsorship of ECFMG. They are here training and providing medical care as residents and clinical fellows across a wide range of specialties such as obstetrics/gynecology, anesthesiology, neurology and diagnostic radiology. We also have J-1 physicians training in psychiatry and helping to address the increasing demand for mental health care. Some of the J-1 clinical fellows have highly technical skills in subspecialty areas within thoracic surgery and cardiology. These J-1 physicians are critical members of the patient care teams at our academic medical centers.

## Concerns with the Proposed Rule

**The proposed regulations would burden scientists and physicians, who clearly benefit the U.S., complicate managing a J-1 program, and add an unnecessary burden to the United States Citizenship**

**and Immigration Services (USCIS) without advancing the Department of Homeland Security's (DHS) stated goals.**

**A. Issues with Limited Duration**

Under these proposed changes, instead of being admitted into the U.S. with an admit date of duration of status, J-1 exchange visitors would be admitted into the U.S. for the length of their DS-2019, not to exceed four years. The most frequently used J-1 category by the Mass General Brigham institutions is research scholar, which allows for stays in J-1 status of up to five years. Previously, this category permitted a three-year stay, and the U.S. Department of State increased the maximum to five years based on stakeholder feedback. Five years is the standard length of a research fellowship for many STEM fields, and many of our J-1 research scholars remain in J status for the full five years while working and training in compliance with our institutional research fellow policies. Limiting the maximum admission end date to four years instead of the five allowed for this J-1 category is contrary to the previous increase in duration. The proposed rule would require anyone doing a standard five-year fellowship to seek additional authorization from USCIS to remain in J-1 status to complete a fellowship.

**B. Proposed Change Does Not Enhance Existing Tools**

The primary reason provided for this proposed change is that "[t]he significant increase in the volume of F academic students, J exchange visitors, and I foreign information media representatives poses a challenge to the Department's ability to monitor and oversee these nonimmigrants while they are in the United States." This is confusing given that all J exchange visitors are logged into an electronic reporting system, the Student and Exchange Visitor Information System (SEVIS), which is maintained by DHS. Each exchange visitor's biographical information, contact information, and status start and end dates, as well as history of travel in and out of the U.S. while under J-1 sponsorship, is available in SEVIS. In addition, the J-1 program has an Incident Reporting process requiring responsible officers to notify the Department of State of any serious incidents involving a J-1 exchange visitor.

DHS also states that this update is required to mitigate risks within the J classification. The provided examples of these risks include a National Institutes of Health (NIH) study that found "small numbers of scientists have committed serious violations of NIH policies and systems by not disclosing foreign support" and details about exchange visitors who were stopped by Customs and Border Protection Officers while attempting to illegally transport research materials. While Mass General Brigham recognizes the seriousness of these incidents, it is unclear how requiring J-1 exchange visitors to file extension paperwork with USCIS would impact or mitigate either issue.

Another reason listed for these proposed regulations is that "DHS believes it would be more effective for an immigration officer to periodically confirm that an alien has properly maintained status, rather than relying on the checks of an RO that the J-1 is pursuing the activities permitted by the exchange visitor program." DHS has not provided a clear justification for how filing extension paperwork with USCIS would assess whether our graduate students, research fellows, and visiting scientists are conducting academic research while gaining a cultural experience in the U.S. or our J-1 alien physicians are engaging in medical education while providing patient care. While the regulations note that immigration officers have "training from the U.S. government," there is no mention of that training being expanded to give officers a background in assessing a biomedical research fellowship or progression through a medical residency program. This raises concerns a request could be denied if an officer isn't familiar with a

physician training pathway (e.g., radiology fellowship first then moving into a nuclear medicine residency).

Instead of advancing DHS's stated goals, the changes would introduce confusion into the system on which sponsors and government officials rely for tracking J-1 program details. Currently, each exchange visitor has a single end date which can be tracked through SEVIS, but with these proposed changes, they would have a DS-2019 end date and an I-94 end date, which may be different. A dependent family member may have an I-94 record with yet another end date. This will make it more challenging for a J program to track someone's status since they'll be tracking multiple dates. This will be especially true if SEVIS and the I-94 Admission Record become misaligned. A firm admission end date will not reduce the likelihood of an exchange visitor violating their status; their stay is already limited by program documentation issued by authorized officials. Rather, this proposed process will create more immigration complications, inadvertently putting scholars out of status.

