# EXHIBIT 11

**RE: Docket No. ICEB-2025-0001, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

The proposed rule eliminating Duration of Status for F-1 and J-1 visa statuses will hurt the United States. It will damage our standing as a world leader in higher education and research. It will diminish the quality of education available to the next generation of American college students. And it will eliminate opportunities to build good will and to influence, through soft power, the international community.

Additionally, the proposed rule imposes an undue burden on students, scholars, USCIS, CBP, and DSOs. It is not an efficient use of government resources and taxpayer money.

I urge that the proposed rule be withdrawn in its entirety and that admission for duration of status remain in effect.

**Harm to America's Position as World Leader**

The United States is a world leader in higher education. Our institutions consistently dominate world rankings and are at the forefront of scientific research and innovation. Students and scholars around the world dream about studying and conducting research in the US, working incredibly hard and making major sacrifices to get to this country. Once here, international students and scholars are part of the lifeblood of college and university campuses and communities. They teach classes, conduct critical research in labs, perform in plays and orchestras, and excel on the athletics field. Under the proposed rule, many of the 296,812 undergraduate international students and almost all of the 149,618 international PhD students (numbers from the 2024 Open Doors report) would have to apply for an extension during their studies.

And that is the impact on campuses for the students that *do* come to the US. The larger impact would be the absence of students who choose not to come to the United States in the first place. Why would a talented PhD student choose to come to a country where they know they will have to go through an extension process at least once, that will cost them hundreds of dollars, stress, anxiety, and perhaps result in a denial and being forced to leave mid-program? Why would anyone choose that when they could go to another more welcoming country where they do not have to worry about such a process? So many excellent students will choose to go to Canada, the UK, or Australia leaving empty seats in US classrooms and labs. At many institutions, the loss of international students and scholars will result in the closures of academic departments and programs, which also deprives American students of the opportunity to learn much-needed skills from scholars who are the best in their field.

In the classroom, on the athletic field, and working in libraries and labs, international students and scholars share their experiences and perspectives, educating US students, staff, and faculty on other cultures and outlooks -- helping Americans to see and understand the world

better and to be successful in the international arena. After getting to know international students, US students, families, and community members are often inspired to learn more about the world and to travel to places they never would have visited before. I know of elderly community volunteers who attended their “adopted” international student’s graduation and then visited her home country the following year and snowboarder dude undergrads who travelled to Germany ten years after graduation to attend their international student friend’s wedding. International students help to make US campuses global learning environments and contribute to valuable lifelong cross-cultural educational experiences for Americans.

In the same way, the experiences of sharing Thanksgiving dinner with local families, volunteering at a school, or studying US democracy helps international students and scholars to understand American values. Students and scholars absorb those values, carrying them with them on their return home and for the rest of their lives. In his article “Higher Ed Exports and ‘Trade Is Not a Four-Letter Word’” published in Inside Higher Ed on February 10, 2020, Joshua Kim points out that:

*Among the purchasers of a U.S. education are current and former heads of state of Japan, Israel, Colombia, Kenya, Singapore, Pakistan and South Korea. All told, nearly 300 current or former heads of government have studied at American universities. The numbers of business, cultural and political leaders who have studied at U.S. schools are incalculable.*

This “soft power” influence is immeasurably valuable. Study in the United States is a life-changing experience for so many students and scholars. All DSOs can tell of international students who stay in touch after returning to their home countries and for years continue to say how much their time in the US meant to them. And there are so many examples of international students changing lives in their home countries. I often think of a deaf student from Pakistan who was impressed by the inclusive environment and support available to students with disabilities at US educational institutions. He went on to run workshops for deaf students when he returned home. American values reach all corners of the world through the international students that study here.

**Harm to the American Economy**

According to a statistic from the Bureau of Economic Analysis cited in Brook Larmer’s January 3, 2019 New York Times article “One of America’s Most Vital Exports, Education, Never Goes Abroad, but It Still Faces Threats” international students generated $42.4 billion in export revenue in 2017. This, points out Larmer, is almost double the amount generated by the top agricultural export -- soybeans -- for the same year. Larmer also highlights the fact that international students created or sustained more than 455,000 jobs in the United States, almost nine times the number of American coal miners, according to NAFSA, the Association of International Educators.

The tuition paid by international students -- in many cases a higher rate than local in-state students -- is critical to the functioning of so many institutions. US colleges and universities are

struggling due to demographic shifts that mean fewer teenagers graduating from high school. These institutions -- so vital to many communities across the country, but especially to small, rural towns -- are already scraping by and loss of international student tuition would be devastating.

International students are also consumers in the economies of college towns across the country. They rent houses and apartments, they eat out, they buy cars, they take taxis and shuttle services, they rent storage for their belongings over the summer, they visit tourist sites and take family and friends who visit to tourist sites. They spend a lot of money in the local area and are reliable customers for small businesses.

After graduation, students on post-completion and STEM OPT work in critical industries and play key roles in, for example, artificial intelligence, increasing crop yield for American farmers, and ensuring the safety of the bridges on our nation's roads. Delays in a student's ability to start work due to long wait times for approval of *both* the I-539 and I-765 and overall fewer qualified graduates in these essential fields are detrimental to the US economy and the nation as a whole.

**Harm to Individual Students & Scholars**

This proposed rule is harmful to international students and scholars.

The financial cost of this proposed rule to individual students and scholars is huge. The current fee for the I-539 is $420. With regular increases in USCIS fees in recent years, we can expect that this fee would likely go up at least once during a student's career. This is in addition to the $350 I-901 fee and $185 MRV fee that they would have already paid to get to the US. For a student who excels in their studies, loves their university and community and wants to complete a bachelors, masters, and PhD at the same institution -- and there are many students like this -- the financial cost of their status extensions for what could potentially be 10-12 years could be upwards of $1200. That is an unreasonable and unfair toll on students who have already paid a high price to DHS, DOS, and their institutions to study here.

In addition to the financial toll, the proposed rule will tax the mental health of international students and scholars. Understanding the rule and how it applies to their individual situation, anticipating the need for an extension, compiling the required documents, gathering the fee, submitting the application on time, waiting for the application to be approved, finding the time and transportation to travel to the biometric collection site, possible loss of employment, and the uncertainty of approval on top of a full time course load, research, dissertations, and exams will increase the stress and anxiety felt by international students studying in the US. International students and scholars have already had to learn, with the help of DSOs and AROS, a complex set of regulations that govern their status in the US. They will now have to understand an entirely new process and remember a whole new set of dates and regulations. Students just want to graduate and scholars just want to do their research. The constant worry and

uncertainty created by the proposed rule will detract from the ability of students and scholars to succeed in their academic pursuits in the United States.

**Burden on USCIS and DSO/AROs**

This proposed rule will also impose an undue burden on USCIS and CBP as well as DSOs and AROs. USCIS is clearly already overwhelmed with the number of applications they receive -- at the time of writing, the USCIS website lists a processing time of 6 months for reinstatement to student status and 4.5 months for a change of status to F-1. Both of those changes use the I-539, the same form that would be used for the EOS under the proposed rule. With this large backlog already, how can we expect USCIS to process potentially tens (or even hundreds) of thousands more I-539s for Extensions of Status, as well as the additional reinstatement applications (also using the I-539) that will inevitably come as a result of students falling afoul of this rule? If a student who applies for an extension in a timely manner then has to wait months for approval, they will surely leave the country to pursue their work or studies elsewhere, depriving US campuses and industries of talent and revenue.

DSOs and AROs currently serve as a vital link between international students and scholars and the Department of Homeland Security, helping to keep F-1 and J-1 students and scholars in status and abiding by current regulations. The SEVIS database, which has been in use for over twenty years, is a critical tool in the student visa process and allows DHS access to a student's academic program information, US address, funding, and enrollment status. Through SEVIS, there is already a mechanism in place to process student I-20 extensions, changes of major, school transfers, and OPT recommendations and reporting. The elimination of duration of status would require an estimated 67 hours of training for DSOs to implement a new system that duplicates a process that already functions effectively through the SEVIS database. This is a waste of valuable time and resources for DSOs, SEVP Field Reps, and others involved in the training process.

Once the new rule goes into effect, the DSO's role would be largely consumed with explaining this rule, reminding students to extend, helping them extend, answering questions about the extension, and helping students who did not extend in time apply for reinstatement. This would not allow for any time for the other work that most DSOs do, such as plan events on campus and in the community to help international students and scholars understand US culture and make connections with US students and neighbors; liaise with other campus offices to support international students academically, socially, and personally (which helps ensure that they are able to graduate in a timely manner without needing to extend); and listening to students' concerns in times of difficulty, building relationships and trust with students. In order to be effective advisors, DSOs need to be more than just processors of immigration paperwork. If this proposed rule goes into effect, that is all they will be able to be.

This proposed rule is damaging to our students, our institutions, our economy, and our country. Please withdraw it and continue to admit F-1 and J-1 international students and scholars (and their dependents) for duration of status.

# EXHIBIT 12

POLICY & RESEARCH / POLICY BRIEF / HIGHER ED / NEWS / IMMIGRATION / LEGAL AVENUES

# International Students Drive Innovation. *Student Visa Cancellations Are Creating Chaos & Uncertainty.*

MAY 23RD, 2025

TAKE ACTION





SHARE

For more than a century, the United States has been the top destination for international students and global talent, and this has provided incredible benefits to every corner of America. Our colleges and universities attract the best and brightest from around the world because of the collaborative and thriving research and entrepreneurial ecosystems that we've created. As a result of our national investment in higher education and ability to attract top talent from across the globe, our colleges and universities have been and are



American history over the last century is filled with individuals who came to our colleges and universities — sometimes seeking refuge as well — and made our country stronger. Whether it was scientists in the early 20th

century pushing the world's technologies forward or teachers and physicians today, this has been a cornerstone of America's prosperity.

America's higher education system has continued this tradition. International students know that the best opportunities for advanced learning, specialized research, and highly skilled work are in the U.S. America today has less than 5% of the world's population–our status as the country with the best institutions of higher education is fueled by international students. International students and scholars have made invaluable medical contributions from cancer research to neurosurgery. The programs on the computer you may be using to view this report, like Zoom or Grammarly, or technology used for your online shopping, like Stripe, were founded by international students.

America's colleges and universities have driven many of the greatest advances over the past century—but that leadership is at risk.

Starting in March of 2025, the Trump administration launched unprecedented efforts targeting the international student population, including a sweeping, unlawful effort to force international students out of legal status. These attacks are creating a chaotic and fearful environment for international scholars, making it impossible for many to maintain legal status and finish earning their degrees in the U.S., and have the potential to undermine decades of progress in securing the United States' role as the world's top higher education destination.

If we lose our reputation as the premier destination for international student education, it is not a status we will be able to easily recover. New research from the National Foundation for American Policy shows that international students are critical to the infrastructure of American colleges and universities, including through the money they contribute to their institutions and their communities. A United States without international enrollment would result in school closures, job losses, and a less educated American workforce. Creating a partisan litmus test around the presence of international scholars in the U.S. will cause uncertainty for prospective students that will threaten the future of everything we have built.

**“A quarter of the U.S. billion-dollar start-up companies were founded by a former international student *who***

*each created an average of 860 jobs.”*

## Why are international students so important to the U.S.?

### *International students and graduates grow the economy and create jobs.*

In the 2023-2024 school year, international students contributed a combined $43.8 billion to the economy and supported more than 375,000 jobs across the U.S. And when international graduates stay in the U.S. long-term and work, they create jobs, start new businesses, and raise wages for U.S.-born workers.

### *International students and graduates are critical to the STEM workforce and industries of the future.*

International students drive innovation by performing essential work in university labs and classrooms and contributing to American companies while working on OPT. Tens of thousands of international students are positioned to graduate with degrees related to key fields like AI and semiconductors each year.

In addition, a quarter of the U.S. billion-dollar start-up companies were founded by a former international student who each created an average of

founded by a former international student who each created an average of 860 jobs. In total, 44% of these "unicorn" startups were started by someone outside the U.S. Examples include Chobani, Stripe, and Cloudfare.

**"International students contributed $9 billion to public universities,** *28% of their overall total revenue, which allows schools to increase domestic student enrollment."*

***Hosting international students is a strategic part of our foreign policy.***

International education has long been acknowledged as a critical soft power tool cultivating global collaboration and networks. Educational institutions play an important role in projecting the U.S.' influence.

When international students return to their home countries or move abroad after being educated in the U.S., they have the potential to act as ambassadors for the U.S. and its higher education system, strengthening ties with other nations. As of October 2024, 70 world leaders from 58 countries had been educated in the U.S.

## *International students benefit U.S.-born students.*

International students bring diverse viewpoints and cultural backgrounds to their colleges and universities that expand the perspectives of all students.

With most international students paying full tuition, their enrollment has important financial benefits to their institutions and the maintenance of key programs, centers, and benefits that all students rely on. A 2015 study found that international students contributed $9 billion to public universities, 28% of their overall total revenue, which allows schools to increase domestic student enrollment. Universities are also able to support bigger and better graduate programs and research efforts as foreign-born individuals not only enroll in the programs but also serve as faculty and postdoctorate researchers, particularly in science and engineering fields.

## *Immigration benefits all Americans and strengthens the*

***economy***

In general, when immigrants come to America, their success yields benefits for their U.S.-born counterparts, as well—a rising tide that lifts all boats. In many cases, increased immigration is associated with increased employment for native-born workers. Immigration has little to no effect on wages for U.S.-born workers, and more likely contributes to higher productivity and wages, especially in fields requiring advanced skills. Immigrants pay nearly $525 billion annually in federal, state, and local taxes.

*Read more in our blog post, International Students and Graduates in the United States: 5 Things to Know.*

**“Tens of thousands of international students are positioned to graduate with degrees related to key fields** *like AI and*

*semiconductors each year."*

## How is the Trump administration targeting international students?

In March 2025, the State Department began revoking visas for numerous current and former international students, apparently based on their involvement in free speech activities. Soon after, the Department of Homeland Security (DHS) began terminating the Student Exchange Visitor Information System (SEVIS) records of some 4,700 international students and graduates, often without any notification to the impacted individual or their college or university.

Individuals targeted by State Department and DHS actions have been impacted in different ways, with some having their visas revoked, others having their SEVIS records deleted, and many dealing with both. Students whose visas are revoked are unable to leave and re-enter the country. If their SEVIS record is terminated, they may no longer be eligible to attend class or maintain their legal work authorization. In either case, they could be deemed out of status and therefore subject to deportation and additional immigration penalties.

SEVIS is the online system managed by the Department of Homeland Security (DHS) that tracks international students in the U.S. and monitors

their status, activities, and compliance with visa requirements. Typically, SEVIS records are maintained by the college or university. However, DHS has been actively canceling SEVIS records without notifying the individuals or the enrolling institution. The unprecedented action of deleting these SEVIS records absent any due process has created intense confusion amongst impacted individuals, higher education institutions, and employers.

According to recent testimony from DHS lawyers, government officials ran the names of more than one million international students through the National Crime Information Center (NCIC), a federal database managed by the FBI that contains broad information about individuals who have come into contact with the criminal justice system. Thousands of students whose names were matched in the database had their SEVIS accounts canceled without any further investigation.

From first-hand accounts collected by the American Immigration Lawyers Association (AILA), we know that examples of contact with the criminal justice system included:

- Speeding five miles per hour over the limit
- Citations for minor driving infractions, like parking tickets and not wearing a seatbelt
- Victims of domestic violence who were taken into custody as a result of state policy when they called the police on their abuser
- Numerous instances where charges were dropped or cases were dismissed

International students are some of the most tracked and vetted visitors in the United States. The government has failed to show evidence that these cases reach the legal standard for revoking a student's ability to remain in the U.S. Often, these individuals' encounters with law enforcement were previously known to the federal government, having been disclosed in subsequent visa applications.

At least 69 lawsuits have been brought against the federal government challenging the legality of the mass action to end the lawful status of these thousands of individuals, including in Georgia, New Hampshire, Colorado, and Massachusetts. As many of these cases were succeeding in the courts with judges granting temporary restraining orders and at least temporarily restoring individuals' legal statuses in 35 cases, the federal government abruptly reversed its actions. On April 25, 2025, the Justice Department announced that it intends to restore the previously terminated records of all individuals who were impacted by its scrutiny of criminal history checks. This announcement came with the caveat that Immigration and Customs Enforcement (ICE) will be developing a policy and procedure to continue with future SEVIS records terminations.

Before their records could be restored, many impacted individuals had already left the country, some even encouraged by their university to do so. It is unknown if those students who have left will be a permanent loss to the U.S. or how having cancellations or revocations on their record will impact any future immigration options, including their ability to return to the U.S. and finish their studies.

It's clear that this administration is taking an adversarial approach to international students. Notably, we have seen efforts to end an entire university's ability to enroll *any* international students as well as a declaration of a "one-strike" immigration policy that would impact students and all temporary visa holders. A "one-strike" policy will will result in visas being instantly revoked at the whim of the government, including for any interaction with the criminal justice system or even social media posts at odds with the administration's positions.

## International students are crucial to U.S. competitiveness in the global race for talent. Unfairly targeting them puts that leadership at risk.

The chaotic, apparently arbitrary, and likely illegal targeting of visiting students, scholars, researchers, and skilled workers is deeply damaging the U.S.' attractiveness to global talent at a time when we need them more than ever. The lack of immigration pathways available after graduation is already a significant challenge. As prospective students' interest in coming to and remaining in the U.S. is already wavering, it is difficult to imagine that future students abroad would feel eager, confident, or even safe in coming to study and work in the U.S. or remaining after graduation.

Optional Practical Training (OPT) is a major factor drawing international students to choose the U.S. and to remain after graduation. The OPT program allows international students to work in the country for a limited time in a field related to their degree of study and often acts as a bridge for

those who wish to stay in the U.S. long-term. Organizations tracking cancellations and revocations have found that roughly half of the impacted individuals were working on OPT. Nearly 400,000 graduates are enrolled in this valuable program. When an individual on OPT has their SEVIS record deleted, they lose their authorization to work, which not only harms their livelihood but also creates massive difficulties for their employers.

After the 2017 travel ban, which caused measurable chaos for higher education institutions, there was a combined 7.7% decline in international undergraduate and graduate students seeking to study in the U.S. This decline was further exacerbated by the COVID-19 pandemic that followed. The international student rate of enrollment was only beginning to recover before these new efforts to force out current students.

As it stands, prospective international students have already shifted in their intentions to remain in the U.S. after graduation. In 2021, three-quarters (75%) of prospective advanced STEM students in a FWD.us survey hoped to stay and work in the U.S. after completing their studies, with 42% hoping for a long-term stay of 4 years or more. A similar survey in 2024 found that fewer international students are prioritizing staying in the U.S. after graduation, and those who are planning to stay increasingly anticipate short-term, rather than long-term, stays.

# The U.S. can strengthen its economy and global competitiveness by investing in international students

Rather than continue, or escalate, these attacks on students, the administration should instead focus on policies that will benefit all Americans, and work with Congress to pass legislation to attract, retain, and support global talent in the U.S. Retaining international student graduates would help to address labor shortages in critical industries of the future, and boost the economy by more than $200 billion this decade, while significantly strengthening our global competitiveness.

Here are 5 common sense policies Congress could pass:

1. Establish direct pathways to permanent residency for international student graduates
2. Codify OPT and establish additional post-graduation work opportunities
3. Exempt advanced degree holders from H-1B caps
4. Permit 'dual-intent' for student visas
5. Create visas for entrepreneurs (many of whom are international student graduates)

*Read more in our blog post, Retaining International Student Graduates: 5 Policy Proposals for Congress.*

# Stand Up for International Students

Take action now to stop ongoing attacks disrupting tens of thousands of international students' lives, including attempts to restrict their enrollment in the United States. This will lead to job losses, hurt the economy, and put the U.S.' global competitive advantage at risk.

First Name

Last Name

Email

SUBMIT

**Ali Procopio**

*Director of Education & Workforce, Immigration*

ali@fwd.us

TELL THE WORLD; SHARE THIS ARTICLE VIA...

SHARE ON FAC

SHARE ON TW

SHARE VIA EMAIL

READ RELATED ARTICLES:

International Students & Graduates: 5 Things to Know →

International Student Graduates: 5 Policy Proposa for Cong →

Needs More Immigrants with STEM Skills →

SEE ALL THE NEWS

ABOUT

Staff & Board
Contact
Careers

IMMIGRATION

DACA & TPS
Global Race for Talent
Legal Avenues Pathway
Protect America's Workforce
Employer Resources
Higher Ed

CRIMINAL JUSTICE

Just a Minute
National
D.C.
Arizona
Oklahoma
Mississippi
New York

NEWS

RESOURCES

Informed Immigrant
I Am An Immigrant
Every Second

ACTION CENTER

FOLLOW US

# EXHIBIT 13

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment)

Share

PUBLIC SUBMISSION

# Comment Submitted by Anonymous

Posted by the **Immigration and Customs Enforcement Bureau** on Sep 2, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

I fully understand the resolve and necessity of your country in regulating international student visas. However, I suggest that the fixed validity period of visas be linked to the length of the academic program.

Many doctoral programs at top U.S. universities have a standard duration of five years. If the maximum visa validity is set at four years, it will lead to uncertainties in completing the program. Dealing with visa-related procedures will instead disrupt students' regular academic plans and cause unnecessary delays in graduation.

I recognize that your country does not wish international students to overstay on the grounds of unfinished studies. In fact, successfully completing studies on time is also the aspiration of most international students studying in the U.S.

Therefore, I recommend setting the visa validity period in accordance with the official length of the academic program. If a student needs to extend their studies, they should be required to explain the reasons. This approach will better ensure that international students can complete their studies on schedule.

