# EXHIBIT 17

alliance
for international exchange

September 29, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, DC 20536

RE: Comments in response to Notice of Proposed Rulemaking – Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (Docket No. ICEB-2025-0001)

Dear Sir or Madam,

On behalf of the Alliance for International Exchange, an association of nongovernmental organizations comprising the international educational and cultural exchange community in the United States, I am writing to comment on the U.S. Department of Homeland Security's (DHS) proposed rule dated August 28, 2025, entitled "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media."

The Alliance's membership consists of organizations that implement, sponsor, and facilitate U.S. Department of State (DOS) international exchange programs, as well as facilitate international student flows to U.S. universities and colleges. These programs bring many different types of participants, including high school and university students, interns, trainees, scholars, teachers, au pairs, camp counselors, and more, to the United States on educational and cultural exchange programs. These programs all contribute significantly to U.S. public diplomacy, strengthen the U.S. economy, and enrich communities across the country.

The Alliance and its members strongly support efforts to bolster our national security and uphold the integrity of J-1 and F-1 visa categories. We recognize the complex task DHS faces in balancing these priorities with the need for policies that reflect the diverse goals, timelines, and requirements of this unique population. However, we are concerned that the Notice of Proposed Rulemaking (NPRM) mischaracterizes the challenges it seeks to address and imposes overly burdensome requirements on exchange visitors and international students, as well as the American businesses, organizations, institutions, and families that sponsor and host them.

**We ask that DHS withdraw the rule as proposed. This rule would have a significant negative impact on the U.S. economy; it would impose an extension of stay process that is too uncertain and wholly unnecessary; and it would not provide periods of admission that are tied to the timelines mandated by federal regulations for well-established, valuable programs.**

**Overall concerns with the proposed rule**

DHS's proposed rule to eliminate the "Duration of Status" (D/S) framework for F-1 students and J-1 exchange visitors is deeply concerning and ultimately unnecessary. While the stated goals of enhancing oversight and immigration control are important, they are already being achieved under the current system. The Student and Exchange Visitor Information System (SEVIS), jointly maintained by DHS, its office of U.S. Immigration and Customs Enforcement (ICE), and sponsoring institutions, provides extensive, real-time monitoring of international students and exchange visitors. Replacing this long-standing framework with fixed admission periods and new Extension of Stay (EOS) requirements would add significant complexity and cost, without improving compliance or security. It would also place new administrative burdens on both participants and U.S. government agencies.

The sections outlined below explain in detail why this rule is unnecessary, inefficient, and harmful to both the U.S. international education and exchange system and the broader national interest.

1. **The proposed rule is unnecessary, as SEVIS is already more than sufficient to accomplish DHS' stated goals.**

   F-1 international students and J-1 exchange visitors are already subject to extensive monitoring through SEVIS, a robust tracking system maintained by DHS, ICE, educational institutions, and exchange program sponsors. SEVIS provides real-time data on arrivals, program durations, participation in Optional Practical Training (OPT), and compliance status, which enables early identification of visa violations or potential security concerns. As one of the most comprehensive and longstanding oversight mechanisms in the U.S. immigration system, SEVIS offers the federal government substantial visibility into the activities and status of J-1 and F-1 visa holders. Rather than enhancing security or improving vetting procedures, the proposed rule would introduce duplicative and unnecessary requirements for a population that is already rigorously monitored while in the United States.

2. **The proposed rule would significantly expand Federal bureaucracy and place additional strain on an already overburdened U.S. Citizenship and Immigration Services (USCIS).**

In the proposed rule, DHS estimates that implementing the rule would cost the federal government over $300 million annually[1] - more than $3 billion over the next decade - primarily to support the processing of new forms, biometric data collection, and interviews. These added administrative responsibilities would overwhelm USCIS, which is already grappling with substantial processing delays and backlogs. As of September 2025, 80% of EOS requests are completed within seven months[2]. Replacing the longstanding D/S policy with a rigid fixed-period admission model would result in a dramatic increase in EOS filings, as such filings would be required for all extensions, regardless of length. It would be incredibly challenging for USCIS to handle such a surge, and doing so would further exacerbate

3. **The proposed rule's added complexity, costs, and uncertainty will make the United States a significantly less attractive destination for international students and exchange visitors.**

The U.S. currently hosts approximately 1.1 million international students[3] and 300,000 J-visa exchange visitors[4] each year, populations that generate substantial economic, educational, and cultural value. In 2024 alone, international students spent $43.8 billion[5] in the U.S. on tuition, housing, and living expenses, while participants from just five of the fifteen J-1 BridgeUSA exchange programs (Au Pair, Intern/Trainee, Summer Work Travel, and Camp Counselor) contributed over $811 million[6] to the U.S. economy.

Beyond their economic contributions, international students play a vital role in building the U.S. STEM workforce, with roughly 50% of graduate students in STEM fields coming from

[1] Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media. (2025, August 28). Federal Register. https://www.federalregister.gov/d/2025-16554
[2] Processing Times. (2019). USCIS Case Processing Times. https://egov.uscis.gov/processing-times/
[3] IIE Open Doors. (n.d.). IIE Open Doors. https://opendoorsdata.org/
[4] State, D. of. (2025, July 24). Facts and Figures 2015-2024 - BridgeUSA. BridgeUSA. https://j1visa.state.gov/facts-and-figures-2015-2024/
[5] NAFSA. (2019). NAFSA International Student Economic Value Tool. NAFSA. https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2
[6] Alliance for International Exchange. (2025). An Investment in America: How Department of State BridgeUSA Exchange Programs Advance U.S. Interests at Home and Abroad.

abroad and more than 400,000 participating in Optional Practical Training (OPT)[7] to fill critical skill gaps. These students and visitors also support local businesses, contribute to community vitality in university and tourist towns, and foster long-term international goodwill.

However, the proposed rule introduces new procedural complexity, increased costs, and heightened uncertainty, such as limited durations of stay and additional monitoring requirements, that could deter prospective students and exchange participants from choosing the United States as their host destination. As competing countries streamline their international education policies, the U.S. risks losing its edge as a top destination. This could have far-reaching consequences, from diminished talent pipelines and reduced innovation to decreased local economic activity and weaker global ties forged through educational and cultural exchange.

4. **The proposed rule fails to account for the significant national economic costs of eliminating the D/S framework.**

The economic consequences of eliminating D/S extend far beyond the direct burdens acknowledged in DHS's analysis. Economist Michael Clemens estimates that this change would conservatively reduce the inflow of international STEM F-1 students by approximately 10%, resulting in a projected annual economic loss of $72–$145 billion within a decade[8]. Unlike DHS's estimate of $3.3 billion, which focuses solely on administrative burdens for visa holders, schools, and sponsors, Clemens' analysis captures broader, economy-wide impacts, including the long-term consequences of a diminished STEM workforce and reduced national innovation capacity.

These projections are reinforced by recent survey data from NAFSA: Association of International Educators[9], which demonstrates that the proposed rule would significantly deter international student enrollment in the United States. Surveys from August-September 2025 of current international graduate students and postdoctoral researchers in the U.S. found that nearly half (49%) would not have enrolled had D/S been replaced with a fixed

[7] Optional Practical Training (OPT) for Foreign Students in the United States. (2025). Congress.gov. https://www.congress.gov/crs-product/IF12631

[8] Clemens, M., Neufeld, J., & Nice, A. (2025). Comment to DHS "Fixed Time of Admission and Extension of Stay". In *Regulations.Gov*.
See "Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in the United States," Clemens, M, Neufeld, J, Nice, A (working paper attached to comment filed to DHS).

[9] Surveys on International Talent Pipelines Institute for Progress and NAFSA: Association of International Educators. (2025). https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf

admission period at the time of their application. Similarly, 16% of surveyed prospective students abroad, primarily at the undergraduate and master's levels, reported that the elimination of D/S would dissuade them from studying in the United States. These findings directly contradict DHS's assumption that the proposed rule would have minimal impact on international enrollment.

The underlying concern is clear: highly skilled and motivated students are less likely to choose the U.S. when there is uncertainty about whether they will be able to complete their educational programs without interruption. Clemens refers to this as weakening the "front door" of America's global talent pipeline, a loss that ultimately affects not only universities and employers but also the productivity and competitiveness of the broader U.S. economy.

Taken together, Clemens' modeling and NAFSA's survey data demonstrate that eliminating D/S would significantly reduce the flow of global talent into the United States and impose economic costs that far exceed DHS's current projections. These national-level impacts must be included in the Department's regulatory analysis to accurately reflect the full consequences of the proposed rule. Without such consideration, the analysis remains incomplete and misaligned with the country's long-term economic and innovation priorities.

<u>**Considerations for J-1 exchange programs**</u>

The proposed rule to eliminate D/S for J-1 exchange visitors overlooks how this DOS-regulated program is already structured to ensure compliance, transparency, and clearly defined participation limits. J-1 programs are built around strict regulatory timelines, centralized oversight by DOS, and comprehensive monitoring through SEVIS. Rather than enhancing integrity, requiring J-1 participants to file separate EOS applications with USCIS would duplicate existing safeguards, add cost and complexity, and undermine a system that already works as intended.

The sections below outline how the current framework addresses the very concerns the proposed rule seeks to solve, making the rule unnecessary and counterproductive.

1. **J-1 exchange programs are already governed by finite, closely monitored participation periods as established in DOS regulations.**

   Each J-1 category is assigned a maximum program duration that is strictly defined by regulation, ensuring that indefinite extensions are not permitted under the current D/S and extension framework. As such, the concerns raised in the proposed rule regarding the

potential for unchecked or indefinite extensions do not accurately reflect how these exchange programs function in practice.

2. **J-1 program participants are subject to continuous oversight through SEVIS, with joint supervision provided by DOS and designated program sponsors.**

Under current rules, DOS retains exclusive authority to approve any program extensions across all J-1 categories. Host organizations and families do not have the discretion to independently prolong a participant's stay; any extension must be formally reviewed and authorized by the Department of State. Furthermore, DS-2019 forms are issued strictly in accordance with the approved program duration.

The proposed rule's requirement that participants file a separate EOS application with USCIS introduces unnecessary duplication of this effort. This change would impose new filing fees, require biometric appointments, and potentially an interview, likely to result in processing delays for cases that have already undergone full vetting and approval through DOS procedures. Replacing the current D/S system with a fixed-date admission model would create redundant layers of bureaucracy without improving program oversight or integrity. In fact, it would complicate a system that is already highly structured and transparent. A clear outline of the maximum durations for each J-1 category below further illustrates the deliberate and limited nature of these exchange programs.

| | |
|---|---|
| Professors and research scholars (22 CFR 62.20(i)(1)) | The length of the program not to exceed 5 years. |
| Short-term scholars (22 CFR 62.21(g)) | The length of the program not to exceed 6 months. Extensions are not permitted. |
| Trainees and interns (22 CFR 62.22(k)) | General trainees may be granted 18 months; trainees in the field of agriculture, hospitality and tourism may be granted 12 months, and interns may be granted 12 months. |
| Teachers (22 CFR 62.24(j)) | The length of time necessary to complete the program, not to exceed 3 years, unless a specific extension of 1 or 2 years is authorized by DOS. |
| Secondary school students (22 CFR 62.25(c)(2)) | Not more than two academic semesters (or quarter equivalency). |

| | |
|---|---|
| Specialists (22 CFR 62.26(i)) | The length of time necessary to complete the program, not to exceed 1 year. |
| Alien physicians (22 CFR 62.27(e)) | Limited to 7 years, unless the alien physician has demonstrated to the satisfaction of the Secretary of State that the country to which the alien physician will return at the end of additional specialty education or training has an exceptional need for an individual with such additional qualification. |
| International visitors (22 CFR 62.28(g)) | The length of time necessary to complete the program, not to exceed 1 year. |
| Government visitors (22 CFR 62.29(h)) | The length of time necessary to complete the program, not to exceed 18 months. |
| Camp counselors (22 CFR 62.30(h)(2)) | Not to exceed 4 months. |
| Au pairs (22 CFR 62.31(c)(1) and (o)) | Not more than 1 year, unless a specific extension of 6, 9, or 12 months is authorized by DOS. |
| Summer work travel (22 CFR 62.32(c)) | Not to exceed 4 months. Extensions beyond that period are not permitted. |

**Recommendations re: J-1 exchange visitors**

**As noted above, we ask that DHS withdraw the rule as proposed, since it would impose redundant and disruptive new requirements on a population that is already subject to close federal oversight and fixed program durations.**

If the rule were to move forward, however, we respectfully make the following recommendations regarding J-1 exchange programs:

1. We strongly recommend that J-1 exchange programs be excluded entirely from the scope of any final rule.

   These programs are already governed by detailed DOS regulations that define maximum durations for each J-1 category and establish clear parameters for program extensions. Sponsors are required to comply with these limitations and to actively monitor and report on participant status through SEVIS, which provides real-time data to DHS and ICE. This system already enables federal oversight of J-1 exchange visitors' arrival, status, and

compliance, making any new extension adjudication through USCIS unnecessary, duplicative, and disruptive. Introducing fixed-date admissions and new USCIS-based extension requirements would only serve to increase administrative burden and create avoidable delays, without offering any meaningful improvement in oversight or program integrity.

2. Alternatively, if J-1 exchange programs were to be included in a final rule, we strongly urge the Department to allow continued lawful presence and work authorization for any participant with a pending EOS application.

   Specifically, J-1 exchange visitors who file timely EOS requests should be permitted to remain in the United States and continue their program activities, including employment previously authorized, while their applications are pending. The current 240-day continuation of employment provision is insufficient in many cases, especially given ongoing USCIS backlogs. We therefore recommend that DHS adopt a policy allowing continued status and employment through the full duration of the requested extension, up to the program end date on the DS-2019, as approved by DOS.

By implementing these adjustments, DHS could preserve the integrity of J-1 exchange programs while avoiding unnecessary disruption for participants, host families, educational institutions, and host employers across the country. These changes would ensure alignment between DHS procedures and the existing DOS regulatory framework, while maintaining the critical contributions J-1 exchange visitors make to communities nationwide.

**Impact of proposed rule on J-1 exchange programs**

**Au Pair Program**

The J-1 Au Pair Program brings together international young adults and American host families for a mutually enriching cultural exchange experience. Each year, approximately 20,000 au pairs come to the United States through this DOS–designated exchange program.[10] In addition to providing in-home childcare, au pairs participate in continuing education and immerse themselves in American culture while sharing their own traditions with their host families and communities.

The program plays a particularly valuable role in supporting working American parents, especially those with unpredictable or non-traditional schedules, such as military service members, law

[10] State, D. of. (2025, July 24). Facts and Figures 2015-2024 - BridgeUSA. BridgeUSA. https://j1visa.state.gov/facts-and-figures-2015-2024/

enforcement officers, and healthcare professionals, who often struggle to find flexible childcare solutions.

Participation in the program is governed by 22 CFR 62.31, which limits au pair stays to a maximum of one year. However, DOS may authorize an extension of six, nine, or twelve months, depending on program and family needs. These extension requests are adjudicated by DOS and managed entirely through SEVIS. To be eligible, program sponsors must submit the requested extension period, verify the au pair's completion of the program's educational requirements, and pay the applicable non-refundable fee.

The NPRM proposes to replace "duration of status" with a fixed initial admission period of up to one year for the Au Pair Program. As a result, au pairs seeking to use the six-, nine-, or twelve-month extensions currently permitted under DOS regulations would be required to file an EOS request directly with USCIS. This change would result in a number of consequences for the Au Pair program.

One of the most immediate concerns is the increased cost of extensions. Currently, DOS–approved extensions cost $367. Under the new rule, that cost would more than double to over $800 due to additional USCIS filing fees, biometrics, and processing charges. In many cases, these costs would fall on host families, many of whom are working- or middle-class households, raising the financial barrier to participation. For unmatched extensions, where an au pair seeks to rematch with a different family, the participant would bear the cost directly, making this pathway far less accessible.

The current DOS-managed extension process is efficient and predictable. Requiring a duplicative EOS through USCIS would introduce unnecessary complexity. Processing times at USCIS often stretch for several months, which could mean au pairs begin their second year without knowing whether they've been approved to remain. This uncertainty creates stress and legal ambiguity for families, au pairs, and sponsors alike. Program sponsors would also be forced to manage new compliance demands, including tracking USCIS filings, assisting with delays, and navigating an unfamiliar and inconsistent adjudication system.

There is also a risk that au pairs could face interruptions in work authorization. While a timely EOS filing allows participants to continue program activities for up to 240 days beyond I-94 expiration, there is a real possibility that this period could expire mid-extension, especially for those pursuing a nine- or twelve-month extension. This would abruptly disrupt the family's childcare arrangements and leave au pairs unable to continue their cultural exchange program. The proposed timeline also interferes with the current educational requirement that au pairs complete six academic credits by their 11th month. To meet USCIS timelines, extension applications would need to be submitted

much earlier, likely by months 9 or 10, limiting access to later starting or longer-term academic programs.

Additionally, the complexity and uncertainty introduced by the proposed rule may unintentionally encourage au pairs to seek alternative immigration statuses, such as switching to a B-2 or F-1 visa, rather than completing their program as intended. This shift undermines the spirit and goals of the J-1 cultural exchange framework. Ultimately, the burdensome nature of the new process may discourage families from extending their au pair's stay, leading to premature program terminations, inconsistent care for children, and a weakened cultural exchange experience. The proposed rule not only threatens the continuity that extensions are designed to provide but could also destabilize a program that benefits thousands of families and young people each year.

**Camp Counselor Program**

The J-1 Camp Counselor program provides international participants, ranging from university students and teachers to youth workers and individuals with specialized skills, with the opportunity to work temporarily at American summer camps. This cultural exchange experience allows participants to gain hands-on leadership experience while immersing themselves in American culture and daily camp life. In turn, they enrich the camp environment by sharing their own cultures, perspectives, and traditions with both campers and camp staff, fostering greater cross-cultural understanding.

Camp counselors play a critical role in camp operations, leading activities, mentoring youth, and ensuring campers' safety and well-being throughout the summer. In 2024 alone, more than 32,000 international counselors participated in camps across the United States[11], contributing to an iconic American tradition while advancing the public diplomacy goals of the J-1 Camp Counselor program.

Participation in the Camp Counselor program is governed by 22 CFR § 62.30, which limits the duration of each exchange to no more than four months. While program extensions beyond this period are not permitted, program sponsors have the flexibility to extend a counselor's placement within the original four-month limit. These short-term extensions, often as brief as two weeks, can accommodate evolving camp staffing needs or travel plans and are managed efficiently through SEVIS without the need for additional filings or government adjudication. This structure provides the responsiveness and administrative simplicity needed for a seasonal program that operates on tight timelines.

---

[11] State, D. of. (2025, July 24). Facts and Figures 2015-2024 - BridgeUSA. BridgeUSA. https://j1visa.state.gov/facts-and-figures-2015-2024/

alliance for international exchange

Under the proposed rule, the participant's initial admission period would be tied to the program end date listed on their DS-2019 form. Any change to that end date, including short extensions commonly used in the Camp Counselor program, would require a formal EOS application with USCIS. This would significantly disrupt the current flexibility built into the program and create multiple challenges for camps, sponsors, and participants.

The J-1 Camp Counselor program is inherently short-term and highly time-sensitive, with most participants staying for only two to four months. The current SEVIS-based process allows sponsors to make modest, in-season extensions when camps experience fluctuating enrollment or staffing shortages. Replacing this with a USCIS-managed EOS process introduces cost, delay, and uncertainty into a program that depends on efficiency and responsiveness.

One of the most immediate consequences would be increased cost. The proposed $420 EOS filing fee, alongside potential sponsor surcharges and biometric appointment requirements, would significantly raise the cost of participation. For a program that does not exceed four months, this fee is disproportionately high. Camps operating on tight seasonal budgets may be unable to absorb the added expense, especially for short-term extensions, potentially limiting their ability to participate fully in the program.

Additionally, the loss of flexibility for in-season extensions would be deeply problematic. When camps identify exceptional counselors or face last-minute increases in camper enrollment, they often request short extensions of two to three weeks. Under the proposed rule, these minor changes would trigger a full EOS application process, which is too slow and burdensome to be practical. As a result, sponsors may choose not to offer extensions at all, reducing camps' ability to meet operational needs later in the summer season.

The proposed changes would also hinder the ability to rematch participants mid-season. Currently, if a counselor's initial placement does not work out, sponsors can quickly place them with a new host site. But if a counselor's status is locked to the original DS-2019 end date, any adjustment for the new placement would require a USCIS extension filing. This barrier would discourage rematching and likely lead to more early terminations, an outcome that is harmful to both participants and camps and directly undermines the goals of cultural exchange.

Compounding these issues is the simple fact that USCIS processing timelines are fundamentally incompatible with the structure of the Camp Counselor program. As noted, most participants are in the U.S. for just two to four months, while typical USCIS adjudications can take several months to

complete. In most cases, decisions on extension filings would arrive well after the program has ended, rendering the process ineffective and irrelevant for nearly all involved.

Finally, the proposed rule fails to consider how these changes would undermine the core needs of both camps and participants. Camps rely on flexible staffing to respond to changing circumstances, and participants benefit from opportunities to extend or rematch when appropriate. By prioritizing bureaucratic procedure over program functionality, the proposed rule would introduce rigidity that diminishes the value, accessibility, and success of the Camp Counselor exchange experience.

**Intern and Trainee Programs**

The J-1 Intern and Trainee exchange programs provide international participants the opportunity to temporarily reside in the United States while gaining hands-on professional experience with American host organizations. These programs are designed not only to support professional development, but also to foster meaningful cultural exchange. Participants enhance their skills in fields such as business, engineering, hospitality, and more, while U.S. host organizations and their staff benefit from the global perspectives these visitors bring.

In 2024, more than 28,500 interns and trainees took part in these exchange programs at sites across the country, making significant contributions to their host communities and workplaces. Under existing regulations (22 CFR § 62.22), J-1 interns may participate for up to 12 months, while J-1 trainees may engage in programs lasting up to 18 months. For training programs in agriculture and in hospitality and tourism, the maximum duration is capped at 12 months.

While extensions beyond these maximum durations are not permitted, sponsors may approve program extensions within the allotted timeframes. Such extensions require a new, fully executed Form DS-7002 Training/Internship Placement Plan (T/IPP) to document the continued need for training and to ensure compliance with the program's educational and cultural objectives.

Although most J-1 interns and trainees do not pursue program extensions, the proposed rule's requirement to obtain formal EOS through USCIS, rather than through the current internal process managed via SEVIS, would still impose meaningful harm to the structure and flexibility of these programs.

One of the key strengths of the Intern and Trainee programs is their built-in flexibility. Not all host organizations or participants wish to commit to the full allowable duration at the outset. Many begin with a shorter initial program period and extend later based on performance, mutual fit, or evolving business needs. Under the current framework, these internal extensions, when still within

the maximum allowed program length, are straightforward, sponsor-managed processes requiring an updated T/IPP. The proposed rule would instead require participants to submit a formal EOS application to USCIS for any such extension, even if it only involves a few additional months. This added layer of complexity would deter both participants and hosts from pursuing reasonable extensions and undermine the responsiveness that is critical to maintaining high-quality training experiences.

While extensions are not frequent, the proposed $420 USCIS filing fee per EOS request would impose a significant financial barrier when they do occur. Adding hundreds of dollars in additional expenses, along with possible sponsor or agent processing fees, could discourage participation altogether or force applicants to consider training opportunities in countries with fewer bureaucratic obstacles and lower financial requirements. Host organizations may also be deterred from supporting extensions, particularly small businesses or nonprofits that cannot absorb these costs. As a result, the rule could reduce the diversity and quality of participants and contribute to a perception that the U.S. is an increasingly difficult destination for international professional exchange.

Even when extensions are requested, they typically occur late in a participant's program, often in the final months. Given current USCIS processing timelines, there is a high risk that EOS decisions would not be issued before the participant's original end date, leading to uncertainty, interrupted training plans, or unnecessary program terminations. This misalignment between the operational realities of the program and the bureaucratic demands of the proposed rule would render many otherwise viable extensions impractical for all parties involved.

In sum, while the number of extensions may be relatively small, the proposed changes would add disproportionate cost, delay, and rigidity to a category that thrives on practical, well-regulated flexibility. These burdens are likely to discourage continued engagement from international talent and U.S. hosts alike, contradicting the stated cultural and professional objectives of the J-1 Intern and Trainee programs.

**Secondary School Student Program**

The J-1 Secondary School Student Program (SSSP) provides international high school students the opportunity to experience life in the United States by attending an accredited public or private secondary school for an academic semester or full academic year. While in the U.S., participants live with American host families or in boarding schools and are encouraged to engage fully in the high

school experience, including participation in school-sanctioned extracurricular activities such as sports, clubs, and other after-school programs.

In 2024, nearly 20,000 students from around the world participated in the SSSP[12], contributing to cross-cultural understanding in local communities and enriching the educational environment of their host schools. The program is governed by 22 CFR § 62.25, which sets a minimum participation length of one academic semester (or quarter equivalency) and a maximum of two academic semesters. While extensions beyond two semesters are not permitted, participants who initially enroll for just one semester are allowed to extend to a full academic year. These in-program extensions are currently managed efficiently through SEVIS and do not require interaction with USCIS.

Although most SSSP participants do not extend their stay, the proposed rule's requirement that any program extension, regardless of length or context, must be processed through a formal EOS application with USCIS would introduce several adverse consequences for this program.

First, the proposal would significantly reduce the flexibility that is foundational to the SSSP. Currently, students who initially plan to stay for just one semester but later wish to extend to a full academic year can do so through a streamlined process managed entirely by program sponsors within the parameters of existing DOS regulations. Under the proposed rule, even this common and straightforward extension would require a full USCIS filing, including a $420 fee, potential biometrics, and a lengthy adjudication timeline. This burdensome new process would create unnecessary complexity for sponsors, students, host families, and host schools alike.

Processing delays are also a major concern. EOS adjudication through USCIS is often slow, and introducing this process into a short-term program like SSSP risks serious disruption. Many students make extension decisions midway through the semester, often based on academic fit, host family relationships, or evolving educational goals. If an EOS decision does not arrive before the student's original program end date, it could interrupt their ability to remain in school and complete the academic year, leading to confusion and unintended departures.

The proposed changes would also introduce additional financial barriers. The added cost of a USCIS extension filing may discourage students and families, particularly those with limited financial means, from pursuing a second semester, reducing overall participation in the program. Sponsors may also face higher administrative costs related to supporting these filings, further complicating their ability to offer and manage program extensions.

---

[12] State, D. of. (2025, July 24). Facts and Figures 2015-2024 - BridgeUSA. BridgeUSA. https://j1visa.state.gov/facts-and-figures-2015-2024/

alliance
for international exchange

Therefore, while SSSP extensions are relatively infrequent, the proposed rule would impose outsized burdens on students, sponsors, and host schools in the rare instances when they do occur. This shift away from a flexible, well-functioning system risks diminishing the program's accessibility and undermining the positive educational and cultural impact it provides.

**Summer Work Travel Program**

The J-1 Summer Work Travel (SWT) program provides international university students with the opportunity to experience life in the United States through short-term cultural exchange. Each year, thousands of students travel to the U.S. during their summer break to work in seasonal, entry-level positions, primarily in the tourism, hospitality, and retail industries, while also exploring American culture and geography through independent travel. These experiences not only support cultural understanding but also provide valuable staffing assistance to U.S. communities, particularly in tourist destinations with seasonal workforce needs.

In 2024, the SWT program welcomed over 107,000 participants, making it the largest J-1 BridgeUSA category. The program is governed by 22 CFR § 62.32, which limits participation to a maximum of four months during the student's academic summer break. While extensions beyond four months are not permitted, program sponsors are allowed to adjust a participant's program dates within that four-month window. These modest extensions, often only for a few weeks, are used to meet unanticipated staffing needs or accommodate participant travel or logistical challenges. They are currently managed efficiently in SEVIS without the need for additional government filings.

Under the proposed rule, a participant's admission to the United States would be tied to the program end date listed on their initial Form DS-2019. Any change to that date, including the short in-season extensions commonly used in the SWT program, would trigger the need for a formal EOS application through USCIS. This shift would significantly disrupt the flexibility that has long been essential to the SWT program's success and introduce a series of negative consequences for participants, sponsors, and host employers.

The imposition of a $420 USCIS filing fee for each extension, along with potential biometric appointment costs and additional sponsor fees, represents a disproportionate financial burden for a short-term program that lasts no more than four months. These costs, often borne by host employers or the participants themselves, could deter participation altogether. Many of the small businesses that host SWT participants operate on narrow seasonal margins, and these added expenses may make continued engagement in the program financially unfeasible.

One of the core strengths of the SWT program is its flexibility to respond to real-time staffing needs. Employers often invite high-performing participants to extend their stay to cover late-season demand. Currently, sponsors can approve such extensions internally, provided they remain within the four-month regulatory cap. Under the proposed rule, these extensions would require a full USCIS filing process, making them impractical due to time constraints and administrative burdens. As a result, employers may lose critical staffing support during peak periods, and sponsors may opt to eliminate these extensions altogether.

If a participant's original job placement becomes unsuitable or untenable, sponsors frequently assist with finding a new host employer, an important safeguard that preserves the participant's experience and the program's cultural exchange mission. The proposed changes would tie the program end date to the original employer, making it exceedingly difficult to adjust the program duration after a rematch without triggering a costly and time-consuming EOS process. This could discourage rematching, leading to more program terminations and missed exchange opportunities.

Most SWT programs last between three and four months, whereas USCIS processing times for EOS applications can span several months. The result is a fundamental mismatch in timelines. Extension decisions would likely not be issued until after the participant's program has ended, rendering the process functionally irrelevant and creating legal uncertainty for those affected.

Ultimately, the proposed rule prioritizes bureaucratic procedure over the practical realities of a short-term, seasonal program. Local businesses rely on SWT participants to meet fluctuating demand, and participants rely on the program's flexibility to maximize their exchange experience. Replacing a well-functioning internal extension process with an inflexible and slow external one would unnecessarily compromise both.

**Teacher Program**

The J-1 Teacher Exchange Program is a critical component of U.S. public diplomacy efforts, bringing highly qualified educators from around the world into American classrooms. These programs not only address persistent teacher shortages, particularly in high-need subjects and hard-to-staff districts, but they also advance key U.S. foreign policy objectives. By sharing their culture, language, and academic instruction expertise, exchange teachers enrich the educational experiences of U.S. students while fostering mutual understanding between nations.

The legal and regulatory framework governing the J-1 Teacher category already ensures rigorous oversight and finite program duration. Under 22 CFR § 62.24, participation is limited to the time

"necessary to complete the program," with a maximum initial stay of three years. Sponsors may request an extension for one or two additional academic years by submitting a reference letter from the host school, documentation of the teacher's cross-cultural activities, and a non-refundable fee. All extension requests are submitted through SEVIS and are adjudicated solely by DOS. Once approved, teachers remain in lawful status for the duration of their program without needing to file additional immigration paperwork. This system is already tightly controlled, transparent, and limited in duration.

Eligibility requirements for J-1 teachers are similarly strict. Participants must hold the equivalent of a U.S. bachelor's degree, meet both home-country and host-state licensure requirements, demonstrate a minimum of two years of full-time teaching experience, and possess sufficient English proficiency. Sponsors are responsible for verifying these qualifications before issuing a DS-2019 form. In addition, participants are required to complete at least two cross-cultural activities each academic year, one introducing aspects of their home culture to U.S. students and another that facilitates engagement between U.S. students and students in their home country. These requirements are central to the program's public diplomacy mission and necessitate uninterrupted classroom presence to be successful.

Teachers are also required to return home for at least two years upon completing their program, preventing indefinite stays and ensuring the benefits of the exchange are shared with their home communities. This reinforces the reciprocal nature of the program and eliminates concerns of long-term U.S. residency through sequential participation.

Despite the small size of the teacher exchange program relative to the broader J-1 population – approximately 6,500 new teachers join annually out of more than 300,000 total exchange visitors[13] – its impact is outsized. Teachers serve in states such as North Carolina, California, Texas, Florida, South Carolina, and Arizona, where chronic teacher shortages threaten educational quality. They receive pay equivalent to their American counterparts, ensuring no incentive exists to use exchange teachers as a lower-cost labor force. Their work supports U.S. education while strengthening global ties and students' cultural competency.

The NPRM proposes to replace "duration of status" with a fixed initial admission period of up to three years for the Teacher Program. As a result, teachers seeking to use the one- or two-year extensions currently permitted under DOS regulations would be required to file an EOS request directly with USCIS. This would introduce several adverse consequences for the Teacher Program.

---

[13] State, D. of. (2025, July 24). Facts and Figures 2015-2024 - BridgeUSA. BridgeUSA. https://j1visa.state.gov/facts-and-figures-2015-2024/

One of the most serious impacts of the proposed rule is the risk of interrupted work authorization. While a timely-filed EOS application allows teachers to continue working for up to 240 days after their I-94 expiration, that period may not be sufficient. Many teachers could find themselves reaching the end of the 240-day window before the school year concludes, particularly given USCIS backlogs. This would force them to stop teaching mid-year, leaving schools scrambling to fill unexpected vacancies and students without continuity in instruction.

The rule also creates significant challenges due to the misalignment with academic calendars. EOS filing and adjudication do not follow school-year cycles, forcing teachers and school human resources departments to manage a confusing tangle of timelines: DS-2019 validity, I-94 expiration, USCIS receipt notices, and I-9 employment reverification. This administrative burden adds unnecessary stress and increases the risk of compliance errors. In some cases, it could even result in unstaffed classrooms at the beginning of a semester.

In addition, the rule places financial strain on participant families, particularly through its impact on J-2 spouses. Under the NPRM, a J-2 spouse's work authorization cannot extend beyond the primary teacher's I-94 date. If an EOS remains pending after that date, the spouse must stop working, causing disruption to dual-income households and making the program less viable for educators who relocate with their families.

In an attempt to avoid these complications, many teachers may feel compelled to travel internationally during summer breaks to obtain a new I-94 through reentry. However, this workaround introduces significant financial and logistical challenges, including airfare, lodging, consular fees, and potential visa delays. Teachers from countries with limited embassy access or high-security screening requirements would face even greater risks and costs.

Finally, the proposed rule introduces confusion around the two-year home residency requirement, a key component of the Teacher program. While the NPRM does not modify the requirement itself, it fails to clarify how a teacher's status would be treated if they remain in the U.S. after their I-94 expires while waiting on an EOS decision. If such a period is deemed unlawful presence, it could unintentionally violate the terms of the home residency rule and jeopardize future visa eligibility for both the teacher and their dependents.

**Impact of the proposed rule on F-1 international students**

The proposed rule would impose significant, unjustified, and ultimately harmful changes to the experience and viability of F-1 international student participation in U.S. higher education. While DHS cites concerns about overstays as a core rationale for replacing the D/S framework with fixed

admission periods, the evidence presented does not support such a sweeping policy overhaul. DHS references a data point showing 2,100 F-1 visa holders from the 2000–2010 period still holding student status in 2025[14], equating to just 0.14% of over 1.5 million students admitted during that time. This amounts to fewer than 14 students per 10,000. Moreover, DHS provides no evidence that these individuals were unlawfully present in the United States, rather than, for example, returning to study after an extended break or being miscategorized due to data anomalies. Without clearer justification, the proposed rule appears to address a statistically negligible issue in a way that could dramatically undermine U.S. higher education and global competitiveness.

In practice, the proposed changes would introduce multiple layers of complexity and risk for F-1 students and the institutions that serve them. Chief among these is the elimination of the D/S framework in favor of a rigid admission period capped at four years or the program end date on the I-20 form, whichever is shorter. This structure fails to reflect the academic realities of many international students: fewer than 60% of international undergraduates complete their degrees within four years[15], and graduate programs often require significantly more time, with doctoral students averaging nearly six years[16]. Requiring students to file EOS applications through USCIS to continue studying would add financial burden, increase the risk of falling out of status due to processing delays, and disrupt academic progress.

The rule also shortens the post-completion grace period from 60 to 30 days, reducing the time students have to transition to Optional Practical Training (OPT), change immigration status, or make departure arrangements. This change would increase stress, cause logistical challenges, and likely result in unintentional status violations. Given the already complex nature of immigration compliance, this change would place significant strain on students and institutional advisors alike.

Optional Practical Training, a key driver of international student enrollment, would also be severely impacted. Students would now need to secure an EOS approval from USCIS before beginning OPT in many cases, adding cost, uncertainty, and processing time. This could deter participation in OPT altogether, reducing the United States' access to highly skilled graduates who fill critical gaps in the U.S. workforce, particularly in STEM fields. As competing countries simplify pathways for post-study work, these added hurdles would weaken U.S. institutions' global competitiveness.

---

[14] Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media. (2025, August 28). Federal Register. https://www.federalregister.gov/d/2025-16554

[15] The NCES Fast Facts Tool provides quick answers to many education questions (National Center for Education Statistics). (n.d.). Nces.ed.gov. https://nces.ed.gov/fastfacts/display.asp?id=569

[16] Survey of Earned Doctorates (SED) 2023 | NSF - National Science Foundation. (2023). Nsf.gov. https://ncses.nsf.gov/surveys/earned-doctorates/2023#data

The consequences for U.S. colleges and universities would be significant. Institutions would face increased advising workloads, higher legal and administrative costs, and greater risk of noncompliance. DHS itself estimates that the first-year compliance cost across higher education institutions would exceed $93 million. The combined effect of reduced program flexibility, increased bureaucracy, and higher costs could deter prospective students, decrease enrollment, and strain already limited international student support services.

Perhaps most concerning, the proposed rule undermines institutional authority over academic progress and decision-making. Under the current D/S framework, schools determine whether students are making satisfactory academic progress. The proposed rule would shift that authority to USCIS officers through the EOS process, individuals who do not have expertise in academia, fundamentally altering the relationship between students, schools, and the government.

Finally, the rule places unnecessary restrictions on academic mobility. It would prohibit undergraduate F-1 students from changing majors or degree levels during their first academic year, and bar graduate students from switching to different programs after enrollment. It would also prevent students from pursuing additional degrees at the same or lower levels, such as a second bachelor's degree or a professional certificate following a master's program. These restrictions ignore common academic trajectories and goals of many international students and would likely lead to forced program abandonment or status violations.

Taken together, these provisions would make the United States a less accessible and less welcoming destination for international students, with little demonstrable benefit to immigration enforcement. Rather than strengthening the system, the rule risks undermining both the integrity of U.S. higher education and the significant contributions international students make to our academic institutions, economy, and global standing.

**Impact of the proposed rule on Short-Term English Language Programs**

The proposed rule would have a particularly harmful and disproportionate impact on Short-Term English Language Programs (ELPs), which include both F-1 and J-1 visa holders. These programs are foundational to the international education ecosystem, providing critical language training to students with diverse goals, including preparation for academic study, career advancement, or general language proficiency. By eliminating the D/S framework and imposing rigid admission periods, USCIS adjudication requirements, and new restrictions on program changes, the rule would severely undermine the operational flexibility that is essential to the success of ELPs and the students they serve.

Unlike degree-seeking students, English language learners often arrive with varying levels of proficiency and a wide range of intended study lengths. For some, this may mean several months of general English coursework; for others, it involves multi-phase academic preparation programs that evolve as language skills improve. The D/S framework has long provided ELPs with the flexibility to adapt to students' progress and educational goals, including through seamless transfers between institutions or extensions of study based on individualized needs. Replacing this structure with fixed admission periods and requiring formal EOS filings with USCIS would introduce costs, uncertainty, and delays that are incompatible with the short-term and highly variable nature of language study.

This is especially true given that many ELP sessions are measured in weeks, not semesters or years. The costs associated with EOS applications, combined with long USCIS processing times, would be impractical for students attending short-term programs or those needing minor adjustments to their academic plans. In many cases, the EOS process would outlast the remaining program duration itself, rendering it functionally meaningless while increasing the risk of falling out of status.

Moreover, the proposed 24-month cap on English language study does not reflect the realities of language acquisition. For students entering with limited English proficiency, especially those whose native languages are structurally different from English or who use non-Roman alphabets, attaining college- or career-ready language skills can easily take more than two years. Imposing a hard limit without accounting for these differences is arbitrary and would cut off legitimate academic pathways for many learners.

The rule's new restrictions on transferring schools and changing educational objectives would also do substantial harm. For example, preventing students from transferring between institutions before completing a full academic year, or from enrolling in additional English coursework at the same or a lower level, would hinder natural academic progression. These restrictions would be especially damaging to students who are preparing for transition into degree programs, where institutional fit and language advancement vary significantly by individual.

Ultimately, these proposed changes would place heavy compliance burdens on both students and institutions, increasing administrative complexity while offering little benefit in terms of oversight or program integrity. Faced with new costs, inflexible timelines, and heightened risk, many prospective students may simply choose other English-speaking destinations with more student-centered visa policies. This would not only weaken the competitiveness of U.S. English Language Programs in the global education market but also reduce the pipeline of international students who go on to pursue higher education and professional training in the United States.

In sum, the proposed rule overlooks the unique characteristics of English language training programs and the needs of the students they serve. Preserving flexibility, affordability, and adaptability is essential to maintaining the strength and global appeal of U.S. English Language Programs.

**Conclusion**

We respectfully urge DHS to withdraw this rule as proposed. The Department should instead reassess the rule and incorporate stakeholder expertise to develop alternatives that meet its objectives without causing widespread negative effects. The current Duration of Status (D/S) system provides the necessary flexibility, oversight, and efficiency to meet national security and compliance goals without imposing undue administrative and financial burdens on international students, exchange visitors, host institutions, and program sponsors.

Thank you for the opportunity to comment on this rulemaking, and we appreciate your consideration.

Sincerely,

Mark Overmann
Executive Director

# EXHIBIT 18

OFFICE OF THE PROVOST

**Nicole S. Sampson**
Provost and Chief Academic Officer
University Professor of Chemistry

UNIVERSITY of ROCHESTER

*Submitted electronically via Federal eRulemaking Portal:* *https://www.regulations.gov*

28 September 2025

The Honorable Kristi Noem
Secretary
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528

**Re: Docket No. ICEB–2025– 0001, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (90 FR 42070, August 28, 2025)**

Dear Secretary Noem:

I write on behalf of the University of Rochester to respectfully submit comments to the U.S. Department of Homeland Security (DHS) proposed rule, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*. This proposal is based on flawed data and would severely restrict the ability of international students and exchange visitors to complete their studies, enhance the U.S. research enterprise, and bolster our nation's health care system at a time when they are desperately needed. **We strongly urge DHS to withdraw this rule in its entirety and allow the current policy of admission for duration of status (D/S) to remain in effect. We believe there is opportunity for DHS to better utilize existing mechanisms, such as the SEVIS system, to achieve the agency's goals, rather than implementing a costly, burdensome, and duplicative new process.**

The University of Rochester is one of the nation's top research universities, the largest private employer in upstate New York, leading source of new physicians for the Finger Lakes Region, and major generator of economic growth across our community. Our broad community includes 11,946 enrolled students, more than 3,250 faculty, and 38,565 staff. In fiscal year 2024 (FY24), we received $485.8 million in sponsored research funding, including $360 million in federal research support toward developing new scientific innovations, treatments, and cures. Our clinical care enterprise, University of Rochester Medicine, comprises eight hospitals and includes the region's only Level 1 Trauma Center, children's hospital, NCI-designated cancer center, and many other unique and highly specialized services such as organ transplant, trauma and burn care, cardiology, gastroenterology, and neurology, reaching a population of more than 3 million across at least 27 counties in the Finger Lakes and Southern Tier regions.

In the years following World War II, the United States became a magnet for international talent that was unrivaled around the world. This influx of top students and scholars has enhanced the U.S. higher education system and contributed to innumerable discoveries and innovations that

200 Wallis Hall · Box 270021 · Rochester, NY 14627-0021
585.275.5931 · provost@rochester.edu · www.rochester.edu

have improved human health, created new technologies and companies, and thereby strengthened our economic and national security. Today, U.S leadership in these fields is in jeopardy as we are in fierce competition with other nations like the United Kingdom, Canada, China, and Australia for the world's top talent. Recent U.S. immigration policies have already left many students with a feeling of uncertainty about their future here. From travel restrictions, processing delays, increasing costs and administrative burden, and threats of benefit reductions, our students and scholars are focused on planning for a worst-case scenario, rather than embracing the various academic opportunities they may attain here. If policies like these continue, the U.S. will continue to lose global market share of research and development expenditures to other countries that have established aggressive national policies and marketing strategies to attract these talented individuals and expand their research enterprise. U.S. policies must balance efforts to safeguard research and national security with the need to draw the individuals and exchange of ideas that are key to global economic leadership**.**

Eliminating duration of status will have significant implications for the U.S. economy. The elimination of Duration of Status (D/S), along with other restrictive immigration policies will impact the number of international students who come to study in the U.S. Data from NAFSA indicates that during the 2023-2024 academic year, international students contributed $43.8 billion dollars to the U.S. economy and supported the creation of 378,175 jobs. The financial contribution that international students make to the U.S. economy does not only support tuition, but it also supports the larger economy by way of apartment rentals, automobile purchases, and daily expenses like food, clothing, school supplies, and other incidentals. International students support local coffee shops, pizza shops, restaurants, and large retail chain stores. Reducing a student's ability to remain in the U.S. for no more than four years, will decrease the total population of international students who choose to come to this country to study. A reduction in the number of international students who choose to study in the U.S. will lead to a decline in consumer spending and an economic decline for the entire country. Current data suggests that the decline in enrollment due to D/S concerns, visa bans, limited appointment availability, and visa interview suspensions will cost the U.S economy $8 billion and a loss of nearly 60,000 jobs. It is worth noting that international students do not receive federal or state financial aid and most pay full tuition, which helps to subsidize scholarships for U.S. students.

In the last academic year, the University of Rochester was proud to sponsor 3,593 international students and 400 scholars from more than 130 countries. In addition to the immeasurable academic and cultural value they provide to our campus and community, international students across colleges and universities in Monroe County generate $400 million in economic activity per year and support nearly 4,000 jobs, including 2,639 jobs, and $269 million in economic activity supported by the University of Rochester's international students alone. Our research enterprise relies heavily on the expertise and talent of our international scientists and postdoctoral researchers as we pursue new treatments, cures, and technological advancements that drive U.S. innovation. Further, as our nation and our region in particular grapples with a physician shortage coupled with the increasingly complex needs of an aging population, significant rates of chronic conditions like diabetes and heart disease, and incidence of cancer, our health care system is more dependent now than ever on immigrants, and our hospitals in rural and underserved areas rely heavily on recruiting U.S.-trained foreign physicians to meet the needs of their communities and improve patient access to care.

**As we stated in our comments on the 2020 proposed rule, "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media" (DHS Docket No. ICEB-2019-0006), we maintain that eliminating duration of status for F and J visa holders will have a devastating impact on U.S. higher education and our ability to attract the best and brightest students, scholars, and physicians. To help restore our nation's position as the world's leader in higher education and innovation, we strongly urge you to consider the following comments.**

**A four-year fixed period of admission is insufficient and does not conform to degree or exchange program completion**

Eliminating duration of status (D/S) in favor of a maximum four-year fixed period in which students must complete a relevant educational program does not conform to the timeline of many academic programs or consider the complexities of academic progression. Such a lack of flexibility will inhibit international students from changing majors, partaking in supportive programs to enrich their educational experience, exploring academics outside of their majors, or extending their studies to pursue an advanced degree. Requiring individuals to file an extension of stay (EOS) – or in some cases, multiple extensions of stay – to complete their studies would be highly impractical and financially burdensome for our students.

At the University of Rochester, the vast majority of students complete a bachelor's degree within four years. However, approximately 5-7% of our F-1 students who enter as undergraduates go on to pursue a master's, doctoral, or professional degree program. Students in combined BS/MS programs typically need five years to complete their programs, while the average PhD student requires 5.7 years and as much as 7.3 years to complete their degree. DHS cannot dismiss the complexity of graduate, postdoctoral, and residency programs, each with differing or non-standard length training programs, many of which may be longer than four years. It is especially critical that doctoral students be exempt from any fixed period of admission. In addition to placing a cumbersome, time-sensitive administrative obligation on students immersed in intense academic or training programs, the additional cost, which DHS estimates will likely be more than $550 per extension, could be financially prohibitive for many.

The rule also does not consider the need for foundational coursework that some international undergraduates, like many American students, find beneficial to undertake. The University of Rochester maintains a close relationship with our local community college to help students close gaps in their educational experiences, which will prove problematic under the proposals to restrict study at a lower educational level and to require an ESO for changes in academic timing. In addition, the rule places an arbitrary lifetime cap of 24 months on language training programs that could be problematic for English Language Learners (ELL) who often transition from language programs into a full-time program of study on the same F-1 visa. The University of Rochester's Eastman School of Music, one of the world's top music conservatories, annually hosts approximately 280 international students – 30% of its total student population – and often admits musically gifted prodigy students to a rigorous theoretical curriculum who may need

additional English language support prior to or during a pause from their degree at the University. The proposed rule will significantly impede those students from gaining the language and cultural skills they need to be successful, even if academically viable and supported.

The proposed rule's narrow and discretionary interpretation of "compelling academic reasons" for students to extend their time to completion and to restrict authorization for certain bona fide training activities is inconsistent with the interdisciplinary nature of academic programs at all levels. The impact of this strategy will create significant impediments for F-1 students that will interfere further with academic collaboration and even time to completion. Such a policy would hold international students to a different standard and is not consistent with the interdisciplinary nature of programs.

**Rule intrudes on academic decision-making**

We are deeply concerned that DHS is encroaching on the academic and programmatic decision-making role of universities by regulating the time in which a student is expected to complete a degree program. The proposed EOS process would put federal immigration officials in charge of evaluating whether a student is making good academic progress, rather than the institution in which they are enrolled. Evaluating whether a student is making good academic progress is a decision that must remain the school's prerogative.

The rule states that only academic reasons will be considered as criteria for an EOS, which ignores a variety of valid reasons for a student to require additional time for completion, such as a leave of absence due to physical or mental health. This characterization also ignores extremely common issues like previously undiagnosed learning disabilities, discretionary resources, or diversity of academic experience – all of which the academic institution is best prepared to evaluate.

Institutions have a vested interest in ensuring students succeed and comply with the rules. In addition to tracking course registration, attendance, academic standing, and graduation requirements, the University of Rochester has long-standing policies in place to address academic progress, probation, and when necessary, dismissal from a program of study. Each semester, academic action is administered by designated committees with the appropriate representation, expertise, and authority to review the academic and advising records of students recommended for consideration by their department. Our International Services Office has an established process for evaluating and approving or denying program extension requests. We believe this existing process is thoughtful, informed, inclusive, expeditious, and therefore the most fair and appropriate method for making these difficult decisions about academic progress.

**Proposed reporting requirements are duplicative of SEVIS**

By virtue of the SEVIS database, the F and J visa categories are arguably the most closely tracked of any non-immigrant visa holders. Despite claims that the proposed changes are necessary to address fraud and abuse, the SEVIS system already provides the necessary

infrastructure to flag and address issues of noncompliance for F and J nonimmigrants with respect to immigration laws and regulations. SEVIS gives DHS immediate access to detailed information related to nearly every student and exchange visitor event that could impact their compliance. For information not directly submitted to SEVIS, DHS has the authority to request all information and documents that institutions are obligated to retain under 8 CFR 214.3 throughout the student's enrollment or scholar's program engagement, and for three years after. We recommend that DHS issue guidance to Principal Designated School Officials (PDSO), Designated School Officials (DSO), and Responsible Officers (RO) to upload supporting documentation as part of the EOS recommendations submitted to the student/scholar SEVIS record. This will streamline the existing process and give DHS the ability to audit records and documentation.

Requiring students to submit the same information to USCIS that DHS already has access to is duplicative and wasteful. It would also place additional burden on institutions to prepare the documentation and help students navigate the reporting process. SEVIS already provides sufficient data to evaluate academic, research, and training activities that might warrant closer evaluation. DHS should utilize existing mechanisms (i.e., SEVIS, I-94 records, CLAIMS Interface) more effectively before burdening students, scholars, and institutions with a superfluous EOS process.

**Fixed admission unreasonably restricts student mobility and academic decisions**

The proposed rule would limit the academic mobility of international students by restricting their ability to transfer schools, change their educational objectives, and pursue additional opportunities after their current program. Prohibiting graduate students from changing their programs/schools unnecessarily restricts academic decision making and does not account for the reality of an individual student's academic journey. It is not uncommon, for example, for PhD students – both international and domestic – to decide not to pursue their PhD degree but to graduate instead with a master's degree. There are legitimate academic, personal, and professional reasons for this decision. For example, a student may realize that they are not suited to a career in academia and would prefer to graduate with a master's degree to pursue other career opportunities.

The same applies to the new rule's prohibition for students to pursue another degree on the same or lower educational level. The rule makes an erroneous assumption that all students' educational journeys are linear and only involves upward progression. This is not always the case: some students decide after achieving a degree that they are interested in a different field of study; or that another degree at the same degree level would enhance their professional development (e.g., a student has a master's degree in engineering and then wants to obtain an MBA to achieve their career goals).

Being able to change majors or programs allows students the option to pursue a field that is a better match for their talents or career plans. Forcing students to remain in a program or at an institution that is not a good fit increases the risk of poor academic performance, incompletion, or an early return home. Allowing students flexibility improves student well-being and success

and provides a fairer academic environment. Academic interests can also shift based on real-world opportunities, and the ability to change programs allows students to train in areas where there is demand for highly skilled workers, which can benefit both them and the nation.

**Eliminating duration of status will harm exchange of J-1 scholars, students, and physicians**

The University of Rochester relies on the J-1 visa program to sponsor visiting scholars, physicians, and students from abroad. The J-1 program is grounded in U.S. diplomacy efforts designed to increase mutual understanding and strengthen ties between Americans and citizens from other nations. Accordingly, J-1 sponsored postdoctoral researchers, physicians, and visiting faculty not only provide enormous value to the University, but also have contributed in immeasurable ways to our community and national interest.

The rule's proposed move from D/S would have an immense impact on the U.S. research enterprise. A four-year fixed time period is largely unworkable for J-1 research scholars, who are permitted for up to five years by the Department of State to complete their research. Postdoctoral programs would also be affected, and fields such as the biomedical sciences, where most postdocs are international students, could be decimated. At the University of Rochester, over 100 J-1 sponsored postdoctoral scholars are involved in research activities. Losing these scholars and their expertise would be devastating for our research and the $360 million in federally sponsored research we undertake annually.

Foreign nationals seeking medical training, residencies, and fellowships as J-1 exchange visitors would be disproportionately affected by the elimination of D/S. These programs can last from one to seven years depending on the medical specialty or subspecialty pursued, and would require at least one EOS to complete commitments. J-1 physicians are already required to apply annually to the Educational Commission for Foreign Medical Graduates (ECFMG), the Department of State designated sponsor of foreign national physicians, to extend their sponsorship and ensure proper monitoring of their progress in training. Duration of participation in these programs is limited to the time "typically required to complete a program," as defined by the Accreditation Council of Graduate Medical Education (ACGME) and/or one of the specialty boards of the American Board of Medical Specialties (ABMS), and duration is further limited to a maximum stay of no more than seven years. Having to apply for EOS on top of the requirements of compliance with existing Department of State approved regulations would be incredibly onerous for our physicians.

This year, the University of Rochester School of Medicine and Dentistry is training more than 85 residents and fellows from abroad. As it becomes increasingly difficult to attract physicians to rural and other underserved areas, we rely more and more on recruiting physicians who have completed their training through the J-1 visa program to ensure access to high-quality care at facilities like St. James Hospital and Jones Memorial Hospital in New York's Southern Tier, both of which are located in federally-designated health professional shortage areas (HPSAs).

As such, the proposed rule ignores the serious shortage of physicians the U.S. is facing, that, according to the Association of American Medical Colleges (AAMC) could reach a need for as

many as 86,000 primary and specialty care physicians by 2036. As our nation's population ages and communities face increasing levels of cancer and chronic disease, it is more important than ever to ensure we have an immigration system that accommodates the health care workforce necessary to support innovative, high-quality, timely care for patients.

**Prohibition on lateral and reverse matriculation will limit specialization, particularly in health care**

Certificate, specialty, or preceptorship programs that often involve a non-traditional or non-linear trajectory to completion would also be affected by the proposed rule. DHS frames this as necessary to deter indefinite study but offers inadequate justification for applying the rule to all F-1 students. Limiting the number of F-1 programs an international student may pursue and barring "reverse matriculation" will be particularly detrimental to students pursuing degrees in the health care field.

The rule proposes these limitations without providing any clarity as to what degree levels are considered "lateral" or "below" an already completed degree program. Many physician scientists, for instance, pursue both an MD and PhD to acquire clinical and research skills and a better understanding of translating research to patients. It is not clear if this provision would bar students from the pursuit of both an MD and PhD. Similarly, many master's degree prepared nurses at our School of Nursing pursue certificate programs before seeking educator and leadership positions or specializing in areas of care like gerontology or mental health.

The University of Rochester's internationally recognized Eastman Institute for Oral Health (EIOH) offers seven Postdoctoral Dental Education and Residency Training Programs leading to a Certificate of Advanced Study or a Certificate of Completion. In addition, several certificate programs of two- and three-year duration offer an additional educational track leading to a Master of Science in Dental Sciences. All such EIOH offerings are fully accredited by the Commission on Dental Accreditation (CODA) and registered with the New York State Education Department. It is common for EIOH students to progress through multiple programs of specialization and advanced training, despite each carrying the official credential of a Certificate program. Under the proposed rule, the government will arbitrarily limit international students' training and compromise the core EIOH mission and longstanding academic structure.

Moreover, EIOH is the only dental residency program in the Rochester area and the leading source of new dentists in the region. EIOH is also the largest safety net provider outside of New York City providing dental care to patients in 55 of NY's 62 counties and the primary source of dental care for Medicaid and uninsured patients locally, as well as those with intellectual and developmental disabilities and other complex conditions. Even with our efforts to expand the dentistry pipeline and offer innovative care options, EIOH has a waiting list of 39,000 patients. Limiting the enrichment and specialty training opportunities providers can pursue will only diminish our ability to train high-quality providers and will be particularly harmful to our most vulnerable patients who rely on the internationally educated providers we train for access to care. We need policies that encourage the training of more providers, not less.

**Extension of stay will disrupt OPT experiential learning programs**

For decades, Optional Practical Training (OPT) has been a valuable incentive that has drawn international students to study in the U.S. and apply what they learn in post-degree on-the-job training as a capstone to their education. Eliminating D/S in favor of an EOS policy will make applying for OPT burdensome and costly and could leave students in limbo as they await multiple required approvals. By requiring students seeking OPT to obtain an EOS as well as employment authorization – two completely separate processes – a student would be left unable to begin their planned training program unless both the work authorization and EOS are granted synchronously. Further, students seeing a 24-month STEM (Science, Technology, Engineering, and Mathematics) OPT extension would have to file again for EOS, paying a separate fee each time. Given current processing wait times, many students will likely miss their entire OPT eligibility window while waiting for their I-539 to process. Adding the ESO requirement will only lead to further disruption and lost opportunities for both students and the U.S. businesses that train them.

At the University of Rochester, over 1,000 students participate in the OPT and STEM OPT extension programs. Many of these students have studied in biomedical and other scientific research fields in which our nation is experiencing workforce supply challenges and are helping to fill those gaps in the pipeline. According to a 2019 report by the Niskanen Center, experiential learning opportunities like OPT help to increase local innovation and higher average earnings, and do not cost U.S. workers their jobs or decrease their wages.[1] In fact, a recent report by the Business Roundtable found that scaling back OPT would result in the loss of 443,000 jobs, including 255,000 jobs held by American workers.[2] While the U.S. has long been the leader in experiential learning, the U.K, Canada, Australia, and China all offer similar programs that have led to dramatic increases in post-secondary enrollments in those nations. If we make it harder for students to seek these opportunities here, they will do so elsewhere, and at the detriment to U.S. higher education, innovation, and workforce and economy.

**Removing duration of status will further delay processing times**

We are deeply concerned that the extensions and authorizations required by the rule will create an enormous influx of new filings at USCIS that will exacerbate existing backlogs and delays. Adding an unnecessary submission of 414,000 more applications to the USCIS workload, as DHS estimates, would have an immediate detrimental impact not only to international students, but to the entire legal immigration system. As of August 26, 2025, the processing time of an extension of status request at USCIS's California Service Center is already 7.5 months while there is a 7 month wait at the Nebraska Service Center. In our experience, processing of an I-539 can take close to a year or more, meaning many students would likely complete their programs before USCIS will even get to their extension application. Recent reporting by *Newsweek* indicates that USCIS has a record backlog of 11.3 million pending cases. Increasing the agency's caseload will only result in greater backlogs.

[1] Niskanen Center (2019). *Optional Practical Training and International Students After Graduation,* 5.
[2] Business Roundtable (2019). *The Economic Impact of Curbing the Optional Practical Training Program*, 8.

Our international populations already face incredibly difficult circumstances affecting their U.S. academic and research activities, separation of families, and delayed work permissions directly resulting from excessive processing times and lack of transparency in government determinations. The increased volatility, disruption, and uncertainty would drive talented students and scholars from the U.S. following delayed approvals or adjudications and would discourage others from studying here.

**Reduction in F-1 period for departure will restrict academic transitions**

Reducing the post-completion "grace period" to prepare for departure from 60 to 30 days will increase pressure on both F-1 students and institutions. Students and their advisors will have less time to prepare for departure, change status, or file extensions after completing their studies or training. Shortening this period will force rushed decisions that could harm compliance and reduce students' opportunities.

Institutions need time to process paperwork, advise students, and update records, while students often must coordinate with employers, attorneys, new schools, or await OPT approvals, while at the same time contend with housing leases, utility contracts, or other financial obligations that cannot be ended immediately. Those leaving the U.S. also need time to arrange international travel, including shipping belongings. For the majority of students who complete at the end of the spring semester, the timing of various admission decisions and waitlist cycles for the following fall semester often extends into mid-summer.

Without a sufficient grace period, DHS may see an increase in emergency filings, expedited requests, and inadvertent overstays – all of which strain resources. Maintaining the 60-day grace period allows for a responsible transition for both students and institutions without abrupt disruption and is more in line with post-study stay options in other countries trying to attract top talent.

**Adding extension of stay requirements will be burdensome to institutions**

In addition to the impact on students, institutions of higher education will also be forced to absorb a considerable administrative and financial burden to implement this rule. DHS notes that an institution's extension of a program of study will no longer be sufficient for extending a period of admission and instead would be used to support a student's EOS application. This will require the production of a considerable volume of documentation to support student applications and associated staff time. Based on our experience, the conclusion that DSOs and ROs will require a total of 40 hours of rule familiarization, development of training materials, and institutional adaptation efforts grossly underestimate the workload this rule will bring about. For example, significant software updates, data collection, and business-process development will be required, since data transfer across agencies is unreliable at best and the fixed period of stay will only be officially recorded in the external I-94 system or by hardcopy Notice of Action.

Additionally, this calculation does not reflect any of the increased advising needs and operational services for our international students and exchange visitors, which will remain prevalent well beyond the first year of this rule. At the University of Rochester, we estimate this level of reporting would require us to hire at least two full-time equivalents (FTE) at a cost of at least $80,000 or more. DHS should continue to rely on DSOs to be compliant, diligent and ethical in evaluating program extensions based on institutional policies, the regulations, and the interest and needs of students. USCIS is not in a position to analyze and evaluate a student's academic programs and progress.

**Conclusion**

Eliminating Duration of Status in favor of a four-year fixed time period of admission will create uncertainty and for students and scholars that will have a long-lasting negative impact on our nation's ability to attract the world's top talent. It is our conclusion that such a policy will not prevent those who intend to overstay from doing so but instead will create an enormous burden for those who wish to comply with our laws and study here. If U.S. colleges and universities are unable to provide incoming or prospective students and postdocs with the confidence that they will be able to complete their entire academic program, they will study in another country and we will lose this critical pipeline of advanced knowledge and talent – and economic infusion –to competitor nations.

**Simply put, the proposed rule will make U.S. institutions less competitive and hamper U.S. leadership in critical fields and exacerbate workforce shortages. We strongly urge DHS to reconsider this proposal and withdraw the rule in its entirety and instead optimize the use of the existing SEVIS system by requiring institutions to upload supporting documentation, which they are already required to keep for up to three years.**

Thank you again for the opportunity to provide comments, and please do not hesitate to contact me if I can provide any additional information.

Sincerely,

Nicole S. Sampson
Provost and Chief Academic Officer
University Professor of Chemistry

# EXHIBIT 19

THE UNIVERSITY OF TEXAS AT DALLAS
Office of Graduate Education
Juan González, Ph.D.

Francis S. Johnson Chair for Graduate Education
Vice Provost for Global Engagement Dean of Graduate Education
Professor of Molecular Biology
800 W. Campbell Road
Richardson TX 75080-3021
972-883-2234 Fax 972-883-4308
Email jgonzal@utdallas.edu

September 29, 2025

The Honorable Kristi Noem
Secretary, U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
725 17th Street NW
Washington, D.C. 20503

**RE: DHS Docket No. ICEB-2025-0001 -Public Comments on Proposed Rulemaking**

Dear Secretary Noem:

On behalf of The University of Texas at Dallas, I submit this comment letter in response to the U.S. Department of Homeland Security's (Department) proposed rule, DHS Docket No.ICEB-2019-2025-0001, published August 28, 2025.

UT Dallas currently hosts 10,773 F-1 students from over 100 countries, making us 19th nationally in total F-1 enrollment, as well as 238 J-1 students and scholars. These students enrich our academic community and make significant contributions to the Texas economy. We are deeply concerned that the proposed rule to replace "Duration of Status" with a fixed period of admission will undermine U.S. higher education, research, and economic competitiveness. We respectfully urge DHS to withdraw this rule.

**1. The proposed rule duplicates the electronically tracking and monitoring the immigration status of international students and exchange visitors already existing in the Student and Exchange Visitor Information System (SEVIS).**

SEVIS already provides DHS with real-time data on student enrollment, transfers, and academic status. Requiring students and schools to duplicate this information through costly USCIS applications is inefficient and unnecessary. The DHS itself estimates $76 million annually in additional compliance costs, plus over 13,000 staff hours at UT Dallas alone for OPT-related requests. These resources would be diverted from student success and security monitoring to administrative tasks, such as paperwork.

SEVIS provides DHS with access to detailed information related to most events that could impact an F-1 or J-1's compliance with the proposed regulation. For information not directly in SEVIS, DHS also has the authority to request information "on any individual student or class of students

upon notice," all information and documents that schools are obligated under 8 CFR 214.3 to retain throughout the student's enrollment and for a period of 3 years beyond that. Requiring F-1 and J-1 non-immigrants to submit to USCIS data that is already available directly through SEVIS or is otherwise available upon request to an institution's DSO is duplicative and an inefficient use of resources.

**2. The time limits on lawful admission in the proposed rule do not accurately reflect the periods most UT Dallas students require to complete these degrees.**

Currently, the time for completion of our study programs is determined by academic departments in accordance with rules developed within the State of Texas Education Code. All our PhD programs have an I-20/DS-2019 program length of 5 years. For students who need additional time, a yearly individualized review by faculty and DSOs ensures that students are only approved for additional time where needed. Further, academic policies require fixed completion times. We currently have over 1,300 SEVIS Active PhD students, however in 2024, we approved approximately 200 program extensions. These programs were extended for a few weeks (to account for their specific dissertation defense date), or for an additional one semester, or up to an additional one year. At UT Dallas, there are rigorous internal controls to ensure timely completion of programs without the need for regulations that impose inflexible time limits.

For undergraduates, the proposed rule will discourage undergraduates from pursuing double degree programs, double major programs, and fast-track Bachelors / Masters programs as those all exceed 4 years. This is even though these programs provide interdisciplinary learning and enrich the students' academic qualifications.

Existing procedures, which include DSO and faculty review, already ensure accountability and timely progress, without the need for federal intervention. As an alternative, if a fixed admission date is required, we recommend that the date should match the specific program completion dates approved by USCIS on the institutions' I-17 and indicated on each I-20/DS-2019. Only students who fail to meet their program-specific completion dates should be required to request an Extension of Stay from USCIS.

**3. Academic requirements that must be analyzed to determine whether a student is making adequate progress in their degree, sufficient to warrant an extension of stay, are not commonly understood by border or immigration officers who will be charged with making these decisions.**

The proposed rule states that the standard of "normal [academic] progress" in the existing regulations is undefined. If that is the case, then we urge DHS to preserve the existing rule and adopt a clearer regulatory definition of "normal progress" so that DSOs/ROs may implement it. The UTD international offices and academic units have developed robust procedures to vet and make sound determinations regarding eligibility for program extensions, to approve or deny them as appropriate for the circumstances, and to assess academic progress holistically. When students fail to complete their programs on time and become ineligible for a program extension, UT Dallas DSOs terminate their immigration status as per the regulations. Immigration officers are not trained to evaluate academic progress, resulting in delays, increased costs, and inconsistent outcomes. The risk that failing a class could be deemed a status violation contradicts long-standing definitions of "full course of study." We urge DHS to retain faculty and DSO-led model, supported by more accurate definitions of "normal progress."

**4. The proposed rule will have a chilling effect on the aspirations of international students, parents, and government and business sponsors who fund study in the U.S. The direct fiscal impact on non-immigrant F and J participants and U.S. universities may be significant.**

International students make vital contributions to U.S. education and the economy. In Texas alone, international students contributed $2.4 billion in 2023–24, supporting more than 7,000 jobs. At UT Dallas, uncertainty about completing a degree would deter prospective students and prompt them to consider competing countries like Canada, Britain, and New Zealand. The result would be reduced U.S. enrollment, diminished economic impact, and fewer opportunities for American students and communities.

**5. There are already less costly and burdensome alternatives available to reach the fraud reduction and national security goals sought by this proposed regulation.**

The rule targets an extremely small percentage of offenders within the broader international student population and the actions of a few unethical and criminal institutions (fewer than 0.1% of SEVP certified schools). Institutions with a successful history of monitoring nonimmigrant student activity will, under the proposed rule, nevertheless be required to hire additional personnel and pay monitoring costs disproportionate to the problem described. Rather than burdening institutions that successfully comply with existing regulations to reduce fraud and protect national security, we urge DHS to increase oversight on high-risk institutions. We recommend that the Student and Exchange Visitor Program (SEVP):

- Strengthen recertification and oversight of schools and DSOs,
- Offer DSO training on fraud detection,
- Ensure timely school recertification,
- Improve the ICE/SEVP data analytics tools to capture fraudulent activity in the SEVIS database,
- Engage in targeted monitoring in SEVIS of extensions of stay requests,
- Utilize prosecutorial discretion to focus on students already identified by schools in SEVIS has having violated their immigration status,
- Conduct targeted SEVIS audits of program extensions, transfers, and program changes, and
- Improved CLAIMS-SEVIS system integration to ensure data accuracy.

These steps would better advance national security and integrity goals than imposing fixed admission periods.

**Conclusion**

We share DHS's commitment to safeguarding national security and preventing fraud. However, the proposed rule will weaken U.S. higher education, deter international talent, and impose unnecessary financial and administrative burdens on institutions and students. We urge DHS to maintain the Duration of Status framework and enhance existing SEVIS oversight mechanisms, rather than revising them.

Sincerely,

Juan E. González, Ph.D.
Vice Provost for Global Engagement
The University of Texas at Dallas

# EXHIBIT 20

CENTER FOR STRATEGY & APPLIED INSIGHTS

FRAGOMEN
ATTORNEYS AT LAW

Fragomen, Del Rey, Bernsen & Loewy, LLP
1101 15th Street, N.W., Suite 700
Washington, DC 20005
USA
O +1 202 223 5515
F +1 202 371 2898
www.fragomen.com

**Bo Cooper**
Executive Director
Direct: +1 202 380 1087
bcooper@fragomen.com

**Leah L. Rogal**
Senior Director
Direct: +1 202 380 1080
lrogal@fragomen.com

September 29, 2025

*Submitted via regulations.gov*

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536

Re: DHS Docket No. ICEB-2025-0001, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*[1]

Dear Sir or Madam:

The Fragomen Center for Strategy and Applied Insights (the Fragomen Center) appreciates the opportunity to comment on this proposed rule. The Fragomen Center seeks to identify and analyze cross-cutting issues and put forward insights-based strategies that strengthen immigration pathways worldwide. For the reasons discussed below, we urge the Department to withdraw this proposed rule and continue the current, well-functioning system providing for the admission of international students and scholars to the United States for the duration of time that they successfully maintain and fulfill the requirements of their student status.

The Department of Homeland Security's proposed rule to impose a fixed period of admission for international students and scholars risks destabilizing critical talent pipelines for U.S. employers. For decades, the "duration of status" framework that has long governed international student admissions has ensured predictability, allowing students to complete their studies and transition where appropriate into the American workforce through the Optional Practical Training (OPT) and H-1B programs. By replacing this proven model with rigid

---

[1] *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070 (Aug. 28, 2025) (proposed rule).

time limits and costly extension requirements, the proposal threatens to shrink the pool of highly skilled early-career candidates, especially in science, technology, engineering, and math (STEM) fields, at a time when U.S. employers face intensifying global competition for talent. Employers across industries rely on international graduates not only to fill pressing skills shortages but also to drive innovation, fuel research, and expand economic growth. Unneeded disruption to this talent flow will reverberate through classrooms, research laboratories, hospitals, and boardrooms, undermining U.S. competitiveness and weakening the nation's long-term workforce strategy.

When DHS last proposed to establish a fixed period of admission for the F, J, and I nonimmigrant classifications in 2020, there was a broad public chorus highlighting its deficiencies and economic harms. An overwhelming and virtually complete majority – 99 percent of the 32,000 individuals and organizations who commented on the proposal – opposed it.[2] The commenters described how the proposal would unduly burden international students, scholars and foreign media, as well as U.S. employers, by widely requiring the filing of additional, nonproductive extension of stay applications.[3] The commenters noted the enormous cost of the proposal, beyond the direct cost of filing fees, highlighting the negative economic impact the proposal would have on colleges and universities, research institutions, and U.S. employers, as well as the economy as a whole.[4] Commenters predicted gaps and delays in completing courses of study due to the inevitable expansion of administrative backlogs in adjudicating hundreds of thousands of additional extension of stay requests.[5] Finally, commenters highlighted the reasons why the minimal security and integrity gains from new scrutiny under the proposal would be far outweighed by the tremendous cost of the rule.[6]

DHS's current proposed rule – nearly identical to the withdrawn 2020 proposal – features all these same defects and should likewise be withdrawn. The scant economic analysis provided in the proposed rule does not address the real cost of upending the duration of status framework which has for decades successfully facilitated our country's ability to attract foreign talent to study and work in the United States. Requiring the repeated filing of requests for extensions of stay would not only mean disruption to existing processes and additional filing fees but would also have substantial negative economic impact to U.S. colleges and universities, U.S. employers, and the U.S. economy as a whole.

A fixed period of admission, and an unnecessarily burdensome and unpredictable process to seek extensions of stay, would undoubtedly make the United States higher education system, long one of the nation's great strengths, less attractive to international students and scholars. In a recent survey conducted by the Institute for Progress and NAFTA, 49% of over 1000 international graduate students and postdocs surveyed indicated they would not have enrolled

[2] *See Notice of Proposed Rulemaking; Withdrawal*, 86 Fed. Reg. 35,410 (July 6, 2021).
[3] *Id*.
[4] *Id*.
[5] *Id*.
[6] *Id*.

in a U.S. program if their period of admission was fixed rather than for duration of status.[7] Similarly, 16% fewer prospective students at all academic levels noted that they would be likely to enroll in a U.S. program if the period of admission was fixed.[8] The deterrent effect was especially pronounced among those considering where to pursue an advanced degree.[9]

In addition to the anticipated decline in international student enrollment, establishing a fixed period of admission would require U.S. educational and research institutions to restructure their international student and scholar support services and absorb a significant reduction in tuition revenue. International students not only contribute importantly to the learning environment of U.S. universities for the entire student population, which of course is made up overwhelmingly of American students,[10] those international students often pay full tuition, generating a significant source of resources for the American higher education system.

Imposing an inflexible and unsubstantiated 4-year limit on the period of stay would cause significant disruptions in students' courses of study, without corresponding benefits, and impact ongoing research projects. A central reason for this is that the 4-year period does not match with academic reality. DHS specifically recognizes in the proposed rule's Regulatory Impact Analysis (RIA) that the average time to complete a bachelor's degree is 52 months (or 4.33 years), citing to the National Center for Education Statistics.[11] Students cannot ordinarily complete a doctoral program in 4 years, and it generally takes 6 or 7 years to do so.[12] The proposed rule does not address the disproportionate impact of the inadequate fixed period of admission on PhD candidates. The 4-year limit also does not account for combined programs, joint degrees, or post-completion training. Moreover, the new string of extension filings could trip up many students who are trying meticulously to adhere to already-complex immigration processes. Minor delays or misfilings could unexpectedly expose students to severe immigration consequences, such as bars to re-entry.

Any decline in enrollment, and additional burdens dissuading or preventing students from remaining in the United States to complete their studies or training, would also severely impact U.S. employers. U.S. employers rely on a steady pipeline of early career talent, particularly in high-demand STEM fields. Many international graduates transition to OPT and H-1B visas, creating a direct pathway from university to the workforce. International students and scholars

---

[7] *See* Institute for Progress & NAFSA: Association of International Educators, *2025 Surveys on International Talent Pipelines* (Sept. 15, 2025), https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf (Accessed: 29 September 2025).
[8] *Id.*
[9] *Id.*
[10] An estimated six percent of students at U.S. universities are international students. *See* Jeanne Batalova & Michael Fix, International Students in the United States, MIGRATION POL'Y INST. (Oct. 26, 2023), https://www.migrationpolicy.org/article/international-students-united-states (Accessed: 29 September 2025).
[11] *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070 (Aug. 28, 2025) (RIN 1653-AA95; Regulatory Impact Analysis), available at https://www.regulations.gov/document/ICEB-2025-0001-0143, at pages 17-18, footnote 13.
[12] National Science Foundation, *Survey of earned doctorates (SED) 2024* (2025), https://ncses.nsf.gov/surveys/earned-doctorates/2024#key-data-tables (Accessed: 09 September 2025).

drawn to the U.S. workforce spur business innovation, expansion, and job creation. Thousands of physicians on J-1 visas staff hospitals across the United States, a benefit especially pronounced in underserved areas. Without predictability in the recruitment of international talent, U.S. employers will face critical skills gaps and declining competitiveness. The proposed rule adds compliance risks and disrupts workforce planning. Repeated extension filings increase the chance of status lapses, especially given the near-certain additional delays that the additional adjudications burden the rule would impose on USCIS, exposing companies to risk and to project delays. Employers in technology, healthcare, manufacturing, finance, and other sectors critical to the health and the sharp edge of the American economy rely on predictable learning-to-workplace pathways to meet critical skills needs and sustain university research partnerships. By introducing uncertainty, the proposed rule would weaken U.S. competitiveness against countries like Canada and the U.K. that strategically offer clearer pathways from study to employment, and it could lead companies to shift jobs or projects abroad.

In its RIA, "DHS acknowledges the economic contribution of foreign students, foreign media representatives, and exchange visitors through tuition and regional spending as well as contributions to research, innovation, teaching, and overall competitiveness of the United States."[13] DHS recognizes, in notably direct terms, that the proposed rule "may adversely affect U.S. competitiveness in the international market" for students and exchange visitors. Nevertheless, DHS moves quickly past the adverse economic impact and concludes without reasoned explanation that it expects the economic benefits to continue. It is not at all clear how this could be correct. Even putting aside the massive economic contribution of international students to this country through their talents, ideas, research, teaching, and business creation, they also create wealth effects in the United States by sheer spending: paying for housing, food, transportation, health insurance, and other personal expenses. NAFSA estimates that international students contribute $43.8 billion to the U.S. economy. Indeed, experts estimate that "reducing the number of F-1 graduates by 10% because of a new fixed period of admissions rule would itself reach an annual loss of as much as $72-145 billion by ten years into the future."[14]

The only justification proffered in the proposed rule for establishing a fixed period of admission is DHS's concern that some individuals or institutions may have abused the duration of status framework, and that additional touchpoints with DHS during extension of stay adjudications would allow for greater scrutiny. The weight of experience shows, though, that DHS has the needed enforcement tools already at its disposal. As evidenced by the examples cited in the proposed rule itself,[15] the SEVIS database — the tool envisioned by Congress to monitor the activities and compliance of international students and scholars — is effective.

[13] *Id*.
[14] Comment by Michael Clemens, Jeremy Neufeld, and Amy Nice to the proposed rule filed at Regulations.Gov, https://ifp.org/wp-content/uploads/Clemens-Neufeld-Nice_D.S.-Elimination.pdf (Accessed: 29 September 2025).
[15] Proposed rule at 42077, footnotes 59-63.

DHS must also consider the impact of adding hundreds of thousands of extension of stay requests to its current backlog, which stands at a record – and staggering – 11.3 million pending cases. This is in addition to tens of thousands of applications in the “frontlog” waiting to be accepted for processing.[16] The drastic decline in case completions, coupled with a shrinking workforce and deprioritization that is currently a part of the USCIS adjudications environment, would inevitably result in even greater adjudication delays. Alongside of this expected consequence, DHS‘s policymaking calculus should also factor in the likelihood of litigation over these delays by affected stakeholders, as in 2021, when a lawsuit brought by international students resulted in a settlement requiring, among other things, that USCIS adjudicate pending OPT extensions within 120 days.[17]

The proposal to establish a fixed period of admission, and necessarily require extension of stay requests, could also create gaps in the system for monitoring the activities and compliance of international students. It would likely leave large numbers of students languishing in administrative backlogs without the close monitoring that designated school officials provide through SEVIS. DHS proposes to include a 240-day extension of stay with a timely-filed application, yet it provides no assurances and could likely not realistically provide them under current resource limits, that the extension requests will be adjudicated within that timeframe. To the contrary, the proposed rule contemplates that adjudicators will review student transcripts and medical records, request further evidence, and even require in-person interviews. The extension request adjudication would also require students to appear at a biometrics appointment at a designated Application Support Center, which could in practice be hundreds of miles away from their school, research facility, or hospital. These adjudicative steps are unnecessary for a cohort of applicants who are interviewed and fingerprinted prior to arrival in the United States, and who are continuously monitored today through SEVIS. Requiring hundreds of thousands of new extension filings would consume substantial agency resources, further straining an already backlogged system. Those same resources could be better directed toward true enforcement priorities—such as combating fraud, enhancing national security, and improving adjudicatory quality standards and efficiency—rather than creating counterproductive paperwork hurdles for bona fide students, schools, and U.S. employers.

The proposed rule would also materially alter the role of U.S. Customs and Border Protection (CBP) officers at ports of entry. While now CBP officers admit students until the completion of their academic or program activities, verified in real time throughout their studies or training through SEVIS, the proposed rule would instead require CBP to assign a fixed expiration date based on a review of the student’s program information, institutional accreditation, OPT or STEM OPT end dates, and, in some cases, country-specific factors. This would lengthen inspection times, as well as add inconsistency. CBP officers are not trained or prepared to assume these adjudicatory responsibilities. An error at the port of entry could trigger the accidental accrual of unlawful presence, exposing international students to severe immigration

[16] Billal Rahman & Dan Gooding, *US Immigration Backlog Hits All-Time High*, Newsweek, July 8, 2025, https://www.newsweek.com/us-immigration-backlog-hits-all-time-high-2095846 (Accessed: 29 September 2025).
[17] *Li v. USCIS*, No. 2:21-cv-00677 (S.D. Ohio).

consequences, including an inability to return to their studies or pursue a career in the United States.

Finally, seemingly by accident, the proposed rule would replace the existing DHS deference policy by writing over 8 CFR 214.1(c)(5). Perhaps due to a drafting error, the proposed rule would renumber 8 CFR 214.1(c)(7) as (c)(5), resulting in the deletion of the current (c)(5) and duplication of the provision in (c)(7). Notably, 214.1(c)(5) codifies the agency's existing deference policy, a policy not discussed or even mentioned in the proposed rule or any of the supporting documents in the docket. Under the Administrative Procedures Act, DHS would be called on to provide notice and reasoning for departing from an established regulatory policy. It has not done so here, and it would be difficult to envision that reasoning. The deference policy allows for consideration of a prior approval in the adjudication of a subsequent application involving the same parties, where there has not been any material change. The policy results in more efficient adjudications and provides needed predictability to U.S. employers and workers in a range of nonimmigrant classifications.

For these reasons, we urge DHS to withdraw the proposed rule and retain the duration of status framework for international students and scholars. To maintain our country's competitiveness, U.S. businesses across industries need flexibility and predictability in their talent pipeline. Allowing international students and scholars to transition seamlessly to the American workforce is key to our country's ability to meet skills needs critical to American innovation leadership and to the well-being of American workers and families. DHS has effective tools already at its disposal to ensure the integrity of the international student system, without the addition of a burdensome process that would further discourage international students and scholars from coming to the United States and helping to build American economic strength.

Respectfully,

Fragomen Center for Strategy and Applied Insights

Bo Cooper
Executive Director

Leah Rogal
Senior Director

# EXHIBIT 21

September 29, 2025

*Submitted via Regulations.gov*

Department of Homeland Security
Immigration and Customs Enforcement
Office of Regulatory Affairs and Policy
500 12th Street, SW
Washington, DC 20536

Re: Duration of Status Elimination NPRM
DHS Docket No. ICEB- 2025–0001
RIN 1653-AA95
90 Fed. Reg. p. 42070 to 42115 (comments due September 29, 2025)
Very high cost to the nation in deterring international STEM graduate students and postdocs if rule finalized as proposed

Dear Sir or Madam,

We are three immigration experts who have undertaken a detailed consideration over the last few months of over 20 years of administrative data from US Citizenship and Immigration Services (USCIS) and the Student and Exchange Visitor Information System (SEVIS), as well as Census data, to assess the role of international STEM students and especially STEM PhDs in the US STEM workforce and in fostering US economic growth.[i] We are confident the Department's Notice of Proposed Rule Making (NPRM or proposed rule) to eliminate so-called "Duration of Status" (D/S) admissions for international students, scholars, and researchers and replace it with fixed periods of admission and required extension of stay applications adjudicated by the Department fails to account for significant potential costs to the nation's innovative capacity and long-term prosperity, especially by ignoring the role of international STEM PhDs and postdocs in the US. Should the Department be interested in discussing our findings and analysis, we stand ready to meet and discuss.

Michael Clemens, an immigration economist, is Professor of Economics at George Mason University and Nonresident Senior Fellow at the Peterson Institute for International Economics. Jeremy Neufeld directs the high-skilled immigration policy work of the Institute for Progress, a nonpartisan think tank focused on innovation policy, including co-publishing the Techno-Industrial Policy Playbook. Amy Nice is a leading thinker on STEM immigration who focuses on using evidence-based research to find practical solutions to immigration policy problems as a Counsel at the Institute for Progress and Fellow at Cornell Law.

**FATAL FLAWS IN THE DEPARTMENT'S NPRM TO ELIMINATE D/S FOR F-1 AND J-1 VISA HOLDERS**

We estimate that DHS's failure to properly account for the costs involved and correctly weigh the risks and benefits of its proposal ignores costs that will rise each year, reaching an annual loss of as much as $72–145 billion by ten years into the future. This *annual* cost is more than 22x the *cumulative total* cost of $3.3 billion the Department identifies as the ten-year cost of the rule. The large difference arises because we account for the role of international students, scholars, and researchers in the US STEM workforce and the innovation that drives rising productivity in the US economy, and the Department does not; and because we expect that such individuals will indeed be deterred in coming to the United States in the first instance *as a result of this rule as proposed*, and the DHS impact analysis does not.

DHS makes clear in the NPRM preamble explanation in the Federal Register and the Regulatory Impact Analysis (RIA) in the DHS docket that national security is one of the primary justifications for the proposed rule.[ii] This justification is not inappropriate given the commitment the Department has to, and the interconnectedness between, providing additional mechanisms to exercise agency oversight that allow DHS to vigorously enforce US

immigration law, protecting the integrity of the F-1 and J-1 visa categories, and promptly detecting national security concerns. We are not aware of legitimate and compliant stakeholders, whether individual international students and scholars, schools, employers, program sponsors, or their associations, that object to these purposes. But the complex web of national security necessitates the Department do more than restate priorities of oversight, integrity, and prompt detection. For example, as a matter of the nation's security, Congress included as part of the National Defense Authorization Act an instruction to the National Academies of Sciences, Engineering, and Medicine to study international talent programs employed by and in the United States.[iii] In response to this statement of work, a 2024 National Academies report concluded, in essence, that the primary if not sole global talent pipeline for the United States is the international students, scholars, and researchers attracted to U.S. university campuses. "The U.S. has a talent program," the National Academies committee chair said, "It's called graduate school."

Yet, in several critical ways the Department's Notice of Proposed Rulemaking fails to account for the vital national security interest of retaining this talent pipeline of international STEM experts,[iv] almost all of whom first come to the United States on F-1 and J-1 visas. In particular, and without a fulsome explanation, the NPRM renders some of its most direct and negative impacts to international PhD students and postdoctoral fellows at the nation's graduate schools in F-1 and J-1 visa categories.

The Department's NPRM (1) does not recognize serious risks of its approach with regard to deterring international students, scholars, and researchers generally and international PhD students and postdoctoral fellows specifically, and (2) does not properly establish the national-level costs of its proposed approach.

**(1) Proposed Rule Understates or Ignores Risks Concerning Reduction in Enrollment Generally and for PhDs and Postdocs Specifically**

> This comment is relevant to the following specific sections of the NPRM and RIA: In the NPRM, the Policy Justification for General period of admission for F and J nonimmigrants, Extension of stay; Summary of Costs and Benefits; and Regulatory Amendments for 214.2(f)(5) (periods of stay for F-1s), 214.2(f)(7) (extensions for F-1s), 214.2(f)(10) (extensions for F-1s seeking OPT), 214.2(j)(1)(ii) (periods of stay for J-1s), 214.2(j)(vii) (pending extensions of stay for J-1s). In the RIA, the Summary and Potential reduction in participation sections.

This part of our comment challenges the risk recognition and weighing employed by the Department of Homeland Security.

DHS states in the NPRM and RIA that if F-1 and J-1 visa holders choose to study and research in another country because of the proposed D/S rule then the reduced demand "could" result in a decrease in enrollment, therefore impacting school programs in terms of foregone tuition and other fees, jobs in communities surrounding schools, and the U.S. economy. But DHS concedes in the NPRM only that the proposed rule "may have a marginal impact on nonimmigrant student enrollment."[v] In the RIA, DHS confidently "maintains that there is a wide range of benefits from pursuing an academic program in the United States that may outweigh the impacts from the admission for a fixed period."[vi]

The facts on international student deterrence say otherwise. In anticipation of the Department's publication of the proposed D/S rule, NAFSA: Association of International Educators conducted surveys in August and September of current graduate students and postdoctoral fellows in the US and prospective students outside the country. The responses of over 1,000 current F-1 and J-1 visa holders, primarily PhD students and postdoctoral fellows, and over 600 prospective students, two-thirds of whom are seeking Masters-level or Bachelors-level degrees, do not

align with the Department's rosy picture of only minimal reductions in enrollment. Overall, 49% of all respondents to the current student survey said they would not have enrolled in the first place had Duration of Status been replaced with a fixed period of admission. [vii] And 16% fewer prospective students said they were likely to enroll in U.S. programs if Duration of Status were replaced with a fixed period of admission.[viii]

DHS accords no special consideration of PhD students who in accredited US programs can almost never complete their degree in less than five years, and does not even mention postdoctoral fellows anywhere in the NPRM. With regard to PhDs (and anyone else who as a standard expectation requires more than four years to complete a program in either F-1 or J-1 status), DHS simply says that 79% of F-1s and J-1s complete their program within a 4-year period, and that while there is a "smaller proportion of students" not pursuing degrees typically completed in 4 years a fixed period of admission up to 4 years would not pose an undue burden to most nonimmigrant students.[ix] As the Center for Security and Emerging Technology explained in its 2020 comment to the prior NPRM on eliminating Duration of Status and replacing it with fixed periods of admission, this reasoning is incomplete:

> "First, foreign doctoral students are a small category relative to undergraduates and masters' students, but not in the absolute: tens of thousands of foreign-born STEM PhD students graduate from U.S. universities every year. The Proposed Rule will affect most of these students, which is clearly a significant burden. Second, and more fundamentally, the costs of the Proposed Rule depend not only on how many students are affected, but on each student's contributions to America's prosperity and national security. There may be relatively few PhD students, but in important respects, each one has a much greater impact; PhD students are more advanced, more specialized, and more engaged in teaching and research than students on shorter programs, such as undergraduates and masters' students. Burdening and deterring this important group will cause harm disproportionate to the number of individual students who are affected."

Looking again at the current student survey, but considering only those PhD students and postdoctoral fellows currently in the US who also said they were planning to try to remain for employment experience in their field after completing their program, and thus excluding those who aren't interested in staying in the US in any event, 48% of PhDs and 33% of postdocs reported they would not have initially come to the US for their program if there was a fixed period of admission of up to four years with the ability to request extensions of stay adjudicated by DHS. [x] Of critical import to our analysis of what we call the "front door" STEM talent pipeline (described below), more than 80% of the 1,039 current student survey respondents were in STEM fields (including 35% in the physical and natural sciences, 19% in biology and biomedical sciences, 16% in engineering). [xi]

We conclude that it is inevitable that if the Duration of Status Elimination rule is finalized as proposed that there will be a precipitous and sustained reduction in PhD and postdoctoral enrollment as a result. We ask that the Department either abandon this proposal or add regulatory text that provides an exception to the 4-year fixed period of admission for PhD students and postdoctoral fellows.

**(2) <u>Proposed Rule Fails to Account for National Interests in STEM Workforce and Economic Prosperity</u>**

This comment is relevant to the following specific sections of the NPRM and RIA: In the NPRM, Costs and Benefits concerning Affected population, Costs to schools and enrollments, Quantitative costs, Qualitative costs; Discussion of Proposed Rule concerning Extension of stay, Requirements for admission, and New process for extension of stay. In the RIA, Estimating EOS requests for F and J nonimmigrants; Costs and benefits of the proposed rule; Total cost estimates including transfers.

The proposed rule *ignores* altogether the costs to the *nation*. This part of our comment challenges the cost calculation by the Department of Homeland Security.

***A. There is no consideration of the role of impacted F-1 students on the US STEM workforce.***

In order to understand the role of individuals who first come to the United States as F-1 visa holders in degree-granting programs, we studied data from both USCIS and SEVIS. While the Department of Homeland Security in this D/S rulemaking did not repeat the required extensive data cleaning steps in order to assess the impacts of the proposed provisions with current data and instead used FY2016-2018 SEVIS data extracted in 2019[xii] for its 2020 rulemaking effort, we reviewed 20 years of administrative data obtained through a Freedom of Information Act (FOIA) request, and completed extensive data cleaning and analysis. We then summarized the "front door" pipeline for international STEM talent coming to the United States, which as the National Academies noted is primarily through the nation's graduate schools.

**The 'Front Door' Pipeline: Principal channels for transition from F-1 student visas to long term (>6 years) STEM workforce and PhD-level work in the United States**

| | All | | STEM | | PhD | |
|---|---|---|---|---|---|---|
| | Num. | % | Num. | % | Num. | % |
| Graduates (F-1), average per year 2018–2022 | 225,752 | | 103,836 | | 22,687 | |
| ***Short term (OPT)*** | | | | | | |
| F-1 to OPT | 121,962 | 54.0 | 66,097 | 63.7 | 15,255 | 67.2 |
| F-1 but no OPT | 103,790 | 46.0 | 37,739 | 36.3 | 7,432 | 32.8 |
| ***Medium term (nonimmigrant work visas)*** | | | | | | |
| OPT to H-1B | 35,479 | 15.4 | 23,919 | 33.4 | 5,987 | 27.8 |
| OPT to 'other' (O-1, E-3, H-1B1, TN) | 2,523 | 1.1 | 864 | 0.8 | 679 | 3 |
| F-1 to H-1B without OPT | 19,866 | 8.8 | 14,127 | 13.6 | 2,461 | 10.8 |
| F-1 to 'other' without OPT | 1,204 | 0.5 | 488 | 0.5 | 327 | 1.4 |
| ***Long term (permanent residency, extended H-1B)*** | | | | | | |
| H-1B to EB-1, EB-2, EB-3 | 22,709 | 10.1 | 15,611 | 15.0 | 3,466 | 15.3 |
| 'Other' visa to EB-1, EB-2, EB-3 | 181 | 0.1 | 66 | 0.1 | 49 | 0.2 |
| Extended H-1B (>6 years) | 19,372 | 8.6 | 13,316 | 12.8 | 2,957 | 13 |

'All' graduates are all completions of bachelor's, master's, or doctoral degrees in all fields of study by F-1 visa holders in a given year. 'STEM' graduates are all completions at all degree levels by F-1 visa holders in DHS-designated STEM fields only. 'PhD' means all completions of doctoral degrees by F-1 visa holders in all fields, not just STEM. In the table, "%" means percentage of the original F-1 graduation cohort in the first row that eventually makes each transition. Numbers are averages over the years 2018–2022. "Other" nonimmigrant work visas are O-1, E-3, H-1B1, and TN. The source is full-universe administrative data from SEVIS 2004–2023, obtained by request from DHS under the Freedom of Information Act.

As is evident from the administrative data, a notable portion of the nation's STEM workforce first enters the United States as international students at the nation's research universities. According to USCIS data, from 2018-

2023, more than 55,000 H-1Bs were awarded to F-1 students per year on average.[xiii] Indeed, administrative data show that 51% of all H-1B petitions by cap-subject employers from 2021-2024 were for F-1 students.

***B. The cost calculation for the proposed elimination of Duration of Status is inaccurate.***

The economic research literature contains very extensive evidence—leading to an overwhelming consensus among economists[xiv]—that high-skill immigration *causes* large increases in productivity and economic growth in the United States. These effects are largest for immigrants with STEM training. The increase in US city-level productivity caused by inflows of foreign STEM workers from 1990 to 2010 is sufficient in magnitude to explain between 30 and 50% of *all* aggregate productivity growth in the United States during that period.[xv] The influx of highly skilled immigrant college graduates to the United States during the 1990s caused a 12–21% rise in the annual number of high-technology innovations reflected by annual patent applications, which in turn raised US GDP per capita by between 1.4 and 2.4 percent—the equivalent, in today's dollars, of adding $267–458 billion to the US economy each year.[xvi] A very large and essentially uncontested body of research finds that these positive effects on productivity and growth arise from high-skill STEM immigrants' effects on new business formation, scientific discovery, and the patenting of new economically valuable ideas, including STEM immigrants' positive effects on innovation *by natives*.[xvii]

The economic literature collectively suggests that a substantial reduction in the supply of foreign talent to the US workforce will have large, negative, and lasting effects on productivity and economic growth in the United States. We can approximate the magnitude of those effects using the productivity effects estimated by Peri et al.,[xviii] who estimate the elasticity of annual growth in Total Factor Productivity (TFP) to the share of the workforce comprising high-skill foreign STEM workers. They estimate an increase of 0.27–0.54 percentage points in annual TFP growth caused by each percentage point increase in high-skill immigrant STEM workers as a fraction of the overall labor force.

We can use this estimate to consider the overall economic growth impact implied by the "front door" of transitions we have assembled from F-1 student status to the nation's workforce, which we have described above based on administrative data. To be conservative, we suggest calculating the impact of a 10% reduction in new enrollments in degree-granting programs by F-1 students as a result of Duration of Status elimination – at the top of our "front door" pipeline. We calculate that reducing the number of F-1 graduates by 10% because of a new fixed period of admissions rule would itself reach an annual loss of as much as $72-145 billion by ten years into the future.

The 10% reduction of a future flow to the "front door" talent pipeline is indeed quite conservative. Besides the fact that the recent student surveys identified a higher percentage of both current and prospective students that would be deterred from coming to the US because of the D/S policy shift, the published proposed terms of D/S elimination include a new system of required Extensions of Stay (EOS) for all OPT and STEM OPT applicants that seems destined to lead to expirations of status before OPT and STEM OPT can be granted. The up-to 240 days DHS has allowed itself to adjudicate a new, large workstream of such EOS applications, which it estimates to be 220,122 new EOS requests annually for F-1s and 240,583 additional EOS requests annually for J-1s,[xix] is best understood as creating sufficient uncertainty about timely EOS adjudications to ultimately discourage the ability of F-1 nonimmigrants to secure US employment experience in their field of study through OPT or a STEM OPT extension. If the D/S elimination rule goes into effect without changes to the EOS process as proposed in the published NPRM, it may be that a much larger reduction scenario is closer to the end result of the D/S rule alone, because F-1s may ultimately see their realistic access to OPT removed, leading to a future further reduction in F-1 degree-granting students coming to the US. The recent surveys of current and prospective students make clear that, standing alone, reducing access to OPT will have a very large and negative impact on future international

student enrollments at US colleges and universities at all degree levels, with 54% of current students and 29% of prospective students reporting they would not come to the US for a degree without access to OPT. [xx]

Moreover, though, the proposal to eliminate D/S admissions is part of a suite of regulatory changes the administration has announced DHS will pursue this year, with other, related rulemakings coming concerning availability of post-completion OPT and a STEM OPT extension as well changes to H-1B access based solely on Wage Level on the Labor Condition Application. In our working paper,[xxi] we detail our methodology and calculation of the impact of the *combined* effect of all three expected new regulations (eliminating D/S, reducing OPT, and restricting H-1B), attaching a realistic 33% reduction in international students, scholars, and researchers coming to the US, and have employed the same method to calculate the impact of a 10% reduction to the future flow of F-1s as a result of the Department's proposed D/S elimination.

An ongoing reduction of 10% in the number of foreign STEM graduates from US universities reduces the total supply of high-skill STEM workers in the United States by 1.9%. Because the 8 million high-skill STEM workers in the US economy represent 4.7% of the US labor force, the 1.9% reduction in high-skill foreign STEM workers equates to a 0.09 percentage-point change in high-skill STEM workers as a fraction of the labor force.

The Peri et al. elasticity thus implies a reduction of 0.024–0.048 percentage points in annual TFP growth, arising from ongoing reduction of one tenth of the number of high skill foreign graduates from US universities. This is comparable in magnitude to the independent estimates of Hunt and Gauthier-Loiselle,[xxii] which together with the effects jointly implied by Kerr and Lincoln[xxiii] and Peri et al., represent the best available evidence on the macroeconomic effects of high-skill foreign STEM workers' presence in the United States economy.

This is a very large impact, which cumulates over time. Over a ten-year period, lost productivity growth of 0.024–0.048 percentage points each year causes GDP at the end of that decade to be 0.239 to 0.478 percent smaller than it otherwise would have been. This is a percent decline in annual GDP, *not* a percentage-point decline in annual *growth* of GDP.

If such a loss occurred today, amid the United States's $30.4 trillion economy,[xxiv] it would be valued at $72-145 billion. That is, this would be the loss to today's US economy if the stock of high-skill foreign STEM workers had been 1.9% lower, in each of the past 10 years, than it actually was—the loss that would have arisen from a longtime reduction of one tenth in the number of foreign STEM students graduating from US universities. That reduction in GDP equates in size to the loss the US economy would suffer from the *disappearance* of the entire economy of the state of Delaware, New Hampshire, or the entire Research Triangle metropolitan area.

The challenges facing America's high-skill workforce would extend far beyond elite coastal enclaves. The impacts ripple through innovation clusters nationwide, threatening not just individual institutions but entire *regional economies* built around science, technology, and higher education. While Silicon Valley and Boston capture imaginations, the dependence on international STEM talent spans the American map. The South's growing technology corridors—from North Carolina's Research Triangle to Texas's emerging tech centers—depend on international talent pipelines to compete globally. Even smaller metropolitan areas like Rochester, New York, or Madison, Wisconsin, have built innovation economies around universities that attract significant international student populations.

The Global Innovation Index identifies 23 U.S. clusters among the world's top 100 science and technology clusters, demonstrating the geographic diversity of American innovation. These clusters include San Jose-San Francisco and Boston-Cambridge but also Austin, Cincinnati, Denver-Boulder, Pittsburgh, and Raleigh-Durham. Each relies heavily on the international student pipeline to maintain their competitive edge. But retention through the "front

door" pipeline varies widely by geography. Between 2012 and 2020, the Mid-Atlantic lost more than 100,000 foreign-born bachelor's graduates, 180,000 foreign-born master's graduates, and 10,000 foreign-born PhDs, including migration to other regions. The Northeast does even worse at retention. Meanwhile, the West Coast does best of all, but the Midwest and South significantly outperform the Northeast and Mid-Atlantic.

***These impact estimates are inherently somewhat uncertain. For that reason, DHS proceeds as if such impacts are zero. This method is inadequate. It fails to meet minimal standards of quality demanded of economic analysis by qualified experts in cost-benefit analysis. In other words, the mere fact that an economic impact is somewhat uncertain does not imply that the best estimate of that impact is zero. The consensus of peer-reviewed economic research on the impacts is question is that they are very large.***

We conclude that DHS has grossly underestimated the potential negative impact of its new system of fixed periods of stay as a replacement for Duration of Status. As such, we ask the Department either abandon this proposal or provide revised regulatory text that creates a less cumbersome system. If less burdensome approaches that also meet the Department's goals for oversight, integrity, and prompt detection are not within DHS's command or are not suggested by other commenters, the Department should restart rulemaking with an Advanced Notice of Proposed Rule Making to better collect ideas and options from interested parties on all sides of the issues presented.

**CONCLUSION**

When federal agency policies, like Duration of Status, are of the type and character that they can only be shifted through new public regulations promulgated in compliance with the Administrative Procedure Act, the Department of Homeland Security must not ignore significant, non-speculative costs to America and Americans.

We look forward to seeing a careful response from DHS, an abandonment of this proposal or a revised, less burdensome approach to establishing fixed periods of time for F-1 and J-1 visa holders that accounts for PhD students and postdoctoral fellows, and the opportunity, if you find it appropriate, to discuss the costs and concerns we have studied and summarize here.

We attach to this comment a Working Paper, which details the methods and data sources used in this analysis.

Thank you for the opportunity to participate in the rulemaking process.

Respectfully submitted,

Michael A. Clemens
Professor of Economics, George Mason University
Nonresident Senior Fellow, Peterson Institute for International Economics

Jeremy Neufeld
Director of Immigration Policy, Institute for Progress

Amy M. Nice
Distinguished Immigration Counsel, Institute for Progress
Immigration Law and Policy Fellow, Cornell Law

ENDNOTES

[i] "Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in the United States," Clemens, M, Neufeld, J, Nice, A (attached, and forthcoming by Institute for Progress and IZA Institute of Labor Economics).

[ii] See eg, discussion in NPRM p. 42079 and RIA p. 43. National security is referenced over 15 times in each the NPRM and RIA.

[iii] Section 238, NDAA for FY2021, Pub.L. 116-283, enacted January 1, 2021 (Mac Thornberry National Defense Auth. Act).

[iv] A bipartisan group of 70 national security experts and officials made these points in a May 2023 letter (reported in Axios) imploring congressional action on international scientific and engineering talent because when America attracts global STEM talent many "will be working in Pentagon-identified critical technology areas."

[v] NPRM at p. 42101 on only marginal impact expected to international student enrollments..

[vi] RIA p. 43 on other benefits of studying in the US that will outweigh any perceived negatives of the new fixed periods of admission.

[vii] Surveys on International Student Talent Pipeline, summarizing Key Results and providing Tabulated Results. The Institute for Progress and NAFSA conducted three surveys to understand the international student talent pipeline and how employers use the H-1B program to hire international talent.

[viii] Id.

[ix] NPRM p. 42082.

[x] Surveys on International Student Talent Pipeline, summarizing Key Results and providing Tabulated Results. The Institute for Progress and NAFSA conducted three surveys to understand the international student talent pipeline and how employers use the H-1B program to hire international talent.

[xi] Id.

[xii] RIA p. 12 on the complexity of utilizing data from the document-centric recordkeeping of SEVIS.

[xiii] USCIS, Change of Status for Nonimmigrants: F-1, F-2, H-4, J-1, J-2 Fiscal Year 2018 – 2023.

[xiv] Chelsea Vail, "What Economists Think about Admitting Highly Skilled Immigrants," Chicago Booth Review, 2016.

[xv] Peri, Giovanni, Kevin Shih, and Chad Sparber. "STEM workers, H-1B visas, and productivity in US cities." *Journal of Labor Economics* 33, no. S1 (2015): S225-S255.

[xvi] Hunt, Jennifer, and Marjolaine Gauthier-Loiselle. "How much does immigration boost innovation?." *American Economic Journal: Macroeconomics* 2, no. 2 (2010): 31-56.

[xvii] Economists have found:

- Increases in foreign master's graduates driven by an unrelated force majeure cause more entrepreneurship in exposed regions, including by US natives (Beine, Michel, Giovanni Peri, and Morgan Raux. "The Contribution of Foreign Master's Students to US Start-Ups." No. w33314. National Bureau of Economic Research, 2024);
- High skill workers who entered the United States on student visas have much larger rates of patenting, publishing, earning, and entrepreneurship than otherwise comparable natives (Hunt, Jennifer. "Which immigrants are most innovative and entrepreneurial? Distinctions by entry visa." Journal of Labor Economics 29, no. 3 (2011): 417-457);
- Foreign STEM PhD students report greater preference for entrepreneurship than their US native colleagues (Roach, Michael, Henry Sauermann, and John Skrentny. "Are foreign STEM PhDs more entrepreneurial? Entrepreneurial characteristics, preferences, and employment outcomes of native and foreign science and engineering PhD students." In The Roles of Immigrants and Foreign Students in US Science, Innovation, and Entrepreneurship, pp. 207-228. University of Chicago Press, 2019);

- Historical increases in barriers against skilled immigration caused reduced scientific productivity in the US as a whole (Moser, Petra, Alessandra Voena, and Fabian Waldinger. "German Jewish émigrés and US invention." *American Economic Review* 104, no. 10 (2014): 3222-3255, and Moser, Petra, Sahar Parsa, and Shmuel San. "Immigration and Innovation: Lessons from the Quota Acts." (2025). Working paper, Dept. of Economics. New York University;
- Increases in foreign STEM PhD student inflows to the United States driven by unrelated shocks overseas cause increased innovation and discovery in US academic departments (Stuen, Eric T., Ahmed Mushfiq Mobarak, and Keith E. Maskus. "Skilled immigration and innovation: evidence from enrolment fluctuations in US doctoral programmes." *Economic Journal* 122, no. 565 (2012): 1143-1176, and Gaulé, Patrick, and Mario Piacentini. "Chinese graduate students and US scientific productivity." *Review of Economics and Statistics* 95, no. 2 (2013): 698-701.
- Roughly one third of the positive effect of foreign master's graduates on US entrepreneurship arises from business created by natives (Beine et al. (2024), supra);
- Immigrant inventors cause their native colleagues to patent more new ideas (Bernstein, Shai, Rebecca Diamond, Abhisit Jiranaphawiboon, Timothy McQuade, and Beatriz Pousada. The contribution of high-skilled immigrants to innovation in the United States. No. w30797. National Bureau of Economic Research, 2022); and
- Increases in foreign STEM worker prevalence cause: increased patenting in US cities (Winters, John. "Foreign and Native-Born STEM Graduates and Innovation Intensity in the United States." No. 8575. Institute of Labor Economics (IZA), 2014), increased entrepreneurship in US regions (Tareque, Inara S., Jorge Guzman, and Dan Wang. "High-skilled immigration enhances regional entrepreneurship." *Proceedings of the National Academy of Sciences* 121, no. 37 (2024): e2402001121), increased employment of high-skill native workers (Kerr, Sari Pekkala, William R. Kerr, and William F. Lincoln. "Skilled immigration and the employment structures of US firms." *Journal of Labor Economics* 33, no. S1 (2015): S147-S186), product innovation (Khanna, Gaurav, and Munseob Lee. "High-skill immigration, innovation, and creative destruction." In *The roles of immigrants and foreign students in US science, innovation, and entrepreneurship*, pp. 73-98. University of Chicago Press, 2019), and entrepreneurial success (Dimmock, Stephen G., Jiekun Huang, and Scott J. Weisbenner. "Give me your tired, your poor, your high-skilled labor: H-1B lottery outcomes and entrepreneurial success." *Management Science* 68, no. 9 (2022): 6950-6970).

[xviii] Peri et al (2015), *supra* Note xv.

[xix] RIA p. 21 and 24 on the number of F and J nonimmigrants requiring an Extension of Stay per year under the DHS proposal.

[xx] Surveys on International Student Talent Pipeline, summarizing Key Results and providing Tabulated Results. The Institute for Progress and NAFSA conducted three surveys to understand the international student talent pipeline and how employers use the H-1B program to hire international talent.

[xxi] "Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in the United States," Clemens, M, Neufeld, J, Nice, A (attached, and forthcoming by Institute for Progress and IZA Institute of Labor Economics). The Brain Freeze working paper analyzes the *combined* effect of DHS instituting three policies that will deter international students at different points in the "front door" talent pipeline (eliminating D/S, reducing OPT, and restricting H-1B), and as such identifies a larger loss valued at $240-482 billion by ten years into the future, based on a sustained 33% reduction of the number of foreign STEM students graduating from US universities.

[xxii] Hunt and Gauthier-Loiselle *supra* Note xvi.

[xxiii] Kerr, William R., and William F. Lincoln. "The supply side of innovation: H-1B visa reforms and US ethnic invention." *Journal of Labor Economics* 28, no. 3 (2010): 473-508.

[xxiv] In the most recent data available at the time of writing, the GDP of the United States in fiscal 2025Q2 was $30.35 trillion: U.S. Bureau of Economic Analysis, Gross Domestic Product [GDP], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/GDP, September 18, 2025.

# EXHIBIT 22

September 29, 2025

*Submitted via Regulations.gov*

Department of Homeland Security
Immigration and Customs Enforcement
Office of Regulatory Affairs and Policy
500 12th Street, SW
Washington, DC 20536

Re: Duration of Status Elimination NPRM
DHS Docket No. ICEB- 2025–0001
RIN 1653-AA95
90 Fed. Reg. p. 42070 to 42115 (comments due September 29, 2025)
Very high cost to the nation in deterring international STEM graduate students and postdocs if rule finalized as proposed

Dear Sir or Madam,

We are three immigration experts who have undertaken a detailed consideration over the last few months of over 20 years of administrative data from US Citizenship and Immigration Services (USCIS) and the Student and Exchange Visitor Information System (SEVIS), as well as Census data, to assess the role of international STEM students and especially STEM PhDs in the US STEM workforce and in fostering US economic growth.[i] We are confident the Department's Notice of Proposed Rule Making (NPRM or proposed rule) to eliminate so-called "Duration of Status" (D/S) admissions for international students, scholars, and researchers and replace it with fixed periods of admission and required extension of stay applications adjudicated by the Department fails to account for significant potential costs to the nation's innovative capacity and long-term prosperity, especially by ignoring the role of international STEM PhDs and postdocs in the US. Should the Department be interested in discussing our findings and analysis, we stand ready to meet and discuss.

Michael Clemens, an immigration economist, is Professor of Economics at George Mason University and Nonresident Senior Fellow at the Peterson Institute for International Economics. Jeremy Neufeld directs the high-skilled immigration policy work of the Institute for Progress, a nonpartisan think tank focused on innovation policy, including co-publishing the Techno-Industrial Policy Playbook. Amy Nice is a leading thinker on STEM immigration who focuses on using evidence-based research to find practical solutions to immigration policy problems as a Counsel at the Institute for Progress and Fellow at Cornell Law.

**FATAL FLAWS IN THE DEPARTMENT'S NPRM TO ELIMINATE D/S FOR F-1 AND J-1 VISA HOLDERS**

We estimate that DHS's failure to properly account for the costs involved and correctly weigh the risks and benefits of its proposal ignores costs that will rise each year, reaching an annual loss of as much as $72–145 billion by ten years into the future. This *annual* cost is more than 22x the *cumulative total* cost of $3.3 billion the Department identifies as the ten-year cost of the rule. The large difference arises because we account for the role of international students, scholars, and researchers in the US STEM workforce and the innovation that drives rising productivity in the US economy, and the Department does not; and because we expect that such individuals will indeed be deterred in coming to the United States in the first instance *as a result of this rule as proposed*, and the DHS impact analysis does not.

DHS makes clear in the NPRM preamble explanation in the Federal Register and the Regulatory Impact Analysis (RIA) in the DHS docket that national security is one of the primary justifications for the proposed rule.[ii] This justification is not inappropriate given the commitment the Department has to, and the interconnectedness between, providing additional mechanisms to exercise agency oversight that allow DHS to vigorously enforce US

immigration law, protecting the integrity of the F-1 and J-1 visa categories, and promptly detecting national security concerns. We are not aware of legitimate and compliant stakeholders, whether individual international students and scholars, schools, employers, program sponsors, or their associations, that object to these purposes. But the complex web of national security necessitates the Department do more than restate priorities of oversight, integrity, and prompt detection. For example, as a matter of the nation's security, Congress included as part of the National Defense Authorization Act an instruction to the National Academies of Sciences, Engineering, and Medicine to study international talent programs employed by and in the United States.[iii] In response to this statement of work, a 2024 National Academies report concluded, in essence, that the primary if not sole global talent pipeline for the United States is the international students, scholars, and researchers attracted to U.S. university campuses. "The U.S. has a talent program," the National Academies committee chair said, "It's called graduate school."

Yet, in several critical ways the Department's Notice of Proposed Rulemaking fails to account for the vital national security interest of retaining this talent pipeline of international STEM experts,[iv] almost all of whom first come to the United States on F-1 and J-1 visas. In particular, and without a fulsome explanation, the NPRM renders some of its most direct and negative impacts to international PhD students and postdoctoral fellows at the nation's graduate schools in F-1 and J-1 visa categories.

The Department's NPRM (1) does not recognize serious risks of its approach with regard to deterring international students, scholars, and researchers generally and international PhD students and postdoctoral fellows specifically, and (2) does not properly establish the national-level costs of its proposed approach.

**(1) Proposed Rule Understates or Ignores Risks Concerning Reduction in Enrollment Generally and for PhDs and Postdocs Specifically**

This comment is relevant to the following specific sections of the NPRM and RIA: In the NPRM, the Policy Justification for General period of admission for F and J nonimmigrants, Extension of stay; Summary of Costs and Benefits; and Regulatory Amendments for 214.2(f)(5) (periods of stay for F-1s), 214.2(f)(7) (extensions for F-1s), 214.2(f)(10) (extensions for F-1s seeking OPT), 214.2(j)(1)(ii) (periods of stay for J-1s), 214.2(j)(vii) (pending extensions of stay for J-1s). In the RIA, the Summary and Potential reduction in participation sections.

This part of our comment challenges the risk recognition and weighing employed by the Department of Homeland Security.

DHS states in the NPRM and RIA that if F-1 and J-1 visa holders choose to study and research in another country because of the proposed D/S rule then the reduced demand "could" result in a decrease in enrollment, therefore impacting school programs in terms of foregone tuition and other fees, jobs in communities surrounding schools, and the U.S. economy. But DHS concedes in the NPRM only that the proposed rule "may have a marginal impact on nonimmigrant student enrollment."[v] In the RIA, DHS confidently "maintains that there is a wide range of benefits from pursuing an academic program in the United States that may outweigh the impacts from the admission for a fixed period."[vi]

The facts on international student deterrence say otherwise. In anticipation of the Department's publication of the proposed D/S rule, NAFSA: Association of International Educators conducted surveys in August and September of current graduate students and postdoctoral fellows in the US and prospective students outside the country. The responses of over 1,000 current F-1 and J-1 visa holders, primarily PhD students and postdoctoral fellows, and over 600 prospective students, two-thirds of whom are seeking Masters-level or Bachelors-level degrees, do not

align with the Department's rosy picture of only minimal reductions in enrollment. Overall, 49% of all respondents to the current student survey said they would not have enrolled in the first place had Duration of Status been replaced with a fixed period of admission. [vii] And 16% fewer prospective students said they were likely to enroll in U.S. programs if Duration of Status were replaced with a fixed period of admission.[viii]

DHS accords no special consideration of PhD students who in accredited US programs can almost never complete their degree in less than five years, and does not even mention postdoctoral fellows anywhere in the NPRM. With regard to PhDs (and anyone else who as a standard expectation requires more than four years to complete a program in either F-1 or J-1 status), DHS simply says that 79% of F-1s and J-1s complete their program within a 4-year period, and that while there is a "smaller proportion of students" not pursuing degrees typically completed in 4 years a fixed period of admission up to 4 years would not pose an undue burden to most nonimmigrant students.[ix] As the Center for Security and Emerging Technology explained in its 2020 comment to the prior NPRM on eliminating Duration of Status and replacing it with fixed periods of admission, this reasoning is incomplete:

> "First, foreign doctoral students are a small category relative to undergraduates and masters' students, but not in the absolute: tens of thousands of foreign-born STEM PhD students graduate from U.S. universities every year. The Proposed Rule will affect most of these students, which is clearly a significant burden. Second, and more fundamentally, the costs of the Proposed Rule depend not only on how many students are affected, but on each student's contributions to America's prosperity and national security. There may be relatively few PhD students, but in important respects, each one has a much greater impact; PhD students are more advanced, more specialized, and more engaged in teaching and research than students on shorter programs, such as undergraduates and masters' students. Burdening and deterring this important group will cause harm disproportionate to the number of individual students who are affected."

Looking again at the current student survey, but considering only those PhD students and postdoctoral fellows currently in the US who also said they were planning to try to remain for employment experience in their field after completing their program, and thus excluding those who aren't interested in staying in the US in any event, 48% of PhDs and 33% of postdocs reported they would not have initially come to the US for their program if there was a fixed period of admission of up to four years with the ability to request extensions of stay adjudicated by DHS. [x] Of critical import to our analysis of what we call the "front door" STEM talent pipeline (described below), more than 80% of the 1,039 current student survey respondents were in STEM fields (including 35% in the physical and natural sciences, 19% in biology and biomedical sciences, 16% in engineering). [xi]

We conclude that it is inevitable that if the Duration of Status Elimination rule is finalized as proposed that there will be a precipitous and sustained reduction in PhD and postdoctoral enrollment as a result. We ask that the Department either abandon this proposal or add regulatory text that provides an exception to the 4-year fixed period of admission for PhD students and postdoctoral fellows.

**(2) <u>Proposed Rule Fails to Account for National Interests in STEM Workforce and Economic Prosperity</u>**

> This comment is relevant to the following specific sections of the NPRM and RIA: In the NPRM, Costs and Benefits concerning Affected population, Costs to schools and enrollments, Quantitative costs, Qualitative costs; Discussion of Proposed Rule concerning Extension of stay, Requirements for admission, and New process for extension of stay. In the RIA, Estimating EOS requests for F and J nonimmigrants; Costs and benefits of the proposed rule; Total cost estimates including transfers.

The proposed rule *ignores* altogether the costs to the *nation*. This part of our comment challenges the cost calculation by the Department of Homeland Security.

### A. *There is no consideration of the role of impacted F-1 students on the US STEM workforce.*

In order to understand the role of individuals who first come to the United States as F-1 visa holders in degree-granting programs, we studied data from both USCIS and SEVIS. While the Department of Homeland Security in this D/S rulemaking did not repeat the required extensive data cleaning steps in order to assess the impacts of the proposed provisions with current data and instead used FY2016-2018 SEVIS data extracted in 2019[xii] for its 2020 rulemaking effort, we reviewed 20 years of administrative data obtained through a Freedom of Information Act (FOIA) request, and completed extensive data cleaning and analysis. We then summarized the "front door" pipeline for international STEM talent coming to the United States, which as the National Academies noted is primarily through the nation's graduate schools.

**The 'Front Door' Pipeline: Principal channels for transition from F-1 student visas to long term (>6 years) STEM workforce and PhD-level work in the United States**

| | All | | STEM | | PhD | |
|---|---|---|---|---|---|---|
| | Num. | % | Num. | % | Num. | % |
| Graduates (F-1), average per year 2018–2022 | 225,752 | | 103,836 | | 22,687 | |
| ***Short term (OPT)*** | | | | | | |
| F-1 to OPT | 121,962 | 54.0 | 66,097 | 63.7 | 15,255 | 67.2 |
| F-1 but no OPT | 103,790 | 46.0 | 37,739 | 36.3 | 7,432 | 32.8 |
| ***Medium term (nonimmigrant work visas)*** | | | | | | |
| OPT to H-1B | 35,479 | 15.4 | 23,919 | 33.4 | 5,987 | 27.8 |
| OPT to 'other' (O-1, E-3, H-1B1, TN) | 2,523 | 1.1 | 864 | 0.8 | 679 | 3 |
| F-1 to H-1B without OPT | 19,866 | 8.8 | 14,127 | 13.6 | 2,461 | 10.8 |
| F-1 to 'other' without OPT | 1,204 | 0.5 | 488 | 0.5 | 327 | 1.4 |
| ***Long term (permanent residency, extended H-1B)*** | | | | | | |
| H-1B to EB-1, EB-2, EB-3 | 22,709 | 10.1 | 15,611 | 15.0 | 3,466 | 15.3 |
| 'Other' visa to EB-1, EB-2, EB-3 | 181 | 0.1 | 66 | 0.1 | 49 | 0.2 |
| Extended H-1B (>6 years) | 19,372 | 8.6 | 13,316 | 12.8 | 2,957 | 13 |

'All' graduates are all completions of bachelor's, master's, or doctoral degrees in all fields of study by F-1 visa holders in a given year. 'STEM' graduates are all completions at all degree levels by F-1 visa holders in DHS-designated STEM fields only. 'PhD' means all completions of doctoral degrees by F-1 visa holders in all fields, not just STEM. In the table, "%" means percentage of the original F-1 graduation cohort in the first row that eventually makes each transition. Numbers are averages over the years 2018–2022. "Other" nonimmigrant work visas are O-1, E-3, H-1B1, and TN. The source is full-universe administrative data from SEVIS 2004–2023, obtained by request from DHS under the Freedom of Information Act.

As is evident from the administrative data, a notable portion of the nation's STEM workforce first enters the United States as international students at the nation's research universities. According to USCIS data, from 2018-

2023, more than 55,000 H-1Bs were awarded to F-1 students per year on average.[xiii] Indeed, administrative data show that 51% of all H-1B petitions by cap-subject employers from 2021-2024 were for F-1 students.

***B. The cost calculation for the proposed elimination of Duration of Status is inaccurate.***

The economic research literature contains very extensive evidence—leading to an overwhelming consensus among economists[xiv]—that high-skill immigration *causes* large increases in productivity and economic growth in the United States. These effects are largest for immigrants with STEM training. The increase in US city-level productivity caused by inflows of foreign STEM workers from 1990 to 2010 is sufficient in magnitude to explain between 30 and 50% of *all* aggregate productivity growth in the United States during that period.[xv] The influx of highly skilled immigrant college graduates to the United States during the 1990s caused a 12–21% rise in the annual number of high-technology innovations reflected by annual patent applications, which in turn raised US GDP per capita by between 1.4 and 2.4 percent—the equivalent, in today's dollars, of adding $267–458 billion to the US economy each year.[xvi] A very large and essentially uncontested body of research finds that these positive effects on productivity and growth arise from high-skill STEM immigrants' effects on new business formation, scientific discovery, and the patenting of new economically valuable ideas, including STEM immigrants' positive effects on innovation *by natives*.[xvii]

The economic literature collectively suggests that a substantial reduction in the supply of foreign talent to the US workforce will have large, negative, and lasting effects on productivity and economic growth in the United States. We can approximate the magnitude of those effects using the productivity effects estimated by Peri et al.,[xviii] who estimate the elasticity of annual growth in Total Factor Productivity (TFP) to the share of the workforce comprising high-skill foreign STEM workers. They estimate an increase of 0.27–0.54 percentage points in annual TFP growth caused by each percentage point increase in high-skill immigrant STEM workers as a fraction of the overall labor force.

We can use this estimate to consider the overall economic growth impact implied by the "front door" of transitions we have assembled from F-1 student status to the nation's workforce, which we have described above based on administrative data. To be conservative, we suggest calculating the impact of a 10% reduction in new enrollments in degree-granting programs by F-1 students as a result of Duration of Status elimination – at the top of our "front door" pipeline. We calculate that reducing the number of F-1 graduates by 10% because of a new fixed period of admissions rule would itself reach an annual loss of as much as $72-145 billion by ten years into the future.

The 10% reduction of a future flow to the "front door" talent pipeline is indeed quite conservative. Besides the fact that the recent student surveys identified a higher percentage of both current and prospective students that would be deterred from coming to the US because of the D/S policy shift, the published proposed terms of D/S elimination include a new system of required Extensions of Stay (EOS) for all OPT and STEM OPT applicants that seems destined to lead to expirations of status before OPT and STEM OPT can be granted. The up-to 240 days DHS has allowed itself to adjudicate a new, large workstream of such EOS applications, which it estimates to be 220,122 new EOS requests annually for F-1s and 240,583 additional EOS requests annually for J-1s,[xix] is best understood as creating sufficient uncertainty about timely EOS adjudications to ultimately discourage the ability of F-1 nonimmigrants to secure US employment experience in their field of study through OPT or a STEM OPT extension. If the D/S elimination rule goes into effect without changes to the EOS process as proposed in the published NPRM, it may be that a much larger reduction scenario is closer to the end result of the D/S rule alone, because F-1s may ultimately see their realistic access to OPT removed, leading to a future further reduction in F-1 degree-granting students coming to the US. The recent surveys of current and prospective students make clear that, standing alone, reducing access to OPT will have a very large and negative impact on future international

student enrollments at US colleges and universities at all degree levels, with 54% of current students and 29% of prospective students reporting they would not come to the US for a degree without access to OPT. [xx]

Moreover, though, the proposal to eliminate D/S admissions is part of a suite of regulatory changes the administration has announced DHS will pursue this year, with other, related rulemakings coming concerning availability of post-completion OPT and a STEM OPT extension as well changes to H-1B access based solely on Wage Level on the Labor Condition Application. In our working paper,[xxi] we detail our methodology and calculation of the impact of the *combined* effect of all three expected new regulations (eliminating D/S, reducing OPT, and restricting H-1B), attaching a realistic 33% reduction in international students, scholars, and researchers coming to the US, and have employed the same method to calculate the impact of a 10% reduction to the future flow of F-1s as a result of the Department's proposed D/S elimination.

An ongoing reduction of 10% in the number of foreign STEM graduates from US universities reduces the total supply of high-skill STEM workers in the United States by 1.9%. Because the 8 million high-skill STEM workers in the US economy represent 4.7% of the US labor force, the 1.9% reduction in high-skill foreign STEM workers equates to a 0.09 percentage-point change in high-skill STEM workers as a fraction of the labor force.

The Peri et al. elasticity thus implies a reduction of 0.024–0.048 percentage points in annual TFP growth, arising from ongoing reduction of one tenth of the number of high skill foreign graduates from US universities. This is comparable in magnitude to the independent estimates of Hunt and Gauthier-Loiselle,[xxii] which together with the effects jointly implied by Kerr and Lincoln[xxiii] and Peri et al., represent the best available evidence on the macroeconomic effects of high-skill foreign STEM workers' presence in the United States economy.

This is a very large impact, which cumulates over time. Over a ten-year period, lost productivity growth of 0.024–0.048 percentage points each year causes GDP at the end of that decade to be 0.239 to 0.478 percent smaller than it otherwise would have been. This is a percent decline in annual GDP, *not* a percentage-point decline in annual *growth* of GDP.

If such a loss occurred today, amid the United States's $30.4 trillion economy,[xxiv] it would be valued at $72-145 billion. That is, this would be the loss to today's US economy if the stock of high-skill foreign STEM workers had been 1.9% lower, in each of the past 10 years, than it actually was—the loss that would have arisen from a longtime reduction of one tenth in the number of foreign STEM students graduating from US universities. That reduction in GDP equates in size to the loss the US economy would suffer from the *disappearance* of the entire economy of the state of Delaware, New Hampshire, or the entire Research Triangle metropolitan area.

The challenges facing America's high-skill workforce would extend far beyond elite coastal enclaves. The impacts ripple through innovation clusters nationwide, threatening not just individual institutions but entire *regional economies* built around science, technology, and higher education. While Silicon Valley and Boston capture imaginations, the dependence on international STEM talent spans the American map. The South's growing technology corridors—from North Carolina's Research Triangle to Texas's emerging tech centers—depend on international talent pipelines to compete globally. Even smaller metropolitan areas like Rochester, New York, or Madison, Wisconsin, have built innovation economies around universities that attract significant international student populations.

The Global Innovation Index identifies 23 U.S. clusters among the world's top 100 science and technology clusters, demonstrating the geographic diversity of American innovation. These clusters include San Jose-San Francisco and Boston-Cambridge but also Austin, Cincinnati, Denver-Boulder, Pittsburgh, and Raleigh-Durham. Each relies heavily on the international student pipeline to maintain their competitive edge. But retention through the "front

door" pipeline varies widely by geography. Between 2012 and 2020, the Mid-Atlantic lost more than 100,000 foreign-born bachelor's graduates, 180,000 foreign-born master's graduates, and 10,000 foreign-born PhDs, including migration to other regions. The Northeast does even worse at retention. Meanwhile, the West Coast does best of all, but the Midwest and South significantly outperform the Northeast and Mid-Atlantic.

***These impact estimates are inherently somewhat uncertain. For that reason, DHS proceeds as if such impacts are zero. This method is inadequate. It fails to meet minimal standards of quality demanded of economic analysis by qualified experts in cost-benefit analysis. In other words, the mere fact that an economic impact is somewhat uncertain does not imply that the best estimate of that impact is zero. The consensus of peer-reviewed economic research on the impacts is question is that they are very large.***

We conclude that DHS has grossly underestimated the potential negative impact of its new system of fixed periods of stay as a replacement for Duration of Status. As such, we ask the Department either abandon this proposal or provide revised regulatory text that creates a less cumbersome system. If less burdensome approaches that also meet the Department's goals for oversight, integrity, and prompt detection are not within DHS's command or are not suggested by other commenters, the Department should restart rulemaking with an Advanced Notice of Proposed Rule Making to better collect ideas and options from interested parties on all sides of the issues presented.

**CONCLUSION**

When federal agency policies, like Duration of Status, are of the type and character that they can only be shifted through new public regulations promulgated in compliance with the Administrative Procedure Act, the Department of Homeland Security must not ignore significant, non-speculative costs to America and Americans.

We look forward to seeing a careful response from DHS, an abandonment of this proposal or a revised, less burdensome approach to establishing fixed periods of time for F-1 and J-1 visa holders that accounts for PhD students and postdoctoral fellows, and the opportunity, if you find it appropriate, to discuss the costs and concerns we have studied and summarize here.

We attach to this comment a Working Paper, which details the methods and data sources used in this analysis.

Thank you for the opportunity to participate in the rulemaking process.

Respectfully submitted,

Michael A. Clemens
Professor of Economics, George Mason University
Nonresident Senior Fellow, Peterson Institute for International Economics

Jeremy Neufeld
Director of Immigration Policy, Institute for Progress

Amy M. Nice
Distinguished Immigration Counsel, Institute for Progress
Immigration Law and Policy Fellow, Cornell Law

ENDNOTES

[i] "Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in the United States," Clemens, M, Neufeld, J, Nice, A (attached, and forthcoming by Institute for Progress and IZA Institute of Labor Economics).

[ii] See eg, discussion in NPRM p. 42079 and RIA p. 43. National security is referenced over 15 times in each the NPRM and RIA.

[iii] Section 238, NDAA for FY2021, Pub.L. 116-283, enacted January 1, 2021 (Mac Thornberry National Defense Auth. Act).

[iv] A bipartisan group of 70 national security experts and officials made these points in a May 2023 letter (reported in Axios) imploring congressional action on international scientific and engineering talent because when America attracts global STEM talent many "will be working in Pentagon-identified critical technology areas."

[v] NPRM at p. 42101 on only marginal impact expected to international student enrollments..

[vi] RIA p. 43 on other benefits of studying in the US that will outweigh any perceived negatives of the new fixed periods of admission.

[vii] Surveys on International Student Talent Pipeline, summarizing Key Results and providing Tabulated Results. The Institute for Progress and NAFSA conducted three surveys to understand the international student talent pipeline and how employers use the H-1B program to hire international talent.

[viii] Id.

[ix] NPRM p. 42082.

[x] Surveys on International Student Talent Pipeline, summarizing Key Results and providing Tabulated Results. The Institute for Progress and NAFSA conducted three surveys to understand the international student talent pipeline and how employers use the H-1B program to hire international talent.

[xi] Id.

[xii] RIA p. 12 on the complexity of utilizing data from the document-centric recordkeeping of SEVIS.

[xiii] USCIS, Change of Status for Nonimmigrants: F-1, F-2, H-4, J-1, J-2 Fiscal Year 2018 – 2023.

[xiv] Chelsea Vail, "What Economists Think about Admitting Highly Skilled Immigrants," Chicago Booth Review, 2016.

[xv] Peri, Giovanni, Kevin Shih, and Chad Sparber. "STEM workers, H-1B visas, and productivity in US cities." *Journal of Labor Economics* 33, no. S1 (2015): S225-S255.

[xvi] Hunt, Jennifer, and Marjolaine Gauthier-Loiselle. "How much does immigration boost innovation?." *American Economic Journal: Macroeconomics* 2, no. 2 (2010): 31-56.

[xvii] Economists have found:

- Increases in foreign master's graduates driven by an unrelated force majeure cause more entrepreneurship in exposed regions, including by US natives (Beine, Michel, Giovanni Peri, and Morgan Raux. "The Contribution of Foreign Master's Students to US Start-Ups." No. w33314. National Bureau of Economic Research, 2024);
- High skill workers who entered the United States on student visas have much larger rates of patenting, publishing, earning, and entrepreneurship than otherwise comparable natives (Hunt, Jennifer. "Which immigrants are most innovative and entrepreneurial? Distinctions by entry visa." Journal of Labor Economics 29, no. 3 (2011): 417-457);
- Foreign STEM PhD students report greater preference for entrepreneurship than their US native colleagues (Roach, Michael, Henry Sauermann, and John Skrentny. "Are foreign STEM PhDs more entrepreneurial? Entrepreneurial characteristics, preferences, and employment outcomes of native and foreign science and engineering PhD students." In The Roles of Immigrants and Foreign Students in US Science, Innovation, and Entrepreneurship, pp. 207-228. University of Chicago Press, 2019);

- Historical increases in barriers against skilled immigration caused reduced scientific productivity in the US as a whole (Moser, Petra, Alessandra Voena, and Fabian Waldinger. "German Jewish émigrés and US invention." *American Economic Review* 104, no. 10 (2014): 3222-3255, and Moser, Petra, Sahar Parsa, and Shmuel San. "Immigration and Innovation: Lessons from the Quota Acts." (2025). Working paper, Dept. of Economics. New York University;
- Increases in foreign STEM PhD student inflows to the United States driven by unrelated shocks overseas cause increased innovation and discovery in US academic departments (Stuen, Eric T., Ahmed Mushfiq Mobarak, and Keith E. Maskus. "Skilled immigration and innovation: evidence from enrolment fluctuations in US doctoral programmes." *Economic Journal* 122, no. 565 (2012): 1143-1176, and Gaulé, Patrick, and Mario Piacentini. "Chinese graduate students and US scientific productivity." *Review of Economics and Statistics* 95, no. 2 (2013): 698-701.
- Roughly one third of the positive effect of foreign master's graduates on US entrepreneurship arises from business created by natives (Beine et al. (2024), supra);
- Immigrant inventors cause their native colleagues to patent more new ideas (Bernstein, Shai, Rebecca Diamond, Abhisit Jiranaphawiboon, Timothy McQuade, and Beatriz Pousada. The contribution of high-skilled immigrants to innovation in the United States. No. w30797. National Bureau of Economic Research, 2022); and
- Increases in foreign STEM worker prevalence cause: increased patenting in US cities (Winters, John. "Foreign and Native-Born STEM Graduates and Innovation Intensity in the United States." No. 8575. Institute of Labor Economics (IZA), 2014), increased entrepreneurship in US regions (Tareque, Inara S., Jorge Guzman, and Dan Wang. "High-skilled immigration enhances regional entrepreneurship." *Proceedings of the National Academy of Sciences* 121, no. 37 (2024): e2402001121), increased employment of high-skill native workers (Kerr, Sari Pekkala, William R. Kerr, and William F. Lincoln. "Skilled immigration and the employment structures of US firms." *Journal of Labor Economics* 33, no. S1 (2015): S147-S186), product innovation (Khanna, Gaurav, and Munseob Lee. "High-skill immigration, innovation, and creative destruction." In *The roles of immigrants and foreign students in US science, innovation, and entrepreneurship*, pp. 73-98. University of Chicago Press, 2019), and entrepreneurial success (Dimmock, Stephen G., Jiekun Huang, and Scott J. Weisbenner. "Give me your tired, your poor, your high-skilled labor: H-1B lottery outcomes and entrepreneurial success." *Management Science* 68, no. 9 (2022): 6950-6970).

[xviii] Peri et al (2015), *supra* Note xv.

[xix] RIA p. 21 and 24 on the number of F and J nonimmigrants requiring an Extension of Stay per year under the DHS proposal.

[xx] Surveys on International Student Talent Pipeline, summarizing Key Results and providing Tabulated Results. The Institute for Progress and NAFSA conducted three surveys to understand the international student talent pipeline and how employers use the H-1B program to hire international talent.

[xxi] "Brain Freeze: How International Student Exclusion Will Shape the STEM Workforce and Economic Growth in the United States," Clemens, M, Neufeld, J, Nice, A (attached, and forthcoming by Institute for Progress and IZA Institute of Labor Economics). The Brain Freeze working paper analyzes the *combined* effect of DHS instituting three policies that will deter international students at different points in the "front door" talent pipeline (eliminating D/S, reducing OPT, and restricting H-1B), and as such identifies a larger loss valued at $240-482 billion by ten years into the future, based on a sustained 33% reduction of the number of foreign STEM students graduating from US universities.

[xxii] Hunt and Gauthier-Loiselle *supra* Note xvi.

[xxiii] Kerr, William R., and William F. Lincoln. "The supply side of innovation: H-1B visa reforms and US ethnic invention." *Journal of Labor Economics* 28, no. 3 (2010): 473-508.

[xxiv] In the most recent data available at the time of writing, the GDP of the United States in fiscal 2025Q2 was $30.35 trillion: U.S. Bureau of Economic Analysis, Gross Domestic Product [GDP], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/GDP, September 18, 2025.

# EXHIBIT 23

ICEB-2025-0001

Critical to the strength of the United States economy is the training of new PhD students.
Many of these students come from outside the United States.
After graduation, a large number of these foreign-born PhD students join companies in the United States.
These new graduates contribute new ideas and crucial labor.
Such work is a large part of what makes American companies competitive on a global scale.

Reductions in the grace period and only admitting students for 4 year would erase these students from our economy.
This would vastly reduce the ingenuity and abilities of companies in the US.

None of the provisions of this rule should be finalized.
Each adds burden to international students and will hurt the US economy in the short and long term.

The RFA as it pertains to small businesses is deeply flawed.

The current RFA notes that the majority of SEVP and J-exchange programs are small entities.
"Rule familiarization and adaptation" in no way captures the actual impact of this rule.
This rule does not centrally affect compliance, it will PREVENT qualified international individuals from working in the United States.

The effect that DHS needs to address is how a vastly depleted labor market in HIGHLY specialized fields will affect small businesses.
The current RFA is defficient.

Based on the CURRENT practices of DHS, the following statement within the cost benefit analysis is clearly FALSE.

"The proposed rule affects only those F-1 and J-1 nonimmigrants who need additional time to complete their program; however, DHS maintains that eligible students should have no difficulty with getting their EOS requests approved,"

Today we have constant examples of students who have difficulty obtaining EOS requests approved.
This MUST be considered.
An approximate probability of students who will will NOT have EOS requests approved should be built into the RIA.

DHS' treatment of qualitative costs is deficient.
All provisions in this rule will act to dissuade international students from obtaining advanced degress in the United States.
This will decrease the number of students who in turn decide to work in the United States.
This cost MUST be considered in a QUANTITATIVE manner.

Estimates of graduate contribution to GDP and the loss of these students should be parameterized.

The following statement is completely unclear.
"DHS expects this proposed rule to have qualitative benefits for national security by providing DHS additional opportunities to evaluate whether F, J, and I nonimmigrants are complying with their status requirements, or if they present a national security concern."
What are these benefits?
To make such a statement requires a baseline for national security.
DHS MUST provide a baseline to make such a claim and CLEARLY and QUANTITATIVELY show how this program would provide benefits in USD.

The claim for benefits is woefully incomplete.
DHS has offered no evidence to support their claim that this rule would have economic benefits.

# EXHIBIT 24

AMERICAN IMMIGRATION LAWYERS ASSOCIATION

American Immigration Council

September 29, 2025

Kristi Noem
Secretary
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

Todd Lyons
Acting Director
Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, DC 20536

**Submitted via** www.regulations.gov

**Re: DHS Docket No. ICEB-2025-0001**
**Regulatory Information Number (RIN) 1653-AA95**
Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors and Representatives of Foreign Information Media

Dear Secretary Noem and Acting Director Lyons:

The American Immigration Lawyers Association (AILA) and the American Immigration Council (Council) submit the following comments in response to the above-referenced notice and request for comments published by the Department of Homeland Security (Department or DHS) in the Federal Register on August 28, 2025[1] (the Proposed Rule or the Rule). The notice solicits comments on the Proposed Rule which would establish a fixed time period of admission for F, J, and I nonimmigrants, establish a procedure to extend the stay of F, J, and I nonimmigrants beyond the fixed period of admission, and make other changes to the F, J, and I nonimmigrant programs.

AILA is a voluntary bar association of over 18,000 attorneys and law professors practicing, researching, and teaching in the field of immigration and nationality law. Our mission includes the advancement of the law pertaining to immigration and nationality and the facilitation of justice in the field. AILA members regularly advise and represent businesses, U.S. citizens, lawful permanent residents, and foreign nationals regarding the application and interpretation of U.S. immigration laws.

---

[1] 90 Fed. Reg. 42070 (Aug. 28, 2025).

The Council is a non-profit organization established to increase public understanding of immigration law and policy, advocate for the fair and just administration of our immigration laws and protect the legal rights of noncitizens. The Council frequently appears before federal courts on issues relating to the interpretation of the Immigration and Nationality Act (INA) and its implementing regulations.

Our collective expertise and experience make us particularly well-qualified to offer views that will benefit the public and the government. While we appreciate the opportunity to comment on the proposed changes to the F, J, and I nonimmigrant programs, as we noted in a separate comment[2] which is incorporated here by reference, a 30-day comment period is insufficient to provide meaningful comment, particularly since this Rule touches on a wide variety of issues, introduces new complexities in the status of F, J, and I nonimmigrants, and has significant economic impact. Therefore, we urge DHS to extend the comment period for a minimum of 60 days in accordance with EO 12866 to allow meaningful opportunity for the public to review and provide comment.

AILA and the Council oppose this Proposed Rule as it does not offer a balanced, data-driven assessment of the benefits and risks within these programs and fails to consider less burdensome alternatives to achieve its objectives. Instead, it relies on insufficiently supported logic and allegations to justify sweeping changes that could harm international students, U.S. institutions of higher education, and U.S. employers, as explained in more detail below.

## I. DHS's PROPOSAL WILL ADVERSELY IMPACT THE U.S. ECONOMY AND INNOVATION

### a. DHS Dramatically Underestimates the Economic Impact of the Proposed Rule

DHS acknowledges in the proposed regulation that it "recognizes that the proposed rule would incur costs."[3] This claim is—even with the most generous interpretation—a massive understatement. DHS significantly underestimates the likely economic impact of this Rule, both in terms of direct costs and the broader negative effects it will have on student enrollment, tuition payments, tax revenue, and consumer spending. In the Regulatory Impact Analysis, DHS only quantified some costs, with a large proportion of costs based on speculative qualitative assessments rather than concrete data.[4] DHS failed to provide any analysis of downstream economic impacts, such as labor market disruptions or the reduction in innovation which will result if DHS finalizes the Rule in its current form. Because DHS has not properly estimated or disclosed these costs, the Proposed Rule does not comply with Executive Orders 12866 or 12563, the Unfunded Mandates Reform Act, or the Regulatory Flexibility Act. DHS should withdraw the Proposed Rule, conduct a full analysis of the direct and indirect costs, and only reconsider reintroducing the Rule once

---

[2] *See* https://www.regulations.gov/comment/ICEB-2025-0001-8627.
[3] 90 Fed. Reg. 42070, 42101.
[4] Regulatory Impact Analysis posted by the Immigration and Customs Enforcement Bureau on August 28, 2025, https://Regulations.gov/document/ICEB-2025-0001-0143, pp 5-7.

those costs are accurately assessed. Importantly, the massive negative economic impact of this Rule far outweighs any potential benefits DHS believes it would provide.

### b. The Proposed Rule Would Impose Significant Costs

DHS admits that the Proposed Rule would, at a minimum, add direct costs related to government filing fees, legal fees, training of Designated School Officials (DSOs), and training of CBP and other DHS officers of around $400 million per year.[5] Importantly, most of these costs would be borne by international students in the form of filing fees—on top of the already significant costs they pay for tuition, housing, and other school-related expenses. Asking this population to absorb hundreds of millions of dollars in additional costs each year is both unfair and unnecessary.

It is the indirect costs, however, that are most troubling. The negative effect this Rule would have on universities, state and local economies, and the United States as a whole has been largely brushed aside by DHS in the Proposed Rule. DHS states that the "proposed rule may have a marginal impact on nonimmigrant student enrollment," but offers no support for its conclusion that the impact would be "marginal."[6] Available data tells a very different story.

A recent analysis published by NAFSA: Association of International Educators shows that visa bans and disruptions in visa interviews and processing implemented by the current administration are already predicted to cause a "potential 30–40 percent decline in new international student enrollment, contributing to a 15 percent drop in overall enrollment this fall."[7] This drop is occurring even before the implementation of any regulatory change that would formally complicate or restrict international students' ability to maintain their nonimmigrant status.

DHS also asserts that "eligible students should have no difficulty with getting their extension of stay (EOS) requests approved, which should alleviate concerns about the uncertainty of EOS approval."[8] This statement is made without any explanation of why or how extensions will be obtained with "no difficulty." Currently, individuals applying to extend their stay incur hundreds, if not thousands, of dollars to submit their applications and often face significant delays in having their applications adjudicated, causing uncertainty and gaps in status and work authorization. In addition, USCIS reports on its website that it is currently taking 3.5 months for the agency to process Form I-539 Application to Extend/Change Nonimmigrant Status for F, M, and J applicants and up to 7 months for other categories.[9] Adding more applications to this workload will further delay processing times. Even if the government's claim that nonimmigrants will receive an extension without difficulty is true, such reassurance offers little comfort to prospective international students, who will be deterred by the increased uncertainty and disincentives created by this Rule and other restrictive policies.

---

[5] *See* Regulatory Impact Analysis, Table 2, page 6, estimated annualized costs of $390.3 million to $393.4 million, https:/regulations.gov/document/ICEB-2025-0001-0143.

[6] *Id*.

[7] https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students.

[8] 90 Fed. Reg. at 42101.

[9] https;//egov.usics.gov/processing-times/, visited Sept. 24, 2025.

### c. DHS Grossly Underestimates the Broader Economic Impact

In the Rule's Regulatory Impact Analysis, DHS estimated that eliminating duration of status will cumulatively cost about $3.3 billion over ten years.[10] This figure grossly underestimates the likely actual costs to the United States if USCIS finalizes this policy. By contrast, economist Michael Clemens and the Institute for Progress (IFP), estimate that the elimination of duration of status as currently proposed, could cost the United States $72-145 billion within ten years.[11]

Both private and public universities rely heavily on tuition paid by international students. A May 2025 Policy Brief by the National Foundation for American Policy (NFAP) found that "[m]any private schools… admit international students on a 'need-aware' basis that takes into consideration how much an international applicant can pay, based on their family resources. And at public universities, international students pay out-of-state tuition, which can be two to three times as high as in-state tuition." The report further noted that private universities received about $4.3 billion in revenue from international master's students in 2015, and public universities received $3 billion.[12] A decline in international student enrollment would directly reduce this revenue and increase costs for American students.

Beyond higher education, the economic impact would ripple across local economies that depend on student spending and tax revenue. The NAFSA report predicts that reduced enrollment will deprive local economies of $7 billion in spending and more than 60,000 jobs.[13]

### d. The Rule Is Not Consistent with U.S. Trade and National Economic Policy Goals

The current administration implemented its "America First" initiative to foster investment and productivity, bolster the Nation's industrial and technological competitiveness, reinforce economic imperatives to reap tangible benefits to American workers, manufacturers, agricultural producers, entrepreneurs, and businesses.[14] The Proposed Rule undermines these objectives. According to Trade.gov, international students represent the seventh-largest U.S. service export. The Department of Commerce's Bureau of Economic Analysis valued education-related travel exports at $54.84 billion in 2024.[15] By discouraging international students from studying in the U.S., the Proposed Rule would directly reduce this major export sector.

---

[10] Regulatory Impact Analysis posted by the Immigration and Customs Enforcement Bureau on Aug. 28, 2025, https://regulations.gov/document/ICEB-2025-0001-0143, page 55.

[11] Comment (https://ifp.org/wp-content/uploads/Clemens-Neufeld-Nice-D-S-Elimination-comment.pdf) to DHS "Fixed Time of Admission and Extension of Stay" for Fs and Js, from Michael Clemens, Jeremy Neufeld, Amy Nice filed at Regulations.gov.

[12] https://nfap.com/research/new-nfap-policy-brief-the-importance-of-immigrants-and-international-students-to-higher-education-in-america/.

[13] https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students.

[14] https://www.whitehouse.gov/presidential-actions/2025/01/america-first-trade-policy/.

[15] https://www.trade.gov/education-service-exports.

## II. DHS's PROPOSAL IS INEFFICIENT AND UNNECESSARY AS OVERSIGHT CAN BE IMPROVED BY BETTER LEVERAGING SEVIS

AILA and the Council object to the proposed changes as unnecessary since the government has already invested significant resources into a mechanism which can conduct the proposed oversight. Rather than creating a new system, if additional oversight is necessary, DHS should fully utilize and improve the existing SEVIS system.

### a. SEVIS is a Major Federal Investment in Oversight and Should Be Utilized to Achieve DHS's Goals

We acknowledge and support DHS's objective of enhancing oversight and ensuring F-1 and J-1 program integrity. In order to achieve those objectives, DHS should reconsider shifting extension authority from schools and program sponsors to USCIS and instead optimize use of the Student and Exchange Visitor Information System (SEVIS). The United States has already invested substantial resources into SEVIS, a centralized platform designed to monitor and track the progress of nonimmigrant students and exchange visitors. SEVIS is effective, efficient, and already provides DHS with real-time oversight. DSOs and Responsible Officers (ROs), who are federally designated and trained, are the individuals best positioned to assess whether a program extension is academically justified. If DHS desires greater visibility, SEVIS already contains the data necessary to generate reports, conduct audits, and verify compliance. Requiring every international student to file an extension application with USCIS duplicates oversight, imposes new costs and delays, and undermines decades of progress in automating and modernizing student tracking.

Congress mandated the creation of SEVIS in the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA),[16] and following the September 11, 2001 terrorist attacks, the government rapidly developed SEVIS under the USA PATRIOT Act[17] and the Enhanced Border Security and Visa Entry Reform Act.[18] DHS and the Department of State have since invested hundreds of millions of dollars in its creation, maintenance, and modernization.

DHS reported that the initial build-out of SEVIS between 2001 and 2003 cost approximately $36 million.[19] Since then, DHS has collected billions of dollars in Form I-901 SEVIS fees to sustain operations. In FY2023 alone, the Student and Exchange Visitor Program (SEVP) collected more than $270 million in SEVIS-related fees.[20] SEVIS has been modernized repeatedly, incorporating stakeholder input, upgraded technology, and improved reporting functionality.[21] This investment has produced a comprehensive system that logs the status of every F, M, and J student or exchange

---

[16] Illegal Immigration Reform and Immigrant Responsibility Act. Pub. L. 104-208, Division C., 110 Stat. 3009, 3009-46 to 74 (1996).
[17] USA PATRIOT Act, Pub. L. 107-56, 115 Stat. 272 (2001).
[18] Enhanced Border Security and Visa Entry Reform Act, PL 107-173, 116 Stat. 543 (2002).
[19] GAO-04-586, *Border Security: Strengthened Visa Process Would Benefit from Improvements in Staffing and Information Sharing*, June 2004.
[20] DHS, *Budget-in-Brief, FY2024*, SEVP Fee Collections, available at www.dhs.gov/sites/default/files/2023-03/DHS%20FY%202024%20BUDGET%20IN%20BRIEF%20%28BIB%29_Remediated.pdf.
[21] GAO-05-26, *Border Security: DHS Needs to Strengthen Management of the Student and Exchange Visitor Information System*, Oct. 2004.

visitor, records their enrollment, transfers, completions, terminations, and extensions, and transmits this data to DHS in real time. Replacing SEVIS extension authority with a duplicative USCIS process would squander this investment and create inefficiencies instead of building upon the infrastructure already in place.

**b. School and Program Officials Are Best Positioned to Monitor Compliance**

DSOs and ROs are federally designated compliance officers trained to carry out SEVP responsibilities. DSOs are closest to the students, their academic program, and the faculty and advisors who can attest to academic progress. With the necessary input from academic departments, DSOs and ROs can confirm whether a student needs additional time due to legitimate academic or personal reasons. DSOs enter program extensions directly into SEVIS, in real time, ensuring DHS has immediate visibility into every extension granted. And DHS already holds schools accountable through SEVP certification, site visits, and potential withdrawal of certification.[22]

Similarly, oversight of the J-1 Exchange Visitor Program is conducted by the State Department's Bureau of Educational and Cultural Affairs (ECA) under 22 CFR Part 62. The State Department, in turn, authorizes certain designated J-1 sponsors who appoint an RO, approved by the State Department, who is then ultimately responsible for compliance, monitoring and record-keeping in SEVIS. Only ROs have the legal authority to issue and sign Form DS-2019 on behalf of the J-1 sponsoring entity. Therefore, J-1 visa oversight and monitoring are already very strong.

USCIS adjudicators, by contrast, lack the same direct access to a student's academic record and an exchange visitors' compliance information, and therefore will be forced to evaluate extensions based solely on limited documentary evidence, rather than first-hand knowledge, introducing delays and erroneous denials.

**c. SEVIS Enables Automation, Efficiency, and Streamlined Oversight**

One of the greatest strengths of SEVIS is its automation. Since its creation, SEVIS has allowed real-time reporting and data sharing, replacing paper-based processes with an integrated electronic system. This has made compliance faster, more transparent, and more efficient.

DSOs and ROs update SEVIS directly, creating immediate federal records. This real-time automation is lacking from DHS filings, which are still largely paper-based, and from tracking of any other nonimmigrant or immigrant categories in the United States. DHS can generate reports from SEVIS to identify high-risk cases, rather than processing every student's extension individually and manually. Program extensions are already logged in SEVIS and visible to DHS, eliminating the need for redundant filings.

Conversely, requiring students to file Form I-539 extensions with USCIS reverses this progress. Under the Proposed Rule, schools will still have the responsibility of updating SEVIS, but students

---

[22] 8 C.F.R. §214.3; SEVP Policy Guidance.

will also have to file paperwork with USCIS, and USCIS adjudicators will then have to review cases that have already been vetted by DSOs. This triple duplication wastes government resources and undermines the very efficiencies SEVIS was built to deliver. Moreover, the Rule would add tens of thousands of filings to USCIS's already overburdened caseload, increasing delays for other applicants. Students would face new fees, biometric appointments, and uncertainty over whether legitimate extensions would be approved in time.

In the era of automation, DHS should be expanding SEVIS functionality, leveraging data analytics to flag anomalies in a responsible manner—not reverting to slower, manual, and duplicative processes. The proposed USCIS extension requirement is a step backward when DHS should be moving forward with greater automation, efficiency, and modernization.[23] For further discussion on leveraging SEVP to ensure compliance, please refer to Section V.3 below.

**d. Alternative Approaches to Strengthen Oversight**

If DHS seeks greater assurance of compliance, it can achieve this within SEVIS itself without burdening students or USCIS. DHS can leverage the automated nature of SEVIS reports and instantly generate lists of students with multiple extensions or long enrollment periods. Those students can then be reviewed for compliance with student immigration regulations. DHS can also conduct focused audits of schools or programs identified through SEVIS reporting as programs that continuously extend student status or transfer them to lower-level degree programs. DHS can also require additional compliance training for DSOs, coupled with periodic reviews of their extension recommendations. Bottom line, DHS can enhance compliance by utilizing SEVIS data, paired with modern analytical tools, and proactively identify the risks that it seeks to isolate. These approaches enhance oversight while respecting taxpayer investments and minimizing burdens on the agency, schools, and students.

**e. The Proposal Would be Inefficient and Costly**

This proposal would create new inefficiencies and costs. USCIS would face hundreds of thousands of new filings annually, exacerbating existing backlogs.[24] Each filing would require fees and biometrics, increasing the financial barriers to studying in the U.S. for legitimate students who want to obtain world-class education in the United States, often at a high cost to themselves and their families. Schools would still be required to issue updated Forms I-20 or DS-2019 in SEVIS, meaning that DSOs and ROs would not experience any workload reduction as the result of the Proposed Rule. By contrast, maintaining SEVIS-based extensions avoids these problems, keeps costs predictable, and allows DHS to allocate USCIS resources to higher-priority adjudications.

In sum, SEVIS is a proven, modern web-based system that already tracks students and exchange visitors efficiently. DSOs and ROs are the officials best equipped to assess program extensions, and DHS already has full visibility through SEVIS reporting and auditing. Adding a USCIS adjudication requirement is duplicative, inefficient, and counterproductive, particularly in an era

[23] https://strategy.data.gov/assets/docs/2020-federal-data-strategy-action-plan.pdf.
[24] USCIS, *Cycle Time Goals*, 2023. https://www.uscis.gov/archive/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work#:~:text=To%20reduce%20the%20agency%27s%20pending,and%20overall%20case%20processing%20times.

where automation and efficiency should be guiding federal policy. ICE proudly maintains on its website that SEVIS is an essential instrument in fulfilling its national security mission while facilitating the lawful entry of nonimmigrants for educational and cultural exchange in the United States.[25] AILA and the Council question why the enforcement duties must be duplicated by USCIS, as it seems to undermine the authority vested in ICE.

For these reasons, we respectfully urge DHS to withdraw or substantially revise the Proposed Rule to preserve DSO and RO authority over program extensions in SEVIS and to maximize the system's existing automation, efficiency, and oversight capacity.

## III. DHS's PROPOSAL TO ESTABLISH FIXED PERIOD OF ADMISSIONS CREATES UNNECESSARY BURDENS

A fixed admission period will create unnecessary paperwork and cost burdens on USCIS, consular posts, CBP officers, DSOs, ROs, individual applicants, and businesses. More importantly, it will impinge upon American competitiveness, innovation and constitutionally protected freedom of the press. Requiring students, exchange visitors, and foreign media representatives to repeatedly file Form I-539 extension applications unnecessarily increase the workload for USCIS without any purported national security benefit.

Given these burdens, AILA and the Council oppose eliminating duration of status admission periods for F, J, and I nonimmigrants, as they provide much needed flexibility to applicants to maintain their nonimmigrant status while they complete their activities. In the alternative, if fixed periods of admission are adopted by DHS, then the periods of admission should be consistent with the maximum period that is typically required in that nonimmigrant status to complete the courses of study, exchange programs or assignments.

### a. DHS Proposals of Periods of Admission for F-1 and J-1 Nonimmigrants Are Inconsistent with Typical Courses of Study and Programs

DHS proposes to limit the entry of F-1 and J-1 nonimmigrants to the program end date shown on the Form I-20 or Form DS-2019, up to a maximum of four (4) years, plus a 30-day grace period following the end of the program. The time spent in F-1 or J-1 status may vary significantly for each nonimmigrant depending on the type of program they are enrolled in. For F-1 students, it will vary based on whether they are enrolled in an undergraduate program, a graduate program, their field of study, and whether they will be engaged in optional practical training. For J-1 nonimmigrants, as noted by DHS in the NPRM, typical periods of admission can range from 12 months to 7 years. As such, admitting individuals for the length and time necessary to complete the program is much more efficient and less arbitrary than an across-the-board 4-year admission period. In this case, one size definitely does not fit all.

[25] https://www.ice.gov/sevis/overview.

Allowing students and exchange visitors to remain in the United States for the time needed to complete their programs ensures a more efficient use of government resources and avoids disrupting American institutions and employers, as opposed to the arbitrary limitations of a fixed four-year admission period. According to Melanie Hanson, an educator, research analyst and the senior editor for the Education Data Initiative, approximately 22% of undergraduates take longer than four (4) years to complete a bachelor's degree program.[26] Corroborating this data, the Department of Education uses six-year completion rates in its official reporting (rather than focusing on four-year completion rates).[27] Another study from NCES reports that only 44% of undergraduate students complete a course of study within 4 years.[28] For example, if the Proposed Rule were to be finalized in its current form, an international student embarking on a 5-year engineering or architecture degree would now need to seek permission from USCIS before completing the final year of their program, creating uncertainty in the student's education plan and putting in doubt the reliability of U.S. academic institutions.

Doctoral programs typically exceed four years to complete due to dissertation requirements and lab research. In fact, it is more common for a doctoral or medical student to spend more than 5-11 years completing their studies.[29] A Ph.D. program that can be completed in four years is a rare exception rather than the Rule. As a result of the proposed shortened entry periods, a Ph.D. candidate would have no guarantee that they will be able to remain in the United States to complete their program, which would make the U.S. less attractive to top international talent. Further, for most students progressing from undergraduate through doctoral studies, it is easy – and reasonable – to expect at least ten years of studies in the U.S. This timeline reflects educational growth, not a plan to remain in the United States without a purpose.

**b. DHS Proposed Period of Admission for F-1 Nonimmigrants Fails to Account for Practical Training**

OPT is a vital part of the F-1 program that allows international students to apply their classroom learning in professional settings, deepening their educational experience. This program creates a mutually beneficial relationship: international students trained at U.S. universities gain invaluable real-world experience, while American universities maintain their competitive edge in the global education marketplace. The Proposed Rule would force international students to obtain an extension of stay to access one year of OPT and, for those eligible, the additional two years of STEM OPT. The ability to obtain OPT and STEM OPT is a critical part of the educational experience for international students.

---

[26] Hanson, Melanie. "College Graduation Statistics" EducationData.org, Mar. 15, 2024, https://educationdata.org/number-of-college-graduates.
[27] Jon Marcus, *The Hechinger Report*, Oct. 10, 2021, https://hechingerreport.org/how-the-college-lobby-got-the-government-to-measure-graduation-rates-over-six-years-instead-of-four/.
[28] National Center for Education Statistics, *Time to Degree*, https://nces.ed.gov/fastfacts/display.asp?id=569.
[29] Carlisle, A. T. *How Long Does it Take to Get a Ph.D. Degree and Should You Get One?* U.S. News & World Report. (Apr. 29, 2025). https://www.usnews.com/education/articles/how-long-does-it-take-to-get-a-phd-degree.

According to data from the Congressional Research Service (CRS), a significant portion of graduating F-1 students apply for OPT. An April 9, 2024 CRS report estimated that there were around 1.5 million F-1 or M-1 students in the United States, and approximately 25% were authorized to work via OPT.[30] Importantly, this does not mean that only 25% of graduating international students choose to apply for OPT. Most F-1 and M-1 students only become eligible for OPT when they graduate from their academic program, and if most students are in either 4-year bachelor's or 2-year Master's degree programs, it would follow that around 17% to 25% of the roughly 1.5 million F-1 students in the United States would graduate each year. Given the CRS's finding that around 25% of those students hold OPT, that would mean that the vast majority of F-1 or M-1 students who graduate each year apply for and obtain OPT.

This conclusion is reinforced by research from the Center for Growth and Opportunity at Utah State University, which found that around 72% of international students utilize OPT following graduation, with the number rising to nearly 80% for international students in STEM fields.[31]

When international students rely on OPT or STEM OPT as part of their educational experience, adding an additional layer of uncertainty by requiring an EOS in advance of an OPT or STEM OPT application will necessarily discourage some from studying in the United States. The significant projected drop in international enrollment for Fall 2025—based on less dramatic policy changes than this Proposed Rule—shows how increased restrictions deter international students from coming to the United States to study. Forcing international students to apply not only for OPT on the Form I-765 but also for an EOS on Form I-539 further destabilizes the process and undermines the value of studying in the United States.

It is also noteworthy that STEM OPT extension increases the likelihood that international students enroll in STEM fields and complete those degrees. This helps to attract top foreign students to U.S. universities which further enhances the academic environment. These STEM students often teach classes in STEM fields that U.S. undergraduate students take and benefit from, so reducing the number of STEM international students will necessarily impact the availability of STEM classes for U.S. students.

After graduation, these international students often take roles in research, technology, and engineering, all of which helps further the United States's standing in high tech fields, expands productivity, and attracts foreign investment. According to a study by economist Gaurav Khanna, Associate Professor of Economics at UC San Diego, "high-skill immigrants contribute to the generation of knowledge and productivity through patenting and innovation, both of which serve to shift out the production possibility frontier in the U.S. and may also slow the erosion of the U.S. comparative advantage in high tech." If OPT/STEM OPT availability is limited, other countries (e.g., China, Canada, United Kingdom, Australia, etc.) will become more attractive to top-performing international students and high skilled immigrants resulting in a loss in innovation outputs by the U.S. and net economic harms to the American economy.

---

[30] https://www.congress.gov/crs-product/IF12631#:~:text=Optional%20Practical%20Training%20(OPT)%20is,student's%20major%20area%20of%20study.

[31] https://www.thecgo.org/research/if-you-extend-it-they-will-come-the-effects-of-the-stem-opt-extension/.

For STEM OPT, there are several key oversight requirements already in place: students can only work for employers enrolled in E-Verify; the employment must be directly related to the STEM degree; employers must sign and certify a Form I-983 training plan with supervision and reporting obligations – all of which are strong oversight tools already in existence. Maintaining the current system will preserve DHS resources, while also maintaining the integrity of our academic institutions and educational competitiveness, particularly in the STEM fields which are in urgent need of workers.

AILA and the Council urge maintaining the current duration of status system, however, if DHS nevertheless chooses to eliminate it, we suggest that the period of stay should extend at least through I-20 end date plus one year for F-1/OPT applicants, with additional adjustments permitted for STEM OPT.

### c. The Proposal to Significantly Curtail I Nonimmigrant Period of Admission Impinges on the First Amendment

The Proposed Rule eliminates admission for duration of status for I nonimmigrant representatives of foreign information media and limits them to a fixed period of admission of no more than 240 days (8 months). Although DHS argues that admitting I nonimmigrants for a fixed period of time will treat them similarly to other nonimmigrant categories, the extremely short period of admission is not comparable to other nonimmigrants, such as those admitted in H, L, or O status who are typically admitted in 3-year increments. This proposal effectively curtails the activities of foreign correspondents being sent to the United States on long-term assignments to provide regular coverage of ongoing events in the United States, infringing on the First Amendment. Requiring I nonimmigrants and their employers to constantly undergo renewals of their status in the United States and visa eligibility every few months, in a manner that is not comparable to other similarly situated nonimmigrants, is a substantial burden on the exercise of press freedoms and unconstitutionally singles out the press for unique and unjustified burdens in violation of *Minneapolis Star Tribune v. Comm'r*, 460 U.S. 575 (1983).

Constant renewals add increased financial requirements and uncertainty to the process, which may serve as a chilling effect on the ability of foreign press to report on the news occurring in the United States. While we appreciate that the Rule provides automatic extension of status for up to 240 days under 8 CFR §274a.12(b)(20) once a timely-filed application for extension of stay is filed, this does not sufficiently negate the effects of shortening the period of admission for foreign journalists so significantly. A 240-day period of admission will require frequent and costly requests to extend their stay, which cannot be expedited because Form I-539 is ineligible for Premium Processing. Extension requests can be filed up to 6 months before an individual's status expires, which means that a journalist will only have been on assignment for 2 months before an extension will need to be filed again. It is currently taking USCIS Service Center Operations more than 6.5 months to

adjudicate 80 percent of extension of stay requests.[32] If an employer is not ready to immediately file an extension of stay, the lengthy processing times at USCIS could still result in a gap in work authorization, even with the automatic extension.

DHS has provided no justification as to why such a limited period of admission is warranted for foreign media representatives, whose duration of status admission has traditionally covered the length of their employment contracts. Such a significant and sudden change has grave implications for the First Amendment. As noted by the European Broadcasting Union, which was joined by over 100 international news organizations, "For decades, the existing system has enabled international correspondents to report on U.S. affairs with depth, context, and consistency. Short-term visas would severely curtail that ability, undermine press freedom, and weaken the flow of accurate, timely coverage from the United States to global audiences."[33]

Accordingly, AILA and the Council oppose eliminating duration of status for I nonimmigrants and believe that they should be permitted to remain in the United States for the duration of their assignment, which is typically up to 5 years.

## IV. THE PROPOSED EXTENSION OF STAY PROCESS FOR F AND J NONIMMIGRANTS IS NOT WORKABLE FOR ANY OF THE AFFECTED PARTIES

If DHS implements a fixed period of admission, the extension of stay (EOS) process contained in the Proposed Rule will adversely impact F and J nonimmigrants, their schools and programs, and USCIS. The proposed process needs to be improved prior to implementation to minimize the impact on all parties.

For F and J nonimmigrants, the Proposed Rule will bring great uncertainty as to whether they will be able to continue their programs in the United States and be eligible for the incidental benefits of their status, such as employment and training options. For colleges, universities and program sponsors, there will be a financial and operational impact in light of the additional advising of F and J nonimmigrants which will be needed and the additional preparation of government forms which will be required. The Proposed Rule indicates that 78 percent of the SEVP-certified institutions and 60 percent of the J exchange visitor program sponsors are considered "small entities."[34] Of these entities, many only have one DSO or RO. These entities may be required to hire additional staff to implement all of the new requirements contained in this Proposed Rule. However, many colleges, universities and programs are already under extreme financial stress and do not have the available resources to hire new staff or provide additional services to comply with newly proposed regulatory requirements.[35]

---

[32] https://egov.uscis.gov/processing-times/.

[33] *See* https://www.ebu.ch/news/2025/09/world-media-bodies-join-ebu-in-urging-u-s-government-not-to-restrict-visas-for-foreign-journalists.

[34] 90 Fed. Reg. at 42103.

[35] https://www.cnbc.com/2024/10/15/more-colleges-set-to-close-in-2025-while-ivy-plus-schools-thrive.html?msockid=16cfbd61564c69582d40a8aa57ca68c0.

For USCIS, the new extension of stay requirement contained in the Proposed Rule will only increase processing times for all of its adjudications, many of which are currently at historic highs. The current processing time for an F-1 reinstatement extension is approximately 6 months.[36] The Proposed Rule indicates that DHS expects an annual average of 205,000; 203,000; 6,000 EOS requests for F, J, and I nonimmigrants, respectively.[37] This is a total of 414,000 new applications filed with USCIS. However, this total is significantly underestimated. For example, as noted above, only 44% of undergraduate students complete a course of study within 4 years.[38] In calendar year 2024, SEVP reported that there were 464,843 F-1 students seeking a bachelor's degree.[39] Therefore, assuming that approximately ¼ of the students are in their 4th year of admission and, as proposed by the regulation, at least 56% of those students will need to file an EOS application, this will account for approximately 66,000 EOS application filings for F-1 undergraduates alone (not factoring in graduate students who, as explained above, will almost always need one or more extensions at the Ph.D. level).

Additionally, according to DHS, in calendar year 2023, there were 344,686 F-1 students who were authorized for regular or STEM OPT, of which approximately 280,000 were authorized for one-year regular OPT.[40] Under the Proposed Rule, an F-1 student would have to file an EOS application before filing an OPT application. Therefore, while only considering F-1 undergraduate EOS applications and EOS applications which will be required to file regular OPT applications, the total number of EOS application filings per year may be at least 340,000 applications, which is 65% higher than what is projected in the Proposed Rule. And this does not include EOS applications which will be filed annually by Ph.D. students or students applying for STEM OPT. With such an increase in workload, it is reasonable to assume that USCIS processing times for F-1 EOS applications will greatly increase beyond the current 6 months into the 1- to 2-year processing range and will significantly impact USCIS's ability to timely process other applications, thereby impacting other categories of nonimmigrants, U.S. businesses and U.S. citizens.

In order to lessen the impact of the proposed EOS application process on international students, international exchange visitors, colleges, universities, program sponsors and USCIS, should DHS decide to continue to move forward with the Proposed Rule, AILA and the Council recommend the following changes to the Proposed Rule:

1. **Increase the admission timeframe from up to 4 years to a validity period that corresponds to the degree level and field of study and practical training**. As discussed above, a majority of undergraduate students do not complete their course of study and practical training in four years. Medical residency and Ph.D. programs take longer than four years to complete and vary in length. Forty-nine percent of current international graduate students and postdoctoral researchers recently surveyed by NAFSA responded that they would not have entered a U.S. program if the admission period had been fixed

[36] https://egov.uscis.gov/processing-times/ (last checked on Sept. 23, 2025).
[37] 90 Fed. Reg. at 42101.
[38] https://nces.ed.gov/fastfacts/display.asp?id=569.
[39] https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf.
[40] https://www.congress.gov/crs_external_products/IF/PDF/IF12631/IF12631.2.pdf.

rather than duration of status.[41] The period of admission must be reasonably related to the length of time within which a particular program is designed to be completed and should not be arbitrarily set across the board.

2. **Incorporate the EOS application process into the I-765 OPT application process.** In the Proposed Rule, DHS is proposing that F-1 students will first have to apply for an extension of stay when the DSO recommends them for a program extension to accommodate a period of OPT, and then will have to apply for the OPT Employment Authorization Document (EAD).

   AILA and the Council recommend that DHS eliminate this duplicative process. An application for extension of stay is presumably needed for DHS to confirm that the applicant has maintained their nonimmigrant status. Currently, USCIS routinely requests evidence of maintenance of status as part of the Form I-765 process. USCIS could formally incorporate this additional evidence of maintenance of status into the Form I-765 process for F-1 students and eliminate the need to file an EOS application with the same evidence, as they already requires biometrics and conduct vetting as part of the Form I-765 application.

   If DHS were to retain a duplicative EOS application process and I-765 OPT application process, DHS should clarify that the I-539 application and I-765 application can be filed concurrently. F-1 students must complete their regular OPT within 14 months after the completion of their course of study.[42] If it is anticipated that EOS applications will take at least one year to be adjudicated and I-765 applications are currently taking approximately four months to be adjudicated, F-1 students will lose their eligibility for OPT because the adjudication process will take longer than 14 months. This would make OPT unavailable to virtually all F-1 students - a result contrary to the regulations explicitly granting F-1 students an opportunity to obtain practical training related to their field of study.

   Additionally, if DHS rejects concurrent filing, then AILA and the Council recommend that DHS incorporate into the Rule that F-1 students may apply for any required extension of stay up to 1 year prior to their expiration date in order to account for the USCIS adjudication delays. Moreover, if DHS will not allow for the concurrent filing of I-539 F-1 EOS applications and I-765 OPT applications, then we recommend that DHS modify 8 CFR §214.2(f)(11)(i)(B)(2) and 8 CFR §214.2(f)(11)(i)(C) to state that F-1 students may file a Form I-765 application any time after the I-539 application is approved. Finally, AILA and the Council also recommend that DHS eliminate the F-1 14-month OPT completion period[43] so that, if USCIS is delayed in adjudicating the I-539 EOS application and I-765 OPT application, the DSO may issue an updated Form I-20 with a full 12-months

[41] NAFSA: Association of International Educators, August-September 2025 surveys, survey summary and distribution, key results, tabulated results, https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf.
[42] 8 CFR 214.2(f)(10)(ii)(A)(3).
[43] 8 CFR 214.2(f)(10)(ii)(A)(3).

of OPT and USCIS may issue a full 12-month OPT EAD card. F-1 students who timely file their OPT applications should not be penalized by USCIS adjudication delays.

3. **Eliminate the time limitations on automatic employment extensions while EOS applications are pending**. AILA and the Council thank DHS for confirming that F and J nonimmigrants may continue their programs while their EOS applications are pending. However, we recommend that DHS eliminate the 240-day automatic extension limitation for on-campus employment, severe economic hardship, Curricular Practical Training (CPT) and J-1 academic training while timely filed EOS applications are pending. As indicated above, F-1 EOS applications are currently taking approximately 6 months for initial review, and it is safe to assume that processing times will only increase with the influx of EOS applications which will be required if this Proposed Rule is implemented. Therefore, in order to eliminate the uncertainty to students, exchange visitors, employers, and schools, above-listed categories of employment authorization should be automatically extended to the earlier of the employment end date stated on the Forms I-20/DS-2019 or the date on which a decision is issued on the EOS application.

   Additionally, because it may take longer than 180 days for an EOS application and STEM OPT application to be approved, AILA and the Council recommend that DHS modify 8 CFR §274a.12(b)(6)(iv) so that OPT employment authorization is automatically extended until USCIS issues a decision on the timely filed STEM OPT I-765 application.

4. **Eliminate duplicate filings in the F-1 program**. F-1 students applying for reinstatement should not be required to file EOS applications in addition to the reinstatement application to obtain an extension of their Form I-94. As part of the reinstatement process, F-1 students should be allowed to request an extension of status. If, due to USCIS processing delays, the I-539 approval is not issued until after the program end date indicated on the Form I-20, USCIS should issue a Request for Evidence for an updated Form I-20 (as is the current practice). If the I-539 is approved, then the validity period should extend through the expiration date contained on the updated Form I-20, without requiring the F-1 student to file a duplicate EOS application.

5. **Eliminate the extension of stay duplication in the J program**. For J-1 nonimmigrants applying for an extension of stay or reinstatement, the Proposed Rule would require that the U.S. Department of State (DOS) first approve the extension or reinstatement and then the J-1 nonimmigrant would be required to apply for another extension of stay through USCIS if the J-1 nonimmigrant's Form I-94 will expire prior to the DOS authorized extension date. DHS and DOS should collaborate to eliminate this duplicative process. After DOS determines that the J-1 nonimmigrant continues to qualify for J-1 status, DOS should transmit this determination directly to USCIS so that USCIS can then issue an updated Form I-94. DHS should defer to DOS determinations in the J-1 program and should not require an unnecessary duplicate filing supported by the same evidence already provided to DOS.

6. **Deference to DOS and DSO determinations as basis for EOS adjudication**. The Proposed Rule states that sponsoring schools may not be well-versed in foreign documentation submitted by F-1 students to ensure that they have sufficient funds to study in the United States. However, sponsoring schools are very motivated to ensure that they are well-versed in foreign funding documentation because the school has to ensure that students will pay the tuition for their studies at the institution. Additionally, as part of the F-1 visa adjudication process, the DOS Consular Official must confirm that the F-1 student has available resources to meet all expenses for the first year of study and that additional funds will be available for the duration of the intended period of study.[44] As part of the EOS adjudication process, USCIS officers should defer to the expertise of their DOS colleagues and DSOs. The Proposed Rule should be modified to indicate that DSOs should not issue a Form I-20 recommending the extension of stay if the F-1 student has not provided sufficient evidence to the school that they have the ability to pay the tuition and fees required by their course of study. DHS also should clarify that if the F-1 students have been studying in the U.S. for more than one year and have been able to pay their school's required tuition, the F-1 students have met their burden to evidence that they have sufficient funds to study in the United States.

7. **DHS should reuse biometrics**. DHS should modify the Proposed Rule to state that USCIS intends to reuse biometrics so that F, J, and I nonimmigrants do not have to appear at a USCIS Application Support Center (ASC) to submit biometrics each time that an EOS application is filed. Additionally, DHS should clarify if F, J, and I nonimmigrants will be required to pay a biometrics fee in addition to the I-539 filing fee with each EOS application.

8. **Revise the proposed EOS provision so that it is consistent with current reinstatement regulations**. The F-1 reinstatement provisions at 8 CFR §214.2(f)(16)(i)(F) provide that "circumstances [beyond a student's control] might include serious injury or illness, closure of the institution, a natural disaster, or inadvertence, oversight, or neglect on the part of the DSO." In the Proposed Rule, DHS states that these should "merit favorable consideration in extension requests" pursuant to the proposed 8 CFR §214.2(f)(7)(i)(C)(3). However, the text of 8 CFR §214.2(f)(16)(i)(F) differs from the proposed 8 CFR §214.2(f)(7)(i)(C)(3). DHS should modify the text in proposed 8 CFR §214.2(f)(7)(i)(C)(3) so that it mirrors 8 CFR §214.2(f)(16)(i)(F) to confirm that DSO oversight is considered a compelling circumstance beyond the student's control. DHS should also emphasize that the list is not all inclusive and that other circumstances not listed may be considered to be beyond the student's control.

## V. DHS SHOULD PRESERVE THE ABILITY OF SCHOOLS TO ENSURE THE SUCCESS OF F-1 STUDENTS

[44] 9 FAM 402.5-5(G)

In the Proposed Rule, DHS restricts the ability of schools to ensure the success of their F-1 students. DHS should modify these restrictive provisions acknowledging that schools have a vested interest in the success of all of their students (both domestic and international) and that they (and not government officials) have the training to make sure that this success is achieved.

**a. Restricting Changes of Educational Objectives for Undergraduates Within Same Institution During First Academic Year is Misguided**

In the Proposed Rule, DHS proposes to restrict school transfers and changes of educational objectives within the first academic year of an undergraduate program of study. DHS defines an "educational objective" as a change to an F-1 student's educational level or major. Even if DHS restricts school transfers, it should not restrict the ability of students to change educational levels or majors within the same school after consultation/approval of an academic advisor. Approximately 80% of undergraduate students end up changing their majors at least once.[45] Additionally, reports indicate that students who change their majors increase their likelihood of graduating from college.[46] The earlier that undergraduate students are able to change their majors, the more likely it is that they will graduate in 5 years.[47] Therefore, DHS should not be restricting the ability of schools' academic advisors to allow students to change majors or academic levels within the same school within the first year because this restriction will only negatively impact the ability of the students to succeed and complete their academic programs faster.

**b. An Absolute Prohibition on Changes of Educational Objectives and Transferring on the Graduate Level is not Justified or Warranted**

In the Proposed Rule, DHS proposes to completely prohibit graduate level F-1 students from changing educational objectives or transferring schools. In order to justify the restrictions on changing educational objectives or transferring schools, the Proposed Rule states that since DHS eliminated the EOS application requirement in 1991 and began relying on DSOs to make decisions about educational progress, it has enabled "thousands to stay here for decades by switching programs and not making any upward progress."[48] In support of this statement, DHS indicates that it has reviewed SEVIS data and has identified 2,134 F-1 students who entered the United States between 2000 and 2010 and still remain in active status. However, DHS fails to indicate that each year there are more than 1 million F-1 students studying in the United States.[49] Therefore, if between 2010 and 2025 there were 15 million students studying in the United States and only 2,134 have been identified continuing their studies since 2010, this accounts for 0.01% of the F-1 student population over this period. There are currently approximately 881,000 F-1 graduate students enrolled at U.S. institutions. Instead of severely impacting these students' ability to progress towards their academic goals which may include a change in major, educational level or institution, DHS should have SEVP review the records for the 2,134 F-1 students that it has

---

[45] *See* https://eab.com/resources/insight-paper/how-late-is-too-late/.
[46] *See* id.
[47] https://nces.ed.gov/fastfacts/display.asp?id=569.
[48] 90 Fed. Reg. 42088.
[49] *See* https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf.

identified as remaining in the U.S. for more than 15 years in order to confirm that they are complying with the terms of their F-1 status - an ability that SEVP has had since the introduction of the SEVIS system in 2003.

### c. DHS Should Leverage SEVP to Ensure Compliance

Instead of creating new requirements and restrictions in the F program, DHS should better use and more fully fund the tools that it already has available through SEVP to detect non-compliant F-1 students and national security threats. SEVP uses its web-based system SEVIS "to qualify individuals for F and M status and to facilitate Port-of-entry admission screening; Processing of nonimmigrant benefit applications; Verification of nonimmigrant status maintenance; and Timely removal of nonimmigrants from the United States, as needed."[50] It also uses SEVIS to review schools through a recertification process every two years. According to SEVP, "law enforcement agencies use SEVIS to protect national security and enforce immigration laws. SEVIS is a critical national security component and a primary resource for conducting counterterrorism and counterintelligence threat analysis by the law enforcement and intelligence communities." [51] SEVP also has numerous analysts and field representatives who have been trained to determine students' and schools' compliance with the F, J, and M regulations.

In the Proposed Rule, DHS acknowledges the expertise of SEVP by allowing SEVP analysts (and not USCIS officers) to adjudicate whether undergraduate students may transfer schools or change educational objectives during their first academic year. However, the Rule does not extend this accommodation to graduate students. Graduate students should not be treated differently than undergraduate students. At a minimum, graduate students should be allowed to demonstrate to SEVP the need to transfer schools or change educational levels. If SEVP grants the transfer or change and the student still needs to apply for an extension of stay through USCIS, USCIS officers should defer to the determination of SEVP.

### d. DHS Should Continue to Allow Flexibility for F-1 Academic Progression

The Rule would prohibit F-1 students from completing two programs at the same educational level or returning to a lower educational level for an additional course of study. There may be many valid reasons why domestic or international students need to complete two programs at the same educational level or at a lower level. For example, a graduate student majoring in Computer Science may be told by his employer that she cannot be promoted to a Project Manager position without a Master of Business Administration degree. Professionals may pursue a second master's degree later in life, and some may combine master's programs in fields like business, public health and public policy, for a specialized skillset essential for a successful career. Therefore, instead of a complete prohibition, DHS should find a balance between its concerns about student educational progress and the need of certain F-1 students to complete an additional course of study at the same

---

[50] https://docs.publicnow.com/viewDoc?filename=139931%5CEXT%5C82522E399476874A0AD17212146493871 5233F3E_1F19F4F9DE9BD84DD1668A9168E54DB00952AD44.PDF

[51] *See* id.

or lower level. The following are some options that DHS should consider in order to promote F-1 students' academic success ensuring the continued integrity of the F-1 student program:

1. DHS could require that all school transfers or changes in educational programs at the same or lower level be reviewed by SEVP. SEVP could require DSOs to upload supporting documentation with the recommendation for the transfer or change. If SEVP identifies an issue, it could request additional information from the student and/or the school to resolve issues about the bona fides of the transfer or change in educational objectives. Additionally, the student may be required to file an EOS application to extend the period of admission to accommodate the change. However, as previously stated, the USCIS officer should defer to the SEVP determination and not re-adjudicate that decision.

2. In a similar rule proposed in September 2020, DHS proposed a different, more practical approach to F-1 students' change in educational levels.[52] This included:
    a. An F-1 student who has completed a program in the United States at one educational level and begins a new program at the same educational level, up to, but not more than two additional times, is considered to be maintaining F-1 status. This is a lifetime limit.
    b. An F-1 student who has completed a program in the United States at one educational level and begins a new program at a lower educational level is considered to be maintaining F-1 status only in the first instance of such a change. This is a lifetime limit.

AILA and the Council do not support lifetime limits because there may be situations where such an educational path may be needed for career progression. For example, a person with a master's degree in finance who wants to move into actuarial science may need a bachelor's degree in mathematics or statistics if their graduate coursework did not cover required quantitative prerequisites. Rather than imposing lifetime limits, DHS could impose additional programmatic requirements by SEVP to verify the need for these types of changes. Also, USCIS may still review those changes when the F-1 student applies for an extension of stay to accommodate the time that it will take the F-1 student to complete the new program, should the EOS application be implemented by DHS in this situation. As mentioned earlier in this comment, extensions of stay should be approved by DOS and reviewed by SEVP through the SEVIS reporting capabilities.

## VI. TRANSITION PROCESS TO A FIXED TIME PERIOD OF ADMISSION

### a. If the Proposed Rule is Finalized, Individuals in F and J Status Should Maintain their Duration of Status Admission

The proposed transition provisions are complicated and will likely result in substantial confusion for the students, exchange visitors, DSOs, DHS officials charged with administering SEVIS

[52] 85 FR 60591 (September 25, 2020),

through SEVP, and USCIS officers adjudicating immigration benefits applications. If DHS implements the change to a fixed period of admission, which AILA and the Council oppose, DHS should consider simplifying the transition provisions to allow those who are in the United States on the date of enactment to retain their "duration of stay" admission status until the end of their program date on their Form I-20, DS-2019, rather than limiting their programs to a fixed stay of up to 4 years from the date of enactment. Allowing those F and J nonimmigrants to complete their programs with "duration of status" would be less confusing for all those affected because the period of admission will be clearly indicated on the nonimmigrant's Form I-20 or DS-2019. Similarly, allowing I nonimmigrants currently in status to maintain D/S through the duration of their current employment contract would minimize burdens.

Individual F and J nonimmigrants whose program end dates are more than 4 years after the enactment date will not have any immigration document evidencing when their period of stay ends (their I-94 records will still state "D/S", and their program end dates on their I-20s or DS-2019s will be different than their new period of fixed stay). Nor will any F or J nonimmigrant have any documentation evidencing whether they have a 30- or 60-day grace period once their period of fixed stay ends. This will make it difficult for F and J nonimmigrants to comply with the new regulations, and for DHS to keep track of those nonimmigrants' status. To apply a fixed period of admission to the current F and J nonimmigrants, DHS would need to provide each F and J nonimmigrant subject to the transition provisions with an immigration document (i.e. a new I-94 record) that clearly states the nonimmigrant's new fixed stay end date and whether the individual has a 30- or 60-day grace period. This would ensure that the nonimmigrant, those who work with them, and all DHS (and local law enforcement) officials who interact with the F or J nonimmigrant, can easily determine what the individual's immigration status is without having to engage in a complicated legal analysis. Because providing such individualized records is logistically complicated, we propose that the continuing F and J nonimmigrants are grandfathered from the application of this Proposed Rule and are allowed to remain in the United States until the end of their programs for the duration of status. The Proposed Rule should only apply to F and J nonimmigrants arriving in the United States after the adoption of the Rule so that they are granted the fixed period of admission and have an accurate I-94record from the very beginning of their program in the United States.

Additionally, we are concerned about how USCIS adjudication delays of I-765 OPT and I-539 applications will affect those F and J students or exchange visitors subject to the transition rules. For example, if an F-1 student who is in the United States on the date of enactment has a timely filed pending I-765 application, but their program date has ended, what would their status be if USCIS ultimately denies the I-765 application more than 60 days after the date of enactment? Would this F-1 student still get a 60-day grace period from the date that the I-765 OPT application was denied? If not, what would the F-1 student's immigration status be, and would they have any grace period? What documentation would the F-1 student have evidencing their new fixed period of authorized stay? These questions raise complex and nuanced issues not currently addressed in the Proposed Rule. They evidence the fact that the simplest and cleanest solution would be to leave the current rules in place for those students and exchange visitors already pursuing their programs and, if DHS were to adopt the Proposed Rule, apply it only prospectively to those students and exchange visitors who have not arrived in the United States yet.

### b. If the Proposed Rule is Finalized, Individuals in I Status Should Maintain their Duration of Status Admission

Similarly, should this Proposed Rule be finalized, individuals in I nonimmigrant status on the effective date of the Rule should be grandfathered in and remain duration of status through the completion of their contract. As explained above, allowing individuals who were admitted before the Final Rule takes effect to remain in valid status on their present I-94s will reduce confusion and compliance issues regarding immigration documentation and periods of stay for I nonimmigrants, their employers, and agency officials.

DHS proposes a 240-day transition period because it is the timeframe authorized for automatic extension under 8 CFR §274a.12(b)(20). DHS states that I nonimmigrants who change employers are already familiar with this provision. However, this is only a portion of I nonimmigrants who need to file Form I-539 applications, so the justification to have such a short transition period is misplaced. As I nonimmigrants typically have 5-year contracts, the vast majority of I nonimmigrants will not only need the automatic transition period, but they will also be required to file an extension of stay application. Current processing times for extension of stay applications are 6.5 months for "all other" and will likely increase significantly when tens of thousands of individuals who are in the United States when the Final Rule takes effect are all forced to file extension applications within a short period. To limit the burden on the applicants, their employers, and USCIS operations, DHS should not impose a fixed period of stay to I nonimmigrants who were admitted prior to the effective date of this Rule, if finalized.

## VII. DHS IS ATTEMPTING TO ELIMINATE CODIFICATION OF THE "DEFERENCE POLICY" WITHOUT THE NOTICE REQUIRED UNDER THE ADMINISTRATIVE PROCEDURE ACT

On December 18, 2024, DHS published a Final Rule entitled "Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers effective on January 17, 2025 ," (H-1B Modernization Rule)[53] As part of the H-1B Modernization Rule, DHS explained it was "codifying its current deference policy to clarify that, when adjudicating a Form I–129, Petition for Nonimmigrant Worker, involving the same parties and the same underlying facts, adjudicators generally should defer to a prior USCIS determination on eligibility, unless a material error in the prior approval is discovered or other material change or information impacts the petitioner's, beneficiary's, or applicant's eligibility."[54] DHS provided extensive commentary about the reasons and justifications for codification of the deference policy, including explaining that the policy "will help ensure consistent and efficient adjudications and provide greater predictability to the visa petition process without… compromising the level of scrutiny needed for substantive assessment."[55] This change was finalized after going through a 60-day notice and comment period.

In the preamble of the H-1B Modernization Rule, DHS devoted a full six pages to a discussion of codification of the deference policy, including the benefits of codification of the policy and an

[53] 89 Fed. Reg. 103054 (Dec. 18, 2024).
[54] *Id*. at 103055.
[55] *Id.* at 103094.

explanation of the limits of deference in adjudications.[56] In this Proposed Rule, however, DHS appears to be seeking to eliminate the deference policy at least as it applies to extension of stay adjudications without proper justification. DHS attempts to justify this change by characterizing this as a simple technical update "[l]ike the technical updates to strike the specific form name from 8 CFR §214.1(c)(2)."[57]

This is simply not correct. The Proposed Rule would make a major change to 8 CFR §214.1(c)(5), which is evident from comparing the current regulatory language implemented after the enactment of the H-1B Modernization Rule in January 2025 to what that language would become under the Proposed Rule.

> Current 8 CFR §214.1(c)(5)
> Deference to prior USCIS determinations of eligibility. When adjudicating a request filed on Form I-129 involving the same parties and the same underlying facts, USCIS gives deference to its prior determination of the petitioner's, applicant's, or beneficiary's eligibility. However, USCIS need not give deference to a prior approval if: there was a material error involved with a prior approval; there has been a material change in circumstances or eligibility requirements; or there is new, material information that adversely impacts the petitioner's, applicant's, or beneficiary's eligibility.
>
> Proposed 8 CFR §214.1(c)(5)
> ***Decisions for extension of stay applications***. Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at USCIS's discretion. The denial of an application for extension of stay may not be appealed.

This substantial change to the very regulation that implemented the codification of deference – deleting essentially **all** of the regulatory language and replacing it with language indicating that extensions will only be granted at USCIS's discretion – is not a "technical update." It is a major regulatory change that would eliminate a carefully developed and considered policy. Implementing such a change in this way would violate the notice provisions of the Administrative Procedure Act at 5 U.S.C. 553(b) because it fails to give the public meaningful notice of a major legislative (substantive) rule.

It should be noted that what DHS is proposing as the new language of 8 CFR §214.1(c)(5) is similar to the current language of 8 CFR §214.1(c)(7), but the proposed regulatory language in the Proposed Rule lists this language as the "new" language for 8 CFR §214.1(c)(5). If DHS intended to keep in place the current language of 8 CFR §214.1(c)(5) and instead update the language of 8 CFR §214.1(c)(7), it should clarify in publication of the Final Rule that this was an error and make a correction accordingly.

AILA and the Council urge DHS to eliminate the proposed change to 8 CFR §214.1(c)(5) and keep in place the current regulatory language. All of the reasons for codification of the deference policy

[56] *Id*. at 103093 – 103098.
[57] 90 Fed. Reg. 42107, 42083.

explained in the preamble of the H-1B Modernization Rule remain valid today, and DHS has not identified any reason for a change in that rule. If it is DHS's intention to make a major change to well-developed, considered, and extensively discussed regulatory language by characterizing that change as a simple "technical update," then DHS has failed to comply with the notice provisions of the Administrative Procedure Act.[58] If that was not DHS's intention, it should specifically clarify what modifications will be made to 8 CFR §214.1(c)(5) and 8 CFR §214.1(c)(7) and provide the public with an opportunity to make meaningful comments on those changes.

## VIII. CONCLUSION

The Proposed Rule is not only unsound economic policy, but it also violates the Administrative Procedure Act. By relying on flawed and misleading economic data, DHS has failed to provide the public with accurate notice of the true costs of the proposal. DHS has also failed to comply with Executive Orders 12866 and 12563, the Unfunded Mandates Reform Act, and the Regulatory Flexibility Act. The Proposed Rule should be withdrawn for failure to provide sufficient notice opportunity to the public, consider the significant economic burdens that would be imposed on the public, and fails to consider proposals that would be less burdensome for students, exchange visitors, foreign media representatives, DHS officers, institutions of higher education, program sponsors and U.S. employers. Duration of status is a proven and effective tool that balances security and flexibility, both of which are essential to supporting American employers' access to high-skilled talent, sustaining economic growth, and attracting top international students without compromising border security. If DHS continues to finalize this Rule, despite opposition, AILA and the Council strongly urge DHS to adopt regulatory modifications reflective of existing law and current market realities to protect the pipeline of talent and innovation that is critical to the United States.

Sincerely,

THE AMERICAN IMMIGRATION LAWYERS ASSOCIATION and
THE AMERICAN IMMIGRATION COUNCIL

---

[58] *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (the procedural rule exception to notice and comment applies only to "internal house-keeping measures organizing agency activities").

# EXHIBIT 25

# Comment Opposing DHS Proposed Rule to Eliminate “Duration of Status” for International Students (Docket ICEB-2025-0001)

## Introduction

On behalf of Local 6156 of the American Federation of Teachers, we write in **strong opposition** to the Department of Homeland Security’s proposed rule “Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media” (DHS Docket No. ICEB-2025-0001).

Our Local represents more than **2,000 student workers and post-doctoral workers** (including teaching assistants, research assistants, proctors, and other essential academic workers at the undergraduate, graduate, and postdoctoral levels) at Brown University.

Nearly half of Brown University’s student workers and postdoctoral workers are non-US-citizens. They are directly impacted by the changes in proposed rules governing F-1 and J-1 visas. Their contributions to our university are invaluable. **The university is unable to accomplish its key research and teaching objectives without the international workforce.** We therefore have a direct stake in this policy and are deeply concerned that the proposed changes will undermine the workers’ **visa security, research, teaching, and overall academic operations**, as well as **harm the broader educational mission and research enterprise** of Brown University and other peer institutions.

Nearly identical changes were attempted in 2020 and met with overwhelming opposition. That previous proposal was ultimately withdrawn before taking effect. Many of the proposed changes faced widespread opposition in 2020, amassing over 32,000 comments in opposition to the rule.[1] Ending D/S would make it much **more challenging to pursue education, conduct doctoral research and teaching, and participate in postdoctoral training in the U.S.,** thus **harming the international workforce** and driving talented international students to other countries.

**We urge DHS not to implement the proposed changes, especially those to 8 CFR 214.2(f)(5)(i) and to maintain the current Duration of Status framework.** In this comment, we outline how the proposed fixed admission period would **undermine U.S. interests**, create **visa insecurity**, cause **research delays**, disrupt **teaching responsibilities**, and

---

[1]“Regulations.Gov.” Accessed September 29, 2025.

https://www.regulations.gov/docket/ICEB-2019-0006/comments.

negatively impact **students and workers at the undergraduate, master's, doctoral and postdoctoral levels**, all while providing no commensurate benefit to justify these harms.

Our argument consists of **four** parts. First, we respectfully raise some questions about the **operational burdens and the economic assumptions** made in the Regulatory Impact Analysis and the OMB statements of the proposed rule. Second, we present **impacts on the student workers and postdoctoral workers** at Brown University, if the proposed rule were to be implemented. Third, we outline the economic impact the proposed rule would have on the **U.S. national economy and Rhode Island economy**. Fourth, we respectfully raise some **statutory questions in the Legal Authority** section (IV.A.) of the proposed rule.

# PART 1: Operational and Administrative Burdens Created by the Proposed Rule

## 01. Critical Timeline and Processing Deficiencies

**Unrealistic Processing Volume Expectations for USCIS:** The Department's own analysis reveals fundamental flaws in the proposed rule's implementation framework. DHS acknowledges that "approximately 414,000 [nonimmigrant academic students] would file an EOS each year" — a volume that exceeds the total number of F-1 student visas issued annually by the Department of State (which issued 401,000 F-1 visas in fiscal year 2024).[2,3] First, USCIS is a department which does not normally process such visas. Second, USCIS would need to process more extension applications annually than the State Department, which normally processes such visas, processes initial visa applications. Third, the scale becomes even more concerning when considering that these 414,000 EOS applications would be concentrated among students in multi-year programs, creating severe bottlenecks as doctoral and graduate students simultaneously approach their four-year limits. Hence, USCIS would need to manage a highly multivariable distribution of operations.

The timing of these applications creates an even more dire scenario. Most international students begin their programs in fall semesters, meaning the vast majority of four-year admission periods will expire simultaneously in late summer. This will concentrate these 414,000 EOS applications, concentrated among students in programs longer than four years, into a narrow 2-3 month window each year. This amounts to potentially more than 300,000 applications filed between June and August. USCIS, which currently processes I-539 extensions in 4.5 months, would face an impossible processing surge that could extend wait times to 8-12 months during peak periods.[4] Students would be forced to submit applications nearly a year before their status expires just to receive decisions on time. And yet, fourth, this proposal provides no adequate mechanism to handle this new, massive, and multi-variable processing burden. The Department further admits that "while USCIS could try to anticipate the volume, the sheer number of simultaneous nonimmigrants filing for EOS could significantly lengthen processing times." This acknowledgment of inevitable delays directly contradicts the rule's

---

[2] Immigration and Customs Enforcement Bureau, "The Regulatory Impact Analysis," 2.
[3] US Department of State, "Nonimmigrant Visas Issued by Classification and Nationality (Including Border Crossing Cards): Fiscal Year 2024," https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2024AnnualReport/Table%20XVI.pdf.
[4] Obtained by manually checking processing time by entering the entry enquires into https://egov.uscis.gov/processing-times/

operational requirements and demonstrates inadequate planning for implementation of a system that would essentially duplicate the State Department's entire F-1 visa processing operation annually.

**Contradictory Timing Requirements Create Impossible Standards for Applicants:** The proposed rule establishes contradictory requirements that render compliance practically impossible. Under 8 CFR 214.2(f)(7)(i), "F-1 applicants generally would need to timely file their EOS application — meaning that USCIS would need to receive the application on or before the date the authorized admission period expires." However, the Department simultaneously acknowledges that "USCIS's average EAD processing time is typically 60-210 days for foreign students and 90-120 days for most others."[5] This creates an untenable situation where students must submit applications before expiration but face processing times that may extend well beyond their authorized stay, potentially rendering them out-of-status through no fault of their own.

## 02. Disproportionate Administrative Burden on Educational Institutions

**Exponential Increase in DSO/RO Workload Without Corresponding Resources:** The proposed rule would impose unprecedented administrative burdens on Designated School Officials (DSOs) and Responsible Officers (ROs) who "carry nearly all their school's reporting burden." Current responsibilities already include "collecting F-1 and M-1 student information... collecting, updating recertification and managing F and M nonimmigrant information in SEVIS... [and] managing their respective school's SEVP certification." According to the Department's Regulatory Impact Analysis, the additional requirements under this rule would require DSOs/ROs to dedicate "35 hours for rule familiarization, 16 hours to create and modify training materials, and 16 hours to adapt to the proposed rule through system-wide briefings and systemic changes" — representing a 67-hour initial burden per official that DHS acknowledges but provides no funding to address.[6]

Beyond initial implementation costs, the Department's own estimates reveal an entirely new category of work that DSOs/ROs would be required to perform: spending “3 hours per EOS request for (1) reviewing the foreign student's or exchange visitor's EOS request form (1 hour), (2) updating the SEVIS record and tracking EOS requests (1 hour), and (3) advising the foreign student or exchange visitor about the extension process.”[7] These regular responsibilities do not currently exist under the Duration of Status system. With DHS's projected 414,000 annual EOS applications, this represents

---

[5] Immigration and Customs Enforcement Bureau, “The Regulatory Impact Analysis,” 4.
[6] Immigration and Customs Enforcement Bureau, “The Regulatory Impact Analysis,” 29.
[7] Immigration and Customs Enforcement Bureau, “The Regulatory Impact Analysis,” 29.

over 1.2 million additional administrative hours annually. This exponential increase in workload without corresponding resources will force institutions to either hire substantial additional staff or reduce services to students, creating an unfunded mandate that undermines educational and business quality.

**Per-Application Processing Requirements Multiply Administrative Costs:** Beyond initial implementation costs, DSOs/ROs would be required to spend three hours per EOS request: one hour reviewing the extension request form, one hour updating SEVIS records and tracking requests, and one hour advising students about the extension process. With an estimated 414,000 annual EOS applications, this represents over 1.2 million additional administrative hours annually across the higher education system — a burden that institutions are not equipped to absorb without significant additional resources. Using conservative salary estimates for higher education administrators, this workload creates massive unfunded costs for institutions. The Bureau of Labor Statistics indicates that the average higher education administration salary is 103,960 per year, or approximately $49.98 per hour including benefits.[8] With DHS's projected 414,000 annual EOS applications requiring 3 hours of DSO/RO time each, this represents over 1.2 million additional administrative hours annually across the higher education system. At current salary levels, this translates to approximately $60 million in additional annual personnel costs that institutions must absorb without any federal funding support. This cost burden will fall most heavily on smaller institutions with limited administrative capacity. While major research universities may have 8-12 DSOs to distribute the workload, small liberal arts colleges typically operate with 1-2 DSOs who must handle all international student processing. For a small college with 200 international students, even a 25% extension rate would require 150 hours of additional DSO time annually — nearly a month of full-time work with no additional staffing budget. This exponential increase in workload without corresponding resources will force institutions to either hire substantial additional staff or reduce services to students, creating an unfunded mandate that undermines educational quality.

**Small Entity Analysis Reveals Inequitable Burden Distribution:** DHS estimates that "4,260 SEVP-certified schools that are authorized to enroll F nonimmigrants meet the SBA definition of a small entity," with "150 small schools (3.5 percent)" experiencing "an impact between 1 percent and 2 percent of their estimated annual revenue."[9] While the Department acknowledges that "the collection of information through SEVIS does

---

[8] The Bureau of Labor Statistics, "Postsecondary Education Administrators," *Occupational Outlook Handbook,* https://www.bls.gov/ooh/management/postsecondary-education-administrators.htm#:~:text=and%20academic%20deans.-,Pay,State%20&%20Area%20Data.

[9] Immigration and Customs Enforcement Bureau, "The Regulatory Impact Analysis," 65.

impact small businesses and other small entities, particularly SEVP-certified schools," it fails to provide adequate mitigation measures for these disproportionate impacts.

### 03. Critical Technology Infrastructure Deficiencies

**Acknowledged System Limitations Undermine Implementation Feasibility for SEVIS:** DHS explicitly recognizes that "this proposal may require updates to SEVIS and other systems," yet admits that "the timeframe for those updates is not fixed and there could be technical issues regarding implementation." Consequently, "DHS is proposing to include a provision whereby the Department may delay or suspend implementation" — an acknowledgment that the rule's technological foundation remains fundamentally uncertain. This admission is particularly concerning given DHS's simultaneous assertion that the rule addresses urgent compliance needs, yet they cannot guarantee the basic technological infrastructure will be ready for implementation. The Department's own admissions reveal the contradictory nature of this proposal. While DHS claims the rule addresses urgent compliance concerns, they simultaneously acknowledge that "the timeframe for those [system] updates is not fixed" and include provisions to "delay or suspend implementation" due to technical issues. This contradiction demonstrates that DHS is proceeding with a rule that they cannot guarantee they can implement, essentially conducting a regulatory experiment on the backs of international students and educational institutions. The Department cannot credibly argue for the urgency of eliminating Duration of Status while admitting they lack the technological capacity to implement their proposed alternative.

**Historical SEVIS System Reliability Issues Compound Implementation Risks:** The Department's confidence in system capabilities is undermined by SEVIS's documented history of outages and technical failures. Stakeholders have repeatedly requested that SEVP provide more advanced notice for planned SEVIS outages and other events that may affect a school's batch processing capabilities, indicating ongoing system instability.[10] Recent examples include SEVP portal shutdowns in April 2024 where students should be able to login again and see their employment information by April 29 after system fixes were implemented.[11] Adding the processing load of 414,000 annual EOS applications to a system that already experiences regular outages and requires frequent emergency repairs creates an untenable risk of widespread processing failures that could leave thousands of students out of status through no fault of their own.

---

[10] "SEVIS Outages and Batch Communications," Study in the States, accessed [09/26/2025], https://studyinthestates.dhs.gov/trends-and-improvements/sevis/sevis-outages-and-batch-communications.

[11] Jennifer King, "SEVP Portal Access and Display Issues," University of Connecticut Center for International Students & Scholars, April 18, 2024, https://international.global.uconn.edu/2024/04/18/sevp-portal-access-and-display-issues/.

Adding the processing load of 414,000 annual EOS applications to a system that already experiences regular outages and requires frequent emergency repairs creates an untenable risk of widespread processing failures that could leave thousands of students out of status through no fault of their own. This concern is not theoretical — recent cases show students losing legal status without warning when universities discovered terminated records only through routine SEVIS monitoring.[12]

**Unquantified IT Investment Requirements Create Fiscal Uncertainty for DHS and Universities:** The proposal acknowledges that implementation "could lead to system upgrades by schools and program sponsors that currently use batch processing to interface with SEVIS." However, "because of the uncertainty of the scope and scale of the system upgrades needed as a result of this proposed rule, DHS has not monetized the cost of these potential, future IT investments." This failure to quantify necessary technological investments represents a critical gap in the regulatory impact analysis and demonstrates inadequate preparation for implementation. Universities currently rely on batch processing systems to efficiently manage hundreds or thousands of student records simultaneously — systems that may require complete overhauls to handle the new extension processing requirements.

## 04. Inadequate Financial Analysis and Resultant Regulatory Insufficiencies

**Vague Financial Evidence Requirements Create Compliance Uncertainty:** The proposed rule mandates that "applicants must submit evidence of sufficient funds to cover expenses," with "failure to provide such evidence" rendering applicants "ineligible for the EOS." However, the Department provides limited guidance on acceptable evidence beyond requiring "complete copies of detailed financial account statements for each account intended to be used to fund the student's education; other immediately available cash assets; receipts and/or a letter from the school accounts office." This vague standard creates uncertainty for both applicants and adjudicators, increasing the likelihood of arbitrary denials and inconsistent application. The Department provides no guidance on what constitutes "sufficient" funding levels, how to evaluate foreign financial documentation, standards for verifying support from family members or sponsors, or treatment of financial aid and assistantship income.

The Department's Regulatory Impact Analysis reveals a fundamental pattern of acknowledging significant costs while refusing to quantify them. On page 42, DHS admits that "the percentage of nonimmigrants that USCIS would ask to provide additional information or participate in an in-person interview is uncertain," yet provides

[12] Kim Lovaas, "Update from the ISS Director: SEVIS records cancelled," University of Washington International Student Services, April 8, 2025, https://iss.washington.edu/immigration-update-sevis-records-cancelled/.

no methodology for estimation despite readily available data sources. DHS acknowledges that "each occurrence could result in additional costs; however, this analysis does not quantify the costs of such requests for either nonimmigrants or USCIS." With 414,000 projected annual applications, even modest interview rates would generate tens of thousands of additional proceedings with quantifiable costs that DHS chose to ignore. Interview costs could easily be estimated using current USCIS data on interview rates for similar I-539 applications, which are publicly tracked and reported. RFE rates for extension applications are documented in USCIS statistics and could provide baseline estimates. The Department's assumption that additional burden would be "equivalent to the added expense of seeking third-party assistance for completing the Form I-539, or $490" appears arbitrary without supporting analysis.

**Unrealistic Travel and Processing Cost Estimates for Applicants:** DHS's cost projections for mandatory biometrics appointments further reveal inadequate analysis. The Department assumes students will travel an average of "50 miles round-trip" to DHS facilities, yet provides no analysis of geographic distribution of Application Support Centers relative to universities. Many students, particularly those at rural institutions, face significantly longer travel distances. Additionally, the Department's travel cost estimates appear to assume universal car ownership, ignoring students who rely on public transit, rideshare services, or must arrange overnight accommodation for distant appointments. These systematic underestimations compound to create actual costs far exceeding DHS projections.

**Missing Federal Implementation Costs Estimates:** Pages 44-45 of the Regulatory Impact Analysis reveal that DHS "continues to explore the necessary upgrades to systems and procedures" but "does not quantify the costs associated with training CBP officers or the operational costs associated with new systems and procedures." The Department acknowledges "implementation and operational costs to the government associated with assessing aliens at the POE for purposes of authorizing an admission period of up to 4 years," yet admits they "continue to explore the necessary upgrades." This represents a massive analytical gap because system modifications to handle 414,000+ annual applications will require substantial USCIS IT infrastructure investments that follow standard government procurement processes. CBP training costs for new admission procedures are routine government training expenses with established cost-per-employee methodologies. The admission that they are still "exploring" basic implementation requirements demonstrates premature rulemaking without adequate preparation.

**Unquantified IT Investment Requirements Demonstrate Analytical Negligence:** Page 45 of the Regulatory Impact Analysis acknowledges that implementation "could lead to system upgrades by schools and program sponsors that currently use batch

processing to interface with SEVIS," requiring "new database management procedures." However, DHS states that "because of the uncertainty of the scope and scale of the system upgrades needed as a result of this proposed rule, DHS has not monetized the cost of these potential, future IT investments." This claimed uncertainty is analytically indefensible. Universities using batch processing represent identifiable entities whose systems can be surveyed and assessed using standard IT cost methodologies. Database modification costs are routine expenditures with established industry benchmarks that government agencies regularly employ for similar assessments. Universities currently rely on these systems to efficiently manage hundreds or thousands of student records simultaneously—systems that would require substantial overhauls to accommodate 414,000 annual extension applications. The Department could easily request cost estimates from affected institutions rather than claiming uncertainty, yet chose to exclude these quantifiable expenses, artificially minimizing the rule's economic impact on educational institutions.

**Incomplete Cost-Benefit Analysis Violates Regulatory Requirements:** The Department's explicit admission that "the proposed rule would result in certain populations incurring costs. Some of the costs have been quantified based on available data, and the remaining costs are qualitative" represents a fundamental failure in regulatory analysis that invalidates their economic justification. DHS cannot credibly impose $390+ million in annual costs while admitting their analysis remains incomplete and excludes major cost categories. The Department's characterization of institutional impacts as affecting "DSOs and ROs from SEVP-certified schools and DOS designated exchange visitor programs by requiring time for rule familiarization, training, modification of training materials, and institutional awareness and responses during the first year only" demonstrates systematic cost underestimation.[13] This "first year only" limitation is factually incorrect — doctoral programs routinely extend beyond four years, and undergraduate programs frequently face delays due to study abroad, internships, health issues, or academic requirements. Each cohort of students will require institutional support for extension applications, making training and compliance responses ongoing annual requirements, not one-time costs. Most critically, DHS acknowledges that "an open education environment provides enormous benefits" but admits the Regulatory Impact Analysis "doesn't account for the loss of those benefits under the proposal." This violation of basic cost-benefit analysis standards — proceeding with expensive regulatory changes while explicitly acknowledging failure to quantify the educational, research, and economic benefits that would be eliminated — renders the entire economic justification invalid. The Department cannot credibly claim their analysis supports regulatory action when they admit to excluding major cost categories,

[13] Immigration and Customs Enforcement Bureau, “The Regulatory Impact Analysis,” 5.

systematically underestimating recurring expenses, and failing to measure significant benefits that implementation would destroy.

### 05. Flawed Data Methodology Undermines Analysis Validity

**Reliance on Outdated Data Compromises Accuracy:** The Department's analysis relies on "detailed nonimmigrant student and exchange visitor program sponsor data from SEVIS for FY 2016, FY 2017, and FY 2018."[14] DHS acknowledges that "since the data extraction and cleaning process applied to FY2016-FY2018 data could not be replicated and the original data cleaning methods would not be compatible with a newer extraction, DHS did not update the individual-level data."[15] Using data that is 6-8 years old to project future impacts fundamentally undermines the analysis's reliability and accuracy.

**Acknowledged Estimation Limitations Further Compromise Analysis:** The Department concedes that "this analysis may overestimate the number of EOS requests by F nonimmigrants because it does not account for (1) premature departures from the program not captured by program lengths... (2) person-level EOS requests triggered by multiple criteria in the same program year, and (3) a potential decline in new foreign student enrollment." These limitations demonstrate that the regulatory impact analysis lacks the precision necessary to support such significant policy changes.

### 06. Conclusion of Operational Burdens and Further Clarifications Needed

The operational challenges identified throughout this analysis demonstrate that the proposed rule creates significant administrative burdens without adequate planning for implementation or realistic assessment of processing capacity across affected institutions and agencies. The Department's own admissions regarding processing delays, technology limitations, unquantified costs, and data deficiencies reveal fundamental flaws that render the proposed rule operationally unworkable and economically unjustifiable. We urge DHS to withdraw this proposal and maintain the current Duration of Status framework that has served students, institutions, and national interests effectively for over three decades.

Based on the potential operational burdens above, we would like to ask:

- How does DHS plan to process an estimated 414,000 annual Extension of Stay applications when this volume exceeds the total number of F-1 student visas

[14] Immigration and Customs Enforcement Bureau, "The Regulatory Impact Analysis," 12.
[15] Immigration and Customs Enforcement Bureau, "The Regulatory Impact Analysis," 12.

issued annually by the Department of State, and what specific measures will prevent the acknowledged processing delays that could extend wait times to 8-12 months during peak periods when most four-year admission periods expire simultaneously in late summer?

- Given that the proposed rule would require over 1.2 million additional administrative hours annually across the higher education system, translating to approximately $60 million in unfunded personnel costs, how does DHS expect educational institutions to absorb these exponential workload increases without compromising educational quality or requiring substantial new hiring that smaller institutions cannot afford?
- Since DHS explicitly acknowledges that implementation "may require updates to SEVIS and other systems" with uncertain timelines and includes provisions to "delay or suspend implementation" due to technical issues, how can the Department justify proceeding with a rule when they cannot guarantee the basic technological infrastructure will be operational, particularly given SEVIS's documented history of outages and system failures?
- How does DHS reconcile imposing $390+ million in annual costs while simultaneously admitting their Regulatory Impact Analysis excludes major cost categories, systematically underestimates recurring expenses, and fails to quantify the educational, research, and economic benefits that current Duration of Status policies provide, thereby violating fundamental regulatory analysis standards?
- What specific guidance will DHS provide to ensure consistent application of the vague "sufficient funds to cover expenses" requirement, including standardized criteria for evaluating foreign financial documentation, family support arrangements, and financial aid income, to prevent arbitrary denials and compliance uncertainty?
- Given that DHS estimates 4,260 SEVP-certified schools meeting small business definitions will face disproportionate impacts, with some experiencing costs between 1-3% of annual revenue, what concrete measures will the Department implement to prevent these unfunded mandates from forcing smaller institutions to reduce international student services or withdraw from international education entirely?
- How does DHS justify basing regulatory projections on 6-8 year old SEVIS data from FY 2016-2018 when they acknowledge the "data extraction and cleaning process could not be replicated" and that the analysis may "overestimate the number of EOS requests" due to multiple unaccounted variables, thereby undermining the reliability necessary to support such significant policy changes?

# PART 2: Impacts on Higher Education Workforce

## Visa Insecurity and Administrative Burdens

PhD and graduate medical programs in the U.S.typically exceed four years in length.[16] Currently, international graduate students and scholars can rely on the D/S framework to ensure they can remain in the U.S. for the full duration of their programs. Under the proposed rule, these students would face **tremendous uncertainty** regarding their ability to complete their studies. Instead of the clarity and stability of D/S, they would be thrust into arbitrary domination of federal authority – navigating frequent extension applications, biometric appointments, and fees. At worst, students could be rendered **unintentionally out-of-status** if an extension is not timely approved. This could lead to detention, deportation, and many consequences adverse to the US scientific enterprise and educational operations. This uncertainty is **deeply destabilizing**. Graduate students already juggle intense academic workloads and research; adding constant fear about visa expiration or extension denials will impose an acute material, mental and emotional burden, which affects the workforce's performance. The **assurance that one's visa will cover the full length of an academic program is essential** – without it, students cannot plan their futures or fully focus on their studies.

Beyond not being able to plan their futures, students will choose programs in other countries where they can have visa stability, thereby taking most of the most qualified students away from the US labor market. By letting the best international students go to countries other than the US, the proposed rule would undercut American technological, healthcare, research, and other vitally important programs that preserve national security and the US economy.

The **bureaucratic hurdles** introduced by this rule are enormous and unprecedented. International students and exchange visitors would have to **regularly and unnecessarily submit additional applications** to extend their stay, **imposing significant burdens** not only on the students but also on universities and even on DHS itself. The cost stands at $390 million by DHS' estimates. Each extension would require filing a Form I-539 with USCIS, paying hefty fees, possibly attending an interview, and awaiting a decision – all while trying to continue making academic progress, completing work assignments, and making key contributions to the US research enterprise. These added steps would **exacerbate USCIS backlogs** and delays, increasing the likelihood that students will not receive decisions before their status expires. It is entirely possible that **through no fault of their own**, a student could fall out of status while waiting for a slow bureaucratic process – an outcome that could **lead to deportation or a bar on re-entry**.

Moreover, international students are already among the most heavily monitored groups in the immigration system. International student employment is already very restricted under F1 and J1 are subject to strict scrutiny and authorization by the university as well

---

[16] National Center for Science and Engineering Statistics, "Survey of Earned Doctorates (SED), 2024," https://ncses.nsf.gov/surveys/earned-doctorates/2024#survey-info.

as by the relevant federal authorities. The student records are tracked via the Student and Exchange Visitor Information System (SEVIS) in real time – their every enrollment, transfer, or change of address is reported. They routinely check in with designated school officials and follow strict visa regulations. International students already represent the most closely monitored population[17] in the U.S by DHS and their host institutions. Imposing additional USCIS oversight over routine academic changes (like updating a major or extending research by a semester) is **redundant and unwarranted**. It would entangle academic planning in red tape, effectively giving immigration officials veto power over scholarly decisions – a role wholly outside their expertise and mission. This is a **dangerous overreach** into the academic realm that will erode student autonomy and confidence in the U.S. as a welcoming place to work and study.

## Disruption to Research and Innovation

International students and workers are **integral to the research enterprise** at Brown University and universities nationwide. They staff our laboratories, drive forward experiments, co-author papers, and contribute expert knowledge across fields. Our union's international workers are at the forefront of research in STEM, social sciences, humanities, and more. By jeopardizing their ability to remain continuously present and focused on their work, the proposed rule threatens to **derail critical research projects** and slow the pace of innovation.

We need only look at recent history for evidence. In July 2020, when a different DHS directive imperiled international students' visas, it was noted that forcing these students out would have **massively disrupted the ability of universities to make progress on COVID and other critical research,** because **international students and scholars are a key workforce responsible for advancing our understanding** in vital areas. The same would hold true if this fixed-term visa rule is implemented. Research is not neatly bound by arbitrary timelines – experiments can take years, and Ph.D. dissertations often extend beyond four years. If students are forced to interrupt their work to navigate extensions, or worse, if they **lose legal status and must leave the country mid-project**, the loss to research momentum is incalculable. Projects could be delayed or abandoned entirely, and labs would lose highly trained team members without warning. This is not a hypothetical concern; it's a near certainty that complex, multi-year research endeavors (from cancer studies to engineering breakthroughs) would suffer delays due to the churn and uncertainty this rule would introduce.

International students and workers also frequently serve as **mentors and collaborators**, training undergraduates and even junior colleagues in specialized research techniques. Their sudden absence would create knowledge gaps and disrupt the continuity of research teams. It bears emphasizing that **international scholars drive innovation, create jobs, and advance groundbreaking research in the United States**. Many have pioneered developments in technology and medicine, launched startups, or enabled major grants

[17] "Archived: ICE Tracks Non-Immigrant Students in the US | ICE." April 20, 2015. https://www.ice.gov/news/releases/ice-tracks-non-immigrant-students-us.

at their host universities. Sending these talented individuals a message that their presence in our labs is precarious or unwelcomed **undermines American scientific leadership**. In an era when other countries are actively recruiting international researchers, policies that introduce instability will cause many to choose more accommodating destinations. The result would be a **brain drain** of current and future scholars that **harms the United States' research output and economic growth**.

The proposed rule's Sufficient Fund Requirement seems very burdensome from the perspective of the Paperwork Reduction Act. **8 CFR 214.2(f)(7)(i)** states that "applicants would need to demonstrate that they are eligible for the nonimmigrant classification sought. Accordingly, the applicants must submit evidence of sufficient funds to cover expenses. **A failure of such evidence would render the applicant ineligible for the EOS [Extension of Stay]**." The evidence includes, "complete copies of detailed financial account statements for each account intended to be used to fund the student's education; other immediately available cash assets; receipts and/or a letter from the school accounts office… and/or other financial documentation."

We also must consider how the fixed admission period and shortened grace period will impact students finishing their master's and moving to the workforce or further studies. Under the current D/S system, a student can finish a degree and make a smooth transition to Optional Practical Training (OPT) or begin a doctoral program at another institution without worrying about an immediate expiration of status. The proposed rule, by contrast, cuts the **grace period after program completion from 60 days to 30 days**. A master's graduate would have just one month to secure all paperwork for OPT or to transfer to a Ph.D. program – a timeline that is often impractical. If USCIS processing of extension or transfer is delayed, the student could fall out of status during that narrow window. This could **cost them a job opportunity or derail continuing education plans**. In effect, the rule creates a **cliff at graduation**, where any small delay could push a student over the edge into losing legal status. For graduating students who have already invested significant money and effort in a U.S. education, this is an unfair and punishing outcome.

In summary, by injecting visa chaos into the lives of workers, the rule would directly cause **research delays and setbacks**. These delays don't just affect the individual student; they ripple outward to impact faculty-led projects, grant timelines, and the scientific advancements that benefit the public. Our university's mission of advancing knowledge relies on the steady, **uninterrupted work of international graduate students**. We cannot afford to have that mission hindered by an unnecessary regulatory barrier.

## Impacts on Teaching and Academic Responsibilities

Graduate student workers and postdoctoral workers – many of whom are international – play a **critical role in undergraduate education** at Brown. They serve as teaching assistants, teaching fellow, proctor, and other hourly positions that make possible the university's mission. They lead discussion sections and labs, grade assignments, supervise theses, fulfill departmentally specific administrative tasks, provide mentoring

and academic support to countless students. The proposed fixed admission period rule jeopardizes the **stability of this teaching workforce**, threatening substantial disruption to learning in our classrooms.

If an international teaching assistant's status expires in the middle of an academic term, that individual could be forced to **abruptly cease teaching duties and even leave the country.** The loss of a TA or instructor with no notice would throw a course into disarray – sections could go untaught, office hours unattended, and grading delayed. It would likely fall on faculty or remaining staff to scramble to cover these gaps, adding workload and diminishing the quality of instruction for students. Even the **fear of an impending visa expiration** can affect teaching: an international TA facing uncertainty about their status may have to divert time and energy to immigration paperwork or experience stress that detracts from their focus on teaching. This is fundamentally unfair to the individuals and detrimental to the educational experience of undergraduates who depend on their instructors being fully present.

It is important to note that international graduate and postdoctoral instructors often teach in fields where their linguistic and cultural knowledge is a great asset (for example, teaching language courses or bringing global perspectives to history and literature classes). Losing these educators would **impoverish the diversity of perspectives in our curriculum**. In STEM fields, where international students comprise a large percentage of graduate TAs, entire laboratory courses and discussion sections are led by them. Removing the **D/S framework's flexibility means the university can no longer be confident that the instructors it assigns to a year-long course will in fact be allowed to stay for the whole year.** This unpredictability undermines academic planning and **harms students' continuity of learning**.

The **mutual commitment of Brown University and Local 6515 to supporting international students** is enshrined in our collective bargaining agreement – recognizing that **"international and undocumented students and scholars are vital members of the Brown University community."**[18] They are vital not only for their scholarship but also for their teaching and mentorship roles. By making those individuals' presence contingent on navigating onerous extension processes, the proposed rule undercuts this commitment and risks **degrading the quality of education** that Brown University can offer to all students. In short, the rule's impacts would reach far beyond the international students and workers themselves, directly **affecting the educational outcomes of the entire student body**.

## Adverse Effects on Master's Students and Academic Progression

**Master's students would also be severely impacted by the proposed change.** Master's degree students typically have programs lasting one to two years. While many may finish within an initial fixed visa period, any **unforeseen circumstance** – such as a health issue, parental leave, research setback, or global event (e.g. a pandemic) – that

[18] "Collective Bargaining Agreements | University Human Resources | Brown University." Accessed September 29, 2025. https://hr.brown.edu/working-brown/collective-bargaining-agreements.

requires extending their studies would force them into the **same onerous extension process** as other international students. Even a brief delay in thesis research or a need to retake a required course could trigger an extension application. The proposed rule, **in particular 8 CFR 214.2(f)(7)(i)(c)(2)**, allows little margin for the normal ebbs and flows of academic progress, especially for master's students who do not have the cushion of D/S flexibility. This **rigidity is harmful**: students might feel pressured to **rush their work or forego valuable opportunities (like internships or additional research)** for fear that taking extra time could jeopardize their status.

**Master's students are far from "safe" under this proposal**, despite their studies typically being shorter than PhD or medical programs. They, too, will face the burden of extension applications, the loss of flexibility to adjust academic plans, and the risk of failing to transition to the next steps in their career. Our union represents many master's students who contribute as teaching and research assistants; their voice is included in this comment, and their message is clear: this rule would make their educational journey markedly more difficult and perilous. We stand with them in calling for DHS to abandon these counterproductive changes.

Furthermore, the rule places new arbitrary limits on academic pathways. Notably, the proposed rule, in particular 8 CFR 214.2(f)(5)(ii), forbids F-1 students from lateral or reverse matriculation **– i.e. pursuing a program at the same or lower educational level after completing one program**. **In theory,** 8 CFR 214.2(f)(5)(ii) acknowledges the necessary coordination with the department of Education, a practice that we would strongly welcome such that all the impacts on education, workforce, and bureaucratic burdens would be more accurately estimated than what the current OMB statement suggests**.** In practice, this means a student who finishes a master's degree in one field would be barred from starting a second master's program (or a second bachelor's) in another field without leaving and reapplying for a new visa. It even appears to **prohibit a completed Ph.D. holder from pursuing another master's or different advanced credential in the U.S.** Such heavy-handed restrictions are *unprecedented*. They intrude on personal academic choices and career development. Students often discover new interests or interdisciplinary opportunities that warrant further study; our immigration rules should not categorically outlaw that. This aspect of the proposal demonstrates how it would **intrude on academic decision-making** in a deeply problematic way. Decisions about changing majors, pursuing a second degree, or transitioning between academic levels have always been made between students and academic institutions based on educational merits – DHS oversight here is unnecessary and inappropriate.

## PART 3: Undermining U.S. Interests

Beyond the direct impacts on individuals and campuses, it is crucial to recognize that this proposed rule is **contrary to the broader interests of the United States**. International students enrich our country in countless ways. Academically, they bolster our universities' excellence; culturally, they bring diversity and global perspectives to our communities; and economically, their presence is a major boon. In 2024-25, **international students contributed an estimated $46 billion**[19] to the US economy and supported 400,000 jobs[20]. This year, NAFSA is estimating that newly implemented visa bans and regulations affecting international students will **cost the economy $7 billion and 60,000 jobs.**[21]

This rule, if implemented, will similarly impact the research and educational capacities of peer institutions, **undermining US domestic and security interests**. In fact, according to the proposed rule's Regulatory Impact Analysis, "rules familiarization" and processing costs alone is in the realm of $390.3 million to $392.4 million[22]. International students are an important source of talent in critical fields. Recent data from the Association of American Universities shows that **73% of STEM international graduates continue to live and work in the US several years after graduation, providing vital scientific, technological, and economic benefits to the US.**[23] A 2024 report from the National Science Board estimates that foreign-born individuals make up **43% of doctorate-level scientists and engineers in the US.**[24] The proposed changes jeopardize U.S. leadership in global higher education.

This proposal would eliminate the longstanding "duration of status" (D/S) framework that currently allows F-1 students and J-1 exchange visitors to remain in the U.S. as long as

---

[19] "International Students Contribute Record-Breaking Level of Spending and 378,000 Jobs to the U.S. Economy." NAFSA, November 18, 2024. https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.

[20] "International Students Contribute Record-Breaking Level of Spending and 378,000 Jobs to the U.S. Economy | NAFSA." November 18, 2024. https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.

[21] "U.S. Economy Could Suffer a $7 Billion Loss from Precipitous Drop in International Students | NAFSA." July 29, 2025. https://www.nafsa.org/about/about-nafsa/us-economy-could-suffer-7-billion-loss-precipitous-drop-international-students.

[22] 3, "Regulations.Gov." Accessed September 26, 2025. https://www.regulations.gov/document/ICEB-2025-0001-0143.

[23] "New Data Show U.S. Retains Significant Share of Foreign Science and Engineering Talent Upon Graduation | Association of American Universities (AAU)." April 18, 2025. https://www.aau.edu/newsroom/leading-research-universities-report/new-data-show-us-retains-significant-share-foreign.

[24] Statistics (NCSES), National Center for Science and Engineering. *The STEM Labor Force: Scientists, Engineers, and Skilled Technical Workers*. May 30, 2024. https://ncses.nsf.gov/pubs/nsb20245/foreign-born-stem-workers#:~:text=The%20prevalence%20of%20foreign%2Dborn,56%25)%20were%20foreign%20born.

they maintain their program requirements. Instead, it imposes fixed end dates (capped at 4 years in most cases) and forces students to apply to U.S. Citizenship and Immigration Services (USCIS) for extensions to continue their studies. Virtually every doctoral program takes longer than 4 years. The Survey of Earned Doctorates from the National Science Foundation in 2024 estimates the average doctoral program takes 5.7 years, meaning that all doctoral international students would have to file an I-539 extension of stay form at least once.[25] **In 2023, there were 206,433 international students pursuing PhDs, or 15.3%** of all international students at the time.[26] Currently, the **USCIS processing times tool estimates that an I-539 extension review for F, J, and M visas takes 4.5 months**[27], unless applicants pay a premium price of $2,805.[28] Almost every single doctoral student needing to file this form would significantly lengthen the wait time.

As a result, this policy will actively **undermine U.S. higher education's competitiveness** on the world stage. **Competing countries like Canada, the U.K., Australia, China, Europe and other emerging hubs** in the Middle East and Asia are eagerly welcoming international talent with policies that provide *more* clarity and support. For instance, China has recently announced a new K visa category[29] aimed at attracting talents who leave the US in search of career opportunities. The U.K. is considering waiving visa fees[30] for top global talents, presumably aiming at the same talents who would be potentially impacted by the changes in U.S. visa rules. Australia technology sectors are actively recruiting workers[31] turned away by the increasingly stringent employment rules, which would have a downstream effect on future student enrollment in the US. If the U.S. imposes onerous time limits and uncertainty, many top students will simply choose to go elsewhere. This outcome is the opposite of an "America First" strategy – it would cede ground to other nations in the race for talent, innovation, and global leadership.

[25] National Center for Science and Engineering Statistics, "Survey of Earned Doctorates (SED), 2024," https://ncses.nsf.gov/surveys/earned-doctorates/2024#survey-info.
[26] "Read the 2023 SEVIS by the Numbers Report | Study in the States." September 24, 2025. https://studyinthestates.dhs.gov/2024/05/read-the-2023-sevis-by-the-numbers-report.
[27] Obtained by manually checking processing time by entering the entry enquires into https://egov.uscis.gov/processing-times/
[28] "How Do I Request Premium Processing? | USCIS." June 18, 2024. https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing.
[29] Wang, Vivian. 2025. "As Trump's H-1B Visa Fee Targets Foreign Workers, China Woos Them." The New York Times, September 26, 2025. https://www.nytimes.com/2025/09/26/world/asia/china-tech-workers-visas-us-h1b.html.
[30] *Reuters*. "UK Considers Plan to Scrap Visa Fees for Top Global Talent, FT Reports." United Kingdom. September 22, 2025. https://www.reuters.com/world/uk/uk-explores-plan-drop-visa-fees-top-global-talent-ft-reports-2025-09-22/.
[31] SBS News. "From Silicon Valley to Sydney: How Trump's H-1B Visa Move Could Make Ripples in Australia." September 26, 2025. https://www.sbs.com.au/news/article/from-silicon-valley-to-sydney-how-trumps-h-1b-visa-move-could-make-ripples-in-australia/amcd339a5.

Crucially, DHS suggests that a fixed time period is needed for better compliance and national security monitoring, implying that the current D/S system is somehow rife with overstays or abuse. However, no convincing data has been presented to show that international students pose a significant overstay problem or security threat. In fact, **duration of status has been in place for decades (since 1991 for F-1 students and 1993 for J-1 students) precisely because it proved effective** at allowing students to complete programs of varying lengths while still ensuring compliance through SEVIS oversight.

## PART 4: Questions about Legal Authority

Here are some observations concerning the proposed rule's citations of legal statues in the Legal Authority section (IV.A.).[32] Below,points 1 to 4 suggests that law conferred upon the Attorney General of the United States as having the power to administer and enforce immigration of aliens. Point 5 suggests that the department of Education should be consulted for implementation of visa rules affecting student visa holders and institutions of education. Point 6 suggests that the DHS and ICE have authority to implement rules promulgated by the Attorney General. Point 7 suggests that the implementation by the Department of Homeland Security should be coordinated with the local government through the Office of State and Local Coordination.

1. It seems that laws relating to "non-immigrants" appear to be "conferred upon" the Attorney General.

**8 U.S.C. § 1103 (a)(1) (2024)**, cited the first paragraph of the Legal Authority section of the proposed rule states, "The secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, **except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the Officers of the State, or diplomatic or consular officers.** Provided, however, that the determination and ruling by the Attorney General with respect to all questions of law shall be controlled."**8 U.S.C. § 1101 (a)(5) (2024)** defines the Attorney General as the Attorney General of the United States and does not mention any other designee.

2. The law cited in the Legal Authority section appears to give explicit authority to promulgate regulations pertaining to nonimmigrants to the Attorney General.

**8 U.S.C. § 1184 (a)(1) (2024),** cited the first paragraph of the Legal Authority section of the proposed rule states, "**The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe."**

3. It appears that the law is conferred upon the Attorney General, the Secretary of State, and the Secretary of Education to regulate student visa (F,J,M) holders in the United States. This broad language below makes no mention of the Secretary of Homeland Security.

**8 U.S.C. § 1372 (a)(1) (2024)** states that "**The Attorney General, in consultation with the Secretary of State and the Secretary of Education**, shall develop and conduct a program to collect from approved institution of higher education, other approved educational institutions, and designated exchange visitor programs in the United States as the information described in subsection © with respect to aliens who — (A)have the status,

[32] "Regulations.Gov." Accessed September 26, 2025. https://www.regulations.gov/document/ICEB-2025-0001-0001.

or are applying for the status of nonimmigrants under subparagraph (F), (J), or (M) section 1101(a)(15) of this title;"

4. And information collection authority also appears to be with the Attorney General, in consultation with the Secretary of State and Secretary of Education. Statue also requires consideration of curriculum calendar. Will the proposed rule consult the affected institutions of higher education regarding its implementation dates?

**8 U.S.C. § 1372 (c)(5) (2024)** reporting requirements states,**"The Attorney General shall prescribe by regulation reporting requirements by taking into account the curriculum calendar of the approved institution of higher education, or other approved educational institution, or exchange visitor program**"

5. It should be noted that the reference to the Secretary of Education is salient. In a few places, the statue references consulting with the Secretary of Education. And yet it does not have happened with this proposed rule. Did the rulemaking involve a consultation of the Secretary of Education? Was the Education Department consulted? If not, the Education Department should be consulted about any changes to the proposed rules.

**8 U.S.C. § 1101 (F)(i) (2024)** says "an alien having a resident in a foreign country which he ahs no intention of abandoning, who is bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 1184(*l*) of this title at an established college, universtiy, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States, **particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education,** which institution of place of study shall have agreed to **report to the Attorney General** the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying of following to join such an alien, and (iii) an alien who is a national of Canada or Mexicao, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except the alien's qualifications for and actual course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico; "

6. It appears that ICE's rule is to carry out a program established in **§ 1372** by the Attorney general. It does not appear to give DHS or ICE the authority to change the program.

It should be noted that the Assistant Secretary of U.S. Immigration and Customs Enforcement is conferred upon authority to a limited scope of activities. **6 U.S.C. §252 (a)(4) (2024)** states, "**the Assistant Secretary of U.S. Immigration and Customs Enforcement shall be responsible for administering the program** to collect information

relating to nonimmigrant foreign students and other exchange program participants described in section 1372 of title 8, including the Student and Exchange Visitor Information System established under that section and shall use such information to carry out the enforcement functions of the agency. ”

7. It appears the proposed rule does not adequately coordinate with State or local government for planning purposes. For instance, a loss of international students and workers from Brown University would be catastrophic economically for the local economy.

**6 U.S.C. 112 (c)(1) (2024)** states that “With respect to homeland security, the Secretary shall coordinate through the Office of State and Local Coordination (established under section 361 of this title) (including the provision of training and equipment) with the State and local government personnel, agencies, and authorities, with the private sector, and other entities, including by — **Coordinating with State and local government personnel, agencies, and authorities and with the private sector, to ensure adequate planning,** equipment, training, and exercise activities.”

Based on the statues above, we would like to ask:

- Is the authority to regulate student visa duration, such as changing the D/S framework, conferred upon the Attorney General and the Department of Justice instead of the Department of Homeland Security?
- Do the changes to the D/S framework require a consultation with the Department of Education? If so, did the rulemaking of the proposed rule involve a consultation with the Department of Education?
- How did the proposed rule take into account curricular calendar, if there rule were to be implemented?
- What is the extent to which the Department of Homeland Security coordinates with local authorities and agencies through the Office of Office of State and Local Coordination?

## Conclusion

In conclusion, the Local 6516 of the American Federation of Teachers at Brown University **urges DHS in the strongest possible terms to withdraw this proposed rule**. The elimination of duration of status and imposition of fixed admission periods for F and J visa holders would cause far-reaching damage: it would undermine **U.S. interests**, sow **visa insecurity**, impose **costly administrative burdens** on students and schools, disrupt the **research and teaching** that our universities depend on, and deter future scholars from coming to the United States. All of these harms come **without any clear corresponding benefit** to immigration enforcement or national security. Our international students and workers – **key contributors to American classrooms and labs** – deserve better than to be treated as a problem to be managed rather than as individuals to be supported. As Brown University contractually recognizes, international students and scholars are **vital members** of our community, **essential workforce** for the state economy. Policies governing their stay should facilitate their success.

In addition, we respectfully raise some questions about the operational burdens and the economic assumptions of the proposed rule and the statutory basis of proposing the rule under the DHS. We further outline the economic impact the proposed rule would have on the U.S. national economy and Rhode Island Economy.

We join a coalition of actors from across the higher education, labor, and immigration communities in **strong opposition** to these changes. In 2020, tens of thousands of commenters, including universities, businesses, labor unions, and students themselves, **explained the myriad problems with this approach**. Those truths remain today, and if anything, the stakes have only grown as global competition for talent increases. We urge DHS to focus on policies that genuinely support program integrity without punishing the very people – international students and workers – who are following the rules and enriching our campuses.

Thank you for the opportunity to submit our comments. We respectfully request that DHS consider the serious negative consequences outlined here and prioritize policies that support the success of international students and workers in the United States.

Sincerely,

The International Committee,

On Behalf of Local 6516, American Federation of Teachers

Providence, Rhode Island

# EXHIBIT 26

Carnegie Mellon University

September 29, 2025

Office of Regulatory Affairs and Policy
US Immigration & Customs Enforcement
Department of Homeland Security
500 12th Street SW Washington, DC 20536

**Re:** *DHS Docket No. ICEB-2025-0001, Comments in Response to Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*

Dear Regulatory Chief,

On behalf of Carnegie Mellon University (CMU), we are writing to submit comments with respect to DHS Docket No. ICEB-2025-0001, published August 28, 2025, in the *Federal Register*. In particular, we are commenting on the impact this regulation would have on F and J students and exchange visitors, and on the institutions that host these visitors.

CMU has a long history of contributing to the nation through our dual mission: educating the next generation of leaders and transferring knowledge to benefit society. From pioneering innovations in AI and robotics to breakthroughs in the sciences, our university has been at the forefront of discovery and impact for more than a century. In pursuing this mission, we are committed to recruiting and supporting the best and brightest students and scholars—from across the United States and around the world—whose perspectives and skills strengthen our classrooms, laboratories, and the broader innovation ecosystem. This work is conducted within a rigorous compliance framework and with a deep respect for national security

In considering this proposed rule, we want to underscore two important observations. First, we recognize that U.S. visa and immigration policies must strike the right balance—preserving the openness that fuels discovery and education while ensuring rigorous oversight that protects national interests and reduces fraud in the system. Second, the nation's long-term competitiveness in science, technology, and innovation depends on sustaining a world-class pipeline of talent. Measures that constrain student mobility without demonstrable security benefits risk weakening both of these objectives.

With this context, we recommend that DHS withdraw the proposed rule and retain admission for duration of status (D/S) for F-1 and J-1 students and exchange visitors. The rule's fixed-term admission and USCIS extension requirements introduce uncertainty and duplication without measurable security benefit, while likely depressing enrollment and disrupting research and

instructional continuity. As institutions of higher education manage fiscal pressures and prepare for constrained federal funding, the government's partnership with universities should emphasize predictability, targeted risk management, and efficient use of existing oversight tools.

At a minimum, DHS should extend the comment period by at least 30 days. The proposed rule was published as schools were beginning their semesters and already navigating multiple regulatory changes. In recent days, for example, additional proposals to amend the I-20 and I-17 have compounded the burden, making it more difficult for institutions to review, assess the consequences, and provide informed feedback. As AILA and NAFSA have noted, Executive Order 12866 directs agencies to allow at least 60 days for public comment on economically significant rules; this proposal clearly meets that threshold. As noted in the NPRM, more than 2.2 million individuals were admitted in F-, I-, and J- nonimmigrant status in 2023. This represents a significant economic impact on the higher education institutions at which they are enrolled, the exchange programs which host them, the employers for whom they work, and the local economies that they support. We encourage extension of the comment period to allow impacted or interested stakeholders to fully understand and comment upon this proposed rule.

**In the pages that follow, we outline (1) the importance of strong international talent pipelines to U.S. competitiveness; (2) the operational impacts of the proposed rule on students, institutions, and local economies; and (3) viable alternatives that leverage the existing SEVIS monitoring system rather than duplicative new processes.**

We stand ready to work with DHS to strengthen oversight in ways that are effective, proportionate, and aligned with national priorities.

1. The Importance of Strong and Secure International Talent Pipelines to U.S. Competitiveness

**International Students Are Vital to Ensuring that American Universities Remain the Best in the World**

For more than a century, Carnegie Mellon has welcomed the best and brightest students and faculty from around the world. Our reputation as a leading global university—and the intellectual and economic contributions for which we are renowned—owe much to this commitment. Today, more than 9,000 students and scholars at our U.S. campuses hold F or J status, representing over 100 countries. Our faculty hail from more than 50 nations, and our 130,000 living alumni represent over 140 countries.

International students and scholars enrich U.S. classrooms, laboratories, and studios with energy, diverse perspectives, and advanced expertise. Their presence strengthens the educational experience for all American students and contributes directly to the discoveries, start-ups, and cultural achievements that make U.S. universities the envy of the world.

At the same time, we recognize that the benefits of international engagement must be paired with a strong commitment to national security. Research security is a core institutional priority at Carnegie Mellon. We maintain rigorous compliance practices—restricted access to designated

facilities, thorough contracting and licensing reviews, and ongoing monitoring to ensure adherence to federal requirements. We understand and support the government's responsibility to safeguard sensitive research, and we have invested heavily in systems that uphold both security and integrity.

Carnegie Mellon's leadership has also contributed to shaping national policy in this area. President Farnam Jahanian served on the Department of Homeland Security's Homeland Security Academic Partnership Council Subcommittee on Foreign Malign Influence in Higher Education, which in 2024 issued recommendations underscoring that *"the nation must continue to invest in strengthening our research and education institutions, which are the bedrock of our national security, and support the recruitment and retention of top talent to ensure U.S. competitiveness."*

For more than seventy-five years, the United States has pursued a strategic approach to attracting global talent—one paired with oversight and accountability—that has made this country the destination of choice for aspiring innovators and entrepreneurs. This deliberate strategy has fueled the world's strongest economy and advanced American values. In today's era of great power competition, the U.S. must continue to refine and strengthen this strategy, ensuring that we recruit the best minds while safeguarding national security and preserving global leadership.

Yet competition for international talent has intensified. Other nations have moved aggressively to attract the same pool of students and scholars, while in the U.S., shifting immigration policies and uncertainty have caused many to feel unwelcome. We are already seeing signs that top talent may choose other destinations. This would represent a serious loss—not only to U.S. universities but also to our economy, our communities, and our national security.

**International Students Contribute to Robust Job Creation and Economic Growth**

International students contributed nearly $44B to the U.S. economy in the 2023-2024 year and created or supported over 378,000 U.S. jobs[1]. In Pennsylvania, international students contributed over $2.2 billion to the economy and supported almost 22,000 jobs[2]. Narrowing that impact further, international students at Carnegie Mellon contributed over $361M to the local economy, supporting over 4,100 jobs. Combined with other higher education institutions, and not counting the area high schools which also enroll international students, international students contributed over $555M to the Pittsburgh-area economy, supporting more than 6,300 jobs[3].

As the majority of Carnegie Mellon's international students are graduate students, they, along with some upper-level undergraduate students and visiting J-1 researchers and professors, live off campus. International students and scholars spend money on rent and groceries, along with many other goods and services, at our community stores and businesses. Pittsburgh is among the most

[1] https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2

[2] https://www.nafsa.org/isev/reports/state?state=PA&year=2023

[3] https://www.nafsa.org/isev/reports/district?state=PA&district=12&year=2023

livable cities in the U.S., including being one of the best cities for college students[4]. One of the criteria measured is education. Pittsburgh's educational institutions, which have thrived in part due to the growth in our international populations, have contributed to the transformation of Pittsburgh. Our community, and the livability of our region, depend on strong academic institutions, which, in turn, depend upon a diverse student population and the ability to welcome the best and the brightest students and researchers from around the world. In a previous proposed rule to eliminate duration of status, there was recognition that students and exchange visitors may choose "another country over the United States because of this proposed rule, (and) the reduced demand could result in a decrease in enrollment, therefore, impacting school programs in terms of forgone tuition and other fees, jobs in communities surrounding schools, and the U.S. economy." The earlier recognition of impact is more accurate than that by the NPRM that indicated there would be "marginal impact on nonimmigrant student enrollment." Already students are expressing concern about this rule and the impact on their ability to complete their programs in the U.S. and some academic programs are beginning to see a decline in their applications for admission to Spring semester programs. It seems unimaginable that the U.S. government would propose regulations that anticipate job losses and negative economic impacts on communities when U.S. job loss and disruption, as well as the overall health of the U.S. economy are concerns.

Beyond the economic impact to our campuses and communities, our nation has benefited from the entrepreneurial efforts of our student and immigrant communities. Nearly a quarter of the founders of the $1 Billion U.S. startup companies first came to America as an international student[5] and 60% of the top AI companies have immigrant founders, many of whom arrived as international students[6]. Two of these $1 Billion U.S. startup companies founded by immigrants, Duolingo and Aurora, have Carnegie Mellon University roots. These companies expand our economy and provide new jobs for U.S. workers.

2. **Operational Impacts of the Proposed Rule on Students, Institutions, and Local Economies**

**The Four-Year Time Limitation That the Proposed Rule Would Impose Is Unreasonable**

The proposed rule would limit students and exchange visitors to a four- year period of stay. This is completely unworkable and unreasonable on multiple levels.

Almost every student and many J researchers would have to request extensions of stay (EOS). For example, many of our undergraduates attend high school in the U.S. Those students would have to apply for at least 2 EOS to make the transition to undergraduate studies and then OPT. If they continue their studies with a graduate degree, they would be required to file another one or two EOS applications.

---

[4] https://www.forbes.com/advisor/education/online-colleges/best-cities-college-students-graduates/
[5] https://www.nafsa.org/sites/default/files/ektron/files/underscore/infographic_econ_value_2018.pdf
[6] https://ifp.org/most-of-americas-top-ai-companies-were-founded-by-immigrants/

Most of undergraduate and PhD students, along with some of our master's students, would be required to file multiple EOSs as they progress through their academic studies, begin new programs (transitioning from undergraduate to graduate or from student to an authorized period of Optional Practical Training in order to gain practical U.S. work experience beyond the completion of their degrees). Students should be able to count on being able to remain in the U.S. as long as they are maintaining status and making normal progress towards the completion of their academic program requirements. This proposed rule introduces uncertainty about whether USCIS will determine that a student who is making "normal progress", a term eliminated in the proposed rule, and working to complete their academic program on time, will have a "compelling academic reason" to be granted an extension of stay to complete their degree.

Most of our J-1 participants are engaged in research. The Research Scholar/Professor category limits are 5 years. Limiting them to 4 year periods of stay, shorter than their category limit, or requiring an USCIS-adjudicated EOS for research appointments which are often funded year to year, creates unnecessary burdens on important research initiatives.

I-539 applications for extension of stay currently cost $420 (online), and the proposed rule mentions biometrics will be required, which currently carries an additional $85 biometric fee. These additional fees, on top of the SEVIS fee ($350 for F-1; $220 for J-1), the $185 visa application fee; the new $250 Visa Integrity Fee and the fees for OPT/STEM OPT (a minimum of $470 per application plus $1685 if requesting premium processing, add costs to students without improving government efficiency or closer to real-time monitoring of students, as should be possible with the SEVIS system and current student/school reporting processes. Current processing times for F/M/J extensions on the USCIS website are 3.5 months however it has not been uncommon or unheard of for I-539 applications to take 8-12 months for USCIS to adjudicate. DHS estimates in the proposed rule that an additional 414,000 extension requests would be filed each year as a result of the changes in the proposed rule, further adding to USCIS' historic backlog of cases, undoubtedly causing processing times to lengthen and making this rule logistically unworkable both for the government as well as for students, scholars and F/J program sponsors.

While we appreciate that DHS did not propose a one-year limit or the two-tier system previously considered, this four-year limit, regardless of the normal program length and a system that requires EOS applications for thousands of students in the middle of their academic programs is neither reasonable nor viable.

Further, eliminating a reference to "normal progress" and incorporating a new standard with respect to EOS requests, that require students to establish that the reason for requesting an extension is due to "compelling academic reasons, a documented illness or medical condition, or circumstances beyond the student's control," disregards the fact that DHS is arbitrarily requiring students to submit EOS applications after a period of time – four years—that does not correspond with many of their academic programs (doctoral programs, for example, or BArch undergraduate programs). One would assume the fact that a student desires to complete their academic program would constitute a compelling academic reason, yet it is unclear from this proposed rule if that is

sufficient to ensure that a continuing student in the middle of their academic program will receive approval for an EOS.

**Limiting Students' Educational Objectives is Too Restrictive**

The proposed rule introduces a new concept of regulating changes of educational objectives, referring to changes in an F-1 student's educational level or major. While the current regulations require a student's program to "lead to the attainment of a specific educational or professional objective, the preamble's note that "Repeated changes to a program of study either within the same educational level or to move to a lower level, as well as immediate changes to a program of study upon initial entry into the United States, are not consistent with attainment of such an educational or professional objective," shows a lack of understanding about the nature of educational objectives which often evolve as students learn and develop new interests or find their ultimate objective requires more than one educational level to accomplish. DHS even includes an "escape clause" in the rules ("DHS may delay or suspend the implementation of paragraphs (f)(5)(ii)(A) through (C) of this section, in its discretion, if it determines that implementation is infeasible for any reason." )

The proposed rule would disallow students from completing a program at one educational level and pursuing another program at the same educational level or at a lower educational level. We have seen an increasing interest in students seeking to obtain degrees in multiple disciplines at the same level. Many positions in our changing economy require cross-disciplinary skills and students sometimes start with one field but then expand their interest as interests change or expand. Similarly, we sometimes see students deciding to stop pursuing a PhD and reverse matriculating to a master's degree either because they want to take a temporary pause in their doctoral studies or because their educational objective changes as they are engaged in their program. If we reduce the ability of students to obtain a 2nd degree at the same level or have educational objectives which evolve, we will cede to competing countries for the investment and academic strengths that international students bring to our campus and community.

**The Proposed Rule Would Impose Significant Costs on Students/Exchange Visitors and Schools**

In the preamble, DHS indicates this rule would impose "incremental costs on F, J and I nonimmigrants". While the current fee, as noted above, is "only" $420 (online) plus $85 for biometrics, if not waived, a typical Carnegie Mellon undergraduate in a STEM field may have to pay at least $840 for EOS applications. A typical Carnegie Mellon PhD student in a STEM field will have to pay at least $1,260 for EOS applications. These fees are on top of the OPT application fees (currently $470, online) which serve to authorize employment and extend the permission to stay (D/S) of F-1 students.

These fees are also on top of the SEVIS fee students and J scholars are required to pay ($350 and $220, respectively), to support the SEVIS system that monitors and tracks their stay in the U.S. and the new $250 Visa Integrity Fee introduced in the "One Big Beautiful Bill Act." These are not incremental costs. Further, government fees typically increase. Students and scholars who are

in the U.S. for four or more years will likely see the SEVIS fee, USCIS application fees, or both, increase. Unfortunately, fee increases have not historically translated to greater government efficiency or speedier processing times. With thousands more applications, we anticipate processing times to increase, causing an additional cost to our students and scholars—the intangible cost of the stress caused by not knowing for months whether or not the government will approve their EOS application so they may complete the program for which they have invested, in the case of many of our students, over $100,000.

Similarly, costs to institutions are not incremental, either. The proposed rule notes it will cost close to $400 million to implement. We believe this is a serious underestimate of the costs to institutions.

There are costs to implement the rule, additional work required to assist students and scholars seeking extensions and additional time needed to explain a complicated and confusing rule. Additional staff will be needed to assist our students and scholars as the rule is complex and requires much more advising of students and academic advising staff. Staff support would need to increase across campus to be careful to not promote academic options that are contrary to the new rule. Over time, the workload related to advising international students has only increased as we continue to advise and communicate changing information in uncertain times to our students, scholars and departments. As schools have lost revenue in the past due to the pandemic, we are mindful that SEVP has lost revenue during that time as well, with fewer students and scholars paying the SEVIS fee. A regulation that anticipates a reduction in enrollment as a result of its implementation, and would result in revenue reductions for both SEVP, and for schools and exchange visitor programs is an ill-conceived, overly costly regulation. Fewer students and exchange visitors, and the resultant fee reductions for SEVP will negatively impact the government's ability to monitor and track students, exchange visitors and schools—the opposite effect that this proposed rule seems to want to achieve.

In addition to the costs involved with staffing and advising, DHS appears to realize that it may be costly and difficult to implement from a systems perspective, indicating: "DHS recognizes that this proposal may require updates to SEVIS and other systems. Because the timeframe for those updates is not fixed and there could be technical issues regarding implementation, DHS is proposing to include a provision whereby the Department may delay or suspend implementation, at its discretion, if it determines that the change in educational level limitation is inoperable for any reason." Perhaps the Service should conduct viability studies before implementing major changes which may not be able to be operationalized.

**Impact on Employment Authorization and Employers**

While we appreciate the provision that would allow on-campus employment to continue for 240 days while an EOS is pending, the fact that I-539 applications have frequently taken between five and twelve months, which could exceed the 240-day period for continued authorized employment while the application is extremely concerning. Particularly for our PhD students who are engaged in teaching or our bachelor's or master's students who hold on campus positions in academic and

administrative units or students engaged in required internships, the potential that people may have to stop working mid-semester would be disruptive and difficult not only for the student but for the people who depend upon their work.

Campuses, as employers, and businesses in our communities rely on the ability of students to obtain employment authorization in a reasonable period of time and to be able to retain that employment authorization while they are maintaining their status. There should not be a mandatory, arbitrary “check-in” point to assess if students are maintaining status; this would be highly disruptive to their employment eligibility.

**Disruption to Research Efforts and Threatening Economic Competitiveness and National Security**

PhD students and postdoctoral research associates contribute mightily to the research being conducted at U.S. institutions. International students and post-docs are commonly in F-1 or J-1 status. While J-1 scholars and PhD students in F-1 and J-1 status would be allowed to continue working for 240 days while the EOS is pending, that time period is not always sufficient to ensure continued employment eligibility as I-539 processing times have ranged from 5 to 12+ months in the past couple of years.

If a researcher were to have to stop working due to an arbitrary 4-year EOS application requirement and lengthy USCIS processing times, important fundamental research could be negatively impacted. Think about a moon-mission for a government agency or crucial AI-related research that is disrupted due to a long-pending EOS application and processing delays. No one is served by requiring people who are admitted to the U.S. and monitored and tracked by an ICE agency/database to have to also be monitored and subject to regular reviews by USCIS as well.

## 3. Alternatives to the Proposed Rule: Leveraging Existing SEVIS Oversight

**International Students Are Already the Most-Tracked Visitors**

We find the proposed rule itself to be an unnecessary barrier for students seeking to pursue education in the U.S. Since 2003, and the implementation of the SEVIS system, students and scholars in F, M and J statuses have been the most-tracked group of visitors to the U.S. Schools and Exchange Visitor Programs which host F and J visitors are required to appoint a Principal Designated School Official (PDSO), for F/M programs and a Responsible Officer (RO) for J Exchange Visitor Programs. Schools/J programs also have additional Designated School Officials (DSOs) and Alternate Responsible Officers (AROs). These school officials are appointed to serve and assist foreign students and exchange visitors but also to ensure that the academic institution or exchange visitor program complies with the reporting and record-keeping requirements outlined in the regulations.

Schools and Exchange Visitor programs are required to report, among other things, the students'/scholars' arrival to the program, students' full-time enrollment or failure to enroll, when students/scholars change or transfer from one institution to another, changes in the students' academic program such as a change of major or degree, early graduation or early program completion and failure to maintain status. Reporting requirements include events that are both regular and event-based[7].

While it is true that most other non-immigrant categories have a certain end date on their I-94s, no other immigration classifications, besides F/J/M, have a monitoring/tracking system like SEVIS. Furthermore, no other immigration classifications, besides F, M and J, require that the designated school/program officials, referenced above, monitor and report continued compliance with the requirements of their status, program changes they may make and violations of their status (such as working without authorization or disciplinary action taken as a result of conviction of a crime). DHS and the Department of State Exchange Visitor Program have given P/DSOs and R/AROs discretion in certain matters but have also tasked these school/program officials with great responsibility. While not paid by or employed by the government, the reporting requirements of school officials effectively serve to broaden the government's monitoring and tracking of students and scholars in ways that other visitors to the U.S., who numbered close to 64 million in the government's most recent report[8], are not tracked. Foreign students and scholars in F/J/M statuses numbered less than 4.4 million during that period. In large part, because of the monitoring/tracking system already in place, as well as the responsibilities of P/DSOs and R/AROs, this proposed rule adds a completely unnecessary extraneous level of oversight and review that will not make our country safer, but will have the real consequence of making our country poorer, on many levels.

For the past 22 years, the Department of Homeland Security has spent millions of dollars setting up the SEVIS system. As indicated on the Immigration and Customs Enforcement (ICE) website, "The Student and Exchange Visitor Program (SEVP) collects, maintains, analyzes and provides information so only legitimate foreign students or exchange visitors gain entry to the United States. SEVP also ensures that the institutions accepting nonimmigrant students are certified and follow the federal rules and regulations that govern them.

SEVP manages the Student and Exchange Visitor Information System (SEVIS), a web-based information system that maintains and allows monitoring of the following records:

- SEVP-certified schools.
- F-1 and M-1 nonimmigrant students and their dependents.
- Exchange visitor program sponsors.
- J-1 exchange visitors and their dependents.

SEVIS enables SEVP to assure proper reporting and record keeping by schools and exchange visitor programs, thereby ensuring data currency and integrity. SEVIS also provides a mechanism for student and exchange visitor status violators to be identified so that appropriate enforcement is taken (i.e., denial of admission, denial of benefits or removal from the United States).

---

[7]https://www.ice.gov/sevis/dso-requirements#:~:text=Initial%20records%20for%20F%2D1,student%20enrolls%20at%20your%20school
[8] https://ohss.dhs.gov/sites/default/files/2024-09/2024_0906_ohss_nonimmigrant_fy2023_0.pdf

SEVP works closely with its government partners involved in the foreign student process, including U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP) and the U.S. Department of State. Working with partner law enforcement agencies, SEVP administratively enforces federal rules and regulations governing schools certified to enroll F and M nonimmigrant students.

This system, in which the government has invested millions of dollars and over 25 years of effort (including the CIPRIS pilot period) is sufficient to accomplish the goals of the proposed regulation, which include encouraging students and scholars to maintain status and to reduce instances of F, J and I nonimmigrants remaining in the U.S. beyond their period of authorized stay. The SEVIS system provides DHS agencies and the Dept. of State immediate, real-time, access to detailed information about schools, exchange visitor programs and events in the student and exchange visitors' lives and programs. SEVP, the State Department's Exchange Visitor Program, Homeland Security Investigations, Immigration and Customs Enforcement and other agencies can easily view data to determine if there are anomalies or to determine which students or visitors have committed status violations and if the visitors have departed the U.S. or remain, determine which schools or exchange visitor programs are not complying with the requirements and take action to withdraw school/program approval or even prosecute people committing fraud. If at any point the SEVIS system does not have the information enforcement entities require, DHS has the authority to request additional information "on any individual student or class of students upon notice." DHS has made use of this authority. DOS/AROs already expend tremendous effort to educate and assist our students and scholars to maintain their status and should any remain in the U.S.beyond their authorized stay, DHS has the information and ability to initiate removal proceedings.

**Duplicative Requirements Do Not Add Additional Value to Screenings and May Cause Confusion and Disruption**

There is no clear benefit to the government to make students apply to U.S. Citizenship and Immigration Services for Extensions of Stay (EOS). Most of the information students would have to submit in an EOS application, is already available to DHS via SEVIS or would require students to obtain information from schools that schools are required to maintain under the recordkeeping requirements (8CFR214.3). It is both duplicative and wasteful of time, effort and resources to make thousands of students and scholars provide information that is already available to the government.

Additionally, it is unclear what criteria would be used to adjudicate EOS applications; however, it is certainly apparent that it would encroach on academic decision-making. Academic institutions determine when students are, or are not, making academic progress. In cases where students are suspended, and no longer able to make academic progress, schools must report the suspension to SEVIS, thus terminating the student's SEVIS record. In cases where a student may need more time, we have followed SEVP's guidance and regulations carefully, requiring students and academic departments to complete extension forms and ensuring that the reasons are related to compelling academic or documented medical issues and not due to failure to academically progress or a failure to maintain academic standing. In those cases, students must apply for a

reinstatement, which we recognize as an appropriate role for DHS to play in deciding whether a student in that situation may extend his/her stay.

We are concerned that DHS agents, who are unfamiliar with our programs or curricula—or who may lack an understanding of the uniqueness of PhD programs compared to bachelor's degree programs—will be arbitrary when deciding who may stay and complete their program and who must leave. If academic institutions and J exchange visitors' programs have determined that students and scholars are able to remain in our programs, and if these students and scholars are not violating any U.S. laws, DHS should not arbitrarily question whether they should remain to finish their programs. There is no benefit to requiring these students and scholars to go through an EOS application, one that will take months for DHS to process and cost hundreds of dollars, when there already is a system in place (SEVIS) to monitor, track and, if necessary, remove, students and scholars who are not maintaining their status.

**Better Path Forward through Improved Data Management**

This proposed regulation presumes guilt—that students and exchange visitors and the P/DSOs and R/AROs supporting their stay in the U.S. are acting illegally or in bad faith. DHS can, and has, investigated and withdrawn school approval when schools have acted illegally and has removed students who have committed violations or broken U.S. laws. Law-abiding people and institutions welcome the prosecution of individuals or organizations that engage in fraud and take advantage of foreign students; however, the government addressed the flaws in its own processes that allowed those schools to operate and issue I-20s to students and successfully shut down those programs. Over 7,200 schools were SEVP-certified in 2024[9] and while that number has decreased over the years, information from news articles indicate most school certification completions have been due to school closures and the number of willful, fraudulent operators has been miniscule.

Since 2003, the U.S. government has monitored and tracked an increasing number of data points but with multiple databases feeding information to each other and some challenges with upgrading or updating some of these systems, in addition to the massive quantity of data being input by schools, J programs and students themselves (via the SEVIS portal), at time it appears that the government may have more data than it can manage. If that is the case, the solution is not to add more redundant data via EOS applications but to streamline the dataflow or to engage in data-driven initiatives that allow SEVP, HSI and other federal agencies to focus resources on violators, or on risk factors that may merit more oversight. More data and information do not always result in better outcomes. Furthermore, the effort to expand oversight so that two agencies (ICE and USCIS) are monitoring students and exchange visitors' maintenance of status at the same time in two separate ways, using much of the same data and information is another example of wasteful and duplicative effort that takes time away from focusing on the real threats or security concerns.

[9] https://www.ice.gov/doclib/sevis/btn/25_0605_2024-sevis-btn.pdf

Before it was disbanded, Carnegie Mellon participated in the SEVP user's group with a variety of sizes and types of academic institutions. We all learned a lot about each other's programs and issues – SEVP representatives used these meetings and feedback to improve and adapt the SEVIS system to better capture the information needed for regulatory compliance and improve outreach to the educational community in order to better achieve compliance. We would welcome the opportunity to participate and provide feedback in the future as SEVP and DHS seek to improve their processes.

**Request to Withdraw This Proposed Rule**

In closing, we encourage DHS to withdraw this proposal in its entirety and to allow admission for duration of status to remain in effect.

We support government efforts to investigate and prosecute people or institutions that are committing fraud and preying upon international students and exchange visitors, but the overwhelming majority of institutions, students and exchange visitors are complying in good faith with federal regulations. Efforts to address problems should be measured and effective, not causing harm to many while trying to solve the problems caused by a few. Particularly during this turbulent time in our country and in international education around the world, we strongly urge DHS to reconsider and pause this effort that would, if enacted as proposed, cause so much damage to a fragile sector of our economy and a group of people who bring so much value to our campuses and communities.

Thank you for your consideration.

Sincerely,

James H. Garrett
Provost
Carnegie Mellon University

Theresa Mayer
Vice President for Research
Carnegie Mellon University

# # #

# EXHIBIT 27

GEORGETOWN UNIVERSITY

*Office of the President*

September 29, 2025

U.S. Department of Homeland Security
500 12th Street SW
Washington, DC 20536

*Submitted via www.regulations.gov*

**Re: DHS Docket No. ICEB-2025-0001 (RIN 1653-AA95)**
**Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

Georgetown University submits this comment in opposition to the U.S. Department of Homeland Security's proposed rule establishing a fixed time period of admission and an extension of stay procedure for nonimmigrant academic students, exchange visitors, and representatives of foreign information media (DHS Docket No. ICEB-2025-0001). We submitted a comment on a similar proposed rule in 2020.

As the nation's oldest Catholic and Jesuit university, Georgetown University has welcomed students from across the world to our campus in Washington, D.C. for more than two centuries. Our international students are integral members of our community, who make vital contributions to the Academy, to the United States, and to our world. In a typical year, Georgetown sponsors more than 3,600 international students and scholars on F-1 and J-1 visas, hailing from more than 130 different countries. The perspectives that these students and scholars bring to Georgetown enhance the educational experience of our entire community, leading to more globally-minded graduates who go on to serve their communities and the United States in disciplines as diverse as medicine, law, the sciences, government, and public policy. International graduate students at Georgetown play essential roles as researchers and teaching assistants, considerably enhancing the University's ability to generate knowledge in the service of the United States and the world. Moreover, according to NAFSA's International Student Economic Value Tool, in 2023-2024 international students at Georgetown University contributed $202.8 million to the local economy and supported 1,622 jobs in Washington, D.C.

This proposed rule will impose great costs on our international students, diminish our ability to recruit and retain the brightest minds in the world, and ultimately harm the United States by depriving our country of the immense academic, cultural, and economic contributions of these students and scholars. The Department of Homeland Security ("Department," or "DHS") does not need to implement this burdensome

new rule to achieve its stated goals, given existing DHS regulations and protections, and institutional safeguards. The proposed rule creates needless and costly barriers for international students and scholars; increases the likelihood of international students and scholars falling out of status, imposes significant costs upon the colleges and universities that host these individuals; threatens these students' and scholars' academic stability and progress; and makes the United States a far less desirable place for international students and scholars to study, research, and contribute to our nation's cultural fabric and economy. For these reasons, and as more fully detailed below, Georgetown strongly urges the Department to withdraw this proposed rule and leave the existing regulations and "Duration of Status" rules for F-1 students and J-1 exchange visitors in place.

## I. This Proposed Rule is Not Necessary Given Existing Regulations, and Imposes Far Greater Burdens than Necessary to Accomplish Regulatory Goals

Georgetown shares the Department's goal of maintaining the integrity of the United States' F-1 student and J-1 exchange visitor programs. We respectfully note that the Department already has the tools and ability to do so under existing regulations. The government should avoid regulating when it is not necessary, and when it does choose to regulate, it should do so in a manner tailored to impose as little burden and cost as possible. Executive Order 12866 on "Regulatory Planning and Review" establishes the principles that govern agency regulation. Among other things, the Executive Order emphasizes:

- "[I]n deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating."
- "Each agency shall tailor its regulations to impose the least burden on society . . . consistent with obtaining the regulatory objectives, taking into account . . . the costs of cumulative regulations."

This proposed rule violates these principles, creating a redundant and overly broad regulation that is not necessary to accomplish the regulatory goals. The proposed rule would require F-1 and J-1 students and scholars to apply to U.S. Citizenship and Immigration Services ("USCIS") for an extension of stay ("EOS") after the end date of their I-94s, instead of maintaining their status for as long as trained university officials confirm that they remain in compliance with the terms of their F-1 or J-1 category. The Department's stated purpose is to "ensure that DHS has an effective mechanism to periodically and directly assess whether these [F, J, and I] nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws, and to obtain timely and accurate information about the activities they have engaged in and plan to engage in during their temporary stay in the United States" (90 Fed. Reg. at 42072).

Respectfully, such mechanisms already exist. The F-1 and J-1 students and scholars covered by this proposed rule are among the most closely monitored nonimmigrants who enter the United States. Prospective F and J visa holders are thoroughly vetted by the U.S. Department of State before being issued visas, with additional scrutiny applied to certain applicants depending upon their country of origin or the subject matter of their proposed academic program or research in the United States. Once granted visas, currently these individuals are permitted entry by Customs and Border Protection and granted entry for their "Duration of Status" (D/S). Institutions like Georgetown, who sponsor F-1 students and J-1 exchange visitors, monitor their status continually, as does the Federal Government. The comprehensive online

Student and Exchange Visitor Information System ("SEVIS") allows the government to monitor detailed information on F-1 and J-1 visitors and ensure they are engaging only in approved activities for their Duration of Status.

Highly trained college and university officials -- called Designated School Officials ("DSOs") for the F-1 program and Alternate/Responsible Officers ("A/ROs") for the J-1 program -- are charged with overseeing compliance with U.S. immigration laws with respect to the school's international students and scholars, and alerting the U.S. Government to changes in the student or scholar's record on an ongoing basis. For example, DSOs must register each student in SEVIS every semester, confirming that they are registered full-time, and must alert DHS through SEVIS of any changes of address, changes in academic programs, authorizations for reduced course loads, and any disciplinary action taken by the school. They likewise monitor course enrollments to ensure students are meeting regulatory guidelines with respect to full-time course of study and online course enrollment. If a student or scholar fails to maintain status, school officials report this promptly through SEVIS. These officers and the schools they serve are closely monitored by DHS and DOS, through mandatory reviews that take place every two years in order for schools to maintain their F-1 certification and J-1 designation. These reviews ensure that the schools are complying with regulations and appropriately reporting on students' and scholars' statuses, and schools that are noncompliant risk losing their authorization to sponsor F-1 and J-1 nonimmigrants.

Given those many layers of regulation and oversight, the Department already has significant tools at its disposal to confirm that F-1 and J-1 visitors are complying with the terms of their visas for the duration of their status, and to address the Department's stated concerns about immigration fraud and noncompliance. We urge the Department to use these existing data and information, in a more appropriately tailored, risk-based manner, to carry out its regulatory goals. Indeed, the proposed rule notes that the Government Accountability Office recommended exactly such an approach to the Department: that it should "develop a fraud risk profile and use data analytics to identify potential fraud indicators in schools petitioning for certification, develop and implement fraud training for DSOs, and strengthen background checks for DSOs" (90 Fed. Reg at 42078). There is no need to impose new requirements, subjecting hundreds of thousands of F-1 and J-1 students and their schools to burdensome and duplicative requirements. We urge the Department to adopt -- in the words of Executive Order 12866 -- "the alternative of not regulating," and to withdraw this proposed rule.

## II. The Proposed Rule Imposes Significant Costs and Burdens Upon Students, Scholars, and U.S. Colleges and Universities

By requiring students and scholars to apply for an extension of stay (EOS) instead of maintaining their status for as long as DSOs and A/ROs confirm that they remain in compliance with the terms of their F-1 or J-1 category, the proposed rule will impose significant unnecessary costs upon students, scholars, and the colleges and universities that support them.

Implementation of this proposal would significantly impact the doctoral student population at Georgetown University. The National Science Foundation reports a median of 5.7 years for completing a Ph.D., and at Georgetown, more than 20% of Ph.D. students take more than four years to complete their degrees. The

four year fixed time period rule would create an additional burden for these Ph.D. students, their departments, and DSOs/AROs. Extensions are typically offered at one year intervals, meaning a doctoral student at Georgetown University could need to apply multiple times for an EOS, spending hundreds of dollars each time, not to mention the academic and emotional burden and uncertainty of waiting to hear if one can continue with their academic program.

While the students and scholars themselves will shoulder much of the burden, the proposed rule also imposes significant costs and burdens on the U.S. colleges and universities that sponsor these individuals. The proposed rule acknowledges that DSOs and A/ROs would require 3 hours per EOS request for reviewing the foreign student's or exchange visitor's EOS request form, updating the SEVIS record and tracking EOS requests, and advising the foreign student or exchange visitor about the extension process and the requirements to file an EOS with USCIS. DHS further estimates time for training and familiarization of up to 67 hours per DSO and A/RO (90 Fed Reg at 42103).

At Georgetown, to implement and maintain compliance with this new rule, University officials would need to overhaul and supplement current processes, run reports to identify and notify students and scholars whose I-94 end dates are approaching, advise on the EOS applications, process extension recommendations, and record new I-94 end dates once USCIS approves the EOS. Using a conservative estimate, if 2,000 of our approximately 3,600 current international students and scholars apply for USCIS EOS, the University's international student/scholar advisors would need to spend 6,000 extra hours of work -- roughly three person-years -- to carry out this new rule, compared to current workload. That figure accounts for the work required once the rule is in place and processes are running smoothly. These numbers do not account for the additional training for academic departments and Human Resource offices who will also need to update their processes and policies to account for these changes. Per DHS, HR departments would need 1.5 hours per student/scholar with EOS request and an additional 1.5 to review I-9 paperwork to ensure there is no unauthorized employment.

With thousands of international students and scholars at Georgetown, this estimate demonstrates the immense additional and ongoing burden that the proposed rule would place on our university and the DSOs and A/ROs that work with our international students and scholars. Burdening colleges and universities with thousands of additional hours of compliance-related work will divert significant time and financial resources away from the University's most critical functions of education and research -- a damaging outcome for students, schools, and society.

## III. The Proposed Rule Infringes Upon Academic Decision-making of Schools

Currently, colleges and universities determine if an F-1 or J-1 visitor is making normal academic progress and is otherwise progressing appropriately in a legitimate program of study consistent with the University's academic policies and in accordance with F-1 and J-1 regulations. The proposed rule would take this discretion away from trained and vetted DSOs and A/ROs, and academic departments, and instead give USCIS officers the sole discretion to determine, upon a student's extension application, whether the F-1/J-1 student has "compelling academic reasons" to remain in the United States.

There are many reasons why students may need to deviate from the standard path to degree and request an extension. For example, students may add another major mid-program; they may be enrolled in a program that alters its structure mid-program; or the scope of a postdoctoral researcher's project may change due to additional funding. Respectfully, institutional DSOs and A/ROs, who have deep familiarity with their institution's academic programs, students, and scholars, are better positioned than USCIS to make the nuanced determination as to whether students and scholars in these scenarios are appropriately progressing toward completion of their program and thus have compelling academic reasons to stay in the United States. Georgetown's DSOs and A/ROs are experienced in making academic evaluations; they carefully reviewed and processed extensions for over 100 F-1 students and over 100 J-1 exchange visitors during calendar year 2024. Substituting the judgment of USCIS officials for that of DSOs and A/ROs will lead to less informed, arbitrary decisions being made with respect to EOS requests, with potentially devastating impacts for students and scholars who are sent back to their home countries prematurely.

Even students who do not deviate from a standard path to degree will be seriously negatively impacted by this rule's stripping DSOs and A/ROs of the ability to make reasonable academic determinations and transfer the SEVIS immigration records of students consistent with immigration regulations. For example, a student who completes their undergraduate degree in F-1 status and is admitted to a new graduate program with assistantship, would need to submit an EOS for their change of education level. Under the proposed rule, the student would be eligible to continue working on campus for 240 days. If their USCIS EOS application takes longer than 240 days, the student would immediately need to stop work and lose their assistantship funding, which covers their housing and food.

Another example would be a Ph.D. student with pending EOS under this proposed rule who is four years into his program and receives permission after his current program end date to gather data for his dissertation research in a lab at the National Institutes of Health. The student would be unable to obtain CPT as their CPT request was not submitted prior to their EOS application. Under the existing rules however, a trained school official (DSO) can review this, confirm that it complies with regulations, and approve it.

Georgetown University school officials who work every day with international students and scholars can identify dozens of similar examples of students, scholars, academic programs, and valuable research projects that will be significantly harmed by DHS's proposal to pull academic decision-making authority related to status extension away from trained DSOs and A/ROs at colleges and universities and substitute that with a lengthy extension review process under the sole discretion of a USCIS officer.

## IV. The Uncertainty Caused by the Proposed Rule will Deter Students and Scholars From Coming to the United States

The proposed rule's provisions -- particularly those that give USCIS the sole discretion to make determinations of an academic nature -- would introduce immense uncertainty into the F-1 and J-1 process, and deter many international students and scholars from coming to the United States. This would deal a significant blow to this country's status as the world's leader in attracting the brightest minds to study, work, and contribute to our economy. International students will understandably question whether they should invest tens of thousands of dollars in tuition and other associated costs and years of their lives in an

academic program that they are not confident they will be permitted to complete or doing research which they may not be able to complete under the proposed rule. Students will turn to other countries in which to conduct their research and studies, and the United States will lose out.

Consider the case of a Ph.D. student in a STEM program who has funding for 5 years and is in a program where the average student needs 5 to 6 years to complete coursework and dissertation. This student would be faced with undertaking the costly and time-consuming extension application process once or possibly twice during the course of her academic program and then again during post-completion OPT or STEM OPT training. Each time, a USCIS official would be given the sole discretion to determine whether the student has a “compelling academic reason” to extend her stay in the United States, as opposed to this decision being made -- as it currently is -- by a DSO who has deep familiarity with the school and the academic program. In the event the USCIS official determines that the student’s academic reason to extend their stay is not “compelling,” the student will be required to depart the country immediately, with no grace period, no degree, and having spent years of her life and significant sums of money on tuition and living expenses for this academic program. The uncertainty introduced by this proposed rule, the disruption in research and academic continuity it could cause, and the drastic consequences that could result from it, paint a discouraging picture for students deciding whether to come to the United States to study. Many will likely opt to study and work in another country where they can have more confidence in their ability to remain through the end of their program.

## V. The Proposed Rule Would Likely Exacerbate Processing Delays within USCIS particularly with Form I-539, with Damaging Results for Students, Scholars and U.S. Colleges and Universities

The current regulations permit DSOs and A/ROs at colleges and universities to promptly grant extensions to a student’s or scholar’s stay when such an extension is supported by U.S. immigration regulations. This flexibility is critical when, for example, a student receives immigration, academic, and medical clearance for a reduced course load and needs an additional semester to finish their degree program, or when a postdoctoral fellow receives additional funding for their research just a month before their program ends, allowing them to stay and expand upon their research for another academic year. This proposed regulation would take away this authority to promptly grant extensions of status in appropriate circumstances from trained university officials, and instead require the student or scholar to submit an application to USCIS in order to be considered for such an extension.

Even under the existing regulations, USCIS takes many months to process I-539 applications based upon Georgetown’s experience. With the tens of thousands of new EOS applications USCIS would need to process every year as a result of this proposed rule, it is likely that these times would only increase. Students needing only an additional semester could still be waiting after their academic program ends to determine if they are legally studying in the U.S. and able to apply for Optional Practical Training or continue on to a new program. Students could potentially be submitting multiple EOS in succession as they move from academic extension, to OPT, to STEM OPT. At Georgetown University alone, using 2024 calendar year data, on average we could expect to see: 100 F-1 students submitting an EOS; 1,000 requests for OPT with

an additional 1,000 accompanying EOS applications; 300 requests for STEM OPT with 300 accompanying EOS applications; and 100 J extensions/EOS applications.

For the students and scholars who will have requested extensions, waiting more than six months to learn if the extension will be approved would be stressful, and students and scholars who are ultimately denied would have continued to invest time and money for a degree or program they would not be able to finish, research that would be left incomplete, or a job they would need to abruptly leave. Universities could also lose teaching assistants and professors mid-semester if their extension of stay were denied, causing significant financial and programmatic damage to U.S. universities and students.

## VI. Conclusion

For more than two centuries, Georgetown has prepared our students to engage in our increasingly interconnected world by building bridges to confront national and global problems. Georgetown alumni, including many who studied while on F-1 and J-1 visas, are leaders in industry, government, science, medicine, law and many other fields, and make significant contributions to the United States and the world. It has never been more urgent or more important for the United States to enable its world-class colleges and universities to continue carrying out this work by welcoming well-qualified international students and scholars to our campuses. The Department's proposed rule will inhibit this progress and harm the standing of U.S. higher education as the world's leader. We strongly urge the Department to rescind this proposed rule.

Sincerely,

Robert M. Groves

Robert M. Groves
Interim President

# EXHIBIT 28

JOHNS HOPKINS UNIVERSITY

Submitted via www.regulations.gov

September 29, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536

Re: DHS Docket No. ICEB–2025–0001, Comments in Response to Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media

On behalf of Johns Hopkins University and Johns Hopkins Medicine, we submit this comment letter in response to the U.S. Department of Homeland Security's (Department) proposed rule, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media* (DHS Docket No. ICEB-2019-0006-0001), published August 28, 2025.

Johns Hopkins, a non-profit university and affiliated medical system, organized under the laws of the State of Maryland, has more than 13,000 F-1 and J-1 international students, scholars, medical residents, and recent alumni in the U.S. (annually), along with their F-2 and J-2 dependents. As such, the Johns Hopkins community will be impacted by this proposed rule in a variety of ways, which we outline herein. We appreciate DHS encouragement of all interested parties to participate in this rulemaking by submitting data, views, and comments on all aspects of this notice of proposed rulemaking.

<u>We urge this proposed rule be withdrawn in its entirety, and that the current regulations allowing for admission for the duration of status remain in effect</u>. First, if adopted, the proposed rule will create confusion and upend several decades of successful implementation of the current duration of status rule. Second, we feel the Department's proposed solution will create substantive and procedural challenges that may likely be worse than the stated problems posed under the current rules. In its summary of the issues, we respectfully submit that the Department may be overlooking alternative and less burdensome solutions using existing data and resources that would resolve many of the issues cited. Third, the unprecedented oversight that the proposed rule would impose over the academic process at higher education institutions and teaching hospitals will negatively impact students and scholars and ultimately U.S. competitiveness in attracting top students, physicians, researchers, and scholars from around the world.

## I. The Department Has Existing Resources to Address Oversight and Overstay Issues

The Department sets forth in the Executive Summary of the proposed rule that the current volume of F and J students and exchange visitors "poses a challenge to the Department's ability to effectively monitor and oversee these nonimmigrants while they are in the Unites States." These claims do not

account for existing data and resources required to be submitted to the Department by institutions of higher education (IHEs).

Under current regulations, including at **8 CFR 214.3(g)(2)(iii), 8 CFR 214.2(f)(12)(i),** and **8 CFR 214.2(f)(12)(ii)**, IHEs must regularly provide detailed documentation to the Department's agencies via the Student and Exchange Visitor Information System (SEVIS). Such SEVIS updates are detailed and undertaken by university hosts at significant effort and expense, including notification of termination of an individual's F or J SEVIS record when the individual is no longer meeting the terms of their SEVIS program and must depart the U.S. Once reported, it is up to the agencies notified, via SEVIS, to ensure these individuals depart the U.S.

The Coordinated Interagency Partnership Regulating International Students (CIPRIS), which is the predecessor to SEVIS, was created for the very purpose of discovering and resolving student overstays. U.S. universities have hosted millions of students and exchange visitors since the creation of CIPRIS, and the data shows that the vast majority of those students and exchange visitors have subsequently departed on time, exactly as schools instruct and desire, consistent with the regulations. Others who have yet to complete their academic objectives in the U.S. may be eligible to (1) transfer their SEVIS program to another program host, or (2) request a Change of Status through USCIS, both options consistent with governing regulations and the desire of universities wishing for their former F and J individuals to maintain a valid status in the U.S. at all times.

We respectfully submit that the Department's suspected overstay statistics fail to fully account for these two possibilities. Moreover, errors and gaps in agency systems coordination may explain a substantial number of those cases identified as overstays.[1] For example, we have witnessed multiple occasions for which an arrival or departure date is not captured accurately by CBP in SEVIS. Importantly, staying even one day beyond an authorized stay counts as an "overstay," and the data do not address how many of these individuals departed the U.S. within a few days, a week, or a month. During COVID, departing flights were scarce and many cancelled, forcing many to overstay as individuals attempted to find a flight home. A separate issue affects individuals applying for a benefit from USCIS, who are permitted to remain in the U.S. while the request is pending. If that request is ultimately denied and the individual must depart, well after their timely-filed original application or petition submission date but as soon as feasible after having received the notice of denial, is the agency factoring this into its analysis? It is also not clear whether the Department has a reliable breakdown of statistics on the duration of most overstays. These issues in recording overstays fall on the Department, as institutions already provide the needed data. We therefore recommend that the Department focus its efforts on more accurate tracking and enforcement of those who are, in fact, overstaying rather than expanding the data requirements for compliant visa holders. Such targeted efforts will address concerns such as the alleged visa overstays without burdening students and institutions (including USCIS) and eliminating duration of status rules on which these stakeholders have relied for decades.

[1] *International students and DHS data* [Policy Brief]. (2020). National Foundation for American Policy. https://nfap.com/wp-content/uploads/2020/09/Analysis-of-DHS-Data-on-International-Students.NFAP-Policy-Brief.September-2020-1.pdf and CBP Entry Exit Overstay Report FY 2024.

Johns Hopkins and many of our peers take an extremely serious approach in self-administering our F and J SEVIS programs. The uncontestable evidence of the commitment to compliance is on full display with the number of Designated School Officials (DSOs) and Alternate Responsible Officers (AROs) serving the F and J populations while simultaneously fulfilling SEVIS reporting obligations.

Moreover, if the Department has evidence that an institution is not serious about compliance or is not evidencing strong compliance practices, it already has at its disposal the Student and Exchange Visitor Program (SEVP) Field Representatives, which was created to support DSOs and U.S. institutions, as well as to track and to enforce these requirements where necessary. The SEVIS program already tracks established metrics based on SEVIS-reported information, which can be leveraged and used within the *existing* system to remedy alleged compliance issues. The Department itself recognizes in the proposed rule that “SEVIS ensures government agencies have essential data related to nonimmigrant students and exchange visitors to preserve national security.” Rather than adding work to on an overburdened and backlogged USCIS, it would be more efficient and better serve national security for the department to focus on improvements to SEVIS that would provide it with the same information it portends to require through an unnecessary extension of status request process.

Additionally, there is already a SEVIS fee structure in place to finance the further development of SEVIS to capture additional documentation surrounding the extension process currently managed well by DSOs and AROs. The Department indicates that it “has many examples of students and exchange visitors staying for decades in their student or exchange visitor status.” The related footnote 16 in the proposed rule indicates this number is 2,100, which is a significantly smaller population than the hundreds of thousands of students annually who may need to go through an extension of stay process with USCIS under this proposed rule. Of note, the Department provides no such data for J-1 Exchange Visitors, which includes professor and research scholar categories limited to program duration of five years maximum, short-term scholars limited to program duration of six months maximum, and specialists limited to program duration of one year maximum, all of whom should be excluded from this rule proposal altogether.

## II. The Department is not the entity best situated to evaluate student or scholar progress

With this proposed rule, the Department is engaging in an area that has traditionally been determined within academic institutions, namely the appropriate length of study and related scholarly activities for F and J individuals. Programs at Johns Hopkins University, particularly at the PhD level, set upper limits on time for completion of a degree program, after which point the student may no longer continue in the program, usually pending appeal and evaluation of necessarily strong justifications for exceeding time to completion policies established by faculty authorities. It is a responsibility not taken lightly. Our faculty and administration have strong incentive to move students along in their programs and have them complete their program to graduate, as they must devote limited time and resources toward the education of subsequent learners. Limited spots are available each year, and mentoring capacities are governed by faculty and academic unit rules.

The proposed rule maintains that the Department will review and adjudicate whether an international student may continue their stay while in one of these programs. This language raises a number of concerns that are not adequately outlined or explained in the proposed regulation. For example: what

will occur if the Department is at odds with a faculty member's academic determination? If an Extension of Stay (EOS) request is denied, will there be an appeal opportunity and what will the appeals process entail? The lack of specificity around these details in the proposed rule is concerning, as the Department's involvement in these university-specific processes could likely result in a material change in a student's studies, career, and entire life, as well as the delicate balance and practices at the university managing these students and their research. Johns Hopkins' oversight and assessment of its programs hosting F- and J-visa students and scholars is constant and meticulous so that it not only ensures the progress and integrity of its research and academic programs, but also its compliance with such U.S. federally-funded research.

Next, the proposed rule states that "switching from D/S to a fixed period of admission would permit immigration officers the opportunity to determine whether an alien is eligible for an additional period of time." As noted above, through CIPRIS and now SEVIS, the Department has required and collected data for years, data which could be easily leveraged to fulfill the purported evaluative needs here. Every time someone travels into or outside of the U.S., an "encounter" occurs. If someone never or rarely travels abroad, and somehow raises concerns about their long-term intent, the Department's existing data would show this as well, and would allow the Department to inquire with the individual at that data point. In sum, the Department is able to access a number of data points, including who is entering and leaving the country, and with what frequency.

Indicative of likely challenges the Department may face in managing these additional burdens is in the final rule *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting Other Nonimmigrant Workers.* Among other welcome changes, the final rule extends the cap-gap extension period from September 29 to April 1 of the fiscal year. The Department said in response to a comment in the final rule, "In addition to avoiding employment disruptions, the lengthier extension of F-1 status and post-completion OPT or 24-month extension of post-completion OPT employment authorization for F-1 students with pending H-1B petitions until April 1, which is one year from the typical initial cap filing start date, accounts for USCIS' competing operational considerations and would enable the agency to balance workloads more appropriately for different types of petitions." This indicates that there are competing considerations and a high volume of caseloads to distribute and balance among USCIS.

## III. The Maximum Four-Year Admission Period Relies on Faulty Data and Unfairly Burdens Students Based on Their Country of Origin

The potentially problematic intervention by the Department set forth in Section II (above), is exacerbated considerably for individuals admitted by CBP for less than a four-year period of admission. We note the rule states the <u>maximum</u> period of initial stay for all F and J individuals will be four years, implying that CBP could use its discretion at any time to admit any F or J individual for a period less than four years, even if their documentation indicates a program length of four years. The rule does not address what would happen if CBP only grants a period of admission for one year for a student in a four-year or longer program. Likewise, it is unclear what would happen if this same student were only granted an EOS by USCIS for a second year. This scenario is possible, and any final rule should address this and factor it into revised financial burden estimates.

## IV. Overall Burdens on Students and Scholars

Next, with respect to the impact on *continuing* students and scholars, it would be counterproductive to apply the EOS process to this group. These individuals have already entered the U.S. with the intention of completing degree or scholarly programs in the United States, endeavors that are well-known in advance to take multiple years to accomplish and typically involve a commitment to the host institution.

### A. Course of Study Timelines

Currently, students must register for a full course of study for each term in which they remain in the U.S. to maintain a valid status. Students who fail to maintain a full course of study must be terminated in SEVIS, at which point they must depart the U.S. Imposing a costly, time-consuming, and uncertain EOS process on this group, particularly those who may have just started their degree programs within the last year, violates the basic equity and time-honored wisdom of a grandfather clause absent from this proposed rule.

At Johns Hopkins, across all degree levels and over the last three years, there is little difference in median time-to-degree for domestic and international students. Over the last three academic years at the undergraduate level, 88% of international degree earners completed their degrees in four years or less compared to 92% of domestic students. Despite this, the proposed rule would still force a very high number of international undergraduates to seek an EOS given the maximum four-year limit on their initial entry and given the likelihood that a high percentage of these individuals will follow their degree program with an application for OPT and potentially STEM OPT. At the master's level, international students complete their degrees in two years or less 83% of the time compared to 65% of domestic students. Again, nearly all of these students, particularly those studying in STEM fields, will find it necessary to request an EOS in order to qualify for OPT and the STEM OPT extension. The impact at the doctoral level will be even more severe: only 11% of international students and 19% of domestic students complete their degrees in four years, and only two percent of each group complete a doctorate in three years or less. The median time to a doctoral degree has ranged between five years and six months to six years for both populations, and that statistic has been stable over the past several years. As such, nearly all international doctoral students will need to seek an EOS during their academic career in order to apply for post-completion OPT and the STEM OPT extension, where applicable. We advocate for maintaining the existing duration of status rule, which – as noted above – already includes safeguards and reporting requirements that trigger oversight by the university and provide data to the Department that can serve to prevent overstays of the type that are described in this proposed rule.

Similarly, J-1 exchange visitors must pursue their scholarly program objectives for the duration of their programs at U.S. institutions. Institutions currently determine who stays and how long they may stay, up to the maximum duration of the individual's J program category. Often, extensions are predicated on a continuation of grant funds, at which time an extension request is processed, frequently with very little time before a deadline. A prolonged EOS process will significantly hamper a variety of government-funded research projects, particularly when the proposed rule would only permit continued employment for up to 240 days while the EOS request is pending. As this rule would undoubtedly have disruptions to ongoing research endeavors germane to U.S. national interest, we respectfully propose that the Department should permit continued employment for *any* duration of the EOS pendency. We

would advocate for the same for all other time-limited continuation periods. Arguably, the Department is signaling here its own expectation of extraordinarily long processing times, so specifying caps on continued employment while USCIS processes the request does not assuage our concerns. Based on our practical experience in managing these types of requests, we feel the proposals of 180 and 240 days are not reasonable periods of time. As of the submission of this comment, the USCIS estimated processing times for the I-539 used to change status to F or J status is 4.5 months for 80% of requests, dependent on the processing center that is processing the form; this is without the estimated additional burden proposed by the Department.[2]

This in turn raises significant questions about short duration extensions, which are often needed to complete a project that needs just a small amount of additional time. This proposed rule is not clear how far in advance an EOS request may be submitted, raising concerns about rejection if USCIS deems the filing to be too early. Further, if an EOS of short duration and an OPT application are needed, there must be a guarantee in any final rule that these requests may be submitted concurrently given the timelines and deadlines for submitting OPT applications. An additional challenge could arise if an individual completes their program while their EOS application is pending, leading them to need to depart the country. The rule does not address whether USCIS will process the request to completion, regardless of the global location of the individual, or if that individual must remain in the U.S. during the entire pendency of the EOS petition, even if it is not yet approved. Does departing the U.S. in this situation effectively result in a termination of the petition, without an extension approval? If this is the case, the departed individual would face an overstay situation, something that would not occur under the current rule. Further, if the relationship in the scenario above were that of a scholar in an employment relationship, the individual would suddenly be confronted with a period of unauthorized employment, and the employer would face a period of having employed the individual without authorization. This may result in the Department being the driver of additional overstay *and* unauthorized employment statistics even for individuals who have departed the U.S.

Finally, we underscore that universities dedicate immense support resources toward assisting all students in navigating the challenges of completing a degree in consideration of challenges in their personal lives. Some students must take a leave of absence and/or depart the U.S. during their degree programs to contend with personal issues. How would this rule address such situations? We assert that the proposed rule does not account for the impact that learning disabilities, learning styles, outside personal challenges, and pressures, etc., have on students working to complete their degrees. Supporting international (and domestic) students through these challenges is the expertise of the team of professionals with training in student development theory and experience in serving students who are at risk of not persisting to graduation, professionals who are there to support the students and help them succeed at the institution of higher education. Additionally, universities, such as Johns Hopkins, have in place progressive measures to determine who can stay and who cannot continue their studies based on academic performance, ranging from academic warning, academic probation, academic suspension, and academic dismissal. Accordingly, DSOs and AROs report what is required in SEVIS related to these academic classifications. Therefore, if the proposed rule were to remove the universities' independence in making such determinations within the existing duration of stay timelines,

[2] USCIS. (2025). Check Case Processing Times. https://egov.uscis.gov/processing-times/

it may jeopardize the entire system of student monitoring and progression that colleges have in place today.

B. EOS Approval Process

Central to the existing duration of stay regulations is a reliance on the timing, factors, and process for what constitutes "normal progress" and the basis for an EOS. As noted above, universities have dedicated staff and expert DSOs and AROs that manage and oversee this process and have for decades. In considering whether an agency can change regulations in a rulemaking, Courts have held that the agency must have a "reasoned analysis for the change" and not just a summary discussion, especially where there have been decades of "industry reliance" on a prior practice or policy.[3] In the instant case, the Department proposes to summarily alter the EOS process and does so without providing sufficient details as to the manner in which this will occur.

The Department states:

> DHS is proposing to eliminate a reference to ''normal progress'' with respect to seeking a program extension and incorporate a new standard clarifying that acceptable reasons for requesting an extension of a stay for additional time to complete a program are: (1) compelling academic reasons; (2) a documented illness or medical condition; or (3) exceptional circumstances beyond the control of the alien. ... A student would be expected to provide evidence demonstrating the compelling academic reason in order for the DSO to recommend a program extension. The student may then apply for an EOS. While a letter from the student may be sufficient to meet his or her burden of proof, an immigration officer will evaluate the individual case and make the determination as to whether additional evidence (such as a letter from a member of the school administration or faculty) is needed to adjudicate the case.[4]

This proposal alters the process and standards by which schools have historically managed these issues but most of this is a reiteration of what DSOs must consider currently under **8 CFR 214.2(f)(7)(iii).** Further, it leaves open crucial questions with unclear explanations surrounding the standard for approving an EOS request. Some of these include:

- How does the Department define "educational level?"
- Assuming the Department approves the EOS request, what will be the duration of that EOS? Will it ever be shorter than that recommended by the institution?

[3] See Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2217, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.")
[4] Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 90 Fed. Reg. 42091-42092 (proposed Aug. 28, 2025) (to be codified at 8 CFR pts. 214, 248, and 274a).

- Will the Department commit to processing these in an efficient and expedited fashion?

- What if the University requests one period of time but the evaluator disagrees? Will the Department grant less time than the university advises as necessary?

- Will these end up being annual EOS requests, condemning an F or J visa holder to periods of uncertainty and worry, costing them thousands of dollars while trying to maintain academic rigor and progress?

- What does the Department deem "compelling?"

- What does the Department deem "exceptional?"

International students rely on the understanding of what it means to make "normal progress" in a degree program, and these questions illustrate that the Department's proposed rule has left open many issues germane to creating a new platform on which these individuals can rely in order to understand next steps and have some degree of certainty surrounding their time at their school. Moreover, the Department must recognize that USCIS has been unable to complete adjudications in a timely manner in the past. As such, this new EOS process itself may likely increase the time needed to complete a degree program. In the eyes of a student and faculty member, simply continuing through completion of the degree program is compelling. There are myriad reasons why it may take one student far longer than another to complete a degree.

Next, the Department states: "Like all other aliens who file a Form I-539," F and J applicants **might be required** to submit biometrics and "may be required to appear for an interview pursuant to 8 CFR 103.2(b)(9)." [emphasis added][5] Biometrics are deemed permanent, so it seems unnecessary to submit biometrics beyond an initial EOS, especially depending on the length of the EOS. Particularly worrisome here is that the Department seems to be potentially indicating that it has no intention of granting more than one EOS to any given student or scholar, which would be untenable. Otherwise, why does the rule state that individuals filing Form I-539 "might be required" to submit biometrics, without qualification? This is costly for all parties. The possibility of requiring applicants to appear for an interview could also raise concerns that applicants may find themselves subject to enforcement actions. For this reason, we submit that the purpose and potential outcomes of such interviews should be specified.

We also feel the requirement to provide evidence to the Department with "sufficient funds to cover expenses" is overly burdensome. Many host institutions already do this. If the Department wishes to examine financial documents, it could create a portal in SEVIS for financial document uploads to support the financial information already included on I-20 and DS-2019 forms. Further, if students do not have an ability to pay tuition and fees, most universities will disenroll students by a relevant payment deadline, which is then reported by DSOs and AROs in SEVIS. Instead, it is recommended that the

[5] Id at 42093.

Department leverage the existing SEVIS framework so that the Department could capture more financial data than it currently does.

**Continuing Students.** Further to the reliance discussion above, for continuing students nearing the end of their studies after the proposed implementation of this rule, it is even more egregious to subject them to the proposed EOS provisions. Such students may have an I-20 or DS-2019 nearing its expiration, which would routinely be extended at the time of application for post-completion Optional Practical Training (OPT) or Academic Training. It is not clear whether this proposed rule would require this group to first apply for an EOS, await adjudication of that, and then apply separately (not concurrently) for OPT or Academic Training, and wait for that adjudication. If concurrent filing is possible, or not possible, any final rule should state this specifically and unequivocally to avoid confusion. The anticipated wait time for EOS adjudication could be the very factor that makes these students ineligible to apply for OPT or Academic Training benefits. The Department offers no discussion of whether an EOS application that applies to students who plan to file for post-completion OPT or the Science, Technology, Engineering, and Mathematics (STEM) OPT extension would fall within what it deems to be “compelling academic reasons,” putting this substantial group of continuing students at a procedural and potentially career-altering disadvantage, as well as taking away certainty in their visa management that has existed since the beginning of their time in the U.S. Relatedly, the proposed rule does not clearly address how transfer students needing an EOS would be evaluated, whether they are continuing a program at the same degree level or beginning a new degree program.

It is unclear how far in advance an EOS request may be filed with USCIS. It is quite possible that the window for application will be shorter than the time USCIS allows itself to process and adjudicate the request. The 180- and 240-day provisions noted in this proposed rule lend no confidence that past behavior is set to change. Rather, given the anticipated hundreds of thousands of additional requests this rule will generate for USCIS, it is a near-certainty the timing for adjudication of EOS applications will get worse across the board.[6] To protect against this eventuality and assist in the administrative processing issues, we propose an automatic extension should have no limit and instead be granted for the full period of a pending EOS application, until such time USCIS adjudicates the request.

This dilemma is further highlighted for those students who are currently in their initial year of OPT and are eligible for a two-year STEM OPT extension. Adding an EOS petition as an additional step from initial OPT to the STEM OPT extension may likely wreak havoc for both the student trainee and their OPT employer. Students could be forced to suspend employment and their income source, and employers forced to face a disruption in their planned business activities, all while awaiting an EOS adjudication followed by an approved STEM OPT extension application.

Also unclear is what happens to students whose OPT or STEM OPT extension is denied during the transition period. The Department indicates this group may remain in the U.S. through the end date of their I-20, plus 60 days, providing they continue to pursue a full course of study. This implies that these students would be eligible to begin a new degree program immediately and remain until their I-20 expires (which would be an additional one or two years), the respective OPT or STEM OPT

[6] Id at 42084 and 42090.

recommended periods, less denial adjudication time. It is unclear the value of this provision given that most students have no reason to expect a denial of their OPT and are unlikely to have an approved admissions application for a new degree program at that juncture. DSOs will be challenged to unambiguously guide recent alumni and advise them on their options, adding to DSO workload and institutional costs. In sum, additional overstays resulting from a rule ostensibly created to address overstays are foreseeable.

C. Financial Burden

This proposed rule will disadvantage students who do not have unlimited financial resources, and by extension, their private or governmental funding sources or host universities. F and J regulations already require students to show funding for an entire academic year up front (or for the full duration of their studies in the case of J-1 students). This proposed rule will add an additional financial burden to what had primarily been an academic decision, with extensions managed directly by DSOs and AROs. The difficulty experienced where USCIS is unable to adhere to standard processing timelines for regularly filed applications will likely exacerbate this issue and lead to students and their financial sponsors paying exorbitant amounts of money in premium processing fees for an arguably unnecessary process. To put this in monetary terms: the current I-539 online filing fee is $420 (and $470 for paper filings). At Johns Hopkins, on average 3,211 EOS applications are anticipated in a given year. Johns Hopkins students and scholars would spend $1,348,620 in filing fees just for online EOS applications, which does not include any premium processing fees likely to accompany requests for those whose timing and circumstances necessitate it, or fees of private immigration attorneys for students with legal questions requiring the assistance of a professional authorized to practice law.

## V. Issues Specific to Medical Residents and Academic Medical Centers

Johns Hopkins Medicine is highly dependent upon trainees on J-1 visas to provide patient care. As of September 2025, 108 of our 1,362 (7.9%) residents and clinical fellows at Johns Hopkins Hospital and Johns Hopkins Bayview Medical Center, the two hospitals of the Johns Hopkins Health System located in Baltimore, are in the U.S. on J-1 visas. Eliminating Duration of Status for these physicians who hold J-1 visas would be highly disruptive to the care of the patients we serve and against the stated interest of the U.S. government to ensure qualified physicians are available in the U.S. healthcare system. After the applicable 240-day period, and based on the processing times of the I-539 form at the time this comment was submitted, our physicians could be taken out of active work for weeks or even several months, dependent on the Processing Service Center handling their application.

Relatedly, the proposed rule change could negatively impact the medical training and education of the U.S. citizens who are the colleagues of our foreign physicians. If the proposed rule is enacted as currently written, due to anticipated longer application times, there may be large gaps in time that 7.9% of our physicians will not be able to work. This means longer duty hours and a significant impact on well-being for our residents and fellows who are U.S. citizens, endangering their health, the other medical professionals at the hospital, and of course our patients. Physician burnout is real and has been

well-studied.[7] Making our U.S. citizen trainees work harder so we can meet the health care needs of the American public is not the right choice.

The challenges facing the U.S. health care system have never been more prevalent than now. We cannot cut off the physician pipeline and expect to fill it immediately with U.S. citizens. Those in rural and medically underserved areas are in dire need of physicians, and it is often international physicians who fill that need across the U.S. We know which of our physicians are here on J-1 visas. Indeed, we can tell you exactly where they are and what clinical activities they are engaged in every day. This day-to-day engagement reflects examples we can provide at two of our major institutions in Baltimore; this does not include the four other hospitals that make up the Johns Hopkins Health Care System. Additionally, this reflects only two hospitals in the country; there are over 15,900 clinicians across the country who are here on J-1 visas.[8] Inhibiting their ability to provide medical care consistently and within predictable timetables and for predictable periods without interruption would have a negative exponential impact on our health care system and medical colleagues all over the U.S.

## VI. Burden on Institutions

In addition to the burdens articulated above, the proposed rule arguably amounts to an unfunded government mandate for U.S. entities, among them non-profit institutions of higher education. The Department states:

> "The proposed rule would impact F, J, and I nonimmigrants, DSOs and ROs from SEVP-certified schools and exchange visitor sponsors that run a SEVP- or DOS-designated program...." [9] It further states: "Under the proposed rule, DSOs and ROs will have to spend approximately 67 hours for rule familiarization and adaptation in the first year after the rule takes effect. For each DSO, rule familiarization would cost $3,342 in the first year after the rule takes effect. Further, each year DSOs/ROs will spend approximately 3 hours per F–1/J–1 EOS request to review the Form I–539 completed by the F–1/J–1 nonimmigrant, update the SEVIS record and track EOS requests, and advise the F–1/J–1 nonimmigrant about the extension process and the requirements to file an EOS with USCIS. Additionally, HR staff will spend approximately 1.5 hours per F–1 EOS request to track form updates related to each EOS request and avoid inadvertent unauthorized employment due to form discrepancies with the I–9. The DSO cost per EOS request is $233."[10]

Of note, this estimated 67 hours is substantially more than what was estimated in the 2020 proposed rule and will have a negative impact on the ability of U.S. institutions to educate, service and manage

---

[7] National Academy of Medicine. (2020). Action Collaborative on Clinician Well-Being and Resilience. https://nam.edu/initiatives/clinician-resilience-and-well-being/

[8] IntHeath (Educational Commission for Foreign Medical Graduates). (February 7, 2025). J-1 Visa Sponsorship, 2024; Essential to U.S. Health Care. https://www.intealth.org/pdfs/J-1_US_Infographic.pdf

[9] Supra at 42101.

[10] Id at 42103.

their international affiliates. The additional annual requirements this proposed rule will create for DSOs and AROs far exceed the Department's estimates. Education on immigration rules is a constant effort and must be repeated many times for a broad number of stakeholders including faculty, departments, students, scholars, university leadership, and financial planners. In the case of EOS requests, more time will be needed for individual consultations with students and scholars and coordination with faculty advisors and academic departments. Reviewing each Form I-539, which is personal to the individual petitioner, for completeness is deemed an unauthorized practice of law for DSOs and AROs. As such, this is a responsibility that should fall to paid professional immigration attorneys, given all that is at stake for the individual and their academic program. This is compounded by the need for dependent inclusion in both EOS and Reinstatement requests, particularly if Reinstatement must be followed separately by an EOS request.

If the final rule provides a structure under which DSOs and AROs may lawfully review and advise on Form I-539 (relying on the Department's estimates for program extensions under this proposed rule alone), then we estimate a minimum of 9,633 additional staff hours would be needed for EOS advising. It is difficult to predict exactly how much additional staff time this rule will necessitate for Johns Hopkins on an annual basis since we advise so infrequently on I-539 requests, even to refer them out to an outside attorney. This excludes advising on denials and requests for evidence (RFEs). If these outcomes are prevalent, then the advising burden will be significantly higher.

Added to the overall discussion of what will be needed for travel and reentry will be explanations of the basic idea behind the date-certain I-94 end date the student/scholar will receive upon re-entry, which will lead to questions about the potential future impact to students who are years away from having to file an EOS. Furthermore, for the first year or more of this new rule's implementation, advising students who were already in F-1 status at the time of rule implementation is going to be an extra burden because we will have to educate them on the change itself and then evaluate the impact on their individual ability to travel and re-enter. Additionally, situations in which a student has filed (or needs to file) an EOS close to a period of travel will be especially complicated and take much longer. As mentioned previously, the rule does not include crucial details about what EOS processing times will be and how early an EOS application can be filed. These details will impact when and how often students may be able to travel, which will lead to many more travel-related questions and time spent advising them as time passes and circumstances change.

Given the 9,633 hours per year in additional staff time to absorb the impact of this rule, we would need approximately five additional full-time DSOs/AROs to support the new rule. Our full-time DSOs are paid to work 1,950 hours each year, so this equates to a minimum budget increase of $511,457. And, without a doubt, this work will be ongoing and will not be a one-time effort.

As referenced above, the lengthy and costly process changes in the proposed rule will also have a negative impact on the decision by students and scholars to choose a U.S. university over one in another competitive country. Based on a balancing of the equities and facts , we assert that Department comments on possible mitigating factors to the potential reduction to enrollment (resulting from this rule) are not persuasive in the face of a proposed rule with uncertain outcomes. Not only do international students, faculty, physicians, and scholars offer valued and critical perspectives in our

classrooms and on our campuses, but they also contribute significantly to our local economy in the State of Maryland. During 2023 in Maryland, Johns Hopkins international students alone brought in $504.3 million and supported 5,394 jobs in the local economy.[11] Johns Hopkins is proud to be the largest private employer in the state, and an anchor institution in Baltimore. These jobs are vital to our local economy, and we represent only a fraction across the U.S.[12] The potential loss of the intellectual and financial capital to the United States that may be caused by this proposed rule is significant and cannot be overlooked.

## VII. Burden on USCIS

Annual reporting by the agency suggests that USCIS struggles with adherence to standard processing time for regularly submitted applications given the incredible volume of submissions already faced by the agency. This has negatively impacted students in the past who have filed for post-completion OPT, been caught in limbo due to processing times, and subsequently postponed job opportunities or lost them altogether because employers cannot or will not wait indefinitely for them to begin a job. USCIS has routinely taken up to five months to adjudicate an I-765 filed for post-completion OPT. Additionally, the form proposed for EOS (the I-539) has seen significant delays of up to a year, such that students needing to change status from within the U.S. in order to begin a degree program very rarely do so by filing the form I-539. Most recently, we experienced long waits for I-539 processing in advance of the fall semester for in-country individuals who requested a change of status to F-1 student. These students were either forced to abandon their change of status request and travel abroad and return at great expense or postpone the start of their studies if their existing status did not permit full-time study.

While USCIS offers “premium processing” for certain types of applications, this option is not always realistic for students and scholars looking to study in the U.S. and is inconsistently used by the agency. In certain instances, premium processing has been like a safeguard for USCIS as it struggles to establish and adhere to regular processing times for applications. However, due to inconsistencies, e.g., a departure from the original 15-calendar day processing time at the introduction of premium processing, it is not a reliable “fix” for the increase in the volume of applications that this proposed rule will create.

The number of applications that must be filed with USCIS for international students all over the U.S. to comply with this proposed rule will exponentially increase the USCIS workload. However, the proposed rule does not address what USCIS will do to manage that increase. We feel it is likely that premium processing will be required in order to obtain a decision on an EOS in a timely manner, which is even more important in the absence of details as to how the Department will deal with potential gaps in status for students or scholars needing to extend their stay without predictable processing times.

Ultimately, this proposed rule assumes consistent, coordinated practices among and within the several government agencies involved in monitoring and adjudicating extensions of stay, but does not identify concrete steps to document how that will be achieved.

---

[11] NAFSA. (2023). Maryland Benefits from International Students. [2023 Economic Value Report for MD | NAFSA]
[12] NAFSA. (2024). NAFSA United States of America Benefits from International Students. HYPERLINK "https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf"EconValue2024_v01_11-11-2024.indd

## VIII. Association with Other Comments

Johns Hopkins would like to echo and underscore the comment submitted by the American Council on Education (ACE), which was signed by several other associations to which Johns Hopkins is a member. Additionally, we support the comments filed by the Association of American Universities (AAU) and NAFSA: Association of International Educators (NAFSA).

## IX. Conclusion

Due to the truncated review and comment period of only 30 days, Johns Hopkins expedited its institutional review of the issues raised by this proposed rule as well as its potential impact on the university community. In sum, and as set forth above, Johns Hopkins respectfully asserts that the change to the duration of stay parameters and "normal progress" standards, in addition to new procedural and financial burdens implicated by this rule, would significantly burden institutions of higher education such as Johns Hopkins and our international student and scholar populations. We would also assert that instead the Department has the opportunity to more narrowly construct this proposed rule, such that it leverages existing systems (SEVIS) and data already provided per the current regulations to the U.S. government to identify and address issues of overstay resulting from J and F visa holders. Johns Hopkins again requests this proposed rule be rescinded in its entirety and that existing duration of status continue.

We understand and agree with the government's national security interest in keeping bad actors out of the United States, and we actively and arduously support efforts to ensure compliance with U.S. laws and regulations. We educate students and scholars to abide by the terms and conditions of their status while in the U.S., and we want them to leave the U.S. on or before the date of their authorized stay. As an institution of higher education, we also have an interest in assisting students and scholars to complete the course of study successfully and in a timely fashion.

We respectfully differ on the best solution. A better way to accomplish the Department's goal would be to invest in SEVIS enhancements that would provide the Department with the additional data it wishes to review, either upon request to school officials, or as a matter of course. We invite the Department to engage in partnership with dedicated, seasoned, and highly knowledgeable PDSOs, DSOs, ROs, and AROs for more efficient, cost-effective, targeted, and meaningful solutions for keeping the country as safe as possible by rooting out and penalizing those who clearly and willfully intend to violate the rules.

Finally, although we feel that we could provide more detailed data on the impact this proposed rule would have on our thousands of students, faculty, staff, and alumni had we been provided more time, we again thank the Department for the opportunity to comment.

Thank you for your consideration.

*James D. Brailer*

James D. Brailer
Associate Vice Provost for International Student and Scholar Services
Office of the Provost/Office of International Student and Scholar Services
3400 North Charles Street
Baltimore, Maryland 21218
Phone: (667) 208-7001
Jbraile1@jhu.edu

# EXHIBIT 29

September 26, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536

Re: DHS Docket No. ICEB-2025-0001, Comments in Response to *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*

Dear Sir/Madam,

On behalf of Arizona State University, we submit this comment letter in response to the U.S. Department of Homeland Security's ("DHS") proposed rule, *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media* (DHS Docket No. ICEB-2025-0001), published August 28, 2025. We urge the DHS to withdraw the proposed rule in its entirety, and that admission for the duration of status remain in effect for F-1 students and J-1 exchange visitors, as well as their dependents in corresponding derivative statuses.

**1. The proposed rule will dramatically increase costs borne by the USCIS**

Under the proposed rule, the USCIS will assume responsibility for adjudicating a new category of Form I-539 applications for extension of stay filed by F, J or I nonimmigrants.

DHS states:

> Based on the historical data, regulatory criteria, and the transition period assumptions, DHS estimates an annual average of 205,000; 203,000; 6,000 EOS requests for F, J, and I nonimmigrants, respectively, over the ten-year period of analysis.

[90 Fed. Reg. at 42101 (August 28, 2025)]

Elsewhere, DHS projects the annual total number of new paper I-539 applications to be 459,860 and new e-filed I-539 applications to be 197,083 (or 653,943 new filings per year). [Id. at 42105]

DHS states that it:

> recognizes that the proposed rule would incur costs. Some of the costs have been quantified based on available data, and the remaining costs are qualitative. DHS welcomes comments on these costs, including data or information that could support quantification as well as proposed alternatives to reduce burdens and impacts.

[Id. at 42101]

We urge DHS to reconsider the assumptions that underlie its assessments of the costs that will be imposed on the USCIS by the proposed rule.

According to published data from the USCIS, it received a total of 271,026 Form I-539 applications during the four most recently-completed quarters:

2nd Qtr 25 FY 68,251
1st Qtr 25 FY 69,012
4th Qtr 24 FY 69,414
3rd Qtr 24 FY 64,349

[Immigration and Citizenship Data, U.S. Citizenship and Immigration Services website]

If we accept the DHS estimates that it will receive an additional 414,000 to 653,943 applications annually if the proposed rule is implemented, the USCIS would experience a 150% to 241% annual increase in its I-539 caseload.

Moreover, it is not at all clear that DHS has accurately considered the actual 4-year graduation rate for international students in making its estimates. DHS asserts that "***many*** F and J nonimmigrants would complete their studies within a 4-year period and [thus] not have to request additional time from DHS" [emphasis supplied], but goes on to cite data showing that the four-year bachelor's degree graduation rate for international students is only 56%. [Id. at 42082 and footnote 92]

We urge DHS to consider whether it may have significantly ***underestimated*** the number of additional Form I-539 applications it will receive.

In addition, the DHS should quantify the impact of collecting biometrics from the new I-539 applicants on DHS field offices and on USCIS processing times.

DHS states that "[a]s part of the EOS application, USCIS requires biometric collection and will require such collection from F, J, and I nonimmigrants under the proposed rule." [Id. at 42083] The proposed rule provides that the I-539 applicant "must file an extension of stay application using the form and in the manner designated by USCIS, including . . . appearing for any biometrics collection required by 8 CFR 103.16." [Id. at 42110].

DHS acknowledges:

> there could be other costs that the Department was not able to quantify and discusses these in the following section. Generally, DHS lacked data and information to quantify the qualitative costs below. DHS welcomes comments on these costs, including data or information that could support quantification as well as proposed alternatives to reduce burdens and impacts.
>
> . . . .
>
> There may be additional costs to DHS associated with potential requests for additional information, in-person interviews, or biometric appointments.

[Id. at 42101]

DHS "estimate[s] [the] total number of respondents providing biometrics is 864,543" annually. [Id. at 42105]

Clearly, collection of biometric data at this scale will dramatically increase the costs to operate DHS field offices.

In sum, we urge DHS to reconsider how a very significant increase in both I-539 filings and biometric collection will increase USCIS costs, impact operations, affect processing times and increase backlogs.

### 2. The proposed rule will dramatically increase costs borne by universities

In addition to the costs imposed on the USCIS by the proposed rule, international offices at universities would experience significantly increased administrative burdens. DHS acknowledges that "[s]chools may also incur costs for changes to their information systems and practices to implement processing under the proposed rule." [Id at 42101]

DHS further notes that:

> Under the proposed rule, DSOs and ROs will have to spend approximately 67 hours for rule familiarization and adaptation in the first year after the rule takes effect. For each DSO, rule familiarization would cost $3,342 in the first year after the rule takes effect. Further, each year DSOs/ROs will spend approximately 3 hours per F–1/J–1 EOS request to review the Form I–539 completed by the F–1/J–1 nonimmigrant, update the SEVIS record and track EOS requests, and advise the F–1/J–1 nonimmigrant about the extension process and the requirements to file an EOS with USCIS.

[Id. at 42103]

We urge DHS to reconsider the full scope of additional costs that international offices (and other university offices) will bear under the proposed rule, including:

- **Increased advising volume:** Students will have more questions about filing extensions, timelines, required documents, and potential risks, leading to longer advising sessions and higher appointment demand.

- **Additional resources:** Offices will need to provide additional resources such as webpages, information sheets, webinars, guides to assist students with the extension filing process.

- **Case tracking workload:** Offices would need to monitor extension deadlines closely for thousands of students to prevent gaps in status.

- **System and staff strain:** Current staffing and technology are designed for duration of status. Transitioning to fixed end dates would require retraining, new workflows, and updates to immigration processing software (i.e., Sunapsis) and SEVIS.

- **Higher risk of status violations:** More students may inadvertently fall out of status due to missed completion or extension deadlines, requiring offices to assist with reinstatement support.

- **Greater liability for academic institutions:** Schools may be viewed as partly responsible if students lose status due to miscommunication, increasing institutional risk exposure.

- **Complications with academic program changes:** Extensions for changing majors or pursuing reduced course load accommodations would now require filings with the USCIS, rather than internal approval, thus complicating the process for ensuring adequate academic progress..

- **Staffing costs:** Additional staff would be needed to manage the increased workload.

- **Training and legal consultation:** Ongoing staff training would increase, with a possible greater reliance on university legal counsel for complex cases.

- **Increased student stress:** Filing with USCIS introduces uncertainty, delays, and financial burdens, requiring more support from university academic and mental health counseling offices.

- **Barriers to retention and graduation:** Students experiencing delays or denials may be unable to complete their programs on time or in person, again requiring additional university resources to develop alternative strategies.

- **Impact on career development:** Lapses in status during extensions could jeopardize CPT/OPT eligibility, requiring offices to provide additional support.

- **USCIS processing delays:** Students would likely encounter longer adjudication timelines as extension cases add to USCIS' workload.

- **Embassy/consulate confusion:** Students may receive inconsistent guidance abroad during and after the transition period, requiring additional DSO support.

- **Coordination with campus stakeholders:** University staff in other offices would need regular updates to accommodate students with uncertain legal status.

### 3. Enhancements to the SEVIS system can achieve DHS's objectives at a significantly lower cost

DHS offers this rationale for ending "duration of status" admission:

> The significant increase in the volume of F academic students, J exchange visitors, and I foreign information media representatives poses a challenge to the Department's ability to monitor and oversee these nonimmigrants while they are in the United States. . . .In turn, this has undermined DHS's ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence and has created incentives for fraud and abuse.

[Id. at 42071]

We believe that DHS's objectives could be adequately addressed through enhanced SEVIS capabilities. In fact, the proposed rule admits as much:

> SEVIS ensures government agencies have essential data related to nonimmigrant students and exchange visitors to preserve national security. SEVIS also implements Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). . . , which requires

> DHS to collect current information from nonimmigrant students and exchange visitors continually during their stay in the United States. In addition, section 416 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), . . . , mandated full implementation and expansion of SEVIS.

[Id. at 42072]

Looking at the first of DHS's objectives, DHS suggests that ending "duration of status" would:

> ensure that DHS has an effective mechanism to periodically and directly assess whether the nonimmigrants are complying with their classifications and to obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States.

[Id at 42072]

Enhancing SEVIS, in contrast, would provide DHS with the expertise of employees of educational institutions and program sponsors and their understanding of the nonimmigrant's program. The proposed rule acknowledges as much:

> Employees of educational institutions and program sponsors, specifically DSOs and ROs, play a large role in SEVIS. They are responsible for monitoring students and exchange visitors, accurately entering information about the students' and exchange visitors' activities into SEVIS, and properly determining whether the student or exchange visitor's SEVIS record should remain in active status or change to reflect a change in circumstances. Under this framework, an academic student or exchange visitor generally maintains lawful status by complying with the conditions of the program, as certified by the DSO or RO.

[Id. at 42076]

In fact, SEVIS provides DHS with more frequent reporting (i.e., reporting at each academic session) than the infrequent reporting that would occur under the proposed rule (i.e., reporting occurring only if and when the F or J nonimmigrant files a form I-539 application for extension of stay). Moreover, DHS's objective would not be addressed in any fashion if the F or J nonimmigrant completes the program within the fixed period of authorized stay and thus does not need to file a form I-539 application for extension of stay.

Turning to DHS's second objective, DHS asserts that ending "duration of status" would deter nonimmigrants in F, J or I classification from overstaying their period of authorized stay. [Id. at 42072] But SEVIS already provides DHS with a comprehensive database, which can readily be utilized by DHS in conjunction with the CBP arrival/departure system to monitor a nonimmigrant's presence in the United States. Enhancements to SEVIS in conjunction with improved integration with other DHS systems would provide DHS with a more effective tool to prevent overstays than would the proposed I-539 extension of stay process.

Finally, DHS identifies remedying specific problems in the SEVIS system as its third objective ("Risks Within the F Classification" and "Risks within the J Classification)." [Id. at 42077 to 42080]

Enhancements to the SEVIS program and more robust auditing by SEVP would address those problems directly and more effectively than the indirect approach of ending "duration of status." And we believe that SEVIS could accomplish this at a much lower cost to both DHS and universities.

We propose, therefore, that DHS enhance the SEVIS system and better integrate it with the government's other data-based systems to meet the stated objectives of the proposed rule.

***Conclusion***

DHS has made a very significant investment in SEVIS. It is a proven, well-understood system designed to manage the F and J programs. By contrast, the I-539 extension of stay process introduced by the proposed rule is ill-suited to the unique circumstances of F and J nonimmigrants. Moreover, it is likely to impose very significant costs on both DHS and universities.

The interests of both DHS and universities would be better served by withdrawing the proposal rule and refocusing on improvements to SEVIS.

Sincerely,

[Name / Title]

# EXHIBIT 30

PRINCETON UNIVERSITY

**Davis International Center**
Louis A. Simpson International Building
Princeton University
Princeton, New Jersey 08544
T 609.258.5006 E davisic@princeton.edu

September 29, 2025

DHS Docket No. ICEB-2025-0001 submitted via http://www.regulations.gov

RIN 1653-AA95

Office of Regulatory Affairs and Policy

U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW, Washington, DC 20536

To Whom it May Concern:

On behalf of Princeton University, I submit the following comments in response to the Notice of Proposed Rulemaking titled *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media* (DHS Docket No. ICEB-2025-0001). Princeton supports the US government in its effort to protect and maintain our national security, intellectual property, and competitiveness in the global research community. However, enhancements to enforcement procedures should not impede the success of US universities or their freedom to define curriculum and set a reasonable and appropriate time to degree.

Princeton's position on immigration policy reflects our conviction that international collaboration and exchange is a vibrant source of creativity and strength for this country. The ability of people to enter the United States in search of educational opportunities is indispensable to the mission and excellence of America's universities, which enhance the country's economy, security, and well-being through the students they educate and the jobs they generate.

Below are some areas of concern in the proposed rule and suggested changes that we believe would ameliorate negative and unintended impacts. We also support the comments submitted by the Association of American Universities, which outline the perspective of America's leading research universities on this issue and request that the rule be withdrawn.

*Insufficient Maximum Admission Period*

In Section V, sub-section A (General Period of Admission for F and J Nonimmigrants), the proposed rule argues that "a 4-year period of admission would not pose an undue burden to most nonimmigrant students." However, that time period does not match the academic reality at Princeton and many other colleges and universities, especially those with PhD programs. International doctoral candidates and research scholars engage in cutting edge research and their programs may range from 5-8 years depending on program objectives and category limitations. The proposed rule, including the maximum admission period, threatens the progress of critical U.S. research through its adverse impact on international researchers and by jeopardizing U.S. capacity to attract outstanding talent.

Princeton University supported 1,455 international graduate candidates in the 2024-2025 academic year, with the majority being PhD candidates. Doctoral education requires original and independent scholarship, presenting the need for more individualized program lengths. The University has always emphasized the timely completion of both undergraduate and graduate programs, consistent with the Department of Homeland Security's goal to align international student and exchange visitor program length to the time to complete educational objectives. In fact, the median time to PhD for international students is lower than the median time for our domestic students. However, if this rule were to go into effect as written, virtually all of our F-1 and J-1 graduate students would need to apply for an extension of stay (EOS). It is not clear what national security risks are being addressed by requiring academic populations with 5-year programs to apply for an extension before the expected end of their studies.

Similarly, the University sponsored 537 J-1 research scholars or professors in the 2024-2025 academic year. 22 CFR 62.20(i)(1) allows participation in the professor and research scholar category "for the length of time necessary to complete his or her program, provided such time does not exceed five years." With the Department of State (DOS) prescribing specific limits for several exchange visitor categories and declining to impose a maximum duration for post-secondary students, DHS's proposed rule does not acknowledge or justify departure from judgements by DOS as to the appropriate duration of the programs it administers.

The proposed uniform 4-year admission period is arbitrary and unreasonable, given the exceptional variety of programs covered. It would be more appropriate to consider a preference for a 4-year admission period where applicable, but defer to the I-20/DS-2019 program dates in cases where educational objectives and the relevant regulatory category limits within the J-1 exchange visitor program often extend beyond that average. This would mirror how the proposed rule already proposes to treat 2-year programs. If a uniform date-certain is implemented, we would encourage you to extend the duration to at least six years to account for PhD programs.

*Arbitrary Limitations on Graduate Level Study*

In Section V, sub-section E (Requirements for Admission, Extension, and Maintenance of Status of F Nonimmigrants), the proposed rule seeks to "prohibit F-1 students in a graduate level program of study from changing educational objectives or transferring from within the United States." While DHS speculates that these proposed restrictions would still accommodate the "legitimate academic activities of a bona fide student", they instead would serve to limit these academic activities for international students unnecessarily, to the detriment of the students, their schools, and the national interest. The proposed bans on graduate level transfers and educational objective changes fail to account for legitimate scenarios in which an update is warranted and beneficial, such as moving from the master's level to doctoral studies or transferring to continue an academic program with an existing thesis advisor who has transitioned to a new institution. The strict limitation on pursuing programs at the same educational level also fails to acknowledge how the interdisciplinary nature of education may warrant or encourage multiple specialties to achieve overall educational goals. Forcing students into a set of constraints that undermine or discourage exploring the unknown and inhibit their ability to pivot to a track that allows them to pursue the most positive impact would severely impede research missions across the U.S.

In addition, the regulations already provide limitations on Optional Practical Training (OPT) eligibility at each educational level to prevent abuse, and all educational changes or program transfers are managed and approved via the Department of Homeland Security's Student and

Exchange Visitor Information (SEVIS) system. Further, the proposed rule seeks to require an extension of stay request in all SEVIS transfer scenarios, allowing for DHS review and approval. As such, we do not believe the strict limitations proposed on graduate level students are warranted; indeed, they would be counterproductive.

*Unrealized costs of legal counsel for personal applications*

The proposed rule encourages–if not mandates–designated school officials (DSOs) and alternate responsible officers (AROs) to advise on I-539s, which are personal applications. As status and work authorization applications have become more complex in nature, there has been a sharp increase in sponsored students and scholars choosing to seek legal counsel to advise on or review their personal (I-539 and I-765) applications. The recurring theme is that they want to ensure that they are completing the process correctly and minimizing any risks of mistakes that could complicate their ability to remain in the U.S. legally. The new procedures contemplated by the proposed rule would almost certainly place much greater pressure and burden on students and scholars to find and retain legal counsel for these applications in order to ensure they are abiding by all U.S. laws and regulations.

*Existing Solutions*

In Section III, sub-section A (Purpose of the Proposed Regulatory Action), DHS asserts that there are not sufficient opportunities for vetting by DHS officials due to D/S. However, the proposed rule fails to acknowledge existing solutions that are available in SEVIS and through established procedures with U.S. Citizenship and Immigration Services (USCIS). Examples include:

- OPT applications through the I-765 require maintenance of status review prior to approval; however, the proposed rule still requires that F-1 students file both an application for employment authorization and an extension of stay request in Section V, sub-section D (Transition Period).

- In Section III, sub-section A (Purpose of the Proposed Regulatory Action), the proposed rule emphasizes that "these changes would ensure that DHS has an effective mechanism… to obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States." SEVIS reporting requirements already dictate the reporting of relevant information no later than 21 calendar days for a DSO/ARO, and in many cases 10 calendar days for the student or scholar. Therefore, SEVIS is inherently a more timely and accurate database compared to the processing of the proposed I-539 extension of stay petition that would take 3.5 months per current posted USCIS processing times (as of September 25, 2025).

- Princeton's DSOs/AROs are familiar with our institution's degree programs, student and scholar needs, as well as the contributions of our international community to the evolution of key research areas, such as quantum science or fusion energy. Our DSOs/AROs, in consultation with academic department advisors and administrators, are in a better position to make status decisions, such as extensions, rather than seek a decision from an already overwhelmed USCIS adjudicator without a scientific background or knowledge of individual institutions – much less their departments or programs.

The proposed rule disregards potential enhancements in SEVIS to facilitate SEVP review for the minority of F-1/J-1 nonimmigrants who have remained in the U.S. uninterrupted on D/S for an extended period of time, as well as to identify possible DSO/ARO wrongdoing.

- In Section IV, sub-section C (Need for Rulemaking), the proposed rule references 2,100 identified aliens who first entered as F-1 students between 2000 and 2010, and remain in active F-1 status as of April 6, 2025. Assuming these individuals have not been re-evaluated by DHS through established petitions (e.g., OPT), managing this group of outliers is more efficient than managing the whole F-1/J-1 population by eliminating D/S. SEVP review mechanisms through SEVIS can be enhanced for those remaining in the U.S. uninterrupted on D/S if they have not sought a benefit or traveled.

- Through Section IV, sub-section C (Need for Rulemaking), the proposed rule identifies DSO and ARO fraud, exploitation, and abuse as a risk necessitating the rulemaking. However, the SEVIS database has rigorous evaluation procedures for institutions to maintain SEVP Certification and/or DOS Designation. With the requirements for recertification and redesignation, the available data on actions related to an institution's students and exchange visitors, and enhanced national security resource of the SEVP Field Representative Unit, the government already has the tools necessary to identify culpable institutions through existing channels, rather than implementing additional costly and functionally duplicative measures that would involve a separate agency already burdened by backlog.

The proposed rule argues that duration of status (D/S) admissions undermine the authority of the Department of Homeland Security to monitor and oversee F-1 and J-1 nonimmigrants. D/S admissions do not undermine this authority, but rather facilitate the student or exchange visitor to complete their program objectives while DHS retains oversight capabilities via the SEVIS database.

*Risk of Inter-Agency Miscommunication*

The nuances of Customs and Border Protection (CBP) and USCIS determinations of admission and/or extension of stay throughout the proposed rule leave significant room for inter-agency miscommunication that could negatively impact a nonimmigrant's immigration status. In Section V, sub-section A (General Period of Admission for F and J Nonimmigrants), CBP would be given discretion to determine admission period while an extension of stay (EOS) petition is pending. Inter-agency communication failures could result in both a premature admission expiration and/or the timely filed EOS petition being abandoned or cancelled inaccurately - posing additional financial hardship and maintenance of status concerns beyond the nonimmigrant's control.

The proposal also fails to acknowledge that there are legitimate reasons throughout an academic year in which a nonimmigrant is required to travel internationally, whether for personal reasons during approved breaks or for academic or professional reasons. The likelihood that nonimmigrants will need to travel and re-enter before the expiration of a prior admission period is very high. CBP should be re-evaluating a new admission window at each entry, thereby allowing a valid alternative that allows maintenance of status by existing DOS and CBP verification procedures, rather than costly and lengthy USCIS petitions.

DHS acknowledges that adjustments to the SEVIS database will be necessary to accomplish the goals set forth in the proposed rule (Section V, sub-section E Requirements for Admission,

Extension, and Maintenance of Status of F Nonimmigrants); however, more specific details on anticipated changes are not yet available or included in the proposal. Errors in inter-agency system communication (CLAIMS) already account for a significant number of correction requests and data fix requests by international offices in SEVIS or through the SEVP Response Center, threatening the student's status and introducing unnecessary stress. The proposed rule would exacerbate this issue if implementation were not reviewed and introduced carefully, including through extensive communication among the implementing agencies and from those agencies to the schools, as well as timely remediation procedures to correct the inevitable errors. This would pose an additional and unnecessary burden on the DSOs/AROs nationwide, especially when DHS could seemingly accomplish its objectives by enhancing or better supporting its existing tools (e.g., SEVIS).

*Concerns on USCIS Capacity for Timely Adjudication*

There is significant concern about USCIS capacity to timely process the volume of new requests that the proposed rule would generate. As noted above, virtually all PhD students—at Princeton and across the country—would need to apply for an EOS. In addition, Section V, sub-section C (Extension of Stay) of the proposed rule outlines that biometric collection will be required for all EOS petitions. In Section IV, under the Affected Population sub-section, "DHS estimates an annual average of 205,000; 203,000; 6,000 EOS requests for F, J, and I nonimmigrants, respectively, over the ten-year period of analysis." These estimates do not align with Open Doors figures, which suggest nearly double the number of F-1 students would be impacted annually. The caseload that would be generated under the proposed rule would place a significant and potentially overwhelming burden on an agency already facing lengthy processing times (USCIS processing times).

Even if DHS strives to implement the proposed rule thoughtfully, accounting for all impacted parties/agencies and procedures, it is likely that there will be significant disruptions to stay authorizations and/or work authorizations. Program extensions and post-graduation authorization requests already require multiple steps through the international office, often followed up by existing adjudication through the Department of State, USCIS, and other agencies such as the DMV, SSA, and IRS. The proposed rule will make things worse – less efficient and more complicated and burdensome – for students, universities, and the government.

As you continue to consider the proposed rule, I urge you to recognize that American universities are the envy of the world in large part because they attract and gain value from the best and brightest minds from across the globe. Princeton University respectfully requests that you withdraw the rule or, at the very least, consider changes to the more onerous and problematic provisions proposed.

Respectfully,

Albert Rivera

Albert Rivera
Director
Davis International Center

# EXHIBIT 31

WashU



September 28, 2025

Kristi Noem
Secretary
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528

Todd Lyons
Acting Director
Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, DC 20536

**Re: DHS Docket No. ICEB-2025-0001**
**Regulatory Information Number (RIN) 1653-AA95**
Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors and Representatives of Foreign Information Media

Dear Secretary Noem and Acting Director Lyons:

I write to submit comments on behalf of Washington University in St. Louis on DHS Docket No. ICEB-2025-0001, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media.

Founded in 1853, The Washington University d/b/a (the "University") is a private, nonprofit research university. Over 16,000 students and 16,000 faculty and staff work together to advance the university's charitable missions of education, research, and patient care.

WashU



International students and exchange visitors (EVs) are an essential part of the University, and they help us to achieve our educational, research, and clinical mission in multiple ways. They strengthen our institution by ensuring that perspectives from different cultures and countries are represented on campus. This is essential for our educational, patient care, and research mission, as all students need to be prepared to engage in business and science as global citizens. International students and EVs bring high levels of talent and knowledge to the University and make vital contributions to the University's ability to conduct cutting-edge research, make scientific discoveries, and care for patients.

This is a benefit not only to the university, but also to the United States more broadly. International students, medical residents, fellows, and allied health professionals serve critical workforce needs, supplying much of the necessary care to those in need, particularly in rural and urban underserved regions. At the graduate medical education level, in particular, the absence of international physician trainees would exacerbate an already critical workforce shortage across the United States with immediate and devastating consequences to Americans, especially those Americans in rural areas who are already underserved.[1]

At the University's School of Medicine, medical trainees care for patients and gain experience alongside our faculty at our nationally ranked teaching hospital partners, Barnes-Jewish Hospital, Missouri Baptist Medical Center, Barnes-Jewish West County Hospital, and St. Louis Children's Hospital, where our faculty members serve as the medical staff. Together we sponsor hundreds of international residents, clinical fellows, and post-doctoral researchers. Our international medical students, post-doctoral researchers and scholars, residents, and clinical fellows play important roles in all our patient care activities alongside their American counterparts.

This proposed rule would have a profound, negative impact on the University's ability to educate students and scholars, perform innovative research, and provide world-class patient care. It would discourage international students and EVs from pursuing educational, research, and training opportunities in the United States, and impose

[1] https://pmc.ncbi.nlm.nih.gov/articles/PMC10356718/

WashU

additional and unnecessary burdens on international students, scholars, clinical residents, and fellows.

We fully recognize the government's national security responsibilities and share a strong commitment to immigration compliance that keeps America safe. We believe there is a practical middle path to address the concerns raised – through targeted, risk-based measures – without eliminating Duration of Status (D/S) or imposing restrictive academic limits. Ending D/S will undermine U.S. competitiveness in critical areas. It will disrupt teaching and research, diminish America's standing as a global education leader, and adversely affect local economies, especially in rural communities.



On behalf of the University, we respectfully request that the U.S. Department of Homeland Security (DHS) withdraw this proposed rule in full and instead work with other federal agencies in cooperation with U.S. universities to take steps to protect our national security and intellectual property, while allowing the United States to remain the premier destination for talented students and scholars from around the world.

To balance security and academic excellence, we recommend: DHS ensure the full funding and staffing of Immigration and Custom Enforcement's (ICE) Student Exchange Visitor Program (SEVP); enhance SEVP Designation School Official (DSO) and Alternate Responsible Officer (ARO) training; create a clear, uniform definition of "normal progress"; and develop risk-based reviews of institutions during both SEVP regular and out-of-cycle certifications. We also urge SEVP to adopt specific, standardized transfer reasons, including medical necessity, changes in program or correction of course-level placement, faculty adviser relocation or loss of funding, difficulty with academic rigor, and unexpected financial hardship. In addition, we support real-time data sharing among U.S. Citizenship and Immigration Services (USCIS), Customs and Border Protection (CBP), and SEVP; and standardized I-94 issuance and updated practices to prevent errors.

Taken together, these calibrated steps would advance national security and compliance while preserving the academic flexibility that enables U.S. institutions to excel.

**IV. Background and Purpose**

**B. Background**

WashU



In this proposed rule, it is made clear that the original decision by Immigration and Naturalization Service (INS) to implement D/S was due to the large number of international students in the U.S. and "would facilitate the admission of nonimmigrant students, provide dollar and manpower savings to the government, and permit more efficient use of resources." This information holds true today in 2025. The history of D/S is directly tied to governmental costs, paperwork burdens, and the ability for institutional DSOs and AROs to process extensions based on legitimate academic or program reasons.

The U.S. higher education system benefits from international students subsidizing educational opportunities for American students, especially in crucial STEM fields that suffer from insufficient domestic enrollment. According to a NAFSA report, international students contribute $43.8 billion to the U.S. economy annually through tuition, fees, and living expenses.[2] This financial influx helps U.S. colleges and universities maintain domestic scholarship programs and offer competitive tuition rates for American students.

Moreover, international students and EVs play a pivotal role in the research ecosystem within the U.S. The Institute of International Education's (IIE) "Open Doors Report on International Educational Exchange" notes that a significant proportion of research involves international graduate students.[3] Their collaboration with American students and researchers often results in groundbreaking discoveries, including significant advancements in medicine and technology benefiting both the U.S. and the world.

Data from the United States Patent and Trademark Office cites that a substantial number of U.S. patents involve inventors from international backgrounds, bringing academic prestige and tangible economic benefits to universities and their surrounding communities by fostering innovation, creating jobs, and attracting industry partnerships. [4]

U.S. higher education is a strategic national asset, and we are the world's leading destination for higher level study.[5] Replacing D/S with fixed admissions and mandatory

[2] https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf
[3] https://opendoorsdata.org/
[4] https://www.uspto.gov/ip-policy/economic-research/intellectual-property-and-us-economy
[5] https://www.openprivilege.com/business/economy/top-global-destinations-for-higher-education-67bd845ae1461dc887610a1c

Office of the Provost
MSC 1173-0149-01
One Brookings Drive
St. Louis, MO 63130

WashU

USCIS extensions would add cost and uncertainty at pivotal academic moments, putting America's hard-won global lead in this sector at risk.

**IV. Background and Purpose**

**C. Need for Rulemaking**



Before imposing an expansive, costly, and onerous new system, DHS should better and more comprehensively use the extensive data that is continuously collected through the Student and Exchange Visitor Information System (SEVIS) to address concerns raised in the proposed rule. Data gathered from Form I-17 is already in SEVIS with extensive academic information about the University, including the programs offered, estimated time to degree, and accreditation. On our students and EVs, SEVIS houses academic program information, personal data, financial sources, visa approval, work authorizations, and academic changes such as reduced course loads and extensions. Since 2003, SEVIS has been used to address many of the concerns that are stated in the proposed rule. The proposed rule does not resolve these concerns and instead points out how agencies can work with a system that is already in place to enhance compliance. Implementing these proposed changes would add cumbersome requirements to an already overburdened U.S. immigration infrastructure. The proposed rule adds layers of complexity because multiple agencies control different parts of the process:

- U.S. Department of State (DOS) oversees J-1 programs and J-1 nonimmigrants (and their dependents)
- DHS' ICE SEVP maintains SEVIS, F-1 school certifications, and F-1 nonimmigrants (and their dependents)
- USCIS adjudicates change of status applications to F/J classification, reinstatement applications, and F-1 Optional Practical Training (OPT) applications
- CBP determines the "Admit Until Date"

This fragmentation already increases the risk of errors, miscommunication, and delays. It also increases the risk of sharing inaccurate data between agencies such as SEVP, the Social Security Administration (SSA), states' Department of Motor Vehicles (DMV), and the Internal Revenue Service (IRS).

WashU



The proposed rule does not outline the additional infrastructure and staffing which will be required at USCIS to implement the rule's new processes, nor does it address training needs, IT integration, per-case costs, or how increased application volumes will be handled. Absent a resourced implementation plan with clear timelines and throughput modeling, the risk of significant backlogs and data inaccuracies will rise, undermining national security.

If implemented, this change would result in at least 400,000 (as estimated in the proposed rule) new applications submitted to USCIS annually. There is currently no system, staffing, or infrastructure in place to enable USCIS to process and adjudicate these applications in a timely manner. Therefore, it would result in interrupted research, studies, and work for students, clinical trainees, and scholars and would likely be reflected in hundreds of additional inquiries to USCIS daily. USCIS itself reports a total net backlog of almost 5 million cases on their Net Backlog and Frontlog Fiscal Year 2025 Quarter 2 file[6] with other sources reporting as high as 11.3 million pending cases as of mid-2025.[7] Form I-539 current processing times are a minimum of 6 months and have been as long as 18 months.

Foreign nationals in F-1 and J-1 status are already among the most closely monitored nonimmigrants in the United States. University programs – including F-1 and J-1 students, J-1 researchers, physicians, and clinical residents and fellows – are continuously tracked in SEVIS, where their records are reviewed by numerous federal and state agencies at any time.[8] Given this visibility, broad new constraints are unnecessary to address concerns about extended time in status. If DHS believes there are outliers, it can use existing SEVIS data and SEVP oversight to conduct targeted, data-driven reviews of specific institutions, specific programs, and/or specific F-1/J-1 nonimmigrants rather than imposing system-wide changes that would add cost and complexity without necessarily improving compliance.

---

[6] https://www.uscis.gov/

[7] https://www.newsweek.com/us-immigration-backlog-hits-all-time-high-2095846 and https://economictimes.indiatimes.com/nri/migrate/us-immigration-backlog-hits-all-time-high-with-11-3-million-pending-applications/articleshow/122356647.cms?from=mdr

[8] https://www.govinfo.gov/content/pkg/FR-2010-01-05/html/E9-31268.htm

WashU



As a SEVP-approved institution, the University already operates under robust federal oversight. We conduct annual verification of all DSOs and AROs and complete rigorous, fee-based recertification (F-1) and redesignation (J-1) processes that establish and document program end dates and authorized periods of stay: the very issues the proposed rule aims to address. We coordinate with SEVP to update our Form I-17 whenever new programs are added. Our SEVP Field Representative – DHS's liaison – meets with us at least once annually; the most recent visit was on June 2, 2025. Our certification is subject to regular review every two years and to out-of-cycle random reviews at any time under current federal regulations. These existing mechanisms give DHS multiple, regular points of access to examine institutional practices and staff conduct and to ensure compliance with existing federal regulations, rendering additional system-wide requirements unnecessary and duplicative.

SEVIS has been largely successful because of the institutional resources universities must commit to remain certified, and because of ongoing efforts made to help keep international students and EVs in compliance. Most importantly, it is successful because a university, through its DSOs and AROs, can easily work with students, trainees, and their advisers to understand and monitor student and EV progress through their education and training. In fact, the University's DSOs and AROs check internal student records **daily** and receive regular academic reports to update SEVIS and ensure compliance with immigration regulations. For example, if a DSO or ARO identifies that a student or EV has worked without authorization, the student's or EV's SEVIS record is terminated and SEVP is notified through SEVIS that the student or EV is no longer maintaining status. If DHS were to fully fund and staff SEVP, SEVP could then notify the pertinent Homeland Security Investigations (HSI) officer that the student's or EV's SEVIS record has been terminated so that HSI can follow up with the student or EV.

DSOs and AROs, working with academic departments, are best positioned to determine when a student or EV needs an extension of status. They understand program structures, calendars, and performance benchmarks, and they already operate within a highly regulated framework that includes institutional accreditation, SEVP certification, and regular recertification/redesignation. Extension decisions are grounded in documented criteria (e.g., substantiation from an academic adviser or program director for compelling

WashU



academic need, and physician or licensed mental-health documentation for medical need) and are subject to audit and review by SEVP at any time. Student extensions are first approved by their academic department through their academic or faculty adviser and then approved by the Office for International Students and Scholars (OISS). Extensions are granted only if students meet all University and immigration eligibility requirements. They must be justified by academic reasons, which could include additional time needed for their program based on required medial leave.

These established, auditable processes make the use of institutional DSOs/AROs an efficient way to safeguard compliance while conserving limited DHS resources. Shifting routine extension approvals to USCIS officers who lack the training and direct visibility into institutional requirements would add cost, delay, and inconsistency without improving oversight. Instead of adding a duplicative, new step into the already complex and overburdened immigration system, DHS could require DSOs to provide a justification for an extension of a program in SEVIS which would then be reviewed by an SEVP analyst who typically has more experience and training on student issues than USCIS officers.

While the proposed rule notes that immigration officers undergo background checks and training, it omits that DSOs/AROs are likewise vetted and trained as part of institutional certification and periodic redesignation, and many institutions mandate extensive immigration and compliance training before staff advise students or scholars. DSOs/AROs are trained in both federal regulations and campus policies, giving them the program-specific knowledge that front-line adjudicators typically do not have. For these reasons, keeping extension authority with DSOs/AROs, subject to existing federal audit mechanisms, aligns enforcement with expertise and preserves system efficiency.

Rather than replace D/S, DHS should modernize SEVIS to deliver stronger oversight with far less friction. Reviving and expanding the SEVIS 2.0 vision would allow limited, role-based access for students and EVs to verify key fields with DSOs/AROs, reducing errors at the source. Core workflows should be fully embedded in SEVIS – such as structured, in-system submission of new programs on the Form I-17 with required data fields and validations – instead of using today's PDF email attachments. Modern capabilities like real-time data checks, audit trails, and secure APIs for interagency sharing (e.g., DOS, SSA, DMVs) would

WashU



improve data integrity, speed up adjudications, and enhance security without shifting routine extensions to USCIS. Investing in SEVIS technology yields measurable compliance gains, cleaner records, and better user experience while preserving the academic flexibility that D/S was designed to support – achieving DHS's goals more effectively and at lower system-wide cost.

DHS cites instances of willful noncompliance and fraud to justify the proposed rule, but these cases are incredibly rare and occurred at for-profit institutions. If DHS believes additional schools may not be compliant, the appropriate remedy is to fully fund and staff SEVP to strengthen certification and compliance oversight, not to replace D/S for the entire, largely compliant U.S. higher education sector. DSOs and AROs are trained, audited, and tasked first with maintaining student and EV compliance. We therefore respectfully recommend withdrawing the proposed rule and instead adopting targeted measures: fully funding and staffing SEVP; enhancing SEVP DSO/ARO training; and expanding SEVP's risk-based reviews of institutions that trigger concerns during SEVP field representative visits, during regular SEVP certification cycles, and out-of-cycle random reviews. This approach addresses misconduct where it occurs while preserving an efficient, compliant system for the vast majority.

**V. Discussion of the Proposed Rule**

**A. General Period of Admission for F and J Nonimmigrants**

Limiting the admission period for student visas to a 4-year period is unworkable for most international students, EVs, and institutions of higher education. The proposed rule notes that the 4-year limit was determined as it "best accounts for the normal progress for most programs" and "because it aligns with the general structure of post-secondary education." These statements are not entirely accurate, as the 4-year period only aligns with some undergraduate and master's programs and does not account for doctoral students or the percentage of undergraduate students who do not finish in a 4-year period. It also does not account for dual-degree programs or specialty programs, including terminal degrees, law, and medical programs.

The majority of doctoral programs offered by the University's nine schools take longer than four years to complete. For example, we currently have one of the most prestigious

WashU

combined M.D./Ph.D. physician-scientist training programs in the world, which takes a minimum of seven years to complete. It is not uncommon for our medical students to seek extensions of a year or more to complete additional training, including an M.D./MBA, M.D./MPH, or M.D./Ph.D. We attract talented, ambitious students to all our programs and their interests sometimes do not fit neatly into "traditional" four-year periods. Our international students should be permitted to complete their academic programs, regardless of duration, without unnecessary delays or disruptions.



A 4-year admission period is unrealistic. For example, the National Center for Education Statistics reports that non-resident aliens complete their undergraduate degrees within four years at a higher rate than most other groups of students.[9] Even still, almost half require more than four years to complete. The biggest impact nationally of the proposed rule will be on M.D. and doctoral students because completing an M.D. dual degree or Ph.D. program within four years is unrealistic. The University currently issues I-20s for our Ph.D. programs for six years. In fact, the U.S. National Science Foundation's (NSF) "Survey of Earned Doctorates" reports that the median time to complete a doctoral degree for all types of programs is over six years.[10] Fixed-duration status would also limit undergraduate students who want to change majors, explore courses outside their major, add a minor, or pursue undergraduate research opportunities.

In addition, the rule is misaligned for J-1 research scholars, who are permitted for up to five years by DOS to conduct their research. J-1 postdoctoral researchers at the University typically aim to complete five-year programs. This timeframe is dependent on performance, progress, and funding. Initially, they are given one to two years, depending on the term of the grant funds. Extensions within the five years require a detailed process involving the EV, faculty supervisor, department, Office for Postdoctoral Affairs, and OISS. For many J-1 EVs, this would mean an annual extension of stay (EOS) application to USCIS, which may significantly disrupt their research.

Further, it will have an especially significant impact on students seeking medical training as well as foreign national physicians participating in medical residencies and fellowships

---

[9] https://nces.ed.gov/programs/digest/d21/tables/dt21_326.10.asp
[10] https://ncses.nsf.gov/pubs/nsf22300/report/path-to-the-doctorate#time-to-degree

WashU



as J-1 EVs. Residency training is for a minimum of three years and can be as long as seven years depending on the specialty. Many residents pursue additional training in a subspecialty area (fellowship), adding one to three additional years. These individuals provide critical clinical care from primary care to subspecialty care throughout the U.S., especially in rural communities.

Depending on medical specialty or subspeciality, training programs last from three to seven years. Current D/S rules allow J-1 physicians to extend their authorized stay at the same time they renew their visa sponsorship annually with the Educational Commission for Foreign Medical Graduates (ECFMG), the only DOS-designated sponsor for foreign national physicians participating in U.S. residencies and fellowships on J-1 visas. The proposed rule would effectively force J-1 physicians to file an EOS application annually with USCIS. Current processing times for extensions range from 6 to 18 months, but most residency/fellowship contracts are issued just three to five months in advance of the start of each new academic year. This timing mismatch would put the continued training of thousands of J-1 physicians in jeopardy every year resulting in significant disruptions to U.S. residency and fellowship training programs and patient care in these areas. Residency and fellowship training programs depend heavily on the supervised practice of these individuals to deliver care 24 hours a day, 7 days a week in hospitals, emergency departments and clinics here in St. Louis and throughout the country.

Implementing the proposed rule would misalign immigration status with the realities of the U.S. research enterprise. Many National Institutes of Health (NIH) and NSF awards run for five years, doctoral and postdoctoral training frequently extends beyond four, and clinical residencies, fellowships, and longitudinal trials often span multiple cycles. Forcing mid-project USCIS extensions would introduce adjudication risk, cost, and potential status gaps at precisely the moments when continuity is essential – disrupting lab operations, data integrity, patient enrollment, and patient care. The predictable result is delayed or canceled projects and a chilling effect on the recruitment and retention of top international trainees and scholars, who will gravitate to countries offering more predictable pathways. This erosion of talent and momentum would weaken America's research leadership and

WashU

clinical infrastructure, undercut national and economic security, and exacerbate the ongoing loss of U.S.-trained international expertise to global competitors.[11]



International researchers are typically working on multi-year projects and research grants, and the process of recruiting these individuals and securing their visas can take months to years. Early-career scientists such as Ph.D. students and postdoctoral scholars drive discovery across our labs. International postdoctoral scholars are a particularly strong part of that ecosystem; studies find they often achieve very high research output (e.g., publications and conference presentations). Their contributions complement and amplify the essential work of U.S. trainees, strengthening the productivity and global reach of our research enterprise. If a researcher's current immigration status is too short, any delay or denial of an EOS can disrupt the momentum and collaborations essential to highly complex, federally sponsored research in biological sciences and other STEM fields.

Additional concerns about how the 4-year admission cycle is mismatched with current research policies and practices include:

- Scholars often need a short extension to complete experiments or publications, which takes less time than the USCIS adjudication process for an extension.
- It can be challenging to coordinate and sequence the start of a research project with the start date of fixed-duration status. There can be delays in starting work on a grant after it is awarded or delays in the recruitment, hiring, and visa approval process for an international researcher.
- Funding for noncompetitive renewal of previously awarded grants has been delayed two to five months and funding for new awards has been delayed up to six months with some well-scored applications still waiting for a final decision on funding. These delays have altered the hiring of international researchers and have caused some to lose their positions for lack of funding.

---

[11] https://ssti.org/blog/global-competition-intensifies-us-research-talent-amid-funding-uncertainty#:~:text=As%20U.S.%20research%20institutions%20face%20funding%20uncertainty%2C%20countries,an%20immigration%20framework%20in%20the%20next%20EU%20budget.

WashU



- Research scholars currently must demonstrate sufficient funding for the entire period of their program and some scholars are funded through shorter-duration grants.
- Multiple extensions may be needed over a five-year research appointment under the proposed rule. There is also uncertainty regarding several aspects of EV status under the proposed rule. These include whether an EV would be able to recapture any time spent abroad waiting for visa issuance or entry to the United States; whether the proposed 30-day grace period will be consistently granted to all EVs; and more broadly, how DOS involvement with the J visa process will be impacted by these new DHS rules. For example, the proposed rule indicates that after DOS approves a reinstatement request, DHS will require that EVs file an EOS application with USCIS within 30 days of the DOS approval so that USCIS can review DOS' adjudication. Such a requirement is duplicative, usurps DOS regulatory authority over the J-1 program and is unnecessarily burdensome on EVs and their sponsoring organizations.

Advances in medicine – from cancer and infectious diseases to neurodegenerative conditions like Alzheimer's, as well as diabetes, cardiovascular disease, and autism – are powered by diverse teams in which international graduate students, postdoctoral fellows, and scholars work shoulder-to-shoulder with U.S. researchers. Their collaboration strengthens discovery and accelerates impact for patients and communities nationwide. For example, we have scholars in F-1 and J-1 status working on neurodegeneration projects. Their work has contributed to new U.S. patents and the translation of this work into biotech firms developing therapies for neurodegenerative diseases. Other international scholars contributed to the implementation of colon cancer screening in rural southeast Missouri resulting in a change in colon cancer rates from one of the highest in the country to one of the lowest. International scholars have made significant contributions to the development of promising immunotherapies for resistant pancreas, prostrate, and brain cancers. Without these key colleagues, this work would not have progressed so far.

The proposed rule states: "Switching from D/S to a fixed period of admission would permit immigration officers the opportunity to determine whether an alien is eligible for *an*

WashU



*additional period of time*." The keyword is "additional." It is stated multiple times in the proposed rule that the purpose of this rule is to prevent overstays: "reduce instances in which F, J, and I nonimmigrants unlawfully remain in the United States after their program, practical training." If the purpose is to check that the nonimmigrant is maintaining status and they need additional time, they should at a minimum be allotted the full time on their I-20 or DS-2019 upon first admission. These program times are already rigorously reviewed and approved by SEVP every two years through the mandatory SEVP re-certification process.

**V. Discussion of the Proposed Rule**
**C. Extension of Stay (EOS)**

The proposed rule does not indicate whether F-1 students would be allowed to file Form I-765 (work authorization) concurrently with Form I-539 (extension of stay). In order to minimize a direct, detrimental, and financial impact on U.S. employers (especially small employers), the University recommends that USCIS incorporate the extension process into the Form I-765 adjudication. Without such a recommendation being implemented, the resulting uncertainty will produce delayed and unpredictable start dates, onboarding disruptions, gaps in work authorization, and increased compliance risk. Employers – particularly in STEM, healthcare, and fast-moving R&D – would face missed project milestones, higher bridging and staffing costs, and a weaker position in global talent competition.

Requiring simultaneous filing of Form I-765 and Form I-539 is unnecessary and duplicative. An I-765 for post-completion OPT – including STEM OPT – already informs USCIS that the student seeks employment authorization incident to continued F-1 status, and approval functions as recognition of lawful stay for that training period without a separate I-539. Currently, as part of the I-765 adjudication, many USCIS officers issue Requests for Evidence (RFE) to confirm that F-1 students have maintained their status. USCIS could modify the I-765 instructions to require the submission of maintenance of status documents. Creating a second, parallel adjudication for the same outcome will add delays, increase the risk of conflicting decisions, and force USCIS to redesign systems,

WashU

forms, and training with no corresponding compliance benefit. The proposed rule should avoid duplicative filings and preserve a single, streamlined pathway.

**V. Discussion of the Proposed Rule**
**D. Transition Period**



It is unclear how multiple agencies (DHS, CBP, USCIS) and systems (SEVIS, I-94s, USCIS applications) will work together to allow a smooth transition period for those currently in F or J nonimmigrant status. We already see data errors in systems such as SAVE and SEVIS. It is likely these errors will persist and even multiply with the new work, causing DSOs and AROs and students and EVs to be unsure of when an EOS is necessary and having to meticulously check documents against each other for inconsistencies. Additionally, we are aware of instances of repetitive errors from USCIS adjudications, including typographical errors and erroneously rejected petitions, with updated responses and replacement employment authorization documents (EADs) taking months to get to the applicant.

Before moving forward with this rule, SEVP will need to both update SEVIS so the I-94 "Admit Until Date" is included and to implement procedures so USCIS and CBP can input and maintain this data accurately. Otherwise, there is a disconnect between SEVIS and the status end date information for the student or EV. Currently, I-94 data is not consistent. There is often missing data and information. CBP will need to increase staffing capacity to ensure they can maintain accurate data and respond to requests for I-94 corrections when an expiration date is incorrectly indicated in the I-94 system. Absent this additional assistance from CBP, it will be nearly impossible for a university to assist its F-1 and J-1 students, clinical trainees, and scholars to ensure they remain in legal status.

**V. Discussion of the Proposed Rule**
**E. Requirements for Admission, Extension, and Maintenance of Status of F Nonimmigrants**
**ii. Changes in Educational Objectives**

Higher education in the United States is inherently fluid. For example, a student might begin a doctoral program but encounter personal or academic difficulties and decide to pursue only a master's degree instead. The student is still achieving an academic objective

WashU



and obtaining a degree. However, the proposed rule would prevent this from happening, as it is considered a change in educational objective to a lower educational level. Similarly, the same situation could arise in a dual-degree bachelor's/master's program. Students should have the flexibility to adjust their educational objectives as circumstances change.

Many academic programs in the U.S. do not fall into the traditional model of bachelor's, master's, doctorate. For example, students often pursue an MBA or an MFA after receiving an MS or MA, because MBAs and MFAs are considered terminal degrees in their respective fields. These degrees complement other programs that students pursue, such as an MS in Finance and then an MBA as an extended learning experience to make candidates more marketable in the corporate business world. Other programs such as JD, LLM, MD, and certificate programs are also likely to be received after completion of another program that would be considered at the same educational level by SEVIS.

The prohibition against pursuing additional degrees at the same or a lower level is intended to prevent students from exploiting F or J status to remain in the U.S. for extended periods while earning multiple degrees. However, as previously mentioned, this issue could be easily managed by SEVP fully utilizing SEVIS and thoroughly reviewing schools' certification details. In addition, the existing limit of 12 months of Post-Completion OPT per higher education level already discourages students from staying at the same or a lower educational level. If DHS believes this deterrent is insufficient, we suggest implementing the practical approach to changes in education level that was part of the September 2020 proposed rule.[12] This included:

- An F-1 student who has completed a program in the United States at one educational level and begins a new program at the same educational level, up to, but not more than two additional times, is considered to be maintaining F-1 status. This is a lifetime limit.
- An F-1 student who has completed a program in the United States at one educational level and begins a new program at a lower educational level is

[12] https://www.federalregister.gov/documents/2020/09/25/2020-20845/establishing-a-fixed-time-period-of-admission-and-an-extension-of-stay-procedure-for-nonimmigrant#p-592

WashU

considered to be maintaining F-1 status only in the first instance of such a change. This is a lifetime limit.



The additional limitation on graduate-level students preventing a change in program or a transfer to another institution will pose significant challenges. The proposed rule defines educational objectives as a "student's educational level or major." Institutions do not use the terminology "major" at the graduate level. This is a limitation of the data collection in SEVIS. Graduate students complete a program that sometimes includes specializations or certifications. Many graduate level students find themselves working with a faculty member who suggests a change in program, whether that is within the same department or a move to another department. A change within the same department may lead to a change in CIP code, or "major" in SEVIS. However, the true educational objective does not change. Additionally, the SEVIS "major" may also change when a program goes through curriculum development and is updated to a new CIP code. This is out of the students' control and should be permitted.

Students are permitted to change their major or program at any time if eligible and approved by the appropriate academic departments. Restrictions would not only treat international students differently than their domestic counterparts but also cause system issues beyond immigration compliance. Faculty and staff would need to be informed of these restrictions, and the University's systems would require significant updates to enforce these limitations.

CIP code changes due to curriculum updates are submitted through an extensive process involving the academic department, the Office of the Provost, and the Office of the University Registrar – not by students. Once a CIP code is changed, students are notified, and their immigration documents are updated. This change may reflect a new "major" on their I-20 or DS-2019, even though their educational objective remains the same and cannot be reverted to the previous program CIP code which no longer exists.

Transfers between institutions, though less common for graduate students, should be permitted. A student may wish to transfer for many reasons that do not affect their ability to maintain their non-immigrant status, such as a change in personal circumstances, a faculty adviser's move to another institution, a change in curriculum, or changes in

WashU



research topics or priorities. All of these are legitimate reasons for a graduate student to transfer to a new institution during their program.

While limiting transfers in the first year for students at the undergraduate level may help institutions with less paperwork when students are beginning their program, it does not allow for changes in personal circumstances or the idea that another program may be a better fit academically.

The proposed rule prohibits these transfers and changes in educational objectives in the first year for undergraduate students "unless an exception is authorized by SEVP" for extenuating circumstances which "may include, but are not limited to, a school closure or a school's prolonged inability to hold in-person classes due to a natural disaster or other cause." Nowhere is it discussed what an "other cause" might be, how SEVP will request proof or receive approval, the timeline, or who at SEVP will be making the exception determination.

Of course, all universities hope that their admitted students choose to attend and continue their education at the university. However, due to longer visa processing times, students are forced to make these decisions very early. It is possible that they will be admitted to additional institutions after this time and should have the freedom to choose the best fit for them, as their domestic counterparts would. It would behoove DHS, DOS, and the host institutions to allow students to transfer their visa to a different institution before arriving in the U.S.

An alternative proposal to this section would be for SEVP to more clearly define these practices. We agree that transfers between institutions should be limited to legitimate reasons. For example, a student may wish to change their program of study, and the first institution may not have that option. Additionally, they may find that their institution is not a fit for them academically and wish to make a transition. We recommend that SEVP institute specific reasons for students to transfer, including those similar to both a reduced course load request and severe economic hardship eligibility. These options may include the following:

WashU



- Illness or medical conditions that affect studies and necessitate a move – for example, a student is unable to get the appropriate care they need at their current institution's location
- Change in program, major, or improper course level placement
- Faculty adviser move or elimination of research funding
- Difficulty with level of academic rigor
- Unexpected financial loss by parent or financial sponsor

A student would need to show proof of meeting one of these requirements when approved for a transfer by a DSO/ARO at their current institution. We also recommend that "normal progress," which is currently used in the regulations, is clearly defined and made part of the general status maintenance guidelines. This would also provide clarity for international students on expectations surrounding time to completion and attendance in courses.

**V. Discussion of the Proposed Rule**
**E. Requirements for Admission, Extension, and Maintenance of Status of F Nonimmigrants**
**iv. Automatic Extension of Authorized Employment**
**2. F-1 Status and Authorized Employment While EOS and/or Employment Authorization Applications Are Pending**

Under the proposed rule, an F-1 student who files an extension of stay (EOS) before the grace period ends may keep enrolling and continue approved CPT through the earlier of the end date of the approved CPT period or 240 days after the expiration of the I-94. A DSO must recommend the extension in SEVIS before the program end date but has no visibility into when the student actually filed or when USCIS received the application. Without this information, the DSO cannot reliably confirm ongoing CPT eligibility or advise on status, creating avoidable compliance risk. The problem is compounded by inconsistent I-94 entries, which are predictable errors in a fast-paced, manual process. CBP and USCIS officers sometimes list the "Admit Until Date" as the status end date and other times as the grace-period end date. These mismatches will confuse students and EVs about lawful stay and EOS filing deadlines and increase inadvertent violations. To enhance program integrity and operational efficiency, we recommend enabling real-time data sharing among

WashU

USCIS, CBP, and SEVIS, and standardizing I-94 issuance and update practices. Absent those prerequisites, the proposed model is likely to generate more errors and may not yield better oversight.



**V. Discussion of the Proposed Rule**
**E. Requirements for Admission, Extension, and Maintenance of Status of F Nonimmigrants**
**v. New Process for EOS Application**

"DHS is also proposing a new factor in the EOS provisions—circumstances beyond the student's control, including a natural disaster, a national health crisis, or the closure of an institution." This provision in the proposed rule is not complete. It should be noted that circumstances beyond the student's control could include but are not limited to DSO error, research or data collection delays, or a change in faculty adviser.

It is also unclear in the proposed rule whether students applying for an EOS for Post-Completion OPT would need to provide the same type of documentation as those applying for an academic program extension. Again, it should be stated here that there is no need for a student to apply for both an EOS and OPT through USCIS at the same time. Instead, as discussed above, the Post-Completion OPT or STEM OPT Extension application should be used as a basis for an extended period of stay. When USCIS approves the OPT application, they are allowing an additional period of stay for the student to remain in the United States in F-1 status.

If an enrolled student's EOS application is denied, the classes completed and paid for by their families may not transfer to another university. As a result, students who are admitted for a 4-year period may be less likely to commit to U.S. universities because there is no assurance that, even if academically successful, they will receive the EOS required to complete their degree. In fact, if a student or EV does decide to come to the U.S. and is denied an EOS partway through their program, the student might be right in the middle of a term, exams, or employment when an EOS is denied. If the EOS is denied for legitimate, non-fraud or criminal reasons, students and EVs should receive at least a 15-day grace period, which is a period similar to the current Authorized Early Withdrawal. The need to immediately leave the country will disrupt more than just their personal situation.

WashU



Removing a student immediately from classes could negatively impact classmates that may be working with them on projects or research.

Another group of students who frequently require an extension are those who encounter unexpected medical issues. Based on our experience, students facing health challenges may struggle to navigate the more complex USCIS EOS process in a timely manner. Consequently, some of these students may fall out of status and need to undergo the reinstatement process. This situation could more easily be avoided and medical issues addressed with more sensitivity if managed as an extension by DSOs which could then be reviewed by SEVP.

**VI. Statutory and Regulatory Requirements**
**A. Executive Order 12866: Regulatory Review**
**Affected Population**

Beyond the populations already identified, the proposed rule would have broad, system-wide effects: it would strain faculty and staff at SEVP-approved institutions; disrupt courses, labs, and clinical training for domestic students and researchers who rely on timely collaboration with international students and EVs; affect patient access to healthcare (especially those in rural communities) with increased wait times for appointments and in some instances, leave gaps in care that cannot be filled for a year or more; and depress local economies as universities (major employers) face higher administrative costs and enrollment volatility. Over time, these frictions will erode the talent pipeline, weaken research output and innovation, and diminish the competitive advantage the United States has built over decades, undercutting opportunities for America's future students, workers, and communities.

Missouri faces a critical need for healthcare professionals, particularly due to the high utilization of emergency services by uninsured and medically underserved populations. The significant volumes of patients – in St. Louis, and in surrounding rural areas in Missouri and Southern Illinois – place immense pressure on the existing healthcare infrastructure. North St. Louis city, south central St. Louis, and the full St. Louis service area are currently

WashU



designated Health Professional Shortage Areas (HPSAs) respectively in a Mental Health HPSA, a Primary Care HPSA, and a Medically Underserved Area/Population (MUA/P).[13]

High retirement rates facing the surgical workforce and burnout rates among current emergency healthcare providers underscore the urgent need to attract more healthcare professionals to Missouri. The demand for specialized services – such as oncology – is rising, with significant gaps in rural and underserved areas where qualified local professionals are scarce. Competition in more popular coastal cities makes it even more difficult to recruit specialized professionals to Missouri. Hence, addressing this shortage with international scholars is vital to meeting the growing demand and ensuring better care for the state's diverse patient population.

**VI. Statutory and Regulatory Requirements**
**A. Executive Order 12866: Regulatory Review**
**Quantitative Costs**

Information regarding costs provided by DHS in the proposed rule is incomplete. Below are statements made in the proposed rule regarding costs:

1. "Over a 10-year period of analysis, DHS estimates the proposed rule would have annualized costs ranging from $390.3 million to $392.4 million (using 3 and 7 percent discount rates, respectively) when considering both U.S. and non-U.S. parties. When considering U.S. parties only, annualized costs range from $86.3 million to $88.1 million (using 3 and 7 percent discount rates, respectively)."
2. "DHS estimates the annualized EOS costs for the DSOs and ROs, and HR staff would range from $76.1 million to $76.2 million (using 3 and 7 percent discount rates, respectively)."
3. "DHS estimates the annualized familiarization and adaptation costs to DSOs and ROs would range from $10.1 million to $11.8 million (using 3 and 7 percent discount rates, respectively)."

As noted above (#1), the DHS estimate of annualized costs for U.S. parties is $86.3 million to $88.1 million. However, DHS estimates a total cost for DSOs and AROs alone (estimates

[13] https://data.hrsa.gov/topics/health-workforce/shortage-areas/by-address

Office of the Provost
MSC 1173-0149-01
One Brookings Drive
St. Louis, MO 63130

WashU



in #2 and #3 added together) of $86.2 million to $88 million. The implication here is that non-DSO/ARO costs would only be equal to the remaining $0.1 million or $100,000. This is not realistic, since these other costs will include training, hiring, and staffing for CBP, USCIS, DHS, DOS, and SEVP, to ensure compliance. Some additional costs are acknowledged as possible but not calculated or included in the proposed rule. Therefore, it is not reasonable to assume that EOS filing fees will cover these additional costs.

**VI. Statutory and Regulatory Requirements**
**A. Executive Order 12866: Regulatory Review**
**Qualitative Costs**

It is especially concerning that the proposed rule acknowledges insufficient data to quantify qualitative costs, even though DHS has acknowledged that this rule will have a significant economic impact. In practice, extensive qualitative indicators – from campus operations and employer demand to peer country policy shifts – point to substantial harm. Most critically, by discouraging international students and EVs, the rule would reduce enrollment, weaken research and innovation capacity, disrupt patient care, negatively impact patient access and safety, increase the burden on remaining physician residents and faculty already under strain in the highly demanding clinical environment, and diminish the United States' standing as the world's leading higher-education destination. Over time, that erosion will undercut local economies and tax bases; reduce opportunities for America's future U.S. students, workers, and communities; reduce medical availability in rural areas that are already being impacted by medical shortages; and squander a competitive advantage that has taken decades to build. For these reasons, the rule should be withdrawn in favor of targeted, data-driven improvements that strengthen oversight without sacrificing competitiveness.

**VI. Statutory and Regulatory Requirements**
**A. Executive Order 12866: Regulatory Review**
**Federal Government Costs**

The proposed rule is likely to impose substantial, unfunded costs across federal agencies without a credible implementation plan. DHS itself acknowledges that CBP will need new training, procedures, and system upgrades to authorize 4-year admissions at ports of entry

WashU



– and that key operational details are still "being explored." Yet the analysis omits USCIS, which will have to adjudicate hundreds of thousands of additional EOS cases on top of existing backlogs, necessitating hiring, training, and IT changes to support additional infrastructure. Absent a resourced, interagency plan, the result will be longer queues, more errors, and inconsistent outcomes that severely impact students, EVs, higher education institutions, U.S. businesses, employers, and government alike.

**VI. Statutory and Regulatory Requirements**
**A. Executive Order 12866: Regulatory Review**
**Costs to Schools and Enrollments**

Universities will need to provide guidance and assistance to students and EVs who require an EOS. International students and EVs will face additional burdens due to the new EOS process, including filing fees, potential legal fees, travel to biometrics appointments and other interviews, and preparing the application. Each EOS application will incorporate a filing fee (currently $470), a biometrics fee (currently $30), as well as potentially a separate EOS application with filing and biometrics fees for dependent family members. It will be a stressful process and a distraction from the academic, research, or patient care obligations of the student or EV. An extension application to USCIS will cost more and be more burdensome than the current D/S process through an institution's DSO or ARO.

Amid all these changes, the processing of regular compliance needs will not halt. DSOs and AROs will need to be more careful than ever to be sure that students and EVs understand status maintenance requirements. It is unrealistic to make so many changes at once that affect status maintenance, academic programs, research, employment, and partnerships within the community. Institutions will face increased challenges in providing optimal and timely advising and support services, as well as significantly higher costs for ensuring compliance with federal requirements. These challenges will coincide with declining enrollment numbers and substantial budget cuts.[14]

DHS estimates that DSOs and AROs will spend approximately 3 hours per EOS request, including advising, reviewing, and tracking. For institutions and hosts with high numbers of

[14] https://www.cnbc.com/2025/04/22/enrollment-decline-hits-school-funding-triggers-cuts.html?msockid=09bb69980c1e621234967ff40d9863c5

WashU



students and EVs, this represents a significant time commitment and use of institutional resources. As the EOS is a personal application and lacks a tracking system within SEVIS, there is a high risk of data omission. The proposed rule does not adequately consider the financial impacts associated with the required "systemic changes," which may not be implemented promptly. These changes extend beyond training and knowledge sharing with campus stakeholders – already a considerable burden – to include updating various systems used for compliance purposes. Such updates involve requests, websites, forms, process guides, webinars, orientations, and other materials shared with departments, international students, and EVs. The proposed rule would significantly increase liability for both the student or EV and the sponsoring institution, and the additional costs imposed on institutions thus result in reduced funding available to support enrolled students, including U.S. citizens.

**Closing Comments**

The new EOS process is unclear, expensive, complicated, and lacks an appeal process for denials. Uncertainty about whether an extension will be granted discourages international students and EVs from choosing to come to the United States. The proposed changes undermine the educational mission of colleges and universities by adding unworkable rules which intensify uncertainty, impede academic progress, and increase costs.

Our J-1 EVs and F-1 students contribute to the local, rural, and federal economies and serve as active members of the University and St. Louis communities. Without the work of our international graduate students and postdoctoral fellows, the University's research and contributions to the local economy would shrink significantly. According to the NAFSA International Student Economic Value Tool:[15]

- At the University, international students alone contribute $322.2 million to the economy and support 3,537 jobs.[16]

---

[15] https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2
[16] https://www.nafsa.org/isev/reports/district?year=2023&state=MO&district=01

WashU



- In District 1 in Missouri, international students contribute $566.1 million to the economy and support 5,367 jobs.[17]
- In Missouri, they contribute $1.1 billion and support 8,837 jobs.[18]
- And in the U.S., they contribute a whopping $43.8 billion and create or support 378,175 jobs.[19]

NAFSA is already projecting a loss of $7 billion and 60,000 jobs this year (for MO, $170 million and 1,395 jobs) as a result of increased vetting and bans, and this proposed rule change will compound on and accelerate those losses.[20]

While we recognize that the proposed rule is intended to address important concerns related to immigration security, there are already policies and processes within SEVP in place to address these issues. If DHS does not believe that these policies and processes have been adequately addressing these immigration security concerns since 2003, DHS should then fully fund and staff SEVP to ensure that it is able to meet its goals and objectives, instead of creating a new layer of duplicative bureaucracy. The proposed rule would impose unmanageable processing demands on USCIS, CBP, and DOS, dramatically increase costs for students and EVs, create repetitive administrative burdens for both students/EVs and institutions, and introduce unnecessary complexity through fragmented agency oversight.

America's leadership in research, education, and health care is the product of decades of deliberate partnership between the federal government and higher education – and of the immeasurable contributions of international students, trainees, and scholars. That leadership is not guaranteed. Policies that add cost, delay, and uncertainty at the heart of our academic and clinical enterprise will weaken our competitiveness, shrink the talent pipeline, impact patient care, and erode local economies – outcomes at odds with national security, innovation, and fiscal prudence.

**Recommendations**

---

[17] https://www.nafsa.org/isev/reports/district?year=2023&state=MO&district=01
[18] https://www.nafsa.org/isev/reports/state?year=2023&state=MO
[19] https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf
[20] https://www.nafsa.org/fall-2025-international-student-enrollment-outlook-and-economic-impact

WashU



We fully appreciate the government's national security responsibilities and share a commitment to immigration compliance. We believe there is a practical middle path to address these concerns through targeted, risk-based measures. In order to balance national security, academic excellence, clinical care, and America's global reputation, we recommend: fully funding and staffing SEVP; enhanced DSO/ARO training by SEVP; a clear, uniform definition of "normal progress"; and risk-based reviews by SEVP of institutions during regular and out-of-cycle certification. We urge SEVP to adopt specific, standardized transfer reasons, including medical necessity, changes in program or correction of course-level placement, faculty adviser relocation or loss of funding, difficulty with academic rigor, and unexpected financial hardship. In addition, we support real-time data sharing among USCIS, CBP, and SEVIS; and standardized I-94 issuance and updated practices to prevent errors.

Together, these steps will enhance national security and compliance while preserving the academic flexibility that allows U.S. institutions to thrive.

The United States should reaffirm, not retreat from, its position as the premier destination to study, train, conduct research, and care for patients. However, this proposal rule would move us in the wrong direction. We respectfully urge DHS to withdraw the rule and instead pursue targeted, data-driven improvements by further modernizing SEVIS, and leveraging DSO/ARO and F/J nonimmigrant oversight through a fully funded and staffed SEVP which will strengthen integrity while preserving the flexibility and predictability that keep America first.

Sincerely,

*Vijay Ramani*

Vijay K. Ramani, Ph.D.
Senior Vice Provost for Graduate Education and International Affairs
On Behalf of
Washington University in St. Louis