# EXHIBIT 34

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment?filter=ICEB-2025-0001-6173)

Share

PUBLIC SUBMISSION

# Comment Submitted by Anonymous

Posted by the **Immigration and Customs Enforcement Bureau** on Sep 11, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

To: U.S. Department of Homeland Security
Re: DHS Docket No. ICEB-2025-0001 - Public Comment on Proposed Rule for F-1 Admission Periods

I am writing to express my opposition to the proposed rule and to offer a constructive alternative that I believe better serves the national interest.

1. Regarding: Proposed Elimination of Duration of Status (as referenced in proposed amendments to 8 CFR § 214.2(f)(5))

Reason for Opposition: This proposal fundamentally misunderstands what makes America attractive to top global talent. While our universities are excellent, the U.S. competes for the best minds based on the entire pathway of opportunity, which explicitly includes post-graduation employment (OPT) and the potential for long-term contribution. By eliminating D/S and introducing profound uncertainty, this rule actively encourages future innovators to choose competitor nations like Canada, the UK, or Australia, which are streamlining their talent pipelines.

Furthermore, this rule is an ineffective security tool. It is a blunt instrument that disrupts the lives of over one million legitimate students to address threats posed by a few. True national security threats require sophisticated, targeted counterintelligence, not broad, burdensome paperwork that diverts resources from real enforcement.

2. Regarding: Constructive Alternative to Proposed Amendments in 8 CFR § 214.2(f)(5)

Recommendation: Instead of eliminating Duration of Status (D/S), I propose retaining it while implementing a risk-based security model that achieves the stated security goals more effectively and with less collateral damage to U.S. competitiveness.

Give Feedback

Reason for Recommendation: A "scalpel" approach is superior to the proposed "sledgehammer." Under this alternative model:

Students in the vast majority of non-sensitive academic fields would remain under the current D/S framework.

For the small subset of students entering specific, critical STEM research areas (e.g., those involving sensitive, federally-funded technologies), DHS could mandate enhanced, periodic check-ins conducted in partnership with university Designated School Officials (DSOs).

This targeted model allows for focused oversight of high-risk areas without crippling the academic stability of all students. It secures our national interests while preserving the talent pipeline that is essential for our economic prosperity and technological leadership.

I urge you to withdraw this rule in favor of a solution, such as the one proposed above, that effectively balances security with U.S. competitiveness.

**Comment ID**

ICEB-2025-0001-6173

**Tracking Number**

mfe-gc8z-gdw9

**Comment Details**

**Received Date**

Sep 10, 2025

Give Feedback

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 35

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment?filter=ICEB-2025-0001-21094)

Share

PUBLIC SUBMISSION

# Comment Submitted by Anonymous

Posted by the **Immigration and Customs Enforcement Bureau** on Oct 3, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

To the Department of Homeland Security,
I am writing as an international graduate student deeply committed to my academic and professional future in the United States. While I recognize the intent of this proposed rule to protect our immigration system, I am compelled to argue that its broader restrictions on same-level degrees and fixed visa terms will do far more harm to America's long-term economic and strategic interests than they will prevent misuse.

My Personal Investment and Professional Path
My journey to the U.S. has been a significant personal and financial investment. I completed my first master's degree in a broad field, such as Computer Science, which provided a strong technical foundation. However, as the industry evolves, a more specialized skill set is crucial. I now need a second master's degree in a cutting-edge field, such as Artificial Intelligence, along with complementary business skills from an MBA.
This isn't a lateral move; it's a deliberate career choice to address a critical market need. The path to achieving deep technical expertise in a niche field like AI, combined with strategic business vision, is a rigorous and demanding journey. For many of us, this path is one we are already committed to, despite the long hours, intense coursework, and financial burdens. Adding more visa struggles and complexity will not stop a few bad actors; instead, it will deter the very talent U.S. companies, especially new AI startups facing a skill shortage, need to innovate and grow. Our skills are not taking away jobs; they are helping to create new ones and ensuring America's competitive edge.

Give Feedback

The Economic and Strategic Disadvantage
My decision to study in the U.S. was also a direct economic contribution. A recent analysis by NAFSA confirms that international students contribute billions of dollars and support thousands of jobs annually. This rule risks turning off the flow of this vital financial lifeline, jeopardizing significant economic activity. Furthermore, existing policies already effectively screen for potential visa misuse, directly addressing the government's stated concerns about oversight. For example, U.S. Citizenship and Immigration Services (USCIS) has a robust Fraud Detection and National Security Directorate that conducts unannounced site

visits to both F-1 and H-1B visa holders to ensure compliance. The system's effectiveness is reflected in the F-1 visa denial rate, which reached a decade-high. Likewise, recent reforms to the H-1B program, including a new beneficiary-centric lottery system and a substantial fee for certain new petitions, were explicitly designed to curb abuse. With these robust measures in place, this new D/S rule appears redundant and overly punitive.

This policy comes at a time when our global competitors are aggressively pursuing the very talent the U.S. is considering turning away. While the U.S. creates new barriers, countries like Germany and Canada have streamlined their pathways. Most notably, China is launching a new "K" visa specifically designed to attract young, foreign STEM talent with long-term residency and no employer sponsor requirements. The global talent competition is real, and it is accelerating.

A More Nuanced Path Forward

I implore the Department of Homeland Security to reconsider this measure. Instead of a one-size-fits-all solution that penalizes a vast pool of dedicated students, I urge you to implement a more nuanced policy that addresses legitimate concerns without sacrificing the very talent and financial investment that fuels American innovation.

The DHS has several alternative options that would better serve national interests. It can continue to strengthen initial visa interviews and enhance existing site visit programs by targeting high-risk individuals. The government could also simplify the process for students in good academic standing to pursue advanced or specialized degrees that align with U.S. economic needs, allowing them to continuously up-skill without facing unnecessary visa hurdles.

**Comment ID**

ICEB-2025-0001-21094

**Tracking Number**

mg5-e0c2-c72o

**Comment Details**

**Received Date**

Sep 29, 2025

Give Feedback

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 36

NATIONAL ASSOCIATION OF Manufacturers

**Jake Kuhns**
*Vice President, Domestic Policy*

September 29, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
Washington, DC 20528

Re: Notice of Proposed Rulemaking Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (DHS docket ICEB-2025-0001)

Dear Secretary Noem,

The National Association of Manufacturers ("NAM") welcomes this opportunity to provide comments to the Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") in response to the NPRM Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (DHS docket ICEB-2025-0001).

