# EXHIBIT 39

American Association of Colleges of Pharmacy AACP
Pharmacists Help People Live Healthier, Better Lives.

September 26, 2025

Submitted electronically via Federal eRulemaking Portal: https://www.regulations.gov
Docket: DHS Docket No. ICEB-2025-0001
RIN: 1653-AA95
FR Citation: 90 Fed. Reg. 42070 (Aug. 28, 2025)

To: Office of Regulatory Affairs and Policy, U.S. Immigration and Customs Enforcement (ICE); U.S. Department of Homeland Security (DHS)

RE: **Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media Proposed Rule**

To Whom It May Concern,

The American Association of Colleges of Pharmacy (AACP) represents U.S. colleges and schools of pharmacy that educate the nation's pharmacist workforce. We write to express concerns with DHS's proposal to replace duration of status (D/S) with fixed end-dates for F and J nonimmigrants and to require routine U.S. Citizenship and Immigration Services (USCIS) extension-of-stay (EOS) filings. The rule would (1) misalign with the length and structure of accredited PharmD programs (including 0–6 pathway programs and 1,440+ required Advanced Pharmacy Practice Experience hours) and most PhD programs, (2) create substantial costs and delays for students, dependents, and institutions, (3) restrict academic mobility (first-year transfer limits; graduate-level change prohibitions), and (4) compress the grace period from 60 to 30 days.

We urge DHS to withdraw the proposal or, at minimum, adopt targeted alternatives: retain D/S; preserve a 60-day grace period; exempt doctoral programs, including both clinical and PhD; allow same-level changes and reasonable transfers; and delegate routine program-extension updates to Designated School Officials (DSOs) without USCIS EOS.

## About AACP

The mission of AACP is to lead and partner with our members in advancing pharmacy education, research, scholarship, practice and service to improve societal health. Our members are the 142 colleges and schools of pharmacy in the United States and over 15,000 faculty and staff members, students and administrators at these schools. PharmD curricula include extensive experiential education (introductory and advanced) and site placements dependent on health-system capacity and preceptor availability. Research training within pharmacy schools includes MS and PhD programs and post-doctoral fellowships. International students are integral to research, teaching, and patient-care teams in academic pharmacy.

## Alternative Solutions

We strongly encourage DHS to consider the following recommendations:

- Withdraw the rule or retain D/S for F and J categories with targeted oversight enhancements.
- If DHS proceeds, exempt doctoral level programs, including health-professional programs with clinical components (e.g., PharmD), and research-focused graduate (e.g., thesis-based dual degree and PhD) programs, from the 4-year cap and routine EOS, and preserve the 60-day grace period.
- Allow academic mobility: remove the first-year transfer ban; permit same-level program changes and graduate-level adjustments with DSO authorization.
- Minimize administrative burden: permit DSO-managed updates (SEVIS) for on-time program extensions and level changes; limit biometrics/interviews to risk-based triggers; bundle dependents; provide fee relief.
- Adopt a phased transition (≥24 months after any final rule) aligned with SEVIS/IT changes and academic calendars; include an Optional Practical Training (OPT)/STEM OPT bridge and robust safe harbors.

**Misalignment with PharmD and PhD Program Structures and Clinical Training**

PharmD education is a sequenced, competency-based program that commonly exceeds a simple four-year administrative window. Many institutions offer 0–6 direct-entry pathways that combine pre-professional and professional coursework into an integrated curriculum. In these programs, students matriculate directly from secondary school into an integrated pre-professional sequence followed by four professional years, earning the PharmD in approximately six years. Even in traditional four-year professional programs, students must complete introductory and advanced pharmacy practice experiences, including a minimum of 1,440 APPE hours with at least 160 hours per rotation under Accreditation Council for Pharmacy Education (ACPE) Standards 2025.[1] Clinical placements depend on hospital and health-system capacity, preceptor availability, affiliation agreement terms, and site readiness—factors outside the control of students and Designated School Officials (DSOs). Replacing D/S with fixed admissions capped at four years would force many otherwise compliant students to file mid-program USCIS EOS applications solely to finish prescribed, curriculum-driven training. D/S paired with SEVIS reporting already enables DSOs to certify normal academic progress and update program end dates when delays are linked to curricular requirements (e.g., site cancellations, public-health surges affecting capacity, remediation of a patient-safety competency). Routine EOS adds cost and legal risk without improving program integrity; it also introduces timing mismatches between academic calendars and USCIS processing cycles.

PhD training is not strictly time bound and instead relies on progress made by students toward generation of new knowledge or understanding in a field of endeavor, through completion of a circumscribed research project that addresses a well-defined and significant question or problem. After completing coursework, doctoral students focus on pursuit of their unique research problem. Completion may be delayed by experimental difficulties, changes in the underlying field or any of a number of unpredictable challenges to the scientific process, even for students engaging in dedicated, good faith studies. Doctoral education can rarely be completed in less than four years. According to the National Center for Science and Engineering Statistics, Survey of Earned Doctorates in 2020 the median

[1] Accreditation Council for Pharmacy Education (ACPE). *Accreditation Standards and Key Elements for the Professional Program in Pharmacy Leading to the Doctor of Pharmacy Degree (Standards 2025).* Chicago, IL: Accreditation Council for Pharmacy Education; 2024.

time to the doctorate for biological and biomedical sciences was nearly six years after entry into the doctoral program.[2] A fixed time limit could encourage students and mentors to rush research projects, potentially sacrificing scientific quality or completeness. Programs could also feel compelled to lower standards for PhD completion, compromising program integrity and undermining the standards and reputation for excellence U.S. universities currently maintain.

DHS should consider creating an explicit exception for accredited U.S. health-professional degree programs whose prescribed curricula, licensure prerequisites, or required experiential hours reasonably exceed four years. Doctoral programs should also be exempt, to prevent pressures that could compromise research quality and program integrity. Where the DSO certifies the student is in good standing and making normal academic progress, SEVIS-only program-end-date updates should suffice and no USCIS EOS should be required.

**Academic Mobility and Student Success**

The proposal's first-year transfer restriction would require students to remain at the issuing school for a full academic year (with limited exceptions) before becoming eligible to transfer. For PharmD students, transfers can be necessary for family obligations, financial hardship, safety concerns, better academic fit, or to secure clinical placements aligned with therapeutic interests. Current SEVIS release and DSO-to-DSO coordination already provide a clear chain of custody for records while protecting status. Additional restrictions could strand students in programs that are no longer viable for them and increase the risk of status lapses that have no relation to program integrity. Similarly, restricting graduate-level program adjustments and prohibiting same-level changes would impede legitimate academic progression—for example, transitions between PharmD programs, movement from a PharmD to a lab-based MS/PhD to pursue translational research, or movement between scientific disciplines as PhD research focus areas. These shifts are common in biomedical education as students refine their focus based on laboratory opportunities, funding, and faculty mentorship. Requiring a USCIS EOS for such changes—when the student is otherwise maintaining status and the DSO validates eligibility—adds processing burden without a proportional oversight benefit.

