# EXHIBIT 44

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment?filter=ICEB-2025-0001-4931)

Share

PUBLIC SUBMISSION

# Unrelated Comment Submitted by Anonymous

Posted by the **Immigration and Customs Enforcement Bureau** on Sep 8, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

Comment on rule ICEB-2025-0001:

(1) Introduction
As an individual who has worked and studied within academic communities in the United States, I am deeply concerned about the proposed rule establishing a fixed time of admission for nonimmigrant academic students. I have seen the essential role they play in advancing scientific innovation, enriching classroom discussions, and strengthening international collaboration. This personal and professional exposure informs my perspective that the proposed changes will be harmful not only to international visitors but also to the U.S. itself.

(2) Background
I am specifically commenting on the removal of D/S and its replacement with fixed terms of admission. This shift would alter a long-standing, flexible policy that has successfully governed the stay of international students, exchange visitors, and journalists for decades.

(3) Analysis
The proposed rule would have several negative consequences:
•Academic and Research Disruption: Many degree programs, particularly Ph.D. and other advanced research tracks, often take longer than four years to complete due to the unpredictable nature of research. Fixed time limits create uncertainty and unnecessary bureaucratic hurdles, disrupting both individual academic progress and the broader research ecosystem. International students contribute significantly to U.S. STEM innovation. In the 2021-2022 academic year, U.S. nonresidents make up 36.5% of the population pursuing master's degrees in STEM and 45.8% of the Doctor's degree pursuing population in STEM (National Center for Education Statistics, 2024). Introducing rigid expiration dates risks undermining this contribution.
•Burden on the Universities' Finances and the Economy: This rule not just affects the international students who are currently enrolled in U.S. institutions, it also highly discourages international students to apply and

Give Feedback

enroll in U.S. universities. However, international students a re a crucial source of tuition revenue because they typically pay full, unsubsidized tuition. In the 2023–2024 academic year alone, international students contributed $43.8 billion to the U.S. economy and supported 378,000 jobs (NAFSA, 2024. Link: https://www.nafsa.org/about/about-nafsa/international-students-contribute-record-breaking-level-spending-and-378000-jobs). Even a modest 10% decline in enrollment would cost U.S. institutions an estimated $3 billion in total revenue, including $900 million in tuition losses (The Financial Times, 2025. Link: https://www.insidehighered.com/news/quick-takes/2025/07/10/10-drop-intl-students-would-cause-billions-revenue-losses?utm_source=chatgpt.com). This impact is especially severe at institutions where international graduate students make up a large share of enrollment, as their tuition often helps subsidize financial aid for domestic students, supports faculty research, and sustains academic programs.

•Administrative Burden on DHS and Universities: The rule will dramatically increase the number of extension applications submitted to USCIS, creating delays and higher costs. Universities will also be forced to divert resources toward managing compliance paperwork instead of supporting students' academic and professional development.

•Unintended Consequences for U.S. Competitiveness: The U.S. has historically been the global leader in attracting top international talent, especially in the STEM fields. By creating barriers and uncertainty, this rule incentivizes prospective students and scholars to choose other countries with more welcoming policies. A decline in international enrollment would reduce the competitiveness of the U.S. institutions and make the U.S. lose its leadership position in STEM research.

•Misaligned Security Concerns: The agency suggests that fixed admission periods are necessary to enhance security and monitoring. However, there is no evidence that D/S has led to widespread noncompliance or security risks. Current systems, such as SEVIS, already provide robust monitoring mechanisms without undermining academic continuity.

(4) Recommendations

I strongly recommend that the agency:

1.Withdraw the proposed rule and preserve the current "duration of status" framework. This system has worked effectively for decades, balancing flexibility for students and exchange visitors with accountability for institutions.

2.Engage with stakeholders in higher education, research, and journalism to ensure that any regulatory adjustments are evidence-based and do not undermine U.S. competitiveness, security, or cultural exchange.

(5) Conclusion

In conclusion, the proposed elimination of "duration of status" and replacement with fixed time limits for F, J, and I visa holders will weaken the U.S. academically, economically, and culturally. I respectfully urge the agency to withdraw this rule and retain the current system, or at minimum, to consider less disruptive alternatives.

