# EXHIBIT 48

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment?filter=ICEB-2025-0001-21303)

Share

PUBLIC SUBMISSION

# Comment Submitted by Jonathan S

Posted by the **Immigration and Customs Enforcement Bureau** on Oct 3, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

Under the Administrative Procedure Act, agencies must consider reliance interests and weigh costs against benefits. This proposal does neither. Students planned degree programs, universities planned compliance infrastructure, and employers planned hiring pipelines around D/S. These are not abstract interests — they involve tuition contracts, apartment leases, employer onboarding, and billions of dollars of regional economic activity.

In *DHS v. Regents of the University of California* (2020), the Supreme Court invalidated DHS's rescission of DACA precisely because it ignored reliance interests. The Court made clear that even when agencies have authority to change policy, they must "assess whether there were reliance interests, determine whether they were significant, and weigh any reliance interests against competing policy concerns." DHS's current proposal mentions reliance only superficially. That is fatal under the APA.

Give Feedback

**Comment ID**

ICEB-2025-0001-21303

**Tracking Number**

mg5-n1fx-4qrd

**Comment Details**

**Received Date**

Sep 29, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 49

An official website of the United States Government.

Back to Document Comments (/document/ICEB-2025-0001-0001/comment?filter=ICEB-2025-0001-13725)

Share

PUBLIC SUBMISSION

# Comment Submitted by Anonymous

Posted by the **Immigration and Customs Enforcement Bureau** on Sep 25, 2025

Docket (/docket/ICEB-2025-0001) / Document (ICEB-2025-0001-0001) (/document/ICEB-2025-0001-0001) / Comment

Comment

I respectfully oppose the NPRM because it (1) lacks a persuasive evidence base for sweeping structural changes, (2) does not demonstrate a least-burdensome approach consistent with modern regulatory review principles, (3) underestimates paperwork and processing burdens that will overwhelm USCIS queues and academic calendars, and (4) increases legal and compliance risk without clear oversight gains.

1) Thin evidence for categorical changes
The proposal replaces D/S with fixed end dates, pushes routine, DSO-validated continuations into USCIS Extension of Stay adjudications, and adds categorical prohibitions (such as limits on program changes and same-level study for F-1). The rule does not show that existing SEVIS controls are inadequate or that targeted fixes would fail. Major reversals of long-standing practice warrant stronger, quantitative justification.

2) Least-burdensome rulemaking not demonstrated
Regulatory review principles require agencies to consider benefits, costs, distributional effects, and reasonable alternatives. Here, narrower options—annual SEVIS validations, risk-based audits, and clear triggers for USCIS review—are available but not meaningfully evaluated. Selecting a universal USCIS routing plus categorical bans, without a side-by-side analysis of lighter-touch approaches, is not a least-burdensome path.

Give Feedback

3) Small-entity impacts are underexplored
Graduate enrollment is tightly coupled to local economies and many smaller institutions. An adequate small-entity analysis should examine alternatives that keep D/S with enhanced validations or limit USCIS filings to exception-based cases, thereby reducing downstream effects on schools and host communities.

4) Predictable processing bottlenecks
I-539 timelines already fluctuate and can span months. Moving time-sensitive student continuations into those queues—potentially with biometrics—will create registration, assistantship, CPT/OPT, and travel gaps that campuses cannot reliably plan around. “Automatic continuation” helps only partially; many decisions

hinge on timely adjudication that service centers cannot guarantee.

5) Transition and legal risk
Intricate transition rules, first-year limits, grace-period nuances, and travel-while-pending scenarios raise the odds of inconsistent application and accidental noncompliance. DSOs and students will be forced to synchronize I-20/DS-2019 dates, fixed I-94 terms, filing windows, and campus systems. Increased inadvertent lapses undermine the oversight objective.

6) Reliance interests and program stability
Institutions have structured admissions cycles, course sequencing, staffing, and funding around settled D/S practice. Reviving a fixed-term concept without squarely addressing reliance interests and earlier criticisms risks instability for campuses and students alike. At minimum, the agency should explain what has changed in evidence and operations to justify a different outcome.

A better path—feasible alternatives to analyze

Keep D/S with targeted checks. Require annual SEVIS validations and risk-based school audits; use data-driven triggers (e.g., anomalous transfer or extension patterns) for USCIS review instead of routing all continuations.

Limit categorical bans. Allow same-level study when the new program is materially different and DSO-justified; curb serial enrollment with objective criteria rather than bright-line prohibitions.

