# EXHIBIT 51

**THE NEWSGUILD**
501 3rd Street NW, 6th floor, Washington, DC 20001
(202) 434-7177 newsguild.org

September 29, 2025

Submitted via regulations.gov

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Re: Revision to the I Visa Program for Representatives of Foreign Media, RIN 1653-AA95/Docket No. ICEB-2025-0001.

The NewsGuild-CWA (the "Guild") is the largest union of journalists in North America, representing more than 20,000 journalists and media workers at more than 300 news outlets, and respectfully submits these comments on the proposed revisions to the I visa program for "bona fide representative[s] of foreign press." 8 U.S.C. § 1101(a)(15)(I); see Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 90 Fed. Reg. 42,070 (Aug. 28, 2025) [hereinafter "Proposed Rule"].

The Guild has major concerns that the Proposed Rule by DHS is in conflict with the First Amendment, is inadequately justified, shortens the duration of I visas to unworkable limits, and will result in reduced international news coverage originating from the United States at a time when there are 37% fewer journalism jobs in the U.S. than in 2000.

## I. Proposed Rule conflicts with the First Amendment by expanding DHS oversight of news and chilling reporting

By shortening the I visa term from five years to just eight months and conditioning extensions on DHS review of "the content that the foreign information media

representative is covering in the United States," the Proposed Rule 90 Fed. Reg. at 42,099 would improperly expand government supervision of journalistic work. This heightened oversight is incompatible with the First Amendment's prohibition on government regulation of press content.

The Supreme Court has long held that the First Amendment's guarantee that "Congress shall make no law…abridging the freedom of speech, or of the press" bars both direct censorship and indirect interference with editorial judgment. In *Near v. Minnesota*, 283 U.S. 697 (1931) and *New York Times Co. v. United States*, 403 U.S. 713 (1971), the Court struck down prior restraints and reaffirmed that official review of journalistic content is presumptively unconstitutional. Likewise, in *Miami Herald v. Tornillo*, 418 U.S. 241 (1974), the Court held that government intrusion into editorial decision making was inappropriate.

By forcing foreign journalists to reapply frequently for I visa renewal, the Proposed Rule creates serious risks that visas could be denied in retaliation for unfavorable reporting, thereby placing government officials in a position to punish journalists for exercising their First Amendment rights. The very process of reapplication would likely chill independent reporting by discouraging journalists and news outlets from pursuing stories deemed too sensitive or controversial by a particular administration or administration officials.

As the Supreme Court cautioned in *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972), "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." The Department should therefore make clear that under no circumstances may a visa applicant be asked to identify sources they have spoken to or expect to speak to in the course of their reporting.

## II. Proposed Rule would shorten duration of I visas to unworkable limits without justification

Our union agrees with other submitted comments in this rulemaking that the proposed revisions are flawed because eight months is not an "appropriate" measure of the time it takes for foreign journalists to do their work. [Proposed Rule, 90 Fed. Reg. at 42,099] The only reason given by the Department to support this term is that it mirrors the automatic extension provided to I visa-holders whose

current visa would otherwise expire because they intend to change media or employers. [CITATION] The time it takes for the government to determine whether an applicant is eligible for a visa should not be used as the determination for how long it takes to complete the reporter activities approved by the visa. The two are unrelated.

The Guild represents dozens of members who are foreign journalists on visas working in the United States. The journalism work these visas are intended to support does not last a mere eight months. Journalists must cultivate sources, gain an understanding of their coverage area and become familiar with the culture. That takes time and cannot be achieved in such a short time frame. This is particularly true for journalists working in the United States for foreign news agencies.

The proposal provided by the Department is also inconsistent with the Department's previous view that visa terms of less than a year, coupled with the specter of non-renewal, can amount to "hostile measures targeting a free press" because of their disruptive effect on journalists' work. 2020 Rule, 85 Fed. Reg. at 27,646. The Department should maintain the existing duration-of-status framework.

The Guild is also concerned about the retaliatory effect the Proposed Rules' shortened duration would have on American journalists working overseas. The Immigration and Nationality Act contemplates that the admission of journalists will be governed on "a basis of reciprocity." 8 U.S.C. § 1101(a)(15)(I); see also H.R. Rep. No. 82-1365, at 45. On that basis, the Department resolved to limit the stays available to Chinese journalists because of China's use of short visa terms to "suppress[]...independent journalism in the PRC." 2020 Rule, 85 Fed. Reg. at 27,646.

By restricting foreign journalists working in the United States, the Proposed Rule threatens to trigger retaliation by other countries against U.S.-based news organizations. This would greatly impact our members, as well as U.S. citizens at home and abroad who depend on a news ecosystem that includes robust newsgathering and reporting in other countries.

**III. Proposed Rule would reduce international news coverage originating from the U.S. at a time when journalism jobs are at a 20-year low**

The Proposed Rule is inadequately justified, lacking any reasoning for why I visa-holders pose a risk to national security or any other government interest Proposed Rule 90 Fed. Reg. at 42,080. The only claim made by the Department is that "the number of representatives of foreign information media has nearly doubled" since 1985, when the existing framework was introduced. [Proposed Rule 90 Fed. Reg. at 42,076] However, resources available to vet visas have far more than doubled over the same period, and media organizations already undertake great effort to ensure their journalists comply with visa requirements.

Across the United States, there were 24,380 fewer journalism jobs in 2024 than in 2000, due to several factors. Bureau of Labor Statistics, Occupational Employment and Wage Statistics, (2000 and 2024). More international news organizations may seek to fill the gap and increase U.S.-based coverage, especially in languages other than English. The Department should not be adopting rules that will result in fewer U.S.-based journalists at a moment when the number of domestic journalists working is at a 20-year low.

## IV. Conclusion

The Guild urges the Department to reject the proposed changes to the I visa regulations. At a minimum, the Department should not use rulemaking to retaliate against journalists or chill newsgathering and reporting. The Department should ensure that the visa terms are long enough to support the reporting activities for which I visas are intended and to ensure that they will not be cited by other countries to reduce the number of domestic journalists working overseas.

The United States has always stood for a strong, independent and free press. Restricting foreign journalists risks undermining that legacy by emulating countries where press freedom is near extinct. The Proposed Rule would damage America's global standing.

Please feel free to contact Dan Bass, senior researcher at the Communications Workers of America with any questions about these comments. He can be reached at dbass@cwa-union.org.

Sincerely,



Jon Schleuss
President
The NewsGuild-CWA

# EXHIBIT 52

RSF REPORTERS WITHOUT BORDERS

*Submitted via regulations.gov* *September 29, 2025*

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

**Re: Comment Regarding the I Visa Program for Representatives of Foreign Media, RIN 1653-AA95/.Docket No. ICEB-2025-0001**

Dear Secretary Noem,

Reporters Without Borders, Inc. (RSF) is writing to strongly urge the Department of Homeland Security (DHS) to withdraw the proposed rule limiting the duration of stay for foreign journalists on I visas. This rule would impose unnecessary bureaucratic burdens that distract from real enforcement priorities, create uncertainty, chill press freedom, open the door to politically motivated visa denials, and weaken the United States' global leadership and influence. The proposal also risks provoking retaliatory actions against American journalists abroad. Importantly, there is no substantial evidence of systemic abuse by I visa holders that justifies these restrictions. For these reasons, this rule threatens American values and interests and should be abandoned.

**Bureaucratic Waste and Inefficiency**

The proposed rule would drastically increase paperwork and case volume at USCIS, an agency already overwhelmed with backlogs, without delivering clear enforcement benefits. This additional administrative burden risks diverting taxpayer resources away from higher-priority immigration enforcement areas, such as preventing fraud, overstays, and visa abuse in other visa categories that pose real threats to national security and immigration integrity. While the administration is planning to add more human capacity at DHS, these new officers will not be in place soon enough to support this rule in order to ensure that journalists will not be arbitrarily forced out by the radically shortened deadline. Furthermore, it is widely reported that the administration is relying on artificial intelligence to screen visa applicants,[1] but time and again these tools are shown to be unreliable because of poor training data, lack of nuanced understanding, and numerous other reasons. In fact, DHS abandoned its plans to vet US

[1] NBC News. "Inside the DHS Task Force Scouring Foreign Students' Social Media," April 10, 2025. https://www.nbcnews.com/politics/national-security/dhs-task-force-scouring-foreign-students-social-media-rcna198532.

RSF REPORTERS WITHOUT BORDERS

visitors and immigrants in 2018.[2] There is simply no way that this rule would not increase the financial cost and administrative burden for the US immigration system.

**Excessive Administrative Burden and Uncertainty**

The fixed period of stay outlined in the proposal is arbitrary, limits journalists' ability to effectively do their job, and engrains unreasonable, constant burden on journalists' lives.

First, the description of the proposed rule states, "DHS based this proposed [240-day] timeframe on the period of stay authorized in 8 CFR 274a.12(b)(20), which generally provides an automatic extension of employment authorization of 240 days to aliens, including I nonimmigrants, whose status has expired but on whose behalf an application for an extension of stay was timely filed through a Form I-539, Application to Extend/Change Nonimmigrant Status, *see* 8 CFR 214.2(i), which currently is also required when an I nonimmigrant changes employers or information mediums. DHS believes that adopting an already established timeframe, to which I nonimmigrants are already accustomed, is reasonable." In this justification, DHS acknowledges that the period is based on the timeframe for extensions after paperwork is already filed, rather than the timeframe given to people who still must file paperwork and be processed. The timeframe in which DHS allows a journalist to wait for their already-filed paperwork is a completely separate calculation than how much time it takes to gather documents and fill out an application. DHS' assumption that I visa holders are "already accustomed" is at odds with the significant departure from existing policy, and based on conversations RSF has held with representatives of international media organizations, many are unprepared for, concerned by, or confused by the proposal.

Furthermore, such a short and firmly fixed timeline impedes the journalistic activity the visa is supposed to support. The proposed rule states that the 240-day limit provides "ample time to any I nonimmigrant to either complete that assignment or ask for an extension, as needed." RSF strongly objects to this assertion. A 240-day visit simply isn't long enough to conduct meaningful, in-depth reporting on complex, ongoing stories such as the many steps of an election, in-depth investigations, and constantly fluctuating economic trends. It is also insufficient time to build relationships with American companies, officials, and ordinary citizens who work with international journalists to tell their stories to audiences around the world. While US media may report on developments in America, foreign reporters in the US are better able to communicate to businesses in key demographics for American markets, US allies, and to people who live in repressive countries hoping to understand more about Americans' daily life.

---

[2] The Washington Post. "ICE just abandoned its dream of 'extreme vetting' software that could predict whether a foreign visitor would become a terrorist," May 17, 2018. https://www.washingtonpost.com/news/the-switch/wp/2018/05/17/ice-just-abandoned-its-dream-of-extreme-vetting-software-that-could-predict-whether-a-foreign-visitor-would-become-a-terrorist/

Finally, requiring foreign journalists to renew their visas every 240 days, rather than allowing duration of status (D/S), would impose excessive administrative burdens and create unnecessary uncertainty. Foreign correspondents already operate under significant time pressures and unpredictable conditions. Requiring frequent visa renewals adds unreasonable burdens for them, their employer, and their family. This renewal cycle would force journalists to repeatedly interrupt their reporting to prepare and submit extension applications, a process that is time-consuming and resource-intensive. The resulting uncertainty would distract journalists by threatening their livelihoods on a constant basis and constantly calling into question if it is even worth covering events in the US for their communities around the world. Foreign journalists also need time to allow their children to enroll in school and finish school years, or secure employment for spouses. Journalists are significantly less likely to come to the United States to work if they can't be certain of their families' stability. The media businesses that send journalists to the United States will also be burdened and less likely to maintain an editorial presence in the country given the uncertainty of their investment.

**Chilling Effect on Press Freedom**

Beyond inefficiency, this rule risks chilling press freedom by placing journalists' ability to remain in the US under continuous government scrutiny through the frequent visa renewals. One of the main benefits for the D/S status of journalists is that the government is not involved in judging visas based on journalistic content, but bases visa approvals on a person's journalistic bona fides when they enter the country as part of a news organization. The proposed new rule states that for anyone who wants to renew their visa, which applies to any journalist who wants to be in the US for more than 8 months, "immigration officers can review their activities in the United States."[3] This could cause journalists to self-censor by avoiding controversial or critical topics altogether out of fear of being misunderstood, depriving billions of people around the world of content adapted to their community. Such outcomes directly contradict the United States' First Amendment values.

**Emboldening Authoritarian Censorship Regimes**

The frequent renewals proposed in this rule provides opportunities for other governments to retaliate against their journalists based in the United States. Immigration decisions often rely on intelligence from foreign governments, a practice RSF identifies as fraught with risks, given that some of this intelligence is dubious or politically motivated. For example, in a 2023 report, Freedom House stated that, "Criminal accusations made by origin-country authorities complicate already arduous immigration and asylum processes by forcing journalists seeking asylum to prove that they are not a security threat to the host country."[4] Other governments

---

[3] Federal Register. "Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media," August 28, 2025. https://www.federalregister.gov/d/2025-16554/p-210.

[4] Freedom House. "NEW REPORT: Governments Are Escalating Transnational Repression to Silence Journalists Around the World." Freedom House, November 27, 2024.

REPORTERS WITHOUT BORDERS

have submitted inaccurate Red Notices that have then been used in US immigration decisions as part of legal proceedings.[5] In one case, in a March 2018 New York Times editorial, James Harkin, Director of the Center for Investigative Journalism in London, said that through conversations with Syrian journalists he concluded the Turkish government, which regularly shares low-level NATO intelligence with the United States, likely shared information about his legal troubles with American authorities, whose systems then flagged him as a "potential terrorist" when he was applying for the visa. Such reliance by US authorities on dubious and politically motivated intelligence from foreign governments fits a pattern that RSF has observed in other cases."[6]

Overworked visa officers, inundated by frequent renewals, may also lack the resources and time necessary to properly vet the evidence in each application, increasing the risk they could accept misleading or false information aimed at suppressing independent journalism. Such misuse of intelligence can lead to wrongful denials or cancellations of visas, unfairly targeting journalists whose work is inconvenient to certain regimes.

The visa review process as it stands also often lacks a deeper understanding about the journalist profession, and applications that are flagged for incorrect or unsubstantiated claims can draw out processing times by months or even years. In January 2014, for example, "the highly-acclaimed British journalist Karl Penhaul, another case RSF previously highlighted, was apparently placed on the No-Fly List as a result of US authorities' misplaced suspicions generated by his work as a reporter in Colombia. While in Colombia, Penhaul reported extensively on the Revolutionary Armed Forces of Colombia (FARC), a US-designated foreign terrorist organization. Though the Department of Homeland Security notified him in 2016 that it had made corrections to its records, Penhaul was still unable to travel to the United States more than two years later."[7] Requiring thousands of international journalists who have worked in countries around the world to submit and be approved for visas every 240 days is an unrealistic proposal given the process already includes faulty foreign intelligence and incorrect automated flags that delay applications for months, and even years.

**Upholding U.S. Leadership and Reputation on the Global Stage**

---

https://freedomhouse.org/article/new-report-governments-are-escalating-transnational-repression-silence-journalists-around.

[5] National Immigrant Justice Center. "THE ROLE OF TRANSNATIONAL DATA SHARING IN THE U.S. IMMIGRATION SYSTEM," 2022.
https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2022-12/NIJC_Policy_Brief_Foreign_data_sharing_December-2022.pdf.

[6] Reporters Without Borders (RSF). "Why Is the United States Making It so Difficult for Foreign Conflict Reporters to Obtain Visas?" Reporters Without Borders (RSF), 2018.
https://rsf.org/sites/default/files/us_visa_analysis.pdf.

[7] Reporters Without Borders (RSF). "Why Is the United States Making It so Difficult for Foreign Conflict Reporters to Obtain Visas?" Reporters Without Borders (RSF), 2018.
https://rsf.org/sites/default/files/us_visa_analysis.pdf.

REPORTERS WITHOUT BORDERS

On the international front, restricting foreign journalists' duration of stay undermines American leadership and soft power. Billions worldwide depend on foreign correspondents in the U.S. to deliver accurate, culturally nuanced news about America. When these journalists face barriers or risk removal, their reporting suffers, creating a vacuum often filled by state-sponsored propaganda from adversaries such as China or Russia.[8] This erosion of reliable, independent international journalism diminishes U.S. influence and hampers an open, international dialogue that benefits American interests.

**Putting American Journalists Abroad at Greater Risk**
There is a well-documented pattern of authoritarian regimes retaliating against American journalists following restrictive U.S. policies, including those toward foreign media representatives. In fact, in 2020, DHS changed the duration for visas for Chinese journalists to 90 days, just as this rule does.[9] This led to immediate threats to American journalists in China, including the denial of visas for American journalists in China working for CNN, The Wall Street Journal, Bloomberg News and Getty Images.[10] Additionally, after increased U.S. visa scrutiny of Russian journalists, Russia expelled multiple American journalists, including correspondents from The Wall Street Journal, The New York Times, and Washington Post, citing visa violations widely seen as retaliation.[11] These examples underscore how burdensome visa policies in the U.S. can provoke retaliatory actions abroad, jeopardizing the safety and work of American journalists. Maintaining fair and predictable visa procedures for foreign journalists is essential to protecting reciprocal treatment for American media professionals.

**No Demonstrated Need for Change: Targeting Real Problems, Not Law-Abiding Press**
Finally, the proposed rule lacks any credible evidence of widespread abuse or noncompliance among I visa holders, nor does it demonstrate that the current "duration of status" system is ineffective. I visa applicants undergo thorough vetting by U.S. consular officers before admission, ensuring only legitimate representatives of foreign media gain entry. These visa holders are restricted to working solely for qualifying foreign media organizations and are subject to oversight by the Department of State and DHS, making them readily identifiable and monitored.

**Conclusion**

[8] The Washington Post. "Chinese propaganda surges as the U.S. defunds Radio Free Asia," June 6, 2025. https://www.washingtonpost.com/politics/2025/06/06/trump-radio-free-asia-cuts-china-propaganda/
[9] The New York Times. "U.S. Hits Back at China With New Visa Restrictions on Journalists," May 9, 2020. https://www.nytimes.com/2020/05/09/us/politics/china-journalists-us-visa-crackdown.html
[10] The New York Times. "China Freezes Credentials for Journalists at U.S. Outlets, Hinting at Expulsions," September 6, 2020. https://www.nytimes.com/2020/09/06/us/politics/china-us-journalists-visas-expulsions.html
[11] CNN. "Russia bans entry to dozens of American journalists, including WSJ, NYT and Washington Post," August 28, 2024. https://www.cnn.com/2024/08/28/media/russia-bans-american-journalists-wsj-nyt-washington-post

RSF REPORTERS WITHOUT BORDERS

In sum, this proposed rule threatens to waste taxpayer resources, undermine U.S. leadership, chill free expression, and harm American journalists abroad—all without addressing any real problem. RSF urges the Department of Homeland Security to abandon this misguided proposal and preserve America's longstanding commitment to press freedom, fairness, and efficient immigration enforcement.

Thank you for your attention to this critical matter.

Sincerely,
Reporters Without Borders, Inc.

# EXHIBIT 53

REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS

PO Box 34176
Washington, DC 20043
(202) 795-9300 • www.rcfp.org

PRESIDENT
Bruce D. Brown

STEERING COMMITTEE CHAIR
STEPHEN J. ADLER

VICE CHAIR
MARGARET LOW
WBUR

SECRETARY-TREASURER
MASSIMO CALABRESI
The New York Times

EXECUTIVE COMMITTEE MEMBERS
DAVID BOARDMAN
Temple University
THEODORE J. BOUTROUS, JR.
Gibson, Dunn & Crutcher LLP
GAIL GOVE
NBCUniversal
LAURA HANDMAN
Davis Wright Tremaine
DIEGO IBARGÜEN
Hearst
THOMAS C. RUBIN
OpenAI

STEERING COMMITTEE MEMBERS
MARTY BARON
Ret., The Washington Post
WOLF BLITZER
CNN
SEWELL CHAN
USC Annenberg
LYNETTE CLEMETSON
University of Michigan
JASON CONTI
Dow Jones
NIKHIL DEOGUN
Brunswick Group
MANNY GARCIA
Freelance Journalist
EMILIO GARCIA-RUIZ
The San Francisco Chronicle
JOSH GERSTEIN
POLITICO
ALEX GIBNEY
Jigsaw Productions
JAMES GRIMALDI
National Catholic Reporter
KAREN KAISER
The Associated Press
KIMBRIELL KELLY
Chicago Public Media
ALEX MACCALLUM
CNN
MATT MURRAY
The Washington Post
NORMAN PEARLSTINE
New York, New York
CHARLIE SAVAGE
The New York Times
NABIHA SYED
Mozilla
ADAM SYMSON
The E.W. Scripps Company
MATT THOMPSON
The New York Times
VICKIE WALTON-JAMES
NPR

*Affiliations appear only for purposes of identification.*

Submitted via regulations.gov September 29, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Re: Revision to the I Visa Program for Representatives of Foreign Media, RIN 1653-AA95/Docket No. ICEB-2025-0001.

The Reporters Committee for Freedom of the Press (the "Reporters Committee") and the 26 news media organizations listed below (together, the "Commenters") respectfully submit these comments on the proposed revisions to the I visa program for "bona fide representative[s] of foreign press." 8 U.S.C. § 1101(a)(15)(I); *see* Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 90 Fed. Reg. 42,070 (Aug. 28, 2025) [hereinafter "Proposed Rule"].

Commenters only address the proposed revisions to the regulations governing I visas for foreign information media representatives, and take no position on portions of the Proposed Rule addressing other visa categories.

The proposed revisions raise press freedom considerations. By shortening the visa term to eight months and requiring that the Department of Homeland Security (the "Department" or "DHS") review "the content that the foreign information media representative is covering in the United States" to determine eligibility for an extension, *id.* at 42,099, the Proposed Rule may entangle DHS in the supervision of journalism. Further, the new framework may chill reporting on the United States, especially reporting in the public interest about the government elements responsible for extension approvals; may invite other nations to retaliate against U.S. journalists; and lacks adequate justification.

## I. The Proposed Rule may chill newsgathering and reporting.

As the Department itself has previously emphasized, "The United States has for decades permitted individuals who are representatives of foreign information media outlets to remain in the United States for the entirety of the period that the individual is engaged in that activity." Period of Admission and Extensions of Stay for Representatives of Foreign Information Media Seeking to Enter the United States, 85 Fed. Reg. 27,645, 27,646 (May 11, 2020) [hereinafter "2020 Rule"]. By reducing the need for recurring encounters between reporters and the Department, the existing

approach avoids undue involvement of the government in the inspection or supervision of journalism.

By contrast, "shorter durations of stay, as well as increasing uncertainty during the visa renewal process," can more easily be manipulated to muzzle reporting. *Id.* at 27,647 (alleging that the People's Republic of China has shortened visas for U.S. reporters for this reason). The proposed revisions present a similar risk.

By shortening the initial length of an I visa to eight months, the Proposed Rule involves DHS in reviewing "the content that the foreign information media representative is covering in the United States" on a more regular basis. Proposed Rule, 90 Fed. Reg. at 42,099. That renewal process creates the risk that visas could potentially be denied on retaliatory grounds. Further, the reapplication process itself could chill legitimate reporting. Border authorities can be and have been used to pry into the content of journalists' work. *See, e.g.*, Sarah Grevy Gotfredensen, *Entry Denied*, Colum. J. Rev. (Apr. 10, 2025), https://perma.cc/GV73-LFAB (noting at least 55 instances of journalists stopped at the border since 2017, including instances where reporters were questioned or criticized by border authorities over their work). The proposed revisions would similarly expose foreign journalists' work to examination when their initial visa term expires, and the threat of that scrutiny may encourage reporters to avoid engaging in reporting perceived to be critical of the government in the first place.

At a minimum, the Department should adopt safeguards to prevent the misuse of information obtained via the extension application process, such as a provision for prompt expungement of any information gained about the subject matter of an applicant's reporting. The Department should also carefully limit the scope of any inquiry into "the content that the foreign information media representative is covering in the United States." Proposed Rule, 90 Fed. Reg. at 42,099. In many cases, such an inquiry would be unnecessary to demonstrate eligibility if the applicant can produce evidence of an employment contract in a journalistic role with a qualifying foreign news organization. There would be no serious question, for instance, that a person hired as the Washington bureau chief of a Canadian daily newspaper is engaged in "journalism" rather than "entertainment." *Id.* In any case, it is difficult to imagine any scenario in which it would be necessary for an applicant to submit more than a high-level description of a beat or assignment to demonstrate that their reporting satisfies the statutory criteria. The Department should make these limitations explicit.

The Department should also make clear that under *no* circumstances may an applicant be asked to discuss sources they have spoken to or expect to speak to in the course of their reporting. As the Supreme Court explained in a different context, "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972).

## II. The proposed I visa duration is too short and the Proposed Rule's revisions to the I visa program are inadequately justified.

Commenters agree with others who have submitted comments in this rulemaking that the proposed revisions are flawed because eight months may not be an "appropriate" measure of the time it takes foreign reporters to do their work. Proposed Rule, 90 Fed. Reg. at 42,099. The only reason the Department gives for asserting that the term *is* appropriate is that it mirrors the automatic extension provided to I visa-holders whose current visa would otherwise expire because they intend to change mediums or employers. *See id.*; 8 CFR § 274a.12(b)(20). This is a non-sequitur. There is no reason to think a period calibrated to give the government time to determine whether an applicant is eligible for a visa is also enough time for the applicant to complete the activities the visa is intended to support. The proposal is also inconsistent with the Department's previous view that visa terms of less than a year, coupled with the specter of non-renewal, can amount to "hostile measures targeting a free press" because of their disruptive effect on journalists' work. 2020 Rule, 85 Fed. Reg. at 27,646. The Department should maintain the existing duration-of-status framework or, at a minimum, lengthen the revised visa term considerably to ensure that it is adequate to support the reporting activities for which I visas are intended.

Commenters also agree that the proposed revisions create the risk that other nations will react by restricting the ability of U.S. journalists to work abroad. The Immigration and Nationality Act contemplates that the admission of journalists will be governed on "a basis of reciprocity." 8 U.S.C. § 1101(a)(15)(I); *see also* H.R. Rep. No. 82-1365, at 45. On that basis, the Department resolved to shorten the stays available to Chinese journalists because of China's use of short visa terms to "suppress[] . . . independent journalism in the PRC." 2020 Rule, 85 Fed. Reg. at 27,646.

The Department's proposed revisions, by restricting the ability of foreign journalists to report from the United States, now threaten to trigger retaliation by other countries against U.S.-based news organizations, which would impair international newsgathering and reporting by domestic members of the news media.

Finally, Commenters agree with other commenters in this rulemaking that the revisions are inadequately justified. In contrast with the Department's discussion of past misconduct by individuals holding F and J visas, the Proposed Rule fails to cite even anecdotal reasons—to say nothing of representative data—to think that I visa-holders pose a risk to national security or any other government interest. *See id.* at 42,080. The only evidence-based claim the Department makes to justify changes to the I visa program is that "the number of representatives of foreign information media has nearly doubled" since 1985, when the existing framework was introduced. *Id.* at 42,076. But resources available to vet them have far more than doubled in the same period, and media organizations already make great efforts to ensure their journalists comply with their visa requirements.

Accordingly, the cited interests for the proposed changes to the I visa program are speculative, and Commenters urge the Department to reconsider them.

## III. Conclusion

Commenters urge the Department to eliminate the proposed changes to the I visa regulations. At a minimum, Commenters urge the Department to revise the Proposed Rule with respect to I visas, to ensure that the I visa program cannot be used to retaliate against foreign journalists or chill newsgathering and reporting; to ensure that the visa term is long enough to support the reporting activities for which I visas are intended; and to ensure that it will not be cited by other countries to impair the international operations of domestic news organizations.

Please feel free to contact Grayson Clary, Staff Attorney at the Reporters Committee, or Gabe Rottman, Vice President of Policy, with any questions about these comments. They can be reached at gclary@rcfp.org and grottman@rcfp.org.

Sincerely,

The Reporters Committee
For Freedom of the Press

Asian American Journalists Association
The Associated Press
Association of Foreign Press Correspondents (USA)
Bloomberg News
The Center for Investigative Reporting
Committee to Protect Journalists
Dow Jones & Company, Inc. (The Wall Street Journal)
European Broadcasting Union
First Amendment Coalition
Foreign Press Association USA
The Intercept Media, Inc.
International Documentary Association
International Women's Media Foundation
The Media Institute
National Newspaper Association
The National Press Club
National Press Photographers Association
National Public Radio, Inc.
News/Media Alliance
The NewsGuild - CWA
Online News Association
Press Freedom Center at The National Press Club
Reuters News & Media Inc.
Society of Environmental Journalists
Society of Professional Journalists
Student Press Law Center

# EXHIBIT 54

**Ian Williams President, Foreign Press Association,**
**780 Riverside Drive# 9B, New York, NY 10032-7453, USA**
**Email:*ian.williams@foreignpressassociation.org* Phone: *+1 917 362 1477***

The Foreign Press Association has represented journalists working in the United States for international news outlets for over a century, since its foundation in 1919.

We have several hundred members, mostly in New York, but also in other cities across the USA, whose status reflects their diversity. New York's predominance in media makes it the prime location for anyone reporting on the US, whether covering finance, media, the arts or technology, and the United Nations, where international journalists have a vital role, explaining developments in the U.S. to the rest of the world. The task is multifaceted and complex and our members tend to be here on long term assignments.We are deeply concerned at the proposals to foreshorten the D/S which would have disproportionate effects on news reporting and information flow for other countries, but also impose huge personal costs. "DHS does not believe such a requirement would place an undue burden on F, J, and I nonimmigrants."

For many reasons, on which we will elaborate, the admission of journalists is *sui generis* and should better be considered separately from the other categories under consideration for change. The Department alleges that "Admitting most I nonimmigrants for D/S affords them different treatment from most other nonimmigrants, who are admitted for a specified period of time." However, it then proposes treating them differently since no other employment-based nonimmigrant visa category such as E-1/E-2, H-1B, L-1, O-1, P-1, TN, have such a short 240-day admission period.

Apart from the bureaucratic uncertainty for media personnel asked to uproot themselves and their families, the financial costs of filing an extension of status

with USCIS on Form I-539 are would currently incur $470 and thousands in legal fees, every 240 days.

Processing times for Form I-539 often exceed 240 days, and there is no option to file premium processing requests for these to speed adjudication. If there were a premium processing option, it would entail an additional $2,805 fee, which would be prohibitively expensive for most media organizations. Extensions for accompanying family members would raise the costs even further. In sum, the proposed rule makes it far more expensive and more complicated for global media organizations and journalists to access the United States.

Such a limit to the D/S would also place serious obstacles to the actual performance of reporting duties. Most states will not issue a temporary driver license to nonimmigrants who do not have a valid I-94/I-94W or employment authorization document (I-766) (see, e.g., https://www.tn.gov/safety/driver-services/classd/temporary.html).

During the period where an extension of stay is pending, I visa holders will have neither of those documents, so I visa holders who need to stay longer than 240 days - most of our members - will not be able to function normally in society in the absence of eligibility for a driver license while their extension of status is pending. This would be especially problematic for journalists who need to move around the US to cover events.

We deduce from the proposals and from the tenor of administration media announcements that a major motivation of these proposed rule changes is the protection of American jobs. Self-evidently this is not an issue with most of our members, who are employed and paid by overseas companies, often to write in foreign languages, and to provide an overseas perspective on US developments.

In addition, many of the overseas desks in the US are responsible for covering the whole hemisphere, Canada, Latin America and the Caribbean, so easy travel in and out the US is essential. The US would not benefit, financially or in reputation, if overseas media were to base their coverage in Toronto or Mexico City!

If the US wants informed reportage on its media, finance, technology, and diplomacy that reflects a diversity of viewpoints of the international press, it needs established correspondents who in turn need stability in their living arrangements, which is precluded by a need to leave and reapply.

The NPRM does not allege, let alone produce any information or evidence to suggest that journalists are more likely to violate their status now than they were in

1985, when D/S was introduced for I visas on the basis that they are "low risk in violating their status" **(50 FR 42006 (Oct. 17, 1985)).** Nor has anyone suggested that I Visa holders in any way pose a security threat to the country.

The notice of proposed change states, "There were 32,470 admissions for I nonimmigrant foreign media representatives in the United States in 2023, nearly double from the 16,753 admissions into the U.S. in 1985." We submit that this should be cause for congratulation, not concern, reflecting as it does the broadening of coverage of the U.S., perspective and media platforms in the expanding global information universe.

For over a half a century, that need had official organizational recognition with the USIA's Foreign Press Centers, in Washington, New York and Los Angeles, which facilitate and encourage journalists to study and report on the country. More recently the USIA was subsumed into the State Department, but the Centers continued the good work.

Throughout the Cold War, FPC's officers gave equal help to correspondents from China and Warsaw Pact countries, which certainly fostered positive feelings about the US and the First Amendment. For example, after Tienanmen Square we facilitated several Chinese correspondents from state agencies entering J-School here, who on their return to China opened non-state media channels inspired by their exposure to standards here.

There is an organizational model to allay any fears of abuse of D/S. In tandem with their visas, many overseas journalists hold renewable three-year accreditations from the Foreign Press Centers, which are issued and extended only after detailed verification of their ongoing professional activities in the U.S.

Subjecting these journalists to additional legal uncertainty, time-limited status, and repetitive application processes would do nothing to improve U.S. immigration enforcement or address abuse. What it will do, however, is impose unnecessary bureaucratic burdens on thousands of highly qualified professionals whose work promotes transparency, international understanding, and accurate reporting of life in America.

Forty years ago many US politicians inveighed against proposals for a "New Information Order" that bypassed the US. Those fears have not been realized. Indeed the US media, now including the Internet, is more influential than ever.

We did not see any reported problems from the Department of Homeland Security about the current five-year duration of status that would justify a reduction, let alone as drastic a change as has been proposed.

As we pointed out four years ago, the last time changes were considered, the I visa has to be very flexible to accommodate a wide range of circumstances, from short-term reporting missions to the needs of long-standing agency desks.

We would suggest that such a breadth of circumstances argues against prescriptive bureaucratic regulation, but rather, as now, informed application of broad principles, which takes into account actual journalistic practice in all its complexity, always bearing mind which the First Amendment commitment to freedom of the press.

