**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, NAFSA: ASSOCIATION OF INTERNATIONAL EDUCATORS; ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES IN MASSACHUSETTS; AMERICAN FEDERATION OF TEACHERS; GRADUATE LABOR ORGANIZATION, AFT LOCAL 6516; THE NEWSGUILD-CWA; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; UNITED AUTO WORKERS LOCAL 2322, Plaintiffs, | Case No. 1:26-cv-13799-FDS |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, DAVID VENTURELLA, in his official capacity as Acting Director of United States Immigration and Customs Enforcement, Defendants. | Leave to file granted Aug. 18, 2026 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR APA § 705 RELIEF, A PRELIMINARY INJUNCTION OR, ALTERNATIVELY, SUMMARY JUDGMENT**

Dana McSherry (MA BBO #664430)
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4060
dmcsherry@mcdermottlaw.com

Paul W. Hughes (DC Bar No. 997235)*
Emmett Witkovsky-Eldred (DC Bar No. 90012725)*
McDermott Will & Schulte LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com

** pro hac vice*

*Counsel for Plaintiffs*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS


Table of Authorities ........ ii

Introduction ........ 1

Background ........ 2

A. Statutory and regulatory background ........ 2

1. The F, J, and I nonimmigrant categories ........ 2

2. The duration of status rule ........ 4

B. Factual and procedural background ........ 5

1. Importance of F, J, and I nonimmigrants to the U.S. Economy ........ 5

2. The Rulemaking ........ 8

a. The Proposed Rule and public response ........ 8

b. The Final Rule ........ 10

Standard of review ........ 10

Argument ........ 11

I. Plaintiffs are likely to succeed on the merits. ........ 11

A. The Final Rule is arbitrary and capricious. ........ 11

1. DHS's conclusion that the Rule's benefits outweigh its costs was irrational and unreasoned. ........ 11

2. Eliminating D/S is not a rational response to the problems identified. ........ 18

3. DHS failed to adequately consider less burdensome alternatives. ........ 21

4. DHS failed to adequately respond to significant comments. ........ 25

5. The 32-day comment period was inadequate. ........ 32

B. The Final Rule's limitation of academic mobility is contrary to law. ........ 34

II. Plaintiffs' members will be irreparably harmed ........ 35

a. Declines in enrollment ........ 35

b. Modifications to programs ........ 38

c. Administrative burdens ........ 40

III. The remaining equities favor emergency relief. ........ 41

IV. A stay—or summary judgment—is warranted. ........ 42

Conclusion ........ 43

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Pediatrics v. Kennedy*,
814 F. Supp. 3d. 150 (D. Mass. 2026) ....................35

*Am. Hosp. Ass'n v. Kennedy*,
820 F. Supp. 3d 30 (D. Me. 2025) ....................12, 21, 30

*Amazentis SA v. Partnerships & Unincorporated Associations*,
2025 WL 4675089 (D. Mass. Oct. 20, 2025)....................38

*Ass'n of Am. Universities v. Dep't of Def.*,
792 F. Supp. 3d 143 (D. Mass. 2025) ....................10, 37

*Ass'n of Am. Universities v. Nat'l Sci. Found.*,
788 F. Supp. 3d 106 (D. Mass. 2025) ....................40

*California v. HHS*,
811 F. Supp. 3d 183 (D. Mass. 2025) ....................41

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) ....................41

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025)....................11

*Chamber of Com. of U.S. v. SEC*,
85 F.4th 760 (5th Cir. 2023) ....................16

*City of Portland v. EPA*,
507 F.3d 706 (D.C. Cir. 2007)....................11

*City of Vernon v. FERC*,
845 F.2d 1042 (D.C. Cir. 1988)....................14

*Coal. for Humane Immigrant Rts. v. Noem*,
805 F. Supp. 3d 48 (D.D.C. 2025)....................42

*Cohen v. Bradford Printing*,
2010 WL 2854443 (D.R.I. 2010)....................37

*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019)....................12

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....................27

*Del. Dep't of Nat. Res. v. EPA*,
785 F.3d 1 (D.C. Cir. 2015)....................21

*Dep't of Educ. v. California*,
604 U.S. 650 (2025)....................41

**Cases—continued**

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 30

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 35

*Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*,
512 U.S. 267 (1994) .......... 13

*Doe v. Noem*,
817 F. Supp. 3d 27 (D. Mass. 2026) .......... 10

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) .......... 41

*Engine Mfrs. Ass'n v. EPA*,
20 F.3d 1177 (D.C. Cir. 1994) .......... 25

*FCC v. Prometheus Radio Proj.*,
592 U.S. 414 (2021) .......... 11

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) .......... 27

*GPA Midstream Ass'n v. U.S. Dep't of Transp.*,
67 F.4th 1188 (D.C. Cir. 2023) .......... 15, 18

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) .......... 19, 25

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 35

*INGAA v. PHMSA*,
114 F.4th 744 (D.C. Cir. 2024) .......... 16, 29

*Lilliputian Sys., Inc. v. PHMSA*,
741 F.3d 1309 (D.C. Cir. 2014) .......... 25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) .......... 18

*Make the Rd. N.Y. v. Noem*,
805 F. Supp. 3d 139 (D.D.C. 2025) .......... 42

*Massachusetts v. Dep't of Educ.*,
828 F. Supp. 3d 198 (D. Mass. 2026) .......... 40

*Massachusetts v. Dep't of Educ.*,
831 F. Supp. 3d 34 (D. Mass. 2026) .......... 43

*Massachusetts v. NIH*,
770 F. Supp. 3d 277 (D. Mass. 2025) .......... 15

**Cases—continued**

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ....................21, 24, 27, 28, 29

*Md. People's Couns. v. FERC*,
761 F.2d 768 (D.C. Cir. 1985) ....................16

*Mex. Gulf Fishing Co. v. U.S. Dept. of Com.*,
60 F.4th 956 (5th Cir. 2023) ....................12

*Michigan v. EPA*,
576 U.S. 743 (2015)....................11

*Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................11, 18

*Nat'l Cmty. Reinv. Coal. v. CFPB*,
2022 WL 4447293 (D.D.C. Sept. 23, 2022) ....................15, 17

*Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen.*,
806 F. Supp. 3d 166 (D.N.H. 2025)....................38

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019) ....................32

*Nat'l Parks Conserv. Ass'n v. U.S. Dep't of Interior*,
2026 WL 1706963 (D. Mass. June 12, 2026) ....................37

*Nat'l Treasury Emps. Union v. Vought*,
774 F.Supp.3d 1 (D.D.C. Mar. 28, 2025) ....................38

*New York v. McMahon*,
784 F. Supp. 3d 311 (D. Mass. 2025) ....................37, 38

*Owner–Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ....................11

*Perez v. Mrtg. Bankers Ass'n*,
575 U.S. 92 (2015)....................17, 25, 32

*Petry v. Block*,
737 F.2d 1193 (D.C. Cir. 1984) ....................32

*Pres. & Fellows of Harvard Coll. v. HHS*,
798 F. Supp. 3d 77 (D. Mass. 2025) ....................10, 11, 35

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
374 F.3d 1209 (D.C. Cir. 2004) ....................15, 17, 18

*RENEW Ne. v. U.S. Dep't of Interior*,
2026 WL 1078282 (D. Mass. Apr. 21, 2026) ....................41

*Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*,
624 F.3d 489 (D.C. Cir. 2010) ....................21

**Cases—continued**

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021) ........ 22, 23

*Sw. Bell Tel. Co. v. FCC*,
28 F.3d 165 (D.C. Cir. 1994) ........ 13

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) ........ 19

*U.S. Telecom Ass'n v. FCC*,
359 F.3d 554 (D.C. Cir. 2004) ........ 22

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 34

*Venezuelan Ass'n of Mass. v. USCIS*,
__ F. Supp. 3d ___, 2026 WL 2255272 (D. Mass. Aug. 5, 2026) ........ 42

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,
788 F. Supp. 3d 70 (D. Mass. 2025) ........ 38

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) ........ 41

*Woonasquatucket River Watershed Council v. USDA*,
__ F.4th ___, 2026 WL 2279789 (1st Cir. Aug. 7, 2026) ........ 2, 42, 43

*Xiaomi Corp. v. Dep't of Defense*,
2021 WL 950144 (D.D.C. 2021) ........ 38

**Statutes**

5 U.S.C.
§ 706 ........ 42, 43
§ 705 ........ 2, 10, 42, 43
§ 553(b)-(c) ........ 32

8 U.S.C.
§ 1101(a)(15) ........ 3
§ 1101(a)(15)(F) ........ 3, 34
§ 1184 ........ 3

**Rules, regulations, and executive documents**

*Admission of Nonimmigrant Students for Duration of Status*,
43 Fed. Reg. 32306 (July 26, 1978) ........ 5

*Establishing a Fixed Time Period of Admission and an Extension of Stay (EOS) Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070 (Aug. 28, 2025) ........ 8, 9

**Rules, regulations, and executive documents—continued**

*Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976 (July 17, 2026) .........................................5, 10, 12-14, 16, 18-20, 22-24, 26-31,33-34, 40-41

*Patient Protection and Affordable Care Act*, 89 Fed. Reg. 26218 (Apr. 15, 2024) .........................................17

43 Fed. Reg. 54618 (Nov. 22, 1978).........................................4

50 Fed. Reg. 42006 (Oct. 17, 1985).........................................4

8 C.F.R.
§ 214.2(i).........................................4
§ 214.2(f)(1)(i)(A).........................................3
§ 214.2(f)(1)(iii).........................................4
§ 214.2(f)(5)(i).........................................4
§ 214.2(f)(5)(iv).........................................4
§ 214.2(f)(7)(i).........................................4
§ 214.2(f)(8).........................................5
§ 214.2(f)(10).........................................5
§ 214.2(j)(1)(i).........................................3
§ 214.2(j)(1)(ii).........................................4
§ 214.2(j)(1)(vii).........................................4
§ 214.2(j)(1)(viii).........................................4
§ 214.3(*l*)(1)(ii).........................................4
§ 235.1(f)(1).........................................4
§ 235.1(h)(1).........................................4

Exec. Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993).........................................11, 22, 32, 33

## INTRODUCTION

Since 1978, international students in F-1 status studying at U.S. institutions have been admitted to the country for their "duration of status"—that is, until their academic studies are complete—rather than for a fixed duration. The same rule has applied to students, scholars, and researchers in J-1 status, and representatives of foreign-based media outlets in I-1 status, for decades. This flexible and welcoming approach has allowed U.S. higher education to flourish—education is among the Nation's top services exports—and has helped power American innovation and productivity, as those students and scholars both perform pathbreaking research while in school and, if they choose to remain in the United States to work after graduation, contribute their talents to leading American companies, or even start their own. Of America's billion-dollar startup "unicorns," twenty-five percent have at least one founder who first came to the United States as an international student. *See* Compl. ¶ 80.

Now, however, the Department of Homeland Security (DHS) has changed its approach. In a final rule issued on July 17, DHS has replaced duration of status with a system of fixed-term admissions, capped at four years—even for Ph.D. students, whose programs almost always last longer than four years, and notwithstanding that even the median undergraduate takes slightly longer than four years to graduate. A student requiring more than four years to complete his or her studies will need to submit a discretionary, unappealable extension-of-stay request to already historically overburdened government administrators at DHS. And the rule does not stop there: it purports to flatly prohibit international students from seeking a second degree at the same or lower level compared to the degree already completed—notwithstanding the many legitimate cases in which that path is professionally valuable, like a J.D. followed by an LL.M. in taxation—and prohibits graduate students from changing educational objectives or transferring between institutions.

