**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants*.

Case No. 1:26-cv-13799-FDS

**Leave to File Granted on August 31, 2026**

**BRIEF OF ASSOCIATION OF AMERICAN UNIVERSITIES AND ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR APA § 705 RELIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ii

IDENTITY AND INTEREST OF *AMICI CURIAE* 1

INTRODUCTION 2

ARGUMENT 4

I. The Rule Irreparably Harms AAU and AAMC Members and Their Affiliated Students, Scholars, and Physicians. 4

A. Declines in Enrollment. 5

B. Administrative Burdens. 6

II. The Final Rule Is Arbitrary and Capricious. 8

A. DHS Failed to Adequately Respond to Significant Comments. 8

1. Impact on U.S. Research and Innovation. 9

2. Impact on U.S. Medical Care. 11

B. DHS Failed to Adequately Justify the Final Rule's Application to J Visas. 13

III. Relief Under APA Section 705 Is Appropriate and Necessary. 15

CONCLUSION 18

# TABLE OF AUTHORITIES

## CASES

*Career Colleges and Schools of Texas v. United States Department of Education*, 98 F.4th 220 (5th Cir. 2024), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (2025) ........ 16

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020) ........ 15

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018) ........ 11

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020), *vacated and remanded on mootness grounds sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022) ........ 11, 13

*Make the Road New York v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) (per curiam) ........ 16

*Massachusetts v. Department of Education*, 831 F. Supp. 3d 34 (D. Mass. 2026) ........ 15, 16

*Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) ........ 11, 13

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ........ 15

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) ........ 8

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ........ 15

*Woonasquatucket River Watershed Council v. USDA*, No. 25-1428, __ F.4th ___, 2026 WL 2279789 (1st Cir. Aug. 7, 2026) ........ 16

## STATUTES

5 U.S.C. § 705 ........ 3, 4, 6

## OTHER AUTHORITIES

8 C.F.R. § 214.2(f)(5)(i) ........ 18

8 C.F.R. § 214.2(f)(5)(ii) (2026) ........ 17

22 C.F.R. § 62.4 ........ 14

22 C.F.R. § 62.20(i)(1) ........ 15

22 C.F.R. § 62.23(h)(1) ........ 15

22 C.F.R. § 62.27(e)(2) ........................................................................................................15

*Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070 (proposed Aug. 28, 2025)......................14

*Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976 (final rule July 17, 2026)..........2, 6, 7, 10, 13, 14, 15, 17, 18

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are leading national higher education associations, the Association of American Universities ("AAU") and the Association of American Medical Colleges ("AAMC") (collectively, "*Amici*"). Together, their members include America's leading research universities, medical schools, and teaching hospitals, and they educate thousands of international students, host thousands of international scholars engaged in cutting-edge research and medical training in critical fields, provide care to millions of patients, and serve as engines of research, innovation, and economic growth in communities across the nation.

AAU was founded in 1900 and is composed of America's leading research universities. AAU's member universities earn the majority of competitively awarded federal funding for research that improves public health, seeks to address national challenges, and contributes significantly to our economic strength, while educating and training tomorrow's visionary leaders and innovators. Its members include 69 public and private research universities in the United States.

Established in 1876, AAMC is a nonprofit association dedicated to improving the health of people everywhere through medical education, clinical care, biomedical research, and community collaborations. Its members include all 163 U.S. medical schools accredited by the Liaison Committee on Medical Education, more than 400 academic health systems and teaching hospitals, and more than 70 academic societies. Through these institutions and organizations, the AAMC leads and serves the millions of individuals across academic medicine, including more than 220,000 full-time faculty members, 100,000 medical students, 167,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences.

*Amici* file this brief because the challenged rule[1] directly and profoundly affects their members by injecting significant uncertainty into the academic and professional trajectories of international students, scholars, and physicians, undermining American research and medical care in ways that the Department of Homeland Security ("DHS") has not adequately addressed or justified. As associations whose members educate and partner with international students, scholars, and physicians to advance critical research and medical care, *Amici* are uniquely positioned to describe the Final Rule's impacts in those contexts.

