# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br>Defendants. | ) | Civil Action No. 1:26-cv-13799 |

**DEFENDANTS' RESPONSE**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR APA § 705 RELIEF,**
**A PRELIMINARY INJUNCTION OR, ALTERNATIVELY, SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ....................1

BACKGROUND ....................2

I. Statistory and Regulatory Background ....................2

A. F-1 Nonimmigrant Student Classification ....................2

B. J Nonimmigrant Classification ....................4

C. I Nonimmigrant Classification ....................5

D. Student and Exchange Visitor Information System (SEVIS) ....................5

II. Factual and Procedural Background ....................6

A. Proposed Rule ....................7

B. Final Rule ....................10

STANDARD OF REVIEW ....................11

ARGUMENT ....................12

I. Plaintiffs Are Not Likely to Succeed on the Merits ....................12

A. The Final Rule Is Adequately Reasoned and Supported by Reliable Evidence ....................13

1. DHS Reasonably Found the Benefits Outweigh the Costs ....................13

2. The Final Rule Is a Rational Response to the Identified Problems ....................19

3. DHS Adequately Considered Alternatives to the Final Rule ....................23

4. DHS Responded to All Significant Comments ....................26

5. The 32-day comment period was adequate and provided a meaningful opportunity for public participation ....................30

II. Plaintiffs Fail to Establish That Their Members Will Suffer Irreparable Harm ....................32

A. Declines in Enrollment ....................33

B. Modifications to Programs....35

III. The Final Rule Supports Academic Mobility While Complying with Immigration Laws and Is Not Contrary to Law....38

IV. Remaining Equities Do Not Favor Emergency Relief....40

V. If the Court Chooses to Grant Preliminary Relief, Such Relief Must be Narrowly Tailored to Plaintiffs and Their Members....41

VI. Plaintiffs' Request for Summary Judgment Is Premature....44

CONCLUSION....44

# TABLE OF AUTHORITIES

## CASES

*Akebia Therapeutics, Inc. v. Azar*,
976 F.3d 86 (1st Cir. 2020) ........................................................................................ 11

*Alignment Healthcare Inc. v. HHS*,
181 F.4th 1236 (D.C. Cir. 2026) ................................................................................. 17

*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022)................................................................................... 39, 40

*Anversa v. Partners Healthcare Sys., Inc.*,
835 F.3d 167 (1st Cir. 2016) ........................................................................................ 37

*Ass'n of American Universities v. Department of Defense*,
792 F. Supp. 3d 143 (D. Mass. 2025) .................................................................... 36, 37

*Ass'n of American Universities v. National Science Foundation*,
788 F. Supp. 3d 106 (D. Mass. 2025) ........................................................................... 36

*Associated Fisheries of Me., Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997) ........................................................................................ 12

*Baptiste v. Kennealy*,
490 F. Supp. 3d 353 (D. Mass. 2020) ........................................................................... 33

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................................... 11

*Bruno Project Rescue, Inc. v. CDC*,
182 F.4th 1 (1st Cir. 2026) ................................................................................ 19, 21, 22

*Burlington Truck Lines v. United States*,

371 U.S. 156 (1962) ........................................................................................................ 13

*Califano v. Sanders*,

430 U.S. 99 (1977) .......................................................................................................... 44

*California v. Kennedy*,

802 F. Supp. 3d (D. Mass. 2025) .............................................................................. 31, 32

*California v. U.S. Dep't of Educ.*,

132 F.4th 92 (1st Cir. 2025) ............................................................................................ 11

*CASA de Md., Inc. v. Trump*,

971 F.3d 220 (4th Cir. 2020)............................................................................................ 43

*Casa de Md., Inc. v. Wolf*,

486 F. Supp. 3d (D. Md. 2020) ........................................................................................ 43

*Charlesbank Equity Fund II v. Blinds To Go*, Inc.,

370 F.3d 151 (1st Cir. 2004) ...................................................................................... 11, 33

*Citadel Sec. LLC v. SEC*,

178 F.4th 621 (11th Cir. 2026)......................................................................................... 22

*Citizens to Pres. Overton Park, Inc. v. Volpe*,

401 U.S. 402 (1971) ........................................................................................................ 44

*City of Arlington v. FCC*,

569 U.S. 290 (2013) ........................................................................................................ 12

*City of Waukesha v. EPA*,

320 F.3d 228 (D.C. Cir. 2003) ........................................................................................ 32

*Coe v. McHugh*,

968 F.Supp.2d 237 (D.D.C. 2013) ................................................................................... 12

*Commonwealth of Massachusetts v. Department of Education*,

828 F. Supp. 3d 198 (D. Mass. 2026) ........................................................................ 37, 38

*Dep't of Commerce v. New York*,

588 U.S. 752 (2019) ........................................................................................................ 19

*Di Biase v. SPX Corp.*,

872 F.3d 224 (4th Cir. 2017)............................................................................................ 33

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,

952 F.2d 802 (4th Cir. 1991)....................................................................................... 32, 34

*Doe v. Trustees of Dartmouth Coll.*,

597 F. Supp. 3d 511 (D.N.H. 2022) ........................................................................... 11, 32

*Encino Motorcars, LLC v. Navarro*,

579 U.S. 211 (2016) ........................................................................................................ 29

*Env't Def. Fund v. EPA*,

183 F.4th 867 (D.C. Cir. 2026) ........................................................................................ 24

*Farah v. U.S. Att'y Gen.*,

12 F.4th 1312 (11th Cir. 2021)......................................................................................... 19

*FCC v. Prometheus Radio Project*,

592 U.S. 414 (2021) ........................................................................................ 13, 19, 23, 30

*Fla. E. Coast Ry. LLC v. Fed. R.R. Admin.*,

No. 24-11076, 2026 WL 2321640 (11th Cir. Aug. 11, 2026)........................................... 25, 34

*Friends of the River v. FERC*,

720 F.2d 93 (D.C. Cir. 1983) ........................................................................................... 18

*Hinge v. Lyons*,

No. CV 25-1097 (RBW), 2025 WL 1134966 (D.D.C. Apr. 15, 2025) .................................... 24

*Holder v. Humanitarian Law Project*,

561 U.S. 1 (2010) ..................................................................................................... 41, 43

*Immigrant Defs. L. Ctr. v. Noem*,

145 F.4th 972 (9th Cir. 2025)............................................................................................. 43

*INGAA v. PHMSA*,

114 F.4th 744 (D.C. Cir. 2024) ............................................................................... 28, 29

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,

802 F.3d 99 (1st Cir. 2015) ................................................................................................ 12

*Kinney-Coastal Oil Co. v. Kieffer*,

277 U.S. 488 (1928) .......................................................................................................... 42

*Loper Bright Enters. v. Raimondo*,

603 U.S. 369 (2024) ..................................................................................................... 12, 39

*Maine Forest Prods. Council v. Cormier*,

51 F.4th 1 (1st Cir. 2022) ........................................................................................ 11, 14, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29 (1983) ........................................................................................................ passim

*Nat'l Lifeline Ass'n v. FCC*,

921 F.3d 1102 (D.C. Cir. 2019) ......................................................................................... 31

*Nat'l Shooting Sports Found., Inc. v. Jones*,

716 F.3d 200 (D.C. Cir. 2013) ........................................................................................... 19

*Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*,

734 F.3d 1208 (D.C. Cir. 2013) ......................................................................................... 17

*Nken v. Holder*,

556 U.S. 418 (2009) ..................................................................................................... 11

*Perez v. Mortgage Bankers Ass'n*,

575 U.S. 92 (2015) ................................................................................................. 26, 27

*Petry v. Block*,

737 F.2d 1193 (D.C. Cir. 1984) ................................................................................... 31

*Pub. Citizen, Inc. v. NHTSA*,

374 F.3d 1251 (D.C. Cir. 2004) ................................................................................... 17

*Regents of the Univ. of Cal.*,

591 U.S. 1 (2020) ............................................................................................ 23, 29, 33

*S. Pac. Transp. Co. v. ICC*,

871 F.2d 838 (9th Cir. 1989)........................................................................................ 17

*S. Shore Hosp., Inc. v. Thompson*,

308 F.3d 91 (1st Cir. 2002) .......................................................................................... 12

*Sampson v. Murray*,

415 U.S. 61 (1974) ................................................................................................. 37, 41

*Save the Sound, Inc. v. FAA*,

183 F.4th 763 (D.C. Cir. 2026) ............................................................................... 18, 30

*Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*,

624 F.3d 489 (D.C. Cir. 2010) ..................................................................................... 23

*Spokane Airport Bd. v. TSA*,

164 F.4th 933 (D.C. Cir. 2026) ..................................................................................... 23

*Starbucks Corp. v. McKinney*,

602 U.S. 339 (2024) ........................................................................................................ 42

*Together Emps. v. Mass Gen. Brigham Inc.*,

32 F.4th 82 (1st Cir. 2022) ................................................................................................ 11

*Trajano v. v. U.S. Citizenship and Immigration Services*,

No. CV 25-12388-FDS, 2026 WL 2137917 (D. Mass. July 24, 2026)................................... 30

*Trump v. CASA, Inc.*,

606 U.S. 831 (2025) ........................................................................................................ 42

*Trump v. Hawaii*,

585 U.S. 667 (2018) ........................................................................................... 14, 15, 16

*Util. Air Regul. Grp. v. EPA*,

573 U.S. 302 (2014) ........................................................................................................ 38

*Wash. All. of Tech. Workers v. DHS*,

50 F.4th 164 (D.C. Cir. 2022) ........................................................................................... 38

*Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7 (2008) ............................................................................................... 35, 40, 41

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,

758 F.2d 669 (D.C. Cir. 1985) ............................................................................ 34, 35, 37

*Woonasquatucket River Watershed Council, v. U.S. Dept. of Agriculture*,

2026 WL 2279789 (1st Cir. Aug. 7, 2026) .......................................................................... 43

**STATUTES**

5 U.S.C. § 553 .................................................................................................................. 31

5 U.S.C. § 704 .................................................................................................................. 11

5 U.S.C. § 705 ............................................................................................................ 42, 44

