**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,**<br><br>**Defendants.** | ) | **Civil Action No. 26-13799-FDS** |

**MEMORANDUM AND ORDER ON**
**MOTION FOR PRELIMINARY INJUNCTION**

**SAYLOR, J.**

This is a challenge to a Final Rule issued by the United States Department of Homeland Security concerning the duration of visas for certain nonimmigrants studying or working in the United States.[1] The new rule applies to international students (F visas), international researchers, professors, or instructors studying or teaching at U.S. colleges and universities (J visas), and foreign press representatives (I visas). Plaintiffs are three organizations, representing a variety of colleges, universities, and educators, and four labor organizations, one of which represents journalists and other communications workers.[2]

[1] *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976 (July 17, 2026) ("Final Rule").

[2] Specifically, plaintiffs are the Presidents' Alliance on Higher Education and Immigration; NAFSA: Association of International Educators; Association of Independent Colleges and Universities in Massachusetts; American Federation of Teachers; Graduate Labor Organization, AFT Local 6516; The NewsGuild-CWA; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; and United Auto Workers Local 2322. The government does not contest the standing of plaintiffs to challenge the Final Rule.

Since 1978, with limited exceptions, the United States has issued visas to foreign students for their "duration of status."[3] That means, in substance, that nonimmigrants are admitted for the duration of their educational programs. Thus, a student with an F visa may remain in the United States while "pursuing a full course of study at an educational institution . . . or engaging in authorized practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i).

That system—which has been in place for nearly half a century—has permitted tens of millions of foreign students and researchers to come to the United States. It has also resulted in groundbreaking research in science, medicine, and technology, substantial economic growth, and a host of other benefits, often on a vast scale. In the words of plaintiffs:

> This flexible and welcoming approach has allowed U.S. higher education to flourish—education is among the Nation's top services exports—and has helped power American innovation and productivity, as those students and scholars both perform pathbreaking research while in school and, if they choose to remain in the United States to work after graduation, contribute their talents to leading American companies, or even start their own.

(Pl. Mem., Dkt. No. 13, at 1).

At any given time, the number of international students, researchers, and professors at American universities is substantial. At present, there are approximately 1.6 million individuals with F visas and 500,000 with J visas. Major research universities typically have large percentages of foreign students, particularly at the graduate level. Thus, for example, for the 2025-26 academic year, more than 40% of the graduate students (and 11.6% of the undergraduate students) at the Massachusetts Institute of Technology were international

[3] The duration-of-status program for individuals with J visas has been in place since 1985. *See* 8 C.F.R. § 214.2(j)(1)(ii) (1985).

students.[4] At Harvard, 38% of the students in the Graduate School of Arts and Sciences are international.[5] At Northeastern, 56.6% of the graduate students are international;[6] at Boston University, the number is 28.4%.[7]

More than half of all international students major in STEM fields (science, technology, engineering, or mathematics).[8] According to a source cited in the complaint, "[i]nternational student alumni have . . . founded one quarter (143 of 582, or 25%) of all the billion-dollar start-ups in the U.S." (Compl. ¶ 80, citing Stuart Anderson, *Immigrant Entrepreneurs and U.S. Billion-Dollar Companies*, NAT'L FOUND. FOR AM. POL'Y, at 12 (July 26, 2022)). Immigrants to the United States who attended American universities have been named as inventors on a disproportionate number of patents[9] and have been awarded a disproportionate number of Nobel Prizes.[10]

---

[4] *Statistics & Reports, 2025-2026 International Enrollment,* MIT REGISTRAR'S OFFICE, https://registrar.mit.edu/stats-reports/international-enrollment (last visited Sep. 14, 2026); *Statistics & Reports, 2025-2026 Enrollment Statistics by Year,* MIT REGISTRAR'S OFFICE, https://registrar.mit.edu/stats-reports/international-enrollment (last visited Sep. 14, 2026) (shares calculated as the number of international students divided by the total number of students, for graduate and undergraduate programs respectively).

[5] *Student Communities*, HARVARD KENNETH C. GRIFFIN GRADUATE SCHOOL OF ARTS AND SCIENCES, https://gsas.harvard.edu/admitted-students/student-communities#international (last visited Sep. 14, 2026).

[6] *Student Demographics*, *Enrollment by Gender and Race/Ethnicity, Fall 2025*, NORTHEASTERN UNIVERSITY, https://facts.northeastern.edu (last visited Sep. 14, 2026) (share calculated as the number of international graduate students (12,519) divided by the total number of graduate students (22,134)).

[7] *Student Enrollment*, BOSTON UNIVERSITY ANALYTICAL SERVICES & INSTITUTIONAL RESEARCH, https://www.bu.edu/asir/bu-facts/fact-book/student-enrollment (last visited Sep. 14, 2026) (share calculated as the number of international students with Student Class Category Level of "Graduate" (5,228) divided by the total number of students with that class category level (18,401)).

[8] *Annual Release, International Students*, OPEN DOORS DATA, https://opendoorsdata.org/annual-release/international-students/ (last visited Sep. 14, 2026).

[9] Ex. 2, Dkt. No. 2-24, at 31 (citing Jennifer Hunt, *Which Immigrants Are Most Innovative and Entrepreneurial? Distinctions by Entry Visa*, 29 J. LAB. ECON. 417, 417 (2011)) ("High skill workers who entered the United States on student visas have much larger rates of patenting, publishing, earning, and entrepreneurship than otherwise comparable natives.").

[10] *Immigrant Nobel Laureates*, GEORGE MASON UNIVERSITY COLLEGE OF HUMANITIES AND SOCIAL SCIENCES, https://chss.gmu.edu/articles/21491 (Dec. 2, 2024) (Of the 410 individual winners of Nobel academic

The current system—like any government regulatory framework—is not without its problems. Rather than attempt to improve that system, DHS elected to replace it with a new program that will substantially restrict the overall number of foreign students, researchers, professors, and journalists in the United States.

On July 17, 2026, DHS issued a Final Rule that provides for a system of fixed-term visas for F, J, and I visas. F and J visas will be capped at four years, regardless of the anticipated or likely length of educational program or research. For journalists with I visas, the cap is only 240 days.

The holder of an F or J visa who requires more than four years to complete his or her studies or work[11]—such as, for example, nearly all students in Ph.D. programs—will need to submit an extension-of-stay request to DHS, using a Form I-539. The rule contains limited guidance, at best, for the exercise of discretion by DHS in considering such a request. The government has provided no indication as to how the immigration system will be expanded, or funded, to accommodate a large influx of such requests. Worse yet, any decision by DHS to deny a request for an extension is entirely discretionary and unappealable, even within DHS itself.[12]

In other words, a DHS official—based on limited and vague criteria, and with no possibility of appeal—will have the power to cut short the academic, research, or teaching activities of any non-U.S. citizen for no reason or any reason. Thus, for example, an

---

prizes awarded between 1901 and 2024, 142 were awarded to immigrants to the United States, 44% of whom obtained their highest educational degree in the United States).

[11] Because of language barriers and other issues, the median foreign undergraduate student takes slightly longer than four years to graduate.

[12] *See* Final Rule, 91 Fed. Reg. 44976, 45096 ("USCIS has discretion to grant decisions on extension or amendment of stay request, and . . . decisions may not be appealed.").

international student who is one credit short of graduating could be required to leave the United States without a degree and without any recourse. That introduces, at a minimum, a high degree of uncertainty into the educational process, which will have an obvious deterrent effect on student enrollment. Moreover, it is not difficult to imagine how that system might be abused to punish those whose viewpoints or research are disfavored by the officials making the decision—or, indeed, punish disfavored institutions. *See, e.g., President and Fellows of Harvard College v. United States Department of Homeland Security*, 788 F. Supp. 3d 182, 186 (D. Mass. 2025) (preliminarily enjoining the government from terminating, by presidential proclamation, the ability of Harvard University to enroll international students or researchers by denying them entry to the United States on grounds of "national security").

In addition to the four-year cap, the rule has other provisions that will restrict the ability of international students to obtain degrees. It prohibits international students from seeking a second degree at the same or lower level compared to a degree already completed—which, as a practical matter, will prevent students from obtaining joint degrees. It effectively prohibits graduate students from changing their educational objectives. And it effectively prohibits students from transferring between institutions.

As for journalists, as noted, the Final Rule limits visas to only 240 days. Journalists can apply for an extension from DHS, under a process that calls for the entirely unguided exercise of discretion by government officials, with no recourse and no appeal. Again, the possibilities for abuse are rampant—in particular, the obvious likelihood that the visas of foreign journalists who are critical of the government (or, more particularly, DHS officials) will not be renewed. It also raises the very likely possibility of retaliation against American journalists working abroad.

Despite the massive anticipated impact of the rule, DHS provided an exceptionally short, and barely legal, 32-day period for public comments. Nonetheless, approximately 22,000 commenters responded during that short interval. The overwhelming majority of those comments expressed strong opposition. Among other things, commenters pointed out serious flaws in DHS's reasoning and offered multiple alternatives that would achieve the stated objectives with far less harmful effects on students, universities, journalists, and the American economy.

DHS summarily rejected those views, dismissing their concerns as merely "speculative," based on mere "predictions," or "unquantifiable." In fact, because it asserted that the impact on enrollment was unquantifiable, it effectively concluded that the cost of that impact was zero. And in support of its own position, it offered almost entirely conclusory statements, *non sequiturs*, and statements of "belief" without supporting reasoning.

