**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 1:26-cv-13799 |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


Introduction ..... 1

Background ..... 2

I. Statutory and Regulatory Background ..... 2

II. Factual and Procedural Background ..... 2

III. Final Rule and This Lawsuit ..... 2

Standard of Review ..... 3

Argument ..... 4

I. Defendants Are Entitled to Summary Judgment Because the Final Rule Complies Fully with the APA ..... 4

**A.** The Final Rule Is Adequately Reasoned and Supported by Reliable Evidence ..... 5

**1.** DHS Reasonably Found the Benefits Outweigh the Costs ..... 5

**a.** The Benefits ..... 5

**b.** The Costs ..... 7

**c.** Comments on Cost-Benefit Analysis ..... 10

**2.** The Final Rule Is a Rational Response to the Identified Problems ..... 11

**3.** DHS Adequately Considered Alternatives to the Final Rule ..... 14

**4.** DHS Responded to All Significant Comments ..... 16

**a.** Effect on Enrollment ..... 16

**b.** Compatibility with Academic Realities ..... 16

**c.** Reliance Interests ..... 17

**d.** DHS Operational Capacity ..... 18

**e.** Press Freedom ..... 19

**5.** The comment period was adequate and the public had a meaningful opportunity to participate ........ 19

II. The Final Rule Supports Academic Mobility While Complying with Immigration Laws and Is Not Contrary to Law ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

Cases ........................................................................................................ Page(s)

*Alignment Healthcare Inc. v. HHS*,
181 F.4th 1236 (D.C. Cir. 2026) ........................................................................ 8

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 2

*Associated Fisheries of Me., Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997) ........................................................................ 4

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................ 3

*Bruno Project Rescue, Inc. v. CDC*,
182 F.4th 1 (1st Cir. 2026) ........................................................................ 11

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) ........................................................................ 4

*California v. Kennedy*,
802 F. Supp. 3d 273 (D. Mass. 2025) ........................................................................ 19, 20

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ........................................................................ 3

*Chamber of Com. of U.S. v. EPA*,
187 F.4th 636 (D.C. Cir. 2026) ........................................................................ 10

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ........................................................................ 7

*Citadel Sec. LLC v. SEC*,

178 F.4th 621 (11th Cir. 2026)........................................................................................ 13

*City of Arlington v. FCC*,

569 U.S. 290 (2013) ........................................................................................................... 3

*City of Waukesha v. EPA*,

320 F.3d 228 (D.C. Cir. 2003) ........................................................................................ 20

*Coe v. McHugh*,

968 F. Supp. 2d 237 (D.D.C. 2013) .................................................................................. 4

*Dep't of Commerce v. New York*,

588 U.S. 752 (2019) ......................................................................................................... 10

*Encino Motorcars, LLC v. Navarro*,

579 U.S. 211 (2016) ......................................................................................................... 17

*Env't Def. Fund v. EPA*,

183 F.4th 867 (D.C. Cir. 2026) ....................................................................................... 14

*Farah v. U.S. Att'y Gen.*,

12 F.4th 1312 (11th Cir. 2021)........................................................................................ 10

*FCC v. Prometheus Radio Project*,

592 U.S. 414 (2021) ............................................................................................. 5, 11, 19

*Fla. E. Coast Ry. LLC v. Fed. R.R. Admin.*,

No. 24-11076, 2026 WL 2321640 (11th Cir. Aug. 11, 2026)............................................ 15

*Friends of the River v. FERC*,

720 F.2d 93 (D.C. Cir. 1983) .......................................................................................... 10

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,

802 F.3d 99 (1st Cir. 2015) .......... 3

*Loper Bright Enters. v. Raimondo*,

603 U.S. 369 (2024) .......... 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29 (1983) .......... 3, 4, 11, 16

*Nat'l Lifeline Ass'n v. FCC*,

921 F.3d 1102 (D.C. Cir. 2019) .......... 19

*Nat'l Shooting Sports Found., Inc. v. Jones*,

716 F.3d 200 (D.C. Cir. 2013) .......... 10

*Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*,

734 F.3d 1208 (D.C. Cir. 2013) .......... 9

*Perez v. Mortg. Bankers Ass'n*,

575 U.S. 92 (2015) .......... 16

*Petry v. Block*,

737 F.2d 1193 (D.C. Cir. 1984) .......... 19

*Pub. Citizen, Inc. v. NHTSA*,

374 F.3d 1251 (D.C. Cir. 2004) .......... 8

*Regents of the Univ. of Cal.*,

591 U.S. 1 (2020) .......... 14, 17

*Save the Sound, Inc. v. FAA.*,

183 F.4th 763 (D.C. Cir. 2026) .......... 9, 18

*S. Pac. Transp. Co. v. ICC*,

871 F.2d 838 (9th Cir. 1989) .......... 8

*S. Shore Hosp., Inc. v. Thompson*,
308 F.3d 91 (1st Cir. 2002) ........................................................................................ 4

