**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 1:26-cv-13799-FDS

# SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dana McSherry (MA BBO #664430)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4060
dmcsherry@mcdermottlaw.com

Paul W. Hughes (DC Bar No. 997235)*
Emmett Witkovsky-Eldred (DC Bar No. 90012725)*
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com

* *pro hac vice*

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

Table of Authorities ........ ii
Introduction ........ 1
Supplemental Background and Argument ........ 2
A. Supplemental regulatory background: SEVP and SEVIS ........ 2
1. SEVP background ........ 3
2. SEVIS background ........ 6
3. How DHS uses SEVIS to detect and prevent abuse ........ 9
B. Supplemental argument ........ 11
1. DHS failed to account for the tools available under SEVIS. ........ 11
2. The Final Rule's limitation on academic mobility is contrary to law. ........ 14
3. The Court should order the default APA remedy of vacatur. ........ 18
Conclusion ........ 20

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ........ 18, 19

*Am. Hosp. Ass'n v. Becerra*,
2022 WL 4534617 (D.D.C. Sept. 28, 2022) ........ 18, 19

*Ass'n of Am. Universities v. Dep't of Def.*,
806 F. Supp. 3d 79 (D. Mass. 2025) ........ 20

*California v. Mullin*,
833 F. Supp. 3d 50 (D. Mass. 2026) ........ 20

*California v. U.S. Dep't of Educ.*,
2026 WL 2754968 (D. Mass. Sept. 17, 2026) ........ 20

*Cboe Futures Exch., LLC v. SEC*,
77 F.4th 971 (D.C. Cir. 2023) ........ 19

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009) ........ 19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ........ 20

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) ........ 18

*In Re: Enrique Ganesh Doreste Kathiravetpillai*,
2010 WL 2390757 (BIA May 27, 2010) ........ 5

*Massachusetts v. Nat'l Institutes of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) ........ 18

*Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 1

*In Re: Myoung Sook Park*,
2017 WL 1330106 (BIA Mar. 8, 2017) ........ 5

*Nat'l Council of Nonprofits v. McMahon*,
836 F. Supp. 3d 265 (D. Mass. 2026) ........ 15

*New York v. Trump*,
811 F. Supp. 3d 215 (D. Mass. 2025) ........ 20

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
969 F.3d 12, 27 (1st Cir. 2020) ........ 17

*President & Fellows of Harvard Coll. v. HHS*,
798 F. Supp. 3d 77 (D. Mass. 2025) ........ 20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 20

**Cases—continued**

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)....................14, 15

*Wash. Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
50 F.4th 164, 178 (D.C. Cir. 2022)....................15, 16, 17

*Woonasquatucket River Watershed Council v. USDA*,
186 F.4th 25 (1st Cir. 2026)....................20

**Statutes**

5 U.S.C. § 706(2)(A)....................18

8 U.S.C.
§ 1101(a)(15)(F)....................14
§ 1101(a)(15)(F)(i)....................3
§ 1101(a)(15)(M)....................3
§ 1103(a)(3)....................15
§ 1184(a)(1)....................15
§ 1372....................6
§ 1762(a)....................4
§ 1762(c)....................4

Pub. L. No. 104–208, div. C, § 641, 110 Stat. 3009-546 (1996)....................6

Pub. L. No. 107-56 § 416, 115 Stat. 354 (2001)....................7

**Regulations**

8 C.F.R.
§ 214.2(f)(5)(i)....................5
§ 214.3....................4
§ 214.3(a)(1)(ii)....................8
§ 214.3(a)(3)(i)....................3
§ 214.3(a)(3)(ii)....................4
§ 214.3(e)....................8
§ 214.3(f)....................3
§ 214.3(f)(1)....................4
§ 214.3(g)(1)....................8
§ 214.3(g)(2)....................7
§ 214.3(h)(3)(iii)....................4
§ 214.4(i)(1)....................4
§ 214.4(i)(2)....................4
§ 214.4(a)(2)....................4, 5
§ 214.4(b)....................4

22 C.F.R.
§ 62.3....................5
§ 62.5(c)(8)(iii)....................5, 8
§ 62.6....................5

**Regulations—continued**

22 C.F.R.
§ 62.7 .......... 5
§ 62.9(a) .......... 5
§ 62.9(d)(1) .......... 6
§ 62.11 .......... 6
§ 62.13(a) .......... 6
§ 62.13(b) .......... 6
§ 62.50(i) .......... 6
§ 62.50(a) .......... 6
§ 62.50(d) .......... 6, 8

**Agency materials**

91 Fed. Reg. 44976 (July 17, 2026) .......... 1, 8, 9, 10, 12, 13, 14, 15, 16, 17

68 Fed. Reg. 28,129 (May 23, 2003) .......... 7

*About SEVIS*, United States Department of Homeland Security (May 25, 2023) .......... 3

Immig. & Customs Enf't, Press Release, *3 Senior Executives of For-profit Schools Plead Guilty to Student Visa, Financial Aid Fraud* (Apr. 30, 2015) .......... 10

Immig. & Customs Enf't, Press Release, *Owner of Georgia English language school sentenced for immigration fraud* (May 7, 2014) .......... 10

*SEVIS Enhancements*, U.S. Department of Homeland Security (Aug. 31, 2026) .......... 9

*Student and Exchange Visitor Information System*, U.S. Immigration and Customs Enforcement (accessed October 26, 2026) .......... 8

## INTRODUCTION[1]

As the Court earlier concluded, DHS's promulgation of the Final Rule, in which DHS eliminated the longstanding Duration of Status (D/S) rule and adopted other restrictions on academic mobility, "clearly failed to comply with the APA in multiple respects." Dkt. 50 at 11. That is, the law requires agencies to "[a]mong other things, … perform a reasoned calculation of the benefits and costs of the rule; adequately consider less burdensome alternatives; adequately respond to significant comments during the rulemaking process; and provide a rational response to the identified problems it seeks to alleviate" and DHS failed that basic standard. *Id.* at 10 (citing *Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51-57 (1983)).

