**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENTS' ALLIANCE ON HIGHER EDUCATION AND IMMIGRATION, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 1:26-cv-13799-FDS

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dana McSherry (MA BBO #664430)
McDermott Will & Schulte LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4060
dmcsherry@mcdermottlaw.com

Paul W. Hughes (DC Bar No. 997235)*
Emmett Witkovsky-Eldred (DC Bar No. 90012725)*
McDermott Will & Schulte LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com

* *pro hac vice*

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Table of Authorities ........................................ ii

Introduction ........................................ 1

Argument ........................................ 1

A. The Final Rule is arbitrary and capricious. ........................................ 1

1. DHS's cost-benefit analysis was inadequate. ........................................ 1

2. DHS failed to rationally connect its action to the problems identified. ........................................ 3

3. DHS failed to adequately consider obvious alternatives. ........................................ 6

4. DHS disregarded significant comments. ........................................ 8

5. DHS's 32-day comment period was inadequate. ........................................ 9

B. The Court should vacate the Final Rule. ........................................ 10

Conclusion ........................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ........................................ 10

*Almeida-León v. WM Cap. Mgmt., Inc.*,
993 F.3d 1 (1st Cir. 2021) ........................................ 3

*Andino Santana v. Bisignano*,
837 F. Supp. 3d 146 (D. Mass. 2026) ........................................ 7

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) (2022) ........................................ 8

*Maryland People's Couns. v. FERC*,
761 F.2d 768 (D.C. Cir. 1985) ........................................ 2

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ........................................ 8

*Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 2, 4, 6

*Petry v. Block*,
737 F.2d 1193 (D.C. Cir. 1984) ........................................ 10

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021) ........................................ 6

*Spokane Airport Board v. TSA*,
164 F.4th 933 (D.C. Cir. 2026) ........................................ 4

*Thompson v. Clark*,
741 F.2d 401 (D.C. Cir. 1984) ........................................ 8

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................ 10, 11

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................ 2

**Regulations and agency materials**

8 C.F.R. § 214.3(g) ........................................ 5

91 Fed. Reg. 449707 (July 17, 2026) ........................................ 2, 3, 5, 6, 9

## INTRODUCTION

DHS's supplemental brief offers no viable reason for the Court to depart from its earlier conclusion that the Final Rule "is arbitrary and capricious in at least four respects." Dkt. 50 at 27. Remarkably, the agency says *nothing* in direct response to the Court's analysis finding that plaintiffs were likely to succeed in their APA challenge. Instead, it largely repeats, sometimes verbatim, arguments the Court rejected. Its emphasis on national security disregards the Court's conclusion that this justification "borders on the absurd." *Id.* at 7. Its demand for deference to "predictive judgments" disregards the Court's explanation that "unsupported qualitative speculation" is "not entitled to deference." *Id.* at 32. And its assertion that it need not "pen a tome on all concerns" disregards the Court's finding that DHS's responses were "casual and superficial." *Id.* at 35.

All the while, DHS discounts existing—and improvable—SEVIS tools, despite this Court's observation that "many of the incidents that DHS cites as evidence of vulnerabilities in the duration-of-status system were discovered through SEVIS." Dkt. 50 at 33 n.17. Nor does the administrative record alter the analysis: DHS scarcely cites material not already before the Court and offers no discussion whatsoever the few times it does.

The Court should deny Defendants' motion for summary judgment, and grant Plaintiffs'.

## ARGUMENT

### A. The Final Rule is arbitrary and capricious.

#### *1. DHS's cost-benefit analysis was inadequate.*

This Court rightly found DHS "utilized no principled method by which to meaningfully compare costs and benefits" (Dkt. 50 at 30), "effectively ignored the immense costs of restricting" the status of nonimmigrants (*id.* at 27), and it relied on "conclusory statements and unsupported expressions of belief" (*id.* at 30); *see also* Dkt. 13 at 11-18. Nothing has changed.