**C. USCIS Processing Delays and Biometrics**

While DHS is proposing a 240-day period during which J exchange visitors can participate in their programs while waiting for an extension to be processed, DHS has not offered any assurance that there is a plan for USCIS to process J exchange visitor extensions within this period. USCIS is currently facing a historic backlog of 11.3 million cases. We're seeing this in the processing times for our physicians and scientists on H-1B visas. As of September 19, 2025, the USCIS website shows that 80% of H-1B extension are processed within 7.5 months. Not only does it seem likely that J exchange visitors will need to wait more than 240 days for their extensions to be processed, the new stream of work going into USCIS will impact already long processing times for the other types of cases the agency is currently handling.

There are multiple reasons why a J-1 research scholar would need to extend their status, other than needing a fifth year to complete a fellowship: (1) J-1 research scholars may have external funding that renews annually; (2) graduate students may need a few extra weeks to process the results they need for their dissertation research; or (3) an I-94 may have been truncated due to an expiring passport. As for the alien physicians, because ECFMG ensures timely progression through an education program by only issuing DS-2019s for one year at a time, physician trainees will need to seek extensions with USCIS annually throughout their residencies and clinical fellowships.

While for any one of our exchange visitors having a gap in work authorization could lead to costly delays and disruptions in work, this would be most problematic for our alien physicians. Foreign residents and clinical fellows are in the U.S. to participate in highly structured clinical training programs that generally start on or near July 1 or August 1. As this extension period will overlap with cap-subject H-1B filings and the peak time for Optional Practical Training (OPT) requests, USCIS will be at their busiest when these extensions are submitted. Having a physician trainee off the floor because of gaps in work authorization puts added strain on other medical staff. It also impacts the ability of that physician to progress to the next phase of training with the rest of the cohort, which can be disruptive to the overall training program. It seems likely that under these proposed regulations, alien physicians would spend a significant portion of their time in the U.S. with a request for extension of stay pending with USCIS.

Under these proposed rules, research scholars and alien physicians will also need to take time away from their programs to complete biometrics. DHS should already have biometrics for all J exchange visitors; it is unclear why they are recollecting this information. Ultimately, while DHS's goal may be to ensure that a J exchange visitor "has been complying with the terms and conditions of his or her

admission," in reality, it seems likely that this process will impose periods of time when J exchange visitors cannot participate in their program.

### D. Additional Burden on J-1 Exchange Visitors and Responsible Officers

We are also concerned that DHS has not properly assessed the burden this proposed change would place on J-1 research scholars, alien physicians, and responsible officers. The form currently used to seek an extension of stay in the U.S. is the Form I-539 (and Form I-539a for dependents). This form is designed to be filed on behalf of an individual, not a sponsoring organization - it is not a form that a responsible officer can complete for the exchange visitor. The proposed rule establishes a process that necessitates exchange visitors to seek direct legal counsel, thereby requiring them to either navigate the legal filing independently or incur additional costs for attorney services alongside the filing fee.

It is highly possible some exchange visitors would fail to maintain status because of incomplete or misfiled forms, not because of an intended failure to comply with the regulations. While responsible officers cannot complete the form, they would need to design a process for tracking each I-539 filing and decision in order to understand the status of the exchange visitors within their programs. This process will also grow murky if SEVIS, the I-94, and I-797 at any one time can all have different end dates.

### E. Lack of Clarity

The proposed regulations lack clarity in some key areas. While the proposed regulations include two options for how extensions could be adjudicated if an exchange visitor departs while an extension request is pending with USCIS, the regulations require further clarification as to whether travel in lieu of filing documents with USCIS is a valid method for extending status.

The proposed regulations have only minimal information about how the proposed process would intersect with the J-1 transfer process. There are permissible reasons for J-1 exchange visitors to complete their academic research at more than one institution. The new sponsoring institution cannot issue a DS-2019 until the exchange visitor has completed their activities at the current institution and their record is transferred. Since J-1 exchange visitors are not permitted to have gaps in their programs, transfers typically occur on the expiration date of the DS-2019. The J-1 regulations allow the new institution 30 days to pick up the record, which allows J-1 programs to accommodate transfers that happen on weekends, holidays, or when the SEVIS system is down. Under the proposed regulations, if a J-1 exchange visitor is unable to file an extension with USCIS prior to their current I-94 expiring because of delays with the transfer process, would that exchange visitor be viewed as out of status and unable to start with their new institution? It is unclear.