Give Feedback

**Comment ID**

ICEB-2025-0001-1610

**Tracking Number**

mey-hjym-zh13

**Comment Details**

**Received Date**

Aug 30, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 14

State of California
Office of the Attorney General

**ROB BONTA**
*ATTORNEY GENERAL*

September 29, 2025

The Honorable Kristi Noem
Secretary
United States Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528

Mr. Todd Lyons
Acting Director
United States Immigration and Customs Enforcement
500 12th St., SW
Washington, DC 20024

RE: Comment Regarding Notice of Proposed Rulemaking, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42,070 (Aug. 28, 2025), DHS Docket No. ICEB-2025-0001, RIN 1653-AA95

Dear Secretary Noem and Acting Director Lyons:

We, the Attorneys General of California, Colorado, Connecticut, District of Columbia, Hawaiʻi, Illinois, Maine, Massachusetts, Minnesota, New Mexico, New Jersey, New York, Nevada, Oregon, Vermont, and Washington (the "States") write to oppose the Department of Homeland Security's ("DHS") Proposed Rule: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, Notice of Proposed Rulemaking, 90 Fed. Reg. 42,070, DHS Docket No. ICEB-2025-0001 (published Aug. 28, 2025).[1]

[1] This proposed rule is similar to DHS's 2020 proposed rule that also sought to end duration of status. *See* Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 85 Fed. Reg. 60,560 (September 25, 2020). A multistate coalition, which included California, also strongly opposed that proposed rule. Attorneys General of the District of Columbia, Massachusetts, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin Comment Letter on Proposed Rule Establishing a Fixed Time Period of Admission and an

American students' education is enhanced by the rich and diverse viewpoints, interests, and skillsets international students and exchange visitors bring to higher education institutions. This education equips Americans to engage more fully with the globalized economy and to better advance American interests. The federal government threatens this aspect of American education by seeking to impose drastic and burdensome restrictions on international students and exchange visitors without adequate legal or factual basis. It does so on an expedited timeline that reflects a disinterest in engaging in meaningful notice and comment rulemaking.

The proposed rule, if finalized, would injure American educational institutions and State economies by discouraging students and exchange visitors from pursuing educational opportunities in the United States. The federal government should consider more targeted approaches to address the concerns it purports the proposed rule will address and withdraw the proposed rule.

## I. Background

The United States has long employed a Duration of Status admission framework for students on F-1 visas and exchange visitors on J-1 visas. Beginning in 1979, the Duration of Status admission period permitted visitors in these categories to remain in the United States for the period during which they are complying with the terms of their respective visas. That framework has provided students and exchange visitors with the certainty that they could remain enrolled long enough to obtain their degrees or complete their programs. This is critical peace of mind when individuals invest significantly, sometimes hundreds of thousands of dollars, in their education and may need several years to complete their studies. Duration of Status also saves considerable American tax dollars by obviating the need for the federal government to process hundreds of thousands of applications on behalf of those seeking to extend their stays in the United States.

Under the proposed rule, DHS would end Duration of Status admission periods entirely. Instead, international students and exchange visitors would be admitted for a fixed period and must apply for an extension of stay (EOS) to remain in the United States beyond the fixed term. Although designated school officials would retain their ability to extend a student or exchange visitor's program duration for valid reasons, that student or exchange visitor would now need to seek separate authorization from DHS to remain in the United States to complete the program that the institution has extended for good reason. Additionally, the proposed rule imposes several other new, burdensome restrictions on international students.

For F-1 and J-1 visa holders, the proposed rule would set a fixed period for admission to the length of the academic program specified on a visa application form or four years,

---

Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (Oct. 26, 2020), https://www.regulations.gov/comment/ICEB-2019-0006-30146.

whichever is shorter. Before the end of the fixed term, visa holders requiring additional time must apply for an EOS directly with DHS or depart the United States and seek readmission. DHS would only grant an extension if the additional time needed is due to (1) a compelling academic reason, (2) documented medical illness or medical condition, or (3) a circumstance that was beyond the student's control, including a natural disaster, a national health crisis, or the closure of an institution. DHS would not grant an EOS if additional time is needed due to academic probation, suspension, or inability to complete course of study.

The proposed rule would restrict school transfers and changes of educational objectives within an undergraduate student's first academic year, unless an exception is authorized by the Student and Exchange Visitor Program ("SEVP"). The proposed rule further would prohibit students in a graduate level program of study from changing educational programs. A visa holder who has completed a program under F-1 status would not be able to obtain F-1 status for another program at the same or lower educational level; instead, to obtain F-1 status for a new program, the individual must begin a program at a higher educational level. The proposed rule would also reduce the time student visa holders have to depart the United States to 30 days, rather than the current 60 days.

As described below, these changes create a system that discourages international students from pursuing educational endeavors at American institutions, creates new administrative burdens for students and institutions, and harms the States' economies.

## II. The Comment Period is Procedurally Deficient

On August 28, 2025, DHS published the proposed rule, proposing to fundamentally overhaul regulations governing international students and exchange visitors. Despite these sweeping changes, the proposed rule allowed for just 30 days for public analysis and comment. Nowhere in the 46-page proposal did DHS attempt to justify such an abbreviated period.

DHS's rush to close the comment period makes the proposed rule procedurally deficient. The Administrative Procedure Act ("APA") and the Executive Branch's longstanding application of the APA's requirements make clear that an abbreviated 30-day comment period fails the APA's notice-and-comment requirements for reasoned agency decision-making. The APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…" 5 U.S.C. § 553(c). For more than two and a half decades, executive agencies have followed a presumption that a minimum of 60 days is necessary to provide the public with a meaningful opportunity to comment on proposed agency regulations. Executive Order 12,866 provides that "[e]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days." Regulatory Planning & Review, Exec. Order 12,866, § 6(a)(l) (Sept. 30, 1993); *see also* Improving Regulation & Regulatory Review, Exec. Order 13,563 (Jan. 18, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60

days."). There is no reasoned justification for a 30-day comment period for a proposal that is estimated to cost nearly $90 million to United States entities. 90 Fed. Reg. 42,073.

### III. The Proposed Rule is Arbitrary and Capricious in Violation of the Administrative Procedure Act

Agencies are required to consider relevant information and evidence and provide a reasoned explanation for their actions under the APA. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must show that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (citation omitted); *Schurz Commc'ns v. FCC*, 982 F.2d 1043, 1049 (7th Cir. 1992). An agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, will be held invalid and vacated. 5 U.S.C. § 706(2)(A).

The proposed rule relies on faulty logic and tenuous reasoning and fails to consider important effects if it becomes final. Therefore, it is arbitrary and capricious and cannot withstand scrutiny under the APA.

#### A. DHS's Basis for Ending Duration of Status Is Illogical.

Duration of Status has been in effect for 47 years for students on F-1 visas and 40 years for exchange visitors on J-1 visas. 90 Fed. Reg. 42,071. The rationale supporting Duration of Status is even stronger today than when it was first instituted. The Duration of Status regulation was justified in 1979, when there were less than 225,000 student and exchange visitors,[2] because of the "need to continually process" nonimmigrant students' EOS applications, which would "provide dollar and manpower savings to the Government and permit more efficient use of resources." 85 Fed. Reg. 60,528. In 2023, over 1.6 million F-1 visa holders and over 480,000 J-1 visa holders were present in United States.[3] Notwithstanding the continuing need to efficiently process extensions, DHS proposes a solution that would only exacerbate its current problem and create new ones.

Despite recognizing in a similar proposed rule in 2020 that academic students and exchange visitors "generally maintain[] lawful status by complying with the conditions of [their respective] program[s]," *id*. at 60,533, DHS continues to "*believe[]* that the admission of F, J, and I nonimmigrants for [Duration of Status] is not appropriate," 90 Fed. Reg. at 42,072 (emphasis added). Currently, compliance is monitored through SEVP and implemented through the Student and Exchange Visitor Information System ("SEVIS") that, according to DHS, "ensures government agencies have essential data related to nonimmigrant students and exchange visitors to preserve national security." *Id*. Without providing evidence, DHS suggests an increase in

---

[2] Chad Haddal, *Foreign Students in the United States: Policies and Legislation*, Congressional Research Service, at 1 (Jan. 31, 2008), https://fas.org/sgp/crs/misc/RL31146.pdf.

[3] Department of Homeland Security, *U.S. Nonimmigrant Admissions: 2023*, Table 1 at 3, (Aug. 2024), https://ohss.dhs.gov/sites/default/files/202409/2024_0906_ohss_nonimmigrant_fy2023_0.pdf.

nonimmigrant visitors "poses a challenge to the Department's ability to monitor and oversee these nonimmigrants," even while acknowledging "these nonimmigrants are not required to have direct interaction with DHS, except for a few limited instances." *Id*. at 42,071. DHS ignores the purpose and effectiveness of SEVIS and does not explain how SEVP and SEVIS, or modifications to these systems, do not address its monitoring concern. *See id*. at 42,076. Already, institutions appoint a principal designated school official and designated school officials (DSOs) to use SEVIS to report material changes to the institution (e.g., a change in academic or vocational programs, etc.) and changes in student information (e.g., address and employment information), regularly register student records, and petition for recertification of the institution every two years.[4] These systems have numerous requirements to report information to the federal government that obviate the need to create the fixed visa limitations proposed in the rule.

DHS's proposed requirement that students whose fixed date of admission is nearing submit EOS applications, which DHS will need to carefully review based on the high standard for EOS proposed by the rule, mandates use of more government resources, thus exacerbating the issues the federal government addressed when it initiated Duration of Status. The proposed rule complicates compliance through SEVIS by separating the mechanisms for extensions of an academic program and exchange visitor program (which DSOs continue to have the ability to approve for valid reasons) from the student or exchange visitor's ability to remain in the United States to complete the extended program (which would now require separate adjudication by DHS). *Id.* at 42,076. DHS suggests, without support, that additional opportunities for scrutiny "*may* also have the effect of deterring individuals who would otherwise seek to come to the United States" and engage in unspecified bad behaviors. *Id.* at 42078 (emphasis added). Again, without evidence that the additional burden would address a material problem, DHS leans on a "belief" that the process "would help to mitigate risks posed by aliens who seek to exploit these programs and live in the United States." *Id.* DHS argues the additional EOS applications would ensure it "has an effective mechanism to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications." *Id*. at 42,072. But, as discussed above, the substantial requirements in the current systems obviate the need to create additional EOS applications or for DHS to adjudicate the applications.

Ultimately, DHS does not adequately explain how the elimination of Duration of Status "may" discourage fraud, nor consider other means to address its monitoring concerns. If more efficiency and less fraud is its aim, DHS could require additional documentation and DHS contact during the Duration of Status period. DHS also could have proposed amendments to SEVP and SEVIS reporting requirements.

---

[4] *What to Know About SEVP Certification,* Department of Homeland Security, https://studyinthestates.dhs.gov/schools/get-started/what-to-know-about-sevp-certification.

B. The Reasoning for the Four-Year Maximum is Flawed.

DHS inappropriately proposes a maximum fixed limit to the term of stay for *all* programs based on an incorrect belief that undergraduate students complete their degrees in four years. Citing to a U.S. Department of Education report, DHS concludes students "can normally" earn a bachelor's degree in four years, and non-resident students "normally" earn their bachelor's degrees within four years of entry. *Id.* at 42,082. Since 79% of the F-1 students in 2023 were enrolled for either a bachelor's degree or a two-year master's degree program, the rule proposes that particular fixed limit to the stay period because DHS "believes" a four-year period of admission "would not pose an undue burden to most nonimmigrant students." *Id.* Without reliance on further data, DHS insists a maximum four-year period of admission "is the best option because it aligns with the general structure of post-secondary education." *Id.*

To the contrary, according to the report DHS relied on, approximately 43.5% of nonresidents in the 2017 cohort required more than four years to earn a bachelor's degree.[5] Analyzing the 2023-24 school year data from the National Center for Education Statistics, the James Martin Center confirms that 34% of *all* college students (including United States citizens) finish their undergraduate degrees within 4 years.[6] DHS does not explore the numerous and varied legitimate reasons why students are unable to complete degrees in four years, such as a change in major, the need to transfer schools, or needing to leave school to earn tuition money or care for a loved one. As such, if degree completion rates remain the same, at least 43.5% of international students pursuing bachelor's degrees would require an EOS, a much larger number than DHS considered. Clearly, the four-year period does not align with the reality of undergraduate education, much less post-secondary education as a whole, and is inappropriate.

Additionally, the four-year maximum applies to undergraduate and graduate students alike. Yet the median amount of time needed to complete a doctoral program is far longer than four years. The median amount of time needed to complete a research doctorate in all fields after starting graduate school was 7.3 years in 2024 and as follows for particular fields:[7]

[5] The Mobile Digest of Education Statistics indicates that only 56.5% of the 2017 cohort of nonresidents graduated in four years. Table 326.10: Graduation rate from first institution attended for first-time, full-time bachelor's degree-seeking students at 4-year postsecondary institutions, by race/ethnicity, time to completion, sex, control of institution, and percentage of applications accepted: Selected cohort entry years, 1996 through 2017, Digest of Education Statistics, https://nces.ed.gov/programs/digest/d24/tables/dt24_326.10.asp.

[6] The James G. Martin Center for Academic Renewal, *50-State Comparison*, https://jamesgmartin.center/wp-content/uploads/2025/04/50-State-College-Graduation-Rates.pdf.

[7] Table 1-12: Median years to research doctorate, by trend broad field of doctorate: Selected years, 1974–2024, National Center for Science and Engineering Statistics, https://ncses.nsf.gov/surveys/earned-doctorates/2024#data.

**Median Time to Degree of Doctorate Recipients By Broad Field of Study: 2024**

| | |
|---|---|
| Computer and information sciences | 7 years |
| Social Sciences | 8.8 years |
| Other non-science and engineering fields | 9.8 years |
| Humanities and arts | 9.7 years |
| Education | 12.3 years |
| Business | 8.7 years |
| Engineering | 6.5 years |
| Health sciences | 8.8 years |

DHS incorrectly suggests that an insignificant number of international students, both F and J nonimmigrants, would complete their studies within a four-period and not have to request additional time from DHS—this ignores the realities of doctoral programs and the fact that, as discussed in more depth below, a substantial number of students will be impacted. *See id.* at 42,082.

C. <u>DHS Fails to Adequately Consider the Burdens the Proposed Rule Imposes on International Students and the Likely Consequences of These Burdens.</u>

The proposed rule imposes significant hurdles on international students, likely resulting in bona fide students declining to study in the United States, including: (1) a serious deportation risk for undergraduate students if they cannot finish their degrees within the fixed time period; (2) a similarly serious risk for graduate students—many of whom are in programs longer than four years; (3) having to navigate a complex and expensive process of obtaining an EOS; (4) reducing the grace period for departing the United States to 30 days; (5) limiting educational objective changes and school transfers in the first year for undergraduates; (6) prohibiting graduate students' program transfers; and (7) uncertainty in the ability to obtain an OPT. DHS fails to adequately assess how burdensome these hurdles are, and in so doing, fails to weigh the likely negative consequences of the proposed rule.

First, the four-year fixed limit coupled with the strict EOS criteria will deter students from seeking to study in the United States.[8] If nonimmigrants' degree completion continues on its current trend, at least 43.5% of nonimmigrant undergraduate students will need an EOS.

---

[8] While the maximum contemplated fixed period is four years, the proposed rule also contemplates a fixed period based on a program's length that is shorter than four years. For students pursuing associate's and master's degrees, this could be a two year period. Like students who would be granted four-year fixed periods, those with two-year periods would need to critically consider the risk that they cannot complete their degrees within the fixed time period and may opt out of studying in the United States.

However, DHS would not grant an EOS due to "repeated inability or unwillingness to complete his or her course of study, as demonstrated by a pattern of failing classes and requesting multiple program extensions." *Id*. at 42,092. Students who are studying in a language foreign to them would need to seriously consider whether they can complete their degrees in four years. Whereas the smallest hiccup, even those reasonably foreseeable, can briefly delay completion of a course of study for United States citizens, it could end an academic career for a nonimmigrant and represent a loss of tens or hundreds of thousands of dollars. This is a strong deterrent for international students applying to undergraduate programs in the United States and will likely exacerbate the current trend of fewer international student applicants.[9]

Second, the four-year maximum would disincentivize international graduate students from beginning programs with no reasonable assurance a degree can be obtained. Nearly all, if not all, students seeking a doctoral degree will need at least one extension, and possibly two.[10] International students make up a significant portion of graduate students, including doctoral students, in the United States. In Fall 2024, about 24% of graduate students, or about 15,000, within the University of California school system were international students.[11] And in Oregon, 16% of graduate students were international students, consisting of 2,340 students. With respect to doctoral programs, in the 2023-24 academic year, 149,618 international students were enrolled in doctoral programs in the United States.[12] In Oregon, 1,028 international students were enrolled in doctoral programs in 2023-24, excluding health programs, which constitutes 27% of all doctoral students outside of health programs. Likewise, the University of Hawaiʻi at Mānoa has a significant number of international students seeking doctoral degrees with 375 such students.[13] The proposed rule would drastically impact their enrollment in the United States and, by extension, how they benefit American colleges and universities and the States' economies.

Third, the proposed framework creates administrative burdens and expenses for students that will likely discourage nonimmigrant visa applications. "[T]he burden would now be upon [the nonimmigrants] to request authorization directly from DHS . . . whereas previously they obtained an extension of lawful status in conjunction with a program extension through a DSO or [Responsible Officer]." *Id*. at 42,085. Foreign students would be required to navigate an unwieldy and difficult process. An error could lead to dire consequences—their departure from the United States and end to educational pursuits that cost significant sums of money.

---

[9] Amid the Trump Administration's shifting and unstable student visa issuance landscape, American educational institutions report significant declines in international students enrolling in the Fall 2025 semester. Elissa Nadworny, *Colleges See a Drop in International Students Under Trump*, NPR, Aug. 27, 2025, https://www.npr.org/2025/08/27/nx-s1-5498669/trump-college-international-student-visa.

[10] Or three for the average student seeking a doctorate in Education.

[11] *Fall Enrollment at a Glance*, University of California, https://www.universityofcalifornia.edu/about-us/information-center/fall-enrollment-glance (last visited Sept. 22, 2025).

[12] *International Students Data,* Open Doors Report (2024), https://opendoorsdata.org/data/international-students/academic-level/.

[13] International Student Data-Fall 2024 Snapshot, https://www.hawaii.edu/issmanoa/wp-content/uploads/2024/10/Factsheet-Fl-2024-20241003.pdf.

Nonimmigrant students must also factor in the fee of $470 for paper filing or $420 for online filing for one or more EOS applications.[14] For doctoral students, who will surely require one or more extensions, these fees compounded would be significant. And there are no time estimates for the background and security checks DHS would now complete for an EOS, which would leave students to anxiously await a response for an unspecified period. For ten years after the rule's implementation, DHS estimates annual EOS requests would average 205,000 F-visa nonimmigrants. *Id*. at 42,101. In the rare circumstances in which F-1 visa holders today file applications to extend or change nonimmigration status, 80% of those applications take three-and-a-half months to be processed at the Service Center Operations.[15] These times would undoubtedly grow with the inestimable time required for immigration officer investigations given the high burden that will need to be met for EOS to be granted.[16] Such unnecessary procedural burdens would discourage students to seek a visa in the first instance.

Fourth, the proposed rule's cutting in half of the grace period under which students must depart—from 60 to 30 days—is overly restrictive. This change would severely restrict students' ability to manage essential academic, immigration, and personal transitions at the conclusion of their studies or training. Students would have far less time to: change to a higher level of academic study at their current school; transfer to another school for advanced study; apply for OPT authorization; and make travel plans within the U.S. before returning home, sell belongings, resolve contractual lease agreements, close accounts, arrange shipping, and prepare for departure. As an example, the shortened grace period may result in students needing to break year-long leases, which renters cannot be released from without an undue financial or logistical burden.[17] While the 60-day grace period provides a reasonable amount of time for students to resolve this issue or fulfill their lease, a 30-day grace period is not, and graduating international

[14] These fees are current as of August 2025. *Fee Schedule*, Department of Homeland Security, 20 (Aug. 29, 2025), https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf. To the extent that, under the proposed rule, international students would need to pay for premium processing to avoid employment or student disruptions, the fee is much higher at $1,965. *Reminder: Adjustment to Premium Processing Fees Takes Effect Today*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/archive/reminder-adjustment-to-premium-processing-fees-takes-effect-today.

[15] *Check Case Processing Times*, U.S. Citizenship and Immigration Services, https://egov.uscis.gov/processing-times/ (last visited Sept. 19, 2025).

[16] The proposed rule only allows a 240-day extension to on-campus employment authorization for nonimmigrants in F-1 status while their EOS applications are pending. 90 Fed. Reg. 42,090. The unknown processing times for EOS applications will increase student anxieties and further deter international students from American institutions, especially those who require on-campus employment to support their expenses while living in the United States. Additionally, the proposed Rule would also come at significant expense to nonimmigrants, which DHS estimates will total approximately $304 million annually. 90 Fed. Reg. 42,101. Further, DHS cannot begin to estimate the additional "implementation and operational costs" that will be passed along to the American taxpayer. *See id*.

[17] These leases likely would begin when the school year does, typically in August, and end one year later at the end of July. But under the proposed rule, after students graduate, they would be forced to depart only 30 days later—so if they graduated in May, they would need to leave in June, shy of a one-year lease term.

students may need to forfeit paid rent or break their lease. Indeed, the current 60-day grace period is not arbitrary; it reflects the unique realities of the international student population in F-1 status. International students often complete lengthy degree programs involving years of study, deep integration into academic and local communities, and substantial logistical considerations for departure. Cutting the grace period in half ignores those realities and imposes unnecessary stress and administrative burden on both students and universities. Moreover, DHS's rationale for the change—that 30 days is "adequate" because other classifications have shorter grace periods—fails to account for the fundamentally different purposes and structures of those classifications. Short-term exchange visitors in J-1 status do not face the same academic transitions, unpredictable timelines for degree requirements such as dissertation research, OPT application timelines, or relocation burdens that international students in F-1 status routinely navigate. This change, like the others, contributes to a culture of fear for international students wherein they risk deportation—one that likely will make many forego studying in the United States entirely.

Fifth, the proposed rule creates unreasonable and unnecessary barriers for undergraduate students by requiring them to complete one academic year of study before transferring institutions or changing majors, absent SEVP authorization for "extenuating circumstances." For undergraduate students, changing majors or transferring schools is a routine and expected part of education. Many students begin their undergraduate studies when they are 18 years old. Throughout formative years such as their first year of college, students discover new fields of interest they may want to pursue through their studies. Forcing them to remain in their initial program for an entire academic year, regardless of fit, undermines student success and well-being and could unnecessarily delay a student's completion of their degree. Studies have shown that "there are characteristic developmental changes that almost all adolescents experience during their transition from childhood to adulthood. It is well established that the brain undergoes a 'rewiring' process that is not complete until approximately 25 years of age."[18] It is reasonable to assume that any student in traditional undergraduate age demographic may desire to change their major after beginning their studies as they mature and develop different academic interests. Many students begin their undergraduate studies in an "undeclared" or "open option" major field of study. If an international student determines their desired field of study within their first year of study, they should be able to immediately change their program of study to enroll in major-specific coursework and avoid an unnecessary delay in their degree completion and additional costs. Restricting the flexibility of international students in this way is unduly burdensome.