The NAM is the largest manufacturing association in the United States, representing manufacturers of all sizes across all 50 states and in every industrial sector. Manufacturing contributes $2.93 trillion to the U.S. economy annually. It employs nearly 13 million people in the U.S., who earn on average almost $103,000, i.e., 18.5% more than in all private nonfarm industries. The NAM advocates for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.[1]

Manufacturers' interest in the proposed rule is twofold. First, there are 437,000 manufacturing job openings, a level that is near our pre-pandemic range.[2] This means that manufacturers face structural and long-term challenges to fill jobs and thus need access to every source of talent, whether domestic or international. Second, manufacturers are vitally dependent on a steady pipeline of high-skilled, in particular science, technology, engineering and mathematics ("STEM") talent:

- While manufacturing represents just under 10% of U.S. GDP, it accounts for almost 53% of all private sector research and development. This means that manufacturing is significantly more innovation-dependent than any other sector of the U.S. economy.[3]
- Factories cannot be built, designed, or operated without engineers and scientists. Without this skilled talent, manufacturers in the U.S. cannot maintain the scale, competitiveness, or leadership needed in the global economy. This means that, in turn, these scientists and engineers create more U.S. manufacturing jobs throughout the industry.
- Artificial intelligence ("AI") is reshaping manufacturing, from digitalization of the shop floor to optimization of the supply chain. To harness these tools, manufacturers need data and computer scientists skilled in these systems. Without a steady pipeline of AI-savvy talent, the U.S. risks falling behind in both productivity and innovation.

[1] https://nam.org/mfgdata/facts-about-manufacturing-expanded/
[2] Id.
[3] See https://nam.org/mfgdata/facts-about-manufacturing-expanded/

The F-1 visa, in particular through its Curricular Practical Training ("CPT") and Optional Practical Training ("OPT") and STEM OPT options, is a major source of high-skilled talent for the manufacturing industry in the U.S. this is why this submission focuses on the proposed changes to the F-1 visa for students (and on the corresponding changes to the F-2 visa for the dependents of F-1 visa holders).

Manufacturers respect the rule of law and thus the Administration's goal of fairly enforcing our nation's immigration laws. However, the proposed rule would impose changes that risk diminishing the appeal of an American education, making it harder for students to transition into careers that strengthen U.S. manufacturing. This would have a negative impact on the growth and international competitiveness of manufacturing in the United States, which is at odds with President Trump's objective to bolster the domestic industry, without meaningfully improving immigration enforcement. Therefore, we respectfully encourage the Department to reconsider the proposed rule.

1. **Manufacturers need American universities to remain the top global destination for international students.**

The United States is the top global destination for international students, ahead of Canada, the UK, Australia, France and Germany.[4] American universities do not just attract the greatest number of international students; they also attract the best and brightest ones. This means that the world's top students come to the U.S. to pay higher tuition fees than those paid by American students (and thus subsidize these students). Many then further fuel our country's economic and entrepreneurial engine by joining its workforce. This is magnified by the fact that the share of foreign students pursuing STEM degrees is higher than that of their U.S. classmates.[5] This last fact is particularly important for the manufacturing industry, which has a vital need to maintain its access to STEM talent (see introduction above).

In short, it is impossible to overstate the advantage that U.S. universities' global leadership gives the U.S. in general, and its manufacturing base in particular, over our foreign competitors. For this reason, manufacturers believe that policymakers should exercise great caution when considering any initiative that has the practical effect of diminishing the attractiveness of U.S. universities relative to universities in foreign countries, and in turn the availability of irreplaceable foreign talent to manufacturers.

2. **A fixed time period of admission is at odds with normal higher education trajectories.**

The centerpiece of the proposed rule is the switch of F-1 student visas from a duration of status ("D/S") that remains in effect for as long as the student is enrolled in an academic program, to a fixed time period that corresponds to the program's length but cannot exceed four years. This would significantly diminish the attractiveness of U.S. universities for prospective international students, because it is at odds with the length of time that many if not most students take, for entirely legitimate reasons, to actually earn their degrees:

- While most undergraduate academic courses are four-year programs, many are not. In particular, many STEM bachelor programs are designed to be completed in five years, or require such a heavy courseload (either by themselves or because they are dual majors from unrelated disciplines) that completion in four years is either impossible or rare.

[4] Institute of International Education (IIE), A Quick Look at Global Mobility Trends, available at https://www.iie.org/wp-content/uploads/2024/11/Project-Atlas_Infographic_2024.pdf
[5] According to IIE, 59% of international students attending U.S. universities pursue a STEM degree. This compares to 21.6% for all students pursuing bachelor degrees in the U.S. according to H.A. Bhatti, One Million More: Assessing a Decade of Progress in Undergraduate STEM Education, https://journals.asm.org/doi/10.1128/jmbe.00155-25

- A clear majority of all undergraduates take more than four years to earn their bachelors.[6]
- Many STEM programs award combined undergraduate/graduate degrees that require five years of study.
- Many PhD candidates take more than four years to earn their doctorate.
- Most graduate programs take less than four years, but it is not rare for graduate students to take more than the advertised length of time to complete their program, which would put them beyond the expiration of their allowed time period.

A fixed period of time would therefore require that a multitude of F-1 visa holders justify to U.S. Citizenship and Immigration Services ("USCIS") why they necessitate an extension of status, creating significant uncertainty that would deter applying for such a visa in the first place.

Moving to a fixed time period, combined with the proposed reduction of the time given F-1 visa holders to prepare for departure from 60 to 30 days, would also create significant risks for F-1 visa holders to unintentionally accrue illegal presence in the U.S., which triggers three or 10-year bars. Such legal risk would constitute a powerful deterrent against electing to come study in the United States in the first place, because few future professionals can afford to forfeit their right to travel to the U.S. for business purposes later in their career.

3. **The proposed restrictions on students' ability to redirect their educational trajectories would inhibit a key strength of U.S. universities.**

The proposed rule would impose excessive restrictions on the ability of F-1 visa holders to change their courses of study, including:

- Undergraduate students would not be allowed to change their majors or transfer to another school in the first year, even though such changes are commonplace for students at that age and at that stage of their education.
- Graduate students would not be allowed to change majors or schools once they are in the U.S., even though such inflexibility would act as a deterrent against committing to the significant financial investment that U.S. graduate school tuition represents.

Giving students the flexibility to change their mind about their course of study is in fact a hallmark of the U.S. higher education system that sets it apart from many of its international competitors. These proposed changes would thus lessen the international competitiveness of U.S. higher education, and therefore the quality and quantity of applicants for F-1 visas.