DHS should consider eliminating the first-year transfer ban and prohibition of program changes of any kind at the graduate level. DHS should allow transfers at any time when the student is maintaining status and in good academic standing, documented via SEVIS and permit same-level changes and intra-graduate transitions (e.g., PharmD↔PharmD; PharmD→MS/PhD) with DSO authorization and timely SEVIS updates. DHS should minimize reporting burdens that do not provide oversight benefit by not requiring a USCIS EOS when there is no gap in full-time enrollment or violation of status. Further clarification on what would count as a program change and changes to the educational objectives under the proposed rule would be needed to ensure individuals and institutions comply with the final rule, if the prohibition on graduate-level program changes is retained.

**Grace Period Compression from 60 to 30 Days**

Shortening the F-1 grace period from 60 to 30 days would create avoidable compliance risk for students who have completed their programs but must navigate multiple time-sensitive transitions. PharmD graduates often relocate to new cities, schedule and sit for licensure examinations (e.g., NAPLEX and

---

[2] National Center for Science and Engineering Statistics. *Doctorate Recipients from U.S. Universities: 2020* (NSF 22-300). Alexandria, VA: National Science Foundation; November 30, 2021. Accessed September 25, 2025. https://ncses.nsf.gov/pubs/nsf22300/report

jurisdictional law exams), finalize employment onboarding or postgraduate training, and file for OPT or STEM OPT where eligible. A 30-day window is frequently insufficient to coordinate these steps with institutional clearance, registrar certification, and employer onboarding timelines, increasing the risk of inadvertent unlawful presence accrual unrelated to program integrity.
The longstanding 60-day period has functioned as a safety valve that protects good-faith transitions and aligns with academic calendars. Compressing it would especially burden graduates from programs with late-summer experiential blocks or those awaiting Employment Authorization Document (EAD) issuance. The change would also run counter to other DHS mechanisms—such as the cap-gap—that recognize adjudication timelines outside students' control.

DHS should consider retaining a 60-day F-1 grace period or at minimum, codify a 60-day period for graduates of accredited health-professional programs and for students with timely-filed OPT/STEM OPT or cap-gap situations to prevent status lapses driven by administrative timing.

**Administrative Burden, Costs, and Processing Delays**

Paperwork Reduction Act (PRA) tables project millions of additional public burden hours driven by new or more frequent I-539/I-539A filings, biometrics appointments, potential interviews, and SEVIS revisions. For students and exchange visit researchers at pharmacy schools, these costs translate to increased advising loads, legal review, and systems changes—resources diverted from student success, time-sensitive experiments, clinical research interactions, experiential education coordination, and patient-care partnerships. Moderate delays in USCIS processing can ripple through academic schedules, clinical placements, and employment start dates, with outsized impact on students who rely on precise timing for APPE blocks and licensure steps. Imposing biometrics and interviews as default requirements will exacerbate backlogs and create access barriers for students located far from application support centers. These are incremental burdens with no change to academic standards. They arise solely from the new requirement to seek USCIS adjudication for routine, curriculum-driven program timelines. Beyond baseline SEVIS reporting, the shift to fixed admissions with routine USCIS extensions would layer recurring, per-student costs—form filing fees for I-539/I-539A (for the principal and each dependent), biometrics fees and travel to application support centers, and, for many, attorney or campus legal costs—plus institutional costs for DSO advising time, document preparation, and SEVIS/IT updates.

DHS should consider preserving D/S and relying on SEVIS-based, risk-triggered reviews instead of routine EOS. If DHS retains EOS, it should limit biometrics/interviews to articulable risk factors; allow bundled dependent processing; enable batch SEVIS updates; and provide fee reductions/waivers for full-time students in accredited health professions.

**Transition & Implementation**

A durable transition plan is essential to prevent inadvertent status violations as policies, SEVIS logic, and campus workflows change. Students currently admitted in D/S should be protected through their program end date plus the existing grace period, with DSOs authorized to continue SEVIS updates without forcing mid-program EOS. Retroactive application would create confusion, duplicate filings, and unnecessary adjudications. The proposed changes also require system development (SEVIS and campus IT), updates to policy manuals and training, revision of template contracts with clinical sites, and staff onboarding, DHS should align any effective date with academic cycles. Institutions need time to revise catalogs, handbooks, and communications; implementing training requirements will take additional time for faculty and advisors; students need clarity to plan clinical sequences and graduation.

DHS should consider implementing any final rule no earlier than 24 months after publication, with SEVP/USCIS issuing detailed guidance and updated SEVIS specifications at least 12 months before the effective date. DHS should provide OPT/STEM OPT continuity protections—automatic status coverage from EAD expiration through adjudication when filings are timely—and publish clear examples illustrating how bridge protections apply across common pharmacy training timelines as well as graduate research programs.

**Workforce Considerations**

Pharmacy programs place students across rural and underserved settings, including safety-net hospitals and federally qualified health centers. Disruptions from forced EOS filings, shortened grace periods, or transfer constraints can cascade into clinical placement gaps, reducing access to medication management, chronic-disease counseling, and interprofessional care for patients who already face barriers. International students and trainees are integral to these teams and contribute meaningfully to language access and cultural competence. The pharmacist workforce is experiencing significant turnover and geographic maldistribution, with thousands of annual openings driven by replacement demand. International students form part of the pipeline feeding residencies, fellowships, industry fellowships, and research programs that support medication safety and innovation. Graduate education programs in pharmaceutical sciences and related fields provide the highly skilled research and development workforce that underlies the world-leading innovation and global competitiveness of the pharmaceutical industry in the United States. Pharmaceutical science and engineering programs also develop the technology and prepare the workforce for advanced pharmaceutical manufacturing in the U.S. Policies that raise friction costs or uncertainty will deter enrollment and undercut national goals.

DHS should consider establishing an exemption pathway from routine EOS for ACPE-accredited PharmD programs and for research-focused graduate education programs when DSOs certify normal academic progress; codify SEVIS-only updates for on-time APPE/IPPE-driven timeline changes; retain the 60-day F-1 grace period; and include explicit transition protections for current student pharmacists and postgraduate trainees to avoid disruption to care and training.

**Questions to Consider**

As DHS considers next steps on the proposed rule, the department should consider the following:

- What data support the educational benefits of a 30-day (vs 60-day) F-1 grace period in health-professional programs with licensure milestones?
- What data supports modifying oversight requirements for F-1 and J visas that prevent disruption to the current compliance standards?
- What is the expected EOS volume for F/J health-professional students under the 4-year cap, and what are the processing time/denial rate assumptions?
- How will DHS coordinate with SEVP/SEVIS vendors and campuses to ensure IT readiness and avoid inadvertent status lapses?
- How will DHS mitigate disparate impacts on students from low-income countries and on rural, urban, and underserved clinical sites?

**Conclusion**

America's higher education system is defined by flexibility, academic mobility, and the vast opportunities it affords international students to learn, discover, and contribute—through research, teaching, and patient care in communities across the country. The proposed shift from duration of status to fixed admissions with routine USCIS extensions would replace that proven flexibility with rigid, process-driven checkpoints that do not reflect how clinical education or research training operate. Rather than strengthening compliance, these requirements would incentivize behaviors that reduce program integrity. The rule would also send the wrong signal about the United States' openness and reliability. New and repeated fees, biometrics appointments, and uncertain adjudication timelines—paired with a shorter grace period—introduce financial and timing risks that peer destinations work to minimize. If finalized as proposed, the likely result is fewer qualified international candidates choosing U.S. pharmacy, pharmaceutical sciences and biomedical programs, with downstream effects on research productivity, clinical service capacity, and the pharmacist and pharmaceutical science workforce pipeline.