Give Feedback

**Comment ID**

ICEB-2025-0001-4931

**Tracking Number**

mf9-5491-nree

**Comment Details**

**Received Date**

Sep 6, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 45

UNIVERSITY OF MINNESOTA

***Duluth Campus***

***International Student Services***

*Office of Diversity and Inclusion*

*237 Kirby Student Center*
*1120 Kirby Drive*
*Duluth, Minnesota 55812-3085*
*Email: issumd@d.umn.edu*

September 26, 2025

Re: DHS Docket No. ICEB-2025-0001, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media

To Whom It May Concern:

Thank you for the opportunity to comment on the Department of Homeland Security's proposed rule: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (DHS Docket No. ICEB-2025-0001), published August 28, 2025. Our names are Anna Gilmore and Alexa Oleson and we respectively serve as a PDSO (Principle Designated School Official) and a DSO (Designated School Official) in the International Student Services office at the University of Minnesota Duluth (UMD). We are writing to express our concerns that this rule would hurt both domestic and international students, our campus, and our local economy. We strongly oppose this proposed rule, and suggest that DHS withdraw it in its entirety. We urge you to continue the current duration of status policy.

**International Student Contributions**

At UMD, we have students and exchange visitors from 35 different counties. These students contribute greatly to the classroom and enrich the learning environment for our domestic students. International students and exchange visitors provide domestic students with opportunities to enhance their knowledge of the world and encourage them to see things from a variety of perspectives; skills that will help all of our students to succeed in an increasingly globalized world. Many domestic students may never have the opportunity to travel outside of the U.S., but with international students in the classroom, they can still learn from and with people from countries other than their own. Our international students are not only excelling in the classroom, but they integrate into the campus community where they show up as student leaders, teaching and research assistants, mentors, tutors, and so much more. We are so lucky

to have an international population here at UMD, and we truly benefit from our international students and exchange visitors.

International students and exchange visitors contribute a great deal to our economy, on a national and local scale. Nationally, NAFSA's Economic Value Tool estimates that for the 2023-24 academic year, international students studying at colleges and universities contributed $43.8 billion and supported 378,175 jobs in the U.S. economy.[1] Locally, NAFSA calculated that UMD's international students contributed $6.1 million to the economy and supported 26 jobs.[2]

This proposed rule has the potential to disrupt these important contributions made by international students and exchange visitors. In this letter, we will go into greater detail and explain the expected negative impacts the proposed rule could have on student learning, university resources, USCIS processing times, and more.

**Common Sense Alternatives**

Increased numbers of international student and exchange visitors and DHS's ability to monitor them, along with concerns about fraud and abuse, are cited as a rationale for this rule. However, this group is already thoroughly vetted and the most highly tracked group of nonimmigrants in the country. From the point that international students apply for their visa, through their academic program and beyond to any employment or training they pursue, international student information is regularly updated and reviewed by international student services staff. As required, we regularly report student enrollment, changes to their program, changes in address, and details related to their employment and training as well as many other data points in SEVIS.

We have institutional academic policies as well as national immigration regulations in place to ensure that students are making sufficient and timely progress towards their degrees and that they are following immigration regulations. This wealth of detailed data and information from SEVIS, along with DHS's ability to request further information, such as that detailed in 8 CFR 214.3 that universities must retain, can be analyzed and utilized to attain DHS goals in a much more efficient way. Asking students to submit information during the extension process that is already tracked in SEVIS or retained by universities as required, is duplicative and a waste of resources.

Many of the concerns that are being used as evidence to support this proposed rule can be identified through data that is already collected in SEVIS, without needing to implement such harsh restrictions on students. In fact, the proposed rule uses data collected from SEVIS to make the very argument that fixed date admission is needed. DHS can use existing SEVIS

---

[1] NAFSA International Student Economic Value Tool https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2#main-content

[2] NAFSA International Student Economic Value Tool - Minnesota District 08 https://www.nafsa.org/isev/reports/district?year=2023&state=MN&district=08

data to help identify people who it suspects may not be maintaining their status and to investigate and request additional information as needed. DHS can also use the current school certification and recertification processes to identify and investigate schools that it suspects are not complying with regulatory requirements. There is no need to implement this costly and time consuming process when more targeted follow up procedures using the current methods for tracking and identifying international students would meet the DHS goals of deterring F, J, and I nonimmigrants and schools from engaging in fraud, give DHS information to detect national security concerns, and increase DHS's ability to detect those nonimmigrants who are not complying with the terms and conditions of their status.