Reserve USCIS EOS for exceptions. Keep DSO-managed extensions under strengthened reporting standards; send only risk-flagged cases to USCIS. Publish processing benchmarks aligned to academic calendars and ensure continuation of study and on-campus work until adjudication.

Phased transition with empirical checkpoints. If proceeding, pilot the framework with clear metrics (fraud detection, overstay rates, processing performance) and adjust based on results.

Conclusion
Because the NPRM does not demonstrate a least-burdensome approach, adequately address small-entity impacts, or reconcile foreseeable processing and compliance harms with documented benefits, it should be withdrawn or substantially revised. A calibrated framework—preserving D/S with strengthened SEVIS validations and deploying USCIS adjudication only where indicated by risk—would better meet oversight goals while safeguarding program feasibility, due process, and the integrity of U.S. higher education.

Give Feedback

**Comment ID**

ICEB-2025-0001-13725

**Tracking Number**

mfz-n5cy-evfi

**Comment Details**

**Received Date**

Sep 25, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

# EXHIBIT 50

Congress of the United States
Washington, DC 20515

September 29, 2025

Kristi Noem
Secretary
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528-0525

**Re: DHS Docket No. ICEB-2025-0001, RIN: 1653-AA95, Notice of Proposed Rulemaking: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media**

Dear Secretary Noem,

We, the undersigned Members of Congress, submit this comment in opposition to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) proposed rule, "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media," published in the Federal Register on August 29, 2025.[1] Although we share with the Administration a mutual objective of protecting against abuses in our temporary visa programs, we are deeply troubled by the changes proposed in this rulemaking, which will introduce needless administrative paperwork into an already overburdened system without meaningfully improving program integrity.

Since the mid-1980s, the United States has recognized the unique needs of the academic, research, and media industries by adopting a reasonable and workable policy regarding the temporary admission of foreign students (F), exchange visitors (J), and media representatives (I). This policy—known as "duration of status"—allows such individuals to be admitted to the United States for the period of time in which they comply with the terms and conditions of their temporary visas, rather than a fixed time period. Over the years, this policy has proven essential to U.S. institutions of higher education, exchange visitor organizations, and other entities that sponsor nonimmigrants, where flexibility is key to the success of these programs and their participants.

Now, nearly 40 years later, DHS proposes to impose a fixed period of admission for F, J, and I nonimmigrants, setting a four-year limitation for F-1 and J-1 nonimmigrants and an arbitrary 240 days for I nonimmigrants. As explained in more detail herein, DHS has failed to provide adequate justification for these changes, which will not only fail to solve the problems they purport to address, but will also impose significant burdens on U.S. Citizenship and Immigration Services (USCIS), an agency already burdened by massive backlogs of cases and

[1] Admission & Stay for F, J, & I Nonimmigrants, 90 Fed. Reg. 42,070 (proposed Aug. 28, 2025) (to be codified at 8 C.F.R. pts. 214, 248, & 274a).

this Administration's detailing of USCIS staff to ICE.[2] We urge DHS to abandon this rulemaking and maintain the duration of status model for F, J, and I nonimmigrants.

## I. DHS Fails to Draw a Rational Connection Between the Proposed Rule and its Stated Goal

When engaging in rulemaking, DHS must "examine the relevant data and articulate a satisfactory explanation for [the] action including a 'rational connection between the facts found and the choice made.'"[3] DHS states that the transition from duration of status to a fixed period of admission is necessary to deter fraud and abuse of the nonimmigrant visa system.[4] While we support DHS's goal of working to eliminate any fraud in the immigration system, the proposed rule does not draw a rational connection between the identified problem and the changes proposed.

In its assessment of "Risks within the F Classification," DHS outlines instances of sweeping fraud perpetrated by for-profit school owners who were criminally prosecuted for collecting tuition from students under false pretenses and falsely reporting that students were maintaining F-1 status.[5] That is why recommendations for reducing fraud in the student visa program from interested government agencies have appropriately centered on increasing monitoring and reporting requirements for school owners and others who prey upon non-citizens and perpetrate fraud. The educational community necessarily plays an important role in the administration of the student visa program and must be scrutinized and closely and subjected to enforcement in situations where there is evidence of fraud.

In 2012, DHS implemented five measures recommended by the Government Accountability Office (GAO), such as monitoring state licensing and accreditation status for institutions of higher education, and developing criteria to refer criminal cases to law enforcement agencies.[6] In 2019, DHS began implementation of a number of additional GAO-recommended measures to manage fraud risks related to school recertification and program oversight.[7] None of the GAO's recommended measures focus on eliminating the duration of status policy.