Any revisions to I visa policies must also take into account the Headquarters Agreements the US has concluded with the United Nations and other International Organizations. For example, the 1947 agreement states, for example:

**The federal, state or local authorities of the United States shall not impose any impediments to transit to or from the headquarters district of ...((3) representatives of the press, or of radio, film or other information agencies, who have been accredited by the United Nations (or by such a specialized agency)**.

Our major objection has to be to **Proposed Rule, 90 Fed. Reg. at 42,099** – which asserts that 8 months (240 days) is the "appropriate" amount of time it takes foreign reporters to do their work. We politely disagree. For all the reasons adduced above. That duration might be appropriate for press covering rock stars or politicians, but not for serious coverage of the US - let alone the UN, World Bank our other international agencies.

The application of requirements for the Duration of Status, must take into account the rapidly changing media environment. When the terms were first drafted, foreign reporting was done with a manual typewriter, a telephone and a Telex and was mostly for the print media. It now covers a huge expanding spectrum of electronic media which is changing rapidly.

Commercial constraints mean that fewer agencies directly employ dedicated correspondents here or abroad. Even US media rely for their overseas coverage much more on freelancers who have to sell their work to a variety of outlets. Without formalizing adaptations, the various US agencies have met such changes with admirable pragmatism when dealing with I Visa applications and renewals.

The **Proposed Rule 90 Fed. Reg. at 42,076** asserts "the number of representatives of foreign information media has nearly doubled" since 1985, when the existing framework was introduced. The current program already includes strict accountability, transparency and compliance by tying each visa to a specific journalist and their employer.

We note that the proposals are short on details of actual abuse of the I Visa, which suggests that diligent application of existing rules, such as by the Foreign Press Center should be more than adequate to allay any unspecified fears. We suspect that the I Visa suffers from its lumping in with other non-immigrant visas which may indeed have concomitant problems of abuse. We take no view on those, but would mention the many students from around the world who enroll in Journalism and Media courses, which is a testament to the country's benign external image as a defender of the free press. They subsequently take those lessons aback with them.

To cover Wall Street, Hollywood, Broadway or City Hall in New York, let alone the Pentagon or White House entails, a commitment, to identifying and cultivating sources, to researching and imbuing the cultures of the US, the relevant state and industry/field.

Filing for taxes, arranging health care, procuring a drivers  license, securing leases or purchasing homes, finding schools for children and persuading a spouse to accompany a journalist are only possible on the basis of a long-term visa. Shortening the visa duration and requiring reapplications will undermine the ability of international reporters for all organizations to provide informed coverage of the United States. And, it will make it more likely, that coverage will be less informed, less based on relationships and knowledge of the complex dynamics of the country.

We already have cases of correspondents who by rule had to leave to reapply for an I visas which were refused or put on hold. They had to break their leases and arrange for repatriation of their belongings. These are early days, but as word get around the Real Estate industry such incidents will surely case increasing reluctance to provide accommodation to journalists.

Foreign correspondents in the US are positive for the economy. Their pay, coming from abroad, helps the balance of payments, while their coverage of the country, its media, culture and industry, contribute strongly to the maintenance of "Brand USA."  Certainly in the case of fashion and technology their work assists American exports. The US itself benefits from being pivotal in the global information network, and this should not be sacrificed.

In the light of the many different aspects of the profession, from so many different countries, we would be happy to contribute to a discussion of criteria to ascertain how genuine an applicant would be while advising flexibility rather than rigidity.

We respectfully suggest that the particular position of journalism requires it to be treated differently from most other visa types and that the duration of status admission remains the same.

Since no problems of compliance with the terms and condition of of the I isa has been identified, our concern is that the changes to the I visa are being made for political reasons.

A core principle of the U.S. is the freedom of the press. The changes that are being proposed will negatively impact the ability of our members to cover the U.S. and their contributions to the U.S.'s international relations for a century.

We are deeply concerned that the changes will serve to chill press freedom by creating uncertainty for foreign journalists over whether visas renewals will be based on coverage of events. Furthermore, tests of political correctness for gaining or retaining an I Visa would fly in the face of international standards and also challenge US constitutional protections and practices.

The foreign press is extremely diverse both in terms of perspective, organizations, countries and technology used to tell America's story. Changing the duration of I visa will impact all journalists in many ways.

The greatest concern around this change is that it may be used to selectively target specific publications and reporters in ways that are both inconsistent with the US constitution and global expectations of press freedom and will cause damage to the reputation of the United States while rising inciting retaliation from other countries' governments and media.

# EXHIBIT 55

The New York Times Company

David E. McCraw
Senior Vice President
& Deputy General Counsel

T 212 556 4031
mccraw@nytimes.com

620 8th Avenue
New York, NY 10018
nytimes.com

September 28, 2025

**VIA REGULATIONS.GOV**

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW
Washington, DC 20536

Re: Revision to the I Visa Program for Representatives of Foreign Media, RIN 1653-AA95/Docket No. ICEB-2025-0001

To ORAP:

I write on behalf of The New York Times Company to provide these comments on the Department of Homeland Security's proposed changes to the I visa program for foreign journalists. *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42,070 (Aug. 28, 2025) [hereinafter "Proposed Rule"].[1] While others have spoken to how the proposed changes would affect foreign news organizations' ability to cover U.S. affairs for their readers and viewers, we write to raise a separate concern: that the Proposed Rule is likely to prompt foreign governments to reciprocate with their own visa restrictions that will make it more difficult for U.S. news organizations to effectively inform the U.S. public about international

[1] The Times takes no position on portions of the Proposed Rule addressing other visa categories.

affairs. We respectfully urge the Department to reconsider the Proposed Rule.

It is The Times's mission to pursue the truth and help our readers understand the world. In furtherance of that mission, we send reporters to every corner of the globe to cover the stories that matter. In a typical year, we report from as many as 160 countries. Journalists working abroad, including those from The Times, regularly operate in countries that are hostile to free expression or skeptical of the foreign press. They carry on because independent international journalism is critical to U.S. readers, including policymakers in our own country, as they try to understand the politics, culture, and economics of America's competitors, allies, and enemies.

For those of us with international news operations, we know well that the Proposed Rule's impact would extend beyond U.S. borders. The United States admits foreign journalists on "a basis of reciprocity." 8 U.S.C. § 1101(a)(15)(I). The U.S. has long gained more from such exchanges than its rivals and adversaries. The American people get a better understanding of sometimes-closed societies through the work of independent U.S. journalists, while foreign journalists are exposed without filter to American way of life. That reciprocity has long been important for U.S. journalists seeking to work abroad. *See* Christopher S. Wren, *Soviet to Extend Newsmen's Visas*, N.Y. Times (Sept. 30, 1975) (describing a "reciprocal" agreement between the United States and USSR to ease visa requirements for journalists).

Against this backdrop, the Department's proposal to dramatically shorten the visa terms of foreign journalists working in the United States is troubling. *See* Proposed Rule at 42,099-42,100. Should other nations respond by shortening visa periods, American journalists would find themselves under closer scrutiny by foreign agencies as they face repeated visa renewals. They also become more susceptible to arbitrary visa denials or denials driven by a foreign government's unhappiness with critical coverage. The risk with more stringent visa requirements is that experienced and knowledgeable journalists would

be forced out in favor of new colleagues who would need time to develop their expertise and cultivate trusted sources in a new country.

As much as we might hope that other countries would simply choose to give long-term visas to U.S. journalists because they believe in press freedom, the truth is that visa rules are driven by concerns about reciprocity. Other nations cannot be expected to disregard what the United States is doing and quietly accept the inconveniences being visited upon their own journalists working here. Continued tit-for-tat tightening of visa terms leaves everyone worse off. It makes it harder for American journalists to cover the most important stories around the world, particularly when those stories hold powerful foreign actors to account. And it leaves U.S. readers less informed about, and less equipped to engage with, world affairs.

The Department should not enact rules that could have such consequences for American journalists and readers without good reason. We are not aware of incidents in which foreign journalists working in the U.S. have taken advantage of the current longer visa period to engage in conduct that threatened harm to U.S. interests. And even if foreign journalists did pose such a threat, it is not clear why a shorter visa period would be an effective way to remediate such problems.

In sum, we ask the Department to consider how the Proposed Rule could ultimately undermine American journalists working abroad and potentially deprive the American people of the kind of independent journalism that they need. The Proposed Rule should not be adopted in its current form.

Sincerely,

David McCraw

David E. McCraw

# EXHIBIT 56

University of New Hampshire

Office of the Provost and
Vice President for Academic Affairs

207 Thompson Hall
105 Main Street
Durham, NH 03824-3547

V: 603.862.3290
F: 603.862.4741
TTY: 7.7.7 (Relay NH)

U.S. Citizenship and Immigration Services
Department of Homeland Security

September 26, 2025

**Re: Comment on Proposed Rule Eliminating "Duration of Status" for F and J Visa Holders (Docket Number ICEB-2025-0001).**

The University of New Hampshire (UNH) writes to express strong opposition to the proposed rule eliminating "duration of status" (D/S) and imposing fixed, date-specific admissions for F and J nonimmigrants. This proposal would cause significant harm to international students and exchange visitors, to the academic integrity and decision-making authority of U.S. universities, and to the global competitiveness of American higher education. It would also lead to government inefficiency by creating duplicated work efforts in the federal government and generate redundant compliance work for institutions of higher education.

**1. The proposed four-year admission period does not align with academic norms and threatens the US economy by slowing the expansion of our technical workforce.**

The proposed rule limits admission to the shorter of four years or the program end date on Form I-20/DS-2019, after which students must file an extension of stay (EOS) with USCIS. This rigid approach is inconsistent with the structure and length of many degree programs:

- According to the National Center for Education Statistics, the median time to complete a bachelor's degree in the U.S. is 52 months (4.3 years), and the National Science Foundation reports a median of 5.7 years for a PhD in STEM fields, which are the predominant fields of completion for international students.
- According to the most recent analysis by the National Center for Education Statistics, over half of all doctorates were awarded to temporary visa holders (https://nces.ed.gov/programs/coe/indicator/ctb/graduate-degree-fields). In the 2024 Survey of Earned Doctorates, NCES highlights important technical fields with high international graduates: computer and information sciences (62%), engineering (56%), and mathematics and statistics (53%). A reduction in those numbers, and thus eligible workers in crucial technology fields, would negatively impact the U.S. workforce.
- Many degree pathways—particularly PhDs, medical and law programs, dual degree tracks, STEM fields such as engineering and artificial intelligence, as well as programs involving co-ops or study abroad—routinely extend beyond four years because the technical requirements for developing skills, and the necessity of launching independent research projects, takes time to develop.
- At UNH, we currently offer 44 PhD programs with over 272 international students currently enrolled in academic programs where the normal time to degree exceeds 4 years.
- As of our last NECHE accreditation, the average time-to-degree for all doctoral students at UNH is 5.6 years, and that is in line with national averages. International students in

that same period had slightly lower time-to-degree, so there is no evidence that they are exploiting loopholes in the education system to extend their time.

- Alternate Time Limit: if a time limit must be imposed, 6 years would be a more appropriate limit, after which extensions could be required. Anything lower than 6 years would dampen recruitment of international students because it would clearly not fit with current academic standards for PhD completion.

By requiring EOS applications for such standard academic timelines, the rule introduces unnecessary costs, delays, and uncertainty for students, undermining their ability to complete studies in the U.S.

**2. The proposed reduction of the departure period after completing an F-1 program from 60 days to 30 days creates an unfair process for students completing degrees, seeking employment, and seeking extensions.**

Slow processing times in some countries have produced enormous backlogs and disparate treatment of applicants. This reduction, coupled with the elimination of “duration of stay,” creates an unfair practice for students from some countries over others.

Further, the reduction creates a much shorter opportunity to seek employment and thus detracts from the focus of the student on their educational progress, which is the intended aim of the F-1 program: to foster degree completion.

The goal of Optional Practical Training (OPT) and Curricular Practical Training (CPT) policy is to create pathways for international students to meet workforce needs, so changes like this proposed shortened timeline, defeat the purpose of the original policies put in place to encourage recruitment of workers.

**3. The proposed rule intrudes on academic decision-making without meeting its objective of reducing our national security risk.**

Currently, universities certify academic progress through the Student and Exchange Visitor Information System (SEVIS), a system in place for two decades that allows DHS to monitor compliance. The proposed rule would shift responsibility from designated school officials—who are experts in evaluating student progress—to USCIS adjudicators, who lack academic context. This is an unwarranted intrusion by the federal government into an area that creates government waste by duplicating resources.

Furthermore, the proposed restrictions on academic mobility—such as prohibiting F-1 students from changing programs in their first year, barring graduate students from changing programs altogether, and disallowing “reverse matriculation” (entering a lower or lateral degree)—conflict with the realities of student decision-making and undermine recruitment and retention.

The Administration points in the rule to F-1 students whom they claim are seeking new degrees to stay in the US indefinitely. We do not see that in our data, nor do we think it is a norm in higher education.

At UNH over the past 10 years, we have a normal range of 10-11% of international students that need to modify their academic programs each year due to normal expected academic progress.

Academic advisors work to align students properly with academic advising resources and expected career outcomes. "Change of degree" requests are often a "routine" change of options within an existing degree: the student may opt for a new focus area but remain in an MBA, for example, or shift their research focus within a PhD but stay within a PhD. These routine cases represent 64% of the students, or 7% of the total population: they simply shift their focus. Under the proposed rule, a needless bureaucratic immigration process would be required, creating more blocks in the current immigration system.

The new rule also requires new paperwork for changing degree levels that is a normal part of academic progress and/or evaluation, and is also not common: 1.6% of international students over the past 10 years at UNH have moved "up" a degree level (from Masters to PhD), a normal process they follow by meeting academic benchmarks. Meanwhile, 2.4% go "down" a level—all but 2 from PhD to Masters—because they failed to meet academic benchmarks. These are uncommon instances, but important ways our system evaluates students on their academic merits, whether they are international or domestic.

Imposing a need for filing additional F-1 paperwork for normal academic alignment is an unnecessary administrative burden that serves no educational function and will significantly decrease efficiency. We do not believe the rule addresses a scale problem, and we think it creates a very serious scale problem for adding bureaucratic review where it is unwarranted.

**4. The proposed rules increased administrative burdens and creates a USCIS backlog.**

The proposal would dramatically increase the number of EOS applications—DHS itself estimates an additional 414,000 annually—at a time when USCIS is already managing a historic backlog of over 11 million cases. Such delays risk students falling out of status through no fault of their own, slowing their academic trajectory and harming US interests.

At UNH, we anticipate the need for approximately 350 EOS applications every year if this proposal is enacted. In addition, UNH anticipates requiring additional staff resources and costs that would otherwise be directed to academic and student support.

UNH understands the Administration's concerns related to misuse of the F and J visa programs by isolated individuals, but we think the proposed rule will do more harm to students who are legitimately attempting to matriculate and future international student recruitment than the scale of abuse warrants.

**5. The rule threatens to diminish the economic and research contributions of international students to the U.S. economy.**

International students and exchange visitors are critical to U.S. higher education, research, and the economy. They contribute not only through tuition and fees, but also as teaching assistants, research collaborators, and members of the broader community. They help sustain academic programs that might otherwise be unavailable to domestic students and provide cultural competencies that prepare all students for a global workforce. UNH works assiduously on efforts to develop the domestic STEM pipeline, including important work as an active research institution in an EPSCoR Region to which we contribute time and research talent. But many PhD programs do not receive enough applicants from domestic PhDs to fill available slots for projects.

According to NAFSA, international students contributed over $40 billion to the U.S. economy in recent years[1]. The proposed rule would jeopardize these contributions by deterring students from choosing the U.S. in favor of countries with more flexible immigration systems.

In the state of New Hampshire, a recent economic study concluded that international students contributed more than $198 million while supporting more than 1,700 jobs. About 30-35% of our PhD graduates are international (around 25 each year), and they have strong track records of contributing to science and industry when they complete their degrees.

**6. SEVIS is sufficient—this rule is duplicative and unnecessary.**

SEVIS already provides DHS the ability to track international students, verify their academic progress, and detect potential fraud. This system allows for oversight and fraud detection at the appropriate administrative level. The proposed rule duplicates these processes, adding administrative burden and expense without improving oversight.

---

**Conclusion**

The proposed rule is unnecessary, duplicative, and harmful to international students, universities, and the U.S. economy. It undermines institutional authority over academic progress, worsens USCIS backlogs, and reduces the appeal of U.S. higher education at a time when global competition is intensifying. The United States is a technological leader in the world because we continue to attract top talent from around the world to join our great tradition. The Administration's goal of retaining its role as a world leader is advanced by continuing to support the expansion of this pipeline through the lawful and regulated immigration of talent in our institutions of higher education (IHE).

For these reasons, we urge USCIS and DHS to withdraw this proposal and maintain duration of status as the framework for F and J nonimmigrant admission.

Respectfully submitted,

Jeanette E. Riley

Dr. Jeannette E. Riley, Ph.D.
Provost and Vice President for Academic Affairs
University of New Hampshire

[1] https://www.nafsa.org/sites/default/files/media/document/EconValue2024.pdf

# EXHIBIT 57

UCCS University of Colorado Colorado Springs

September 29, 2025

Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street SW, Washington, DC 20536

*RE: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (RIN 1653-AA95)*

On behalf of the University of Colorado Colorado Springs (UCCS), thank you for the opportunity to comment pursuant to DEPARTMENT OF HOMELAND SECURITY 8 CFR Parts 214, 248, and 274a [DHS Docket No. ICEB–2025–0001], RIN 1653–AA95: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media. AGENCY: U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS).

UCCS is a leading public research university in Southern Colorado, dedicated to fueling innovation, advancing knowledge, and serving all the communities of Colorado. Nestled at the foot of Pikes Peak, UCCS combines academic excellence with a spirit of exploration, offering a wide variety of undergraduate, graduate, and doctoral programs across six colleges. With a strong emphasis on hands-on learning, research and community engagement, UCCS empowers students to turn ideas into impact. As part of the state’s largest university system, UCCS drives economic and workforce development in the Pikes Peak region and beyond.

UCCS has enrolled thousands of international students and scholars over the years, representing more than 60 countries. Our Designated School Officials and Responsible Officers have many years of experience working with SEVIS, monitoring compliance, and supporting students as they work toward completing their academic programs. This work gives us a clear perspective of how this proposed rule would affect both our students and the institution. With these comments we look to inform revisions to the proposed rule to mitigate the impact on US higher education and the US economy. Our concerns regarding the proposed rule include: the limitations of the proposed four-year admission period, the uncertainty it creates for international students amid existing USCIS backlogs, the lack of consideration for institutional decision-making and academic mobility, the failure to recognize international student contributions, and the disregard for the strong oversight system already in place through SEVIS.

**Limitations of the Proposed Four- Year Specific Admissions Period**

Replacing Duration of Status with a proposed fixed period of admission capped at four years is insufficient because academic programs may take longer than four years to complete. Undergraduate students often need longer than four years to graduate, especially those in engineering, nursing, health sciences, or students who double major. The average completion time for first-time, first-year international students at UCCS to earn a bachelor's degree is 4.05 years—just above the proposed threshold. Additionally, Ph.D. and some dual graduate degree programs at UCCS are not designed to be completed in four years and may take up to seven years to complete.

National data shows that a majority of students do not complete their degrees in four years. According to the U.S. National Center for Education Statistics (NCES), only 44% of 2015-16 first-time, full-time bachelor's degree students completed within 48 months (4.0 years). (NCES Digest of Education Statistics, Table 326.10, 2022). For graduate education, data from the National Science Foundation's Survey of Earned Doctorates shows that the median time to doctorate in science and engineering fields is 5.8 years, and in the humanities it extends beyond 7 years (NSF NCSES, Doctorate Recipients from U.S. Universities, 2022). These timelines reflect normal, satisfactory academic progress and not deficiencies on the part of students. At UCCS, our Ph.D. programs range from 5 to 7 years for completion. These are not signs of failure on UCCS or our international student population, but it accurately reflects the complexity and rigor of U.S. higher education.

**Uncertainty for International Students and USCIS Backlogs**

The proposed rule would create uncertainty about whether international students could complete their programs and would force them into a time-consuming, expensive, and risky process. Filing fees, attorney costs, and biometrics would impose a heavy financial burden on each student, while USCIS backlogs and inconsistent adjudications would threaten students' ability to complete their studies. These hurdles would apply even to students who are meeting all academic expectations, penalizing them simply because their degree program takes longer than four years. Imposing a four-year rule would force thousands of students into the costly and uncertain Extension of Stay process even when they are making normal progress. It would penalize students pursuing demanding fields or doctoral research, and it would be particularly harmful to international students at institutions such as ours where programs simply take longer than the proposed limits due to their rigor.

**Institutional Decision Making and Academic Mobility**

The proposed rule does not account for current processes in existence, within universities. At UCCS, extension requests put forward by students are carefully reviewed by UCCS' International Student and Scholar Program ("ISSP") staff in consultation with faculty and their departments. ISSP reviews academic records, advisor recommendations, and individual student circumstances. Our team has the knowledge of

the unique circumstances of each case to grant extensions only when needed. Removing institutions from the process and moving the burden to USCIS, where a historic backlog exists, would not be advisable.

The proposed rule would limit student mobility by not allowing F-1 students in their first year of study under the graduate level to change their program and prohibiting certain changes of level or pursuit of additional degrees. It is common for undergraduates to transfer between programs or for students to move from a bachelor's degree into a master's degree program.

The proposed rule would disallow international students to pursue a program at the same or "lower" degree, creating uncertainty around the ability to pursue dual degrees. Additionally, sometimes graduate students change from a Ph.D. to an additional master's degree for various valid reasons, which would no longer be allowed. These pathways are already tracked in SEVIS and restricting them would harm recruitment and unfairly penalize non-traditional students.

**Contributions of International Students**

International students are vital to our campus, Colorado Springs, and the state of Colorado. Our students work as research and teaching assistants and serve as leaders in student organizations. Their presence enriches our classrooms and helps prepare U.S. students for a global workforce. They also contribute directly to the local economy. According to NAFSA's International Student Economic Value Tool, international students add over $40 billion to the U.S. economy annually, including over $400 million dollars to Colorado. Further, UCCS International Students contributed $6.3 Million to the local Colorado Springs economy during 2023-2024.

**SEVIS**

The proposed rule does not take into account SEVIS, which already provides DHS with a strong oversight system. At UCCS, our ISSP staff: submit required reports each term confirming enrollment, progress, and status changes; and issue new I-20s or DS-2019s when extensions are needed. The SEVIS system has been effective for decades and gives DHS real-time visibility without imposing new costs and delays. The proposed rule's requirement for extension request filings duplicates SEVIS reporting requirements, since universities hosting international students and exchange visitors are already required to monitor full-time enrollment, participation in exchange visitor activities, arrival on campus, physical presence on campus, etc. Current regulations state that failing to engage in this oversight could jeopardize the university's ability to participate in the F-1 and J-1 visa programs. Additionally, adding an Extension of Stay requirement would only exacerbate existing USCIS backlogs.

Other countries are moving in the opposite direction. Canada has expanded its Post-Graduation Work Permit Program and admitted more than 800,000 international students in 2023, the highest number on record (IRCC, 2023). The United Kingdom reintroduced its Graduate Route visa in 2021, allowing international graduates to stay and work for up to three years (UK Home Office, 2021). Australia extended

post-study work rights in 2023, granting international graduates up to six years in fields of skills shortage (Australian Department of Education, 2023). This proposal sends the opposite message, and that the United States is no longer a reliable or supportive place to study.

**Conclusion**

For all these reasons, we respectfully urge DHS to withdraw this proposed rule, which would have a significant adverse impact on our institution and our international student community.

We appreciate the opportunity to submit comments to the proposed rule for your consideration. If you have any additional questions, please reach out.

Sincerely,

Jennifer Sobanet, Ed.D.
Chancellor

# EXHIBIT 58

Northern Illinois University
Office of the President

September 29, 2025

U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street S.W.
Washington, D.C. 20536

RE: DHS Docket No. ICEB-2025-0001, Comments in Response to Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media.

On behalf of Northern Illinois University (NIU), I submit this comment letter in response to the U.S. Department of Homeland Security's (Department or DHS) proposed rule, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (DHS Docket No. ICEB-2025-0001), published August 28, 2025.

Request:
We believe this rule is arbitrary and capricious. We urge that the proposed rule be withdrawn in its entirety, and that the current admission for the duration of status remain in effect. We urge the Department of Homeland Security to utilize the systems they already have in place, to achieve their goals.

General Information on NIU:
Northern Illinois University, located in DeKalb, IL approximately 60 miles from Chicago, has:

- A student body of over 16,000
- Approximately 1,350 active SEVIS records for students and exchange visitors in F-1 and J-1 status
    - 650 F-1 and J-1 students currently enrolled
    - 700 recent graduates participating on OPT & STEM OPT
- Approximately 300 enrolled students pursuing academic programs that normally take four or more years to complete.
    - Nearly 150 Ph.D. and other Doctoral students pursuing programs that have durations of five to seven years

**International students have made extensive contributions to our campus, the DeKalb community, and the nation.**

- Nationally, international students studying at U.S. colleges and universities contribute $43.8 billion and support 378,175 jobs to the U.S. economy annually. For every three

international students, one U.S. job is created and supported by spending in the higher education, accommodation, dining, retail, transportation, telecommunications and health insurance sectors.
    - In Illinois, international students contribute $2.4 billion to the economy and support 23,055 jobs annually.
    - International students at NIU are estimated to contribute $26.5 million to the U.S. economy, supporting 201 jobs annually.[1]
- NIU has international students from 104 countries who come to live and study in DeKalb, IL. Their contributions to the core values of the institution, are placed at risk by rules that make completing an education in the U.S. more daunting.
- The continuation of a number of academic programs will be imperiled if international students are deterred from attending, thereby limiting opportunities for U.S. students to achieve an education in STEM fields.

**The proposed rule demonstrates an intrusion into academic decision-making; such intrusion is unwarranted, unnecessary and harmful to academic institutions.**

- The proposed rule encroaches on the role of the academic institution. It should be an academic institution's responsibility alone to evaluate student progress and determine whether a student requires additional time to complete a degree, not the federal governments.
- It is inappropriate and overreaching as the rule proposes to give a USCIS officer the ability to evaluate whether a student is making good academic progress, rather than the school who has the knowledge of the academic program and curriculum required to make such academic progress.
- At NIU, international students are responsible for their own immigration status. All academic requests require support and certification from academic advisors or departments. International students' academic success and timeline are determined by those most familiar with their progress and performance.
- The proposed rule states that students must show "compelling academic reasons" when applying for an Extension of Stay (EOS). Compelling academic reasons are not clearly defined by the proposed rule. This provides the government with more discretionary power over the students' academic program than the colleges and universities granting the degrees. It's an institution that has the in-depth understanding of its academic programs, who should make these determinations.
- The proposed rule says academic difficulties are *not* a compelling academic reason for an EOS request. Providing a single example of what is not a compelling academic reason does not provide enough clarity for students or schools. It also creates an inherent contradiction with 8 CFR 214.2(f)(6)(iii)(A) which sets forth that the DSO may authorize a reduced courseload based on academic difficulties in a student's first semester, including initial difficulty with English/reading, unfamiliarity with U.S. teaching methods, and/or improper course placement. Such authorization by a DSO may create the need for an EOS, which could then be denied by DHS under the proposed rule.

[1] NAFSA Economic Value Tool http://www.nafsa.org/economicvalue.

- NIU has a multi-step process that our PDSO and DSOs follow prior to granting a program extension.
    - The student must initiate the extension request; the request must be supported by the students' Academic Advisor who provides the PDSO or DSOs the number of credits or requirements remaining to complete degree, the academic reasons the extension is necessary, and expected completion date; the student must then submit financial documentation to cover the length of the extension; the PDSO or DSOs then review the request with reference to the totality of the students' immigration record.

**SEVIS has extensive information on nonimmigrants in F and J status, sufficient to accomplish DHS's goals outlined in the proposed rule. This makes the rule duplicative, wasteful, and unnecessary.**

- F and J nonimmigrants are admitted for duration of status. The proposed rule finds issue with the fact that this is unlike "most other nonimmigrant categories". However, no other categories are connected to an extensive electronic reporting system like SEVIS.
- SEVIS provides DHS immediate and direct access to detailed information related to almost every F and J nonimmigrant event that could impact compliance with regulations. For information that is not directly reflected in SEVIS, DHS also has the authority to request "on any individual student or class of students upon notice" all information and documents that schools are obligated under 8 CFR 214.3 to retain throughout the student's enrollment and for a period of 3 years beyond that.
- When applying for an EOS under the proposed rule, students would be required to submit supporting documentation and information o DHS that would already have been obtained by their schools or programs; and is the same information that schools and programs have already reported in SEVIS or are required to retain by existing regulation. Requiring students to submit this same information to USCIS that DHS already has access to is wasteful and duplicative.
- DHS currently has the resources and capabilities with SEVIS to identify individuals of concern without the need to burden the majority of the nonimmigrant population who are not of concern with this duplicative rule. As an example, DHS was able to identify 2100 students of concern for the purpose of this proposed rule.
- The Homeland Security Investigations' (HSI) Project Campus Sentinel remains active under the Counter Threat Lead Development Unit (CTLD). Therefore, there are systems and teams currently in place to monitor students and campus compliance. Additional measures would be duplicative of these efforts. Under the limited interactions NIU has had with agents under this program we have provided all required documentation.

**The date-specific admission does not accommodate the normal time to completion for many academic programs.**

- Four-year admission limits are impractical, and do not conform to academic program lengths, which can vary due to many factors.[2]

[2] "Time to Degree." National Center for Education Studies. https://nces.ed.gov/fastfacts/display.asp?id=569; Kowarski, Ilana. "How Long Does It Take to Get a Ph.D. Degree?" U.S. News. https://www.usnews.com/education/best-graduate-

- The rule does not recognize today's reality of the time needed for degree completion in many academic programs, such as students pursuing Ph.D.'s, post doctorates, joint degree programs, and those pursuing dual or accelerated programs among others.
- There are many reasons that students, regardless of where they are from, may require more than four years to complete their degrees. Common reasons for additional time to degree at NIU include:
  - Ph.D. and other Doctoral degrees, normal time to completion is five to seven years rather than four years (approximately 20% of NIU's international student population fall into this category).
  - Changing from a Bachelor of Arts to a Bachelor of Science degree may require additional courses, especially if a student makes this change well into their program of study.
  - The addition of a minor for undergraduate students or the addition of an emphasis for graduate students would typically require additional courses.
  - Research delays for graduate thesis or dissertation students may be caused by an uncertain funding landscape, broken equipment, unexpected findings that require further investigation and other common research delays could require additional time to completion.

**Date specific admission would inhibit students' academic mobility**

- The proposed rule takes issue with the fact that F-1 and J-1 nonimmigrants are treated differently than other nonimmigrant categories. Our immigration system has long been based upon intent. The intent to pursue a degree requires flexibility to navigate the often-fluid nature of higher education.
- It's a normal and common pathway for students who enroll at a community college to transfer to another institution to complete a Bachelor's degree. This proposed rule creates an undue burden on students in the early stages of their educational pursuits. As they would have to undergo all the current transfer procedures and pay for and submit an EOS petition to seek permission from USCIS.
- Many institutions including NIU have accelerated degree pathways for students earning a Bachelor's degree, to begin pursuing a Master's during their senior year. The burden and timing of the EOS requirement would cause confusion over eligibility, and could delay or prevent students from pursuing these programs.
- The proposed rule would add burdens and restrict access to 2+2 programs and other agreements established between academic institutions. NIU currently maintains 161 active agreements with Illinois community colleges, including 56 2+2 agreements, 37 program-to-program articulations, and 21 guaranteed admission programs. These agreements are designed to streamline the transfer process, minimize credit loss, and enhance student mobility across the region. This proposed rule would prevent students from accessing these well-established opportunities, undermining their ability to complete degrees efficiently and affordably.
- The rule restricts students' ability to pursue a degree at a lower educational level or pursue multiple degrees at the same educational level.

---

schools/articles/2019-08-12/how-long-does-it-take-to-get-a-phd -degree-and-should-you-get-one. August 12, 2019.

  - It is not uncommon for students to begin pursuing a Doctoral or other terminal degree to decide that they are better suited for a Master's degree.
  - It is common for individuals to pursue multiple Master's programs in different subject areas. At NIU many students who earned a Master's degree in Engineering, then pursue an MBA to expand their business and leadership acumen.

**The proposed rule ignores DHS and USCIS's inability to timely process applications to ensure that institutions and students are able to efficiently move forward along current academic timelines.**

- The timeline and logistics are unworkable due to the uncertainty and length of current processing times for extension of status applications. USCIS' own website[3] lists a processing time of 4.5 months on I-539, Application to Extend/Change Nonimmigrant Status to F or M student or J exchange visitor category.
  - USCIS is currently experiencing a backlog of 11.3 million cases.[4] In the proposed rule, DHS has estimated an *additional* 414,000 EOS petitions would be filed yearly as a result of the changes. In FY 24, only 253,876 EOS petitions were filed[5]. Given this backlog, we believe these additional petitions could overextend USCIS' capacity.
- Additional backlog pressures will result in extended adjudication timelines which would result in uncertainty, disruption and potential harm to the student and academic institution.
- The increased adjudication burden from this proposed rule may lead to more significant delays on all applications within USCIS, increasing uncertainty and volatility throughout the legal immigration system, disrupting business interests and the economy.

**Implementing the rule would result in a significant burden for institutions and the offices that provide support and immigration guidance to international students.**

- In its assessment of the costs of the proposed rule, DHS asserts that DSOs and ROs would primarily be impacted by the change in the first year of implementation. DHS further estimates that it would take 67 total hours to complete rule familiarization training, create and modify training materials, and adapt to the proposed rule through system wide briefings and systemic changes.
- The Department significantly underestimates the amount of time it will take for DSOs and ROs to adapt to the changes and provide necessary training, materials and resource updates for a wide variety of stakeholders including students, academic advisors, faculty, career counselors, and senior leadership. NIU estimates the implementation and adaptation to the new rule would take at least three times the 67 hours cited in the

---

[3] https://egov.uscis.gov/processing-times/; processing times access September 19, 2025
[4] U.S. Citizenship and Immigration Services. (2025, June 30). *All USCIS application and petition form types (Fiscal Year 2025, Quarter 2)*[Data File]. U.S. Department of Homeland Security. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx
[5] U.S. Citizenship and Immigration Services. (2024,December 29) *All USCIS application and petition form types (Fiscal Year2024, Quarter 4)*[Data File] U.S. Department of Homeland Security. https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx.

proposed rule. It also fails to understand the ongoing commitment to advising and processing that will be needed beyond the first year of implementation. This change impacts all areas of international student advising and planning.