As many commenters pointed out, this change will have the unavoidable effect of making the United States a less attractive destination for the world's top students. Research conducted by

Plaintiff NAFSA revealed that some 49% of current international students stated that they would not have enrolled under the system DHS just adopted, and 16% fewer prospective students indicated likelihood to enroll in the United States under that scheme. Translated into dollars, the loss for the Nation is massive: As an expert economic analysis in the comment record explained, even conservatively assuming only a 10% reduction in international student enrollment, the negative effects on the American economy are likely to reach *tens of billions* of dollars each year.

DHS was presented with all this evidence, and more. Even in an unduly compressed, 32-day comment period, some 22,000 commenters responded, overwhelmingly supporting duration of status, pointing out serious flaws in DHS's reasoning—which relies on essentially anecdotal evidence to support entirely unquantified benefits—and offering multiple alternatives that would achieve DHS's stated objectives (which relate to purported "fraud and abuse" and national-security concerns) with far less harmful effects on students, universities, and the American economy. Yet DHS rejected each one, forging ahead with its plan to fix a system that was not broken—to the tune of hundreds of millions of dollars per year just in the costs that the agency *did* acknowledge.

The Final Rule is arbitrary, capricious, and contrary to law. The Court should stay it pursuant to Administrative Procedure Act (APA) Section 705—authority that the First Circuit recently reaffirmed. *See Woonasquatucket River Watershed Council v. USDA*, __ F.4th ___, 2026 WL 2279789 (1st Cir. Aug. 7, 2026). Alternatively, it should issue a preliminary injunction enjoining the government from enforcing the Final Rule against any nonimmigrants affiliated with Plaintiffs or their members. Or, recognizing that the APA claims here are legal in nature and require no factual development, it should simply grant summary judgment and vacate the Final Rule.

## BACKGROUND

### A. Statutory and regulatory background

#### *1. The F, J, and I nonimmigrant categories*

The Immigration and Nationality Act (INA) governs admission of noncitizens into the U.S.

*See generally* 8 U.S.C. §§ 1101 et seq. The INA creates categories of nonimmigrant status for noncitizens to enter the U.S. temporarily, for a specific purpose. *See id.* §§ 1101(a)(15), 1184.

The Final Rule concerns three categories of nonimmigrant status, typically discussed with reference to the corresponding visa. An **F Visa** covers a "bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study" at an American education institution, provided the nonimmigrant "ha[s] a residence in a foreign country which he has no intention of abandoning." 8 U.S.C. § 1101(a)(15)(F). A **J Visa** covers a "bona fide student, scholar, … professor, research assistant, … or other person of similar description, who is coming temporarily to the United States … for the purpose of teaching, instructing or lecturing, studying, … conducting research, … or receiving training." *Id.* § 1101(a)(15)(J). An **I Visa** covers "a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation." *Id.* § 1101(a)(15)(I). Each category makes status available for the primary recipient (*e.g.* for a student, F-1 status) as well as dependent children and/or spouse (*e.g.* F-2 status).

After an international student is admitted to a school, the school's Designated School Official (DSO) completes Form I-20, which certifies the student's academic eligibility for F-1 status, program of enrollment, and program end date. *See* 8 C.F.R. § 214.2(f)(1)(i)(A). The student must also complete Form DS-160, which governs all nonimmigrant visas, and interview with a consular officer, who determines whether to approve the F-1 visa. *Id.* § 214.2(f)(1)(ii).

Obtaining J-1 status is similar. Once the nonimmigrant is accepted into a J visa program (relevant here, as a student, visiting professor, postdoctoral fellow, medical resident, etc.), the school's Responsible Officer (RO) completes Form DS-2019, which certifies the program and anticipated end date. 8 C.F.R. § 214.2(j)(1)(i). The nonimmigrant must complete Form DS-160 and interview with a consular officer, who determines whether to approve the J-1 visa. *Id*. To obtain an I visa, the nonimmigrant completes Form DS-160, attests to being a representative of

foreign media, and is interviewed by a consular officer. *See generally* 8 C.F.R. § 214.2(i).

Once a visa is awarded, the noncitizen must present at a port of entry, where a Customs and Border Protection officer determines if the nonimmigrant "is entitled … to enter the United States." 8 C.F.R. § 235.1(f)(1). Upon admission, a nonimmigrant is issued Form I-94, which sets forth the "terms of admission" (*id.* § 235.1(h)(1)), including the Admit Until Date (AUD).

***2. The duration of status rule***

All three categories of nonimmigrant status have long been subject to the "duration of status" (D/S) rule. *See, e.g.,* 43 Fed. Reg. 54618, 54620 (Nov. 22, 1978) (establishing D/S for F nonimmigrants); 50 Fed. Reg. 42006, 42007 (Oct. 17, 1985) (similar, for J and I nonimmigrants). Rather than a fixed period, the nonimmigrant is admitted for the duration of their program. For example, an F student may remain for the "time during which [the] F-1 student is pursuing a full course of study at an educational institution … , or engaging in authorized practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i). A nonimmigrant with D/S "is not required to apply for extension of stay" while maintaining status. *Id.* § 214.2(f)(7)(i). Under the preexisting rules, F nonimmigrants had a 60-day grace period to depart. *Id.* § 214.2(f)(5)(iv). For J nonimmigrants, the grace period is 30 days. *Id.* § 214.2(j)(1)(ii).

The government monitors F and J nonimmigrants via the Student and Exchange Visitor Information System (SEVIS). *See, e.g.,* 8 C.F.R. §§ 214.2(f)(1)(iii), (j)(1)(vii). SEVIS is a web-based database managed by DHS to track F and J nonimmigrants. DHS primarily relies on DSOs and ROs to ensure that the nonimmigrant's information in SEVIS remains up-to-date, including if they transfer schools or educational programs. *Id.* § 214.3(*l*)(1)(ii); *id.* § 214.2(j)(1)(viii).

D/S ensures that those with F, J, and I status—of whom there are over one million present at any time—may remain in the U.S. until they have completed their purpose for being here, without overwhelming immigration officials with paperwork. For example, D/S enables an F-1 student to attend their program to completion, transition schools or programs, or complete OPT—that is,

practical training through time-limited post-graduation employment—without needing to apply for an extension of stay. 8 C.F.R. §§ 214.2(f)(8), (10). Indeed, the immigration agency first proposed D/S "to reduce the Service adjudications workload," which would "result in dollar and manpower savings to the Government and the Service." *Admission of Nonimmigrant Students for Duration of Status*, 43 Fed. Reg. 32306, 32306-32307 (July 26, 1978).

### B. Factual and procedural background

#### *1. Importance of F, J, and I nonimmigrants to the U.S. Economy*

There are currently approximately 1.6 million students and dependents in F status, 504,000 J nonimmigrants, and 24,000 I nonimmigrants. 91 Fed. Reg. at 45116. These individuals make countless contributions to the Nation, not to mention their individual academic communities.

International students are essential to the U.S. economy, starting with the economic output generated by their presence here. Serving more than a million international students annually, education is the U.S.'s seventh-largest service export. *See* Ex. 1, Presidents' Alliance cmt. 12 & n.25. In 2023-2024, international students contributed $44 billion to the economy and directly supported nearly 400,000 jobs, one job for every three international students. *Id.* at 12 & n.24; *see also* Ex. 2, attachment, Michael Clemens et al., *Brain Freeze: How International Student Exclusion Will Shape the Stem Workforce and Economic Growth in the United States* at 6 (Sept. 28, 2025) (international education "contribut[ed] $54.8 billion to the US economy in 2024").

Beyond that, international students and scholars are engines of innovation. One analysis cited by commenters noted that "immigrants founded 44% of all 'unicorn' billion-dollar startup companies from 1997-2019," and that "[o]f the immigrants who founded high-potential startups backed by venture capital, 75% came to the United States as international students." Ex. 2 at 6. Additionally, 70% of U.S. AI firms with significant venture capital support "have a co-founder that is an immigrant who first came to the US as an international student at a US university." *Id.* at 7. As one university commented, "[a]pproximately 44% of immigrant Nobel Laureates in

academic disciplines attended U.S. institutions for their highest educational degree" and "[i]n 2024, about 41% of patents had at least one foreign-born, U.S.-based inventor," more than half being educated in the U.S. Ex. 3, Yale Univ. cmt. 5 & nn. 6, 8.

International students also support innovation and research on campus and through OPT. As one commenter noted, "[o]ver 55 percent of all international students are STEM majors," including large majorities in key disciplines like electrical engineering (74%), computer science (72%), and industrial and manufacturing engineering (71%). Ex. 4, Saumsiegle cmt. 6. Many innovative companies thus rely on students participating in OPT for high-skilled talent. *E.g.*, *id*.

The impact of international students and scholars goes beyond the economy. They also contribute invaluable perspective that enriches the educational environment, and, as one study found, helped U.S. students develop "greater self-confidence, leadership skills, quantitative abilities, and cross-cultural understanding." Ex. 5, *Fixed Terms, Unstable Futures: An Analysis of the Proposed Elimination of 'Duration of Status' and its Impact on U.S. Higher Education and National Competitiveness* at 14 & n.13 (Sept. 24, 2025). Indeed, a Presidents' Alliance survey found that "80% of responding faculty members with experience supervising international students and scholars indicated they are crucial for enhancing research productivity and output and cross-cultural communication and collaboration" and 75% reported that "[i]nternational students and scholars also play a key role in bringing a global or comparative perspective to the classroom and in mentoring other students, researchers and professionals." Ex. 1, Presidents' Alliance cmt. 13.

F and J nonimmigrants also make important contributions to their communities through clinical and field work. For example, "approximately 16,000 medical residents and fellows were in J-1 status in 2024, comprising roughly 10% of resident physicians in the US." Ex. 6, Emory Univ. cmt. 8 & n.8. These J-1 physicians "often serve in rural and medically underserved areas of the US," and often "go on to pursue additional training in medical specialties that are much needed in the US," meaning they "serve a critical role in the US healthcare infrastructure." *Id.* at 8 & n.9;

*see also* Ex. 7, Intealth cmt. 4 ("More than 70% of J-1 physicians train in hospitals located in communities ranked as medium- to high-vulnerability by the CDC … meaning they provide essential care for patients facing higher rates of poverty, disability, lack of insurance, and other barriers to health."). One Massachusetts hospital system noted it has "1,500+ Research Scholar, Specialist, and Short-term Scholar J-1 visa holders at our medical centers at any given time," and "100+ Alien Physician J-1s … training and providing medical care as residents and clinical fellows across a wide range of specialties." Ex. 9, Mass General Brigham cmt. 1.

Finally, international students bridge nations and peoples. As a commenter put it: "[w]hen these students complete their education and return home, they carry with them more than just degrees—they carry a unique, first-hand understanding of America. Their time in the U.S. fosters an appreciation for the nation's values, institutions, and culture of excellence. … Many of these graduates become informal ambassadors, spreading a positive, deeply informed message about American society, innovation, and educational leadership." Ex. 10, Monroe Univ. cmt. 2. Indeed, "nearly 300 current or former heads of government have studied at American universities" and "[t]he numbers of business, cultural and political leaders who have studied at U.S. schools are incalculable." Ex. 11, Anonymous comment at 2 (quoting Joshua Kim, *Higher Ed Exports and 'Trade Is Not a Four-Letter Word'*, Inside Higher Ed (February 10, 2020).

Commenters also detailed international journalists' significant contributions to the U.S. These include both direct economic contributions as wage earners and taxpayers, plus world-facing "coverage of the country, its media, culture and industry, [which] contribute strongly to the maintenance of 'Brand USA.'" Ex. 54, Foreign Press Association cmt. 1. U.S. persons also benefit from their coverage, which helps to "fill the gap … when the number of domestic journalists working is at a 20-year low," and "especially in languages other than English." Ex. 51, The NewsGuild-CWA cmt. 4. And because of reciprocity arrangements, their presence ensures that American journalists will be welcomed into other countries. *See, e.g.,* Ex. 55, New York Times cmt. 2-3.