## INTRODUCTION

For nearly half a century, international students, research scholars, physicians, and other exchange visitors have been admitted to the United States for "duration of status"—a framework that has permitted such individuals to remain in the country for as long as they are pursuing their authorized programs and complying with the terms of their status. *Amici*'s members have built their graduate programs, research enterprises, and medical training programs in reliance on that settled framework, recruiting doctoral students, postdoctoral researchers, and physician trainees whose programs routinely—and by design—run longer than four years.

The Final Rule upends that longstanding regulatory framework, replacing duration of status with a fixed admission period of no more than four years and conditioning any additional time on a discretionary extension-of-stay adjudication by an already-backlogged U.S. Citizenship and Immigration Services ("USCIS"). DHS adopted these sweeping changes in the face of nearly 22,000 comments from *Amici*, their members, and other stakeholders documenting the severe

[1] *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976 (final rule July 17, 2026) ("Final Rule").

harms the Final Rule would inflict on students, scholars, institutions, and the patients and communities they serve.

The consequences, already unfolding, track precisely what commenters predicted. The Final Rule is deterring international students and scholars from enrolling at *Amici*'s member institutions. It threatens to interrupt cutting-edge research mid-project. It jeopardizes patient care by threatening to pull physician trainees—who provide critical care in pediatrics, psychiatry, and other high-need specialties—away from the bedside while extension requests languish at USCIS. And it imposes enormous administrative burdens on institutions, including, by DHS's own estimate, more than $250 million in nonrecoverable compliance costs in the first year alone. DHS's responses to comments did not meaningfully engage with these serious and well-documented concerns, offering little more than the agency's unsupported "belie[f]" that the harms would not materialize. As Plaintiffs have explained, the Final Rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). *Amici*'s members' experience confirms the breadth and severity of these harms and the need for preliminary relief.

That relief should take the form of a stay of the Final Rule's September 15, 2026, effective date under Section 705 of the APA. 5 U.S.C. § 705. Only relief that operates on the Final Rule itself will preserve the status quo for all affected students and exchange visitors, avoid the confusion and competitive harm of a patchwork regime in which the Final Rule applies to some institutions and visa-holders but not others, and spare *Amici*'s members the burden of overhauling their programs to comply with a rule that may ultimately be vacated.

## ARGUMENT

### I. The Rule Irreparably Harms AAU and AAMC Members and Their Affiliated Students, Scholars, and Physicians.

The Final Rule's sweeping regulatory changes are causing, and will continue to cause, irreparable harm to AAU and AAMC members and their affiliated international students, scholars, and physicians. As Plaintiffs have demonstrated, the Final Rule is deterring enrollment by international students and scholars, forcing institutions to choose between making fundamental changes to their programs or no longer offering those programs to international students, and imposing significant administrative burdens. *See* Memo ISO Plaintiffs' Mot. ("Pls. Memo") at 35–41 (Aug. 18, 2026), ECF No. 13. These effects are well-documented in the university declarations submitted by Plaintiffs, including those from AAU members. *See* Arizona State Univ. Decl., ECF No. 2-9; Boston Univ. Decl. ("BU Decl."), ECF No. 2-10; Columbia Univ. Decl., ECF No. 2-11; Cornell Univ. Decl., ECF No. 2-12; Univ. of Pennsylvania Decl. ("Penn Decl."), ECF No. 2-15; Univ. of Maryland College Park Decl. ("UMD Decl."), ECF No. 2-20. And these harms are plainly irreparable. *See* Pls. Memo at 35–41; *see also* Amicus Br. of States ISO Pls. Mot. at 5–15 (Aug. 25, 2026), ECF No. 21-1.

And because these harms are already happening, preliminary relief is both urgent and necessary to preserve the pre-rule status quo until the Court can fully consider and rule on the merits of Plaintiffs' challenge. *Amici* strongly urge this Court to stay the effective date of the Final Rule under 5 U.S.C. § 705, which will avoid harmful and unfair piecemeal implementation during the pendency of this litigation, and, as explained further below, preserve all stakeholders' interests in "uniformity." Part III, *infra* (quoting 91 Fed. Reg. at 45019). AAU and AAMC adopt and incorporate the facts in their members' declarations here. Additional details on harms to their members are set forth below.