5 U.S.C. § 706 .......... 44

5 U.S.C. § 706(2)(A) .......... 11

8 U.S.C. 1184(a)(1) .......... 1, 38

8 U.S.C. § 1101(a)(15)(I) .......... 5, 7

8 U.S.C. § 1101(a)(15)(J) .......... 4

8 U.S.C. § 1103(a)(3) .......... 38, 39

8 U.S.C. § 1372 .......... 6, 24

8 U.S.C. § 1372(a)(1) .......... 6

8 U.S.C. §§ 1184(a) .......... 39

**RULES**

Fed. R. Civ. P. 56(a) .......... 12

**REGULATIONS**

38 Fed. Reg. 35425 .......... 3

8 C.F.R. § 214 .......... 3

8 C.F.R. § 214.2 (f)(5)(i) (2025) .......... 6

8 C.F.R. § 214.2(f) .......... 2

8 C.F.R. § 214.2(f)(3) .......... 2, 7

8 C.F.R. § 214.2(i) .......... 5

8 C.F.R. § 214.2(j)(1)(iv) (2025) .......... 6

8 C.F.R § 214.2(j)(1)(ii) (1985) .......... 4, 6

22 C.F.R. § 41.52(c) .......... 7

22 C.F.R. § 41.61 .......... 2

22 C.F.R. § 62.43 ........ 6

22 C.F.R. §§ 62.20-62.32 ........ 4

85 Fed. Reg. 60526 (Sept. 25, 2020) ........ 4, 5

90 Fed. Reg. 42070 ........ passim

8 C.F.R. § 214.2(i) (2025) ........ 7

8 C.F.R § 214.2(j)(1)(ii) (1985) ........ 4

91 Fed. Reg. 44976 ........ passim

43 Fed. Reg. 32306 (July 26, 1978) ........ 3

43 Fed. Reg. 54618 (Nov. 22, 1978) ........ 3

46 Fed. Reg 7267 (Jan. 23, 1981) ........ 3

48 Fed. Reg. 14575 (Apr. 5, 1983) ........ 3

52 Fed. Reg. 13223 (Apr. 22, 1987) ........ 3

56 Fed. Reg 55608 (Oct. 29, 1991) ........ 4

58 Fed. Reg. ........ 31

86 Fed. Reg 35410 (July 6, 2021) ........ 4, 5

## OTHER AUTHORITIES

Executive Order 12866 ........ 31

## INTRODUCTION

The U.S. Department of Homeland Security (DHS) promulgated the challenged Final Rule to modernize an outdated immigration framework and close systemic vulnerabilities within the F, J, and I nonimmigrant visa categories. By replacing the indefinite "duration of status" (D/S) admission framework with a fixed period of admission, the Final Rule establishes predetermined intervals for immigration officers to evaluate whether nonimmigrants are complying with the terms and conditions of their nonimmigrant status. This change, which requires all F, J, and I nonimmigrants who wish to remain in the United States beyond their specific authorized admission period to extend their stay, change their nonimmigrant status, or otherwise obtain authorization to remain in the United States, is a necessary measure to safeguard national security, combat documented instances of fraud and abuse, and ensure the overall integrity of the U.S. immigration system.

Plaintiffs seek to halt this critical regulatory update, but their motion for extraordinary relief must be denied because they are unlikely to succeed on the merits of their Administrative Procedure Act (APA) claims. DHS acted well within its broad, congressionally delegated authority to prescribe the time and conditions of nonimmigrant admissions pursuant to 8 U.S.C. 1184(a)(1). Furthermore, the agency engaged in reasoned decision-making throughout the rulemaking process. DHS provided a 32-day public comment period, adequately addressed significant concerns raised by commenters, and reasonably concluded that the profound national security and program-integrity benefits of the Final Rule far outweigh the speculative costs forecasted by Plaintiffs.

In addition to their failure on the merits, Plaintiffs cannot establish the actual and imminent irreparable harm required to justify a preliminary injunction. The injuries alleged by Plaintiffs—including declines in international student enrollment because of the Final Rule, routine

adjustments to academic programs, and standard administrative compliance costs—are conjectural and do not rise to the level of legally cognizable irreparable harm. Conversely, the balance of the equities and the public interest weigh heavily in favor of the Government, as enjoining the Final Rule would actively frustrate the Government's urgent objective to mitigate national security threats and enforce immigration laws.

Finally, even if this Court were to find that some form of equitable relief is warranted, such relief must be narrowly tailored to the specific Plaintiffs before the Court, rather than issued as a sweeping, nationwide injunction or universal stay under APA § 705 which cannot be squared with *CASA*. Furthermore, Plaintiffs' alternative request for summary judgment is procedurally premature, as a definitive ruling on the merits cannot be rendered before the Government has produced the full administrative record for the Court's review.

## BACKGROUND

### I. Statutory and Regulatory Background

#### A. F-1 Nonimmigrant Student Classification

The Immigration and Nationality Act ("INA"), as amended, permits aliens who are bona fide students to be temporarily admitted to the United States solely for the purpose of pursuing a full course of study at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic language training program. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f); 22 C.F.R. § 41.61. Principal applicants are categorized as F-1 nonimmigrants and their spouses and children who may accompany or follow to join as F-2 dependents. *See* 8 U.S.C. § 1101(a)(15)(F)(i)-(ii); 8 C.F.R. § 214.2(f)(3).

From 1973 to 1979, F students were admitted for one year and could be granted an Extension of Stay ("EOS") in increments of up to 12 months if they established that they were

maintaining status. *See* 38 Fed. Reg. 35425, 35426 (Dec. 28, 1973) ("The period of admission of a nonimmigrant student shall not exceed one year.").

On July 26, 1978, legacy INS proposed amending regulations to permit F-1 nonimmigrant students to be admitted for the duration of their status as students. *See* 43 Fed. Reg. 32306 (July 26, 1978) (Admission of Nonimmigrant Students for Duration of Status). Legacy INS explained the changes would facilitate the admission of nonimmigrant students, provide dollar and manpower savings to the Government, and permit more efficient use of resources. *Id.* at 32307.

On November 22, 1978, a final rule was published to amend the regulations at 8 C.F.R. § 214 to allow the legacy INS to admit F-1 nonimmigrant students for a duration of status ("D/S") period. *See* 43 Fed. Reg. 54618 (Nov. 22, 1978) ("The period of admission of a nonimmigrant student shall be for the duration of status in the United States as a student if the information on his/her Form I-20 indicates that he/she will remain in the United States as a student for more than 1 year. If the information on Form I-20 indicates the student will remain in the United States for 1 year or less, he/she shall be admitted for the time necessary to complete his/her period of study."). That rule became effective on January 1, 1979.

Subsequently, between 1981 and 1991, the INS amended the regulations addressing admission periods for F-1 nonimmigrant students four more times. *See* 46 Fed. Reg 7267 (Jan. 23, 1981) (changing admission for F-1 nonimmigrants to a fixed period, the time necessary to complete course of study with the opportunity for an EOS on a case-by case basis); 48 Fed. Reg. 14575 (Apr. 5, 1983) (reinstituting D/S along with new notification procedures for transfers between schools and improved reporting requirements for Designated School Officials); 52 Fed. Reg. 13223 (Apr. 22, 1987) (final rule outlining medical and academic reasons allowing F-1 students to drop below a full-time course of study while remaining in D/S and clarifying EOS and

reinstatement procedures); 56 Fed. Reg 55608 (Oct. 29, 1991) (clarifying procedures for F-1 students seeking EOS and employment authorization and giving Designated School Officials ("DSO") the authority to grant program extensions for F-1 students with a compelling academic or medical reason).

Pursuant to the 1991 final rule and since then, DHS has relied on DSOs to report on student status, issue program extensions, and transfer students between programs and schools with information being tracked in Student and Exchange Visitor Information System ("SEVIS"). *See* 91 Fed. Reg. 44976, 44981. Changes to D/S were proposed in 2020, but the proposal was withdrawn in 2021. *See* 85 Fed. Reg. 60526 (Sept. 25, 2020); 86 Fed. Reg 35410 (July 6, 2021).

**B. J Nonimmigrant Classification**

The J nonimmigrant classification was created in 1961 and authorizes aliens to participate in a variety of exchange visitor programs in the United States. The Exchange Visitor Program regulations cover the following categories: professors and research scholars, short-term scholars, trainees and interns, college and university students, teachers, secondary school students, specialists, alien physicians, international visitors, government visitors, camp counselors, au pairs, and summer work travel. *See* 8 U.S.C. § 1101(a)(15)(J); 22 C.F.R. §§ 62.20-62.32.

Prior to 1985, J exchange visitors were granted an initial admission for the period of their program up to one year, and in 1985, the regulations were amended to allow J exchange visitors to be admitted for the duration of their program plus 30 days. *See* 8 C.F.R § 214.2(j)(1)(ii) (1985). Changes to D/S were proposed for J exchange visitors in 2020, but the proposal was withdrawn in 2021. *See* 85 Fed. Reg. 60526 (Sept. 25, 2020); 86 Fed. Reg 35410 (July 6, 2021).

A prospective exchange visitor who seeks to be admitted to the United States in the J nonimmigrant classification must be sponsored by a U.S. Department of State ("DoS")-designated

program sponsor, who will issue a prospective J exchange visitor a Form DS-2019, which permits a prospective exchange visitor to apply for a J-1 nonimmigrant visa at a U.S. embassy or seek admission as a J-1 nonimmigrant at a point of entry ("POE"). A J-1 exchange visitor is admitted into the United States for D/S, which is the length of his or her exchange visitor program.

### C. I Nonimmigrant Classification

The INA defines the I classification as, "upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative, if accompanying or following to join him or her." 8 U.S.C. § 1101(a)(15)(I). Most nonimmigrant representatives of information media, with the exception of those presenting a passport issued by the People's Republic of China ("PRC"), are currently admitted for the duration of their employment and are not permitted to change their information medium or employer without obtaining permission from USCIS. *See* 8 C.F.R. § 214.2(i). Changes to D/S were proposed in 2020, but the proposed rule was withdrawn in 2021. *See* 85 Fed. Reg. 60526 (Sept. 25, 2020); 86 Fed. Reg 35410 (July 6, 2021).

### D. Student and Exchange Visitor Information System (SEVIS)

SEVIS "is a web-based system" that, as relevant here, DHS "uses to maintain information on Student and Exchange Visitor Program ("SEVP")-certified schools, [and] F-1 … students who come to the United States to attend those schools." ICE, SEVIS, *available at* https://www.ice.gov/sevis/overview (last visited Aug. 26, 2026).