To the extent DHS engaged at all on substantive issues, its responses were largely disconnected from academic or practical realities. For example, in response to concerns that the rule would impair the ability of the American universities to attract the brightest available students from around the world, the government simply offered this: "DHS expects that U.S. educational institutions may attract other students who are not dissuaded by the requirements of this rule. U.S. universities and colleges may be able to fill vacancies left by nonimmigrant students who choose not to enroll with other qualified applicants, which could reduce the overall impact on enrollment numbers such that the net impact is difficult to estimate." 91 Fed. Reg. at 45088. The proposition that graduate students in science or technology at MIT or Harvard could simply be replaced by "other qualified applicants"—because DHS believes that such students are fungible—is not a rational response to a legitimate concern.

The damage to the higher education system and to the economy of the United States is likely to be catastrophic. The government has acknowledged that compliance costs alone will likely total more than $250 million in the first year. But the real expected costs go far beyond the figure. According to plaintiffs:

> [T]his change will have the unavoidable effect of making the United States a less attractive destination for the world's top students. Research conducted by Plaintiff NAFSA revealed that some 49% of current international students stated that they would not have enrolled under the system DHS just adopted, and 16% fewer prospective students indicated likelihood to enroll in the United States under that scheme. Translated into dollars, the loss for the Nation is massive: As an expert economic analysis in the comment record explained, even conservatively assuming only a 10% reduction in international student enrollment, the negative effects on the American economy are likely to reach *tens of billions* of dollars each year.

(Pl. Mem. at 2). Many American colleges and universities—already struggling with declining enrollment based on demographic changes—will likewise suffer huge economic impacts.

In fact, the anticipated harms have begun to materialize, even though the new rule has not yet taken effect. Multiple commenters noted that large numbers of international students have already disenrolled from American university programs or declined to apply at all.

Notwithstanding the scale of the likely harm, the government's proffered rationales for the rule are exceptionally weak, and the connection between the rule and the problems it purports to address is exceptionally attenuated. In substance, the government offers two justifications: the protection of "national security" and the prevention of fraud and abuse in the visa program.

The government's contention that the rule is necessary to safeguard national security borders on the absurd. It is based almost entirely on a small handful of anecdotes, each of which involved incidents that the new rule would do nothing to prevent or even mitigate. For

example, in its brief, the government points to five such instances involving eleven individuals (out of tens of millions of individuals admitted under a program in effect for more than four decades). Three of those (involving nine individuals) involved Chinese students attempting to photograph military installations or exercises. The other two involved an individual who overstayed his visa and a Russian intelligence operative who entered the U.S. with an F-1 visa obtained with a fraudulent Brazilian identity.

Those episodes, and the other anecdotes cited by the government, are of course unfortunate. But the government makes no real effort to explain how the four-year cap would eliminate, or even reduce, those types of such activities. Presumably, a foreign student who wishes to photograph military bases could do so during a four-year period—or, indeed, could do so on a six-month B-1 tourist visa. The Russian agent who obtained a visa by fraud, for example, had been present in the U.S. for only two years. 91 Fed. Reg. at 44985. And the government failed to consider less drastic and more obvious ways to address security vulnerabilities, or even attempt to explain why the arbitrary four-year cap was preferable to the alternatives.[13]

As to fraud and abuse, the government again relies to a large extent on anecdotes concerning F-1 status students who had "enroll[ed] in schools for extended periods of time," *id.* at 44983, and provided statistics that some small fraction of those students had spent "more than 10 years in student status" since 2003, *id.* at 45103. The government also expressed concern as to visa holders who overstayed their status. *Id*. at 44998.

[13] DHS expressed concern as to threats to national security posed by individuals in the academic community from the People's Republic of China. 91 Fed. Reg. at 44990. An obvious alternative that DHS could have considered, with fewer adverse impacts, would have involved greater restrictions on, or monitoring of, students and researchers from the PRC.

DHS did not explain how a four-year cap will prevent individuals from obtaining visas by fraud. Similarly, for those who overstay their visas, DHS offered no real explanation as to how the Final Rule will prevent or deter such abuse to any meaningful degree as compared to the current system. And as multiple commenters pointed out, there is nothing inherently suspect in an education and training program that lasts ten years, particularly at the highest levels. Finally, to the extent that there are individuals who do in fact manipulate their academic careers in order to prolong their status, DHS failed to consider a multitude of less drastic ways to curb the abuse.

As to journalists, DHS makes no real effort even to defend the new rule on its merits—in fact, it did not offer any national security or fraud-and-abuse evidence, or indeed provide any reasoned explanation, at all.

The weakness of the connection between the rule and its purported rationales raises legitimate questions as to whether its real purpose is not to safeguard national security and protect our borders, but to achieve other, undisclosed, goals—such as, for example, asserting greater government control over academic institutions and the press.[14] And by invoking "national security," and pointing to the President's broad powers over immigration, DHS no doubt seeks to insulate its actions from judicial review to the greatest extent possible. *See Trump v. Hawaii*, 585 U.S. 667, 670 (2018) (stating that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.").

[14] DHS disclaimed any intention to promote protectionist goals. It noted that in support of the rule, "[m]ultiple commenters remarked that universities should give preference to American students and expressed concern that foreign students are taking spots from more qualified American students." 91 Fed. Reg. 44990 (July 17, 2026). Although DHS expressed appreciation for the support of those commenters, it responded that "this rule is not intended to address whether foreign students are taking opportunities away from American students/workers and such issue is beyond the scope of this rule." *Id.*

In any event—and to be absolutely clear—this Court does not have the power to block the rule on the ground that it is misguided or ill-advised; that the government's candor in promulgating the rule is questionable; or that the rule may inflict substantial and long-term damage upon the United States and its educational institutions. The role of the judiciary is not to ensure that the executive branch does not make unwise decisions. In this context, at least, the only authority that the Court possesses is to ensure that when the government promulgates a new regulation, it adheres to the law.

In this case, the relevant law is the Administrative Procedure Act, 5 U.S.C. § 705. That statute permits courts to set aside agency actions that are arbitrary, capricious, or contrary to law. To satisfy the requirements of the APA, the agency action must "be reasonable and reasonably explained," and the agency must "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *California v. U.S. Dep't of Educ*., 132 F.4th 92, 98 (1st Cir. 2025) (quoting *FCC v. Prometheus Radio Proj*., 592 U.S. 414, 423 (2021) and *Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Among other things, the agency must perform a reasoned calculation of the benefits and costs of the rule; adequately consider less burdensome alternatives; adequately respond to significant comments during the rulemaking process; and provide a rational response to the identified problems it seeks to alleviate. *See State Farm*, 463 U.S. at 51-57.

Here, DHS does not dispute, at least directly, that it was obligated to follow the requirements of the APA when it promulgated the Final Rule. But it largely tries to sidestep meaningful APA review, based on its invocation of national security and border protection.[15]

---

[15] DHS contends that the rule was "well within" its congressionally delegated authority in matters concerning national security and immigration matters, and therefore valid. (Gov. Opp. Mem. at 1). But that

The use of such labels does not, however, give DHS license to ignore its statutory obligations. And for the reasons set forth below, the promulgation of the rule clearly failed to comply with the APA in multiple respects. Plaintiffs are therefore likely to succeed on the merits of their claims; immediate irreparable harm will ensue if an injunction does not issue; and the balance of equities and public interest favor the issuance of an injunction. Accordingly, the Final Rule will be postponed pending final resolution of this matter on the merits.

## I. Background

### A. Statutory and Regulatory Background

#### 1. Overview of Nonimmigrant Visas

The Immigration and Nationality Act ("INA") governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 et seq. The INA creates categories of nonimmigrant visas for certain noncitizens to enter the U.S. temporarily for a specific purpose. *See id.* §§ 1101(a)(15), 1184.

The challenged rule concerns three types of nonimmigrant visas: F visas (international students), J visas (international researchers, professors, teachers, and trainees, such as medical residents), and I visas (foreign press and media). *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 91 Fed. Reg. 44976, 44980-82 (July 17, 2026) ("Final Rule"). All three visa types provide status both to the primary recipient and to their spouse and minor children. *See* 8 U.S.C. § 1101(a)(15)(F)(ii); *id.* § 1101(a)(15)(j); *id.* § 1101(a)(15)(I). All applicants for a

---

statute does not supersede the APA; it simply provides the grant of authority that permits DHS to adopt rules concerning immigration in the first place.

nonimmigrant visa, including F, J, and I visas, must complete Form DS-160 and sit for an interview with a consular officer, who determines the applicant's visa eligibility. 22 C.F.R. §§ 41.102, 41.103. Applicants are also typically required to pay fees and provide supporting documentation. *Id.* §§ 41.104-41.107.

Once a F, J, or I visa is granted, the noncitizen must present at a port of entry, where they are inspected by a Customs and Border Protection officer to ensure that they are not subject to removal and are thus "entitled . . . to enter the United States." 8 C.F.R. § 235.1(f)(1). Upon admission, a nonimmigrant is issued Form I-94, which sets forth the "terms of admission," *id.* § 235.1(h)(1), including the "admit until" date.

F, J, and I Visas are issued based on "duration of status," or "D/S." *See Admission of Nonimmigrant Students for Duration of Status*, 43 Fed. Reg. 54618, 54620 (Nov. 22, 1978); *Nonimmigrant Classes; Admission Period and Extensions of Stay*, 50 Fed. Reg. 42006, 42007 (Oct. 17, 1985). That means that the nonimmigrant is admitted for the duration of their program or purpose in entering the country, rather than for a fixed time period. *See* 8 C.F.R. § 14.2(f)(5)(i); *id.* § 214.2(j)(1); *id.* § 214.2(i)(1).