*Seven Cnty. Infrastructure Coal. V. Eagle Cnty., Colo.*,
605 U.S. 168 (2025) ........................................................................................ 9

*Shielda,lloy Metallurgical Corp. v. Nuclear Regul. Comm'n*,
624 F.3d 489 (D.C. Cir. 2010) ........................................................................................ 14

*Spokane Airport Bd. v. TSA*,
164 F.4th 933 (D.C. Cir. 2026) ........................................................................................ 11

*Trajano v. U.S. Citizenship & Immigr. Servs.*,
No. CV 25-12388-FDS, 2026 WL 2137917 (D. Mass. July 24, 2026)................................... 18

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................................ 2

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................................................ 6, 7

## STATUTES

5 U.S.C. § 553 ........................................................................................ 19

5 U.S.C. § 704 ........................................................................................ 3

5 U.S.C. § 705 ........................................................................................ 2

5 U.S.C. § 706 ........................................................................................ 2

5 U.S.C. § 706(2)(A), (C) ........................................................................................ 3

8 U.S.C. § 1184(a)(1) ........................................................................................ 1

## RULES

Fed. R. Civ. P. 56(a) .......................................................................................................... 3

**OTHER AUTHORITIES**

Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 91 Fed. Reg. 44976 (July 17, 2026) .................................................... passim

## INTRODUCTION

The U.S. Department of Homeland Security (DHS) promulgated the challenged Final Rule to modernize an outdated immigration framework and close systemic vulnerabilities within the F, J, and I nonimmigrant visa categories. By replacing the indefinite "duration of status" (D/S) admission framework with a fixed period of admission, the Final Rule establishes predetermined intervals for immigration officers to evaluate whether nonimmigrants are complying with the terms and conditions of their nonimmigrant status. This change, which requires all F, J, and I nonimmigrants who wish to remain in the United States beyond their specific authorized admission period to obtain authorization to extend their stay, change their nonimmigrant status, or otherwise obtain authorization to remain in the United States, is a necessary measure to safeguard national security, combat documented instances of fraud and abuse, and ensure the overall integrity of the U.S. immigration system.

Plaintiffs seek to invalidate this critical regulatory initiative, but Defendants are entitled to summary judgment on all of Plaintiffs' Administrative Procedure Act (APA) claims based on the Certified Administrative Record now before the Court. DHS acted well within its broad, congressionally delegated authority to prescribe the time and conditions of nonimmigrant admissions pursuant to 8 U.S.C. § 1184(a)(1). Furthermore, the agency engaged in reasoned decision-making throughout the rulemaking process. DHS provided a 32-day public comment period, adequately addressed significant concerns raised by commenters, and reasonably concluded that the profound national security and program-integrity benefits of the Final Rule far outweigh the speculative costs forecasted by Plaintiffs.

Finally, even if this Court were to find that some form of final relief is warranted on summary judgment, the proper course under the APA is a remand to the agency without vacatur

under *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993), or, at most, such relief must be narrowly tailored to the specific Plaintiffs before the Court and severable provisions left intact, rather than issued as a sweeping, nationwide vacatur or universal injunction under 5 U.S.C. § 706, which cannot be squared with *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025).

## BACKGROUND

### I. Statutory and Regulatory Background

In accordance with this Court's Order (ECF No. 61), Defendants incorporate by reference the statutory and regulatory background section from their Response in Opposition to Plaintiffs' Motion for APA § 705 Relief, a Preliminary Injunction or, alternatively, summary judgement ("Opposition"). *See* ECF No. 46-1 at 2-6.

### II. Factual and Procedural Background

Defendants incorporate by reference their factual and procedural background section from their Opposition. *See* ECF No. 46-1 at 6-10.

### III. Final Rule and This Lawsuit

On July 17, 2026, following careful consideration of nearly 22,000 public comments during the 32-day comment period on the proposed rule, DHS made several changes to the regulatory text proposed in the NPRM and adopted most of the proposed changes in its final rule. *See* Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Information Media, 91 Fed. Reg. 44976 (July 17, 2026) (Final Rule). The Final Rule's effective date was scheduled for September 15, 2026. On September 14, 2026, this Court granted Plaintiffs' motion for a preliminary injunction and stayed the effective date of the Final Rule under 5 U.S.C. § 705 (ECF

No. 50). Defendants subsequently noticed an interlocutory appeal to the U.S. Court of Appeals for the First Circuit (No. 26-2112) and, pursuant to this Court's October 16, 2026, Order (ECF No. 61), transmitted the Certified Administrative Record to Plaintiffs and filed the administrative record index with the Court.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), courts may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). APA review requires "final agency action," 5 U.S.C. § 704, that (1) "mark[s] the consummation of the agency's decisionmaking process" rather than being "tentative or interlocutory," and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025). Courts apply a "narrow and deferential scope of review" and may "not substitute [their] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An *ultra vires* claim requires demonstrating the agency acted outside bounds of authority delegated by Congress, *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), determined using "traditional tools of statutory construction," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024).