The Final Rule works a sea-change in existing and longstanding law, throwing into disarray the plans of international students and scholars, their institutions, and members of the foreign press. *See generally* 91 Fed. Reg. 44976 (July 17, 2026). The harm, if the rule takes effect, would be "catastrophic," as this Court found. Dkt. 50 at 7. Of course, "this Court does not have the power to block the rule on the ground that it is misguided or ill-advised" (*id.* at 10), and plaintiffs do not ask it to. But DHS must "adhere[] to the law" (*id.*), and here, it did not.

The agency "summarily rejected" nearly 22,000 commenters' views, the "overwhelming majority of [whom] expressed strong opposition." Dkt. 50 at 6. And DHS "effectively concluded that the cost of [the Final Rule's] impact was zero." *Id.* In support, "it offered almost entirely conclusory statements, *non sequiturs*, and statements of 'belief' without supporting reasoning." *Id.* "To the extent DHS engaged at all on substantive issues, its responses were largely disconnected from academic or practical realities." *Id.* Nonetheless, "[n]otwithstanding the scale of the likely harm" the Final Rule would cause, "the government's proffered rationales for the rule are exceptionally weak, and the connection between the rule and the problems it purports to address is

---

[1] The parties previously briefed summary judgment. *See* Dkts. 13, 46-1. Consistent with this Court's October 16, 2026 order, Plaintiffs incorporate by reference their prior briefing in full.

exceptionally attenuated." *Id.* at 7. Indeed, "[t]he weakness of the connection between the rule and its purported rationales raises legitimate questions as to whether its real purpose is not to safeguard national security and protect our borders, but to achieve other, undisclosed, goals—such as, for example, asserting greater government control over academic institutions and the press." *Id.* at 9.

The Court's prior analysis is a roadmap for granting Plaintiffs' motion for summary judgment. As Plaintiffs explained—and the Court already laid out—the Final Rule is arbitrary and capricious for at least four reasons: (1) DHS failed to appropriately weigh costs and benefits; (2) DHS's proffered rationales—fraud and national security—do not sustain its action; (3) DHS failed to consider less burdensome alternatives; and (4) DHS failed to adequately respond to significant comments.[2] Further, the rule's restrictions on academic mobility contravene the text of the INA.

The Court's careful analysis needs no retreading. Plaintiffs therefore adopt and incorporate by reference their prior briefing in full. In this supplemental brief, Plaintiffs seek primarily to elucidate one critical aspect of this case that has escaped thorough briefing thus far: The regulatory background of the SEVIS system, which is the backbone of F and J nonimmigrant programs and has enabled DHS to closely monitor the more than one million F and J nonimmigrants present in the United States at any time. This regulatory context confirms what Plaintiffs already contended and this Court previously found: SEVIS—and possible improvements to it—readily provided DHS a less burdensome way to pursue its putative policy aims. Plaintiffs further explain why the Court should grant summary judgment on the ground that the Final Rule violates the INA, and why the Court should vacate the rule in its entirety—the default APA remedy.

## SUPPLEMENTAL BACKGROUND AND ARGUMENT

### A. Supplemental regulatory background: SEVP and SEVIS

Plaintiffs have already described the statutory and regulatory background of this case. *See*

---

[2] The Court described the 32-day comment period DHS provided as "barely legal." Dkt. 50 at 6. For reasons explained previously, Plaintiffs contend it was not legal at all. *See* Dkt. 13 at 32-34.

Dkt. 13 at 2-5. Here, Plaintiffs offer further background on the critical regulatory machinery underlying this dispute, namely: the Student and Exchange Visitor Program (SEVP), the program within ICE that certifies schools as eligible to enroll F nonimmigrants and administers the F nonimmigrant program, and the Student and Exchange Visitor Information System (SEVIS), which is the existing database through which DHS tracks and monitors international students and exchange visitors, as well as their dependents. As DHS itself states on its website, SEVIS "is a critical tool in SEVP's mission to protect national security while supporting the legal entry and stay of the more than one million F, M and J nonimmigrants coming to the United States for educational and cultural exchange programs." *About SEVIS*, United States Department of Homeland Security (May 25, 2023), available at https://studyinthestates.dhs.gov/site/about-sevis.

***1. SEVP background***

SEVP is the division within ICE that oversees F and M[3] nonimmigrant students and their institutions of enrollment. A core responsibility of SEVP is certifying educational institutions as eligible to enroll international students, which they may not do unless certified. *See* 8 C.F.R. § 214.3(f); *see also* 8 U.S.C. § 1101(a)(15)(F)(i) (noncitizen must be pursuing a "course of study … approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn.").

To qualify, institutions must petition for SEVP certification and demonstrate that they are "*bona fide*" educational institutions capable of providing—and do provide—the educational services they claim. *See* 8 C.F.R. § 214.3(a)(3)(i)(A)-(D). SEVP certification requires ongoing maintenance: to remain eligible for SEVP certification, institutions agree to comply with extensive

[3] M nonimmigrants are admitted to the United States temporarily to engage in vocational or non-academic studies (other than language training). *See* 8 U.S.C. § 1101(a)(15)(M). Unlike F and J nonimmigrants, they are not subject to the D/S rule and are not relevant to this case.

recordkeeping and reporting obligations, among other regulatory requirements. *See* 8 C.F.R. § 214.3(a)-(g). Schools must also apply for recertification every two years. *Id.* § 214.3(h); *see also* 8 U.S.C. § 1762(a). To qualify for recertification, a school must establish that it continues to satisfy all the eligibility criteria for certification and that it has "complied during its previous period of certification … with recordkeeping, retention, and reporting requirements and all other requirements." *See* 8 C.F.R. § 214.3(a)(3)(ii)(A)-(B). The school personnel tasked with maintaining these reporting and recordkeeping requirements are called "designated school officials" (DSOs).