*First*, DHS invokes "analytical latitude," arguing that nothing "mandate[s] monetization or quantification in all circumstances," and that national security assessments involve an element of

"prophecy." Dkt. 67 at 6-7 (quoting *Trump v. Hawaii*, 585 U.S. 667, 708 (2018)). But the problem with the Final Rule, as Plaintiffs argued and the Court found, is not merely that it eschews quantification (calculating a fraction of likely monetary costs and no benefits), but that DHS effectively "dismissed without further inquiry" the "unquantified factors" at play. Dkt. 50 at 31 (quoting *Maryland People's Couns. v. FERC*, 761 F.2d 768, 776 (D.C. Cir. 1985)). DHS "provided no counter-estimate, let alone any methodology, of what it deemed to be the cost of declining enrollment," instead claiming "'substantial uncertainty'" justifies skipping over any "reasoned balancing" of costs and benefits, quantified or not. *Id.* (quoting *Mot. Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)); *accord* Dkt. 13 at 12-17. Nor does invoking "national security" "insulate [DHS's] actions from judicial review": An agency must still show that the policy is "plausibly related to its stated objective". Dkt. 50 at 9, 10 n.15, 41 (citation modified).

*Second*, DHS invokes deference to "predictive judgements concerning the expected responses of a regulated industry" to justify disregarding the NAFSA/IFP surveys and Clemens study. Dkt. 67 at 8. But the Court rejected DHS's virtually identical earlier claim (Dkt. 46-1 at 17). The cases DHS cites involved "highly technical often scientific data," while here DHS supplied *no* "data or methodology, let alone a highly technical analysis" of costs and benefits. Dkt. 50 at 31-32 (collecting authorities). The Court rightly declined to defer to "unsupported qualitative speculation." *Id.* at 32; *see also* Dkt, 13 at 13-14.

DHS likewise did not "appropriately consider[]" and "weigh[]" that evidence. *Cf.* Dkt. 67 at 9. It merely asserted that "survey responses often reflect hypothetical preferences rather than actual behavior," and "may overstate the likelihood of enrollment declines." 91 Fed. Reg. at 45086. But it identified no specific methodological flaw in the surveys or analyses; disregarded that the Clemens analysis *already accounted for* potential overstatement; and failed to account for the enormous economic consequences of even far more modest enrollment declines. Dkt. 13 at 13-14. DHS instead offered an unsourced prediction of what students "may" consider "when making

enrollment decisions" (91 Fed. Reg. at 45087-45088)—which itself was nonresponsive to the actual concerns voiced. *See* Dkt. 13 at 14. That is not reasoned analysis.

*Third*, DHS cites a handful of portions of the administrative record, often spanning large ranges of pages, with no explanation.[1] *See* Dkt. 67 at 6-7, 9-10. Its undeveloped arguments are waived. *See, e.g., Almeida-León v. WM Cap. Mgmt., Inc.*, 993 F.3d 1, 10 (1st Cir. 2021) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do [the] work, create the ossature for the argument, and put flesh on its bones.").

Regardless, these citations do nothing to alter the Court's prior conclusions. GOV-174140-174192 (*see* Dkt. 67 at 7, 12) discusses the same types of anecdotes of extended stays cited in the Final Rule. *Accord* 91 Fed. Reg. 449707, 44983 (July 17, 2026). As the Court noted, "there is nothing inherently suspect in an education and training program" lasting many years (Dkt. 50 at 9) and "DHS never demonstrated why those instances were fraudulent" since students often pursue lengthy academic paths. (Dkt. 50 at 41-42). Indeed, as Plaintiffs noted (Dkt. 69 at 13), *SEVIS* identified those apparent anomalies, demonstrating that existing tools can flag potential issues for investigation (though Plaintiffs also cautioned that not every such use of SEVIS is necessarily lawful). The same holds for alleged OPT fraud discussed in GOV-217233-217235. Dkt. 69 at 13; *cf.* Dkt. 67 at 7, 12. And the GAO report at GOV-215886-215967 (Dkt. 67 at 7) *recommends* that ICE deploy expanded "data analytics," including "network analysis." GOV-215941.[2]