The regulations also do not address J Change of Category requests. It is common for foreign medical graduates to enter the U.S. as J-1 research scholars, conduct one to two years of research in their medical field of specialty, and then seek to change their J-1 category to alien physician so they may further train and practice in that specialty.

While Department of State already has a vetting process to determine who is eligible for a J-1 change of category, it is unclear if USCIS will view a change of category from research scholar to alien physician as a valid reason for a J-1 to seek an extension of stay in the U.S. Since a change of category to "alien physician" must occur immediately before transitioning from a research program to medical training, and most requests are processed at the same time each year, it is common for physicians to receive

their alien physician DS-2019 as their research scholar DS-2019 expires. This raises two questions: (1) If a physician does not receive their DS-2019 before their I-94 expires, will they be considered out of status and ineligible to participate in their medical training program? (2) If an alien physician has an unexpired I-94 based on a previous research scholar DS-2019, will that I-94 be valid in combination with an alien physician DS-2019? The proposed rule is silent on this process.

There are also other areas the proposed rules negate. While the proposed regulations address how to file for an extension in the case of reinstatement, they do not address how to file for an extension in the case of a 30-day correction. Similarly, they do not address whether the 30-day correction and reinstatement processes can be used to correct a status in cases where the SEVIS record was extended in a timely manner but the extension request to USCIS was either filed late or misfiled and returned after an I-94 has expired.

**F. Conclusion**

MGB fully supports the mission of the J-1 exchange visitor program. We have seen firsthand the benefits of allowing students, physicians, and scientists from around the world to come to our institutions to train, share knowledge and experience our culture. For the above stated reasons, we believe that the proposed regulatory changes would unnecessarily burden exchange visitors, responsible officers, and USCIS. We ask that DHS reconsider implementation of these proposed regulations and maintain the status quo.

Sincerely,

Noel Palatas
Manager, GPS
Responsible Officer

# EXHIBIT 10

MONROE UNIVERSITY

2501 Jerome Avenue
Bronx, New York 10468
Tel: 718.933.6700

434 Main Street
New Rochelle, New York 10801
Tel: 914.632.5400

September 29, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
Department of Homeland Security
MS 0525
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

**Re: Comment on Docket ICEB-2025-0001: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

Dear Secretary Noem:

On behalf of Monroe University ("Monroe"), thank you for the opportunity to provide comments regarding the above-referenced Notice of Proposed Rulemaking, 90 FR 42070 (below, "NPRM" or "Proposed Rule").

At Monroe, we have long championed higher education grounded in affordability, outcomes, and support of our local economy. We believe in the transformative power of education to uplift individuals, families, and communities. Our graduates -- this year representing 65 countries -- stand as proof of the enduring value of global education.

Monroe's academic structure includes seven schools and 65 programs, educating more than 11,500 students annually. We offer Certificate, Associate, Bachelor's, and Master's degrees on campuses in the Bronx, New Rochelle, and Saint Lucia, as well as through Monroe Online.

Our 20 master's programs -- several in high-demand STEM fields -- are housed in King Graduate School (KGS), a teaching and research community focused on practical, applied learning. Graduate offerings span Accounting, Business, Computer Science, Criminal Justice, Data Science, Forensic Psychology, Health Care Administration, Public Administration, Public Health, and Teacher Education.

This fall, 2,175 international students are enrolled on our New York campuses, more than 80% at the graduate level. Following graduation, many return home as entrepreneurs, business professionals, IT leaders, educators, and public servants who strengthen their economies and civil societies; others remain temporarily in the U.S. through Optional Practical Training (OPT), applying their talents in critical sectors of the American workforce.

**We Support the Proposal to Restrict Transfers to Another Institution During a Student's First Academic Year**

We support the intent of restricting transfers to another institution during a student's first academic year, as this preserves stability and integrity within the system.

We also believe that the Department's intentions for limiting program of study changes in the first year are laudable yet note that the concept of maintaining a singular "educational objective" across majors, programs, and levels is entirely new to DHS. The Department itself acknowledges that implementation may require delays if SEVIS systems cannot accommodate the proposed changes (see 8 CFR 214.2(f)(5)(ii)(E)).