Sixth, prohibiting graduate students from changing programs of study is impractical. Graduate study is by nature flexible and exploratory. Students, both domestic and international, often shift their research focus, change advisors, or transition to programs better aligned with their academic and professional goals. Such a blanket prohibition is unprecedented and out of step with the realities of graduate education in the United States. Graduate students with on-

---

[18] Mariam Arian et al., *Maturation of the Adolescent Brain*, Neuropsychiatric Disease and Treatment (2013) https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/.

campus assistantships that fund their educational programs are in a particularly precarious position as both full-time degree-seeking students *and* employees of the university. Many graduate-level students rely on one individual (University Faculty Member) to serve as their academic research advisor as well as their on-campus employment supervisor. If the relationship with this individual deteriorates due to a reason outside of the student's control, the student may need to explore transferring to a program that still supports their academic endeavors and research objectives but provides a more constructive educational and work environment for the international scholar. This proposed rule would limit this, creating yet another block for international students as they consider pursuing their educations in the United States.

Finally, the cumbersome EOS process will deter individuals seeking OPTs. Under the proposed rule, those seeking OPTs must apply for an EOS and await adjudication for an unspecified period of time as described above. *Id.* at 42,084 The uncertainty that an EOS application will be approved would discourage individuals from seeking OPTs. This would reduce the workforce, including within the STEM workforce which is an area that employs individuals with highly technical expertise.

In sum, the proposed rule's burdensome and unnecessary restrictions create obstacles at every post-secondary educational level for international students—DHS fails to account for the significance of these changes and the likely deterrent effect they will have on international students' applications as a whole.

## IV. The Proposed Rule Would Directly and Significantly Impact American Educational Institutions and State Economies

The proposed rule would acutely and negatively affect the quality of education in the States' educational institutions, including public colleges and universities, as well as State economies. These harms would permanently alter the landscape of American higher education.

### A. The Proposed Rule Would Diminish American Students' Quality of Education.

As discussed above, the proposed rule's imposition of new obstacles for international students would likely cause a decline in international student enrollment, which will deprive American students and institutions of the educational, cultural, and research contributions of international students. International students and exchange visitors bring rich and diverse viewpoints, interests, and skillsets, which they share in classrooms, research projects, on-campus jobs, clubs, and other extracurricular activities, as well as in everyday social interactions. Research shows that American students appreciate the different perspectives that international students bring to class, and, equally, international students stated that they

benefit too from this cross-national interaction.[19] In one study, students shared that cross-national interactions helped them gain knowledge and skills needed for effective intercultural communication, improved their ability to reflect on their own culture, helped them develop leadership and problem-solving skills, and increased their engagement with course content utilizing multiple perspectives.[20] International students also valuably add to critical research fields further enhancing American institutions and the education they offer, as well as American innovation.

Further, diminished international student enrollment will have financial ramifications that, in turn, impact core educational objectives. For example, during the 2023-24 school year, international students contributed an estimated $217 million in gross student tuition and fee revenue to public New Jersey institutions. At California State Universities, during academic year 2024-25, international students contributed nearly $230 million in tuition and fees. At California Community Colleges, during academic year 2024-25, international students contributed nearly $163 million in tuition. And during the 2023-24 school year, international students contributed an estimated $190 million in gross tuition and fees to Oregon public higher education institutions.

This fiscal impact will be felt across the States' university and college systems, including their ability to serve lower-income in-state students by reducing the amount of tuition they are required to pay. Financial losses could mean fewer course offerings, student services, academic support, and housing services, harming even American students. The loss will be particularly acute in certain degrees and fields. Significantly, nonimmigrant visa holders represented an average of approximately 36% of all science and engineering doctoral students in the United States each year between 2011 and 2018.[21] In Fall 2024, approximately 25% of science and engineering doctoral students within the University of California school system were international students, [22] and 31% of Oregon's science and engineering doctoral statutes were international students (550 international students). In Fall 2025, 40% of international students attending California State University schools were enrolled in graduate programs. If there is a decrease in international students, certain graduate programs, such as those in STEM that enroll a particularly high number of international students, could be compromised. The arbitrary four-year limit the rule proposes would undermine enrollment without due consideration of the associated harms.

If international students and exchange visitors are effectively forced to pursue their studies outside of the United States—either as a result of the restrictions imposed by the

---

[19] *See generally* Diana F. Yefanova et al., *Instructional Practices Facilitating Cross-National Interactions in Undergraduate Classes*, 7 J. of Int'l Students 786 (2017), https://ncses.nsf.gov/pubs/nsf20301/report/u-s-doctorate-awards#citizenship.

[20] *Id*.

[21] *U.S. Doctorate Awards,* Survey of Earned Doctorates (2018), https://tinyurl.com/ys9dvxy5.

[22] *Fall Enrollment at a Glance*, University of California, https://www.universityofcalifornia.edu/about-us/information-center/fall-enrollment-glance (last visited Sept. 22, 2025).

proposed rule or because of a perceived hostility toward international students—American students and institutions will lose out on their numerous contributions. As a result, American students will be less prepared and less able to compete in an increasingly globalized economy.

### B. The Proposed Rule Would Increase American Educational Institutions' Administrative Burdens and Costs.

The proposed rule would also impose direct costs on educational institutions. Institutions would have to divert valuable, limited resources to assist a significantly larger number of international students with navigating the new system, an increase caused by the proposed rule, in completing EOS applications. Schools will need to increase academic counseling to ensure students meticulously plan their schedules, so they complete their programs in four years or by the end of the academic program (e.g., two years for master's or associate's programs). For example, many institutions do not offer prerequisite classes every semester, and it is a complicated process to ensure that students take all classes in the right sequence to graduate on time. Students will also need counseling to comply with the proposed rule's additional restrictions on undergraduate first year educational objective changes and the prohibition on graduate level program transfers.[23] Also, the additional pressure of a four-year deadline and the potential loss of tens or hundreds of thousands of dollars if an EOS is rejected will create justifiable anxiety for international students. This will create the need for educational institutions to increase their mental health services. Meanwhile, nonimmigrants in F or J status with pending EOS applications will be awaiting adjudication of their applications for an unspecified period of time prompting an increase of inquiries from these individuals, contributing further to the administrative backlog of universities and USCIS alike.

For example, one New Jersey institution estimates an initial burden of about $1.5 million, followed by an average of $1.3 million per year, to implement necessary technological and training changes. It estimates a burden of about 67 hours of trainings per staff member and over $180,000 just to train staff on the adaptations for the new policies required by the proposed rule. It estimates approximately three hours of support for each EOS application totaling approximately $234,000. The compounded costs and burdens among the States' many schools will be significant.

### C. The Rule Would Negatively Affect State Economies.

The proposed rule poses a significant risk to the health of State economies. In addition to tuition, international students and exchange visitors rent apartments and houses from local landlords; purchase food from grocery stores and restaurants; frequent retail stores; and

[23] Notably, the proposed rule does not contain sufficient reasoning for the restriction on changing educational objectives. The fraud cases discussed in the proposed rule are predominately related to school transfers by first year students, and not changes in educational objectives. Thus, this aspect of the proposed rule, too, makes it arbitrary and capricious.

make entertainment and leisure purchases. According to the U.S. Department of Commerce, international students contributed $43.8 billion to the U.S. economy and according to the NAFSA Association of International Educators, supported 378,175 jobs during the 2023-24 school year.[24] In California, during the 2023-24 school year, international students attending California institutions contributed $6.4 billion to the economy and supported 55,114 jobs.[25] In Colorado, during academic year 2023-24, 10,363 international students contributed over $404 million to the economy in tuition and fees, housing and other costs, making higher education Colorado's sixth largest export. During the same time period, international students in Massachusetts contributed an estimated $3.9 billion to the state economy, supporting almost 36,000 jobs.[26]

Even without the proposed rule, the NAFSA Association of International Educators report already projects a decline of $7 billion to the economy as a result of already implemented visa restrictions, leading to a potential loss of 60,000 jobs nationwide.[27] The proposed rule would likely exacerbate these already significant harms by accelerating the decline in international enrollment, resulting in additional job losses and declines in sorely needed tax revenue.

## V. The Proposed Rule Conflicts with Relevant Statutes and Regulations

The proposed rule conflicts with and undermines the statutory and regulatory scheme, which clearly contemplates that a student can remain in the United States as long as necessary to complete their course of study. To begin, under 8 U.S.C. § 1101(a)(15)(F)(i), the F-1 visa requires that an international student be "qualified to pursue a full course of study" and enter the country "solely for the purpose of pursuing such a course of study" at a qualifying college, university, or other academic institution. This statutory provision indicates that the purpose of F-1 visas was to permit students to pursue a course of study and therefore, complete that course of study. By cutting students' course of study short, as many programs cannot be completed within four years, the proposed time limitation undermines this congressional mandate. And while the proposed rule would allow for an extension of stay for "compelling academic reason, documented medical illness or medical condition, or circumstance that was beyond the student's control," 90 Fed. Reg. 42,092, this narrow exception would fail to ensure that a nonimmigrant student could complete their degree.

---

[24] *Economic Value Statistics*, NAFSA https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[25] *The United States of America Benefits from International Students*, NAFSA https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf.

[26] *Economic Value Statistics*, NAFSA, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[27] *U.S. Economy Could Suffer a $7 Billion Loss from Precipitous Drop in International Students*, NAFSA https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students.

Additionally, Section 1101(a)(15)(F)(i) instructs that a student's institution must report to the Attorney General "the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn." 8 U.S.C. § 1101(a)(15)(F)(i). The information to be collected includes the date of and reason for the termination of enrollment. 8 U.S.C. § 1372(c)(1)(H). The requirements to notify the federal government about an event that results in the end of a student's studies (i.e., graduation, disciplinary action, dismissal, or failure to re-enroll) lends further support to the argument that F visa admissions should be governed by a student's participation in their course of study rather than arbitrary time limits. The proposed rule, by contrast, would impose an artificial fixed end date that is contrary to the statute and congressional intent.

The proposed rule is also at odds with 8 C.F.R. § 214 and would result in internally incoherent and contradictory regulations. As provided in 8 C.F.R. § 214.2 (f)(6)(i), the "[s]uccessful completion of the full course of study must lead to the attainment of a specific educational or professional objective." The regulation recognizes that inherent in a "full course of study" is the opportunity to successfully complete that course of study by graduating or otherwise attaining a specific educational objective. By contrast, the proposed rule would limit many students to admission periods insufficient for "successful completion." Consequently, it will be uncertain, at best, whether many students would be able to complete their degree or otherwise reach their academic goals.

The regulations also define a college or university as "an institution of higher learning which awards recognized associate, bachelor's, master's, doctorate, or professional degrees." 8 C.F.R. § 214.2 (f)(6)(ii). This regulatory definition contemplates the awarding of degrees. For vocational or business programs, a school seeking to accept F visa students must specifically "submit evidence that its courses of study are accepted as fulfilling the requirements for the attainment of an educational, professional, or vocational objective, and are not avocational or recreational in character." 8 C.F.R. § 214.3 (c)(1). For private schools that are not accredited by a nationally recognized accrediting body, the schools must submit evidence that "[i]t confers upon its graduates recognized bachelor, master, doctor, professional, or divinity degrees," or "[i]f it does not confer such degrees, its credits have been and are accepted unconditionally by at least three other institutions of higher learning." 8 C.F.R. § 214.3 (c)(3). In contrast, the proposed four-year maximum is unrelated to the time regularly necessary to complete a degree, which creates an internally contradictory regulatory scheme.

## VI. Conclusion

The proposed rule is procedurally deficient, arbitrary and capricious, and contrary to law. DHS does not present any facts that justify the need to dramatically increase restrictions on international students and exchange visitors; rather, available evidence suggests the contrary. At no point does DHS demonstrate that it fully considered the multitude of costs and harms the proposed rule would have on the States or to the American

educational system, including the deterrent effect it would have on international students. For all the above reasons, the States urge DHS to withdraw the proposed rule.

Sincerely,

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

BRIAN L. SCHWALB
District of Columbia Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

KWAME RAOUL
Illinois Attorney General

AARON M. FREY
Maine Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

KEITH ELLISON
Minnesota Attorney General

RAÚL TORREZ
New Mexico Attorney General

MATTHEW J. PLATKIN
New Jersey Attorney General

LETITIA JAMES
New York Attorney General

AARON D. FORD
Nevada Attorney General

DAN RAYFIELD
Oregon Attorney General

CHARITY R. CLARK
Vermont Attorney General

NICHOLAS W. BROWN
Washington Attorney General

# EXHIBIT 15

NAFSA

September 29, 2025

U.S. Immigration and Customs Enforcement (ICE)
U.S. Department of Homeland Security (DHS)

**Re: DHS Docket No. ICEB-2025-0001**
**Regulatory Information Number (RIN) 1653-AA95**
**Proposed Rule, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media***
**Comments submitted by NAFSA: Association of International Educators**

Submitted via: https://www.regulations.gov/

# Introduction

On behalf of NAFSA: Association of International Educators (NAFSA), we submit this comment to the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) in response to the notice of proposed rulemaking (NPRM or "proposed rule") published in the Federal Register on August 28, 2025, titled *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media* (**DHS Docket No. ICEB-2025-0001**). **We urge you to withdraw this rule from consideration**. If the rule does move forward, we reiterate NAFSA's request for at least an additional 30-day comment period given the drastic policy change.

**About NAFSA**

With approximately 10,000 members at more than 3,500 colleges and universities, **NAFSA is the world's largest nonprofit comprehensive professional association dedicated to international education**. NAFSA believes that international education advances learning and scholarship, fosters understanding and respect among people of diverse backgrounds and perspectives, is essential for developing globally competent individuals, and builds leadership for the global community. We believe that international education lies at the core of an interconnected world. NAFSA believes that international engagement in our classrooms, our communities, and our workplaces is our strength.

NAFSA realizes its values, vision, and mission by convening people to advance international education. Based in the United States, we provide high-quality programs, products, services, and physical and virtual meeting spaces for the worldwide community of international educators. NAFSA serves international educators and their profession, advances international education in institutions of higher education, and promotes international education and the policies that sustain it in the public arena. The association helps define the profession of international education by establishing principles of good practice and providing professional development opportunities. NAFSA aspires to an environment in which every student, scholar, and practitioner seeking the benefits of international education finds a path, and every institution of higher education integrates international perspectives into its teaching, research, and service missions. We aspire to enlightened international relations, globally engaged citizenry, and a more peaceful and just world.

**NAFSA Comment Overview**

The proposed rule[1] will impact all international students and exchange visitors in the United States, higher education institutions that admit or host them, and employers who benefit from the international students pursuing optional practical training (OPT). If it becomes final, **the damage done by this rule will be felt on our campuses and in our communities and will harm our country's standing in the world.**

Our country's ability to attract and retain international students and exchange visitors is a key element of U.S. public diplomacy, foreign policy, competitiveness, and innovation. We are in a global competition for talent, as other countries around the world recognize the outsized economic and social benefits of international students and exchange visitors and have implemented policies to create a welcoming environment for these students to thrive.

The "Duration of Status" (D/S) policy allows F students and J exchange visitors to remain in the country as long as they are making normal progress towards completing their academic or exchange objectives or are engaging in OPT or J-1 academic training, provided they are properly tracked in the Student and Exchange Visitor Information System (SEVIS). D/S recognizes common educational scenarios and facilitates students and exchange visitors progress to completion of their programs. This proposed rule would eliminate D/S and replace it with a system that admits F students and J exchange visitors for a *fixed* period of time: only until the program end date on their SEVIS document, but not to exceed four years. This means students and exchange visitors who need more time to accomplish their purpose would need to apply for a formal extension of stay (EOS) from United States Citizenship and Immigration Services (USCIS), an agency already mired in processing backlogs. This will deter people from choosing to study and/or stay in the United States. Ending D/S would also create higher compliance costs and legal risks, enrollment impacts, and heavier advising burdens for higher education institutions. If D/S is abolished, students and exchange visitors will need to file an EOS application with USCIS to:

- Complete a Ph.D. program;
- Complete any educational, research, or teaching programs that require more time than four years;
- Complete any program where a student falls a few credits short of graduation requirements;
- Engage in post-completion practical training or academic training,
- Move to a higher level of study;
- Transition from an English language program into a degree program; or
- Transfer to a new school or program sponsor.

[1] The "proposed rule" or "proposal" in this letter refer to the proposed rule published in the Federal Register at 90 FR 42070 (August 28, 2025*), Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*. https://www.federalregister.gov/d/2025-16554. DHS Docket No. ICEB-2025-0001. References to the "2025 proposed rule preamble" are to agency comments in the *Supplementary Information* section of the Federal Register document. Links are to the version of the proposed rule published on federalregister.gov.

The proposed rule also prohibits F-1 graduate students from changing educational objectives or transferring from within the United States, without explanation for why that is necessary.

Participants in Ph.D. programs in the United States will face a particular hardship as the median time to complete this degree is 5.7 years, according to the National Center for Science and Engineering Statistics, or as high as 7.3 years, based on National Center for Education Statistics data. This means that **nearly every international Ph.D. student will be required to file for an extension status**. The ability of Ph.D. students to complete their studies will be in the hands of USCIS and not their higher education institution.

**This proposed rule is a policy that will benefit countries other than our own**. If finalized, the rule will foster tremendous uncertainty for many international students and exchange visitors about whether they will be able to maintain their legal status in the United States through the completion of their studies or program, discouraging students and exchange visitors from coming here, and pushing them to look for opportunities in other countries instead.

**This proposed rule would replace a proven, flexible policy that has served the nation, international students, and exchange visitors for decades with a policy that is duplicative, burdensome and creates uncertainty**. Less onerous options are available for ICE to meet the stated goals of the proposed rule. More importantly, the ICE Student and Exchange Visitor Program (SEVP) and the Department of State's (DOS) Bureau of Educational and Cultural Affairs (ECA) already track international students and exchange visitors through the Student and Exchange Visitor Information System (SEVIS) and certify U.S. institutions of higher education and research and other organizations that admit or sponsor them. International students and exchange visitors are the only nonimmigrants tracked the entire time they are in the country. If they overstay, the system already exists to alert ICE to this violation. **We urge DHS to examine how the current system can be used to achieve stated goals instead of establishing new policies that will only do harm.**

This proposed rule is both procedurally and substantively inadequate. Procedurally**, the NPRM does not provide adequate time for the public to provide feedback**, and the formal comment period should be extended by at least 30 days. Substantively, **the proposed rule is arbitrary and capricious for a number of reasons**, including not considering less expensive and burdensome alternatives, insufficient analysis of the financial impact of this rule on the U.S. education sector and economy, the arbitrary nature of the details of the rule in the context of higher education, and not considering the reliance interests of students, faculty, and the education sector more broadly. **DHS should withdraw this rule entirely and consult directly with NAFSA and other stakeholders to address the agency's stated concerns in a way that does not harm U.S. national interest or international education and improves upon systems and processes that already exist and for which significant financial and human resource investments have already been deployed.**

The proposed rule does not meet the APA's requirement of reasoned decision making in multiple, independent ways, each sufficient to render it arbitrary and capricious. **Throughout the proposal, DHS offers unsupported assertions instead of the evidence and reasoned analysis that the APA demands.**

**DHS would reverse longstanding policy, without identifying concrete problems with the current system**. The proposal does not grapple with the reliance interests that current students and institutions have built around the D/S framework that has been in place for decades, **nor does it address the reality of academic degree timelines**. DHS proposes, without sufficient justification, to prohibit all transfers

and changes in field of study for graduate-level students and imposes an arbitrary four-year admission period that is divorced from the reality of academic degree programs and serves no legitimate aim. The agency's cost-benefit analysis is fundamentally inadequate, ignoring substantial costs and overstating speculative, unsubstantiated benefits. **DHS also does not consider obvious, less burdensome alternatives**.

We have provided a table of contents at the end of this letter as a reader's aid.

# I. DHS Should Provide Adequate Notice and Comment Process

The truncated comment period for this proposed rule of only 30 days, despite its extensive and controversial nature with the potential of affecting over 1.8 million international students and exchange visitors,[2] over 6,500 F-1-certified schools[3] , and over 1,200 exchange visitor program sponsors,[4] is insufficient for the public to adequately respond. **DHS should provide at least 60 days but preferably 90 days to comment.**

The APA requires that agencies "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" before a rule is finalized.[5]

In addition, Executive Order 14219 of February 19, 2025,[6] instructs that "[a]gencies shall continue to follow the processes set out in Executive Order 12866 for submitting regulations for review by OIRA." Executive Order 12866 provides that "... each agency should afford the public a meaningful opportunity to comment on any proposed regulation, **which in most cases should include a comment period of not less than 60 days**." [emphasis added] [7]. For a proposed rule of this type, 60 days is the minimum comment period that should be given, but preferably 90 days.

Lastly, even the comparatively minor actions to make changes to the SEVIS and USCIS forms that will be impacted by the proposed rule changes have been given a 60-day comment period.[8]

**A 30-day comment period does not allow the public to adequately gather information and data, including from FOIA requests.** NAFSA and other organizations have already filed an initial comment requesting at least a 60-day comment period,[9] and we reiterate this request here.

---

[2] The total number of SEVIS records for active F-1 and M-1 students was 1,582,808 in calendar year 2024. https://studyinthestates.dhs.gov/2025/06/read-the-2024-sevis-by-the-numbers-report. Total J-1 category participation in 2024: 301,694: https://j1visa.state.gov/facts-and-figures-2015-2024/

[3] Derived from SEVP 2024 SEVIS by the Numbers Report, https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf

[4] Derived from https://j1visa.state.gov/participants/how-to-apply/sponsor-search/

[5] See 5 USC 553(b)-(c).