4. **The proposed rule would greatly inhibit international students' transition into the U.S. manufacturing workforce.**

First, the proposed move to a fixed time period complicates the ability of F-1 visa holders to secure OPT or STEM OPT, which is a critical gateway into the U.S. workforce. At a time when more than 400,000 manufacturing jobs remain open, this is of great concern to manufacturers, who are very dependent on this foreign talent (see introduction above).

Second, the proposed rule does not address its impact on cap-gap.[7] As a result, individuals in that situation may either accrue illegal presence in the U.S. or be unnecessarily forced to depart the U.S. until their H-1B is active.

[6] According to the U.S. Department of Education, National Center for Education Statistics, available at https://nces.ed.gov/fastfacts/display.asp?id=569
[7] Cap-gap is an automatic extension of an F-1 holder's status and work authorization in the U.S. that bridges the gap between their OPT expiration and the start of their H-1B employment.

Finally, the proposed prohibition on graduate students' ability to change their major or school would also negatively affect the smooth transition of this talent into the U.S. manufacturing workforce: F-1 visa holders finishing a master's program who did not win the H-1B lottery would not be able to enroll in another master's program to try the lottery again.

**5. <u>The proposed rule would impose excessive compliance burdens and create bureaucratic bottlenecks.</u>**

To continue beyond the proposed four-year limit, or to change schools or majors (in those circumstances allowed by the proposed rule), an international student would be required to apply for an extension of status with USCIS, rather than (as is currently the case) rely on their school declaring them as a student in the Student and Exchange Visitor Information System ("SEVIS") and issuing them an I-20 form.

Given the considerable proportion of students who do not finish their degrees within the fixed time period (see section 2 above), or who change their majors or schools (see section 3 above), the proposed rule would impose this requirement on a very large number of F-1 visa holders. We expect that it will not be rare for individual students to have to file several such applications.

To compound this problem, the process to apply for and receive an extension of status would not be a trivial paperwork matter but a significant compliance burden consisting of preparing, gathering supporting documentation for, and filing an application, as well as paying filing fees and undergoing biometric screening. Such burdens would in and of themselves act as a genuine deterrent against electing to study in the United States.

Furthermore, we are concerned that USCIS would not have the necessary staff resources to process in a timely fashion the expected dramatic increase in the volume of applications for extensions of status it would receive, even when taking into account the 240-day auto-extension included in the proposed rule. As a result, it is likely that most applicants would have to elect to pay for premium processing and thus add additional costs to their already extremely expensive educational journeys.

These excessive compliance burdens that would weigh on very large numbers of F-1 visa holders stand in stark contrast with the very small number of individuals abusing the F-1 visa program. As a quantitative basis for the proposed rule, footnote 16 of the NPRM offers this statistic: "DHS has identified over 2,100 aliens who first entered as F-1 students between 2000 and 2010 and remain in active F-1 status as of Apr. 6, 2025." However, the NPRM also states that "there were over 1.6 million admissions in F status" in 2023. This means that the rate of abuse is infinitesimally small.

Manufacturers believe that such an incredibly low rate of abuse does not justify the significant hardships that the proposed rule would impose on U.S. universities, their international students and domestic manufacturers' pipeline of foreign talent.

**6. <u>The monitoring and enforcement rationale of the proposed rule is unclear.</u>**

The NPRM states that the policy rationale of the proposed rule is to provide DHS with "an effective mechanism to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws, and to obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States."

However, ICE's Student and Exchange Visitor Program ("SEVP") and its corresponding Student and Exchange Visitor Information System (SEVIS) already put F-1 visa holders under significant monitoring. Given the existence of ICE's SEVP and SEVIS, it is unclear whether the creation of an added layer of monitoring by another agency, USCIS, is necessary.

Furthermore, when Congress mandated the creation of SEVP and SEVIS it did not give any indication that it disapproved of the D/S system for F-1 visa holders. As a result, we ask that the Department consider whether this new monitoring and enforcement mechanism represents the best interpretation of congressional intent.

* * * * * *

Drawing on international STEM talent is essential to U.S. competitiveness, in particular to manufacturers who struggle to fill more than 400,000 manufacturing jobs. Manufacturers are concerned that the proposed rule would render the U.S. higher education system rigid, risky and unwelcoming for international students and therefore materially weaken its attractiveness relative to its international competitors. These proposed changes will discourage the very students and researchers whose innovations will shape the future of manufacturing, technology and economic growth. This would weaken manufacturers' access to a plentiful pool of elite global talent upon which we depend to fulfill President Trump's vision for a manufacturing renaissance in America. Programs like this must continue to help manufacturers retain talent and drive the U.S. competitive edge. Therefore, we respectfully urge the Department to reconsider the proposed rule.

Sincerely,

Jake Kuhns
Vice President, Domestic Policy

# EXHIBIT 37

IANDOLI DESAI & CRONIN P.C.
ATTORNEYS AT LAW

38 THIRD AVENUE, SUITE 100
BOSTON, MASSACHUSETTS 02129

RICHARD L. IANDOLI
PRASANT D. DESAI
MADELINE CHOI CRONIN*
MARY E. WALSH

* *ADMITTED IN CALIFORNIA*

PHONE (617) 482-1010 • FAX (617) 423-9070
WWW.IANDOLI.COM

ALISON HOWARD-YILMAZ
ERIN C. MURPHY
MEGAN PARKER-JOHNSON
KATHLEEN MICCICHE
GHENWA HAKIM

September 29, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536
T: 202-732-6960

Submitted via http://www.regulations.gov
DHS Docket ID: ICEB-2025-0001

**RE: Comment to Notice of Proposed Rulemaking (90 F.R. 42070) Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

Dear Secretary Noem:

Iandoli Desai & Cronin P.C. ("Iandoli Desai & Cronin" or "IDC") respectfully submits the following comments in response to the above-referenced U.S. Immigration and Customs Enforcement ("ICE") Notice of Proposed Rulemaking ("NPRM"). Iandoli Desai & Cronin is an immigration law firm in Boston, Massachusetts. We represent numerous universities, hospitals, research institutions, and private employers who employ and teach F and J nonimmigrants and whose businesses will be severely negatively impacted if this Rule is implemented.

The Proposed Rule seeks to eliminate Duration of Status ("D/S") as an authorized period of stay for F, J, and I nonimmigrants and replace it with a predetermined maximum period of stay, not to exceed four years. If implemented, international students, researchers, physicians, and others would be required to regularly apply to USCIS for extensions of status ("EOS"), a process that can take months, would substitute industry expertise for USCIS discretion, and would add unnecessary work to the already overburdened agency. The Proposed Rule also severely restricts program changes and would prohibit students from continuing their education in the US if their desired program happens to not align with DHS's idea of typical academic progression.