For these reasons, AACP urges DHS to withdraw the proposal. If DHS elects to proceed, we respectfully request that the Department retain duration of status for F and J categories or, at minimum, adopt the targeted adjustments outlined in this comment: preserve the 60-day F-1 grace period; remove categorical limits on transfers and same-level changes; exempt ACPE-accredited PharmD, other health-professional programs, and PhD programs from routine extension-of-stay filings; and permit DSO-managed SEVIS updates for on-time, curriculum-driven program extensions. These practical steps would maintain security and accountability while ensuring the United States remains a destination of choice for the world's most promising students.

Thank you for the opportunity to share our comments on this matter. Please contact Dorothy Farrell (dfarrell@aacp.org) and Olunife Akinmolayan (oakinmolayan@aacp.org) if DHS would like to engage in further conversations with colleges and schools of pharmacy preparing the next generation of healthcare professionals and pharmaceutical scientists.

Sincerely,

Lee Vermeulen, BSPharm, MS, FCCP, FFIP
Executive Vice President and CEO
American Association of Colleges of Pharmacy

# EXHIBIT 40

# THE NATIONAL FOUNDATION FOR AMERICAN POLICY

September 27, 2025

Office of Regulatory Affairs and Policy,
U.S. Immigration and Customs
Enforcement, Department of Homeland Security
500 12th Street, S.W.
Washington, DC 20536

Re: Comment on Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, DHS Docket No. ICEB–2025–0001

Submitted online via www.regulations.gov.

On behalf of the National Foundation for American Policy (NFAP), a nonpartisan policy research organization, I submit this comment to provide information on the proposed rule to establish fixed periods of admission for students, exchange visitors and foreign journalists.

**The Most Significant And Disqualifying Flaw In The Proposed Rule**

The proposed rule's most significant and disqualifying flaw is that it fails to adopt readily available and easily implemented policy alternatives that are far less intrusive than burdening all students and exchange visitors with fixed periods of admission. Failing to choose less burdensome alternatives raises the legitimate suspicion that DHS chose examples in the rule to justify its unnecessary policy rather than conducting a serious analysis and concluding that, after completing that analysis, the only way to address the examples cited would be to require fixed periods of admission.

DHS cites national security benefits to justify a sea-change in how international students attend U.S. universities (i.e., to move from duration of status to fixed admission periods). Under "Costs to Schools and Enrollments" in the proposed rule's preamble, it states, "DHS expects this proposed rule to have qualitative benefits for national security by providing DHS additional opportunities to

evaluate whether F, J, and I nonimmigrants are complying with their status requirements, or if they present a national security concern."

In the section on the need for rulemaking, DHS discusses five cases of Chinese nationals who entered on J-1 visas, whose actions, the department believes, represented national security threats. DHS places significant confidence in the extension approval process to protect against threats. "As with F nonimmigrants, *setting the length of the J nonimmigrant's specific program to not exceed a 4-year period would establish a mechanism for immigration officers to assess these nonimmigrants at defined periods (such as when applying for an EOS in the United States beyond a 4-year admission period) and determine whether they are complying with the conditions of their classification*," according to DHS. "This will increase vetting of the J nonimmigrant population, which can help to prevent and deter nefarious actors." (Emphasis added.)

DHS's argument is not credible. Government officials cannot believe that the best way to address the national security concerns raised by the cases of the five Chinese nationals is to require fixed periods of admission to "establish a mechanism for immigration officers to assess these nonimmigrants at defined periods (such as when applying for an EOS in the United States beyond a 4-year admission period)."

If individuals represent national security concerns, hoping that they apply for an extension after four years so that an immigration officer can review their application is a woeful or even absurd security measure. Under DHS's reasoning, if the proposed rule is finalized, all a national security threat needs to do to avoid scrutiny is to complete their academic program quickly enough to prevent the need to file for an extension.

It is not true, as DHS implies, that the only way its personnel can scrutinize potential national security threats among international students and exchange visitors is to hope they apply for an extension.

"DHS has the authority to check any individual F-1 or J-1 visa holder," noted an August 28, 2025, *Forbes* article authored by NFAP Executive Director Stuart Anderson. "If there are particular concerns about visa holders from specific countries or working in certain areas, a focused and likely more effective approach would be for DHS or the FBI to increase checks on those individuals based on the information the agencies received, rather than subjecting all international students and J-1 visa holders to new restrictions."

There are numerous alternatives that DHS and the U.S. security apparatus could choose to address potential national security threats among exchange visitors or international students that would be far more effective and produce far less collateral impact on hundreds of thousands of exchange visitors and international students each year, as well as on U.S. universities and the American economy.

These alternatives include:

1) DHS can use intelligence that it acquires or receives on individual international students or exchange visitors to engage in enhanced surveillance or verification of those individuals and their activities in the United States. DHS can monitor or check on the activities and academic progress of such individuals every 6 months.

2) DHS can identify international students and exchange visitors in specific fields or from particular countries that it chooses to scrutinize more than others. DHS can check on those international students and exchange visitors annually (or more frequently), including through a Designated School Official, to ensure they are complying with their immigration obligations.

3) DHS can conduct interviews or liaise with campus personnel on an ongoing basis to ensure that concerns about individuals or countries of interest are addressed.

4) DHS can develop a new interagency task force that includes the FBI to gather information on international students and exchange visitors for counterintelligence and counterespionage purposes, or to address other national security issues.

These alternatives—and there are additional alternatives—would be more effective and are more plausible for addressing national security or fraud concerns than DHS relying on an adjudicator or other immigration specialist to review the academic progress of an international student or exchange visitor only if they request an extension of stay, which would likely be four years after individuals enter the United States.

DHS knows if a student is meeting academic requirements through the SEVIS system. That means there is little reason to subject more than one million students to heightened scrutiny when it is possible to prioritize individuals about whom

government officials are concerned. Expending resources on individuals who do not represent a threat weakens national security. When DHS treats everyone as an equal threat, no one is a priority.

Elizabeth Neumann, former assistant secretary for counterterrorism and threat prevention at the Department of Homeland Security during Donald Trump's first term, said in the August 28, 2025, *Forbes* article: "It seems like they're trying to focus on national security as a justification for what is really a policy preference. If I had to characterize this action, I would say there are legitimate needs to strengthen the student visa programs to prevent fraud and protect national security, but it might be possible to do so through other, more narrow means."

DHS also cites the existence of a comparatively small number of longtime students to justify the rule: "DHS has identified over 2,100 aliens who first entered as F-1 students between 2000 and 2010 and remain in active F-1 status as of April 6, 2025."