**Costs**

The targeted follow up using SEVIS and other DHS data would be a more logical use of resources than the large time and cost burdens associated by this proposed rule. DHS estimates the rule would cost $86.3-$88.1 million for U.S. parties and $304-$304.3 million for non-U.S. parties. UMD has a small population of about 138 F-1 international students. Based on our student data from the past several years, we estimate that UMD international students would require about 38 Extension of Stay (EOS) applications per year at a cost of $15,960 to students based on the current online I-539 filing fee of $420. DHS also estimates that in the first year, Designated School Officials will require 67 hours to familiarize themselves with the rule and make adaptations (DHS estimating $3,342 per DSO) and that each extension application would require an estimated 3 hours of DSO advising (DHS estimating $233 for DSOs for each application). Given the 2 DSOs who would be heavily involved in this process, that adds up to an estimated cost of $15,538 in the first year for our university and $8,854 annually after that. The burden of both cost and time to our institution and students that this proposed rule will create is unnecessary. As a mid-sized institution with relatively low international student enrollment, this cost will be difficult for us to meet. Withdrawing this proposed rule will save our institution and others like it both time and money. As we previously noted, many of the security concerns brought up in this proposed rule can be addressed through use of data that is already collected, making the burden of this rule unnecessary.

If this rule were to take effect, our staff would be burdened with other additional tasks related to the change. We would need to update our website, make changes to both in-person and online orientations, create and update presentations, create forms and processes associated with these requests (Extension of Stay (EOS), changes to major, and more), change and edit the majority of our existing forms and processes (e.g. travel signatures, transfers, OPT applications, etc.), and educate campus partners who will be impacted by these changes and work with them to change current policies and processes. We will also need to connect students working on EOS applications to legal counsel for immigration advice and assistance with forms. Therefore, our task of advising F-1 international students will become even more complex and time consuming, both in terms of informing students and in terms of informing other campus partners who support them.

**USCIS Processing Concerns**

What's more, we are extremely concerned that if the proposed rule were implemented, these additional changes would only cause further delays in USCIS processing times. Based on previous experiences, we are particularly concerned that delays in USCIS processing time will adversely impact our international students and exchange visitors as well as our institution. Current USCIS estimated processing times for I-539 applications for extensions of stay for F, M, and J students are listed at 3.5 months[3]. However, we have seen instances in the past few years where students have had to wait more than a year for their I-539 applications to be processed by USCIS. We are concerned similar situations could arise, particularly with the influx of applications to USCIS that this proposed rule would cause, the additional biometric collection requirements, and potential requirement for someone filing the application to need to appear for an interview. The variation semester to semester and year to year of USCIS application processing times also creates a great deal of uncertainty and makes it difficult to plan effectively.

As of March 31, 2025, USCIS has a historically high total of more than 11.3 million pending cases[4], of which more than 4.9 million are considered backlogged and exceed the target level of pending cases and more than 34,000 are frontlogged and were unopened and not entered in the system.[5] During fiscal year 2024, USCIS received 253,876 I-539 applications to extend/change nonimmigrant status[6]. This proposed rule estimates an additional 414,000 applications would be added to that total. This increase in applications would contribute to the already high number of pending and backlogged/frontlogged applications and is also likely to further increase processing times.

**Unreasonable Time Limits**

Additionally, we are concerned that these time limits do not adequately reflect the amount of time it takes for many students to get a degree. The National Center for Educational Statistics found that the median time for completing a bachelor's degree was 52 months (4.33 years)[7]. The average time on the UMD campus for a new international student without previous college credit to complete their Bachelor degree is 4.32 years. Moreover, UMD offers several Bachelor degrees that require more than 120 credits to graduate and sometimes have very strict course sequencing, such as our Mechanical Engineering (BSME) degree which requires 129 credits. We also currently have two PhD programs, both enrolling international students, that require more than 4 years to complete. As of the 2024-24 academic year, the expected time to complete the Water Resources Sciences PhD program was 5.5 years, and the Integrated