In the proposed rule, DHS has not identified widespread problems that can be solved by eliminating the duration of status policy, pointing primarily to evidence of some students who have remained in the United States for extended periods of time in F-1 status by enrolling in consecutive educational programs, transferring to new schools, or repeatedly requesting program extensions.[8] However, DHS admits that these instances of extended stay do "not always result in

---

[2] *See, e.g.*, Owen Tritt, *The Impact of Reassigning 6,700 Federal Workers to Immigration*, NISKANEN CTR. (Aug. 5, 2025), https://www.niskanencenter.org/the-impact-of-reassigning-6700-federal-workers-to-immigration/.

[3] Motor Vehicle Mfrs. Assn. v. State Farm Ins., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

[4] Admission & Stay for F, J & I Nonimmigrants, 90 Fed. Reg. at 42,072.

[5] *Id.* at 42,077.

[6] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-12-572, STUDENT AND EXCHANGE VISITOR PROGRAM: DHS NEEDS TO ASSESS RISKS AND STRENGTHEN OVERSIGHT FUNCTIONS (2012).

[7] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-297, STUDENT AND EXCHANGE VISITOR PROGRAM: DHS CAN TAKE ADDITIONAL STEPS TO MANAGE FRAUD RISKS RELATED TO SCHOOL RECERTIFICATION AND PROGRAM OVERSIGHT (2019).

[8] Admission & Stay for F, J, & I Nonimmigrants, 90 Fed. Reg. at 42,077-78.

technical violations of the law" and fails to provide a reasoned explanation as to why changing programs and pursuing consecutive degrees is impermissible or undesirable.[9]

DHS further states that the changes in the proposed rule "would ensure that DHS has an effective mechanism to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws, and to obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States."[10] Yet, with respect to F and J nonimmigrants, DHS currently has this capability—the Student and Exchange Visitor Information System (SEVIS), administered by ICE. Through SEVIS, Designated School Officials are obligated by law to routinely and timely report to ICE on the activities and status of students, including address changes, academic progress and program completion, disciplinary action, failure to maintain a full course of study, and employment status for students engaged in practical training.

If such records are not timely updated, SEVIS flags the records with automatic updates and in certain circumstances, automatically terminates the student's record.[11] SEVIS provides DHS with more than adequate information to take action against students who are believed to have violated their status, as was demonstrated just days ago when ICE arrested 15 students who allegedly claimed to be working on OPT for companies that do not exist, and sent termination notices to approximately 3,300 students who were in active OPT status but had not reported employer information in SEVIS.[12] As such, it is unclear how these sweeping changes, which will impose significant additional paperwork burdens and costs on individual students and USCIS, will lead to the identification of program abuses that cannot be currently identified by ICE through SEVIS.

## II. DHS Failed to Adequately Consider the Economic and Operational Effect of the Proposed Changes on USCIS

DHS recognizes that the proposed rule would place a significant burden on USCIS operations and costs, but fails to provide an adequate analysis of either.[13] USCIS currently has a backlog of 11.3 million cases—the largest net backlog ever.[14] USCIS has lost due to this administration's prioritization of immigration enforcement above other core DHS responsibilities.[15] International students, universities, and businesses consistently struggle to

---

[9] *Id.* at 42,088. As part of its flawed analysis, DHS claims that frequent changes within an educational level or changes to a lower level are "not consistent with attainment of a 'specific educational or professional objective,'" as required by the definition of "full-course of study." However, the regulation simply states that such objective be attained upon "successful completion" of the full course of study and in no way limits a student's ability to explore other career paths or change objectives.

[10] Admission & Stay for F, J & I Nonimmigrants, 90 Fed. Reg. at 42,072.

[11] *See generally SEVIS Reporting Requirements for Designated School Officials,* IMMIGR. AND CUSTOMS ENF'T (last updated Dec. 12, 2024),https://www.ice.gov/sevis/dso-requirements

[12] *ICE Arrests 15 Nonimmigrant Students for OPT-Related Fraud,* IMMIGR. & CUSTOMS ENF'T (Oct. 21, 2020), https://www.ice.gov/news/releases/ice-arrests-15-nonimmigrant-students-opt-related-fraud.