- While the majority of international students at NIU complete their programs in four years or less, the vast majority choose to participate in OPT and STEM OPT.
    - Approximately 1,350 active SEVIS records for students and exchange visitors in F-1 and J-1 status
        - 650 F-1 and J-1 students are currently enrolled
        - 700 OPT & STEM OPT
    - Approximately 300 enrolled students are pursuing academic programs that normally take four or more years to complete.
        - Doctoral: Approx 150 (normal time to completion five to seven years)
        - Bachelors: Approx 150 (normal time to completion four years)
    - Approximately 325 students on Post Completion OPT
    - Approximately 375 students on STEM OPT Extension
- For students currently enrolled, NIU estimates our international student population will require a total of approximately 800[6] EOS applications to complete their academic programs and utilize visa benefits like OPT (or Academic Training for J-1s).
- For the academic year 2024-2025, former NIU students filed approximately 300 STEM OPT Extensions. We estimate that the proposed rule would lead to at least 300 EOS applications for STEM OPT Extensions in addition to the 800 estimated above.
- Using the Departments own estimated cost of $233 and three hours per 1100 EOS petitions, this will cost NIU $256,300 and 3,300 hours of (P)DSO/(A)RO time.
    - This will add 1.68 years of work added to our (P)DSO and (A)RO duties

**The proposed rule makes U.S. higher education less competitive internationally.[7]**

- The proposed rule fundamentally alters the agreement between current international students and institutions midway through their academic programs. It's a mistake to create yet another hurdle to study in the United States. Our international competitors (including, Canada, the United Kingdom, Australia, Germany) see the value of international students and are implementing policies to attract and retain them, including students from the United States.
- International students rely on their academic institutions to provide them with confidence to complete their entire academic program. If colleges and universities are unable to do so, they will decide to study in another country that can guarantee their degree completion.

**In conclusion, given these extensive concerns we strongly oppose this proposed rule and ask that DHS withdraw it.** We believe it is based on flawed data and attempts to address problems that don't exist among our international students and scholars or within the current system. DHS should work with institutions of higher education to address the limited issues of fraud and abuse raised in the proposed rule, by utilizing the already established SEVIS system and other programs

[6] 650 students at least 1 EOS for OPT. 150 PhD students at least 2 EOS for academics and OPT.
[7] https://www.forbes.com/sites/brandonbusteed/2020/07/27/want-to-know-where-international-students-are-headed-next-year/#25774d262609

like Campus Sentinel. DHS and the federal government should support academic flexibility for nonimmigrant student and scholars so the U.S. can continue to attract international talent to support and strengthen the U.S. education and research enterprises and the U.S. economy.

Sincerely,

Dr. Lisa C. Freeman, President
Northern Illinois University

# EXHIBIT 59

UNIVERSITY OF MINNESOTA

***Duluth Campus***

***International Student Services***

*Office of Diversity and Inclusion*

*237 Kirby Student Center*
*1120 Kirby Drive*
*Duluth, Minnesota 55812-3085*
*Email: issumd@d.umn.edu*

September 26, 2025

Re: DHS Docket No. ICEB-2025-0001, Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media

To Whom It May Concern:

Thank you for the opportunity to comment on the Department of Homeland Security's proposed rule: Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media (DHS Docket No. ICEB-2025-0001), published August 28, 2025. Our names are Anna Gilmore and Alexa Oleson and we respectively serve as a PDSO (Principle Designated School Official) and a DSO (Designated School Official) in the International Student Services office at the University of Minnesota Duluth (UMD). We are writing to express our concerns that this rule would hurt both domestic and international students, our campus, and our local economy. We strongly oppose this proposed rule, and suggest that DHS withdraw it in its entirety. We urge you to continue the current duration of status policy.

**International Student Contributions**

At UMD, we have students and exchange visitors from 35 different counties. These students contribute greatly to the classroom and enrich the learning environment for our domestic students. International students and exchange visitors provide domestic students with opportunities to enhance their knowledge of the world and encourage them to see things from a variety of perspectives; skills that will help all of our students to succeed in an increasingly globalized world. Many domestic students may never have the opportunity to travel outside of the U.S., but with international students in the classroom, they can still learn from and with people from countries other than their own. Our international students are not only excelling in the classroom, but they integrate into the campus community where they show up as student leaders, teaching and research assistants, mentors, tutors, and so much more. We are so lucky

to have an international population here at UMD, and we truly benefit from our international students and exchange visitors.

International students and exchange visitors contribute a great deal to our economy, on a national and local scale. Nationally, NAFSA's Economic Value Tool estimates that for the 2023-24 academic year, international students studying at colleges and universities contributed $43.8 billion and supported 378,175 jobs in the U.S. economy.[1] Locally, NAFSA calculated that UMD's international students contributed $6.1 million to the economy and supported 26 jobs.[2]

This proposed rule has the potential to disrupt these important contributions made by international students and exchange visitors. In this letter, we will go into greater detail and explain the expected negative impacts the proposed rule could have on student learning, university resources, USCIS processing times, and more.

**Common Sense Alternatives**

Increased numbers of international student and exchange visitors and DHS's ability to monitor them, along with concerns about fraud and abuse, are cited as a rationale for this rule. However, this group is already thoroughly vetted and the most highly tracked group of nonimmigrants in the country. From the point that international students apply for their visa, through their academic program and beyond to any employment or training they pursue, international student information is regularly updated and reviewed by international student services staff. As required, we regularly report student enrollment, changes to their program, changes in address, and details related to their employment and training as well as many other data points in SEVIS.

We have institutional academic policies as well as national immigration regulations in place to ensure that students are making sufficient and timely progress towards their degrees and that they are following immigration regulations. This wealth of detailed data and information from SEVIS, along with DHS's ability to request further information, such as that detailed in 8 CFR 214.3 that universities must retain, can be analyzed and utilized to attain DHS goals in a much more efficient way. Asking students to submit information during the extension process that is already tracked in SEVIS or retained by universities as required, is duplicative and a waste of resources.

Many of the concerns that are being used as evidence to support this proposed rule can be identified through data that is already collected in SEVIS, without needing to implement such harsh restrictions on students. In fact, the proposed rule uses data collected from SEVIS to make the very argument that fixed date admission is needed. DHS can use existing SEVIS

---

[1] NAFSA International Student Economic Value Tool
https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2#main-content

[2] NAFSA International Student Economic Value Tool - Minnesota District 08
https://www.nafsa.org/isev/reports/district?year=2023&state=MN&district=08

data to help identify people who it suspects may not be maintaining their status and to investigate and request additional information as needed. DHS can also use the current school certification and recertification processes to identify and investigate schools that it suspects are not complying with regulatory requirements. There is no need to implement this costly and time consuming process when more targeted follow up procedures using the current methods for tracking and identifying international students would meet the DHS goals of deterring F, J, and I nonimmigrants and schools from engaging in fraud, give DHS information to detect national security concerns, and increase DHS's ability to detect those nonimmigrants who are not complying with the terms and conditions of their status.

**Costs**

The targeted follow up using SEVIS and other DHS data would be a more logical use of resources than the large time and cost burdens associated by this proposed rule. DHS estimates the rule would cost $86.3-$88.1 million for U.S. parties and $304-$304.3 million for non-U.S. parties. UMD has a small population of about 138 F-1 international students. Based on our student data from the past several years, we estimate that UMD international students would require about 38 Extension of Stay (EOS) applications per year at a cost of $15,960 to students based on the current online I-539 filing fee of $420. DHS also estimates that in the first year, Designated School Officials will require 67 hours to familiarize themselves with the rule and make adaptations (DHS estimating $3,342 per DSO) and that each extension application would require an estimated 3 hours of DSO advising (DHS estimating $233 for DSOs for each application). Given the 2 DSOs who would be heavily involved in this process, that adds up to an estimated cost of $15,538 in the first year for our university and $8,854 annually after that. The burden of both cost and time to our institution and students that this proposed rule will create is unnecessary. As a mid-sized institution with relatively low international student enrollment, this cost will be difficult for us to meet. Withdrawing this proposed rule will save our institution and others like it both time and money. As we previously noted, many of the security concerns brought up in this proposed rule can be addressed through use of data that is already collected, making the burden of this rule unnecessary.

If this rule were to take effect, our staff would be burdened with other additional tasks related to the change. We would need to update our website, make changes to both in-person and online orientations, create and update presentations, create forms and processes associated with these requests (Extension of Stay (EOS), changes to major, and more), change and edit the majority of our existing forms and processes (e.g. travel signatures, transfers, OPT applications, etc.), and educate campus partners who will be impacted by these changes and work with them to change current policies and processes. We will also need to connect students working on EOS applications to legal counsel for immigration advice and assistance with forms. Therefore, our task of advising F-1 international students will become even more complex and time consuming, both in terms of informing students and in terms of informing other campus partners who support them.

**USCIS Processing Concerns**

What's more, we are extremely concerned that if the proposed rule were implemented, these additional changes would only cause further delays in USCIS processing times. Based on previous experiences, we are particularly concerned that delays in USCIS processing time will adversely impact our international students and exchange visitors as well as our institution. Current USCIS estimated processing times for I-539 applications for extensions of stay for F, M, and J students are listed at 3.5 months[3]. However, we have seen instances in the past few years where students have had to wait more than a year for their I-539 applications to be processed by USCIS. We are concerned similar situations could arise, particularly with the influx of applications to USCIS that this proposed rule would cause, the additional biometric collection requirements, and potential requirement for someone filing the application to need to appear for an interview. The variation semester to semester and year to year of USCIS application processing times also creates a great deal of uncertainty and makes it difficult to plan effectively.

As of March 31, 2025, USCIS has a historically high total of more than 11.3 million pending cases[4], of which more than 4.9 million are considered backlogged and exceed the target level of pending cases and more than 34,000 are frontlogged and were unopened and not entered in the system.[5] During fiscal year 2024, USCIS received 253,876 I-539 applications to extend/change nonimmigrant status[6]. This proposed rule estimates an additional 414,000 applications would be added to that total. This increase in applications would contribute to the already high number of pending and backlogged/frontlogged applications and is also likely to further increase processing times.

**Unreasonable Time Limits**

Additionally, we are concerned that these time limits do not adequately reflect the amount of time it takes for many students to get a degree. The National Center for Educational Statistics found that the median time for completing a bachelor's degree was 52 months (4.33 years)[7]. The average time on the UMD campus for a new international student without previous college credit to complete their Bachelor degree is 4.32 years. Moreover, UMD offers several Bachelor degrees that require more than 120 credits to graduate and sometimes have very strict course sequencing, such as our Mechanical Engineering (BSME) degree which requires 129 credits. We also currently have two PhD programs, both enrolling international students, that require more than 4 years to complete. As of the 2024-24 academic year, the expected time to complete the Water Resources Sciences PhD program was 5.5 years, and the Integrated

---

[3] USCIS Check Case Processing Times https://egov.uscis.gov/processing-times/
[4] USCIS (2025) All USCIS Application and Form Types (Fiscal Year 2025, Quarter 2) https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx
[5] USCIS (2025) Net Backlog and Frontlog (Fiscal Year 2025, Quarter 2) https://www.uscis.gov/sites/default/files/document/data/net_backlog_frontlog_fy2025_q2.xlsx
[6] USCIS (2024) All USCIS Application and Form Types (Fiscal Year 2024, Quarter 4) https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2024_q4.xlsx
[7] National Center for Education Statistics https://nces.ed.gov/fastfacts/display.asp?id=569

Bioscience PhD average time to degree was 5.9 years. Any international students in these PhD programs would require at least one EOS application just to complete their degree, not including any practical training they could be authorized for based on degree completion.

The end of duration of status adds additional uncertainty and hurdles for international students to be able to complete their degree. All students in our PhD programs and many of our Bachelor's degree level international students would need to apply for an extension of stay while they were in the midst of their program. This means that after several years of work towards their degree, and for most, investing thousands of dollars in their education, they may not be able to complete their program.

**Impact on International Student Enrollment**

Related to the above section, we are very concerned about the impact this rule is likely to have on international student enrollment in the U.S. and at our institution. With the added uncertainty caused by the implementation of this rule, some students are likely to pursue their education in other countries that can offer more certainty and less risk in their educational investment. We expect that students may choose to forgo a U.S. education altogether and instead pursue an education in another country that will be less of an educational and financial risk. While DHS may believe that "the proposed rule may have a marginal impact on nonimmigrant student enrollment," recent survey data says otherwise. The Institute for Progress and NAFSA: Association of International Educators recently conducted and survey and found that 49% of the international student respondents said they would not have enrolled in the first place if Duration of Status had been replaced with a fixed period of admission[8].

A decrease in international student enrollment of up to 49% would have severe financial impacts on our institution and would likely decrease the programs available to domestic students. For example, international students make up about ⅓ of enrollment in graduate programs UMN wide. A significant decrease in international students would likely cause some programs to be discontinued due to low enrollment. Additionally, international students contribute a great deal to our educational environment, the globalization of our campus, and to allowing our domestic students to learn about the world while studying in Minnesota.

**Limitations on Educational Objective Changes**

We are also concerned with the proposed limitations on educational objective changes: including all changes in educational objectives for graduate students, limitations on undergraduate students to change objectives or transfer in their first year of study, and the prohibition on students starting studies at the same or lower degree levels. These limitations are unnecessary and will hinder academic mobility that is a normal part of the educational process. As long as they are following the rules and maintaining their status, international

---

[8] Institute for Progress and NAFSA: Association of International Educators (2025, Sept. 15) https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf

students, like their domestic counterparts, should have the freedom to change their educational objectives as they learn and grow during their educational journey.

The proposal to limit graduate student change in educational objectives is offered without any reason provided, and runs counter to what are appropriate, justified educational paths and objectives. Almost 1 in 5 of our international graduate students complete their masters and then move on to a PhD program as part of their academic journey. We also have students each year who end up choosing to pursue two master's degrees. This is often related to the interdisciplinary nature of their research interests or because they decide another degree program is more suited to their educational and career objectives. They may also feel the need to transfer schools for various reasons: sometimes a research advisor they are working with leaves to work at another school, they decide the program they are pursuing is not a good match for them, or they conclude that UMD or Duluth is not a good fit for them personally.

It is very common for undergraduate students, both domestic and international, to decide in their first year of study that they would like to change their major or change the school they are attending. The majority of these students are young people who are learning about who they are and what they are interested in. Academic flexibility is one of the traits that makes education in the U.S. great, and it is one of the reasons we attract so many students. Compared to some other countries, students in the U.S. have great flexibility in changing their majors or choosing to pursue other academic interests. Like with domestic students, attending college helps to expose our undergraduate international students to new courses and areas of study, which can influence their decisions about what and where to study. Restricting changes in the whole first year of study is unreasonable and will also be burdensome for students and schools. There are many valid reasons a student may decide to change their major in their first year of study or decide to attend a different school. Keeping track of which students would be allowed to change their major or transfer out would be very challenging for institutions and would override existing academic policy for a subset of students at the institution. Academic advisors would need to continually check with international student advisors to see who is eligible for changing their major and who is not since this knowledge would require access to the student's SEVIS record. If immediate SEVIS transfers after someone has initially entered the country are a concern, then requiring a student to stay for one term at the initial school should be sufficient deterrent. The proposed rule requiring students to study for an entire year at the initial school without changing their major would be unfair to the pursuit of academia that we so cherish in this nation.

Additionally, combining this with the proposed end to duration of status would make it even more likely that students who do want to change their major or educational institution would be unable to graduate within the 4 year time limit. Students may decide they want to pursue a new major within their first term, but be forced to wait one year to formally change their major. In this case, it may take them even longer to complete their degree than if they had been able to change when they originally decided. This will also lead to increased extension of stay applications, creating more work for international student advisors and adding to the number of applications, and therefore backlog, that USCIS will need to process.

Prohibitions on starting degrees at the same or lower levels are overly restrictive. There are very legitimate reasons for a student to get a second degree at the same level or to change to a lower level. Some students may find that they are not academically ready for the rigors of study in their degree program and therefore would benefit from a semester or two of study at a community college, which gives them time to further develop their academic skills and/or may make sense for them financially. Often this allows them to continue to make progress towards their UMD degree since they are taking credits that are frequently transferable. As mentioned previously, we also have a number of students who decide to pursue two degrees at the same level due to their interests or career paths. This may happen for a variety of reasons. Students may begin a degree program and develop interests in other additional areas or may find that interdisciplinary approaches are needed to understand the real-world complexity inherent in their field. For example, in the last few years we have seen a number of students pursue both a Mathematical Sciences and a Computer Science degree because the areas complement each other. People researching or working in areas such as Artificial Intelligence often need strong backgrounds in both math and computer science. Lastly, some students complete their degree and then begin working in their field only to find that this is not a good fit for them and they would like to change career paths. It is common for a change in career paths to require a different degree. This degree may be at the same level or higher and it may also require them to pursue prerequisite classes at a lower level in order to be able to gain admission to the degree program. Again, it is this flexibility and ability for students to choose their own path that makes the U.S. such a popular place to study, and that speaks to our emphasis on academic freedom. To not only bring in great minds from around the world, but to allow them to develop in a variety of areas is what has contributed to our academic and research-dependent success so far.

**Academic Institution Policies and Decision Making**

The proposed rule does not adequately take into consideration that academic institutions are best placed to make decisions about whether a student is making adequate progress towards their degree. At UMD, we have rules and policies in place for academic standing because we want students to be successful in their program, and if they are not, to have a specified amount of time, usually 1 semester, to reflect and make needed changes. Students at UMD must have a GPA of 2.00 to be in good academic standing. Students who do not meet that requirement receive an academic warning. Generally during this time students are required to meet with their academic advisor, helping them assess the situation and come up with a plan to help them be more successful in their coursework. If things do not improve, the student is academically suspended.

Most of the students studying towards their Bachelor's degrees are young and are often in the midst of a time of big adjustments in their lives. Graduate students, while often more mature, are also adjusting to big changes as international students. Many international students are moving far from their families and support systems, perhaps for the first time in their life, adapting to new-found independence, navigating a totally new location, school, and educational

system, and are often studying in a language that is not their native tongue. There are many things for students to adjust to as well as unexpected challenges that come up along the way (e.g. changes in financial situation, health issues, etc.). Not allowing students who have had academic probation or suspension in the past to have an extension of their status fails to allow students a reasonable opportunity to complete their degree while learning and growing. If a school has evaluated the situation and believes the student can successfully finish their degree in a reasonable amount of time, the student should not be prevented from finishing a degree they have spent a significant amount of time and money on. For example, the academic probation may have been caused by a short-term situation the student has resolved, they may have developed additional time management or study skills that allow them to be successful in their degree program, or they may have changed to a new major that better matches their skills and talents.

**Impact on Employment**

This proposed rule also has the potential to impact employment for both students and schools. We appreciate that there is some automatic extension of employment authorization associated with this proposed rule, but there are still significant potential employment impacts that could arise. With a timely filed extension application, a student can receive an auto extension of their on-campus employment for 240 days. However, based on our experiences with USCIS in the past, processing times could exceed 8 months, interrupting student's ability to work on campus: depriving them of income they may depend on for living and academic expenses as well as disrupting teaching, research, and services at the university. Students engaged in Optional Practical Training may also be forced to stop working during their experience, again disrupting their lives and livelihood as well as their employers' business. There is also the issue of students who may apply for the extension of stay within their 30-day grace period after completing their program with the intention of starting a new degree program who would have to wait for the approval of their extension before they would be potentially authorized to work on campus. They would be able to start studying for the new degree program, but could not work on campus.

**Reducing F-1 Grace Period**

The proposed rule reduces the current F-1 grace period from 60 days to 30 days. While this is longer than other non-immigrant classifications, it is important for a number of reasons that may differ from the other visa classifications. Students may need to wait several weeks after school ends for their grades to be posted as well as several weeks beyond that for their degree to officially be marked as completed. Students may not find out well into their grace period if they have officially completed their degree. This greatly complicates things for students who were prevented from graduating because final grades ended up being lower than anticipated, who find out they have a degree requirement remaining when the Registrar's Office is going through final degree checks, or who need official final academic information in order to be fully admitted to a new degree program they will pursue after graduation.

Students applying for Optional Practical Training also face issues with timing during their grace period. Students applying for OPT frequently do not have a decision from USCIS on their I-765 application prior to finishing their degree program. The long USCIS adjudication timeline leaves very little room for error in a complicated and confusing process. For example, if a student submits their application to USCIS 31 days after their OPT I-20 was issued, their OPT will be denied, but often they do not receive their denial for more than 3 months. If they are outside their grace period when they learn of this decision, they will be out of status and have no option other than to depart the U.S. or apply for reinstatement if admitted to a new degree program. Students also need time to find an acceptable job that meets OPT requirements while accounting for the long USCIS processing time. They often request an OPT start date that is closer to the end of the 60-day grace period to accommodate USCIS processing times and so that they have sufficient time to get a job, move to a new location, and start the position.

**Additional Clarification and Considerations Needed**

If the proposed rule were implemented, it is important that there be additional clarification or consideration of the following:

Currently premium processing for I-539 applications is only available for change of status applications. With the timing and complexity of this issue and its impact on students and schools, it is imperative that premium processing is offered as an option for applicants.

The section titled ‘Transition Period’ considers a variety of scenarios that may occur for students who will transition from the current duration of status regulation to the proposed fixed date of admission. Students traveling internationally would re-enter and receive their new fixed date of admission. Those F-1s who do not travel during the transition period would have until the program end date of their I-20, not to exceed 4 years, with an additional 60 days. Any of our PhD, PharmD, or Bachelor’s students in their 1st year at that point in time would have no documents that actually show the exact date of their fixed admission. None of their immigration documents would reflect this specific date, causing great amounts of confusion for students, the DSOs advising them, anyone involved with I-9s and employment, and any government agencies working with them (e.g. driver’s licenses, etc.).

Clarification is also needed on a number of points. How would an institutional change in CIP (Classification of Instructional Programs) code assigned to a major/degree program impact graduate students and undergraduate students in their first year in the U.S.? Would this be viewed as a change in educational objective even though the student’s objective has not changed? Would this functionality in SEVIS still exist for graduate students?

The proposed rule is unnecessary, burdensome, and harmful to our university. It is also detrimental to international students and exchange visitors, with the likely result being that the talents and contributions from many international students and exchange visitors will be lost.

Sincerely,

Anna Gilmore, M.A.
Associate Director of International Student Services

Alexa Oleson, M.Ed.
International Student Services Program Coordinator

# EXHIBIT 60

**Regulatory Impact Analysis for the Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media Notice of Final Rulemaking**

**A. Executive Orders 12866, 13563, and 14192: Regulatory Review**

Executive Orders 12866 (Regulatory Planning and Review), and 13563 (Improving Regulation and Regulatory Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, harmonizing rules, and promoting flexibility. Executive Order 14192 (Unleashing Prosperity Through Deregulation) directs agencies to significantly reduce the private expenditures required to comply with Federal regulations and provides that "any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least 10 prior regulations."

This rule has been designated a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

This rule is not an Executive Order 14192 regulatory action because it is being issued with respect to an immigration-related function of the United States. The rule's primary direct purpose is to implement or interpret the immigration laws of the United States (as described in INA section 101(a)(17), 8 U.S.C. 1101(a)(17)) or any other function performed by the U.S. Federal Government with respect to aliens. *See* OMB Memorandum M-25-20, "Guidance Implementing Section 3 of Executive Order 14192, titled 'Unleashing Prosperity Through Deregulation'" (Mar. 26, 2025).

## 1. Summary

Currently, aliens in the F (academic student), J (exchange visitor), and most I (representatives of foreign information media) nonimmigrant categories are admitted to the United States under the Duration of Status (D/S) framework. However, this framework poses a challenge to DHS's ability to efficiently monitor and oversee these categories of nonimmigrants, as the D/S framework does not require immigration officers to assess at pre-determined intervals whether these nonimmigrants are complying with the terms and conditions of their status or whether they present a national security concern. To address these vulnerabilities, DHS is replacing D/S with an admission for a fixed time period for aliens admitted in the F, J, and I nonimmigrant categories. Admitting aliens in the F, J, and I categories for a fixed period of time will require all F, J, and I nonimmigrants who wish to remain in the United States beyond their specific authorized admission period to apply for authorization to extend their stay directly with USCIS. This change will impose incremental costs on F, J, and I nonimmigrants as well as schools and exchange visitor program sponsors, but it will, in turn, protect the integrity of the F, J, and I programs by having immigration officers evaluate and assess the appropriate length of stay for these nonimmigrants. Table 1 summarizes the final rule provisions and how this Regulatory Impact Analysis handles each provision (i.e., qualitatively, quantitatively, or not addressed). Provisions related to language changes and clarifications are not included in the summary of provisions and are not expected to have an impact.

**Table 1. Summary of Provisions and Impacts**

| Provision | Purpose of Provision | Regulatory Impact Analysis | | | |
|---|---|---|---|---|---|
| | | Qualitative | Quantified | Monetized | Section for more Details |
| 8 CFR 214.1, Requirements for admission, extension, and maintenance of status | Outlines the process for Extension of Stay (EOS) application and specifying procedures for transition to admission for a fixed time period of authorized stay. | | ü | ü | 3. Affected Population;<br>4. Costs and Benefits of the Final Rule |
| | Describes the requirements for F and J nonimmigrants, including after travel abroad and those approved for optional practical training. | | ü | ü | 3. Affected Population;<br>4. Costs and Benefits of the Final Rule |
| 8 CFR 214.2, Special requirements for admission, extension, and maintenance of status | Sets authorized admission and extension periods for F and J nonimmigrants up to program length, not to exceed a 4-year period plus a 30-day period to prepare for departure. | | ü | ü | 3. Affected Population;<br>4. Costs and Benefits of the Final Rule |
| | Sets limitations on transferring the first year, prohibiting changes in programs for graduate students, and only allowing nonimmigrants to begin a higher education level after graduation. Language training is limited to an aggregate 24-month period of stay. | ü | | | English Language Training; Limitations on Transfers, Program Changes, and Departure Period |
| | Decreases from 60 to 30 days the allowed period for F-1 nonimmigrants to prepare to depart from the United States after completion of a course of study or authorized period of post-completion practical training | ü | | | Limitations on Transfers, Program Changes, and Departure Period |
| | Provides for collection of biometric information in conjunction with an EOS application for F, J, and I nonimmigrants as may be required by 8 CFR 103.16 | ü | | | 4. Costs and Benefits of the Final Rule (EOS Filing Costs) |
| | Specifies delays related to academic performance as unacceptable for EOS requests. | ü | | | Limitations on Transfers, Program Changes, and Departure Period |

| Provision | Purpose of Provision | Regulatory Impact Analysis | | | |
|---|---|---|---|---|---|
| | | Qualitative | Quantified | Monetized | Section for more Details |
| | Allows F nonimmigrants who file a timely EOS to receive an auto extension for employment based on severe hardship. | ü | | | Pending EOS Applications |
| | Sets authorized stay for I nonimmigrants to not exceed 240 days, with EOS available with specific requirements; updated evidence required for eligibility for I classification. | | ü | ü | 3. Affected Population; 4. Costs and Benefits of the Final Rule |
| | Clarifies J and I nonimmigrants who are working with an employer incident to status continue authorized to work up to 240 days while EOS is pending, but J-2 dependents do not have the same benefit to continue working once an Employment Authorization Document (EAD) expires. | ü | | | Pending EOS Applications |
| 8 CFR 248.1, Eligibility | Establishes requirements to determine period of stay for F or J nonimmigrants during transition period. | | ü | ü | 3. Affected Population; 4. Costs and Benefits of the Final Rule |

The period of analysis for this final rule covers 10 years, denoted Year 1 through Year 10. This analysis estimates the annualized value of future costs using two discount rates: 3-percent and 7-percent. In Circular A-4,[1] OMB recommends that a 3-percent discount rate be used when a regulation affects private consumption, and a 7-percent discount rate be used in evaluating a regulation that will mainly displace or alter the use of capital in the private sector. The discount rate accounts for the fact that costs that occur sooner are greater in present value. As shown in Table 2, the final rule will have a quantified annualized cost ranging from $443.1

[1] OMB Circular A-4, Regulatory Analysis (2003), https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf.

million to $448.6 million (with 3- and 7-percent discount rates, respectively) when considering U.S. and non-U.S. parties. When considering U.S. parties only, annual costs range from $119.9 million to $125.1 million (with 3- and 7-percent discount rates, respectively).

There could be other indirect impacts, and DHS acknowledges that a potential reduction in F-1 enrollments could lead to lost tuition and revenue for schools, decreased practical training, and impacts on student employment and employers. However, these impacts are not quantified due to uncertainty in estimating enrollment changes directly resulting from this rule. See Appendix A for further discussion. DHS does not intend for this rule to reduce enrollment, but instead strengthen program integrity and address national security concerns.

**Table 2. OMB A-4 Accounting Statement, U.S. and Non-U.S. Parties (2024$)**

| Category | 3-Percent Discount Rate | 7-Percent Discount Rate | Source Citation (RIA, preamble, etc.) |
|---|---|---|---|
| *BENEFITS* | | | |
| Annualized Monetized $millions/year | N/A | N/A | N/A |
| Annualized Quantified | N/A | N/A | N/A |
| Qualitative | • Enhance DHS's ability to enforce the unlawful presence provisions of the INA at the conclusion of F, J, and I nonimmigrants' fixed period of admission.<br>• Deter F, J, and I nonimmigrants from engaging in fraud and abuse and strengthen the integrity of these nonimmigrant classifications.<br>• Provide DHS with additional information to promptly detect national security concerns.<br>• Increase DHS's ability to detect those nonimmigrants who are not complying with the terms and conditions of their status.<br>• Ensure that immigration officers, who are U.S. Government officials, are responsible for reviewing and deciding each F, J, or I nonimmigrant's extension of stay (EOS) request. | | Preamble, RIA Section A.4 |
| *COSTS* | | | |
| Annualized Monetized $millions/year | $443.1 | $448.6 | RIA Section A.4 |

| **Category** | **3-Percent Discount Rate** | **7-Percent Discount Rate** | **Source Citation (RIA, preamble, etc.)** |
|---|---|---|---|
| Annualized Quantified | N/A | N/A | N/A |
| Qualitative | • Potential burden for DHS and nonimmigrants associated with government requests for additional information or in-person interviews.<br>• Potential reduction in enrollment of nonimmigrant students and exchange visitors and subsequent revenue effects on sponsoring institutions.<br>• DHS costs for rule familiarization and training and additional steps at port of entries (POEs) to assess fixed period of time for admission.<br>• Potential burden to schools/program sponsors and DHS to update batch processing systems that facilitate exchange of data between Designated School Officials (DSOs)/ Responsible Officers (ROs) and the Student and Exchange Visitor Information System (SEVIS).<br>• Potential costs to F-1 students and schools stemming from limitations on change of education level procedures.<br>• Potential burden on F-1 English language training (ELT) program students and schools from the restriction against ELT study beyond 24 months.<br>• Burden to employers of nonimmigrant students and the students if Employment Authorization Documents (EADs) may lapse or may not be approved if EOS requests are not approved in a timely manner.<br>• Burden to spouses and employers of spouses of nonimmigrants who hold J-2 visas. | | RIA Section A.4 |
| *TRANSFERS* | | | |
| Annualized Monetized $millions/year | N/A | N/A | N/A |
| Annualized Quantified | N/A | N/A | N/A |
| Qualitative | Potential reduction in fees collected by Student and Exchange Visitor Program (SEVP) and Department of State (DoS) to cover the respective program costs due to a potential reduction in international enrollment. | | RIA A.4 |
| State, Local, and/or Tribal Government | Some public schools will incur incremental costs to comply with the final rule and a potential decline in international enrollment with potential decreases in tuition payments. | | RIA A.4 |
| Small Business | Some small businesses will incur incremental costs to comply with the final rule. | | Regulatory Flexibility Analysis |

| Category | 3-Percent Discount Rate | 7-Percent Discount Rate | Source Citation (RIA, preamble, etc.) |
|---|---|---|---|
| Wages | N/A | | N/A |
| Growth | N/A | | N/A |

DHS recognizes that the final rule will result in certain populations incurring costs. Some of the costs have been quantified based on available data, and the remaining costs are qualitative.

**2. Background and Purpose of the Final Rule**

Unlike aliens in most nonimmigrant classifications who are admitted until a specific departure date, F, J, and I (except for some I aliens from the People's Republic of China (PRC)) nonimmigrants are admitted into the United States for an unspecified period of time to engage in activities authorized under their respective nonimmigrant classifications. This unspecified period of time is referred to as "duration of status" (D/S) and has historically equated with the actual time required to complete the intended activity associated with their visa classification. The Department uses SEVIS, a web-based system, to maintain biographical and program information on participants in duration of status, including SEVP-certified schools; F-1 students (and their F-2 dependents); M-1 students (and their M-2 dependents); DOS-designated Exchange Visitor Program sponsors; and J-1 Exchange Visitor Program participants (and their J-2 dependents). SEVIS tracks changes to the physical address, program of study, school or program site of activity, off-campus employment, and nonimmigrant status of F and J nonimmigrants. The integrity of SEVIS data depends on timely and accurate reporting on F, M or J student activities by DSOs and ROs. These officials are responsible for monitoring students and exchange visitors, reporting their activities in SEVIS, and determining whether their SEVIS records should remain

in active status (an indicator of lawful engagement in their intended activity).[2] A DSO must report on F and M students at the start of each academic term or session and, on average, makes at least four updates to the SEVIS record. These updates may include recommendations for off-campus employment or practical training. Under the duration of status framework, an academic student or exchange visitor generally maintains lawful status by complying with the conditions of their program, as determined by the DSO or RO.

Since the introduction of D/S, the number of F, J, and I nonimmigrants admitted into the United States has significantly increased. Admission for D/S, in general, does not afford immigration officers enough pre-determined opportunities to directly verify that aliens granted such nonimmigrant statuses are engaging only in those activities authorized by their respective classifications while they are in the United States. In turn, this has undermined DHS's ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence and has created incentives for fraud and abuse.