### *2. The Rulemaking*

#### *a. The Proposed Rule and public response*

**1.** On August 28, 2025 DHS announced *Establishing a Fixed Time Period of Admission and an Extension of Stay (EOS) Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070 (Aug. 28, 2025) (the Proposed Rule). In the Proposed Rule, DHS proposed to eliminate duration of status and replace it with fixed periods of admissions for F, J, and I nonimmigrants. *Id.* at 42,070. For F and J status, the fixed period of admission would be the earlier of 4 years or the program end date on the nonimmigrant's Form I-20 or DS-2019. *Id.* at 42,073. For I status, the maximum period of admission would be 240 days. *Id*. DHS also proposed to shorten the 60-day departure grace period for F students to 30 days. *Id.* To extend their stay beyond the fixed period, nonimmigrants would have to request an Extension of Stay (EOS) using Form I-539, entailing a filing fee, the collection biometric information, and potentially an interview. *Id.*; *see also id.* at 42,093. Whether to grant the extension would be in the immigration official's discretion and unappealable. *Id.* at 42,107. The student would have to demonstrate a "compelling academic reason" to merit an extension—replacing the prior standard of "normal academic progress." *Id.* at 42,091-42,092.

The Proposed Rule also proposed significant restrictions on academic mobility for international students. DHS proposed to prohibit any student who completes their academic program from enrolling in another at the same or lower level. *Id.* at 42,073. For example, a student who completes a doctoral degree could not enroll in another doctoral program or a master's program. Further, the rule would prohibit graduate students from transferring schools or academic program. *Id*. Undergraduate students would be barred from transferring or changing majors during their first year. *Id*.

DHS cited two primary rationales for its proposed changes. First, it cited national security concerns, highlighting anecdotes of F and J nonimmigrants conducting espionage outside of military bases. 90 Fed. Reg. 42078-42079. Second, it claimed the proposed rule was necessary to

prevent fraud and abuse of nonimmigrant status, again relying on anecdotes of particular F-1 students who resided in the U.S. for many years. *Id.* at 42077-42078. DHS argued that eliminating D/S would allow "DHS to periodically and directly assess whether these nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws, as well as allow DHS to obtain timely and accurate information about the activities they have engaged in and plan to engage in during their temporary stay in the United States." *Id.* at 42100-42101.

DHS, however, did not make any effort to quantify these factors, instead citing only "qualitative benefits for national security" and "deter[ring] fraud and abuse." 90 Fed. Reg. at 42102. On the other hand, DHS estimated that the Proposed Rule would result in annualized costs of $390.3 to $392.4 million for nonimmigrants to file EOS requests and for universities and other stakeholders to familiarize and adapt to the new rule and process EOS requests. *Id.* at 42101-42102.

DHS allowed just 32 days of public comment on this major change. 90 Fed. Reg. at 42070.

**2.** Nearly 22,000 commenters weighed in, the vast majority in opposition. They explained that replacing D/S with a fixed term would deter international students from coming to the U.S., as shown by survey data, experience, and student feedback. *E.g.* Ex. 1, Presidents' Alliance cmt. 14; Ex. 15, NAFSA cmt. 22-23. Any such decline, they warned, would deprive the economy of international students' contributions and increase costs for universities. *See, e.g.*, Ex. 15, NAFSA cmt. 23-24; Ex. 1, Presidents' Alliance cmt. 15-17; Ex. 16, Ass'n of Am. Univs. (AAU) cmt. 13-15; Ex. 14, Att'ys Gen. cmt. 11-14, Ex. 22, Penn cmt. 1-2. Commenters also warned the Proposed Rule's restrictions on academic mobility—particularly for graduate students—"would disrupt longstanding and essential graduate education practices" and were incompatible with the realities of higher education. Ex. 15, NAFSA cmt. 15; *see, e.g.,* Ex. 18, Univ. of Rochester cmt. 5.

To avoid these harms, commenters proposed numerous alternatives that would advance DHS's purported aims more effectively without broadly disruptive changes, from making improvements to SEVIS (*see, e.g.,* Ex. 15, NAFSA cmt. 7-11) to adopting a fixed term based on each

student's anticipated program end date with no *ex ante* cap (*see, e.g.,* Ex. 19, Univ. of Tex. at Dallas cmt. 2). Commenters also criticized the truncated public comment period and requested a period more appropriate for the significance and complexity of the Proposed Rule. *See, e.g.* Ex. 15, NAFSA cmt. 4-5; Ex. 1, Presidents' Alliance cmt. 2-3.

#### ***b. The Final Rule***

On July 17, 2026, DHS published *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976 (July 17, 2026) (the Final Rule). DHS adopted the Final Rule with very few substantive changes. Most significantly, the Final Rule eliminates D/S and adopts the restrictions on academic mobility discussed above. *Id.* at 44978-44979. The preamble maintained essentially the same cost-benefit analysis, aside from modestly increasing the estimated costs. *Id.* at 45003. The Final Rule's effective date is September 15, 2026.

## STANDARD OF REVIEW

"The same standard governs" a request to stay agency action under Section 705 of the APA and a motion for preliminary injunction. *Ass'n of Am. Universities v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025). In either case, "the court considers four factors: '(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions … ; and (4) the effect (if any) of the court's ruling on the public interest.'" *Doe v. Noem*, 817 F. Supp. 3d 27, 44 (D. Mass. 2026).

Alternatively, in APA cases "[s]ummary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Pres. & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 103 (D. Mass. 2025) (quotation marks omitted; alteration incorporated). In that case, "the Court's review is ordinarily limited to the administrative record, and the entire case on review

is a question of law." *Id.* at 102-103 (quotation marks, citation omitted; alterations incorporated).[1]

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to show that the Final Rule is arbitrary and capricious. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021)). "[A]lthough judicial review of agency action is 'narrow' in scope, [the Court] must still determine if the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). DHS's action fails that standard many times over.

#### A. The Final Rule is arbitrary and capricious.

##### *1. DHS's conclusion that the Rule's benefits outweigh its costs was irrational and unreasoned.*

As the Supreme Court has explained, "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015)*; see also* Exec. Order No. 12866, 58 Fed. Reg. 51735, 51758 (Sept. 30, 1993). Thus, courts "will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses." *City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007); *see, e.g.*, *Owner–Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007) (vacating rule for an unexplained cost-benefit methodology). Rather, "[a] regulation is arbitrary and capricious 'if the agency failed to consider an important aspect of the problem,' which

[1] Although the government has not yet produced an administrative record here, the only evidence relied on by Plaintiffs (apart from Plaintiff and member declarations demonstrating standing and irreparable injury) consists of material drawn from the public comment record. *See* Cover Mot. at 2 (explaining appropriateness of pre-answer summary judgment in APA cases).

'includes … considering the costs and benefits.'" *Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30, 44 (D. Me. 2025) (quoting *Mex. Gulf Fishing Co. v. U.S. Dept. of Com.*, 60 F.4th 956, 973 (5th Cir. 2023)); *accord, e.g.*, *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 53-54 (D.D.C. 2019) (action was "arbitrary and capricious because the government failed to consider all the relevant factors when considering the cost of the regulation").

DHS's cost-benefit analysis fails these standards: DHS failed to adequately account for the costs of the Final Rule, and did not rationally balance those costs against its supposed benefits.

**Costs.** DHS acknowledged that the Final Rule has significant costs, including at least $443 million in compliance and implementation costs annually. 91 Fed. Reg. 45117. But even that figure fails to include orders-of-magnitude greater costs that DHS unreasonably refused to quantify, including the consequences of declining international enrollment caused by the Final Rule. *See id.*

Heavily cited survey data in the comment record shows that many international students will not enroll in U.S. colleges and universities if D/S is eliminated. *See, e.g.* Ex. 15, NAFSA cmt. 22-23 (citing *Surveys on International Talent Pipelines*, Institute for Progress (IFP) and NAFSA: Association of International Educators, (September 15, 2025), https://perma.cc/QLV3-M6HF). This NAFSA/IFP survey of 1,650 current or prospective international students demonstrated that "49% of respondents who were current international students studying in the United States said they would not have enrolled in the first place had D/S been replaced with a fixed period of admission" and "16% fewer [prospective student] respondents said they were likely to enroll in U.S. programs if D/S were replaced with a fixed period of admission." *Id.*

Commenters explained that the resulting decline in enrollment would cost the economy billions. A scholarly analysis by an economist and two immigration experts showed that "reducing the number of F-1 graduates by 10% because of a new fixed period of admissions rule would itself reach an ***annual loss of as much as $72-145 billion*** by ten years into the future." Ex. 21, Clemens cmt. 5 (emphasis added); *see also* Ex. 2, Clemens *et al.*, *Brain Freeze* (underlying economic

analysis). As they explained, the estimated 10% enrollment reduction was actually "quite conservative," both since the NAFSA/IFP survey had predicted a significantly greater disenrollment effect and because the Proposed Rule rendered uncertain students' confidence in OPT, while the survey also showed that "reducing access to OPT will [itself] have a very large and negative impact on future international student enrollments." Ex. 21, Clemens cmt. 5-6. Many commenters relied on this evidence to explain that DHS's accounting of costs was massively underinclusive.[2]

Despite "acknowledg[ing] that the rule may have an impact on U.S. competitiveness in attracting foreign students and exchange visitors" and that "[a]ny reduction in enrollment could potentially diminish the economic benefits that foreign students and exchange visitors contribute to the U.S. economy," DHS refused to meaningfully account for these costs. 91 Fed. Reg. at 45086. It claimed that "survey responses often reflect hypothetical preferences rather than actual behavior, and such results may overstate the likelihood of enrollment declines" (*id.* at 45,088), but never questioned the rigor of the survey or of the Clemens analysis, and never explained why its vague generalization about surveys discounts the empirical evidence on which commenters relied. An agency cannot "arbitrarily disbelieve credible evidence." *Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 279 (1994); *see also Sw. Bell Tel. Co. v. F.C.C.*, 28 F.3d 165, 172 (D.C. Cir. 1994) ("[A]n agency can[not] reject an econometric study merely by observing that it employed unproven assumptions.").

Even more tellingly, even if DHS were right that the NAFSA/IFP survey results "may overstate the likelihood of enrollment declines" (91 Fed. Reg. at 45088), the Clemens study *already accounts for overstatement*—conservatively assuming a 10% international enrollment decline, while the NAFSA study predicts a decline of 16-49%. *Compare* Ex. 21, at 5, *with* Ex. 15, at 22-23. And even if that conservative 10% were still overstated, the immense magnitude of the resulting harms ($72-145 billion annually) means that harms would still be significant even with

2 *E.g.*, Ex. 15, NAFSA cmt. 23; Ex. 16, AAU cmt. 13-15; Ex. 20, Fragomen cmt. 3-4.

less deterrence. In short, DHS's speculation that the survey results "may [be] overstate[d]"—itself based on no contrary data—cannot logically justify treating the resulting economic harms as *zero*.

Apart from that speculation, DHS contended that "[e]nrollment decisions are driven by a wide variety of factors beyond EOS costs, including perceived quality of education, total cost of education, and job opportunities offered by the education." *Id.* But that is a complete non sequitur. Commenters' point about deterrence was (obviously) not primarily about the direct costs of an EOS on students—*i.e.*, the filing fee—but the *uncertainty* brought on by hinging the fate of the student's continuing studies on a discretionary, non-appealable EOS decision by DHS personnel. *See, e.g.,* Ex. 1, Presidents' Alliance cmt. 13. That was arbitrary and capricious. *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988) ("No matter how rudimentary a claim, an agency is not entitled under the APA to respond with a non sequitur."). Further, eliminating D/S affects every factor DHS mentioned, including education quality and job opportunities. *Supra* at 8-10.