**A. Declines in Enrollment.**

As AAU cautioned in its comments on the Proposed Rule, implementing DHS's proposed regulatory changes "will deter enrollment of international students and exchange visitors at significant cost to our [nation's] research enterprise, technological and medical innovation, and the U.S. economy." AAU cmt. at 3 (Ex. 16 to Pls. Mot., ECF No. 2-25). AAMC, too, warned that these "disruptions" "will lead to reduced interest in U.S. educational opportunities among international learners." AAMC cmt. at 2.[2] That is because a four-year admission period "does not cover the expected timeline for completion of many academic and exchange programs," particularly those at the doctoral and postdoctoral levels. AAU cmt. at 3; *see id.* at 4 (noting doctoral students require a median of 5.7 years from start of program to completion of degree); *id.* at 5 (discussing joint degree programs ranging from five to eight years).

The harm starts before enrollment: When considering schools, many prospective students—whether because of the type of program they are applying to or personal circumstances affecting the pace of their coursework relative to their peers—cannot be confident they will be able to complete their programs in the new fixed timeframes. And once enrolled, with extension of stay requests "left to the discretion of USCIS officers," *id.* at 4, "a doctoral student … cannot be certain that they will be allowed to complete their degree," *id.* at 5. Given this uncertainty, according to recent surveys conducted by Plaintiff NAFSA and the Institute for Progress, nearly 50% of currently enrolled graduate students say they would not have enrolled had they known their admission would be for a fixed period, rather than duration of status. *See id.* at 13 (citing Clemens cmt. at 3 (Ex. 21 to Pls. Mot., ECF No. 2-26)).

[2] All public comments, including those not filed as an exhibit to Plaintiffs' Motion, are accessible at: https://www.regulations.gov/document/ICEB-2025-0001-0001/comment.

*Amici*'s members are already experiencing the effects of the Final Rule. For instance, AAU member University of Pennsylvania "has already observed a decline in international student enrollment," including dozens of international students withdrawing from a single master's program. Penn Decl. ¶ 13. AAU members the University of Maryland College Park and Boston University likewise cite "students' concerns about their ability to complete their studies absent duration of status" as a "major influence on enrollment decisions," UMD Decl. ¶ 16, and anticipate a resulting "decline in international student enrollment," BU Decl. ¶ 9.

Other AAU and AAMC members shared similar concerns in their comments. AAU member Washington University in St. Louis, for example, expressed concerns that the rule would "reduce enrollment" and "discourage international students and [exchange visitors] from pursuing educational, research, and training opportunities in the United States." WashU cmt. at 2, 23 (Ex. 31 to Pls. Mot., ECF No. 2-26). AAU member Yale University echoed those concerns, explaining that the uncertainty created by eliminating the duration of status framework "will clearly have a chilling effect" on the "willingness" of international students "to study in the U.S." Yale cmt. at 7 (Ex. 3 to Pls. Mot., ECF No. 2-24). And AAMC member University of Arkansas for Medical Sciences ("UAMS") reported similar anticipated effects on international enrollment at medical institutions, highlighting a "projected drop in international graduate student enrollment due to fears of not being able to complete a degree." UAMS cmt. at 2.

**B. Administrative Burdens.**

AAU and AAMC members will face significant administrative burdens to comply with the Final Rule, even before the Court reaches a decision on the merits, unless the Court stays the Final Rule's effective date under 5 U.S.C. § 705.

As DHS concedes, the Final Rule imposes massive nonrecoverable compliance costs, including more than $250 million in the first year alone. 91 Fed. Reg. at 45116. By DHS's own

estimate, "DSOs and ROs will have to spend approximately 135 hours for rule familiarization and adaptation in the first year after the rule takes effect." *Id.* at 45118. If not stayed, the Final Rule is set to take effect on September 15, 2026—just twelve days after the hearing on Plaintiffs' motion. *See* ECF No. 15 (setting hearing for Sept. 3, 2026). AAU and AAMC members therefore face imminent administrative burdens that would not be remedied if the Court were ultimately to vacate the Final Rule.