It is the most recent iteration of a system created pursuant to a congressional mandate that

"[t]he [Secretary of Homeland Security][1] . . . develop and conduct a program to collect [certain information] from approved institutions of higher education, other approved educational institutions, and designated exchange visitor programs in the United States [certain information] with respect to aliens who have the status, or are applying for the status, of nonimmigrants under subparagraph (F), (J), or (M) of section 1101(a)(15) of this title." 8 U.S.C. § 1372(a)(1).

## II. Factual and Procedural Background

Unlike aliens in most nonimmigrant classifications who are admitted until a specific departure date, F, J, and I[2], nonimmigrants are admitted into the United States for an unspecified period, known as duration of status, to engage in activities authorized under their respective nonimmigrant classifications.

For F academic students, D/S is generally the time during which a student is pursuing a full course of study at an educational institution approved by DHS or engaging in authorized practical training following completion of studies, plus authorized time to depart the country. *See* 8 C.F.R. § 214.2 (f)(5)(i) (2025).

For J exchange visitors, D/S is the time during which an exchange visitor participates in an authorized program, plus authorized time to depart the country. *See* 8 C.F.R. § 214.2(j)(1)(ii) (2025) (explaining the initial admission period); 8 C.F.R. § 214.2(j)(1)(iv) (2025) (explaining that extensions of stay can be obtained with a new Form DS-2019); *see also* 22 C.F.R. § 62.43 (permitting responsible officers to extend J nonimmigrant's program beyond the original DS-2019 end date according to length permitted for the specific program category).

[1] 8 U.S.C. § 1372 refers to the Attorney General, but those functions were transferred to DHS in the Homeland Security Act of 2002.

[2] Except for some I nonimmigrants from the People's Republic of China.

For I representatives of foreign information media, D/S amounts to the duration of their foreign employment duties in the United States. 8 C.F.R. § 214.2(i) (2025). D/S for dependents of principal F, J or I nonimmigrants, generally corresponds with the principal's period of admission, as long as they are also complying with requirements of their classifications. *See* 8 C.F.R. § 214.2(f)(3) (2025), (f)(5)(vi)(D) (2025) (discussing F-2 period of authorized admission); 214.2(j)(1)(ii) (2025), (j)(1)(iv) (2025) (discussing J-2 authorized period of admission); *see also* 8 U.S.C. § 1101(a)(15)(I); 22 C.F.R. § 41.52(c).

Since the introduction of D/S, the number of F, J, and I nonimmigrants admitted each year into the United States has significantly increased. In Fiscal Year ("FY") 2024 alone, there were over 1.8 million admissions in F status, over 500,000 admissions in J status and 37,330 admissions for I classification, figures which represent a substantial increase when compared to FY23 and which represent a dramatic increase since the inception of D/S by the legacy INS. *See* 90 Fed. Reg. 42070, 42071. The significant increases in volume and lack of direct engagement with DHS undermine DHS's ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence and has created incentives for fraud and abuse. *See* 91 Fed. Reg. 44976, 44977. DHS believes greater oversight will deter F, J or I nonimmigrants from engaging in fraud and abuse and strengthen the integrity of these nonimmigrant classifications while enhancing national security. *Id.*

**A. Proposed Rule**

In an attempt to institute policies that would encourage aliens to maintain lawful status and mitigate fraud risks and security concerns, DHS announced its proposed rule on August 25, 2025. *See Establishing a Fixed Time Period of Admission and an Extension of Stay (EOS) Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign*

*Information Media*, 90 Fed. Reg. 42070 (Aug. 28, 2025) (Proposed Rule). In the Proposed Rule, DHS identified national security risks associated with F and J classifications along with the need for stronger vetting categories and information collection for the I classification of nonimmigrants. *Id*.

For F and J nonimmigrants, DHS proposed replacing D/S and setting the length of the specific program not to exceed a 4-year period or the end of the program end date on Form I-20 or DS-2019, whichever is shorter. *Id*. at 42081. This proposed change would establish a mechanism for immigration officers to assess nonimmigrants and determine whether they are complying with the conditions of their classification. *Id*. at 42084. DHS proposed clarifying the calculation periods for F-1 and J-1 nonimmigrants and explained that the 30-day arrival period would not begin from the date of admission, but instead from the program start date. Similarly, the 30-day departure period would not count towards the 4-year maximum period of admission. *Id*. at 42082.

For I nonimmigrants, DHS proposed updating the evidence required to demonstrate eligibility and a period of admission that does not exceed 240 days or the time necessary to complete their activities, whichever is shorter, while also allowing an extension of stay of up to 240 days. *Id*. at 42086.[3]

DHS also observed a pattern of changes in educational objectives, including students continuously enrolling in different programs at the same degree level, immediately transferring schools upon arrival in the United States or changing to a lower educational level despite having completed a graduate program. Proposed Rule at 42088. Since 2020, there have been over 13,000 F-1 students who transferred before the start of classes or within their first term, including over

[3] Nonimmigrants in the I-classification presenting passports from the PRC (other than a Hong Kong SAR passport or Macau SAR passport) would be given admission and extension of stay periods of up to 90 days or until the activities or assignments consistent with the I classification are completed, whichever is shorter.

4,400 transfers from higher education to an English language program. *Id*. While the number of transfers represent a small percentage of the total F-1 student population, such transfers are often promoted by third-party recruiters or other for-profit entities, allowing aliens to use the visa process to mask their intent in the United States or circumvent F-1 restrictions. *Id.*

Accordingly, DHS proposed 1) to restrict school transfers and changes of educational objectives within the first academic year, unless an exception is authorized 2) to prohibit F-1 graduate students from changing educational objectives or transferring within the United States and 3) to require nonimmigrants who have completed a program at one educational level to only pursue a program at a higher educational level. *Id*.

Nonimmigrants seeking an extension beyond the fixed period would be required to apply for an extension of stay ("EOS") request using Form I-539, Application to Extend/Change Nonimmigrant Status, along with providing any necessary biometrics, which USCIS has the general authority to require and collect. Proposed Rule at 42083. For example, an F-1 student with a fixed date of admission may request an additional 4 months to complete his or her program because of an authorized drop below a full course of study for one semester due to illness *Id.* at 42092. However, a delay caused by academic probation, suspension or students' inability or unwillingness to complete the course of study is generally an unacceptable reason for an extension for F nonimmigrants. DHS also proposed a new factor in the EOS provisions —circumstances beyond the student's control, including a natural disaster, a national health crisis, or the closure of an institution. *Id*. at 42093.

For an F, J or I alien who timely files an application for EOS and leaves the United States before USCIS approves the EOS application and applies for admission to continue his or her activities for the balance of the previously authorized admission period, USCIS would not consider

the EOS application abandoned. Proposed Rule at 42083.

In support of its proposed changes, DHS provided multiple examples of ongoing national security threats posed by certain nonimmigrant classifications along with school owners and officials who engaged in "pay-to-stay" fraud by falsely reporting F-1 students' status in return for cash payments. *See* 90 Fed. Reg. 42070 nn.59, 61, 72, 78, 79; *see also* Press Release, Immig. and Customs Enf't, *Owner of schools that illegally allowed foreign nationals to remain in US as "students" sentenced to 15 months in federal prison* (Apr. 19, 2018), available at *https://www.ice.gov/news/releases/owner-schools-illegally-allowed-foreign-nationals-remain-us-students-sentenced-15* (last visited Aug. 27, 2026); Press Release, U.S. Dep't of Justice, *Chinese Government Employee Convicted of Participating in Conspiracy to Defraud the United States and Fraudulently Obtain U.S. Visas* (Mar. 23, 2022), available at *https://www.justice.gov/usao-sdny/pr/chinese-government-employee-convicted-participating-conspiracy-defraud-united-states* (last visited Aug. 27, 2026); Press Release, U.S. Dep't of Justice, *Chinese Business Woman Sentenced to 37 Months in Federal Prison for Conspiracy to Commit Visa Fraud* (June 26, 2020), available at *https://www.justice.gov/usao-ndil/pr/chinese-businesswoman-sentenced-37-months-federal-prison-conspiracy-commit-visa-fraud* (last visited Aug. 27, 2026).

**B. Final Rule**

On July 17, 2026, following careful consideration of nearly 22,000 public comments during the 32-day comment period on the proposed rule, DHS made several changes to the regulatory text proposed in the NPRM and adopted most of the proposed changes in its final rule. *See Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976 (July 17, 2026) (Final Rule). The Final Rule's effective date is September 15,

2026.

## STANDARD OF REVIEW

Preliminary injunctive relief is extraordinary. *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022). Plaintiffs must establish likelihood of success on merits, likely irreparable harm absent relief, favorable balance of equities, and that injunction serves public interest. *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022). The most important factor is "likelihood of success on the merits." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). Irreparable harm is also "a necessary threshold showing," *Charlesbank Equity Fund II v. Blinds To Go*, Inc., 370 F.3d 151, 162 (1st Cir. 2004); without it, "remaining factors become matters of idle curiosity," *Doe v. Trustees of Dartmouth Coll.*, 597 F. Supp. 3d 511, 513 (D.N.H. 2022). When the Government opposes, the balance of hardships and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Under the Administrative Procedure Act ("APA"), courts may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). But APA review requires "final agency action," 5 U.S.C. § 704: action that (1) "mark[s] the consummation of the agency's decisionmaking process" rather than being "tentative or interlocutory," and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025). Courts apply "narrow and deferential scope of review" and may "not substitute [their] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An *ultra vires* claim requires demonstrating the agency acted outside

bounds of authority delegated by Congress, *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), determined using "traditional tools of statutory construction," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024).

Summary judgment is ordinarily appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). [I]n cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record. *See Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015) ("The summary judgment 'rubric' also 'has a special twist in the administrative law context.'" (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997))). Rather, when administrative action is challenged under the APA "[s]ummary judgment ... serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F.Supp.2d 237, 240 (D.D.C. 2013); *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97–98 (1st Cir. 2002) ("That the parties brought the issues forward on cross-motions for summary judgment is not significant; substance must prevail over form, and the fact remains that the parties have presented this matter as a case stated[ ] on a fully developed administrative record.").