Upon entry into the United States, F and J visa holders are monitored through the Student and Exchange Visitor Information System ("SEVIS"). *See id.* §§ 214.2(f)(1)(iii); *id.* § 214.2(j)(1)(vii). SEVIS is an online database managed by DHS to track F and J nonimmigrants and ensure that students are maintaining status and complying with federal regulatory requirements. *See SEVP Overview*, IMMIGR. & CUSTOMS ENF'T, https://www.ice.gov/sevis. Educational institutions are responsible for updating SEVIS with new information concerning F and J visa holders, such as address changes, program progress and completion, school or program transfers, extensions, significant reductions in course load,

and practical training experiences. *See, e.g.*, *id.* § 214.3(f)(7)(iv); *id.* § 214.3(f)(8)(ii); *id.* § 214.3(f)(10)(i); *id.* § 214.2(j)(1)(viii); *id.* § 214.3(a)(1). Educational institutions also use SEVIS to apply for and maintain their certification. *Id.* § 214.3(h).

**2. <u>The F Visa</u>**

An F visa may be issued to a nonimmigrant who resides in a foreign country "which he has no intention of abandoning" and is a "bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study" at an American educational institution. 8 U.S.C. § 1101(a)(15)(F)(i). The course of study must take place at an institution that the government has approved for participation in the F visa program through SEVIS. *See id.* For an international student to obtain an F visa, he or she must have a Form I-20 issued by the school's Designated School Official ("DSO"). 8 C.F.R. §§ 214.2(1)-(2), 214.3(K)-(I). Form I-20 certifies the student's academic eligibility for F-1 status, the student's qualifications for pursuing the specified program of enrollment, and the program's start and end dates. *See id.* §§ 214.2(f), 214.3(k).

"Duration of status is defined as the time during which an F-1 student is pursuing a full course of study" at a certified educational institution. *Id.* § 214.2(f)(5)(i). Therefore, an F visa holder maintains status if he or she is "making normal progress toward completing a course of study." *Id.* For that reason, "[a]n F-1 student who is admitted for duration of status is not required to apply for extension of stay as long as the student is maintaining status." *Id.* § 214.2(f)(7)(i). If a student cannot complete his or her studies by the anticipated end date, the student may obtain an extension of stay from their DSO, who must certify that the student has maintained status up to that point and that there are "compelling academic or medical reasons" for the delay. *Id.* § 214.2(f)(7)(iii). Generally, an F visa holder is permitted to

transfer to another certified school while still maintaining status if the student complies with the procedures laid out in 8 C.F.R § 214.2(f)(8). Likewise, students are permitted to engage in part-time on-campus employment at any point, although they can only engage in part-time off-campus employment by seeking authorization from USCIS after one year of study upon a showing of severe economic hardship. *Id.* § 214.2(f)(9).

Federal regulations permit international students to engage in curricular practical training ("CPT") and/or optional practical training ("OPT") while maintaining status. *Id.* § 214.2(f)(10)(i); § 214.2(f)(10)(ii)(C). CPT involves "alternative work/study, internship, cooperative education or any other type of required internship or practicum" that constitutes "an integral part of an established curriculum." *Id.* § 214.2(f)(10)(i). A DSO can directly authorize CPT and then must sign an updated I-20 Form to reflect the authorization and update SEVIS accordingly. *Id.* While CPT must occur during the educational program, OPT can occur either during or after the program, so long as it is "directly related to the student's major area of study." *Id.* § 214.2(f)(10)(ii). OPT must ordinarily be completed within 14 months of the end of the student's course of study, but STEM students can apply for a 24-month extension of OPT in accordance with the requirements laid out in 8 C.F.R. § 214.2(f)(10)(ii)(C). Unlike CPT, OPT is not directly approved by the DSO but must receive authorization from USCIS upon the recommendation of the student's DSO. *Id.* §214.2(f)(11). A student's duration of status ends 60 days after the completion of OPT or their academic program. *Id.* § 214.2(f)(10)(ii)(D).

### 3. <u>The J Visa</u>

A J visa covers a "bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description," who temporarily resides in the United States "for the purpose of

teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training." 8 U.S.C. § 1101(a)(15)(J). Like an F visa holder, a J visa holder must participate in a government-certified program and must have "no intention of abandoning" the foreign country where he or she permanently resides. *Id.*

The process for obtaining a J visa is similar to that for obtaining an F visa, and applicants are subject to the same requirements for all nonimmigrant visa applicants described above. After securing acceptance into a certified J visa program, applicants must present a Form DS-2019 completed by their program's Responsible Officer ("RO"). 8 C.F.R. § 214.2(j)(1). Form DS-2019 certifies the nonimmigrant's participation in the approved program and specifies a period of admission based on the start and end dates of the program. *Id.* § 214.2(j)(1)(i). J visa holders can enter the United States up to 30 days before the program start date and must depart within 30 days of the program end date. *Id.* § 214.2(j)(1)(ii). They must apply for extensions of stay beyond the specified admission period by submitting a new Form DS-2019. *Id.* § 214.2(j)(1)(iv). ROs can then approve the extension of stay "up to the limit of the permissible period of participation authorized for [the applicant's] specific program category." 22 C.F.R. § 62.43(a).

**4. <u>The I Visa</u>**

An I visa recipient must be "a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation." 8 U.S.C. § 1101(a)(15)(I). An I visa is based in a principle of "reciprocity," that is, the ability of American press and media to reside and work in the I visa holder's home country. *Id.*

A nonimmigrant seeking an I visa must satisfy the baseline requirements of completing Form DS-160—that is, interviewing with a consular officer, paying fees, and

providing any required supplementary documentation. After doing so, I visa recipients are typically granted admission for the duration of their employment, except for noncitizens with a passport issued by the People's Republic of China, who are instead subject to a maximum-stay period determined by the DHS Secretary. 8 C.F.R. § 214.2(i). Because a nonimmigrant with an I visa can remain in the United States throughout the course of their assignment, there is no requirement to file for an extension. *Id.* § 214.2(i)(2). The one exception is for Chinese media personnel, whose I visa has a fixed end date. *Id.* Regardless of their home country, I visa holders cannot change their information medium or employer without first obtaining permission from USCIS. *Id.* § 214.2(i)(1).

### B. <u>The Rulemaking</u>

#### 1. <u>The Proposed Rule</u>

On August 28, 2025, DHS proposed amendments to the regulations governing F, J, and I visas. *Establishing a Fixed Time Period of Admission and an Extension of Stay (EOS) Procedure for Non-immigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media*, 90 Fed. Reg. 42070 (Aug. 28, 2025) ("Proposed Rule"). In the Proposed Rule, DHS sought to replace the duration-of-status rule for F, J, and I visas with a fixed-period approach. *Id.* at 42070.

For F and J status, DHS proposed to set a fixed period of admission of four years or the program end date, whichever occurred earlier. *Id.* at 42081.[16] F visa recipients who are undergraduates would not be allowed to transfer schools or change their program of study within their first year, with graduate students prohibited from changing schools or programs

[16] For F Visa nonimmigrants, the admission period for students in an English-language training program and public high-school students would be capped at 24 months and 12 months, respectively. *Id.* at 42086-87.

at any point. *Id.* at 42073. The Proposed Rule included a requirement that F Visa holders pursue subsequent programs only at a higher educational level—in other words, visa holders could not pursue a degree at the same or lower level. Thus, an F visa holder who had a J.D. could not pursue an L.L.M. in taxation, and students could not participate in a joint degree program, such as an engineering degree with an MBA. The departure period for F Visa holders was reduced from 60 days to 30 days. *Id.* For I Visa holders, the Proposed Rule would determine the admission period by the earlier of 240 days or the completion of the assignment. *Id.*

Under the Proposed Rule, F, J, and I nonimmigrants would have to request an Extension of Stay ("EOS") to remain in the United States beyond the fixed period. *Id.* at 42072. F visa holders could not engage in OPT after completing their program of study without first applying for and receiving an EOS. *Id.* at 42111. Moreover, instead of the "normal progress" standard currently governing F-1 program extensions, there would be three enumerated grounds for granting an EOS: (1) a "compelling academic reason"; (2) a "compelling medical reason, such as a serious injury, that is supported by medical documentation"; and (3) "[c]ircumstances beyond the student's control, including a natural disaster, national health crisis, or closure of an institution." *Id.* at 42110. "Compelling academic reason[s]" include "a change of major or research topic or unexpected research problems," with unexpected research problems defined as "those caused by an unexpected change in faculty advisor, need to refine an investigatory topic based on initial research, research funding delays, and similar issues." *Id.* Academic probation, suspension, or unwillingness to complete the course of study would not constitute "compelling academic reason[s]." *Id.* The expected time for program completion, proximity to degree completion,

and delays due to language and culture adjustment were also not listed as factors meriting consideration.

The decision to grant or deny an extension, once the applicant demonstrated eligibility, would be subject entirely to the discretion of an immigration official. *Id.* at 42107. Any denial would be unappealable. *Id.* The Proposed Rule did not provide further details as to how EOS requests would be adjudicated by USCIS. There was no provision specifying whether the decision would be made by a single immigration officer or whether there would be an internal USCIS procedure for reviewing EOS requests.