Summary judgment is ordinarily appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record. *See Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106

(1st Cir. 2015) ("The summary judgment 'rubric' also 'has a special twist in the administrative law context.'" (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997))). Rather, when administrative action is challenged under the APA "[s]ummary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013); *see S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97-98 (1st Cir. 2002) ("That the parties brought the issues forward on cross-motions for summary judgment is not significant; substance must prevail over form, and the fact remains that the parties have presented this matter as a case stated[] on a fully developed administrative record.").

## ARGUMENT

### I. Defendants Are Entitled to Summary Judgment Because the Final Rule Complies Fully with the APA.

Plaintiffs have not demonstrated that the Rule violates the APA. DHS articulated a reasoned basis for the Final Rule, evaluated relevant data, adequately addressed significant comments, and acted within its broad discretion to protect national security, ensure program integrity, and modernize the outdated D/S framework. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Instead, courts ask whether the agency "articulated a rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). As explained below, DHS adequately articulated the reasoning supporting the Final Rule. As a result, the Court should grant summary judgment in favor of Defendants and deny Plaintiffs' motion for summary judgment.

### A. The Final Rule Is Adequately Reasoned and Supported by Reliable Evidence.

#### 1. DHS Reasonably Found the Benefits Outweigh the Costs.

DHS's conclusion that the benefits outweigh the costs of the Final Rule is rational and reasoned. The downside to the Final Rule is minimal. While there may be a reduction in nonimmigrant travel to the United States, which could be attributable to myriad reasons not necessarily related to the Final Rule, the countervailing upshots are that the Final Rule will strengthen the government's efforts to safeguard national security and combat fraud and abuse as it pertains to the nonimmigrant visa categories at issue. 91 Fed. Reg. 45088.

With regard to DHS's cost-benefit analysis, Plaintiffs largely take issue with underlying methodology and evidence-weighing. *See* ECF No. 13 at 19-25. Although an agency evaluates all evidence, pursuant to the appropriate methodology, it need not base its judgment or conclusion on evidence, including predictive evidence, that it finds unreliable. *Cf. FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). DHS properly evaluated the evidence, adequately considered and responded to the numerous Commenters' critiques, and rationally articulated the basis for the Rule. GOV-171684-171783; Regulatory Impact Analysis, Regulations.gov ("RIA"), available at https://www.regulations.gov/document/ICEB-2025-0001-21963, at 97 (last visited Oct. 30, 2026).

##### a. The Benefits.

Plaintiffs attempt to detract from the benefits of safeguarding national security and combating fraud and abuse that are achieved by the Final Rule. In doing so, they attack the methodology used by the agency in calculating the benefit of the Final Rule on crucial functions of the immigration system. *See* ECF No. 13 at 24-25. Plaintiffs' challenge to the methodology is

baseless, as the benefits to national security and fraud and abuse mitigation, are significant. GOV-171592-171637; 171684-171783; 171786-171871.

Plaintiffs wrongly assert that DHS "failed to estimate the Final Rule's purported benefits in a way that would allow the agency to meaningfully weigh them against even the acknowledged costs" by "choos[ing] only to 'qualitative[ly]' describe them." ECF No. 13 at 24. Plaintiffs assert that DHS misapplied Circular A-4, guidance from the U.S. Office of Management and Budget that instructs federal agencies on conducting economic and cost-benefit analysis for new regulations.

Importantly, in an attempt to undermine DHS's legitimate concerns regarding national security and fraud, Plaintiffs overstate the monetization criterion within Circular A-4, which constitutes "guidance to Federal agencies on the development of regulatory analysis." Circular A-4, Regulatory Analysis, Sept. 17, 2003, available at https://www.whitehouse.gov/wp-content/uploads/2025/08/CircularA-4.pdf (last accessed Oct. 30, 2026). Indeed, as Plaintiffs appear to acknowledge, Circular A-4 does not mandate monetization or quantification in all circumstances, *See* ECF No. 13 at 24 ("[A]gencies may describe some benefits qualitatively, they 'should monetize quantitative estimates whenever possible.'"). As guidance, Circular A-4 instead provides agencies with analytical latitude, explaining that some "important benefits and costs (e.g., privacy protection) may be inherently too difficult to quantify or monetize given current data and methods. Some authorities refer to these non-monetized and non-quantified effects as 'intangible.'" *Id.* at 26-27.