DHS maintains the authority to review and withdraw a school's certification at any time—a process also known as "out-of-cycle" review leading to "[w]ithdrawal on notice." 8 C.F.R. §§ 214.3(f)(1); 214.4(b). SEVP may initiate an out-of-cycle review "to verify the school's compliance with the recordkeeping, retention, reporting and other requirements … to verify the school's continued eligibility for SEVP certification pursuant to paragraph (a)(3) of this section." *Id.* § 214.3(h)(3)(iii). If SEVP identifies any non-compliance during this process, it may either "initiate remedial action with the school, as appropriate," or "initiate withdrawal proceedings against the school." *Id.* § 214.3(h)(3)(iii). "Material failure … to comply with the recordkeeping and reporting requirements to receive nonimmigrant students" is grounds for withdrawal of certification. 8 U.S.C. § 1762(c). DHS regulations specify 19 grounds for withdrawing certification, including failure to comply with reporting and recordkeeping requirements and failure by DSOs to adhere to regulatory requirements. *See* 8 C.F.R. § 214.4(a)(2).

Withdrawal of SEVP certification is catastrophic for an impacted institution. If SEVP withdraws a school's certification, the school immediately loses its ability to accept or enroll new international students, as it may not issue new Forms I-20. 8 C.F.R. § 214.4(i)(1). The school will also, eventually, lose access to SEVIS (known as the "SEVIS access termination date")—though this is generally not immediate except in cases of "suspected … criminal activity" or "a potential national security threat." 8 C.F.R. § 214.4(i)(2). A school, once its certification is withdrawn, is

ineligible to petition for SEVP certification for one year, and "[e]ligibility to re-petition will be at the discretion of the Director of SEVP." Id. § 214.4(a)(2).

Consequences for currently enrolled students are also dire. They may be at immediate risk of losing their F-1 status—meaning they may be subject to removal—as they are by definition no longer "pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students." 8 C.F.R. § 214.2(f)(5)(i) (2025). That aside, upon the school's SEVIS access termination date, DHS "will automatically terminate any remaining Active SEVIS records for that school." 8 C.F.R. § 214.4(i)(2). The termination of a student's record has immediate consequences, including possible removal proceedings. *See, e.g., In Re: Myoung Sook Park*, 2017 WL 1330106 (BIA Mar. 8, 2017); *In Re: Enrique Ganesh Doreste Kathiravetpillai*, 2010 WL 2390757 (BIA May 27, 2010). To avoid this outcome, a student would have to try to transfer schools.

A similar regime governs the J visa program, which is directly overseen by the Department of State rather than SEVP.[4] To be eligible to host J nonimmigrants, an institution must be designated as an "Exchange Visitor Program sponsor" by the Department of State. 22 C.F.R. § 62.6. To be eligible for designation, an organization must "[d]emonstrate, to the Department of State's satisfaction, its ability to comply and remain in continual compliance with all applicable provisions," among other showings. *Id.* § 62.3. Once designated, the institution must apply for redesignation every one or two years. *Id.* § 62.7. As described in more detail below, the program personnel tasked with maintaining reporting and recordkeeping requirements under the J visa program are called "responsible officers" (ROs). Among other criteria for designation and redesignation, the sponsor must complete a criminal background check on all its ROs. *Id.* § 62.5(c)(8)(iii).

To achieve and maintain designation, sponsors are obligated to "adhere to all regulations" governing the J exchange visitor program (22 C.F.R. § 62.9(a)) and agree to "[p]rovide accurate,

[4] Though SEVP does not directly oversee program eligibility and compliance for the J visa program, it does play an important role in the program's management, including monitoring nonimmigrants' maintenance of their status, via SEVP's management of SEVIS, described below.

complete, and timely information … to the Department of State and the Department of Homeland Security regarding their exchange visitor program(s), exchange visitors, and accompanying spouses and dependents (if any)" (*id.* § 62.9(d)(1)), among other requirements. ROs are required under governing regulations to "[b]e thoroughly familiar" with all applicable laws and regulations, among other requirements. *Id.* § 62.11. Regulations additionally impose on sponsors, via their ROs, certain "[n]otification requirements" via SEVIS, including to validate the beginning and end of an exchange visitor's participation in the program (22 C.F.R. § 62.13(a)) and report changes in circumstances of the nonimmigrant, including change of address or site activity. *Id.* § 62.13(b).

The Department of State can revoke an institution's designation under 22 C.F.R. § 62.50(d), "[u]pon a finding of any act or omission set forth" in paragraph (a) of the same section. Grounds for revocation include a finding that the sponsor has violated one or more regulatory provisions governing the J visa program, or has a pattern of doing so, including failure to adhere to its recording and reporting requirements, or taking an action that might compromise national security. *See* 22 C.F.R. § 62.50(a). Once program designation is revoked, the sponsor "may not thereafter issue any Certificate of Eligibility for Exchange Visitor (J-1) Status (Form DS-2019) or advertise, recruit for, or otherwise promote its program." 22 C.F.R. § 62.50(i). Nor may the sponsor "facilitate the entry of an exchange visitor into the United States." *Id.*

### *2. SEVIS background*

In 1996, Congress authorized the former Immigration and Naturalization Service (INS) to create an electronic system to collect information on F, M, and J nonimmigrants to ensure INS was equipped to monitor nonimmigrants in these categories while they are present in the United States, and to prevent overstays should a nonimmigrant's lawful status lapse. *See* Pub. L. No. 104–208, div. C, § 641, 110 Stat. 3009-546, 3009-704 (1996); *see also* 8 U.S.C. § 1372. Congress sought to ensure that the United States knows precisely how many F, M, and J nonimmigrants are present in the United States, where they are, and what they are doing. In the aftermath of September 11, 2001,

Congress in the USA PATRIOT Act mandated INS to implement such a system. Pub. L. No. 107-56 § 416, 115 Stat. 354 (2001). DHS—which succeeded INS—and the Department of State deployed SEVIS in January of 2003. *See* U.S. Department of State, *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended: Student and Exchange Visitor Information System (SEVIS)*, 68 Fed. Reg. 28,129 (May 23, 2003). SEVIS is a centralized database maintained by SEVP and allows DHS to collect information on F, M, and J nonimmigrants, monitor their activity, and track their compliance with the terms of their nonimmigrant status.