### 2. *DHS failed to rationally connect its action to the problems identified.*

The Court found "the government's proffered rationales … exceptionally weak," and their

[1] For example, on page 6 of its memorandum, DHS cites three ranges of the administrative record that collectively span more than 200 pages and consist of the proposed rule, the final RIA, and a draft RIA. *See* also Dkt. 67 at 10 (also citing the full RIA).

[2] DHS on page 9 of its memorandum cites three documents at GOV-219318-219320 apparently meant to demonstrate that "the level of foreign student enrollment … fluctuate[s]." These documents—each a breakdown of nonimmigrant admissions by year—demonstrate just some of the breadth of data DHS has at its disposal thanks to SEVIS.

connection to asserted problems "exceptionally attenuated." Dkt. 50 at 7. DHS offers no answer.

*First*, DHS cannot overcome this Court's conclusion that any supposed national security justification for the Final Rule "borders on the absurd" because the agency relied on "incidents that the new rule would do nothing to prevent or even mitigate." Dkt. 50 at 7. DHS responds that it is owed broad deference on national security issues. Dkt. 67 at 11. But an agency's national security portfolio is no "license to ignore its statutory obligations" under the APA. Dkt. 50 at 11. DHS itself recognizes that national security agencies remain subject to ordinary APA standards. Dkt. 67 at 11. Nor does *Spokane Airport Board v. TSA* help*:* The quoted reference to TSA's national security prerogatives concerns the court's analysis of the agency's statutory authority; in conducting APA review, the court applies ordinary standards. *Compare* 64 F.4th 933, 937 (D.C. Cir. 2026) *with id.* at 938-939.

*Second*, DHS asserts the Rule "directly address[es]" "structural vulnerabilities inherent in D/S." Dkt. 67 at 12. But the Court found that "DHS provided no reason for why a 'predetermined' interaction with an immigration official, after a four-year fixed period of admission, would prevent, deter, or mitigate any of th[e] types of incidents" the agency identified. Dkt. 50 at 41. DHS still cannot explain how four-year check-ins would prevent those security incidents. Indeed, it admits it "did not claim that each cited incident was preventable through fixed-term admission" arguing instead that these "incidents illustrate observable patterns of security threats and fraud risks." Dkt. 67 at 12. That is insufficient: DHS must "connect[]" the perceived risk to its chosen response. *State Farm*, 463 U.S. at 43. DHS's argument seemingly concedes that DHS's preference for periodic in-person check-ins does not actually address the incidents the agency invoked. That disconnect is the essence of arbitrary and capricious agency action—and it raises "legitimate questions as to whether its real purpose is not to safeguard national security and protect our borders, but to achieve other, undisclosed, goals." Dkt. 50 at 9.

What is more, SEVIS already enables DHS to conduct the real-time supervision of

nonimmigrants that DHS says is necessary—much more than quadrennial check-ins. *See* Dkt. 69 at 9-14. DHS claims periodic check-ins will "ensure DHS has the opportunity to conduct screening to identify noncompliance by nonimmigrants and academic institutions." Dkt. 67 at 13. But SEVIS already allows DHS to monitor nonimmigrants, obtain up-to-date status information, flag suspected violations, and conduct targeted investigations (including in-person check-ins) at *any* time—not merely every four years. For example, DSOs must report material changes (address, course load, GPA, etc.) within 21 days. *See* 8 C.F.R. § 214.3(g). One university reports that "DSOs and AROs check internal student records **daily**." GOV-00190770. Another describes "frequent communication" between DSO/ROs and "students, scholars, and the faculty, staff, and administrators who support them." GOV-00203454. DHS's own RIA says DSOs "must report on F and M students at the start of each academic term or session and, on average, make[] at least four updates to the SEVIS record." GOV-171691.