We encourage DHS to thoughtfully refine this proposal to ensure it supports regulatory goals while remaining practical and student-centered. Defining "extenuating circumstances" with clarity and flexibility will help safeguard legitimate academic pathways and uphold the best interests of students.

**A U.S. Education Provides International Students with First-Hand Experience and Appreciation for American Exceptionalism and is an Important Form of American Soft Power**

International students are drawn to the United States by the unparalleled quality of our post-secondary education system. Home to many of the world's most prestigious companies, industries and cutting-edge research institutions, the U.S. offers academic rigor, innovation, and opportunity that few other nations can match.

From STEM disciplines to the liberal arts, students from across the globe seek out American colleges and universities not only for the education itself, but for the intellectual freedom, diverse perspectives, and access to world-class faculty and resources that define the U.S. academic experience.

When these students complete their education and return home, they carry with them more than just degrees -- they carry a unique, first-hand understanding of America.

Their time in the U.S. fosters an appreciation for the nation's values, institutions, and culture of excellence. Importantly, they also gain direct experience with the U.S. system of free enterprise, market-driven innovation, and entrepreneurship. Many embrace these lessons and bring them back to their home countries, where they contribute to economic growth, private-sector development, and stronger global trade ties.

Many of these graduates become informal ambassadors, spreading a positive, deeply informed message about American society, innovation, and educational leadership. This promotes American exceptionalism on a global scale, reinforcing our country's role as a beacon of opportunity and progress.

It is critical to recognize the long-term value of welcoming international students and to revisit policies that might discourage their enrollment. Overly restrictive visa rules undermine one of America's greatest soft power advantages. Supporting international education not only strengthens our institutions financially and academically, but also ensures that the United States continues to lead globally through the ideas, values, and influence that our students carry with them far beyond our borders.

**International Students Contribute More Than $40 Billion to the US Economy, Which is Put at Risk by Overly Restrictive Student Visa Policies**

In addition to being scholars, international students are significant contributors to the U.S. economy. In the 2022-2023 academic year alone, international students contributed $40.1 billion to the U.S. economy and supported more than 368,000 jobs nationwide, according to NAFSA: Association of International Educators.[1] At Monroe, we see this impact firsthand. Our international enrollment sustains tuition revenue that helps fund programs and services for all students, domestic and international alike.

Beyond graduation, thousands of international students participate in Optional Practical Training (OPT), a program that allows them to work temporarily in fields directly related to their studies. Far from displacing domestic workers, OPT participants often fill critical workforce gaps in STEM, healthcare, and emerging technology sectors.

According to a report from the National Foundation for American Policy, international students on OPT are particularly concentrated in fields where there are documented shortages of qualified U.S. workers, helping small and mid-size companies remain competitive.[2] As reported:

> *"There is no evidence that foreign students participating in the OPT program reduce job opportunities for U.S. workers. Instead, the evidence suggests that U.S. employers are more likely to turn to foreign student workers when U.S. workers are scarcer."*

OPT participants also pay federal, state, and local taxes, receive no public benefits, and contribute to innovation ecosystems by bringing global perspectives into American workplaces. They fill roles in mid-size companies and emerging sectors that often struggle to attract U.S.-born talent. Their involvement not only meets employer demand for specialized talent, but also enhances U.S.

---

[1] https://www.nafsa.org/about/about-nafsa/new-nafsa-data-reveal-international-student-economic-contributions-continue

[2] https://nfap.com/wp-content/uploads/2019/03/International-Students-STEM-OPT-And-The-US-STEM-Workforce.NFAP-Policy-Brief.March-2019.pdf

economic resilience, competitiveness, and global leadership in key industries, particularly in STEM and business fields.

Monroe students engaged in Curriculum Practical Training (CPT) and alumni participating in OPT have found wide-ranging and significant work opportunities with Fortune 500 companies, such as Amazon, Capital One, JP Morgan Chase, and Pfizer, to start-ups, small and medium firms. Their diverse roles have included Account Executives, Business Analytics, Data Analysts, Investment Bankers, Product Managers, Software Engineers, and Statistical Programming, among others. Across all these opportunities, Monroe's international students are helping to fulfill specialized workforce needs that might otherwise have remained unfilled.

Restrictive policies that curtail access to OPT or limit educational mobility jeopardize vital economic gains at a moment when the nation faces acute skills shortages and demographic headwinds. Preserving a welcoming, stable policy environment for international students -- both during their studies and as they transition into the workforce -- is essential to sustaining U.S. higher education, driving innovation, and securing long-term economic growth.