[6] Section 4, Executive Order 14219 of February 19, 2025, https://www.federalregister.gov/d/2025-03138/p-17

[7] Section 6(a)(1), Executive Order 12866 of September 30, 1993, 58 FR 51735 (October 4, 1993), https://www.federalregister.gov/executive-order/12866

[8] 2025 proposed rule preamble at https://www.federalregister.gov/d/2025-16554/p-4

[9] See https://www.regulations.gov/comment/ICEB-2025-0001-8627

Executive Order 12866 also directs each agency “to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking.”[10] We are unaware of any outreach to explore or otherwise incorporate the views of the DSOs or ROs who will be charged under this proposal with ensuring its proper execution. Compare this, for example, to the 1986 proposed rule where legacy INS stated in the preamble that the proposals "were developed in part through a series of meetings between the Service and the National Association for Foreign Student Affairs (NAFSA)."[11]

# II. DHS Should Avoid Waste That Doesn’t Achieve Its Goals

DHS’s proposed elimination of duration of status represents a costly and inefficient shift away from a system that has worked for more than three decades. **Instead of strengthening oversight, the rule would create layers of duplicative process, divert scarce government resources, and impose new burdens** on students, scholars, and institutions without offering clear or evidence-based benefits. By discarding a proven framework in favor of untested and unnecessary requirements, DHS risks increasing uncertainty, wasting resources, and undermining the very goals it seeks to achieve.

## DHS should build upon longstanding D/S policy.

The proposed DHS rule would eliminate D/S for F and J nonimmigrants, a more than 30-year policy, with insufficient evidence of systemic policy failure. DHS does not adequately:

- Identify concrete problems with D/S oversight that are not already addressed by SEVIS.
- Justify why previous reforms to SEVIS and DSO and RO oversight are now deemed inadequate.
- Quantify how the proposed rule would meaningfully reduce fraud or security risk.

**In the preamble to the proposed rule, DHS characterizes D/S as an admission for “an unspecified period of time.”[12] But this is not accurate**. The length of a D/S admission is tied to the student or exchange visitor’s program end date in SEVIS. **International students and exchange visitors are already the most tracked of all nonimmigrant categories in the United States, and schools and exchange programs already comply with significant reporting requirements**. Rather than doing away with the D/S system that has successfully operated for more than 30 years and creating in its place an overinclusive protocol covering all F and J nonimmigrants, DHS should instead use the information sources (to include SEVIS) and human resources it already has at its disposal to spot trends and focus its enforcement efforts on specific individuals or organizations who are out of compliance.

---

[10] Section 6(a)(1), Executive Order 12866 of September 30, 1993, *Regulatory Planning and Review*, published at 58 FR 51735 (October 4, 1993), https://www.federalregister.gov/executive-order/12866.
[11] *Nonimmigrant Classes; Change of Nonimmigrant Classification*, proposed rule, 51 FR 27867 (August 4, 1986)
[12] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-46

## DHS should not rely on speculative harms.

DHS justifies the rule by vague references to "noncompliance," "regulatory violations," "national security," and "fraud risk," without articulating evidence beyond anecdotal anomalies and without showing systemic problems with the current D/S structure.

**No empirical link is drawn between D/S and increased fraud or risk, particularly for students at accredited institutions and at long-established exchange visitor programs.**

In the 2020 proposed rule that also sought to eliminate D/S, DHS admitted that it had no data to support its contentions, and only speculated that it "believes" it "could result" in data to show reduced fraud, abuse, and national security risks only after the D/S elimination was put into place.[13] Five years later, DHS has scrubbed such language from the preamble to the current proposed rule but has produced no new data, only anecdote.

In the preamble to the current proposed rule, the agency no longer expects the post-implementation quantitative data it hypothesized about in 2020. With the current proposed rule, it states that it only expects "qualitative benefits… by providing DHS additional opportunities to evaluate whether F, J, and I nonimmigrants are complying with their status requirements, or if they present a national security concern."[14]

**DHS's "feeling" that ending D/S might result in uncovering high rates of noncompliance, fraud, or national security risks is an insufficient basis on which to impose this heavy additional administrative burden** on F and J nonimmigrants who, thanks to the enormous expenditures on SEVIS and SEVP, are already the most tracked and monitored of all nonimmigrants.

## DHS should avoid duplicative processes.

Eliminating D/S and limiting international students' and exchange visitors' admission period will mean that all such students and exchange visitors who are not able to complete their degrees or programs within the initial time period granted must file an EOS application with USCIS. In addition, any student who wishes to pursue another degree at a higher level will also have to apply to USCIS for an EOS. This is an unnecessary, expensive, and time-consuming process. In the course of an EOS application, students would have to submit information to USCIS that their schools and programs have already provided

[13] In the preamble to the 2020 proposed rule, DHS had stated: "DHS believes this proposed rule could result in reduced fraud, abuse, and national security risks for these nonimmigrant programs, but whether the rule will in fact result in a reduction will be borne out when the final rule is implemented. Compared to the current D/S framework in which a nonimmigrant's substantive compliance might never be reviewed by DHS, DHS believes that the rule would be likely to result in more prompt detection of national security concerns or abuse by F, J and I nonimmigrants and could serve as a deterrent to those who would otherwise plan to engage in fraud or otherwise abuse these nonimmigrant classifications. The rule proposes additional oversight of these individuals. Without this oversight, there is no data on prevalence of fraud and abuse by F, J, and I nonimmigrants and only limited data on these individuals' impact on national security." *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 85 FR 60526, 60554 (September 25, 2020), preamble to the 2020 proposed rule, at https://www.federalregister.gov/d/2020-20845/p-623

[14] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-448

directly through SEVIS or are required to provide upon DHS or DOS request when warranted, **creating a duplicative process that increases bureaucratic burdens on the government and individuals without providing a demonstrable gain for the government.**[15]

Making international students and exchange visitors pay fees and wait for USCIS to make the same decision that is already made by the education institution or program sponsor and recorded in SEVIS thereby notifying DHS is duplicative and wasteful. **DHS can effectively enforce current immigration laws by wisely using its resources to engage in data-driven initiatives that focus on risk factors rather than subject entire nonimmigrant categories to an expensive, cumbersome, and time-consuming process** that largely duplicates the efforts of schools and exchange visitor programs that already comply with heavy SEVIS reporting and information retention obligations.

## Change in policy will unnecessarily burden an already overloaded USCIS.

The problems facing USCIS are well known and dire, as it is unable to handle even its current caseload of applications. This summer, USCIS threatened to furlough thousands of employees due to shortfalls in expected fee funding. However, as ongoing USCIS processing delays illustrate, the agency currently does not have the staff necessary to deal with these requests.

As of September 5, 2025, the USCIS website reported processing times[16] for Form I-539 for EOS applications at 6.5 months. **Ending D/S would exacerbate an existing problem by adding an enormous number of new EOS filings to the current backlog**. With SEVIS tracking in place, this is only creating extra, unnecessary work for USCIS.

It is a poor use of resources to direct USCIS to adjudicate EOS requests. No matter the fees generated by the requirement, there is no reason to believe that USCIS would be able to improve its timely adjudication of cases if this proposed rule were implemented. The amount of time required to train adjudicators on a new, duplicative requirement could be better spent focused on the present caseload that is already overwhelming the agency.[17]

## DHS should better use SEVIS and other tools to achieve desired goals.

Rather than upend the D/S system that has worked well for three decades, **DHS should engage in smart and targeted enforcement that is made possible by the SEVIS tracking system.** DHS should develop

[15] SEVIS transactions that would likely result in a new program end date or OPT end date necessitating an EOS with USCIS would likely include:

- F-1: Extend Program. Correct Program Dates. Create Transfer-In I-20. Create Reinstatement I-20. Change Educational Level. OPT Request (Employment End Date). STEM OPT Extension Request (Employment End Date).
- J-1: Extension Within the Maximum Duration of Participation Request. Extension Beyond the Maximum Duration of Participation Request. Change of Category Request. Amend Program.

[16] USCIS, "Check Processing Times," https://egov.uscis.gov/processing-times/ (Accessed September 5, 2025), "all other extension of stay applications by Service Center Operations (SCOPS).

[17] Reporting by *Newsweek* indicates that USCIS has a record backlog of 11.3 million pending cases. US Immigration Backlog Hits All-Time High, Newsweek, July 8, 2025, https://www.newsweek.com/us-immigration-backlog-hits-all-time-high-2095846.

SEVIS and maximize its use of its human resources in ICE rather than adding a duplicative USCIS layer, otherwise SEVIS becomes just a very expensive[18] way to produce a paper Form I-20 or DS-2019. The costly SEVIS endeavor commanded by Congress[19] now yields data for DHS that would have been unthinkable in prior decades.

Although, **unlike most other nonimmigrant categories, F and J nonimmigrants are admitted for D/S, none of those other categories are connected to a massive electronic database reporting system** like SEVIS. Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, is the core statutory authority for the electronic collection of information in SEVIS. In passing Section 641, Congress established reporting and document retention obligations for U.S. schools that admit international students in the F-1 and M-1 categories and organizations that sponsor exchange visitors in the J-1 category.

Congress has had opportunities to end D/S for international students and exchange visitors since 1991 but has not done so. However, when IIRIRA was passed in 1996, Congress opted to require U.S. schools to report to SEVIS the date of the alien's termination of enrollment and the reason for such termination (including graduation, disciplinary action or other dismissal, and failure to re-enroll).[20] **SEVIS and other DHS information systems give DHS immediate access to this detailed information about almost every student and exchange visitor event that could impact a student or exchange visitor's compliance with the regulations**, including where students and exchange visitors are; the fields they are studying, researching, or teaching; when they have been properly authorized for employment; and when their programs have ended.

DHS states in the preamble to the proposed rule that "the significant increase in the volume of F academic students [and] J exchange visitors...poses a challenge to the Department's ability to monitor and oversee these categories of nonimmigrants while they are in the United States."[21] Then, citing the statutes that underlie SEVIS, DHS simply asserts, circularly, that "DHS believes that the admission of F, J, and I nonimmigrants for D/S is not appropriate."[22]

The only justification that DHS makes for abandoning the D/S system is an unsubstantiated assertion that "DHS believes that this process would help to mitigate risks posed by aliens who seek to exploit these programs"[23] and anecdotal examples in the footnotes to support an assertion that "DHS believes this greater oversight would deter F, J, or I nonimmigrants from engaging in fraud and abuse and strengthen the integrity of these nonimmigrant classifications."[24]

---

[18] IT spending for SEVIS in FY 2025 alone is 23.53 million dollars. See ITDashboard.gov, ICE - Student and Exchange Visitor Information System (SEVIS) / 024-000005363, https://www.itdashboard.gov/investment-details/024-000005363

[19] Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) as amended is the core statutory authority for the electronic collection of information in SEVIS. IIRIRA 641 is codified at 8 USC 1372.

[20] IIRIRA 641(c)(1)(H)/8 USC 1372(c)(1)(H)

[21] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-61

[22] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-69

[23] Id.

[24] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-74



1425 K Street, NW, Suite 1200, Washington, DC 20005-4175 USA • **Telephone**: 1.202.737.3699 • **E-mail**: inbox@nafsa.org

**Greater oversight does not require overturning a longstanding policy that applies to all F and J nonimmigrants, but rather better utilizing the data in the SEVIS system to identify and target bad actors.**

For information not directly submitted in SEVIS, DHS already has the authority to request, on any individual student or class of students upon notice, all information and documents that schools are obligated to retain throughout the student's enrollment and for a period of three years beyond that.[25] Likewise, the DOS exchange visitor program regulations already require sponsors to cooperate with any inquiry or investigation that may be undertaken by DOS or DHS.[26]

In the preamble to the current proposed rule, DHS cites a 2020 GAO report[27] that recommended "that ICE modify the SEVIS system to include factors that potentially indicate which foreign students or scholars may pose more risk of transferring technology at U.S. universities." This makes sense, because the SEVP Office that manages SEVIS is within the National Security division of ICE's HSI Directorate. **DHS does not adequately explain why it has ruled out first implementing additional SEVIS data requirements and analysis of its own SEVIS data before abandoning the current well-functioning D/S policy**, nor does it adequately address why its robust training materials, Field Representative corps, sector outreach, and ownership of the SEVIS database and SEVIS data are viewed as insufficient.[28]

In the Regulatory Impact Analysis for the proposed rule,[29] DHS states simply that SEVIS "does not readily lend itself" to identifying higher-risk cases, but this conclusion rests entirely on the current structure of SEVIS, not its potential. DHS has full authority to modify SEVIS data fields through rulemaking or programmatic changes to supplement the areas it believes are currently lacking. DHS itself notes that SEVIS data already plays a critical role in visa issuance, admission, and ongoing status monitoring. Ignoring the possibility of modest SEVIS upgrades, rather than ending D/S and requiring F and J nonimmigrants to incur the uncertainty and cost of EOS and burdening USCIS with processing these filings, demonstrates a lack of seriously weighing alternatives. Lastly, DHS efforts to modify the information in SEVIS are already underway, as shown by DHS's September 3, 2025, proposal to significantly expand the data collected through SEVIS Forms I-17 and I-20.[30]

---

[25] 8 CFR 214.3(g)(1)
[26] 22 CFR 62.10(f)
[27] See U.S. Gov't Accountability Off., GAO 23-106114, China, Efforts Underway to Address Technology Transfer Risk at U.S. Universities, but ICE Could Improve Related Data (Nov. 2022), available at https://www.gao.gov/assets/gao-23-106114.pdf.
[28] The enormous investment in SEVIS and SEVP should yield data sufficient to detect patterns. DHS's Regulatory Impact Analysis rejects this, stating only that "While this information is likely to be helpful in identifying aliens who should be subjected to further review, in some cases the information may not be sufficient for determining whether these nonimmigrants are engaging in fraudulent behavior or otherwise have fallen out of status." This response reflects DHS's assertion that if there are a few "bad actor" cases there must be so many more that it justifies replacing the current system with the proposed EOS system. But this is based on mere speculation and is insufficient basis for the proposed action.
[29] DHS Regulatory Impact Analysis, https://www.regulations.gov/document/ICEB-2025-0001-0143
[30] See the information collection review notice published at 90 FR 42602 (September 3, 2025). This information collection is separate from the information collection notice that is part of the proposed rule to eliminate duration of status.



1425 K Street, NW, Suite 1200, Washington, DC 20005-4175 USA • **Telephone**: 1.202.737.3699 • **E-mail**: inbox@nafsa.org

**DHS's concern with fraud is legitimate, but the proposed solution is misplaced. SEVP has the resources necessary to enforce actions to mitigate fraud.** DHS cites a few press releases from 2008 to 2015 (and one from 2018) detailing actions taken against certain schools. DHS also points to an anomalous instance of "a nonimmigrant who has been an F-1 student at a dance school since 1991 and who has been issued 16 program extensions since 2003" and a few other English as a Second Language (ESL) and associate degree students who were enrolled beyond the normal period of time needed to complete their courses of study. DHS also states that it identified "nearly 29,000 F-1 students who, since SEVIS was implemented in 2003, have spent more than 10 years in student status," including students "who enrolled in programs at the same educational level as many as 12 times, as well as students who have completed graduate programs followed by enrolling in undergraduate programs, including associate's degrees."

The fact that DHS has access to the  data already shows the effectiveness of SEVIS. Rather than place all international student and exchange visitor nonimmigrants into a USCIS EOS scheme that would unnecessarily burden schools, programs, students and exchange visitors, and USCIS, **DHS should continue its work by analyzing SEVIS data and using its pre-existing authority to further investigate the individuals and institutions it believes are not acting within the bounds of the laws.** For example, schools and exchange programs are statutorily required to recertify or redesignate with DHS or DOS every two years, which provides the agencies with regular opportunities to determine the bona fides of the institution.

Over the years that SEVIS has been in operation, DHS has cultivated and maintained an excellent working relationship with U.S. schools through their principal designated school officials (PDSOs) and designated school officials (DSOs). DOS has done likewise with exchange visitor programs through their responsible officers (ROs) and alternate responsible officers (AROs). A 2009 letter from to U.S. university presidents lauded DSOs: "I know of no other group like these international school officials who handle so many pressures so successfully….They are unique in America in that they are the only group whose good and diligent work determines the success of the very Federal agency that regulates their activities. And they are doing this while serving five masters-their academic institutions, international students, faculty and researchers, the Federal government and their families.…They have provided SEVP with thousands of improvements to SEVIS I (the current system), and they are key players in the proper development of SEVIS II. They provide critical feedback on the policies and regulations SEVP is drafting, and they do so in a most professional manner."[31]

In its analysis, **DHS also does not account for the nationwide fleet of SEVP field representatives who already contribute to compliance and the integrity of the SEVIS system**. According to SEVP,[32] the field representatives "serve as liaisons between SEVP and SEVP-certified schools. As a stakeholder resource, field representatives enhance national security by helping schools comply with federal policy and regulations," and "SEVP field representatives and Homeland Security Investigations' (HSI) Counter Threat Lead Development Unit (CLTD) work together through the Project Campus Sentinel initiative to provide an open communication channel for DSOs to report any fraudulent activity. Project Campus

[31] 2009 letter from then-SEVP director Lou Farrell to U.S. university presidents, https://www.nafsa.org/professional-resources/browse-by-interest/sevp-director-letter-university-presidents
[32] SEVP Field Representatives, https://studyinthestates.dhs.gov/schools/apply/sevp-field-representatives (accessed September 5, 2025)

Sentinel provides resources to help DSOs identify any fraudulent activity and any threats to national security."

Current SEVP and ECA leadership do a good job of educating and engaging with schools, sponsors, programs, and participants. SEVP's relationship with schools and ECA's relationship with program sponsors have continued to grow, and DHS should continue to trust this group of highly trained professionals to competently and conscientiously perform the statutory duties that provide DHS with all the information it needs to ensure compliance while balancing burdens placed on schools and programs.

## DHS should consider more efficient ways of increasing oversight and adequately examine less burdensome alternatives.

**DHS's proposal should adequately explore less burdensome alternatives and demonstrate the factual, policy, and legal reasons for not considering or rejecting other available mechanisms.**

DHS has not adequately explained why, for example, longer admission periods, SEVIS upgrades, or a registration system would not suffice. Nor does it show why such options would be inconsistent with the INA or with DHS's fraud-prevention objectives.

DHS seeks to overturn the more than 30-year D/S system partly on the premise that it needs to more regularly "check in" on students and exchange visitors. DHS says fixed-date admissions will "strengthen vetting" and deter "nefarious actors," yet the NPRM identifies no evidence that current D/S prevents biometrics collection for targeted cases, nor does it present failure-to-detect rates under existing SEVIS and benefits adjudications. **Assertions that more frequent EOS filings will improve vetting, without analysis of adjudicatory capacity, false positives, or processing delays, are purely speculative**.

Even assuming that more regular "check ins" are indeed necessary, the proposal takes for granted that meaningful oversight can only occur through the Form I-539 EOS process managed by USCIS, without considering reasonable alternatives.

The Department did not adequately consider other less costly and less burdensome, but equally secure, ways of accomplishing the same objective. DHS should consider, for example, whether a streamlined "registration" requirement for longer-term students or exchange visitors could provide a compliance checkpoint without the full adjudicative burdens of an EOS.

This, in combination with the detailed data available in the SEVIS database, would certainly provide DHS with sufficient contact and information on longer-term nonimmigrants, without upending the D/S policy that is already adequately managed through SEVIS. Yet DHS does not consider this or any other reasonable alternative methods that could facilitate the desired oversight in less costly and burdensome ways.

## DHS should not eliminate D/S to address its concerns with enforcing the unlawful presence statute.

DHS presents the elimination of D/S as a way to improve oversight and integrity of the nonimmigrant visa programs, claiming that:

- D/S hinders DHS's ability to track status violations,

- D/S delays or prevents individuals from beginning to accrue "unlawful presence" under INA 212(a)(9)(B),
- Fixed periods of admission would trigger earlier unlawful presence accrual, enabling more effective enforcement.

DHS also avers that, "[a]dmission for D/S, in general, does not afford immigration officers enough predetermined opportunities to directly verify that aliens granted such nonimmigrant statuses are engaging only in those activities their respective classifications authorize while they are in the United States. In turn, this has undermined DHS's ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence and has created incentives for fraud and abuse."[33]

In essence, **DHS would use a D/S rule change that institutes a massive administrative requirement impacting schools, students, exchange visitors, and USCIS resources as a *workaround* to expand the scope and enforcement of INA 212(a)(9)(B), rather than engaging in substantive rulemaking on that separate statute.**

In addition, DHS overstates the number of international students and exchange visitors who illegally remain in the country after completing their studies or programs by reliance on deeply flawed data. According to notable demographer Robert Warren, **the overstay statistics cited by DHS are incorrect**.[34] Warren published a study that identifies serious flaws in the overstay statistics, stating, "The DHS figures represent actual overstays plus arrivals whose departure could not be verified. That is, they include both actual overstays and unrecorded departures." The report concludes that "[s]lightly more than half of the 628,799 reported to be overstays by DHS actually left the country but their departures were not recorded." The inability of U.S. Customs and Border Protection (CBP) to consistently match nonimmigrant entry and exit data creates unreliable data.

The passage of IIRIRA in 1996 created distinct sections of the INA to define visa overstays, INA 222(g) [8 USC 1202(g)], and unlawful presence, INA 212(a)(9)(B) [8 USC 1282(a)(9)(B)]. This legal distinction was created in the same law that mandated SEVIS (8 USC 1372). While DHS and DOS have promulgated detailed regulations to implement SEVIS, DHS and its predecessor INS never issued regulations for the overstay and unlawful presence provisions. Now, DHS is revising international student and exchange visitor regulations in part to address the statutory overstay and unlawful presence provisions that have been left undefined by regulations for almost a quarter century. **DHS should address its issues with the overstay and unlawful presence provisions by separate rulemaking rather than obliquely attacking the duration of status policy that has worked so well for more than 30 years**.

## DHS should avoid arbitrarily linking legal immigration status and threats to national security.

In the proposed rule, ICE argues that ending D/S will advance national security. However, it is difficult to understand how the damage done to the many interests served by admitting international students and exchange visitors to the United States will be balanced out by requiring an exact status expiration date.

[33] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-61
[34] Stuart Anderson. *USCIS Uses Questionable Overstay Report to Justify Policies.* Forbes, June 6, 2018, https://tinyurl.com/y4y8brxl


1425 K Street, NW, Suite 1200, Washington, DC 20005-4175 USA • **Telephone**: 1.202.737.3699 • **E-mail**: inbox@nafsa.org

The DHS proposed rule shifts the narrative on international students and exchange visitors from welcome contributors to our campuses and communities to those to be treated with continuous suspicion. We recognize the need to identify and address the threats posed by foreign malign actors and governments that seek to undermine U.S. national security, and the higher education community already does and will continue to work closely with the U.S. government to address threats through improved research security.