The proposed changes would result in marginal, if any, improvements in DHS's stated justifications of fraud prevention and national security, making the Proposed Rule unreasonable and overly burdensome. We believe that the already-existing mechanisms used to track F and J nonimmigrants, the Student and Exchange Visitor Program ("SEVP") and the Student and Exchange Visitor Information System ("SEVIS"), meet DHS's needs and can be further developed to maximize national security and minimize fraud. These proposed changes unnecessarily burden

not just the F and J nonimmigrants who make up the 1.5 million currently active SEVIS records (including 17,000 J-1 physicians, many of whom work in areas of the US with medical worker shortages) but also higher education, medical centers, and research institutions, making the American economy more vulnerable.[1] Furthermore, the additional unnecessary USCIS filings will distract the agency from tackling its long backlogs in adjudications for American citizens and business.

## I. Elimination of D/S Designation for F and J Nonimmigrants and replacement with 4-year maximum authorized period of stay

### a. Summary of Proposed Changes

The D/S designation was intentionally and purposely created almost fifty years ago to allow students to adjust their educational and training programs to their academic needs without significant administrative burden. Instead of having a set status expiration date upon admission to the United States, students and exchange visitors are admitted for "Duration of Stay," or D/S, with the duration of stay set through SEVIS. ICE also monitors numerous aspects of immigration compliance through SEVIS, making F-1 students and J-1 exchange visitors the most highly tracked and monitored nonimmigrants in the United States.

Despite the success of SEVIS and the D/S designation, DHS states in the Proposed Rule that D/S should be eliminated to increase national security and reduce fraud. The Proposed Rule would only allow F and J nonimmigrants to be admitted to the United States up to the date noted on their respective Form I-20 or DS-2019, with the maximum admission period limited to four years. F and J nonimmigrants who need additional time to complete their programs would be required to apply to extend their status with USCIS and potentially have their biometrics collected as part of the process, similar to how other nonimmigrants extend their status. Application approval would be subject to USCIS discretion.

### b. Challenges

### i. The Rule is vague

The Proposed Rule's explanation of the extension process when international travel is involved is vague. The most glaring issue is the lack of information regarding whether students and exchange visitors may extend their status by travelling internationally and then re-entering the United States. DHS alludes to the potential for nonimmigrants caught in the transition period to extend their stay through international travel. In Section V(D)(I), DHS writes that their transition proposal

> "would ensure that no F and J nonimmigrants remain in the United States indefinitely by requiring all F and J nonimmigrants admitted for D/S who wish to extend their stay beyond their program end date or the 4-year maximum, whichever is applicable, to either file an EOS request or depart the United States and apply for admission at a POE by their program end date or the 4-year maximum period of

[1] U.S. DEP'T OF HOMELAND SEC. IMMIGR. AND CUSTOMS ENF'T, 2024 SEVIS BY THE NUMBERS REP., 2; Intealth, "Protect Duration of Status for J-1 Physicians Advocacy Partner Toolkit (Sept. 2025).

> stay from the final rule's effective date, plus an additional 60 days for F nonimmigrants, and 30 days for J nonimmigrants."[2]

This is the only section of the Proposal that describes how international travel could extend a student or exchange visitor's stay. However, it is limited to the transition period. We therefore respectfully request that DHS provide guidance on whether F and J nonimmigrants may extend their status expiration date through international travel *after the transition period*.

A second important issue that is not addressed by the proposal is the timing of extension applications. The proposed rule does not state how early a student or exchange visitor can apply to extend their status through USCIS. Must they wait until six months before their status expiration like some nonimmigrant categories, or may they apply for an extension immediately upon receiving a new I-20 or DS-2019? If students must wait until six months before their status expires, then students and exchange visitors who have received a new I-20 or DS-2019 with a recommendation to extend their program early on (such as in their Sophomore year of classes) will not know if they can finish their program until they are within six months of their status expiration (such as in their Senior year). This potentially years-long uncertainty would cause unnecessary emotional distress for students and exchange visitors and lead many to reconsider attending an American university or training program altogether, which could cause financial losses for these industries and negatively impact America's global competitiveness and national security.

**ii. Administrative duplication and cost burden**

Based on our own extensive immigration law experience and our particular expertise in SEVP and SEVIS, DHS's proposal to require USCIS adjudication for F and J extensions of stay is administratively duplicative and a waste of valuable agency resources. The information that is requested on the I-539 applications that USCIS will likely use for extension applications is the same or similar information that is input into SEVIS, such as: current status information; program duration; home address; worksite and training site address(es); reporting mechanism for arrests or criminal convictions; and a variety of disciplinary actions. Further, SEVIS provides reporting mechanisms to ICE in real time, which is a better way to report potential status violations than through an extension application.

Additionally, SEVIS is jointly managed by DHS and the Statement Department ("DOS"), meaning that ICE and DHS already have access to all the information stored in SEVIS and don't need an extension application to gather more information.

Furthermore, a method of assuring that accredited schools and program sponsors are adhering to the guidance already exists. ICE deploys site visits and other investigatory activities to ensure schools and program sponsors are fulfilling their obligations to F and J nonimmigrants. For schools to receive F-1 students, they must be an SEVP-certified institution and must periodically undergo recertification. SEVP officials also conduct site visits at universities to ensure students are actually attending classes. The J-1 equivalent is program re-designation. During this process, sponsors must

[2] Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 90 Fed. Reg.42070, 42085 (proposed Aug. 28, 2025) [hereinafter Proposed Rule].

submit annual requests for allotments of DS-2019 forms, which in itself limits the number of nonimmigrants that a program may sponsor. All of these mechanisms enable DHS to monitor F and J programs for compliance and sufficiently enable DHS to catch infractions.

Because of this duplication of efforts, the costs associated with preparing EOS applications, such as hiring counsel to prepare applications, is unjustified.