A total of 2,100 aliens would equal 0.067% of the estimated 3.1 million people who may have entered the United States as F-1 students on visas between 2000 and 2010. The proportion could be even lower under other calculations. Additionally, DHS recordkeeping has been flawed in the past, which means that not all these students may currently be in F-1 student status. When DHS went to arrest Mahmoud Khalil, a high-profile protest leader at Columbia University, DHS agents thought he was still a student, even though he had been a lawful permanent resident for several months after marrying a U.S. citizen spouse.

As the August 28, 2025, *Forbes* article notes, "The proportion indicates that, to the extent DHS believes it must address this group of students, it could direct resources at that population rather than impose a far-reaching policy that could negatively affect the other 99.93% of international students."

Ironically, DHS does not allege these 2,100 students have violated the law but only "the spirit of the law." Given the small number, this might not even be a sign of slow academic progress, as some international students move from elementary school to high school to college to graduate school.

Among the alternatives to fixed admission periods that DHS could choose to address what it characterizes as longtime students are:

1) A rule that requires an extension of stay if an individual remains in F-1 status for 10 years.

2) A rule that allows DHS to review the F-1 status of any student whose stay has exceeded 8 years and requires that student to submit information to confirm their continued academic progress. As part of the rule, DHS could require an extension of status application to be approved if the information it receives does not satisfy the department's concerns. There is a precedent for this in the final rule from INS published on April 22, 1987, which states, "Any student who has been in student status for eight consecutive academic years must request an extension of stay from the Service." This 8-year rule should not be triggered for students who have completed their degree and begun a period of Optional Practical Training. A transition to OPT is a regular postdoctorate activity from which the United States receives substantial benefits.

The two alternatives cited above would address the issue DHS raised, which concerns well less than 1% of F-1 students, and do so without compelling other students and institutions to incur significant costs to address a minor problem. The two alternatives are not exhaustive but illustrative. The 1987 final rule shows INS established a mechanism to address longtime students without burdening the other 99% of international students.

**Insufficient Time To Complete Degrees**

Currently, international students can remain in lawful status as long as they are pursuing an academic program toward completion, and can, for example, transition from undergraduate to graduate studies. The new rule would replace that policy, with limited exceptions, by establishing a fixed four-year period for F-1 and J-1 visa holders. The rule also limits the period of stay for "foreign information media" on I visas. Language training students are limited to an aggregate 24-month period of stay.[1]

The four-year limit will likely be insufficient for many international students. The National Center for Education Statistics reports a median of 52 months (4.3 years) for completing a bachelor's degree. The National Science Foundation reports a

---

[1] The following sections of the comment letter are taken from Stuart Anderson, "Trump Deals A New Immigration Blow To International Students," *Forbes*, August 28, 2025.

median of 5.7 years for completing a Ph.D. The proposed rule requires students to obtain approved extensions from government adjudicators to continue their studies.

Education organizations oppose the proposed rule, expressing concerns about its impact on international student enrollment. "If finalized, this rule would create additional uncertainty, intrude on academic decision-making, increase bureaucratic hurdles and risk deterring international students, researchers and scholars from coming to the United States," said Miriam Feldblum, president and CEO of the Presidents' Alliance on Higher Education and Immigration, in a statement. She believes that by forcing students to submit additional applications, the rule would impose significant burdens on students, colleges and universities, and USCIS, which already has extensive immigration backlogs.

Educators view the proposed rule as an example of government overreach. "The proposal represents a dangerous overreach by government into academia, as it would give USCIS oversight over decisions that have long been the domain of academia, including changes to a student's course of study and to their level of study," said Fanta Aw, Executive Director and CEO of NAFSA: Association of International Educators, in a statement. "International students and exchange visitors are already rigorously tracked in the SEVIS database and are the most closely monitored nonimmigrants in the country."

"Government interference into the academic realm in this way introduces a wholly unnecessary and new level of uncertainty to international student experience in the United States as degree completion is now highly unpredictable," said Aw. "It will certainly act as an additional deterrent to international students choosing to study in the United States, to the detriment of American economies, innovation and global competitiveness."

**Sponsoring Students For Permanent Residents**

Today, universities (and others) may choose to sponsor a graduate student for permanent residence. It makes sense to start the process early, given that it can take years to complete. The proposed rule raises concerns that if an individual is sponsored for permanent residence, whether by an employer or a spouse, they may be considered an intended immigrant when applying for an extension and be denied. That would be another argument against finalizing the rule. If the rule is finalized, DHS should clarify that it does not intend to deny extension applications for individuals who have been sponsored for permanent residence.

**Eliminating Deference**

During Donald Trump's first term, USCIS ended deference to prior findings of fact for adjudications, which contributed to a dramatic increase in Requests for Evidence and a significant rise in denials for H-1B extensions. This led to many longtime employees of companies leaving the United States when USCIS adjudicators rejected their H-1B applications. The H-1B rule finalized by the Biden administration in December 2024 codified deference, and, at the time, attorneys and employers viewed it as a way to improve USCIS operations.

The proposed rule on duration of status eliminates the deference provision and cloaks the significant change in bureaucratic language.

As Nancy Morowitz of Fragomen points out, the current 8 CFR 214.1(c)(5) with the discretion language states: "***Deference to prior USCIS determinations of eligibility.*** When adjudicating a request filed on Form I-129 involving the same parties and the same underlying facts, USCIS gives deference to its prior determination of the petitioner's, applicant's, or beneficiary's eligibility. However, USCIS need not give deference to a prior approval if: there was a material error involved with a prior approval; there has been a material change in circumstances or eligibility requirements; or there is new, material information that adversely impacts the petitioner's, applicant's, or beneficiary's eligibility."

That section would be replaced with the proposed: "**(5)** ***Decisions for extension of stay applications***. Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at USCIS's discretion. The denial of an application for extension of stay may not be appealed."

The regulatory preamble in the proposed rule masks this alteration by characterizing it as a minor technical change related to forms. The preamble reads: "Like the technical updates to strike the specific form name from 8 CFR 214.1(c)(2), DHS is proposing to strike the references to Forms 'I-129' and 'I-539' in 8 CFR 214.1(c)(5), replacing those specific form numbers with the aforementioned general language. See proposed 8 CFR 214.1(c)(5). The substance of that provision, including the language that does not allow an alien to appeal an EOS denial would remain the same."

Eliminating deference is unwarranted and will lead to increased bureaucracy and expenses for employers.

Sincerely,

[Signature Redacted]

Stuart Anderson
Executive Director
National Foundation for American Policy

# EXHIBIT 41

# Comment on DHS Docket No. ICEB-2025-0001: Proposed Rule to End "Duration of Status" for F, J, and I Visas

As someone who believes that it is important that the United States prosper and maintain its global hegemony, I object to DHS's proposed rule *"Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media"*. This rule would replace the current "duration of status" framework with fixed visa time limits, adding regulatory friction that would harm U.S. economic interests and global competitiveness while doing little to enhance national security. In short, the effects of Docket No. ICEB-2025-0001 would be as follows:

- **Deterrence of International Talent**: The 4-year cap and added hurdles will deter international students from choosing U.S. universities, costing billions in tuition and local spending and stifling innovation. International students contributed **$43.8 billion to the U.S. economy in 2023-2024 and supported 378,000 jobs**. Public universities alone received over **$9 billion (28% of their tuition revenue) from international students in one year**, revenue that helps fund programs and scholarships for domestic students. Losing these students means lost funding, fewer research breakthroughs, and fewer American jobs.