---

[3] USCIS Check Case Processing Times https://egov.uscis.gov/processing-times/
[4] USCIS (2025) All USCIS Application and Form Types (Fiscal Year 2025, Quarter 2) https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx
[5] USCIS (2025) Net Backlog and Frontlog (Fiscal Year 2025, Quarter 2) https://www.uscis.gov/sites/default/files/document/data/net_backlog_frontlog_fy2025_q2.xlsx
[6] USCIS (2024) All USCIS Application and Form Types (Fiscal Year 2024, Quarter 4) https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx
[7] National Center for Education Statistics https://nces.ed.gov/fastfacts/display.asp?id=569

Bioscience PhD average time to degree was 5.9 years. Any international students in these PhD programs would require at least one EOS application just to complete their degree, not including any practical training they could be authorized for based on degree completion.

The end of duration of status adds additional uncertainty and hurdles for international students to be able to complete their degree. All students in our PhD programs and many of our Bachelor's degree level international students would need to apply for an extension of stay while they were in the midst of their program. This means that after several years of work towards their degree, and for most, investing thousands of dollars in their education, they may not be able to complete their program.

**Impact on International Student Enrollment**

Related to the above section, we are very concerned about the impact this rule is likely to have on international student enrollment in the U.S. and at our institution. With the added uncertainty caused by the implementation of this rule, some students are likely to pursue their education in other countries that can offer more certainty and less risk in their educational investment. We expect that students may choose to forgo a U.S. education altogether and instead pursue an education in another country that will be less of an educational and financial risk. While DHS may believe that "the proposed rule may have a marginal impact on nonimmigrant student enrollment," recent survey data says otherwise. The Institute for Progress and NAFSA: Association of International Educators recently conducted and survey and found that 49% of the international student respondents said they would not have enrolled in the first place if Duration of Status had been replaced with a fixed period of admission[8].

A decrease in international student enrollment of up to 49% would have severe financial impacts on our institution and would likely decrease the programs available to domestic students. For example, international students make up about ⅓ of enrollment in graduate programs UMN wide. A significant decrease in international students would likely cause some programs to be discontinued due to low enrollment. Additionally, international students contribute a great deal to our educational environment, the globalization of our campus, and to allowing our domestic students to learn about the world while studying in Minnesota.

**Limitations on Educational Objective Changes**

We are also concerned with the proposed limitations on educational objective changes: including all changes in educational objectives for graduate students, limitations on undergraduate students to change objectives or transfer in their first year of study, and the prohibition on students starting studies at the same or lower degree levels. These limitations are unnecessary and will hinder academic mobility that is a normal part of the educational process. As long as they are following the rules and maintaining their status, international

---

[8] Institute for Progress and NAFSA: Association of International Educators (2025, Sept. 15) https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf

students, like their domestic counterparts, should have the freedom to change their educational objectives as they learn and grow during their educational journey.

The proposal to limit graduate student change in educational objectives is offered without any reason provided, and runs counter to what are appropriate, justified educational paths and objectives. Almost 1 in 5 of our international graduate students complete their masters and then move on to a PhD program as part of their academic journey. We also have students each year who end up choosing to pursue two master's degrees. This is often related to the interdisciplinary nature of their research interests or because they decide another degree program is more suited to their educational and career objectives. They may also feel the need to transfer schools for various reasons: sometimes a research advisor they are working with leaves to work at another school, they decide the program they are pursuing is not a good match for them, or they conclude that UMD or Duluth is not a good fit for them personally.

It is very common for undergraduate students, both domestic and international, to decide in their first year of study that they would like to change their major or change the school they are attending. The majority of these students are young people who are learning about who they are and what they are interested in. Academic flexibility is one of the traits that makes education in the U.S. great, and it is one of the reasons we attract so many students. Compared to some other countries, students in the U.S. have great flexibility in changing their majors or choosing to pursue other academic interests. Like with domestic students, attending college helps to expose our undergraduate international students to new courses and areas of study, which can influence their decisions about what and where to study. Restricting changes in the whole first year of study is unreasonable and will also be burdensome for students and schools. There are many valid reasons a student may decide to change their major in their first year of study or decide to attend a different school. Keeping track of which students would be allowed to change their major or transfer out would be very challenging for institutions and would override existing academic policy for a subset of students at the institution. Academic advisors would need to continually check with international student advisors to see who is eligible for changing their major and who is not since this knowledge would require access to the student's SEVIS record. If immediate SEVIS transfers after someone has initially entered the country are a concern, then requiring a student to stay for one term at the initial school should be sufficient deterrent. The proposed rule requiring students to study for an entire year at the initial school without changing their major would be unfair to the pursuit of academia that we so cherish in this nation.