[13] Admission & Stay for F, J & I Nonimmigrants, 85 Fed. Reg. 60,526, 60,568 tbl. 6 (proposed Sep. 25, 2020) (to be codified at 8 CFR pts. 214, 248, & 274a.12).

[14] Billal Rahman & Dan Gooding, *U.S. Immigration Backlog Hits All-Time High,* NEWSWEEK (July 8, 2025), https://www.newsweek.com/us-immigration-backlog-hits-all-time-high.

[15] Montoya-Galvez, *Legal immigration agency employees asked to volunteer to help ICE operations,* CBS NEWS (Mar. 8, 2025, at 3:37 ET),

manage the effects of lengthy processing times, particularly when it comes to applications for employment authorization for students to engage in practical training, which currently average taking 3 months to process.[16] Because international students can only file an application 90 days before they complete their academic program,[17] processing delays have resulted in significant financial hardships and the loss of valuable job opportunities for such students.[18]

According to the proposed rule "DHS estimates an annual average of 205,000; 203,000; 6,000 EOS requests for F, J, and I nonimmigrants, respectively, over the ten-year period of analysis."[19] DHS estimates that the annualized cost to the agency just to process the extension of status applications will be $76 million, while admitting there are likely other costs it cannot quantify.[20] Further, the proposed rule also states that in-person interviews may be required in connection with extension applications.[21] As history has indicated, additional interview and vetting requirements will undoubtedly lead to further delays.[22]

Further, it should not be forgotten that prior to the creation of USCIS and ICE, both agencies' predecessor, the Legacy Immigration and Naturalization Service (INS), transitioned to a fixed period of admission for F nonimmigrant students on two occasions—in 1973[23] and 1981.[24] In both instances, Legacy INS reversed course, primarily citing the administrative burdens associated with processing requests for student extensions of status.[25]

Until 1973, F-1 students, along with their spouses and minor children, were admitted to the United States for the duration of the student's academic program.[26] In 1973, a rule was promulgated limiting the period of admission for students to one year.[27] By 1978, Legacy INS proposed changing the admission period back to duration of status to "eliminate the need for the Service to adjudicate the large number of applications" required under the 1973 regulations and "permit more efficient use of Service manpower and resources."[28] In 1981, Legacy INS again imposed a fixed period of admission for students, with extension applications accepted and reviewed on a case-by-case basis.[29] However, the change once again proved to be too

https://www.cbsnews.com/news/legal-immigration-agency-employees-asked-volunteer-help-ice-operations/.

[16] *Check Case Processing Times,* U.S. CITIZENSHIP & IMMIG. SERVS., https://egov.uscis.gov/processing-times/ (last visited Aug. 29, 2025).

[17] 8 C.F.R. § 214.2(f)(11)(B) (2025).

[18] Erica Green, *Visa Delays at Backlogged Immigration Service Strand International Students*, N.Y. TIMES (June 16, 2019), https://www.nytimes.com/2019/06/16/us/politics/visas-international-students.html.

[19] Admission & Stay for F, J & I Nonimmigrants, 90 Fed. Reg. at 42,101.

[20] *Id.*

[21] *Id.*

[22] Citizenship & Immigration Services Fee Schedule and Changes, 84 Fed. Reg. 62,280, 62,304-05, nn.48, 106-07 (proposed Nov. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 106, 204, 211, 212, 214, 216, 223, 235, 236, 240, 244, 245-45a, 248, 264, 274a, 301, 319, 320, 322, 324, 334, 341, 343a, 343b, & 392) (discussing the impact of new interview procedures on the cost of processing adjustment of status applications).

[23] Special Requirements for Admission, Extension, & Maintenance of Status, 38 Fed. Reg. 35,425 (Dec. 28, 1973).

[24] Nonimmigrant Classes; Revised Requirements for Nonimmigrant "F-1" Students, 46 Fed. Reg. 7,267 (Jan. 23, 1981) (to be codified at 8 C.F.R. pt. 214).

[25] Admission of Nonimmigrants for Duration of Status, 43 Fed. Reg. 32,306 (proposed July 26, 1978) (to be codified at 8 C.F.R. pt. 214); Change of Nonimmigrant Classification; Revisions to Student & School Regulations, 48 Fed. Reg. 14,575 (Apr. 5, 1983) (to be codified at 8 C.F.R. pts. 214 and 248).

[26] *See* Admission & Stay for F, J & I Nonimmigrants, 85 Fed. Reg. at 60,531.