Additionally, the D/S framework creates opportunities for foreign adversaries to exploit these programs and undermine U.S. national security, in part due to the reduced opportunities for direct vetting of foreign academic students by immigration officers. (*see* Final Rule III.C Need for Rulemaking). An open education environment in the United States offers enormous benefits, but it also places research universities and the nation at risk for economic, academic, or military espionage by foreign students and exchange visitors. DHS believes that replacing admissions for D/S with admission for a fixed time period will help mitigate these national security risks by ensuring an immigration official will directly and periodically vet their applications for extension

---

[2]*See* 8 CFR 214.3(g)(1), (g)(2) (detailing a DSO's reporting requirements); 214.4(a)(2) (stating that failure to comply with reporting requirements may result in loss of SEVP certification).

of stay (EOS). By doing so, DHS will confirm that these aliens are engaged only in activities consistent with their foreign student status. Under the final rule, DHS will more frequently collect information to enhance the Government's oversight and monitoring of these aliens.

To address these concerns (*see* Final Rule III.C. Need for Rulemaking), the final rule replaces the D/S framework for F, J, and I nonimmigrants with a framework that authorizes an admission period with a specific date upon which an authorized stay ends. F, J, and I nonimmigrants who would like to stay in the United States beyond their fixed date of admission will need to apply directly with DHS for an EOS. As the admission for a fixed time period of authorized stay is already in place for most other nonimmigrant categories, this change brings F, J, and I nonimmigrants in line with most other classifications. Providing F, J, and I nonimmigrants a fixed time period of authorized stay will require them to apply to extend their stay, change their nonimmigrant status, or otherwise obtain authorization to remain in the United States (e.g., by filing an application for adjustment of status) by the end of this specific admission period, similar to most other nonimmigrants.

The final rule will ensure an effective mechanism for DHS to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws, as well as allow DHS to obtain timely and accurate information about the activities they have engaged in and plan to engage in during their temporary stay in the United States. DHS believes that the determinations of program extension and EOS should be separated, with the DSO's and RO's recommendation being one factor an immigration officer reviews while adjudicating an application for EOS. Changing to a fixed period of admission will give immigration officers a mechanism to make this evaluation at reasonably frequent intervals. In addition, as F, J, and I nonimmigrants will be admitted for a fixed period of admission under

the final rule, they may begin to accrue unlawful presence following the expiration of their authorized period of admission, as noted on the Form I-94, and could potentially become inadmissible based on that accrual of unlawful presence under INA section 212(a)(9)(B) and (C), 8 U.S.C. 1182(a)(9)(B) and (C), upon departing the United States. Those grounds of inadmissibility have important and far-reaching implications on an alien's future eligibility for a nonimmigrant visa, admission to the United States, an immigrant visa, or adjustment of status to that of a lawful permanent resident and, therefore, may deter F, J, and I nonimmigrants from failing to maintain status and deter them from engaging in fraud and abuse. By increasing DHS assessments and clarifying when unlawful presence accrual begins, the final rule will strengthen the integrity of these nonimmigrant classifications.

Table 3 summarizes rule provisions that have changed for the final rule, relative to the Notice of Proposed Rulemaking (NPRM), and describes how the regulatory impact analysis methodology changed in response to the rule provision revisions.

**Table 3. Rule Provision Changes from the Proposed Rule to the Final Rule and Assumptions for Impacts on the Regulatory Impact Analysis**

| Element of the Analysis | NPRM | Final Rule | Resulting Change in RIA |
|---|---|---|---|
| F and J sponsor labor burden estimates | DSO/RO rule familiarization and adaptation burden estimate of 67 hours; HR staff burden of 1.5 hours per EOS request | In response to public input, DHS increased the DSO/RO rule familiarization and adaptation burden to 135 hours; maintained HR staff burden of 1.5 hours per EOS request; and additionally accounted for student advisors and nonimmigrants incurring an additional 1 hour per current student in Year 1 for | Higher F and J sponsor labor burden estimates |

| Element of the Analysis | NPRM | Final Rule | Resulting Change in RIA |
|---|---|---|---|
| | | transition advising burden | |
| Clarification on J Visas and Annual Reappointment Cycles | J-1 nonimmigrants would be required to file an EOS request with every annual reappointment | J-1 nonimmigrants will be admitted for the maximum duration of their program or 4 years, whichever is first. | Significant reduction in the number of EOS requests from J-1 and J-2 nonimmigrants. |

### 3. Affected Population

The final rule will primarily affect F, J, and I nonimmigrants and their dependents by requiring nonimmigrants in these categories to file an EOS application to extend their stay beyond their fixed period of admission. F nonimmigrants are aliens enrolled as bona fide foreign students at SEVP-certified schools, J nonimmigrants are aliens participating in work- and study-based exchange visitor programs, and I nonimmigrants are foreign information media representatives. In the sections below, DHS describes the data and methods used to: (1) estimate the annual population size for each analyzed visa classification, (2) characterize these annual populations with respect to the need to file an EOS request (8 CFR part 214), and (3) develop projections for the annual number of EOS requests for the evaluation period. These analytical steps have been implemented using the R Project for Statistical Computing, an open-source analytical software platform.[3]

Table 4 summarizes data and modeling differences between the proposed and final rule analyses for the F and J nonimmigrant analyses. The I nonimmigrant analysis is unchanged

[3] https://www.r-project.org/about.html.

between the proposed and final rules. The following subsections provide more details about the final rule analysis.

**Table 4. Changes in EOS Burden Analysis between the Proposed Rule and the Final Rule**

| Element of the Analysis | NPRM | Final Rule |
|---|---|---|
| F data | FY2016-FY2018 data, adjusted to represent years FY2022-FY2024<br><br>Snapshot data of basic program information for each SEVIS ID, including start dates, actual or projected end dates, major, school, education level, and OPT participation. | FY2016-FY2024 data<br><br>Same snapshot data plus program change event history for each SEVIS ID, including any changes in major, program end date, education level, or institution. |
| J data | FY2016-FY2018 data, adjusted to represent years FY2022-FY2024<br><br>Snapshot data of basic program information for each SEVIS ID, including start dates, actual or projected end dates, and program type. | FY2016-FY2024 data<br><br>Same snapshot data plus program change event history for each SEVIS ID, including any program extensions or transfers to another sponsor. |
| F modeling framework | Cohort analysis using information on program durations from a data cross-section to determine how quickly participants will finish their programs.<br><br>The model assumed mandatory EOS requests at 4-year intervals and used fixed annual rates of OPT initiation and institution changes.<br><br>DHS summed the estimated number of EOS requests for each trigger without adjustments for interactions between events. | Cohort analysis using a Markov model that jointly tracks multiple EOS triggers, including (1) program changes (duration extensions, major, education level, and institution) and OPT and (2) adjustments for how these other EOS triggers affect the mandatory EOS requirements at 4-year intervals.<br><br>The model uses DHS-estimated rates of program exits and EOS triggering events that are dependent on program type and tenure.<br><br>The model accounts for education level changes (e.g., transitions from Bachelor's to Master's to |

| Element of the Analysis | NPRM | Final Rule |
| --- | --- | --- |
| | | Doctoral) and for final rule restrictions on program changes. |
| J modeling framework | Cohort analysis using information on program durations from a data cross-section to determine how quickly participants will finish their programs.<br><br>The model assumed mandatory EOS requests at 4-year intervals. DHS assumed that some programs would require annual EOS requests and that no participants would stay beyond DOS's maximum durations for each program.<br><br>DHS summed the estimated number of EOS requests for each trigger without adjustments for interactions between events. | Cohort analysis using a Markov model that jointly tracks multiple EOS triggers, including (1) institution changes and requests for extensions beyond DOS's maximum; and (2) adjustments for how these other EOS triggers affect the mandatory EOS requirements at 4-year intervals.<br><br>The model uses DHS-estimated rates of program exits and EOS triggering events that are dependent on program type and tenure. DHS no longer assumes annual EOS requests for some programs. |
| Critical assumptions for F and J modeling | No changes in enrollment or distribution across program types.<br><br>For F nonimmigrants, no modeling of EOS requests for major/education level changes and no modeling of final rule restrictions on program changes.<br><br>For J nonimmigrants, no consideration of extensions beyond the DOS-imposed maximum program durations. | No changes in enrollment or distribution across program types. |

**Estimating the Affected Population**

To identify potentially affected nonimmigrants, DHS used data from several agencies. Data for F and J nonimmigrants were extracted from SEVIS, including (1) F-1 student program

details, Optional Practical Training (OPT), and event history data, (2) F-2 dependent counts, (3) F sponsors data, (4) J-1 exchange visitor program details and program change information, (5) J-2 dependent counts, and (6) J sponsors data. SEVP oversees schools certified to enroll F nonimmigrant students and their dependents.[4] DOS manages Exchange Visitor Programs for nonimmigrant exchange visitors in the J classification and their dependents. Both SEVP and DOS use SEVIS to track and monitor schools, exchange visitor programs, and F and J nonimmigrants while they are temporarily in the United States.[5] SEVIS data is a document-centric system that tracks unique SEVIS identification numbers associated with each Form I-20 and DS-2019 issued; as a result, a person could have multiple active and inactive records. The F and J nonimmigrant population analysis relied on individual-level SEVIS data from FY2016–FY2024 extracted in 2025.[6]

DHS obtained data on I nonimmigrants from U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS), which is person centric environment, where an individual is either active or inactive. ADIS consolidates entry, exit, and admission status information from DHS components, DOS, and the Canada Border Services Agency. ADIS contains biographic information, biometric indicators, and encounter data.[7] The I nonimmigrant population analysis relied on aggregate data from ADIS for FY2015–FY2024 extracted in March 2025.

---

[4] SEVP also oversees schools certified to enroll M nonimmigrants, but this rulemaking does not apply to M nonimmigrants.

[5] More information on SEVIS can be found at https://www.ice.gov/sevis/overview.

[6] DHS received F-1 event history data for years 2016, 2018, 2020, 2022, 2023, and 2024. The remainder of detailed F and J data covered years 2016-2024, with aggregate data (i.e., counts of new and continuing F and J nonimmigrants) covering years 2022-2024. For the proposed rule analysis, DHS used F and J data from FY2016-FY2018 and extrapolated to FY2022-2024. The proposed rule data did not include the same level of event history information as the final rule data. Recent SEVIS updates enabled more detailed data extracts for the final rule analysis.

[7] More information on ADIS can be found at https://www.dhs.gov/publication/arrival-and-departure-information-system.

Details on data processing steps and affected F, J, and I nonimmigrant population size estimation are provided below.

*F and J Nonimmigrant Population Analysis*

To assess the F and J nonimmigrant population, DHS used SEVIS counts of new (i.e., arrived in the United States to study in the given year) and continuing (i.e., continuing studies in the United States in the given year) F and J nonimmigrants for FY2022-FY2024. For J exchange visitors, SEVP provided counts of new and continuing participants for each year, by category and visa type (J-1 or J-2). For F nonimmigrants, SEVP provided counts of new and continuing participants F-1 students only, by category. For F-2 dependents, SEVP provided counts of dependents per F-1 student starting their program in a given year for years 2016-2024. Because DHS did not have data on "continuing" F-2 dependents from before 2016, the number of F-2 dependents was underestimated (i.e., excluded any F-2 dependents who arrived in the country prior to 2016). To correct for this underestimation, DHS calculated adjustment factors using F-1 data (actual counts / calculated counts) for years 2022-2024 and applied these adjustment factors to the calculated F-2 counts.[8]

F and J nonimmigrant population counts are presented in Table 5. The counts include border commuter students, who are exempt from the general length of admission provisions and will continue to be governed by 8 CFR 214.2(f)(18), because border commuter students would be subject to the rule's behavior limitations. Based on F student data from 2016-2024, less than 0.5% of F-1 students are border commuters. DHS removed border commuter students from consideration in the EOS request analysis.

[8] Using individual year-level data for years 2016-2024, DHS calculated adjustment factors of 1.143, 1.078, 1.045 based on SEVIS-provided F-1 aggregate counts relative to calculated F-1 aggregate counts for years 2022, 2023, and 2024, respectively. DHS applied these adjustment factors to the calculated F-2 aggregate counts to correct for missing data for F-2s in the country prior to 2016.

*I Nonimmigrant Population Analysis*

DHS estimated the size of the I nonimmigrant population using unique person-level counts for years 2022-2024, including counts for individuals with known departure dates and counts for individuals with known arrival dates but unknown departure dates. Using annual ADIS 2015-2024 data on the distribution of year-specific I nonimmigrant arrival counts across 10 length-of-stay categories,[9] DHS implemented a cohort analysis methodology to estimate the total number of active I nonimmigrants in the United States in 2022-2024, including both new arrivals and longer-stay I nonimmigrants.[10]

*Affected Population Analysis Results*

Table 5 shows the estimated total number of F, J, and I nonimmigrants for years 2022-2024, including new, continuing and total counts for each visa type. The table also provides 3-year averages for all categories. I estimates include both principal I and dependent I nonimmigrants, as there are not multiple categories of I visas. Over the 3-year period (2022-2024), DHS estimated there were approximately 1.6 million F nonimmigrants, 504,000 J nonimmigrants, and 24,000 I nonimmigrants active per year.[11] Overall, approximately 2.1 million persons participated annually in the F, J, and I nonimmigrant programs combined.

**Table 5. Total Number of Active Nonimmigrants by Category and Fiscal Year**

| Nonimmigrant Category | FY 2022 | FY 2023 | FY 2024 | 3-Year Average |
|---|---|---|---|---|
| F-1 New[1] | 394,450 | 402,925 | 367,459 | 388,278 |

[9] Categories include departures between 0–6 days, 7–14 days, 15–30 days, 31–90 days, 91–184 days, 185–240 days, 241–365 days, 1–2 years, 2–3 years, and more than 3 years after admission.
[10] Assumptions/uncertainties of the cohort analysis include: 1) people with unknown departure dates are assumed to be in the United States (overestimate), 2) analysis assumes no mortality among longer-stay I nonimmigrants (overestimate), 3) analysis is based on a 10-year timeframe and may miss very long-term I nonimmigrants, and 4) the 10-year timeframe includes COVID years, which may bias the analysis toward longer stays (uncertain).
[11] F-1 counts include border commuter students, who are exempt from the general length of admission provisions and will continue to be governed by 8 CFR 214.2(f)(18), because border commuter students would be subject to the rule's behavior limitations. Based on F student data from 2016-2024, less than 0.5% of F-1 students are border commuters.

| Nonimmigrant Category | FY 2022 | FY 2023 | FY 2024 | 3-Year Average |
|---|---|---|---|---|
| F-1 Continuing[1] | 956,275 | 1,087,896 | 1,201,172 | 1,081,781 |
| **F-1 Total[1]** | **1,350,725** | **1,490,821** | **1,568,631** | **1,470,059** |
| F-2 New | 36,571 | 40,666 | 34,636 | 37,291 |
| F-2 Continuing[2] | 96,912 | 108,009 | 122,233 | 109,051 |
| **F-2 Total** | **133,483** | **148,675** | **156,869** | **146,342** |
| **F Total** | **1,484,208** | **1,639,496** | **1,725,500** | **1,616,401** |
| J-1 New | 277,637 | 298,796 | 301,668 | 292,700 |
| J-1 Continuing | 142,078 | 184,557 | 193,293 | 173,309 |
| **J-1 Total** | **419,715** | **483,353** | **494,961** | **466,010** |
| J-2 New | 11,655 | 15,632 | 20,336 | 15,874 |
| J-2 Continuing | 9,340 | 20,984 | 36,614 | 22,313 |
| **J-2 Total** | **20,995** | **36,616** | **56,950** | **38,187** |
| **J Total** | **440,710** | **519,969** | **551,911** | **504,197** |
| I New | 17,356 | 20,806 | 23,415 | 20,526 |
| I Continuing | 3,388 | 3,380 | 3,823 | 3,530 |
| **I Total** | **20,744** | **24,186** | **27,238** | **24,056** |
| **Total** | **1,945,662** | **2,183,651** | **2,304,649** | **2,144,654** |

Source: F and J estimates derived from SEVIS 2022-2024; I estimates derived from ADIS 2022-2024 data.
[1] F-1 counts include border commuter students, who are exempt from the general length of admission provisions and will continue to be governed by 8 CFR 214.2(f)(18), because border commuter students would be subject to the rule's behavior limitations. Based on F student data from 2016-2024, less than 0.5% of F-1 students are border commuters.
[2] DHS did not have data on "continuing" F-2 dependents from before 2016, resulting in underestimated counts. To correct for this underestimation, DHS calculated adjustment factors using F-1 data (actual counts / calculated counts) for years 2022-2024 and applied these adjustment factors to the calculated F-2 counts.

Each year, only a subset of the total nonimmigrant F, J, and I population will be affected by the final rule provisions. DHS applied the criteria contained within the final rule (*see* Final Rule Discussion of the Final Rule, V.F, V.G, and V.H) to identify the subset of F, J, and I nonimmigrants that will be required to extend their authorized period of admission in order to continue the duration of studies or assignments. These criteria vary across the nonimmigrant categories.

**Estimating EOS Requests for F Nonimmigrants**

F-1 academic students are noncitizens admitted to the United States to pursue a full course of study at DHS-certified schools, and F-2 nonimmigrants are their dependents. The final rule will impose a fixed period of admission for F nonimmigrants, up to the applicable maximum

(e.g., 4 years, or shorter depending on program-specific limitations), after which remaining students must request an Extension of Status (EOS) or apply for admission with a new I-94 exit date at the POE to continue their studies or authorized post-completion activity. Because DHS is unable to estimate how many nonimmigrants will seek an extension to their period of stay while traveling through a POE instead of filing the I-539 or I-539A form, this analysis assumes that affected nonimmigrants will choose to use the EOS option. The final rule imposes several restrictions on program changes and duration: no program changes in the first year of undergraduate study, no graduate program changes, only upward educational-level transfers after completing an education level, and a two-year maximum duration for English language programs.

To estimate the number of EOS requests required by F nonimmigrants under the final rule, DHS developed a deterministic, open-cohort Markov model that simulates student outcomes over a 10-year analysis period using annual time steps.[12] The model simultaneously tracks multiple cohorts, including: (1) new F-1 students entering each education level during the analysis period; (2) continuing F-1 students who began their current program prior to Year 1 and remain active at the start of the analysis period ("grandfathered" cohorts); and (3) students who enter during the analysis period and continue into subsequent years. For grandfathered cohorts, mandatory EOS request timing (i.e., EOSs required to continue studies after four years, assuming an EOS was not triggered for another reason that restarted the four-year clock) is measured relative to the start of the analysis period (Year 1), regardless of the student's current program year at baseline. The model assumes compliance with all applicable restrictions on program

[12] Markov models simulate the progression of a population over time, allowing for the entry and exit of individuals into the cohort during the simulation period. An open-cohort model allows for new entrants at various time points in the analysis.

changes and duration, with cohort proportions based only on F-1 students who did not engage in any restricted behaviors. DHS assumes that after the final rule effective date, F-1 students will adjust their behaviors as needed to comply with the behavioral restrictions (i.e., the model parameters based on students engaging in no restricted behaviors will apply to all F-1 students).

The model tracks F-1 cohorts by education level and is calibrated using administrative data from 2022–2024. Table 6 summarizes cohort sizes using three-year average counts from 2022 through 2024, including the number of new F-1 students and the number of continuing (active) F-1 students at the start of the analysis period (Year 1). The number of new entrants into each education level is assumed to remain constant over the analysis period.[13] Commuter students, (representing approximately 0.2% of F program participants in 2022–2024) are excluded from these cohort counts because they already have fixed admission periods.

**Table 6. F-1 Cohort Sizes by Education Level, Using 3-Year Average Counts from 2022-2024**

| Education Level | F-1 New[1,2] | F-1 Cont[1,2] | F-1 Total[1,3] | F-2 New | F-2 Cont | F-2 Total[3] |
|---|---|---|---|---|---|---|
| Associate | 20,030 | 49,583 | 69,613 | 1,289 | 3,428 | 4,717 |
| Bachelor’s | 94,423 | 303,816 | 398,239 | 1,299 | 4,668 | 5,967 |
| Doctorate | 25,316 | 101,752 | 127,068 | 6,453 | 25,034 | 31,487 |
| Language Training | 45,239 | 84,475 | 129,714 | 11,535 | 25,912 | 37,447 |
| Master’s | 157,206 | 363,181 | 520,387 | 15,615 | 38,843 | 54,458 |
| Other | 25,621 | 34,794 | 60,414 | 1,092 | 2,693 | 3,786 |
| Primary | 1,540 | 4,827 | 6,367 | 0 | 0 | 0 |
| Secondary | 17,906 | 53,761 | 71,667 | 1 | 49 | 49 |

Source: Estimates derived from SEVIS 2022-2024.
[1] F-1 cohort counts exclude border commuter students because they are already subject to fixed periods of admission under 8 CFR 214.2(f)(18).
[2] Entries in these columns are used to initialize the F-1 model.
[3] Entries in these columns are used to scale the number of F-2 EOS requests based on the estimated number of F-1 EOS requests.

[13] Potential enrollment effects of the final rule are discussed in the “Potential Reduction in Participation” section.

To keep the EOS request analysis computationally manageable while still yielding realistic, policy-relevant insights, the model does not account for F-1 participant history prior to the start of the current educational program, as defined by a combination of education level, major, and institution/school. Once a student enters a given educational program, the model assumes their future EOS-related behavior depends only on their current education level and annual in-program tenure (e.g., a second-year student in a four-year program) and not on what they did in prior programs or prior schools/majors. Correspondingly, state transition probabilities[14] are estimated as average rates for students with the same current education level and annual in-program tenure, without further conditioning on earlier history. Compared with a richer model that conditions behavior on prior F-1 participation history, this pooled-average approach could bias EOS estimates in either direction. If students with certain histories are more likely to transfer, change programs, or remain longer, the DHS model will smooth over those differences. The net effect on EOS estimates depends on how those histories are distributed across education levels and tenures.

Model parameters, including state transition probabilities and tenure distributions for continuing students, are estimated from a 15% sample of F-1 event history records for 2016, 2018, 2020, and 2022–2024.[15] The sample is stratified across calendar years and education levels. In processing the administrative SEVIS event history data to support transition probability estimation, DHS identified and excluded 25.75% of F-1 participants that did not comply with the rule's program-change and duration restrictions, thereby assuming full compliance starting in

---

[14] State transition probabilities (i.e., the likelihood of moving to one model state, conditional on currently being in another model state) are calculated for the purpose of the Markov model and are distinct from the final rule transition period discussed later in the RIA.

[15] To reduce the data request burden on SEVP, DHS requested event history data for every other year for years 2016-2022. The subset of data years still allowed DHS to estimate applicable state transition probabilities and tenure distributions for the Markov model, including for long-tenure programs (e.g., PhD programs).

Year 1. This exclusion ensured that the calculated model probabilities better predicted future behavior under the final rule since DHS assumes that F-1 students will adjust their behaviors to comply with the behavior restrictions. DHS used this event history dataset to estimate the distribution of program tenures (measured in integer years) by education level among continuing active students in 2024. To estimate state transition probabilities, DHS further adjusted the F-1 student event histories in the analytical dataset by retaining a single EOS trigger event per student-year when multiple trigger events occurred in the same student-year (i.e., the model only counts one EOS request per student per year). DHS selected the retained EOS trigger using a priority rule (exit[16] > education level change > post-completion OPT request > program length extension > institution/school transfer > major change) that reflects which events most clearly determine EOS need in a given year. Exit definitively ends F-1 participation (i.e., no future EOS requests are expected since they are removed from the simulated population). Other events consistently trigger an EOS request. Education level changes most clearly redefine the program. OPT and current program length extensions directly signal continued time in status, while transfers/major changes are more context dependent. Limiting each student-year to one EOS request trigger event prevents double-counting clustered administrative updates that likely reflect a single underlying change, thereby avoiding inflation of EOS estimates. An EOS request for any reason resets the 4-year mandatory clock (i.e., F-1 students filing an EOS receive a new date certain for four years or the length of their current program, whichever is shorter).

In the model, F-1 students occupy educational-level states that jointly track their current education level, their current in-program tenure (measured in integer years), and a separate EOS clock that tracks time since the last EOS request, plus an absorbing exit state. Overall, there are

---

[16] Exit means ending F-1 participation, due to program completion, early termination, or other reasons.

321 states in the Markov model, including the exit state and 320 active states (8 education levels[17] × 10 tenure years[18] × 4 EOS clock years[19]). Each year, students may exit, advance to the next tenure year at the same education level, or reset the tenure clock by changing their program via an education level, major, or institution/school transition, with transitions governed by education-level- and tenure-specific probabilities estimated from rule-compliant histories. The 4-year fixed period of admission requirement is implemented via the EOS clock: it advances annually unless reset by an event requiring an EOS request, including an educational program change, a current program extension, the initiation of post-completion OPT, or 4 years having elapsed since the last EOS request. DHS conservatively assumes that educational program changes always trigger an EOS request due to students requiring additional time to complete the modified course of study.[20] This likely overestimates the number of EOS requests, for example, because some changes may result in students receiving credit for prior coursework and, thus, requiring less time to complete the new program.

The model's behavioral rules assume full compliance with restrictions on program changes and on program duration. For undergraduates, the model enforces no program changes in the first year. Because issuance of degrees is not tracked by SEVIS, DHS assumes that after completing the first year of the undergraduate program, downward education level changes (e.g.,

[17] The eight education levels include Associate, Bachelor's, Doctorate, Language Training, Master's, Other, Primary, and Secondary.

[18] The model includes a maximum on 10 tenure years for each program (i.e., being in the first, second, third…tenth year of a program. To make the model tractable, we included a maximum program tenure length of 10 years. However, many programs are shorter. We used actual data to estimate state transition probabilities, including program tenure years. This means that in practice, participants in shorter programs completely exit the model before ten years elapse.

[19] EOS clock years accounts for the number of years since the rule effect date (for students in the country when the rule takes effect), the program start date, or the last EOS request date. After four years, a mandatory EOS is triggered if additional time is needed to complete the current program.

[20] DHS did not have event history data for the proposed rule analysis; thus, this is a new assumption for the final rule analysis to best leverage newly available data. However, the event history data does not track how each program change affects the program completion end date. The assumption that all program changes would require additional time is a conservative assumption.

from bachelor's to associate level) reflect an uncompleted course of study (i.e., no degree received), while upward education level changes occur after completing the current course of study (i.e., degree received). If completions were observed in SEVIS, the model could enforce this more directly (timing "downward" changes to pre-completion and "upward" changes to post-completion); in their absence, some moves may be effectively mis-timed, which could bias EOS estimates in an uncertain direction. For graduate students, the model allows only the master's-to-doctoral progression after two years of tenure in a master's program, assuming that the master's degree has been completed by then. Because DHS does not observe degree completion timing and approximate it with a two-year master's tenure threshold, the model's EOS request estimates could be biased upward or downward depending on whether actual master's-to-doctoral progression tends to occur earlier or later, and how EOS request trigger probabilities differ between master's and doctoral pathways. While DHS may grant exceptions to the transfer prohibition for graduate students due to school closure or other emergencies, DHS is unable to calculate the rate of transfers due to closure for graduate students. Therefore, in calculating the number of EOS requests, DHS did not attribute any to school closures or other emergencies that may result in graduate level transfers. This assumption may result in an undercount in total EOS requests. DHS expects this bias to be not significant. English language training has an additional constraint: tenure is capped at two years. Because the model structure cannot enforce a cumulative two-year cap across multiple non-consecutive English language training programs, the number of EOS requests may be overestimated due to repeated participation.[21]

[21] Because the Markov model does not account for how prior programs affect the current program, the estimated number of EOS requests may be biased upward by counting EOS requests that would not be allowed under the final rule's 2-year restriction. English language training students may need EOS requests when making any change to their current program, such as transferring from one English language training program to another.

EOS requests for F-2 dependents are estimated by scaling modeled F-1 EOS counts using education-level-specific ratios of F-2 to F-1 participants, and total EOS is reported as the sum of F-1 and scaled F-2 EOS. DHS used the combined totals to develop EOS request attribution summaries (i.e., the proportion of EOS requests generated by the student-driven program changes vs those due to the 4-year fixed period of admission).

Table 7 presents the estimated number of EOS requests over the 10-year analysis period by F education level and visa type (F-1 and F-2). DHS estimates that the number of required EOS requests will fluctuate in the years following the rule effective date but will reach a relative steady state by Year 10 once the F student population present in the country when the rule takes effect (i.e., the grandfathered population) completes their programs and arrivals after the rule was in effect comprise the majority of the F student population. By Year 10, approximately 354,000 F-1 students and 36,000 F-2 dependents will be required to apply for an EOS per year, for an annual F nonimmigrant total of approximately 390,000. EOS request volumes peak in Years 2 and 4, then level off and reach a steady state by Year 10. The peak around Year 2 is driven mainly by program change-triggered EOS: many grandfathered students are already past the “no program change” window (especially undergraduates and longer-tenured master’s students), whereas most new entrants are restricted from changing in Year 1 and only begin to change (and generate EOS requests) once those constraints lift. The peak around Year 4 is driven mainly by the mandatory 4-year EOS for students who stay in the same program, counting from entry for new cohorts and from the current program year for grandfathered cohorts, creating a synchronized wave that is especially visible in longer programs (bachelor’s and doctorate). By Year 10, the pattern stabilizes because the grandfathered population has largely cycled out, and remaining flows reflect only new cohorts.

**Table 7. Estimated Number of EOS Requests over the 10-year Analysis Period, by F Education Level and Visa Type**

| Education Level | Visa Type | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Associate | F-1 | 12,782 | 18,551 | 16,805 | 15,591 | 14,553 | 14,059 | 13,812 | 13,705 | 13,650 | 13,619 |
| | F-2 | 866 | 1,257 | 1,139 | 1,057 | 986 | 953 | 936 | 929 | 925 | 923 |
| | **Total** | **13,648** | **19,808** | **17,944** | **16,647** | **15,539** | **15,012** | **14,747** | **14,634** | **14,575** | **14,542** |
| Bachelor’s | F-1 | 74,957 | 91,967 | 92,187 | 104,162 | 99,964 | 99,814 | 98,188 | 97,014 | 96,090 | 95,458 |
| | F-2 | 1,123 | 1,378 | 1,381 | 1,561 | 1,498 | 1,496 | 1,471 | 1,454 | 1,440 | 1,430 |
| | **Total** | **76,080** | **93,345** | **93,568** | **105,722** | **101,462** | **101,310** | **99,659** | **98,467** | **97,529** | **96,888** |
| Doctorate | F-1 | 10,205 | 9,829 | 12,787 | 52,141 | 39,109 | 41,460 | 41,724 | 41,093 | 41,004 | 40,802 |
| | F-2 | 2,529 | 2,436 | 3,169 | 12,921 | 9,691 | 10,274 | 10,339 | 10,183 | 10,161 | 10,111 |
| | **Total** | **12,733** | **12,265** | **15,955** | **65,062** | **48,800** | **51,733** | **52,063** | **51,276** | **51,164** | **50,912** |
| Language Training | F-1 | 43,065 | 28,414 | 23,434 | 22,373 | 22,142 | 22,086 | 22,069 | 22,064 | 22,061 | 22,060 |
| | F-2 | 12,432 | 8,203 | 6,765 | 6,459 | 6,392 | 6,376 | 6,371 | 6,370 | 6,369 | 6,369 |
| | **Total** | **55,497** | **36,617** | **30,199** | **28,832** | **28,535** | **28,462** | **28,441** | **28,434** | **28,430** | **28,429** |
| Master’s | F-1 | 148,082 | 199,293 | 179,040 | 163,632 | 159,597 | 159,985 | 160,153 | 160,183 | 160,061 | 159,860 |
| | F-2 | 15,497 | 20,856 | 18,736 | 17,124 | 16,702 | 16,742 | 16,760 | 16,763 | 16,750 | 16,729 |
| | **Total** | **163,579** | **220,149** | **197,776** | **180,756** | **176,299** | **176,727** | **176,912** | **176,946** | **176,811** | **176,589** |
| Other | F-1 | 13,914 | 10,786 | 9,128 | 8,695 | 8,418 | 8,369 | 8,365 | 8,372 | 8,362 | 8,357 |
| | F-2 | 872 | 676 | 572 | 545 | 527 | 524 | 524 | 525 | 524 | 524 |
| | **Total** | **14,785** | **11,461** | **9,700** | **9,240** | **8,945** | **8,893** | **8,890** | **8,897** | **8,886** | **8,880** |
| Primary | F-1 | 2,133 | 1,697 | 1,421 | 1,425 | 1,256 | 1,218 | 1,203 | 1,208 | 1,199 | 1,197 |
| | F-2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Total** | **2,133** | **1,697** | **1,421** | **1,425** | **1,256** | **1,218** | **1,203** | **1,208** | **1,199** | **1,197** |
| Secondary | F-1 | 19,205 | 17,349 | 16,211 | 15,436 | 13,394 | 12,893 | 12,705 | 12,734 | 12,631 | 12,606 |
| | F-2 | 13 | 12 | 11 | 11 | 9 | 9 | 9 | 9 | 9 | 9 |
| | **Total** | **19,219** | **17,361** | **16,222** | **15,447** | **13,403** | **12,902** | **12,713** | **12,743** | **12,639** | **12,614** |
| Total, All Categories | F-1 | 324,342 | 377,886 | 351,013 | 383,455 | 358,434 | 359,884 | 358,217 | 356,374 | 355,057 | 353,958 |
| | F-2 | 33,332 | 34,817 | 31,773 | 39,676 | 35,806 | 36,373 | 36,410 | 36,231 | 36,177 | 36,094 |
| | **Total** | **357,674** | **412,703** | **382,787** | **423,132** | **394,239** | **396,257** | **394,628** | **392,605** | **391,234** | **390,052** |

Table 8 shows the distribution of EOS request estimates over the 10-year analysis period by EOS trigger (student-driven program changes, program length exceeding four or eight years since the rule effective date or arrival in the country) and F education level. EOS requests in shorter programs (associate, language training, primary/secondary, and other) are dominated by program change-related triggers, with very few coming from OPT initiations or extensions beyond the 4-year maximum (i.e., mandatory EOS requests). EOS request drivers in master's programs differ from those for other shorter-duration programs in that they are overwhelmingly OPT-driven, which is consistent with both typical master's program length and limits on program changes during the first two years. EOS requests in longer programs (bachelor's, doctorate) show higher proportions coming from OPT initiations and mandatory EOS requests than shorter programs. For EOS requests in bachelor's programs, most requests will come from changes to their programs or OPT initiations. Only 3.4% of those requests are due solely to the 4 year maximum. EOS requests in doctoral programs are driven almost entirely by OPT initiations and mandatory EOS, reflecting restrictions that prevent program changes for graduate students (especially doctoral students).