Based on these arguments, DHS elected to describe the cost of disenrollment only "qualitatively" (91 Fed. Reg. at 45088)—though even that is a misnomer. DHS referred to its discussion of enrollment behavior in the Final Rule's Regulatory Impact Analysis (RIA). *Id.*; *see also* Ex. 60, RIA, at 97-100. And in the RIA, DHS made no effort to describe declining enrollment as a *cost*; all it offers is several paragraphs of unsupported speculation about why the enrollment effects might be negligible. For example, DHS asserted without any support that "U.S. educational programs remain attractive to international students," notwithstanding potential deterrence effects from eliminating D/S. RIA at 97. But that does not explain why DHS is justified in disregarding an economic impact analysis premised on a 10% decline: The 10% figure reflects that a large majority of international students (90%) *will continue* to find an American education attractive. DHS's impression that American education remains attractive is not a valid reason to entirely disregard cost estimates in the comment record that reflect the same assumption.

In the RIA, DHS then made a series of one-off, unsupported observations that likewise

overlook the comment record: DHS noted that "[t]he market for foreign students is shaped by academic offerings and opportunities in the United States relative to other countries" (RIA at 97) without acknowledging commenters' point that losing D/S puts the U.S. at a competitive disadvantage. *E.g.,* Ex. 22, Penn cmt. 2. DHS next noted a recent decline in F-1 visa applications and issuances "independent of this regulation" (RIA at 97), again disregarding commenters' point that the broader trend of declining international enrollment *supports* the idea that eliminating D/S would have similar effect. *E.g.*, Ex. 1, Presidents' Alliance cmt. 13. Finally, DHS speculated that "the effect of this rule on enrollment could be short-term" because "EOS uncertainty concerns will decline" as students and DSOs become familiar with it. RIA at 98. But, again, concerns about the uncertainty are not primarily related to *unfamiliarity* with the rule, but to the uncertainty inherent in gambling years' worth of study on the outcome of a discretionary, unappealable EOS request. *See, e.g.*, Ex. 1, Presidents' Alliance cmt. 13. DHS never contended with that uncertainty.

The upshot of the "qualitative description" in the RIA is to pay the thinnest of lip service to the notion that the Final Rule will have a disenrollment effect, while in actuality disregarding the cost of disenrollment entirely. DHS's approach is arbitrary and capricious: "The mere fact that the magnitude of [a regulation's consequences] is uncertain is no justification for disregarding the effect entirely." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004); *see also GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1200 (D.C. Cir. 2023) ("[A] reasoned decision would explain why any unquantified benefits cannot reasonably be quantified"). That is, an agency cannot simply "assume away" even difficult-to-quantify effects (*Pub. Citizen*, 374 F.3d at 1219), but DHS did so here, disregarding "an important aspect of the problem." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 304 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026). In other words, "[w]hen the impact of a cost or benefit is 'both evident and massively significant,' that cost or benefit 'cannot be dismissed without further inquiry,' even if its value is 'unquantified.'" *Nat'l Cmty. Reinv. Coal. v. CFPB*, 2022 WL 4447293, at *29 (D.D.C.

Sept. 23, 2022) (quoting *Md. People's Couns. v. FERC*, 761 F.2d 768, 776 (D.C. Cir. 1985)). Having acknowledged an enrollment effect, DHS cannot entirely disregard that cost by first branding it "difficult to quantify" and then dismissing it in the qualitative discussion.

DHS's approach is also internally inconsistent. DHS accepted "that the rule may have an impact on U.S. competitiveness in attracting foreign students." 91 Fed. Reg. 45086. Yet, despite this acknowledgment, DHS effectively treated the effect as non-existent in its cost-benefit analysis. Courts have rejected such "internal[] inconsisten[cies]" in a cost-benefit analysis. *INGAA v. PHMSA*, 114 F.4th 744, 755 (D.C. Cir. 2024) (rejecting cost-benefit analysis where agency said there were no "compliance activities or costs" but also "while there may be compliance costs, precisely how much those compliance costs are is hard to determine"); *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023) (rejecting an internally contradictory agency cost-benefit analysis).

**Benefits.** DHS also failed to estimate the Final Rule's purported benefits in a way that would allow the agency to meaningfully weigh them against even the acknowledged costs. *See, e.g.*, *Chamber of Com.*, 85 F.4th at 779 (agency must "show that" the rule addresses "a genuine problem," or else the purported benefits are "inadequately substantiated."). DHS identified two primary benefits: protecting national security and preventing fraud and abuse. 91 Fed. Reg. at 45117. But it chose only to "qualitative[ly]" describe them. *Id.*

DHS's approach was arbitrary and capricious. While Circular 4-A (on which DHS relied) acknowledges that agencies may describe some benefits qualitatively, they "should monetize quantitative estimates *whenever possible*," and "present all available quantitative information" even when "monetization is *impossible*." Circular 4-A at 27 (emphasis added). And when an agency is "not able to quantify the effects, [it] should present any relevant quantitative information along with a description of the unquantified effects." *Id.* DHS never did so. It identified no principled basis by which it—or this Court—could meaningfully compare costs and benefits. Despite

identifying hundreds of millions of dollars' worth of annual costs—an extreme underestimate (*see supra* at 12-16)—it quantified *zero* dollars' worth of benefits, yet adopted the rule anyway.

There was no plausible defense for forgoing *any* quantification. *See Pub. Citizen*, 374 F.3d at 1219 ("The mere fact that the magnitude of time-on-task effects is uncertain is no justification for disregarding the effect entirely."). Nothing about the nature of the claimed benefits defies measurement in dollars. Circular A-4 calls for qualitative description of "intangible" benefits like "aesthetic beauty." But national security and the deterrence of fraud can readily be monetized. *See, e.g. Patient Protection and Affordable Care Act*, 89 Fed. Reg. 26218, 26302-26303 (Apr. 15, 2024) (estimating "expected cost savings" of a policy change related to program integrity).

In reality, DHS's refusal to quantify benefits likely owes to the fact that eliminating D/S will have little effect on national security or program integrity, as discussed immediately below. *See infra* at 18-21. But that there may *be no* benefit is not the same as the benefits being *unquantifiable*. *Cf. Pub. Citizen,* 374 F.3d at 1218 (rejecting agency's decision to "disregard[ ]" a factor when it claimed it "did not have sufficient data" to quantify it). DHS cannot evade its duty to show that its approach outweighs hundreds of millions of dollars in acknowledged costs (truly, billions) by "dismiss[ing] without further inquiry" the balancing of costs and benefits, "even if [their] value is 'unquantified.'" *Nat'l Cmty. Reinv. Coal.*, 2022 WL 4447293, at *29.

**Comments.** DHS's approach is further arbitrary and capricious because many commenters pointed out these flaws, yet DHS failed to offer an adequate response. *See, e.g., Perez v. Mrtg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment."); *infra* at 25-32; *see* Ex. 25, AFT Local 6516 cmt. 7 (the RIA "reveals a fundamental pattern of acknowledging significant costs while refusing to quantify them," which "renders the entire economic justification invalid."); Ex. 24, AILA cmt. 2 (criticizing the "large proportion of costs based on speculative qualitative assessments rather than concrete data" and noting that "DHS failed to provide any analysis of

downstream economic impacts"); Ex. 15, NAFSA cmt. 6 ("DHS's 'feeling' that ending D/S might result in uncovering high rates of noncompliance, fraud, or national security risks is an insufficient basis on which to impose this heavy additional administrative burden on F and J nonimmigrants").

DHS's response was conclusory. While "acknowledg[ing] that not all costs of the rule are quantified in the regulatory impact analysis," DHS asserted it was not *required* to quantify them "when a regulation's impact is difficult to quantify." 91 Fed. Reg. 45080. But, again, Circular A-4 says to do so only when quantifying is "impossible" and should present "any relevant quantitative information along with a description of the unquantified effects … [and] provide a discussion of the strengths and limitations of the qualitative information." DHS never did. The agency simply declared quantification of both costs and benefits "difficult" and stopped there. That was arbitrary and capricious (*Pub. Citizen*, 374 F.3d at 1219; *GPA Midstream*, 67 F.4th at 1200), and it certainly is not an adequate response to the detailed comments pointing out the flaws in DHS's reasoning.

***2. Eliminating D/S is not a rational response to the problems identified.***

An agency must reasonably articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. That means when an agency has identified a particular issue to justify its action, it must provide a reasoned explanation for why its chosen course would resolve that issue. In other words, an agency must "draw a 'rational connection' between the problem it has identified and the solution it has chosen." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 707 (2020) (Kagan, J., concurring).

Here, DHS offered two rationales for the Final Rule: (1) to prevent national security threats, such as nonimmigrants conducting espionage and (2) to prevent fraud and abuse. But it articulated no reasonable connection between the Final Rule and either interest.

*First,* regarding national security, DHS cited a series of anecdotes in which F and J nonimmigrants were involved in "illegal activities pertaining to U.S. military bases," largely by taking photographs of them. 91 Fed. Reg. at 44985. But DHS drew no rational connection between these

threats and the Final Rule. Under the Final Rule, nonimmigrants can be present in the U.S. for up to four years before any "predetermined" interaction with an immigration official. That is plenty of time for any national security threat to come to fruition; indeed, it appears that *none* of the incidents identified in the Final Rule would have been prevented by a four-year fixed period of admission. For example, DHS's lead example cites a Russian agent who obtained an F-1 visa under false pretenses and was present in the U.S. for only two years. 91 Fed. Reg. at 44985.

The comment record pointed out these obvious flaws in DHS's reasoning: "[A] true threat actor could easily plan their activities within a 4-year window or file an extension with perfectly clean paperwork. Meanwhile, thousands of innocent students would be treated as potential threats by default." Ex. 41; *see also, e.g.*, Ex. 40, NFAP cmt. 2 ("Under DHS's reasoning, if the proposed rule is finalized, all a national security threat needs to do to avoid scrutiny is to complete their academic program quickly enough to prevent the need to file for an extension."); Ex. 42, Hamilton Coll. cmt. (similar). Yet in response, DHS asserted only that it "disagrees with the general premise of these comments," noting that it "provided specific examples of fraud, national security concerns, and nonimmigrant students remaining in the United States for lengthy periods of time." 91 Fed. Reg. at 44995. That response says nothing about commenters' fundamental point that these anecdotes do not logically support ending D/S. And "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated on unrelated grounds*, 142 S. Ct. 1665 (2022); *accord Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (same, quoting *Gresham*).

*Second*, regarding fraud and abuse, DHS again relied mostly on scattered anecdotes, identifying several F-1 students who had "enroll[ed] in schools for extended periods of time." 91 Fed. Reg. at 44983. But DHS never indicated that it had found any of these isolated incidents to be fraudulent and, regardless, reliance on such a small sample is not a rational ground for making a program-wide change affecting millions. DHS also pointed to "over 2,100 aliens who first entered

as F–1 students between 2000 and 2010 and remain in active F–1 status as of April 6, 2025." *Id.* But, as commenters noted, this is a tiny fraction of 1.6 million active SEVIS records DHS considered—"mean[ing] that the rate of abuse is infinitesimally small." Ex. 36, Nat'l Ass'n of Mfrs. cmt. 4. DHS, in response, failed to explain why a system-wide overhaul was justified.

DHS also noted that "77,000 F–1 students … have spent more than 10 years in student status since SEVIS was implemented in 2003." 91 Fed. Reg. at 45103. This statistic is even less compelling. It is, again, small compared to the millions of nonimmigrants present—but even more importantly, DHS failed to explain why a ten-year stay is inherently suspect. On the contrary, "a significant share of that count is entirely consistent with a single doctoral program plus authorized post-completion training, or with other legitimate, DSO-supported academic paths," like a four-year undergraduate degree followed by a Ph.D. Ex. 1, Presidents' Alliance cmt. 6.