Comments by AAU and AAMC members are replete with examples of the administrative burdens imposed by the Final Rule. For instance, Johns Hopkins, a member of both AAU and (through its affiliated medical system) AAMC, estimates that extension-of-stay advising alone will require an additional 9,633 hours of staff time per year, equating to approximately five additional full-time advisors and a minimum budget increase of $511,457. Hopkins cmt. at 12 (Ex. 28 to Pls. Mot., ECF No. 2-26). The University of Illinois System, which includes AAU member University of Illinois Urbana-Champaign, estimates that compliance will "require 13 full-time positions, one part-time position and close to $2 million across the System for the first year alone." Univ. Ill. System cmt. at 3 (alterations omitted). AAU member Dartmouth reports that compliance will require at least an additional 2,505 hours of staff time within its Office of Visa and Immigration Services, the equivalent of more than one full-time employee, and at least an additional 1,252.5 hours among Human Resources personnel, the equivalent of more than sixty percent of a full-time employee's annual work. Dartmouth cmt. at 6–7. And AAU member University of Rochester, encompassing AAMC member University of Rochester Medicine, estimates increased advising needs will require hiring two full-time staff members at a cost of at least $80,000 per staff member. Rochester cmt. at 9–10 (Ex. 18 to Pls. Mot., ECF No. 2-26). Additional examples abound. *See, e.g.*, Ohio State Univ. cmt. at 2 (estimating $630,265 in costs for extension of stay advising alone).

Most imminently, institutions face staggering upfront administrative burdens as the Final Rule's September 15, 2026, effective date approaches. Existing systems must be entirely redesigned to bring schools into compliance. *See, e.g.*, Dartmouth cmt. at 6 ("international offices … will need to create and implement new systems and reporting structures for tracking I-94 expiration dates, employment authorization expiration dates, and application processing times"); Univ. of Rochester cmt. at 9 ("significant software updates, data collection, and business-process development will be required"); WashU cmt. at 25 (compliance will require upfront "update[es]" to "various systems," including "requests, websites, forms, process guides, webinars, orientations, and other materials shared with departments, international students, and [exchange visitors]"). If the Final Rule is not stayed, those burdens will accrue immediately as sunk costs that could not be recovered were the Court ultimately to vacate the Final Rule, rendering institutions' newly designed systems obsolete.

## II. The Final Rule Is Arbitrary and Capricious.

In addition to the grounds advanced by Plaintiffs, *see* Pls. Memo at 11–34, the Final Rule is arbitrary and capricious because DHS failed to consider and respond to significant concerns raised by AAU, AAMC, and their members and, separately, failed to adequately justify the Final Rule's application to J visas.

### A. DHS Failed to Adequately Respond to Significant Comments.

The Final Rule is arbitrary and capricious because DHS failed to adequately address "significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). In addition to the unaddressed comments highlighted by Plaintiffs, *see* Pls. Memo at 25–32, DHS also failed to adequately respond to comments regarding adverse impacts on U.S. research, innovation, and medical care.

### 1. Impact on U.S. Research and Innovation.

AAU, AAMC, and their members warned in public comments that the uncertainty created by the Proposed Rule's sweeping regulatory changes would have devastating impacts on American research and innovation. *See, e.g.*, AAU cmt. at 14 ("If the changes outlined in the proposed rule are implemented, it will be even more likely that the next great medical cure or scientific or technological innovation will be developed in another country."). AAU member Yale University, for instance, warned that the proposed regulatory changes "would undermine America's position as the preeminent destination for international graduate students, and, more importantly, undercut our national leadership in science and technology, to the benefit of competitor nations." Yale cmt. at 4. That is because, AAU explained, "[a]n important component of American leadership in research is our ability not only to cultivate domestic talent, but also to attract and retain the best and brightest from around the world." AAU cmt. at 12–13. Replacing duration of status with a fixed period of admission, subject to discretionary and backlogged extension requests, is likely to have the opposite effect by "discourag[ing] international students from seeking doctoral training in the U.S." and "forcing leading research universities to select trainees from a smaller pool of candidates." Yale cmt. at 4.