## ARGUMENT

### I. Plaintiffs Are Not Likely to Succeed on the Merits.

Plaintiffs have not demonstrated that the Rule violates the APA. DHS articulated a reasoned basis for the Final Rule, evaluated relevant data, adequately addressed significant comments, and acted within its broad discretion to protect national security, ensure program integrity, and modernize the outdated D/S framework. "The scope of review under the 'arbitrary

and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 31. Instead, courts ask whether the agency "articulated a rational connection between the facts found and the choice made." *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). As explained below, DHS adequately articulated the reasoning supporting the Final Rule. The Court should deny Plaintiffs' motion in its entirety.

**A. The Final Rule Is Adequately Reasoned and Supported by Reliable Evidence.**

*1. DHS Reasonably Found the Benefits Outweigh the Costs.*

DHS's conclusion that the benefits outweigh the costs of the Final Rule is rational and reasoned. The downside to the Final Rule is minimal. There may be a reduction in nonimmigrant travel to the United States, which could be attributable to myriad reasons not necessarily related to the Final Rule. The countervailing upshots are that the Final Rule will strengthen the government's efforts to safeguard national security and combat fraud and abuse as it pertains to the nonimmigrant visa categories at issue.

Plaintiffs dislike the Final Rule and, with regard to DHS's cost-benefit analysis, largely take issue with underlying methodology and evidence-weighing. *See* ECF No. 19–25. However, an agency evaluates all evidence, pursuant to the appropriate methodology; an agency need not base its judgment or conclusion on evidence, including predictive evidence, that it finds unreliable. *Cf. FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (upholding agency's reliance predictive analysis). DHS properly evaluated the evidence, adequately considered and responded to the numerous Commenters' critiques, and rationally articulated the basis for the Rule.

*a. The Benefits.*

Plaintiffs attempt to detract from the benefits of safeguarding national security and combating fraud and abuse that are provided by the Final Rule. In doing so, they attack the

methodology used by the agency in calculating the benefit of the Final Rule to such crucial functions of government. *See* ECF No. 13 at 24–25. Their challenge to the methodology is baseless, and the benefits to national security and fraud and abuse mitigation are significant.

Plaintiffs wrongly assert that DHS "failed to estimate the Final Rule's purported benefits in a way that would allow the agency to meaningfully weigh them against even the acknowledged costs" by "choos[ing] only to 'qualitative[ly]' describe them." ECF No. 13 at 24. Plaintiffs assert that DHS misapplied Circular A-4, guidance from the U.S. Office of Management and Budget that instructs federal agencies on conducting economic and cost-benefit analysis for new regulations.

Importantly, in an attempt to undermine DHS's significant, sincere concerns regarding national security and fraud, Plaintiffs overstate the monetization criterion within Circular A-4, which constitutes "guidance to Federal agencies on the development of regulatory analysis." Circular A-4, Regulatory Analysis, Sept. 17, 2003, *available at* https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf (last accessed Aug. 30, 2026). To be clear, Circular A-4 does not mandate monetization or quantification in all circumstances. Plaintiffs appear to acknowledge this. *See* ECF No. 13 at 24 ("[A]gencies may describe some benefits qualitatively, they 'should monetize quantitative estimates *whenever possible*"). As guidance, Circular A-4 instead provides agencies with analytical latitude, explaining that some "important benefits and costs (e.g., privacy protection) may be inherently too difficult to quantify or monetize given current data and methods. . . . Some authorities refer to these non-monetized and non-quantified effects as 'intangible.'" *Id.* at 26–27.

Many of the benefits that arise from combating national security threats and immigration fraud are undoubtedly difficult to monetize or quantify, as they often implicate potential harm to United States sovereignty and to persons and property within the United States. *See Trump v.*

*Hawaii*, 585 U.S. 667, 708 (2018) (explaining national security matters, "are delicate, complex, and involve large elements of prophecy.") (citation and quotes omitted). The impact of such ills comes in myriad forms and may result in a constellation of consequences of varying degrees. *See* 91 Fed. Reg. at 44977 (discussing events of September 11, 2001, and the potential for exploitation of student visas). To be sure, the agency detailed numerous examples of national security threats and fraud regarding the relevant nonimmigrant visa categories.

Defendants will not repeat all instances cited in the Final Rule but provide a few examples: In 2024, an F-1 overstay posed as an Amazon driver and attempted to breach a Marine Corps Base in what experts believe may have been a dry run for a terrorist attack, *id.* at 44990; in 2018, a Russian intelligence operative entered the United States on an F-1 visa obtained with a fraudulent Brazilian identity and was later charged in 2023 with multiple fraud offenses and acting as an agent of a foreign power, *id.* at 44985; in 2020, three Chinese nationals, two F-1 students and one J-1 exchange visitor, were sentenced to federal prison for illegal photography of a U.S. naval installation in Florida, *id.*; in a 2024 case in Virginia, a Chinese student used a drone to photograph naval installations, resulting in a conviction and later removal from the United States, *id.*; and, in 2024, five Chinese students were charged with conspiracy and related offenses after being found photographing a military training exercise at Camp Grayling, *id.* Notably, in 2019, the Government Accountability Office and ICE published a report identifying fraud risks to SEVP related to managing school recertification and program training. *Id.* at 44984. Said risks reflected vulnerabilities associated with school owners and DSOs in overseeing the maintenance of status of F-1 students. *See id.*

These are not merely "anecdotes," ECF No. 13 at 17. They are demonstrative of systematic security gaps in the relevant nonimmigrant visa programs which present substantial risks to the

United States. The government is entitled to fix said flaws and is appropriately so doing through the Final Rule. *See Hawaii*, 585 U.S. at 708 (deferring to "predictive judgments" on national security matters, "all of which 'are delicate, complex, and involve large elements of prophecy.'") (citation omitted).

*b. The Costs.*

Plaintiffs allege that DHS failed to consider adequately the cost presented by possible disenrollment in U.S. academic instructions. ECF No. 13 at 20–24. They base this argument primarily on NAFSA/IFP survey data, including survey responses from 1,650 prospective or current international students predicting how they might possibly act in the future if D/S were eliminated. *See id.* at 20. This data, however, is not empirical; it is hypothetical and based on self-reported predictive preferences. *See id.* (discussing survey based on responses from "1,650 current or prospective international students"). DHS expressly acknowledged the submitted survey evidence and explained that "survey responses often reflect hypothetical preferences rather than actual behavior, and such results may overstate the likelihood of enrollment declines." 91 Fed. Reg. at 45087. DHS further explained that "students may weigh other factors, such as the quality of U.S. educational institutions and career opportunities, more heavily when making enrollment decisions." *Id.* Notably, with respect to external factors affecting student enrollment decisions, DHS acknowledged a "2.7 percent decline in [F-1 visa] applications and 10.1 percent decline in visa issuance between 2023 and 2024, independent of this regulation, further complicating attribution of enrollment changes to this rule." *Regulatory Impact Analysis*, Regulations.gov, *available at* https://www.regulations.gov/document/ICEB-2025-0001-21963, at 97 (last visited Sept. 2, 2026). DHS thus identified vulnerabilities in the data and soundly decided it did not render the cost of the Final Rule to outweigh its benefit.

The agency was entitled to consider the predictive data and determine the appropriate weight to accord it. Indeed, agency evaluations of predictive judgments concerning the expected responses of a regulated industry are entitled to particular deference. *See Pub. Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1260 (D.C. Cir. 2004) (deferring to "NHTSA's prediction that manufacturers will not likely reduce the protectiveness of current air bags"); *S. Pac. Transp. Co. v. ICC*, 871 F.2d 838, 842 (9th Cir. 1989) ("Such predictive judgments, when based upon credible evidence, are best left to the expertise of the administrative agency familiar with the industry.") (citation omitted); *Alignment Healthcare Inc. v. HHS*, 181 F.4th 1236, 1239 (D.C. Cir. 2026) (heeding finding that challenged survey data was reliable because agency "examined Alignment's concerns and explained why there was no indication of survey administration error.").

As applied here, DHS appropriately considered the survey-data submitted, considered its reliability, and accorded it appropriate weight. DHS specifically acknowledged that "the level of foreign student enrollment does fluctuate, and it is speculative to assess any declination is a direct and sole result of the rule." 91 Fed. Reg. at 45001. DHS further explained that "[a]ny decline would likely include some prospective or current foreign students who do not intend to comply or have not been complying with the conditions of their nonimmigrant classification." *Id.* In short, DHS appropriately considered the survey data, evaluated its limitations, and reasonably concluded it was not a reliable predictor of enrollment behavior sufficient to alter the cost-benefit analysis.

Plaintiffs further argue that DHS should have accepted Commenters' forecasted annual loss from possible disenrollment "of as much as $72-145 billion by ten years into the future." ECF No. 13 at 20. But said predicted losses are based on one survey alone—the Clemens study. *See id.* (citing the Clemens study). And agencies may reject private economic models where assumptions are uncertain, unrepresentative, or inconsistent with broader empirical evidence. *Newspaper Ass'n*

*of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) ("When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loath to second-guess its analysis.") (citation omitted).

Indeed, the D.C. Circuit reaffirmed in *Save the Sound, Inc. v. FAA* that agencies may rely on their own "economic or technical assumptions." 183 F.4th 763, 774 (D.C. Cir. 2026). Resolution of issues requiring technical expertise are "properly left to the informed discretion of the responsible federal agency" when projections involve significant uncertainty, such as here. *Id.* (quoting *Friends of the River v. FERC*, 720 F.2d 93, 102 (D.C. Cir. 1983) (R.B. Ginsburg, J.)). DHS exercised its expertise and authority appropriately.

Moreover, while the Clemens study assumed, "conservatively," a ten percent decline in international enrollment based solely on survey-derived behavioral predictions, ECF No. 13 at 21–22, global student mobility trends obviously depend on a myriad variables far beyond visa classifications, undermining reliable precision in even the allegedly conservative Clemens estimate. Indeed, DHS explained it "remains uncertain as to how many students will choose not to enroll," but that "DHS believes that this [R]ule will not be a major deterrent, as the main regulatory burden to file an EOS request . . . may not be costly enough to dissuade enrolling." 91 Fed. Reg. at 45087. DHS reasonably concluded the Clemens model did not render the costs countervailing of the benefits, especially given that U.S. institutions remain globally competitive notwithstanding changes in immigration policy. 91 Fed. Reg. at 45088 (noting expectation of "United States to remain a popular, competitive, and attractive place for nonimmigrant students and exchange visitors to pursue their program of interest.").