As justification for the rule, DHS contended that the changes were necessary to safeguard national security and prevent fraud and abuse, citing instances of F and J nonimmigrants engaging in espionage and smuggling and examples of "pay-to-stay" and other types of fraud. *Id.* at 42076-80. It further contended that the duration-of-status rule needed to be replaced because it "pose[d] a challenge to DHS's ability to efficiently monitor and oversee these nonimmigrants to assess whether these nonimmigrants [were] complying with the terms and conditions of their status and whether they present[ed] national security concerns." *Id.* at 42073.

Using a ten-year period of analysis, DHS estimated that the annualized costs of the Proposed Rule ranged from $390.3 to $392.4 million for all parties. *Id.* at 42102. The estimated range for U.S.-specific parties was $86.3 to $88.1 million. *Id.* Those estimates accounted for costs incurred by applicants due to application fees and time needed to file EOS requests, as well as the additional burden imposed on DSOs, ROs, and other university staff to familiarize themselves with the new regulatory requirements, make appropriate changes to existing systems and training materials, and process additional EOS requests. *Id.* at 42101.

DHS also acknowledged some qualitative costs that included the potential for a "marginal" impact on nonimmigrant student enrollment and for costs of implementation incurred by the government. *Id.* at 42101-03. DHS predicted that the Proposed Rule would result in "qualitative benefits for national security" and "deter fraud and abuse" by creating more opportunities to review compliance and status. *Id.* at 42102.

**2. <u>Summary of Public Comments</u>**

DHS required public comments on the Proposed Rule to be submitted by September 29, 2025, within 32 days. *Id.* at 42070. Nearly 22,000 comments were submitted. Final Rule, 91 Fed. Reg. at 44978. Among other things, the commenters disputed DHS's cost-benefit analysis; noted that the Proposed Rule was incompatible with academic realities; cited longstanding reliance interests; noted the potential for worsening DHS's case backlog; and raised concerns about press freedom. Many commenters proposed a variety of less-restrictive alternatives that would achieve the stated goals of the rule with many fewer adverse consequences.

Several commenters expressed concerns that DHS's quantitative and qualitative cost analysis was significantly underestimated. Those commenters submitted evidence that the proposed changes would substantially deter foreign-student enrollment. For example, NAFSA: Association of International Educators ("NAFSA") and the Association of American Universities cited a survey of current and prospective international students conducted by the Institute for Progress. Ex. 15, Dkt. No. 2-25, at 23 (citing *Surveys on International Talent Pipelines*, INST. FOR PROGRESS (IFP) AND NAFSA: ASS'N OF INT'L EDUCATORS, (Sep. 15, 2025), https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf.). In that survey, 49% of respondents who were current international students said they would not have enrolled under a fixed-period approach and

16% fewer respondents who were prospective international students said they would enroll under a fixed-period system. *Id.*; Ex. 16, Dkt. No. 2-25, at 13-14. Those commenters also pointed to an analysis conducted by an immigration economist and two immigration policy experts, who concluded that a 10% reduction in F-1 graduates (which they considered a conservative estimate) would create annual economic losses of $72 to $145 billion within a ten-year timeframe. Ex. 15, Dkt. No. 2-25, at 23; Ex. 16, Dkt. No. 2-25, at 14; Ex. 21, Dkt. No. 2-26, at 5.

Multiple commenters noted that the Proposed Rule failed to account for the realities of program completion. Several commenters predicted that the Proposed Rule would require most doctoral students and many undergraduates to seek EOSs, which would create significant uncertainty and thus substantially deter enrollment. Among other things, the commenters pointed to statistics showing that the median completion time for doctorates is nearly six years and exceeds four years for bachelor's degrees. *See, e.g.*, Ex. 15, Dkt. No. 2-25, at 20-21; Ex. 16, Dkt. No. 2-25, at 3-4; Ex. 27, Dkt. No. 2-26, at 3-4.

Several commenters discussed the substantial reliance interests of students and educational institutions in the duration-of-status system. NAFSA described the additional uncertainty created by the proposed EOS framework as disrupting the "settled expectations" of students, exchange visitors, and educational institutions. Ex. 15, Dkt. No. 2-25, at 14. One anonymous commenter noted that international students enrolled in their programs, paid tuition, planned OPT and employment opportunities, and made other "major life decisions" around the duration-of-status approach. Ex. 47, Dkt. No. 2-31, at 1; *see also* Ex. 48, Dkt. No. 2-31, at 1 ("Students planned degree programs, universities planned compliance infrastructure, and employers planned hiring pipelines around D/S."). Another comment

discussed how "[i]nstitutions have structured admissions cycles, course sequencing, staffing, and funding around settled D/S practice." Ex. 49, Dkt. No. 2-31, at 2.

Several comments predicted that the Proposed Rule would exacerbate DHS's case backlog. A comment submitted by several members of Congress indicated that the Proposed Rule would "exponentially increase[] paperwork and processing" and thus worsen that backlog. Ex. 50, Dkt. No. 2-31, at 6. The Association of American Universities raised similar concerns, predicting a 163% increase in Form I-539 applications on top of a "historically high backlog." Ex. 16, Dkt. No. 2-25, at 17; *see also* Ex. 17, Dkt. No. 2-25, at 3.

Other commenters expressed concerns about press freedom and the feasibility of the proposed 240-day fixed period for I visas. For example, the NewsGuild argued that the 240-day period was too short a timeframe for foreign journalists to familiarize themselves with a new country and develop sources. Ex. 51, Dkt. No. 2-33, at 3; *see also* Ex. 52, Dkt. No. 2-33, at 2. Commenters noted that Proposed Rule would chill reporting and other press activity due to the risk of retaliatory denials of EOS requests. *See, e.g.*, Ex. 51, Dkt. No. 2-33, at 2; Ex. 52, Dkt. No. 2-33, at 3; Ex. 53, Dkt. No. 2-33, at 1-2. And commenters also noted that the proposed changes could lead to retaliatory actions against American journalists working abroad. *See* Ex. 51, Dkt. No. 2-33, at 3; Ex. 52, Dkt. No. 2-33, at 5.

Multiple commenters proposed less-restrictive alternatives that DHS could adopt to achieve its stated goals of protecting national security and preventing fraud and abuse. Several comments suggested that the fixed admission period should reflect the specific completion time for programs and degrees. *See, e.g.*, Ex. 13, Dkt. 2-25, at 1; Ex. 19, Dkt. 2-26, at 2. A common proposal was to rely on existing tools, such as SEVIS, to detect fraud and safeguard national security, given existing reporting requirements and opportunities for

review that DHS had already used to discover the incidents cited in the Proposed Rule. *See, e.g.*, Ex. 15, Dkt. No. 2-25, at 7-8; Ex. 16, Dkt. No. 2-25, at 15-16. Commenters also suggested more tailored monitoring processes for fields with national-security implications and/or students from foreign countries of concern, rather than entirely eliminating the duration-of-status approach. *See, e.g.*, Ex. 33, Dkt. No. 2-27, at 1; Ex. 34, Dkt. No. 2-28, at 1-2; Ex. 35, Dkt. No. 2-28, at 2.

**3. <u>The Final Rule</u>**

On July 17, 2026, DHS published the final version of the rule. Final Rule, 91 Fed. Reg. 44976. The Final Rule's effective date is September 15, 2026. *Id.* at 44976.

Although the Final Rule adopts nearly all of the provisions in the Proposed Rule, DHS made some substantive clarifications and changes. The Final Rule provides that F-1 students below the graduate level may be authorized to transfer during their first year if there are extenuating circumstances, such as "a student needing to change schools to complete elementary or secondary education." *Id.* at 45097. In response to comments criticizing the rigidity of the prohibition for graduate students, the Final Rule provides that they may not change educational objectives or transfer at any point, but does allow for exceptions if there are extenuating circumstances. *Id.* at 45097, 45043. The Final Rule further provides that F and J visa holders who complete their program early must leave the country within 30 days. *Id.* In addition, DHS updated the cost-benefit analysis in light of more recent data. The updated projections for the quantified costs are $443.1 million to $448.6 million overall and $119.9 million to $125.1 million for U.S.-specific parties. *Id.* at 45117.

DHS's responses to the comments were, to a very considerable extent, conclusory or dismissive. Responding to comments that the changes would lead to a much larger decline in enrollment than forecasted, DHS simply stated that it "does not intend for the rule to cause

significant shift in student enrollment." *Id.* at 45087. In response to the surveys discussed by commenters, DHS provided no countervailing data or quantitative analysis. It stated that it considered the "the exact magnitude of any enrollment decline and its downstream economic effects" to be "uncertain and speculative," and therefore best analyzed qualitatively rather than quantitatively. *Id.* at 45086-87. Although it dismissed the Institute for Progress Study, it offered no study or data of its own. DHS expressed its disagreement with the analysis underlying commenters' impact estimate of $72 to $145 billion, stating that it was based on survey results that could "reflect hypothetical preferences rather than actual behavior" and reiterated its belief that "this rule will not be a major deterrent, as the main regulatory burden to file an EOS request in order to remain in the country may not be costly enough to dissuade enrolling." *Id.* at 45088. As noted, DHS also suggested that students who were deterred from enrolling by the rule could be replaced by "other students who are not dissuaded by the requirements of this rule" or by "other qualified applicants." *Id.*

DHS responded to concerns about the incompatibility of the proposed changes with academic realities by simply noting that "foreign students may still study, teach, and research in the United States under this fixed period of admission framework" and can apply for an EOS if needed. *Id.* at 45043. DHS stated that it "does not intend to discourage academic advancement or require students to abandon years of work." *Id.* It acknowledged that "some F and J nonimmigrants may have program end dates longer than 4 years," but stated that the four-year cap was "the best option because it aligns with the general structure of post-secondary education while still allowing for the government to have increased oversight of this population." *Id.* at 45099.