As the Supreme Court has recognized, many of the benefits that arise from combating national security threats and immigration fraud are undoubtedly difficult to monetize or quantify, as they often implicate potential harm to United States sovereignty and to persons and property within the United States. *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (explaining national

security matters, "are delicate, complex, and involve large elements of prophecy.") (internal citation and quotation omitted). The impact of such threats comes in myriad forms and may result in a constellation of consequences of varying degrees. *See* 91 Fed. Reg. at 44977 (discussing events of September 11, 2001, and the potential for exploitation of student visas). To be sure, the agency detailed numerous examples of national security threats and fraud regarding the relevant nonimmigrant visa categories. *See* ECF No. 46-1 at 15; s*ee also* 91 Fed. Reg. 44976, 44983 nn.60-66, 82; 44984; *see also* GOV-174140-174192; GOV-217233-217235.

Defendants will not repeat all instances cited in the Final Rule or their opposition (ECF No. 46-1 at 15), but note that these examples are not merely "anecdotes"; they reflect systematic security gaps in the relevant nonimmigrant visa programs, which present substantial risks to the United States. Notably, in 2019, the Government Accountability Office and ICE published a report identifying fraud risks to SEVP related to managing school recertification and program training. *Id.* at 44984. Said risks reflected vulnerabilities associated with school owners and DSOs in overseeing the maintenance of status of F-1 students. *See* GOV-215886-215967.

The government is entitled to fix said flaws and is appropriately so doing through the Final Rule. *See Hawaii*, 585 U.S. at 708 (deferring to "predictive judgments" on national security matters, "all of which 'are delicate, complex, and involve large elements of prophecy.'") (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)).

**b. The Costs.**

Plaintiffs allege that DHS failed to adequately consider the cost presented by possible disenrollment in U.S. academic institutions. ECF No. 13 at 20-24. They base this argument primarily on NAFSA/IFP survey data, including survey responses from 1,650 prospective or current international students predicting how they might possibly act in the future if D/S were

eliminated. *See id.* at 20. This data, however, is not empirical; it is hypothetical and based on self-reported predictive preferences. *See id.* (discussing survey based on responses from "1,650 current or prospective international students"). DHS expressly acknowledged the submitted survey evidence and explained that "survey responses often reflect hypothetical preferences rather than actual behavior, and such results may overstate the likelihood of enrollment declines." 91 Fed. Reg. at 45087-88. DHS further explained that "students may weigh other factors, such as the quality of U.S. educational institutions and career opportunities, more heavily when making enrollment decisions." *Id.* Notably, with respect to external factors affecting student enrollment decisions, DHS acknowledged a "2.7 percent decline in [F-1 visa] applications and 10.1 percent decline in visa issuance between 2023 and 2024, independent of this regulation, [thus] further complicating attribution of enrollment changes to this rule." Regulatory Impact Analysis, available at https://www.regulations.gov/document/ICEB-2025-0001-21963, at 97 (last visited Oct. 30, 2026). The record is therefore clear that DHS decided that certain identified vulnerabilities in the data did not render the cost of the Final Rule to outweigh its benefit.

The agency was entitled to consider the predictive data and determine the appropriate weight to accord it. Indeed, agency evaluations of predictive judgments concerning the expected responses of a regulated industry are entitled to particular deference. *See Pub. Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1260 (D.C. Cir. 2004) (deferring to "NHTSA's prediction that manufacturers will not likely reduce the protectiveness of current air bags"); *S. Pac. Transp. Co. v. ICC*, 871 F.2d 838, 842 (9th Cir. 1989) ("Such predictive judgments, when based upon credible evidence, are best left to the expertise of the administrative agency familiar with the industry.") (citation omitted); *Alignment Healthcare Inc. v. HHS*, 181 F.4th 1236, 1239 (D.C. Cir. 2026) (heeding finding that challenged survey data was reliable because agency "examined Alignment's

concerns and explained why there was no indication of survey administration error."); *cf. Seven Cnty. Infrastructure Coal. V. Eagle Cnty., Colo.* 605 U.S. 168, 179-180 (2025) (holding agency is entitled deference when assessing environmental impacts under the National Environmental Policy Act).

As applied here, DHS appropriately considered the survey-data submitted, considered its reliability, and accorded it appropriate weight. DHS specifically acknowledged that "the level of foreign student enrollment does fluctuate, and it is speculative to assess any declination is a direct and sole result of the rule." 91 Fed. Reg. at 44977 n.11; 45001 n.134; *see also* GOV- 219318-219318; 219319-219319; 219320-219320. DHS further explained that "[a]ny decline would likely include some prospective or current foreign students who do not intend to comply or have not been complying with the conditions of their nonimmigrant classification." *Id.* In short, DHS appropriately considered the survey data, evaluated its limitations, and reasonably concluded it was not a reliable predictor of enrollment behavior sufficient to alter the cost-benefit analysis.