SEVIS is the operational backbone of the F and J visa programs and serves as the program interface between DSOs (for the F nonimmigrant program) and ROs (for the J nonimmigrant program) and DHS. For one thing, SEVIS is the system through which DSOs and ROs seek and maintain program certification/designation on behalf of their institutions. SEVIS also allows DHS to communicate with DSOs and ROs, including to broadcast program updates and information and sub-regulatory guidance as well as to communicate with individual DSOs.

Of particular relevance, DSOs and ROs also play a crucial role in this system by sharing information with DHS, via SEVIS, in accordance with their recording and reporting obligations. For starters, DSOs and ROs create a SEVIS record for a nonimmigrant after admitting the student or exchange visitor into a program, which generates a SEVIS ID. DSOs and ROs also use SEVIS to generate Forms I-20 and DS-2019—the forms used to obtain admission into the United States.

DSOs and ROs use SEVIS to keep DHS informed about F and J nonimmigrants and their dependents by keeping nonimmigrants' SEVIS records up to date. For example, 8 C.F.R. § 214.3(g)(2) obligates DSOs to report certain information in SEVIS within 21 days of any change, including a student's failure to maintain status by failing to remain enrolled in a program full-time. Other information a DSO must report in SEVIS includes the student's biographical information (such as name, date and place of birth, country of citizenship, student identification number, and current address), record of coursework (including degree program and field of study, courses of

enrollment, and grade point average), academic status, participation in practical training, graduation or termination, and more. *Id.* § 214.3(g)(1).

Though DSOs and ROs play an important role in SEVIS, the system is not built on trust alone. Department of State regulations require ROs to undergo periodic criminal background checks (22 C.F.R. § 62.5(c)(8)(iii)), and DSOs must certify under penalty of perjury that they are familiar with and intend to comply with all applicable regulations (8 C.F.R. § 214.3(a)(1)(ii)). Sanctions for noncompliance can include, for institutions, withdrawal of SEVP certification/revocation of J program designation (*id.* § 214.3(e); 22 C.F.R. § 62.50(d)); for students, removal; and for DSOs/ROs, potential civil or even criminal liability. *See* 91 Fed. Reg. at 44983 n.60 (collecting examples of criminal charges brought against individuals suspected of defrauding the system).

DHS may also update and improve SEVIS, and frequently does. For example, one comment noted, "[i]n 2019, DHS implemented several GAO-provided recommendations to further mitigate risk within SEVIS, including implementing techniques to identify fraud in institutions seeking SEVP certification, verifying the eligibility of Designated School Officials (DSOs), and Developing a Risk Assessment model." Ex. A, ICEB-2025-0001-16108 at 2. Likewise, a 2024 SEVIS enhancement requires DSOs to provide additional information any time a student is approved for a reduced course load. Ex. B, ICEB-2025-0001-19025 at 1. Another commenter noted that planned enhancements, "including program-level data, online and hybrid course tracking, and [CPT] monitoring, will further strengthen oversight." Ex. C, ICEB-2025-0001-16055 at 5.

In fact, ICE advises program participants on its website that "[t]he Student and Exchange Visitor Information System (SEVIS) is constantly evolving" to "[a]ddress national security and public policy concerns," and thus "SEVIS users should be aware of planned changes to the system that could affect schools and programs." *See Student and Exchange Visitor Information System*, U.S. Immigration and Customs Enforcement (accessed October 26, 2026), available at https://www.ice.gov/sevis/overview. DHS maintains a "SEVIS enhancements" website that

advises DSOs and ROs of upcoming and past changes to SEVIS. *See SEVIS Enhancements*, U.S. Department of Homeland Security (Aug. 31, 2026), available at https://study-inthestates.dhs.gov/sevis-help-hub/learn-more/sevis-enhancements. According to this website, DHS made 14 enhancements to SEVIS in 2025 alone. *Id.*

### *3. How DHS uses SEVIS to detect and prevent abuse*

Aided by this reporting and data-collection regime, DHS possesses a wealth of information about the more than one million F and J nonimmigrants and their dependents present in the United States at any time. As one commenting DSO put it, "F-1 Students and J-1 Exchange Visitors are … the most heavily-monitored groups of nonimmigrants in the US," as "[t]he Department already has thousands of US citizens and US permanent residents on campuses around the country"—meaning DSOs and ROs—"duly collecting the required information for the Department every day, all year long." Ex. D, ICEB-2025-0001-18453 at 1-2. Other commenters described how seriously institutions and DSOs/ROs take their responsibilities. For instance, one university explained how "the University's DSOs and AROs check internal student records **daily** and receive regular academic reports to update SEVIS and ensure compliance with immigration regulations." Ex. E, ICEB-2025-0001-18649 at 7. "For example, if a DSO or ARO identifies that a student or EV has worked without authorization, the student's or EV's SEVIS record is terminated and SEVP is notified through SEVIS that the student or EV is no longer maintaining status." *Id.*