Regarding its fraud concerns, DHS notes how it "observed a pattern of students immediately transferring schools or changing educational levels or programs of study upon their arrival in the United States." Dkt. 67 at 13 (quoting 91 Fed. Reg. at 45102). That proves the point. SEVIS immediately revealed conduct DHS regarded as suspicious, permitting investigations and, where warranted, in-person checks. The Court likewise found it "[n]otabl[e]" that "many of the incidents that DHS cites as evidence of vulnerabilities in the duration-of-status system were discovered through SEVIS." Dkt. 50 at 33 n.17. DHS never explains why four-year check-ins better address conduct already detectable in real time. Relatedly, DHS asserts it has "never claimed that most or all" nonimmigrants "who remain in the United States for a lengthy duration are committing fraud or pose national security threats." Dkt. 67 at 14.[3] That concession undercuts requiring hundreds of thousands, potentially millions, of costly and time-consuming additional in-person check-ins

[3] This claim is difficult to square with DHS's analysis in the Final Rule, which relies heavily on the raw length of time that some nonimmigrants remain in the country as evidence of abuse, without showing that any such individuals actually abused the system. *See, e.g.,* 91 Fed. Reg. at 44983.

annually to address what DHS now apparently states is only a "modest" abuse problem. *Id.* at 13.

*Third*, DHS again cites lengthy record excerpts without elaboration, thereby waiving any undeveloped argument. Dkt. 67 at 12-13. In any event, the cited anecdotes of potential fraud or abuse add nothing new to this case and establish no rational connection with DHS's chosen approach: GOV-174140-174192 (long stays); GOV-216545-216557 (sham college); 216603-216605 (DSO visa fraud); GOV-217233-217235 & GOV-217491-21749 (suspected OPT fraud); 217294-217295 (student espionage). DHS still offers no reason why a "predetermined" check-in after four years "would prevent, deter, or mitigate any of those types of incidents." Dkt. 50 at 41.

### *3. DHS failed to adequately consider obvious alternatives.*

The Court correctly found that "DHS did not seriously consider alternative methods and did not provide adequate reasons for rejecting them" despite "every indication in the record point[ing] the other way." Dkt. 50 at 32, 34 (quoting *State Farm*, 463 U.S. at 56-57). Nothing DHS says now warrants abandoning that analysis.

*First*, DHS suggests its approach is proper because it "identified that the core problem with D/S is the absence of predetermined DHS screening opportunities." Dkt. 67 at 14. On that view, the absence of DHS's preferred check-in procedure is itself the problem, so adopting that procedure is the only solution. That circular approach is not reasoned analysis. An agency cannot assume its chosen policy is "self-evidently reasonable" to avoid evaluating alternatives. *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255-1256 (D.C. Cir. 2021); Dkt. 13 at 22.

*Second*, DHS says SEVIS is not a viable alternative because it "is a data-reporting system" not an "immigration-status adjudication system … designed for performing all relevant fraud and security screening." Dkt. 67 at 15. The Court already rejected that "circular" analysis, finding both that "SEVIS, as currently designed, could accomplish the government's purported goals of reducing fraud and protecting national security" and that "SEVIS could be upgraded to better address those issues." Dkt. 50 at 33. DHS never explains why improving SEVIS would not achieve its

ends less intrusively than eliminating D/S for more than a million nonimmigrants.

Nor could it. As Plaintiffs have explained (Dkt. 69 at 2-11), Congress authorized (then mandated) a system like SEVIS to prevent fraud and protect national security. As configured—and even more so with possible enhancements—its comprehensive reporting system enlists DSOs and ROs to supply real-time information on international students and scholars, which DHS can (and already does) use to detect anomalies, identify red flags, and take enforcement action. DHS's dismissal of this alternative remains unsupported.