**Proposed Policy Changes Will Have a Disproportionate Impact on Enrollment at Non-Elite Institutions Like Monroe, Which Will Hurt American Students as Budgets Are Cut**

We are especially concerned that the Proposed Rule will disproportionately harm non-elite institutions like Monroe. While Ivy League and other highly selective universities may weather these changes with minimal disruption, institutions such as Monroe -- those that serve large international student populations and are simultaneously preparing for the looming "enrollment cliff" in the U.S. -- will face profound challenges.

For institutions like ours, international enrollment not only offsets domestic declines but also sustains revenue critical to our mission: funding financial aid for domestic students, supporting essential campus services, and maintaining access-driven programs that advance workforce development. Curtailing international student enrollment would destabilize broad segments of American higher education that serve as the frontlines of opportunity and mobility. For Monroe, the impact could be an abrupt enrollment decline with serious financial repercussions.

At a time when college closures nationwide are accelerating, we urge the Department to withdraw these Proposed Rules and abandon measures that would dramatically restrict international student enrollment. The closure of even a single institution carries devastating ripple effects -- for local economies, regional workforces, and the thousands of students whose educational pathways would be disrupted.[3]

---

[3] https://www.brookings.edu/articles/who-loses-if-us-colleges-lose-international-students/

**Restrictions on Second Master's Degrees Harm Workforce Goals and the U.S. Economy**

Most urgently, we implore the Department to reconsider the provision that would prohibit students from pursuing a second degree at what the Proposed Rule describes as the same level (e.g., a second master's degree) in the U.S. Such restrictions ignore the realities of today's knowledge economy, where specialization and cross-disciplinary expertise are not optional but essential for advancement in fields like business, technology, cybersecurity, and healthcare management.

Employers increasingly demand professionals with layered expertise who can operate at the intersection of disciplines. A student with a Master's in Health Care Administration, for example, may need an MBA with a concentration in data analytics or project management to remain competitive and meet employer expectations. These are not redundant pursuits -- they are strategic career pathways that align with documented workforce needs.

Restricting such opportunities undermines national workforce development goals, stifles innovation, and diminishes the appeal of U.S. higher education in an increasingly competitive global market.

At Monroe, more than 700 students each year pursue second master's degrees in distinct disciplines that enhance their professional versatility without the cost or time investment of a doctoral program. These students are not prolonging their education arbitrarily; they are pursuing targeted credentials that strengthen their employability and align with labor market demand.

To treat all master's degrees as equivalent "same-level" programs disregards fundamental differences in curricula, competencies, and career trajectories. An MBA, MA, MS, MPH, or MAT each prepares students for highly distinct roles. The rule, as written, risks creating artificial limitations that will ultimately disadvantage both students and the industries that rely on their expertise.

We strongly urge the Department to revise the rule to explicitly differentiate among types of master's degrees and permit students to pursue additional graduate education across disciplines. Without this flexibility, the rule will unintentionally hinder professional advancement, constrict the pipeline of adaptable, highly skilled talent, and weaken the global standing of U.S. higher education.

**Time Limitations Rather Than Degree Restrictions are an Easier-to-Implement Path to Ensure Integrity While Preserving Academic and Economic Benefits of International Students' Presence in the U.S.**

At Monroe, we see hundreds of graduate students each year earn a second master's degree in a discipline that directly advances their career goals. These students are pursuing strategic academic pathways that enhance their skillsets, expand their professional versatility, and respond to real workforce needs.

While enrolled, these students contribute meaningfully to the fabric of our campus and community. They boost the local economy through housing, transportation, and consumer spending. They help fund institutional aid that benefits U.S. students. They engage in service learning, professional internships, and other career opportunities. Importantly, as stated, they also immerse themselves in American culture -- building relationships, strengthening cross-cultural understanding, and returning home with a deeper appreciation for U.S. values and democratic ideals. The benefits of these experiences are long-lasting and immeasurable.

The Proposed Rule puts all of these benefits at significant risk.

By imposing overly rigid restrictions on pursuing additional graduate credentials at the same educational level, the Department could unintentionally deter talented international students from choosing the U.S. as their academic destination. In a global higher education landscape marked by increasing competition, policies that limit flexibility will weaken our ability to attract and retain high-caliber students who bring diverse perspectives and vital skills to our classrooms and workforce.