Being born outside the United States is not a precondition of threat to national security. In the proposed rule, DHS cites only a few discrete examples of espionage by students and exchange visitors from China as a reason to impose burdensome, uncertain new processes on all international students. While essential, any legitimate concerns about espionage should be addressed by existing law enforcement and national security mechanisms using agencies and provisions that are designed and equipped to deal with such issues should they occur, without imposing costly and duplicative paperwork and obligations on all international students and exchange visitors.

## Students applying for post-completion OPT should not have to file for extension of stay.

DHS's proposed rule is premised in part on the need to formally "check in" on the status of students and exchange visitors. In the case of F-1 post-completion Optional Practical Training (OPT), applicants must file a Form I-765 along with a Form I-20 bearing the DSO's recommendation for OPT. The I-765 is a robust form that results in an employment authorization document (Form I-765) bearing the applicant's photograph and an expiration date. The I-765 process is certainly equivalent to the I-539 process in many respects and should obviate the need for a duplicative EOS application in OPT scenarios.[35]

## Students applying for reinstatement should not have to file for extension of stay.

Like the I-765 application for post-completion OPT, filing for F-1 reinstatement already involves the filing of Form I-539. To require in some cases the filing of a parallel or consecutive Form I-539 to address the F-1 student's prior I-94 end date is duplicative and unnecessary. The reinstatement recommendation in SEVIS involves specifying a program end date.[36] The reinstatement I-539 should satisfy the dual purpose of reinstating the applicant's F-1 status and extending their stay until the Program End Date on the Reinstatement I-20, without the need for setting another 6-month deadline as DHS discusses in the preamble to the proposed rule.[37]

---

[35] Note that DHS's proposed transition provisions will not require students covered by them to file a duplicative I-539 extension of stay application (see proposed 8 CFR 214.1(m)), but only for six months.

[36] See SEVIS Help Hub, Reinstatement COE (Form I-20), at https://studyinthestates.dhs.gov/sevis-help-hub/student-records/certificates-of-eligibility/reinstatement-coe-form-i-20

[37] DHS describes this complicated process in the preamble to the proposed rule: "If a student is reinstated and his or her admit until date expires within 6 months, but the student is unable to complete his or her program of study within that time, then the F-1 student also would need to apply to USCIS for an EOS. In that scenario, the F-1 student would need to make separate requests for reinstatement and for EOS by submitting a separate form for each request, including the required filing fee for each form, by marking reinstatement on one form and then EOS

## DHS should consider legal costs and liability.

An EOS application is a personal application of the individual applying for that benefit and can have a complex impact on the applicant's immigration status and eligibility for future immigration benefits.

Although college-based advisers need to be aware of the general issues surrounding EOS applications, they cannot provide legal advice. Applicants needing immigration advice and help weighing risks or planning an immigration strategy should be referred to an experienced immigration attorney. An experienced immigration lawyer is best positioned to advise on all aspects of any EOS application, including responding to Requests for Evidence (RFEs), applicability of overstay and unlawful presence rules, dependents, and other matters that relate to the personal immigration status of applicants and their dependents.

The proposed rule does not consider the costs of immigration representation to the student or exchange visitor, or the potential liability of advisers who will be involved in the EOS process and expected by applicants for advice and assistance that in many cases would border on legal advice, leading to situations that could be seen as the unauthorized practice of law.

## DHS should consider reliance interests and increased uncertainty.

The rule disrupts settled expectations of students, scholars, universities, and sponsors who relied on D/S flexibility. DHS does not account for reliance interests in the longstanding D/S rules.

DHS admits D/S was re-adopted in 1983 and again in 1991 based on efficiency and trust in schools' DSO oversight but does not adequately weigh these benefits against the proposed change.

It is clear that the proposed rule will increase uncertainty for international students and exchange visitors.

Under the proposed rule, students and exchange visitors must file an EOS application with USCIS to continue their studies or research. To participate in F-1 post-completion OPT to gain critical experiential knowledge that complements their academic studies, a date-specific admission period will require international students to file EOS requests in addition to applying to USCIS for OPT. As noted earlier, USCIS is already overburdened by its current workload, so there is justified concern for the ability of USCIS to complete timely adjudications. International students are already required to apply to USCIS for work authorization; adding an EOS request creates another level of uncertainty. A U.S. degree is devalued when international students are not given the opportunity to participate in experiential learning that is available to their U.S. peers.

Students and their families cannot make plans based on an unknowable, future USCIS decision or USCIS backlogs. It becomes increasingly difficult to justify studying in the United States when the ability to retain legal student status throughout the period of study is uncertain. The benefits of studying in the United States are great; however, it becomes far riskier when success is tied not to students' abilities or

---

on the other. Both forms can then be submitted together at the same time to avoid unnecessary adjudication delays. In the event both forms are submitted together, and the F-1 student's application to reinstate student status is denied, his or her application for EOS would also be denied, with both filing fees being retained by USCIS and not refunded." See 2025 proposed rule preamble, at https://www.federalregister.gov/d/2025-16554/p-334

school, but to unknown USCIS representatives who adjudicate the EOS requests and their academic futures.

# III. DHS Should Consider Academic Purviews and Avoid Making Academic Decisions

DHS's proposal reaches into academic matters that are best left to educational institutions themselves. By imposing rigid restrictions on student mobility, program structures, and timelines, the rule would replace well-established academic norms with federal mandates that are disconnected from how U.S. education actually functions. These incursions risk undermining institutional autonomy, disrupting long-standing practices that support student and research success, and introducing unnecessary barriers to innovation in higher education.

## DHS should not limit graduate-level program mobility.

Proposed 8 CFR 214.2(f)(8)(i) (students who are "currently in a graduate level program of study" are not eligible for school transfer and changes in educational objectives) and proposed 8 CFR 214.2(f)(5)(ii)(A) ("An F-1 student at the graduate degree level or above may not change programs at any point during a program of study") disallow changes in educational objectives and transfers for graduate students. **These provisions are unusually harsh and would severely restrict academic flexibility for graduate-level study**.

In the preamble regarding these provisions,[38] DHS simply says that it's proposing "to prohibit F-1 students in a graduate level program of study from changing educational objectives or transferring from within the United States," but offers inadequate justification for these limits.

**The proposed restrictions on graduate-level program changes should be abandoned.**

The proposal to restrict graduate-level program changes is also overbroad. While perhaps aimed at preventing students from shifting to unrelated graduate degree objectives midstream, the proposed categorical prohibition would disrupt longstanding and essential graduate education practices. Here are two examples.

*Disrupted practice: Student mobility to match adviser mobility*

It is not uncommon for a faculty member to accept a new position at a new university or laboratory. Where the faculty member is the thesis or dissertation adviser of a student, an F-1 student currently has the option to transfer to the new school to continue the mentorship with that faculty member. The absolute prohibition on graduate student mobility would unnecessarily disrupt longstanding and essential graduate education practices. Here are two examples:

*Disrupted practice: The awarding of a master's en route to the Ph.D.*

At many U.S. universities, the master's en route is not a separate academic program but rather an embedded milestone within the Ph.D. curriculum. It serves both to recognize academic progress and to

[38] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-296

provide an exit credential for students who complete substantial graduate-level work but do not finish the dissertation. Importantly, students who receive this credential have not changed their program of study - they have simply concluded it early. In other cases, a student who sets out to do a doctoral degree may decide for a variety of legitimate reasons to discontinue that program and accept the master's degree.

The proposed rule's wording could be interpreted to prohibit conferral of a master's en route, which could be seen as a change of educational objective (defined as "educational level or major") that is prohibited under proposed 8 CFR 214.2(f)(8)(i)(C), or as a "change in program" that's prohibited under proposed 8 CFR 214.2(f)(5)(ii)(A) (since the use of the term "program" throughout the rule is so nebulous and undefined).

This would create several harmful consequences:

- **Institutional noncompliance risk:** Universities would be unsure whether awarding the master's en route would violate the new prohibition, chilling their willingness to award earned credentials.
- **Adverse student outcomes:** Students who leave a Ph.D. program after years of work could be denied any credential or forced to depart and seek readmission on a new F-1 solely to receive the master's, despite already meeting all academic requirements.
- **Misalignment with academic structure:** The rule assumes degree programs are discrete and sequential, but graduate education often uses nested structures (master's within Ph.D.), which SEVIS can already accommodate under current D/S rules.

If DHS does not abandon the provision in its entirety, as we recommend, to preserve the integrity of graduate education, DHS should at the very least establish exceptions to include, among others, that students can transfer to continue mentorship with their advisor, and that the conferral of a master's en route to the Ph.D. does not constitute a "change of program" and thus should not be barred by proposed 8 CFR 214.2(f)(8)(i)(C) or proposed 8 CFR 214.2(f)(5)(ii)(A).

## DHS should not regulate the maximum amount of time needed for language study.

DHS proposes limiting ESL study to an aggregate of 24 months, including breaks and an annual vacation. NAFSA believes that achieving mastery of a language at a level sufficient for study at the college level should not be determined by an arbitrary limit set by an agency that does not specialize in language learning and pedagogy.

In addition, the language used in the proposed regulation and the explanatory notes in the preamble do not clarify whether the proposed limit is per uninterrupted stay in F-1 status or lifetime. A lifetime limit would be particularly unwise. Maintenance of language expertise over time is an ongoing process. For example, an 18-year old student who studies ESL for two years might return to their home country build a career in a non-English-speaking environment, only to find an opportunity years later that requires her to refresh her language skills and return to the United States for a second round of ESL.

## The proposal to prohibit transfers and educational level changes during the first academic year is overbroad.

DHS proposes prohibiting a student studying at lower than the graduate level from either transferring or changing educational objectives "within the first academic year of a program of study" at the school whose Form I-20 was used to enter the United States.[39] This provision is overbroad.

For example, how would it apply to an ESL student who has completed a three-month program of intensive English language study who then wishes to transfer to another school to pursue an associate or bachelor's degree? Under SEVP's current definition of "academic year,"[40] three months would not constitute a full academic year and this provision as proposed would prohibit the student from transferring or even from changing levels at the same school, given the proposed rule's equally overbroad definition of educational objectives.

Also, although the proposed rule would allow SEVP to pre-authorize changing educational objectives or transferring before the completion of the first academic year, the proposal does not specify what the procedure is to request that SEVP authorization, nor does the proposed rule further explain what might constitute "extenuating circumstances" for this purpose, except for identifying school-level circumstances "that may include, but are not limited to, a school closure or a school's prolonged inability to hold in-person classes due to a natural disaster or other cause."[41]

## DHS should allow international students to pursue new F-1 programs of study at the same or lower educational level.

DHS should not disallow or prohibit academic choice with arbitrary restrictions that limit movement between academic programs or levels. Instead, DHS should continue to focus its ongoing compliance and enforcement efforts based on smart, data-driven analysis, using the tools and regulatory authorities already available to it.

Proposed 8 CFR 214.2(f)(5)(ii)(C) provides that a student "who has completed a program in the United States as an F-1 nonimmigrant at one educational level may not maintain, be admitted, or otherwise be provided F-1 status through a program at the same educational level or a lower educational level."

This proposed rule language could possibly be read as a lifetime limit. Even though the preamble[42] talks about this as prohibiting "a change to the same or a lower educational level *while in F-1 status*," the language of the proposed rule (e.g., "be admitted, or otherwise be provided F-1 status") moves interpretation towards a lifetime limit. DHS must clarify this.

[39] Proposed 8 CFR 214.2(f)(5)(ii)(A)

[40] SEVP Policy Guidance for Adjudicators 1408-01: Academic Year (October 10, 2014) provides that to constitute an "academic" year, an F-1 program measured in clock hours must "include a minimum duration of… Twenty-six weeks of instructional time." See: https://www.ice.gov/sites/default/files/documents/Document/2016/sevp-PG1408-01.pdf

[41] See proposed 8 CFR 214.2(f)(5)(ii)(A) and proposed 8 CFR 214.2(f)(8)(i)(D)

[42] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-90

**A lifetime limit is particularly uncalled for** and unjustified. There are many situations where another degree or certificate at the same or "lower" level would make academic or professional sense. For example, a student who completes an engineering degree should be able to then do a Master of Business Administration (MBA) to prepare for a career in technical patents, or a Master of Fine Arts degree recipient should be able to enroll in a post-graduate certificate in Photography to hone skills in that specialty discipline.

## DHS should avoid durational limits that dampen innovation in educational programming.

The proposed rule, although characterized as a simple "check-in" with the government, would institute an unwieldy process that disproportionately impacts innovative courses, including those that involve collaboration between learning institutions.

For example, "2+2 degree programs" are educational pathways where students complete the first two years of a degree at a community college (often for an associate's degree) and then transfer to a four-year institution to finish the final two years and earn a bachelor's degree. This model is also known as the "2+2 model" and is a popular and affordable option for earning a bachelor's degree, with a major benefit being the cost savings and smooth credit transfer between institutions. Inserting a de-facto EOS requirement for educational programs of this type will upend the "smoothness" promised by the educational package and even discourage programs that pool resources.

## DHS should preserve the requirement to make normal progress.

DHS also proposes to eliminate from the current regulations[43] a reference to "making normal progress" with respect to seeking a program extension.[44] While the "normal progress" standard for status maintenance is not overly specific, it is similar to standards used in the education industry. For example, schools are familiar with applying the concept of "satisfactory academic progress" for U.S. students who are receiving federal financial aid.[45] DHS proposes that it will adjudicate whether a student's need for an extension to complete a program of study is due to "compelling academic reasons."[46]

In addition, DHS dives deeply into the academic realm by proposing that it would find ineligible for a school transfer or changes to educational level or major a student who has "a pattern of behavior demonstrating a repeated inability or unwillingness to complete his or her course of study."[47] **These are academic decisions that the experts at educational institutions are better equipped to handle**.

DHS also asserts in the preamble that it "believes that the determinations of program extension and EOS should be separated, with the DSO's and RO's recommendation being one factor an immigration officer reviews while adjudicating an application for EOS."[48] **DHS, however, does not have expertise in making such determinations or creating such restrictions**. NAFSA asserts that the DSO's decision to

---

[43] Current 8 CFR 214.2(f)(5)(i)
[44] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-332
[45] https://studentaid.gov/understand-aid/eligibility/staying-eligible#satisfactory-academic-progress
[46] Proposed 8 CFR 214.2(f)(7)(i)(C)(2)(i)
[47] Proposed 8 CFR 214.2(f)(8)(i)(F)
[48] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-164

extend the program of a student who is making satisfactory academic progress according to the school's standards is sufficient. The current regulation already requires DSOs to approve extensions only after determining that the delays in completion "are caused by compelling academic or medical reasons, such as changes of major or research topics, unexpected research problems, or documented illnesses."

If DHS is interested in enhancing the requirements for DSO determinations of eligibility for a program extension, rather than change a decades-old policy that works well, it could change 8 CFR 214.2(f)7)(iii) to specify that the DSO must base the academic determination on documentation such as a letter from the student's academic adviser or dean and retain that documentation for inspection upon the request of the agency.

We also believe that **the current system provides adequate information to DHS, through SEVIS, to spot any trends that merit further inquiry** through the procedures that already exist at 8 CFR 214.3.

## DHS should reconsider its 4-year limit.

In the Regulatory Impact Statement (RIS) for the August 28, 2025, proposed rule,[49] DHS acknowledges only a narrow set of alternatives—"no action," a 2-year period, the hybrid 2/4-year period proposed in the 2020 rulemaking, and limited SEVIS-based targeting.

DHS justifies a 4-year maximum period by weighing enforcement desires against nonimmigrant and school or program burden but does not explain why other systems within the context of D/S were not considered.[50]

Regardless, even longer periods of maximum admission would do nothing to address the plight of shorter programs like ESL and pathway programs and other situations where students seek to achieve their academic objectives through a series of connected educational opportunities.

In the end, DHS simply dismisses all alternatives in favor of a one-size-fits-all EOS requirement.

## DHS should increase the J-1 and M-1 category grace periods to 60 days, not reduce the F-1 grace period to 30 days.

DHS states in the preamble that it believes that the F category, albeit distinct from M or J, shares a core similarity in that many aliens in these categories are seeking admission to the United States to study at U. S. educational institutions.[51] Thus, DHS thinks that the current 60-day F-1 post-completion "grace period" to prepare for departure, or take other actions to extend, change, or otherwise maintain lawful status should be reduced to the 30-day "grace period" of the J-1 and M-1 categories.[52] While we agree that the F, M, and J categories share some important aspects, we submit that the parity DHS seeks should be achieved by increasing the J-1 and M-1 grace periods to 60 days, not by reducing the F-1 grace period to 30 days.

---

[49] DHS Regulatory Impact Analysis, at https://www.regulations.gov/document/ICEB-2025-0001-0143
[50] For example, under the 1987 final rule students were admitted for duration of status but also had to file a request for extension of stay with (legacy) INS if they would be "in student status for eight consecutive academic years." See the 1987 final rule published at 52 FR 13223, 13227 (April 22, 1987).
[51] See 2025 proposed rule preamble at https://www.federalregister.gov/d/2025-16554/p-308
[52] See proposed 8 CFR 214.1(a)(4)(i)(A)

# IV. DHS Should Seek to Preserve and Promote U.S. Preeminence in Education

DHS's proposal to eliminate duration of status and impose restrictions on academic mobility does not adequately account for the realities of U.S. higher education and exchange programming, and in doing so risks undermining America's global preeminence. The proposed rule relies on incomplete sources for average program lengths, imposes a four-year maximum admission period that is inconsistent with normal academic pathways, and disregards the length of doctoral, medical, and research programs. By forcing nearly all international Ph.D. students and many J-1 exchange visitors to seek extensions of stay, DHS would shift authority for program completion away from U.S. institutions and into USCIS's hands. At the same time, DHS offers only a cursory and inaccurate assessment of the proposal's economic and diplomatic consequences, ignoring well-documented contributions of international students and exchange visitors to U.S. campuses, the workforce, local economies, and global engagement.

## DHS should account for the dynamic nature of modern U.S. educational offerings and exchange programming.

DHS points to a simple, outdated Department of Education webpage as the source of its data on average degree completion times.[53] While the majority of U.S. bachelor's degree programs may be structured to be completed within four years, a maximum admission period of four years is not adequate for doctoral degree completion. The Education Department webpage indicates four years for a doctorate without specifying the source of that assertion.

While U.S. higher education is often viewed through the lens of bachelor's degree programs at what are known as "four-year institutions," the four-year maximum period of admission proposed by DHS does not match the reality of study.

According to the Education Department's primary statistics agency, the National Center for Education Statistics (NCES), **the median time to complete a bachelor's degree is 56.3 months (or 4.33 years)**.[54] The maximum admission period does not account for normal academic endeavors such as the need to change majors, take courses outside of one's major, or add a minor. Dual-degree programs often require additional years of study. According to the National Science Foundation's principal statistics agency, the National Center for Science and Engineering Statistics (NCSES), the median years to a research doctorate

---

[53] See preamble footnote 91 at https://www.federalregister.gov/d/2025-16554/p-233, citing "The Mobile Digest of Education Statistics, 2017, The Structure of American Education, available at https://nces.ed.gov/programs/digest/mobile/The_Structure_of_American_Education.aspx". Also see preamble footnote 92 at https://www.federalregister.gov/d/2025-16554/p-234, which, although it cites from the Department of Education's 2023 Digest of Education Statistics at https://nces.ed.gov/programs/digest/d23/tables/dt23_326.10.asp, that data is from cohort entry years 1996-2016.

[54] National Center for Education Statistics Fast Facts, https://nces.ed.gov/fastfacts/display.asp?id=569 (accessed September 24, 2025)

is 5.7 years from entering a program to completion, while those who complete the master's/doctorate sequence take an average of 7.3 years from entering graduate school to completion.[55]

Participants in Ph.D. programs in the United States will face a particular and unwarranted hardship This means that **nearly every international PhD student will be required to file for an extension of stay**. The ability of PhD students to complete their studies will be in the hands of USCIS and not their higher education institution.

In the preamble, DHS notes that before arriving at the four-year admission period it proposes, it considered only a two-year standard admission period, in addition to taking no action (which we recommend) and the 2/4-year system proposed in 2020.[56] Although DHS states that a two-year period would "unduly burden many F and J nonimmigrants" as well as "place greater administrative burdens on USCIS and CBP,"[57] **it does not adequately address the same burdens on many shorter-term students**, including ESL students, many of whom may be admitted for a single term and would need to extend as needed to reach their linguistic goals, to associate's degree students coming to a U.S. community college with a view to transferring to a bachelor's degree program,[58] pathway programs who have been instructed by SEVP[59] to first issue an I-20 for the ESL pathway portion of the program and then after completing that portion to issue a change of level I-20 to begin their degree program to which they had initially only been conditionally admitted, etc. All of these innovative programs and approaches would be required to navigate the unnecessary EOS protocol proposed by DHS.

In addition, on the J-1 side of the equation:

- The J-1 Professor/Research Scholar category is available for a maximum of five years. A four-year limit would arbitrarily limit all five-year research and postdoctoral programs to four years, making these exchange participants apply for an expensive and time-consuming extension of stay in every case in order to complete the last year of the program.
- The J-1 Alien Physician category, for physicians engaged in clinical residencies and fellowships, is available up to seven years to accommodate the lengthy preparation involved in many medical specialties. Requiring all physicians in such specialties to file an extension of stay application would introduce unnecessary distractions and could interrupt the continuity of patient care.

## DHS must analyze the financial and diplomatic impact of this proposed rule.

In the proposed rule, DHS provides only a perfunctory and inadequate analysis of the rule's financial impact on the U.S. education sector. Most fundamentally, DHS vastly underestimates the adverse

---

[55] NSF, "Survey of Earned Doctorates," 2024, https://www.nsf.gov/statistics/srvydoctorates/#tabs-2 (accessed September 5, 2025)
[56] 2025 proposed rule preamble to the proposed rule, https://www.federalregister.gov/d/2025-16554/p-237
[57] Id.
[58] See, e.g. SEVP's Study in the States page "What is Community College" at https://studyinthestates.dhs.gov/2012/03/what-community-college that describes community colleges as "two-year schools that provide affordable postsecondary education as a pathway to a four-year degree."
[59] See SEVP Policy Guidance S7.2: Pathway Programs for Reasons of English Proficiency, October 28, 2016, at https://www.ice.gov/doclib/sevis/pdf/pathwayS7.2englishProficiencyReasons.pdf

impact this proposed rule will have on foreign student enrollments and exchange programs, which will in turn impact colleges, universities, and foreign exchange programs generally. International students at U.S. colleges and universities contribute billions of dollars to the U.S. economy and support hundreds of thousands of U.S. jobs. Beyond those direct economic impacts, the presence of foreign students in U.S. higher education contributes substantially to academia, workforce development, global understanding, and diplomatic ties more generally. This proposed rule will negatively impact the entire country.