**iii. Lack of rational justification**

F-1 and J-1 students have been exempt from the extension of stay application process applicable to most other nonimmigrants for good reason. The D/S system was created because of the administrative nightmare that F-1 extension of stay applications previously caused the government. DHS notes in the Proposed Rule that

> "…given the large number of nonimmigrant students in the United States at the time and the need to continually process their EOS applications, legacy INS proposed amending the regulations to permit F-1 [noncitizens] to be admitted for the duration of their status as students. Legacy INS explained the changes would facilitate the admission of nonimmigrant students, provide dollar and manpower savings to the Government, and permit more efficient use of resources."[3]

However, after noting that D/S was created because of the large F-1 student population, DHS states that D/S should be eliminated for the same reason. The Rule states that "the sheer size of the population complicates oversight and vetting functions" and that "since D/S was introduced for J and I nonimmigrants in 1985, the number of exchange visitors admitted into the United States has more than quadrupled."[4] DHS fails to explain how exactly the size of the F-1 and J-1 student populations makes it difficult for DHS to vet and monitor them. DHS simply states that they "believe[] that the determination of program extension and EOS should be separated, with the DSO's and RO's recommendation being one factor an immigration officer reviews while adjudicating an application for EOS."[5]

As explained above, SEVP and SEVIS enable ICE to closely monitor F-1 and J-1 nonimmigrants for potential status violations. ICE could simply increase the number of agents it has monitoring SEVIS or alter the system as needed to adjust for the increase in active records.

DHS also cites a handful of fraud and national security incidents involving F-1 students as justification for eliminating D/S for the entire F and J populations. For example, DHS reasons that SEVP and SEVIS are vulnerable to impermissible Day One CPT programs. However, as explained above, ICE is already capable of monitoring and investigating these programs with SEVIS, site visits, recertifications, and other tools. If Day 1 CPT is a major concern of DHS, then that should be addressed separately and specifically instead of punishing all F-1 students in order to detect any apparent fraud in these programs.

---

[3] Proposed Rule, *supra* note 2, at 42074.
[4] *Id.* at 42076.
[5] *Id.*

Additionally, DHS claims that D/S too easily allows students to perpetually remain in F-1 status "in violation of the spirit of the law." The Proposal summary states that DHS identified over 2,100 noncitizens who first entered the US as F-1 students between 2000 and 2010 and remain in active F-1 status as of April 2025.[6] However, in comparison to the 1,582,808 active SEVIS records in Calendar Year 2024, these 2,100 individuals make up approximately a tenth of one percent of the total SEVIS record population, making "the perpetual student" a much smaller problem than DHS stipulates.[7] Further, DHS most likely identified these 2,100 records through SEVIS, which further shows how well SEVIS functions. Instead of eliminating a well-functioning system just to target 0.13% of records, DHS could launch individual investigations into these records to determine if the student is making progress toward a bona fide educational objective.

Finally, DHS's national security concerns do not justify these changes. DOS and CBP already thoroughly vet students and exchange visitors before they enter the US, especially if the student or exchange visitor will be receiving training in sensitive technology or knowledge. The proposed changes do not note *how exactly* requiring extension applications will allow DHS to better detect national security concerns, especially given the Rule's procedural issues.

**iv. Misalignment with education and medical training cycles**

Not all F and J nonimmigrants are able to complete their educational or exchange visitor program within the proposed four years of authorized stay. For example, J-1 research scholars can require up to five years to complete their visitor exchange program, and they are already unable to extend their stay beyond these five years. Further, according to the National Science Foundation, for the past 50 years the median Ph.D. program has taken 5.7 years to complete, meaning that most PhD candidates would not be able to complete their PhD within 4 years and would be required to file an extension of status petition.[8]

It is particularly concerning that a student or exchange visitor could be prohibited from completing their program after investing so much time and money into their studies if their extension of stay is not approved. Aside from the individual consequence to the student or exchange visitor, multiple instances of this would likely cause international students to choose not to attend a US university, which would significantly impact universities' revenue and finances. According to NAFSA: Association of International Educators ("NAFSA"), 1.1 million international students in the US contributed $43.8 billion to the US economy during the 2023-2024 academic school year.[9] Colleges, universities, hospitals, and research institutions therefore stand to lose a substantial amount of revenue and jobs if these changes are implemented.

Even the traditional bachelor's degree program can take longer than the expected four years to complete. NAFSA estimates that the median baccalaureate holder takes 52 months, or 4.3 years, to complete their program. This means that *at least half* of international students *would most likely*

---

[6] Proposed Rule, *supra* note 2, at 42077.
[7] U.S. DEP'T OF HOMELAND SEC. IMMIGR. & CUSTOMS ENF'T, 2024 SEVIS BY THE NUMBERS REP., 2.
[8] U.S. NAT'L SCI. FOUND. NAT'L CTR. FOR SCI. & ENG'G STAT., SURV. OF EARNED DOCTORATES 2024, https://ncses.nsf.gov/surveys/earned-doctorates/2024#data.
[9] Press Release, NAFSA: Ass'n of Int'l Educators, International Students Contribute Record-breaking Level of Spending and 378,000 Jobs to the U.S. Economy (Nov. 18, 2024), https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs.

need to apply for an extension of stay. This not only increases the volume of EOS applications that USCIS would need to adjudicate but also shows that DHS's proposal to eliminate the standard of "normal progress" towards degree completion is unreasonable.

Lastly, the Proposed Rule would likely cause frequent extension applications for J-1 physicians. Currently, the typical DS-2019 for J-1 physician training is issued in one-year increments. ECFMG then extends the program on an annual basis upon the physician completing that year of training. If the proposed changes are implemented, J-1 physicians would only be admitted into the US in one-year increments based on their DS-2019s and would therefore have to apply for an extension of stay *every* year until they complete their program.

**v. Intrusion into academic decision-making**

As indicated above, the typical student requires at least *some* time beyond the stated 4-year program end, which clearly indicates that "normal progress" is often beyond a 4-year time allotment. The Proposed Rule as it is currently written bypasses the best judgment of student needs by university officials and faculty. The individual relationships that students form with academic advisors would be replaced with bureaucracy. A USCIS officer does not have the same in-depth knowledge of a university's curricula and programs as a DSO. A DSO, in contrast, is best positioned to contact the appropriate people within the university to determine whether continued F-1 status is appropriate.

**vi. Likely processing delays**

The Proposed Rule will burden an already overwhelmed system. As of September 2025, USCIS had an estimated 1.3 million backlogged cases.[10] According to NAFSA, the Form I-539 application that USCIS will likely use for F and J extensions of stay often take 5-6 months to adjudicate, and some take as long as 12 to 18 months.[11] The Proposed Rule offers no information on how USCIS is prepared to handle the increase I-539 application volume that will result from these changes. Simply responding that premium processing will be an option will fail to recognize the extreme burden such a high fee places on a college student or recent graduate. Requiring students to pay an extra fee to ensure timely adjudication is inequitable. Without premium processing, delayed adjudications may jeopardize employment opportunities, but with it, students may feel compelled to shoulder the extra cost despite tight budgets. Forcing students to pay for premium processing to receive a timely adjudication transfers the consequences of USCIS processing delays.