- **Burden on Graduate Programs**: A rigid 4-year limit ignores the reality of doctoral and other long-term programs. Ph.D. students take on average **~5.7 years after starting their doctorate to earn their degree**. Nearly every Ph.D. student would be forced to file at least one extension under the rule, adding cost (roughly $500 in fees per extension, and several hundreds to thousands in airfares) and uncertainty that could derail their research. In practice, this unnecessary friction would risk driving talented researchers to other countries or discouraging them from enrolling at all.

- **Minimal Security Benefit**: The proposed rule's national security justification is unconvincing. Almost all international students comply with visa rules and do not pose security threats, and they are already **among the most tracked visitors in the U.S. via the SEVIS monitoring system**. DHS's own data shows that the F-1 student overstay rate is about 2.7% in 2023, a figure which is plausibly overstated due to data lags and status changes. In fact, DHS reported that suspected student overstay counts dropped 42% after 15 months as records were updated. Documented cases of fraud (e.g. fake schools or "forever students") are extremely rare and dealt through existing enforcement. Punishing over a million law-abiding students to potentially catch a tiny number (dozens out of 1.1 million)

is an inefficient and heavy-handed approach that will not meaningfully improve security. Bad actors, if any, can be addressed with targeted measures, rather than a blanket rule that treats every international scholar with suspicion.

- **Erosion of U.S. Soft Power & Competitiveness**: Perhaps most importantly, curtailing international student flows will undermine U.S. soft power and **accelerate a global "brain drain" away from America**. U.S. higher education has long been a pillar of the United States international influence, and as of 2024, **70 current world leaders from 58 countries were educated in the United States**. These relationships foster goodwill and international collaboration. If talented students instead choose Canada, the U.K., Australia, or China (all of whom are eagerly attracting global talent with friendlier policies), the U.S. will forfeit its edge. Notably, the U.S. has already **lost 20% of its global share of international students since 2000 to competitor countries**. Canada, for example, now hosts over 1 million international students after creating streamlined pathways from study to residency. The proposed rule would further tip the scales by making U.S. study and career pathways even harder. It would also hamper America's innovation pipeline, as international students, while just 5% of the student population, earn **nearly half of all U.S. STEM master's and PhD degrees** and have founded or co-founded **25% of U.S. billion-dollar startup companies (143 of 582 unicorns)**. Those unicorn companies founded by former international students have each created an average of 860 U.S. jobs, with total estimates exceeding 123,000. We risk losing the next generation of job-creating innovators to our foreign competitors if we send a message that they are not welcome or trusted here.

For these reasons, I urge DHS to **withdraw or substantially revise** the proposed rule. Below, I provide detailed comments organized by issue and propose alternative solutions that would address DHS's concerns **without sacrificing our economic and academic interests**.

## § 214.1(b): Imposing a Four-Year Limit on F-1 Student Visas

**Problem**: The rule would cap F-1 student admissions to the length of their program, not to exceed four years. This one-size-fits-all limit fails to accommodate legitimate long-term study and will deter many prospective students. Research programs often exceed four years, and even undergraduate or master's students may need extra time due to dual degrees, co-ops, or unforeseen delays. Under the proposal, any student in a program longer than 4 years (or who needs more time) must file for an extension

partway through their studies, introducing risk and cost that do not exist under the current Duration of Status (D/S) policy.

**Impacts on Ph.D. and Long Programs**: The average doctoral program duration far exceeds four years. Recent National Science Foundation data show that in 2023 doctoral recipients spent ~5.7 years from the start of their PhD program to completion on average, and median times in many fields are 6+ years (e.g. 6.8 years in humanities, 5.7 in biosciences). It is the norm, not the exception, for a Ph.D. to take five to seven years. Imposing a 4-year cutoff means virtually every international Ph.D. student will face at least one, if not multiple, visa renewal hurdles. This is akin to forcing a mid-program re-application for permission to continue, something domestic students never endure. The uncertainty of obtaining an extension (and fear of a denial that could abruptly end one's studies) will discourage top international candidates from enrolling in U.S. Ph.D. programs. Universities could lose out on talented researchers who drive innovation in STEM labs and beyond. As one analysis warns, "the competition for the world's best and brightest is increasing" and the U.S. "cannot afford to lose international students' meaningful positive impact on … STEM-related research and innovation." In practical terms, a 4-year limit undermines multi-year research projects and training grants, and places needless administrative stress on students who should be focused on their research, not on paper-pushing to justify their stay.

**Broader Deterrent Effect:** Even for undergraduates or master's students, the message sent by a fixed short duration is negative. International students highly value stability and a clear pathway to complete their education. Knowing that "DHS could force me to leave after 4 years regardless of whether my degree is done" will make the U.S. comparatively less attractive. The rule explicitly aims to "limit the amount of time certain visa holders are allowed to remain"; such language and policy signal a fundamentally less welcoming stance. Meanwhile, peer countries are emphasizing the opposite: for example, Canada and Australia offer student visas that cover the full program length and often allow easy extensions or post-study work opportunities. The proposed U.S. rule, by contrast, would create fear of disruption. Students might worry: "What if my program runs long or I need an extra semester? Will I be kicked out?" This uncertainty alone can lead many to opt for universities in other countries where their education timeline is not arbitrarily capped. It is difficult to quantify exactly how many prospective students might be deterred, but recent history is instructive: During 2017–2019, when U.S. immigration policies grew more restrictive (travel bans, visa delays, etc.), new international student enrollment declined markedly. Some experts are warning that 2025 could see a significant downturn again, especially if policies like this rule go into effect. **Each percentage drop in international enrollment can cost the U.S.**

**economy hundreds of millions of dollars in lost tuition and local spending**, not to mention the loss of cultural and academic contributions on campuses.

**Economic Stakes:** International students are not just classroom guests; they are an economic engine for universities and communities. In the 2023–24 academic year, **1.1 million international students contributed $43.8 billion to the U.S. economy** through tuition and living expenses. For every 3 international students, 1 U.S. job is supported in sectors like education, housing, retail, and healthcare. Public colleges heavily rely on foreign students' tuition; in 2015, public universities took in over **$9 billion from international student tuition and fees, about 28% of their total tuition revenue**. This revenue often subsidizes and expands opportunities for domestic students. Studies indicate that schools use the added funds to **keep tuition lower for in-state students and to increase domestic enrollment capacity**. For example, one analysis found that the fees from international students effectively "bail out" public universities, allowing more spots for local students and funding various programs. If stricter rules cause a significant drop in international enrollments, universities could face budget shortfalls, potentially passing costs onto American families or cutting programs. Moreover, many graduate programs (especially in STEM fields) depend on international student enrollment to sustain course offerings and research projects. Fewer international grad students can mean smaller or canceled programs, which hurts the U.S. academic research enterprise.