Additionally, combining this with the proposed end to duration of status would make it even more likely that students who do want to change their major or educational institution would be unable to graduate within the 4 year time limit. Students may decide they want to pursue a new major within their first term, but be forced to wait one year to formally change their major. In this case, it may take them even longer to complete their degree than if they had been able to change when they originally decided. This will also lead to increased extension of stay applications, creating more work for international student advisors and adding to the number of applications, and therefore backlog, that USCIS will need to process.

Prohibitions on starting degrees at the same or lower levels are overly restrictive. There are very legitimate reasons for a student to get a second degree at the same level or to change to a lower level. Some students may find that they are not academically ready for the rigors of study in their degree program and therefore would benefit from a semester or two of study at a community college, which gives them time to further develop their academic skills and/or may make sense for them financially. Often this allows them to continue to make progress towards their UMD degree since they are taking credits that are frequently transferable. As mentioned previously, we also have a number of students who decide to pursue two degrees at the same level due to their interests or career paths. This may happen for a variety of reasons. Students may begin a degree program and develop interests in other additional areas or may find that interdisciplinary approaches are needed to understand the real-world complexity inherent in their field. For example, in the last few years we have seen a number of students pursue both a Mathematical Sciences and a Computer Science degree because the areas complement each other. People researching or working in areas such as Artificial Intelligence often need strong backgrounds in both math and computer science. Lastly, some students complete their degree and then begin working in their field only to find that this is not a good fit for them and they would like to change career paths. It is common for a change in career paths to require a different degree. This degree may be at the same level or higher and it may also require them to pursue prerequisite classes at a lower level in order to be able to gain admission to the degree program. Again, it is this flexibility and ability for students to choose their own path that makes the U.S. such a popular place to study, and that speaks to our emphasis on academic freedom. To not only bring in great minds from around the world, but to allow them to develop in a variety of areas is what has contributed to our academic and research-dependent success so far.

**Academic Institution Policies and Decision Making**

The proposed rule does not adequately take into consideration that academic institutions are best placed to make decisions about whether a student is making adequate progress towards their degree. At UMD, we have rules and policies in place for academic standing because we want students to be successful in their program, and if they are not, to have a specified amount of time, usually 1 semester, to reflect and make needed changes. Students at UMD must have a GPA of 2.00 to be in good academic standing. Students who do not meet that requirement receive an academic warning. Generally during this time students are required to meet with their academic advisor, helping them assess the situation and come up with a plan to help them be more successful in their coursework. If things do not improve, the student is academically suspended.

Most of the students studying towards their Bachelor's degrees are young and are often in the midst of a time of big adjustments in their lives. Graduate students, while often more mature, are also adjusting to big changes as international students. Many international students are moving far from their families and support systems, perhaps for the first time in their life, adapting to new-found independence, navigating a totally new location, school, and educational

system, and are often studying in a language that is not their native tongue. There are many things for students to adjust to as well as unexpected challenges that come up along the way (e.g. changes in financial situation, health issues, etc.). Not allowing students who have had academic probation or suspension in the past to have an extension of their status fails to allow students a reasonable opportunity to complete their degree while learning and growing. If a school has evaluated the situation and believes the student can successfully finish their degree in a reasonable amount of time, the student should not be prevented from finishing a degree they have spent a significant amount of time and money on. For example, the academic probation may have been caused by a short-term situation the student has resolved, they may have developed additional time management or study skills that allow them to be successful in their degree program, or they may have changed to a new major that better matches their skills and talents.