[27] Special Requirements for Admission, Extension, & Maintenance of Status, 38 Fed. Reg. 35,425.

[28] Admission of Nonimmigrants for Duration of Status, 43 Fed. Reg. at 32,306-07.

[29] Nonimmigrant Classes; Revised Requirements for Nonimmigrant "F-1" Students, 46 Fed. Reg. 7,267.

burdensome for the agency, and in two years, with other program fixes to address the issues that precipitated the change, duration of status for students was reinstated.[30]

These past aborted attempts to eliminate duration of status make it clear that DHS's current proposal would place overwhelming administrative burdens on USCIS that would exacerbate existing backlogs and further increase already record-high processing times. Notably, these burdens were deemed excessive in 1978, when there were roughly 280,000 nonimmigrant students in the United States. Today, more than 1 million foreign students pursue educational degrees in this country, making up over 5.5 percent of total enrollment in U.S. colleges and universities.[31] If the administrative burdens were deemed excessive in 1978, there can be little doubt that they will be exponentially higher today. Without concrete proof that these changes will lead to significant improvements in program integrity, they cannot be justified.

## III. The Limitations on Periods of Admission are Arbitrary and Based on Flawed Analyses and Assumptions

### A. *The Proposed Four-Year Limitation for Students is Arbitrary and Based on Outdated Assumptions*

DHS proposes to arbitrarily impose a four-year period of admission for most students with the justification that "the fixed date of admission is the best option because it aligns with the general structure of post-secondary education…"[32] This justification, however, relies on the outdated assumption that four-year programs are "the general structure of post-secondary education."[33] The vast majority of full-time college students in the United States do not graduate within the four-year timeframe for their respective associates or bachelor's degree.

According to a national survey in 2021, only 45 percent of students at a university of college will graduate within 4 years.[34] Students in Ph.D. and medical programs will be especially disadvantaged, as the median amount of time to complete a doctorate degree in 2024 was 5.7 years; 6.8 years for those in humanities and arts programs.[35] Between classes, residencies, fellowships, and training, medical school students are often enrolled for over a decade.[36] As with the rest of DHS's proposal, this one-size-fits-all approach does not match with the reality of post-secondary education today.

## IV. DHS Downplays the Potential Economic Impact of the Rule on Institutions of Higher Education

[30] Change of Nonimmigrant Classification; Revisions to Student & School Regulations, 48 Fed. Reg. 14575.

[31] INST. OF INT'L EDUC., OPEN DOORS 2024 REPORT ON INTERNATIONAL EDUCATIONAL EXCHANGE, tbl. *Student Enrollment Trends, 1948/49–2016/17* (2024), https://opendoorsdata.org/data/international-students/enrollment-trends/.

[32] Admission and Stay for F, J & I Nonimmigrants, 90 Fed. Reg. at 42082.

[33] *Id*.

[34] Jon Marcus, *Most college students don't graduate in 4 years, so the government counts 6 years as 'success'*, NBC (Oct. 10, 2021), https://www.nbcnews.com/news/us-news/college-students-dont-graduate-4-years-government-counts-6-years-succe-.

[35] NAT'L CTR. FOR SCI. AND ENG'G STATISTICS, SURVEY OF EARNED DOCTORATES, tbl. *Median Years to Research Doctorate, by Trend Broad Field of Doctorate: Selected Years, 1974–2024* (Aug. 28, 2025), https://ncses.nsf.gov/surveys/earned-doctorates/2024.

[36] Sarah Wood, *How Long Is Medical School and What Is It Like?,* U.S. NEWS & WORLD REPORT (Jan. 12, 2024), https://www.usnews.com/education/best-graduate-schools/top-medical-schools/articles/how-long-is-medical-school-and-what-is-it-like.

DHS also fails to adequately consider the economic impact on institutions of higher education.[37] In its Regulatory Impact Analysis, DHS concedes that "the proposed rule may adversely affect U.S. competitiveness in the international market for nonimmigrant student enrollment and exchange visitor participation."[38] When a very similar rule was proposed in 2020, DHS noted that in the 2018 academic year, international students had an economic impact of $44.7 billion from tuition, fees, and other spending during their time in the United States as students.[39] Further, during the 2018 academic year alone, such students supported 458,290 U.S. jobs.[40] However, this version of the rule omits this analysis. Instead, DHS makes a mere cursory mention, stating, "DHS acknowledges the economic contribution of foreign students, foreign media representatives, and exchange visitors through tuition and regional spending as well as contributions to research, innovation, teaching, and overall competitiveness of the United States."[41] However, DHS attempts to downplay the economic impact by saying the benefits of a U.S. education may outweigh any concerns applicants may have about the difficulties created by this new rule and does no further analysis.[42]

By failing to consider the significant difficulties that the proposed rule is likely to impose on international students and American post-secondary institutions, DHS fails to assess the broader economic impact of the proposed rule on universities, students, and the U.S. economy. Before DHS can implement such sweeping changes to the student visa system, it must provide the public with a complete and accurate assessment of the rule's projected economic impact.