**Table 8. Distribution of F EOS Requests by EOS Trigger Over the 10-Year Analysis Period**

| Education Level | Proportion Education Level Change | Proportion Change to Existing Program | Proportion OPT | Proportion Mandatory EOS |
|---|---|---|---|---|
| Associate | 57.4% | 28.7% | 13.4% | 0.5% |
| Bachelor's | 22.2% | 47.3% | 27.1% | 3.4% |
| Doctorate | 0.0% | 0.0% | 57.8% | 42.2% |
| Language Training | 58.4% | 41.5% | 0.0% | 0.0% |
| Master's | 3.0% | 0.0% | 96.4% | 0.6% |
| Other | 43.7% | 36.5% | 19.2% | 0.5% |
| Primary | 62.6% | 34.6% | 0.0% | 2.8% |
| Secondary | 61.0% | 36.8% | 0.0% | 2.2% |

**Estimating EOS Requests for J Exchange Visitors**

J-1 exchange visitor participants are aliens approved to participate in work- and study-based exchange visitor programs overseen by DOS, and J-2 nonimmigrants are their dependents. J exchange visitor participants include aliens enrolled in alien physician programs, camp counselors, and au pairs, among others.[22]

The final rule will impose a fixed period of admission of up to 4 years on J nonimmigrants or shorter, depending on exchange program-specific limitations on the length of admission. To estimate the number of EOS requests required by J nonimmigrants under the final rule, DHS developed a deterministic, annual-step, open-cohort Markov model to simulate exchange visitor outcomes over a 10-year period. The model simultaneously tracks multiple cohorts, including: (1) new exchange visitors entering each program category during the analysis period; (2) exchange visitors who began their programs prior to Year 1 and continue under the final rule ("grandfathered" cohorts); and (3) exchange visitors who enter during the analysis period and continue into subsequent years. For grandfathered cohorts, mandatory EOS timing is measured relative to the start of the analysis period, consistent with grandfathering provisions. As discussed in Table 3, the final rule clarifies how annual reappointment cycles will affect EOS request requirements. Under the proposed rule, DHS assumed that all alien physicians, research scholars, and professors would need to file EOS requests for every year of their program. The final rule clarifies that annual reappointment cycles will not trigger additional EOS requests, resulting in significantly lower EOS request estimates for alien physicians, research scholars, and professors relative to the proposed rule analysis (*see* Table 10).

---

[22] J exchange visitor programs include: professors and research scholars; short-term scholars; trainees and interns; college and university students; teachers; secondary school students; specialists; alien physicians; international visitors; government visitors; camp counselors; au pairs; and summer work travel. *See* INA section 101(a)(15)(J), 8 U.S.C. 1101(a)(15)(J) and 22 CFR 62.20 through 62.32.

The model is specified separately for each J program category and is calibrated using administrative data from 2016 through 2024. Table 9 shows the distribution of J exchange visitors by category based on three-year average counts from 2022 through 2024; it includes the number of new exchange visitors each year and the number of continuing exchange visitors over the 10-year analysis period. The number of new entrants into each category is assumed to remain constant over the analysis period. To initialize the model, continuing exchange visitors are allocated across program-year states based on the program-year distribution observed among active exchange visitors in 2024.

**Table 9. J-1 Cohort Sizes by Category**

| Category | New Arrivals Each Year | Continuing Over the 10-Year Analysis Period |
|---|---:|---:|
| Alien Physician | 3,767 | 13,235 |
| Au Pair | 20,771 | 26,374 |
| Camp Counselor | 27,529 | 0 |
| Government Visitor | 2,649 | 12 |
| Intern | 18,296 | 9,181 |
| International Visitor | 5,280 | 78 |
| Professor | 732 | 1,152 |
| Research Scholar | 24,159 | 43,728 |
| Short-Term Scholar | 13,632 | 1,553 |
| Specialist | 1,526 | 640 |
| Student Associate | 2 | 5 |
| Student Bachelors | 1,517 | 2,433 |
| Student Doctorate | 922 | 6,162 |
| Student Intern | 3,126 | 611 |
| Student Masters | 2,275 | 3,592 |
| Student Non-Degree | 28,074 | 6,841 |
| Student Secondary | 20,112 | 18,224 |
| Summer Travel/Work | 101,456 | 18,910 |
| Teacher | 6,443 | 13,828 |
| Trainee | 10,433 | 8,115 |

The model assumes that exchange visitors do not switch between J program categories during the analysis period. Analysis of J exchange visitor data from 2016–2024 indicates that such switching is uncommon: fewer than one percent of exchange visitors transferred between categories, with transitions from Research Scholar to Alien Physician being the most frequent

(2,828 transfers over nine years). Category switching is even rarer for other J program categories. Because program category transfers require EOS requests and may extend time in J status, the assumption of no category switching is expected to bias EOS estimates downward.

Exchange visitors in a specific J category are tracked in annual cycles using 10 program-year states that represent time elapsed since the start of an exchange visitor's current program category, along with a terminal completion/exit state. These program-year states allow program completion and EOS filing probabilities to vary by time spent in the program category. In each modeled year, exchange visitors may complete their program, advance to the next program-year state, or file an EOS request based on category- and program-year-specific probabilities.

An EOS request is required when an exchange visitor's participation in a program category extends beyond a four-year interval, or when the exchange visitor seeks to extend the DOS-imposed maximum duration for their program category.[23] Mandatory four-year EOS requirements are implemented using the program-year tunnel states and exclude exchange visitors who file EOS requests to extend the DOS-imposed maximum duration in the same year, thereby preventing double-counting and resetting the four-year interval following such filings. To estimate EOS request requirements for J-2 dependents, DHS applies category-specific ratios of J-2 dependents to J-1 exchange visitors to the modeled number of required J-1 EOS requests.

Table 10 presents the estimated number of EOS requests over the 10-year analysis period by J category and visa type (J-1 and J-2). DHS estimates that the number of required EOS requests will fluctuate in the years following the rule effective date but will reach a relative steady state by Year 10 once the J population present in the country when the rule takes effect

[23] For example, the alien physicians program has a DOS-imposed maximum duration of seven years. Approval from DOS is required to extend a program beyond the DOS-imposed maximum duration. *See* Chapter 3 - Terms and Conditions of J Exchange Visitor Status: https://www.uscis.gov/policy-manual/volume-2-part-d-chapter-3.

(i.e., the grandfathered population) completes their programs and arrivals after the rule was in effect comprise the majority of the J population. By Year 10, approximately 24,000 J-1 exchange visitors and 7,000 J-2 dependents will be required to apply for an EOS per year, for an annual J nonimmigrant total of approximately 31,000. The estimated number of EOS requests is lowest in Years 1-3 prior to reaching any four-year intervals and highest at the first four-year interval (when any grandfathered students or Year 1 new arrivals needing to continue participation into Year 5 and beyond would require an EOS request). In Years 5-7, the estimate is stable but slightly lower than the eventual steady state values due to being in between 4-year intervals and lingering effects of grandfathering provisions (i.e., all participants in the country when the rule took effect filing for extensions at the same time during Year 4 and not needing another EOS request until Year 8). Starting in Year 8, the estimates approach a relative steady state for the J exchange visitor population.

**Table 10. Estimated Number of EOS Requests over the 10-year Analysis Period, by J Category and Visa Type**

| Category | Visa Type | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alien Physician | J-1 | 54 | 62 | 66 | 5,827 | 2,106 | 2,121 | 2,129 | 2,386 | 2,271 | 2,270 |
| | J-2 | 11 | 12 | 13 | 1,137 | 411 | 414 | 415 | 465 | 443 | 443 |
| | **Total** | **64** | **74** | **79** | **6,964** | **2,517** | **2,534** | **2,545** | **2,852** | **2,714** | **2,713** |
| Au Pair | J-1 | 13,679 | 9,082 | 9,017 | 9,013 | 9,013 | 9,013 | 9,013 | 9,013 | 9,013 | 9,013 |
| | J-2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Total** | **13,679** | **9,082** | **9,017** | **9,013** | **9,013** | **9,013** | **9,013** | **9,013** | **9,013** | **9,013** |
| Intern | J-1 | 14 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| | J-2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Total** | **14** | **10** | **10** | **10** | **10** | **10** | **10** | **10** | **10** | **10** |
| Professor | J-1 | 0 | 0 | 0 | 164 | 94 | 94 | 94 | 94 | 94 | 94 |
| | J-2 | 0 | 0 | 0 | 35 | 20 | 20 | 20 | 20 | 20 | 20 |
| | **Total** | **0** | **0** | **0** | **199** | **114** | **114** | **114** | **114** | **114** | **114** |
| Research Scholar | J-1 | 17 | 19 | 27 | 7,740 | 4,400 | 4,393 | 4,394 | 4,489 | 4,455 | 4,453 |
| | J-2 | 4 | 4 | 6 | 1,813 | 1,031 | 1,029 | 1,029 | 1,052 | 1,044 | 1,043 |
| | **Total** | **21** | **23** | **33** | **9,553** | **5,431** | **5,423** | **5,424** | **5,541** | **5,498** | **5,496** |
| Specialist | J-1 | 87 | 89 | 81 | 85 | 84 | 84 | 84 | 84 | 84 | 84 |
| | J-2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | **Total** | **91** | **94** | **85** | **89** | **88** | **88** | **88** | **88** | **88** | **88** |
| Student Bachelors | J-1 | 0 | 0 | 0 | 507 | 239 | 239 | 239 | 262 | 253 | 253 |
| | J-2 | 0 | 0 | 0 | 23 | 11 | 11 | 11 | 12 | 11 | 11 |
| | **Total** | **0** | **0** | **0** | **530** | **250** | **250** | **250** | **274** | **264** | **264** |
| Student Doctorate | J-1 | 0 | 0 | 0 | 2,926 | 712 | 693 | 680 | 1,162 | 905 | 878 |
| | J-2 | 0 | 0 | 0 | 1,257 | 306 | 298 | 292 | 499 | 389 | 377 |
| | **Total** | **0** | **0** | **0** | **4,183** | **1,017** | **991** | **972** | **1,661** | **1,294** | **1,255** |
| Student Masters | J-1 | 0 | 0 | 0 | 257 | 75 | 73 | 73 | 135 | 101 | 100 |
| | J-2 | 0 | 0 | 0 | 20 | 6 | 6 | 6 | 11 | 8 | 8 |
| | **Total** | **0** | **0** | **0** | **277** | **81** | **79** | **78** | **146** | **109** | **107** |
| Teacher | J-1 | 1,911 | 2,446 | 4,066 | 9,901 | 6,942 | 6,919 | 6,919 | 6,919 | 6,919 | 6,919 |

| Category | Visa Type | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | J-2 | 1,375 | 1,761 | 2,926 | 7,126 | 4,996 | 4,980 | 4,980 | 4,980 | 4,980 | 4,980 |
| | **Total** | **3,286** | **4,207** | **6,992** | **17,027** | **11,938** | **11,899** | **11,899** | **11,899** | **11,899** | **11,899** |
| Trainee | J-1 | 68 | 48 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| | J-2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Total** | **68** | **48** | **47** | **47** | **47** | **47** | **47** | **47** | **47** | **47** |
| Total, All Categories | J-1 | 15,829 | 11,756 | 13,312 | 36,477 | 23,722 | 23,687 | 23,683 | 24,602 | 24,152 | 24,120 |
| | J-2 | 1,395 | 1,782 | 2,950 | 11,416 | 6,785 | 6,762 | 6,758 | 7,043 | 6,899 | 6,887 |
| | **Total** | **17,223** | **13,538** | **16,262** | **47,893** | **30,507** | **30,449** | **30,440** | **31,645** | **31,052** | **31,007** |

Notes: This table excludes any categories with fewer than 10 estimated EOS requests over the 10-year analysis period, including camp counselor, government visitor, international visitor, secondary student, short-term scholar, student associate, student intern, student non-degree, and summer travel/work. Thus, the totals across individual categories may sum to a smaller value than the “Total, All Category” values.

Table 11 shows the distribution of EOS request estimates over the 10-year analysis period by EOS trigger (extending program maximum duration, program length exceeding four or eight years since the rule effective date or arrival in the country) and J category. For several short-duration categories (au pairs, interns, trainees, specialists), all or the vast majority of estimated EOS requests are from extending the program duration beyond the maximum duration. For longer-duration categories (alien physicians, professors, research scholars, student bachelors, student doctorate, student masters), the estimated number of EOS requests are driven by the 4-year interval requirements. For teachers, the number of EOS requests is split nearly evenly between extending the program maximum duration and the first 4-year interval.

**Table 11. Distribution of J EOS Requests by EOS Trigger Over the 10-Year Analysis Period**

| Category | Proportion from Max Duration | Proportion after 4 Years | Proportion after 8 Years |
|---|---|---|---|
| Alien Physician | 4.3% | 92.6% | 3.1% |
| Au Pair | 100.0% | 0.0% | 0.0% |
| Intern | 100.0% | 0.0% | 0.0% |
| Professor | 0.0% | 100.0% | 0.0% |
| Research Scholar | 0.8% | 98.6% | 0.6% |
| Specialist | 97.0% | 3.0% | 0.0% |
| Student Bachelors | 0.0% | 97.5% | 2.5% |
| Student Doctorate | 0.0% | 88.0% | 12.0% |
| Student Masters | 0.0% | 85.4% | 14.6% |
| Teacher | 47.9% | 52.0% | 0.0% |
| Trainee | 100.0% | 0.0% | 0.0% |

This table excludes any categories with fewer than 10 estimated EOS requests over the 10-year analysis period, including camp counselor, government visitor, international visitor, secondary student, short-term scholar, student associate, student intern, student non-degree, and summer travel/work.

**Estimating EOS Requests for I Nonimmigrants**

I nonimmigrants are bona fide representatives of foreign information media (such as press, radio, film, print) seeking to enter the United States to engage in such vocation, as well as for the spouses and children of such aliens. *See* INA section 101(a)(15)(I), 8 U.S.C. 1101(a)(15)(I).

The final rule gives I nonimmigrants an admission period not to exceed 240 days, except for aliens who present a passport from the People's Republic of China (excluding aliens in I nonimmigrant status presenting passports issued by the Hong Kong Special Administrative Region and Macau Special Administrative Region) who are authorized to remain in the United States in I nonimmigrant status for a period necessary to complete the activity or assignments consistent with the I classification, not to exceed 90 days after the rule takes effect. I nonimmigrants requiring additional time beyond the initial admission period can file an EOS request. In order to estimate the number of EOS requests that will likely be filed by I nonimmigrants, DHS calculated the number of nonimmigrants in I status in FY 2022, FY 2023, and FY 2024 staying for greater than 240 days.[24] Any I category nonimmigrant with a total in-country time of greater than 240 days was included in the analysis, as they will be required to get additional time from DHS under the final rule by filing an EOS. To estimate the number of EOS requests among new I nonimmigrant arrivals, DHS used the 2022-2023 proportion of nonimmigrants staying longer than 240 days. For longer-stay I nonimmigrants (i.e., multiple years), DHS assumed that one or two EOS requests will be required in a given year because the default period of stay is 240 days (i.e., less than one year). To account for this, DHS assumed that longer-term I nonimmigrants submit one EOS request in odd analysis years (Years 1, 3, 5, 7, and 9) and two EOS requests in even years (Years 2, 4, 6, 8, and 10). DHS did not model the 90-

[24] DHS used data from ADIS on the number of unique I nonimmigrants whose duration of stay fell either into 241-365 days or 366 days or longer, inclusive of nonimmigrants without official departure dates (i.e., potentially still in the United States). DHS acknowledges that the number of EOS requests for I nonimmigrants may be overestimated, because some nonimmigrants with missing departure dates in ADIS may have left the United States without an official departure record.

day limitation for the I nonimmigrants who are People's Republic of China passport holders because available ADIS data did not contain passport information.[25]

Table 12 provides estimates for the number of I nonimmigrants that will apply for an EOS per year, based on FY2022-2024. DHS estimated that, based on a 3-year average across 2022-2024, approximately 6,400 I nonimmigrants will request an EOS each year. These estimates do not include I nonimmigrants who departed the United States before their total in-country time exceeded 240 days.

**Table 12. Number of I Foreign Information Media Representatives Requiring an EOS Per Year**

| Nonimmigrant Category | FY 2022 | FY 2023 | FY 2024 | 3-Year Average |
|---|---|---|---|---|
| Longer-stay | 4,720 | 4,709 | 5,326 | 4,918 |
| New Arrivals | 1,278 | 1,532 | 1,724 | 1,511 |
| **Total** | **5,998** | **6,241** | **7,050** | **6,429** |
| Source: Estimates derived from ADIS data. | | | | |

**Transition Period**

8 CFR 214.1(m)(1) establishes a transition period for phasing in admissions for a fixed time period. Specifically, F and J nonimmigrants present in the United States 60 days after the final rule's effective date who are properly maintaining their status with admission for D/S may remain in the United States in F or J status, without filing an EOS request, until the later date of either the expiration date on an Employment Authorization Document (Form I-766, or successor form), or the program end date. The authorized period of admission will be reflected on their Form I-20 or DS-2019, not to exceed 4 years from 60 days after the final rule's publication date, as long as there are no additional changes to their I-20 or DS-2019 that will subject them to the

[25] This modeling limitation is expected to generate a downward bias in the number of EOS requests by I nonimmigrants, because People's Republic of China passport holders may need to require additional time more often.

new rule. *See* 8 CFR 214.1(m)(1). I nonimmigrants who are properly maintaining their status 60 days after the final rule's publication date with admission for D/S are authorized to remain in the United States in I nonimmigrant status for a period necessary to complete their activity, not to exceed 300 days after the final rule's publication with the exception of aliens in I nonimmigrant status presenting with passports described in 8 CFR 214.2(i)(3)(ii), who are authorized to remain in the United States in I nonimmigrant status for a period necessary to complete their activity, not to exceed 150 days after the final rule's publication. *See* 8 CFR 214.1(m)(3). Consistent with the current process, an I nonimmigrant who departs the United States after the final rule's effective date and would like to return to the United States in that same status will need to reapply for admission as an I nonimmigrant at a POE.

As described in the subsections above, DHS modeled the transition period for nonimmigrants present in the United States at the time of rule implementation using Markov models for F and J nonimmigrant and a cohort analysis methodology for I nonimmigrants. Table 13 provides the estimated number of EOS requests for each year in the 10-year analysis period. The total number of EOS requests ranges from a low of approximately 380,000 in Year 1 to a high of approximately 478,000 in Year 4. The early years of the analysis period account for two populations: (1) nonimmigrants already in the country when the final rule takes effect and (2) newly arriving nonimmigrants each year. The later years of the analysis period account mostly for new arrivals only since the population remaining in the country when the final rule takes effect becomes increasingly small. In Years 1 through 3, EOS estimates are for individuals starting OPT or revising their programs.[26] EOSs for starting OPT or revising their programs

[26] During the rule transition period, F-1 students with a pending post-completion OPT or STEM OPT application on the effective date of the final rule would not need to file an EOS request. Thus, the Year 1 estimates may overestimate the number of EOS requests since we do not know what proportion of F-1 students will have a pending application on the effective date.

occur throughout the analysis period. In Year 4, two additional populations will need EOSs: (1) nonimmigrants arriving in Year 1 who need more than four years to complete their program and (2) nonimmigrants already in the country in Year 1 who also need additional time. In Year 5, nonimmigrants arriving in Year 2 will need to file EOSs if they need additional time (and so on for subsequent years).

**Table 13. Number of EOS Requests by Nonimmigrant Category and Year**

| Cat | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| F-1 | 324,342 | 377,886 | 351,013 | 383,455 | 358,434 | 359,884 | 358,217 | 356,374 | 355,057 | 353,958 |
| F-2 | 33,332 | 34,817 | 31,773 | 39,676 | 35,806 | 36,373 | 36,410 | 36,231 | 36,177 | 36,094 |
| J-1 | 15,829 | 11,756 | 13,312 | 36,477 | 23,722 | 23,687 | 23,683 | 24,602 | 24,152 | 24,120 |
| J-2 | 1,395 | 1,782 | 2,950 | 11,416 | 6,785 | 6,762 | 6,758 | 7,043 | 6,899 | 6,887 |
| I | 4,665 | 8,017 | 5,448 | 7,171 | 5,529 | 6,490 | 5,971 | 6,253 | 6,018 | 6,161 |
| **Total** | **379,562** | **434,258** | **404,497** | **478,196** | **430,275** | **433,196** | **431,039** | **430,503** | **428,304** | **427,220** |
| Estimates derived from SEVIS and ADIS data. | | | | | | | | | | |

Table 14 presents a comparison of estimated number of EOS estimates in Year 10[27] under the Final Rule relative to the EOS estimates previously in the NPRM. In comparison to the NPRM estimates, the estimated number of EOS requests increased for F nonimmigrants, decreased for J nonimmigrants, and remained the same for I nonimmigrants. Overall, the estimated number of EOS requests was approximately 13,000 higher under the final rule relative to the NPRM analysis.

**Table 14. Comparison of Final Rule and NPRM Number of EOS Requests in Year 10 by Nonimmigrant Category**

| Rule Stage | Visa Type | EOS Request Estimates in Year 10 |
|---|---|---|
| Final | F | 390,052 |
| NPRM | F | 204,701 |
| **Difference** | **F** | **185,351** |
| Final | J | 31,007 |
| NPRM | J | 203,468 |

[27] Year 10 is likely the closest approximation to a "steady state" estimate of EOS requests, with the majority of the estimate based on new arrivals only (i.e., the population remaining in the country from when the rulemaking takes effect is at its smallest in Year 10).

| Rule Stage | Visa Type | EOS Request Estimates in Year 10 |
|---|---|---|
| **Difference** | **J** | **-172,461** |
| NPRM & Final | I | 6,161 |
| Final | Total | 427,220 |
| NPRM | Total | 414,330 |
| **Difference** | **Total** | **12,890** |

### 4. Costs and Benefits of the Final Rule

**Costs**

The final rule implements a fixed period of admission for F, J, and I nonimmigrants. For F and J nonimmigrants, the period of admission will not exceed 4 years. For I nonimmigrants, the period of admission will not exceed 240 days. As these nonimmigrants will have a fixed time period of admission, the final rule includes provisions that require nonimmigrants to apply for an EOS directly with USCIS if seeking to continue their studies, to participate in any type of post completion training related to their academic course of study, to continue working in their information medium, or to participate in an exchange visitor program beyond the initial admission period granted at entry.

DHS assessed the costs and benefits of the final rule relative to the existing baseline (that is, the current practice of admitting F, J, and most I nonimmigrants for D/S) as well as the costs and benefits of monitoring and overseeing these categories of nonimmigrants. As summarized in Table 2 OMB A-4 Accounting Statement, some impacts of the requirements are discussed throughout this section qualitatively. In accordance with the regulatory analysis guidance articulated in OMB Circular A-4 and consistent with DHS's practices in previous rulemakings, this regulatory analysis focuses on the likely consequences of the final rule (i.e., costs and benefits that accrue for affected parties). The analysis covers 10 years to ensure it captures costs and benefits that accrue over time. DHS expresses all quantifiable impacts in 2024 dollars and uses 7-percent and 3-percent discount rates following OMB Circular A-4.

*Rule Familiarization and Adaptation: F and J Sponsors*

The final rule will impact DSOs and ROs from SEVP-certified schools and DOS-designated exchange visitor programs by requiring time for rule familiarization training, modification of training materials, and institutional awareness and response (during the first year only). I foreign information media representatives will not incur similar costs from the final rule as those incurred by DSOs and ROs because the burden for filing an EOS request falls on the I nonimmigrant, who DHS assumes familiarize themselves in the baseline with the pertinent visa requirements at the time the visa is needed, not at the point in time that Federal regulations change. DHS expects this behavior will not change as a result of the rule and that there will be no incremental costs associated with rule familiarization and adaptation for I foreign information media representatives. Based on best professional judgement and public comment input, SEVP estimates that DSOs/ROs will require 70 hours for rule familiarization, 33 hours to create and modify training materials, and 32 hours to adapt to the final rule through system-wide briefings and systemic changes.[28] To estimate these costs, DHS multiplied the total familiarization/adaptation burden estimate (135 hours) by the loaded wage rate for DSOs and ROs ($49.89 = $34.38 wage rate x a 1.451 loaded wage rate factor[29]) and by the number of DSOs and ROs (26,625; 21,357 DSOs + 5,268 ROs[30]).

---

[28] In response to comments providing alternative estimates for the DSO/RO labor burden, DHS has revised the rule familiarization and adaptation burden estimate from 67 hours to the median value the public comments provided of 135 hours. For the proposed rule, the 67 hours per DSO/RO included 35 hours for rule familiarization, 16 hours to create and modify training materials, and 16 hours to adapt to the rule through system-wide briefings and systemic changes.

[29] Based on the Bureau of Labor Statistics (BLS) average hourly wage for SOC 21-1012 (Educational, Guidance, and Career Counselors and Advisors) for May 2024 of $34.38 (available at https://www.bls.gov/news.release/archives/ocwage_04022025.pdf:). The benefits-to-wage multiplier is calculated by the BLS, using December 2024 data, released on March 14, 2025, as (Total Employee Compensation per hour) / (Total wages and Salaries per hour) = $47.20 / $32.52 = 1.451, based on the average national wage for all occupations (*see* Civilian workers in Table 1; https://www.bls.gov/news.release/archives/ecec_03142025.pdf).

[30] The numbers of DSOs and ROs are based on a SEVP SEVIS pull for year 2024. More information on SEVIS can be found at https://www.ice.gov/sevis/overview.

In addition to the DSO/RO rule familiarization and adaptation costs, DHS accounted for increased advising burden for existing F-1 students and J-1 exchange visitors after the rule takes effect. DHS added the increased advising burden for the final rule in response to public comment input. DHS acknowledges that F-1 and J-1 nonimmigrants already in the country when the rule takes effect will require additional advising to discuss how the rule may affect their educational plans. DHS assumed that, under the rule, each existing F-1 and J-1 nonimmigrant would require an additional hour of advising time. To account for increased advising burden, DHS multiplied the 2022-2024 3-year average number of F-1 and J-1 nonimmigrants (1,470,059 F-1 + 466,010 J-1 = 1,936,069 total; *see* Table 5) by 1.0 hour and the loaded wage rate for advisors (i.e., the same BLS wage category as DSOs and ROs) ($49.89 = $34.38 wage rate x a 1.451 loaded wage rate factor).

DHS estimates that rule familiarization and adaptation, including DSO/RO burden and increased advising burden, will cost $275.9 million undiscounted ([$49.89 loaded wage rate x 135 hours x 26,625 DSOs and ROs] + [$49.89 loaded wage rate x 1 hour x 1,936,069 F-1s/J-1s]), or $267.9 million and $257.8 million at discount rates of 3 and 7 percent, respectively, during the first year only once the rule takes effect.

*Rule Familiarization: F-1 Students & J-1 Exchange Visitors*

DHS accounted for rule familiarization burden for F-1 students and J-2 exchange visitors who are in the country when the rule takes effect. This burden is specifically for additional advising to discuss how the rule may affect their educational plans. DHS assumed that, under the rule, each existing F-1 and J-1 nonimmigrant would require an additional hour of advising time. To account for the nonimmigrant burden of increased advising, DHS multiplied the 2022-2024 3-year average number of F-1 and J-1 nonimmigrants (1,470,059 F-1 and 466,010 J-1; *see* Table

5) by 1.0 hour and the average hourly wage rate for F-1 and J-1 nonimmigrants ($16.96 and $47.39, respectively; *see* Table 16 for details).

DHS estimates that rule familiarization for F-1 students and J-1 exchange visitors in the country when the rule takes effect will cost $47.0 million undiscounted ([$16.96 average hourly wage rate x 1 hour x 1,470,059 F-1 students] + [$47.39 average hourly wage rate x 1 hour x 466,010 J-1 exchange ]), or $45.6 million and $43.9 million at discount rates of 3 and 7 percent, respectively, during the first year only once the rule takes effect.

*EOS Burden: Sponsors*

SEVIS is a web-based system that DHS and DOS use to maintain information regarding: SEVP-certified schools, F-1 and M-1 students studying in the United States (and their F-2 and M-2 dependents), DOS-designated Exchange Visitor Program sponsors, and J-1 Exchange Visitor Program participants (and their J-2 dependents). Under the final rule, DSOs and ROs will need to process EOS requests, update SEVIS entries, and provide counseling for any foreign students and exchange visitors requesting an EOS. Based on best professional judgment, SEVP estimates that DSOs/ROs will require 3 hours per EOS request for (1) reviewing the foreign student's or exchange visitor's EOS request form (1 hour), (2) updating the SEVIS record and tracking EOS requests (1 hour), and (3) advising the foreign student or exchange visitor about the extension process and the requirements to file an EOS with USCIS (1 hour).

DHS added 1.5 hours of Human Resources (HR) labor burden per EOS request to the EOS processing estimates. The 1.5-hour burden estimate accounts for time required by HR staff to track form updates related to each EOS request and avoid inadvertent unauthorized employment due to form discrepancies with the I-9.

To estimate DSO/RO costs for processing EOS requests and updating SEVIS, DHS multiplied the estimated number of EOS requests for F-1 and J-1 nonimmigrants (Table 14) by the expected DSO/RO time requirement per EOS request (3 hours) and the DSO/RO loaded wage rate ($49.89). DHS assumed that, on average, the 3-hour time estimate accounted for time required to update SEVIS entries for F-2 and J-2 dependents. The per-EOS DSO/RO costs are $149.66 (3 hours x $49.89 loaded wage rate).

To estimate HR costs related to EOS requests, DHS multiplied the estimated number of EOS requests for F-1 and J-1 nonimmigrants (Table 14) by the expected HR time requirement per EOS request (1.5 hours) and the HR loaded wage rate ($55.62 = $38.33[31] x 1.451 loaded wage rate factor). The per-EOS HR costs are $83.43 (1.5 hours x $55.62 loaded wage rate).

Table 15 presents undiscounted DSO/RO and HR costs for processing EOS requests over the analysis period. Similar to EOS filing costs, DSO/RO and HR costs for processing EOS requests are lowest in Year 1 and highest in Year 4.[32]

**Table 15. DSO/RO and HR Costs for Processing EOS Requests, by Year (Millions 2024$, Undiscounted)**

| | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of EOS Requests[1] | 340,171 | 389,642 | 364,326 | 419,933 | 382,156 | 383,571 | 381,900 | 380,976 | 379,210 | 378,078 |
| Costs[2] | $79.3 | $90.8 | $84.9 | $97.9 | $89.1 | $89.4 | $89.0 | $88.8 | $88.4 | $88.1 |

[1] Sum of EOS request estimates for F-1 students and J-1 exchange visitors.
[2] (Number of EOS requests) x (3 hours) x (DSO/RO loaded wage rate of $49.89) + (Number of EOS requests) x (1.5 hours) x (HR loaded wage rate of $55.62).

[31] Based on the BLS OEWS May 2024 period average hourly wage for SOC 13-1071 (Human Resources Specialists), available at: https://www.bls.gov/news.release/archives/ocwage_04022025.htm.
[32] The HR costs estimated in Table 15 may be an overestimation. Only the employers whose nonimmigrant employees need an EOS will incur these costs. There may be a portion of unemployed F-1 and J-1 nonimmigrants who will request an EOS. Therefore, the number of EOS requests that require HR costs may be lower than presented in Table 15.

The total cost estimate for DSO/RO and HR EOS request processing is $885.7 million undiscounted,[33] or $754.8 million and $620.5 million at discount rates of 3 and 7 percent, respectively. DHS recognizes that additional departments may also incur additional labor burden from the rulemaking, such as personnel offices and planning committees, among others. DHS discusses this potential cost qualitatively within the Regulatory Impact Analysis because the additional labor burden is difficult to project. DSOs and ROs already coordinate with other departments when completing regular SEVIS updates, and DHS anticipates that these updates will provide the information needed for most EOS requests. EOS requests that require additional input from other departments will be less common and, thus, difficult to project. DHS also anticipates that updated training materials compiled by DSOs and ROs will help minimize additional labor burden for other departments.

*EOS Burden: F, J, and I Filing Costs*

Under the final rule, nonimmigrants who want to extend their stay beyond their fixed period of admission will need to apply for additional time directly with DHS. Under the framework, nonimmigrants could choose to file an EOS using the appropriate form from USCIS or apply for admission with CBP at a POE if they are eligible to do so. DHS assumes eligible nonimmigrants with existing international travel plans may prefer to request readmission with CBP at a POE rather than incur the costs of filing an EOS (*see* 8 CFR 214.1(a)(4)(i)(A) and (ii)(A)). The exact proportion of eligible nonimmigrants who will choose to re-enter through a POE is unknown, but in the regulatory impact analysis for the NPRM and Final Rule, DHS assumes that, while requesting an EOS at a POE is an option, many nonimmigrants wishing to

[33] The undiscounted total differs slightly from the sum of the years provided in Table 15 because of rounding in the table values.

remain in the country will file an EOS using the I-539 or I-539A forms instead of incurring costs due to travel and reentry.

DHS is unable to estimate how many nonimmigrants will seek an extension to their period of stay while traveling through a POE instead of filing the I-539 or I-539A form. The analysis thus assumes that all F, J, and I nonimmigrants requiring an EOS will file using the I-539 or I-539A form. If DHS made the opposite assumption—that all F, J, and I nonimmigrants requiring an EOS would extend while traveling through a POE—the cost estimates would change in the following ways. First, F, J, and I nonimmigrants would not pay the I-539 or I-539A filing. However, the process of applying for readmission at a POE would require 8 minutes of time for each F, J, or I nonimmigrant requiring an EOS. The time estimate of 8 minutes is based on the time required for completing a paper I-94 form.[34] The time burden may be reduced to 4 minutes for nonimmigrants who complete their I-94 on the website. The cost to F, J, and I nonimmigrants for applying for readmission at a POE translates to a total undiscounted cost of $11.2 million over the 10-year analysis period using the number of EOS requests presented in Table 14 and the nonimmigrant wage rates described in Table 16. F, J, and I nonimmigrants would also incur costs to travel to a POE. Second, CBP officers would also spend 8 minutes of time per F, J, or I nonimmigrant applying for readmission at a POE. Using a loaded wage rate of $99.33 for FY 2024[35] and the number of EOS requests presented in Table 14, the total undiscounted cost to CBP officers for completing readmission at a POE for F, J, and I nonimmigrants requiring an EOS translates to $56.6 million over the 10-year analysis period.