Notably, DHS did not even attempt to identify any national security or program integrity risk with I-status journalists, acknowledging a "lack of public data" suggesting any such risks. 91 Fed. Reg. at 44998. It simply asserted that "the lack of public data for the I nonimmigrant classification does not mean that the vulnerabilities are absent for that classification." *Id.* DHS, in other words, has candidly admitted that no evidence suggests a national security or fraud problem in the I category, yet implemented a solution in search of a problem. That is arbitrary and capricious.

*Third,* DHS voiced concern about F, J, and I nonimmigrants overstaying their status. *See* 91 Fed. Reg. at 44998. But, as NAFSA and others noted, DHS misinterpreted its statistics. In fact, "slightly more than half of the 628,799 reported to be overstays by DHS actually left the country but their departures were not recorded." Ex. 15, NAFSA cmt. 12 (emphasis added). DHS gave no satisfactory response. It stated that "[t]his decline is an intended result of the system design, not a flaw in the methodology." 91 Fed. Reg. 44999. That is a *non sequitur*. It does not explain why overstay statistics reliably indicate a need for eliminating D/S if the actual rate is much lower.

Further, DHS's argument about overstay rates makes little sense. A student who would

*intentionally* overstay under D/S would be acting unlawfully, and would presumably do the same under a fixed term. And eliminating D/S materially increases the risk of *unintentional* overstays by creating delays and traps for the unwary. *See, e.g.,* Ex. 37, Iandoli Desai & Cronin P.C. cmt. 7; Ex. 38, Univ. of Md. cmt. 2. Shortening the grace period from 60 days to 30 also increases the risk of an unintentional overstay by halving the time students have to depart or make other arrangements. *See, e.g.*, Ex. 39, Am. Ass'n of Colls. of Pharmacy cmt. DHS's only response is that it "does not believe that this rule will increase overstays and unlawful presence especially due to USCIS processing delays" because students have the opportunity to timely request an EOS. 91 Fed. Reg. at 45054. That is non-responsive—many of the scenarios commenters mention are possible even when an EOS is timely submitted, such as when an EOS is denied and unlawful presence begins accruing immediately. Again, "[a]n agency … cannot simply state it 'believes' something to be true" and leave it at that. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020).

In sum, DHS's proffered national-security and fraud-and-abuse justifications, based on conjecture and anecdote, are unreasoned on their face—and they certainly are insufficient to rationally outweigh even the acknowledged costs of the rule (hundreds of millions of dollars a year), let alone those that DHS failed to account for (up to $145 billion annually). *See* pages 12-16, *supra*; *Am. Hosp. Ass'n*, 820 F. Supp. 3d at 44 ("As part of its analysis, the agency must identify benefits that bear a rational relationship to the ... costs imposed.") (quotation marks omitted).

***3. DHS failed to adequately consider less burdensome alternatives.***

"To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses." *Del. Dep't of Nat. Res. v. EPA*, 785 F.3d 1, 17-18 (D.C. Cir. 2015)); *see also Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*, 624 F.3d 489, 493 (D.C. Cir. 2010) (agency must consider "proposals of 'significant and viable' alternatives" surfaced by parties, including commenters). Agencies may not offer "vague" justifications; the alternative must be squarely "addressed and adequate reasons given for its abandonment," and the Court must

vacate if the agency "cavalierly sidestepped [this] responsibility." *Del. Dep't*, 785 F.3d at 11. "This principle goes to the heart of reasoned decisionmaking." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). Here, DHS gave short shrift to several alternatives:

**Relying on existing tools, like SEVIS, to detect and deter fraud and abuse.** Many commenters proposed maintaining D/S, noting that SEVIS already enables DHS to detect fraud and abuse. *See, e.g.* Ex. 15, NAFSA cmt. 5; Ex. 1, Presidents' Alliance cmt. 9; Ex. 26, Carnegie Mellon Univ. cmt. 10. In other words, commenters urged DHS to consider "the alternative of not regulating." Ex. 27, Georgetown Univ. cmt. (quoting E.O. 12866).

DHS replied only that this would not provide officers "an opportunity to evaluate an alien's maintenance of status at pre-determined points, nor to assess whether an alien is accruing unlawful presence." 91 Fed. Reg. 45009. That reasoning is circular: It rejects an alternative by simply pointing to the features of the agency's proposal, without explaining why those features are necessary. An agency cannot rely on the tautological assumption that its approach is superior. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 577 (D.C. Cir. 2004) (agency's rejection of alternative methodology on grounds that it would "be contrary to … our determination that TELRIC is the appropriate methodology for determining … rates" was arbitrarily "circular"); *Spirit Airlines*, 997 F.3d at 1256 (agency response to alternative proposals inadequate where it simply "assume[d] embracing a 'middle-of-the-road approach' … is self-evidently reasonable" without explaining why).

Relatedly, commenters also urged DHS "to focus on improvements to SEVIS" to enhance its capabilities for flagging possible fraud or national security threats. Ex. 28, Johns Hopkins University comment at 3; *see* Ex. 15, NAFSA cmt. 9; Ex. 29, Ariz. State Univ. cmt. 5-6. This approach would broadly preserve D/S while expanding DHS's ability to follow up on red flags. *See* Ex. 22, Penn cmt. 5 (urging DHS to "[e]xpand data-driven fraud detection" using SEVIS).

DHS rejected the notion that "leveraging data in SEVIS alone to identify possible student or exchange visitor status violations is sufficient" because "there is a difference between

conducting oversight of schools … and conducting oversight of students to ensure they have complied with the terms and conditions of their admission." 91 Fed. Reg. 45014. But that reasoning does not address the suggestion. Commenters did not focus solely on *school* fraud and abuse, they suggested using SEVIS to flag suspected *student* activity. For instance, NAFSA suggested that DHS incorporate into SEVIS a "'registration' requirement for longer-term students or exchange visitors," which "could provide a compliance checkpoint without the full adjudicative burdens of an EOS." Ex. 15, NAFSA cmt. 10-11; *see also, e.g.*, Ex. 30, Princeton cmt. 4 ("The proposed rule disregards potential enhancements in SEVIS to facilitate SEVP review for the minority of F-1/J-1 nonimmigrants who have remained in the U.S. uninterrupted on D/S for an extended period of time."); Ex. 31, Wash. Univ. in St. Louis cmt. 6 (suggesting DHS "conduct targeted, data-driven reviews of … specific F-1/J-1 nonimmigrants rather than imposing system-wide changes."). DHS never explained why a targeted approach was inferior to a blunt instrument that will cost hundreds of millions of dollars—if not tens of billions—annually.

**Aligning the fixed term with academic realities.** Commenters also suggested that if a fixed term is necessary it should align with academic realities using program duration, not an *ex ante* cap (*e.g.* four years for most undergraduate programs, seven years for a Ph.D. anticipated to take that long, etc.). *See, e.g.* Ex. 19, Univ. of Tex. at Dallas cmt. 2 ("[I]f a fixed admission date is required, we recommend that the date should match the specific program completion dates approved by USCIS."); Ex. 22, Penn cmt. 5; Ex. 32, Ohio State Univ. cmt. 5. Doing so would allow DHS to institute in-person interactions between students and immigration officials at regular intervals, while alleviating much of the uncertainty that would deter international student enrollment.

DHS offered one conclusory response: "DHS wishes to establish predetermined points in time, not to exceed 4 years." 91 Fed. Reg. at 45011. Beyond this "wish," DHS did not explain why a four-year fixed term, not one based on anticipated program duration, was preferable. *Spirit Airlines*, 997 F.3d at 1256 (agency cannot assume the reasonableness of its selected approach). Nor

is DHS's observation that "those who require additional time to complete their programs[] … may apply to extend their stay" adequate. *Cf.* 91 Fed. Reg. at 45011. Commenters suggested a program-specific duration in large part to alleviate concerns and uncertainty surrounding the EOS process, which is costly, burdensome, and invites arbitrary results that could derail a student's studies. DHS never explained why requiring an EOS, even when the agency knows all along the student must remain in the country longer than four years, is superior to a longer admission.

**National security enhancements.** Commenters suggested enhancements to DHS's vetting and monitoring procedures as an alternative way to address national security concerns. One suggested DHS "focus enhanced screening and monitoring on the small subset of individuals in highly sensitive research fields or those with funding from foreign government entities of concern." Ex. 33. Another explained "[a] 'scalpel' approach is superior to the proposed 'sledgehammer,'" suggesting "enhanced, periodic check-ins" in coordination with DSOs "[f]or the small subset of students entering specific, critical STEM research areas (*e.g.*, those involving sensitive, federally-funded technologies)." Ex. 34. Another suggested "strengthen[ing] initial visa interviews and enhanc[ing] existing site visit programs by targeting high-risk individuals." Ex. 35.

DHS offered no substantive response. It replied only that "[i]n order to help mitigate national security threats, DHS believes that this rule will best allow immigration officials to directly and periodically vet applicants for extensions of stay." 91 Fed. Reg. at 45015. But that is again, circular, and completely nonresponsive. It says nothing about the specific proposals of enhanced vetting or focusing on high-risk environments, and certainly does not explain why these would not be a better, less burdensome approach. *See, e.g., Baltimore*, 973 F.3d at 276 ("An agency … cannot simply state it 'believes' something to be true—against the weight of all the evidence before it—without further support."). And, as discussed above (*supra* at 18-19), periodic vetting as infrequently as every four years does *not* meaningfully enhance national security—a critique DHS never addressed when rejecting alternatives that actually *would* do so.

#### *4. DHS failed to adequately respond to significant comments.*

As noted, "[a]n agency must consider and respond to significant comments received during the period for public comment" (*Perez*, 575 U.S. at 96), as its failure to do so "generally 'demonstrates that the agency's decision was not based on a consideration of the relevant factors'" (*Lilliputian Sys., Inc. v. PHMSA*, 741 F.3d 1309, 1312 (D.C. Cir. 2014)). Lip service is insufficient. *See, e.g.*, *Gresham,* 950 F.3d at 103 (agency does not demonstrate "reasoned decisionmaking" by merely "[n]odding to concerns"); *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) (vacating where "[i]n its response to comments received during final rulemaking, the agency recounted some vague and unsubstantiated considerations leading it to this conclusion").

As discussed above, DHS failed to adequately address comments about its cost-benefit analysis (*supra* at 17-18), alternatives (*id.* at 21-24), and its irrational reasons for acting (*id.* at 21-28). Its consideration of other comments was the same.

**Deterring enrollment.** Commenters warned that eliminating D/S would reduce international student enrollment. Many referenced the NAFSA/IFP survey, which showed that 49% of current international students would not have studied in the U.S. without D/S and 16% fewer prospective students said they would do so absent D/S. Ex. 15, NAFSA cmt. 22-23. NAFSA explained that the Proposed Rule "will necessarily depress the enrollment of foreign students at U.S. colleges and universities to a far greater extent than what the NPRM is willing to admit." *Id.* at 23.

Commenters noted that global context helps explain why eliminating D/S would deter foreign students. One explained that the rule would place the U.S. at a competitive disadvantage to "countries like Canada, the UK, and Australia," which "grant visas for the full duration of study, signaling stability and welcome." Ex. 22, Penn cmt. 2. The Presidents' Alliance noted that "[s]ince 2000, the U.S. has already lost at least 20% of the global share of international students and global talent to countries like Australia, Canada, and the U.K." Ex. 1 at 13. Others cited findings that "student flows from China to the U.S." had fallen from "more than 10 times larger than the flows

to Australia and Canada in 2000" to "2.5 to 1 and 3.3 to 1, respectively" by 2017. Ex. 43 at 3.