Moreover, even for those researchers who choose to attend U.S. institutions, the inevitable delays and denials of extension of stay requests mid-project will irreversibly disrupt critical research. *See, e.g.*, AAMC cmt. at 4 ("Research projects will be adversely affected by training disruptions or premature termination of research training if EOS applications are delayed or denied."); Yale cmt. at 6 ("Interruptions in research would disrupt ongoing projects and delay scientific discoveries critical to the U.S.' advancement and national interest."). To make these risks concrete: AAU member the University of Pittsburgh ("Pitt") reports that its J-1 postdoctoral researchers are "pursuing research with the potential to fundamentally reshape entire fields of

knowledge," including a project that is "[c]reating nanoparticles that can penetrate tumor shields and deliver chemotherapy drugs directly to cancer cells, while avoiding healthy tissues." Pitt cmt. at 4. And at AAU member Michigan State University ("MSU"), ongoing research conducted by and with international students and scholars includes a project working to develop unique "adhesives [with] abundant applications in automotive, defense and aerospace industries," which has already "gathered considerable attention from the U.S. automotive industry," as well as "mechanical engineering developed thermochemical energy storage technologies that will result in patents." MSU cmt. at 2.

In response to commenters' concerns about adverse impacts on U.S. research and innovation, DHS baldly asserted that it "believes that legitimate foreign national researchers will continue to seek educational and research opportunities in the United States based on the excellence of United States institutions and programs." 91 Fed. Reg. at 45002. The agency also pointed to the provision permitting continued on-campus employment for up to 240 days after the expiration of a visa-holder's stay if a timely filed extension of stay is pending. *Id*. But that is no response at all to the concerns commenters raised—that 240-day period was already contemplated in the Proposed Rule. And commenters explained that such period was insufficient to prevent research disruptions in light of USCIS processing times. As Yale University explained, the 240-day period of continued on-campus employment authorization would not prevent mid-project disruptions because "USCIS adjudication historically takes significantly longer." Yale cmt. at 6. Indeed, the Final Rule itself acknowledges that there are already "backlogs in the processing of [extension of stay] applications," and the rule will cause a further *increase* in the volume of applications and USCIS processing times. 91 Fed. Reg. at 45009. DHS has thus confirmed commenters' concerns—that delays in extension of stay adjudications will prevent students and

exchange visitors from continuing to pursue important work—but made no meaningful effort to address this important aspect of the problem.

DHS's failure to meaningfully engage with commenters' projections of adverse impacts on American research and innovation—beyond a mere acknowledgment that such concerns were raised—was arbitrary and capricious. *See, e.g.*, *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) ("An agency … cannot simply state it 'believes' something to be true -- against the weight of all the evidence before it -- without further support."); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."); *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) (agency does not demonstrate "reasoned decisionmaking" by merely "[n]odding to concerns"), *vacated and remanded on mootness grounds sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022).

### 2. Impact on U.S. Medical Care.

AAMC, AAU, and their members also emphasized that the Final Rule "will be detrimental for access to [medical] care in our nation in the near future and in the long term." AAMC cmt. at 2. That is because "[d]elays or denials of [extension of stay] applications will result in physicians" on J visas—particularly those in "high need specialties that require four or more years of training like psychiatry, neurology, and surgery"—"being required to leave the country immediately, disrupting patient care and program continuity." *Id.* at 3. That is no small problem: "Roughly 17,000 international physicians, both residents and fellows, train in the U.S. each year in J visa status," making up approximately 10% of all resident physicians training in the U.S. in 2023. *Id.* at 2–3. And because those "J-1 physicians often specialize in primary care specialties" and fill critical gaps in care for "underserved and rural communities," "their presence [is] all the more important." AAU cmt. at 8; *see also* AAMC cmt. at 2–3 ("States like Texas, Florida,

Pennsylvania, Michigan, and Ohio have some of the highest percentages of non-citizen graduate medical education (GME) trainees" and also "some of the most Health Professional Shortage Areas (HPSAs).").