*c. Comments on Cost-Benefit Analysis.*

Plaintiffs additionally contend that "DHS's approach is further arbitrary and capricious

because many commenters pointed out [asserted] flaws, yet DHS failed to offer an adequate response." ECF No. 13 at 25. But this contention misapprehends the record.

To be sure, agencies are not required to respond to every comment from every Commenter during the notice-and-comment process, but they must respond to comments that "raise points relevant to the agency's decision and which, if adopted, would require a change in an agency proposed rule[.]" *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 216 (D.C. Cir. 2013) (citations omitted). And, importantly, an agency's explanations are not required to be encyclopedically thorough. Indeed, a "court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). Plaintiffs take issue with DHS's response to certain concerns raised by Commenters, but DHS was not required to write an "exegesis." *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1329 (11th Cir. 2021).

As partially demonstrated in the above analysis, the record reflects that DHS addressed the substance of the comments, including the uncertainty in estimating student enrollment behavior, and explained the basis for its analytical choices. All such choices are within the "zone of reasonableness." *Bruno Project Rescue, Inc. v. CDC*, 182 F.4th 1, 12 (1st Cir. 2026) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). That Plaintiffs may have preferred that the agency pen a tome on all concerns they claim that it did not adequately address does not render the Final Rule violative of the APA.

**2. The Final Rule Is a Rational Response to the Identified Problems.**

Plaintiffs' argument that DHS failed to draw a rational connection misconstrues both the rulemaking rationale and the nature of the problems DHS seeks to address. And, under *State Farm*, an agency must "supply a reasoned analysis for the change," 463 U.S. at 42, not find perfect logical

symmetry. ECF No. 13 at 26. DHS identified structural vulnerabilities inherent in D/S. Specifically, DHS identified the absence of predetermined immigration compliance review and prolonged unsupervised periods of presence. *See* 91 Fed. Reg. at 45010 (explaining the Final Rule is intended to "establish predetermined points in time, not to exceed 4 years, for immigration officers to directly evaluate whether F-1 students are maintaining their nonimmigrant status and remain eligible for that status."). Such vulnerabilities impede detection of national security threats, immigration fraud, and status violations, which the Final Rule will directly address by replacing indefinite stays with fixed-term admissions and subsequent screening.

The Final Rule is reasonably connected to the problems DHS identified. It "will ensure that DHS has an effective mechanism to periodically and directly assess whether [the relevant] nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws." 91 Fed. Reg. at 44978. It will also ensure DHS may "obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States." *Id.* The problems are reflected by concrete, real-world instances of national security threats, fraud, and abuse, as briefly set forth above, *see supra* section A.I.a.

The suggestion that the instances of such threats referenced in the Final Rule would still have occurred under the four-year limit imposed by the Final Rule, ECF No. 13 at 27, mischaracterizes DHS's explanation and the objective of the Final Rule. DHS did not claim that each cited incident was preventable through fixed-term admission. Rather, the incidents illustrate observable patterns of security threats and fraud risks, and D/S enables prolonged stays without DHS oversight and opportunity to combat such issues. *See, e.g.*, 91 Fed. Reg. at 44995 ("[A]dmission for D/S does not afford immigration officers enough predetermined opportunities to directly verify that aliens granted such nonimmigrant statuses are engaging only in those

activities their respective classifications authorize while they are in the United States.”).

Indeed, the issue is structural and has potential to be pervasive as, by its very nature, D/S grants students potentially unlimited time without periodic screening. A four-year cap combined with the EOS requirement introduces predictable DHS touchpoints that increase opportunities to detect fraud, status violations, and security risks. An agency is not required to adopt commenters' narrow framing or demonstrate perfect efficacy. It need only provide a “rational connection between facts and judgment.” *State Farm*, 463 U.S. at 56; *see also Bruno Project Rescue*, 182 F.4th at 12 (“[W]e will -- in our highly deferential review -- uphold an agency determination if it is supported by any rational view of the record.” (quotation marks omitted)).

Moreover, the suggestion that DHS inadequately responded to comments that a fixed-term should “align with academic realities using program duration, not an *ex ante* cap,” ECF No. 13 at 31, ignores that DHS had addressed the core premise of the comments: whether D/S contributes to security and integrity vulnerabilities—to include abuse by some academic institutions. *See* 91 Fed. Reg. at 44984 (indicia some academic institutions engaged in or facilitate visa fraud). Indeed, DHS explained that the Final Rule is aimed at correcting the identified vulnerabilities by “establish[ing] predetermined points in time, not to exceed 4 years, for immigration officers to directly evaluate whether F-1 students are maintaining their nonimmigrant status *and remain eligible for that status*.” 91 Fed. Reg. at 45010 (emphasis added). The temporal checkpoint will ensure DHS has the opportunity to conduct screening to identify noncompliance by students and academic institutions.

An agency also need not respond to every hypothetical offered by Commenters—such as the notion that “true threat actor could easily plan their activities within a 4-year window or file an extension with perfectly clean paperwork.” ECF No. 13 at 27. The APA does not require

addressing speculative scenarios. In any event, complaints that sophisticated relevant nonimmigrant visa-holders may evade detection do not undermine the rationality of closing structural gaps that allow *all* such visa-holders to remain indefinitely without adequate DHS oversight.

Plaintiffs additionally argue DHS relied on "scattered anecdotes," *id.* at 27, but sample size is not the APA standard—and the evidence DHS relied on does not constitute mere anecdotes. DHS raised instances of fraud concerns that DHS determined to constitute a pattern. *See, e.g.*, 91 Fed. Reg. at 45102 ("DHS has also observed a pattern of students immediately transferring schools or changing educational levels or programs of study upon their arrival in the United States."). And agencies may act to reduce national security and fraud risk even if documented abuse is modest, particularly where such risk is difficult to detect under existing structures. *See Citadel Sec. LLC v. SEC*, 178 F.4th 621, 636 (11th Cir. 2026) ("Administrative law doesn't constrain agencies to act only when they have gold-standard quantitative data."). The cited cases in the Final Rule illustrate real vulnerabilities, including unusually prolonged enrollments and threats to national security.

Further, Commenters' reliance on proportional comparisons ignores that even small fractions can pose substantial fraud and national security risks. *See* ECF No. 13 at 28 ("DHS also pointed to 'over 2,100 aliens who first entered as F–1 students between 2000 and 2010 and remain in active F–1 status as of April 6, 2025.' But, as commenters noted, this is a tiny fraction of 1.6 million active SEVIS records DHS considered") (citations omitted). DHS explained that fixed-term admissions and extension requirements would strengthen program integrity through such periodic screening. *See, e.g.*, 91 Fed. Reg. at 44993. And DHS has never claimed that most or all international students who remain in the United States for a lengthy duration are committing fraud or pose national security threats; rather, extended stays create elevated opportunities for abuse,

status violations, or exploitation of loopholes. *See, e.g.*, 91 Fed. Reg. at 44976 (D/S "has undermined DHS's ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence and has created incentives for fraud and abuse.").

Federal agencies entrusted with the security of the Nation are often entitled to adopt rules under the APA that reduce opportunities for security threats. *See, e.g.*, *Spokane Airport Bd. v. TSA*, 164 F.4th 933, 937 (D.C. Cir. 2026) (applying APA standard of review and explaining "Congress has conferred on TSA 'broad statutory authority to protect civil aviation security.'"). DHS may regulate to prevent misuse even if the regulation sweeps more broadly than preferred, so long as the "agency has acted within a zone of reasonableness" and "has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. The record shows DHS so considered and explained.

**3. DHS Adequately Considered Alternatives to the Final Rule.**

Plaintiffs' assertion that DHS "gave short shrift" to asserted alternative options to the Final Rule understates the depth of DHS's responses and its related obligations under the APA. An agency must consider "significant and viable alternatives," not necessarily every suggested refinement. *Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*, 624 F.3d 489, 493 (D.C. Cir. 2010) (citation omitted); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("DHS was not required . . . to consider all policy alternatives in reaching its decision. Agencies are not compelled to explore every alternative device and thought conceivable by the mind of man." (quotation marks and citation omitted)). DHS considered the proposed alternatives adequately and properly rejected them. Indeed, the record shows DHS acknowledged SEVIS as an alternative and explained why it would fail to remedy the structural vulnerabilities inherent in D/S.

Agencies may reasonably conclude that alternatives to rules do not meaningfully address

the underlying systemic problem. *See Env't Def. Fund v. EPA*, 183 F.4th 867, 882 (D.C. Cir. 2026) ("[T]he EPA reasonably explained its decision to forgo adoption of a more forceful alternative and thus we conclude that this arbitrary-or-capricious claim falls short."). As explained, DHS identified that the core problem with D/S is the absence of predetermined DHS screening opportunities over significant stretches of time. This establishes a rational basis for rejecting alternatives aimed at preserving D/S.

Plaintiffs argue DHS improperly rejected SEVIS circularly as an alternative, but DHS's reasoning is grounded in reality. Among other factors, SEVIS is a data-reporting system for schools, not an immigration-status adjudication system. 91 Fed. Reg. at 44981 ("Since then, and pursuant to the 1991 final rule, the DHS has relied on DSOs to report on student status, issue program extensions, and transfer students between programs and schools."); *Hinge v. Lyons*, No. CV 25-1097 (RBW), 2025 WL 1134966 (D.D.C. Apr. 15, 2025). It is not designed for detecting status violations or performing all relevant fraud and security screening. Rather, it was created and is used for information collection pursuant to 8 U.S.C. § 1372. SEVIS also similarly does not allow for the consideration of evidence and adjudication of benefits for nonimmigrant students. DHS also cited to multiple examples of school owners or DSOs who facilitated misuse by failing to require attendance or generating fraudulent documents for ineligible students. *See* 91 Fed. Reg. at 44984.

This reasoning is not circular but rather identifies a substantive deficiency. The suggestion that DHS must justify why such features are "necessary" oddly seems to misapprehend the Rule. ECF No. 13 at 30. The Rule provides necessary additional screening, which SEVIS cannot provide. That is a rational justification for the rejection of alterations to SEVIS as an alternative.

Commenters' proposal of a "scalpel approach," including adding targeted red-flag

monitoring as part of SEVIS was also properly rejected. ECF No. 13 at 30–32. DHS considered and ruled against the proposal because it would not provide broad, periodic and reliable screening by immigration authorities. *See, e.g.*, 91 Fed. Reg. at 45007. Again, SEVIS focuses on data collection by schools, but the problem DHS identified pertains to immigration enforcement responsibility entrusted to the government under the Immigration and Nationality Act. It cannot be outsourced.