In response to comments concerning reliance interests, DHS stated that it "sought to

minimize disruption by including a transition period, mechanisms for extensions of stay, and clear guidance," and that it had "provided a reasoned explanation for this policy shift, consistent with Supreme Court precedent." *Id.* at 45017, 45073.

In response to concerns about the exacerbation of USCIS backlogs, DHS stated that it was "continuing to explore operational alternatives to address USCIS backlogs." *Id.* at 45015. It expressed its "belie[f] that, given that 90 percent of Form I-539 adjudications for F, M, and J aliens are completed in three months, factors contributing to this backlog w[ould] not be present when the EOS applications resulting from this final rule [were] anticipated to be filed." *Id.* at 45084. At another point, DHS acknowledged that "the rule may cause an increase in USCIS processing times," but stated that "the benefits of increased contact with these nonimmigrants outweigh[ed] processing time considerations." *Id.* at 45021.

DHS responded to comments about the I visa changes by noting that "internal data show that the vast majority of I nonimmigrants stay for less than 240 days" and that those who require longer stays can request an EOS. *Id.* at 45063. It responded to concerns about press freedom by stating that it "does not have data, and cannot draw on any relevant historical precedence, to quantify or monetize the rule's potential chilling effect." *Id.* at 45065. And it responded to concerns about retaliation against American journalists in foreign countries by stating that it "does not anticipate that foreign media organizations or governments will react to the rule with reciprocal, retaliatory actions against U.S. news correspondents or interests." *Id.*

As to the proposed less-restrictive alternatives, DHS disagreed that "leveraging data in SEVIS alone . . . is sufficient to address the vulnerabilities of the D/S framework." *Id.* at 44999. It stated that "SEVIS relies on information that is inputted by educational institutions

and program sponsors" and that "DSOs and ROs should no longer serve as direct proxies for immigration officers." *Id.* In response to calls for more tailored monitoring and vetting to serve national-security interests, it "assert[ed] that the fixed admission period and the EOS application requirements are not punitive or specific to the F, J, and I nonimmigrants." *Id.* at 45000. And in rejecting admission periods that would depend on program completion time, it stated the need for a "uniform standard . . . regardless of program type," expressed its "wish[] to establish predetermined points in time, not to exceed 4 years" to evaluate compliance, and noted the ability to apply for an EOS. *Id.* at 45011.

## II. <u>Standard of Review</u>

The APA provides that a reviewing court should "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. The APA also authorizes courts "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

In determining whether to postpone or stay agency action under § 705, courts evaluate the same four factors that govern the issuance of a preliminary injunction. *See African Communities Together v. Noem*, 820 F.Supp.3d 48, 59-60 (D. Mass. Feb. 12, 2026) (citing *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *Colorado v. United States EPA*, 989 F.3d 874, 883 (10th Cir. 2021)). Accordingly, a party seeking relief under § 705 must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) that the

balance of equities weighs in its favor, and (4) that an injunction or stay is in the public interest. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the government is the opposing party, the equities and public interest factors merge. *Massachusetts v. Nat'l Inst. of Health*, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In addition, of those four factors, the likelihood of success on the merits "normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009) (citation omitted); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.") (citation omitted).

Alternatively, when administrative action is challenged under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F.Supp.2d 237, 240 (D.D.C. 2013); *see S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97-98 (1st Cir. 2002) ("That the parties brought the issues forward on cross-motions for summary judgment is not significant; substance must prevail over form, and the fact remains that the parties have presented this matter as a case stated[ ] on a fully developed administrative record.").

## III. Analysis

### A. Likelihood of Success on the Merits

In determining whether agency action is arbitrary or capricious, courts must examine the evidence relied on by the agency and the reasons given for its decision. The agency is required

to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 351-52 (1st Cir. 2004). "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)).

Here, the agency action is arbitrary and capricious in at least four respects: DHS failed to conduct a reasoned calculation of the benefits and costs of the Final Rule; failed to conduct a meaningful consideration of other alternatives; failed to respond to significant comments expressing substantial concerns; and failed to show that there is a rational connection between the Final Rule and its purported objectives.

**1. <u>Cost-Benefit Analysis</u>**

First, DHS failed to conduct any reasoned calculation of the costs and benefits of the Final Rule. In particular, DHS effectively ignored the immense costs of restricting international student enrollment, research and teaching by international individuals, and press nonimmigrant travel. Cost is a "centrally relevant factor when deciding whether to regulate." *Michigan v. E.P.A.*, 576 U.S. 743, 752-53 (2015). It "reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decision." *Id*. at 753.

Multiple commenters, citing detailed survey data, explained that many international students would not enroll in United States universities if the duration-of-status policy was terminated. Again, NAFSA cited an Institute for Progress survey of 1,039 current students that found that "49% of respondents . . . said they would not have enrolled in the first place had D/S been replaced with a fixed period of admission." Ex. 15, Dkt. No. 2-25, at 23. Moreover, considering only those who said they were planning to try to remain after completing their program, that study also found that 48% of Ph.D. students and 33% of postdoctoral fellows would not have initially come to the United States if duration of status was eliminated. Ex. 21, Dkt. No. 2-26, at 3. The Institute for Progress also surveyed 611 prospective students. It found that "16% fewer prospective students said they were likely to enroll in U.S. programs if Duration of Status were replaced with a fixed period of admission." *Id.* One of the main findings in the underlying data was that "[t]hose interested in advanced education were the least sure they would come to the United States" if duration of status were eliminated. *Surveys on International Talent Pipelines*, INST. FOR PROGRESS (IFP) AND NAFSA: ASS'N OF INT'L EDUCATORS 3, (Sep. 15, 2025), https://ifp.org/wp-content/uploads/2025-Surveys-on-International-Talent-Pipelines-1.pdf.

Those survey results reflect both practical realities and common sense. Higher education is exceptionally expensive and involves a lengthy commitment of time. It is hardly surprising that the introduction of significant uncertainties into the process for international students would have a substantial deterrent effect.

Multiple commenters also noted that a decline in international student enrollment would have significant economic costs. For example, Michael Clemens, a Professor of Economics at George Mason University, along with two immigration policy experts, Jeremy Neufeld and Amy Nice, explained that "[t]he increase in US city-level productivity caused by inflows of foreign

STEM workers from 1990 to 2010 [was] sufficient in magnitude to explain 30 and 50% of *all* aggregate productivity growth in the United States during that period." Ex. 21, Dkt. No. 2-26, at 5. That growth caused a "12-21% rise in the annual number of high-technology innovations reflected by annual patent applications, which in turn raised US GDP per capita by between 1.4 and 2.4 percent—the equivalent, in today's dollars, of adding $267-458 billion to the US economy each year." *Id.* The Clemens study estimated that the Final Rule would, conservatively, reduce the number of F-1 graduates by 10%. *Id.* at 5-6. According to their analysis, that would cause "GDP at the end of that decade to be 0.239 to 0.478 percent smaller than it otherwise would have been," resulting in "an annual loss of as much as $72-145 billion by ten years into the future." *Id.*

DHS purported to respond to those concerns. In a brief one-page OMB Accounting Statement, the agency described the benefits and costs of the Final Rule. 91 Fed. Reg. at 45117-18. The statement qualitatively described, in five bullets, the anticipated national security and fraud benefits of the Final Rule, such as "[d]eter[ring] F, J, and I nonimmigrants from engaging in fraud and abuse," and "[p]rovid[ing] DHS with additional information to promptly detect national security concerns." *Id.* The statement also qualitatively described, in seven bullets, the costs of the Final Rule, such as "[p]otential burden for DHS and nonimmigrants associated with government requests," "DHS costs for rule familiarization," and "[p]otential burden to schools/program sponsors and DHS to update batch processing systems." *Id.* Although one bullet acknowledged "[p]otential reduction in enrollment of nonimmigrant students and exchange visitors and subsequent revenue effects on sponsoring institutions," *id.* (citing DHS's Regulatory Impact Analysis), DHS made no real effort to quantify those costs. Instead, it calculated only $443.1 to $448.6 million in DSO and RO rule familiarization, EOS filing, and

DSO/RO and HR EOS request processing costs. *Id.* (citing DHS's Regulatory Impact Analysis); *see id.* at 45116.

To justify its decision not to quantify decreased enrollment costs, DHS relied on conclusory statements and unsupported expressions of belief. It asserted that the downside to the Final Rule was "minimal," because decreasing enrollment could be attributable to myriad reasons not necessarily related to the Final Rule. *Id.* at 45088; *see also id.* at 45001 ("[T]he level of foreign student enrollment does fluctuate, and it is speculative to assess any declination is a direct and sole result of the rule."). DHS also stated that it "believe[d] that this [R]ule w[ould] not be a major deterrent, as the main regulatory burden to file an EOS request in order to remain in the country may not be costly enough to dissuade enrolling." *Id.* at 45088. Ultimately, and as noted, DHS concluded that it expected the "United States to remain a popular, competitive, and attractive place for nonimmigrant students and exchange visitors to pursue their program of interest," and offered the view that universities could "fill vacancies left by nonimmigrant students who choose not to enroll with other qualified applicants." *Id.*

An agency acts arbitrarily and capriciously when it "fail[s] adequately to quantify certain costs or to explain why those costs could not be quantified; neglect[s] to support its predictive judgments [or] contradict[s] itself." *Bus. Roundtable v. S.E.C.*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011); *see also GPA Midstream Ass'n v. United States Dep't of Transportation*, 67 F.4th 1188, 1200 (D.C. Cir. 2023) ("[A] reasoned decision would explain why any unquantified benefits cannot reasonably be quantified."). Here, DHS utilized no principled method by which to meaningfully compare costs and benefits of the Final Rule. Many commenters, citing the Clemens study, explained that DHS's cost analysis was massively underinclusive because it did not account for decreasing enrollment caused by uncertainty—namely, the uncertainty caused by

a student's continuing education being conditioned on a discretionary, unappealable decision. Yet in response, DHS stated only that it disagreed with Clemens's 10% assumption because the study relied on survey results which "often reflect hypothetical preferences rather than actual behavior," and that it "remain[ed] uncertain as to how many students will choose not to enroll due to this rule." 91 Fed. Reg. at 45088. And the agency provided no counter-estimate, let alone any methodology, of what it deemed to be the cost of declining enrollment.