Plaintiffs further argue that DHS should have accepted Commenters' forecasted annual loss from possible disenrollment "of as much as $72-145 billion by ten years into the future." ECF No. 13 at 20. But said predicted losses are based on one survey alone—the Clemens study. *See id.* (citing the Clemens study). And agencies may reject private economic models where assumptions are uncertain, unrepresentative, or inconsistent with broader empirical evidence. *Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) ("When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loath to second-guess its analysis.") (citation omitted).

Indeed, the D.C. Circuit reaffirmed such an approach in *Save the Sound, Inc. v. FAA*, recognizing that agencies may rely on their own "economic or technical assumptions." 183 F.4th

763, 774 (D.C. Cir. 2026). Resolution of issues requiring technical expertise are "properly left to the informed discretion of the responsible federal agency" when projections involve significant uncertainty. *Id.* (quoting *Friends of the River v. FERC*, 720 F.2d 93, 102 (D.C. Cir. 1983)). So too here.

Moreover, while the Clemens study assumed a ten percent decline in international enrollment, based solely on survey-derived behavioral predictions, ECF No. 13 at 21-22, global student mobility trends depend on a myriad variables far beyond visa classifications. GOV-171684-171783. DHS reasonably concluded the Clemens model did not render the costs countervailing of the benefits, especially given that U.S. institutions remain globally competitive notwithstanding changes in immigration policy. 91 Fed. Reg. at 45088 (noting expectation of "United States to remain a popular, competitive, and attractive place for nonimmigrant students and exchange visitors to pursue their program of interest.").

**c. Comments on Cost-Benefit Analysis.**

Agencies are not required to respond to every comment from every Commenter during the notice-and-comment process, but they must respond to comments that "raise points relevant to the agency's decision and which, if adopted, would require a change in an agency proposed rule[.]" *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 216 (D.C. Cir. 2013) (citations omitted). Indeed, a "court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). Plaintiffs take issue with DHS's response to certain concerns raised by Commenters, but DHS was not required to write an "exegesis." *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1329 (11th Cir. 2021); *see also Chamber of Com. of U.S. v. EPA*, 187 F.4th 636, 669 (D.C. Cir. 2026) (agency

"is not required to respond to every comment, or to analyze every issue or alternative raised by the comments" (quotation marks omitted)).

As partially demonstrated in the above analysis, the record reflects that DHS addressed the substance of the comments, including the uncertainty in estimating student enrollment behavior, and explained the basis for its analytical choices. All such choices are within the "zone of reasonableness." *Bruno Project Rescue, Inc. v. CDC*, 182 F.4th 1, 12 (1st Cir. 2026) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). That Plaintiffs may have preferred that the agency pen a tome on all concerns they claim were not adequately addressed, however, this does not render the Final Rule violative of the APA.

**2. The Final Rule Is a Rational Response to the Identified Problems.**

Under *State Farm*, an agency is not required to adopt commenters' narrow framing or demonstrate perfect efficacy; it must "supply a reasoned analysis for the change," 463 U.S. at 42, not find perfect logical symmetry. An agency need only provide a "rational connection between facts and judgment." *State Farm*, 463 U.S. at 56; s*ee also Bruno Project Rescue*, 182 F.4th at 12 ("[W]e will – in our highly deferential review – uphold an agency determination if it is supported by any rational view of the record." (quotation marks omitted)).

Federal agencies entrusted with national security are often entitled to adopt rules under the APA that reduce opportunities for security threats. *See*, *e.g.*, *Spokane Airport Bd. v. TSA*, 164 F.4th 933, 937 (D.C. Cir. 2026) (applying APA standard of review and explaining "Congress has conferred on TSA 'broad statutory authority to protect civil aviation security.'"). And even if the regulation sweeps more broadly than preferred, DHS may regulate to prevent misuse so long as it "has acted within a zone of reasonableness" and "has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.

Here, DHS identified structural vulnerabilities inherent in D/S. Specifically, DHS identified the absence of predetermined immigration compliance review and prolonged unsupervised periods of presence. *See* 91 Fed. Reg. at 45010 (explaining the Final Rule is intended to "establish predetermined points in time, not to exceed 4 years, for immigration officers to directly evaluate whether F-1 students are maintaining their nonimmigrant status and remain eligible for that status."). Such vulnerabilities impede detection of national security threats, immigration fraud, and status violations, which the Final Rule will directly address by replacing indefinite stays with fixed-term admissions and subsequent screening. *Id.* at 45027; 45049; 45055.