The record reveals many examples of DHS using SEVIS to identify and prevent abusive practices, many of which DHS itself identified in the Final Rule. For instance, DHS noted that "multiple school owners and others have been criminally prosecuted for 'pay-to-stay' fraud, in which school officials, in return for cash payments, falsely report that F–1 students who do not attend school are maintaining their student status." 91 Fed. Reg. at 44983. In a footnote, DHS cited several related press releases discussing law enforcement operations which appear to have been aided by SEVIS data collection. *Id.* at 44983 n.60. Several extol SEVIS's usefulness to "protect

national security by ensuring that students, visitors and schools comply with U.S. laws," explaining that "SEVP also collects and shares SEVIS information with government partners, including CBP and U.S. Citizenship and Immigration Services, so only legitimate international students and exchange visitors gain entry into the United States." Immig. & Customs Enf't, Press Release, *Owner of Georgia English language school sentenced for immigration fraud* (May 7, 2014), https://www.ice.gov/news/releases/owner-georgia-english-language-school-sentenced-immigration-fraud (cited at 91 Fed. Reg. at 44983 n.60). Further, "[Homeland Security Investigations (HSI)] reviews SEVIS records for potential violations and refers cases with potential national security or public safety concerns to its field offices for further investigation." *Id.* (cited at 91 Fed. Reg. at 44983 n.60). And "SEVP's Analysis and Operations Center reviews student and school records for administrative compliance with federal regulations related to studying in the United States." *Id.* (cited at 91 Fed. Reg. at 44983 n.60). *See also* Immig. & Customs Enf't, Press Release, *3 Senior Executives of For-profit Schools Plead Guilty to Student Visa, Financial Aid Fraud* (Apr. 30, 2015), https://www.ice.gov/news/releases/3-senior-executives-profit-schools-plead-guilty-student-visa-financial-aid-fraud (similar) (cited at 91 Fed. Reg. at 44983 n.60).

Furthermore, the Final Rule showed just how SEVIS helps DHS identify potentially questionable conduct. DHS noted several examples of specific nonimmigrants maintaining F-1 status for longer than DHS considers appropriate (91 Fed. Reg. at 44983)—while there is nothing necessarily unlawful in these examples, the point is that it was SEVIS data that enabled DHS to detect these possible anomalies, allowing investigation and further action as appropriate.

The record discusses additional ways DHS uses SEVIS records—some quite far reaching.[5] One comment explained that DHS recently "ran the names of more than one million international students through the National Crime Information Center (NCIC)," and "[t]housands of students

[5] Plaintiffs include these examples to illustrate DHS's demonstrated willingness to pursue enforcement objectives via SEVIS, without suggesting the examples are necessarily lawful or proper.

whose names were matched in the database had their SEVIS accounts canceled without any further investigation." Ex. F, ICEB-2025-0001-2168_5 at 10. Another noted "SEVIS populates student & exchange visitor real-time data (including active status) into various government database systems (i.e. SAVE, E-verify, etc.) which are accessible by the related federal agencies (e.g. CBP, USCIS, Social Security, etc.) as well as state governments (e.g. DMVs)." Ex. G, ICEB-2025-0001-21230_attachment_1 at 8-9. SEVIS thus stands apart from "other nonimmigrant status systems," in that it "provides immediate access to detailed information related to every student and exchange visitor to determine eligibility for and compliance with their immigration status." *Id.* at 9. Likewise, a commenter noted that SEVIS information is shared with "ICE and HSI, as well as with law enforcement, Customs and Border Protection, USCIS, the Department of State, and the FBI," making "[t]hose in F and J visa status … the most carefully monitored group of temporary visitors in the United States, and the only ones tracked by a database." Ex. H, ICEB-2025-0001-21851 at 7.

* * *

In sum, SEVIS is a comprehensive database dedicated to F, M, and J nonimmigrants, making this population of noncitizens the most closely monitored subset of nonimmigrants in the U.S. immigration system. The system has long allowed DHS to keep close tabs on these nonimmigrants' whereabouts and activity, and exists to ensure they remain in the United States only so long as they maintain their status. Immigration officials and institutional personnel work hand-in-glove to make this system function, on pain of removal from nonimmigrant programs and even criminal prosecution. What is more, should DHS identify any need for improvement, it can adopt any enhancements it needs (subject to the requirements of the APA and governing law).

## B. Supplemental argument

### *1. DHS failed to account for the tools available under SEVIS.*

In their prior brief, Plaintiffs explained that the Final Rule is arbitrary and capricious in several respects, including, most relevant to this supplemental submission, the fact that DHS

disregarded numerous alternatives less burdensome than eliminating D/S and restricting academic mobility (Dkt. 13 at 21-24) and that the Final Rule is an irrational response to the problems identified of supposed national security and fraud concerns (*id.* at 18-21). The regulatory details described above provide additional context explaining why DHS's approach fails under the APA. In particular, as plaintiffs noted, SEVIS already provides DHS with tools it can use to address the national security and program integrity concerns it nominally raised in defense of its actions, and DHS can also improve SEVIS to further those ends. *Id.* at 21-22. The Court agreed. Dkt. 50 at 32-34. As it explained, DHS "dismiss[ed] [existing SEVIS capabilities and enhancements] out of hand simply because it disagree[d]." *Id.* at 33. That is arbitrary and capricious, both because it is an insufficient response to concrete suggestions offered by commenters and also because it confirms that DHS's rote insistence on periodic in-person check-ins is a solution in search of a problem.

DHS's only rationale for refusing to consider existing capabilities in SEVIS, or making enhancements to SEVIS, was its stated preference for creating "an opportunity to evaluate an alien's maintenance of status at pre-determined points" and to "conduct[] oversight of students" as opposed to "conducting oversight of schools." 91 Fed. Reg. at 45009, 45014. As explained (and noted by the Court), that reasoning is circular, simply presupposing that requiring periodic in-person contacts is superior. It is thus neither an adequate response to comments—the burden of imposing on the system the costs of hundreds of thousands of new, in-person contacts annually is precisely what commenters sought to alleviate through SEVIS-based alternatives—nor is it a rational explanation of why SEVIS does not already give DHS all the tools it needs to "check in" with F and J nonimmigrants as needed. An agency cannot simply assume its preferred approach is best to eschew available alternatives and existing solutions. *See* Dkt. 13 at 22; Dkt. 50 at 33.