*Third*, DHS argues its approach was necessary to achieve a "uniform, administratively manageable nonimmigrant visa admission framework" (Dkt. 67 at 15), but the Final Rule does not even accomplish that. In setting a four-year *maximum*, the rule still permits variable lengths of admission under that cap. Plus as this Court observed, "DHS did not explain why fixed terms that aligned with academic realities would not provide the desired uniformity and manageability." Dkt. 50 at 34. DHS now says program-specific terms "would increase uncertainty in adjudication and enforcement" because program lengths can be "nebulous." Dkt. 67 at 15. But, under *Chenery* principles, "an agency's lawyers [may not] defend the agency's decision on grounds that the agency itself had not embraced." *Andino Santana v. Bisignano,* 837 F. Supp. 3d 146, 156 (D. Mass. 2026).

Regardless, DHS never explains why tying the date to expected program completion is "nebulous" while an arbitrary four-year date is not. Either approach would limit admission to a date certain; the distinction is whether the date reflects an arbitrary cap or when the student actually expects to complete the academic program. Indeed, the Rule *itself* uses expected program date if the program lasts less than four years—DHS apparently saw nothing "nebulous" in that approach.

Nor does the availability of an extension request show that DHS reasonably rejected alternatives. *Cf.* Dkt. 67 at 15-16. As the Court noted, a major concern among commenters was "the uncertainty caused by a student's continuing education being conditioned on a discretionary, unappealable [EOS] decision." Dkt. 50 at 30-31. That concern remains unaddressed.

***4. DHS disregarded significant comments.***

The Court properly found that "DHS did not respond to, let alone meaningfully engage with, multiple substantial comments." Dkt. 50 at 40. That remains true. DHS replies that it need not answer every comment in detail and even suggests that merely acknowledging each concern sufficed. *See generally* Dkt. 67 at 16-19. But while DHS need not offer a lengthy exegesis or address every minor concern, the APA standard supplies its obligation: When an agency fails to take comments seriously and reasonably explain its position in light of them, this "demonstrates that the agency's decision was not 'based on a consideration of the relevant factors.'" Dkt. 50 at 34-35 (quoting *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)). DHS failed to meet that standard. *See* Dkt. 50 at 34-40; Dkt. 13 at 25-32.

**Enrollment**. As the Court explained in depth, DHS's response to comments about deterring international student enrollment was woefully deficient: DHS summarily dismissed the NAFSA/IFP survey; offered a wholly speculative account of how and why enrollment might (or might not) change; and disregarded the substance of the Clemens study and other evidence discussing enrollment effects, among other faults. *See* Dkt. 50 at 35-36. An agency "cannot simply state it 'believes' something to be true—against the weight of all the evidence before it—without further support." *Id.* at 36 (quoting *Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020)). DHS's reply that it at least "acknowledged Commenters' evidence," is not a "satisfactory explanation" (*cf.* Dkt. 67 at 16) as "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). *vacated on other grounds,* 142 S. Ct. 1665 (mem.) (2022).

**Academic realities.** DHS defends its arbitrary 4-year cap by noting that nonimmigrants can apply for extensions of stay, as with some other visa categories. Dkt. 67 at 17. But the agency fails to contend with this Court's analysis regarding DHS's response to academic realities. As the Court observed, DHS's response boiled down to the agency's unsupported "belie[f]" that "four

years was proper." Dkt. 50 at 37. Nor did DHS grapple with why an "uncertain[]" and "unappealable" EOS process would adequately address commenters' concerns about uncertainty caused by a 4-year cap's disruptions to long-term academic programs. Dkt. 50 at 30-31.

**Reliance interests.** As in the Final Rule, DHS repeats the conclusory assertion that it "acknowledge[d]" reliance interests and gave a "reasoned justification" for abandoning them. Dkt. 67 at 18. The Court, however, already found that DHS "offered little substantive response" on reliance interests, holding that DHS's claim to have "carefully considered" those interests was "not a reasoned analysis." Dkt. 50 at 38 (quoting 91 Fed. Reg. at 45073). It still is not.