Moreover, the complexity and inconsistency of defining “educational level” across various types of degrees -- such as MBAs, MPHs, MATs, or professional degrees like the J.D. or M.D. -- will likely create significant compliance challenges for institutions and confusion for students. Without clear, consistent definitions, schools may struggle to interpret and implement the rule, increasing the risk of errors and unintended consequences.

If the federal government believes that four years is a reasonable timeframe for an international student to complete their studies, we urge DHS to focus on that duration-based limit rather than restricting which degrees may be earned -- such as permitting a second master’s degree provided that the total duration of both programs does not exceed four years. This approach would more effectively address concerns about program misuse and be easier to implement without sacrificing legitimate academic or professional pursuits.

**Clear Definitions of Educational Levels are Essential to Ensure Fair Implementation and Protect Academic Mobility**

We are concerned with the vague and inconsistent use of the term “educational level” in this provision. The rule leaves critical questions unanswered:

- Is a Juris Doctor (J.D.) equivalent to, higher than, or lower than a Master’s degree?
- Is a post-Master’s certificate equivalent to, higher than, or lower than a Master’s degree? (We would argue that a second Master’s requiring a first Master’s as a prerequisite should constitute a higher educational level.)
- Is an M.D. equivalent to, higher than, or lower than a Ph.D.?

Without clarity, institutions and students alike will face uncertainty, compliance risks, and unnecessary enrollment barriers.

**Automatic EOS Extensions and Detailed Guidance Are Essential to Prevent Student and Institutional Risk**

Given provisions in the Proposed Rule that are likely to cause significant delays in the adjudication of Extension of Stay (EOS) requests, we strongly urge the Department to implement an automatic extension of the 240-day period while EOS applications remain pending.

We further urge the Department to provide clear, detailed guidance on what constitutes acceptable reasons for requesting an EOS for additional time to complete a program, including (1) compelling academic reasons, (2) a documented illness or medical condition, and (3) exceptional circumstances beyond the control of the student. The current language is vague and insufficient for Designated School Officials (DSOs) to make informed recommendations. Written guidance, including specific examples of scenarios that do and do not qualify, is essential to reduce confusion, minimize legal risk for institutions, and ensure that students who legitimately require extensions are not adversely affected.

Finally, we note that it is inappropriate for the Department, rather than the institution through its DSOs, to determine what constitutes “compelling academic reasons” for an EOS. Institutions are best positioned to assess academic circumstances and should retain the authority to make these determinations based on clear, consistent standards.

**Should the Proposal Take Effect, Please Incorporate a One-Year Implementation Period to Protect Institutions, Students, and U.S. Competitiveness in Global Education**

Should the Department move forward with the Proposed Rule in its current form, we strongly urge the inclusion of a minimum one-year grace period for implementation. Institutions that enroll a substantial number of international students -- particularly those pursuing second Master’s degrees -- require sufficient time to adapt recruitment strategies, program offerings, and financial planning in order to mitigate potential disruption.

Without an adequate transition period, the consequences could be severe, affecting institutional budgets, student services, and, ultimately, access to quality education for all.

We deeply appreciate the Department’s commitment to safeguarding the integrity of the immigration system. Monroe supports reforms that strengthen nonimmigrant classifications and help prevent fraud; however, the Proposed Rule, as written, threatens this vital economic and educational engine.

Increased visa uncertainty and administrative burdens risk discouraging enrollment and undermine programs such as Optional Practical Training (OPT) and STEM OPT, which are critical for workforce development in high-demand sectors. For every three international students enrolled, one new domestic job is created. We are concerned that, if international students perceive the system as unpredictable or unwelcoming, the United States may lose its competitive edge in global education.

In closing, we sincerely appreciate the Department's ongoing efforts to safeguard the integrity of our immigration system. Monroe fully supports reforms to nonimmigrant classifications aimed at preventing and reducing instances of fraud.

We appreciate the opportunity to provide comments regarding Docket ICEB-2025-0001 and will gladly meet with Department officials to discuss these concerns and offer constructive recommendations for ensuring that reforms strengthen, rather than weaken, the U.S. higher education system and its contributions to the economy.

Sincerely,

Marc M Jerome

Marc M. Jerome
President