## The NPRM underestimates the adverse impact on enrollments and exchange.

In the proposed rule's preamble, DHS correctly states that the "global market for nonimmigrant students is competitive and many U.S. schools hold an advantage over foreign institutions due to the quality of the programs they offer." But the agency then grossly underestimates the effect of the proposal, stating only that "the proposed rule may have a marginal impact on nonimmigrant student enrollment." [60]

Compare this to the agency's statement in the similar 2020 proposed rule, where DHS admitted that ending D/S "may adversely affect U.S. competitiveness in the international market for nonimmigrant student enrollment and exchange visitor participation," and "could decrease nonimmigrant student enrollments in the United States with corresponding increased enrollments in other English-speaking countries."[61] These other countries have policies akin to D/S that allow ongoing legal immigration status for the length of students' enrollment without the uncertainty of a required EOS filing that could derail their studies.

U.S. higher education is already under enormous pressure due to a slate of unwelcoming immigration policies and executive orders**. Ending D/S would add yet another significant deterrent to talented students and exchange visitors who are seeking a predictable educational experience or research opportunity in the United States**.[62]

In the proposed rule, DHS also brushes away any concerns or uncertainty that current and prospective students and exchange visitors would experience, stating in a conclusory manner only that "DHS maintains that eligible students should have no difficulty with getting their EOS requests approved, which should alleviate concerns about the uncertainty of EOS approval."[63] As stated above, DHS makes an anemic nod to the fact that "many U.S. schools hold an advantage over foreign institutions due to the quality of the programs they offer" but says nothing about the erosion of that advantage due to unfortunate government policies and the fierce and increasing competition from other countries for the same talent.

---

[60] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-445

[61] 2020 proposed rule preamble, https://www.federalregister.gov/d/2020-20845/p-592

[62] NAFSA Fall 2025 International Student Enrollment Outlook and Economic Impact: "Scenario modeling based on a potential 30-40 percent decline in new international student enrollment in the United States this fall could result in a 15 percent drop in overall enrollment." See https://www.nafsa.org/fall-2025-international-student-enrollment-outlook-and-economic-impact

[63] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-445

The Institute for Progress and NAFSA conducted recent surveys to understand the international student talent pipeline[64] **where 49% of respondents who were current international students studying in the United States said they would not have enrolled in the first place had D/S been replaced with a fixed period of admission**. Of the **prospective students surveyed, 16% fewer respondents said they were likely to enroll in U.S. programs if D/S were replaced with a fixed period of admission** (57%) compared to the current rules (67%).

It is unrealistic to expect international students to choose to study here when it is entirely possible that their legal immigration status will not be extended throughout the time they would need to complete their studies or finish their programs. The prospect of being forced to leave a country before completing a degree or program or instead losing one's valid immigration status is hard to justify for many students. **This proposed rule will necessarily depress the enrollment of foreign students at U.S. colleges and universities to a far greater extent than what the NPRM is willing to admit**.

## International students make significant contributions to the U.S. economy and support hundreds of thousands of jobs.

Noted earlier, international students and exchange visitors generate billions of dollars of spending in local economies and contribute groundbreaking research and innovation that maintains the United States' critical edge in a competitive global economy. NAFSA and JB International conduct an annual analysis of the economic contributions of international students and their families to the U.S. economy, and their latest analysis found that international students studying at U.S. colleges and universities contributed that international students studying at U.S. colleges and universities contributed **$43.8 billion** and supported **378,175 jobs** to the U.S. economy during the 2023-2024 academic year.[65] For every three international students, one U.S. job is created or supported.[66]

Another study[67] separately submitted in comment on this proposed rule by three immigration experts who have assessed over 20 years of administrative data from USCIS, SEVIS, and the U.S. Census estimates that **the proposal to eliminate D/S, if implemented, would incur annual losses of $72-145 billion by 10 years into the future**, compared to the $3.3 billion of costs cited by DHS in the proposed rule preamble and DHS's Regulatory Impact Assessment. This is a difference of more than 22 times higher in cost to what DHS presents.

---

[64] Surveys on International Talent Pipelines, Institute for Progress and NAFSA: Association of International Educators, September 15, 2025, accessed at https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf

[65] NAFSA International Student Economic Value Tool, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2

[66] The United States of America: Benefits from International Students, NAFSA: Association of International Educators, https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf

[67] Comment of M. Clemens, J. Neufeld, A. Nice, submitted on the proposed rule, text at https://ifp.org/wp-content/uploads/Clemens-Neufeld-Nice-D-S-Elimination-comment.pdf

An additional study by the same experts[68] also points out that **international students form an essential part of the science, technology, engineering, and mathematics (STEM) workforce pipeline.** That study finds that **expected reductions in STEM international students after the combined effect of eliminating duration of status admissions, restricting Optional Practical Training, and reducing access to H-1B status, would impact the U.S. STEM workforce and ultimately "reduce annual productivity growth in the US economy by 3 to 6% (not percentage points), cumulating to a loss of $220–439 billion per year after 10 years."**

Driving away international talent in general is predicted to **cost the U.S. economy $7 billion in revenue and more than 60,000 jobs** due to projected declines in new international student enrollment in the upcoming 2025-2026 academic year.[69]

In its proposed rule, however, DHS does not even mention the economic and job contributions of international students and exchange visitors. The absence of acknowledging or addressing these very real and inevitable economic impacts render this proposed rule's analysis inadequate. Because DHS does not analyze or engage in any way with the costs the proposal would impose on America's job market, talent pool, and economic growth, **the cost-benefit and regulatory impact analyses in the proposal are inadequate and unrealistic**.

## International students' and exchange visitors' contributions extend to academia, workforce development, global understanding, and diplomatic ties.

Beyond the economic contributions illustrated above, international students and exchange visitors provide immense contributions to our campuses and communities in the areas of academia, workforce development, global understanding, and diplomatic ties. **International student enrollment helps to maintain the viability of courses and majors when domestic enrollment lags, specifically in some STEM fields**.

Since 2000, immigrants have represented 40 percent of all American Nobel Prize recipients in chemistry, medicine, and physics.[70] To be sure, the United States must do more to ensure more American students are prepared and eager to study in STEM fields. But in the meantime, the presence of foreign students allows U.S. colleges and universities to maintain robust STEM departments and offer a wider and stronger selection of courses for American and foreign students alike. According to IIE's 2024 *Open Doors* report, 56% of international students in the United States pursue STEM fields.[71] Without these students in the classroom, there would be fewer course options for American students.

---

[68] Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in The United States, M. Clemens, J. Neufeld, A. Nice, text at https://ifp.org/wp-content/uploads/Clemens-Neufeld-Nice-9-28-25.pdf

[69] NAFSA Fall 2025 International Student Enrollment Outlook and Economic Impact, https://www.nafsa.org/fall-2025-international-student-enrollment-outlook-and-economic-impact

[70] National Foundation for American Policy, NFAP Policy Brief, October 2023, *Immigrants and Nobel Prizes: 1901-2023*, https://nfap.com/wp-content/uploads/2023/10/Immigrants-and-Nobel-Prizes-1901-to-2023.NFAP-Policy-Brief.October-2023.pdf

[71] Open Doors International students data, https://opendoorsdata.org/annual-release/international-students/

International students and scholars studying and conducting research alongside American students and scholars also helps foster a mutual understanding of each other's cultures. Their perspectives, experiences, and competencies provide a window to the world that U.S. students and researchers need to be successful in developing products and services for the global marketplace. No matter the political winds, growth in the U.S. job market is inextricably tied to the world outside our borders. **The ability to conceive of, develop, and market goods and services to non-U.S. markets is essential to future business success and innovation**.

When international students and exchange visitors return home, they bring with them a deeper knowledge and understanding of our country and become America's greatest foreign policy assets. They strengthen links in trade, research cooperation, and diplomacy. Since World War II, U.S. institutions of higher education have welcomed and educated millions of students from all over the world, with many going on to become world leaders and some of our closest friends and allies. U.S. foreign policy leaders across the political spectrum, from Colin Powell to Madeleine Albright to Robert Gates, all agree that our openness to international students and exchange visitors helps to strengthen ties with countries across the globe.

It is also worth mentioning that **almost half of U.S. "unicorns" have a foreign-born founder**.[72]

# V. Miscellaneous and Technical Comments

## F and J nonimmigrant status, not just period of authorized stay, should be extended while EOS applications are pending.

DHS states in the preamble that F nonimmigrants with a timely filed EOS application and whose EOS application is still pending after their admission period indicated on Form I-94 has expired "would be authorized to continue pursuing a full course of study after the end date of his or her admission until USCIS adjudicates the EOS application."[73]

Although logical and appreciated, this does not mean that the student is seen to be in valid F-1 status while the EOS is pending.

And although the heading of proposed 8 CFR 214.2(f)(5)(viii) implies that students with a timely filed extension of stay application would receive "Automatic Extension of F stay," the wording of that provision states only that a student with a timely filed extension application "will be considered to be in a period of authorized stay."

Likewise, proposed 8 CFR 214.2(j)(1)(vii)(A) says that a J-1 exchange visitor who has filed a timely EOS application with USCIS would be "authorized to continue engaging in activities consistent with pursuing the terms and conditions of the alien's program objectives," but not that the exchange visitor remains in actual J-1 nonimmigrant status while the EOS is pending.

---

[72] A unicorn founder is the leader of a privately held startup company that has achieved a valuation of over $1 billion. See *Nearly Half Of US Unicorns Have Foreign-Born Founders*, Global Finance magazine, December 4, 2024, https://gfmag.com/capital-raising-corporate-finance/us-unicorns-immigrant-founders/

[73] 2025 proposed rule preamble, https://www.federalregister.gov/d/2025-16554/p-317

A period of authorized stay is very different than nonimmigrant status. While being considered in a period of authorized stay may protect an applicant from being subject to the INA 222(g) overstay penalty and accruing unlawful presence under INA 212(a)(9)(B), DHS has long distinguished between valid nonimmigrant status and a period of authorized stay.[74]

In fact, it has been USCIS's long-standing policy that "lawful nonimmigrant status ends and you are out of status when your Form I-94 expires, even if you have timely applied to extend your nonimmigrant status.[75] Given exceedingly long USCIS processing times, this rule would needlessly jeopardize the immigration status of international students and exchange visitors if finalized as proposed.

NAFSA urges DHS to withdraw this proposal in its entirety. However, if DHS continues toward a final rule, at a minimum, for an F or J nonimmigrant, the regulatory wording should be revised to clarify that an applicant with a timely filed EOS application should be considered to be in valid F or J nonimmigrant status, not just in a period of authorized stay, while an EOS application is pending, and remain eligible for all benefits of such status while the application is pending.

## Erroneous or beyond-the-scope removal of I-129 deference language.

The proposed rule would replace the "deference" to prior Form I-129 determinations language in the current regulation at 8 CFR 214.1(c)(3)(v) with completely new language relating to USCIS discretion in granting EOS applications:

- **Current** 8 CFR 214.1(c)(5): "(5) *Deference to prior USCIS determinations of eligibility.* When adjudicating a request filed on Form I-129 involving the same parties and the same underlying facts, USCIS gives deference to its prior determination of the petitioner's, applicant's, or beneficiary's eligibility. However, USCIS need not give deference to a prior approval if: there was a material error involved with a prior approval; there has been a material change in circumstances or eligibility requirements; or there is new, material information that adversely impacts the petitioner's, applicant's, or beneficiary's eligibility."
- **Proposed** 8 CFR 214.1(c)(5): "(5) *Decisions for extension of stay applications.* Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at USCIS's discretion. The denial of an application for extension of stay may not be appealed."

This is odd for two reasons. First, it revises a petition-based immigration provision in a rulemaking on F students, J exchange visitors, and I media professionals. Second, it would leave 8 CFR 214.1(c) with two almost identical "discretion" paragraphs, as the proposed rule leaves intact the existing "discretion" provision at current 8 CFR 214.1(c)(7):

> (7) *Decision on extension or amendment of stay request*. Where an applicant or petitioner demonstrates eligibility for a requested extension or amendment of stay, USCIS may grant the

[74] See USCIS Adjudicator's Field Manual 40.9.2, at https://www.uscis.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf; AFM 40.9.2 is also referenced and linked to on USCIS's Unlawful Presence and Inadmissibility page at https://www.uscis.gov/laws-and-policy/other-resources/unlawful-presence-and-inadmissibility

[75] See for example "C1—I am a nonimmigrant…How do I extend my nonimmigrant stay in the United States?" [Form M-579B], May 2016, at https://www.uscis.gov/sites/default/files/document/guides/C1en.pdf

> extension or amendment in its discretion. The denial of an extension or amendment of stay request may not be appealed.

We suggest that DHS possibly meant to revise paragraph (c)(7) rather than paragraph (c)(5). In any case, we believe that amending an H-1B provision is beyond the scope of this proposed rulemaking and should not be included.

## Cleaning up pre-SEVIS language.

If DHS adopts any part of this proposed rule, the agency should also take the opportunity to clean up current 8 CFR 214.2(j)(1)(i) by removing this outdated language at the end of that paragraph:

> "… Prior to August 1, 2003, if exigent circumstances are demonstrated, the Service will allow the dependent of an exchange visitor possessing a SEVIS Form DS-2019 to enter the United States using a copy of the exchange visitor's SEVIS Form DS-2019. However, where the exchange visitor presents a properly completed Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, which was issued to the J-1 exchange visitor by a program approved by the Department of State for participation by exchange visitors and which remains valid for the admission of the exchange visitor, the accompanying spouse and children may be admitted on the basis of the J-1's non-SEVIS Form DS-2019."

## DHS should remove the 30-day I-765 filing requirement, as it had proposed doing in 2020.

In the preamble to the 2020 proposed rule,[76] DHS proposed striking the current language in 8 CFR 214.2(f)(11)(i)(B)(2) and (C) which requires students to file their Form I-765 with USCIS within 30 days and 60 days, respectively, of the date that the DSO enters a post-completion OPT or STEM OPT recommendation into SEVIS, stating that "such a timeframe for obtaining the DSO recommendation seems unnecessary given that students would always be required to first get their DSO's recommendation before filing their Form I-765 requesting OPT employment authorization and a regulatory timeframe for submitting the I-765 is already in place."

We recommend that DHS also remove the 30/60-day I-765 filing requirement in the 2025 rulemaking, as it proposed doing in 2020.

## F-1 SEVIS is currently programmed to allow only one year of extension at a time.

The "Extend Program" functionality of the F-1 SEVIS release in effect at the time this comment was prepared limits the new program end date of the extension to no more than one year from the date of

[76] *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 85 FR 60526, 60554 (September 25, 2020), preamble to the 2020 proposed rule, at https://www.federalregister.gov/d/2020-20845/p-405

the student's current program end date.[77] This programming exists despite the fact that the current extension of stay regulation[78] does not limit the term of the extension period. This would have to be remedied. This comment would also go towards the information collection comment on DHS Docket No. ICEB-2025-0001.

# Conclusion

For more than three decades, the D/S framework has enabled the United States to attract the world's most talented students and exchange visitors while ensuring robust oversight through the SEVIS system and the expertise and commitment of designated school and exchange program officials. **The proposed rule would dismantle this proven model and replace it with a duplicative, costly, and burdensome system that offers no demonstrated benefit. It would inject profound uncertainty into the educational experience, deter international talent, and overwhelm an already overextended USCIS—undermining U.S. competitiveness, innovation, and global standing in the process**. DHS has not shown systemic problems with the current D/S policy beyond speculation based on anecdote and has not meaningfully evaluated less disruptive alternatives such as modest SEVIS enhancements or a simple registration mechanism.

For all of the reasons explained above, **NAFSA strongly opposes the proposed rule to eliminate D/S for F and J nonimmigrants, including its attendant restrictions on academic mobility**. We urge DHS to withdraw this proposal. If DHS nevertheless proceeds, it must at a minimum provide a substantially longer comment period, revisit its assumptions and data, and fully engage with the educational and exchange community to develop any reforms collaboratively. Our nation's success depends on an immigration policy that is secure, efficient, and welcoming—one that strengthens rather than undermines the global exchange of knowledge and ideas that fuels the preeminence of U.S. higher education, research, and economic vitality.

Respectfully submitted,

**NAFSA: Association of International Educators**

[77] SEVP's SEVIS Help Hub, Extending the F-1 Form I-20, confirms: "The Student and Exchange Visitor Information System (SEVIS) allows for an extension period of up to one year." See https://studyinthestates.dhs.gov/sevis-help-hub/student-records/manage-program-dates-registration-and-course-load/extending-the-f-1.
[78] Current 8 CFR 214.2(f)(7)

## Table of Contents

Introduction ........ 1

I. DHS Should Provide Adequate Notice and Comment Process ........ 4

II. DHS Should Avoid Waste That Doesn't Achieve Its Goals ........ 5

DHS should build upon longstanding D/S policy. ........ 5

DHS should not rely on speculative harms. ........ 6

DHS should avoid duplicative processes. ........ 6

Change in policy will unnecessarily burden an already overloaded USCIS. ........ 7

DHS should better use SEVIS and other tools to achieve desired goals. ........ 7

DHS should consider more efficient ways of increasing oversight and adequately examine less burdensome alternatives. ........ 11

DHS should not eliminate D/S to address its concerns with enforcing the unlawful presence statute. 11

DHS should avoid arbitrarily linking legal immigration status and threats to national security. ........ 12

Students applying for post-completion OPT should not have to file for extension of stay. ........ 13

Students applying for reinstatement should not have to file for extension of stay. ........ 13

DHS should consider legal costs and liability. ........ 14

DHS should consider reliance interests and increased uncertainty. ........ 14

III. DHS Should Consider Academic Purviews and Avoid Making Academic Decisions ........ 15

DHS should not limit graduate-level program mobility. ........ 15

DHS should not regulate the maximum amount of time needed for language study. ........ 16

The proposal to prohibit transfers and educational level changes during the first academic year is overbroad. ........ 17

DHS should allow international students to pursue new F-1 programs of study at the same or lower educational level. ........ 17

DHS should avoid durational limits that dampen innovation in educational programming. ........ 18

DHS should preserve the requirement to make normal progress. ........ 18

DHS should reconsider its 4-year limit. ........ 19

DHS should increase the J-1 and M-1 category grace periods to 60 days, not reduce the F-1 grace period to 30 days. ........ 19

IV. DHS Should Seek to Preserve and Promote U.S. Preeminence in Education ........ 20

DHS should account for the dynamic nature of modern U.S. educational offerings and exchange programming. ........ 20

DHS must analyze the financial and diplomatic impact of this proposed rule. .................................. 21

The NPRM underestimates the adverse impact on enrollments and exchange. ................................. 22

International students make significant contributions to the U.S. economy and support hundreds of thousands of jobs. ........................................................................................................................ 23

International students' and exchange visitors' contributions extend to academia, workforce development, global understanding, and diplomatic ties. ................................................................ 24

V. Miscellaneous and Technical Comments.......................................................................................... 25

F and J nonimmigrant status, not just period of authorized stay, should be extended while EOS applications are pending...................................................................................................... 25

Erroneous or beyond-the-scope removal of I-129 deference language............................................. 26

Cleaning up pre-SEVIS language. .......................................................................................................... 27

DHS should remove the 30-day I-765 filing requirement, as it had proposed doing in 2020................ 27

F-1 SEVIS is currently programmed to allow only one year of extension at a time. ............................ 27

Conclusion................................................................................................................................................ 28

# EXHIBIT 16

Association of American Universities
America's Leading Research Universities

September 29, 2025

**To**: Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW, Washington, DC 20536

**From**: Hanan Saab, Associate Vice President, Association of American Universities
Paul Stern, Legal Analyst, Association of American Universities

**Re: Notice of Proposed Rulemaking, "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media"**

DHS Docket No. ICEB-2025-0001
RIN 1653-AA95

*Submitted online via https://www.federalregister.gov/documents/2025/08/28/2025-16554/establishing-a-fixed-time-period-of-admission-and-an-extension-of-stay-procedure-for-nonimmigrant#open-comment*

The Association of American Universities (AAU) provides the following comments expressing our significant concern and opposition to the Department of Homeland Security's (DHS) and Immigration and Customs Enforcement's (ICE) notice of proposed rulemaking (the proposed rule) titled "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media" issued in the *Federal Register* on August 28, 2025.[1]

AAU represents America's leading research universities that collectively educate and train nearly 42% of our nation's PhDs, 70% of all postdoctoral researchers, 23% of all graduate students, and 38% of all international students.[2] As America's leading research universities, AAU institutions have been the destination of choice for international students interested in earning undergraduate and graduate degrees in every academic discipline.[3] As such, AAU and our members are uniquely qualified to provide comments on the detrimental effect this proposed rule will have on our nation's institutions of higher education and research enterprise.

---

[1] 90 Fed. Reg. 42070 (08/28/25)
[2] National Center for Education Statistics, CES; Survey of Graduate Students and Postdoctorates in Science and Engineering (GSS), NCSES, 2023, https://ncses.nsf.gov/surveys/graduate-students-postdoctorates-s-e/2023#survey-info. See also, Integrated Postsecondary Education Data System, https://nces.ed.gov/ipeds
[3] Institute of International Education, "Open Doors Data on Leading Institutions," November 2024, https://opendoorsdata.org/data/international-students/leading-institutions/

***We urge DHS to withdraw the proposed rule.*** If adopted, this rule would create confusion for both international students and universities while adding costly, unnecessary, and burdensome procedural hurdles through the creation of a new extension-of-stay process. In addition, it will unnecessarily restrict and limit students from adjusting their studies and pursuing additional degree opportunities. This approach will create unnecessary risks for international students and universities working to comply with U.S. immigration laws and hamper our nation's ability to attract and retain talent that is vital to our workforce and higher education system.