**vii. Visa Processing Delays at U.S. Embassies**

Eliminating D/S for F, J, and I nonimmigrants and instead requiring fixed end dates with extension requests will impose significant operational burdens on U.S. embassies and consulates abroad. The proposed shift would require students and exchange visitors to obtain new visa stamps more

[10] U.S. CITIZENSHIP & IMMIGR. SERV., U.S. DEP'T OF HOMELAND SEC., ALL USCIS APPLICATION AND PETITION FORM TYPES (FISCAL YEAR 2025, QUARTER 2) (May 2025), https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.
[11] *Duration of Stay Explainer*, NAFSA: ASS'N OF INT'L EDUCATORS (Sept. 2025), https://www.nafsa.org/Duration-status-explainer.

frequently, particularly when academic programs or research activities extend beyond the initial period of stay. This change will substantially increase the volume of nonimmigrant visa applications submitted worldwide. At the same time, the Administration's elimination of visa interview waivers has already escalated demand for in-person interviews, straining limited consular staffing and resources. The combined effect is to create a sharp rise in consular workloads without a corresponding expansion in capacity. Many embassies and consulates already face significant wait times for appointments. Requiring more frequent visa renewals will exacerbate delays. Moreover, students and scholars may be unable to return to the United States in a timely manner after visa renewal abroad, jeopardizing degree completion, research continuity, and employment. The rule risks deterring talented individuals from choosing the United States as their destination for education and research.

**viii. Elimination of Duration of Status (D/S) and Unlawful Presence Consequences**

The elimination of D/S for F, J, and I nonimmigrants raises serious concerns due to the way it would trigger the accrual of unlawful presence for this population. Replacing D/S with fixed end dates introduces significant risk of individuals unknowingly falling out of status and immediately accruing unlawful presence. Because the regulatory structure governing F, J, and I statuses is highly technical, even minor administrative errors, delays in program extensions, or misunderstandings of reporting obligations could cause a student or scholar to begin accruing unlawful presence without notice. This in turn could subject them to three- or ten-year bars on reentry into the United States under INA §212(a)(9)(B), despite the fact that their noncompliance may have been inadvertent, outside their control, or based on their necessary reliance on school officials. Once triggered, the unlawful presence bars carry life-altering consequences that can derail educational and career trajectories. The uncertainty and harsh penalties associated with fixed status periods will discourage talented international students and researchers from choosing educational and research institutions in the United States. SEVIS already provides robust monitoring of compliance; layering unlawful presence accrual on top of fixed end dates is unnecessary and duplicative. Eliminating D/S and applying unlawful presence rules to this population will not improve compliance and will instead create an overly punitive system that jeopardizes the United States' ability to attract and retain international talent. A more balanced approach is to preserve D/S, which ensures accountability through SEVIS while avoiding disproportionate consequences for inadvertent or minor status violations.

## II. <u>Prohibiting all graduate-level program changes and first-year baccalaureate program changes, and restricting new program admissions to only "upward progression"</u>

**a. Summary of Proposed Change**

DHS also wishes to make the following changes to the F-1 program:

(1) "DHS proposes to restrict school transfers and changes of educational objectives within a student's first academic year of a program of study, unless an exception is authorized by SEVP, and to prohibit F-1 students in a graduate level program of

study from changing educational objectives or transferring from within the United States;" and

(2) "[A noncitizen] who has completed a program as an F-1 nonimmigrant at one educational level would be unable to maintain F-1 status, depart and be readmitted in F-1 status, or otherwise obtain F-1 status (e.g., via a change of status) through a program at the educational level or a lower educational level."[12]

Change (1) above would mean that undergraduate students who wish to change their major during their freshman year would need to wait until the end of their freshman year to change their educational objective.

**b. Challenges**

**i. Lack of rational justification**

Similar to our comments in Section I, DHS has not provided a rational justification for these changes. As mentioned above, DHS attempts to reason that preventing course of study changes will prevent nonimmigrants from changing to a field of study containing training in sensitive knowledge or technology. However, the small potential that this change to all programs would measurably improve national security comes at exorbitant financial and time costs to students and universities.

Additionally, DHS could utilize already existing tools to investigate potential national security threats in the F-1 program. For example, in March 2025, *Reuters* reported that DHS diverted FBI agents away from crime-fighting and towards immigration enforcement, ordering money laundering investigators to look into noncitizens potentially engaging in authorized employment.[13] The American Immigration Council reported that "[a]gents from the Drug Enforcement Agency and FBI's Joint Terrorism Task Force now focus instead on arrests of migrants, farmworkers, and local businessowners who lack U.S. citizenship."[14] DHS could re-divert these FBI agents towards the national security threats it highlights in the Proposed Rule and forego this change.

**ii. Confusing and vague**

There are several confusing elements of the proposed change. First, it is not clear what constitutes "changing educational objectives." DHS states that "educational objectives refers to an F-1 student's educational level or major," but this is not descriptive enough. It is not clear whether students may add or remove a baccalaureate major or minor or if they may add or drop a

[12] Proposed Rule, *supra* note 2, at 42088.
[13] Brad Heath et al, *Exclusive: Thousands of agents diverted to Trump immigration crackdown,* REUTERS (Mar. 22, 2025), https://www.reuters.com/world/us/thousands-agents-diverted-trump-immigration-crackdown-2025-03-22/#:~:text=Summary,to%20sexual%20abuse%20and%20fraud.
[14] Nayna Gupta, *Realigning the Federal Government as a Mass Deportation Machine*, AMERICAN IMMIGR. COUNCIL (Jul. 29, 2025), https://www.americanimmigrationcouncil.org/blog/realigning-federal-government-mass-deportation-machine/.

combination baccalaureate and master's program during their first year of study. Similarly, it is not clear whether an international student in a doctoral program can "master out" of their program and receive just their master's degree under the current language. The regulatory language is also unclear regarding whether different types of postgraduate degrees are the same level. We ask that DHS please clarify whether a Doctor of Philosophy, Doctor of Medicine, Juris Doctor, and Doctor of Psychology are the "same" educational level or whether students may pursue more than one of these degrees under the F-1 program.

**iii. Limits interdisciplinary studies for crucial fields**

Academic disciplines can overlap significantly, making acquiring multiple graduate degrees a necessity for certain professions. For example, law librarians typically need to have both a master's degree in Library and Information Science and a Juris Doctor, and physician scientists typically need both a medical degree and a doctoral degree to conduct their research. However, if a student completes their graduate degrees in the "wrong" order, the proposed changes would prevent them from obtaining that additional degree.