**Innovation and Talent Loss:** International students are often among the top performers and innovators. They fuel our research labs and even future industries. Notably, **45% of all Master's and PhDs in STEM fields awarded by U.S. universities in recent years have gone to international students**. These are highly skilled individuals in artificial intelligence, biotechnology, natural sciences, and other critical areas; they are the very fields where the U.S. faces intense global competition. Making it harder for such talent to study and stay here is essentially handing the competitors of the U.S. a gift. Many of these students would otherwise stay and join the U.S. workforce, contributing to our innovation economy. In fact, when international graduates are able to remain and work in the U.S., **they create jobs and even start new businesses at high rates**. A quarter of America's billion-dollar startup companies (the "unicorns") were founded by someone who first came to the U.S. as an international student. These immigrant-founded unicorns have collectively created tens of thousands of jobs (an average of 860 jobs per company) and include household names like SpaceX and Stripe. By limiting student visas arbitrarily, we may forfeit the next Elon Musk or Sergey Brin from launching their big idea on U.S. soil. Instead, they may take their genius to more hospitable shores.

### Recommendation

**Match Visa Duration to Program Length Plus Buffer**: Rather than a hard 4-year cap, DHS should consider admitting students for the full length of their academic program as indicated by their Form I-20 or DS-2019, plus a modest buffer period (e.g. 1 extra year) to account for reasonable delays or academic extensions. For example, if a Ph.D. program is officially 5 years, the student's visa/status could be admitted for 6 years. This would align the immigration timeline with academic reality, ensuring bona fide students can complete their studies without the disruption of a premature expiration. Such an approach would still allow DHS to set an upper bound (preventing truly indefinite stays) but would drastically reduce the number of extension filings to only those who genuinely need significantly more time. If DHS is concerned about undue program switching or "forever students," it could impose reasonable limits on how many times a student can change degree levels or programs without departing, instead of truncating everyone's stay arbitrarily. In short, the policy should facilitate, not frustrate, the completion of studies for legitimate students. The default assumption should be that an admitted student is allowed to finish the education they came for, barring any violation of status. This honors the spirit of academic exchange and keeps the U.S. competitive for top talent.

## Extension of Stay Criteria and Administrative Burdens

**Problem**: Under the proposed rule, any F-1 or J-1 who needs to stay beyond the initial period (max 4 years) must file an extension of stay application with USCIS, submitting biometrics, proof of finances, and proof of ongoing eligibility. The rule adds that even graduate students in F-1 status would be barred from changing their educational program or level except through this extension process (and possibly not at all, per the academic progression restrictions). Additionally, the rule would shorten the post-completion grace period from 60 to 30 days and provide no grace period at all if an extension is denied, meaning immediate departure is required (source). **These changes introduce tremendous administrative burdens and uncertainty for students, schools, and the immigration system itself.**

**Burden on Students:** Filing a Form I-539 extension is not a trivial matter. It currently involves a $470 USCIS filing fee (paper filing) plus a biometrics fee (around $30), which will likely total around $500 per application. Many international students already make large financial commitments by paying higher tuition and living expenses; an extra $500 "visa toll" partway through their program is significant. Moreover, students must gather extensive documentation for each extension: updated proof of full-time enrollment and good academic standing, evidence of sufficient financial support for the remaining period, a new endorsement from their school's international office, etc. This

is essentially re-applying for the same status they were already vetted for, which is redundant and time-consuming. It shifts focus away from academics. Imagine a Ph.D. candidate juggling lab work and teaching, now having to compile immigration paperwork and attend a biometric appointment in the middle of the semester. The stress and anxiety cannot be overstated: until the extension is approved, the student's future is in limbo. According to USCIS guidance, a student can remain in the U.S. for up to 240 days while an I-539 extension is pending, but if that pending period runs into their next semester, how can they confidently continue investing in their research or coursework? A single bureaucratic delay or error could derail their degree. And if, worst-case, the extension is denied after their initial status has expired, the rule provides a zero grace period as the student would become immediately deportable. **This draconian policy means a student could invest 4+ years in a graduate degree, only to be told "leave at once" due to a paper filing issue or an USCIS officer's discretion.** The risk of such an outcome, even if small, will hang over every extension applicant and is likely to scare away many would-be students from even starting programs that might exceed the fixed period.

**Burden on Universities**: U.S. schools will also shoulder new workload and uncertainty. International student advisors (Designated School Officials, DSOs) would need to assist perhaps tens of thousands of extension applications each year across the country. Instead of the current D/S system, where schools report in SEVIS each semester that a student is enrolled and making normal progress, DSOs would now have to help assemble extension packets, issue updated I-20s with extended program dates, and often coordinate with students' lawyers or directly handle questions about the extension. This is a massive unfunded mandate on universities. Many campus international offices are already stretched thin; diverting staff to handle frequent extension filings means less bandwidth to support students' educational and cultural adjustment needs. Notably, the President's Alliance on Higher Education and Immigration (a coalition of universities) has warned that the rule **"will burden schools and students"_ and indeed deter foreign students and scholars from coming**. The administrative burden also extends to USCIS itself, as adjudicating these extensions will require significant staff time and resources. DHS must consider: is this heavy paperwork cycle justified by tangible benefits? Or does it simply create a new bottleneck and potential backlogs in the immigration system?

**Processing Delays and Uncertainty**: Current USCIS processing times for I-539 vary, but are often several months. If thousands of F-1 extensions flood in each year (many concentrated at the end of academic terms), delays are inevitable. The student may have to apply while still unsure of their remaining program needs (e.g., a fourth-year student might not know if they need 1 or 2 more years until closer to year 5, but they'd have to apply in year 4 anyway). Multiple sequential extensions could be needed if the first

extension granted is not for the full remaining time requested, or if the student's research goes longer than expected. Each cycle repeats the cost, paperwork, and nerve-wracking wait. Importantly, if a student's extension is denied or significantly delayed, it can also hurt the research projects and faculty mentors depending on that student's work. **U.S. labs could lose key team members abruptly, jeopardizing grants and progress. In sum, the extension requirement is a recipe for friction that undermines academic continuity.**

**On Specific Concerns, Grace Period and Unlawful Presence:** Shortening the grace period from 60 to 30 days upon completion of studies is problematic. Sixty days was already a short window for students to wrap up their affairs, attend commencement, say goodbye, or apply for next steps (like OPT, a new program, or returning back). Cutting it to 30 days increases the chance of accidental overstay, especially if travel arrangements face hiccups. More critically, eliminating any grace period after an extension denial is punitive. Under current D/S, a student whose program ended or visa status ended due to completion/expiration isn't immediately counted as "unlawfully present," they had some flexibility. Under the proposal, if an extension is denied, the student is not just out of status but immediately accruing unlawful presence the day after denial. Accruing over 180 days of unlawful presence makes one subject to 3- or 10-year reentry bans under immigration law. So a student could unknowingly tumble into a situation that bars them from returning to the U.S. for years, even to visit or do business, simply because an extension got denied and they couldn't depart overnight. **This is an unduly harsh consequence for someone whose only "fault" was needing more time to study.**