**Impact on Employment**

This proposed rule also has the potential to impact employment for both students and schools. We appreciate that there is some automatic extension of employment authorization associated with this proposed rule, but there are still significant potential employment impacts that could arise. With a timely filed extension application, a student can receive an auto extension of their on-campus employment for 240 days. However, based on our experiences with USCIS in the past, processing times could exceed 8 months, interrupting student's ability to work on campus: depriving them of income they may depend on for living and academic expenses as well as disrupting teaching, research, and services at the university. Students engaged in Optional Practical Training may also be forced to stop working during their experience, again disrupting their lives and livelihood as well as their employers' business. There is also the issue of students who may apply for the extension of stay within their 30-day grace period after completing their program with the intention of starting a new degree program who would have to wait for the approval of their extension before they would be potentially authorized to work on campus. They would be able to start studying for the new degree program, but could not work on campus.

**Reducing F-1 Grace Period**

The proposed rule reduces the current F-1 grace period from 60 days to 30 days. While this is longer than other non-immigrant classifications, it is important for a number of reasons that may differ from the other visa classifications. Students may need to wait several weeks after school ends for their grades to be posted as well as several weeks beyond that for their degree to officially be marked as completed. Students may not find out well into their grace period if they have officially completed their degree. This greatly complicates things for students who were prevented from graduating because final grades ended up being lower than anticipated, who find out they have a degree requirement remaining when the Registrar's Office is going through final degree checks, or who need official final academic information in order to be fully admitted to a new degree program they will pursue after graduation.

Students applying for Optional Practical Training also face issues with timing during their grace period. Students applying for OPT frequently do not have a decision from USCIS on their I-765 application prior to finishing their degree program. The long USCIS adjudication timeline leaves very little room for error in a complicated and confusing process. For example, if a student submits their application to USCIS 31 days after their OPT I-20 was issued, their OPT will be denied, but often they do not receive their denial for more than 3 months. If they are outside their grace period when they learn of this decision, they will be out of status and have no option other than to depart the U.S. or apply for reinstatement if admitted to a new degree program. Students also need time to find an acceptable job that meets OPT requirements while accounting for the long USCIS processing time. They often request an OPT start date that is closer to the end of the 60-day grace period to accommodate USCIS processing times and so that they have sufficient time to get a job, move to a new location, and start the position.

**Additional Clarification and Considerations Needed**

If the proposed rule were implemented, it is important that there be additional clarification or consideration of the following:

Currently premium processing for I-539 applications is only available for change of status applications. With the timing and complexity of this issue and its impact on students and schools, it is imperative that premium processing is offered as an option for applicants.

The section titled 'Transition Period' considers a variety of scenarios that may occur for students who will transition from the current duration of status regulation to the proposed fixed date of admission. Students traveling internationally would re-enter and receive their new fixed date of admission. Those F-1s who do not travel during the transition period would have until the program end date of their I-20, not to exceed 4 years, with an additional 60 days. Any of our PhD, PharmD, or Bachelor's students in their 1st year at that point in time would have no documents that actually show the exact date of their fixed admission. None of their immigration documents would reflect this specific date, causing great amounts of confusion for students, the DSOs advising them, anyone involved with I-9s and employment, and any government agencies working with them (e.g. driver's licenses, etc.).

Clarification is also needed on a number of points. How would an institutional change in CIP (Classification of Instructional Programs) code assigned to a major/degree program impact graduate students and undergraduate students in their first year in the U.S.? Would this be viewed as a change in educational objective even though the student's objective has not changed? Would this functionality in SEVIS still exist for graduate students?

The proposed rule is unnecessary, burdensome, and harmful to our university. It is also detrimental to international students and exchange visitors, with the likely result being that the talents and contributions from many international students and exchange visitors will be lost.

Sincerely,

Anna Gilmore, M.A.
Associate Director of International Student Services

Alexa Oleson, M.Ed.
International Student Services Program Coordinator

# EXHIBIT 46

## Public Comment on ICEB-2025-0001-0001

**Re: Opposition to limitations on graduate-level transfers and program changes in proposed rule**

**Title: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure**

I am writing to express deep concern about the provisions in the proposed rule that prohibit F-1 students currently enrolled in a graduate-level program from transferring to another SEVP-certified institution or changing their program of study. Specifically, I object to Section 8 "**School transfer and change in educational objectives**," and the eligibility restriction in Subsection (C), which states:

> "**The student is not currently in a graduate level program of study.**"

This prohibition applies both to changes in major field of study and to transitions into other graduate programs at the same or lower level, as both are considered changes in "educational objective" under Section 8. This creates a blanket ban on flexibility for graduate students, even when such changes are academically justified or necessary for personal or professional reasons.