## V. Conclusion

DHS's proposal to constrain the timeframe of admission for students, exchange visitors, and members of the media to a fixed period of time is the latest in a series of unwarranted policy changes that have undermined our role as a leader in international education, and harmed universities, businesses, and U.S. students that depend on foreign student enrollment. Although DHS states that the transition from duration of status to a fixed period of admission is necessary to deter fraud and abuse of the nonimmigrant visa system, the proposed rule does not draw a rational connection between the identified problem and the changes proposed.

Worse still, this is not the first time such procedures have been proposed—fixed time limits on these visas have failed twice in the past, primarily due to the onslaught of additional paperwork and subsequent processing created by such changes. With the current processing backlog at USCIS, a change to limited fixed timeframes for admission, which exponentially increases paperwork and processing, would create a system that is simply untenable.

And although DHS fails to adequately justify these sweeping changes, DHS's proposal shifts the burden to visa holders, higher education institutions, and program facilitators—and its own subagency, USCIS—and available data makes clear that the proposed changes will result in

---

[37] IMMIGR. AND CUSTOMS ENF'T BUREAU, REGULATORY IMPACT ANALYSIS FOR THE ESTABLISHING A FIXED TIME PERIOD OF ADMISSION AND AN EXTENSION OF STAY PROCEDURE FOR NONIMMIGRANT ACADEMIC STUDENTS, EXCHANGE VISITORS, AND REPRESENTATIVES OF FOREIGN INFORMATION MEDIA NOTICE OF PROPOSED RULEMAKING 42 (2025), https://www.regulations.gov/document/ICEB-2025-.

[38] Admission and Stay for F, J & I Nonimmigrants, 90 Fed. Reg. at 42101.

[39] *Id*.

[40] NAFSA: ASS'N OF INT'L EDUCATORS, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2 (last visited Sep. 24, 2025).

[41] IMMIGR. AND CUSTOMS ENF'T BUREAU, *supra* note 38, at 43.

[42] *Id.* at 44.

a significant economic impact on such entities. We cannot condone the erosion of our platforms of learning, culture, and expression—particularly when there is no basis to do so. For the reasons discussed herein, we urge DHS to abandon this rulemaking and maintain the duration of status model for F, J, and I nonimmigrant visas.

Sincerely,

Pramila Jayapal
Ranking Member
Immigration Integrity,
Security, and Enforcement
House Judiciary Committee

Jamie Raskin
Ranking Member
House Committee on the
Judiciary

Henry C. "Hank" Johnson, Jr.
Member of Congress

Becca Balint
Member of Congress

Eleanor Holmes Norton
Member of Congress

Deborah K. Ross
Member of Congress

Jerrold Nadler
Member of Congress

Dan Goldman
Member of Congress

Yassamin Ansari
Member of Congress

Jan Schakowsky
Member of Congress

Lloyd Doggett
Member of Congress

Summer L. Lee
Member of Congress

Rashida Tlaib
Member of Congress

Stephen F. Lynch
Member of Congress

André Carson
Member of Congress

Raja Krishnamoorthi
Member of Congress

Greg Casar
Member of Congress

Jesús G. "Chuy" García
Member of Congress

Sylvia R. Garcia
Member of Congress

Mike Thompson
Member of Congress

Judy Chu
Member of Congress

Danny K. Davis
Member of Congress

J. Luis Correa
Member of Congress

Hillary J. Scholten
Member of Congress

Lateefah Simon
Member of Congress

Alexandria Ocasio-Cortez
Member of Congress

Juan Vargas
Member of Congress

Shri Thanedar
Member of Congress

Delia C. Ramirez
Member of Congress

Lizzie Fletcher
Member of Congress

Donald S. Beyer Jr.
Member of Congress

Diana DeGette
Member of Congress

James P. McGovern
Member of Congress

Debbie Dingell
Member of Congress

Ted W. Lieu
Member of Congress