---

[34] Supporting Statement A for Form I-94, “Arrival and Departure Record,” OMB Control Number 1651-0111, https://www.reginfo.gov/public/do/DownloadDocument?objectID=118995402.
[35] Provided by CBP Office of Finance on June 17,2024; based on the loaded wage rate for FY 2024 [salary + benefits + premium pay + non-salary costs] for the GS-11 Step 10 labor category.

DHS anticipates that the CBP labor burden required to process readmissions at a POE can be incorporated in existing procedures without requiring additional staff.

Because DHS is unable to estimate how many nonimmigrants will prefer to readmit to the United States with CBP, DHS's best assessment of the cost of the final rule to the affected population is based on the assumption that each extension will require a Form I-539 (Application to Extend/Change Nonimmigrant Status) filing. Actual costs to the affected population could be lower for those nonimmigrants able to extend while traveling through a POE. During the transition, F and J nonimmigrants who are properly maintaining their status, are present in the United States when the rule takes effect, and were admitted for D/S will be authorized to remain in the United States for a period of time up to the program end date noted on their Form I-20 or DS-2019, plus 30 days, not to exceed a period of 4 years. I nonimmigrants who are properly maintaining their status and are present in the United States when the rule takes effect will have their status, and employment authorization incident to such status, automatically extended for a period necessary to complete their activity, not to exceed 240 days after the rule takes effect, with the exception of aliens in I nonimmigrant status presenting passports issued by the People's Republic of China (excluding Hong Kong Special Administrative Region and Macau Special Administrative Region passport holders) who are authorized to remain in the United States in I nonimmigrant status for a period necessary to complete their activity, not to exceed 90 days after the rule takes effect. 8 CFR 214.2(m)(3). Any F foreign students, J exchange visitors, and I representatives of foreign information media who are present when the rule takes effect will need to apply for an EOS if they require additional time required beyond the maximum specified transition time period.

EOS applicants will need to file Form I-539 (F-1, J-1, and I nonimmigrants) or Form I-539A (F-2 and J-2 nonimmigrants and I dependents), depending on the nonimmigrant category, in order to extend their period of stay. DHS assumes that all F-2 nonimmigrants, J-2 nonimmigrants, and I nonimmigrant dependents will complete the I-539A instead of completing a separate Form I-539 because the I-539A is less burdensome to complete and does not require a separate application fee.[36] However, I nonimmigrant data contained the representatives of foreign information media and their dependents, without differentiating between the two. As a result, this analysis overestimates EOS filing costs for I nonimmigrants by assigning the primary I nonimmigrant costs to both the representatives of foreign information media and their dependents.

The most recently approved Paperwork Reduction Act (PRA) Information Collection Package Supporting Statement for Form I-539 at the time of this analysis, which provides the average applicant burden estimates for completing and submitting the form, states that F-1, J-1, and I nonimmigrants require 1.67 hours to complete a paper version of the Form I-539 (70 percent of applicants) or 1.00 hours to complete an electronic version (30 percent of applicants). In addition, the PRA Information Collection Package Supporting Statement for Form I-539 states that F-2 and J-2 nonimmigrants require 0.35 hours to complete the I-539A form.[37] In addition to the labor burden of completing the Form I-539, DHS estimates in the Supporting Statement for Form I-539 that 46 percent of F-1, J-1, and I applicants may incur additional expenses for third party assistance to prepare responses, legal services, translators, and document search and

[36] Form I-539 instructions ask applicants to list all family members in Form I-539A. Therefore, it is reasonable to assume that the co-applicants (F-2 and J-2 nonimmigrants and I dependents) will use Form I-539A.
[37] Time estimates are taken from the Supporting Statement A for Form I-539, "Application to Extend/Change Nonimmigrant Status," available at: https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202408-1615-006.

generation. For those applicants who seek additional assistance, the Supporting Statement for Form I-539 estimates the average cost for these activities is approximately $490. DHS assumes that F-2 and J-2 applicants will not incur additional expenses for outside assistance and will, instead, work with the F-1 and J-1 applicants to complete the I-539A form.

In addition to completing the Form I-539/I-539A, all F, J, and I applicants will be required to submit biometrics. The submission of biometrics requires travel to a USCIS Application Support Center (ASC) for the biometric services appointment,[38] with an average round-trip travel time of 2.5 hours.[39] On average, each individual will spend approximately 1 hour and 10 minutes (1.17 hours) at an ASC to submit biometrics.[40] Summing the ASC time and travel time yields 3.67 hours for each applicant to submit biometrics. To estimate travel costs, DHS used an average round-trip distance to an ASC of 50 miles[41] and the 2025 General Services Administration (GSA) rate of $0.70 per mile,[42] resulting in estimated costs of $35. DHS assumes that F-2 and J-2 applicants will not separately incur these travel costs since they will likely travel to an ASC with the F-1 and J-1 applicants.

F, J, and I nonimmigrants will pay fees to USCIS to file the Form I-539. F-1, J-1, and I nonimmigrants will pay a $470 (paper filing) or $420 (electronic filing) fee when submitting the

[38] DHS expects the majority of biometrics appointments to occur in the United States at an ASC. However, in certain instances, nonimmigrants may submit biometrics at an overseas USCIS office or DOS Embassy or consulate. However, because DHS does not currently have data tracking the specific number of biometric appointments that occur overseas, it uses the cost and travel time estimates for submitting biometrics at an ASC as an approximate estimate for all populations submitting biometrics in support of an EOS request.

[39] *See* DHS Final Rule, Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 535 (Jan. 3, 2013).

[40] The 1 hour and 10 minute burden estimate for time spent at an ASC to submit biometrics is included in an older iteration of the Form I-539 Supporting Statement (OMB Control Number: 1615-0003; ICR Reference Number: 202211-1615-017; available at: https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202211-1615-017.

[41] *See* DHS Final Rule, Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 535 (Jan. 3, 2013). The 50-mile round trip estimate is intended to be an average. DHS acknowledges that some non-immigrants will need to travel farther than 50 miles, while others will travel less than 50 miles.

[42] https://www.gsa.gov/travel/plan-book/transportation-airfare-rates-pov-rates/privately-owned-vehicle-pov-mileage-reimbursement-rates. Effective rates as of January 1, 2025. Retrieved April 14, 2025.

Form I-539 (F-2 and J-2 nonimmigrants are not required to pay a fee when submitting the I-539A form).

Table 16 provides the unit cost and references for the costs for completing and submitting the Form I-539/I-539A and biometrics for each nonimmigrant category.

**Table 16. Applicant Unit Costs for Filing an EOS with USCIS (2024$)**

| | F-1 | F-2 | J-1 | J-2 | I |
|---|---|---|---|---|---|
| [a] Average applicant burden for paper applications (in hours)[1] | 1.67 | 0.35 | 1.67 | 0.35 | 1.67 |
| [b] Average applicant burden for electronic applications (in hours)[2] | 1.00 | 0.35 | 1.00 | 0.35 | 1.00 |
| [c] Average Biometric Processing Burden (in hours)[3] | 3.67 | 3.67 | 3.67 | 3.67 | 3.67 |
| [d] Total labor burden (70% paper filers) [a] + [c] | 5.34 | 4.02 | 5.34 | 4.02 | 5.34 |
| [e] Total labor burden (30% e-filers) [b] + [c] | 4.67 | 4.02 | 4.67 | 4.02 | 4.67 |
| [f] Average hourly wage rate | $16.96[11] | $16.96[11] | $47.39[12] | $47.39[12] | $59.22[13] |
| [g] Filing fee (paper)[4] | $470 | - | $470 | - | $470 |
| [h] Filing fee (electronic)[4] | $420 | - | $420 | - | $420 |
| [i] Travel costs to ASC to submit biometrics[5] | $35 | - | $35 | - | $35 |
| **[j] Burden costs for paper applications not requiring outside help[6] ([d]*[f])+[g]+[i]** | **$596** | **$68** | **$758** | **$191** | **$821** |
| **[k] Burden costs for electronic applications not requiring outside help[7] ([e]*[f])+[h]+[i]** | **$534** | **$68** | **$676** | **$191** | **$732** |
| [l] Additional expenses for outside help with form[8] | $490 | - | $490 | - | $490 |
| **[m] Burden costs for paper applications requiring outside help[9] [j] + [l]** | **$1,086** | **-** | **$1,248** | **-** | **$1,311** |
| **[n] Burden costs for electronic applications requiring outside help[10] [k] + [l]** | **$1,024** | **-** | **$1,166** | **-** | **$1,222** |

| | F-1 | F-2 | J-1 | J-2 | I |
|---|---|---|---|---|---|
| [1] Supporting Statement for Form I-539 states that 70 percent of applicants file by paper, with time burden estimates of 1.67 hours for Form I-539 (F-1, J-1, and I) and 0.35 hours for Form I-539A (F-2 and J-2).<br>[2] Supporting Statement for Form I-539 states that 30 percent of applicants file electronically, with time burden estimates of 1.00 hours for Form I-539 (F-1, J-1, and I) and 0.35 hours for Form I-539A (F-2 and J-2).<br>[3] 1.17 hours at an ASC (Supporting Statement for Form I-539) + 2.5 hours of travel time to an ASC (78 FR 535) = 3.67 hours per applicant.<br>[4] Filing fees (paper: $470; electronic: $420) described in the Supporting Statement for Form I-539.<br>[5] 50 miles (78 FR 535) * $0.70/mile (2020 GSA rate) = $35.00<br>[6] Supporting Statement for Form I-539 states that 46 percent of applicants need outside help for completing the form (i.e., 54 percent of applicants will NOT need outside help). DHS assumed that all F-2 and J-2 nonimmigrants will not need outside help. Thus, 37.8 percent of F-1, J-1, and I applicants (70% paper * 54% not requiring outside assistance = 37.8%) and 70 percent of F-2 and J-2 applicants will incur these costs.<br>[7] Based on the Supporting Statement for Form I-539 values, 16.2 percent of F-1, J-1, and I applicants (30% electronic * 54% not requiring outside assistance = 16.2%) and 30 percent of F-2 and J-2 applicants will incur these costs.<br>[8] Supporting Statement for Form I-539 states that 46 percent of applicants require outside help for completing the form. DHS assumed that no F-2 or J-2 nonimmigrants will require outside help.<br>[9] Based on Supporting Statement for Form I-539 values, 24.5 percent of F-1, J-1, and I applicants (70% paper applicants * 35% requiring outside assistance = 24.5%) will incur these costs.<br>[10] Based on Supporting Statement for Form I-539 values, 10.5 percent of F-1, J-1, and I applicants (30% electronic applicants * 35% requiring outside assistance = 10.5%) will incur these costs.<br>[11] The hourly wage rate for unskilled labor is represented by the national average of state minimum wage rates (across 50 states and Washington, D.C., weighted by their respective populations), $11.69 estimated from the Consolidated Minimum Wage Table, January 1, 2025, https://www.dol.gov/agencies/whd/minimum-wage/state. To calculate the loaded wage rate, DHS multiplied the population-weighted national average of state minimum wage rates by the benefit-to-wage multiplier (1.451) to produce a loaded wage rate of $16.96. As is reported by the Economic Policy Institute (EPI, 2016; https://www.epi.org/publication/when-it-comes-to-the-minimum-wage-we-cannot-just-leave-it-to-the-states-effective-state-minimum-wages-today-and-projected-for-2020/), many states have their own minimum wage, and, even within states, there are multiple tiers. *See* U.S. Department of Labor, Wage and Hour Division, State Minimum Wage Laws, available at https://www.dol.gov/agencies/whd/minimum-wage/state. Although the minimum wage could be considered a lower bound on true earnings, the prevailing minimum wage is 61.2 percent higher than the Federal minimum wage ($7.25 per hour; effective since July 24, 2009).<br>[12] The average hourly loaded wage rate for J nonimmigrants is based on the BLS May 2024 Occupational Employment and Wage Statistics (OEWS) release wage rate of $32.66 for “All Occupations” (00-0000)), found at https://www.bls.gov/news.release/archives/ocwage_04022025.htm. DHS used the “All Occupations” wage rate for J exchange visitors because of the diverse types of occupations that J exchange visitors can hold. A loaded wage (wages + benefits) is calculated using the benefits-to-wage multiplier of 1.451: $32.66 x 1.451 = $47.39.<br>[13] The average hourly loaded wage rate for I nonimmigrants is based on the BLS May 2024 OEWS release wage rate of $40.81 for “Media and Communication Workers, All Other” (27-3099)), found at https://www.bls.gov/news.release/archives/ocwage_04022025.htm. The value is adjusted to account for total compensation (wages + benefits): $40.81 x 1.451 = $59.22. | | | | | |

DHS multiplied the expected number of EOS requests for F, J, and I nonimmigrants (Table 14) by the appropriate applicant unit costs (Table 16) to estimate EOS filing costs. As

shown in table note 6 of Table 16, DHS assumed that 37.8 percent of F-1, J-1, and I nonimmigrants will incur burden costs for paper applications without outside help, 16.2 percent will incur burden costs for electronic applications without outside help, 32.2 percent will incur burden costs for paper applications with outside help, and 13.8 percent will incur burden costs for electronic applications with outside help. Burden costs for F-2 and J-2 nonimmigrants remain constant ($68 and $191, respectively) because their labor burden does not vary depending on paper versus electronic filing, and DHS assumes that F-2 and J-2 nonimmigrants do not pay for outside assistance with the I-539A form.

Table 17 presents undiscounted EOS filing costs by nonimmigrant category and year, along with a breakdown of costs based on filing type (paper or electronic) and the need for outside help to complete the form. Similar to the estimated number of EOS requests (Table 14), total EOS filing costs are lowest in Year 1 and highest in Year 4.

**Table 17. EOS Filing Costs by Nonimmigrant Category and Year (Millions 2024$, Undiscounted)**

| # EOS / Cost | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **F-1** | | | | | | | | | | |
| F-1 EOS Requests | 324,342 | 377,886 | 351,013 | 383,455 | 358,434 | 359,884 | 358,217 | 356,374 | 355,057 | 353,958 |
| Paper filing cost, no help[1] | $73.0 | $85.1 | $79.0 | $86.3 | $80.7 | $81.0 | $80.6 | $80.2 | $79.9 | $79.7 |
| E-filing cost, no help[2] | $28.1 | $32.7 | $30.4 | $33.2 | $31.0 | $31.1 | $31.0 | $30.8 | $30.7 | $30.6 |
| Paper filing cost, with help[3] | $113.4 | $132.1 | $122.7 | $134.0 | $125.3 | $125.8 | $125.2 | $124.6 | $124.1 | $123.7 |
| E-filing cost, with help[4] | $45.8 | $53.4 | $49.6 | $54.2 | $50.7 | $50.9 | $50.6 | $50.4 | $50.2 | $50.0 |
| **F-1 Total*** | **$260.3** | **$303.3** | **$281.7** | **$307.7** | **$287.7** | **$288.8** | **$287.5** | **$286.0** | **$284.9** | **$284.1** |
| **F-2** | | | | | | | | | | |
| F-2 EOS Requests | 33,332 | 34,817 | 31,773 | 39,676 | 35,806 | 36,373 | 36,410 | 36,231 | 36,177 | 36,094 |
| Paper filing cost, no help[5] | $1.6 | $1.7 | $1.5 | $1.9 | $1.7 | $1.7 | $1.7 | $1.7 | $1.7 | $1.7 |
| E-filing cost, no help[6] | $0.7 | $0.7 | $0.6 | $0.8 | $0.7 | $0.7 | $0.7 | $0.7 | $0.7 | $0.7 |
| **F-2 Total*** | **$2.3** | **$2.4** | **$2.2** | **$2.7** | **$2.4** | **$2.5** | **$2.5** | **$2.5** | **$2.5** | **$2.5** |
| **J-1** | | | | | | | | | | |
| J-1 EOS Requests | 15,829 | 11,756 | 13,312 | 36,477 | 23,722 | 23,687 | 23,683 | 24,602 | 24,152 | 24,120 |

| # EOS / Cost | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Paper filing cost, no help[1] | $4.5 | $3.4 | $3.8 | $10.5 | $6.8 | $6.8 | $6.8 | $7.0 | $6.9 | $6.9 |
| E-filing cost, no help[2] | $1.7 | $1.3 | $1.5 | $4.0 | $2.6 | $2.6 | $2.6 | $2.7 | $2.6 | $2.6 |
| Paper filing cost, with help[3] | $6.4 | $4.7 | $5.3 | $14.7 | $9.5 | $9.5 | $9.5 | $9.9 | $9.7 | $9.7 |
| E-filing cost, with help[4] | $2.5 | $1.9 | $2.1 | $5.9 | $3.8 | $3.8 | $3.8 | $4.0 | $3.9 | $3.9 |
| **J-1 Total*** | **$15.2** | **$11.3** | **$12.8** | **$35.0** | **$22.7** | **$22.7** | **$22.7** | **$23.6** | **$23.2** | **$23.1** |
| **J-2** | | | | | | | | | | |
| J-2 EOS Requests | 1,395 | 1,782 | 2,950 | 11,416 | 6,785 | 6,762 | 6,758 | 7,043 | 6,899 | 6,887 |
| Paper filing cost, no help[5] | $0.2 | $0.2 | $0.4 | $1.5 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| E-filing cost, no help[6] | $0.1 | $0.1 | $0.2 | $0.7 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 | $0.4 |
| **J-2 Total*** | **$0.3** | **$0.3** | **$0.6** | **$2.2** | **$1.3** | **$1.3** | **$1.3** | **$1.3** | **$1.3** | **$1.3** |
| **I** | | | | | | | | | | |
| I EOS Requests | 4,665 | 8,017 | 5,448 | 7,171 | 5,529 | 6,490 | 5,971 | 6,253 | 6,018 | 6,161 |
| Paper filing cost, no help[1] | $1.4 | $2.5 | $1.7 | $2.2 | $1.7 | $2.0 | $1.9 | $1.9 | $1.9 | $1.9 |
| E-filing cost, no help[2] | $0.6 | $1.0 | $0.6 | $0.8 | $0.7 | $0.8 | $0.7 | $0.7 | $0.7 | $0.7 |
| Paper filing cost, with help[3] | $2.0 | $3.4 | $2.3 | $3.0 | $2.3 | $2.7 | $2.5 | $2.6 | $2.5 | $2.6 |
| E-filing cost, with help[4] | $0.8 | $1.4 | $0.9 | $1.2 | $0.9 | $1.1 | $1.0 | $1.1 | $1.0 | $1.0 |
| **I Total*** | **$4.8** | **$8.2** | **$5.6** | **$7.3** | **$5.6** | **$6.6** | **$6.1** | **$6.4** | **$6.1** | **$6.3** |
| **Total, All Visas*** | **$282.8** | **$325.4** | **$302.7** | **$354.9** | **$319.8** | **$321.9** | **$320.0** | **$319.8** | **$318.0** | **$317.2** |

*Totals may not sum due to rounding to the nearest 100,000.
[1] (EOS request estimate) x (unit cost for paper applicants not requiring outside help) x (0.378)
[2] (EOS request estimate) x (unit cost for electronic applicants not requiring outside help) x (0.162)
[3] (EOS request estimate) x (unit cost for paper applicants requiring outside help) x (0.322)
[4] (EOS request estimate) x (unit cost for electronic applicants requiring outside help) x (0.138)
[5] (EOS request estimate) x (unit cost for paper applicants not requiring outside help) x (0.7)
[6] (EOS request estimate) x (unit cost for electronic applicants requiring outside help) x (0.3)

The total estimated cost for EOS filing in 2024 dollars is $3.2 billion undiscounted,[43] or $2.7 billion and $2.2 billion at discount rates of 3 and 7 percent, respectively. In addition to these quantified costs, DHS acknowledges there could be unquantifiable and intangible costs associated with the uncertainty of applying for a new period of admission, and that a denial of

[43] The undiscounted total differs slightly from the sum of the years provided in Table 17 because of rounding in the table values.

EOS may cause an interruption in a student's studies. However, any such denial would be warranted due to an applicant's lack of eligibility for an EOS.

*Requests for Additional Information or In-Person Interviews*

For a subset of EOS request cases, USCIS may request additional information or conduct an in-person interview, if the applicant has raised concerns of a risk to national security or public safety, possible criminal activity, or status violation. These requests will result in costs for both USCIS and the nonimmigrant EOS applicant. The additional burden on USCIS will depend on the time required to obtain and review the additional information or conduct the in-person interview. DHS anticipates that the additional burden on applicants, on average, will be equivalent to the added expense of seeking third-party assistance for completing the Form I-539, or $490.[44] This rulemaking does not intend for the filing of I-539s to result in in-person interviews, which are costly to both nonimmigrants and USCIS. DHS expects the amount of time DSOs/ROs spend assisting in the filing of Form I-539, as a result of this rule, to minimize the need for in-person interviews. Because the percentage of nonimmigrants that USCIS will ask to provide additional information or participate in an in-person interview is uncertain, DHS discusses this potential cost of in-person interviews qualitatively. DHS acknowledges each occurrence could result in additional costs; however, this analysis does not quantify the costs of such requests for either nonimmigrants or USCIS.

*Potential Reduction in Participation*

While the intent of the final rule is to enhance national security, the elimination of D/S has the potential to reduce nonimmigrant student enrollment and participation of exchange

[44] The cost estimate, based on the average "out-of-pocket costs on respondents" beyond the time burden to complete the Form I-539, is from the Supporting Statement A for Form I-539, "Application to Extend/Change Nonimmigrant Status," available at: https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202408-1615-006.

visitor and foreign media representatives due to additional costs and other burdens associated with extensions of the admission period. DHS acknowledges the economic contribution of foreign students, foreign media representatives, and exchange visitors through tuition and regional spending as well as contributions to research, innovation, teaching, and overall competitiveness of the United States. DHS anticipates the economic benefits to municipalities, educational institutions, and firms whose businesses rely on foreign students, foreign media representatives, and exchange visitors to continue. Qualitative discussion of these potential impacts for each category of nonimmigrant affected by the final rule is provided in sections below.

1) F and J nonimmigrants affiliated with SEVP-certified schools and DOS-designated programs:

The final rule may adversely affect U.S. competitiveness in the international market for nonimmigrant student enrollment and exchange visitor participation. If these foreign students and exchange visitors choose to study in another country, rather than the United States, because of this final rule, then the reduced demand could result in a decrease in enrollment, therefore impacting school programs in terms of foregone tuition and other fees, jobs in communities surrounding schools, and the U.S. economy. However, DHS maintains that there is a wide range of benefits from pursuing an academic program in the United States that may outweigh the impacts from the admission for a fixed period. See Appendix A for further discussion of enrollment behavior and uncertainty.

2) Other J exchange visitors:

DHS does not expect the final rule to have a significant impact on participation of other J exchange visitors, such as government visitors and alien physicians. Alternatives to U.S.-based

exchange visitor programs (outside of academia) may be more difficult to find in other countries, providing less of an incentive for nonimmigrants to choose an alternative.

3) I foreign information media representatives:

DHS does not expect the final rule to have a significant impact on I nonimmigrant foreign media representative participation as obtaining information directly from the U.S. and having access to U.S. individuals for interviews is still a desirable incentive. DHS appreciates the importance of international visitor participation to the U.S. culture and economy and expects the United States to remain a popular, competitive, and attractive place for foreign students, foreign media representatives, and exchange visitors to pursue their program of interest. While DHS acknowledges the potential for the final rule to reduce future international visitor participation, DHS does not expect the magnitude of this reduction to be significant.

*Implementation Costs to the U.S. Government*

DHS acknowledges there will be implementation and operational costs to the government associated with assessing aliens at the POE for purposes of authorizing an admission period of up to 4 years. There may be marginal costs to ICE for providing guidance and answering questions about the implementation and clarification of the rule to school DSOs. CBP officers will need training on new systems and procedures for conducting inspections at the POE consistent with the final requirements on setting a period of admission for F, J, or I nonimmigrants. DHS also acknowledges that there could be additional costs to the government to upgrade SEVIS and provide additional support services to implement the final rule. DHS anticipates there may be costs for SEVIS development, supplemental Federal staff to assist in the development, increased call center volume, and operation and maintenance of SEVIS databases and other DHS IT systems. However, these system updates will not incur additional costs, as the

updates for SEVIS are part of regular software updates and incorporated within the budget allocations into current financial and resource allocations for SEVIS operations and maintenance. Furthermore, ADIS does not require any additional costs for new software updates as a direct result of the D/S rule. Training costs are similarly expected and incorporated within the overall training budget allocations and incur no additional cost to the U.S. taxpayer. The training for compliance with the rule will be part of regular training and training budgets and cannot be separated as a distinct cost. USCIS is a fee-funded agency, and any additional training or system upgrades required during or after implementation of the rule will be covered by those fees. They incur no additional cost to the taxpayer through appropriations. In preparation for the final rule DHS engaged in identifying, updating and planning the changes needed to implement this rule, including form updates, training, and the shifting of resources to accommodate this rule. DHS agency components are modifying interfaces to make sure that all relevant data related to the regulation is available. These costs are supported through fees, in the case of SEVIS upgrades, or are part of overall updates that incur no additional cost to the U.S. taxpayer.

*Batch Processing*

Batch processing is a data-based transaction between a school or program sponsor and the SEVIS information database maintained by DHS. Batch processing is intended to help DSOs and ROs update and report their nonimmigrant student and exchange visitor information to SEVIS in a timely manner by automating the exchange of data. Rather than updating individual nonimmigrant student and exchange visitor information manually through SEVIS, batch processing allows schools and program sponsors to pool together and automatically process updates at the same time. The intended benefit of using batch processing is to streamline the

SEVIS updating process. Instead of updating individual record information one-by-one through the SEVIS Portal, DSOs and ROs can update multiple records at once, automatically.

The rule could lead to system upgrades by schools and program sponsors that currently use batch processing to interface with SEVIS. Preparing the SEVIS batch system to accept novel categories of information from schools and program sponsors could require new database management procedures. These system upgrades have variable costs across schools, particularly if schools use proprietary systems. However, it is unclear how costly these upgrades would be and how intensive they are per system. Because of the uncertainty of the scope and scale of the system upgrades needed as a result of this final rule, DHS has not monetized the cost of these potential, future IT investments.

*English Language Training*

DHS is implementing a limitation of an aggregate 24-month period of stay, including breaks and an annual vacation, for language training students. Unlike degree programs, there are no nationally recognized, standard completion requirements for language training programs, allowing foreign students to exploit the current system and stay for an excessive period of time. The 24-month period of stay allows foreign students a reasonable period of time to attain proficiency in the English language while mitigating the Department's concerns of fraud with the program. DHS estimates that an average of 130,000 foreign students participate in English language training programs annually.[45] This analysis does not estimate a cost for this provision, as foreign students enrolled in English language training will not be able to extend their fixed period of stay beyond two years and will, therefore, not incur the costs associated with applying

[45] This estimate was developed using data from SEVIS for years 2022-2024. DHS used R Statistical Software to develop logic allowing DHS to identify nonimmigrants enrolled in language training programs.

for an extension to their period of admission. However, it is possible that language training programs will experience reduced enrollment due to the final rule. Additionally, some schools may choose to change their curriculum to be covered in a 2-year time period, representing an additional burden on language training program providers. However, DHS expects this to affect relatively few programs. For all years of analysis, the majority of English language training students were enrolled in programs for less than 2 years total. In recent years (2022-23), only approximately 10.7 percent of English language training students were enrolled in programs for more than two years total.

*Limitations on Transfers, Program Changes, and Departure Period*

To further strengthen the integrity of the F visa category, the final rule places restrictions on the ability for foreign students to change educational objectives and programs. Specifically, the final rule restricts school transfers and changes of educational objectives within a student's first academic year of a program of study, unless an exception is authorized by SEVP, and prohibits with exception for F-1 students in a graduate level program of study from changing educational objectives or transferring. In addition, an F-1 student who has completed a program at one education level will be unable to maintain F-1 status through a program at the same education level or a lower education level. *See* 8 CFR 214.2(f)(5)(ii)(A) through (C). Lastly, the final rule clarifies that, in addition to academic probation and suspension, an F-1 student's repeated inability or unwillingness to complete his or her course of study, as demonstrated by a pattern of failing classes and requesting multiple program extensions, are not acceptable reasons for an EOS for additional time to complete a program.

These limitations reduce options for F-1 nonimmigrants to change or extend programs available to nonimmigrant students, including those who are properly maintaining their status.

Limiting changes between education levels to only higher levels could potentially result in a corresponding reduction in tuition revenue for universities and a reduction in EOS filing fees for the government from foreign students who are otherwise in compliance with their status and fulfilling their academic requirements, but are interested in additional programs beyond the limitation.[46] Based on an analysis of event history data from SEVIS for years 2016, 2018, 2020, and 2022-2024, DHS estimated that approximately 25 percent of F-1 students engaged in behaviors that will be restricted under the final rule. Individuals who would have engaged in behavior that is restricted under this rule may choose to leave or engage in nonrestricted behavior instead. Table 18 shows the breakdown of behavior restrictions by F-1 category and behavior change type.

**Table 18. Anticipated Impact of Restrictions on Nonimmigrant Student Program Changes**

| F-1 Category[5] | Change | Category Sample Count[4] | Percent Impacted |
|---|---|---|---|
| Graduate | Education Level Change[2] | 162,323 | 6.14 |
| Graduate | Institution Change | 162,323 | 9.03 |
| Graduate | Major Change | 162,323 | 10.59 |
| Non-graduate | Education Level Change[1] | 188,776 | 7.79 |
| Non-graduate | Institution Change[1] | 188,776 | 9.74 |
| Non-graduate | Major Change[1] | 188,776 | 13.94 |
| English language training[6] | Duration Exceedance[3] | 60,906 | 10.71 |
| All | Any Change* | 357,570 | 25.75 |

* Totals do not add up because unique F-1 participants could appear in multiple groups.
[1] Change within the first year of participation in a given program.
[2] Not including movement from master's program to doctoral program after two years of participation in master's program.
[3] Maximum duration of two years participation in any English language training program allotted.
[4] Number of unique F-1 participants in SEVIS sampled for the analysis that participated in any program of the given category during the analysis period.
[5] Graduate category represents all students who participated in a master's and/or doctoral program. Non-graduate category represents students who participated in a bachelor's, associates, or English

[46] Potential enrollment effects of the final rule are discussed in the "Potential Reduction in Participation" section.

| F-1 Category[5] | Change | Category Sample Count[4] | Percent Impacted |
|---|---|---|---|
| language training program. English language training represents students who explicitly participated in an English language training program.<br>[6] F-1 participants beginning participation in F programs in 2024 were not included in final percent calculation. | | | |

The final rule also decreases the allowed period for F-1 nonimmigrants to prepare to depart from the United States after completion of a course of study or authorized period of post-completion practical training from 60 days to 30 days. DHS expects that 30 days is an adequate period for F-1 students to prepare for departure and is in line with the departure period for similar nonimmigrant classifications (i.e., J and M nonimmigrants).

*Pending EOS Applications*

The final rule establishes certain adjustments for F nonimmigrants with pending EOS applications. Specifically, an F nonimmigrant with a timely filed EOS application and whose EOS application is still pending after the admission period indicated on their Form I-94 has expired will:

- Be considered to be in a period of authorized stay from the date of the expiration noted on their Form I-94 until USCIS issues a decision on the extension of stay application;
- Receive an automatic extension of their current authorization for on-campus and off-campus employment based on severe economic hardship resulting from emergent circumstances under 8 CFR 214.2(f)(5)(v), for up to 240 days or the end date of the FRN announcing the suspension of certain requirements, whichever is earlier;
- Be prohibited from engaging in CPT or employment until their EOS applications and applications for employment authorization (Form I-765) are approved. However, F nonimmigrants retaining D/S who are filing for post-completion OPT or STEM OPT

prior to the final rule's effective date will **not** need to file an I-539 in addition to their I-765. While this rule would introduce an additional process in the EOS application and approval, the rule does not change eligibility criteria for an employment authorization benefit (Form I-765).

The final rule allows certain adjustments for J nonimmigrants with pending EOS applications for the continuation of employment or authorized training. Specifically, these adjustments are as follows:

- J-1s who have properly filed an EOS up to six months after the final rule's effective date may engage in activities consistent with pursuing the terms and conditions of the exchange program objectives, including authorized training and activities pursuant to a new or transferred program, while the EOS is pending, up to the DS-2019 end date filed with the EOS application.
- If a J-1's EOS remains pending upon the end date of the DS-2019 filed with the EOS application, and the alien obtains a program extension from the sponsor and/or DOS, as applicable, the alien may remain in the United States and continue engaging in activities consistent with the exchange program objectives, including authorized training. This may happen so long as the EOS application is pending, and he or she has filed a subsequent EOS request with an end date beyond the DS-2019 end date requested in the preceding EOS request.
- After the six-month period after the final rule's effective date (or longer if extended by DHS by an announcement in the Federal Register), J-1 nonimmigrants who are employment authorized with a specific employer incident to status, will continue to be

authorized for such employment for up to 240 days, if their status expires while their timely filed EOS application is pending.

- J-2 dependents, who must apply for employment authorization as evidenced by an EAD, will not have the benefit of continued work authorization under the final rule once the EAD expires.

Lastly, the final rule allows certain adjustments for I nonimmigrants with pending EOS applications. Specifically, these adjustments are as follows:

- I nonimmigrants could continue activities consistent with the I classification while a timely application for EOS is pending, as provided for in 8 CFR 274a.12(b)(20), for a period not to exceed 240 days or the actual additional time requested on the EOS application, whichever is shorter.
- I nonimmigrants submitting a passport from the PRC, except Hong Kong SAR and Macau SAR, could continue activities consistent with the I classification while a timely EOS is pending for a period not to exceed 90 days or the actual additional time requested on the EOS application, whichever is shorter.

In the future, the six-month period after the final rule's effective date may be extended, if DHS determines such an extension is necessary (as discussed in the regulatory provisions). DHS acknowledges that these requirements affect a cohort of F and J nonimmigrants. For the F category, the total impact depends on the number of F nonimmigrants with a timely filed EOS application and whose EOS application is still pending after the admission period indicated on their Form I-94 has expired. For the J category, the total impact depends on the number of J-1s

who file for an EOS prior to six months after the final rule's effective date, and whose EOS is still pending upon the end date of the DS-2019. DHS does not have data to estimate these sub-populations. DHS believes that the incremental impact from these requirements will not have a material impact on the results of this analysis.