Commenters warned that declining international enrollment would be catastrophic. Many cited the Clemens study, which estimated that within ten years, the economic costs of eliminating D/S would be $72-145 billion *annually*, dwarfing DHS's estimate. Ex. 21, Clemens cmt. 1. One stated universities would endure "significant financial stress" if D/S is eliminated, citing a Moody's analysis concluding that a "20% drop in international enrollment would cause 130 institutions to lose at least half a percentage point from their operating margins, with 18 of those losing between two and eight percentage points." *See* Ex. 5, attachment, *Fixed Terms* at 8. Another cited study showed that "[e]ven a modest 10% decline in enrollment would cost U.S. institutions an estimated $3 billion in total revenue, including $900 million in tuition losses." Ex. 44.

DHS offered little in response. It "acknowledge[d] that enrollment of foreign students in U.S. educational institutions may decline" but refused to "quantify the extent of this decline," citing a lack of "precedent from which accurate conclusions can be drawn as to the rule's impact." 91 Fed. Reg. 45001. It also concluded that any decline in enrollment and effects of this decline were "uncertain and speculative." *Id.* at 45087.

In other words, DHS refused to engage with the data and research commenters presented, offering only its unsupported view that the harms might not be that bad. In response to the NAFSA/IFP survey, it argued that "survey responses often reflect hypothetical preferences rather than actual behavior, and such results may overstate the likelihood of enrollment declines." 91 Fed. Reg. 45087. But beyond those generalizations, DHS never addressed the survey itself—neither its methodology nor its findings. Instead, DHS parroted a vague "expect[ation] that U.S. educational institutions will continue to attract other students who are not dissuaded by the requirements of this rule." *Id.* And it said *nothing* about all the other evidence, outlined above, that commenters offered, to explain why international student enrollment would predictably drop.

Instead, DHS "acknowledge[d] that the rule may adversely affect U.S. competitiveness"

but asserted that "DHS does not intend for the rule to cause significant impacts on enrollment." 91 Fed. Reg. 45088. What DHS *intended* is irrelevant to whether DHS "took a sufficiently 'hard look' at probable consequences," including *unintended* ones. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020). Again, DHS responded that it "expects the United States to remain a popular, competitive, and attractive place for nonimmigrant students and exchange visitors to pursue their program of interest" (91 Fed. Reg. 45088), but it never substantively engaged with the evidence showing otherwise, nor the logical flaw that *even if* the United States remains popular and competitive, even a relatively small decline would have huge consequences. *See, e.g., Baltimore*, 973 F.3d at 276 ("An agency … cannot simply state it 'believes' something to be true—against the weight of all the evidence before it—without further support."); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation.").

**Incompatibility with academic realities.** Commenters explained that key aspects of the Proposed Rule are incompatible with the realities of academic progression.

*First*, commenters explained that a four-year fixed term is incompatible with many programs, particularly PhDs. NAFSA noted that DHS relied on a "simple, outdated Department of Education webpage as the source of its data on average degree completion times" but this source, which "indicate[d] four years for a doctorate without specifying the source of that assertion," simply "does not match the reality of study." Ex. 15, NAFSA cmt. 20. In reality, "the median years to a research doctorate is 5.7 years from entering a program to completion, while those who complete the master's/doctorate sequence take an average of 7.3 years from entering graduate school to completion." *Id.* at 20-21. Thus, "nearly every international PhD student will be required to file for an extension of stay." *Id.* at 21. Further, "[a]ccording to the Education Department[] … the median time to complete a bachelor's degree is 56.3 months (or 4.33 years)." *Id.* at 20. Several universities offered their own data showing PhD program lengths often exceeding 4 years. *E.g.*

Ex. 6, Emory Univ. cmt. (median Ph.D. duration 5.7 years); Ex. 56, Univ. of N.H. cmt. (5.6 years).

Despite all this, DHS responded that it "believes" 4 years is proper because it "aligns with the general structure of post-secondary education." 91 Fed. Reg. at 45099. But an agency "cannot simply state it 'believes' something to be true." *Baltimore*, 973 F.3d at 276. DHS asserted that "students can normally earn a bachelor's degree in 4 years" without acknowledging comments showing that the median student actually takes longer. 91 Fed. Reg. at 45099. And while DHS acknowledged that Ph.D. students may need longer, it asserted simply that "[s]tudents who demonstrate continued academic progress and meet F–1 eligibility criteria may apply for an EOS to complete their programs." *Id.* at 45,001. That is unresponsive: the comments' premise is that injecting uncertainty into students' academic programs by forcing them to seek an EOS is itself harmful and unnecessary. DHS never grappled with this problem of uncertainty, nor did it explain why a 4-year maximum duration was the correct line to draw when many students take longer.

*Second*, commenters challenged the "erroneous assumption that all students' educational journeys … only involve upward progression." Ex. 18, Univ. of Rochester cmt. 5. Rather, for some, "another degree at the same degree level would enhance their professional development (e.g., a student has a master's degree in engineering and then wants to obtain an MBA to achieve their career goals)." *Id.*; *see, e.g.*, Ex. 10, Monroe Univ. cmt. ("[M]ore than 700 students each year pursue second master's degrees in distinct disciplines that enhance their professional versatility without the cost or time investment of a doctoral program. These students are not prolonging their education arbitrarily; they are pursuing targeted credentials that strengthen their employability.").

DHS acknowledged there are "legitimate cases of students gaining knowledge at a lower or the same educational level." 91 Fed. Reg. at 45041. But it deferred to its subjective "belie[f] that most students follow an upward trajectory." *Id.* In expressing this belief, DHS never engaged with the scenarios described by commenters in which students routinely pursue a second degree at the same or lower level for legitimate reasons. Instead, DHS broadly asserted that it "believes" its

approach "will accommodate the legitimate academic activities of bona fide students" while proclaiming that the current approach "raises serious concerns that the intent is not to pursue a full course of study but rather to circumvent the U.S. immigration system and prolong their stay in the U.S. under the guise of pursuing education." *Id.*; *but see Baltimore,* 973 F.3d at 276. That reasoning is self-contradictory and illogical—it acknowledges in one breath the "legitim[acy]" of a practice before banning the practice as illegitimate. Such "internally inconsistent" "decision making" is "arbitrary and capricious." *INGAA*, 114 F.4th at 755 (quotation marks omitted).

*Third*, commenters challenged the restrictions on graduate students' academic mobility, which NAFSA said "would disrupt longstanding and essential graduate education practices." Ex. 15, NAFSA cmt. 15. Another commenter offered seven common scenarios of legitimate need to transfer, including several having nothing to do with the student's dedication or progress, like an advisor's loss of grant funding or advisor relocation to another university. Ex. 46 at 2.

DHS never seriously considered these concerns, stating only that "DHS maintains it is appropriate to prohibit an F–1 student at the graduate degree level or above from changing educational objectives," based on "the general ages of the students, a graduate student's previous opportunities to explore academic interests prior to entering graduate school, and a focus on more specific degree programs at the graduate level." 91 Fed. Reg. at 45043. These generalizations offer no insight as to why DHS thought it was appropriate to institute an across-the-board ban on graduate student mobility even in scenarios when it is essential.

**Reliance interests.** Commenters cited deeply entrenched reliance interests that DHS failed to consider. *See, e.g.*, Ex. 15, NAFSA cmt. 3 (DHS "does not grapple with the reliance interests that current students and institutions have built around the D/S framework that has been in place for decades"). International students have "made major life decisions—enrolling in multi-year programs, paying tens of thousands in tuition, committing to OPT/H-1B pathways—in reliance on the stability of that framework." Ex. 47. These are not abstract interests—they involve tuition

contracts, apartment leases, employer onboarding, and billions of dollars of regional economic activity." Ex. 48. Likewise, "[i]nstitutions have structured admissions cycles, course sequencing, staffing, and funding around settled D/S practice." Ex. 49.

All DHS responded is that it "carefully considered the reliance interests of F, J, and I visa holders, as well as those universities, sponsors, and employers who have structured programs and operations around the D/S framework." It never explained *what* it considered or *why* it found reliance interests insufficient to modify or withdraw the rule. DHS's failure to meaningfully consider the interests reflected in the comments violates its obligation under the APA to "take[] into account" "serious reliance interests." *DHS v. Regents of the Univ. of Cal.,* 591 U.S. 1, 30 (2020).

**DHS's Case Backlog.** Commenters argued replacing D/S with fixed terms of admission requiring regular EOS applications would swamp USCIS—which already had an unprecedented backlog of paperwork—with hundreds of thousands of additional applications annually. AAU, for example, predicted a 163% increase in Form I-539 volume, cautioning that USCIS's median processing time for Forms I-539 is already "nearly 9.59 months or just over 290 days," and "[f]or an agency that has historically had a difficult time reining in its backlog and processing times and recently experienced a budget crisis, it is concerning that USCIS will be required to handle this additional workload." Ex. 16, AAU cmt. 17; *see also* Ex. 25, AFT Local 6516 cmt. 3 (USCIS "would face an impossible processing surge that could extend wait times to 8-12 months during peak periods."). Members of Congress similarly noted that "USCIS currently has a backlog of 11.3 million cases—the largest net backlog ever." Ex. 50, Members of Congress cmt. 3.

Despite these concerns, DHS insisted no "additional safeguards are needed in this rule." 91 Fed. Reg. 45015. But DHS provided no explanations or specifics, instead simply remarking that "DHS is continuing to explore operational alternatives to address USCIS backlogs." *Id.* But that assurance that DHS *will* consider the problem comes too late in the preamble of the Final Rule. *See Am. Hosp. Ass'n*, 820 F. Supp. 3d at 44. And DHS never discussed its adjudicative capacity

or how it proposed to handle the flood of new applications while dealing with its existing backlog. These conclusory assurances that DHS has it under control—in other words, that DHS will forge ahead without a clear plan—are hallmarks of arbitrary and capricious decisionmaking.

**Press freedom concerns**. Many commenters expressed concerns that the rule would undermine press freedom for international journalists. They warned that forcing foreign journalists to file frequent (every 240 days) EOS requests would "create[] serious risks that visas could be denied in retaliation for unfavorable reporting, thereby placing government officials in a position to punish journalists for exercising their First Amendment rights" (Ex. 51, The NewsGuild-CWA cmt. 2) particularly because any content-based review by immigration officers "could cause journalists to self-censor by avoiding controversial or critical topics" (Ex. 52, Reporters Without Borders cmt. 3). *See also, e.g.*, Ex. 53 at 1, Reporters' Committee for Freedom of the Press cmt. 2 (similar). Further, commenters pointed out in subjecting *only* I-1 journalists to a very short 240-day fixed term, DHS would impose a "substantial burden on the exercise of press freedoms and unconstitutionally single[] out the press for unique and unjustified burdens." Ex. 24, at 11.

DHS did not adequately respond to these points. Regarding the potential chilling effect, DHS stated that it "does not intend for the rule to chill speech, encourage censorship, or result in viewpoint discrimination" (91 Fed. Reg. at 45078)—but DHS's claims of good intent do not address concerns that the rule will *reasonably cause* foreign journalists to self-censor—a classic chilling effect under First Amendment doctrine. DHS said nothing about whether journalists would be reasonably deterred from exercising press freedoms and whether to adopt the rule notwithstanding this potential deterrence effect, entirely failing to consider this aspect of the problem.