For example, Johns Hopkins University, a member of both AAU and (through its affiliated medical system) AAMC, explained that its hospitals are "highly dependent upon trainees on J-1 visas to provide patient care," with 7.9% of its medical residents and clinical fellows being J nonimmigrants. Hopkins cmt. at 10. Based on USCIS processing times, Johns Hopkins estimates that extension of stay processing delays alone could take those providers "out of active work for weeks or even several months," even after accounting for the applicable 240-day period of continued work authorization. *Id.* That would mean "longer duty hours and a significant impact on well-being for our residents and fellows who are U.S. citizens, endangering their health, the other medical professionals at the hospital, and of course our patients." *Id.*

Similarly, the University of Washington ("UW"), a member of both AAU and (through its medical school) AAMC, reported that "[d]isruptions to patient care, and the possibility of vacancies, cannot be addressed by filling these positions with U.S. citizen physicians simply because there are not enough U.S. citizen physicians to fill them"—each year, "there are more available positions than total number of applicants." UW cmt. at 7. As such, inevitable extension of stay delays and denials will "impact patient care in our emergency departments, operating rooms, inpatient wards, and ambulatory clinics, resulting in a decrease in both access to care and quality of care for patients in our health care settings." *Id.* "At a time when many parts of the country, especially rural areas, are suffering from healthcare shortages," the University of Washington cautioned, "the proposed rule would only exacerbate the problem." *Id.*

In response to commenters' dire warnings of adverse impacts on U.S. medical care, DHS disputed the premise, baselessly asserting that "[a]ny reduction in J-1 Alien Physicians is expected to be minimal and not impact healthcare systems in a significant way." 91 Fed. Reg. at 45089. The agency offered no data or evidence to support that cursory conclusion. And the conclusion is directly contradicted by the extensive analysis provided by medical institutions themselves.

As to commenters' overwhelming "concerns regarding delays in EOS adjudications and potential disruptions while the EOS application is pending," DHS simply reiterated that J-1 nonimmigrants "who have timely filed" for an extension of stay will be permitted to "continue employment and training activities, consistent with the exchange program, for up to 240 days beyond the expiration of their authorized period of admission." 91 Fed. Reg. at 45052. But, once again, this was no response at all: The 240-day period was already contemplated in the Proposed Rule, accounted for in medical institutions' projections of disrupted care, *see, e.g.*, Hopkins cmt. at 10, and is inadequate in light of existing USCIS backlogs and processing times that will only be further exacerbated by the rule, *see* 91 Fed. Reg. at 45009.

As with impacts on research and innovation, DHS's failure to meaningfully engage with commenters' projections of adverse impacts on patient care—beyond merely "[n]odding to concerns," *Gresham*, 950 F.3d at 103, and asserting that the agency "believes" otherwise, *Baltimore*, 973 F.3d at 276—was arbitrary and capricious.

### B. DHS Failed to Adequately Justify the Final Rule's Application to J Visas.

The Final Rule is particularly arbitrary and capricious in its application to J visas for exchange visitors for two distinct reasons.

*First*, DHS failed to justify its imposition of the same fixed admission period on *all* exchange visitor programs, including programs for non-students. Many J visa-holders are not students. Unlike the F visa category, which comprises only students enrolled in a full-time

program of study, the J visa category encompasses a wide range of exchange visitor programs, including those for professors and physicians. 22 C.F.R. § 62.4; *see also* 91 Fed. Reg. 44981 (listing exchange visitor program categories).

Yet, DHS focused its rationale for the Final Rule almost exclusively on characteristics of exchange visitors enrolled as students in post-secondary programs, observing that "[e]xchange visitor program categories include college and university students" who "are pursuing post-secondary studies alongside F-1 nonimmigrants." 91 Fed. Reg. at 44987. Deeming J nonimmigrants "similarly situated" to F nonimmigrants in that both categories include post-secondary students, DHS opted to treat those categories in a "consistent manner"—without ever recognizing that J nonimmigrants are often not similarly situated in their work or in the nature of their programs. *Id.* at 45111.