And the argument that DHS did not explain why a targeted approach was inferior ignores the agency's concern—DHS identified systematic issues that require a systematic approach. Implementing a targeted approach would result in failures to identify real yet unknown risks, while periodic screening offers an opportunity to uncover risks, including threats from individuals not within the "high-risk environments" Commenters propose targeting. *Cf.* ECF No. 13 at 32. To be sure, agencies may appropriately adopt systemic safeguards over sparse, piecemeal safeguards. DHS therefore reasonably concluded the proposal was insufficient to address national security and fraud vulnerabilities created by long, unsupervised periods of stay.

Moreover, the claim that DHS acted arbitrarily by imposing a four-year time-limit—which can be extended—misunderstands the agency's objective: to produce a *uniform*, administratively manageable nonimmigrant visa admission framework. 91 Fed. Reg. at 45011 (explaining Final Rule "provides a uniform standard to ensure compliance with the immigration laws . . . regardless of program type."). To be sure, uniformity is not necessarily arbitrary, capricious, or otherwise unreasonable but rather is an acceptable manner to impose rules on relevant regulated actors. *See Fla. E. Coast Ry. LLC v. Fed. R.R. Admin.*, No. 24-11076, 2026 WL 2321640, at *4 (11th Cir. Aug. 11, 2026) (slip op.) (upholding "national, uniform standard provided in . . . rule [that] preempt[s] State laws governing crew size."). DHS explained that a general four-year cap

facilitates manageable oversight and creates clear expectations. 91 Fed. Reg. at 45072 ("The rule change sets clear and defined expectations for program of study completion for the universities and nonimmigrant students."). Commenters' claim that matching program length would "alleviate concern and uncertainty" ignores that the nebulous nature of program length at certain institutions and that it concomitantly would increase uncertainty in adjudication and enforcement, making the system less consistent and secure. ECF No. 13 at 32; 91 Fed. Reg. at 45020 ("Requiring F, J, and I nonimmigrants to request additional periods of admission directly with DHS will improve consistency, enable stronger oversight, and deter fraud and abuse.").

Furthermore, DHS reasonably concluded that EOS provides adequate flexibility for legitimate academic needs. *See, e.g.*, 91 Fed. Reg. at 45020 ("F-1 students may apply for an EOS if they require additional time under their F-1 status, and the rulemaking includes a transition period for students currently on D/S, allowing for an orderly transition."). Commenters' assertion that EOS burdens students does not render D/S superior. ECF No. 13 at 32. Agencies are allowed to balance administrative efficiency against individualized burdens and choose a standardized framework.

**4. DHS Responded to All Significant Comments.**

Plaintiffs' argument that DHS failed to adequately respond to significant comments rests on a mischaracterization of both the record and the scope of the APA's requirements. While an agency must "consider and respond to significant comments received during the period for public comment," it is not required to adopt commenters' asserted concerns or concerns. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). Agencies must address material criticisms in a manner that shows the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. They need not produce exhaustive,

line-by-line rebuttals. Nor is an agency's disagreement with Commenters tantamount to arbitrary or capricious action.

DHS addressed each significant issue raised, provided adequate explanations, and exercised judgment in areas involving uncertainty and predictive assessments. That Commenters believed DHS should have credited their predictions does not give rise to an APA violation.

*a. Effect on Enrollment.*

Contrary to Plaintiffs' framing, DHS adequately addressed the speculative claims that the Rule may reduce international enrollment at U.S. academic institutions. DHS expressly acknowledged the possibility of enrollment impacts and explained why available evidence, *e.g.*, surveys of hypothetical preferences, was inadequate, as explained above. DHS reasonably concluded that these predictions were "uncertain and speculative." 91 Fed. Reg. 45001, 45087. Because DHS acknowledged Commenters' evidence and provided a satisfactory explanation as to its limitations, its response satisfies the APA. *Perez*, 575 U.S. at 96; *State Farm*, 463 U.S. at 43.

*b. Compatibility with Academic Realities.*

Plaintiffs contend the four-year cap is incompatible with academic realities. ECF No. 13 at 36–37. But individuals who hold any of the nonimmigrant visas at issue are certainly capable of managing necessary extensions to their nonimmigrant stay. It is not unrealistic or unreasonable for the government to require affirmative extensions to stay, as is the case for many other visa categories. 91 Fed. Reg. at 44995 ("Additionally, this requirement is consistent with the extension filing requirements for other nonimmigrant categories, including B-1/B-2s, H-1Bs, H-2s, L-1s, and TNs, to name but a few."); *id.* at 45053 ("[T]his [R]ule will create consistency by aligning the requirements with other nonimmigrant classifications"). Those who hold other visas requiring extensions are already unobjectionably expected and required to do so. That is not unrealistic or

overly burdensome.

And DHS acknowledged that some academic programs take longer than four years to complete but nevertheless reasonably concluded that a uniform admission period, coupled with the EOS process, best promotes consistency and effective enforcement. Indeed, DHS explained "this [R]ule does not require students or exchange visitors to complete their intended program within four years. Rather, the four-year period serves as a law enforcement and screening tool to assess whether a student or exchange visitor is maintaining their nonimmigrant status." 91 Fed. Reg. at 45001. Plaintiffs assert that the DHS's reasoning is "self-contradictory and illogical" given that it claims D/S "raises serious concerns that the intent is not to pursue a full course of study but rather to circumvent the U.S. immigration system" while reasoning that the Final Rule "will accommodate the legitimate academic activities of bona fide students." ECF No. 13 at 37–38. Plaintiffs distort the point of the Final Rule. Again, DHS recognizes there are aliens with the relevant visas who comply with the terms of and legitimately remain within their nonimmigrant status while in the United States—but DHS also identified security and fraud risks presented by some such individuals.

These two notions do not contradict one another. They are not "internally inconsistent" and do not render the Rule "arbitrary and capricious." *INGAA v. PHMSA*, 114 F.4th 744, 755 (D.C. Cir. 2024).

*c. Reliance Interests*

Plaintiffs argue DHS did not consider reliance interests. ECF No. 13 at 37. But DHS expressly stated it "carefully considered" the interests of relevant actors and entities, *i.e.*, students, sponsors, universities, and employers, who have structured plans around D/S. 91 Fed. Reg. at 45073. DHS acknowledged these interests and balanced them against systemic enforcement

vulnerabilities. *Id.* ("While DHS recognizes that some may prefer the D/S model, and this rule represents a change from longstanding practice, DHS has provided a reasoned explanation for this policy shift, consistent with Supreme Court precedent.").

In any event, reliance interests do not bar agencies from changing practices—even longstanding practices—if the agency acknowledges the interests and provides a reasoned justification in response. Indeed, an agency is required to consider, not necessarily adopt or preserve, serious reliance interests. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an agency changes course, as DHS did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)) (internal quotes omitted). Here, DHS did exactly what *Regents* requires: DHS acknowledged putative reliance interests and explained the necessity of replacing D/S even considering said interests.

*d. DHS Operational Capacity*

Plaintiffs note that Commenters claimed that replacing D/S would "swamp" DHS. ECF No. 13 at 39. DHS responded that no "additional safeguards are needed in this rule" but that it was "explor[ing] operational alternatives to address USCIS backlogs." 91 Fed. Reg. at 45015. DHS further explained that it "continually monitors workload distribution and adjusts workloads as necessary for quality and efficiency. This [R]ule, while expected to increase the volume of EOS cases, is not the first time that DHS, and USCIS in particular, has prepared for an increase in application volume." *Id.* DHS also provided an example of its ability to handle an increase in workload due to a policy change. *See id.* (referring to implementation of Deferred Action of Childhood Arrivals (DACA)). That response is adequate under the APA.

Agencies are not required to provide detailed operational plans for responding to

speculative predictions regarding the quantity of EOS filings, and DHS's assumption regarding its operational capacity is entitled to deference. *See Save the Sound, Inc.*, 183 F.4th at 774 (agencies may rely on their own "technical assumptions"). The APA does not require DHS to prove in advance that it will have the capacity for processing all future applications of an unknown quantity. The APA does require that "agency action be reasonable and reasonably explained." *Trajano, v. U.S. Citizenship & Immigr. Servs.*, No. CV 25-12388-FDS, 2026 WL 2137917, at *6 (D. Mass. July 24, 2026). Throughout the Final Rule, and notwithstanding Plaintiffs' myriad complaints, that is precisely what DHS provided.

*e. Press Freedom*

Plaintiffs claim DHS failed to adequately address concerns of a chilling effect on foreign journalists, including self-censorship. ECF No. 13 at 40–41. DHS responded that it "acknowledges that First Amendment rights apply to aliens lawfully in the United States . . . [and] takes seriously the First Amendment concerns surrounding any review of journalistic information." 91 Fed. Reg. at 45078. DHS further explained that it "does not intend" to chill speech, that content review would be conducted solely to verify *bona fide* journalistic activity, and that the rule does not impose viewpoint discrimination. *See id*.

Although Commenters speculated about hypothetical encroachment on press freedom, agencies are not required to rebut every hypothetical consequence in detail. DHS was obligated to reasonably consider the relevant issues and reasonably explain the decision, not to provide an extensive analysis of speculative future First Amendment harms. *See Prometheus Radio Project*, 592 U.S. at 423. DHS satisfied that obligation.

**5. The 32-day comment period was adequate and provided a meaningful opportunity for public participation.**

Plaintiffs first argue that 32 days to respond to such a consequential and complex

rulemaking was well under the recommended 60 days, thus making the process arbitrary and capricious. ECF No.13 at 32. Plaintiffs' argument misses the mark.

While the authorities cited by Plaintiffs suggest a longer comment period is recommended, there is no statutorily mandated length of time for the notice and comment period. *See California v. Kennedy*, 802 F.Supp.3d 273, 284 (D. Mass. 2025) (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Rather, the standard is whether interested parties are given a meaningful opportunity to participate in rulemaking. 5 U.S.C. § 553.

Even when substantial rule changes are proposed, a 30-day comment period is generally the shortest period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *see also Kennedy*, 802 F.Supp.3d at 284 ("While 30 days is an oft-cited benchmark, there is nothing talismanic about that number . . . ." ).