DHS also argues that its treatment of the survey and economic forecast data was reasonable because agencies may rely on their own economic and technical assumptions where projections involve significant uncertainty. Defendants' Response, Ex. A, Dkt. No. 46-1, at 17-18. In so doing, it mischaracterizes the law and misses the point. *All* cost-benefit analyses, for *all* agency rules, are inherently predictive and uncertain. *See State Farm.*, 463 U.S. at 52 ("Recognizing that policymaking in a complex society must account for uncertainty . . . does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions."). Therefore, "unquantified factors . . . cannot be dismissed without further inquiry where their impact is both evident and massively significant." *Maryland People's Couns. v. FERC*, 761 F.2d 768, 776 (D.C. Cir. 1985). Here, DHS did not even attempt to quantify the actual costs and purported benefits of the Final Rule, much less perform a reasoned balancing. Its treatment of the costs was egregiously flawed and incomplete, consisting almost entirely of the statement that the Final Rule "may" have an impact on enrollment, school tuition, and the labor market.

Finally, DHS argues that agency evaluations of predictive judgments are entitled to particular deference. Defendants' Response, Ex. A, Dkt. No. 46-1, at 17. It again mischaracterizes the law. Courts may defer to agencies when they are relying on highly

technical, often scientific, data. *See, e.g.*, *Marsh v. Oregon Nat'l Res. Council*, 490 U.S. 360, 377 (1989) (deferring to the agency's environmental impact analysis because it 'require[d] a high level of technical expertise'") (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)); *Sierra Club v. E.P.A.*, 353 F.3d 976, 991 (D.C. Cir. 2004) (same); *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 336 (D.C. Cir. 2014) (same). Here, DHS did not offer its own data or methodology, let alone a highly technical analysis, on the costs and benefits of the Final Rule. It simply provided an unsupported qualitative speculation that educational programs will remain attractive to international students. That speculation is not entitled to deference under the law.

In short, the perfunctory and conclusory analysis performed by DHS fails to satisfy even the bare minimum cost-benefit analysis the APA requires. DHS's action in adopting the Final Rule without a reasoned cost-benefit analysis is arbitrary and capricious, and therefore violated the APA.

**2. <u>Consideration of Other Alternatives</u>**

Next, DHS failed entirely to perform a meaningful consideration of reasonable alternatives. An agency must "consider significant alternatives to the course it ultimately chooses." *Allied Local & Reg'l Mfrs. Caucus v. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000). Courts do not "broadly require an agency to consider all policy alternatives in reaching [a] decision." *State Farm*, 463 U.S. at 51. But, "[a]t the very least," alternative methods "should have been addressed and adequate reasons given for [their] abandonment." *Id.* at 48. DHS did not seriously consider alternative methods and did not provide adequate reasons for rejecting them.

First, several commenters proposed improving existing tools, such as SEVIS, to detect and deter fraud and abuse.[17] DHS rejected that alternative, stating only that the SEVIS system does not provide officers "an opportunity to evaluate an alien's maintenance of status at pre-determined points," because it is a data-reporting system managed by school DSOs, not an immigration-status adjudication system overseen by DHS. 91 Fed. Reg. at 45009; *id.* at 44999. That reasoning is circular. The commenters' point was not only that SEVIS, as currently designed, could accomplish the government's purported goals of reducing fraud and protecting national security, but also that SEVIS could be upgraded to better address those issues. For example, SEVIS could be upgraded to require registration for longer-term students or exchange visitors, which could provide a compliance checkpoint without the full burdens of an extension of stay. DHS was of course not required to accept any of those alternatives, but neither is it permitted to dismiss them out of hand simply because it disagrees.

Second, commenters suggested that if a fixed term was necessary, it should be based on program duration to align with academic realities. DHS offered only a conclusory response, stating that "DHS wishes to establish predetermined points in time, not to exceed 4 years," and that "[t]he rule change sets clear and defined expectations for program of study completion for the universities and nonimmigrant students." 91 Fed. Reg. at 45011, 45074. An *ipse dixit* response is not a reasoned analysis. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 726 (1988) (Scalia, J., dissenting) ("[H]e who lives by the *ipse dixit* dies by the *ipse dixit*."). DHS was required to give serious consideration to those comments, not dismiss them without reasoning or analysis. DHS argues that the agency's objective is "to produce a uniform, administratively

[17] Notably, many of the incidents that DHS cites as evidence of vulnerabilities in the duration-of-status system were discovered through SEVIS. *See* 91 Fed. Reg. at 44985.

manageable nonimmigrant visa admission framework." Defendants' Response, Ex. A, Dkt. No. 46-1, at 25 (emphasis removed); *see* 91 Fed. Reg. at 45011. But DHS did not explain why fixed terms that aligned with academic realities would not provide the desired uniformity and manageability.

Finally, commenters suggested enhancements to DHS vetting and monitoring procedures as an alternative method to address national-security concerns. One suggested that DHS "focus enhanced screening and monitoring on the small subset of individuals in highly sensitive research fields or those with funding from foreign government entities of concern." Ex. 33, Dkt. No. 2-27, at 1. Another suggested "strengthen[ing] initial visa interviews and enhanc[ing] existing site visit programs by targeting high-risk individuals." Ex. 35, Dkt. No 2-28, at 2. DHS stated that such proposals would not provide broad, periodic, and reliable screening by immigration authorities. *See, e.g.*, 91 Fed. Reg. at 44999-45000. But again, this is simply a conclusory statement. DHS did not explain why the proposed alternative would not be a less burdensome way of accomplishing the same end goal.

It is the "agency's responsibility" to explain why it rejected other less burdensome alternatives, when "every indication in the record points the other way." *State Farm*, 463 U.S. at 56-57. Because DHS failed to do so, the Final Rule is arbitrary and capricious in that respect as well.

**3. <u>Response to Significant Comments</u>**

Third, DHS failed to provide meaningful responses to significant comments. "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). An agency's failure to respond to relevant comments generally "demonstrates that the agency's decision was not 'based

on a consideration of the relevant factors.'" *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

As a preliminary matter, it is notable that DHS provided only 32 days to gather public comment on a major change to the international student visa program—a time period that is barely sufficient under the APA. Although courts have found that "the shortest period in which parties can meaningfully review a proposed rule and filed informed responses is thirty days," "there is scarcely anything talismanic about that particular length of time." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984); *see also Hollingsworth v. Perry*, 558 U.S. 183, 192-93 (2010) (per curiam) ("Administrative agencies . . . 'usually' provide a comment period of 'thirty days or more.'" (quoting *River-bend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992)). Indeed, 30 days is "an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data." *Petry*, 737 F.2d at 1201 (quoting ADMIN. CONF. OF THE UNITED STATES, A GUIDE TO FEDERAL AGENCY RULEMAKING 124 (1983); *see also id.* at 1202 (noting that 30 days is "a barebones period . . . for comments to be filed" and that such a timeframe would "cut the comment period to the bone").

Even so, DHS received nearly 22,000 comments. While it was not required to respond on an individualized basis to each, it was not permitted to ignore significant comments or respond to them in a casual and superficial manner. First, DHS failed to respond to comments concerning how the Final Rule would likely deter international student enrollment. As noted, many comments referred to the Institute for Progress survey and Clemens analysis, which showed that the Final Rule would significantly depress the enrollment of international students. Again, DHS dispensed with the studies simply by saying that survey data was unreliable. It also never acknowledged that the Clemens study based its analysis not just on survey data, but also

on how the new system for all OPT applicants (specifically, the reduction from a 60 to 30-day departure period) would lead to expirations of status before OPT could be granted, which would impair the ability of F-1 nonimmigrants to secure employment in their field of study. *See* Ex. 21, Dkt. No. 2-2-26, at 5.

Moreover, commenters observed that the rule would place the United States at a competitive disadvantage with other countries. One cited a Moody's analysis concluding that a "20% drop in international enrollment would cause 130 institutions to lose at least half a percentage point from their operating margins." Ex. 5, Dkt. No. 2-24, at 8. DHS did not substantively engage with those concerns. Instead, DHS responded only that it "acknowledge[d] that enrollment of foreign students in U.S. educational institutions may decline," and that it was impossible to "quantify the extent of this decline" because of lack of "precedent from which accurate conclusions [could] be drawn as to the rule's impact." 91 Fed. Reg. at 45001. DHS also speculatively stated—with no apparent basis—that it "expected that U.S. educational institutions w[ould] continue to attract other students who w[ere] not dissuaded by the requirements of this rule." *Id.* at 45087. *See, e.g.*, *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (emphasizing that an agency "cannot simply state it 'believes' something to be true—against the weight of all the evidence before it—without further support").