The Final Rule is reasonably connected to the problems DHS identified. It "will ensure that DHS has an effective mechanism to periodically and directly assess whether [the relevant] nonimmigrants are complying with the conditions of their classifications and U.S. immigration laws." 91 Fed. Reg. at 44978. It will also ensure DHS may "obtain timely and accurate information about the activities these aliens have engaged in and plan to engage in during their temporary stay in the United States." *Id.* The problems are reflected by concrete, real-world instances of national security threats, fraud, and abuse, as briefly set forth above, *See supra* section I.A.1.a.; *see also* GOV-174190-174192; 216603-216605; 217233-21723; 217294-217295.

The suggestion that the instances of such threats referenced in the Final Rule would still have occurred under the four-year limit imposed by the Final Rule, ECF No. 13 at 27, mischaracterizes DHS's explanation and the objective of the Final Rule. DHS did not claim that each cited incident was preventable through fixed-term admission. Rather, the incidents illustrate observable patterns of security threats and fraud risks, and D/S enables prolonged stays without DHS oversight and opportunity to combat such issues. *See, e.g.*, 91 Fed. Reg. at 44995 ("[A]dmission for D/S does not afford immigration officers enough predetermined opportunities

to directly verify that aliens granted such nonimmigrant statuses are engaging only in those activities their respective classifications authorize while they are in the United States.”).

Indeed, the issue is structural and has potential to be pervasive as, by its very nature, D/S grants the nonimmigrant visa categories at issue potentially unlimited time without periodic screening. The Rule’s EOS requirement is aimed at correcting the identified vulnerabilities by “establish[ing] predetermined points in time, not to exceed 4 years, for immigration officers to directly evaluate whether F-1 students are maintaining their nonimmigrant status and remain eligible for that status.” 91 Fed. Reg. at 45010 (emphasis added). The temporal checkpoint imposed by the Rule will ensure DHS has the opportunity to conduct screening to identify noncompliance by nonimmigrants and academic institutions. Moreover, the suggestion that DHS inadequately responded to comments that a fixed-term should “align with academic realities using program duration, not an ex ante cap,” ignores that DHS had addressed the core premise of the comments: whether D/S contributes to security and integrity vulnerabilities to include abuse by some academic institutions. *See* 91 Fed. Reg. at 44984 (indicia some academic institutions engaged in or facilitate visa fraud); GOV-217491-217494; GOV-216545-216557

Further, agencies may act to reduce national security and fraud risk even if documented abuse is modest, particularly where such risk is difficult to detect under existing structures. *See Citadel Sec. LLC v. SEC*, 178 F.4th 621, 636 (11th Cir. 2026) (“Administrative law doesn’t constrain agencies to act only when they have gold-standard quantitative data.”). Far from mere anecdotes, DHS raised instances of fraud concerns that it determined to be a pattern that could be addressable through the Final Rule. *See, e.g.*, 91 Fed. Reg. at 45102 (“DHS has also observed a pattern of students immediately transferring schools or changing educational levels or programs of study upon their arrival in the United States.”); *see also* GOV-174140-174192.

DHS explained that fixed-term admissions and extension requirements would strengthen program integrity through such periodic screening. *See, e.g.*, 91 Fed. Reg. at 44993. And DHS has never claimed that most or all international students, exchange visitors, and representatives of foreign information media who remain in the United States for a lengthy duration are committing fraud or pose national security threats; rather, as DHS explained in the Rule, extended stays create elevated opportunities for abuse, status violations, or exploitation of loopholes. *See*, *e.g.*, 91 Fed. Reg. at 44976 (D/S "has undermined DHS's ability to effectively enforce compliance with the statutory inadmissibility grounds related to unlawful presence and has created incentives for fraud and abuse.").

**3. DHS Adequately Considered Alternatives to the Final Rule.**

An agency must consider "significant and viable alternatives," not necessarily every suggested refinement. *Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*, 624 F.3d 489, 493 (D.C. Cir. 2010) (citation omitted); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("DHS was not required . . . to consider all policy alternatives in reaching its decision. Agencies are not compelled to explore every alternative device and thought conceivable by the mind of man." (quotation marks and citation omitted)). And agencies may reasonably conclude that alternatives to rules do not meaningfully address the underlying systemic problem. *See Env't Def. Fund v. EPA*, 183 F.4th 867, 882 (D.C. Cir. 2026) ("[T]he EPA reasonably explained its decision to forgo adoption of a more forceful alternative and thus we conclude that this arbitrary-or-capricious claim falls short."). As explained, DHS identified that the core problem with D/S is the absence of predetermined DHS screening opportunities over significant stretches of time. This establishes a rational basis for rejecting alternatives aimed at preserving D/S.

DHS offered a rational justification for the rejection of alterations to SEVIS as an alternative. As explained in Defendants' Opposition, SEVIS is a data-reporting system for schools, not an immigration-status adjudication system, and is not designed for performing all relevant fraud and security screening. *See* ECF No. 46-1.