The Final Rule disregards the capabilities DHS has within SEVIS. As fully described above, the comprehensive reporting and data collecting responsibilities that DSOs and ROs take on, coupled with strong incentives on both institutions and individuals to fully comply with

governing regulations, ensure that DHS is able to collect up-to-date information regarding the status of F and J nonimmigrants. This mass data collection regime makes F and J nonimmigrants already "the most carefully monitored" cohort of noncitizens present in the country. Ex. H, ICEB-2025-0001-21851 at 7. And DHS is positioned to adjust that system as needed to ensure the data in hand fits its national security and program integrity prerogatives. Indeed, the fact that after nearly 25 years of implementing SEVIS, DHS only managed to come up with a few individual anecdotes and rounding error statistics that *might* be indicative of abuse (but have not been proven to be) shows well the system's capabilities and its effectiveness at detecting and preventing fraud.

What is more, DHS uses SEVIS to conduct oversight of international students and scholars as well as schools—and commenters suggested improvements to SEVIS that could further enhance its ability to do so. *See* Dkt. 13 at 22-23 (collecting examples).[6] Among other things, DHS has used SEVIS records both to identify individual students whose behavior raises red flags (such as a dance student who has remained in the United States on an F-1 visa for decades, 91 Fed. Reg. at 44983) and identify trends involving a greater number of students (such as 2,100 students who have been present in the United States in F-1 status since entering between 2000 and 2010, *id.*). Additionally, the record discloses several enforcement actions (*but see supra* at 10 n.5), focused on or involving students and aided or initiated by SEVIS data, including operations from 2020 and 2026 targeting students suspected of Optional Practical Training (OPT) fraud (*see* 91 Fed. Reg. at 44983 n.62; 44984 & n.71), DHS's cross-referencing of SEVIS data with the FBI's NCIC database (Ex. F, ICEB-2025-0001-2168_5 at 10), and "sting" operations where ICE identified students

[6] *See also, e.g.*, Ex. I, ICEB-2025-0001-18999 at 25-26 (suggesting that DHS incorporate into SEVIS "machine learning algorithms to identify at-risk students," among several other suggested SEVIS enhancements); Ex. C, ICEB-2025-0001-16055 at 5 (suggesting that DHS "[c]onduct targeted SEVIS audits of programs or institutions with documented irregularities"); Ex. J, ICEB-2025-0001-15908 at 8 (similar); Ex. K, ICEB-2025-0001-20645 at 2 (suggesting DHS add a field in SEVIS to allow DSOs and ROs to flag suspected fraud); Ex. E, ICEB-2025-0001-18649 at 7 (suggesting that DHS improve funding and staffing of SEVP so it can better coordinate with HSI).

abusing the F-1 system by creating fake schools (*see* 91 Fed. Reg. at 44988 & n.103).

At bottom, the legal obligations of DSOs and ROs to promptly and accurately report information about nonimmigrants, the wealth of data DHS already has by virtue of SEVIS, and the numerous possible improvements to SEVIS DHS could undertake to obtain yet more useful data provide the agency with all the technological and regulatory infrastructure it needs. DHS can, and does, monitor and track nonimmigrants, flag in real time potential status violations, and follow up on a targeted basis. DHS's unexplained *ipse dixit* that it must instead implement periodic, in-person contacts for all international students and scholars—of whom more than one million are present at any time—simply does not pass muster under the APA, as the Court correctly found.

***2. The Final Rule's limitation on academic mobility is contrary to law.***

Plaintiffs' prior brief explained that the Final Rule also exceeds DHS's statutory authority because it modifies the statutory eligibility criteria for F-1 students. Dkt. 13 at 34. The Court reserved judgment on this issue in its prior opinion (Dkt. 50 at 42 n.19), but it should reach the issue now and grant Plaintiffs summary judgment on this alternative basis as well.

The statute opens the F-1 program to "bona fide student[s] qualified to pursue a full course of study … who seek[] to enter the United States temporarily and solely for the purpose of pursuing such a course of study." 8 U.S.C. § 1101(a)(15)(F). Any student who satisfies these criteria—i.e., one who is (1) pursuing a bona fide course of study, (2) qualified, (3) coming temporarily, and (4) coming solely for this purpose—is eligible for F-1 status, assuming he or she is otherwise admissible. The Final Rule rewrites that statutory scheme by imposing a new criterion: the "course of study" the nonimmigrant "seeks to enter" must be at a higher academic level than any previously completed program. An agency may not rewrite a statute in such a fashion. *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).[7] But that is just what DHS has done: a student can

[7] Bizarrely, DHS attempted to dismiss this case as an "EPA case … under the now-abandoned *Chevron* framework" (Dkt. 46-1) without engaging its "core … principle[:]" "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air*

be a bona fide, qualified, temporary student seeking to enter the United States solely to study, *and also* be pursuing a program at the same or lower level than one already completed—as DHS itself explicitly acknowledged. *See* 91 Fed. Reg. at 45041 (stating there are "legitimate" reasons why a student might pursue a second degree at the same or lower academic level as one already obtained).

In its prior brief, DHS pointed to two sources of regulatory authority that it says justify altering the plain text of the statute: 8 U.S.C. § 1103(a)(3), a general catchall grant of authority to promulgate "regulations … as [the Secretary] deems necessary for carrying out his authority under" the INA, and 8 U.S.C. § 1184(a)(1), which states that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe." Dkt. 46-1 at 38. Neither statute authorizes DHS to categorically exclude from the F-1 program a whole group of nonimmigrants eligible under the statute.