**Operational capacity.** DHS claims it need not furnish "detailed operational plans" or "prove in advance that it will have the capacity for processing all future applications of an unknown quantity." Dkt. 67 at 18. That is a curious position given the comment record. Commenters warned that the flood of new EOS applications caused by the Final Rule would explode the agency's workload and exacerbate DHS's already untenable backlog. *See* Dkt. 13 at 30. DHS offered only its unexplained "belie[f]" that it could handle the increase, which this Court rightly rejected as conclusory. Dkt. 50 at 39 (quoting 91 Fed. Reg. at 45015).

**Press freedom.** DHS's only response to comments about press freedoms is that it "does not intend" to chill protected conduct. Dkt. 67 at 19; 91 Fed. Reg. at 45078. The Court readily rejected that statement: DHS "did not address, in any respect, reasonable concerns that the Final Rule would cause foreign journalists to self-censor," regardless of intent. Dkt. 50 at 40. Nor did it contend with other reasonable concerns, such as how the Final Rule singles out journalists with an especially harsh fixed term (240 days) and exposes U.S. journalists abroad to possible retaliation. *Id*. DHS's dismissal of these weighty concerns was unjustifiable.

#### ***5. DHS's 32-day comment period was inadequate.***

DHS cannot justify a 32-day comment period for this consequential and complex rulemaking. *Cf.* Dkt. 67 at 19-20. This Court expressed incredulity at the agency's approach, and rightly

so. *See* Dkt. 50 at 6 (calling it "barely legal"); *id.* at 35 (citing authorities that 30 days is the bare minimum). DHS itself acknowledges that "a 30-day comment period is generally the *shortest* period sufficient" and the number is not "talismanic." Dkt. 67 at 19-20 (emphasis added). If 30 days is the bare minimum for an ordinary, relatively inconsequential rule, more time was required here given the complexity, economic consequences, and vast reliance interests at stake. *See Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (30 days is "an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data" and "a sixty-day period [is] 'a more reasonable *minimum*'") ; *see also* Dkt. 13 at 32-34.

* * *

For the reasons the Court explained already, the Final Rule was arbitrary and capricious.[4]

### B. The Court should vacate the Final Rule.

DHS in its introduction suggests remand without vacatur under *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,* 988 F.2d 146 (D.C. Cir. 1993) or plaintiff-specific relief under *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025), without developing either contention. For the reasons explained in Plaintiffs' supplemental brief, that is wrong. Dkt. 69 at 18-20. The Final Rule's harms clearly warrant vacatur, as does the extent of DHS's APA violations. And *CASA* expressly disavowed saying anything about "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." 606 U.S. at 847 n.10.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and vacate the Final Rule.

---

[4] DHS asserts that the Final Rule's limitations on academic mobility comport with the INA. Dkt. 67 at 20. For the reasons explained in Plaintiffs' initial brief (Dkt. 13 at 34) and supplemental brief (Dkt. 69 at 14-18), that is wrong. The Final Rule directly contravenes the INA by categorically excluding a large class of students whom Congress included.

Dated: November 2, 2026

Respectfully submitted,

/s/ *Paul W. Hughes*

Paul W. Hughes (DC Bar No. 997235)*
Emmett Witkovsky-Eldred (DC Bar No. 90012725)*
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com
* *pro hac vice*

Dana McSherry (MA BBO #664430)
MCDERMOTT WILL & SCHULTE LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
(617) 535-4060
dmcsherry@mcdermottlaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that, on November 2, 2026, I caused a copy of the foregoing memorandum of law to be filed via the Court's ECF system, which served counsel for all parties required to be served.

Dated: November 2, 2026

/s/ *Paul W. Hughes*
Paul W. Hughes (DC Bar No. 997235)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com