At a time when nations across the world are actively reforming their immigration systems to facilitate international study and work, the United States cannot afford to introduce deleterious policies that threaten our resounding competitive advantage. Immediately below, AAU highlights five key points for consideration, which we discuss in much greater detail in our more comprehensive comments that follow:

1. ***The proposed rulemaking establishes a period of admission that does not account for a reasonable timeline for completion for many academic and exchange programs; therefore, it should be withdrawn and reconsidered.*** This is especially true for doctoral programs, joint degree programs, practical training programs, and programs for foreign researchers and physicians. If DHS decides to move forward with a final rule setting a fixed period of admission for F and J visa holders, it should account for the variance in durations across different education levels and programs to avoid disrupting the flow of average and expected completion.[4]
2. ***The extension of stay process proposed by DHS will be lengthy, costly, and unpredictable.*** The process places significant discretion in the hands of U.S. Citizenship and Immigration Services (USCIS) officers who lack the experience and expertise developed by academic officials to make decisions about the need to extend a student or exchange visitor's program. If students cannot be confident that they will be able to complete their degree programs as planned, they may find that the potential risks and uncertainties are too great for them to pursue studies in the United States. It will also create a significant new workload for USCIS officials, likely resulting in increases to the USCIS backlog and processing delays.
3. ***The proposal to restrict students' academic mobility constitutes an undue interference in the essential decision-making processes that underpin the relationship between students and their institutions.*** By limiting the ability of international students to change their educational objectives, transfer between institutions, or pursue further studies – rights afforded to their U.S. citizen peers – the rule risks discouraging talented individuals from choosing to study in the United States. Such limitations not only undermine institutional autonomy but also diminish the appeal of U.S. higher education as a flexible and supportive environment for academic growth.

[4] As an example of a potentially viable alternative, between 1987 and 1991 legacy Immigration and Naturalization Service (INS) had a fixed admissions period in place of eight consecutive academic years, before abandoning it after feedback received from institutions of higher education and agency officials in favor of admission for duration of status. See 52 FR 13223 (4/22/87).

4. ***If implemented, the proposal will negatively impact U.S. competitiveness, including our advantage in attracting, developing, and retaining top talent from around the world.*** Implementing DHS's proposals will deter enrollment of international students and exchange visitors at significant cost to our research enterprise, technological and medical innovation, and the U.S. economy. It will also lead many of these individuals to take their knowledge and talent to competing nations' universities and workforces.
5. ***Sensible and less burdensome alternatives exist that would better achieve DHS's goals of eliminating fraud and abuse and addressing national security concerns.*** DHS should consider less costly and burdensome alternatives to this rulemaking, including utilizing and expanding existing mechanisms for screening and vetting international students and exchange visitors, strengthening oversight through the Student and Visitor Information System (SEVIS) program, and fully implementing recommendations made by the U.S. Government Accountability Office (GAO)[5] to address instances of fraud and abuse.

The following are our full technical comments in response to this notice of proposed rulemaking:

**A. The proposed rulemaking establishes a period of admission that does not cover the expected timeline for completion of many academic and exchange programs**

*The Proposed Fixed Admissions Period is Incompatible with the Typical Timeline for Students in the Undergraduate to PhD Pipeline*

The proposed rule would impose a fixed period of admission for student visas for the shorter of their program end date or four years before an extension of stay is required. This is despite more than thirty years of policy dating back to the legacy Immigration and Naturalization Service (INS) on October 29, 1991, when a determination was made after feedback both from university Designated School Officials (DSOs) and immigration service officers that the "burdensome and difficult to follow" extension process be simplified.[6] The fixed period of admission of four years offered in the proposed rule is insufficient and out of line with the time needed to complete typical academic programs. Furthermore, restricting admissions to the program end date on a Form I-20 or DS-2019 if shorter than four years also does not consider that this kind of arbitrary time allocation will lead to increased burden on students, institutions, and USCIS. According to data from the Baccalaureate and Beyond Longitudinal Study conducted by NCES, the median time to complete a bachelor's degree is 53 months (4.4 years) for all students, compared to 46 months (3.8 years) for international students.[7] Despite this, a significant number of international undergraduate students will still be unable to complete their degrees within four years due to academic, medical, or circumstantial reasons, and as a result, they will be required to request an extension for USCIS consideration. In addition, under the changes of the proposed rule, all students pursuing optional practical training (OPT) and science, technology, engineering, and mathematics (STEM) OPT,

---

[5] GAO Report, Student and Exchange Visitor Program, DHS Can Take Additional Steps to Manage Fraud Risks Related to School Recertification and Program Oversight https://www.gao.gov/products/gao-19-297?mobile_opt_out=1 - summary_recommend (March 2019)
[6] 56 Fed. Reg. 27212 (06/13/91)
[7] U.S. Department of Education, National Center for Education Statistics, Baccalaureate and Beyond: 2016/2020 (B&B). Months between initial enrollment in PSE and BA completion (median) with zeros by Citizenship. https://nces.ed.gov/datalab/powerstats/table/ubqprl

currently estimated to be close to 200,000 as of 2024, will be required to file extension of stay requests.[8] More troubling is that these extensions will be left to the discretion of USCIS officers who, through no fault of their own or the agency, lack the necessary expertise to adjudicate the academic or personal reasons for why a student may need an extension to complete a program.

Given the time to completion, AAU is especially concerned for international students who enter the United States to complete their doctoral studies or a master's degree with the hope of continuing their studies at the doctoral level. Under the proposed rule, these students would be required to file burdensome extension of stay requests, likely multiple times, and at an additional cost of $420 per online filing and $470 per paper filing.[9] This process will sow uncertainty among international students who may worry about potential delays and interruptions of their education and training, and a potential impediment to their ability to join our nation's workforce. For STEM fields, this could be particularly burdensome and would disincentivize the very students we need to educate and train to fill significant gaps in the U.S. workforce.[10]

*The Proposed Fixed Admissions Period Fails to Account for the Average PhD Program Timelines*

Graduate education programs in the United States are magnets for the best and brightest domestic and international students and are widely respected and emulated at institutions worldwide. AAU institutions make up only 3% of all four-year universities in the United States. However, our universities award 50% of all doctoral degrees in science and engineering fields and 49% of all doctoral degrees in the visual and performing arts or humanities.[11] Collectively, 31% (roughly 234,000 international students) of all graduate students at AAU institutions are international students.[12] In addition, in 2023, temporary visa holders earned almost 37% of doctoral degrees in science and engineering.[13] These individuals account for more than half of doctoral degrees awarded in computer and information sciences, engineering, mathematics, and statistics.[14]

According to the 2024 Survey of Earned Doctorates, it took doctoral students a median of 5.7 years from the start of their program to complete their degree.[15] As written, the proposed rule would require nearly ***all*** international doctoral students to receive at least one extension of stay (EOS) request approved by USCIS to complete their degree programs. This will come at a financial cost to the student and additional burden to the institution and USCIS. In addition, this new extension process will lead to unnecessary uncertainty for doctoral students and potentially jeopardize their

---

[8] Immigrations Customs Enforcement, Student and Exchange Visitor Program (SEVP) 2024 SEVIS by the Numbers Report, https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf

[9] USCIS G-1055, Fee Schedule, Form I-539, Application to Extend/Change Nonimmigrant Status https://www.uscis.gov/g-1055?topic_id=97292

[10] FWD.us, Strengthening America's Competitiveness and Security by Welcoming More Immigrants with STEM Skills, https://www.fwd.us/news/stem-immigrants/

[11] National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), https://nces.ed.gov/ipeds/use-the-data

[12] *Id.*

[13] National Center for Science and Engineering Statistics, Survey of Earned Doctorates, Table 1-6, 2024, https://ncses.nsf.gov/surveys/earned-doctorates/2024#data

[14] *Id.*

[15] National Center for Science and Engineering Statistics, Survey of Earned Doctorates, Table 3-5, 2024, https://ncses.nsf.gov/surveys/earned-doctorates/2024#data

ability to complete their degree in the United States. Under the proposed rule, after applying for a student visa, undergoing significant vetting, and maintaining full-time status, a doctoral student still cannot be certain that they will be allowed to complete their degree.

Earning a PhD requires a significant investment of time, energy, and work, typically for a period greater than four years. Without the certainty that they will be able to complete their academic programs and graduate, many prospective students will choose to attend universities in other nations that provide greater certainty and appealing pathways to completion and future employment. This is a possibility that DHS recognized in a 2020 proposed rule that also proposed establishing a fixed period of admission for these visa categories.[16] In fact, the possibility that international students may choose another nation in which to pursue their studies extends beyond those nations listed in the 2020 proposed rule (Canada, Australia, and the United Kingdom) to nations like India and China. In addition, as a required part of their program, many doctoral students spend considerable time engaged in research and teaching undergraduate students. Any disruption of their ability to complete their program also jeopardizes this research, as well as the education of countless college students across the United States.

International students pursuing graduate education at American universities, along with their domestic student colleagues, represent the next generation of leaders in STEM-related fields. While PhD students may not make up a significant percentage of international students, international students do make up a significant percentage of PhD students in critical STEM areas. If prospective students decide against attending a U.S. institution based on procedural roadblocks and a lack of certainty about their ability to complete their degrees or continue their work or education, it will have a lasting impact on the U.S. economy and national security.

*The Proposed Fixed Admissions Period Is Inharmonious with Timelines for Many Joint Degrees and Master's and Professional Degree Timelines*

Many of AAU's member institutions offer joint degree programs, which attract the world's best and brightest students and scholars and offer domestic and international students an opportunity to save both time and money when completing multiple degrees. These programs can often span five to eight years for completion. Common options offered by many universities include 4+1 or 3+2 programs, which allow students to obtain multiple degrees, sometimes at different levels, in five years. For medical students, a joint MD/PhD program can take eight years to complete, and a joint MD/JD program can take seven years on average to complete.[17] In addition, other programs that combine master's degrees and JDs or MBAs may also extend between five and seven years. The extension of stay process creates uncertainty and establishes another time-consuming procedural hurdle to the attainment of an advanced or joint degree. As a result, both students and the degree

---

[16] 85 Fed. Reg. 60526 (09/25/20)

[17] Association of American Medical Colleges, Is an MD-PhD Right for Me?, https://students-residents.aamc.org/md-phd-dual-degree-training/md-phd-right-me. See also: Association of American Medical Colleges, Considering a Combined Degree: MD-PhD, MD-MBA, MD-MPH, MD-JD https://students-residents.aamc.org/applying-medical-school/considering-combined-degree-md-phd-md-mba-md-mph-md-jd

programs they attend will suffer, and our nation will miss an opportunity to benefit from the education and expertise these students obtain.

*The Proposed Fixed Admission Period Does Not Adequately Consider the Length of Postdoctoral Education, Teaching, and Research Programs*

Postdoctoral education has been a part of our nation's higher education system for over a century.[18] Postdoctoral appointees earn PhD or equivalent doctoral degrees, after which they perform research full-time under the supervision of a senior scientist or scholar before taking a full-time position elsewhere. Postdoctoral education has effectively replaced the PhD degree as the terminal academic credential in critical fields like physics and the life sciences.[19] International students in these positions are typically sponsored on J-1 visas or H-1B visas, with some beginning positions in F-1 status through OPT or STEM OPT.[20] These opportunities provide recent PhD recipients an opportunity to develop their research and professional skills, while also furthering the U.S. research enterprise. As a result, postdoctoral appointees perform a significant portion of our nation's research and often support research instruction to enrolled international and domestic students.

We are concerned about the impact the proposed rule will have on postdoctoral researchers and their desire and ability to complete this training after they have completed their graduate degree. First, as stated above, greater levels of uncertainty and confusion created by this proposed rule will likely lead many talented students to complete their studies or postdoctoral education in a more welcoming country. In addition, postdoctoral education opportunities range in length. J-1 research visas are typically valid for five years and can be extended in certain circumstances.[21] This means that there is a very real possibility that many talented individuals will be required to complete several extensions of stay requests between their doctoral degree, practical training, and postdoctoral education, compounding the costs and uncertainty for these students and researchers and driving many of them out of our nation's STEM pipeline to our detriment.

*The Proposed Fixed Period of Admission and Extension of Stay Process Does Not Adequately Consider Existing Requirements and Documentation Required for Practical Training Programs*

The continued use of practical training, dating back to 1947, is a testament to its importance.[22] Today, the 12-month OPT and the 24-month STEM OPT extension are an important part of the post-secondary education experience. These opportunities allow students to apply the knowledge earned in the classroom and obtain hands-on, practical experience in their fields. This experiential learning opportunity provides important skills such as the ability to think critically and

---

[18] National Institutes of Health, National Library of Medicine, Enhancing the Postdoctoral Experience for Scientists and Engineers: A Guide for Postdoctoral Scholars, Advisers, Institutions, Funding Organizations, and Disciplinary Societies, https://www.ncbi.nlm.nih.gov/books/NBK547069/

[19] Association of American Universities, "Committee on Postdoctoral Education, Report and Recommendations," https://www.aau.edu/sites/default/files/AAU%20Files/Education%20and%20Service/PostdocRpt.pdf

[20] National Postdoctoral Association, IMMIGRATION POLICIES AFFECT POSTDOCTORAL SCHOLARS, https://www.nationalpostdoc.org/general/custom.asp?page=postdocket_11174

[21] USCIS Policy Manual Policy, Volume 2 - Nonimmigrants Part D - Exchange Visitors (J) Chapter 3 - Terms and Conditions of J Exchange Visitor Status, https://www.uscis.gov/policy-manual/volume-2-part-d-chapter-3

[22] 12 Fed. Reg. 5355 (8/7/47)

operationalize one's knowledge in complex situations. It is a key step in gaining professional experience and a pathway to our nation's highly skilled workforce. The OPT and STEM OPT programs have a net positive impact on American enterprise and ingenuity. For example, according to the Niskanen Center, levels of OPT participants in a particular region result in increased innovation in that region, without negative consequences on domestic workers' employment, earnings, or participation in the labor force.[23] Despite how integral OPT is to this pipeline, the proposed rule proposes a cumbersome and costly process with insufficient reasoning that does not guarantee approval for practical training through one or both OPT programs.

First, the proposed rule requires extensions of stay applications to be filed for both OPT and STEM OPT with a separate fee paid for each application. This is in addition to the fee for the Form I-765, Application for Employment Authorization, that all students are required to file for both OPT and STEM OPT. Furthermore, DHS acknowledges in the proposed rule that currently, F-1 visa holders applying for OPT have "direct engagement" with USCIS through these applications. For STEM OPT, a Form I-983 Training Plan is required to be filed and submitted to a school's DSO as well. This document is available for review by DHS if needed. Additionally, an I-765 application must be filed with USCIS for each applicant on OPT. Both forms are available for review by DHS, and one, the Form I-765, is adjudicated directly by USCIS. The information collected and available through these forms should be sufficient for DHS to confirm eligibility. DHS fails to adequately address why the information collected on the Form I-765 and Form I-983 is insufficient to verify eligibility of F-1 students for OPT and STEM OPT. Despite this, DHS adds yet another procedural roadblock for F-1 students and, in the process, creates additional and redundant work for USCIS officers.

Should DHS decide to move forward with a rulemaking that would establish a fixed period of admission and extension of stay procedure for F and J visa holders, AAU asks that it strike these requirements for those seeking to apply for 12-month and 24-month STEM OPT, given existing mechanisms already in place to vet and facilitate direct or indirect engagement of those participating in practical training programs with DHS.

*The Proposed Fixed Period of Admission and Extension of Stay Process Would Significantly Curtail the Delivery of Medical Care By J-1 Foreign Physicians*

AAU aligns our comments with those of the Association of American Medical Colleges (AAMC), and other leading organizations in medical education and healthcare on the deleterious impact the proposed rule would have on medical training, research, and healthcare. In addition to the many international students in Doctor of Medicine (MD) programs whose studies will be impacted and potentially impeded due to this proposed rule, the proposed changes will also harm the foreign national physicians who are currently in the United States as J-1 visa holders.[24] In a report titled, *The Complexities of Physician Supply and Demand: Projections From 2021 to 2036*, AAMC

[23] Niskanen Center. *Optional Practical Training (OPT) and International Students after Graduation Human Capital, Innovation, and the Labor Market*. 2019. https://www.niskanencenter.org/wp-content/uploads/old_uploads/2019/03/OPT.pdf and New research: Foreign students in STEM don't hurt American workers,https://www.niskanencenter.org/wp-content/uploads/old_uploads/2019/03/OPT.pdf and https://www.niskanencenter.org/new-research-foreign-students-in-stem-dont-hurt-american-workers/
[24] Intealth, J-1 Visa Sponsorship, https://www.intealth.org/pdfs/J-1_US_Infographic.pdf

projects a physician shortage of up to 86,000 by the year 2036, with population growth and aging of the physician workforce being a primary driver of demand.[25]

According to Intealth, as of January 2025, there were nearly 16,000 foreign national physicians in residency and fellowship programs and serving patients at 770 teaching hospitals accredited by the Accreditation Council for Graduate Medical Education (ACGME).[26] The care that these foreign national physicians provide, as trainees under supervision, is critical to our nation's healthcare system. In addition, J-1 physicians often specialize in primary care specialties, making their presence all the more important.[27] The extension process required by the proposed rule would be disruptive not only to these individuals but also to their colleagues, their respective institution or hospital, and the communities that they serve. The proposed rule poses a particular threat to underserved and rural communities that are already facing issues of receiving accessible healthcare, especially in states like New York, Michigan, Texas, and Pennsylvania, where over 1,000 J-1 physicians complete their training.[28] While international medical graduates are by no means a panacea to the issues facing our nation's healthcare system, implementing policies that will make it more difficult for foreign national physicians to study and provide much-needed care in underserved areas will only worsen the projected physician shortage and undermine patient care across the United States.

Finally, it is important to note that while a program for a graduate medical education (GME) trainee can last up to seven years[29], sponsorship is often granted in one-year increments[30] through completion of a DS-2019[31] to ensure trainees are credentialed and certified to continue providing care and progressing in their program. Based on the language in the proposed rule, this could mean that these J-1 visa holders will be required to file an extension of status with USCIS each year, for up to seven years. Not only is this particularly burdensome on the agency's operations, but it also may require submission of several separate application fees. The proposed changes create even more uncertainty and room for error for a population of medical professionals who are key to the continued functioning of our nation's healthcare system.

**B. The extension of stay process proposed by DHS will be lengthy, costly, and unpredictable.**

In addition to the considerations raised about the broader policy change in the proposed rule, AAU is also concerned about the impact of the proposed extension of stay procedures on university administrators and international students. They would also result in an increased burden for DHS

---

[25] Association of American Medical Colleges, The Complexities of Physician Supply and Demand: Projections From 2021 to 2036, March 2024, https://www.aamc.org/media/75236/download
[26] *Id.*
[27] Intealth, J-1 Visa Sponsorship Infographic, https://www.intealth.org/pdfs/J-1_US_Infographic.pdf
[28] Intealth, J-1 Visa Sponsorship Infographic, https://www.intealth.org/pdfs/J-1_US_Infographic.pdf
[29] USCIS Policy Manual, Volume 2 – Nonimmigrants Part D – Exchange Visitors (J) Chapter 3 – Terms and Conditions of J Exchange Visitor Status, https://www.uscis.gov/policy-manual/volume-2-part-d-chapter-3/https://www.uscis.gov/policy-manual/volume-2-part-d-chapter-3
[30] University of Kentucky College of Medicine, J-1 Overview/Important Policies, https://medicine.uky.edu/sites/default/files/inline-files/VISA%20Presentation.pdf
[31] Department of State, Bridge USA, Adjustments and Extensions, https://j1visa.state.gov/participants/current/adjustments-and-extensions/

agency staff, especially USCIS officers. The proposed rule curtails existing authority for university DSOs to extend a student's status for valid reasons and reassigns this responsibility to USCIS officers, who must determine whether a student receives an extension of stay to complete their studies by reviewing documentation showing the valid academic, medical, or circumstantial reason as to why the request is being made. The DSO's assessment then becomes just one factor in this approval process. We do not feel this is an appropriate role for USCIS officers who, through no fault of their own, lack the training, expertise, and overall academic context to assess a student's educational progress or the medical and otherwise circumstantial reasons why they might need additional time to complete a program.

*Discretion and Authority for Extension Decisions Are Best Placed with School Officials*

As stated in the proposed rule and existing regulations, F-1 students are eligible for an extension of their academic program if they are maintaining their F-1 status and making "normal progress" towards the completion of their degree. The discretion to determine whether the student is meeting these requirements has been appropriately placed with university DSOs, who, through education, expertise, and experience with student populations, are well credentialed to make this determination. The proposed rule removes reference to "normal progress," which it claims is inconsistently applied, and uses this argument to remove deference to DSO expertise and instead implement an extension of stay process where criteria is determined and applied by USCIS and USCIS officers, with DSO recommendations being just one factor of a determination. The same is true for Responsible Officers (RO) whose recommendation for J-1 exchange visitors will also be factored into a DHS determination. As previously stated, this is an inappropriate role for DHS to assume. DSOs understand the unique characteristics and circumstances of their students and what is and is not considered "normal progress" towards the completion of a degree. USCIS officers will be tasked with adjudicating the need for an extension for a myriad of academic, medical, and circumstantial reasons that extend far beyond those provided in the proposed rule. Removing that authority from DSOs represents an intrusion into the academic process and neglects the reality that each student's needs and circumstances are unique. Doing so will lead to greater inconsistency and greater confusion and uncertainty for both institutions and students.

*The Extension of Stay Criteria Considered by DHS Are Ambiguous and Do Not Consider Common and Valid Reasons Unique to Each Student*

As it relates to international students, the extension of status criteria outlined in the proposed rule would remove the requirement for "normal progress" and replace it with a standard of "compelling academic reasons," a documented illness or medical condition, or exceptional circumstances beyond the control of the student like natural disasters, national health crisis, or the closure of an institution. The new proposed regulatory language states that delays that are caused by academic probation, suspension, or a student's inability or unwillingness to complete their degree would not be considered valid reasons for an extension. However, as discussed above, there are many reasons why a student may be unable to complete their programs within four years, often unique to the student and the program. Those reasons do not always fit neatly into the categories mentioned in the proposed rule. In addition, the proposed rule's exclusion of a student's "unwillingness" or "inability" to complete a program as a valid reason for extension disregards the fact that a student

failing a class is not always disqualifying for program completion. In addition, AAU is concerned about the need for USCIS to review on a case-by-case basis the illness and medical conditions of students who request an extension of stay. Giving USCIS officers such oversight will not only require individuals with no experience or knowledge of the impact of these conditions on academic progress or program completion to make significant decisions affecting a student's ability to complete their program, but may also dissuade international students from making their illness or condition known to school officials to avoid it becoming a matter for adjudication.