**Conclusion**

DHS's proposal to eliminate D/S will create a duplicative bureaucratic burden which will not enhance national security or prevent fraud. These changes will instead be an improper intrusion into the practices of universities, hospitals, and research institutions, costing our clients significant time, money, and other resources without a compelling justification. For these reasons, we urge DHS withdraw the proposed changes and leave the D/S designation as-is.

We thank DHS for taking the time to consider our comments.

Respectfully submitted,

Iandoli Desai & Cronin P.C.

# EXHIBIT 38

INTERNATIONAL STUDENT & SCHOLAR SERVICES | MARYLAND GLOBAL

International Student & Scholar Services
University of Maryland
1126 H.J. Patterson Hall, College Park, MD 20742
P: 301-314-7740 | isss.umd.edu

**Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

**DHS Docket No. ICEB-2025-0001**
**Regulatory Information Number (RIN) 1653-AA95**

Submitted via: https://www.regulations.gov/

September 29, 2025

To Whom It May Concern:

On behalf of the University of Maryland (UMD), I am writing this letter to comment on the proposed U.S. Department of Homeland Security (DHS) rule to amend its regulations on international students on F-1 visas and exchange visitors on J-1 visas, specifically replacing the current Duration of Status (D/S) regulations for these students and research scholars, and its impact on UMD. UMD is proud to be a U.S. public institution of higher education. We respect DHS's concerns about potential abuse and fraud and its emphasis on protecting our country, but we believe the proposal to rescind and replace D/S is too blunt an instrument whose negative impacts on institutions, the nation, the advancement of discovery and knowledge, and on visiting students and researchers would outweigh any potential intended benefits. We appreciate the opportunity to comment and will use this letter to explain the deleterious impacts the proposed changes would have for us specifically, illustrative of the impacts likely to be felt by many other institutions of higher education across the country.

**The University of Maryland**

The University of Maryland is a top-ranked public research university, the flagship campus of the University System of Maryland, and the original 1862 land-grant institution in the State. It is one of 62 members of the Association of American Universities, comprising the leading research universities in the United States and Canada. The University offers over 90 undergraduate majors and 200 graduate programs across 12 colleges. The University creates and applies knowledge, nourishing a climate of intellectual growth and providing outstanding instruction in a broad range of academic disciplines and interdisciplinary fields. Its collaborations with State, federal, private and non-profit partners promote economic development and improve quality of life. The University offers faculty and students a vibrant ecosystem that nurtures and encourages innovation and entrepreneurship in a variety of ways. We are a community of 38,000 students, 9,000 faculty and staff, and 352,000 alumni, all dedicated to the pursuit of Fearless Ideas.

The comments below focus on nine proposals specified in the Notice of Proposed Rulemaking (NPRM):

(1) Eliminate D/S for F-1 and F-1 immigration status
(2) Implementation of a date-specific admission, not to exceed 4 years

(3) Remove academic and research decisions from the academic institutions, allowing for only a recommendation from the academic institution
(4) Prohibit F-1 graduate students from changing their educational objective from within the U.S.
(5) Shorten the grace period of F-1 students from 60 days to 30 days
(6) Require an application to U.S. Citizenship and Immigration Services (USCIS) for a student to transfer, extend, change academic program (move to a higher level of education or study for a second degree at the same level) or engage in post-completion academic training.
(7) Eliminate deference to prior status
(8) English Language Programs
(9) Increased costs to the University

**Eliminate Duration of Status for F-1 and J-1 Immigration Status**

UMD is a Student and Exchange Visitor Information System,(SEVIS) certified institution and complies with SEVIS reporting requirements on its entire population of F-1 students and J-1 exchange visitors. These two groups of nonimmigrants are among the most closely monitored nonimmigrants in the United States. D/S is a logical policy, given the SEVIS reporting requirements placed on these two nonimmigrant statuses. The existence of SEVIS makes the elimination of D/S unnecessary. If a student is to extend immigration status, transfer to another institution, begin study at another educational level it is recorded first in SEVIS. DHS has access to SEVIS data.

The greatest burden will be on the students and exchange visitors who will experience application processing backlogs due to the additional workload being unnecessarily channeled to USCIS. USCIS has struggled for many years with its processing work load. Reporting in *Newsweek*[1] indicates that USCIS has a record backlog of 11.3 million pending applications. Current processing times for the I-539 form range from four to six months with some cases that have taken longer than 12 months. It seems that increasing the workload on an already stretched government agency will result in longer and greater backlogs.

Eliminating D/S adds additional risk for the international student or exchange visitor. Should USCIS deny the I-539 application, the individual will become subject to “unlawful presence” the day after the issuance of the denial, opening the student or exchange visitor to possible removal proceedings and the potential for years-long bars on future U.S. visas.

**Implementation of a date-specific admission, not to exceed 4 years**

As a top tier research institution in the United States, the institution sponsors doctoral students, whose median time to complete this degree is 5.7 years, according to the National Center for Science and Engineering Statistics (NCSES), or as high as 7.3 years, based on NCSES data. This means that nearly every international PhD student will be required to file for an extension of international student status. The ability of PhD students to complete their studies will be in the hands of USCIS and not their higher education institution. Every F-1 doctoral student will need to request an extension at least one time and the need to request several extensions exists for this student population. This rule has a chilling effect on the recruitment of international doctoral students who are attracted to U.S. institutions because of our high global university

[1] Rahman, B., & Gooding, D. (2025, July 8). US immigration backlog hits all-time high. Newsweek. Retrieved from https://www.newsweek.com/us-immigration-backlog-hits-all-time-high-2095846

rankings, the diversity of fields of study offered and academic flexibility and freedom to pursue a research topic. These students are the talent pipeline driving innovation and technological advancements in critical STEM fields.

The midpoint of a Ph.D. program is typically marked by the completion of coursework and qualifying or comprehensive examinations. This important milestone is how a student progresses to 'Ph.D. candidate" status. Candidates shift their focus to original research and writing of the dissertation. This is important because a student in this phase may need to travel internationally to complete field research or present papers at research conferences. The need for continued F-1 status at this phase is imperative to facilitate educational progress and complete the degree. The intensity of research and data collection can consume a student's focus. The institution needs to maintain the flexibility to work with the student on immigration status and support their academic success.

Students at the undergraduate level may also require more than four years to complete their Bachelor's degree. Statistics on Bachelor's degree reveal a 6-year completion rate of 71% for 4-year public institutions in the United States. According to publicly available information, 73% of the Fall 2020 cohort at the University of Maryland completed their degree in 4 years. 27% of that cohort required additional years to complete their degree. The burden and expense of having to apply to USCIS for an extension of status only serves to create uncertainty for young people trying to improve their lives through education. Many of these students are away from home and family for the first time in their lives and need to have a foundational sense of safety and security to succeed in their educational program.