## Recommendation

**Streamlined Oversight in Lieu of Extensions**: If DHS's goal is to have more check-ins on student progress (as stated, to "enhance DHS oversight" and avoid letting students stay indefinitely without review), there are less burdensome alternatives than requiring formal USCIS extensions. For instance, **DHS could implement a periodic verification system via SEVIS** where students and schools could confirm each year (or each semester beyond year 4) that the student is still enrolled full-time and making progress. In fact, such reporting already happens in SEVIS to a large extent; DSOs must update student status each term. DHS might choose to augment this by requiring an extra attestation from the DSO for students exceeding a certain time (say 4 years for undergrad, 6 years for PhD) that the student is in good standing and needs the additional time. This would keep the government informed without forcing every student into a formal extension adjudication. Another approach: if extensions are deemed absolutely necessary, make the process as simple and guaranteed as possible for bona fide students. For example, waive biometrics and interview for students who have no violations and are just continuing studies; allow premium (expedited) processing either for free or a nominal fee so that

students get decisions quickly and can plan accordingly; and approve extensions in multi-year increments (e.g. give PhD students 4 extra years in one go if the DSO certifies that is the normal remaining time needed) instead of year-by-year. At minimum, maintain the 60-day grace period after program completion, and provide a short grace period (e.g. 30 days) after an extension denial so that a student can depart in an orderly fashion rather than under panic. These tweaks would greatly reduce the chaos and hardship that the current proposal's extension scheme could cause. They would also still meet DHS's oversight goals: the Department would get periodic confirmation of status and an updated end date, without shutting the door on talented students who simply need a bit more time to finish their degree.

## National Security and Compliance: Misaligned Solutions to a Limited Problem

**DHS's Stated Rationale:** The Notice of Proposed Rulemaking (NPRM) and DHS press releases suggest that eliminating D/S and imposing fixed terms is needed to reduce visa abuse, prevent overstays, and address national security concerns by ensuring more frequent vetting . The implication is that the current system allows foreign students to stay indefinitely and potentially engage in misconduct without oversight. However, the factual evidence does not support the notion that international students en masse are abusing their visas or pose a security threat. On the contrary, **the data shows high rates of compliance and existing robust monitoring, meaning the proposed cure is disproportionate to the ailment.**

**Overstay Rates Are Low**: According to DHS's own Entry/Exit Overstay Report, the **suspected in-country overstay rate for F-1 students in FY2023 was 2.69%**. This means roughly 97% of F-1 students departed on time or transitioned to a legal status. And even the 2.69% figure is acknowledged by DHS to be an overestimate of actual violators. Many of those counted as "overstays" are in fact students who changed to another status (H-1B workers, permanent residents, etc.) or departed via land borders where exit isn't captured. DHS itself found that with more time to update records, the apparent "overstay" numbers dropped dramatically; by **42% over a 15-month update period for F, J, M visas**. In short, the vast majority of students follow the rules, and the current system eventually accounts for most of those who initially appeared to overstay. A roughly 2–3% gap (likely even smaller in reality) does not warrant a sweeping overhaul that burdens 100% of students. Those few who truly overstay or violate terms can and should be handled via targeted enforcement (e.g. termination of SEVIS record, removal proceedings if encountered). Indeed, **mechanisms already exist**: if a student fails to enroll or drops out, their SEVIS record is terminated and they are out of status. ICE and CBP can investigate and remove individuals who willfully overstay. The proposed fixed term adds nothing new to catch willful violators. Someone intent on overstaying their visa could

just as well do so after a 4-year expiration as they could under D/S. The key to preventing overstays is better information and tracking, not shortening lawful stay for everyone. As NAFSA has argued, improving DHS's intra-agency data sharing and statistical accuracy would help identify problem cases without painting all students with a broad brush.

**"Forever Students" and Fraudulent Schools are rare outliers**: DHS commentary claims some foreigners exploit D/S to become "perpetual students" or that fraudulent schools admit sham students. In reality, such cases are exceedingly rare and already addressed by existing regulations. To maintain F-1 status, a student must pursue a full course of study and make normal progress. Universities are required to ensure this, and they report to DHS if a student falls out of status. As noted by international education experts, "International students are the most tracked nonimmigrants in the United States. Certified schools … report on students' status throughout their period of study. Enforcement mechanisms are in place to address students who violate status." The idea of someone hiding out indefinitely as a student is far-fetched under the current SEVIS oversight. Yes, there have been a handful of scandals with sham institutions (so-called "visa mills"), but documented examples of fraudulent schools are extremely rare. ICE's SEVP already has a certification process to vet schools and can (and has) shut down those that violate the rules. **It's important not to conflate these isolated incidents with the 99% of legitimate colleges and genuine students.** We should not, as the saying goes, "kill a fly with a sledgehammer." The proposed rule is a sledgehammer that strikes all students and schools, despite the fact that the system's integrity issues are limited to a tiny minority of bad actors that can be dealt with through targeted actions (e.g., more frequent audits of schools with suspiciously low attendance or high transfer-out rates).

**National Security Concerns**: DHS cites national security, alluding that more frequent vetting could catch spies or terrorists posing as students. Of course, protecting national security is paramount, but there is scant evidence that the D/S system has been exploited in this way on any significant scale. Students already undergo background checks for their visa issuance. If new intelligence emerges on a particular individual, DHS has authority to investigate or even revoke status (as apparently happened in 2025 with the State Department's mass visa revocations over alleged ties to protests). Those actions, while arguably overbroad, show that the government can already take security-related action without needing an automatic visa expiry. **It is unclear how forcing students to file extensions every few years makes us safer.** A true threat actor (e.g. a foreign intelligence agent) could easily plan their activities within a 4-year window or file an extension with perfectly clean paperwork. Meanwhile, thousands of innocent students would be treated as potential threats by default, subject to extra screenings for an extension. It's a lot of security theater with high collateral cost. Notably, a recent sweep by DHS of international student records (running over a million names through a

criminal database) resulted in thousands of SEVIS terminations for minor or irrelevant infractions (like old traffic tickets) and sparked dozens of lawsuits . This illustrates that casting a wider net (more checks, more vetting) can ensnare many false positives, i.e., students who posed no danger yet suffered great harm to their studies and lives. The proposed rule's blanket approach risks similar outcomes: treating everyone with suspicion will inevitably punish the innocent majority.

### Recommendation

**Focus on Data and Bad Actors, Not Broad Limits**: If national security and compliance are the concern, DHS should invest in better data integration and inter-agency communication to track student visa holders, rather than eliminate D/S. For example, improving real-time updates between SEVIS and CBP entry/exit data could more quickly flag true overstays without ending D/S. DHS's own experts have noted the need to "ensure statistical integrity and accuracy" in understanding student visa outcomes, which is a far more constructive solution than cutting all visas short. Targeted measures could include: conducting periodic reviews of institutions that host large numbers of international students to ensure they're complying with reporting (most do); strengthening penalties for the few "visa mills" rather than burdening bona fide schools; and continuing to use the existing tools (like visa revocation or denial of future visas) against individuals who do show derogatory information. DHS could also consider requiring one additional security check at a midpoint (for instance, a mandatory SEVIS validation around year 4 for longer programs) where the student answers a few basic questions or updates address/employer information, without requiring a full visa extension application. This would provide an extra touchpoint for security screening but would be far less onerous than the full extension regime. In essence, the Department can achieve the oversight it seeks by narrowly focusing on the small problem areas, not by overhauling the entire system to the detriment of our educational interests. The current D/S system has worked for decades; even DHS operated under it for many years with improvements in SEVIS after 9/11. Unless there is clear evidence of a systemic security gap (which has not been demonstrated in the NPRM), a regulatory sledgehammer is unwarranted.