### Impact on Graduate Students

The rule, as currently written, will **undermine federally funded research**, create instability for international graduate students, and conflict with how academic careers and interdisciplinary training are structured in the U.S.

Requiring students to leave the U.S. and reapply from abroad when changing programs or institutions **risks abruptly ending many academic careers, as most faculty members are unwilling or unable to work with students who are no longer physically present or guaranteed reentry**.

Graduate students who change programs or pursue a second degree typically fall into two distinct categories:

- A small number who might attempt to prolong stay without academic intent — the population DHS is rightly concerned about.
- A larger group of students conducting interdisciplinary, high-value research who must adapt their academic paths across fields or institutions due to valid reasons. These students drive innovation and add value to U.S. science. Many scientific breakthroughs have resulted from such cross-disciplinary trajectories.

### Alternative Policy Recommendation

Instead of prohibiting all same-level changes, DHS could maintain integrity by limiting the number of permitted transfers and same-level degrees (e.g., 2 per level), while still allowing documented exceptions for students with valid academic, medical, or safety-related reasons.

### Justified Reasons for Graduate-Level Transfers

1. **Loss of Funding**

    a) Faculty may lose NIH or NSF grants. Students in these labs are left without financial support.

    b) Students returning from **approved medical reduced course loads** often find that their advisor can no longer support them.

2. **Medical or Disability Needs**

    Relocation may be essential to access family support, specific medical care, or a more supportive academic environment.

3. **Advisor–Student Mismatch**

    Around 20% of PhD students change advisors, which may require transfer to a different department or university.

4. **Advisor Relocation**

    Professors frequently move to new universities. Without the ability to transfer alongside them, graduate students are left academically stranded.

5. **Dead-End Research Topics**

    Not all research projects work out. Transferring to pivot fields — sometimes with a new degree program — is essential for finishing a dissertation and continuing a research career.

6. **Interdisciplinary Research Needs**

    Fields such as computational biology, mechanobiology, or bioengineering span multiple departments. Students often need to switch programs or degrees to build the necessary cross-training.

7. **Abusive or Unsafe Advising Relationships**

    Students in hostile or exploitative academic environments must have a safe pathway to continue study. This rule, as written, denies them that.

When any of the 7 above situations happen, PhD students may need to find a new position. This means applying for other programs and universities. In many cases this means that PhD students have to start as a master's first to gain new advisors trust and then transition to PhD. The process is extremely time consuming and stressful on its own (specifically if this happened b/c of a medical issue). Requiring students to leave the US to do this, will effectively end the academic career for many of them.

### On "Change of Major Field of Study"

Section 8 defines "educational objectives" as including changes in "educational level or major." However, in modern academia:

- "Major field of study" at the graduate level is often an administrative classification — not reflective of real research boundaries.
- Graduate students will end up applying to majors different from their current degrees, because faculty members working on identical topics may be housed in different departments: chemical engineering, electrical engineering, computer science, biomedical engineering, etc. This happens because of the way universities recruit Faculty members. You will find many professors with PhDs in Electrical or Mechanical engineering that work in Biomedical, bioengineering, or even chemical engineering departments. Students may end up applying to a different major, but their research field remains the same.
- Changing one's "major" in this context does not reflect a shift in immigration intent. It reflects how interdisciplinary science works in the U.S.

Blocking such flexibility will reduce the U.S.'s ability to recruit and retain global research talent.

### Conclusion

The blanket prohibition in Section 8(C) against graduate-level F-1 students transferring programs, changing majors, or pursuing a lower or similar-level degree is overly broad and harmful.

To preserve program integrity without harming U.S. science, DHS should:

- Cap repeat same-level degree changes and transfers (e.g., max 2).
- Permit documented exceptions for loss of funding, medical needs, abuse, or interdisciplinary research.
- Clarify that graduate-level changes in "major field of study" are not inherently noncompliant but often essential to research success.

This targeted approach would achieve DHS's goals while avoiding harm to the very students who contribute most to U.S. academic leadership.