*Total Cost Estimates*

Table 19 summarizes the impacts of the final rule. Total monetized costs of the final rule include DSO and RO rule familiarization and adaptation costs, EOS filing costs, and DSO/RO and HR EOS request processing costs. DHS has not quantified the costs to U.S. universities that may be impacted by reductions in international student enrollment, including the resulting reduction in tuition revenue. The 10-year discounted cost of the final rule in 2024 dollars is $3.8 billion and $3.2 billion (with 3- and 7-percent discount rates, respectively). The annualized costs of the final rule range from $443.1 million to $448.6 million (with 3- and 7-percent discount rates, respectively). When considering U.S. parties only (i.e., rule familiarization and adaptation, EOS burden costs), annualized costs range from $119.9 million to $125.1 million (with 3- and 7-percent discount rates, respectively).

**Table 19. Costs of the Final Rule (2024$ millions)**

| Fiscal Year | Rule Familiarization and Adaptation: F and J Sponsors | Rule Familiarization: F-1 Students & J-1 Exchange Visitors | EOS Burden: Sponsors | EOS Burden: F, J, and I Filing Costs | Total Costs |
|---|---|---|---|---|---|
| Year 1 | $275.9 | $47.0 | $79.3 | $282.8 | $685.0 |
| Year 2 | $0.0 | $0.0 | $90.8 | $325.4 | $416.2 |
| Year 3 | $0.0 | $0.0 | $84.9 | $302.7 | $387.7 |
| Year 4 | $0.0 | $0.0 | $97.9 | $354.9 | $452.8 |
| Year 5 | $0.0 | $0.0 | $89.1 | $319.8 | $408.8 |
| Year 6 | $0.0 | $0.0 | $89.4 | $321.9 | $411.3 |
| Year 7 | $0.0 | $0.0 | $89.0 | $320.0 | $409.1 |
| Year 8 | $0.0 | $0.0 | $88.8 | $319.8 | $408.6 |

| Fiscal Year | Rule Familiarization and Adaptation: F and J Sponsors | Rule Familiarization: F-1 Students & J-1 Exchange Visitors | EOS Burden: Sponsors | EOS Burden: F, J, and I Filing Costs | Total Costs |
|---|---|---|---|---|---|
| Year 9 | $0.0 | $0.0 | $88.4 | $318.0 | $406.4 |
| Year 10 | $0.0 | $0.0 | $88.1 | $317.2 | $405.4 |
| **Undiscounted Total** | **$275.9** | **$47.0** | **$885.7** | **$3,182.6** | **$4,391.2** |
| | | | | | |
| **Total with 3% discounting** | **$267.9** | **$45.6** | **$754.8** | **$2,711.5** | **$3,779.8** |
| **Total with 7% discounting** | **$257.8** | **$43.9** | **$620.5** | **$2,228.5** | **$3,150.8** |
| | | | | | |
| **Annualized, 3% discount rate, 10 years** | **$31.4** | **$5.4** | **$88.5** | **$317.9** | **$443.1** |
| **Annualized, 7% discount rate, 10 years** | **$36.7** | **$6.3** | **$88.3** | **$317.3** | **$448.6** |

**Transfers**

Should there be a reduction in the number of nonimmigrant students and exchange visitors applying for visas or for F or J status in the United States as a result of the rule, then there will be an impact on the amount of fees collected by SEVP and DOS from nonimmigrant students and exchange visitors through visa applications and SEVIS fees. These fees are used to cover the operational costs associated with processing the applications and adjudications. Nonetheless, DHS anticipates that any impacts resulting from potential decreased nonimmigrant student enrollment and exchange visitor participation will be outweighed by the national security benefits anticipated as a result of the requirements.

**Benefits**

Among the unquantified benefits of the final rule is the opportunity for DHS to have additional opportunities to evaluate whether F, J, and I nonimmigrants are complying with their

nonimmigrant status requirements. Currently, the D/S framework does not require immigration officers at pre-determined intervals to assess whether these nonimmigrants are complying with the terms and conditions of their status nor whether they present a national security concern. By implementing fixed periods of admission for these nonimmigrants, they will be required to apply for EOS, which they are not currently required to do, in order to stay beyond their period of admission. This gives DHS additional opportunities to evaluate whether they are complying with the requirements of their status, or if they present a national security concern. Requiring nonimmigrant academic students, exchange visitors, and representatives of foreign information media to request an additional period of admission directly with the Department will improve consistency of admissions among nonimmigrant categories, enable stronger oversight by immigration officers who will review the nonimmigrant’s request and assess whether the nonimmigrant had been complying with the terms and conditions of his or her status, enhance DHS’s ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence, and deter aliens and other parties from engaging in fraud and abuse within these nonimmigrant programs. Accordingly, these changes will provide the Department with additional protections and mechanisms to exercise the oversight necessary to vigorously enforce our nation’s immigration laws, protect the integrity of these categories, and promptly detect national security concerns.

DHS believes this final rule will reduce fraud, abuse, and national security risks for these nonimmigrant programs. Compared to the current D/S framework, in which a nonimmigrant’s substantive compliance might never be reviewed by DHS, DHS believes that the rule will likely result in more prompt detection of national security concerns or abuse by F, J, and I nonimmigrants by implementing additional oversight of these aliens. The rule could also serve as

a deterrent to those who would otherwise plan to engage in fraud or abuse of these nonimmigrant classifications. Additionally, the behavior restrictions under the final rule will further prevent fraud and abuse.

**5. Alternatives**

Before arriving at a fixed admission period not to exceed 4 years, DHS considered various options, including no action and a standard 2-year fixed admission period for all F and J nonimmigrants, evaluating SEVIS data and requiring EOS for a subset of the population.

**No Action Alternative**

DHS first considered a "no action" alternative, under which F, J, and I nonimmigrants would continue being admitted for D/S. DHS determined that this alternative would not address the lack of pre-determined points for immigration officers to directly evaluate whether F, J, and I nonimmigrants are maintaining their status, currently lacking because of the D/S framework. Additionally, DSOs and ROs would continue extending the program duration and, therefore, the nonimmigrant status of F and J aliens, instead of having immigration officers, who are government officials, make this assessment. As a result, there would continue to be challenges to the Department's ability to effectively monitor and oversee these categories of nonimmigrants. With this option, the Department would continue to be concerned about the integrity of the programs and the potential for fraud, abuse, and increased risk to national security.

**Alternative #1: 2-Year Fixed Admission Period**

An alternative that DHS considered was to admit F and J nonimmigrants for up to a 2-year fixed admission period. While such an option would provide the Department with more frequent direct check-in points with these nonimmigrants than provided by a 4-year maximum period of admission, DHS was concerned it would be unduly burdensome on many F and J

nonimmigrants. Additionally, under the selected option, the most significant increase in the volume of EOS applications will not materialize until 4 years after the effective date of this rule. This will allow time for DHS to shift resources as needed and as appropriate to ensure that the larger increased volumes are integrated into existing workflows. The 2-year alternative would not provide DHS as much time to shift resources in response to the rule.

Under the alternative, DHS estimates that approximately 600,000 nonimmigrants would file an EOS each year, based on the estimate in Year 10.[47] By comparison, DHS estimates that under the final rule, approximately 427,000 nonimmigrants will file an EOS each year, based on the estimate in Year 10. By selecting the 4-year option in the final rule over the 2-year alternative, DHS expects to receive approximately 173,000 fewer EOS requests each year, based on the estimate in Year 10. DHS believes that a 4-year period is the appropriate length of time to allow progress for most programs, and a 2-year fixed admission period would require every nonimmigrant enrolled in a 4-year program to apply for an EOS. A 2-year fixed admission period would also result in greater administrative burdens on USCIS and CBP compared to the 4-year maximum period of admission. USCIS would have to adjudicate EOS applications with more frequency if a 2-year maximum period of stay was chosen over a 4-year period. Similarly, CBP would have to process applications for admission at POEs more frequently under the 2-year maximum period of stay alternative. Therefore, DHS believes an admission for the program end date, not to exceed 4 years, is the best option.

DHS calculated costs for the 2-year alternative. Rule familiarization and adaptation costs would remain the same under this alternative. For sponsors, rule familiarization and adaptation

---

[47] Year 10 is likely the closest approximation to a "steady state" estimate of EOS requests, with the majority of the estimate based on new arrivals only (i.e., the population remaining in the country from when the rulemaking takes effect is at its smallest in Year 10).

costs are $275.9 million undiscounted, or $267.9 million and $257.8 million at discount rates of 3 and 7 percent, respectively, during the first year after the rule takes effect. For F-1 students and J-1 exchange visitors, rule familiarization costs are $47.0 million undiscounted, or $45.6 million and $43.9 million at discount rates of 3 and 7 percent, respectively, during the first year after the rule takes effect.

To calculate EOS filing costs for F, J, and I nonimmigrants, DHS multiplied the expected number of EOS requests under the 2-year fixed admission period alternative for F, I, and J nonimmigrants (Table 20) by the appropriate applicant unit costs (Table 16). *See* discussion around Table 14 regarding the variation in the number of EOS requests over the 10-year analysis period.

**Table 20. Number of EOS Requests Under Alternative #1 by Nonimmigrant Category and Year**

| Category | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| F-1 | 324,342 | 632,806 | 477,015 | 516,918 | 490,262 | 493,744 | 489,627 | 487,420 | 485,808 | 484,313 |
| F-2 | 33,332 | 61,533 | 42,516 | 51,160 | 47,647 | 48,768 | 48,509 | 48,321 | 48,269 | 48,143 |
| J-1 | 15,829 | 72,375 | 34,926 | 58,080 | 45,317 | 49,122 | 46,928 | 47,830 | 47,368 | 47,494 |
| J-2 | 1,395 | 21,184 | 9,865 | 18,326 | 13,692 | 14,733 | 14,088 | 14,367 | 14,218 | 14,258 |
| I | 4,665 | 8,017 | 5,448 | 7,171 | 5,529 | 6,490 | 5,971 | 6,253 | 6,018 | 6,161 |
| **Total** | **379,562** | **795,914** | **569,771** | **651,656** | **602,447** | **612,858** | **605,122** | **604,190** | **601,680** | **600,370** |

Table 21 presents undiscounted EOS filing costs under the 2-year fixed admission period alternative by nonimmigrant category and year, along with a breakdown of costs based on filing type (paper or electronic) and the use or nonuse of outside help to complete the form. EOS filing costs are lowest in Year 1 and highest in Year 2 because of the variation in the estimated number of EOS requests (Table 20).

**Table 21. EOS Filing Costs Under Alternative #1, by Nonimmigrant Category and Year (Millions 2024$, Undiscounted)**

| # EOS / Cost | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **F-1** | | | | | | | | | | |
| F-1 EOS Requests | 324,342 | 632,806 | 477,015 | 516,918 | 490,262 | 493,744 | 489,627 | 487,420 | 485,808 | 484,313 |
| Paper filing cost, no help[1] | $73.0 | $142.4 | $107.4 | $116.4 | $110.4 | $111.1 | $110.2 | $109.7 | $109.4 | $109.0 |
| E-filing cost, no help[2] | $28.1 | $54.8 | $41.3 | $44.7 | $42.4 | $42.7 | $42.4 | $42.2 | $42.0 | $41.9 |
| Paper filing cost, with help[3] | $113.4 | $221.2 | $166.7 | $180.7 | $171.4 | $172.6 | $171.1 | $170.4 | $169.8 | $169.3 |
| E-filing cost, with help[4] | $45.8 | $89.4 | $67.4 | $73.1 | $69.3 | $69.8 | $69.2 | $68.9 | $68.7 | $68.5 |
| **F-1 Total** | **$260.3** | **$507.8** | **$382.8** | **$414.8** | **$393.4** | **$396.2** | **$392.9** | **$391.2** | **$389.9** | **$388.7** |
| **F-2** | | | | | | | | | | |
| F-2 EOS Requests | 33,332 | 61,533 | 42,516 | 51,160 | 47,647 | 48,768 | 48,509 | 48,321 | 48,269 | 48,143 |
| Paper filing cost, no help[5] | $1.6 | $2.9 | $2.0 | $2.4 | $2.3 | $2.3 | $2.3 | $2.3 | $2.3 | $2.3 |
| E-filing cost, no help[6] | $0.7 | $1.3 | $0.9 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 |
| **F-2 Total** | **$2.3** | **$4.2** | **$2.9** | **$3.5** | **$3.2** | **$3.3** | **$3.3** | **$3.3** | **$3.3** | **$3.3** |
| **J-1** | | | | | | | | | | |
| J-1 EOS Requests | 15,829 | 72,375 | 34,926 | 58,080 | 45,317 | 49,122 | 46,928 | 47,830 | 47,368 | 47,494 |
| Paper filing cost, no help[1] | $4.5 | $20.7 | $10.0 | $16.6 | $13.0 | $14.1 | $13.4 | $13.7 | $13.6 | $13.6 |
| E-filing cost, no help[2] | $1.7 | $7.9 | $3.8 | $6.4 | $5.0 | $5.4 | $5.1 | $5.2 | $5.2 | $5.2 |
| Paper filing cost, with help[3] | $6.4 | $29.1 | $14.0 | $23.3 | $18.2 | $19.7 | $18.9 | $19.2 | $19.0 | $19.1 |
| E-filing cost, with help[4] | $2.5 | $11.6 | $5.6 | $9.3 | $7.3 | $7.9 | $7.6 | $7.7 | $7.6 | $7.6 |
| **J-1 Total** | **$15.2** | **$69.4** | **$33.5** | **$55.7** | **$43.5** | **$47.1** | **$45.0** | **$45.9** | **$45.4** | **$45.5** |
| **J-2** | | | | | | | | | | |
| J-2 EOS Requests | 1,395 | 21,184 | 9,865 | 18,326 | 13,692 | 14,733 | 14,088 | 14,367 | 14,218 | 14,258 |
| Paper filing cost, no help[5] | $0.2 | $2.8 | $1.3 | $2.4 | $1.8 | $2.0 | $1.9 | $1.9 | $1.9 | $1.9 |
| E-filing cost, no help[6] | $0.1 | $1.2 | $0.6 | $1.0 | $0.8 | $0.8 | $0.8 | $0.8 | $0.8 | $0.8 |
| **J-2 Total** | **$0.3** | **$4.0** | **$1.9** | **$3.5** | **$2.6** | **$2.8** | **$2.7** | **$2.7** | **$2.7** | **$2.7** |
| **I** | | | | | | | | | | |
| I EOS Requests | 4,665 | 8,017 | 5,448 | 7,171 | 5,529 | 6,490 | 5,971 | 6,253 | 6,018 | 6,161 |
| Paper filing cost, no help[1] | $1.4 | $2.5 | $1.7 | $2.2 | $1.7 | $2.0 | $1.9 | $1.9 | $1.9 | $1.9 |
| E-filing cost, no help[2] | $0.6 | $1.0 | $0.6 | $0.8 | $0.7 | $0.8 | $0.7 | $0.7 | $0.7 | $0.7 |
| Paper filing cost, with help[3] | $2.0 | $3.4 | $2.3 | $3.0 | $2.3 | $2.7 | $2.5 | $2.6 | $2.5 | $2.6 |

| # EOS / Cost | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| E-filing cost, with help[4] | $0.8 | $1.4 | $0.9 | $1.2 | $0.9 | $1.1 | $1.0 | $1.1 | $1.0 | $1.0 |
| **I Total** | **$4.8** | **$8.2** | **$5.6** | **$7.3** | **$5.6** | **$6.6** | **$6.1** | **$6.4** | **$6.1** | **$6.3** |
| **Total, All Categories** | **$282.8** | **$593.6** | **$426.6** | **$484.8** | **$448.4** | **$456.1** | **$450.0** | **$449.4** | **$447.4** | **$446.5** |

*Totals may not sum due to rounding to the nearest 100,000.
[1] (EOS request estimate) x (unit cost for paper applicants not requiring outside help) x (0.378)
[2] (EOS request estimate) x (unit cost for electronic applicants not requiring outside help) x (0.162)
[3] (EOS request estimate) x (unit cost for paper applicants requiring outside help) x (0.322)
[4] (EOS request estimate) x (unit cost for electronic applicants requiring outside help) x (0.138)
[5] (EOS request estimate) x (unit cost for paper applicants not requiring outside help) x (0.7)
[6] (EOS request estimate) x (unit cost for electronic applicants requiring outside help) x (0.3)

The total costs for EOS request filing under the 2-year fixed period of admission alternative would be $4.5 billion undiscounted,[48] or $3.8 billion and $3.1 billion at discount rates of 3 and 7 percent, respectively.

To estimate costs for DSOs and ROs to process EOS requests and update SEVIS (i.e., sponsor EOS burden) under the 2-year fixed period of admission alternative, DHS multiplied the estimated number of F-1 and J-1 EOS requests under the 2-year fixed admission period alternative (Table 20) by the expected DSO and RO time requirement per EOS request (3 hours) and the DSO and RO loaded wage rate ($49.89 loaded wage rate). To estimate HR costs related to EOS requests, DHS multiplied the estimated number of F-1 and J-1 EOS requests under the 2-year fixed admission alternative (Table 20) by the expected HR time requirement per EOS request (1.5 hours) and the HR loaded wage rate ($55.62 loaded wage rate).

Table 22 presents undiscounted DSO/RO and HR costs to process EOS requests throughout the analysis period under the 2-year fixed admission period alternative. Similar to

[48] The undiscounted total differs slightly from the sum of the years provided in Table 21 because of rounding in the table values.

EOS filing costs, DSO/RO and HR costs to process EOS requests are lowest in Year 1 and highest in Year 4 because of the variation in the estimated number of EOS requests (Table 20).

**Table 22. DSO/RO and HR Costs for Processing EOS Requests Under Alternative #1, by Year (Millions 2024$, Undiscounted)**

| | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Y7 | Y8 | Y9 | Y10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of EOS Requests[1] | 340,171 | 705,181 | 511,941 | 574,998 | 535,578 | 542,866 | 536,554 | 535,250 | 533,176 | 531,807 |
| Costs[2] | $79.3 | $164.4 | $119.3 | $134.0 | $124.8 | $126.5 | $125.1 | $124.8 | $124.3 | $124.0 |
| [1] Sum of extension request estimates for F-1 students and J-1 exchange visitors.<br>[2] (Number of extension requests) x (3 hours) x (DSO/RO loaded wage rate of $49.89) + (Number of EOS requests) x (1.5 hours) x (HR loaded wage rate of $55.62). | | | | | | | | | | |

The total cost estimate for DSOs/ROs and HR to process EOS requests under the 2-year fixed period of admission alternative would be $1.2 billion undiscounted,[49] or $1.1 billion and $871.7 million at discount rates of 3 and 7 percent, respectively.

Total monetized costs of the 2-year fixed period of admission alternative include rule familiarization and adaptation costs (sponsors and F-1/J-1 nonimmigrants), EOS filing costs, and DSO/RO and HR costs for processing EOS requests. The 10-year discounted total costs of the 2-year fixed period of admission alternative would be $5.2 billion with a 3 percent discount rate and $4.3 billion with a 7 percent discount rate. The annualized total costs of the 2-year fixed period of admission alternative would range from $609.0 million to $613.7 million (with 3- and 7-percent discount rates, respectively). The qualitative benefits of the 2-year fixed period of admission alternative are similar to the qualitative benefits of the 4-year fixed period of admission approach described in RIA Section A.4.

[49] The undiscounted total differs slightly from the sum of the years provided in Table 22 because of rounding in the table values.

**Other Alternatives**

DHS also considered a 2-year/4-year alternative, under which the maximum fixed admission period is 4 years in most cases but 2 years when certain conditions apply. This 2-year/4-year approach was proposed in 2020,[50] but the rulemaking was ultimately withdrawn. The 2-year/4-year approach is not used in the final rule due to numerous implementation concerns, including extensive IT upgrades required to make the 2-year versus 4-year determination feasible. Thus, DHS rejected this alternative.

DHS also considered whether the Department could use data from SEVIS to identify potentially problematic F and J nonimmigrants and require only this targeted subset of F and J nonimmigrants to complete an EOS. SEVIS information is used when aliens apply for a visa and admission to the United States as an F or J nonimmigrant, as well as to track and monitor their status. While this information is likely to be helpful in identifying aliens who should be subjected to further review, in some cases the information may not be sufficient for determining whether these nonimmigrants are engaging in fraudulent behavior or otherwise have fallen out of status. The data received when applying for an EOS provide additional information not contained in SEVIS that helps the Department effectively monitor and oversee F and J nonimmigrants.

Further, an EOS provides a direct interaction with an immigration officer. As a potential remedy, the DHS considered whether the SEVIS data could be used to classify a subset of nonimmigrants as presenting a higher risk of being a national security threat or committing fraud. The identified subset would then be required to complete an EOS. Depending on how the Department targeted higher risk aliens, a smaller number of EOS requests would need to be completed, as compared to the final rule, resulting in a lower burden on nonimmigrants, program

[50] https://www.federalregister.gov/documents/2020/09/25/2020-20845/establishing-a-fixed-time-period-of-admission-and-an-extension-of-stay-procedure-for-nonimmigrant.

sponsors, and the Department. The Department rejected this alternative in favor of moving all F and J nonimmigrants to a fixed period admission because SEVIS does not readily lend itself to this purpose, as it is used to gather information regarding technical compliance. In addition, the data cannot replace the information that can be developed in the course of an adjudication, in which USCIS has the opportunity to ask questions via a request for evidence and, if necessary, conduct an interview.

DHS also rejected this alternative due to the operational burden and challenges that would exist if some F and J nonimmigrants were admitted for D/S, but others for a fixed period of admission. In addition, by requiring all F and J nonimmigrants to be admitted for a fixed period, this allows for the opportunity for improved detection of fraud or abuse, as the Department has observed that abuse is not limited to one particular type of school or program. By fixing a date certain period of admission, all of these nonimmigrants receive a specific date for the expiration of their period of stay, and the Department would be in a position to provide greater oversight to help deter F and J nonimmigrants from engaging in fraud and abuse, including staying beyond that fixed date. All those who overstay would begin to accrue unlawful presence, generally the day after their period of stay expires, when admitted for a fixed period of admission. Lastly, the Department believes that a fixed period of admission for these nonimmigrant populations may deter fraud, allow for earlier detection of national security concerns, and help reduce overstays, which outweighs reducing the number of EOS requests that may be required.

DHS also considered a 6-year/educational level alternative where the maximum period is 6 years for F and J nonimmigrants pursuing PhDs, but shorter maximums for other types such as master's or bachelor's degrees. This alternative was also not used in the final rule due to similar

implementation concerns and IT upgrades as the 2-year/4-year alternative. The Department also rejected the alternative because of the benefits of EOS request at a 4-year interval versus 6-year in providing opportunities sooner to detect possible fraudulent behavior or abuse.

**Comparison Table of Alternatives**

Table 23 compares the quantitative costs and qualitative benefits of the various alternatives. The "no action" alternative has zero costs but does not address how the D/S framework challenges the Department's ability to effectively enforce compliance with the statutory inadmissibility grounds of unlawful presence, undermines the integrity of these programs, and presents a risk to national security. The alternative with a 2-year maximum period of admission would provide the Department with more frequent direct check-in points on the nonimmigrants than under a 4-year maximum period of admission, but DHS determined that the expense and workload implications of this option would be too burdensome on all stakeholders. DHS, thus, selected the final rule, which imposes lower costs while providing the Department with an effective mechanism to exercise the oversight necessary to vigorously enforce our nation's immigration laws, protect the integrity of these categories, and promptly detect national security concerns.

**Table 23. Summary of Alternatives**

| **10-Year Discounted Totals (in Million 2024$)** | | | |
|---|---|---|---|
| ***3-Percent Discount*** | | | |
| **Alternative** | **Annualized Costs** | **Total Costs** | **Qualitative Benefits** |
| No action | $0.00 | $0.00 | N/A |

| | | | |
|---|---|---|---|
| Final Rule (4-year maximum admission) | $443.1 | $3,779.8 | Evaluations at pre-determined intervals provide oversight necessary to enforce immigration laws, protect the integrity of F, J, and I nonimmigrant categories, and promptly detect national security concerns |
| Alternative #1 (2-year maximum admission) | $609.0 | $5,194.8 | More frequent evaluations of F and J nonimmigrants |
| ***7-Percent Discount*** | | | |
| **Alternative** | **Annualized Costs** | **Total Costs** | **Qualitative Benefits** |
| No action | $0.00 | $0.00 | N/A |
| Final Rule (4-year maximum admission) | $448.6 | $3,150.8 | Evaluations at pre-determined intervals provide oversight necessary to enforce immigration laws, protect the integrity of F, J, and I nonimmigrant categories, and promptly detect national security concerns |
| Alternative #1 (2-year maximum admission) | $613.7 | $4,310.2 | More frequent evaluations of F and J nonimmigrants |

**B. Regulatory Flexibility Act Analysis**

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601-612, as amended, requires Federal agencies to consider the potential impact of regulations on small entities during rulemaking. The term "small entities" is comprised of small business, not-for-profit organizations that are independently owned and operated and are not dominant in their fields and governmental jurisdictions with populations of less than 50,000. A regulatory flexibility analysis (RFA) follows.

**1. A Description of the Reasons Why the Action by the Agency is Being Considered**

DHS is amending its regulations to eliminate the practice of admitting F academic students, I representatives of foreign information media, and J exchange visitors for the period of time that they are complying with the conditions of their nonimmigrant category (D/S) and replace it with a fixed period of admission. The final rule enables DHS to more effectively combat fraud and abuse, more accurately account for the accrual of unlawful presence grounds of inadmissibility, and better protect our nation's immigration system. DHS's objectives and legal authority are discussed further within the final rule.

**2. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Final Rule as a Result of Such Comments.**

*Comments*: Commenters expressed concern that the proposed rule would disproportionately burden small educational institutions, stating that DHS failed to accurately estimate or disclose the true costs and rendering the rule non-compliant with the RFA. One commenter said the NPRM lacks the required analysis of impacts on small entities mandated by 5 U.S.C. 605 and stated that the rule fails to include adequate regulatory flexibility provisions to mitigate disproportionate burdens to small entities. A commenter stated that they estimated their

school would see, at minimum, a 75-percent reduction in F-1 student numbers and that their business would see, at minimum, a 70-percent reduction in annual revenue, resulting in job losses and a distinct possibility that the school would no longer be financially viable. Another commenter stated that DHS estimates did not reflect realities at small, rural colleges with no dedicated international staff, noting that at their institution, DSO duties fell to three Associate Deans of Student Affairs who were already balancing multiple responsibilities. One commenter asked what concrete measures DHS would implement to prevent rule requirements from forcing smaller institutions to reduce foreign student services or withdraw from international education entirely.

*Response*: DHS appreciates the commenter's concerns regarding the analysis of impacts on small entities as required by the RFA, 5 U.S.C. 605, and the adequacy of regulatory flexibility provisions to mitigate disproportionate burdens on small entities. However, DHS respectfully disagrees with the commenter's assertions that the proposed rule lacked the required analysis and failed to include adequate regulatory flexibility provisions.

In addition to preparing an initial regulatory flexibility analysis (IRFA), DHS prepared and publishes this full Final Regulatory Flexibility Analysis (FRFA). The IRFA and FRFA evaluate the potential impacts of the rule on small entities, including whether the rule is likely to have a significant economic impact on a substantial number of small entities. The analyses also consider alternatives to minimize such impacts while ensuring the rule achieves its intended objectives.

DHS analyzed all the entities that would be affected by the final rule and DHS found that 78 percent of SEVP-certified institutions and 62 percent of J exchange visitor program sponsors would be considered small entities.

Under the final rule, DSOs and ROs will have to spend approximately 135 hours for rule familiarization and adaptation in the first year after the rule takes effect. For each DSO, rule familiarization would cost $6,735 in the first year after the rule takes effect. Further, each year DSOs/ROs will spend approximately 3 hours per F-1/J-1 EOS request to review the Form I-539 completed by the F-1/J-1 nonimmigrant, update the SEVIS record and track EOS requests, and advise the F-1/J-1 nonimmigrant about the extension process and the requirements to file an EOS with USCIS. Additionally, HR staff will spend approximately 1.5 hours per F-1 EOS request to track form updates related to each EOS request and avoid inadvertent unauthorized employment due to form discrepancies with the I-9. The DSO and HR cost per EOS request is $233.

DHS estimates that 73.4 percent of small schools will experience an annual impact less than or equal to one percent of their annual revenue. DHS estimates that the majority of small J sponsors would experience an impact less than or equal to one percent of their annual revenue.

DHS acknowledges the possibility of reduced enrollment, and resulting reduced tuition revenue, because of this rule. DHS does not quantify these impacts as there is uncertainty regarding the number of nonimmigrants who would not enroll and how many may be replaced by other students. See Appendix A for further discussion on enrollment behavior and uncertainty. While there is expectation that staff members at these institutions will incur burden to familiarize and assist with the EOS request process, much of the burden, which has been calculated and described in the Regulatory Impact Analysis, falls to the nonimmigrant.

In order to implement this rule, DHS believes that the best method is to have the rule apply uniformly to affected entities. This will minimize training and confusion, as all nonimmigrants entering the country once the rule is effective will be governed by the same regulations, and little difference would be made between nonimmigrants based on their specific

program. Only border commuter students will have different restrictions, as they are exempt from the general length of admission provisions and will continue to be governed by 8 CFR 214.2(f)(18). They would be subject to the rule's behavior limitations. This will minimize implementation costs and allow the accrual of benefits to occur.

**3. A Succinct Statement of the Objectives of, and Legal Basis for, the Final Rule**

The objective of the final rule is to establish requirements that help: (1) Ensure that the Department has an effective mechanism to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws; and (2) obtain timely and accurate information about the activities they engage in during their temporary stay in the United States. If immigration officers discover a nonimmigrant in one of these categories has overstayed or otherwise violated his or her status, the final changes ensure the Department is better able to enforce the INA. DHS believes this greater oversight will deter F, J, or I nonimmigrants from engaging in fraud and abuse and strengthen the integrity of these nonimmigrant classifications.

The legal basis for this final rule is grounded in the Secretary of Homeland Security's broad authority to administer and enforce the nation's immigration laws. Section 102 of the Homeland Security Act of 2002 (HSA) (Pub. L. 107-296, 116 Stat. 2135), 6 U.S.C. 112 and section 103(a)(1) and (3) of the INA, 8 U.S.C. 1103 (a)(1), (3), charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. Section 402(4) of the HSA, 6 U.S.C. 202(4), expressly authorizes the Secretary, consistent with 6 U.S.C. 236 (the DOS's statutory authority concerning visa issuance and refusal), to establish and administer rules governing the granting of visas or other forms of permission to enter the United States to individuals who are not U.S. citizens or lawful permanent residents. *See* also 6 U.S.C.

271(a)(3), (b) (describing certain USCIS functions and authorities, including USCIS' authority to establish national immigration services policies and priorities and adjudicate applications) and 6 U.S.C. 252(a)(4) (describing ICE's authority to collect information relating to foreign students and program participants and to use such information to carry out its enforcement functions). Section 214(a)(1) of the INA, 8 U.S.C. 1184(a)(1), and Title IV of the Homeland Security Act of 2002, Public Law 107-296, the Secretary of Homeland Security has the authority to prescribe, by regulation, the time and conditions of admission of all nonimmigrants.

**4. A Description of, and, Where Feasible, an Estimate of, the Number of Small Entities to Which the Final Rule Applies, or an Explanation of Why No Such Estimate is Available.**

The small entities to which the final rule applies include all small SEVP-certified schools and J exchange visitor program sponsors. There may be some impact to English Language Training programs; however, since most English Language Training programs take less than 24 months to complete, DHS assumes such programs will not incur any additional burden from the 24-month limitation.[51] Employers of I foreign information media representatives will incur negligible costs from the final rule because the burden for filing an EOS request falls on the I nonimmigrant, not the employer. Employers of I foreign information media representatives are, thus, excluded from the small business impact analysis.

**SEVP-Certified Institutions Certified to Enroll Nonimmigrant Students**

As of 2024, there are approximately 6,541 SEVP-certified institutions (schools) authorized to enroll F nonimmigrant students that will be subject to the final rule because they

[51] According to Cambridge English, it takes approximately 1,000 to 1,200 hours to achieve the highest level of English proficiency from being a beginner of English. This time estimate is based on the Common European Framework of Reference (CEFR), which is an international standard for describing language ability. Given that an academic year is 9 months, it would take the average F-1 student less than 18 months (or less than 24 months to include summer breaks and annual vacations) to achieve advanced English proficiency through guided instruction. *See* Guided Learning Hours, Cambridge English, 2025, available at https://support.cambridgeenglish.org/hc/en-gb/articles/202838506-Guided-learning-hours (last visited Mar. 31, 2025).

are authorized to enroll F-1 nonimmigrants for a length of time greater than 1 year. Of these schools, DHS estimates 1,318 are public, 948 are for-profit, 4,274 are private nonprofit, and 1 is private without a for-profit/nonprofit designation.[52]

DHS assumed that all 1,318 public schools are not small entities. Similarly, DHS conservatively assumed that all private nonprofit schools (and one private school without a for-profit/nonprofit designation) are small entities because they are not dominant in their field.[53]

To determine which of the remaining 948 private for-profit schools are considered a small entity, DHS calculated average annual earnings using the "average annual enrollment" and "Cost Per Student" SEVIS fields.[54] DHS then compared annual earnings to the SBA size standards represented by business average annual receipts. Receipts are generally defined as a firm's total income or gross income. SBA's Table of Small Business Size Standards provides business size standards for all sections of the North American Industry Classification System (NAICS) for industries.[55] DHS matched information provided by the schools in SEVIS regarding what programs of study it is engaged in with an appropriate six-digit NAICS industry description. NAICS is the standard classification used to categorize business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. economy. DHS found that the revenue of 802 of the 948 for-profit schools fell below the SBA size standard

[52] The numbers of each type of school are based on 2024 F sponsor data extracted from SEVIS, retrieved on August 26, 2025. For the proposed rule analysis, DHS used 2018 data with values extrapolated to represent 2024. Value changes between the proposed and final rule analyses are due to the use of more recent data. More information on SEVIS can be found at https://www.ice.gov/sevis/overview.

[53] Section 601(4) of the Regulatory Flexibility Act defines the term "small organization" to mean any not-for-profit enterprise that is independently owned and operated and is not dominant in its field. Based on "average annual enrollment" data from SEVIS in 2024, enrollment among private nonprofit schools ranged from a low of 1 (25th percentile of 188) to a high of 650,725, with a median of 440 and an average of 1,658. Annual receipts (average annual enrollment x cost per student; 2024$) ranged from a low of $1 (25th percentile of $4.1 million) to a high of $8.9 billion, with a median of $13.7 million and an average of $72.0 million.

[54] The "cost per student" field amount includes tuition, fees, and living expenses.

[55] U.S. Small Business Administration, Tables of Small Business Size Standards Matched to NAICS Codes (effective March 17, 2023), available at https://www.sba.gov/sites/default/files/2023-06/Table%20of%20Size%20Standards_Effective%20March%2017%2C%202023%20%282%29.pdf.

of a small business, according to their industry. Table 24 shows a breakdown of the number of small for-profit SEVP-certified schools by industry.

DHS estimated each F sponsor's annual receipts by multiplying the approximate annual cost of room, board, and tuition by the average annual number of total students, based on data provided by the schools to SEVP. DHS acknowledges that this method of estimating receipts may be an incomplete account of a school's income, which may also include contributions from private individuals or other endowments. Because these data reflect a snapshot of all SEVP-certified schools authorized to enroll F nonimmigrant students in 2024, DHS acknowledges there may be changes in the school's enrollment numbers and that a school's estimated revenue may differ from actual revenue, which could include income generated from other sources.

**Table 24. For-Profit SEVP-Certified F Sponsor Schools by Industry**

| School industry | NAICS codes | Size standard in millions of dollars | Number of small schools | Number of non-small schools | Total SEVP-certified schools | Percent small schools |
|---|---|---|---|---|---|---|
| Elementary and Secondary Schools | 611110 | $20.0 | 158 | 27 | 185 | 85% |
| Junior Colleges | 611210 | $32.5 | 48 | 10 | 58 | 83% |
| Colleges, Universities and Professional Schools | 611310 | $34.5 | 136 | 48 | 184 | 74% |
| Computer Training | 611420 | $16.0 | 1 | 0 | 1 | 100% |
| Cosmetology and Barber Schools | 611511 | $13.0 | 50 | 3 | 53 | 94% |
| Flight Training | 611512 | $34.0 | 168 | 14 | 182 | 92% |
| Other Technical and Trade Schools | 611519 | $21.0 | 54 | 11 | 65 | 83% |
| Fine Arts Schools | 611610 | $9.0 | 11 | 9 | 20 | 55% |
| Sports and Recreation Instruction | 611620 | $9.0 | 1 | 0 | 1 | 100% |
| Language Schools | 611630 | $20.5 | 173 | 24 | 197 | 88% |
| Exam Preparation and Tutoring | 611691 | $12.5 | 1 | 0 | 1 | 100% |
| All Other Miscellaneous Schools and Instruction | 611699 | $16.5 | 1 | 0 | 1 | 100% |
| **Total** | | | **802** | **146** | **948** | **85%** |

| School industry | NAICS codes | Size standard in millions of dollars | Number of small schools | Number of non-small schools | Total SEVP-certified schools | Percent small schools |
|---|---|---|---|---|---|---|
| [1] U.S. Small Business Administration, Tables of Small Business Size Standards Matched to NAICS Codes (size standards effective March 17,2023); size standards rounded.<br>[2] Number of schools derived from 2024 F sponsor data. | | | | | | |

Table 25 shows a summary, by school type, of the estimated number of SEVP-certified schools authorized to enroll F nonimmigrants and estimated small entities. DHS estimates that 5,077 schools meet the SBA definition of a small entity, or approximately 78 percent of the 6,541 schools included in this analysis.

**Table 25. SEVP-Certified Schools Authorized to Enroll F Nonimmigrants by School Type**

| Description | Total Estimated Number of Schools | Number of Small Schools | Percent Small Schools |
|---|---|---|---|
| Public schools | 1,318 | 0 | 0% |
| Private, nonprofit schools | 4,274 | 4,274 | 100% |
| Private, unspecified schools | 1 | 1 | 100% |
| For-profit schools | 948 | 802 | 85% |
| **Total Number of SEVP-Certified Schools** | **6,541** | **5,077** | **78%** |
| Note: School counts are based on 2024 F sponsor data, excluding public high schools because F-1 students enrolled in public high schools are already given a fixed period of stay under 8 CFR 214.2(f)(5)(i). | | | |

**J Exchange Visitor Program Sponsors**

As of 2024, there are approximately 1,203 J exchange visitor program sponsors that will be subject to the final rule because they are authorized by DOS to sponsor J exchange visitor programs.[56] Of these sponsors, approximately 50 are government entities, 823 are educational institutions, 22 are hospitals and related institutions, 220 are nonprofit institutions, and 88 are

[56] Based on 2024 J sponsor data, retrieved on August 13, 2025. For the proposed rule analysis, DHS used 2018 data with values extrapolated to represent 2024. Value changes between the proposed and final rule analyses are due to the use of more recent data.

for-profit institutions. These sponsors issue DS-2019s according to certain designation codes that map to specific programs. Table 26 shows the type for each J exchange visitor program designation code.

**Table 26. Descriptions of J Exchange Visitor Program Sponsor Types by Designation Code**

| Designation Code | Program Type |
|---|---|
| **G-1** | Programs sponsored by DOS |
| **G-2** | Programs sponsored by the Agency for International Development (USAID) |
| **G-3** | Other U.S. Federal agencies |
| **G-4** | International agencies or organizations in which the U.S. Government participates |
| **G-5** | Other national, State, or local government agencies |
| **G-7** | Federally funded national research and development center or a U.S. Federal laboratory |
| **P-1** | Educational institutions (e.g., schools, colleges, universities, seminaries, libraries, museums, and institutions devoted to scientific and technological research) |
| **P-2** | Hospitals and related institutions |
| **P-3** | Nonprofit organizations, associations, foundations, and institutions (academic institutions conducting training programs can be classified as a P-3, as long as they are considered nonprofit) |
| **P-4** | For-profit organizations (business and industrial concerns) |

*Government Entities*

DHS assumed that all 50 government entities (G-1, G-2, G-3, G-4, G-5, and G-7 program sponsors) are large entities.

*Educational Institutions*

DHS identified approximately 823 educational institutions that are J exchange visitor program sponsors. To identify which J exchange visitor program sponsors were small entities, DHS compared the 823 schools sponsoring J exchange visitor programs to the schools certified

by SEVP to enroll F nonimmigrants. Of the 823 schools sponsoring J exchange visitor programs, approximately 77 percent also enrolled F nonimmigrants. Among the schools sponsoring both F and J nonimmigrants, approximately 50 percent of the schools are public schools and 50 percent are private, nonprofit schools. DHS assumes that the remaining 23 percent of schools sponsoring only J exchange visitors are also 50 percent public and 50 percent private, nonprofit schools. DHS, thus, estimates that there are 411 public schools and 412 private, nonprofit schools (approximately 50 percent each of the 823 J-sponsor schools). Since all affected public schools have been found to be large entities and all affected private, nonprofit schools are assumed to be small entities, DHS estimates that 412 of the 823 J-sponsor schools are small entities.

*Hospitals and Related Institutions*

DHS identified approximately 22 hospitals and related institutions sponsoring J exchange visitor programs. Based on external research, DHS believes all 22 hospitals are non-profits. DHS assumes that all 22 hospitals and related institutions are small entities because they are not dominant in their fields.

*Nonprofit Organizations*

DHS conservatively assumes that all 220 nonprofits sponsoring J exchange visitor programs are small entities because they are not dominant in their field.

*For-Profit Organizations*

DHS identified 88 potentially affected for-profit organizations sponsoring J exchange visitor programs. Due to the lack of available revenue data for these 88 for-profit organizations, DHS assumed that all 88 are small entities. For the proposed rule analysis, DHS extracted revenue information from external sources and determined that approximately 65 percent of for-profit organizations were small based on SBA size standards. However, the use of multiple

external sources for the revenue data—with different sources, methodologies, and standardization protocols—introduced uncertainty into this analysis. Thus, DHS conservatively estimates that all 88 for-profit organizations are small entities for the final rule analysis.

*Total J Exchange Visitor Program Sponsors*

Overall, DHS identified approximately 1,203 unique entities sponsoring J exchange visitor programs. Of these 1,203 entities, DHS identified 742 small entities that may be affected by the final rule. Table 27 shows a summary by sponsor type of the number of J exchange visitor program sponsors and estimated small entities.

**Table 27. J Exchange Visitor Program Sponsors by Type and Small Entity Status**

| Description | Total Number of Sponsors[1] | Number of Affected Small Entities[1] |
|---|---|---|
| DOS | 1 | 0 |
| USAID | 1 | 0 |
| Other U.S. Federal agencies | 22 | 0 |
| International agencies or organizations[2] | 0 | 0 |
| Other national, state, or local government agencies | 25 | 0 |
| National research and development centers or laboratories[3] | 1[7] | 0 |
| Educational institutions[4] | 823 | 412 |
| Hospitals and related institutions | 22 | 22 |
| Nonprofit organizations, associations, etc.[5] | 220 | 220 |
| For-profit organizations[6] | 88 | 88 |
| **Total** | **1,203** | **742** |

[1] All counts are based on 2024 J sponsor data.
[2] International agencies or organizations in which the U.S. Government participates
[3] Federally funded national research and development centers or U.S. Federal laboratories
[4] Educational institutions (e.g., schools, colleges, universities, seminaries, libraries, museums, and institutions devoted to scientific and technological research)
[5] Nonprofit organizations, associations, foundations, and institutions (academic institutions conducting training programs can be included here, as long as they are considered nonprofit)
[6] For-profit organizations (business and industrial concerns)
[7] Count includes a National Institutes of Health (NIH) program. Because two NIH programs fall into two different designation codes (G-3 and G-7), we counted the programs separately instead of eliminating the second NIH program as a duplicate.

### 5. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Final Rule, Including an Estimate of the Classes of Small Entities that Will Be Subject to the Requirement and the Types of Professional Skills Necessary for Preparation of the Report or Record

The final rule will increase costs for SEVP-certified schools and J exchange visitor program sponsors. Each DSO or RO at each sponsor will require approximately 135 hours for rule familiarization and adaptation in the first year after the rule takes effect (70 hours to complete rule familiarization training, 33 hours to create and modify training materials, and 32 hours to adapt to the final rule through systemwide briefings and systemic changes). In the first year, sponsors will also incur additional advisory burden (1 hour per F-1 and J-1 nonimmigrant in the country when the rule takes effect) to inform existing students about the rule changes and discuss how the changes affect their educational plans.

Each year, DSOs/ROs will spend approximately 3 hours per F-1/J-1 EOS request: 1 hour to review the Form I-539 completed by the F-1/J-1 nonimmigrant, 1 hour update the SEVIS record and track EOS requests, and 1 hour to advise the F-1/J-1 nonimmigrant about the extension process and the requirements to file an EOS with USCIS. Additionally, HR staff will spend approximately 1.5 hours per F-1 and J-1 EOS request to track form updates related to each EOS request and avoid inadvertent unauthorized employment due to form discrepancies with the I-9. DHS estimates the annual impact to small SEVP-certified schools and J exchange visitor program sponsors based on the cost of compliance as represented as a percentage of their annual revenue. This analysis examines the impact that the final rule will have on small SEVP-certified schools and J exchange visitor program sponsors.

The RFA evaluates the impacts that have been quantitatively estimated in the regulatory impact analysis. As discussed in the regulatory impact analysis, there are other final rule requirements that could impact small SEVP-certified schools and J exchange visitor program

sponsors. The regulatory impact analysis qualitatively discusses requirements affecting English language training programs, changes in education levels, and extensions to employment authorizations. Therefore, the potential impacts of these requirements on small entities are not quantitatively evaluated in this RFA. DHS acknowledges these impacts could include reduction in student enrollment due to the regulatory program and education level restrictions. A change to enrollment could result in tuition revenue reductions for F sponsors. DHS cannot assess this as an impact, and expects that other students will replace the affected nonimmigrants that no longer enroll due to the final rule.

**SEVP-Certified Schools Authorized to Enroll F Nonimmigrants**

As shown in Table 25, DHS estimates that 5,077 SEVP- certified schools that are authorized to enroll F nonimmigrants meet the SBA definition of a small entity, including 4,274 private, nonprofit schools, 1 private school without a for-profit/nonprofit designation, and 802 for-profit schools. DHS determined a SEVP-certified school's annual revenue by multiplying the average cost per F nonimmigrant student per school by average annual enrollment for each school. DHS acknowledges that this method to estimate revenue may be an incomplete account of a SEVP-certified school's revenue, which may also include contributions from private individuals or other endowments.

DHS examined all 5,077 small SEVP-certified schools authorized to enroll F nonimmigrants to estimate the impact of rule familiarization and adaptation costs in the first year of the rule. For this analysis, DHS used the number of DSOs for each F sponsor provided via the "Approved PDSO and DSO" field in SEVIS. For each DSO, rule familiarization will cost $6,735 (135 hours x $49.89 loaded wage rate) in the first year after the rule takes effect.[57] DHS also

[57] *See* Section A.4 of the final rule Regulatory Impact Analysis for a detailed discussion of DSO rule familiarization and adaptation costs.

accounted for additional advising costs for each F school when the rule takes effect by multiplying the school-level average annual enrollment by a cost of $50 per existing F-1 student (1 hour x $49.89 loaded wage rate).

Table 28 shows the number of small schools within the range of impact to each school's estimated annual revenue. Of the 5,077 small schools, 4,244, or 83.6 percent, will experience an impact less than or equal to 1 percent of their estimated annual revenue as a result of the rule familiarization and adaptation costs. DHS estimates 526 small schools (10.4 percent) will realize an impact between 1 percent and 2 percent of their estimated annual revenue, 116 small schools (2.3 percent) will realize an impact between 2 percent and 3 percent, and 191 small schools (3.8 percent) will realize an impact greater than or equal to 3 percent.

**Table 28. First Year Impact of Rule Familiarization and Adaptation Costs for SEVP-Certified Schools Certified to Enroll F Nonimmigrant Students[1]**

| Type of School | Rule Familiarization and Adaptation Costs as a Percent of Annual Revenue | | | | Total |
|---|---|---|---|---|---|
| | < 1% | 1% - 2% | 2% - 3% | ≥ 3% | |
| Private, nonprofit schools | 3,654 | 394 | 88 | 138 | 4,274 |
| Private, unspecified schools | 0 | 0 | 0 | 1 | 1 |
| For-profit schools | 590 | 132 | 28 | 52 | 802 |
| **Total Small Schools** | **4,244** | **526** | **116** | **191** | **5,077** |
| **% of Small Schools** | **83.6%** | **10.4%** | **2.3%** | **3.8%** | **100.0%** |
| [1] Based on 2024 F sponsor data. | | | | | |

DHS also examined all 5,077 small SEVP-certified schools to estimate the impact of annual DSO and HR costs for processing EOS requests. For this analysis, DHS estimated the number of EOS requests that each school is expected to process by dividing the estimated annual number of F-1 nonimmigrant EOS requests from Year 10 of the analysis period (353,958; *see*

Table 14)[58] by the total number of SEVP-certified schools, small and large (6,541). This methodology produced an estimated average of 54 annual EOS requests for each school. The DSO/HR cost per EOS request is $233 (3 hours x $49.89 loaded DSO wage rate + 1.5 hours x $55.62 loaded HR wage rate).[59] DHS calculates the impact by dividing the processing costs for 54 EOS requests ($12,586) by each school's estimated annual revenue.

Of the 5,077 small schools, 4,599, or 90.6 percent, will experience an annual impact of EOS costs less than or equal to 1 percent of their estimated annual revenue. DHS estimates 233 small schools (4.6 percent) will realize an impact between 1 percent and 2 percent of their estimated annual revenue, 93 small schools (1.8 percent) will realize an impact between 2 percent and 3 percent, and 152 small schools (3.0 percent) will realize an impact greater than or equal to 3 percent. Table 29 shows the number of small schools within the range of impact to each school's estimated annual revenue.

**Table 29. Annual Impact of EOS Costs for SEVP-Certified Schools[1]**

| Type of School | EOS Costs as a Percent of Annual Revenue | | | | Total |
|---|---|---|---|---|---|
| | < 1% | 1% - 2% | 2% - 3% | ≥ 3% | |
| Private, nonprofit schools | 3,925 | 168 | 72 | 109 | 4,274 |
| Private, unspecified schools | 0 | 0 | 0 | 1 | 1 |
| For-profit schools | 674 | 65 | 21 | 42 | 802 |
| **Total Small Schools** | **4,599** | **233** | **93** | **152** | **5,077** |
| **% Small Schools** | **90.6%** | **4.6%** | **1.8%** | **3.0%** | **100.0%** |

[58] Year 10 is likely the closest approximation to a "steady state" estimate of EOS requests, with the majority of the estimate based on new arrivals only (i.e., the population remaining in the country from when the rulemaking takes effect is at its smallest in Year 10).
[59] *See* Section V. Costs and Benefits of the Final Rule for a detailed discussion of DSO rule familiarization and adaptation costs.
Wages based on the Bureau of Labor Statistics (BLS) average hourly wage for SOC 21-1012 (Educational, Guidance, and Career Counselors and Advisors) for May 2024 of $34.38 (available at: https://www.bls.gov/oes/tables.htm). The benefits-to-wage multiplier is calculated by the BLS as (Total Employee Compensation per hour) / (Total wages and Salaries per hour) = $47.20 / $32.52 = 1.451, based on the average national wage for all occupations, released March 14, 2025 (*see* Civilian workers in Table 1; https://www.bls.gov/news.release/archives/ecec_03142025.htm).

| Type of School | EOS Costs as a Percent of Annual Revenue | | | | Total |
|---|---|---|---|---|---|
| | < 1% | 1% - 2% | 2% - 3% | ≥ 3% | |
| [1] Values based on the assumption that each small entity will process 54 EOS requests annually. | | | | | |

DHS recognizes that the 54 annual EOS requests assumption for each SEVP-certified school may overestimate the costs for schools with low average annual enrollment. As shown in Table 30, approximately 83.6 percent of the small schools identified as having EOS processing cost impacts greater than or equal to 3 percent of annual school revenue have 54 or fewer total students enrolled on average, implying that the analysis may be overestimating the number of schools with impacts greater than 3 percent.[60]

**Table 30. Small Entity SEVP-Certified Schools Certified to Enroll F Nonimmigrants with EOS Impacts Greater than or Equal to 3 Percent of School Earnings and Total Enrollment of 54 or Fewer Students[1]**

| Type of School | Number of Schools with Total Enrollment at or Under 54 Students and Impacts ≥ 3% | Number of Schools with Impacts ≥ 3% | Percent of Schools with Impacts ≥ 3% and Total Enrollment at or Under 54 Students |
|---|---|---|---|
| Private, nonprofit schools | 86 | 109 | 78.9% |
| Private, unspecified schools | 1 | 1 | 100.0% |
| For-profit schools | 40 | 42 | 95.2% |
| **Total Small Schools** | **127** | **152** | **83.6%** |
| [1] Impact percentage based on the assumption that each small entity will process 54 EOS requests annually. | | | |

DHS acknowledges that in Year 1, costs will be higher compared to other years, as the costs of rule familiarization and adaptation (Year 1 only) will coincide with the annual EOS costs. Table 31 shows how total first-year costs (rule familiarization/adaptation + annual EOS costs) for SEVP-certified schools are distributed across revenue impact categories (<1%, 1%-2%, 2%-3%, >3%). DHS acknowledges that the total first-year costs are likely overestimated from using the average number of EOS requests based on Year 10 of the analysis when estimating annual EOS

[60] Schools with 34 or fewer total students include religious institutions, Montessori schools, schools for students with disabilities, specialty graduate schools, and boarding schools.

costs (i.e., the number of EOS requests in Year 1 is expected to be lower than in Year 10). Of the 5,077 small schools, 3,727, or 73.4 percent, will experience an impact less than or equal to 1 percent of their estimated annual revenue. DHS estimates 716 small schools (14.1 percent) will realize an impact between 1 percent and 2 percent of their estimated annual revenue, 264 small schools (5.2 percent) will realize an impact between 2 percent and 3 percent, and 370 small schools (7.3 percent) will realize an impact greater than or equal to 3 percent.

**Table 31. Total First-Year Costs (Rule Familiarization/Adaptation Costs + Annual EOS Costs) for SEVP-Certified Schools[1]**

| Type of School | EOS Costs as a Percent of Annual Revenue | | | | Total |
|---|---|---|---|---|---|
| | < 1% | 1% - 2% | 2% - 3% | ≥ 3% | |
| Private, nonprofit schools | 3,286 | 522 | 195 | 271 | 4,274 |
| Private, unspecified schools | 0 | 0 | 0 | 1 | 1 |
| For-profit schools | 441 | 194 | 69 | 98 | 802 |
| **Total Small Schools** | **3,727** | **716** | **264** | **370** | **5,077** |
| **% Small Schools** | **73.4%** | **14.1%** | **5.2%** | **7.3%** | **100.0%** |

[1] Annual EOS Costs are based on the assumption that each small entity will process 54 EOS requests annually. Because the annual EOS costs are based on the number of EOS requests for Year 10 of the analysis (i.e., the closest approximation to a "steady state" estimate of EOS requests), the "Total First-Year Costs" thresholds are likely overestimated because fewer EOS requests are expected in Year 1.

### J Exchange Visitor Program Sponsors

As shown in Table 27, 742 J exchange visitor program sponsors meet the SBA definition of a small entity. Because reliable financial information is not available for all J sponsors, DHS did not assess impacts of the final rule for each small J exchange visitor program sponsor. Instead, DHS determined the minimum earnings required for final rule costs to equal 1 percent, 2 percent, and 3 percent of J sponsor revenue. For this analysis, DHS assumed that each small J exchange visitor program sponsor will have three ROs that will incur rule familiarization and

adaptation costs in the first year.[61] DHS also assumed that each J sponsor will have 42 existing J-1 exchange visitors, or the median number of J-1 students enrolled in J sponsors in 2024,[62] requiring one hour of additional advising burden when the rule takes effect. To assess the annual impacts of costs for processing EOS requests, DHS estimated the number of EOS requests that each J exchange visitor program sponsor is expected to process by dividing the estimated annual number of J-1 nonimmigrant EOS requests from Year 10 of the analysis period (24,120; *see* Table 14) by the total number of J exchange visitor program sponsors, small and large (1,203). This methodology produced an estimated average of 20 annual EOS requests for each J sponsor. DHS recognizes that small entities will likely process fewer EOS requests than the average but does not have more detailed data on the EOS requests by entity. DHS also recognizes potential non-quantifiable risks of reduced enrollment in J exchange visitor programs that can lead to revenue reductions.

Table 32 provides the minimum annual earnings required for final rule costs to equal 1 percent, 2 percent, and 3 percent of J exchange visitor program visitor sponsor revenue. The impact of the rule familiarization and adaptation costs of the final rule for 3 ROs and additional advising costs for 42 existing J-1 exchange visitors ($22,299) would not exceed 1 percent of sponsor earnings if earnings are at least $2.2 million. If J exchange visitor program sponsors earnings are at least $0.7 million or $1.1 million, the rule familiarization and adaptation costs of the final rule would not exceed 3 percent or 2 percent, respectively, of sponsor earnings. DHS anticipates that the majority of small J sponsors have earnings that exceed these thresholds.

---

[61] DHS estimated costs assuming that each small J exchange visitor program sponsor has one, three, or five ROs. DHS presented the estimates for three ROs as a midpoint value. The actual number of ROs may vary by small J exchange visitor program sponsor.

[62] DHS used the median because the mean is highly skewed by a few large J sponsors with up to hundreds of thousands of enrolled J-1 exchange visitors. The median is more representative of a more typical J sponsor.

The impact of the costs for processing EOS requests (20 EOS requests; $4,662) would not exceed 1 percent of sponsor earnings if earnings are at least $466,000. If J exchange visitor program sponsor earnings are at least $155,000 or $233,000 the EOS request processing costs of the final rule would not exceed 3 percent or 2 percent, respectively, of sponsor earnings. DHS anticipates that the majority of small J sponsors have earnings that exceed these thresholds. The costs in Year 1 will be higher compared to other years, as the costs of rule familiarization and adaptation will coincide with the annual EOS costs. The table provides an approximate estimate of total first-year costs, but DHS acknowledges that the total first-year costs are likely overestimated from using the average number of EOS requests based on Year 10 of the analysis when estimating annual EOS costs (i.e., the number of EOS requests in Year 1 is expected to be lower than in Year 10).

**Table 32. Minimum J Exchange Visitor Program Sponsor Earnings for Final Rule Costs to Equal 1 Percent, 2 Percent, or 3 Percent of Sponsor Revenue (2024$)**

| Minimum Annual Earnings | Percent of Annual Revenue | | |
|---|---|---|---|
| | 1% | 2% | 3% |
| Rule Familiarization and Adaptation Costs (first year only)[1] | $2,229,876 | $1,114,938 | $743,292 |
| EOS Costs (annual)[2] | $466,163 | $233,081 | $155,388 |
| **Total First-Year Costs[3]** | **$2,696,039** | **$1,348,020** | **$898,680** |

[1] Values based on the assumption that small entities will have 3 ROs that will incur rule familiarization/adaptation costs and 42 J-1 exchange visitors when the rule takes effect who will each need 1 additional hour of advising to discuss how the rulemaking affects their education plans.
[2] Values based on the assumption that each small entity will process 20 EOS requests annually.
[3] Sum of the "Rule Familiarization and Adaptation Costs (first year only)" and "EOS Costs (annual)" thresholds. Because the annual EOS costs are based on the number of EOS requests for Year 10 of the analysis (i.e., the closest approximation to a "steady state" estimate of EOS requests), the "Total First-Year Costs" thresholds are likely overestimated because fewer EOS requests are expected in Year 1.

### 6. Description of the Steps the Agency Has Taken to Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered By the Agency That Affect the Impact on Small Entities Was Rejected

DHS first considered a "no action" alternative, under which DHS would continue admitting nonimmigrants with F, I, and J status for D/S. DHS determined that this alternative would not adequately provide immigration officers with an opportunity to evaluate an alien's maintenance of status at pre-determined points, nor would it enable immigration officers an opportunity to assess whether an alien is accruing unlawful presence, and the "no action" alternative would do nothing to address the fraud and abuse currently present in these categories.

DHS also considered a standard 2-year fixed admission period for all F and J nonimmigrants. While such an option would provide the Department with more frequent direct check-in points with these nonimmigrants than provided by a 4-year maximum period of admission, DHS was concerned it would be unduly burdensome on many F and J nonimmigrants.

DHS also considered a 2-year/4-year alternative, under which the maximum fixed admission period would be 4 years in most cases but 2 years when certain conditions apply. This 2-year/4-year approach was proposed in 2020, but the rulemaking was ultimately withdrawn. The 2-year/4-year approach is not being used in the final rule due to numerous implementation concerns, including extensive IT upgrades required to make the 2-year versus 4-year determination feasible. Thus, DHS rejected this alternative.

Lastly, DHS also considered whether the Department could use data from SEVIS to identify potentially problematic F and J nonimmigrants and require only this targeted subset of F and J nonimmigrants to complete an EOS. SEVIS information is used when aliens apply for a visa and admission to the United States as an F or J nonimmigrant, as well as to track and monitor their status. While this information is likely to be helpful in identifying aliens who should be subjected to further review, in some cases, the information may not be sufficient for

determining whether these nonimmigrants are engaging in fraudulent behavior or otherwise have fallen out of status. The data received when applying for an EOS, or for an extension at the POE, provide additional information not contained in SEVIS that helps the Department effectively monitor and oversee F and J nonimmigrants.

Further, an EOS provides a direct interaction with an immigration officer. As a potential remedy, the Department considered whether the SEVIS data could be used to classify a subset of nonimmigrants as presenting a higher risk of being a national security threat or committing fraud. The identified subset would then be required to complete an EOS. Depending on how the Department targeted higher risk aliens, a smaller number of EOS requests would need to be completed as compared to the final rule, thus, lowering the burden on nonimmigrants, program sponsors, and the Department. The Department rejected this alternative in favor of moving all F and J nonimmigrants to a fixed period admission because SEVIS does not readily lend itself to this purpose. SEVIS is used to gather information regarding technical compliance, and the data cannot replace the information that can be developed in the course of an adjudication, in which USCIS has the opportunity to ask questions via a request for evidence and, if necessary, conduct an interview. The Department also rejected this alternative due to the operational burden and challenges that would exist if some F and J nonimmigrants were admitted for D/S, but others for a fixed period of admission.

In addition, by requiring all F and J nonimmigrants to be admitted for a fixed period, this allows for the opportunity for improved detection of fraud or abuse, as the Department has observed that abuse is not limited to one particular type of school or program. By fixing a date certain period of admission, all of these nonimmigrants are on notice as to the date their period of stay expires, and the Department will be in a position to provide greater oversight to help deter F

and J nonimmigrants from engaging in fraud and abuse, including staying beyond that fixed date. All those who overstay will begin to accrue unlawful presence, generally the day after their period of stay expires, when admitted for a fixed period of admission. Lastly, the Department believes that a fixed period of admission for these populations may deter fraud, allow for earlier detection of national security concerns, and help reduce overstays, which outweighs reducing the number of EOS requests that may be required.

**Appendix A**

**Enrollment Behavior and Uncertainty**

DHS impact estimates assume no quantified change in enrollment behavior; however, DHS acknowledges that perceived uncertainty regarding the rule and the EOS process may influence enrollment decisions. The magnitude and duration of any enrollment impact are unknown and difficult to predict, as multiple factors affect the decision to study in the United States. DHS recognizes concerns raised by commenters that uncertainty may deter some students from enrolling, but notes that U.S. educational programs remain attractive to international students. The market for foreign students is shaped by academic offerings and opportunities in the United States relative to other countries, making it challenging to isolate the effect of this final rule from other concurrent international influences, such as enrollment caps, program offerings, and fees the country charges students or institutions.[63]

Additionally, external factors unrelated to this rulemaking may also contribute to declines in enrollment, making it infeasible to estimate and attribute such declines specifically to this rule. For example, the Department of State reported a 2.7 percent decline in applications and a 10.1 percent decline in F-1 visa issuances between 2023 and 2024, independent of this regulation, further complicating attribution of enrollment changes to this rule.[64]

---

[63] The following are examples of influences from other countries that may counter enrollment decline impacts from this rule. Canada includes enrollment caps which started in 2024. https://www.canada.ca/en/immigration-refugees-citizenship/news/notices/2026-provincial-territorial-allocations-under-international-student-cap.html The United Kingdom is considering a new annual levy on universities for international students. https://www.gov.uk/government/consultations/international-student-levy-technical-detail. Australia is blocking private colleges from certain new programs to reduce fraud and improve program integrity. https://ministers.education.gov.au/hill/suspension-new-vet-applications-teach-international-students

[64] Department of State, Nonimmigrant Worldwide Issuance and Refusal Data by Visa Category, Annual Report FY23 and FY24. There were 698,773 F-1 NIV applications and of these, 445,418 were issued in FY23. There were 679,290 F-1 NIV applications and of these, 400,737 were issued in FY24. Available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html

**Period of Uncertainty and reduced enrollment**

Further, the effect of this rule on enrollment could be short-term. As affected foreign students become more familiar with the EOS process and their risk perceptions change, DHS expects their EOS uncertainty concerns will decline. DHS anticipates that DSOs will gain experience and provide clearer guidance on EOSs, facilitating improved compliance and requests for EOS. DHS has accounted for additional DSO time per EOS and for a transition period based on public comments regarding increased administrative burden. While this uncertainty is likely to decline over time as affected parties become more familiar with the EOS and other requirements in the final rule, DHS still acknowledges other external factors that may contribute to continued declining enrollment.

**Effects on schools' tuition**

Estimating the possible marginal impact of this rule on tuition revenue is challenging due to various influencing factors. DHS recognizes that academic institutions are concerned about potential tuition losses from international students who may choose not to enroll. However, the scale and duration of any reduction in tuition revenue are uncertain. Factors such as enrollment substitution, alternative funding sources, and variations in institutional funding structures complicate efforts to isolate the net impact. College and university funding structures vary by institutional type, generally relying on a mix of student tuition, revenue-generating academic offerings, government programs, private philanthropy, and auxiliary revenues. Revenue streams differ depending on whether a school is public, private non-profit, or private for-profit. As a result, the overall net effect to academic institutions' budgets directly attributable to this rule is infeasible to accurately quantify.

**Effects on labor market, employers and student workers**

DHS received comments regarding potential secondary impacts on employers and the U.S. economy, particularly related to contributions to the STEM labor market and other sectors benefiting from international student labor. While DHS acknowledges these contributions, it does not assume that the primary impact of this rule will be a reduction in such labor contributions. Over time, students may continue to participate in practical training programs as perceptions of risk change, resulting in less pronounced effects on enrollment and practical training. Further, students' decisions to pursue practical training are likely influenced by the prevailing labor market conditions. DHS believes it would be speculative to assume that this rule alone would be the main factor affecting students' decisions to enroll in practical training. Other considerations such as job availability, compensation, and opportunities in other countries also play a significant role in these decisions. These external factors contribute to uncertainty regarding both the immediate and long-term impacts of this rulemaking on the overall labor market.

Furthermore, the F non-immigrant visa program is not an employment-based immigration program. DHS does not conduct labor market analyses or assess potential displacement of U.S. workers when approving practical training employment applications, as it does for certain other employment-based programs. Practical training programs do not require employers to complete a labor certification demonstrating that no qualified U.S. workers were available for the position. While STEM OPT extension employers must attest on the Form I-983 that the student will not replace a U.S. worker, this attestation does not provide sufficient information to determine whether a U.S. worker could replace the student if students choose not to enroll and participate in practical training due to this rule. Other employment-based programs have caps to reduce the risk of displacing U.S. workers, but the practical training programs do not have such limits.

As a result, DHS has limited data on whether practical training positions could be filled by U.S. workers. One way to assess the potential for employers to replace foreign student labor with U.S. workers is to examine unemployment rates among recent college graduates. Data from the first quarter of 2026 indicates that labor market conditions remain challenging for recent college graduates, with an unemployment rate of 5.7 percent—higher than that of other U.S. workers. [65] This suggests that employers may be able to find replacement labor for F-1 students who choose not to enroll or participate in practical training

Therefore, DHS concludes secondary employment impacts, from reduced student enrollment and reduced practical training due to this rule cannot be accurately quantified. Any attempt to estimate labor market impacts would be highly speculative, as it would require assumptions about the availability of replacement labor from U.S. workers. Consequently, the broader economic impacts are also highly uncertain and speculative.

[65] Federal Reserve Bank of New York, The Labor Market for Recent College Graduates, 2026:Q1 Quarterly Highlights https://nyfed.org/collegelabor. The Labor Market for Recent College Graduates - FEDERAL RESERVE BANK of NEW YORK Accessed May 28, 2026.