Nor did DHS adequately address commenters' concerns about content-based review. DHS argued it "will review content solely to confirm that the foreign information media representative is engaging in *bona fide* journalism." 91 Fed. Reg. at 45078. But commenters' concern was that *any* content-based scrutiny by the government in connection with adjudicating EOS requests

necessarily chills protected expression, and they noted that review of content is not even necessary when "the applicant can produce evidence of an employment contract in a journalistic role with a qualifying foreign news organization" or, at most, "a high-level description of a beat or assignment." Ex. 53, Reporters' Committee for Freedom of the Press cmt. 2. DHS never explained how DHS officers will determine whether a particular work of journalism is "*bona fide*," nor why reviewing the content of that work was necessary or even helpful in ascertaining its legitimacy.

Finally, DHS said *nothing* in response to commenters' concerns that the Proposed Rule burdened press freedom by singling journalists with an especially short fixed-term period. This failure to address at all a significant comment raising grave concerns about constitutional freedoms is arbitrary and capricious. *See, e.g., Perez*, 575 U.S. at 96.

***5. The 32-day comment period was inadequate.***

Agencies must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments." 5 USC § 553(b)-(c). Executive Order 12866 further elaborates that "each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days." 58 Fed. Reg. at 51735. "[G]enerally the shortest time period sufficient" for *any* rule is 30 days, but that is appropriate only when the rule is simple. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *see also Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (30 days is "an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data.") (quotation marks omitted). Accordingly, "a sixty-day period [is] 'a more reasonable *minimum* time for'" public comment. *Id.*

Here, a 32-day comment period was insufficient. DHS knew it was proposing a fundamental shift to visa categories used by millions, with ramifications for billions in economic activity. When DHS proposed a similar rule in 2020, it received more than 32,000 public comments, and the public outcry was so great that it withdrew its proposal. *See* 86 Fed. Reg. at 34410. To provide

only 32 days to respond to such a consequential and complex rulemaking—well under the recommended 60-day minimum—is arbitrary and capricious. It left the public scrambling to digest a complex rule, collect and analyze data to ascertain its consequences, and prepare their comments.

Many argued that the period was insufficient and asked for more time. NAFSA cited the Proposed Rule's "extensive and controversial nature with the potential of affecting over 1.8 million international students and exchange visitors, over 6,500 F-1-certified schools, and over 1,200 exchange visitor program sponsors" and asked for "at least 60 days but preferably 90 days to comment." Ex. 15, NAFSA cmt. 4. A coalition of attorneys general similarly advised that "[f]or more than two and a half decades, executive agencies have followed a presumption that a minimum of 60 days is necessary to provide the public with a meaningful opportunity to comment… There is no reasoned justification for a 30-day comment period for a proposal that is estimated to cost nearly $90 million [annually] to United States entities." Ex. 14, Att'ys Gen. cmt. 3-4.

DHS's response was inadequate. It simply noted there is no "specific minimum duration for public comments" under the APA or Executive Order 12866. 91 Fed. Reg. at 45072. But that has nothing to do with whether, under the circumstances, the comment period length was *reasonable*. It was not. DHS admitted that "this is a significant rule and that E.O. 12866 encourages agencies to provide 'not less than 60 days' for public comment on significant regulatory actions." 91 Fed. Reg. at 45072. Nonetheless, it offered the conclusory assertion that the 32-day comment period "balance[d] the need for stakeholder input with the urgency of implementing the rule." *Id.* But DHS never explained *why* the balance was proper. Nor is that appeal to supposed urgency compelling when DHS itself took nearly a full year to finalize the rule after proposing it.

DHS also noted the "nearly 22,000 public comments received" to suggest that "stakeholders were able to analyze the rule and provide thoughtful feedback within the allowed timeframe." 91 Fed. Reg. at 45072. But this is a textbook *post hoc* rationalization. The volume of comments received does not show that DHS acted reasonably when it decided before any comments were

submitted to set the comment period. Putting that aside, the volume of comments does not mean commenters had adequate time to prepare the most useful responses possible, nor that even more people would not have responded if given sufficient time.

For all these reasons, the Final Rule is arbitrary and capricious. It must be set aside.

**B. The Final Rule's limitation of academic mobility is contrary to law.**

The Final Rule also unlawfully exceeds DHS's statutory authority. Congress defined F-1 status to include any "bona fide student qualified to pursue a full course of study … who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study." 8 U.S.C. § 1101(a)(15)(F). But in the Final Rule, DHS has essentially rewritten the statute to add an additional criterion: that the "course of study" the nonimmigrant "seeks to enter" in order to "pursu[e]" (*id.*) is at a higher academic level than any previously completed program.

That is unlawful: It is black-letter law that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). But that is just what DHS has done here, by categorically excluding from the F-1 definition students who meet all of the actual statutory elements—that the student is "bona fide," "qualified," and seeking admission "temporarily" and "solely" to study in the U.S. while maintaining a residence elsewhere. 8 U.S.C. § 1101(a)(15)(F). Nor can DHS defend its rule by claiming that students pursuing second degrees at an equal or lower level categorically fail the statutory "bona fide" requirement: The Final Rule itself *acknowledges* "that there are legitimate cases of students gaining knowledge at a lower or the same educational level." 91 Fed. Reg. at 45041.

By nonetheless categorically barring F-1 status for any such student, DHS has "rewrit[ten]" the INA "to suit its own sense of how the statute should operate." *Util. Air. Regul. Grp.*, 573 U.S. at 328. That decision is unlawful, and must be set aside.

## II. PLAINTIFFS' MEMBERS WILL BE IRREPARABLY HARMED[3]

### *a. Declines in enrollment*

**1.** Numerous commenters—including many of plaintiffs' members—warned that the rule would harm efforts to recruit international students and scholars: Requiring students to apply for an EOS would "[i]ntroduc[e] a significant amount of uncertainty." Ex. 1, Presidents' Alliance cmt. at 13. Particularly "troubling" was "that these extensions will be left to the discretion of USCIS officers who … lack the necessary expertise to adjudicate the academic or personal reasons for why a student may need an extension to complete a program." Ex. 16, AAU cmt. at 3. Thus, "many prospective students will choose to attend universities in other nations that provide greater certainty and appealing pathways to completion." *Id.*

The Presidents' Alliance's members are seeing that effect. The University of Wisconsin Madison quoted two student messages leaving no doubt about the Final Rule's effect. One stated: "I have made the difficult decision to withdraw from the program and not proceed with my plan to study in the United States. A significant factor in my decision was the recently published DHS final rule. … [T]he policy direction has created uncertainty for my longer-term academic planning." UW-Madison Decl. ¶ 16. Another said: "Unfortunately, I had to withdraw from the program and abandon my plans to study in the United States. The recent DHS final rule … created

[3] For the same reasons that the member universities are irreparably harmed—not least because of acknowledged compliance costs—both the Presidents' Alliance and AICUM have associational standing on behalf of those members. *See, e.g.*, *Harvard Coll.*, 798 F. Supp. 3d at 110 (associational standing requires members with standing, germaneness to institutional purpose, and lack of need for participation by individual members) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); Feldblum Decl. ¶¶ 2-8; McCarron Decl. ¶¶ 3-5; BU Decl. ¶ 3. NAFSA has organizational standing from diversion of resources. Aw Decl. ¶¶ 5-6; *see, e.g.*, *Am. Ass'n of Pediatrics v. Kennedy*, 814 F. Supp. 3d. 150, 159-161 (D. Mass. 2026). Each union plaintiff has associational standing on behalf of international student and journalist members who would themselves have standing both as the "object of the action … at issue" (*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025)), and due to, at minimum, the financial injury of paying EOS filing fees (*id.* at 114 ("[M]onetary costs 'are of course an injury.'")). *See* Schmid Decl. ¶¶ 10-17; Ziegler Decl. ¶¶ 5-13; Carey Decl. ¶ 7-13; Burke Decl. ¶ 6-10; Schleuss Decl. ¶¶ 6-12.

substantial uncertainty for my academic and immigration plans. … I was left with no realistic choice but to withdraw." *Id*. The University of Maryland Baltimore has stated that "32 students admitted for the Fall 2026 semester … have already decided against joining our academic community since the announcement of the Final Rule" and "14 students … have requested a deferral of their admission, citing the announcement of the Final Rule." UMD-Baltimore Decl. ¶ 17.

Other institutions have observed a clear trend in disenrollment following the announcement of the Final Rule. The University of Pennsylvania noted that in just one of its master's programs, dozens of international students have withdrawn, twice as many as this time last year and three times the rate of previous years. Penn Decl. ¶ 13. The University of Wisconsin Milwaukee has observed "a 42 percent decrease in applications, a 29 percent decrease in admissions, and a 38.7 percent decrease in enrollments from international students during the 2026-2027 academic term as compared to the previous academic year." UW-Milwaukee Decl. ¶ 17. And other members have shared their on-the-ground view—based on factors like trends in this year's admissions, recent experience from international student reactions to immigration policy changes, and feedback from administrators, faculty, staff, and current and prospective students and scholars—that the Final Rule is having and/or will have a "major influence" on international student enrollment. Reed College Decl. ¶ 25; *see also, e.g.*, UMD Decl. ¶ 16; OSU Decl. ¶ 7; UIC Decl. ¶ 18-19; UIUC Decl. ¶ 25; Cornell Decl. ¶ 9; BU Decl. ¶ 9.

Further, the Final Rule will certainly alter the composition of international student bodies at many institutions, as it bars graduate student transfers, first-year undergraduate transfers, and lateral or backwards matriculation. Presidents' Alliance members have explained that international students covered by this bar transfer into the institution every year. *See, e.g.* UMD-Baltimore Decl. ¶ 33 (restrictions on graduate student mobility will inhibit enrollment in a JD-MBA program jointly offered with another institution); Columbia Decl. ¶¶ 15-16 (7-10 first-year international undergraduates transfer into the School of General Studies annually and a number of LL.M.

students are pursuing a second master's degree); Cornell Decl. ¶¶ 27-31 (discussing impact of restrictions on graduate mobility in Weill Cornell Medical College's tri-institutional degree programs). Now, they cannot, altering the composition of many members' institutions going forward. Additionally, institutions have noted how "[t]he lack of mobility of international graduate students will also negatively impact faculty mobility" as "[i]f faculty members cannot bring their current international graduate student advisees to a new institution, it will be a disincentive for them to change institutions." UW-Madison Decl. ¶ 33.

**2.** These harms to enrollment and student body composition are irreparable. For one thing, any individual lost enrollment is "unlikely to be recovered." Cornell Decl. ¶ 10; *see also, e.g.*, UW-Madison Decl. ¶ 24; UMD-Baltimore Decl. ¶ 21. As the University of Pennsylvania put it, "[t]he loss of any admitted student represents a lost opportunity to educate a talented and promising individual whom Penn has specifically selected from among many applicants. … Each admitted international student represents a talented individual who would enrich the campus community, enliven classroom discussion, contribute to Penn's research and educational mission, and become a Penn alum representing the university to governments, employers, and civil society around the world. When Penn's ability to educate the talented students of its choice is impinged … that broken educational relationship cannot later be repaired." Penn Decl. ¶ 15. Courts agree that such harm to an institution's ability to compose a cohort of its preferred design is irreparable. *Cf. Cohen v. Bradford Printing*, 2010 WL 2854443, at *7 (D.R.I. 2010) (action that "discourages [employees'] membership in unions" constitutes irreparable harm to union); *Nat'l Parks Conserv. Ass'n v. U.S. Dep't of Interior,* 2026 WL 1706963, at *25 (D. Mass. June 12, 2026) ("[C]ourts have recognized loss of educational opportunity for children as incommensurable and immeasurable harm," including by "finding schools were irreparably harmed by threats to their ability to educate children.") (citing *McMahon*, 784 F. Supp. 3d at 362-363); *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 178 (D. Mass. 2025) (business's "inability to recruit replacements following layoffs is

irreparable harm"); *Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144, at *12 ("[D]ifficulty recruiting and retaining top talent due to [government] restrictions … can constitute irreparable harm.").

Additionally, the downstream consequences of declining international enrollment caused by the Final Rule are profound. *Supra* at 25-27 (discussing comments). Plaintiffs' members have said much the same here, noting that losing international students and scholars will have dire ramifications across the board, from research (*e.g.*, UIUC Decl. ¶¶ 22-25; BU Decl. ¶¶ 11-13) to classroom instruction (*e.g.*, UW-Madison Decl. ¶ 13) to reputation (*e.g.*, Grinnell Decl. ¶ 9-12) to campus culture (*e.g.* Penn Decl. ¶ 16) to University finances (*e.g.* OSU Decl. ¶ 27-33) and far beyond.

These harms go to institutions' ability to fulfill their mission, including educating students and conducting research. Courts readily recognize that "[a]ctions by a defendant that 'make it more difficult' for an organization 'to accomplish [its] primary mission ... provide injury for purposes ... irreparable harm.'" *New York v. McMahon*, 784 F. Supp. 3d 311, 362 (D. Mass. 2025) (quoting *Nat'l Treasury Emps. Union v. Vought*, 774 F.Supp.3d 1, 49-50 (D.D.C. Mar. 28, 2025)); *see also, e.g.*, *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, 788 F. Supp. 3d 70, 97 (D. Mass. 2025) ("[Plaintiff] has shown that their ability to fulfill their core mission has been impeded and that they are likely to suffer irreparable reputational harm, absent an injunction."); *Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen*., 806 F. Supp. 3d 166, 208 (D.N.H. 2025) ("[I]mpair[ing] [a] group's organizational mission … constitutes irreparable harm."). And "courts often find" the types of reputational harms reported by many members here to be "irreparable." *Amazentis SA v. Partnerships & Unincorporated Associations*, 2025 WL 4675089, at *6 (D. Mass. Oct. 20, 2025).

***b. Modifications to programs***

International students who do enroll at members' institutions will face unique challenges under the Final Rule, with consequences for the universities themselves as those institutions work to either adjust to the new rule by modifying programs or face the prospect of being unable to offer

them to international students. For one, because of the Final Rule's restrictions on academic mobility, international students risk losing access to certain academic pathways unless the institutions restructure those programs. Grinnell College, for instance, notes that it offers engineering pathways in which students earn bachelor's degrees from two separate colleges in their fourth and fifth years of study. Grinnell Decl. ¶ 13. Many other members report offering similar combined degree programs that are either incompatible with the Final Rule or complicated by it. *See, e.g.,* UMD-Baltimore Decl. ¶ 33; Columbia Decl. ¶ 17; Cornell Decl. ¶ 33; BU Decl. ¶ 16.

Because the Final Rule bars or complicates these offerings, institutions are forced to choose between changing the program to a non-optimal structure or being unable to offer the program. As explained, being unable to enroll a student in such a program is a clear irreparable harm. *See supra* at 37-38. But so is requiring the university to alter the program to salvage full participation. The University of Maryland Baltimore notes that it may "be required to make changes to its program offerings and academic pathways to ensure they remain open to international students" such as "having students pursue part of their PhD programs from outside the U.S., resulting in a loss of their valued perspectives in our classrooms, their work on research grants in our laboratories, and their economic contributions to businesses in the local community." UMD-Baltimore Decl. ¶ 34; *see also, e.g.*, UW-Madison Decl. ¶ 38-39 (similar). As members have explained, such "changes are costly and time consuming to implement and, once implemented, are not easy to unwind. They are thus irreparable harms to the university." *Id.* at ¶ 41.

Plaintiffs' members have also stated that many currently enrolled international students are concerned about traveling internationally due to the Final Rule, leading students to "cancel[] their plans for international research and international travel to conferences." Columbia Decl. ¶ 27. *See, e.g.*, Penn Decl. ¶¶ 18-21 (similar). Members whose international students cannot travel will be unable to operate these programs with the full cohort of desired students (an irreparable harm, *see supra* at 37-38), or may have to restructure them. *See, e.g.,* UW-Madison ¶¶ 49-50.

Courts recognize that an organization needing to permanently alter its programmatic structure constitutes irreparable harm, as "the reallocation of existing resources disrupts University budgeting processes, which is an irreparable injury itself." *Ass'n of Am. Universities v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 141 (D. Mass. 2025). That is certainly true here. Changes to academic programs are hard to unwind once made, as they require institutional buy-in and investments of time, resources, and personnel. And any change to an academic program in a university setting generates significant reliance interests, including student interests that often span several years.

***c. Administrative burdens***

Plaintiffs' members will endure significant administrative burdens to comply with the Final Rule. DHS acknowledged that the rule "may result in … administrative costs, and time." 91 Fed. Reg. at 45048. Among these burdens, DHS estimated that "DSOs and ROs will have to spend approximately 135 hours for rule familiarization and adaptation in the first year after the rule takes effect," acknowledging total up-front compliance costs to universities and J-1 sponsors between "*$267.9 million [and] $257.8 million*" in the first year alone. *Id.* at 45,034, 45,116.

Testimony here bears that out, and more. The University of Maryland, for instance, has stated that it "anticipates needing to divert significant resources to ISSS to handle the changes of the Final Rule, including hiring two new staff, spending 120 hours on training, and filing 400 new EOS requests each year." UMD Decl. ¶ 49. "This diversion of resources to regulatory compliance will mean having to make cuts elsewhere to programs and administrative or academic offerings," including "[p]rogramming offered to the international community to engage with the public, gain exposure to American culture, and have experiential opportunities that enhance learning." *Id.* at ¶ 50. The University of Pennsylvania anticipates needing to overhaul its IT system for interfacing with international students, an estimated cost of $500,000-$1,000,000. Penn Decl. ¶ 23.

"The First Circuit has found that 'administrative upheaval' from complying with government regulation may constitute an irreparable harm." *Massachusetts v. Dep't of Educ.*, 828 F.

Supp. 3d 198, 220-221 (D. Mass. 2026) (quoting *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025)); *cf. California v. HHS*, 811 F. Supp. 3d 183, 210 (D. Mass. 2025) ("[T]he costs [plaintiffs] may incur to comply with new federal policies can constitute irreparable harm."). And "Courts within this district and others have recognized that money damages resulting from agency action is sufficient to establish irreparable harm in an APA suit" because of the government's "sovereign immunity." *RENEW Ne. v. U.S. Dep't of Interior*, 2026 WL 1078282, at *30 (D. Mass. Apr. 21, 2026) (quoting *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025)); *see also id.* ("[C]omplying with [a regulation] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.") (quoting *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), and collecting additional cases).

Here, those "nonrecoverable compliance costs"—by DHS's *own admission*—are huge: more than $250 million in the first year alone. 91 Fed. Reg. at 45116. Much of that burden will be borne by Plaintiffs' members: Of the roughly 2.1 million F, J, and I nonimmigrants in the country (Ex. 60, RIA, at 17 tbl.5), over 600,000 are F-1 students affiliated with Presidents' Alliance member institutions (Feldblum Decl. ¶ 8). Assuming that compliance costs scale with number of international students served, that means that Presidents' Alliance members will spend *over $72 million* (of the total $257.8 million) just in year-one familiarization costs. That alone justifies a finding of irreparable injury—even apart from all the additional injuries discussed above.

## III. THE REMAINING EQUITIES FAVOR EMERGENCY RELIEF.

When the government is a party, the remaining factors—the public interest and harm to the opposing party—merge. *See, e.g. California v. Trump*, 786 F. Supp. 3d 359, 394 (D. Mass. 2025).

Here, the public interest weighs strongly in favor of emergency relief. As the comment record details, international students and scholars are vital to the American economy. *Supra* at 5-7. Billions of dollars of economic activity and hundreds of thousands of American jobs depend on international students studying in the U.S. More, they contribute to breakthroughs in research and

innovation, treat ailing people at American hospitals, teach American students, and help build the Nation's goodwill abroad. The Final Rule threatens those benefits. *Supra* at 9-10; 12-16.

On the other hand, relief would not harm the public interest. As noted (*supra* at 18-21), the Final Rule does not logically relate to the purported problems DHS sought to address. That is especially true of interim relief: many of the Final Rule's benefits—assuming there are any, *but see supra* at 16-17—will go unrealized for four years. Nor can DHS plausibly claim urgent harm from interim relief. D/S is a decades-old policy, yet DHS mustered only scattered anecdotes and marginal statistics to support its national security or fraud concerns. And DHS took nearly a year to finalize the rule after its proposal. There is simply no urgent need to disrupt the decades-long status quo—certainly not one that outweighs the harms to Plaintiffs' members and the public.

## IV. A STAY—OR SUMMARY JUDGMENT—IS WARRANTED.

Section 705 of the APA authorizes the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "[V]acatur of the agency action—not merely exempting plaintiffs from the agency action—is the normal remedy under APA section 706" and courts have repeatedly "applied that same rule to section 705 stays." *Make the Rd. N.Y. v. Noem*, 805 F. Supp. 3d 139, 173-174 (D.D.C. 2025), *vacated on other grounds*, 179 F.4th 16 (D.C. Cir. 2026); *see also Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 103 (D.D.C. 2025) (collecting examples). Nothing here compels any different approach. *Supra* at 35-41; *see also Woonasquatucket*, 2026 WL 2279789, at *18-21 (The Supreme Court's decision in "[*Trump v.*] *CASA*[, *Inc.*, 606 U.S. 831 (2025)] cannot … be understood to foreclose" "universal relief" under APA Section 705); *Venezuelan Ass'n of Mass. v. USCIS*, __ F. Supp. 3d ___, 2026 WL 2255272, at *5-6 (D. Mass. Aug. 5, 2026) ("The Court concludes that the Supreme Court decision in *CASA* does

not limit the scope of relief under the APA," and granting "universal relief" under "Section 705").[4]

Alternatively, summary judgment—and vacatur of the Final Rule—is proper. For the reasons why Plaintiffs are *likely* to succeed, they are also right that the Final Rule must be set aside. Again, vacatur is the traditional remedy. *Woonasquatucket*, 2026 WL 2279789, at *21 ("[V]acatur" is "the remedy … to which a plaintiff, if ultimately successful [on an APA claim], is entitled" under 5 U.S.C. § 706). And, again, nothing about this case counsels any other approach.

**CONCLUSION**

The Court should stay the Final Rule pending resolution of this case under 5 U.S.C. § 705. Alternatively, it should award Plaintiffs summary judgment and vacate the Final Rule.

Dated: August 18, 2026

Respectfully submitted,

/s/ *Paul W. Hughes*

Paul W. Hughes (DC Bar No. 997235)*
Emmett Witkovsky-Eldred (DC Bar No. 90012725)*
McDermott Will & Schulte LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com
* *pro hac vice*

Dana McSherry (MA BBO #664430)
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4060
dmcsherry@mcdermottlaw.com

*Counsel for Plaintiffs*

---

[4] Alternatively, a preliminary injunction would appropriately extend to all individual members of the union Plaintiffs, and all nonimmigrants affiliated with all members of the higher education Plaintiffs. *See, e.g.*, *Massachusetts v. Dep't of Educ.*, 831 F. Supp. 3d 34, 49-51 (D. Mass. 2026) (recognizing that universal relief under Section 705 is authorized, but instead issuing preliminary injunction limited to plaintiffs and their associational members).

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.2(a) and Federal Rule of Civil Procedure 5(i), undersigned counsel certifies that, on August 18, 2026, I caused a copy of the foregoing ECF filing to be served by hand delivery to the United States Attorney for the District of Massachusetts. I further caused to be delivered by certified mail copies of the foregoing to all agency and officer defendants.

Dated: August 18, 2026

/s/ *Paul W. Hughes*

Paul W. Hughes (DC Bar No. 997235)
McDermott Will & Schulte LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com