Likewise, DHS purported to justify the selected four-year duration with reference to the typical length of *student* degree programs. In the Proposed Rule, DHS recognized that "some F and J nonimmigrants may have program end dates longer than 4 years" but stated that a four-year maximum was "the best option because it aligns with the general structure of post-secondary education."[3] In the Final Rule, DHS recognized that "certain groups under the affected J Visa populations have longer program lengths than the 4-year length of stay," 91 Fed. Reg. at 45015, but again failed to justify the selected four-year duration as an appropriate length across all J visa programs beyond asserting that the agency desired "consistent application across the board." *Id.*

DHS's failure to provide a rationale for imposing the same four-year duration on all exchange visitor programs, including those whose participants are not students, renders that

[3] *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070, 42082 (proposed Aug. 28, 2025).

decision arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*Second*, the State Department—as the agency responsible for administering the J visa program—has already prescribed specific limits on program duration for several J visa categories, including a five-year limit for professors and research scholars, 22 C.F.R. § 62.20(i)(1), and a default seven-year limit for physicians, *id.* § 62.27(e)(2). The State Department has declined to impose a maximum duration for post-secondary students. *See id.* § 62.23(h)(1). DHS scarcely acknowledges, let alone justifies, a departure from the reasoned judgments of the State Department as to the appropriate duration of the programs it administers. *See* 91 Fed. Reg. at 44982 (acknowledging only that "[e]xtensions of J exchange visitor programs are governed by DoS regulations" which establish "maximum program duration"); *id.* at 45049 (referring to State Department approval of a J-1 program extension as only "one factor" DHS would consider in adjudicating an extension of stay). This omission, too, was arbitrary and capricious. *See Regents*, 591 U.S. at 30; *State Farm*, 463 U.S. at 43.

**III. Relief Under APA Section 705 Is Appropriate and Necessary.**

Finally, *Amici* write to emphasize their support for a stay of the Final Rule under Section 705 of the APA. *See* Pls. Memo at 42–43; Compl. at 80 (Prayer for Relief (b)).

As this Court recently recognized, Section 705 provides "clear … statutory authority to stay" a challenged agency action "in its entirety." *Massachusetts v. Dep't of Educ.*, 831 F. Supp. 3d 34, 49–51 (D. Mass. 2026) (Saylor, J.) (citing cases holding that APA relief is "not coextensive" with "the equitable authority" discussed in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which "therefore does not control the scope of relief available under § 705"). That is because, as the First Circuit has since reaffirmed, this early-stage remedy, like permanent APA relief, "operates" "on

the agency action itself"—here, the Final Rule. *Woonasquatucket River Watershed Council v. USDA*, No. 25-1428, __ F.4th ___, 2026 WL 2279789, at *19 (1st Cir. Aug. 7, 2026). Postponing the Final Rule's effective date would therefore preserve the status quo for all affected students, scholars, and physicians, regardless of institutional affiliation, pending a final decision on the merits. *See id.* at *20–21 (reaffirming that APA authorizes "nonparty relief" as both preliminary and permanent remedies); *accord Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." (citation omitted)), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (2025) (declining to grant review as to remedy); *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *35–36 (D.C. Cir. Nov. 22, 2025) (per curiam).

To the extent the Court weighs "efficiency and uniformity" against concerns about judicial overreach, *Massachusetts*, 831 F. Supp. 3d at 51, this is the paradigmatic case for Section 705 relief. Two sets of rules would cause chaos and harm, while on the other end of the balance, Section 705 relief would not harm the government and would serve the interests of judicial economy.

<u>A Section 705 stay would avoid confusion and educational disruption</u>. The Final Rule has not yet taken effect, so a stay would preserve the existing status quo nationwide. Allowing the rule to go into effect in some places but not others will sow confusion and uncertainty while this case proceeds—confusion that would prove entirely unnecessary if the Court ultimately vacates the rule and restores the pre-rule status quo. That outcome would harm students, institutions, and the government alike, with no offsetting benefits.

While this case proceeds, students, scholars, and physicians will be actively making choices about where to start or continue their education, medical training, or research, particularly if their programs of study or research projects are likely to last more than four years. Under a piecemeal preliminary injunction, individuals would be incentivized to choose a program that is not subject to the Final Rule's four-year maximum admission period and other restrictions. Students, scholars, and physicians will thus be forced to make difficult and potentially irreversible choices, which may interrupt or disrupt their educational or research progress. *See, e.g.*, 8 C.F.R. § 214.2(f)(5)(ii) (2026) (prohibiting F-1 graduate students from transferring programs or changing educational objectives once Final Rule takes effect). This scenario puts nonparty institutions at a distinct competitive disadvantage, and it subjects *all* institutions to the burdens of processing an inevitably increased volume of transfer requests in anticipation of the Final Rule's effective date. And as discussed above, *see* Part I.B, *supra*, the immense administrative burdens the Final Rule imposes upfront would be sunk costs if, at the conclusion of this litigation, the Court were to vacate the Final Rule thereby forcing institutions nationwide to upend their practices once more and revert to their current systems.

<u>A Section 705 stay would not harm the government</u>. The government will not be harmed by a delayed effective date while litigation continues. To the contrary, different rules for different institutions while this case is pending would undermine the government's expressed preference for "ensur[ing] uniformity in the conditions placed on nonimmigrants." 91 Fed. Reg. at 45019. Each student's or scholar's period of admission runs from the Final Rule's effective date. *See, e.g.*, *id.* at 45099 ("an alien's period of admission will expire on the program end date on the alien's Form I-20 or DS-2019 that is valid on the final rule's effective date, not to exceed a period of 4

years from the final rule's effective date…"). But if the rule has different effective dates depending on institutional affiliation, that would thwart the government's goal of uniformity.

A Section 705 stay would not harm nonparty schools. Moreover, a stay would cause no harm to nonparty schools that prefer the Final Rule's fixed period of admission, in lieu of the pre-rule status quo. If the rule is stayed, institutions would retain their discretion under existing regulations to determine when a student's status expires by defining what constitutes "normal progress toward completing a course of study." 8 C.F.R. § 214.2(f)(5)(i). Indeed, in issuing the Final Rule, DHS emphasized the discretion afforded to school officials pursuant to the existing "normal progress" standard, noting that some DSOs elect to apply a "strict standard" for program extensions akin to that established in the Final Rule. 91 Fed. Reg. at 45107; *see also* AAU cmt. at 9 (explaining discretion enjoyed by DSOs in making program extension decisions under existing regulatory framework).

A Section 705 stay would serve judicial economy. Finally, judicial economy would be served by a stay. Party-specific preliminary relief would leave individuals and institutions outside its scope facing irreparable harm—compounded by a regime in which the Final Rule applies to some visa-holders but not others—and would predictably invite duplicative litigation as those left uncovered bring their own challenges. That duplication is not warranted here: a lack of systemwide uniformity would harm nonparties and the government alike, while systemwide preliminary relief would cause no countervailing harm to the government or to schools that prefer the Final Rule's fixed period of admission.

## CONCLUSION

For these reasons, and for those stated in Plaintiffs' memorandum in support of their motion, *Amici* respectfully request that the Court grant Plaintiffs' Motion for APA § 705 Relief, a Preliminary Injunction or, in the Alternative, Summary Judgment.

Dated: August 31, 2026

Respectfully submitted,

/s/ *Shoba Pillay*

JENNER & BLOCK LLP

Shoba Pillay, BBO No. 659739
Andrianna D. Kastanek
*(pro hac vice)*
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com
AKastanek@jenner.com

Ishan K. Bhabha
*(pro hac vice)*
Lindsay C. Harrison
*(pro hac vice)*
Elizabeth Henthorne
*(pro hac vice)*
1099 New York Avenue NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
LHarrison@jenner.com
BHenthorne@jenner.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of August, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

Dated: August 31, 2026

/s/ *Shoba Pillay*

Shoba Pillay, BBO No. 659739
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com