Here, DHS correctly noted, that "[t]he APA does not mandate a specific minimum duration for public comments, and DHS fully complied with the legal requirements for providing notice to seek input from the general public in accordance with the APA." 91 Fed. Reg. 44976, 45072. Similarly, Executive Order 12866 encourages agencies to provide "not less than 60 days" for public comment on significant regulatory actions, however, it does not impose it as a binding requirement. *Id*; 58 Fed. Reg. 51724, 51740 (Oct. 4, 1993).

Second, Plaintiffs argue that DHS's response was insufficient, that it failed to explain the balanced need for stakeholder input with the urgency of implementing the rule, and that the volume of comments does not mean commenters had adequate time to prepare the most useful responses. ECF No. 13 at 33-34. While a longer comment period could have arguably produced more responses, it does not necessarily mean that those responses would have been of higher quality or

significantly differed from the responses submitted during the comment period provided. DHS explained in its proposed and final rule the importance of deterring F, J and I nonimmigrants from engaging in fraud and the need for strengthening the integrity of the nonimmigrant classifications. *See* 90 Fed. Reg. 42070; 91 Fed. Reg. 44976.

The public had a meaningful opportunity to participate in the notice and comment period, as evidenced by the nearly 22,000 comments and many commenters providing proposed alternatives, evidence-based feedback and specific concerns regarding implementation. 91 Fed. Reg. 44976, 45072; *see also Kennedy*, 802 F. Supp. 3d at 284 (D. Mass. 2025) (proposed rule made available for public inspection and comment for at least 30 days, giving the public a meaningful opportunity to participate in the rulemaking).

While some commenters requested an extension of the comment period for as much as 120 days due to the timing, complexity and significance of the rule, it is unclear what additional issues would have been raised during a longer comment period. 91 Fed. Reg. 44976, 45072. Regardless, an agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (citations omitted). Accordingly, DHS complied with the legal requirements for providing notice and adequately addressed input received from the public during the comment period. Therefore, there is nothing arbitrary or capricious about the agency's actions.

## II. Plaintiffs Fail to Establish That Their Members Will Suffer Irreparable Harm

In the First Circuit, establishing irreparable harm is an indispensable, "necessary threshold showing," and in its absence, the remaining preliminary injunction factors become "matters of idle curiosity." *Trs. of Dartmouth Coll.*, 597 F. Supp. 3d at 513. To carry their burden, Plaintiffs must make a clear showing that their alleged injury is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). A

finding of irreparable harm "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). It is not enough to show injuries that are merely substantial in terms of money, time, or administrative energy expended. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

**A. Declines in Enrollment**

Plaintiffs' primary contention is that replacing the D/S framework with a fixed admission period will precipitate catastrophic and permanent declines in international student enrollment. To support this sweeping proposition, Plaintiffs point to a third-party survey and allege that "49% of respondents who were current international students studying in the United States said they would not have enrolled in the first place had D/S been replaced with a fixed period of admission" and that "16% fewer prospective student respondents said they were likely to enroll in U.S. programs if D/S were replaced with a fixed period of admission." Pls.' Mem. in Supp. of Mot. for Prelim. Inj., ECF No. 4-1 ("Motion"), 12. Plaintiffs insist that requiring students to apply for an extension of stay would "introduce a significant amount of uncertainty," *id.* at 35, arguing that "the loss of any admitted student represents a lost opportunity to educate a talented and promising individual." *Id.* at 37. Consequently, Plaintiffs predict that "[c]olleges and universities also are facing the prospect of losing a significant proportion of their international student population in *future years*." Compl. ¶ 134 (emphasis added).

This assertion rests entirely on conjecture, macroeconomic modeling, and unverified survey responses that fail to establish the particularized evidence of imminent harm necessary to justify injunctive relief. Indeed, the allegations made by Plaintiffs here are "so speculative and

hypothetical that it would be difficult to conclude that irreparable injury would occur even if the allegations were supported by evidence." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 675 (D.C. Cir. 1985). As the Department of Homeland Security concluded during its rulemaking process, "survey responses often reflect hypothetical preferences rather than actual behavior, and such results may overstate the likelihood of enrollment declines." 91 Fed. Reg. 44976, 45088 (July 17, 2026). Indeed, enrollment decisions by prospective students are driven by a highly complex set of variables, including the perceived quality of education, the total cost of tuition and living expenses, international currency exchange rates, and the availability of post-graduation job opportunities. Attempting to trace a massive, multi-billion-dollar market decline exclusively to a shift in federal administrative visa notations relies on a causal chain that is far too attenuated to constitute a certainly impending harm. *See Direx Israel, Ltd.*, 952 F.2d at 812.

Furthermore, the alleged uncertainty of losing status mid-program—which forms the foundation of Plaintiffs' rationale for a purported enrollment deterrence—is neutralized by the plain text of the Final Rule itself. The regulation explicitly states that "an F-1 student who has timely filed an EOS application, will be authorized to continue pursuing a full course of study after the expiration of the admission period until USCIS adjudicates the EOS application." 91 Fed. Reg. at 44978. In addition, the Final Rule provides robust transition provisions for nonimmigrants currently admitted for duration of status, allowing them to remain in the United States until their program end date, or for four years after the effective date of the Final Rule, whichever comes first. *Id*. at 45017. Because procedural compliance guarantees uninterrupted lawful status, and legally shields the student from accruing unlawful presence, the purported harm of mass disenrollment relies entirely on the hypothetical, voluntary choices of third-party students who might choose to forego an American education for countless reasons unrelated to the promulgation

of the Final Rule. Such hypothetical impacts on third parties are legally insufficient to establish an imminent, irreparable injury to Plaintiffs sufficient to warrant the "extraordinary remedy" of injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

**B. Modifications to Programs**

Plaintiffs next argue that "[t]he rule's restrictions on changes in educational objectives endanger integrated joint- or dual-degree programs, a settled framework of academic mobility upon which universities have long relied." Compl. ¶ 139. They contend that a four-year fixed term is fundamentally incompatible with the realities of graduate education, noting that "the median years to a research doctorate is 5.7 years from entering a program to completion, while those who complete the master's/doctorate sequence take an average of 7.3 years from entering graduate school to completion." Motion at 27. Plaintiffs claim that "another degree at the same degree level would enhance their professional development" and that it is an "erroneous assumption that all students' educational journeys [] only involve upward progression." *Id.* at 28. Ultimately, they allege that member universities may "be required to make changes to its program offerings and academic pathways to ensure they remain open to international students," suggesting drastic measures such as "having students pursue part of their PhD programs from outside the U.S." *Id.* at 39. Additionally, Plaintiffs complain that currently enrolled students are "canceling their plans for international research and international travel to conferences" out of fear of the new rule. *Id.*

These ordinary operational adaptations and voluntary travel decisions do not constitute irreparable harm under the law. While economic or operational harm may be deemed irreparable in the rare circumstance where it "threatens the very existence of the movant's business," *Wis. Gas Co.*, 758 F.2d at 674, routine institutional accommodation to updated federal regulations falls short of this standard. The Final Rule fully accommodates academic progression and does not bar

legitimate academic pursuits. The four-year admission period functions as a necessary law enforcement and vetting checkpoint, not a definitive academic cap. The regulatory framework expressly ensures that "[s]tudents who demonstrate continued academic progress and meet F-1 eligibility criteria may apply for an EOS to complete their programs." 91 Fed. Reg. at 45001. Extensions of stay are routinely available for compelling academic reasons, documented medical illnesses, or circumstances beyond the student's control, which readily encompasses the extended timelines inherent in doctoral research and complex dual-degree sequences. *Id.* at 45010. Plaintiffs' members' decisions to adjust internal degree tracks, update advising protocols, or accommodate students who voluntarily forego international travel are self-inflicted administrative choices that cannot be attributed to Defendants as a basis for sweeping equitable relief.

Plaintiffs' reliance on cases such as *Ass'n of American Universities v. Department of Defense*, 792 F. Supp. 3d 143 (D. Mass. 2025), and *Ass'n of American Universities v. National Science Foundation*, 788 F. Supp. 3d 106 (D. Mass. 2025), to demonstrate programmatic harm is likewise misplaced. Those cases involved direct, immediate, and permanent cuts to federal research grant reimbursements through a rigid, indirect-cost cap that made ongoing laboratory research physically and financially impossible. In *Department of Defense*, the court found that the government's policy "would end or seriously jeopardize research projects," 792 F. Supp. 3d at 172, forcing institutions to "cease projects, reduce head count, and stop operating facilities," *Id.* at 177. Here, by contrast, the Department of Homeland Security has not terminated educational funding, slashed research budgets, or prohibited academic programming. Standardizing an administrative visa renewal timeline does not inflict the severe, existential institutional disruption required to bypass the ordinary administrative process.

**C. Administrative Burdens**

Finally, Plaintiffs allege that "[t]he international student offices of colleges and universities will see an exponential increase in the administrative burden of helping international students remain in the United States with proper status." Compl. ¶ 133. Pointing to the Department of Homeland Security's own estimates, Plaintiffs highlight total up-front compliance costs to universities and J-1 sponsors of "$267.9 million and $257.8 million." Motion at 40. They complain of at least one member university "needing to divert significant resources . . . including hiring two new staff, spending 120 hours on training, and filing 400 new EOS requests each year," as well as "135 hours for rule familiarization and adaptation in the first year after the rule takes effect." *Id*. Such routine expenditures are the "type of mere economic loss which will not support a finding of irreparable injury." *Wis. Gas Co.*, 758 F.2d at 675. What's more, Plaintiffs' argument directly contravenes the Supreme Court's explicit holding that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs next express concern over potential processing backlogs, claiming that USCIS "currently has a backlog of 11.3 million cases—the largest net backlog ever." Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 30, ECF No. 4-1. They argue that the agency "would face an impossible processing surge that could extend wait times to 8-12 months during peak periods." *Id.* Yet the First Circuit has repeatedly recognized that the duration of administrative proceedings, without more, cannot suffice to demonstrate that an agency's actions are unreasonable or constitute irreparable injury. *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 178 (1st Cir. 2016). Because timely filing confers an automatic authorized stay, legally protects the student from accruing unlawful presence, and guarantees educational continuity, mere agency processing time

causes no cognizable legal prejudice to the applicant or the institution.

Plaintiffs' attempt to draw parallels to *Commonwealth of Massachusetts v. Department of Education*, 828 F. Supp. 3d 198 (D. Mass. 2026), is similarly unavailing. In that case, the court found irreparable harm stemming from "administrative upheaval" when the agency imposed a sudden, highly compressed 120-day deadline that threatened statutory fines of up to $71,545 per violation and the total loss of Title IV funding eligibility for institutions. 828 F. Supp. 3d at 221. The Final Rule here imposes no such fines for EOS applications and instead establishes a straightforward multi-year transition framework. In the absence of actual, imminent, and certain harm, Plaintiffs' motion for preliminary relief must be denied.

## III. The Final Rule Supports Academic Mobility While Complying with Immigration Laws And is not Contrary to Law.

Plaintiffs argue that the Final Rule exceeds DHS's statutory authority and that DHS "has essentially rewritten the statute to add an additional criterion." ECF No. 13 at 34. In support, Plaintiffs cite an EPA case that dealt with the agency's assertion of newfound authority and rewriting of the unambiguous statutory thresholds under the now-abandoned *Chevron* framework. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014). Their arguments fail for two reasons.

*First*, Plaintiffs overlook that Congress delegated to the Secretary of Homeland Security authority to promulgate "regulations . . . as he deems necessary for carrying out his authority under" the INA. 8 U.S.C. § 1103(a)(3). Furthermore, Section 1184(a)(1), in pertinent part, provides, "[t]he admission to the United States of *any* alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary of Homeland Security] may by regulations prescribe . . . ." 8 U.S.C. § 1184(a)(1) (emphasis added). "In short: The INA uses visa classes to identify who may enter temporarily and why, but leaves to DHS the authority to specify, consistent with the visa class definitions, the time and conditions of that admission." *Wash. All. of Tech.*

*Workers v. DHS*, 50 F.4th 164, 178 (D.C. Cir. 2022).

Similarly, 1101(a)(15)(F)(i) provides that "an alien . . . who is a bona fide student qualified to pursue a *full course of study* and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . particularly designated by him and *approved* by the [Secretary of Homeland Security] after consultation with the Secretary of Education . . . ." 8 U.S.C. § 1101(a)(15)(F)(i) (emphasis added).

While this Court must "exercise [its] independent judgment" in deciding whether an agency action is lawful, 8 U.S.C. § 1103(a)(3) coupled with 8 U.S.C. §§ 1184(a) and 1101(a)(15)(F)(i) underscore that the agency has broad discretion in implementing the statutory scheme. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes."); *see* 8 U.S.C. § 1103(a)(3), (a)(4); *see also Amin v. Mayorkas*, 24 F.4th 383 (5th Cir. 2022)[4] (finding that regulation fills out statute's "extensive documentation" requirement, while final merits determination of *Kazarian* Policy speaks to statute's requirement of a showing of "extraordinary ability" as "demonstrated by sustained national or international acclaim").

Plaintiffs provide a list of phrases from the statute and argue that DHS somehow excluded students from the F-1 definition who meet all the statutory elements, without explaining what those elements mean. ECF No. 13 at 34. Likewise, Plaintiffs tend to overlook the importance of the phrase "full course of study" and seem to suggest that Section 1101(a)(15)(F) means that any nonimmigrant who "seeks to enter" and pursue a "course of study" should be admitted.

[4] Defendants cite this extraordinary ability visa denial case for the purpose of illustrating the Court's interpretation of the statute and governing regulation without affording any deference to the agency's interpretation.

Such a reading seems to contradict the statute's meaning and purpose for the F-1 classification. Thus, it logically follows that a student who completed a full course of study in the United States at a certain level would not return to pursue the same full course at an equal or lower level. Regardless, DHS can clarify any inconsistencies by virtue of its congressionally delegated authority.

*Second*, Plaintiffs neglect to recognize that most students follow an upward educational progression and fail to provide the meaning or prior use of the statutory "bona fide" requirement. ECF No. 13 at 34; 91 Fed. Reg. at 45038. Plaintiffs argue that DHS cannot defend its rule by claiming that students pursuing degrees at an equal or lower level categorically fail the bona fide requirements because the final rule acknowledges legitimate cases of students pursuing the same or lower levels of education. ECF No. 13 at 34.

While that may be true, the Final Rule also recognizes that most students follow an upward educational progression and explains the need for preventing F-1 students from using the U.S. educational system as a means of circumventing the immigration laws. 91 Fed. Reg. at 45038. The rule also illustrates DHS's general reliance on NCES' definition of educational levels and structure for determining upward academic progression. *Id*.

Accordingly, the Final Rule does not exceed DHS's statutory authority, it complies with the agency's objectives and resembles a customary educational progression.

## IV. Remaining Equities Do Not Favor Emergency Relief

The Court should deny Plaintiffs' motion because the balance of equities and the public interest weigh strongly in the government's favor. Any injunctive relief—preliminary or permanent—"is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. NRDC,* 555 U.S. 7, 32 (2008). Plaintiffs have not met their burden

to prove that the Court should exercise its equitable discretion to enter an injunction here. Indeed, the public interest factors that Plaintiffs identify show that the Court should not enter an injunction. Thus, a "proper consideration of these factors alone requires denial of the requested injunctive relief." *Id.* at 23. Furthermore, the Government's interest in national security is "an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). The Government "is not required to conclusively link all the pieces in the puzzle" before courts grant weight to its conclusions. *Id.* at 35.

Here, DHS adequately explained its objectives in maintaining the integrity of the world-renowned instructional and educational programs without imposing an undue burden on the interested parties. *See* 91 Fed. Reg. 44976, 44978. Contrary to Plaintiffs' claims, the public interest favors compliance with immigration laws and DHS's goals of preventing fraud, strengthening the integrity of nonimmigrant classifications and deterring threats to national security. *Id*; ECF No. 13 at 42. DHS provided many examples of fraud that extend well beyond "scattered anecdotes and marginal statistics." ECF No. 13 at 42; *See* 91 Fed. Reg. 44976, 44983 nn.60-66, 82. The public interest supports deferring to DHS's expert judgment about the steps needed to prevent fraud and potential national security threats. Accordingly, balance of equities and the public interest show that this Court should not grant a preliminary injunction.

## V. If the Court Chooses to Grant Preliminary Relief, Such Relief Must be Narrowly Tailored to Plaintiffs and Their Members

If the Court chooses to grant Plaintiffs preliminary relief, it should narrowly tailor any relief to Plaintiffs and its members. Here, Plaintiffs seek a stay "pursuant to Administrative Procedure Act (APA) Section 705," or alternatively, "a preliminary injunction enjoining the government from enforcing the Final Rule against any nonimmigrants affiliated with Plaintiffs or their members." ECF No. 13 at 10. But both kinds of relief are subject to the same equitable

principles. That's because § 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). And when a court crafts equitable relief, it is bound to issue at most "complete relief *between the parties*." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

Accordingly, "the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court." *Id*. at 852. In keeping with that longstanding principle, the House Report that accompanied the APA explained, at the time of the statute's passage in 1946, that relief under § 705 should "normally, if not always, be limited to the parties complainant." H.R. Rep. No. 79-1980, at 277 (1946). More broadly, the Supreme Court has recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).

The plain language of § 705 requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" and is tailored "to the extent necessary to prevent irreparable injury." In limiting such relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Accordingly, if the Court chooses to grant preliminary relief, it makes no difference whether such relief is couched as a preliminary injunction or a § 705 stay; rather than staying or vacating the rule altogether, any preliminary relief granted must be cabined to the parties presently before the Court.

Plaintiffs' reliance on the First Circuit's decision in *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, as authority supporting a Section 705 stay here is misplaced to the extent they request that it apply beyond the named Plaintiffs. No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026). The First Circuit in *Woonasquatucket River* did not definitively decide whether Section 705 authorized universal stays pending judicial review of agency, instead acknowledging that relief, based on the House Report cited above, "'would normally' be limited to the parties to the litigation" even though relief may "in some circumstances, extend to nonparties." *Id*. at *22. And the First Circuit recognized that the "Government can succeed in showing that [a 705 stay order] is overbroad." *Id*. at *21. Further, after discussing in dicta that a court's authority to postpone agency action under Section 705 could seemingly extend relief beyond the plaintiffs, the First Circuit ultimately held that the government had not shown that the district court had abused its discretion in granting a stay in that case. *Id.* 20-23. In any event, even were this Court to improperly issue a universal stay under Section 705, it would necessarily have to stay (pending appeal) those aspects of its ruling that extend beyond the parties if requested by the Defendants, given the stay factors would necessarily favor the government to the extent the Court's order provided relief to non-parties. *See id*. at *22 (noting that the government had "not advanced a persuasive argument" in that case to limit relief to the parties). The point being that relief that extends beyond the parties to the dispute should follow only once there is appellate consideration of these issues.

Other courts have appropriately limited Section 705 relief to the "plaintiffs who have demonstrated … standing at this stage" rather than authorizing nationwide vacatur of agency action, *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d, 970–72 (D. Md. 2020) (citing *CASA de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020)), *order dissolved sub nom. Casa de Maryland, Inc. v.*

*Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (applying traditional limitations on equitable relief to § 705 stay). This Court should do the same.

### VI. Plaintiffs' Request for Summary Judgment is Premature

The Court should deny Plaintiffs' alternative request for summary judgment as premature because at this early stage of the case (filed less than two weeks ago) the Court does not yet have the administrative record of the challenged rule. Judicial review under the APA is based on "the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (remanding APA case where the lower courts did not have "the whole record compiled by the agency"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Here, there is a voluminous record of Defendants' rulemaking. Plaintiffs have not demonstrated that they are entitled to summary judgment based on that record and, accordingly, the Court should deny this request.

## CONCLUSION

For the reasons stated above and others, this Court should deny Plaintiffs' motion for a stay under 5 U.S.C. § 705 and for a preliminary injunction. Additionally, this Court should deny Plaintiffs' request for summary judgment.

Dated: September 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

WILLIAM C. SILVIS
Assistant Director

DANIEL SCHUTRUM-BOWARD
Senior Litigation Counsel

OLEKSIY ISAEV
Trial Attorney

/s/Michael A. Celone
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
General Litigation and Appeals Section
Post Office Box 868 | Ben Franklin Station |
Washington, D.C. 20044-0868
Michael.A.Celone@usdoj.gov
202-305-2040

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Michael A. Celone
MICHAEL A. CELONE
Senior Litigation Counsel