Second, DHS failed to engage with comments that suggested less burdensome alternatives. Again, many commenters suggested alternatives such as upgrading the SEVIS system, aligning the fixed term with academic program durations, or enhancing DHS's vetting and monitoring procedures. DHS did not explain why those alternatives could not achieve its goals with substantially lower burdens. The agency offered a conclusory response, saying only that the Final Rule would provide officers "an opportunity to evaluate an alien's maintenance of

status at pre-determined points." 91 Fed. Reg. at 45009. *See, e.g.*, *Genuine Parts Co. v. E.P.A.*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation.").

Third, DHS failed to respond to comments explaining how the Final Rule was incompatible with the realities of academic progression, particularly Ph.D. programs. For example, NAFSA noted that DHS relied on a "simple, outdated Department of Education webpage as the source of its data on average degree completion times," but that this source, which "indicate[d] four years for a doctorate without specifying the source of that assertion," did not align with the reality of study. Ex. 15, Dkt. No. 2-25, at 20. In reality, "the median years to a research doctorate is 5.7 years from entering a program to completion, while those who complete the master's/doctorate sequence take an average of 7.3 years from entering graduate school to completion." *Id.* at 20-21. Several universities also offered their own data that showed Ph.D. program lengths exceeding four years. *See, e.g.*, Ex. 28, Dkt. No. 2-26, at 5. DHS, in response, only asserted without basis that it "believe[d]" four years was proper because it "align[ed] with the general structure of post-secondary education." 91 Fed. Reg. at 45099. Moreover, although the agency acknowledged that some "smaller proportion" of students may enroll in programs that last longer than four years, it "believe[d]" that the "benefit to program integrity of this rule would outweigh the burden to this population." *Id.*

Fourth, DHS failed to respond to commenters who challenged its assumption that all students followed an upward progression in their academic careers. Many comments noted that students frequently pursue another degree at the same level (for example, a master's degree in engineering and an MBA), because such degrees enhance professional versatility without the cost or time investment of a doctoral program. *See, e.g.*, Ex. 18, Dkt. No. 2-26, at 3. In

response, DHS stated only that it "believe[d] that most students follow an upward trajectory," and that its approach "w[ould] accommodate the legitimate academic activities of bonafide students." 91 Fed. Reg. at 45041. It also stated that in its view, the current approach "raise[d] serious concerns that the intent is not to pursue a full course of study but rather to circumvent the U.S. immigration system and prolong their stay in the U.S. under the guise of pursuing education." *Id.* But again, that reasoning is circular. DHS acknowledged the legitimacy of pursuing joint degrees, but stated that it intended to curtail the practice without assessing the costs to students and universities of doing so.

Fifth, DHS failed to consider deeply entrenched reliance costs. As commenters emphasized, international students and journalists rely on a stable framework to make major life decisions, including enrolling in multiyear education programs and spending tens of thousands of dollars per year on tuition. *See, e.g.*, Ex. 15, Dkt. No. 2-25, at 3-4. DHS again offered little substantive response. The agency stated only that although it had "carefully considered the reliance interests of F, J, and I visa holders, as well as . . . universities, sponsors, and employers," and considered less-restrictive alternatives, it believed that it had provided "adequate notice and a transition period to minimize disruption." 91 Fed. Reg. at 45073. Again, a statement of "belief" is not a reasoned analysis.

Sixth, DHS failed to consider the concerns of commenters that regular EOS applications would swamp USCIS with hundreds of thousands of additional applications annually. One comment, for example, predicted a 163% increase in volume, cautioning that USCIS's median processing time is already "nearly 9.59 months," and that "[f]or an agency that has historically had a difficult time reining in its backlog and processing times and recently experienced a budget crisis, it is concerning that USCIS will be required to handle

this additional workload." Ex. 16, Dkt. No. 2-25, at 17. DHS again responded with a statement of belief: it did not "believe that additional safeguards [were] needed in this rule." 91 Fed. Reg. at 45015. It stated only that it would "adjust[] workloads as necessary for quality and efficiency." *Id.* At a different point, DHS conceded that "the rule may cause an increase in USCIS processing times," but asserted in a conclusory manner that "the benefits of increased contact with these nonimmigrants outweigh[ed] processing time considerations." *Id.* at 45021.

Finally, DHS failed to respond to commenters' concerns that the Final Rule would substantially undermine press freedom for international journalists.[18] Commenters warned that requiring foreign journalists to file EOS requests every 240 days would "create[] serious risks that visas could be denied in retaliation for unfavorable reporting, thereby placing government officials in a position to punish journalists for exercising their First Amendment rights." Ex. 51, Dkt. No. 2-33, at 2. In particular, commenters warned that content-based review by immigration officers "could cause journalists to self-censor by avoiding controversial or critical topics." Ex. 51, Dkt. No. 2-33, at 3. Further, commenters pointed out that subjecting only I-1 journalists to a very short 240-day fixed term would impose a "substantial burden on the exercise of press freedoms and unconstitutionally single[] out the press for unique and unjustified burdens." Ex. 24, Dkt. No. 2-26, at 11.

Again, DHS failed to provide a meaningful response to those concerns. As to the potential chilling effect, DHS stated only that it "d[id] not intend for the rule to chill speech,

[18] Plaintiffs contend that the Final Rule contravenes the First Amendment because it creates an impermissible chilling effect on foreign journalists and permits government retaliation based on press and speech content. Plaintiffs are correct that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (citation omitted). The Court does not reach the constitutional argument because it finds that the Final Rule is arbitrary and capricious within the meaning of the APA.

encourage censorship, or result in viewpoint discrimination" and that the agency "w[ould] review content solely to confirm that the foreign information media representative [was] engaging in bona fide journalism." 91 Fed. Reg. at 45078. It did not address, in any respect, reasonable concerns that the Final Rule would cause foreign journalists to self-censor, as their EOS request would be subject to a purely discretionary, unappealable decision. Moreover, DHS said nothing in response to commenters' concerns that the Final Rule would particularly burden press freedom by singling out journalists with an especially short fixed-term period. Nor did DHS respond to apparently well-founded concerns as to retaliatory actions by other nations against U.S. journalists working abroad.

In short, DHS did not respond to, let alone meaningfully engage with, multiple substantial comments concerning the Final Rule. Its failure to do so was arbitrary and capricious in violation of § 705.

**4. <u>Rational Relation to Government's Objectives</u>**

Finally, DHS failed to show that there is a rational connection between the Final Rule and its purported objectives of preventing fraud and furthering national security. An agency must articulate a "rational connection between the facts found and choice made." *State Farm*, 463 U.S. at 43 (citation omitted). Put differently, an agency must "draw a 'rational connection' between the problem it has identified and the solution it has chosen." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 707 (2020) (Kagan, J., concurring).

First, DHS argues that the Final Rule prevents national security threats because it mandates predetermined immigration compliance reviews and curtails prolonged unsupervised periods of presence. As the Supreme Court has emphasized in *Trump v. Hawaii*, "[judicial] inquiry into matters of entry and national security is highly constrained" because it "raises concerns for the separation of powers." 585 U.S. 667, 704 (2018). However, the court must still

apply "rational basis review" when determining whether the government's policy is "plausibly related" to its "stated objective." *Id.* (finding that the government's new vetting procedures for individuals from high-risk nations were plausibly related to the government's stated objective to protect the country).

Here, DHS simply cited a series of anecdotes in which F and J nonimmigrants were involved in "illegal activities pertaining to U.S. military bases" by taking photographs of them or by smuggling materials out of laboratories. 91 Fed. Reg. 44985-88. DHS provided no reason for why a "predetermined" interaction with an immigration official, after a four-year fixed period of admission, would prevent, deter, or mitigate any of those types of incidents. Indeed, as several commenters noted, a hostile actor could plan and execute his illegal activities within a four-year window or conduct those activities on another type of visa. In response, DHS asserted only that it "disagrees with the general premise of these comments," noting that it had "provided specific examples" of national security concerns. *Id.* at 44995.

Moreover, DHS did not identify a single specific national security risk associated with foreign journalists on I-visas. It stated only that "the lack of public data for I nonimmigrant classification does not mean that vulnerabilities are absent for that classification" and that a fixed period will help immigration officers "ensure that the I nonimmigrants are, and will be, engaged in activities that are permissible under [their visa]." *Id.* at 44988, 44966.

Second, DHS argues that the Final Rule will help mitigate visa fraud and abuse. But again, DHS relied only on anecdotal evidence, identifying only some F-1 students who had "enroll[ed] in schools for extended periods of time," or had pursued several concurrent degrees. *Id.* at 44983. But DHS never demonstrated why those instances were fraudulent, as the duration-of-stay program is intended to allow foreign students the flexibility to pursue multiple degrees

and to conduct studies or research over extended periods of time. Moreover, DHS noted that nearly 77,000 F-1 students "have spent more than 10 years in nonimmigrant student status since SEVIS was implemented in 2003." *Id.* at 45091. But DHS never explained why that duration, characterizing less than 5% of F-1 students, was inherently suspect, as it is entirely consistent with many educational programs, such as a doctoral program followed by post-completion training.

Finally, DHS expressed that the Final Rule would curtail nonimmigrants from overstaying their status. But again, there is no rational basis for that assertion. As a preliminary matter, DHS's overstay data may be "inflated" and contain "significant flaws" due to syncing errors, capturing data from students who are properly maintaining status, or counting students whose departure may have occurred but has not been verified. Ex. 1, Dkt. No. 2-24, at 6. In any case, those who overstay unlawfully under the duration-of-status rule could also overstay unlawfully under the fixed-period approach. Indeed, eliminating duration of status may well increase the risk of unintentional overstays because it shortens the departure period from 60 to 30 days.

In summary, DHS's proffered objectives bear no reasonable connection to the Final Rule. Accordingly, the Final Rule is arbitrary and capricious within the meaning of the APA.[19]

For all of those reasons, plaintiffs have demonstrated a substantial likelihood of success on their claims that the agency action (the adoption of the Final Rule) was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

---

[19] Plaintiffs also contend that the Final Rule's limitation of academic mobility is contrary to law because it contravenes 8 U.S.C. § 1101(a)(15)(F). Because the Court finds that the Final Rule is arbitrary and capricious, it does not reach that claim.

**B. <u>Irreparable Injury</u>**

Next, plaintiffs contend that international students, universities, and employers will be irreparably harmed by the Final Rule. "[I]rreparable harm is [a] necessary threshold showing for awarding preliminary injunctive relief." *Matos v. Clinton Sch. Dist.,* 367 F.3d 68, 73 (1st Cir. 2004) (citation omitted). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantial fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (citation omitted).

Plaintiffs easily meet that burden here. First, requiring international students to apply for Extension of Stay introduces a significant amount of uncertainty, because those extensions are left to the sole discretion of USCIS officers with no option of appeal. Therefore, many students will choose to attend universities in other countries that provide more stable pathways to completion.

DHS argues that plaintiffs allege only speculative harm. But, the harm is far from speculative; indeed, it is already occurring. For example, two international students from the University of Wisconsin Madison and 32 from the University of Maryland Baltimore have already withdrawn from their program of study. Ex. 21, Dkt. No. 2-21, at ¶ 16-17; Ex. 21, Dkt. No. 2-19, at ¶ 17. Additionally, the University of Wisconsin Milwaukee has reported a 42% decrease in applications from international students this academic year. Ex. 22, Dkt. No. 2-22, at ¶ 17. Declining international student enrollment will have substantial financial, educational, research, and cultural ramifications. *See, e.g.*, *Victim Rts. L. Ctr. v. United States Dep't of Educ.*, 788 F. Supp. 3d 70, 95 (D. Mass. 2025) (finding irreparable harm, as organization's "core mission" was impeded).

Second, international students who do enroll in U.S. colleges and universities will face complications, such as those associated with enrolling for joint or combined degrees. Institutions are already being forced to choose between changing such programs or being unable to offer them to international students. *See, e.g.*, Ex. 19, Dkt. No. 2-19, at ¶ 33. Moreover, due to the Final Rule, many international students already lawfully present in the United States are concerned about traveling internationally, leading to students canceling international research or travel to conferences. *See, e.g.*, Ex. 11, Dkt. No. 2-11, at ¶ 27. Universities whose students cannot travel will be unable to operate those programs or may have to restructure them.

Finally, by DHS's account, universities will endure substantial administrative burdens to comply with the final rule. DHS has estimated that "DSOs and ROs will have to spend approximately 135 hours for rule familiarization and adaptation in the first year after the rule takes effect," with costs up to $267.9 million. 91 Fed. Reg. at 45058. At a minimum, the upheaval from the Final Rule constitutes irreparable harm. *See, e.g.*, *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025) (noting that "administrative upheaval" constitutes irreparable harm).

In short, plaintiffs have clearly demonstrated that immediate irreparable harm will occur if a preliminary injunction is not issued.

### C. <u>Balance of Equities</u>

Finally, the public interest weighs heavily in favor of providing relief. There are currently approximately 1.6 million students and dependents in F status, 504,000 J nonimmigrants, and 24,000 I nonimmigrants. 91 Fed. Reg. at 45116.

As the Clemens study notes, in 2023-2024, international students contributed $44 billion to the economy and directly supported nearly 400,000 jobs, one job for every three international students. Ex. 21, Dkt. No. 2-24, at 2. Moreover, as other commenters explained, of the immigrants who founded high-potential startups backed by venture capital, 75% came to the

United States as international students, and approximately 44% of immigrant Nobel Laureates in academic disciplines attended United States institutions for their highest educational degree. Ex. 2, Dkt. No. 2-24, at 6; Ex. 3, Dkt. No. 2-24, at 5.

Nonimmigrants with F and J visas also make important contributions to their communities through clinical and field work. For example, as commenters noted, "approximately 16,000 medical residents and fellows were in J-1 status in 2024, comprising roughly 10% of resident physicians in the US." Ex. 6, Dkt. No. 2-24, at 8. Those J-1 physicians "often serve in rural and medically underserved areas of the US," and often "go on to pursue additional training in medical specialties that are much needed in the US," meaning they "serve a critical role in the US healthcare infrastructure." *Id.*

Finally, international journalists make significant contributions to the United States, in particular, contributing to the open exchange of information, ideas, and opinions that are the hallmarks of a free and democratic society. *See, e.g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). ("A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.").

The Final Rule directly threatens those benefits to the substantial detriment of the American public. Moreover, postponing the effective date of the Final Rule would not harm the public interest because, as explained above, it is not reasonably related to any legitimate DHS objective. The balance of equities and the public interest thus strongly favor the issuance of a preliminary injunction.

### D. <u>Conclusion</u>

Accordingly, plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims; that immediate irreparable harm will ensue if the Final Rule is not enjoined; and that the balance of the equities and the public interest favor issuance of a

preliminary injunction. The Court will therefore issue such an injunction staying the operation of the rule.

**E. <u>Scope of Relief</u>**

The remaining issue is the proper scope of relief. Plaintiffs seek vacatur under 5 U.S.C. § 706 or in the alternative, postponement under 5 U.S.C. § 705. Under the circumstances, while vacatur under § 706 may ultimately prove to be appropriate, the Court will take the more cautious approach of postponing the effective date of the Final Rule. The question then becomes whether, under § 705, the Court should issue a narrower order specifically tailored to plaintiffs or a broader order staying the Final Rule.

Section 705 of the APA states that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action." Defendants contend that § 705, as evidenced by its use of "necessary and appropriate," directs courts to apply traditional equitable principles. Therefore, defendants assert, under the Supreme Court's decision in *Trump v. Casa, Inc.*, that relief must be limited to parties before the court. 606 U.S. 831, 837 (2025) (holding that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts" in the Judiciary Act of 1789).

The prevailing view, however, is that the authority to grant relief under the APA is not coextensive with the equitable authority granted under the Judiciary Act of 1789. *See Massachusetts v. Dep't of Educ.*, 831 F. Supp. 3d 34, 49-51 (D. Mass. 2026). Section 706 of the APA authorizes a reviewing court to "set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). The *CASA* court itself observed that "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" is a "distinct question" from the limits of equitable relief under the Judiciary Act of 1789. *CASA*, 606 U.S. at 847 n.10 (citing 5 U.S.C.

§ 706(2)); *see also id.* at 873 (Kavanaugh, J., concurring) ("Going forward, . . . different district courts may . . . grant or deny the functional equivalent of a universal injunction . . . by preliminarily setting aside or declining to set aside an agency rule under the APA.").

The First Circuit has affirmed that view. In *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, the court rejected a categorical limitation on § 705 as a "mistaken understanding" of the statute's postponement authority: the ability to provide relief beyond the named parties. 2026 WL 2279789, at *21-23 (1st Cir. Aug. 7, 2026) (rejecting arguments that § 705 was coextensive with traditional equitable authority). And other courts have concluded that § 705 authorizes relief beyond the named parties. *See, e.g.*, *Venezuelan Ass'n of Massachusetts v. United States Citizenship & Immigr. Servs.*, 2026 WL 2255272, at *5 (D. Mass. Aug. 5, 2026) ("[T]he Supreme Court decision in *CASA* does not limit the scope of relief under the APA."); *Career Colls. & Schs. of Tex. v. U. S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted."). This Court therefore has the statutory authority to stay the Final Rule in its entirety.

Of course, simply because this Court has the broad authority to exercise relief does not mean it is necessary or appropriate to exercise it. *See United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring in the judgment) ("[A] district court should 'think twice—and perhaps twice again—before granting' such sweeping relief'" because of concerns such as judicial overreach, forum-shopping, and separation of powers). The question is whether considerations of administrability, efficiency, and uniformity are sufficient to outweigh factors counseling judicial restraint.

Such is the case here. Plaintiffs represent almost 600 public and private institutions. But there are more than 5,000 higher-education institutions in the United States. Limiting relief to the parties represented would require maintaining parallel regulatory regimes and making repeated and potentially inconsistent determinations of whether a particular student or institution falls within the scope of the order. Such a regulatory regime would be further complicated by the fact that students regularly transfer between institutions or pursue joint degrees. In this case, nationwide relief—which, again, is permitted by § 705—prevents chaos and confusion that a party-specific order would inevitably generate. The Court will therefore grant the motion for a preliminary injunction to the extent it seeks to postpone the effective date of the Final Rule.

## IV. Conclusion

For the foregoing reasons, plaintiffs' motion for APA § 705 relief, a preliminary injunction, or, in the alternative, summary judgment, is GRANTED to the extent that it seeks to postpone the effective date of the Final Rule pursuant to the Administrative Procedure Act, 5 U.S.C. § 705. To the extent that plaintiffs seek vacatur of the Final Rule, summary judgment, or other relief, the motion is DENIED without prejudice to its renewal.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: September 14, 2026