Moreover, the claim that DHS acted arbitrarily by imposing an extendable four-year time period misunderstands the agency's objective: to produce a uniform, administratively manageable nonimmigrant visa admission framework. 91 Fed. Reg. at 45011 (explaining Final Rule "provides a uniform standard to ensure compliance with the immigration laws . . . regardless of program type."). Indeed, uniformity is an acceptable manner to impose rules on relevant regulated actors. *See Fla. E. Coast Ry. LLC v. Fed. R.R. Admin.*, No. 24-11076, 2026 WL 2321640, at *4 (11th Cir. Aug. 11, 2026) (slip op.) (upholding "national, uniform standard provided in rule [that] preempt[s] State laws governing crew size."). DHS explained that a general four-year cap facilitates manageable oversight and creates clear expectations. 91 Fed. Reg. at 45072 ("The rule change sets clear and defined expectations for program of study completion for the universities and nonimmigrant students."). Commenters' claim that matching D/S with program length would "alleviate concern and uncertainty" ignores the nebulous nature of program length at certain institutions, which would increase uncertainty in adjudication and enforcement and thus make the system less consistent and secure. ECF No. 13 at 32; 91 Fed. Reg. at 45020 ("Requiring F, J, and I nonimmigrants to request additional periods of admission directly with DHS will improve consistency, enable stronger oversight, and deter fraud and abuse.").

Furthermore, DHS reasonably concluded that EOS provides adequate flexibility for legitimate academic needs. *See*, e.g., 91 Fed. Reg. at 45020 ("F-1 students may apply for an EOS

if they require additional time under their F-1 status, and the rulemaking includes a transition period for students currently on D/S, allowing for an orderly transition.").

**4. DHS Responded to All Significant Comments.**

Plaintiffs' argument that DHS failed to adequately respond to significant comments rests on a mischaracterization of both the record and the scope of the APA's requirements. While an agency must "consider and respond to significant comments received during the period for public comment," it is not required to adopt commenters' asserted concerns. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Agencies must address material criticisms in a manner that shows the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. They need not produce exhaustive, line-by-line rebuttals. Nor is an agency's disagreement with Commenters tantamount to arbitrary or capricious action.

DHS addressed each significant issue raised, provided adequate explanations, and exercised judgment in areas involving uncertainty and predictive assessments. That Commenters believed DHS should have credited their predictions does not give rise to an APA violation.

**a. Effect on Enrollment.**

Contrary to Plaintiffs' framing, DHS adequately addressed the speculative claims that the Rule may reduce international enrollment at U.S. academic institutions. GOV-171684-171783. DHS expressly acknowledged the possibility of enrollment impacts and explained why available evidence (e.g., surveys of hypothetical preferences) was inadequate. DHS reasonably concluded that these predictions were "uncertain and speculative." 91 Fed. Reg. 45001, 45087. Because DHS acknowledged Commenters' evidence and provided a satisfactory explanation as to its limitations, its response satisfies the APA. *Perez*, 575 U.S. at 96; *State Farm*, 463 U.S. at 43.

**b. Compatibility with Academic Realities.**

DHS acknowledged that some academic programs take longer than four years to complete but nevertheless reasonably concluded that a uniform admission period, coupled with the EOS process, best promotes consistency and effective enforcement. 91 Fed. Reg. 45001-02; 45011.

Indeed, DHS explained "this [R]ule does not require students or exchange visitors to complete their intended program within four years. Rather, the four-year period serves as a law enforcement and screening tool to assess whether a student or exchange visitor is maintaining their nonimmigrant status." 91 Fed. Reg. at 45001.

And it is not unreasonable for the government to require affirmative applications for extensions to stay—a routine process for many other visa categories. 91 Fed. Reg. at 44995 ("Additionally, this requirement is consistent with the extension filing requirements for other nonimmigrant categories, including B-1/B-2s, H-1Bs, H-2s, L-1s, and TNs, to name but a few."); *id.* at 45053 ("[T]his [R]ule will create consistency by aligning the requirements with other nonimmigrant classifications").

**c. Reliance Interests**

An agency generally is required to consider, not necessarily adopt or preserve, serious reliance interests. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an agency changes course, as DHS did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)) (internal quotes omitted). Here, DHS did exactly what *Regents* requires: it acknowledged putative reliance interests and explained the necessity of replacing D/S notwithstanding said interests.

DHS "carefully considered" the interests of relevant actors and entities (i.e., students, sponsors, universities, and employers) who have structured plans around D/S. 91 Fed. Reg. at

45073. DHS acknowledged these interests and balanced them against systemic enforcement vulnerabilities. *Id.* ("While DHS recognizes that some may prefer the D/S model, and this rule represents a change from longstanding practice, DHS has provided a reasoned explanation for this policy shift, consistent with Supreme Court precedent."). In any event, reliance interests do not bar agencies from changing practices—even longstanding practices—if the agency acknowledges the interests and provides a reasoned justification in response.

**d. DHS Operational Capacity**

Plaintiffs note that Commenters claimed that replacing D/S would "swamp" DHS. ECF No. 13 at 39. DHS responded that no "additional safeguards are needed in this rule," but that it was "explor[ing] operational alternatives to address USCIS backlogs." 91 Fed. Reg. at 45015. DHS further explained that it "continually monitors workload distribution and adjusts workloads as necessary for quality and efficiency. This [R]ule, while expected to increase the volume of EOS cases, is not the first time that DHS, and USCIS in particular, has prepared for an increase in application volume." *Id.* DHS also provided an example of its ability to handle an increase in workload due to a policy change. *See id.* (referring to implementation of Deferred Action for Childhood Arrivals (DACA)). That response is adequate under the APA.

Agencies are not required to provide detailed operational plans for responding to speculative predictions regarding the quantity of EOS filings, and DHS's assumption regarding its operational capacity is entitled to deference. *See Save the Sound, Inc.*, 183 F.4th at 774 (agencies may rely on their own "technical assumptions"). The APA does not require DHS to prove in advance that it will have the capacity for processing all future applications of an unknown quantity. The APA does require that "agency action be reasonable and reasonably explained." *Trajano v. U.S. Citizenship & Immigr. Servs.*, No. CV 25-12388-FDS, 2026 WL 2137917, at *6 (D. Mass.

July 24, 2026). Throughout the Final Rule, and notwithstanding Plaintiffs' myriad complaints, that is precisely what DHS provided.

**e. Press Freedom**

DHS considered potential chilling effects on foreign journalists in stating that it "acknowledges that First Amendment rights apply to aliens lawfully in the United States . . . [and] takes seriously the First Amendment concerns surrounding any review of journalistic information." 91 Fed. Reg. at 45078. DHS explained that it "does not intend" to chill speech, that content review would be conducted solely to verify bona fide journalistic activity, and that the rule does not impose viewpoint discrimination. *See id.* Although Commenters speculated about hypothetical encroachment on press freedom, agencies are not required to rebut every hypothetical consequence in detail. DHS was obligated to reasonably consider the relevant issues and reasonably explain the decision, not to provide an extensive analysis of speculative future First Amendment harms. *See Prometheus Radio Project*, 592 U.S. at 423. DHS satisfied that obligation.

**5. The comment period was adequate and the public had a meaningful opportunity to participate.**

The interested parties had a meaningful opportunity to participate in the rulemaking process, because there is no statutorily mandated length of time for notice and comment period. *See* 5 U.S.C. § 553; s*ee California v. Kennedy*, 802 F. Supp. 3d 273, 284 (D. Mass. 2025) (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)).

Even when substantial rule changes are proposed, a 30-day comment period is generally the shortest period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019);

*See also Kennedy*, 802 F. Supp. 3d at 284 ("While 30 days is an oft-cited benchmark, there is nothing talismanic about that number . . . .").

Here, DHS correctly noted, that "[t]he APA does not mandate a specific minimum duration for public comments, and DHS fully complied with the legal requirements for providing notice to seek input from the general public in accordance with the APA." 91 Fed. Reg. 44976, 45072. Further, meaningful participation can be ascertained from the nearly 22,000 comments with many commenters providing proposed alternatives, evidence-based feedback and specific concerns regarding implementation. 91 Fed. Reg. 44976, 45072; *see also Kennedy*, 802 F. Supp. 3d at 284 (D. Mass. 2025) (proposed rule made available for public inspection and comment for at least 30 days, giving the public a meaningful opportunity to participate in the rulemaking). Regardless, an agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (citations omitted). Accordingly, there is nothing arbitrary or capricious about the agency's actions.

### II. The Final Rule Supports Academic Mobility While Complying with Immigration Laws and Is Not Contrary to Law.

This Court did not reach Plaintiffs' claim regarding the Final Rule's limitations on academic mobility being contrary to law because it found that the Final Rule is arbitrary and capricious. As a result, Defendants incorporate by reference their arguments made in their Opposition. *See* ECF No. 46-1 at 38-40.

## CONCLUSION

For the reasons stated above, this Court should grant Defendants' motion for summary judgment, deny Plaintiffs' cross-motion for summary judgment, and enter final judgment in favor of Defendants.

Dated: October 30, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

WILLIAM C. SILVIS
Assistant Director

DANIEL SCHUTRUM-BOWARD
MICHAEL A. CELONE
Senior Litigation Counsels

/s/ Oleksiy Isaev
OLEKSIY ISAEV
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
Post Office Box 878 | Ben Franklin Station |
Washington, D.C. 20044
Oleksiy.Isaev@usdoj.gov
202-431-1481
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Oleksiy Isaev

OLEKSIY ISAEV
Trial Attorney