DHS cites *Washington Alliance of Technology Workers v. United States Department of Homeland Security* (*Washtech*) to defend its position (Dkt. 46-1 at 38-39), but the analysis DHS invokes cuts directly against it. In *Washtech*, the D.C. Circuit upheld under Sections 1184(a)(1) and 1103(a) DHS's creation of OPT by regulation, explaining that the "INA uses visa classes to identify *who* may enter temporarily and *why*, but leaves to DHS the authority to specify, *consistent with the visa class definitions*, the time and conditions of that admission." 50 F.4th 164, 178 (D.C. Cir. 2022) (emphases added). Thus, "the F-1 class definition serves as the Secretary's guide." *Id.* While it "does not, itself, delineate the full terms of that stay," the "F-1 provision … sets the criteria for entry and guides DHS in exercising its authority to set the time and conditions of F-1 students' stay." *Id.* Nothing about authorizing a year of post-graduation practical training contravenes the F-1 statute—in many cases, practical training is an essential part of a full academic program: a

---

*Regul. Grp.*, 573 U.S. at 328. That fundamental principle—prohibiting precisely what DHS did here—has nothing to do with *Chevron*; it is bedrock administrative law. *See, e.g.*, *Nat'l Council of Nonprofits v. McMahon*, 836 F. Supp. 3d 265, 304 (D. Mass. 2026) ("[A] general grant of rulemaking authority, even a broad one, does not authorize an agency 'to alter the specific choices Congress made.'") (citing *Util. Air Regul. Grp*. for the same principle on which Plaintiffs rely).

student "can succeed at classroom training but need practical training in a workplace setting to operationalize their new knowledge." *Id.* at 179. The regulation was thus "reasonably related to the nature and purpose of the F-1 visa class," did not conflict with the statute's text, and the rule "explain[ed] in detail DHS's educational rationale" for authorizing OPT. *Id.*

This same analysis runs the other way here. DHS's decision to limit F-1 eligibility to students advancing to a higher course of study, and thus exclude all students seeking backward or lateral matriculation, is not "consistent with the visa class definition[]" of the F-1 program. *Washtech*, 50 F.4th at 178. The F-1 statute lays out the "who" and "why" of F-1 eligibility (*id.*): bona fide and qualified students coming to the United States solely to temporarily pursue a full course of study. But DHS's regulation excludes many students who fit comfortably within those statutory criteria—indeed, the record details many examples of students whose decision to take that pathway is a logical next step in their academic progression.[8] And DHS itself admitted that many students have "legitimate" reasons for pursuing this academic path. 91 Fed. Reg. at 45041.

Nor can DHS defend its rule as "reasonably related to the nature and purpose of the F-1 visa class." *Washtech*, 50 F.4th at 179. The class's nature and purpose is "pursuing a full course of study at an established academic institution." *Id.* at 190. This "provides the touchstone for assessing the validity of the Department's exercise" of its regulatory authority. *Id.* at 189. Eliminating from program eligibility a significant portion of the F-1 class as defined by the statute is not consistent with the program's nature and purpose. It excludes bona fide students who intend to enroll in a full course of study, exactly the students Congress included within the class.

---

8 *See, e.g.*, Ex. L, ICEB-2025-0001-15966 at 5 (explaining that at Emory University, a Master of Divinity degree is *required* before pursuing a Master of Theology); Ex. M, ICEB-2025-0001-14336 at 3 (explaining why students "choose to pursue 2 or more master's programs in sequence," or follow a "[d]octoral degree" with "a master's degree to strengthen their specialization"); Ex. N, ICEB-2025-0001-14417 at 3 (university explaining that "[w]e often have international students pursue a graduate program in Data Science and then move forward to pursue an MBA as the two can really advance someone's knowledge, experience and ability to enter the job market.").

Nonetheless, DHS in its response brief seemed to contend that either the statutory phrase "full course of study" or "bona fide" student might justify its restriction on F-1 eligibility here. Dkt. 46-1 at 39-40. Not so. For one thing, DHS cannot question as illegitimate students the agency itself admitted had "legitimate" reasons in the Final Rule for pursuing the academic pathways they do. 91 Fed. Reg. at 45041; *see also Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 27 (1st Cir. 2020) ("In the administrative law context, 'it is a foundational principle that judicial review of agency action is limited to the grounds that the agency invoked when it took the action' and a reviewing court may not uphold agency action 'on the basis of impermissible *post hoc* rationalization.'") (citation modified). Even if *some* students who pursue a backwards or lateral course of study might not be "bona fide" students, DHS itself does not (and cannot) contend that all students taking that approach are illegitimate. DHS thus cannot excise all such students from the statute; its concern is better suited for targeted investigation and enforcement.

And though DHS argues that "it logically follows that a student who completed a full course of study in the United States at a certain level would not return to pursue the same full course at an equal or lower level" (Dkt. 46-1 at 40), this is not what its rule accomplishes. The rule does not stop students from pursuing the "same" course of study they've already completed; it prevents them from completing *any* course of study if they've completed one at the same or higher level. Plainly enough, pursuing an MBA after a JD (or any other number of permutations) is not pursuing the "same" course of study. It is just pursuing a full course of study. Had DHS adopted a rule that prevents students from pursuing the exact same degree program they've just completed, that might well align with the statute. But the approach DHS has taken does not.

Lastly, the Final Rule did not "explain[] in detail DHS's educational rationale" for excluding an entire group of statutorily eligible students from the program. *Washtech*, 50 F.4th at 179. To the contrary, DHS *accepted* backward or lateral academic progression as academically "legitimate" in certain cases, but prohibited it wholesale anyway. 91 Fed. Reg. at 45041. DHS, in its

response brief, flatly admits that it is "true" that students have legitimate reasons for pursuing this pathway but nonetheless insisted that "most students follow an upward educational progression." Dkt. 46-1 at 40. But the fact that most students do something one way does not in any way suggest that students choosing a different path are not "bona fide," or that anything else grounded in the text of the F-1 provision countenances excluding them. Thus, while DHS points to the "need for preventing F-1 students from using the U.S. educational system as a means of circumventing the immigration laws" (*id.*), it has not explained how preventing *all* students from pursuing a particular course of study is necessary to accomplish this goal, much less consistent with statutory command.

***3. The Court should order the default APA remedy of vacatur.***

Finally, Plaintiffs explained in a recent filing that the Court should adopt the default remedy of APA vacatur. *See* Dkt. 60 at 7-8; *see, e.g.*, *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026); 5 U.S.C. § 706(2)(A). Plaintiffs incorporate that discussion by reference to avoid needlessly duplicating it here, except as necessary to respond to DHS's contrary arguments in its concurrent filing.

DHS agreed that the default remedy is APA set-aside relief, *i.e.* vacatur (Dkt. 59 at 3), yet nonetheless stated that "complete vacatur is not mandatory," depending on "the seriousness of the rule's deficiencies alongside the disruptive consequences that would result from vacatur." *Id.* at 4 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993)). Plaintiffs do not take issue with DHS's description of the legal standard for remand without vacatur, but insofar as DHS meant to imply that *this* case presents the "limited circumstances" under which this "exceptional remedy" may be warranted (*Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 382 (D.C. Cir. 2026) (quotation marks omitted)), the government has not come close to making that high showing. *See, e.g.*, *Am. Hosp. Ass'n v. Becerra*, 2022 WL 4534617, at *2 (D.D.C. Sept. 28, 2022) ("Because vacatur is the default remedy ... defendants bear the burden to prove that vacatur is unnecessary.") (quotation marks omitted). Indeed, DHS's prior brief

supplied no application whatsoever of the legal standards it described (*see generally* Dkt. 59), and as Plaintiffs explained (Dkt. 60 at 8), here vacatur is necessary.

In *Allied-Signal*, the D.C. Circuit declined to vacate because there was a "serious possibility that the [agency] will be able to substantiate its decision on remand" yet "the consequences of vacating may be quite disruptive," as the agency would need to refund fees it had collected and would be unable to recover even if the same rule was later upheld. 988 F.2d at 151. Here, the second consideration is more than enough to justify vacatur—D/S has existed for four decades, and the Court blocked the Final Rule before it took effect. There is no disruption at all from vacatur except that the agency will continue to be unable to implement what is at present an unlawful rule. *See, e.g.*, *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023) ("declin[ing]" to remand without vacatur solely because defendants "have not shown that vacatur would be so disruptive as to justify a departure from our normal course," without analyzing the second *Allied-Signal* factor). On the contrary, as the Court explained in its preliminary analysis, eliminating D/S would be a "catastrophic" disruption to the long-settled status quo. Dkt. 50 at 7.

The "seriousness of the [rule]'s deficiencies," too, points in favor of vacatur. *Allied-Signal*, 988 F.2d at 150. Whether DHS might find a lawful justification on remand is inherently speculative, but the Court's preliminary analysis is instructive. The Final Rule's justifications are "exceptionally weak" and its purported motivations "exceptionally attenuated," "rais[ing] legitimate questions as to whether its real purpose is … to achieve other, undisclosed, goals—such as, for example, asserting greater government control over academic institutions and the press." Dkt. 50 at 7-9. Those are more than sufficiently serious defects to preclude the extraordinary remedy of remand without vacatur. *See, e.g.*, *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) ("[W]e have not hesitated to vacate a rule" under the *Allied-Signal* analysis "when the agency has not responded to empirical data or to an argument inconsistent with its conclusion.").

Lastly, DHS states—again, without elaboration or application—that "any final declaratory

or vacatur relief must be strictly tailored to redress the concrete injuries of the plaintiffs before the Court, consistent with Article III principles and equitable limits on universal relief." Dkt. 59 at 4. But that is not the law: "Vacatur" is the "remedy … to which a plaintiff, if ultimately successful, is entitled" under Section 706, notwithstanding the Supreme Court's *CASA* decision as to the very different issue of universal preliminary injunctions. *Woonasquatucket River Watershed Council v. USDA*, 186 F.4th 25, 54 (1st Cir. 2026); *see Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838, 842-843 (2024) (Kavanaugh, J., concurring) ("I agree with the longstanding consensus—a consensus based on text, history, precedent, and common sense—that vacatur is an appropriate remedy when a federal court holds that an agency rule is unlawful," and explaining that APA vacatur is differently situated from "nationwide injunctions").[9]

In any event, the Court's Section 705 stay analysis resolves the issue as a factual matter: "Limiting relief to the parties represented would require maintaining parallel regulatory regimes and making repeated and potentially inconsistent determinations of whether a particular student or institution falls within the scope of the order." Dkt. 50 at 48. The same concerns exist for international journalists—it would be impossible to implement a rule that permits some members of the international press to be admitted under D/S but others, coming through the same ports of entry and operating within the same system, to request extensions every 240 days.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and vacate the Final Rule.

---

[9] Courts in this district have, accordingly, continued to apply the default rule post-*CASA*. *E.g.*, *Ass'n of Am. Universities v. Dep't of Def.*, 806 F. Supp. 3d 79, 123 (D. Mass. 2025); *New York v. Trump*, 811 F. Supp. 3d 215, 244 (D. Mass. 2025); *President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 138 (D. Mass. 2025); *California v. U.S. Dep't of Educ.*, 2026 WL 2754968, at *31 (D. Mass. Sept. 17, 2026); *California v. Mullin*, 833 F. Supp. 3d 50, 80-81 (D. Mass. 2026).

Dated: October 30, 2026

Respectfully submitted,

/s/ *Paul W. Hughes*

Paul W. Hughes (DC Bar No. 997235)*
Emmett Witkovsky-Eldred (DC Bar No. 90012725)*
McDermott Will & Schulte LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com
* *pro hac vice*

Dana McSherry (MA BBO #664430)
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4060
dmcsherry@mcdermottlaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that, on October 30, 2026, I caused a copy of the foregoing memorandum of law to be filed via the Court's ECF system, which served counsel for all parties required to be served.

Dated: October 30, 2026

/s/ *Paul W. Hughes*

Paul W. Hughes (DC Bar No. 997235)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com