*Uncertainty Created by the Extension Process, Including Discretion Offered to USCIS Officials, the Lack of an Appeals Process, and Accrual of Unlawful Presence Will Be an Impediment to International Students*

In addition to leaving analysis of these criteria to USCIS officials, the proposed rule reiterates that an appeal would be unavailable after a denial, leaving students no opportunity to challenge decisions by a USCIS officer. This is particularly troubling given the lack of training and expertise of USCIS officers to handle unique and complex requests as a part of a new process, as well as the potential for applicant error when submitting an extension of stay request. Applicants whose applications are denied would be considered immediately out of status and accruing unlawful presence if they have surpassed the visa expiration listed on their I-94 record. In addition, the proposed rule is unclear on how USCIS will adjudicate an extension of status application. For example, the proposed rule provides no standard by which USCIS will determine how much additional time to provide based on an extension request. This discretion is concerning, as a USCIS officer could, for example, grant only one year when the student needs two or more to complete a program. Timely, efficient, and predictable processing is necessary to ensure students understand their compliance requirements to remain in lawful status. Conversely, compulsory status extensions that introduce new costs, ambiguous standards, and threaten program continuity introduce levels of risk that will hinder interest in U.S. higher education and damage our national interests.

*DHS Should Offer a 60-Day Grace Period for F, M, and J Visa Holders*

The proposed rule seeks to reduce the current grace period offered to F-1 visa holders from 60 days after the completion of their studies, to 30 days. The current 60-day period provided allows for international students, many of whom have been in the country for several years, to take care of remaining housing logistics and moving costs, prepare for departure, or to maintain, extend, or change their status. The proposed rule states that its goal proposing this change is to bring it in line with the 30 days provided to M and J applicants for their post-completion grace period. We agree that these visa categories should have parity in the grace periods provided. However, we would recommend that DHS instead consider extending the grace period for M and J visa holders to 60 days to allow sufficient time for F and J visa holders to make the necessary decisions for their next steps, whether it is departure or to maintain, change, or extend their status.

**C. The proposal to restrict students' academic mobility represents an intrusion into the kind of decision-making that is critical to the relationship between students and their institutions.**

In addition to the proposed changes ending duration of status for F and J visa applicants, the proposed rule would also impose restrictions on academic mobility affecting international students at all degree levels in ways that DHS may not have considered when promulgating the proposed rule. These changes represent a significant and unprecedented intrusion into academic decision-making and programs. To support these proposed changes, DHS offers statistics that the agency admits show that the numbers of students transferring or changing educational levels represents a small percentage of the total F-1 student population. Despite this, and without further demonstrating a clear need, the agency proposes placing significant restrictions on international students at graduate and lower levels and prohibiting movement after completion of a degree program to programs at the same or lower level.

*The Prohibition on Changing Educational Objective in the 1st Academic Year is Too Restrictive*

DHS proposes prohibiting, with exception, international students from changing their educational objectives, which includes their programs, majors, and educational levels, or transferring institutions, within their first academic year. The first academic year is a time of exploration for many students, both international and domestic. Many students will refrain from identifying a major during this time, while others, after introductory classes, realize that another option may better suit them, or that adding another area of study would better reflect their professional interests or round out their education. The proposed rule does not discuss how these scenarios would be handled or the rationale for limiting opportunities available to international students that are available to U.S. citizen students.

The proposed rule states that the changes would facilitate "legitimate academic activities" like the desire to "pursue a different field of study or more specialized studies in their current field" but fails to identify the process by which these circumstances would be identified. DHS does include an opportunity for exceptions authorized by the Student Exchange and Visitor Program (SEVP) for circumstances that include, but are not limited to, natural disasters or school closure. However, the proposed rule fails to identify other "extenuating circumstances" that would warrant an exception. Furthermore, even with a process in place to review and issue exceptions, this proposal once again places significant discretion with officers to make decisions about a student's academic mobility, when those decisions are best left to students and institutions.

*The Total Prohibition on Changing Educational Objectives for Graduate Level Programs is Too Restrictive and Detrimental to Completion of Graduate Programs*

Even more troubling, DHS proposes a complete prohibition on international students in graduate programs from changing their educational objectives or transferring institutions. While DHS provides exceptions for "extenuating circumstances" for students at lower levels, it fails to offer comparable flexibility for those at the graduate level. In addition, the proposed rule fails to consider "legitimate academic activities" utilized by students, both international and domestic, to enhance or complete their education. For example, it is a common occurrence that an advisor or supervising

Principal Investigator (PI) will depart one institution to take a position at another during the time needed to complete a graduate program, such as a PhD program. Students will often need to determine whether they can complete their studies at their current institution, or whether they will need to join the PI to complete their research. Under the proposed rule, international students would be unable to do so, and as a result, their research and education requirements may suffer. In addition, it is common for both domestic and international students who enter a PhD program to consider an "off ramp" or "mastering out," where the student obtains a master's degree after completing or nearing completion of coursework to obtain a master's degree. Under the proposed rule, this option appears to no longer be available to international students despite remaining available for domestic students. DHS should reconsider its proposed changes restricting academic mobility. If the agency moves forward with placing restrictions on academic mobility, we urge that it reconsider the total prohibition on international students at the graduate level from changing educational objectives and transferring institutions.

*The Prohibition on Pursuit of Degrees After Program Completion at the Same or Lower Level Does Not Account for Valid Non-Linear Career Paths*

Finally, DHS proposes a prohibition on international students being able to pursue degrees at the same or lower level as degrees they have completed. DHS states that the basis for this proposal is to avoid a situation where an international student continuously pursues degrees at the same or lower level to remain in the U.S. with F-1 status for an extended period of time. While AAU understands this concern, we are far more concerned with the DHS's proposed solution. First, it is unclear based on the language included in the proposed rule whether F-1 students would be indefinitely prohibited from pursuing degrees at these levels, or whether it would be possible to do so after departing the United States and obtaining a new F-1 visa. Second, while DHS does indicate it plans to update the list of education levels, DHS fails to do so in the proposed rule or in the other materials provided in the docket. Considering the agency is proposing a prohibition on pursuing degrees at the same or lower level as one that has been completed, it is imperative that the public understand what degrees are considered on the "same" or "lower level." For example, would an individual who just obtained a PhD in a field such as Biology be able to pursue a JD, as many patent attorneys do? Is an MD at the same level as a PhD? Would a master's certificate be considered a "higher educational level" than a master's degree? Would a PhD student be able to "master out," as is, as discussed above, an option typically available for domestic and international students? These are all questions that the proposed rule fails to address and pose significant concerns for international students and institutions of higher education. DHS should reconsider this prohibition. If it chooses to move forward with this or a similar proposal, we urge the agency to provide stakeholders an opportunity to brief the agency about valid, non-linear education pathways that are critical to obtaining the education and skills needed to enter the U.S. workforce.

**D. If implemented, the proposal will negatively impact U.S. competitiveness, including our advantage in attracting, developing, and retaining talent.**

The United States leads the world in science, technology, and scholarship, but competitor nations are taking great strides to outpace us. An important component of American leadership in research is our ability not only to cultivate domestic talent, but also to attract and retain the best and brightest

from around the world. The contributions of international students, scholars, researchers, and physicians have been a tremendous benefit for our nation's health, economy, and national security. These individuals, working collaboratively with their domestic colleagues, have been critical to ensuring our nation follows a gold standard approach to science and technology that is as impactful as it is rigorous. In addition, they have also been tremendous contributors of economic value to their communities and to our nation. The economic impact of international students during the 2023/2024 school year is estimated at $43.8 billion and supports over 378,175 jobs across U.S. economic sectors (accommodation, dining, retail, transportation, telecommunications, health insurance, etc.), not just institutions of higher education.[32]

In the proposed rule, DHS downplays the considerable impact these changes would have on the overall enrollment of international students and exchange visitors at U.S. institutions. This is in direct contrast to the sentiment offered by DHS in the 2020 proposed rule that also sought to eliminate duration of status. In that proposed rule, DHS acknowledged that changes such as establishing a fixed period of admission for F and J visa holders "may adversely affect U.S. competitiveness in the international market for nonimmigrant student enrollment and exchange visitor participation. Specifically, the proposed changes could decrease nonimmigrant student enrollments in the United States with corresponding increased enrollments in other English-speaking countries, notably Canada, Australia, and the United Kingdom."[33] As stated above, in addition to countries identified in the 2020 proposed rule, countries such as India and China are already taking advantage of restrictive policies proposed by the U.S. to implement their own policies to attract and retain exceptional talent from around the world.

Five years after the 2020 proposal to end duration of status, DHS's initial assessment remains accurate. Recent surveys conducted by the Institute for Progress and NAFSA: Association of International Educators of 1,039 current graduate students and postdoctoral fellows and 611 prospective international students found that ending duration of status would indeed deter enrollment or applications of international students and exchange visitors.[34] Out of the sample of currently enrolled students 49% are in PhD programs, 26% are postdocs, and a significant majority are in STEM fields critical to U.S. research and innovation.[35] According to the survey results, 49% of currently enrolled students responded that they would not have enrolled in the first place if there was a fixed period of admission rather than duration of status.[36] Prospective students were also less inclined to study in the United States if duration of status were replaced with a fixed period of

---

[32] NAFSA International Student Economic Value Tool, *NAFSA: Association of International Educators*, Updated 2025, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2

[33] 85 Fed. Reg. 60526 (09/25/20)

[34] Comment to DHS "Fixed Time of Admission and Extension of Stay" for Fs and Js, from Michael Clemens, Jeremy Neufeld, Amy Nice filed at regulations.gov, https://ifp.org/wp-content/uploads/Clemens-Neufeld-Nice-D-S-Elimination-comment.pdf and see "Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in The United States", https://ifp.org/wp-content/uploads/Clemens-Neufeld-Nice-9-28-25.pdf

[35] *Id.*

[36] *Id.*

admission. According to the survey, 16% fewer respondents would be likely to enroll in an education program in the U.S. if duration of status policy is ended.[37]

An analysis of the survey data performed by three immigration experts and submitted to DHS found that DHS drastically underestimated the annual economic cost, including economic loss, that would result from the implementation of this proposed rulemaking.[38] The analysis found that when accounting for the role of international students and exchange visitors in the U.S. STEM workforce and the deterrence for both current and prospective students from attending or completing programs and remaining in the U.S. workforce, the annual cost of the proposed rule would be closer to between $72 to 145 billion.[39] This is more than 22 times the $3.3 billion that DHS states as the estimated annual cost of ending duration of status. AAU refers DHS to a joint letter from several science, policy, and education organizations submitted on September 29, 2025, that provides further analysis and sensible alternatives to this proposed rulemaking that DHS should consider.[40]

Policies like those in the proposed rule are already discouraging talented students, graduates, researchers, physicians, and other talented visitors from starting or completing their programs in the U.S., to the benefit of other nations and to our detriment. If the changes outlined in the proposed rule are implemented, it will be even more likely that the next great medical cure or scientific or technological innovation will be developed in another country. It will also be more likely that competing nations are able to take advantage of this expertise to take or expand their lead in critical areas with significant economic and security implications for the U.S. DHS should withdraw this proposed rule, and consider alternative policies that can assure against fraud, abuse and national security concerns while allowing the U.S. to maintain its competitive advantage.

### E. Sensible and less burdensome alternatives exist that would facilitate DHS's goals of eliminating fraud and abuse and addressing national security concerns.

The proposed rule discusses the basis for the changes proposed as pertaining to certain institutions and individuals taking advantage of the existing SEVIS system and student and exchange visitor admissions period. The notice discusses specific examples of institutions, staff, students or visitors that have, in rare circumstances, engaged in fraud and abuse or presented national security concerns. America's leading research universities understand and acknowledge that this kind of fraud and abuse exists and share the agency's commitment to preventing threats posed by foreign adversaries to our national security and research enterprise, including efforts to protect sensitive information housed at universities. We continue to actively work with U.S. federal science agencies, security and intelligence agencies, and Congress to combat these threats and proactively address security concerns in academia[41] and welcome continued partnership in doing so. However, we feel that the severity of these problems is overstated in the proposed rule and the means by

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] Comment of 39 Science, Education and Policy Organizations to DHS, Filed on September 29, 2025 https://ifp.org/wp-content/uploads/Multi-Sector-D-S-comment.pdf
[41] Association of American Universities, Securing University Research Against Foreign Threats One Pager, https://www.aau.edu/key-issues/securing-university-research-against-foreign-threats-one-pager

which the agency is seeking to resolve these issues is excessively burdensome and unnecessary while also undermining our national competitiveness compared to alternative solutions that are available.

As it relates to potential fraud or abuse in the student visa system, DHS proposes upending over three decades of agency policy and placing unnecessary burden on institutions, international students, and agency staff to combat what appear, based on DHS's own evidence, to be rare occurrences. For example, DHS discusses the fact that a total of over 2,100 international students who entered the United States on F-1 status from 2000 to 2010 remain in the United States in F-1 status as of 2025. Without being able to determine the individual circumstances of these 2,100 plus international students, DHS fails to mention that for the 2023-2024 academic year, the United States hosted 1.1 million international students[42]. Those 2,100 students make up just 0.2% of the total international student population at present.

DHS also cites its review of SEVIS, which found that nearly 77,000 F-1 students have spent more than 10 years in student status since 2010. In addition, the review states that there have been over 13,000 F-1 students who have transferred before the start of classes or within their first term, and 8,400 who changed education levels within the first 60 days of their program. Again, these numbers are an extremely small percentage of the total number of international students in the U.S., especially dating back to 2010. DHS itself states that "the number of students transferring or changing educational levels represents a small percentage of the total F-1 student population." While this data might require DHS to improve its oversight of international study visa programs, it should not lead DHS to make such drastic changes as it seeks to make in this proposed rule. Instead, it should consider ways it can strengthen existing programs to reduce these risks while also working with stakeholders to develop solutions.

In addition, the proposed rule includes a section discussing a small number of examples of J-1 exchange visitors who presented a national security threat, as well as a 2018 NIH report that states: "Small numbers of scientists have committed serious violations of NIH policies and systems by not disclosing foreign support (*i.e.,* grants), laboratories, or funded faculty positions in other countries." Much like the supporting evidence provided in the section discussing risks posed by F-1 international students, the information details a limited number of security risks posed by J-1 exchange visitor program. The evidence fails to support why DHS proposes to upend a policy that has been in place since the early 1990s. If DHS would like to take steps to prevent instances like those it has identified in the proposed rule, it should consider less burdensome alternatives that would strengthen the Student and Exchange Visitor Program (SEVP) and other vetting processes already available.

*Less Burdensome Alternatives Should Be Considered Before Implementing the Proposed Rule*

To start, the federal government already has comprehensive systems in place to thoroughly vet international students and exchange visitors through the application process and related interviews with the Department of State. In addition to recently imposed changes that heightened the scrutiny

[42] Institute of International Education, 2024 Open Doors report: https://opendoorsdata.org/data/international-students/

and review placed on these applicants, the Department of State also utilizes tools like the classified Technology Alert List (TAL) to screen out individuals who may pose concerns. In addition, international students and exchange visitors are subjected to screening and vetting performed by US Customs and Border Protection upon arrival. After undergoing this rigorous review process, any student or exchange visitor who chooses to travel outside of the United States and subsequently re-enter is once again vetted by both the Department of State and Customs and Border Protection upon entry.

Second, DHS should make full use of the SEVIS system, which was created in response to the September 11, 2001 attacks and has been in place for over two decades. Indeed, students are the mostly closely tracked and monitored visa holders in the United States as a result. The Student and Exchange Visitor Program, a component of Immigration and Customs Enforcement, monitors the SEVIS database. Use of SEVIS is mandatory for both institutions enrolling F-1 students and sponsors for J-1 exchange visitors. Each entity is required to adhere to reporting requirements that among other things identify the academic progress of students and visitors in their programs. DHS has ready access to the information collected in SEVIS, as well as the ability to monitor and request information from institutions concerning alleged instances of fraud or abuse connected with the F and J visa programs. In fact, DHS cites its review of existing SEVIS data to identify many of the examples it discusses in the proposed rule. The proposed rule does not provide sufficient reasoning as to why the existing mechanisms for data collection through SEVIS are insufficient to protect against instances of fraud and abuse or potential national security concerns. As stated earlier, limited statistics and anecdotal examples are provided that appear to show a minimal number of a cases involving fraud, abuse, or national security concerns, and a similarly small number of F and J applicants inappropriately taking advantage of their respective visa programs. As it relates to potential fraud or abuse by institutions, we note that SEVP has an opportunity every two years to review institutions' compliance with regulatory requirements and reporting requirements in SEVIS. SEVP then makes a determination as to whether an institution can continue to enroll international students or exchange visitors. We implore the Department to address efficiencies in existing capacities rather than implement a complicated, burdensome, and costly new extension of stay process to address a problem they are already capable of handling.

Lastly, in the proposed rule, DHS discusses recommendations made in 2019 by the GAO in response to DHS's reported concerns with fraud and abuse in the F-1 visa program from both institutions and students.[43] The proposed rule briefly mentions that "GAO recommended that ICE develop a fraud risk profile and use data analytics to identify potential fraud indicators in schools petitioning for certification, develop and implement fraud training for DSOs, and strengthen background checks for DSOs." However, the proposed rule does not identify further what steps were taken to adhere to the GAO's recommendations, the results of those efforts, its efforts to fully address outstanding recommendations, and why additional changes made in the proposed rule are still required.

---

[43] GAO Report, STUDENT AND EXCHANGE VISITOR PROGRAM, DHS Can Take Additional Steps to Manage Fraud Risks Related to School Recertification and Program Oversight https://www.gao.gov/products/gao-19-297?mobile_opt_out=1#summary_recommend (March 2019)

### F. Implementation of the proposal will result in an increased burden on USCIS processing and operations.

We are also concerned about how these changes will exhaust already strained USCIS processing operations. Historically, USCIS has struggled with timely processing of immigration benefits. In recent years, USCIS has faced a historically high backlog. The current backlog of pending cases with USCIS is approximately 11.3 million.[44] As a comparison, in FY15, at the end of the fourth quarter, USCIS had just over 3.2 million cases pending. In other words, there has been an over 250% increase in the number of pending cases at the agency in just the last ten years. Processing times also remain high. As of June 2025, the average processing time for USCIS forms is nearly 9.59 months or just over 290 days. As recently as FY21, the median processing time for the Form I-539, Application to Extend/Change Nonimmigrant Status [45], was over 270 days. While USCIS processing times have variably risen and fallen, the average processing time has consistently remained high and nearly double from the averages in FY15.

This is not surprising. In fact, as stated in the proposed rule, the reason "duration of status" was established in 1978 by the legacy INS was in response to significant case load and the need for agency resources to handle extension of status. As stated above, this is a similar sentiment offered by DHS when discussing subsequently implemented extension of stay (EOS) processes until revisions in the early 1990s rules covering F and J visa applicants. Unfortunately, the problems created by establishing an extension of stay system and a fixed period of admission remain the same. The proposed rule estimates that because of the changes suggested covering F, J, and I nonimmigrants that 414,000 EOS requests will be filed on average over a ten-year period. According to data released by USCIS, in FY24 the agency received 253,876 Form I-539 applications. When adding this number to the expected average annual number offered by DHS, it is 667,876, which represents a 163% increase *for just this form* from FY24.[46] This also does not account for years when DHS will receive well north of 414,000 additional EOS applications.

For an agency that has historically had a difficult time reining in its backlog and processing times and recently experienced a budget crisis[47], it is concerning that USCIS will be required to handle this additional workload which will almost definitely have an impact not only on processing times for the Form I-539, but also other benefit types. The proposed rule fails to provide adequate reasoning to justify placing this kind of a burden on USCIS and its staff, as well as on international

[44] U.S. Citizenship and Immigration Services. (2025, June 30). *All USCIS application and petition form types (Fiscal Year 2025, Quarter 2)* [Data file]. U.S. Department of Homeland Security. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx.

[45] *Id.*

[46] U.S. Citizenship and Immigration Services. (2024, December 29). *All USCIS application and petition form types (Fiscal Year 2024, Quarter 4)* [Data file]. U.S. Department of Homeland Security. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx.

[47] Gov Exec, DHS to Begin Sending Furlough Notices to 15,000 Employees Next Week HYPERLINK "https://www.govexec.com/workforce/2020/06/dhs-begin-sending-furlough-notices-15000-employees-next-week/166096/"https://www.govexec.com/workforce/2020/06/dhs-begin-sending-furlough-notices-15000-employees-next-week/166096/

students, institutions, and exchange visitors and how doing so will achieve DHS's goals. The rule also fails to articulate why less burdensome alternatives were considered insufficient.

**Conclusion**

For the reasons stated above, we strongly urge DHS to withdraw the proposed rule. The changes proposed would create significant procedural uncertainty for international students, exchange visitors, and universities and would adversely impact U.S. competitiveness. One of the best tools in the United States' innovation-based economy is our resounding advantage in attracting, developing, and retaining the brightest minds from across the globe to study and work in the United States. These talented individuals offer invaluable contributions to our institutions, their U.S. colleagues, the U.S. research enterprise, and the U.S. economy. AAU believes that the implementation of the proposed extension of status process and academic mobility restrictions will be costly and confusing, leading to higher costs, greater redundancy, and severe repercussions on our ability to maintain our leadership in this critical area.

We share DHS's goal of eliminating the rare cases of fraud and abuse and addressing any potential national security concerns. However, we urge DHS to consider less costly and less burdensome alternatives such as utilizing existing scrutiny and vetting authorities through federal agencies, strengthening oversight and reporting requirements in SEVIS, and fully implementing the recommendations previously made by the GAO. If DHS plans to move forward with some version of the changes in this proposed rulemaking, AAU urges DHS to consider policies that create the least burden possible for international students, academic institutions, and federal immigration agencies. For example, an admissions period that better captures the unique nature of degree and program timelines and lessening restrictions on academic mobility to account for non-linear career and education paths should be considered.

As other nations aggressively expand their international recruitment and retention policies aimed at international students, it would be self-defeating to implement policies that push talented individuals from around the world away from the United States. International students irrefutably enrich our academic communities, strengthen our research enterprise, and bolster the American workforce. Many of the stated objectives of the proposed rule could instead be achieved by leveraging the existing mechanisms readily available to the agency. We appreciate your consideration of our views and look forward to working with you to achieve our shared goals.