**Remove academic decisions from the academic institutions, allowing for only a recommendation from the academic institution**

This proposed rule removes the academic decisions from the academic institution and places the decision with a USCIS adjudicator who does not know the context of the academic situation. Academic institutions are staffed with faculty and administrators who are professionally trained and possess experience supporting student success. At UMD, the International Students and Scholars Services (ISSS) office has two staff with Ph.D.s in Education and the remaining staff all have Masters degrees in Education. The University has specific policies that pertain to academic progress, admission/enrollment periods for each degree level, and limits on employment hours for enrolled students. International students are mentored and guided through their academic study and receive support to ensure they graduate with a degree. The University has the mission to educate and graduate people that will go on to create benefits to the State of Maryland, the United States and the World.

**Prohibit F-1 graduate students from changing their educational objective from within the U.S.**

The proposed rule prohibits F-1 graduate students from changing educational objectives or transferring from within the United States, without explanation for why this restriction is necessary. Even more concerning, the rule would prevent international graduate students from changing their field of study at any point during their program. This reflects a fundamental misunderstanding of graduate education, where students frequently refine or shift their research focus as their interests evolve. Such a limitation would significantly reduce the appeal of U.S. universities to international students by denying them the academic flexibility essential to

meaningful intellectual growth and exploration. At the UMD during the 2024 /2025 academic year, over 100 graduate students petitioned to change their academic program at the Graduate School. The request is reviewed by the college, academic department and the Graduate School prior to a student receiving permission to change their academic objective.

**Shorten the grace period of F-1 students from 60 days to 30 days**

The recommendation to shorten the grace period from a 60 day grace period for F-1 students to 30 days seems unreasonable and without sufficient evidence. F-1 students that come for Bachelors degrees and Graduate degrees reside in the U.S. for multiple years. Preparing to return home requires a multitude of logistical, financial, and personal tasks. Travel arrangements have to be made, closing bank accounts, canceling health insurance, ending a lease, canceling utilities, along with deciding what to ship, sell, or donate. This organizing takes time and effort. Thirty days to complete the necessary steps is not long enough.

According to the *Open Doors Report*[2], *"International students and scholars generate billions of dollars of spending in local economies and contribute groundbreaking research and innovation that maintains the United States' critical edge in a competitive global economy."* Driving away international talent is predicted to cost the U.S. economy $7 billion in revenue and more than 60,000 jobs in the upcoming 2025-2026 academic year. The shortening of the grace period is unnecessary and demonstrates an unwelcome policy for the U.S. Students will choose other study destinations that have a more welcoming policy.

**Require an application to USCIS for a student to transfer, extend, change academic program (move to a higher level of education or study for a second degree at the same level) or engage in post-completion academic training**

The University of Maryland anticipates a more complicated advising environment for the following reasons: the transition period from D/S to a date-specific I-94; increased student and exchange visitor confusion; higher costs and delays for students and exchange visitors (filing fees, biometrics, interviews, legal representation); potential enrollment and research declines; increased workload for international office staff (DHS estimates that Designated School Officials and Responsible Officers will have to spend approximately 67 hours for rule familiarization and adaptation in the first year after the rule takes effect); training and adaptation costs for international office staff (estimated by DHS at $93.3 million across the sector in year one); possible increase in legal liability.

U.S. higher education is already under enormous pressure due to a slate of unwelcoming immigration policies and executive orders. Ending D/S would add yet another significant deterrent to talented students and exchange visitors who are seeking a predictable educational experience or research opportunity in the United States.

**Eliminate deference in adjudication of status**

The prior experience with the elimination of an adjudicator's deference for a prior immigration

[2] Institute of International Education. (n.d.). Research special reports and analyses. Open Doors. Retrieved September 26, 2025 from https://opendoorsdata.org/services/research-special-reports-and-analyses/

status led to spikes in denials and increased levels of uncertainty in the U.S. immigration system. It is very important for students and researchers to have confidence in their immigration status and to have a sense of continuity of status to permit them to focus on their education and research. This prior action also harmed the institution by creating more workload on each application.

**English Language Programs**

The current D/S process is essential for skill-based language programs, particularly at institutions such as UMD, in providing flexible opportunities for international students to attain their academic language goals. Under D/S, language programs receive dozens of transfer students, affording choice and flexibility to students as they adjust to academic life in the United States. The prohibition on lateral and reverse matriculation would mean that these programs could not receive *any* transfers and students would not be able to find the language school that best meets their specific academic needs.

At institutions like UMD, D/S allows for timely program-level changes as students progress in English proficiency and begin academic coursework, typically within a single semester or course. Replacing this system with a lengthy, expensive Extension of Status (EOS) process would discourage applicants, particularly given UMD's high language proficiency standards.

The Maryland English Institute at UMD exists to provide academic language support for students that meet our high academic standards. Under D/S, the institute has served thousands of F-1 students—many of whom later enrolled in UMD degree programs and became leading scholars, professionals, artists, and athletes. The flexibility of D/S was crucial to their success; had it been restricted, many would likely have pursued higher education in other countries.

**Increased costs to the University**

Based on the time estimates published in the proposed rule the University estimates annual additional expenses of approximately $767,000.00. The costs were estimated by taking an average hourly wage of office staff and multiplying it by the number of hours to train on the NPRM and multiplying that by the number of staff. This result was added to the result of (the number of estimated I-539s that would have been filed in 2024) multiplied by (the estimated cost per extension filing in the NPRM). This is an unfunded mandate being given to institutions at a time when state budgets are already crippled.

**Conclusion**

There are several reasons for retaining D/S as the default policy for F-1 students and J-1 students and researchers:

- D/S has a successful 30 year history;
- This population of international students and exchange visitors are already rigorously monitored in SEVIS and may be the most monitored nonimmigrants in the U.S.;
- USCIS already faces a considerable backlog and the proposed rule would further exacerbate that;
- Academic decision making continues to be vetted properly by academic institutions;

- The policy has helped attract the best and brightest students and researchers in the world to US institutions of higher education, supporting US economic growth and leadership in critical emerging industries.

Thank you for providing the opportunity to express our opposition to the proposed rule, which would create cumbersome new requirements and uncertainty for international students and visitors. The proposed rule would also impose significant administrative and financial burdens on universities that generate economic growth and workforce development in our state and country.

Respectfully submitted,

S. Dougherty

Susan Dougherty,
Director
International Students and Scholars Services
University of Maryland, College Park