## U.S. Soft Power and Global Talent Competition

**Impact on Soft Power**: The international students who come to America don't just bring brainpower, they also become informal ambassadors of American values and culture. For generations, U.S. universities educated future leaders of countries around the world, fostering goodwill and understanding. As noted, **70 sitting heads of state or government were educated in the U.S. as of 2024**. This is a tremendous soft power asset; those leaders are likely to have a positive disposition towards the U.S., having lived here

and forged connections. If onerous visa rules turn away the next wave of global leaders, the U.S. risks losing that influence. Competitor nations are acutely aware of this dynamic and are ramping up their own international education efforts. The proposed rule would unfortunately signal a retreat by the U.S. in the arena of international education exchange, ceding ground to others.

**Global Competition for Talent:** Countries like Canada, the U.K., Australia, and even China have developed strategies to attract top international students, often explicitly marketing themselves as friendlier alternatives to the U.S. For example, Canada offers an easy path from student visa to work permit to permanent residency, making it very attractive to ambitious students who want to build a life where they study . The results speak for themselves: Canada's international student population surpassed 1 million in 2023, a huge increase that coincided with U.S. stricter policies in past years. Australia and the U.K. have also grown their international enrollments after introducing post-study work visas and other incentives. Meanwhile, by some analyses, the U.S. share of globally mobile students has fallen from ~28% in 2000 to about 22% today . That is a significant loss of market share in a field we used to dominate. The **proposed fixed-term rule would likely exacerbate this trend**, as students who receive offers from multiple countries may choose the option with less visa uncertainty. A talented student from India or Nigeria might think: "If I go to the U.S., I might have to leave in the middle of my PhD. But if I go to Canada or Germany, I can stay through graduation and maybe settle there." We have to recognize that international students have choices, and policies perceived as restrictive or hostile will tip decisions away from the U.S. The American Association of Universities (AAU) recently highlighted that international students contributed a record **$44 billion last year** and cautioned that "we cannot be complacent" as other countries vie for these students. Proposals like this one risk exactly that complacency or worse, an unforced error undermining our competitive advantage in higher education.

**Brain Drain in Reverse**: The U.S. has historically benefited from a "brain gain" as many of the world's top students come here and often stay to become U.S. scientists, engineers, physicians, and entrepreneurs. This fuels our innovation economy and workforce. But our immigration policies have not kept up with this advantage (for instance, there is still no direct green card pathway for PhD graduates in needed fields). Imposing new barriers at the front end (the student visa stage) will compound the problem by reducing the "pipeline" of talent entering the U.S. A recent study noted that more international graduates are now leaving the U.S. after graduation due to limited visa options, and more prospective students plan only a short-term stay, while countries like Canada scoop them up. If we also discourage them at the admission stage, we essentially create a talent drain where the brightest minds take their skills elsewhere. This does not only harm

universities; U.S. employers in sectors from tech to healthcare suffer. (It's worth noting that **foreign-born graduates are crucial in healthcare, comprising a quarter of U.S. doctors**, often serving in underserved areas. We need more such talent, not less, especially given domestic skill shortages in STEM and medicine.)

**Reputation and Goodwill**: International education is a key facet of U.S. diplomacy and image abroad. Policies that are viewed as anti-student or excessively bureaucratic send a message that the U.S. is closing its doors. Past proposals to end D/S in 2020 drew over 32,000 public comments overwhelmingly opposing the change, indicating broad consensus that it would harm U.S. interests and hospitality. If this rule goes into effect, foreign publics may interpret it as unwelcoming. That has intangible but real costs: fewer international collaborations, fewer American-educated alumni abroad who act as bridges between countries, and potentially a view that the U.S. is turning inward. Especially given that the rule explicitly targets _only_ certain visa categories (students, exchange visitors, foreign media), it could be seen as singling out international students as suspicious. This is the opposite of the message we should project if we want to attract global talent and friends.

### Recommendation

**Strengthen, Don't Weaken, the U.S. as a Magnet for Talent**: Rather than implementing this restrictive rule, DHS (and the U.S. government broadly) should be looking for ways to streamline and enhance the experience for international students. Some ideas include: reinstating or codifying Duration of Status so that bona fide students can focus on studies; expanding dual intent for student visas (so applicants aren't presumed guilty for wanting to eventually work here); and creating pathways for top graduates to stay (e.g. an automatic work authorization or expedited green card for STEM PhDs). These positive steps would bolster America's ability to recruit the top 1% of students worldwide, who in turn create jobs and innovation here. At minimum, DHS should avoid adding friction where it isn't necessary. If there are concerns about specific countries or programs (the NPRM alludes to possible shorter limits for certain groups, like 2-year limit for some language programs), those can be addressed in narrow ways (for instance, extra scrutiny on unaccredited language schools) rather than a broad-brush 4-year rule. The U.S. benefits enormously from being the destination of choice for ambitious students globally, **a status that took decades to build through our institutions' excellence and openness.** We should not undercut that competitive advantage with policies that yield little benefit and carry high costs. As one coalition put it, "unfairly targeting [international students] puts [U.S.] leadership at risk." **The smarter policy path is to fix genuine problems (fraud, security vetting) with precise tools while keeping the welcome mat out for the world's future innovators and leaders**.

## Conclusion

In conclusion, the proposed elimination of Duration of Status and imposition of fixed admission periods for F-1/J-1 students is a **misguided approach that would do far more harm than good**. It would deter talented individuals who contribute to our economy and society, burden educational institutions and students with red tape, and damage America's standing as a global leader in higher education, all while not significantly enhancing security or immigration compliance. The rule risks "shooting ourselves in the foot" by undermining the very goals (economic growth, innovation, global competitiveness) that the United States should be striving to bolster.

I strongly urge DHS to withdraw or significantly revise this proposed rule. If the Department believes changes are needed to address specific issues, I encourage a fresh dialogue with stakeholders (universities, student groups, security experts) to develop solutions that are targeted and evidence-based. For example, improved data tracking, sensible limits on truly long-term study without progress, and enhanced interagency vetting for known risks could all be pursued without ending the Duration of Status framework that has served the U.S. well for decades. At a minimum, if moving forward, DHS should seriously consider the alternative recommendations mentioned: aligning admission period with program length, simplifying any required extensions, preserving grace periods, and mitigating the harsh consequences of status lapses.

Finally, I want to emphasize a positive vision: International students are not a problem to be managed; they are an asset to be welcomed. They enrich U.S. classrooms, spur discoveries, create jobs, and forge lifelong ties between their homelands and the United States. As one study aptly noted, "international students' contributions to the U.S. are significant and multi-faceted," economically, academically, and culturally. Let us not through policy changes inadvertently turn those contributions away. I respectfully request DHS to maintain a policy environment that continues to attract and retain the best and brightest to our shores, which is clearly in the national interest.

I appreciate the opportunity to comment on this proposal. Thank you for considering these views and data as you evaluate the path forward on this important issue.