# EXHIBIT 47

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment?filter=ICEB-2025-0001-2005)

Share

PUBLIC SUBMISSION

# Comment Submitted by Anonymous

Posted by the **Immigration and Customs Enforcement Bureau** on Sep 2, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

Expanded Legal Risks of the DHS Proposed Rule
1. Due Process Violations

Non-Appealable Denials: The rule requires students to file repeated extensions with USCIS. If denied, there is no right of appeal or meaningful review. This deprives individuals of liberty and property interests (education, employment, housing) without fair process.

Arbitrary Unlawful Presence: Students become “unlawful” the very next day after a fixed expiration if USCIS delays or mishandles filings. This is fundamentally unfair — government error should not create life-altering bans.

Legal hook: Mathews v. Eldridge balancing test → here, the risk of erroneous deprivation is high, safeguards are weak, and the individual interest is enormous.

2. Violation of Reliance Interests (Administrative Law)

For decades, F-1 and J-1 students have entered under “duration of status” (D/S). They made major life decisions — enrolling in multi-year programs, paying tens of thousands in tuition, committing to OPT/H-1B pathways — in reliance on the stability of that framework.

The Supreme Court in DHS v. Regents of the University of California (2020) held that agencies must consider reliance interests when dismantling long-standing immigration policies. DHS has ignored these interests entirely.

Legal hook: APA arbitrary-and-capricious challenge → failure to consider reliance interests makes the rule unlawful.

Give Feedback

3. Ultra Vires Overreach (Exceeding Statutory Authority)

The Immigration and Nationality Act (INA) authorizes admission of students “for the period of their studies” as determined by regulation. For decades, DHS (and INS before it) interpreted this as D/S.

Replacing that with fixed, arbitrary caps (two or four years) is not a reasonable interpretation of the statute but a rewriting of it.

Courts could hold this exceeds delegated authority because Congress never mandated DHS to eliminate D/S or impose rigid, one-size-fits-all limits.

Legal hook: Chevron step two — agency interpretation unreasonable → rule invalid.

4. Arbitrary and Capricious Action (Administrative Procedure Act, 5 U.S.C. § 706(2))

DHS has not produced data showing systemic abuse of D/S. Instead, it offers speculation about “overstays.”

The arbitrary 2-year limit for certain countries (based on visa overstay rates) is collective punishment and not rationally tied to an individual’s compliance.

Cutting the F-1 grace period from 60 to 30 days ignores decades of consistent practice and fails to consider the real-world consequences on housing, employment, and transition to new programs.

Legal hook: Agency acted without reasoned decision-making → APA violation.

5. Equal Protection / Discriminatory Impact

By assigning shorter admission periods (two years) to students from specific countries (based on nationality, not conduct), DHS effectively discriminates against individuals by origin.

Courts have repeatedly scrutinized policies with disparate treatment of groups without individualized assessment.

This selective burden mirrors national-origin discrimination, raising constitutional equal protection issues under the Fifth Amendment’s Due Process Clause.

Legal hook: Nationality-based distinctions must be tied to legitimate, narrowly tailored objectives — here, they are not.

6. Conflict with Congressional Intent and International Obligations

Congress created F-1 and J-1 categories specifically to promote educational and cultural exchange. The proposed rule undermines that intent by making study in the U.S. unstable and unattractive.

The U.S. is also a party to treaties and agreements promoting academic and journalistic exchange. Undermining lawful participation could place the U.S. in breach of international commitments.

Legal hook: Rule conflicts with statutory purpose → Chevron and APA grounds.

Give Feedback

7. Procedural Defects in Rulemaking

DHS has failed to adequately consult with universities, accrediting bodies, and stakeholders most affected.

The regulatory impact analysis underestimates compliance costs for institutions and students.

These flaws may render the rule procedurally defective under the APA's notice-and-comment requirements.

Conclusion on Legal Risks

If finalized, this rule would invite a barrage of litigation from universities, advocacy groups, and individuals. It is vulnerable on every front: due process, reliance interests, statutory overreach, arbitrary decision-making, discriminatory impact, and failure to consider costs.

Rather than achieving "clarity," the rule would collapse under the weight of lawsuits, injunctions, and inevitable reversal in federal court.

**Comment ID**

ICEB-2025-0001-2005

**Tracking Number**

mez-w63k-rnpy

**Comment Details**

**Received Date**

Aug 31, 2025

Give Feedback

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback